# Exhibit E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

STEFANIE MARVIN, *et al.*,

*On Behalf Of Themselves And
All Others Similarly Situated*,

                          Plaintiffs,

v.

KIA AMERICA, INC., *et al.*

                          Defendants.

Case No.: 2:21–cv–01146–PP

PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

BARTON LEGAL S.C.
James B. Barton
Email: *jbb@bartonlegalsc.com*
Joshua S. Greenberg
Email: *jsg@bartonlegalsc.com*
313 North Plankinton Ave., Ste. 207
Milwaukee, WI 53203
T: (414) 877–0690
F: (414) 877–3039

*Counsel for Plaintiffs, Stefanie Marvin,
Katherine Wargin, Chaid Przybelski,
Chad Just, Amy Flasch, Lydia Davis,
and the Proposed Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iv

DEFINED TERMS.........................................................................................................xiv

INTRODUCTION.............................................................................................................1

FACTS...............................................................................................................................2

A.     Auto Theft Is A Safety Risk, Which NHTSA Has Sought To Redress For Decades................2

B.     Defendants' Corporate Structure And Their Obligations Under The Safety Act...................3

C.     Defendants' Tout Themselves As Innovative Companies Committed To Safety...................4

D.     Defendants' Distribution Model And Corresponding Obligations Under The MDVL.........4

E.     The Industry, Save Defendants, Embraces Better Antitheft Protections...............................5

F.     Defendants Ignore NHTSA's Advice And Redesign
The Class Vehicles With The Defect...........................................................................6

G.     Despite Knowledge Of The Defect, Defendants
Advertise The Class Vehicles As Safe........................................................................6

H.     Auto Theft Soars In Milwaukee And Elsewhere, Creating A Public Safety Crisis...................8

LEGAL STANDARD.........................................................................................................9

ARGUMENT....................................................................................................................9

I.     DEFENDANT' CAUSATION, PREEMPTION, AND STANDING ARGUMENTS LACK MERIT.............9

     A.     Defendants' Superseding Cause Defense Is Dubious..................................................9

     B.     Plaintiffs' Claims Are Not Federally Preempted.......................................................11

     C.     Standing...................................................................................................13

II.     PLAINTIFFS' STATUTORY CLAIMS ARE COGNIZABLE AND SUFFICIENTLY PLED.....................15

     A.     Retail Plaintiffs' MVDL Claim Against Kia And Hyundai Is Cognizable..................15

i

B.   Plaintiffs' Civil Theft Claim Against All Defendants Is Cognizable..........................17

    1.   Defendants Had A Duty To Disclose The Defect............................................17

    2.   Plaintiffs' Civil Theft Claim Satisfies Rule 9(b)..............................................18

C.   Plaintiffs' False Advertising Claim Against All Defendants Is Cognizable................19

    1.   Defendants Made Actionable, Deceptive Statements—
Not Just Omissions................................................................................19

    2.   Defendants' Deceptive Statements Are Not Puffery......................................20

    3.   Plaintiffs' Allegations Satisfy Rule 9(b)..........................................................22

D.   Plaintiffs' Unfair Marketing Claim Against Kia And Hyundai Is Cognizable..........23

E.   Plaintiffs' Statutory Product Liability Claim Against
All Defendants Is Cognizable................................................................................24

    1.   The ELD Does Not Apply To Statutory Claims............................................24

    2.   Even If The ELD Was Implicated, The "Other
Property" And "Public Safety" Exceptions Apply.........................................25

        a.   The "Other Property" Exception Applies.........................................25

        b.   The "Public Safety" Exception Applies.............................................26

    3.   HATCI Falls Within The Scope Of Wis. Stat. § 895.047...........................27

III.   PLAINTIFFS HAVE VIABLE EXPRESS AND IMPLIED WARRANTY CLAIMS.................................27

A.   Warranty Plaintiffs' Implied Warranty Claim
Against Kia/Hyundai Is Cognizable.......................................................................27

    1.   The Class Vehicles Are Not Merchantable.....................................................27

    2.   Kia And Hyundai's Pass–Through Warranties Create Privity.......................28

    3.   Even If Privity Is Lacking, Applicable Exceptions Exist.................................32

B.   Warranty Plaintiffs' Express Warranty Claim
Against Kia/Hyundai Is Cognizable.......................................................................34

ii

   1.  Defendants' Conflicting Warranty Disclaimers Are Inapplicable................34

   2.  The Express Warranty Disclaimers Are Unconscionable...........................35

  C.  Plaintiffs' MMWA Claim, Which Turns On State Law, Is Cognizable...................36

IV. Plaintiffs' Remaining Claims Are Also Viable................................................36

  A.  Amy's Contractual/Equitable Rescission Claim Is Cognizable...............................36

  B.  Plaintiffs Have A Viable Unjust Enrichment Claim Against All Defendants...........37

  C.  Plaintiffs Have A Viable Failure To Warn Claim Against All Defendants...............38

  D.  Plaintiffs Declaratory Judgment Claim Is Cognizable.................................................39

V. Plaintiffs' Respectfully Request Leave To Amend The FAC If Required.................40

CONCLUSION...................................................................................................................40

# TABLE OF AUTHORITIES

<u>Cases</u>

*Am. Ortho Corp. v. Epicor Software Corp.*,
  746 F. Supp. 2d 996 (E.D. Wis. 2010)................................................................24

*Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*,
  65 F.3d 1381 (7th Cir. 1995)............................................................................33

*Attoe v. State Farm Mut. Auto Ins. Co.*,
  36 Wis. 2d 539, 153 N.W.2d 575 (1967)........................................................38

*Baranco v. Ford Motor Co.*,
  294 F. Supp. 3d 950 (N.D. Cal. 2018)..............................................................28

*Bearden v. Honeywell Int'l Inc.*,
  720 F. Supp. 2d 932 (M.D. Tenn. 2010)..........................................................18

*Bersch v. Van Kleeck*,
  112 Wis. 2d 594, 334 N.W.2d 114 (1983)........................................................25

*Bieda v. CNH Indus. America, LLC*,
  518 F. Supp. 3d 863 (W.D. Pa. 2021)...........................................................35, 36

*Bietsch v. Sergeant's Pet Care Prod., Inc.*,
  No. 15 C 5432, 2016 WL 1011512 (N.D. Ill. Mar. 15, 2016)........................21

*Bilek v. Fed. Ins. Co.*,
  8 F.4th 581 (7th Cir. 2021).................................................................................9

*Bob Willow Motors, Inc. v. GM Corp.*,
  872 F.2d 788 (7th Cir. 1989)..........................................................................16, 17

*Brame v. GM LLC*,
  535 F. Supp. 3d 832 (E.D. Wis. 2021).............................................................37

*Browning v. Anheuser–Busch, LLC*,
  539 F. Supp. 3d 965 (W.D. Mo. 2021)............................................................14

*Bushmaker v. A.W. Chesterton Co.*,
  No. 09–CV–726, 2013 WL 11079371 (E.D. Wis. Mar. 1, 2013)...................38

iv

*Carlson v. Gen. Motors Corp.,*
  883 F.2d 287 (4th Cir. 1989)................................................................36

*Cedillo v. Igbanugo,*
  No. A18–0860, 2019 WL 2168766 (Minn. Ct. App. May 20, 2019)..............9

*Christensen v. TDS Metrocom LLC,*
  2009 WI App 21, 316 Wis. 2d 356, 763 N.W.2d 248.................................20

*CMFG Life Ins. Co. v. RBS Sec., Inc.,*
  No. 12–cv–037, 2013 WL 4483068 (W.D. Wis. Aug. 9, 2013)....................37

*Collins v. Eli Lily Co.,*
  116 Wis. 2d 166, 342 N.W.2d 37 (1984)..............................................39, 40

*Daanen & Janssen, Inc. v. Cedarapids, Inc.,*
  216 Wis. 2d 395, 573 N.W.2d 842 (1998)...............................................26

*Daugherty v. Jacobs,*
  187 S.W.3d 607 (Tex. App. 2006)..........................................................9

*Digicorp, Inc. v. Ameritech Corp.,*
  2003 WI 54, 262 Wis. 2d 32, 662 N.W.2d 652.........................................26

*Dippel v. Sciano,*
  37 Wis. 2d 443, 155 N.W. 55 (1967)..........................................31, 32, 34

*Doll v. Ford Motor Co.,*
  814 F. Supp. 2d 526 (D. Md. 2011).......................................................18

*Eichstedt v. Lakefield Arms Ltd.,*
  849 F. Supp. 1287 (E.D. Wis. 1994)......................................................10

*Est. of Miller v. Storey,*
  2017 WI 99, 378 Wis. 2d 358, 903 N.W.2d 759........................................24

*Fed. Deposit Ins. Corp. v. Patel,*
  No. 19–cv–6917, 2020 WL 6681348 (N.D. Ill. Nov. 12, 2020)......................9

*Ferris v. Location 3 Corp.,*
  2011 WI App 134, 337 Wis. 2d 155, 804 N.W.2d 822................................24

*Foremost Farms USA Co–op v. Perf. Process, Inc.,*
  2006 WI App 246, 297 Wis. 2d 724, 726 N.W.2d 289................................25

*Forest Home Dodge, Inc. v. Karns,*
  29 Wis. 2d 78, 138 N.W.2d 214 (1965)......................................................................17

*Foursquare Prop. Joint Venture I v. Johnny's Loaf & Stein,*
  116 Wis. 2d 679, 343 N.W.2d 126 (Ct. App. 1983)..............................................35, 36

*Freightliner Corp. v. Myrick,*
  514 U.S. 280 (1995)........................................................................................................11

*F.T.C. v. Trudeau,*
  579 F.3d 754 (7th Cir. 2009)........................................................................................21

*Geier v. American Honda Motor Co., Inc.,*
  529 U.S. 861 (2000)............................................................................................11, 12, 13

*Geske v. PNY Tech., Inc.,*
  503 F. Supp. 3d 687 (N.D. Ill. 2020)..........................................................................14

*Gisairo v. Lenovo, Inc.,*
  516 F. Supp. 3d 880 (D. Minn. 2021)..........................................................................14

*Goldman v. Tapestry, Inc.,*
  501 F. Supp. 3d 662 (E.D. Mo. 2020)..........................................................................14

*Grams v. Milk Prods., Inc.,*
  2005 WI 112, 283 Wis. 2d 511, 699 N.W.2d 167........................................................25

*Grant v. Kia Motor Corp.,*
  185 F. Supp. 3d 1033 (E.D. Tenn. 2016).......................................................................3

*Gratz v. Bollinger,*
  539 U.S. 244 (2003)........................................................................................................14

*Harris v. Great Dane Trailers, Inc.,*
  234 F.3d 398 (8th Cir. 2000).........................................................................................12

*Hawes v. Macy's Inc.,*
  346 F. Supp. 3d 1086 (S.D. Ohio 2018)........................................................................14

*Hileman v. Maze,*
  No. 02-CV-4059-DRH, 2005 WL 8173722 (S.D. Ill. Mar. 28, 2005)...........................9

*Hurley v. Motor Coach Indus., Inc.,*
  222 F.3d 377 (7th Cir. 2000).........................................................................................13

vi

*Indus. Risk Insurers v. Am. Eng'g Testing, Inc.,*
2009 WI App 62, 318 Wis. 2d 148, 769 N.W.2d 82......................................................26

*In re Gen. Motors LLC Ignition Switch Litig.,*
154 F. Supp. 3d 30 (S.D.N.Y. 2015)............................................................................12

*In re GM LLC Ignition Switch Litig.,*
257 F. Supp. 3d 372 (S.D.N.Y. 2017)..........................................................................20

*In re G'ship of Muriel K.,*
2002 WI 27, 251 Wis. 2d 10, 640 N.W.2d 773......................................................27, 33

*In re Lecic's Est.,*
104 Wis. 2d 592, 312 N.W.2d 773 (1981).....................................................................17

*In re Norplant Contraceptive Prod. Litig.,*
165 F.3d 374 (5th Cir. 1999).........................................................................................9

*In re Rust–Oleum Restore Mktg., Sales Pracs. & Prod. Liab. Litig.,*
155 F. Supp. 3d 772 (N.D. Ill. 2016)........................................................................9, 34

*In re Saturn L–Series Timing Chain Prod. Liab. Litig.,*
No. 8:07CV298, 2008 WL 4866604 (D. Neb. Nov. 7, 2008)........................................18

*In re Takata Airbag Prod. Liab. Litig.,*
462 F. Supp. 3d 1304 (S.D. Fla 2020).........................................................................21

*In re Toyota Motor Corp.,*
No. 8:10ML 02151 JVS (FMOx), 2012 WL 12929769 (C.D. Cal. May 4, 2012).........................21

*In re Vizio Inc. Privacy Litig.,*
238 F. Supp. 3d 1204 (C.D. Cal. 2017)...................................................................14, 22

*Kaloti Enter., Inc. v. Kellogg Sales Co.,*
2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205..........................................................17

*Kennedy–Ingalls Corp. v. Meissner,*
5 Wis. 2d 100, 92 N.W.2d 247 (1958)..........................................................................32

*Kisting v. Gregg Appliances, Inc.,*
No. 16–CV–141, 2016 WL 5875007 (E.D. Wis. Oct. 7, 2016)......................................14

*Kohl v. F.J.A. Christiansen Roofing Co.,*
95 Wis. 2d 27, 289 N.W.2d 329 (Ct. App. 1980)..........................................................33

vii

*Kolupar v. Wilde Pontiac Cadillac, Inc.,*
    2007 WI 98, 303 Wis. 2d 258, 735 N.W.2d 93.......................................................16, 17

*Lamont v. Winnebago Indus., Inc.,*
    569 F. Supp. 2d 806 (E.D. Wis. 2008)...........................................................30, 31, 32

*Langford v. Rite Aid of Ala., Inc.,*
    231 F.3d 1308 (11th Cir. 2000).......................................................................................18

*Le v. Kohls Dept. Stores, Inc.,*
    160 F. Supp. 3d 1096 (E.D. Wis. 2016)........................................................................37

*Loeb v. Champion Petfoods USA Inc.,*
    No. 18-CV-494, 2018 WL 2745254 (E.D. Wis. June 7, 2018).....................................20

*Mayberry v. Volkswagen of Am., Inc.,*
    2005 WI 13, 278 Wis. 2d 39, 692 N.W.2d 226.............................................................29

*Merco Distrib. Corp. v. Com. Police Alarm Co., Inc.,*
    84 Wis. 2d 455, 267 N.W.2d 652 (1978).......................................................................10

*Midwhey Powder Co., Inc. v. Clayton Indus.,*
    157 Wis. 2d 585, 460 N.W.2d 426 (Ct. App. 1990).....................................................29

*Mross v. G.M., LLC,*
    No. 15-C-0435, 2016 WL 4497300 (E.D. Wis. Aug. 25, 2016).....................17, 18, 27

*Munsell v. Colgate–Palmolive Co.,*
    463 F. Supp. 3d 43 (D. Mass. 2020)..............................................................................14

*Murillo v. Kohl's Corp.,*
    197 F. Supp. 3d 1119 (E.D. Wis. 2016)..............................................................9, 20, 39

