UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

IN RE:  KIA HYUNDAI        ) CERTIFIED TRANSCRIPT
VEHICLE THEFT MARKETING,   )
SALES PRACTICES, AND       )
PRODUCTS LIABILITY         )    SAML-22-03052-JVS
LITIGATION                 )
--------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

February 7, 2023

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiffs:

 3   STEVE W. BERMAN
     HAGENS BERMAN SOBOL SHAPIRO, LLP
 4   1301 Second Avenue, Suite 2000
     Seattle, WA 98101
 5   (206) 623-7292

 6   ELIZABETH A. FEGAN
     FEGAN SCOTT, LLC
 7   150 South Wacker Drive, 24th Floor
     Chicago, IL 60606
 8   (312) 741-1019

 9   KENNETH B. MCCLAIN
     HUMPHREY, FARRINGTON & MCCLAIN, PC
10   221 West Lexington, Suite 400
     Independence, MO 64051
11   (816) 836-5050

12

13   For the Defendants:

14   PETER J. BRENNAN
     JENNER & BLOCK, LLP
15   353 North Clark Street
     Chicago, IL 60654-3456
16   (312) 222-9350

17

18   ALSO PRESENT:

19   MASON BARNEY
     SIRI & GLIMSTAD, LLP
20   745 Fifth Ave, Suite 500
     New York, NY 10151
21   (212) 532-1091

22   JAMES B. BARTON
     BARTON LEGAL S.C.
23   313 N. Plankinton Ave., Suite 207
     Milwaukee, WI 53203
24   (414) 488-1822

25
```

1    GRETCHEN FREEMAN CAPPIO
     KELLER ROHRBACK, LLP
2    1201 Third Avenue, Suite 3200
     Seattle, WA 98101
3    (206) 623-1900

4    MATTHEW L. DAMERON
     WILLIAMS DIRKS DAMERON, LLC
5    1100 Main Street, Suite 2600
     Kansas City, MO 64105
6    (816) 945-7110

7    KAITLYN DENNIS
     GUSTAFSON GLUEK, PLLC
8    Canadian Pacific Plaza
     120 South Sixth Street, Suite 2600
9    Minneapolis, MN 55402
     (612) 333-8844
10
     DAVID B. FERNANDES, JR.
11   BARON & BUDD, PC
     Encino Plaza
12   15910 Ventura Boulevard, Suite 1600
     Encino, CA 91436
13   (818) 839-2333

14   SRIDAVI GANESAN
     ROME & ASSOCIATES
15   2029 Century Park East, Suite 450
     Los Angeles, CA 90067
16   (310) 282-0690

17   DAVID A. GOODWIN
     GUSTAFSON GLUEK, PLLC
18   Canadian Pacific Plaza
     120 South Sixth Street, Suite 2600
19   Minneapolis, MN 55402
     (612) 333-8844
20
     JEFFREY S. GOLDENBERG
21   GOLDENBERG SCHNEIDER, LPA
     4445 Lake Forest Drive, Suite 490
22   Cincinnati, OH 45242
     (513) 345-8291
23

24

25

```
 1   CHRIS D. HENDERSON
     MLG ATTORNEYS AT LAW
 2   600 Anton Boulevard, Suite 1240
     Costa Mesa, CA 92626
 3   (949) 581-6900

 4   MICHAEL RAM
     MORGAN & MORGAN
 5   711 Van Ness Avenue, Suite 500
     San Francisco, CA 94102
 6   (415) 358-6913

 7   JASON S. RATHOD
     MIGLIACCIO & RATHOD, LLP
 8   412 H Street NE, Suite 302
     Washington, D.C. 20002
 9   (202) 470-3520

10   ANNE T. REGAN
     HELLMUTH & JOHNSON
11   8050 West 78th Street
     Edina, MN 55439
12   (952) 460-9285

13   MATTHEW D. SCHELKOPF
     SAUDER SCHELKOPF, LLC
14   555 Lancaster Avenue
     Berwyn, PA 19312
15   (610) 200-0581

16   AMBER L. SCHUBERT
     SCHUBERT JONCKHEER & KOLBE
17   3 Embarcadero Center, Suite 1650
     San Francisco, CA 94111
18   (415) 788-4220

19   ROBERT K. SHELQUIST
     LOCKRIDGE GRINDAL NAUEN, PLLP
20   100 Washington Avenue South, Suite 2200
     Minneapolis, MN 55401
21   (612) 339-6900

22   MADELINE P. SKITZKI
     JENNER & BLOCK, LLP
23   515 South Flower Street, Suite 3300
     Los Angeles, Ca 90071-2246
24   (213) 239-2284

25
```

1   JONATHAN M. SOPER
    HUMPHREY, FARRINGTON & MCCLAIN, PC
2   221 West Lexington, Suite 400
    Independence, MO 64051
3   (816) 836-5050

4   KEVIN D. STANLEY
    HUMPHREY, FARRINGTON & MCCLAIN, PC
5   221 West Lexington, Suite 400
    Independence, MO 64051
6   (816) 836-5050

7   ROLAND TELLIS
    BARON & BUDD, PC
8   Encino Plaza
    15910 Ventura Boulevard, Suite 1600
9   Encino, CA 91436
    (818) 839-2333

10

11  ROBERTA A. YARD
    REINHARDT WENDORF & BLANCHFIELD
12  322 Minnesota Street, Suite W1050
    Saint Paul, MN 55101
13  (651) 287-2100

14  TIFFANY YIATRAS
    CAREY DANIS & LOWE
15  8235 Forsyth Boulevard, Suite 1100
    St. Louis, MO 63105
16  (314) 678-1073

17

18

19

20

21

22

23

24

25

1    SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 7, 2023; 9:04 A.M.

2              THE CLERK:  Calling Item 1, SAML-22-03052-JVS, In

3    Re:  Kia Hyundai Vehicle Theft Litigation.

4              THE COURT:  Good morning, and welcome to Santa Ana

5    and our first session in this brand new MDL.  I want to

6    begin by thanking interim counsel for the report which they

7    prepared.  I think it gives us all a good common basis to

8    discuss the matters we're going to discuss today.

9              Rather than take individual appearances,

10   Ms. Vargas has your card, and you will be noted there.

11             Here is what I would like to do today.  First of

12   all, I would like to discuss the overall structure on the

13   plaintiffs' side and see if we can come to a consensus.

14   Then I would like to discuss the scheduling conference which

15   we'll hold in about a month and outline what my expectations

16   for that are.

17             Then I would like to hear any individual counsel

18   that would like to address the Court with respect to his or

19   her application.  Given the number of folks, I'm going to

20   hold that to five or seven minutes.

21             If any applicant wishes to stand on his or her

22   application, that's fine.  I won't take it as any lack of

23   interest if you feel that you've fully outlined your

24   qualifications for appointment in your filing.

25             Let me begin with a thanks to our interim counsel.

 1   Mr. Berman, Ms. Fegan, Mr. McClain, and Mr. Brennan, I thank

 2   you.  Your work has been very helpful.

 3          Well, let's turn to the overall structure.  I

 4   think we could have a slightly leaner structure than

 5   proposed by the interim counsel.  I think that a Leadership

 6   Committee of four rather than three and an Expert Committee

 7   and a Fact Discovery Committee comprised of one member of

 8   the leadership group and three other lawyers, I think that

 9   that's just a little bit leaner.  And I'm not sure we need

10   an Executive Committee as well as those folks.

11          If we adopted a proposal and the interim

12   counsel -- I mean, virtually everybody who had an

13   application would have a position, and that's little more

14   than we need.  And as you probably all know, I handled the

15   Toyota matter, and we did that with four times the number

16   of cases and less of a leadership group.

17          So those are the Court's thoughts on structure.  I

18   would be happy to hear interim counsel or anyone else who

19   would like to address that topic.

20          Mr. Berman.

21          MR. BERMAN:  Good morning, Your Honor.  Steve

22   Berman on behalf of interim counsel.

23          Having heard your comments, we won't press our

24   proposal any further.  I understand it.  We tried to be more

25   inclusive so that perhaps goals of diversity and younger

```
 1    lawyers on the Executive Committee, it might give them a
 2    chance to participate.  And we had in mind that, you know,
 3    even though the three of us represent a cross-section of
 4    clients, it wouldn't hurt us to have this group just in our
 5    ear.  Don't forget.  I have an uninsured.  Here's what I'm
 6    worried about.  So we thought there was an opportunity for
 7    an Executive Committee for that purpose, but I'm not
 8    pressing the issue.
 9              In terms of the four leadership structure that you
10    have, the only comment I would make, Your Honor, is I was
11    trying to wrestle -- we were trying to wrestle with your
12    notion that there be one leadership member on the Fact
13    Committee and the Expert Committee.  That would leave one or
14    two leadership people not on a committee.
15              That's why we thought there should be two
16    leadership people on each committee, and the reason that we
17    think that, it's just my experience that if I am lead
18    counsel on a case, I'm hands on everything.  I don't want to
19    not be involved in the experts.  I don't want to not be
20    involved in the facts.  So that's why we thought there
21    should be at least two lead on each committee.
22              And we thought there should be a chair for two
23    reasons.  One, anytime you have a committee of four, I think
24    it helps organizationally to have someone that people can go
25    to in the first instance, someone that other lawyers can go
```