*Nelson v. Great Lakes Educ. Loan Servs., Inc.,*
    928 F.3d 639 (7th Cir. 2019)..........................................................................................11

*Northridge Co. v. W.R. Grace & Co.,*
    162 Wis. 2d 918, 471 N.W.2d 179 (1991)........................................................26, 27, 34, 35

*Ollerman v. O'Rourke,*
    94 Wis. 2d 17, 288 N.W.2d 95 (1980)...........................................................................17

*Opheim v. Aktiengesellschaft,*
    No. CV2002483KMESK, 2021 WL 2621689 (D.N.J. June 25, 2021)..........................32

viii

*Ortiz v. Fireboard Corp.,*
    527 U.S. 815 (1999).................................................................................................14, 15

*Pagoudis v. Keidl,*
    2021 WI App 56, 399 Wis. 2d 75, 963 N.W.2d 803.........................................19, 24

*Paulson v. Olson Implement Co., Inc.,*
    107 Wis. 2d 510, 319 N.W.2d 855 (1982)...................................................................31

*Payne v. Fujifilm U.S.A., Inc.,*
    No. 07–385, 2007 WL 4591281 (D.N.J. Dec. 28, 2007)...........................................36

*Payton v. County of Kane,*
    308 F.3d 673 (7th Cir. 2002)..............................................................................14, 15

*Peters v. Holiday Inns, Inc.,*
    89 Wis. 2d 115, 278 N.W.2d 208 (1979).............................................................11, 38

*Piano Gallery Mad., LLC v. Create Music, LLC,*
    No. 17–CV–713–JDP, 2018 WL 734430 (W.D. Wis. Feb. 6, 2018)...........................24

*Prinsen v. Russos,*
    194 Wis. 142, 215 N.W. 905 (1927).........................................................................32

*Puttkammer v. Minth,*
    83 Wis. 2d 686, 226 N.W.2d 361 (1971)..................................................................37

*Riaubia v. Hyundai Motor Am.,*
    No. CV 16–5150, 2017 WL 3602520 (E.D. Pa. Aug. 22, 2017)..................................14

*Rodas v. Seidlin,*
    656 F.3d 610 (7th Cir. 2011).....................................................................................34

*R.S.B. v. Merck & Co.,*
    No. 20–C–1402, 2012 WL 1842280 (E.D. Wis. May 7, 2021)...................................24

*Ruff v. Burger,*
    32 Wis. 2d 141, 145 N.W.2d 73 (1966).....................................................................11

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Ind.,*
    786 F.3d 510 (7th Cir. 2015).....................................................................................40

*Schechter v. Hyundai Motor Am.,*
    No. CV 18–13634 (FLW), 2019 WL 3416902 (D.N.J. July 29, 2019)................27, 28

ix

*Schneider F. & S. Co. v. Thomas H. Bentley & Son, Inc.*,
  26 Wis. 2d 549, 133 N.W.2d 254 (1965)................................................................10

*Simos v. Embassy Suites, Inc.*,
  983 F.2d 1404 (7th Cir. 1993)................................................................16

*Singh v. Lenovo Inc.*,
  510 F. Supp. 3d 310, 322 (D. Md. 2021)................................................................36

*Sloan v. GM LLC*,
  287 F. Supp. 3d 840 (N.D. Cal. 2018)................................................................27

*Smith v. Atco Co.*,
  6 Wis. 2d 371, 94 N.W.2d 697 (1959)................................................................32

*Snyder v. Badgerland Mobile Homes, Inc.*,
  2003 WI App 49, 260 Wis. 2d 770, 659 N.W.2d 887................................................................23

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002)................................................................28

*State v. Hemp*,
  2014 WI 129, 359 Wis. 2d 320, 856 N.W.2d 811................................................................16, 17

*State ex rel. Kalal v. Cr. Ct. of Dane Cty.*,
  2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110................................................................16

*State v. Ploeckelman*,
  2007 WI App 31, 299 Wis. 2d 251, 729 N.W.2d 784................................................................17

*Strahlendorf v. Walgreen Co.*,
  16 Wis. 2d 421, 114 N.W.2d 823 (1962)................................................................32

*Stewart v. Wulf*,
  85 Wis. 2d 461, 271 N.W.2d 79 (1978)................................................................10

*St. Paul Mercury Ins. Co. v. The Viking Corp.*,
  539 F.3d 623 (7th Cir. 2008)................................................................28

*Stuart v. Wiesflog's Showroom Gallery, Inc.*,
  2008 WI 22, 308 Wis. 2d 103, 746 N.W.2d 762................................................................23, 24, 27

*Sunnyslope Grading Inc. v. Miller, Bradford & Risberg, Inc.*,
  148 Wis. 2d 910, 437 N.W.2d 213 (1989)................................................................28, 29, 30, 31

x

*Sussex T. & S., Inc. v. Mainline S & W., Inc.,*
231 Wis. 2d 404, 605 N.W.2d 620 (Ct. App. 1999) ..................................................... 33

*Taterka v. Ford Motor Co.,*
86 Wis. 2d 140, 271 N.W.2d 653 (1978) ............................................................. 27, 29

*Tietsworth v. Harley–Davidson, Inc.,*
2004 WI 32, 270 Wis. 2d 146, 677 N.W.2d 233 .......................................................... 20

*Twin Disc, Inc. v. Big Bud Tractor,*
582 F. Supp. 208 (E.D. Wis. 1984) .................................................................... 31

*T&M Farms v. CNH Indus. Am., LLC,*
488 F. Supp. 3d 756 (E.D. Wis. 2020) ............................................................30, 31, 32, 37

*T&M Farms v. CNH Indus. Am., LLC,*
No. 19-C-0085, 2020 WL 1082768 (E.D. Wis. Mar. 5, 2020) .............................30, 31, 32, 37

*Uebelacker v. Paula Allen Hldgs., Inc.,*
464 F. Supp. 2d 791 (W.D. Wis. 2006) ............................................................... 19, 20

*United Concrete & Const. v. Red–D–Mix Concrete, Inc.,*
2013 WI 72, 349 Wis. 2d 587, 836 N.W.2d 807 .......................................................... 21

*Watkins v. Ford Motor Co.,*
190 F.3d 1213 (11th Cir. 1999) ...................................................................... 38

*Wausau Tile, Inc. v. Cty Concrete Corp.,*
226 Wis. 2d 235, 593 N.W.2d 445 (1999) .............................................................. 26

*Weaver v. Champion Petfoods USA Inc.,*
No. 18-CV-1996, 2019 WL 2774139 (E.D. Wis. July 1, 2019) ........................................... 21

*Webber v. Armslist LLC,*
--- F. Supp. 3d ---, 2021 WL 5206580 (E.D. Wis. Nov. 9, 2021) ....................................... 10

*WEL Co., Inc. v. Haldex Brake Prods.,*
467 F. Supp. 3d 545 (S.D. Ohio 2020) ............................................................. 35, 36

*Westmas v. Creekside Tree Serv., Inc.,*
2018 WI 12, 379 Wis. 2d 471, 907 N.W.2d 68 ........................................................... 33

*Whitlock v. Brueggeman,*
682 F.3d 567 (7th Cir. 2012) ......................................................................... 9

xi

*Williamson v. Mazda Motor of America, Inc.*,
    562 U.S. 323 (2011)................................................................................12, 13

*Wis. Auto Title Loans, Inc. v. Jones*,
    2006 WI 53, 290 Wis. 2d 514, 714 N.W.2d 155.................................35, 36

*Wrenshall State Bank v. Shutt*,
    202 Wis. 281, 232 N.W. 530 (1930)..............................................................28

<u>Statutes and Regulations</u>

15 U.S.C. § 2308.................................................................................................29, 34

49 U.S.C. § 30102....................................................................................................3

49 U.S.C. § 30103..................................................................................................11

49 U.S.C. § 30116....................................................................................................3

49 U.S.C. § 30118................................................................................................3, 18

Civil L.R. 3.............................................................................................................15

Rule 1 of the Federal Rules of Civil Procedure....................................................15

Rule 9 of the Federal Rules of Civil Procedure...................9, 18, 19, 22, 36, 37

Rule 23 of the Federal Rules of Civil Procedure.............................................14, 15

Wis. Admin. Code ATCP § 127.01......................................................................23, 24

Wis. Admin. Code ATCP § 127.60...........................................................................23

Wis. Admin. Code ATCP § 127.64...........................................................................24

Wis. Admin. Code ATCP § 127.72...........................................................................24

Wis. Admin. Code TRANS § 139.02.........................................................................30

Wis. Admin. Code TRANS § 139.03.....................................................................5, 22

Wis. Admin. Code TRANS § 139.04..................................................................5, 29, 30

Wis. Admin. Code TRANS § 139.06..................................................................5, 30, 33

Wis. Admin Code TRANS § 139.09.............................................................................5

Wis. Const. Art. I, § 9..........................................................................................39, 40

Wis. Stat. § 100.18................................................................19, 20, 21, 22, 37

Wis. Stat. § 100.20..........................................................................................23

Wis. Stat. § 218.0114.......................................................................................16

Wis. Stat. § 218.0116................................................................5, 16, 17, 18

Wis. Stat. § 218.0128..........................................................................................5

Wis. Stat. § 218.0152..........................................................................................5

Wis. Stat. § 218.0163................................................................5, 16, 17

Wis. Stat. § 402.102.........................................................................................32

Wis. Stat. § 402.210.........................................................................................32

Wis. Stat. § 402.302.........................................................................................35

Wis. Stat. § 402.313................................................................29, 32, 34

Wis. Stat. § 402.314..........................................................................29, 32

Wis. Stat. § 402.316.........................................................................................35

Wis. Stat. § 402.608.........................................................................................37

Wis. Stat. § 895.047..........................................................................24, 27

Wis. Stat. § 895.446.........................................................................................24

Wis. Stat. § 943.20...........................................................................................24

Secondary Sources

Restatement (Second) of Torts (1965)............................................10, 17, 19

Restatement (Third) of Torts: Products Liability (1998)................................38

## DEFINED TERMS

The following terms are used extensively throughout Plaintiffs' Omnibus Brief in opposition to Defendants' motions to dismiss the First Amended Complaint (Dkt. ## 12 (redacted version), 12–1 (unredacted version) hereinafter referred to as the "FAC") and are defined here for the Court's convenience:

- **Amy**: as used herein, the term "Amy" refers to Plaintiff, Amy Flasch. (FAC, ¶ 10.)

- **Chad**: as used herein, the term "Chad" refers to Plaintiff, Chad Just. (FAC, ¶ 9.)

- **Chaid**: as used herein, the term "Chaid" refers to Plaintiff, Chaid Przybelski. (FAC, ¶ 8.)

- **Class**: as used herein, the term the "Class" refers to all persons or entities residing in Wisconsin who are current or former owners/lessees of a Class Vehicle. (FAC, ¶ 468.)

- **Class Vehicles**: as used herein, the term "Class Vehicles" refers to Kia and Hyundai vehicles with standard–key ignition systems manufactured between 2011 to 2021 that contain the Defect. (FAC, ¶ 94–97.)

- **Consumer Plaintiffs**: as used herein, the term "Consumer Plaintiffs" refers collectively to Chaid, Chad, Amy, and Lydia in their capacities as class representatives bringing Count VIII of the FAC for statutory violations of Wis. Stat. § 100.20 and Wis. Admin. Code ATCP §§ 127.01 *et seq.* against Kia and Hyundai on behalf of themselves and the Consumer Subclass. (FAC, ¶ 666.)

- **Consumer Subclass**: as used herein, the term "Consumer Subclass" refers to the subclass consisting of all persons residing in Wisconsin who meet the definition of "consumer" as that term is defined in Wis. Admin. Code ATCP § 127.01(2), and who therefore have standing to assert a claim under Wis. Stat. § 100.20(5) in connection with the purchase and/or lease of a Class Vehicle. (FAC, ¶ 468.)

- **DATCP Plaintiffs**: as used herein, the term "DATCP Plaintiffs" refers collectively to Chaid, Chad, Amy, and Lydia in their capacities as class representatives bringing Count VII of the FAC for statutory violations of Wis. Stat. § 100.18 against Defendants on behalf of themselves and the Class. (FAC, ¶ 650.)

- **Defect**: as used herein, the term "Defect" refers to the combination of design flaws that render a Class Vehicle defective. (FAC, ¶¶ 94–95.)

- **Defendants**: as used herein, the term "Defendants" refers collectively to Kia, Hyundai, and HATCI. (FAC, ¶¶ 12–14.)

- **DOT**: as used herein, the term "DOT" refers to the U.S. Department of Transportation. (FAC, ¶ 22.)

- **FMVSS**: as used herein, the term "FMVSS" refers to the federal motor vehicle safety standards promulgated by NHTSA pursuant to the Safety Act. (FAC, ¶ 22.)

- **FMVSS 114**: as used herein, the term "FMVSS 114" refers to the federal motor vehicle safety standard codified at 49 C.F.R. § 571.114, which NHTSA promulgated in April 1968 pursuant to the Safety Act. (FAC, ¶¶ 24–25.)

- **HATCI**: as used herein, the term "HATCI" refers to Defendant, Hyundai Kia Technical Center, Inc. (FAC, ¶ 14.)

- **HCA**: as used herein, the term "HCA" refers to Hyundai Capital America, a corporate affiliate of Defendants doing business as "Kia Motor Finance" and "Hyundai Motor Finance," among others, through which authorized dealers obtain inventory from Kia and Hyundai pursuant to a financing arrangement with HCA. (FAC, ¶ 66.)

- **HMC**: as used herein, the term "HMC" refers to Hyundai Motor Company, Hyundai's Korean parent entity. (FAC, ¶ 41.)

- **Hyundai**: as used herein, the term "Hyundai" refers to Defendant, Hyundai Motor America. (FAC, ¶ 13.)

- **Katie**: as used herein, the term "Katie" refers to Plaintiff, Katherine Wargin. (FAC, ¶ 7.)

- **Kia**: as used herein, the term "Kia" refers to Defendant, Kia America, Inc. (FAC, ¶ 12.)

- **KMC**: as used herein, the term "KMC" refers to Kia Motor Corporation, Kia's Korean parent entity. (FAC, ¶ 42.)

- **Lydia**: as used herein, the term "Lydia" refers to Plaintiff, Lydia Davis. (FAC, ¶ 11.)

- **MVDL**: as used herein, the term "MVDL" refers to the Wisconsin Motor Vehicle Dealership Law, Wis. Stat. §§ 218.01.01 *et seq.* (FAC, ¶ 64.)

- **NCIC**: as used herein, the term "NCIC" refers to the National Crime  Information Center, a division of the Federal Bureau of Investigation. (FAC, ¶ 39.)

- **NICB**: as used herein, the term "NICB" refers to the National Insurance Crime Bureau, a not-for-profit organization that publishes an annual "Hot Wheels" report identifying the most stolen vehicles by make and model in the U.S. and in each state. (FAC, ¶¶ 212–14.)

- **NHTSA**: as used herein, the term "NHTSA" refers to the National Highway Traffic Safety Administration. (FAC, ¶ 22.)