```
1    to in the first instance.  And more importantly, I thought
2    the chair would have an omnibus role who would be on both
3    committees as the chair, again so you have a lead lawyer
4    that's immersed in everything.
5           I just -- I struggle with the notion that one of
6    the lead lawyers would be kind of not involved from A to Z.
7    That's my only comment on that.
8           THE COURT:  Okay.  Would anyone else like to be
9    heard on the topic of structure?
10          MS. CAPPIO:  Good morning, Your Honor.  I'm
11   Gretchen Freeman Cappio of Keller Rohrback, and I represent
12   the City of Seattle here.  If Your Honor would indulge me, I
13   just have a couple comments about sort of why Seattle is
14   here, and it relates to structure.
15          THE COURT:  Well, I'm not sure, given the number
16   of governmental entities presently in the docket, namely,
17   one, that we need to have specific representation of
18   governmental entities.
19          I appreciate the remarks you outlined in your
20   position paper.  There are impacts on municipalities,
21   cities, et cetera, that go far beyond having their citizens'
22   cars stolen, but I'm not sure that there is any recompense
23   for those problems that the cities may sustain apart from
24   damages on fleets of these cars or other cars.
25          MS. CAPPIO:  Your Honor, you won't be surprised to
```

| | |
|---|---|
| 1 | hear perhaps that numerous cities are contacting us about |
| 2 | similar problems.  So at this point you're right.  There's |
| 3 | only one complaint filed.  The City of Cincinnati authorized |
| 4 | me to share with Your Honor that they're planning to file |
| 5 | shortly as well as numerous other cities.  So in case that |
| 6 | helps inform the Court's planning here, I just wanted to |
| 7 | share that information. |
| 8 | I would also be happy to address the nuisance |
| 9 | claims a little bit.  There are quite different from the |
| 10 | consumer claims.  I have worn both hats in litigation, Your |
| 11 | Honor, and I'm very familiar with the consumer claims as |
| 12 | well and would be happy to address how the nuisance claims |
| 13 | are different, how their remedies are slightly different, et |
| 14 | cetera, and why I think, and Seattle feels, that leadership |
| 15 | is important when it comes to resolving those claims -- as |
| 16 | well as litigating them, of course. |
| 17 | THE COURT:  Are you suggesting that the cities |
| 18 | would have claims in this proceeding other than for losses |
| 19 | with respect to the vehicles the City owns? |
| 20 | MS. CAPPIO:  That's right, Your Honor.  There are |
| 21 | many downstream consequences that occur when we have -- many |
| 22 | times it's youths who are stealing these vehicles and |
| 23 | joyriding with them, and that creates a major public safety |
| 24 | concern. |
| 25 | So there are abatement remedies that the cities |

1    are seeking for funds relating to law enforcement having to

2    do with the youths who are driving these vehicles.  And

3    anytime you have youth offenders, there is a long line of

4    collateral consequences that cities are internalizing.

5            It's much like the Juul litigation, Your Honor,

6    where it starts with teen vaping, and it evolved into a much

7    broader public health and public safety concern.  And Judge

8    Orrick similarly organized the Juul MDL with government

9    entity representation and the leadership, and that would be

10   what we are seeking here as well, Your Honor.

11           THE COURT:  Okay.  Thank you.

12           MS. CAPPIO:  Thank you, Your Honor.

13           THE COURT:  Would anyone else like to be heard on

14   the structure issue?

15           MS. FEGAN:  Your Honor, Elizabeth Fegan on behalf

16   of interim conference counsel.  Just a short response on

17   Seattle.  Your Honor, we have no issue with coordinating

18   with the Keller Rohrback firm and Ms. Cappio.  I think that

19   that's the appropriate role here for Seattle.

20           Certainly if more governmental entities come,

21   there may be perhaps a liaison between consumer counsel and

22   government counsel, but the idea of having a government

23   lawyer on the Consumer Class Committee -- basically given

24   that the strategies are going to be different, the remedies

25   are going to be different, and the claims are different --

1   we think that that should not occur.

2            So we are open and frankly support coordination,

3   but we think coordination is different than having a lead

4   government lawyer managing the consumer cases.

5            THE COURT:  Okay.  Thank you.

6            MS. FEGAN:  Thank you.

7            THE COURT:  It's not really your dog in the hunt,

8   Mr. Brennan, but do you have any thoughts?

9            MR. BRENNAN:  I do, Your Honor.  We agree with the

10  structure that you propose, Your Honor.  Obviously you read

11  our papers and everybody's papers, and you had our comments.

12  And I won't get into the substance of Seattle's comments.

13  That's all we have.

14           THE COURT:  Thank you.

15           Well, let me give this further thought, but I

16  think Mr. Berman's suggestion that there be two members of

17  the Leadership Committee on the Fact and Expert Committees

18  makes sense.

19           I also think it makes sense to have one point

20  person, although my inclination would be to appoint four

21  members of the Leadership Committee and let the Leadership

22  Committee pick its own chair, whether that's a permanent

23  chair or rotating chair or whatever.  But I agree there

24  ought to be one point of sheer contact on the Leadership

25  Committee.

```
 1              Well, let's move to the scheduling conference.  I
 2     would propose to set a scheduling conference for Monday,
 3     March 13, assuming that's convenient, at either 8:00 or
 4     3:00.  Now, people are coming from all different directions,
 5     and I'm not sure any one time is going to be more or less
 6     convenient for everybody.  But if you have any suggestions,
 7     I would be happy to hear you.
 8              At the scheduling conference I'd ask the
 9     leadership committee to produce a joint report and a
10     proposed order.  I think I've got a pretty extensive laundry
11     list in the initial order of topics that ought to be
12     considered, but on some specifics I think we need a
13     discovery plan, a likely phase with document production and
14     30(b)(6)s before we get into the real grist of discovery.
15              I think we're going to need a consolidated
16     complaint which we can use to test any theories as to the
17     liability of the claims asserted.
18              Now, given what Ms. Cappio has raised about graps
19     and unique aspects of the potential governmental claims, is
20     a single Consolidated Complaint the correct vehicle to cover
21     everything?
22              MR. BERMAN:  We think that we should go ahead and
23     file a Consolidated Complaint.  We would actually propose,
24     Your Honor -- and I think we put this in our papers -- that
25     once you make your appointments, that we file that Complaint
```

```
 1   60 days from the date of appointment rather than waiting for

 2   the scheduling conference and then filing.  We might as well

 3   get the parties started if that's okay with Your Honor.

 4               THE COURT:  That's fine.

 5               MR. BERMAN:  Okay.  And then we would propose

 6   filing a Consolidated Complaint on behalf of all consumer

 7   claims and if the governmental entity Seattle should file

 8   its own Complaint.  It's such a different claim that we

 9   think it shouldn't be part of the consumer claim.

10               THE COURT:  Okay.

11               Ms. Cappio.

12               MS. CAPPIO:  Good morning again, Your Honor.

13   Gretchen Cappio of Keller Rohrback for Seattle.

14               Yes, Your Honor, we agree that the governmental

15   entities should have their own Complaint, and that's very

16   much why we think a co-lead would be appropriate for the

17   governmental entities here.  They're seeking unique remedies

18   and have unique causes of action and need unique voice and

19   representation here.

20               I would also just add that in addition to the

21   overlapping facts, there will be dedicated experts needed to

22   flush out the nuisance claims.  We have worked with a lot of

23   these experts in the opioids and Juul litigation and others.

24   So it's kind of a specialized area, Your Honor.

25               And we have worked a lot with, like I said
```

```
 1    earlier, with consumer automotive claims.  We are very
 2    familiar with that, but this is a lot like, I would say,
 3    something like the VW litigation where you had the
 4    Department of Justice representing governments.  You had
 5    CARB, the California Air Resources Board, and so forth hand
 6    in hand with the consumer plaintiffs.  We think a similar
 7    structure is important here so we can land the plane for
 8    everybody, Your Honor.
 9              Thank you very much.
10              THE COURT:  Mr. Berman.
11              MR. BERMAN:  Very briefly, Your Honor.  I think
12    what counsel said points out why there shouldn't be a
13    Consolidated Complaint involving the government.
14              So in the Volkswagen case, for example, in which I
15    was one on the Executive Committee, the government was not
16    part of the Executive Committee.  There was a consumer-only
17    Executive Committee.  Yes, we worked closely with DOJ and
18    with CARB, but they were their own entities.  They weren't
19    part of the leadership structure.  They weren't involved in
20    making decisions on behalf of the leadership structure.
21              The experts that Ms. Cappio talks about on her
22    nuisance claim are not going to be hired by the consumers.
23    It's completely different theories, completely different
24    experts.  Why should we be involved working with those
25    experts and having a common fund that pays for that?  We
```

1   don't think it's in the interest of the class.

2           THE COURT:  Okay.

3           Mr. Brennan.

4           MR. BRENNAN:  Your Honor, I want to put on the

5   record that obviously this case has nothing to do with the

6   Juul case and nothing to do with the opioids case.

7           On the 60-days point, as you saw in our papers,

8   our point is we had a motion to dismiss filed and completely

9   briefed a year ago.  That's what we would like to get tested

10  before we get further along in discovery.  That's our issue,

11  which we do believe -- obviously it will be up to you, Your

12  Honor, but the claims will get knocked out as a result of

13  that.  That's why we were anxious about this a year ago, and

14  it didn't happen for various reasons that you saw in our

15  papers.  That's all we have.

16          THE COURT:  I think 45 days ought to be enough for

17  a Consolidated Complaint.  I'm going to get this order out

18  this week, so it's likely what I'm going to order.

19          Are there any other suggestions for what we ought

20  to take up in the context of the scheduling conference?

21          MR. BERMAN:  There is one other suggestion, Your

22  Honor, that I will put out there to think about, that you

23  might want to think about.  And that is I envision that we

24  are going to file a Complaint that invokes California law

25  nationwide.