- **Ongoing User Subclass**: as used herein, the term "Ongoing User Subclass" refers to the subclass consisting of all persons or entities residing in Wisconsin who currently own or lease a Class Vehicle. (FAC, ¶ 468.)

- **Plaintiffs**: as used herein, the term "Plaintiffs" refers collectively to Stefanie, Katie, Chaid, Chad, Amy, and Lydia. (FAC, ¶¶ 6–11.)

- **PMR**: as used herein, the term "PMR" refers to the "parts–marking requirement," a process by which auto manufacturers mark major parts of passenger vehicles with non–removable labels that make these parts identifiable if stolen. (FAC, ¶ 37.)

- **Retail Buyer**: as used herein, the term "Retail Buyer" refers to Retail Plaintiffs in their capacity as "retail buyers," as defined in Wis. Stat. § 218.01.01(31). (FAC, ¶ 698.)

- **Retail Buyer Subclass**: as used herein, the term "Retail Buyer Subclass" refers to the subclass consisting of all persons residing in Wisconsin who meet the definition of "retail buyer" or "lessee" as those terms are defined within the MVDL, as who therefore have standing to assert a statutory claim under Wis. Stat. § 218.0163(2) in connection with the purchase and/or lease of a Class Vehicle. (FAC, ¶ 468.)

- **Retail Plaintiffs**: as used herein, the term "Retail Plaintiffs" refers collectively to Katie, Chaid, Chad, Amy, and Lydia in their capacities as class representatives bringing Count IX of the FAC for statutory violations of Wis. Stat. § 218.0116 against Kia and Hyundai on behalf of themselves and the Retail Buyer Subclass. (FAC, ¶ 691.)

- **Safety Act**: as used herein, the term "Safety" Act" refers to the National Traffic and Motor Safety Act enacted by Congress in 1966 to empower the federal government to set and administer new safety standards for motor vehicles and road traffic safety. (FAC, ¶ 21.)

- **Safety Standards**: as used herein, the term "Safety Standards" refers to the federal motor vehicle safety standards promulgated by NHTSA pursuant to the Safety Act. (FAC, ¶ 22.) This term has the same meaning as and is used interchange with the term "FMVSS" defined above.

- **Safety Standard 114**: as used herein, the term "FMVSS 114" refers to the federal motor vehicle safety standard codified at 49 C.F.R. § 571.114, which NHTSA promulgate in April 1968 pursuant to the Safety Act. (FAC, ¶¶ 24–25.) This term has the same meaning as and is used interchange with the term "FMVSS 114" defined above.

- **Stefanie**: as used herein, the term "Stefanie" refers to Plaintiff, Stefanie Marvin. (FAC, ¶ 6.)

- **Warranty Plaintiffs**: as used herein, the term "Warranty Plaintiffs" refers collectively to Chaid, Chad, Amy, and Lydia in their capacities as class representatives bringing Counts I–III of the FAC for breach of express warranty, breach of the implied warranty of merchantability, and violation of the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.* respectively against Kia and Hyundai on behalf of themselves and the Class. (FAC, ¶ 483.)

- **WDPTA**: as used herein, the term "WDTPA" refers to the Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.01 *et seq.* (*See* § II(C)(2), *infra.*)

- **WIDOT**: as used herein, the term "WIDOT" refers to the Wisconsin Department of Transportation. (*See* Facts, § D, *infra.*)

## INTRODUCTION

This case needs a healthy dose of common sense: thousands of Kias and Hyundais were stolen in Milwaukee last year, roughly double the total number of all vehicles stolen in year's past. The perpetrators are teenagers, some of whom have dubbed themselves the "Kia Boyz" in homage to how easy the cars are to steal. Why? Because unlike their competitors, Defendants failed to outfit the Class Vehicles with basic antitheft measures designed to curb easy cases of auto theft. Fifty years ago, NHTSA warned about this very risk; twenty-five years ago, it advised manufacturers to take further steps to mitigate it; and for at least fifteen years, Defendants have recognized the utility of one such feature (an immobilizer) to curb the very type of auto theft now plaguing Milwaukee.

But Defendants ignored NHTSA's advice and did nothing to protect the Class Vehicles. The consequences of that decision have now arrived, just as NHTSA warned in 1968. Kids, with a penchant for reckless joyriding, are stealing these cars in droves because Defendants ignored that risk. Yet all the while, they touted the safety of these vehicles and the strength of their warranties to consumers who bought and leased them thinking they could take Defendants at their word.

Now Defendants move to dismiss this suit, which seeks to hold them accountable for the foreseeable consequences of their own malfeasance. In support, they cobble together a patchwork of specious arguments that ignore governing law and the FAC's allegations along the way. The upshot, as Defendants would have it, is they get to wash their hands of the very problem that they alone created, and they alone can fix. Their customers and the community at large? Tough luck. Yet neither logic nor the law permits them to flood the market with dangerous vehicles—thereby creating an endemic, community-wide safety hazard—and shirk their responsibility to fix it. Plaintiffs' claims are plausibly alleged and amply supported under the law. Defendants' motions should be denied.

1

## FACTS

**A.  Auto Theft Is A Safety Risk, Which NHTSA Has Sought To Redress For Decades.**

In 1966, Congress passed the Safety Act, which created  DOT and various subsidiary agencies to reduce motor vehicle fatalities, including through the creation of FMVSSs, which set "minimum standard[s]" for motor vehicle performance. (FAC, ¶¶ 21–23.) In April 1968, following an alarming DOJ study showing a 200x higher rate of accidents involving stolen vehicles, DOT passed Safety Standard 114: a minimum theft–protection standard applicable to virtually all vehicles sold in the U.S., including the Class Vehicles (*Id.* ¶¶ 24–27 (citing Ex. A).) FMVSS 114 was passed despite objections claiming that theft was "not related to improving motor vehicle safety." (*Id.* ¶ 28.) DOT rejected this claim, explaining that "*the large majority of car thieves are amateurs, almost half of whom are engaged in so–called 'joy–riding.*'" (*Id.* ¶ 31 (quoting Ex. A); *id.* ¶¶ 29–34 & Ex. B.)

Thus, FMVSS 114 was created to prevent easy cases of auto theft, including the <u>exact</u> way the Class Vehicles are now being stolen, albeit fifty–five years later. (*Compare id.* ¶¶ 35(ii), 116 & Exs. A–B *with id.* ¶¶ 133–64.) NHTSA oversees the adoption/amendment of FMVSSs and administers other regulatory schemes to combat vehicle theft. (*Id.* ¶ 36 & Ex. C.) One scheme is the PMR, a process by which vehicle parts are marked with a VIN, so they can be traced, recovered, and used as evidence in criminal prosecutions. (*Id.* ¶ 37.) NHTSA grants exemptions from the PMR if a manufacturer installs an antitheft device as standard equipment on a model line, which NHTSA determines to be at least as effective as the PMR in curbing theft. (*Id.* ¶ 38.)  Additionally, NHTSA has historically gathered theft data from the NCIC, a division of the FBI, disseminated it to auto manufacturers, and has regularly interacted with them—including Defendants—on various issues in connection with fulfilling its administrative mandate. (*Id.* ¶¶ 39–40.)

2

## B. Defendants' Corporate Structure And Their Obligations Under The Safety Act.

Kia and Hyundai oversee the importing, distribution, and sale of Kias and Hyundais in the United States; they also operate manufacturing plants in America. (FAC, ¶¶ 41–42, 45–46.) Their corporate parents—KMC and HMC, respectively—are based in Korea. (*Id.* ¶¶ 41–42.) The entities are closely intertwined: HMC is KMC's largest shareholder, (*id.* ¶ 44); dealers and customers use a corporate affiliate, HCA (d/b/a Kia Finance and Hyundai Finance) to finance and lease vehicles, (*id.* ¶¶ 65–71); and they share a joint-design center, HATCI—the "technological arm" of these entities' operations—which is why they feature the same or similar design elements throughout their respective product lines. (*Id.* ¶¶ 47–49.)

As "importers" and "distributors" under the Safety Act, Kia and Hyundai must: (i) repair defective vehicles furnished to their dealers pre-sale, (*id.* ¶¶ 63, 611 (citing 49 U.S.C. § 30116); and (ii) notify owners of any defects implicating motor vehicle safety[1] post-sale. (*Id.* ¶¶ 241, 612 (citing 49 U.S.C. § 30118).)[2] KMC and HMC have also appointed HATCI to fulfill their obligations under the Safety Act. (*Id.* ¶¶ 47–51, 81 & n.6, 241 & n.57, 612; *see also* Declaration of James B. Barton ("Barton Decl."), ¶¶ 2–5, Exs. 1–4 (attaching NHTSA documents).) NHTSA described HATCI's interaction with HMC/KMC as akin to an attorney-client relationship. (*Id.* ¶ 2, Ex. 1 at 2.) HATCI also petitions NHTSA for exemptions from the PMR for the few models of Defendants' vehicles that are equipped with better antitheft measures. (FAC, ¶¶ 195, 209, 224, Exs. L–N, Q–S.)

---

[1] The Act defines "motor vehicle safety" as the "performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident. . . ." *Id.* § 30102(8).

[2] The FAC cites to § 30118(d), but this obligation is set forth in § 30118(c)(2). Although § 30118's requirements apply to "manufacturers," this definition includes an "importer," *see id.* § 30102(5)(b), which encompasses Kia and Hyundai even if the Class Vehicles are manufactured in Korea. *See, e.g., Grant v. Kia Motors Corp.*, 185 F. Supp. 3d 1033, 1039 (E.D. Tenn. 2016) (recognizing that Kia America, Inc. is a "manufacturer" under the Safety Act).

3

### C.   Defendants Tout Themselves As Innovative Companies Committed To Safety.

Kia and Hyundai have become a force in the U.S. auto market by positioning themselves as providing an incredible value proposition; brands that offer various models at cheaper prices than the competition, but which they claim are still loaded with standard features, innovative design, and backed by industry-leading warranties. (FAC, ¶ 72.) They have also staked their reputation on a material consideration to virtually every consumer: safety. (*Id.* ¶ 73–76, 79–82, 86–87, 320, 356, 382, Exs. E, G).) Defendants also tout their self-proclaimed, industry-leading warranties to induce the sale of their vehicles, which are uniformly distributed to their customers throughout the U.S. (*Id.* ¶¶ 76–78, 82–85, Exs. D, F.) Despite conflicting statements in each warranty, however, Kia and Hyundai contend that their express warranties disclaim coverage for auto theft. (*Id.* ¶¶ 244–63.)

### D.   Defendants' Distribution Model And Corresponding Obligations Under The MVDL.

Kia and Hyundai maintain consumer-facing websites with a trove of information about their vehicles, commitment to the customer, and accolades achieved, but no consumer can buy or lease a vehicle directly from them; these transactions are facilitated through authorized dealers, which are identified on their websites. (FAC, ¶¶ 52–57, 60.) Kia and Hyundai control facets of their dealers' operations to facilitate these sales, (*id.* ¶ 58), including by providing dealers with marketing materials and warranties to furnish to buyers and lessees. (*Id.* ¶¶ 61–62.) Dealers have a "floor plan" financing arrangement with HCA, which also extends financing to buyers and lessees using Kia and Hyundai's name and trademarks. (*Id.* ¶¶ 65–70.) Dealers make little profit on new car sales/leases; the proceeds flow back to Defendants. (*Id.* ¶ 70.) Thus, consumers are the ultimate beneficiaries of this web of relationships—that is, the only way to acquire one of Defendants' vehicles—and are led to believe that each dealer is an arm of Defendants themselves. (*Id.* ¶ 71.)

4

In Wisconsin, Kia, Hyundai, and their dealers are "licensees" under the MVDL and subject to its regulatory scheme. (*Id*. ¶ 64.) Given each dealer's role as a mere (and lone) conduit through which consumers acquire the vehicles, Kia/Hyundai must indemnify their dealers for vehicular defects. (*Id.* (citing Wis. Stat. § 218.0128).) Further, WIDOT has prescribed various regulations to "define unfair practices . . . *between any licensees and retail buyers, lessees or prospective lessees*." Wis. Stat. § 218.0152 (emphasis added). For instance, WIDOT has declared that deceptive advertising "*by any licensee* to induce the purchase of a motor vehicle constitutes an unfair practice and is prohibited." Wis. Admin. Code TRANS § 139.03(1). Other provisions prevent disclaimers of implied warranties:

(1) CONTENTS. *<u>If a sale of a motor vehicle by a licensee</u>* is made subject to a warranty, the warranty shall be in writing and shall be provided to the purchaser at the time of delivery of the vehicle and shall include the following items [in subs. (a)–(g)].

(3) IMPLIED WARRANTY. *<u>No implied warranty of merchantability</u>* or fitness *<u>shall be excluded in the sale of a motor vehicle unless</u>* the sale is explicitly negotiated between the purchaser and dealer licensee on an "AS IS–NO WARRANTY" basis *<u>and</u>* is in conformity with s. Trans 139.04(6)(a)5. *<u>No implied warranty of merchantability or fitness shall be modified or limited</u>*, except that implied warranties may be limited to the duration of a written limited warranty of reasonable duration.

TRANS § 139.06 (emphasis added). Any waiver of these requirements is void, *id*. § 139.09, which can subject a "licensee" to discipline, Wis. Stat. § 218.0116(1)(bm), and also vests a retail buyer with a claim under Wis. Stat. § 218.0163(2) for the violation of § 218.0116(1)(bm).

**E. The Industry, Save Defendants, Embraces Better Antitheft Protections.**

Although FMVSS 114 was codified in 1968, its "minimum performance requirements" have not changed. (FAC, ¶ 34 (citing Ex. B); *id.* ¶¶ 35(ii), 116 (how the "device" should operate).) But antitheft technology has improved since then, largely because of immobilizers. (*Id.* ¶ 107.) These devices were so successful at deterring auto theft that the EU and other countries—including places

5

where Defendants sell their cars (*id.* ¶¶ 121–22)–mandated them decades ago. (*Id.* ¶¶ 108–109.)

The advent of the device dates back to the 1980s, when GM began using it with resounding success.

(*Id.* ¶¶ 203–07 (citing Exs. M, O–P).) In 1997, NHTSA entertained a petition to amend FMVSS

114 and require immobilizers as standard equipment. (*Id.* ¶¶ 110 –11 (citing Ex. H).) But NHTSA

rejected the petition because it lacked authority to impose design criteria. (*Id.*) Instead, it incentivized

the industry to install this technology in other ways within its authority by granting petitions for

exemption from the PMR. (*Id.* ¶¶ 112–20 (citing Ex. I).) Most of the industry obliged, but

Defendants did not as a cost–saving measure. (Compare *id. with id.* ¶¶ 124–25.) Indeed, in the few

petitions they have filed (via HATCI), they touted the success of the technology, but only sought to

make it standard on their higher–end models. (*Id.* ¶¶ 193–203, 208–11 (citing L–N, P–Q).)