```
 1            We dealt with that before, and we will deal with
 2   it again, and then in the alternative a claims involving the
 3   laws of all 50 states.
 4            THE COURT:  Right.
 5            MR. BERMAN:  If you recall in the Toyota case --
 6            THE COURT:  I don't think you have plaintiffs in
 7   all 50 states; do you?
 8            MR. BERMAN:  We do.
 9            THE COURT:  Okay.
10            MR. BERMAN:  I think we do.  And then there is an
11   issue, by the way, from the Ninth Circuit where if you have
12   plaintiffs for certain states, whether they can represent
13   plaintiffs from other states.  So that's an open legal
14   issue, but I think we have all 50 states covered.
15            THE COURT:  Okay.
16            MR. BERMAN:  The point I was going to make is we
17   might give some thought in just planning this in your head,
18   if you recall in the Toyota case, we briefed the California
19   motion exhaustively.
20            THE COURT:  Right.
21            MR. BERMAN:  And then the Toyota defendants wanted
22   to brief all the 49 other states and Your Honor said no,
23   that we would go forward.  And then we went to the
24   bellwether.  So, you know, we're going to have 50 states, so
25   thought might be given by us and by you what to do with all
```

| | |
|---|---|
| 1 | the states when you want to tackle them all on 12(b)(6) at |
| 2 | once or whether there's some more efficient way to get |
| 3 | there.  I'm flagging an issue ahead of time for you. |
| 4 | THE COURT:  Well, my preliminary thought is we |
| 5 | don't need 50, 12(b)(6)s or 51 or 52 if you have got Puerto |
| 6 | Rico and D.C. in this round as well.  But let me think about |
| 7 | that, and it's something we'll address at the scheduling |
| 8 | conference. |
| 9 | MR. BERMAN:  Thank you. |
| 10 | THE COURT:  Now, are there any other broad-brush |
| 11 | issues anyone would like to address at this point? |
| 12 | Okay.  Well, then, I think I would like to give |
| 13 | each applicant a brief opportunity to address the Court in |
| 14 | order of appearance.  I'm just going to use the order in |
| 15 | which the applications were filed on January 23rd, so I'm |
| 16 | just going to go down that.  I think that's the easiest way |
| 17 | to make sure I hear from everyone. |
| 18 | At Docket No. 11, Ms. Fegan, would you like to be |
| 19 | heard briefly? |
| 20 | MS. FEGAN:  Thank you, Your Honor.  Elizabeth |
| 21 | Fegan on behalf of plaintiffs and interim conference |
| 22 | counsel. |
| 23 | I appreciate the appointment and the opportunity |
| 24 | to work on the initial conference report.  Thank you.  I do |
| 25 | feel like this is a little bit of I should sit down while |

1   I'm ahead, but I would like to --

2           THE COURT:  Well, I can't say you're ahead, but

3   you are not behind.

4           MS. FEGAN:  There you go.  I just have a couple of

5   points to make.  I think that there are a lot of great

6   lawyers in this room, as we have seen from the applications,

7   and a lot of lawyers with very specific skill sets.

8           I think one of the rules of lead counsel is to be

9   able to identify and tap into those skill sets as they're

10  needed on particular fact issues, on particular expert

11  issues, even on particular mechanical issues of the

12  vehicles.

13          I think that's one of the things that I can bring

14  to this table is my ability to work with everyone in this

15  room, whether we're on the defense side or on the plaintiff

16  side, to really maximize the skill sets that are here today.

17  Even when I don't have a room full of people and these types

18  of skill sets, I still am success driven.

19          And we actually have a settlement currently

20  pending here in the Central District involving Hyundai Kia,

21  and that settlement arose after two years of really

22  hard-fought litigation, discovery both of the Korean parents

23  as well as the American manufacturer and sellers.

24          I think that that really will inform my ability

25  here to contribute to discovery and frankly to experts also,

```
 1   but we certainly have a track record of success on that
 2   front.
 3          Finally, Your Honor, I worked extensively with
 4   Steve Berman over almost 20 years, but I started my own firm
 5   in 2019.  I think I did that in part to show that diversity
 6   can come and lead these types of cases without sacrificing
 7   quality.  So I think I do bring that to the table.
 8          Thank you, Your Honor.  I appreciate your
 9   consideration.
10          THE COURT:  Thank you.
11          Docket No. 12, Mr. Shelquist.
12          Good morning.
13          MR. SHELQUIST:  Good morning, Your Honor.  I
14   appreciate the opportunity to appear before the Court in
15   support of my motion.  One item I didn't address was
16   geographic issues.  Minnesota and the upper midwest I think
17   are unique here for a couple of reasons.  One, following the
18   George Floyd civil unrest, there has been a lot of crime in
19   Minneapolis due to depressed numbers of officers, and
20   Minneapolis has become a hotbed of these types of thefts.
21   The Minneapolis Police Department alone said that there were
22   1,948 excess thefts due to Kia and Hyundai thefts of the
23   type we are here before Your Honor addressing just in 2022
24   alone.
25          A couple of insurance issues that I think are
```

```
 1    unique here.  The insurers have said they're either going to
 2    raise rates or in some instances cancel policies.  In
 3    Minnesota and some of the surrounding states, you have to
 4    have insurance in order to get title to the car, and several
 5    of our clients are afraid that they're going to get caught
 6    in a never-ending circle here where there is the car they
 7    use to go to work.  Their work is paying for the automobile
 8    loan.  And if they can't drive their car to work, they have
 9    got no way to pay for it.
10             Additionally, insurance is required to get a
11    rental vehicle.  So if the automobile insurers are not going
12    to carry coverage, again, these people are going to be
13    injured because it's taking two, three, four months
14    sometimes for these cars to be fixed and they won't be able
15    to get a rental replacement.
16             Finally, Minnesota and a number of other states
17    are no-fault states, and part of the no-fault package is
18    personal injury protection.  If these cars are sitting idle
19    and get stolen or other things happen, that system starts to
20    break down.  So I think -- I am bringing a regional
21    opportunity here for the Court and for lead counsel to help
22    them whether it's in discovery, developing experts' damages
23    reports, or getting ready for trial.
24             I have worked with each of the three proposed
25    co-lead counsel before.  I think I can work with them well
```

```
 1   again in that capacity or would be able to help them at
 2   their direction either on the expert or fact discovery
 3   committee.
 4              Thank you, Your Honor.
 5              THE COURT:  Thank you.
 6              At Docket No. 13, Mr. Michael A. Williams.
 7              MR. DAMERON:  Good morning, Your Honor.
 8              THE COURT:  Good morning.
 9              MR. DAMERON:  My name is Matt Dameron from
10   Williams Dirks Dameron.  I'm actually here today on behalf
11   of Mr. Williams.  Mr. Williams started a two-week jury trial
12   yesterday in Missouri state court.
13              THE COURT:  Okay.
14              MR. DAMERON:  And I just wanted -- I'm here to
15   reaffirm his commitment and our firm's commitment to this
16   case.  Had this been last week or two weeks from now, he
17   would be here, and he sends his regrets and his apologies.
18              THE COURT:  Very good.  I understand that.  Thank
19   you.
20              MR. DAMERON:  Thank you, Your Honor.
21              THE COURT:  Jeffrey Goldenberg at Docket 14.
22              MR. GOLDENBERG:  Good morning, Your Honor.
23   Jeffrey Goldenberg from the law firm of Goldenberg
24   Schneider, Cincinnati, Ohio.  I'm one of the plaintiffs'
25   counsel in two actions pending before the Court, the
```

1   McNerney action and also the Lucas action, both of which are
2   with Mr. Berman.  We represent 37 plaintiffs from
3   approximately 20 different states.
4        We also filed the initial MDL petition, which is
5   why we are all here today before Your Honor.  I am
6   respectfully requesting appointment to the fact discovery
7   committee, or in the alternative to the expert discovery
8   committee, Your Honor.
9        I have been personally litigating automotive
10  defect class actions for over 25 years, so I have
11  substantial experience in this area and could bring that to
12  the benefit of the class here.
13       I just want to highlight a couple cases for the
14  Court to consider.  Recently, I was co-lead counsel in two
15  infotainment system defect cases against Acura and Honda
16  here in the Central District of California, the Bond case
17  which was in front of Judge Klausner, and the Conti case
18  which was in front of Judge Carney.  Both motions to dismiss
19  were substantially denied by both Courts, and my firm,
20  Goldenberg Schneider, took all of the liability depositions
21  in those cases.
22       And then following a highly contested class
23  certification process, Judge Klausner did certify class of
24  California vehicle purchasers, and we recently resolved both
25  of those cases successfully here in the Central District

1   with final approval being granted in December of 2021 and
2   also January of 2022.

3          I have worked with Mr. Berman's firm on multiple
4   auto defect cases including Mercedes diesel emission fraud
5   which recently resolved for over $700 million settlement.
6   In that case I served on the executive committee.

7          I was co-lead counsel on the Ford F150 engine
8   spark plug litigation which was pending in the Northern
9   District of Ohio with Judge Pearson, and we successfully
10  resolved that following denial and summary judgment by Judge
11  Pearson on Ford's motion.

12         I was also co-lead counsel on the Nissan Quest
13  minivan throttle body litigation, which was in California
14  state court but resolved on a nationwide basis.

15         Lastly, I was co-lead counsel on the Dabbs v. Ford
16  Motor Company case.  This case is of note because it was --
17  the class certification was upheld by the Sixth Circuit and
18  it was one of the first opinions to identify diminished
19  value as a measure of damage.  So I do have substantial
20  experience in auto defect litigation and would bring the
21  benefit of that here, Your Honor.

22         Lastly, I want to mention one other point, and
23  that is Cincinnati, Ohio, is based in the midwest.  We are
24  relatively close to many points or cities that are dealing
25  with this issue now, including Columbus, Ohio; Detroit, and

1   St. Louis.  These cities are experiencing some of the

2   highest rates of Kia and Hyundai vehicle thefts, and my firm

3   is ideally located to easily travel if necessary to these

4   locations to effectively prosecute this litigation.

5         So with that, I respectfully request that my firm

6   and myself be appointed to the fact discovery committee or

7   in the alternative to the expert discovery committee.

8         Thank you.

9         THE COURT:  Thank you.

10        The next application is from the Gustafson Gluek

11   firm.  The docket entry doesn't give the name of the

12   specific attorney, so help me out on that.

13        MR. GOODWIN:  Good morning, Your Honor.  David

14   Goodwin from Gustafson Gluek out of Minneapolis and

15   California.  I will be brief.  Our firm has worked with

16   virtually everybody in this room.  I have worked with many

17   people here.

18        And as Mr. Berman pointed out, I think, I have 15

19   years of experience in class-action litigation, but I'm on

20   the other side of the room.  So this is my first application

21   for an MDL leadership position.  We have been successful in

22   a number of auto defect cases, consumer fraud cases, and

23   other large class-action cases.  So I think I have laid out

24   my qualifications in the application, but I'm happy to serve

25   in any capacity the Court would see fit.

```
1              Thank you.

2              THE COURT:  Thank you.

3              At Docket No. 16, Ms. Dennis.

4              MS. DENNIS:  Kaitlyn Dennis, Gustafson Gluek,

5    Minneapolis, Minnesota.  Good morning, Your Honor.

6              I certainly cannot say I have the most years of

7    experience.  I have many qualified counsel in this room.

8    But as a younger attorney, I can bring a lot of energy and

9    curiosity to an appointment to the expert committee, which I

10   believe I would be a valuable addition.

11             I have spent my entire career working in complex

12   class-action litigation including many vehicle-focused

13   cases.  Most recently I was appointed interim co-lead

14   counsel in the Deere Repair Services antitrust litigation, a

15   case which involved a significant amount of coordination in

16   a large leadership structure, as well as requiring an

17   understanding of technical designs of complex,

18   technologically advanced off-road vehicles.

19             I have also worked on a variety of expert issues

20   in my cases.  In the Interior Molded Doors direct purchaser

21   antitrust litigation, I was the primary point of contact for

22   plaintiffs' survey expert.  And I have also within the last

23   year worked on a trial team where I assisted with the

24   preparation of plaintiffs' industry expert.