**F. Defendants Ignore NHTSA's Advice And Redesign The Class Vehicles With The Defect.**

Fifteen years after NHTSA rejected the 1997 petition–and despite filing three petitions for

exemption from the PMR for their high–end models, (*see id.*)–Defendants redesigned the Class

Vehicles but neglected NHTSA's advice to make immobilizers standard. (*Id.* ¶¶ 94(b)–96.) In fact,

this redesign exposed the Class Vehicles to *more risk* by ignoring NHTSA's other advice apart from

their failure to install immobilizers. (*Id.* ¶¶ 127–32 (citing Ex. H (one aspect of the Defect)); *see also*

*id.* ¶¶ 133–56 (other aspects).) All told, this comedy of design errors created a latent Defect making

the Class Vehicles incredibly easy to steal, (*id.* ¶¶ 89–156)–in the exact way NHTSA warned about

a half century earlier–as Milwaukee and other cities would ultimately learn. (Facts, § A.)

**G. Despite Knowledge Of The Defect, Defendants Advertise The Class Vehicles As Safe.**

As noted above, a central tenet of Defendants' marketing strategy touts their commitment

to safety, (*see* Facts, § C), one facet of which–as Safety Standard 114 makes plain–is vehicle security.

6

(*Id.* § A.) But unlike their competitors, Defendants failed to make immobilizers standard on most of their model lines despite their appreciation of the safety benefits they provide. (*Id.* § E; *see also* FAC, Ex. I.) And despite this risk, Defendants continued to tout the safety and reliability of their cars, including the Class Vehicles. (Facts, § C.) Some models had an "option" for an immobilizer—by "upgrading" to a push-button start—but Defendants admit that they advertised this safety feature as an accoutrement for its "premium" and "technology" packages.[3] In other words, Defendants touted the safety and technological design of these cars, while misrepresenting other safety features as tantamount to a sunroof, leather seats, or a better stereo. (*Id.* ¶¶ 125, 320-24 353-60, 382, 394-96, 421, 426, 458, 629, 657, Exs. E & G; *see also* Barton Decl. ¶¶ 6-8, Exs. 5-7.)[4]

For instance, in the 2019 Elantra brochure, the "proximity key entry with push button start" is listed in the "interior features" section with the vehicle's cupholders, leather seating, and heated seats, amongst other items. (*Id.* ¶ 6, Ex. 5 at 14). The "remote keyless entry system with alarm" is also listed as standard on all trims package, meaning consumers are led to believe they get the *same antitheft protection* no matter the trim selected. (*Id.* at 12-13.) In the 2019 Forte brochure, the "push-button w/Smart Key" is listed under the "EX & Launch" trim packages, which "take[ ] things up a notch with more tech and premium features." (*Id.* ¶ 7, Ex. 6 at 3.) In the 2020 Sportage brochure, the "Smart key & push-button start" is listed under the "S Sunroof Package," (*id.* ¶ 8, Ex. 7 at 17), and advertised for the "ultimate road trip," explaining that it "allows you to start or stop the engine with the Smart Key in your pocket or bag." (*Id.* at 7.)

---

[3] "Notably absent from the restrain and safety systems discussion [of these ads] is anything dealing with security or deterring theft or other crime. Instead, the brochure places discussion of immobilizer and 'push button start w/ Smart Key' options in entirely separate sections on premium packages and technology packages." (Dkt. # 20 at 18–19.)

[4] For context, this declaration attaches the full brochures for: (i) Chaid's Hyundai Elantra, (FAC, ¶ 320–26); (ii) Chad's Kia Forte, (*id.* ¶¶ 356–62); and Amy/Lydia's Kia Sportage (*id.* ¶¶ 382, 394–96, 421, 426–28).

7

### H.  Auto Theft Soars In Milwaukee And Elsewhere, Creating a Public Safety Crisis.

Local officials began "sounding the alarm" about the surge in thefts of Class Vehicles in Fall 2020, (FAC, ¶¶ 165, 233), but Defendants' awareness of the problem started well beforehand. Indeed, the NICB's "Hot Wheels" reports—annual summaries of the most stolen cars based on data gathered by the NCIC and disseminated to the industry—show that the Class Vehicles began being targeted immediately after the redesign. (*Id.* ¶¶ 212–19.) These thefts saw a steady uptick and then exploded in 2020. (*Id.* ¶¶ 220–34.) In fact, a year before hitting Milwaukee, Denver was raising red flags too. (*Id.* ¶ 235.) Public awareness aside, Defendants have known about it *for years*. (*Id.* ¶¶ 236–42.) But rather than fix it, they kept selling the Class Vehicles and ignored these risks; an apparent, top–down corporate strategy, as evidenced by the "first ever" whistleblower award that NHTSA made based on Defendants' concealment of "serious safety problems that [were] hidden from the agency."[5]

This "epidemic" has been particularly troubling in Milwaukee, in part because it has been chronicled on social media, providing "know–how" and encouragement to scores of juveniles. (*Id.* ¶¶ 184, 264–73.) Numerous people have been injured or killed as a direct byproduct of these thefts, just as NHTSA warned in 1968. (*Id.* ¶¶ 274–78.) When the FAC was filed, a total of <u>*5,362*</u> Class Vehicles were stolen through September 2021, on pace to reach 7,149 cars by year's end. (*Id.* ¶¶ 279–80.) The final tally of stolen Class Vehicles is not yet known, but one outlet reported that the total figure for all thefts was 11,500. (*See* n.21, *infra*.) If 66% were Class Vehicles (the first half trend in 2021), then <u>*7,590*</u> Class Vehicles were stolen in 2021: <u>*120% more*</u> than <u>*all stolen vehicles*</u> in 2019 (3,450) and <u>*68% more*</u> than <u>*all stolen vehicles*</u> in 2020 (4,509).

---

[5] "NHTSA Makes Its First Ever Whistleblower Award," NHTSA, https://www.nhtsa.gov/press-releases/first-whistleblower-award (Nov. 9, 2021).

## LEGAL STANDARD

A plaintiff need only allege facts to state a claim that is plausible on its face. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021). A claim is plausible if it pleads facts to reasonably infer that a defendant is liable for the misconduct alleged. *Id.* When a pleading sounds in fraud, "a plaintiff who provides a 'general outline of the fraud scheme' sufficient to 'reasonably notify the defendants of their purported role' in the fraud satisfies Rule 9(b)." *In re Rust–Oleum Restore Mktg., Sales Pracs. & Prod. Liab. Litig.* ("*Rust–Oleum*"), 155 F. Supp. 3d 772, 812 (N.D. Ill. 2016) (collecting cases). This requires the "who, what, when, where, and how of the fraud[;] the first paragraph of any newspaper story." *Murillo v. Kohl's Corp.*, 197 F. Supp. 3d 1119, 1130 (E.D. Wis. 2016). Rule 9(b) also "requires flexibility when information lies outside of plaintiff's control." *Id.* (citation omitted); *Fed. Dep. Ins. Corp. v. Patel*, No. 19–cv–6917, 2020 WL 6681348, at *4 (N.D. Ill. Nov. 12, 2020) (collecting cases).

## ARGUMENT

**I.   DEFENDANTS' CAUSATION, PREEMPTION, AND STANDING ARGUMENTS LACK MERIT.**

**A.      Defendants' Superseding Cause Defense Is Dubious.**

Defendants first claim that they are "not responsible" for flooding the market with defective Class Vehicles because each theft is an "intervening action that disrupts causation." (Dkt. # 20 at 13.) As a threshold matter, they do not explain how this "standard element of tort liability," *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012), bars Plaintiffs' contract or statutory claims.[6] Regardless, Defendants are mistaken.

---

[6] Research revealed no Wisconsin law applying this doctrine in other contexts. But courts elsewhere have ruled that it: (i) does not apply to contract claims, *see, e.g., Cedillo v. Igbanugo*, No. A18–0860, 2019 WL 2168766, at *6 (Minn. Ct. App. May 20, 2019); (ii) has no or limited application to intentional tort claims, *see e.g., Hileman v. Maze*, No. 02–CV–4059–DRH, 2005 WL 8173722, at *4 (S.D. Ill. Mar. 28, 2005) (collecting cases); and (iii) has been applied once in a Texas DTPA case, but its applicably has been questioned. *Compare Daugherty v. Jacobs*, 187 S.W.3d 607, 615 (Tex. App. 2006) *with In re Norplant Contraceptive Prod. Litig.*, 165 F.3d 374, 377 (5th Cir. 1999).

9

If a defendant's conduct was a "substantial factor" in causing harm, the defendant is liable in tort. *Webber v. Armslist LLC*, --- F. Supp. 3d ---, 2021 WL 5206580, at *8 (E.D. Wis. Nov. 9, 2021) (citing *Merco Distrib. Corp. v. Com. Police Alarm Co., Inc.*, 84 Wis. 2d 455, 458, 267 N.W.2d 652 (1978)). A "superseding cause" may break the chain of causation, however. *Stewart v. Wulf*, 85 Wis. 2d 461, 475, 271 N.W.2d 79 (1978) (defining "superseding cause[s]" and "intervening force[s]") (citing Restatement (Second) of Torts, §§ 440–41 (1965)). The inquiry centers on the foreseeability of the defendant's actions. *Schneider F. & S. Co. v. Thomas H. Bentley & Son, Inc.* ("*Schneider*"), 26 Wis. 2d 549, 553, 133 N.W.2d 254 (1965). It is a question of law that is usually decided "after the verdict has been rendered." *Merlino v. Mut. Serv. Cas. Ins. Co.*, 23 Wis. 2d 571, 580, 127 N.W.2d 741 (1964).

Here, Defendants claim they are immune from liability on *all claims*, on a clipped record, and based on one case, *Eichstedt v. Lakefield Arms Ltd.*, 849 F. Supp. 1287, 1293 (E.D. Wis. 1994), which absolved a gun manufacturer of liability in a suit where the plaintiff sought damages that were caused by his friend intentionally shooting him. *Eichstedt* held that the friend's "reckless action" was a superseding cause because "[n]o firearms manufacturer can prevent shootings by those who disregard the most basic rules of gun safety." *Id.* at 1291. But nothing changes the rule that "intentional criminal acts 'are not a superseding cause *per se*.'" *Webber*, *supra*, at *8 (collecting cases).

Indeed, even *Eichstedt* noted that a third person's criminal act *is not a superseding cause* if the defendant "*realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.*" *Id.* at 1292 (emphasis added) (quoting Restatement (Second) Torts, § 448); *see also Schneider*, *supra* at 554 (an actor is liable for an act, whether "intentionally tortious or criminal" when "the realizable likelihood that a third person may act in [that] particular manner [creates] the hazard") (quoting Restatement, *supra*, § 449).

10

The FAC alleges that Defendants knowingly disregarded the very risk they created. (Facts, §§ E–G.) Thus, the "intervening causes" they now seek to weaponize as a defense "are exactly the types of foreseeable consequences that [they] should be prepared to guard against as the consequence of [their] own [misconduct]." *Ruff v. Burger*, 32 Wis. 2d 141, 150–51, 145 N.W.2d 73 (1966); *Peters v. Holiday Inns, Inc.*, 89 Wis. 2d 115, 123, 278 N.W.2d 208 (1979) (a hotel's failure to protect patrons is actionable if "it is foreseeable that [the] failure to maintain adequate security measures not only permits but may even encourage intruders to rob or assault hotel patrons").

### B.       Plaintiffs' Claims Are Not Federally Preempted.

Defendants also claim that Plaintiffs' suit is preempted because it "interfere[s] with NHTSA's important federal objectives." (Dkt. # 20 at 14.) Clarification is first needed on what is *not* in dispute. The FAC alleges that the Class Vehicles violated FMVSS 114, (FAC, ¶¶ 88, 93, 126, 150–56), and imposing liability for violating this Safety Standard does not "interfere with" federal law. *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019). The FAC also alleges that the Defect is a culmination of errors, some of which are not addressed by a FMVSS, (FAC, ¶¶ 94–95, 98–106, 127–32); this does not raise a colorable preemption defense either. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 282 (1995) ("[T]he absence of a [FMVSS] cannot implicitly extinguish state common law."). Rather, the nub of their argument is that holding them liable for failing to install immobilizers is preempted because it conflicts with FMVSS 114. This is wrong too.

Preemption comes in three flavors: express, field, and conflict preemption. *Nelson*, *supra* at 646–47. Defendants invoke conflict preemption,[7] which holds that "a state law that 'stands as an

---

[7] The Safety Act's savings clause forecloses a finding of express preemption. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 870 (2000) (49 U.S.C. § 30103(e) "preserves those actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor"). Any argument that field preemption is

obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law is preempted." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011). They rely on *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861 (2000), which barred a suit seeking to impose liability on a manufacturer for not installing airbags as preempted by the 1984 version of FMVSS 208. *Id.* at 886.

Inexplicably, however, Defendants fail to cite to the Court's decision in *Williamson*, which clarified its holding in *Geier* when interpreting another version of FMVSS 208 concerning seat belts. 562 U.S. at 330-31. There, the plaintiffs sought to hold a manufacturer liable for failing to install a lap-and-shoulder belt in the rear-middle seat of a minivan. *Id.* at 326-27. As in *Geier*, the defendant asserted that because the operative version of FMVSS 208 granted a choice to install either lap belts or lap-and-shoulder belts, conflict preemption barred the suit. *Id. Williamson* disagreed, held that preemption did not apply, and endorsed the DOT's position on its own regulations, which explained that "*state tort law does not conflict with a federal 'minimum standard' because state law imposes a more stringent requirement.*" *Id.* at 336 (emphasis added).

Rather, the suit in *Geier* was preempted because it addressed DOT's 1984 "policy judgment" regarding the safest way to implement passive restraints to gain widespread consumer support. *Geier, supra* at 878-81. Holding a manufacturer liable for failing to install airbags "would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed." *Id.* at 881. But unlike airbags, there was no declaration vis-à-vis FMVSS 208's choice of seat belts to conclude that granting the option, in and of itself, was designed to promote safety. *Williamson, supra* at 332-34. In fact, *Williamson* explained that "a standard giving manufacturers 'multiple

---

applicable would also fail. *See Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir. 2000); *In re Gen. Motors LLC Ignition Switch Litig.*, 154 F. Supp. 3d 30, 44-45 (S.D.N.Y. 2015) (same) (citing *Geier* and *Harris, supra*).

12

options for the design of a device *would not preempt a suit* claiming that a manufacturer should have chosen one particular option, where the [DOT] did not determine that the availability of options was necessary to promote safety." *Id.* at 336 (emphasis added).

So too here. Defendants point to nothing that suggests Safety Standard 114's option of devices to prevent "steering" or "forward self–mobility" was expressly designed to promote safety. In fact, NHTSA rejected a 1997 petition[8] to make immobilizers standard because *it lacked authority* to do so, reiterating that FMVSS 114 is a "minimum safety standard." (FAC, ¶ 111 (citing Ex. H).) That said, it incentivized the industry to install immobilizers in ways that were *within its authority.* (*Id.*) Unlike their competitors, however, Defendants just failed to do so. (*See* FAC, Ex. I.) Thus, Plaintiffs' suit does not stand as an "obstacle" to NHTSA's objectives; it actively supports them.