25             As my colleague Mr. Goodwin said, our firm has
```

```
 1    worked on many vehicle defect cases.  I have worked on
 2    several of those as well, and we have ample resources to
 3    dedicate to the prosecution of this litigation.
 4              Thank you for your consideration.
 5              THE COURT:  Thank you very much.
 6              Ms. Anne Regan.
 7              MS. REGAN:  Thank you, Your Honor.  Anne Regan on
 8    behalf of plaintiff in the Hilliard matter and multiple
 9    other clients who have retained us because they have
10    unfortunately had their cars stolen over the past nine
11    months.
12              I'm seeking appointment respectfully to the
13    committee for fact discovery.  I have over 20 years'
14    experience prosecuting consumer protection, product defect,
15    antitrust, securities fraud, and employment actions.  I have
16    been on both sides of the B.  Just as pertinent, I am now
17    leading a case against Hyundai that is also pending in the
18    Central District involving both the Korean parent and HMA.
19              Relevant to my appointment to the fact discovery
20    committee, I have extensive experience developing plaintiff
21    questionnaires, marshaling resources from multiple firms and
22    multiple co-counsel firms to ensure that the plaintiffs meet
23    the discovery obligations, negotiating ESI protocols, being
24    involved in all steps of the discovery process directed to
25    the other side.
```

```
 1              In terms of my recent class action and MDL
 2    experience, I was appointed to the interim executive
 3    committee in the CenturyLink MDL that was venued in the
 4    District of Minnesota.  And although the majority of my
 5    practice is concentrated in the upper midwest, I have had
 6    cases on all coasts and in the middle as well.
 7              In virtually all of my cases, I have partnered
 8    with other firms and done so successfully.  In this case I'm
 9    hopeful for the opportunity to do that here.  It's clear
10    that many of the attorneys who have applied for leadership
11    here have long working relationships.  This case gives the
12    Court an opportunity to broaden those relationships and
13    introduce new energy and commitment into this MDL.
14              I and my firm are committed to dedicating the
15    necessary resources to this case, and we will work very,
16    very hard to achieve excellent results on behalf of the
17    class.
18              I thank the Court for its consideration.
19              THE COURT:  Thank you.
20              Ms. Roberta Yard.  Good morning.
21              MS. YARD:  Good morning, Your Honor.  Roberta Yard
22    from Reinhardt Wendorf & Blanchfield.  I initially submitted
23    my application to the Executive Committee as an alternative
24    to the Expert or Fact Discovery Subcommittees.
25              I have been working in this industry nearly 20
```

```
 1    years in class actions in various types of cases --
 2    antitrust, securities fraud, consumer protection, and even
 3    some civil rights litigation.
 4              I'm proud to announce that I'm working on a case
 5    that was just recently granted certification before the
 6    United States Supreme Court on a civil rights matter that I
 7    am excited about.
 8              I have also recently been named to the executive
 9    committee on the Crop Inputs antitrust litigation.  I have
10    also worked on the fact and expert discovery and many other
11    matters.  One was the Dahl versus Bain Capital Partners and
12    also the Benz versus Amadeus IT Group.  I'm working with
13    experts and fact discovery in those matters.
14              As with everyone working in this area of law, you
15    do have to work cooperatively with others.  That's just the
16    nature of the game.  I'm very personable.  I believe in
17    working out solutions rather than having conflict.  So I
18    believe I would be well suited for that.
19              Regarding the additional factors for diversity,
20    I'm obviously female.  I'm the first female partner at
21    Reinhardt Wendorf & Blanchfield.  And I believe it's great
22    that Courts are taking a closer look at that and giving
23    attorneys that maybe do not have all the opportunities
24    afforded to them in the past and trying to account for that
25    now.
```

1          My firm is also based in St. Paul, Minnesota, so I

2     believe we would contribute to the geographic diversity of

3     this case.  As one of my colleagues mentioned, the Twin

4     Cities is kind of a hotbed of crime and this activity in

5     recent years, so our firm can also add to that knowledge.

6          And finally diversity among plaintiff firms.  Our

7     firm is a relatively small firm.  We don't have 500 lawyers

8     or even 50 lawyers, but we do have a wealth of experience.

9     We are very passionate about the work that we do, and we

10    believe we have something valuable to contribute.

11         Thank you very much for your consideration.  I

12    appreciate it.

13         THE COURT:  Thank you very much.

14         Docket 19, Mr. McClain.

15         MR. MCCLAIN:  Good morning, Your Honor.  Kevin

16    McClain, Humphrey Farrington McClain.  I'm applying for lead

17    counsel and also lead counsel representative on the Expert

18    Committee.  I will leave most of the discussion of my

19    qualifications in the papers to save time.

20         I'm appreciative of the Court's appointment to the

21    interim committee.  It's been a very good experience working

22    with Mr. Berman and Ms. Fegan.

23         I will just mention a few things to highlight.  Of

24    course, we've had extensive class-action experience in my 40

25    years of practice, including MDLs, most recently serving in

```
 1    leadership on the Dollar General MDL that was settled.  I
 2    was the lead negotiator and did most of the expert discovery
 3    in that case.
 4            But we have also had a number of firsts throughout
 5    my history.  We had the first asbestos in buildings case on
 6    behalf of the school district.  We were the first firm in
 7    the country to get the tobacco documents de-privileged.  I
 8    represented the State of Missouri in the nationwide tobacco
 9    litigation.
10            I currently represent the Province of Newfoundland
11    in the Canadian tobacco litigation which is wrapping up
12    currently.  I was the first lawyer to recognize butter
13    flavor as a major hazard to microwave popcorn workers and
14    handled thousands of those cases across the country,
15    including over a dozen trials.
16            I have tried hundreds of cases over the years
17    involving thousands of plaintiffs, and I think that in
18    keeping with recognizing the emerging issues is the reason
19    we filed 13 first-filed cases in the various jurisdictions
20    recognizing that this was a nationwide problem that needed a
21    more comprehensive approach than currently existed.  And
22    ultimately through Mr. Berman's application, the MDL came
23    forward in part because of those 13 classes that we filed,
24    but that also brought us in contact with many individuals
25    because we received a lot of publicity where people were
```

1    asking questions:  What is this all about?  What's

2    happening?  And we received calls from all over the country

3    and currently represent over 400 individuals.

4            So I personally have heard their stories, you

5    know, the people that have had cars broken into one, two,

6    three times, people whose cars have been broken into that

7    already had immobilizers because people couldn't recognize

8    the difference between cars with the mobilizers and cars

9    without, insurance problems affecting all kinds of aspects

10   of people's lives because of the threatened increase in

11   insurance premiums or the complete discontinuance of

12   insurance problems.

13           So I'm very aware and in some way a bellwether of

14   some of these problems for our interim group thus far to

15   make sure that we were considering the full range of

16   problems that people were having as we were thinking about

17   these cases and looking at discovery plans and other aspects

18   that we might be called upon to employ.

19           So I would appreciate a further appointment by the

20   Court and thank the Court for allowing my application.

21           THE COURT:  Very good.  Thank you.

22           Mr. Roland Tellis, Docket 20.

23           MR. TELLIS:  Good morning, Your Honor.  Roland

24   Tellis.  I am a partner in the Los Angeles office of Baron &

25   Budd where I lead the firm's Los Angeles-based class-action

1   practice group.  I represent plaintiffs and several putative

2   class members who have had their vehicles stolen, some who

3   haven't, those who have adequate insurance coverage, those

4   who don't.  I'm very well versed in the issues that we will

5   be facing in this case.

6            I have applied to serve as co-lead counsel.

7   You've appointed some of the finest lawyers in the country

8   on a known basis, and I'm happy to take that fourth open

9   seat to join them or any other group of lawyers that Your

10  Honor selects.

11           I don't think this is a time for false modesty, so

12  I will just say that I think my application easily satisfies

13  Your Honor's criteria to serve as lead counsel.

14           My application details the 27 years of complex

15  litigation experience I have, including my personal

16  appointment in many automotive MDLs including in this

17  district.  I am very familiar with the legal issues that are

18  likely to arise.  I have faced them in many class cases

19  including class cases against Hyundai Kia.

20           I'm currently co-lead counsel in an airbag defect

21  MDL involving millions of vehicles pending before Judge

22  Kronstadt in the Central District against Hyundai Kia and

23  seven other automakers.  We're presently in the throes of

24  motion practice dealing with many of the same issues that

25  Hyundai Kia identifies in the joint report as a basis for

 1    dismissal of these cases.

 2         If I am selected, Your Honor, I assure you I'll

 3    put in the time, energy, and financial resources that make

 4    this case one of my highest priorities.  Thank you.

 5         THE COURT:  Thank you.

 6         At Docket 21, Mr. James Barton.

 7         Good morning.

 8         MR. BARTON:  Good morning, Your Honor.  Thank you

 9    for allowing us to be here today.

10         I was quipping with my partner this morning that

11    they're going to need to amend the definition of beauty

12    pageant in the dictionary to include an MDL leadership

13    hearing.  Obviously everyone is up here, and it's odd to

14    kind of tout one's bona fides, but it's very, very

15    important.  And the reason why it's so important is because

16    this Court's job is to select and effectively create this ad

17    hoc law firm on the plaintiffs' side to represent the

18    millions of consumers who will never step foot in this

19    courtroom, and that's extremely important.

20         Why I'm here ultimately, I don't think it's

21    hyperbole to say that it's our lawsuit that was first filed

22    on June 23rd, 2021, that really started this whole process.

23    We filed more than a year before any other lawsuit was next

24    filed.

25         Living in Milwaukee, it's been my hometown for 18