Regardless, even if Defendants could shoehorn these facts into *Geier*'s holding, the Court left open whether "FMVSS 208 would preempt a different kind of tort case" not before it, *Geier, supra* at 885; that is, one where "a manufacturer's own design decisions may foreclose one or more of the choices left open by the federal standards." *Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 382 (7th Cir. 2000) (citing *Geier, supra*). Here, the FAC avers that Defendants' "choice" to implement a steering lock was ineffective. (FAC, ¶¶ 150–56.) Thus, even if *Geier* mattered, this case falls within its exception based on the "design–related circumstance[s]" of the Class Vehicles. *Geier, supra* at 887.

## C.    Standing

Defendants concede that Plaintiffs have individual standing (Dkt. # 20 at 35) but seek to front class certification issues when the court "can weed out claims if the class representative is not

---

[8] Although NHTSA rejected the petition, "[i]t is quite wrong to view that decision as the functional equivalent of a regulation prohibiting" states from adopting such a rule. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) (rejecting argument that when the Coast Guard declined to adopt regulations to mandate propeller guards, it meant that any claim seeking to hold a manufacturer liable for failing to install propeller guards was preempted).

13

sufficiently similar to members of the putative class." *Geske v. PNY Tech., Inc.*, 503 F. Supp. 3d 687, 700 (N.D. Ill. 2020) (citations omitted). They rely on *Kisting v. Gregg Appliances, Inc.*, No. 16–CV–141, 2016 WL 5875007 (E.D. Wis. Oct. 7, 2016), which held that a party lacks standing "to bring claims for products he did not purchase[,]" *id.* at *3, yet ignore that *Kisting* "is irreconcilable with" *Gratz v. Bollinger*, 539 U.S. 244 (2003). *See In re Vizio, Inc. Privacy Litig.*, 238 F. Supp. 3d 1204, 1218 (C.D. Cal. 2017)[9] (explaining how *Kisting* conflicts with *Gratz*, *supra*, which allowed one class rep (a transfer student) to represent a class of student–applicants (including freshman) to challenge a university's treatment of race in its admissions process because the freshman protocol "[did] not implicate a *significantly different* set of concerns") (emphasis in original) (quoting *Gratz*, *supra* at 265).

Unlike *Kisting*, the "majority" of courts hold that "a plaintiff has standing to sue on behalf of purchasers who sustained a substantially similar injury." *Geske*, *supra* at 700; *Gisairo v. Lenovo, Inc.*, 516 F. Supp. 3d 880, 887 (D. Minn. 2021).[10] This assesses the similarities between the products and advertisements to see if the Plaintiffs' "injury is sufficiently similar to that suffered by class members who purchased other accused products." *Id.* If so, the adequacy to serve as a class rep is deferred until class certification because it bears on Rule 23's requirements, which are "logically antecedent" to standing in these cases. *Id.* at 886 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)).

The Seventh Circuit held as much in *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002), where it permitted six plaintiffs to represent a class of arrestees and sue 19 Illinois counties to challenge the "bond fees" imposed by the county jails, even though the plaintiffs were only assessed

---

[9] *Accord Riaubia v. Hyundai Motor Am.*, No. CV 16–5150, 2017 WL 3602520, at *2 (E.D. Pa. Aug. 22, 2017); *Browning v. Anheuser–Busch, LLC*, 539 F. Supp. 3d 965, 978 (W.D. Mo. 2021) (same).

[10] *Munsell v. Colgate–Palmolive Co.*, 463 F. Supp. 3d 43, 53 (D. Mass. 2020); *Goldman v. Tapestry, Inc.*, 501 F. Supp. 3d. 662, 666–67 (E.D. Mo. 2020); *Hawes v. Macy's Inc.*, 346 F. Supp. 3d 1086, 1091 (S.D. Ohio 2018).

14

fees by two counties. The plaintiffs had standing for those two, so the "central issue" was whether they could *also* "represent a class that include[d] people from the other 17 named counties" absent being assessed fees by them. *Id.* at 680. The court held they did, noting that the plaintiffs' harm derived from the "same statute that caused the injuries to all other members of the proposed class." *Id.* at 682. Thus, class certification was "logically antecedent" to standing, *see id.* (citing *Ortiz, supra*), and there was "no reason to truncate potentially efficient uses of the class action device." *Id.* at 681.

Here, Plaintiffs' vehicles—despite being different years and models—were stolen in the *same manner* because they have the *same Defect.* (FAC, ¶¶ 94–96, 342, 373, 407, 438.) They are covered by the *same warranties* and were marketed in the *same way.* (*See* Facts, § D; FAC, ¶¶ 77–86, 317–26, 351–62, 380–96, 421–28; Exs. D–G). Just as "[o]ther named plaintiffs could be supplied to match with each named defendant but it would be unwieldy to do so[,]" *Payton, supra* at 679, other plaintiffs could be joined to match each year/model of Class Vehicle, but it would be unwieldy; indeed, it belies the very purpose of a class action, which aims to redress common harms when joinder is "impracticable." Fed. R. Civ. P. 23(a)(1). Likewise, flooding the Court's docket[11] with scores of copycat suits will hinder their just and speedy determination. Fed. R. Civ. P. 1. Defendants' proposal for *more litigation* to redress uniform acts of malfeasance is practically senseless and legally infirm.

## II. PLAINTIFFS' STATUTORY CLAIMS ARE COGNIZABLE AND SUFFICIENTLY PLED.

### A. Retail Plaintiffs' MVDL Claim Against Kia and Hyundai Is Cognizable.

Kia and Hyundai seek dismissal of Retail Plaintiffs' MVDL claim by attempting to inject ambiguity into the statute when none exists. They concede they are licensed distributors under the

---

[11] Per Civil L.R. 3, all "related action[s]" would be assigned to the same judge because the only difference between each suit would be the name of each plaintiff and the year and model of his or her respective Class Vehicle.

MVDL, Wis. Stat. § 218.0114(2m), which codified offenses that can subject them to discipline. *Id.* §§ 218.0116(1)(a)–(z). And they concede the FAC's allegations substantiate Plaintiffs' claim under § 218.0163(2) *if* it applies to distributors. Despite its plain language, Kia and Hyundai assert that the statute means something other than what it says. (Dkt. # 20 at 29–30.) The law disagrees.

If a statute "is unambiguous, [courts] apply the statute's plain language to the facts at hand." *State v. Hemp*, 2014 WI 129, ¶ 13, 359 Wis. 2d 320, 856 N.W.2d 811. Courts are "not at liberty to disregard the plain, clear words of the statute." *State ex rel. v. Cir. Ct. for Dane Cty.*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110. Finally, remedial statutes are "liberally construed." *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2007 WI 98, ¶ 33, 303 Wis. 2d 258, 735 N.W.2d 93.

Here, the MVDL codifies fifty-three grounds that permit WIDOT to discipline a licensee. Wis. Stat. § 218.0116(1). Some apply to manufacturers and distributors, *see, e.g.*, §§ 218.0116(1)(h), (km); some apply to dealers, *see, e.g.*, §§ 218.0116(1)(gr), (n); and some apply *to all licensees. See, e.g.*, §§ 218.0116(1)(bm), (c), (dm), (e). If only dealers were involved in the consumer sales, the legislature would have limited the scope of § 218.0116(1)'s consumer-oriented violations to dealers alone, but it did not. *Bob Willow Motors, Inc. v. GM Corp.* ("*BWM*"), 872 F.2d 788, 794 (7th Cir. 1989) ("[E]ach ground in § 3(a) [now § 218.0116(1)] applies to all licensees, unless expressly limited. . . .").

More to the point, had the legislature intended to limit a consumer's redress to a claim against a dealer alone, it would have written § 218.0163(2) as follows:

> Any retail buyer, lessee, or prospective lessee suffering pecuniary loss **because of a violation by a ~~licensee~~ [dealer]** of s. 218.0116(1)(bm), (c), (cm), (d), (e), (em), (f), (im), (m) or (p) may recover damages for the loss. . . .

*Id.* § 218.0163(2). Other MVDL provisions support § 218.0163(2) to all "licensees." (*See* Facts, § D, *supra*.) The lack of caselaw defining § 218.0163(2) is irrelevant. *Simos v. Embassy Suites, Inc.*, 983 F.2d

16

1404, 1411 (7th Cir. 1993) (citing *BWM*, *supra*). Nor does Defendants' reliance on inapposite authority matter.[12] (Dkt. # 20 at 29–30.) The statute's plain language vests consumers with a claim against any licensee that violates ten of the fifty–three provisions in § 218.0116(1).

### B.    Plaintiffs' Civil Theft Claim Against All Defendants Is Cognizable.

#### 1.    Defendants Had A Duty To Disclose The Defect.

The existence of a duty to disclose is a question of law based on "the mores of the community." *Ollerman v. O'Rourke*, 94 Wis. 2d 17, 28, 288 N.W.2d 95 (1980). Courts rely on various sources to determine if it exists. *Kaloti Enter., Inc. v. Kellogg Sales Co.* ("*Kaloti*"), 2005 WI 111, ¶ 17, 283 Wis. 2d 555, 699 N.W.2d 205 (Restatement); *Archdiocese of Mke.*, 2007 WI 95, ¶ 49 (common law); *In re Lecic's Est.*, 104 Wis. 2d 592, 615, 312 N.W.2d 773 (1981) (statutes). One exists here.

*First*, courts hold that a duty to disclose arises in a commercial transaction where, *inter alia*, the party knows of "material facts" of which the other party is not aware and that a reasonable person would expect to be disclosed. *State v. Ploeckelman*, 2007 WI App 31, ¶¶ 17-18, 299 Wis. 2d 251, 729 N.W.2d 784 (citing *Kaloti*, 2005 WI 111, ¶ 20) (relying on Restatement (Second) of Torts, § 551). This Court also relied on the Restatement to hold that a duty to disclose a safety defect exists. *Mross v. G.M., LLC*, No. 15–C–0435, 2016 WL 4497300, at *4–5 (E.D. Wis. Aug. 25, 2016) (relying on Restatement, *supra*, to recognize a "claim for nondisclosure of [a] safety risk").

*Second*, Defendants concede they have a post–sale duty to warn of dangerous defects when they "knew or should have known" of them. (*See* § IV(C), *infra*.) If a seller has a duty to disclose

---

[12] *Forest Home Dodge, Inc. v. Karns* interpreted the MVDL's predecessor in a dispute where a manufacturer applied for a license to own a dealership through its distributor. 29 Wis. 2d 78, 82–83, 138 N.W.2d 214 (1965). Likewise, dicta in *Kolupar*—where the court described § 218.0163(2) as a "consumer protection statute regulating motor vehicle dealers, salespersons and sales finance companies," 2007 WI 98, ¶ 20—was made when addressing a consumer's claim against a dealer and its salesman who defrauded her. *Id.* ¶¶ 5–6. No distributor was named in the suit and the court was simply applying the statute's language "to the facts at hand." *Hemp*, 2014 WI 129, ¶ 13.

17

post-sale, it *perforce* arises pre-sale if the seller knows of the same facts. Requiring a seller to disclose a defect of which it has knowledge *after* the sale yet immunizing its intentional failure to disclose the same defect *before* the sale is untenable.

    *Third*, the MVDL prohibits statutory "licensees" from defrauding retail buyers through, *inter alia*, the "*concealment*" of "*material particulars.*" Wis. Stat. § 218.0116(e) (emphasis added). The Safety Act also requires Defendants to notify NHTSA and vehicle owners when they learn that a "vehicle or equipment contains a defect and decide[ ] in good faith that the defect is related to motor vehicle safety." 49 U.S.C. § 30118(c); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 537 (D. Md. 2011) (citing the Safety Act to note that "a duty to disclose can arise under a federal statute") (citing *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000)). The same holds true with HATCI, who, according to NHTSA, was an agent operating in a fiduciary-like capacity for Defendants and their parent companies. (*See* Facts, § B, *supra* (collecting materials).)

    Accordingly, the "mores of the community" impose a duty on manufacturers to disclose latent safety defects. This Court held as much, *Mross*, 2016 WL 4497300, at *4–5, as have other jurisdictions. *See Doll*, 814 F. Supp. 2d at 537; *Bearden v. Honeywell Int'l Inc.*, 720 F. Supp. 2d 932, 941 (M.D. Tenn. 2010) (a seller must "disclose any condition or defect that it knows or should know about that renders the product defective or dangerous"); *In re Saturn L–Series Timing Chain Prod. Liab. Litig.*, No. 8:07CV298, 2008 WL 4866604, at *20, 22–23 (D. Neb. Nov. 7, 2008) (same).

### 2. Plaintiffs' Civil Theft Claim Satisfies Rule 9(b).

    Plaintiffs' civil theft claim also meets Rule 9(b). (*See* Legal Standard, *supra*.) *First*, the FAC alleges the existence of the Defect in the Class Vehicles. (FAC, ¶¶ 94–96.) *Second*, the FAC's allegations—including photos, social media links, and news reports cited therein—depict the safety

18

risk the Defect presents, (*id.* ¶¶ 145, 165–90, 264–82, 342, 373, 407, 438); precisely why NHTSA promulgated FMVSS 114 in the first place. (*Id.* ¶¶ 21–35.) *Third*, the FAC alleges myriad ways Defendants knew about the Defect for decades,[13] well before December 27, 2016: the earliest date when a Plaintiff (Katie) purchased a Class Vehicle. (*Id.* ¶ 286.) Although Defendants claim they did not "know" about this problem until mid–2021, they conflate *public recognition* with *actual knowledge*. (Dkt. # 20 at 32–33.) Indeed, this is not the first time they buried safety concerns. (*See* n.5, *supra*.)

Thus, Plaintiffs' concealment allegations satisfy Rule 9(b). Given the safety risks associated with the Defect, it was also material to Plaintiffs' decision, thus giving rise to a duty to disclose it. (*See* § II(B)(1), *supra*; FAC, ¶¶ 282–92, 323–27, 360–63, 393–97, 426–30.) Defendants' lack of direct interaction is irrelevant because fraud can be established through intermediaries. *See Pagoudis v. Keidl*, 2021 WI App 56, ¶ 27, 399 Wis. 2d 75, 963 N.W.2d 803 (citing Restatement (Second) Torts § 533). Their concealment of the Defect thus amounts to knowingly false representations, which induced Plaintiffs. (FAC, ¶¶ 606–45.) Defendants concealed the Defect, intending to defraud, and accomplished this result, thereby causing pecuniary harm. (*Id.* ¶¶ 631–48.)

### C.   Plaintiffs' False Advertising Claim Against All Defendants Is Cognizable.

#### 1.   Defendants Made Actionable, Deceptive Statements—Not Just Omissions.

Wis. Stat. § 100.18 prohibits false, deceptive, *or* misleading advertisements. *Uebelacker v. Paula Allen Hldgs., Inc.*, 464 F. Supp. 2d 791, 804 (W.D. Wis. 2006) (defining each term). Omissions are not actionable, but "a nondisclosure of facts, combined with an affirmative representation that

---

[13] These ways include: (i) alternative design specifications used by competitors; (ii) the design mandates in other countries where Defendants or their affiliates sell their cars; (iii) Defendants' petitions for an exemption from the PMR, which acknowledge superior designs; (iii) NCIC data; (iv) NICB's annual Hot Wheels Reports; (v) Defendants' increased provision of replacement parts for their stolen vehicles; (vi) early reports of the crisis unfolding here; and (vii) the same problem unfolding elsewhere. (FAC, ¶¶ 98–156, 165–170, 193–239, 745–50, Exs. H–I, & L–S.)

is undermined by the non–disclosed facts" establishes liability under § 100.18. *Murillo*, 197 F. Supp. 3d at 1127 (quoting *Christensen v. TDS Metrocom LLC*, 2009 WI App 21, ¶ 11 n.4, 316 Wis. 2d 356, 763 N.W.2d 248). Thus, "concealment–related" averments are relevant to the analysis and do not prevent Plaintiffs from "bringing misrepresentation–based claims." *In re GM LLC Ignition Switch Litig.*, ("*GM Ignition*"), 257 F. Supp. 3d 372, 456–57 (S.D.N.Y. 2017) (construing § 100.18 claim).