```
 1    years.  It served as kind of the epicenter of this crisis
 2    that's happened.  It didn't get much publicity at the time,
 3    though, Your Honor, because we filed it under seal, and we
 4    did so because at the end of the day, while we would --
 5    certainly a nascent, growing firm would like the opportunity
 6    and the publicity associated with it.  It was more important
 7    that our pleading did not exacerbate the problem.
 8         Ultimately Judge Pepper, who was, when the case
 9    was ultimately here, removed, agreed and sealed our
10    complaint and -- granted the seal order but then ultimately
11    agreed that there needed to be some set of redactions filed
12    to it.
13         The reason why the redactions were needed was
14    because at the time we filed, our investigation for weeks
15    beforehand led to the most comprehensive Complaint in terms
16    of the factual substance that described the scope and extent
17    of the defect.
18         So ultimately that Complaint was filed on July 8
19    of 2022, and then a deluge of lawsuits came thereafter.  I
20    think we are up to 55 consumer cases at that point.  I would
21    submit to this Court, though, that if you look at our
22    complaint -- it's Docket 12.1 of the Original Amended
23    Complaint that was filed on November 4, 2021 -- versus a
24    comparison of what came thereafter, that they find all the
25    complaints that came after find their lifeblood in what we
```

 1   started back a year prior.

 2           And we did so, Your Honor, because -- not looking

 3   for the credit or the accolades but because our city is

 4   under siege.  Milwaukee has been ground zero that has had

 5   this problem.

 6           And I would direct the Court's attention to

 7   paragraphs 264 to 274 of that first amended complaint, and

 8   you can see a collection of numerous social media posts that

 9   depict what is happening in Milwaukee all over the place.

10   We landed at LAX yesterday, Your Honor, and it was kind of

11   funny.  There was a bevy of Kias and Hyundais when we were

12   selecting a rental car.  You won't see that in Milwaukee

13   because you can't rent a Kia or a Hyundai anymore because

14   they're getting stolen at such an alarming clip.

15           So then as this problem kind of started to

16   proliferate beyond Wisconsin borders, we went out and

17   secured co-counsel, Mr. Matthew Schelkopf of his firm Sauder

18   Schelkopf.

19           Now, Mr. Schelkopf might be modest up here about

20   his background, but I won't be.  The reason that we went out

21   and, you know, co-counseled the Marvin case and the

22   subsequently filed Henry case with him is because he has a

23   niche practice in automotive class-action litigation in

24   large part driven by his former work as a mechanic.  His dad

25   was an aerospace engineer.  He is uniquely suited in this

 1    case.

 2              And I think he also co-counseled the Kia Hyundai

 3    engine case with Mr. Berman, and that's why we selected

 4    Mr. Schelkopf.  I said to myself and kind of laughed after

 5    we got off the phone:  Who's better to depose Kia and

 6    Hyundai's experts?  The guy who litigates the case all day

 7    and then goes home and takes apart cars in his spare time.

 8    I mean, that's why we partnered with them.

 9              So if we go through these factors, Your Honor, I

10    had originally asked for a leadership position not knowing

11    exactly how the Court was going to structure the ultimate

12    committees.  I would leave it to the Court's discretion as

13    to what involvement my firm should have based off what we

14    have done to date.

15              If you look at the main factor, knowledge and

16    experience in prosecuting complex litigation, Your Honor, I

17    would submit to this Court that a detailed review of the

18    complaint that we filed as well as the motion to dismiss

19    briefing that was currently pending, as Mr. Berman noted,

20    since March 25th, 2022.

21              It addresses the various issues.  It's ready to

22    roll.  And the work product is such that I think the Court

23    will appreciate and, respectfully, that if you remove Barton

24    Legal's name and you added Hagens Berman or Fegan Scott or

25    Humphrey Farrington McClain or Sauder Schelkopf or Baron &

| | |
|---|---|
| 1 | Budd on the Barton Legal name, you'd say, oh, of course, |
| 2 | this person is going to have an opportunity to be part of a |
| 3 | leadership, the Leadership Committee, given the work that |
| 4 | has been put in to date. |
| 5 | Willingness and ability to commit to the process, |
| 6 | I think we've already demonstrated that.  The ability to |
| 7 | cooperate with others, I think even Mr. Brennan will tell |
| 8 | you that we have a very collegial, professional |
| 9 | relationship.  That's our job.  We're officers of the court. |
| 10 | And access to resources, we absolutely have spent the most |
| 11 | time and energy and have the funds to see this thing |
| 12 | through. |
| 13 | You know, in terms of diversity considerations, |
| 14 | Your Honor, that's very important.  What we bring to the |
| 15 | table is that we're not a repeat player.  This would be our |
| 16 | first opportunity to participate in an MDL, but |
| 17 | geographically everyone has talked about kind of how this is |
| 18 | affecting their city. |
| 19 | I can tell you from firsthand experience that this |
| 20 | has been really tough.  I mentioned earlier to the Court the |
| 21 | social media posts that are laden throughout our First |
| 22 | Amended Complaint, but I want to specifically ask the Court |
| 23 | to take a look at the video at paragraph 275 of the Amended |
| 24 | Complaint. |
| 25 | I don't know if Your Honor has ever been in |

```
 1    Milwaukee, but what it is is it's a dash cam footage of a
 2    police car that gets involved in a high-speed chase.  A kid
 3    steals a Kia Hyundai.  He's going 90 miles an hour in
 4    oncoming traffic down Good Hope Road, which is a main
 5    east/west thoroughfare on the north side of the city.  He
 6    smokes another car, kills himself, and injures the occupants
 7    in the other vehicle.
 8            Now, Good Hope Road, as I mentioned, is the main
 9    east/west thoroughfare.  I live at the east side of Good
10    Hope Road.  It's a few miles from my house.  My nanny lives
11    on the west side.  She takes Good Hope Road oftentimes with
12    my children in the vehicle.
13            When it hit me that that happened, right, and then
14    you look into the investigation, that, as we investigated
15    this further, that, you know, Kia and Hyundai -- I know
16    we're not getting into the merits -- have flouted --
17            THE COURT:  We're not getting into the facts.
18            MR. BARTON:  Understood, Your Honor.  Based off
19    the allegations, we want to see this through.  We started
20    the process, and I would respectfully submit, Your Honor,
21    that we deserve an opportunity.  I will leave it to the
22    Court's discretion as to where we're slotted if Your Honor
23    deems us worthy, but we will not let this Court down.
24            Thank you.
25            THE COURT:  Very good.  Thank you.
```

```
1              At Docket 22, Mr. Michael Ram.

2              MR. RAM:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. RAM:  Mike Ram, head of automotive class

5    actions at Morgan & Morgan.

6              Your Honor, I have been prosecuting consumer class

7    actions for over 40 years with an emphasis on car class

8    actions.  I'm certified and tried a number of consumer

9    protection class actions, and I'm here before Your Honor

10   respectfully asking to be included in the expert discovery

11   committee.

12             I have worked with experts in numerous automotive

13   class actions.  I have briefed and argued Daubert motions

14   including in trial for three hours.  I have put on experts

15   at trial.  I have cross-examined experts at trial.  I have

16   consulted with experts in this case, Your Honor.  And as the

17   head of consumer class actions at Morgan & Morgan, I feel

18   like we bring substantial financial resources as well as our

19   expertise.

20             Thank you very much, Your Honor.

21             THE COURT:  Thank you.

22             At Docket No. 23, Amanda Klevorn.

23             MS. KLEVORN:  Good morning, Your Honor.  Amanda

24   Klevorn with the firm Burns Charest in the New Orleans

25   office.  I have applied for a position on either the expert
```

```
 1    or the fact discovery subcommittee.  I would be truly
 2    honored to serve in either capacity and wherever the Court
 3    deems I would fit best.
 4            I have the privilege of currently representing
 5    four plaintiffs in this litigation.  I represent two people
 6    whose vehicles have not been stolen, thankfully, and
 7    hopefully they won't be.  That's the goal.
 8            But I also represent two people whose vehicles
 9    have been stolen.  Ms. Sellers lives in Peoria, Illinois,
10    and Mr. Ian Michael Scott, like me, lives in New Orleans.
11    Unfortunately for Mr. Scott, his Hyundai Sonata has now been
12    stolen twice.  I mention that because I think it's sort of
13    illustrative of the extent of the problem in New Orleans.
14            New Orleans has been particularly hard hit by this
15    recent onslaught of Kia and Hyundai thefts, and our local
16    paper has actually published several articles in the last
17    few months covering the extent of the problem.
18            There was just an article that came out a couple
19    of days ago talking about the fact that State Farm has
20    declared 105 Kia and Hyundai models ineligible for new
21    insurance in the state of Louisiana.  So it's a really big
22    problem in New Orleans, in Louisiana.
23            And I say all that to sort of express why I'm
24    interested in this case and why I'm applying for a
25    leadership role.  This is impacting people in my community
```

1    in a pretty -- at an alarming rate.  So that's why I'm

2    interested.

3            On the personal note, I've had the privilege of

4    working at Burns Charest for about seven years now.  In that

5    period of time I've been very fortunate to work on a variety

6    of complex cases in many different areas.  I've worked on

7    antitrust cases, several mass torts, data privacy, a Fifth

8    Amendment takings case against the U.S. Government.

9            And now I'm involved in the opioid litigation.  We

10   represent hospitals all over the country in their cases

11   against the manufacturers and distributors and retailers of

12   opioids.  So because of the variety of cases I have been on,

13   I also have a lot of experience both with fact and expert

14   discovery.

15           I think I would just conclude by saying I have the

16   experience to serve on either committee.  I have the backing

17   of my firm.  We certainly have the resources to contribute

18   to this case in a meaningful way, and I would appreciate the

19   opportunity.

20           Thank you for your time and your consideration.

21           THE COURT:  Thank you.

22           At Docket 24, Mr. Matthew Schelkopf.

23           MR. SCHELKOPF:  May it please the Court, Matthew

24   Schelkopf from Sauder Schelkopf.  We are located in Berwyn,

25   Pennsylvania.  It's just outside of Philadelphia, Your

1  Honor.  It's a pleasure to be here today among such an

2  esteemed group of attorneys.  I have worked with a number of

3  these attorneys over the years.  Some I even call friends.

4         Your Honor, there are obviously many, many smart

5  people in this courtroom today, and I am not here to tell

6  you that I'm the smartest.  I think I would lose that

7  argument.  Instead, I'm here to explain my unique background

8  that I think is important and valuable for this litigation.

9         First, for the past 30 years, I've been restoring,

10 building, and racing automobiles.  It's safe to say that in

11 that time I've disassembled, rebuilt, repaired, or replaced

12 nearly every component on an automobile.  I have used my

13 knowledge of automobiles to successfully litigate numerous

14 class actions against nearly every automaker to date.  Many

15 of these cases I developed myself, oftentimes by tearing

16 down the part that's in question, and many times that means

17 getting my hands dirty on an engine.

18        In the Hyundai Kia engine litigation, as

19 Mr. Barton mentioned, that was a case that I was involved

20 in.  I was a co-lead on that case with Mr. Berman.  The

21 defect that presented itself in that case was a high-speed

22 stalling and in some events fires, engine fires.

23        I was able to tear down one of the engines in that

24 case.  And I realized when I tore that engine down, it

25 became apparent and obvious to me that it was a defect in

1   the rotating assembly of that engine.

2           I along with Mr. Berman spent many months

3   negotiating a settlement in that case.  In the end it is the

4   largest Hyundai and Kia settlement to date, valued at

5   approximately $1 billion and providing relief to over

6   10 million class members.

7           Importantly, that settlement included both a

8   mechanical and an electrical fix to ensure that class

9   members did not continue to experience failures while they

10  were driving.  It wasn't just a settlement that provided

11  refunds to class members.  It was a settlement about

12  correcting a safety issue.

13          The technical knowledge that I have gained for

14  almost three decades by working on cars helped our team

15  reach the right resolution in that case.  Similarly, it's my

16  position that the Hyundai Kia theft litigation presents a

17  safety issue, but it's not an issue that is just an

18  immobilizer issue.

19          Without getting into the facts, I think it's a

20  similar case for the Hyundai Kia engine litigation in that

21  it needs to know the mechanics and the electronics to

22  provide a resolution to these class members.  If we just go

23  and settle a class-action lawsuit and we don't actually fix

24  the defect at hand, all we're going to see is a continuation

25  of these thefts.  If I am appointed as a co-lead to this

1  case as I've requested, I will use my automotive knowledge

2  to help make sure that Hyundai Kia is held accountable and

3  that the correct fix is put in place should a settlement be

4  reached.

5          Lastly, Your Honor, in every case I treat

6  co-counsel with respect and as a teammate with a common

7  goal.  Over one year ago Mr. James Barton contacted me about

8  this case, and since then our firms have been working

9  together on it.  He was the first to file this case.  He was

10 the only one to engage in litigation in this matter.

11         This is a case that came about, as he explained,

12 because it occurred in his hometown of Milwaukee.  And while

13 he isn't seeking to be the sole lead or a co-lead in the

14 case, I respectfully request that he be appointed to a

15 meaningful position so that he can be part of the litigation

16 that he started.

17         Thank you very much, Your Honor.

18         THE COURT:  Thank you.

19         At Docket No. 25, Ms. Tiffany Marko Yiatris.

20         MS. YIATRIS:  Good morning, Your Honor.  My name

21 is Tiffany Marko Yiatris, and I am from the law firm of

22 Consumer Protection Legal, LLC.  It's based out of

23 St. Louis, Missouri, which has been hard hit in the

24 automotive theft of the Kia and Hyundai vehicles.  Since

25 last year -- well, a couple of years ago there had only been