Here, Defendants led Plaintiffs "to believe that Defendants place[d] an emphasis on their customers' safety through well–designed vehicles equipped with advanced technological features and backed up by an unparalleled product warranty." (FAC, ¶ 657; *id.* ¶¶ 320–24, 351–62, 382–96, 421–28, Exs. E-G.) NHTSA advised the industry to take steps to improve the safety of their vehicles twenty-five years ago. (*Id.* ¶¶ 110–13, 127–29 & Ex. H). But Defendants: (i) redesigned the Class Vehicles *fifteen years later* and ignored this advice, (Facts, § F); (ii) touted the benefits of one measure (an immobilizer), but only made it standard on high–end models, (*compare* FAC, ¶¶ 107–26 *with id.* ¶¶ 191–211 & Exs. L–N, Q); (iii) installed immobilizers in other countries that required them, (*id.* ¶¶ 114, 194); and yet (iv) advertised its "push–button" vehicles with this safety measure as a perk like a sunroof. (Facts, § G, *supra*.) Thus, Defendants' advertising–when juxtaposed against what they knew but concealed–caused Plaintiffs to believe something other than what is true. *Uebelacker*, *supra*.

### 2.    Defendants' Deceptive Statements Are Not Puffery.

"Puffery" is an exaggeration about a product's quality, "the truth or falsity of which cannot be precisely determined." *Tietsworth v. Harley–Davidson, Inc.*, 2004 WI 32, ¶ 41, 270 Wis.2d 146, 677 N.W.2d 233. "'Commercial puffs' are excluded from the ambit of the WDTPA because 'they are not capable of being substantiated or refuted.'" *Loeb v. Champion Petfoods USA Inc.*, No. 18–CV–494, 2018 WL 2745254, at *6 (E.D. Wis. June 7, 2018) (citing *Tietsworth*, *supra* ¶ 44). Context matters:

statements are not analyzed in a vacuum. *F.T.C. v. Trudeau*, 579 F.3d 754, 766 (7th Cir. 2009). As this is typically "a question of fact[,]" *United Concrete & Const. v. Red–D–Mix Concrete, Inc.*, 2013 WI 72, ¶ 37, 349 Wis. 2d 587, 836 N.W.2d 807, courts "decline [a defendant's] invitation to parse the minutiae of its marketing statements or accept factual arguments in a motion to dismiss." *Weaver v. Champion Petfoods USA Inc.*, No. 18–CV–1996, 2019 WL 2774139, at *4 (E.D. Wis. July 1, 2019).

Like any advertising, touting safety may be "puffery" in the abstract, but it gets more scrutiny. Indeed, "such marketing can 'cross the line from mere puffery to active misrepresentations' when statements about safety *are read next to allegations that an automotive manufacturer had actual knowledge of the alleged safety defect*." *In re Takata Airbag Prod. Liab. Litig.* ("*Takata*"), 462 F. Supp. 3d 1304, 1318 (S.D. Fla. 2020) (emphasis added) (quoting GM *Ignition*, 257 F. Supp. 3d at 457–58). In GM *Ignition*, for example, the following statements, when read "in conjunction with other allegations" showing GM knew of the defect, were actionable under § 100.18 because they could be objectively measured:

> (1) the vehicles had "world class engineering" and "advanced safety and security features," making them "some of the safest vehicles on earth[;]" (2) GM's "above-and-beyond commitment to provide continuous occupant protection before, during, and after a crash," and its use of "the world's most sophisticated safety technology[;]" and (3) GM's promise that "passenger safety is a primary consideration throughout the engineering process," even the "top priority."

*Id.* at 457.[14]  The same was true in *Takata*, where the court held the following statements were not puffery when construed with allegations that the defendant knew of a safety defect:

> (1) touted their vehicles' standard and optional airbags; (2) asserted that they put safety at the top of their list; (3) promised passive safety features to help protect

---

[14] *Accord Bietsch v. Sergeant's Pet Care Prod., Inc.*, No. 15 C 5432, 2016 WL 1011512, at *4 (N.D. Ill. Mar. 15, 2016) ("[W]hile certain statements that a product is 'safe' may constitute puffery, it is an actionable deceptive practice to mislead consumers into believing a product is safe for a particular use when it is not."); *In re Toyota Motor Corp.*, No. 8:10ML 02151 JVS (FMOx), 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012) ("Advertising a car as safe and reliable when it actually has a safety–related defect . . . is not 'within the tolerable range of commercial puffery'").

consumers (including airbag options); and (4) promoted certain vehicles as receiving an Insurance Institute for Highway Safety "top safety pick."

462 F. Supp. 3d at 1318.

Here, the FAC alleges that Defendants knowingly disregarded the safety risk they created for years. (*See* Facts, §§ A, E, & F, n.13, *supra*.) Yet at each turn, they touted the Class Vehicles as safe, technologically advanced, and packed with features. (Facts, §§ C & G; FAC, Exs. E & G.) Far from being "squishy," these statements are objectively and measurably false. Defendants even admit they deceptively marketed the "push button" as a convenience perk. (Facts, § G.) They must keep "detailed evidence of the validity and accuracy" of their ads, *see* TRANS § 139.03(2)(a), so discovery will establish their deceptiveness. Resolution on the pleadings is therefore improper.

### 3.    Plaintiffs' Allegations Satisfy Rule 9(b).

Plaintiffs' § 100.18 claim meets Rule 9(b). (*See* Legal Standard.) They allege: (i) Defendants ("<u>who</u>") engaged in false advertising by touting the safety and reliability of their vehicles while failing to outfit them with basic measures, which has culminated in the auto theft spree of which Plaintiffs were victims ("<u>what</u>"), (FAC, ¶ 657 & ¶¶ 320–24, 351–62, 382–96, 421–28, & Exs. E–G); (ii) when they purchased/leased their vehicles, which is when they were exposed to the deceptive ads ("<u>when</u>"), (*id.* ¶¶ 315, 349, 384, 424); (iii) the dealership that provided these materials and the other places they saw them ("<u>where</u>"), (*id.* ¶¶ 320–22, 356–59, 380–82, 418–23); (iv) the "substantial similarity" of other ads for other vehicles with the same Defect (more "<u>what</u>"), (Exs. E & G), *see Vizio*, 238 F. Supp. 3d at 1229 (holding that plaintiffs' allegations satisfied 9(b) and met the substantially similarity test); and finally, (v) Defendants' knowledge of the Defect, the growing problem occurring elsewhere, and how Defendants' deceptive ads misled them, ("<u>how</u>") (FAC, ¶¶ 191–243, 317–27, 351–63, 380–97, 421–29.) Defendants even concede as much. (*See* Facts, § G, *supra*.)

**D.      Plaintiffs' Unfair Marketing Claim Against Kia and Hyundai Is Cognizable.**

Defendants seek dismissal of Plaintiffs' unfair marketing claim by advancing a myopic reading of Wis. Admin. Code ATCP §§ 127.01 *et seq.* ("ATCP 127"). (Dkt. # 20 at 26–27.) Wis. Stat. § 100.20 is an "enabling statute" to remedy "unfair trade practices in business." *Snyder v. Badgerland Mobile Homes, Inc.*, 2003 WI App 49, ¶ 19, 260 Wis. 2d 770, 659 N.W.2d 887. The unfair trade practices are codified in various regulations, including ATCP 127, which regulates marketing. They are "liberally construed" given their remedial aim. *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, ¶ 21, 308 Wis. 2d 103, 746 N.W.2d 762.

Defendants attempt to insulate themselves from ATCP 127's expansive definition of "seller," which includes one "*engaged in the business of selling,* offering to sell, or *promoting the sale of consumer goods or services to consumers.*" ATCP § 127.01(21) (emphasis added).[15] The definition also provides examples, including "agent[s]" of the seller or those who "make solicitation[s] under an arrangement with a seller." *Id.* §§ 127.01(21)(b)–(c). Thus, Defendants and their dealers fall within this definition. (*See* Facts, § D, *supra.*) A "solicitation" is then defined as "*a communication* received by a consumer *at a place other than the seller's regular place of business*, in which a seller *offers or promotes the sale of consumer goods* or services *to a consumer.*" *Id.* § 127.01(22) (emphasis added). A "face-to-face solicitation" is a "solicitation" that a seller makes in a face-to-face encounter. *Id.* § 127.60(1).

True, a "solicitation" excludes a "mass advertisement," *id.* § 127.01(22)(a)—which cannot form the basis of a violation—but the point remains that Defendants solicit the sale of Class Vehicles through their dealers, who promote the sale of them at *a place other than Defendants' corporate offices in California.* The fact that consumers visit websites or are exposed to "mass advertisement[s]" does

---

[15] Plaintiffs are "consumers" and the Class Vehicles are "consumer goods." ATCP § 127.01(2)–(3).

23

not mean that Defendants—with the assistance of their dealers—are not soliciting the sale of Class Vehicles in these face-to-face encounters. *See* Note to ATCP § 127.01(22) ("A 'solicitation' under sub. (22) is covered by this rule even though it is not the first communication between the seller and the consumer.") As such, Defendants were required to "disclose" material information related to the sale, (*see* FAC, ¶¶ 676–78, 685–87 (citing ATCP §§ 127.64(1)(c) & 127.72(4)–(7), (15)), which they did not do, thus giving rise to the claim.

> **E.**    **Plaintiffs' Statutory Product Liability Claim Against All Defendants Is Cognizable.**

> **1.**    **The ELD Does Not Apply To Statutory Claims.**

Defendants claim that Plaintiffs' § 895.047 claim is "*essentially* [a claim] for strict products liability" that is barred by the ELD, but this "fails for the simple reason that the Wisconsin Supreme Court has held that the judicially created [ELD] does not apply to statutory claims." *Am. Ortho. Corp. v. Epicor Software Corp.*, 746 F. Supp. 2d 996, 998–99 (E.D. Wis. 2010).[16] "Statutory claims are distinct from common law claims[,]" *Est. of Miller v. Storey*, 2017 WI 99, ¶ 39, 378 Wis. 2d 358, 903 N.W.2d 759, and § 895.047's enactment "altered the way in which a plaintiff must prove a strict products liability claim." *R.S.B. v. Merck & Co.*, No. 20-C-1402, 2021 WL 1842280, at *3 (E.D. Wis. May 7, 2021). Just as §§ 895.446 and 943.20(1)(d) render actionable "the tort of fraud in the inducement[,]" *Pagoudis*, 2021 WI App 56, ¶ 29–a viable claim despite the ELD, *see Ferris*, n.16, *supra*–Plaintiffs' § 895.047 claim, which codified aspects of strict liability law, is also viable.

---

[16] *Accord Piano Gallery Mad., LLC v. Create Music, LLC*, No. 17-CV-713-JDP, 2018 WL 734430, at *2 (W.D. Wis. Feb. 6, 2018) ("Wisconsin courts have consistently held that the [ELD] does not bar statutory claims"); *Stuart*, 2008 WI 22, ¶ 33 & n.12 (holding that "the ELD cannot apply to statutory claims" and "[t]he ELD does not bar statutory claims"); *Ferris v. Location 3 Corp.*, 2011 WI App 134, ¶ 12, 337 Wis. 2d 155, 804 N.W.2d 822.

2.      Even If The ELD Was Implicated, The "Other Property" And "Public
        Safety" Exceptions Apply.

        a.      The "Other Property" Exception Applies

The ELD's "other property" exception permits tort recovery for damages to property other

than the product itself. *Foremost Farms USA Co–op. v. Perf. Process, Inc.*, 2006 WI App 246, ¶ 13, 297

Wis. 2d 724, 726 N.W.2d 289. Courts assess this exception under a "disappointed expectations"

test, which focuses on whether a "reasonable purchaser" could have foreseen the risk to "obtain[ ]

protection in the contract" for it. *Id.* ¶ 19. This is not an easy line to draw, and a court must be

mindful to "prevent tort from drowning in a sea of contract." *Grams v. Milk Prods., Inc.*, 2005 WI

112, ¶ 54, 283 Wis. 2d 511, 699 N.W.2d 167.

In here, Amy had personal property stolen in connection with the theft of her 2020 Kia

Sportage; her car was recovered, but these items were not. (FAC, ¶ 408.) Likewise, Plaintiffs face

increased premiums that flow from not only having their vehicles stolen, but from living in a

community afflicted by an auto theft epidemic caused by the sheer number of Class Vehicles being

stolen. (FAC, ¶¶ 179, 207, 263, 314, 326, 362, 393, 409, 428, 732.) Because an insurance policy is

"property" under the law, *see Bersch v. Van Kleeck*, 112 Wis. 2d 594, 596–97, 334 N.W.2d 114 (1983),

these damages are also harm to "other property." Nor are they mere "disappointed expectations."

In a vacuum, a "reasonable consumer" can foresee the possibility that his or her car could

get broken into—maybe even stolen—but Plaintiffs could not have "bargained for" this protection in

their adhesion contracts; Defendants attempted to disclaim it. Further, *thousands of reasonable

consumers* do not contemplate that despite buying/leasing new vehicles, billed as having the latest

features designed to keep them safe, they were not equipped with decades–old technology that would

have prevented the harm they all suffered. Indeed, Lydia and Chaid had their 2020 and 2019 Class

Vehicles stolen *multiple times* in a matter of weeks. (FAC, ¶¶ 331–39, 435–46.)  It's a function of degree and the magnitude of this problem cannot be ignored. *See Indus. Risk Insurers v. Am. Eng'g Testing, Inc.*, 2009 WI App 62, ¶¶ 31–43, 318 Wis. 2d 148, 769 N.W.2d 82 (defective product which caused fire within first three weeks of purchase was not within consumer's reasonable expectations).

### b. The "Public Safety" Exception Applies

Wisconsin also has "a narrow public safety exception to the [ELD]." *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 41, 262 Wis. 2d 32, 662 N.W.2d 652 (citing *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 471 N.W.2d 179 (1991)). It was created to address "special public safety concerns" like those "involving contamination by inherently hazardous substances like asbestos." *Wausau Tile, Inc. v. Cty. Concrete Corp.*, 226 Wis. 2d 235, 264, 593 N.W.2d 445 (1999) (citing *Northridge*, *supra* at 937–38). *Northridge* is a rare bird, but public policy weighs resoundingly in favor of tort principles here. *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 405, 573 N.W.2d 842 (1998) ("It is society's interest in human life, health, and safety that demands protection against defective products, and imposes a duty upon manufacturers of those products.").