```
 1    maybe like 300 vehicles that were Kia Hyundai to be stolen
 2    in the area, and now it's at 1,500, so almost 2000 percent.
 3    So it's pretty bad for the people in the area.
 4            I represent people who have had their car stolen
 5    and I represent people who have not had their car stolen as
 6    of date.  The case that I had before, Your Honor, is the
 7    Sarim Buck case that was recently transferred.  I have 18
 8    years of experience litigating consumer class actions in
 9    both MDL and non-MDL settings.
10            In the non-MDL setting I have been appointed
11    co-lead counsel and resolved several cases on behalf of the
12    class successfully.  In the MDL setting I have been
13    appointed to plaintiffs' executive committee positions
14    including in the TD overdraft banking case, the Deloitte
15    data breach case, which I worked with people some of whom
16    are in this room.
17            Right now I'm on the CPAP, one of the CPAP
18    committees, which is a product liability class action which
19    involves some non-economic losses.
20            And also I would like to note that I was appointed
21    interim lead counsel of actions which -- pending transfer to
22    the MDL, during which time I helped mediate a settlement on
23    behalf of privacy members in the TikTok class action.  And
24    Honorable John Lee, he said of our group:  A Court-appointed
25    leadership group comprising a diverse cast of experienced
```

```
 1   plaintiffs' attorneys.
 2            In my 18 years of doing class-action work, I have
 3   worked with many people and I have worked with many people
 4   after that fact.  So I'm a team player.  I work well with
 5   people.  We had a good year last year, so we have plenty of
 6   resources to put towards the litigation fund both money wise
 7   and timewise.
 8            I'm a female-owned law firm owner from St. Louis.
 9   Again, we were hit hard and I would love the opportunity to
10   either basically be on one of the fact or expert committees,
11   whichever Your Honor would like.
12            Thank you so much for your time.
13            THE COURT:  Thank you.
14            At Docket No. 26, Ms. Amber Schubert.
15            MS. SCHUBERT:  Good morning, Your Honor.  Amber
16   Schubert of Schubert Jonckheer & Kolbe.  Thank you for the
17   opportunity to address the Court this morning.
18            I have applied for a position on the leadership
19   committee or, in the alternative, on the fact discovery
20   subcommittee.  I think there is a broad range of experience,
21   a wealth of experience, in this room.  Your Honor certainly
22   wouldn't go wrong picking any number of my colleagues from
23   across the plaintiffs' bar, so I don't envy your decision.
24            I do want to echo what some others have said,
25   which is I do think it's important to consider a broader
```

1    range of experience and not just the same faces that we

2    often see before.  In that sense, I think it is important to

3    consider people for leadership who have litigated their own

4    cases, served as lead counsel in important cases, negotiated

5    successful resolutions of those cases, but like myself have

6    not yet had an opportunity to participate in a leadership

7    capacity in an MDL proceeding.

8            So I think instead of belaboring my experience

9    which is laid out in the papers in detail, I would just like

10   to make two brief points to the Court this morning and then

11   rest on the papers.

12           The first point I think is that one of the factors

13   that Your Honor laid out in this proceeding today was the

14   willingness to commit to a time-consuming process.  Of

15   course, that's a table stake.  You shouldn't be submitting

16   an application here unless you're willing to commit to that

17   time-consuming process.

18           What I will say is that we have had over 500

19   clients who have contacted our firm now, all with cars that

20   have either been stolen or that have a substantial risk of

21   being stolen.  We have people who have had their insurance

22   rates go sky high and any number of situations.  We filed

23   two complaints in this MDL representing 15 plaintiffs, 38

24   claims, ten state classes.

25           And we don't file every client that contacts us,

```
 1    but I do think, like Mr. Berman said, this is a case that
 2    probably will get to clients from all 50 states plus of
 3    District of Columbia, and it is going to be very important
 4    to have a process within that 45-day period that I
 5    understand Your Honor will allow for a Consolidated
 6    Complaint to vet the huge number of clients that have
 7    contacted our firm and others to identify the best clients
 8    for this litigation and make sure that those are quality
 9    clients, that we're not just signing up everyone that
10    contacts us, that these are people who understand their
11    responsibilities, have a good story to tell, have been
12    harmed, and have standing.
13              So I think that is a very important part of the
14    process.  It's something our firm has done before.  For
15    example, in the Toyota fuel tank litigation where we served
16    as lead counsel, represented 39 plaintiffs, 29 state
17    classes, litigated motions to dismiss in that case.  So I
18    think it is a very important fact discovery role.
19              The second point I would make with regard to fact
20    discovery is we applied in the alternative for a position on
21    the Fact Discovery Subcommittee.  This strikes me as a case
22    that is going to involve a large amount of discovery.  If
23    you just look at the core discovery topics that are laid out
24    in the initial joint statement, there's a large amount of
25    potential topics there concerning the marketing of these
```

1    systems, the manufacturer, the knowledge on Hyundai Kia's

2    part, as well as fact discovery as to all the plaintiffs and

3    discovery in Korea as these are companies controlled by

4    Korean parent companies.

5         Our firm has really focused on that discovery

6    process.  I work very closely -- we have one associate who

7    is basically an expert when it comes to managing the

8    document review process.  He has managed large teams working

9    together with other firms.  We have really been able to

10   harness many of the electronic tools that are available in

11   discovery today whether it be targeted searches, filtering.

12   There's an AI component to many discovery systems now.

13        We were involved in the management and review of

14   6.8 million documents in the Altria shareholder derivative

15   litigation.  We were heavily involved in helping to manage

16   the review in the Anthem data breach MDL, the Accela cross

17   action which was also a data breach, the MacBook defective

18   keyboard case, and many others.

19        So I think within those cases we have carved out

20   an ability where I think we would be very productive, and I

21   think I and my firm would make a contribution here either as

22   part of the leadership or as part of the Fact Discovery

23   Subcommittee.  So we would appreciate an appointment to the

24   leadership in this case.

25        And I thank you for your time.