An entire city is grappling with a crisis rooted in Defendants' failure to outfit the Class Vehicles with basic technology–around for decades, required in other locales, and pervasively used by the industry–that could have prevented it. The societal impacts are not limited to Kia and Hyundai owners. Cars are stolen to recklessly joyride around the city, or as instrumentalities in other crime, thereby exposing the community at large to risk. (*See* FAC, ¶¶ 180–85, 265–82). Indeed, the city itself is mulling a suit, which explains the unique, wide–spread nature of this problem.[17] True,

---

[17]   Nick Bohr, "Milwaukee considers suing 2 automakers over stolen cars," WISN 12 ABC, https://www.wisn.com/article/milwaukee-considers-suing-two-automakers-over-stolen-cars/38444595.

those physically injured will have the ability to seek redress, but that does little to holistically solve the problem and prevent harm in the first instance. Thus, unless *Northridge* is dead letter, the public safety exception applies to this unique case.

### 3. HATCI Falls Within The Scope of Wis. Stat. § 895.047.

Wis. Stat. § 895.047 holds manufacturers liable for damages flowing from their defective products. *Id.* § 895.047(1)(a). HATCI claims it is not a manufacturer; ergo, it cannot be liable. (Dkt. # 22 at 6–7.) But the term is not defined and this argument ignores HATCI's role as Kia and Hyundai's agent—as well as for KMC/HMC—to design the Class Vehicles. (*See* Barton Decl. ¶ 3 Ex. 2 at 1 (stating that "HATCI is an authorized representative of both [HMC] and [KMC]"); *id.* ¶¶ 4–5 Exs. 3–4.) In fact, NHTSA compared HATCI's relationship with HMC/KMC to that of an attorney and its clients. (*Id.* ¶ 2 Ex. 1 at 2.) An agent is a substitute for its principal, *In re G'ship of Muriel K.*, 2002 WI 27, ¶ 25, 251 Wis. 2d 10, 640 N.W.2d 773, and is liable for its own torts. *Stuart*, 2008 WI 22, ¶ 42. Here, HATCI is the joint-design center responsible for designing the Class Vehicles. (FAC, ¶¶ 47–51, 231.) Because HATCI serves as agent for Kia/KMC and Hyundai/HMC, it stands in their shoes, (Facts, § B, *supra*), and is liable for violating Wis. Stat. § 895.047.

## III. PLAINTIFFS HAVE VIABLE EXPRESS AND IMPLIED WARRANTY CLAIMS.

### A. Warranty Plaintiffs' Implied Warranty Claim Against Kia/Hyundai Is Cognizable.

#### 1. The Class Vehicles Are Not Merchantable.

A vehicle is not "merchantable" if it fails to "provide safe, reliable transportation." *Mross*, 2016 WL 4497300, at *6 (citing *Taterka v. Ford Motor Co.*, 86 Wis. 2d 140, 146, 271 N.W.2d 653 (1978)); *Sloan v. GM LLC*, 287 F. Supp. 3d 840, 879 (N.D. Cal. 2018) (rejecting claim that a vehicle is merchantable if "it continues to provide transportation, irrespective of safety concerns"); *Schechter*

*v. Hyundai Motor Am.*, No. CV 18–13634 (FLW), 2019 WL 3416902, at *14 (D.N.J. July 29, 2019) (merchantability "requires more than the mere capability of just getting from point A to point B").

Here, Defendants draw an artificial distinction between "safety" and "security" to contend that the Class Vehicles are "merchantable" despite how easily they can be stolen. Yet fifty years ago, NHTSA rejected this very claim when it promulgated *Safety Standard 114* to mandate antitheft devices given the profound safety risk that auto theft creates. (*See* Facts, § A, *supra*.) Thus, a defect that impairs a vehicle's security presents a safety risk and gives rise to an implied warranty claim. *See Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 976–77 (N.D. Cal. 2018) (stating an implied warranty claim when a vehicle's door defect "cause[d] basic functions like locking of the doors to fail, with possibly safety-related consequences such as . . . *vulnerability to intruders*") (emphasis added).

### 2.    Kia And Hyundai's Pass–Through Warranties Create Privity.

Wisconsin "requires privity of contract between the parties before liability can be founded on breach of express or implied warranty." *St. Paul Mercury Ins. Co. v. The Viking Corp.* ("*Viking*"), 539 F.3d 623, 626 (7th Cir. 2008). "Privity is nothing more than the relationship between parties to a contract and follows from the fact that a contract exists." *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.* ("*Sunnyslope*"), 148 Wis. 2d 910, 916, 437 N.W.2d 213 (1989); *Wrenshall State Bank v. Shutt*, 202 Wis. 281, 232 N.W. 530 (1930) ("The term 'privity,' used with respect to [a] contract, implies a connection, mutuality of will, and interaction of parties.").

In *Sunnyslope*, the court first applied the ELD to bar a purchaser from suing a manufacturer in tort to evade the limited remedies in the manufacturer's express, pass–through warranty. 148 Wis. 2d at 921. Although the plaintiff bought the product from a distributor, the *manufacturer and plaintiff were in privity* because of the warranty, which limited the plaintiff's recourse to the remedies in the

warranty. *Id.* at 916. ("*Since this warranty created privity between [the parties], the limitations of the warranty were available.*") (emphasis added); Wis. Stat. § 402.313(1)(a) (defining express warranty). These "limitations of the warranty" included a disclaimer of implied warranties. *Sunnyslope, supra* at 913 n.2; Wis. Stat. § 402.314 (an implied warranty exists "[u]nless excluded or modified").

Privity was never in doubt—there was a "connection" between the parties, *Shutt, supra*—but the plaintiff, unable to bring an implied warranty claim and stuck with the express warranty's other limitations, tried to sue in tort. Hence, the advent of the ELD. Both before and after *Sunnyslope*, courts have reiterated that the privity requirement typically turns on the existence of either a direct sale <u>or</u> a pass–through warranty. *Compare Midwhey Powder Co., Inc. v. Clayton Indus.*, 157 Wis. 2d 585, 588 & n.1, 460 N.W. 2d 426 (Ct. App. 1990) (citing *Sunnyslope* to find privity) *with Viking*, 539 F.3d at 626 (finding no privity where, *inter alia*, the "*express warranty was explicitly limited to the original purchaser*") (emphasis added). In fact, the very case defining the auto merchantability standard for implied warranties, *Taterka*, dealt with a pass–through warranty. 86 Wis. 2d at 142–43.

As in *Sunnyslope*, Kia and Hyundai offer express, pass–through warranties and concede that "privity" exists on an express warranty claim. (Dkt. # 20 at 15.) But unlike *Sunnyslope*, automobiles are consumer products under the Magnuson Moss Warranty Act ("MMWA"), *Mayberry v. Volkswagen of Am., Inc.*, 2005 WI 13, ¶ 16, 278 Wis. 2d 39, 692 N.W.2d 226, which prevents the disclaimer of implied warranties if an express warranty is offered. 15 U.S.C. § 2308. The existence of an implied warranty still turns on state law, but WIDOT codified regulations to echo the MMWA:

> <u>No implied warranty of merchantability</u> or fitness <u>shall be excluded in the sale of a motor vehicle unless</u> the sale is explicitly negotiated between the purchaser and dealer licensee on an "AS IS–NO WARRANTY" basis <u>***and***</u> is in <u>***conformity with s. Trans 139.04(6)(a)5***</u>. <u>***No implied warranty of merchantability or fitness shall be modified or limited***</u>, except that implied warranties may be limited to the duration of a written limited warranty of reasonable duration.

29

Wis. Admin. Code TRANS § 139.06(3) (emphasis added).

Kia and Hyundai are "manufacturer" "licensees" under Chapter 139, *id.* §§ 139.02(8)–(9), which contemplates their involvement in the "sale" (including leases, *id.* § 139.02(18)) of these vehicles. *See id.* § 139.06(1) ("If *a sale of a motor vehicle by a licensee* is made subject to a warranty," it shall contain the information in subs. (a)–(g)) (emphasis added). Further, the only time an implied warranty can be "excluded in the sale of a motor vehicle" is if: (i) it is sold "AS-IS[;]" *and* (ii) complies with TRANS § 139.04(6)(a)(5), *id.* § 139.06(3), a section addressing "*used motor vehicle[s]* displayed or offered for sale by a dealer." *Id.* § 139.04(6)(a).

The FAC explains that Defendants' dealers sell and lease new cars without any warranties; instead, they offer Kia and Hyundai's respective pass-through warranties. (FAC, ¶ 62.) And because implied warranties cannot be "excluded" per TRANS § 139.06(3), the implied warranty necessarily runs along with the Defendants' express warranties because there is privity. Defendants' reliance on two cases misconstruing *Sunnyslope* and not addressing these regulations is of no help to them. (Dkt. # 20 at 12–13 (citing *Lamont v. Winnebago Indus., Inc.*, 569 F. Supp. 2d 806, 815 (E.D. Wis. 2008) and *T&M Farms v. CNH Indus. Am., LLC* ("*T&M II*"), 488 F. Supp. 3d 756, 764 (E.D. Wis. 2020).)

*T&M II* did not involve products subject to foregoing provisions, did not address the agency or third-party beneficiary exceptions to the privity requirement (discussed *infra*), and, relevant here, made a fundamental error in the first decision. *See T&M Farms v. CNH Indus. America LLC* ("*T&M I*"), No. 19-C-0085, 2020 WL 1082768 (E.D. Wis. Mar. 5, 2020). There, the defendant raised a privity defense on its *used* products only, but for *new* products, it claimed they were subject to a pass-through warranty with an implied warranty disclaimer—just like *Sunnyslope*. *Id.* at *4. But the farmers claimed they never received the warranty, so the court declined to consider it. *Id.* That's when the

30

court took a wrong turn: it cited to *Sunnyslope* and *Lamont* to assert that the only claim the farmers "can pursue against a non–seller manufacturer of goods is a claim for breach of the manufacturer's express warranty." *Id.* at *5. Thus, even though the defendant "concede[d]" that privity might exist, *id.*, the court invited it to re-raise the defense, *id.* n.3, which it did when the plaintiffs amended the complaint, prompting the court to dismiss the claim. *T&M II*, *supra* at 764.

*T&M I* relied on *Lamont*, which made a similar misstep. 569 F. Supp. 2d at 815–16. It cited *Sunnyslope* to reject a manufacturer's argument that a plaintiff had no express warranty claim despite its pass–through warranty but said that whether an "implied warranty can arise in the absence of a contract is less clear." *Id.* at 815. *Lamont* then noted that plaintiffs "point[ed] to no other Wisconsin statute that creates by implication" an implied warranty and ultimately held there was none, citing *Dippel v. Sciano*, 37 Wis. 2d 443, 452–58, 155 N.W. 55 (1967), *Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 582 F. Supp. 208, 215 (E.D. Wis. 1984), and *Paulson v. Olson Implement Co., Inc.*, 107 Wis. 2d 510, 319 N.W.2d 855 (1982). Of course, *Lamont* never addressed TRANS § 139.06(3), but the cases it cited undercut that conclusion—not support it.

Again, *Sunnyslope* never held that the plaintiff lacked privity to assert an implied warranty claim; it *just had no implied warranty claim because the express warranty disclaimed it*. Likewise, *Paulson*, *supra*, had "*no difficulty, in law or equity, in finding privity*" between plaintiffs and a manufacturer when they bought the product through a distributor because "[t]he sales contract [between distributor and plaintiffs] *furnished the underlying consideration for the warranty contract* between [manufacturer] and the plaintiffs." *Id.* at 517 (emphasis added). In *Twin Disc*, the court held no privity existed *because* there was a contract at all between the parties. 582 F. Supp. at 215. And in *Dippel*, the court held that an invitee could sue a manufacturer in strict liability for personal injuries sustained at a bar when a

31

pool table collapsed on his foot. 37 Wis. 2d at 459. Notably, *Dippel* traced the doctrine's roots, cited to many Wisconsin cases, and *none of them* addressed privity in a pass–through warranty context.[18]

Accordingly, if a seller's express warranty creates privity to become part of the bargain, Wis. Stat. § 402.313(1)(a), it carries an implied warranty unless disclaimed. Wis. Stat. § 402.314. Because the MVDL regulations prevent disclaimer, however, the implied warranty stands. *T&M/Lamont* embraced two classes of "privity" despite Chapter 402's usage of the same terms and no Wisconsin authority recognizing this distinction. Nor is this conclusion consistent with other U.C.C. provisions stating that: (i) "[a] party may perform that party's duty through a delegate" (like a dealer), Wis. Stat. § 402.210(1); (ii) it "shall be liberally construed and applied to promote its underlying purposes and policies[,]" *id.* § 401.102(1)); and (iii) nothing "impair[s] or repeal[s] any statute regulating sales to consumers." *Id.* § 402.102. *T&M/Lamont's* holdings were wrong and did not address the MVDL or its regulations in any event.

### 3.    Even If Privity Is Lacking, Applicable Exceptions Exist.

Even assuming the law is in flux, however, a "persuasive consensus of courts has emerged to recognize the [third–party beneficiary and agency] exceptions" to the privity requirement when cars are bought through authorized dealers *Opheim v. Aktiengesellschaft*, No. CV2002483KMESK, 2021 WL 2621689, at *9 (D.N.J. June 25, 2021) (collecting cases); (FAC, ¶ 523 (collecting cases)). Wisconsin has recognized these exceptions, which apply here.

---

[18] *See Prinsen v. Russos*, 194 Wis. 142, 215 N.W. 905 (1927) (no pass–through warranty where customer sued restaurant after becoming ill from contaminated food); *Kennedy–Ingalls Corp. v. Meissner*, 5 Wis. 2d 100, 92 N.W.2d 247 (1958) (same where employer sought recovery of medical expenses paid for employee injured by manufacturer's defective product); *Smith v. Atco Co.*, 6 Wis. 2d 371, 94 N.W.2d 697 (1959) (same where mink farmer sued manufacturer of wood preservative); *Strahlendorf v. Walgreen Co.*, 16 Wis. 2d 421, 114 N.W.2d 823 (1962) (same where defendant's toy airplane sold to plaintiff caused injuries).

32

**Agency:** An "agent is a substitute for the principal[;]" one who "'acts for,' 'in the place of,' and 'instead of' the principal." *In re G'ship of Muriel K.*, 2002 WI 27, ¶ 25. "Whether an independent contractor is an agent is a fact-specific inquiry." *Westmas v. Creekside Tree Serv., Inc.*, 2018 WI 12, ¶ 36, 379 Wis. 2d 471, 907 N.W.2d 68; *Kohl v. F. J. A. Christiansen Roofing Co.*, 95 Wis. 2d 27, 40, 289 N.W.2d 329 (Ct. App. 1980) (reversing dismissal of implied warranty claim based on fact questions). Here, Defendants sell their vehicles to consumers, but only through dealers. (FAC, ¶¶ 52–57.) They exercise control over the dealers' business, furnish them with marketing materials, and provide pass-through warranties to the end-user. (*Id.* ¶¶ 58–62.) Dealers make little money on the sale of these vehicles, (*id.* ¶¶ 65–71), the MVDL grants them indemnity, and the Safety Act requires Defendants to repair/replace defective vehicles pre-sale. (*Id.* ¶¶ 63–64.) The FAC alleges an agency relationship and this inquiry is bound up in the facts, meaning that dismissal is improper at this stage.