```
 1              THE COURT:  Thank you.
 2              At Docket No. 27, I believe it's Mr. Michaels.
 3              Good morning.
 4              MR. ANDERSON:  Christopher Anderson appearing on
 5    behalf of MLG Attorneys at Law based in Costa Mesa.  We
 6    represent plaintiffs Marcioni, Becerra, and McQuery in the
 7    class action.
 8              Mr. Michaels was unable to attend today.  He's
 9    traveling on business and is experiencing weather delays,
10    and he's asked me to come and speak on his and the firm's
11    behalf.
12              THE COURT:  Okay.
13              MR. ANDERSON:  Your Honor, I will only highlight a
14    couple things in the papers here, and I'll be brief.  MLG
15    Attorneys at Law is based here in Costa Mesa.  I think we
16    likely have some of the most cases brought against Kia and
17    Hyundai.  We are based in Costa Mesa.  We have sued them
18    here locally.  We have experience in large automotive
19    class-action cases.  We were involved in the GM ignition
20    switch case.  We were among the first to file in Lumpkin
21    versus Chrysler.
22              We also have been involved in the VW emissions
23    cases, and we have emerged as of late as one of the nation's
24    experts in the Kia theft issue.  We have two wrongful death
25    cases currently involved in that issue, a mass torts case in
```

1   the class, Your Honor.

2          We have had roughly 15 media appearances on this.

3   We have Mr. Michaels' extensive appearance in the automotive

4   products defect space and his local and nationwide

5   recognition in the automotive 101 series by the Daily

6   Journal.  Folks come to talk to Mr. Michaels and the firm

7   about these issues.

8          We were the first to file in Orange County on this

9   instant issue.  It's strategically done.  Kia and Hyundai

10  are both located here.  We've had dozens of cases versus Kia

11  and Hyundai.  We have gone to trial against both.  I believe

12  we know the inner workings of both those companies as well

13  as if not better than most firms.

14         We believe that we could assist lead counsel,

15  pretty much Mr. Michaels, in terms of the Fact Discovery

16  Subcommittee in order to help facilitate discovery.  That's

17  our main weapon in cases brought against Kia and Hyundai.

18  We have had tremendous successes, and we believe we would be

19  an asset to the Fact Discovery Subcommittee.

20         Thank you, Your Honor.

21         THE COURT:  You indicated wrongful death cases.

22  Are they part of this docket?

23         MR. ANDERSON:  They are, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         Mr. Jason Rathod.

| | |
|---|---|
| 1 | MR. RATHOD:  Good morning, Your Honor.  Jason |
| 2 | Rathod from the law firm Migliaccio Rathod, LLP, based in |
| 3 | Washington, D.C., here on behalf of our plaintiff Benevin. |
| 4 | Her car was stolen in Maryland on October 31st, 2022, so we |
| 5 | have seen a recent uptick in such thefts in the D.C. area. |
| 6 | I'm applying for a co-lead position on the expert committee. |
| 7 | I believe I have the depth and breadth of |
| 8 | experiences for a leadership position in this case.  First, |
| 9 | with depth I have 12 years of experience litigating complex |
| 10 | class actions.  My primary area of practice has been in |
| 11 | product defect class actions. |
| 12 | I started as an intern at a plaintiffs' side law |
| 13 | firm, moved up to an associate, and then started my own firm |
| 14 | with my partner about seven years ago and have been |
| 15 | litigating product defect class actions actively.  And today |
| 16 | I am grateful to say that I have had leadership appointments |
| 17 | in other major cases including the Philips CPAP DL. |
| 18 | I also serve as faculty on the ABA class action |
| 19 | group, so I'm well versed in these issues.  I live and |
| 20 | breathe these cases, and there is a certain cadence that |
| 21 | comes with that experience.  So you start to see similar |
| 22 | issues coming up, similar pleadings, similar defenses being |
| 23 | raised.  You start to know the experts that are often in |
| 24 | play and the authorities people will cite. |
| 25 | I think it's important to have that grounding and |

1   that depth.  If you look around this courtroom, it's really

2   an embarrassment of riches that we have.  There are any

3   number of lawyers who have that experience, and I like to

4   count myself among them.

5          Equally important I believe is breadth of

6   experience, and I think I could enrich the leadership of

7   this case with the breadth of experience that I have.  And I

8   think breadth is important because if you just do one type

9   of case and you follow up similar playbook case to case,

10  that can lead to path dependency where you're not

11  necessarily serving the client's best interest.  You're just

12  doing what's familiar.  And I think it's important to

13  recognize that flaw in decision-making and try to correct

14  for it.

15         One thing I would point to with the Toyota and

16  unintended acceleration litigation that I thought was an

17  important innovation, there was what Mr. Berman pointed to,

18  which is the class bellwether technique which previously has

19  been used primarily in personal injury cases or in generic

20  drug MDLs.

21         But it was important in product defect and has

22  recently become the norm, so in the GM ignition switch.  It

23  was also used in a number of cases.  Most recently on the

24  West Coast in the Juul MDL, it was deployed where there was

25  one California bellwether, and very quickly they are able to

1    streamline the litigation within just a few years from the

2    pleadings through class certification.  And on the eve of

3    trial there was just a global settlement.  So I recommend

4    the Court continue, as Mr. Berman urged, on that path.

5            In terms of what I could offer in that breadth, I

6    think similar, a vision to be able to import things from

7    other areas of law.  When I read through the case management

8    plan looking at the defenses, one thing that leapt out to

9    me, one of the primary defenses is that they cannot be held

10   responsible for the acts of third-party criminals.  The

11   chain of causation is too remote.

12           My firm has a number of leadership appointments in

13   data privacy, and we see that argument a lot that hackers,

14   the responsibility of third-party acts of hackers, how could

15   we have known.  My firm I can say has been able to

16   successfully meet and beat those arguments, and we could

17   bring that line of sight from other areas of law into this

18   area.

19           I also point out in my papers that we have civil

20   rights class actions and in that have been able to thread

21   the needle of establishing common injury through tools like

22   Rule 23(c)(4) and bifurcating liability and damages in a way

23   that you can capture the full extent of damages and not

24   sacrifice that in the class-action mechanism.

25           The last thing I'll just end with in terms of case

1    management, I mentioned bellwether class trials I think will

2    be an important part of this litigation.  The other thing is

3    I think an early deadline for substantial completion of

4    document discovery as early as we can get in 2023 will be

5    key to deriving a resolution because really having that

6    established, a lot gets keyed off of that, including the

7    expert work, to have that completed and other things so we

8    can march this case successfully to trial and honor the

9    command of rule one for a speedy, expeditious, and fair

10    resolution of all cases.

11            Thank you, Your Honor.

12            THE COURT:  Thank you.

13            We've been going for a while.  I want to give our

14    court reporter a rest, so let's take a ten-minute break.

15                (Recess taken at 10:21 a.m.;

16                proceedings resumed at 10:31 a.m.)

17            THE COURT:  At Docket 31, Mr. Mason Barney.

18            MR. BARNEY:  Good morning, Your Honor.  Thank you.

19            My name is Mason Barney from the law firm of Siri

20    and Glimstad in New York City.  My qualifications were set

21    out in our brief that we submitted for the position, but I'm

22    just highlighting a few points.  I have been active in

23    complex litigation for over 18 years on both the plaintiff's

24    and defendant's side.  That is, while I may not have as much

25    class-action experience as certain people in this room, I

1    have had a large amount of experience in representing

2    companies in Asia specifically.  Many of my clients over the

3    years have been Asian corporations, and therefore I'm very

4    familiar with the discovery issues and transnational issues

5    that come up in such litigation.

6            In addition, I have been lucky enough to be first

7    or second chair in six trials and therefore have the

8    experience necessary to understand how discovery is

9    collected and then used during trials.  As such, I feel that

10   that is a strong set of knowledge to bring to either the

11   Fact or Expert Discovery Subcommittees.

12           In addition, even though my firm has less

13   experience in these fields -- this will be our first MDL

14   that we have applied for a leadership position on -- I

15   believe that does bring a new diversity of information and

16   knowledge.  And as I said, having represented defendants for

17   the majority of my 18 years in practice, I also have a

18   different understanding from that perspective as well.

19           We also have a diverse group of clients that we

20   represent.  We represent clients from all over the country,

21   from California to Michigan to Pennsylvania.  As such we

22   have a broad view of how this matter has impacted the entire

23   nation and not just particular cities which are particularly

24   hardest hit.

25           In addition, we are one of the few firms from

1    New York City who is applying for a position; therefore, we

2    also bring geographic diversity as well.

3              In short, we feel that our application for either

4    fact or expert discovery will bring new views and will lead

5    to a growth in the plaintiffs' bar of qualified firms.

6              So we thank you for your consideration, Your

7    Honor.

8              THE COURT:  Thank you.

9              At Docket No. 32, Jonathan Michaels.

10             MR. HENDERSON:  Chris Henderson from MLG again.  I

11   believe we occupied both Nos. 27 and 32 on the docket.

12   Docket 32 was our refiling.  I have no other comments to

13   add.

14             THE COURT:  Okay.  Thank you.

15             At Docket No. 33, Mr. Berman.

16             MR. BERMAN:  Thank you, Your Honor.

17             I think as I view your role, you're almost

18   standing in the shoes of a class representative trying to

19   pick the best lawyer.  I hate to toot my own horn, but I do

20   think if I were class rep, I have some attributes that would

21   be something that a class rep would want in their lawyer.

22             First, since you appointed me, I didn't know my

23   career was going to go down this path, but I have since

24   handled almost all the significant automobile defects class

25   actions in this country, and I think I'm probably the most

1    experienced class-action auto defect lawyer now in the

2    country.  And I think that plays for the benefit of the

3    class -- unintended consequences.

4           Second, I think I'm one of the few lawyers in the

5    room that has actually tried an automobile defect class

6    action which I did last September.  It was an issue trial.

7    We tried the issue for 20 states, and the Court didn't

8    certify it because the Court thought it was not manageable,

9    but I think we demonstrated it is manageable.  I have been a

10   lawyer for over 40 years.  I have tried 40 cases at least,

11   and I learned a lot in that case.  I learned a lot about how

12   to try an auto defect case that I can bring to the table

13   here.  You would think after 40 years that wouldn't be the

14   case, but it was.

15          Third, I have the unique experience involving

16   these defendants.  This is my fourth case involving Hyundai

17   Kia class-action auto defect.  We settled three of them.

18   One settlement went all the way to an en banc affirmative in

19   the Ninth Circuit.  What that brings is I know how these

20   people think.  I'm familiar with the inside lawyers.  I have

21   dealt with the outside lawyers for the most part.  I know

22   how the company thinks.  I know where their documents are

23   located.  So I come to this case with a lot of valuable

24   experience for the class.

25          Fourth, I think you saw this before.  I don't give

1    up.  In the Toyota case, when NASA said there was nothing

2    wrong with the cars, I kept going, and a lot of plaintiffs'

3    lawyers thought I was frankly nuts.  But I didn't give up.

4           What happened in that case, Your Honor, is

5    something that we should be proud of, both of us.  We put in

6    break overrides in over one million cars.  There is no

7    unintended acceleration problem.  We did a huge public

8    service there and hope to do that again in this case.

9           Then finally, Mike Bench, Your Honor, I want to

10   talk about Mike Bench at my firm.  I understand the

11   appointments for individuals, but I have lawyers who backed

12   me up in all these other defect cases that I could call on.

13   I knew I could call on all these folks, and I will.  But I

14   have a partner who spends 60, 70 percent of his time doing

15   nothing but damages expert work in automobile cases.  There

16   is no one in the country that has been through more Daubert

17   theories and machinology issues that I can call on.

18          The last point I want to make, a point that I

19   think is very important that no one addressed in the room,

20   and that is what happens when the case is settled.  When the

21   case is setted, there has to be administration.  I have

22   lawyers who have spent thousands of hours talking to

23   thousands of people once you approve the settlement.  We

24   have a team to set up to make sure it goes smoothly once

25   you've approved it.