**Third-Party Beneficiary:** A third party can enforce a contract between two signatories if it is an intended beneficiary. *Sussex T. & S., Inc. v. Mainline S. & W., Inc.*, 231 Wis. 2d 404, 409, 605 N.W.2d 620 (Ct. App. 1999). Defendants' dealership agreements are for the sale of goods, *Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir. 1995), and their purpose is to create a conduit through which Defendants sell their vehicles to the end-user. (FAC, ¶¶ 52–71.) But unlike a normal Article 2 case, the parties' obligations are augmented by the Safety Act, the MVDL, and its regulations, such that dealers have no need for warranties. (*Id.* ¶¶ 62–63.) Express warranties are given to consumers and the implied warranties flow with it. *See* TRANS § 139.06. Thus, as noted above, Plaintiffs have alleged facts to establish that they are third-party beneficiaries.

**MMWA:** Finally, no sound principle justifies a privity requirement for consumer products when the ELD was extended to consumer transactions on the notion that warranty law provides

33

protection. The MMWA was enacted "in response to a swell of consumer complaints regarding the inadequacy of warranties to protect consumers' interests[,]" *Rust–Oleum*, 155 F. Supp. 3d at 810, and limits suppliers from disclaiming implied warranties when they offer express warranties. 15 U.S.C. § 2308. The disparity in bargaining power is undeniable, *Northridge*, 162 Wis. 2d at 934 n.11, and WIDOT codified regulations to extend consumers the benefit of an implied warranty.

This Court's charge "is to determine how the state's highest court would rule" on this issue, *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011), which the Wisconsin Supreme Court has never done. Logic and fundamental fairness dictate that unless it intends to harken back to the Industrial Revolution, *see Dippel*, *supra* at 450, the implied warranty claims are viable. Any other result grants a seller free license to do what Defendants are doing here: flood the market with dangerous products, perry off suits for personal injuries, invoke the ELD to bar torts claims on the rest, and weaponize a sales model using a distributor—coupled with an unsupported notion of strict privity and a narrowly crafted express warranty—to place the ultimate loss for their malfeasance on the public.

**B.      Warranty Plaintiffs' Express Warranty Claim Against Kia/Hyundai Is Cognizable.**

**1.      Defendants' Conflicting Warranty Disclaimers Are Inapplicable.**

Defendants' claim that because their express warranties disclaim damages from theft, they did not breach them. (Dkt. # 20 at 15–18.) They focus on exclusions in both warranties yet overlook other clauses that conflict with each disclaimer. Kia's warranty states that the "*latest engineering techniques have been incorporated into the design and production*" of its vehicles, (FAC, ¶ 245 (quoting Ex. D at 3)), and Hyundai's warranty states that its vehicles are manufactured according to "*United States–specifications.*" (*Id.* ¶ 256 (quoting Ex. F at 17).) These statements create express warranties that the Class Vehicles conform to what they promise. Wis. Stat. § 402.313(1)(a)–(b). But the Class Vehicles

lack "*the latest engineering techniques*" and do not satisfy FMVSS 114. (FAC, ¶ 133–56.) The theft disclaimer is thus void; Defendants cannot warrant something and take it away with a conflicting disclaimer. Wis. Stat. § 402.316(1). As such, Plaintiffs have a viable breach of express warranty claim.

## 2.     The Express Warranty Disclaimers Are Unconscionable.

"A contract is unconscionable when no decent, fair–minded person would view the result of its enforcement without being possessed of a profound sense of injustice." *Foursquare Prop. Joint Venture I v. Johnny's Loaf & Stein*, 116 Wis. 2d 679, 681, 343 N.W.2d 126 (Ct. App. 1983). Whether a clause is unconscionable is question of law, but a party "shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." Wis. Stat. § 402.302. This typically requires an evidentiary hearing. *Wis. Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 40, 290 Wis. 2d 514, 714 N.W.2d 155. Unconscionability has "procedural" and "substantive" prongs; the analysis looks for a "quantum" of both. *Id.* ¶ 33.

The procedural prong assesses if there was a "real and voluntary meeting of the minds." *Id.* There was none here. *First*, Defendants' warranties are adhesion contracts. *Id.* ¶ 52. *Second*, the disparity in bargaining power is established. *Northridge*, 162 Wis. 2d at 934 n.11. *Third*, Defendants' knowing failure to disclose the Defect supports this fact. Courts across the country agree, finding that "when a manufacturer is aware that its product is inherently defective and the buyer has no notice of, or ability to detect, the problem, 'there is *perforce* a substantial disparity in the parties' relative bargaining power.'" *WEL Co., Inc. v. Haldex Brake Prods.*, 467 F. Supp. 3d 545, 566 (S.D. Ohio 2020) (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989); *Bieda v. CNH Indus. America, LLC*, 518 F. Supp. 3d 863, 873 (W.D. Pa. 2021) (finding unconscionability "where prior to [buyer's] purchase, [seller] knew of a fundamental flaw in the [product's] hydraulic system

35

that would prevent it from operating as intended").[19] Plaintiffs alleged just that. The "quantum" of procedural unconscionability is therefore established.

The substantive prong assesses whether a clause is "unreasonably favorable to the more powerful party." *Jones*, 2006 WI 53, ¶ 36. This is also satisfied. First, the Class Vehicles fail to provide safe, reliable transportation. (*See* II(A)(1), *supra*.) Thus, even if the Court finds privity lacking, Defendants cannot rely on express warranties that disclaim what would be covered in an implied warranty given their knowledge of the Defect. *See WEL Co.*, *supra* ("A warranty disclaimer that leaves a party with a defective product and no avenue for recourse against the manufacturer, however, is unconscionable.") Indeed, "no decent, fair–minded person" can find it reasonable for Defendants to escape liability when they have known of the Defect for years. *Foursquare*, *supra*. Thus, Defendants' warranty disclaimers are substantively unconscionable, as are their durational limits when they redesigned the Class Vehicles *fifteen years after* NHTSA provided concrete advice on improving security and they rejected it wholesale. *See id.* & n.13, *supra*. (*See* Facts, §§ E–G, *supra*.)

### C.     Plaintiffs' MMWA Claim, Which Turns On State Law, Is Cognizable.

The viability of Plaintiffs' MMWA claims hinge on the viability of their warranty claims. Because these are plausibly alleged, (*see* § III(A)–(B), *supra*), the MMWA claims also survive.

## IV.    Plaintiffs' Remaining Claims Are Also Viable.

### A.     Amy's Contractual/Equitable Rescission Claim Is Cognizable.

Defendants contend that Amy's rescission claim fails because it is not a cause of action. (Dkt. # 20 at 24.) If it is, they argue that it does not meet Rule 9(b) and is barred by the ELD. (*Id.* at 24–

---

[19] *Accord Payne v. Fujifilm U.S.A., Inc.*, No. 07–385, 2007 WL 4591281, at *5 (D. N.J. Dec. 28, 2007); *Singh v. Lenovo Inc.*, 510 F. Supp. 3d 310, 322 (D. Md. 2021).

25.) Each contention fails. *First*, rescission is identified in Wis. Stat. § 402.608(2) and can also be pursued in equity. *See CMFG Life Ins. Co. v. RBS Sec., Inc.*, No. 12–cv–037, 2013 WL 4483068, at *4 (W.D. Wis. Aug. 9, 2013). Amy pled both. (FAC, ¶¶ 555–82.) *Second*, Amy alleged fraudulent concealment pursuant to Rule 9(b). (*See* II(B), *supra*.) Even so, rescission does not require a showing of fraud or intent. *CMFG*, *supra*. *Third*, the ELD does not apply if the remedy sought is rescission. *Teitsworth*, 2004 WI 32, ¶ 36. Thus, Amy and the Ongoing User Subclass' rescission claim is viable.

### B.   Plaintiffs Have A Viable Unjust Enrichment Claim Against All Defendants.

Defendants' request to dismiss the unjust enrichment claim ignores the law and the FAC's fraud averments. Defendants first claim that Plaintiffs cannot assert an unjust enrichment claim because their contracts were with third–party dealers. (Dkt. # 20 at 21.) But Defendants' relationship with their dealers are intertwined, as these purchase/lease contracts are entered into for Defendants' benefit, *see Puttkammer v. Minth*, 83 Wis. 2d 686, 692–93, 266 N.W.2d 361 (1971), which is what Plaintiffs alleged here. (FAC, ¶¶ 70, 586–93 (Kia/Hyundai); *id.* ¶ 594 (HATCI).)

Defendants' main argument rests on the "something for nothing" principle articulated in *T&M II*, 488 F. Supp. 3d at 769 and *Brame v. GM LLC*, 535 F. Supp. 3d 832, 843 (E.D. Wis. 2021), but this ignores the car payments many Plaintiffs made to Defendants' affiliates despite their vehicles being totaled, for which they received no benefit. (*Id.* ¶¶ 343, 376, 448.) Further, in *T&M II* and *Brame*, the plaintiffs' fraud–based claims were dismissed.[20] An unjust enrichment claim is viable if the contract voidable, *Le v. Kohls Dept. Stores, Inc.*, 160 F. Supp. 3d 1096, 1116–17 (E.D. Wis. 2016), which is what Plaintiffs alleged here. (FAC, ¶¶ 601–05 (All Defendants).)

---

[20] *See T&M I*, 2020 WL 1082768, at *12 (dismissing fraud claim); *Brame*, 535 F. Supp. 3d at 842 (same); *T&M II*, 488 F. Supp. 3d at 762–63 (dismissing § 100.18 claim).

37

### C.      Plaintiffs Have A Viable Failure To Warn Claim Against All Defendants.

Defendants concede that they owe a post-sale duty to warn in some cases but contend that: (i) they need not warn about theft, which is not a safety issue; (iii) they did not know about the problem; and (iii) HATCI cannot be liable because it was not a manufacturer. Each argument fails.

*First*, a post-sale duty to warn arises where Defendants know or reasonably should know of the risk of harm. *Bushmaker v. A.W. Chesterton Co.*, No. 09-CV-726, 2013 WL 11079371, at *7 (E.D. Wis. Mar. 1, 2013) (citing Restatement (Third) of Torts: Products Liability § 10 (1998)). The focus is on *increased risk* beyond what a user anticipates, so an "informed decision" about using the product can be made. *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1219-20 (11th Cir. 1999) (citing Restatement, *supra*) Further, any claim that "theft does not affect an occupant's personal safety" is bogus when there is a *Safety Standard* governing theft. (Facts, § A.) Easy-to-steal cars subject their owners to greater risk of falling victim to criminal activity. *See Peters,* 89 Wis. 2d at 123 (inadequate security subject's invitees to a greater risk of being victimized); (*see also* FAC, ¶¶ 276-78).

*Second*, Defendants conflate *formal recognition* of the crisis with *actual or constructive* knowledge of the Defect. *Bushmaker*, 2013 WL 11079371, at *3. What Defendants knew and when they knew it are fact questions. *Attoe v. State Farm Mut. Auto. Ins. Co.*, 36 Wis. 2d 539, 546, 153 N.W.2d 575 (1967). Their formal acknowledgement of the crisis hardly serves as reliable proxy for their actual knowledge of the Defect (*Compare* n.5 *with* n.13, *supra*.)

*Third*, HATCI's immunity argument ignores its agency relationship with Kia, Hyundai, and their parent-companies. (*See* § II(E)(3), *supra*.) Because an agent is liable for its own torts, HATCI's argument fails, especially when it designed the Class Vehicles containing the Defect at issue.

38

### D.    Plaintiffs' Declaratory Judgment Claim Is Cognizable.

Finally, Defendants argue that Plaintiffs' declaratory relief claim must be dismissed because it is duplicative and does not entitle Plaintiffs to a basis for relief. (Dkt. # 20 at 34.) They are wrong. *First*, declaratory relief is permissible where, as here, Defendants are engaging in an ongoing, deceptive scheme to sell the Class Vehicles. *Murillo*, 197 F. Supp. 3d at 1136 (citation omitted). *Second*, the Court is obligated to craft a remedy to leave otherwise blameless victims without a remedy. *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 182, 342 N.W.2d 37 (1984) (invoking "right to a remedy" clause to create "market share" theory of liability) (citing Wis. Const. Art. I, § 9).

This epidemic will rage on until this problem is fixed; the total number of auto thefts in January 2022 was on pace with last year.[21] People have been injured and killed (FAC, ¶¶ 274–78), and others have had their lives turned upside down. Take, for instance, a recent story about a woman whose 2021 Kia Forte has been stolen *five times in the last six months*. Her plea for help is illuminating:

> I'm not the one making all these mistakes and causing accidents. ***I'm the victim, but still, I'm being charged every which way.*** Everybody tells me (to get a new car), get rid of it, get rid of it, but it's a new lease. My credit already, ***it's not like you can turn around and say 'Oh, I don't like this one, I want a different one.'*** . . . I think I've said that more than anything. ***I don't know what to do.***

(*See* n.22 (emphasis added).) [22] True, this victim is covered by the Class and has remedies, which are being vindicated here. But what about the scores of victims who own a Class Vehicle with an expired warranty, yet lack the financial means to just "get rid of it"? Absent crafting a remedy under Wis.

---

[21] *See* Evan Casey & Bob Dohr, "Over 11,500 vehicles were stolen across the Milwaukee area in 2021. The trend doesn't seem to be stopping anytime soon," MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/communities/west/news/wauwatosa/2022/01/14/2021-record-setting-year-vehicle-thefts-in-around-milwaukee/9109596002/ (last updated Jan. 14, 2022, 8:10 PM).

[22] Caroline Reinwald, "Kia owner targeted 5+ times," WISN 12 ABC, https://www.wisn.com/article/kia-owner-targeted-5-times/39018110 (last updated Feb. 8, 2022, 11:15 PM).

Const. Art. I, § 9, they may face an "insurmountable obstacle." *Collins, supra* at 45. Accordingly, Plaintiffs' Declaratory Judgment Claim calls upon the Court to also craft a remedy for these people.

## V. PLAINTIFFS RESPECTFULLY REQUEST LEAVE TO AMEND THE FAC IF REQUIRED.

Plaintiffs have been diligent in researching their claims, presenting them to the Court, and maintain that the FAC is sufficiently pled. Should the Court require more detail, however, Plaintiffs respectfully request leave to amend pursuant to F. R. Civ. P 15(a)(2). *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss the Amended Complaint in their entirety, or alternatively, grant Plaintiffs leave to amend.

Dated this 28th day of February, 2022.

BARTON LEGAL S.C.

*/s/ Electronically Signed By James B. Barton*
James B. Barton
Email: *jbb@bartonlegalsc.com*
Joshua S. Greenberg
Email: *jsg@bartonlegalsc.com*
313 North Plankinton Ave., Ste. 207
Milwaukee, WI 53203
T: (414) 877–0690
F: (414) 877–3039

*Counsel for Plaintiffs, Stefanie Marvin,
Katherine Wargin, Chaid Przybelski,
Chad Just, Amy Flasch, Lydia Davis,
and the Proposed Class*

40