```
 1            I think that's important to the administration of
 2    class actions and the administration of justice, frankly.
 3    So unless you have questions, Your Honor, I would be pleased
 4    to serve again.
 5            THE COURT:  No.  Thank you.
 6            Mr. Kevin Stanley.
 7            MR. STANLEY:  Good morning, Your Honor.  Kevin
 8    Stanley of Humphrey Farrington & McClain.
 9            To pick up on something Ms. Fegan said earlier, I
10    think one of the things that everybody is trying to do here
11    is identify what skill sets they would bring to the co-lead
12    counsel to tap into in the different roles that are required
13    to move this case forward.
14            I specifically asked for a position on the
15    Plaintiff Fact Discovery Committee because that's where my
16    skill set lies.  I have been involved in auto defect cases
17    since before I passed the bar.  I clerked at a firm that did
18    nationwide auto defect cases.  After a clerkship I returned
19    to that firm and practiced for several years before moving
20    into a solo practitioner practice where I worked for several
21    years continuing to do auto defect cases as a sole
22    practitioner working in co-counsel arrangements with other
23    firms.
24            So I was involved in high-stakes litigation
25    against Ford, General Motors, Kia, and Nissan, among others
```

1  in these types of cases doing discovery, working with

2  experts, and trying cases against these companies.

3          To follow up on something that Mr. Berman did say,

4  I actually have tried an auto defect case, a class-action

5  case, against an automobile manufacturer.  I actually tried

6  a case against Mr. Brennan a few years back in Kansas City,

7  Missouri.  So I have the experience of the big picture to

8  bring to the Plaintiff Fact Discovery Subcommittee, and I

9  would ask for an appointment in that position because I

10 think that's the best place that I can serve this

11 litigation.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          At Docket No. 35, Ms. Cappio.

15          MS. CAPPIO:  Hello again, Your Honor.  I'll be

16 brief.  Gretchen Cappio of Keller Rohrback for plaintiff

17 City of Seattle.  You know, we've heard today a lot about

18 areas that have been really impacted.  We've heard terms

19 like ground zero or Good Hope Road, and those are the

20 stories of the people talking to us from cities across the

21 country that have been deeply impacted.

22          So I just want to touch really briefly on how I

23 got here and what I can add on behalf of the City of Seattle

24 and other municipalities.  This is client-driven litigation.

25 This is clients coming to us saying you have automotive

1    expertise including against Hyundai and Kia.

2            In fact, I have been appointed to leadership in a

3    couple of cases in this district against the defendant.  In

4    addition, it's clients saying you have a lot of experience

5    in nuisance.  And that's what we've got on our hands here.

6    Their Police Departments are literally begging them to do

7    something, and so we are taking those calls right now.

8            You have got cases like Juul and opioids.  Our

9    co-lead counsel in the Juul litigation have had major roles

10   in the opioid litigation as well.  I have been very involved

11   with the client interface in those, including landing the

12   plain and allocation issues specifically in the states of

13   Arizona and Colorado for opioid.

14           So this is a kind of perfect springboard for not

15   only me but also for our clients, and we just want to say

16   we're humbled by the expertise and experience in this

17   courtroom.  I have personally worked with many of these

18   lawyers and think the world of them.  So I'm a team player,

19   and I want to point that out as well.

20           Another issue here specifically is it takes time

21   for governmental entities to file suit.  I know that

22   probably goes without saying, but that's why we're going to

23   see these cases, these Complaints, trickle in a little bit.

24           I have taken calls over the years, many, many

25   calls, from consumers and governmental entities, and I will

```
1    just say for governmental entities, their processes involve
2    sometimes the city attorney directly who hires sometimes
3    their votes and that kind of thing and need to be meetings
4    held and things are on a schedule.  So those cases will
5    start to trickle in here.
6            I did just want to touch on, you know, what models
7    to look for for leadership in a case like this.  I do think
8    Juul is a good model.  I recognize that there are
9    differences there.  There were class claims, personal injury
10   claims, and governmental entity claims there.  Here we don't
11   have as many personal injury claims, although there are
12   some.  I recognize that.  But there was a governmental
13   entity track more or less designated in that litigation by
14   Judge Orrick.  We would be happy to supply more information
15   if Your Honor would like it on that.  My law partner, Dean
16   Kawamoto, was the co-lead counsel named in that case, and I
17   have worked with him extensively on it.
18           I would just posit, Your Honor, that the Toyota
19   unintended acceleration case does provide a very apt model
20   of leadership here where you had a personal injury track and
21   also the consumer track, and leadership for both.
22           With that I will just say, you know, I know we
23   mentioned earlier Volkswagen.  We are very focused on the
24   remedies here and working together, but the leadership model
25   in Volkswagen was a little bit different because the
```

1    government was represented by the Department of Justice, who

2    could enforce the Clean Air Act.

3           Here the nature of the problem, the fact that

4    these kids are wrecking these vehicles all over and we've

5    heard about the downstream consequences to that, it means

6    that local governments, local Police Departments, are

7    footing the bill.  And that's why local governments are

8    suing here and why you can expect to see more of these

9    cases.

10          Unless Your Honor has any questions -- thank you

11   so much.

12          THE COURT:  No.  Thank you.  I think each

13   applicant has had an opportunity to address the Court.  Have

14   I missed anyone?

15          This has been very helpful to me to better

16   appreciate the multiple aspects of this.  I come away from

17   this believing that there ought to be a track for

18   governmental entities that's separate from the basic

19   consumer track.  I think at least nominally I ought to

20   appoint a personal injury committee.

21          MR. BRENNAN:  Your Honor, I did want to point out

22   on the personal injury is that I think the indication had

23   been that the two wrongful death cases which were brought by

24   passengers -- it's in the case in the Western District of

25   New York, transferred to the MDL -- was posed in the JPML.

```
 1   They set a briefing schedule, and the plaintiffs actually
 2   did not then push further for the transfer.
 3           So I actually suspect that case will not be heard.
 4   And I think when Mr. Henderson spoke earlier, and I
 5   understand he's appearing for Mr. Michaels, but I think when
 6   he said that, he indicated that they were part of this MDL,
 7   and they certainly aren't yet.  And I actually don't
 8   anticipate they will be.  So I apologize.  That's one of the
 9   very rare instances as I would never interrupt Your Honor.
10           THE COURT:  That's very helpful.  I will defer on
11   that point.  If we wind up having personal injury cases, we
12   will just simply have to treat it differently given that
13   individual counsel have individual clients and so on.  So I
14   will simply defer on that.
15           I'm not sure what we're going to do as to how we
16   manage discovery, but I want to introduce to you our
17   magistrate judge, Judge Karen Scott.  I think one of the
18   things that the joint report will deal with is the necessity
19   for a special master for discovery, how we ought to treat
20   discovery disputes, but in one way or another, Judge Scott
21   is going to be involved in this.  So I will let you come
22   back to me.
23           Are there any peculiar discovery problems that
24   relate to Korea?  For example, can Americans go over there
25   and take depositions, or is it like Japan where you have to
```

1   go to the embassy?

2          MR. BRENNAN:  Your Honor, the typical rule is they

3   actually cannot, that that's the law, but it's my

4   understanding in Korea, we have gotten things worked out in

5   prior --

6          MR. SCHELKOPF:  Your Honor, Matthew Schelkopf.  I

7   have actually taken a deposition of at least three Korean

8   vice-presidents for Hyundai, and we did have an arrangement

9   where that was done in California.  And then this most

10  recent time was actually done via Zoom.

11          THE COURT:  Okay.

12          MR. SCHELKOPF:  Thank you, Your Honor.

13          THE COURT:  Well, two points.  I indicated in the

14  initial order that we would have a block on the Court's

15  website for major pleadings.  That will get established

16  shortly.  If you go to the homepage and go down to the

17  bottom, there's a block that says cases of interest.  The

18  Toyota case is still there.  Obviously I remember that

19  experience pretty well.

20          So if you have a curiosity to see what I did with

21  another case, most of the major orders are there.  Those

22  orders and those approaches may or may not fit this case,

23  but at least they're out there for consideration.

24          Any concluding thoughts anyone would like to share

25  with the Court?

```
 1              Mr. Berman.
 2              MR. BERMAN:  Yes, Your Honor.  Thank you.
 3              We would like to address the timing of the main
 4   Complaint again or the Consolidated Complaint.  You said 45.
 5              THE COURT:  Right.
 6              MR. BERMAN:  I had suggested 60.
 7              THE COURT:  Right.
 8              MR. BERMAN:  I think, as I listened to all these
 9   lawyers who all have clients, I would like whoever is lead
10   wants more time to vet and give everyone a chance to weigh
11   in, so I would again ask for 60.  I know you want to move it
12   along, but --
13              THE COURT:  Well -- Mr. Brennan.
14              MR. BRENNAN:  If he wants 60, that's fine.  As you
15   know, not to sound like a broken record, we just want to be
16   heard on our motion to dismiss.
17              THE COURT:  Understood.  High priority.  Sixty it
18   is.
19              MR. BERMAN:  Thank you, Your Honor.
20              THE COURT:  Yes, sir.  Mr. McClain.
21              MR. MCCLAIN:  Judge, the only other point, you
22   asked us did we want 8:00 or 3:00 for the scheduling
23   conference.
24              THE COURT:  Right.
25              MR. MCCLAIN:  So I would vote for 8:00.
```

1        THE COURT:  That means everybody has got to come

2   in the night before, but there is just no way around that.

3        MR. BRENNAN:  Your Honor, I think that's correct.

4   That will be fine certainly from the defendant's standpoint.

5        THE COURT:  Okay.  Then that's what we will do.

6        Let me share one last thing.  It's my philosophy

7   of management.  My approach is to identify the major paths

8   that we go down and the major decisions in going down those

9   paths, and let the counsel fill in the particulars as to how

10   we accomplish any given task.

11        You're the ones who are going to have to carry out

12   the orders, and I will benefit and have benefited from the

13   insights of counsel as to how we implement in a way the

14   Court marks a particular path that we're going to go down.

15   So I look for that type of input in this case, and I think

16   it causes us to work collaboratively, and I think it's a

17   better result for everyone.  And let's everyone accomplish

18   their task in an efficient manner.

19        So if there is no further thoughts, we're going to

20   be adjourned.  Thank you all for coming today.

21        (Proceedings adjourned at 10:51 a.m.)

22                  *    *    *

23

24

25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

70

1

2

3

4                              CERTIFICATE

5

6          I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of th6 Judicial Conference of the United States.

12

13   Date:  February 11, 2023

14

15                        /s/   Sharon A. Seffens  2/11/23
16                        _____
17                        SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER