Nathan Dooley (SBN 224331)
COZEN O'CONNOR
601 S. Figueroa Street
Suite 3700
Los Angeles, CA 90017
Tel.: 213.892.7933; Fax: 213.892.7999

Elliott R. Feldman (*pro hac vice motion pending*)
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel.: 215.665.2071; Fax: 215.701.2282

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE AUTOMOBILE MUTUAL INSURANCE COMPANY; STATE AUTO PROPERTY & CASUALTY INSURANCE COMPANY; MILBANK INSURANCE COMPANY; AMERICAN FAMILY INSURANCE COMPANY; AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I.; AMERICAN STANDARD INSURANCE COMPANY OF OHIO; AMERICAN STANDARD INSURANCE COMPANY OF WISCONSIN; MAIN STREET AMERICA PROTECTION INSURANCE COMPANY; NGM INSURANCE COMPANY; OLD DOMINION INSURANCE COMPANY; PERMANENT GENERAL ASSURANCE CORPORATION; THE GENERAL AUTOMOBILE INSURANCE COMPANY, INC.; CHURCH MUTUAL INSURANCE COMPANY, S.I.; ERIE INSURANCE COMPANY; ERIE INSURANCE EXCHANGE ; ERIE INSURANCE COMPANY OF NEW YORK; ERIE INSURANCE PROPERTY & CASUALTY CO.; FLAGSHIP CITY INSURANCE COMPANY; AMERICAN STATES INSURANCE COMPANY; AMERICA FIRST INSURANCE COMPANY; AMERICAN ECONOMY INSURANCE COMPANY; AMERICAN STATES PREFERRED INSURANCE COMPANY; CONSOLIDATED INSURANCE COMPANY; EMPLOYERS INSURANCE | Case No.: 8:22-ml-03052-JVS-KES<br><br>**OBJECTION TO CASE MANAGEMENT ORDER (DKT. NO. 70), AND APPLICATION OF ELLIOTT R. FELDMAN AND NATHAN DOOLEY OF COZEN O'CONNOR FOR APPOINTMENT TO (1) CHAIR A SUBROGATION INSURANCE CLASS ACTION COMMITTEE, (2) FOR REPRESENTATION ON THE CONSUMER CLASS ACTION LEADERSHIP COMMITTEE (3) TO VACATE CASE MANAGEMENT DEADLINES RELATED TO THE SUBROGATION INSURANCE CLASS ACTION AND (4) LEAVE TO FILE A CONSOLIDATED INSURANCE CLASS ACTION COMPLAINT**<br><br>**DATE:** May 15, 2023<br>**TIME:** 1:30 p.m.<br>**PLACE:** 411 West Fourth Street Santa Ana, CA 92701 Court Room 10C |

1

| | |
|---|---|
| 1 | COMPANY OF WAUSAU; FIRST )
| | NATIONAL INSURANCE COMPANY OF )
| 2 | AMERICA; GENERAL INSURANCE )
| | COMPANY OF AMERICA; LIBERTY )
| 3 | COUNTY MUTUAL INSURANCE )
| | COMPANY; LIBERTY INSURANCE )
| 4 | CORPORATION; LIBERTY MUTUAL )
| | FIRE INSURANCE COMPANY; LIBERTY )
| 5 | MUTUAL INSURANCE COMPANY; )
| | LIBERTY MUTUAL MID-ATLANTIC )
| 6 | INSURANCE COMPANY; LIBERTY )
| | MUTUAL PERSONAL INSURANCE )
| 7 | COMPANY; LIBERTY PERSONAL )
| | INSURANCE COMPANY; LM GENERAL )
| 8 | INSURANCE COMPANY; LM )
| | INSURANCE CORPORATION; )
| 9 | MONTGOMERY MUTUAL INSURANCE )
| | COMPANY; PEERLESS INDEMNITY )
| 10 | INSURANCE COMPANY; SAFECO )
| | INSURANCE COMPANY OF AMERICA; )
| 11 | SAFECO INSURANCE COMPANY OF )
| | ILLINOIS; SAFECO INSURANCE )
| 12 | COMPANY OF INDIANA; SAFECO )
| | INSURANCE COMPANY OF OREGON; )
| 13 | SAFECO NATIONAL INSURANCE )
| | COMPANY; THE FIRST LIBERTY )
| 14 | INSURANCE CORPORATION; THE )
| | NETHERLANDS INSURANCE )
| 15 | COMPANY; WAUSAU UNDERWRITERS )
| | INSURANCE COMPANY; ALLIED )
| 16 | PROPERTY & CASUALTY INSURANCE )
| | COMPANY; AMCO INSURANCE )
| 17 | COMPANY; COLONIAL COUNTY )
| | MUTUAL INSURANCE CO.; )
| 18 | DEPOSITORS INSURANCE COMPANY; )
| | HARLEYSVILLE INSURANCE )
| 19 | COMPANY; HARLEYSVILLE )
| | INSURANCE COMPANY OF NEW )
| 20 | JERSEY; HARLEYSVILLE INSURANCE )
| | COMPANY OF NEW YORK; )
| 21 | NATIONWIDE AFFINITY INSURANCE )
| | COMPANY OF AMERICA; NATIONWIDE )
| 22 | AGRIBUSINESS INSURANCE )
| | COMPANY; NATIONWIDE GENERAL )
| 23 | INSURANCE COMPANY; NATIONWIDE )
| | INSURANCE COMPANY OF AMERICA; )
| 24 | NATIONWIDE MUTUAL FIRE )
| | INSURANCE COMPANY; NATIONWIDE )
| 25 | MUTUAL INSURANCE COMPANY; )
| | NATIONWIDE PROPERTY & CASUALTY )
| 26 | INSURANCE COMPANY; TITAN )
| | INSURANCE COMPANY; VICTORIA )
| 27 | FIRE & CASUALTY COMPANY; )
| | VICTORIA SELECT INSURANCE )
| 28 | COMPANY; NEW JERSEY INDEMNITY )

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | INSURANCE COMPANY; NEW JERSEY MANUFACTURERS INSURANCE COMPANY; GENERAL CASUALTY COMPANY OF WISCONSIN; GENERAL CASUALTY INSURANCE COMPANY; SOUTHERN PILOT INSURANCE COMPANY; and UNIGARD INSURANCE COMPANY<br><br>      Plaintiffs,<br><br>  v.<br><br>HYUNDAI MOTOR AMERICA, HYUNDAI MOTOR COMPANY, KIA AMERICA, INC., KIA CORPORATION,<br><br>      Defendants. |

Pursuant to the Court's Case Management Orders in this matter, Dkt. Nos., 2 (noting the potential need for "specific representation on the Leadership Committee for commercial interests") and 50 (noting "[t]he Court will review the leadership structure from time to time as the docket proceeds, and may make changes or additions as warranted"), Elliott R. Feldman and Nathan Dooley of Cozen O'Connor respectfully submit the following Objection to the Case Management Order and Application ("Application")[1] on behalf of the insurance carrier class of Plaintiffs ("Insurance Plaintiffs), *see State Auto. Mut. Ins. Co. et al. v. Hyundai Motor Am. et al.*, No. 8:23-cv-00443 (C.D. Cal. Mar. 10, 2023) ("Subrogation Class Action"), for (1) the creation of a Subrogating Insurance Class Action Committee for this MDL proceeding ("Subrogation Committee") and an appointment to co-chair the Subrogation Committee; and (2) for two seats on the Consumer Class Action Leadership

---

[1] The *Subrogation Class Action* was transferred to the MDL proceeding by Order dated March 21, 2023. *See State Automobile Mutual Insurance Company et al v. Hyundai Motor America et al.,* Dkt. No. 16 (C.D. Cal. Mar. 21, 2023). After transfer of the *Subrogation Class Action* to the MDL proceeding, the Executive Committee did not provide Insurance Plaintiffs with a copy of the Case Management Order. Nevertheless, the Insurance Plaintiffs first filed its Application on April 3, 2023, but as noted during the April 6, 2023 status conference, the Insurance Plaintiffs were not able to file any document in the MDL proceeding due to a technical error in the Court's ECF system, and as a result, were forced to file their Application in the *Subrogation Class Action*. *Id.* Dkt. No. 17. On April 10, 2023, the Court clerk informed counsel for the Insurance Plaintiffs that the technical problem preventing them from filing any documents in the MDL proceeding was resolved, and they were granted access to file in the MDL proceeding. This Application follows.

Committee. Separately, as an independent Committee, the Insurance Plaintiffs seek (3) an order vacating any deadlines applicable to the Insurance Plaintiffs, just as the Court vacated the case management deadlines applicable to the governmental entities, and leave to file a Consolidated Insurance Class Action Complaint. *See* Dkt. No. 70 at 3:7–9 (vacating "any orders affirmatively setting any deadlines for governmental entity actions, including but not limited to any deadlines set by the Order for a consolidated government entities complaint").

## INTRODUCTION

This Application should be granted in its entirety, particularly in view of the allegations set forth within the Consolidated Amended Consumer Class Action Complaint ("Consumer Counsel Complaint"), Dkt. No. 84, filed by members of the Consumer Class Action Leadership Committee ("Consumer Counsel") on behalf of the Plaintiffs they represent ("Consumer Counsel Plaintiffs"), while excluding the Insurance Plaintiffs. Notably, the Court's Case Management Order directs Plaintiffs to file a Consolidated Complaint that "shall synthesize the facts, class definitions, and causes of action alleged in the actions constituting this MDL." Dkt. No. 70 at 2:2–5. Consumer Counsel failed to do that here.

The Consumer Counsel Complaint excludes the Insurance Plaintiffs as named plaintiffs, and excludes salient facts and allegations of the Insurance Plaintiffs' Complaint. Yet the Consumer Counsel Complaint claims the losses sustained by the same Insurance Plaintiffs that have been excluded from the Consumer Counsel Complaint. This is impermissible overreach that renders the Consumer Counsel Complaint ripe for attack, jeopardizing the claims for consumers, as well as the Insurance Plaintiffs.

Whether by mistake or design, the Consumer Counsel Complaint is infirm as pled, and susceptible to obvious arguments available to Defendants in a Motion to Dismiss or Strike. For this reason, this Application must be granted in its entirety. The Complaint, for example, bizarrely asserts "claim splitting" as a justification for the Consumer Counsel's attempt to assert damages sustained by clients they *do not* (and cannot) represent, and did not even deign to consult, or even name as Plaintiffs in the Consumer Counsel Complaint.

Claim splitting, however, is a *defense* that can only be raised by *Defendants* in this action. This allegation, therefore, is both peculiar and infirm.

The Consumer Counsel Plaintiffs and their counsel, moreover, do not have the right, authorization, or standing to bring any claim for damages that is owned by the Insurance Plaintiffs. For this reason as well, the Consumer Counsel Complaint is invalid to the extent that it seeks to self-arrogate control over the subrogation claims by unilaterally attempting to represent numerous members of the insurance industry whose subrogation claims are outside the scope of the consumer complaint, and which have retained Cozen O'Connor as their exclusive counsel. Notably, the Insurance Plaintiffs own the lion's share of alleged damages in this MDL action, with provable liquidated damages capable of calculation down to the penny, as opposed to the claims of Plaintiffs represented by Consumer Counsel, whose claims are based on damages that are alleged—in the very same complaint—to be separate and apart from any insurance claim that was paid out by the Insurance Plaintiffs. *See, e.g.*, Dkt. No. 84 ¶¶ 36–1206. For example, the Consumer Plaintiffs seek damages for alleged overpayment for purchase of class vehicles, as well as damages for diminution in value of vehicles owned by class members which have not yet been stolen. *Id.* Neither of these claims, nor any of the other damages alleged by Consumer Counsel Plaintiffs, are involved in the Insurance Plaintiffs' claims. *Id.*

Indeed, the Consumer Plaintiffs would have no means of proving damages for the Insurance Plaintiffs' claims. The Consumer Counsel Complaint makes it clear, moreover, that the Consumer Counsel may have a non-waivable conflict of interest in view of their attempt to include representation of the Insurance Plaintiffs' subrogation claims within the scope of the Consumer Counsel Complaint. Consumer Counsel has repeatedly sued many of the named Insurance Plaintiffs, who vociferously object to purported representation by Consumer Counsel. To the extent Insurance Plaintiffs are not made whole, the allegations set forth within the Consumer Counsel Complaint create a clear conflict of interest between the Consumer Counsel who authorized the Complaint and the Insurance Plaintiffs, mandating separate representation. Consumer Counsel did not even consult with counsel

representing the Insurance Plaintiffs regarding the Consumer Counsel Complaint. Insurance Plaintiffs may be forced to pursue their claims in collateral litigation – a result this MDL proceeding is intended to avoid. For these reasons, among others, it is clear the Insurance Plaintiffs require representation on the Consumer Class Action Leadership Committee in addition to a separate track governed by a Subrogation Committee.

The named Consumer Counsel Plaintiffs seek damages in the Consumer Counsel Complaint such as diminution in value of the vehicles, deductible payments (that the Executive Committee seeks to rely upon the Insurance Plaintiffs to prove), and other uninsured losses. *See* Dkt. No. 84 ¶¶ 36–1206. Within the allegations describing the harm to each individual named class member, the Consumer Counsel Complaint fails to mention *any* amounts paid out by the Insurance Plaintiffs. *See id. This is understandable since Consumer Counsel have absolutely no information regarding the Insurance Plaintiffs' subrogation claims.* Yet Consumer Counsel then allege their consumer claims are typical and give rise to a claim to insurance proceeds paid out by the Insurance Plaintiffs, which actually are excluded from the Consumer Counsel Complaint. *See id.* ¶ 1534. These allegations show a fundamental misunderstanding of the nature of, and basis for the insurance subrogation claims which Cozen O'Connor is handling. The Insurance Plaintiffs' claims do not include the various diminution in value claims being alleged by the consumer plaintiffs. It appears the primary goal of including the Insurance Plaintiffs' damages is to pad attorneys' fees to be sought by Consumer Counsel while ignoring the gravamen of those same claims.

The Insurance Plaintiffs, moreover, also own data that is vital to this case. That data has been informally sought by the Defendants, and Consumer Counsel. Of course, Insurance Plaintiffs have volunteered to supply their own detailed claim data[2] without a formal discovery request from Defendants, demonstrating the Insurance Plaintiffs' willingness to

---

[2] Even though this data is vital to the Consumer Counsel Plaintiffs' claims as pled, Consumer Counsel has failed to even contact the Insurance Plaintiffs to include this data in initial disclosures due this week. For this reason, and to avoid such damages from being precluded by subsequent motion practice, Insurance Plaintiffs are serving their own initial disclosures this week so that their claims are not further hampered by this peculiar oversight.

cooperate, and ability to efficiently provide information vital to the claims and defenses asserted by all parties to this MDL.

## THE INSURANCE PLAINTIFFS

The Insurance Plaintiffs are property and casualty insurers that have paid claims under policies issued to their policyholders for thefts of certain Hyundai and Kia vehicles. Ten insurance groups with sixty-eight named member companies have been identified in the Complaint. As of the date of submission of this Application, six additional insurance groups have retained Cozen O'Connor to participate as named class members in this Subrogation Class Action. A significant number and magnitude of additional insurance groups are expected to participate as named class members. Insurance Plaintiffs seek leave by way of this Application to file an amended complaint to identify all of these additional named class members in the Subrogation Class Action.

The Insurance Plaintiffs, moreover, are in separate negotiations with Defendants, and are represented exclusively by Cozen O'Connor, without any involvement by Consumer Counsel, for the purposes of discovery, and settlement. Consumer counsel have made it clear that they view their claims to be separate and distinct from the Insurance Plaintiffs' claims, and refuse to provide Cozen O'Connor any information regarding discovery or settlement. This point is crucial to the efficient management of the MDL proceedings as the absence of any voice on behalf of the Insurance Plaintiffs can only serve to hinder discovery, motion practice, trial, or other resolution of this matter.

## THE INSURANCE PLAINTIFFS' CURRENT ESTIMATED DAMAGES

Currently, indemnity payments for the losses sustained by named Insurance Plaintiffs amount to more than One Hundred Ninety Million Dollars ($190M). Depending upon which additional companies join the action as named class members, indemnity loss payments for the named class members likely will approach or exceed the range of Two Hundred Fifty to Three Hundred Million Dollars ($250–$300M). It is difficult to provide a scientific estimate of aggregate payments for collective thefts of the Class Vehicles which have or will be paid by the entire insurance industry at this stage, but a preliminary benchmark of approximately

Five to Six Hundred Million Dollars ($500M–$600M) may be a reasonable estimate of the total damages to the class, excluding exemplary damages, costs and attorneys' fees.

## **BACKGROUND**

The background of the Subrogation Class Action is straightforward: the Hyundai and Kia Defendants violated industry standards, including FMVSS 114, by failing to equip their vehicles with anti-theft protection. The latest iteration of FMVSS 114 went into effect in mid-2010. Since that time, every manufacturer of vehicles sold in the U.S.—except Hyundai and Kia—has utilized immobilizer technology to provide consumers with this mandatory anti-theft protection. Indeed, Hyundai and Kia utilize immobilizers in many of their vehicles, including vehicles of the same make, model, and year as the Class Vehicles but that are sold in Canada, where Canadian regulatory requirements mandate immobilizers in all vehicles. (This mandate went into effect in Canada on September 1, 2007, and all manufacturers have complied with this standard for all cars sold in Canada, including Hyundai and Kia).

Immobilizers prevent vehicles from being started and moved forward unless a unique code is transmitted from the vehicle's key. Without immobilizers or some comparable anti-theft protection, cars are easily stolen. Kia and Hyundai have long known this fact but made no effort to warn customers about the risk presented by their vehicles. The effectiveness of immobilizers is well documented throughout the industry, but the actions and words of the defendants may prove to be most compelling: in petitioning NHTSA for relief from complying with 49 CFR Part 541 relating to marking parts to facilitate tracing stolen vehicles, Kia and Hyundai stated that vehicles equipped with immobilizers (unlike the Class Vehicles) are about 70% less likely to be stolen compared to vehicles without immobilizers. (*See* Exhibit "A".) Of course, once it became public knowledge that Class Vehicles lacked immobilizers, the theft of Kia and Hyundai's vehicles escalated dramatically.

There has been a firestorm of publicity, all very adverse to Kia and Hyundai, regarding their unique violation of federal law in failing to equip all of their vehicles with immobilizers. Kia and Hyundai have responded in a number of ways, by offering old

fashioned "Clubs" to certain of these vehicle owners to prevent thefts, and providing an unspecified software upgrade, which may not be implemented for an indeterminate period of time, to provide some sort of anti-theft protection. The details of this software upgrade are not clear. If anything, these remedial measures indicate the problem is more widespread than originally understood. These various upgrades only serve to reinforce the fact that Defendants violated federal law and industry standards by failing to equip their vehicles with required anti-theft protection. For purposes of the Subrogation Class Action, the horse truly is out of the stable; these vehicles have been stolen and resulting claims have been submitted and paid by the insurance industry, both named and unnamed class members.

HLDI data through 2021 establishes that thefts of Class Vehicles occurred at a rate more than double the reported thefts for other vehicles, and it is expected that the more recent data will reflect a ratio of approaching quadruple the rate for other vehicles—this for a class of vehicles that would normally be stolen at a rate much lower than the rate of all other vehicles. Indeed, the rate has been increasing steadily from 2019 onward, when videos showcasing the defective nature of the Class Vehicles went viral on social media. These thefts have created an immediate danger to Hyundai and Kia's customers, as well as the general public, as their vehicles have become an attractive target for thieves. Immediate remedial measures are therefore required by Hyundai and Kia.

**SUBROGATION PRINCIPLES**

The Insurance Plaintiffs represented by Cozen O'Connor have full ownership and exclusive interest in their subrogation claims, which have arisen under the contracts of insurance and by operation of law upon payment of claims to their insureds/policyholders for the thefts of their Hyundai and Kia vehicles. Exemplar subrogation provisions in certain of the subject policies are attached collectively as Exhibit "B." These provisions are standard in the insurance industry and uniformly appear in automobile insurance policies.

"Subrogation is the insurer's right to be put in the position of the insured, in order to recover from third parties who are legally responsible to the insured for a loss paid by the insurer." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1120 (9th Cir. 2010)

(cleaned up). The Insurance Plaintiffs, as subrogating insurers, are entitled to proceed independently to pursue reimbursement for their subrogation claims. *Id.* at 1117–18; *see also Pac. Gas & Elec. Co. v. Superior Ct.*, 144 Cal. App. 4th 19, 23 (2006) ("Both the subrogee (insurer) and the subrogor (insured) have a right of action against the tortfeasor." (quoting *Basin Constr. Corp. v. Dep't of Water & Power*, 199 Cal. App. 3d 819, 825 (1988); *Deutschmann v. Sears, Roebuck & Co.,* 132 Cal. App. 3d 912, 916 (1982) (holding an insurer "has an independent cause of action against the third party for recovery of the amount he was obligated to pay to the insured as a result of the liability of the third party"); *Hodge v. Kirkpatrick Dev., Inc.*, 130 Cal. App. 4th 540, 548 (2005) (same). The insurance subrogation class action does *not* include any claim to recover the deductibles or any other uninsured losses on the part of Insurance Plaintiffs' insureds, which instead necessarily are addressed in the consumer class action.

By way of example, Class Action Settlement Agreements that Kia and Hyundai entered into in connection with separate actions arising out of engine fires explicitly carved out subrogation claims as falling outside the parameters of the settlement agreements. *See In re Hyundai & Kia Engine Litig. II* ("*Engine II*"), No. 8:18-cv-02223-JLS-JDE (C.D. Cal. Dec. 14, 2018), Order 2:24–25, 4:32–5, ECF No. 99 (noting exclusion of subrogation claims from settlement).[3] Accordingly, each set of plaintiffs—the Insurance Plaintiffs, the Consumer Counsel Plaintiffs representing uninsured consumer claims, and municipality plaintiffs—are able to independently prosecute and resolve their claims against the Hyundai and Kia defendants, irrespective of the timing of any potential recovery or settlement for each class of Plaintiffs.

---

[3] Subrogation claims were also carved out of the class action settlement agreements in *In re Hyundai and Kia Engine Litigation* ("*Engine I*"), No. 8:17-cv-00838 (C.D. Cal. May 10, 2017), Notice of Mot. & Mot. 4 n.2, ECF No. 112, and *Zakikhani et al. v. Hyundai Motor Co.*, No. 8:20-cv-01584-SB-JDE (C.D. Cal. Aug. 25, 2020), Amended Settlement Agmt. 6 ¶ 1.15, ECF No. 129-1 ("Excluded from the Hyundai Class are (a) all claims for death, personal injury . . . and subrogation.") ("ABS Settlement"), among other similar cases. So it seems Consumer Counsel well recognizes that it cannot purport to settle the subrogation claims as those claims were explicitly carved out of settlement agreements where the same counsel represented the class plaintiffs.

California courts have long recognized that the "made whole" doctrine has no application where, as here, the subrogating insurers are actively prosecuting their claims against responsible third parties. *See, e.g.*, *Chandler*, 598 F.3d at 1120. The made whole doctrine is further inapplicable, where, as here, there is no limited recovery fund. *Id.*; *21st Century Ins. Co. v. Superior Ct.*, 47 Cal. 4th 511, 519 (2009) (observing the "made whole" rule typically only applies in cases where there is underinsurance that would prevent the insured from recovering). In *Chandler*, the Ninth Circuit observed "a carrier may pursue reimbursement and has no obligation to make the policyholder 'whole' out of reimbursement proceeds unless and until the policyholder attempts and fails to recover from the tortfeasor." 598 F.3d at 1115 (citation omitted). Moreover, "the made-whole rule does not apply" where, as here "the insurer participates in prosecuting the claim against the third-party tortfeasor." *See id.* at 1118 (citations omitted).

### ALLEGATIONS IN THE CONSUMER COUNSEL COMPLAINT

The Consumer Counsel Complaint raises claims and issues that the named Plaintiffs have no right or standing to assert. In paragraph 1532 of the Consumer Counsel Complaint the Consumer Counsel Plaintiffs allege "Typicality" on the grounds that "Plaintiffs and all Members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct." *See* Dkt. No. 84 ¶ 1532. The only injuries identified by the named Plaintiffs in the Consumer Counsel Complaint, however, are damages in the form of diminution of value, paid deductible, and other uninsured losses. *See* Dkt. No. 84 ¶¶ 36–1206. This stands in stark contrast to the claims and damages alleged by the Insurance Plaintiffs, which are based only on paid claims, and projected future claims, capable of calculation to the penny.

The remaining allegations in paragraph 1532 of the Consumer Counsel Complaint are vague. Paragraph 1532 also alleges that the Consumer Counsel Plaintiffs "are advancing the same claims and legal theories on behalf of themselves and all absent Class members and assert claims, if they had insurance, for all monies paid by their insurance company as a result of the theft or damage to a Class Vehicle resulting from the manifestation of the

Theft Prone Defect, subject to any applicable right of subrogation." Dkt. No. 84 ¶ 1532. While admittedly unclear, this allegation appears to lay claim to damages that are exclusively owned and controlled by, and which can only be claimed and pursued by, the Insurance Plaintiffs, namely "all monies paid by [the Consumer Counsel Plaintiffs'] insurance company." *See id.* To the extent this allegation only intends to set forth claims by uninsured Consumer Counsel Plaintiffs, the inartful drafting only serves to underscore the need for Cozen O'Connor to have coequal standing on the Executive Committee, and to chair the insurance subrogation track. This is doubly important as this matter will progress shortly into discovery proceedings, and it is unclear whether Consumer Plaintiffs are prepared, able, or even willing to conduct discovery in support of the Insurance Plaintiffs' causes of action which are separate and distinct from those being claimed by the Consumer Plaintiffs.

Paragraph 1534 of the Consumer Counsel Complaint is particularly problematic as it clearly attempts to lay claim to damages that the named Consumer Counsel Plaintiffs *cannot* assert. Paragraph 1534 is meant to establish "superiority" pursuant to Rule 23(b)(3), but the named Consumer Counsel Plaintiffs clearly have no cognizable interest as *a matter of law* in regard to subrogation claims they do not own, thus violating Rule 23(b)(3)(A). Nor can Consumer Counsel seek to manage claims brought by the Insurance Plaintiffs, since they know nothing about the basis for or scope of these claims and have sued Insurance Plaintiffs in other actions. Yet the Consumer Counsel Plaintiffs allege that "allowing insured consumers to proceed on behalf of themselves *and any insurance company who paid a loss resulting from the Theft Prone Defect is superior to these claims being split and prosecuted by both the injured consumer and their insurance company*." Dkt. 84 ¶ 1534 (emphasis added). This allegation is problematic for at least five additional reasons.

First, only *Defendants* have standing to raise the *defense* of claim splitting, which is clearly being invoked here to the detriment of the Insurance Plaintiffs, purportedly on behalf of the Consumer Counsel Plaintiffs, but *solely* for the benefit of the *counsel* who represent those consumers. *See, e.g., Ferraro v. S. Cal. Gas Co.*, 102 Cal. App. 3d 33, 43 (1980),

*overruled on other grounds in Goodman v. Lozano*, 47 Cal. 4th 1327 (2010) ("The defense that a plaintiff has split a cause of action is an affirmative defense, which must be pleaded by a defendant in abatement."). Here, the Consumer Counsel Complaint sets forth the *defense* of claim splitting as part of class allegations as part of an attempt to allege superiority, but this is not Consumer Counsel's defense to raise. This ham-fisted attempt to raise *defenses* in a complaint provides further illustration of the need for Insurance Plaintiffs' Counsel on the Consumer Class Action Leadership Committee, and for the Subrogation Class claims to proceed on a separate track overseen by Cozen O'Connor. As the *Ferraro* court has stated, the "[p]rohibition against splitting a cause of action is for the benefit of the defendant and he may waive or renounce it by agreement." *Id.* (citations omitted). Whether defendants will invoke or waive this non-meritorious defense (which has no application to the subrogation claims being litigated by the Insurance Plaintiffs) is up to them, not Consumer Counsel.

Second, a tortfeasor who is aware of the insurer's subrogation claim and nonetheless chooses to settle the insured's claim independent from the insurer's claim, cannot invoke the rule against splitting a cause of action to bar a later action by the insurer: "[S]uch a settlement, effected with 'knowledge, actual or constructive' of the insurer's subrogation rights constitutes a 'fraud on the insurer.'" *See Allstate Ins. Co. v. Mel Rapton, Inc.*, 77 Cal. App. 4th 901, 912 (2000) (citations omitted); *see also Hodge,* 130 Cal. App. 4th at 553–554 (holding "a settlement between the Hodges and defendants would not bar State Farm's recovery from defendants, unless State Farm consented to the settlement"). Thus, there is nothing to be accomplished by excluding Insurance Plaintiffs from representation in this action.

Third, the Insurance Plaintiffs are entitled to proceed independently to pursue reimbursement for their subrogation claims. *Chandler,* 598 F.3d at 1117–18; *Pac. Gas & Elec. Co*, 144 Cal. App. 4th at 23; *Deutschmann*, 132 Cal. App. 3d at 915–16 ("[A]n insurer who is subrogated to the rights of the insured against the tortfeasor] is not limited to an action in intervention; he may bring a separate independent action to recover directly from the

third-party tortfeasor. . . . Thus, he has an independent cause of action against the third party for recovery of the amount he was obligated to pay to the insured . . ..."); *see also Hodge*, 130 Cal. App. 4th at 550 ("State Farm has stepped into the Hodges' shoes and, to the extent it has made payments under the Policy, has the same rights as the Hodges against the various defendants and tortfeasors in the construction defect lawsuit.").

In *Hodge,* for example, the Court allowed the insurance carrier to intervene because it had a "direct pecuniary interest in the Hodges' action against the allegedly responsible third parties." 130 Cal. App. 4th at 550. "The insured can sue the responsible party for any loss not fully compensated by insurance, and the insurer can sue the responsible party for the insurer's loss in the amount on the insurance policy." *Id.* at 551. Where, as here, claim splitting *may impede* the Insurance Plaintiffs' rights, intervention must be allowed. As the *Hodge* court observed,

> A subrogated insurer's right to intervene should not depend on a predetermination whether the defense of splitting a cause of action will succeed; it is enough the defense is available in a second lawsuit and may, in the statute's words, "as a practical matter impair or impede the subrogated insurer's ability to protect its rights."

*Id.* (quoting Cal. Code Civ. Proc. § 387(b)).

Fourth, the defense of claim splitting is obviated by intervention. *See Hodge* 130 Cal. App. 4th at 550–551. Insurance Plaintiffs respectfully submit that formal intervention should not be required as they have already joined this MDL proceeding and are able to form a separate Subrogation Committee to pursue their own claims. This point renders the defense of claim-splitting inapplicable here. *See id.*

Fifth, Consumer Counsel erroneously assert that "subrogation rights can be dealt with in the claims processing part of the case." Dkt. No. 84 ¶ 1534. The *Hodge* court squarely holds, however, that "recouping payments directly from the insured's recovery—also would, as a practical matter, impair or impede the insurer's ability to protect its subrogation rights." *See* 130 Cal. App. 4th at 550–553 (holding that at a minimum that alternative "would impair or impede State Farm's ability to protect its interest"). "[A]bsent intervention, the insurer is

to a large extent at the mercy of its insured's efforts and success in recovering from the responsible third party." *Id.* at 553. There also may be a conflict of interest between representation of the diminution in value claims of the Consumer Plaintiffs and the paid indemnity losses of the Insurance Plaintiffs which requires separate representation for the Insurance Plaintiffs pursuant to their engagement of Cozen O'Connor for this purpose.

Finally, the same counsel who drafted the Consumer Counsel Complaint expressly *carved out* any subrogation claims from the settlement classes in at least three class actions brought against the same Defendants. *See Engine I, Engine II,* and the *ABS Settlement.* Thus, even Consumer Counsel appears to have recognized in other class action litigation against the same Defendants that they have no real right or ability to prosecute subrogation claims on behalf of the Insurance Plaintiffs. Perhaps for this reason, there have been separate mediation sessions with Defendants by the Consumer Plaintiffs, and by the Insurance Plaintiffs.

## **RELEVANT EXPERIENCE**

Elliott R. Feldman has been a practicing attorney since 1980. (*See* Feldman Bio, attached as Exhibit "C".) Since 1982, his practice has been exclusively focused upon representing insurers in connection with subrogation claims. Feldman has chaired or co-chaired Cozen O'Connor's subrogation and recovery department for the past twenty years, and in this capacity, has established himself as one of the most highly regarded subrogation attorneys in the country. Cozen O'Connor is the leading subrogation law firm in the country, and has held this distinction for many decades. (*See* Cozen O'Connor Subrogation Department Profile, attached as Exhibit "D.")

Cozen O'Connor employs approximately one hundred subrogation attorneys who represent hundreds of insurers in connection with thousands of subrogation claims filed in jurisdictions throughout North America. Feldman also oversees a wholly-owned subsidiary of Cozen O'Connor, National Subrogation Services, which has over one hundred employees engaged in pursuing subrogation claims on behalf of the insurance industry involving, annually, hundreds of thousands of automobile and property damage claims. Feldman has

served as the previous president of the National Association of Subrogation Professionals ("NASP"), and also has served on the NASP Board of Directors. Feldman has represented numerous insurers in hundreds of complex subrogation matters in state and federal courts throughout the country, and is admitted, *inter alia*, to the bars of the United States Supreme Court, the United States Court of Appeals for the Third Circuit, and the United States District Court for the Eastern District of Pennsylvania.

Together with co-counsel, Nathan Dooley, Feldman acted as the principal client liaison in the subrogation industry class action filed by Cozen O'Connor in *Homesite Insurance Company of the Midwest v. Gree USA, Inc.*, which was filed in this Court. *See* No. 2:16 cv-06769-ODW-JC (C.D. Cal. May 24, 2017). As here, *Homesite* involved a putative subrogation industry class action in which Cozen O'Connor represented insurers which had paid for hundreds of property damage claims resulting from the defective condition of dehumidifiers made and sold by the *Gree* defendants. *Id.* at *2–3.

In addition, Cozen O'Connor has served as one of the recognized lead counsel in numerous mass tort wildfire actions filed against California utilities, seeking and obtaining recoveries of hundreds of millions of dollars as a result of subrogation property damage losses caused by the violation of civil duties by these utilities. These subrogation mass tort claims were brought at the same time as consumer class actions brought on behalf of consumers with uninsured losses, and were resolved separate and apart from the consumer class actions arising from the same underlying tortious acts. Our experience in representing dozens of insurers in connection with thousands of claim payments arising out of these catastrophic wildfire events further demonstrates the firm's qualifications to lead an Insurance Subrogation Sub-Committee in this MDL. Due to the complexity of aggregating and managing these claims, which are necessarily separate and apart from the pure consumer class action claims, the creation of a Subrogation Subcommittee is necessary.

Nathan Dooley has more than a decade of experience in managing complex litigation, including class actions as lead counsel. (*See* Dooley Bio, attached as Exhibit "E".) He was lead counsel in a prior subrogation class action, *Homesite Insurance Company of the*

*Midwest v. Gree USA, Inc.*, as discussed above, and currently advises a publicly traded company in active class action litigation. His experience includes the representation of Maersk, among other terminal operators, as lead counsel in a series of class actions brought against terminal operators by industry groups. *See Elkay Plastics Co. v. APM Terminals N. Am., Inc.*, No. 2:16-cv-00272-SJO-KS (C.D. Cal. Jan. 13, 2016); *Optima Steel Int'l, LLC v. APM Terminals Pac., LLC*, No. NC060343 (Cal. Super. Ct. L.A. Cnty. Nov. 3, 2015). He has also represented defendants as lead counsel in consumer class actions. *See, e.g.*, *Mollicone v. Universal Handicraft*, No. 2:16-cv-07322-CAS-MRW (C.D. Cal. Sept. 29, 2016), *transferred* No. 1:17-cv-21468-RNS (S.D. Fla. Apr. 20, 2017). Cozen O'Connor's class action practice group currently includes fifty-seven attorneys spread across offices around the country with extensive experience managing class actions on behalf of plaintiffs and defendants in a variety of industries.

## CRITERIA

The Court set forth the following criteria for evaluating petitions related to MDL subcommittees: (1) knowledge and experience prosecuting complex litigation, including class actions; (2) willingness and ability to commit to a time-consuming process; (3) ability to work cooperatively with other individuals; and (4) access to sufficient resources. *See In re Apple Device Performance Litig.*, No. 18-md-02827-EJD, at *22–23 (N.D. Cal. May 15, 2018). Cozen O'Connor easily satisfies these factors with respect to the proposed Subrogation Subcommittee.

Cozen O'Connor has a distinguished history of leadership in significant mass tort lawsuits and class actions. On September 11, 2003, for example, Feldman, together with Stephen A. Cozen, founder of Cozen O'Connor, as lead counsel, filed an action on behalf of prominent members of the property and casualty insurance industry against the Kingdom of Saudi Arabia, and other sovereign states, commercial entities and individuals, all of whom were asserted to have provided material support to the 9/11 terrorists. *See In re Terrorist Attacks*, No. 03 MDL 1570 (GBD) (FM) (S.D.N.Y. Jan. 13, 2021). Feldman has served as co-chair, together with another Cozen O'Connor attorney, of the commercial executive

committee for the 9/11 anti-terrorism claims in this MDL. The commercial claims essentially are comprised of subrogation claims. Cozen O'Connor's clients incurred losses in excess of Eleven Billion Dollars ($11B). Cozen O'Connor also took a leadership role in the management and settlement of the California wildfire cases on behalf of the subrogating insurance industry.

Cozen O'Connor is the exclusive law firm representing long-time clients as the Insurance Plaintiffs in the subrogation class action. As a large law firm with a commitment to the interests of its insurance industry clients, there can be no question that Cozen O'Connor is willing and able to commit to this important process. As counsel for the Insurance Plaintiffs, undersigned counsel have already met with the Executive Committee appointed by the Court in this MDL proceeding, as well as counsel for Kia and Hyundai, and are working cooperatively toward the effective management of this matter.

As a large, multi-national law firm with separate practice groups dedicated to class actions and subrogation, there can be no question that Cozen O'Connor has sufficient resources to manage a Subrogation Subcommittee. Indeed, as the leading subrogation firm in the country, Cozen O'Connor is uniquely situated to leverage its decades-long relationship with insurance carriers across the country to help manage this case on behalf of the Insurance Plaintiffs. Given the sheer number of claims, Cozen O'Connor is also well situated to lead a Subrogation Subcommittee given its past experience in managing similar mass tort claims, including the wildfire actions, and can bring that experience to bear in effectively managing and aggregating claims data, and consolidating issues for discovery.

The necessity of a Subrogation Subcommittee is easily demonstrated by the fact that the current Plaintiffs cannot purport to bring any claims on behalf of the Insurance Plaintiffs, and have, indeed, carved out subrogation claims from similar class actions brought against these same Defendants. *See Engine II.* Many of the factual and legal issues presented by Insurance Plaintiffs are unique to that class of Plaintiffs and require management, as well as leadership, which is separate and apart from the existing subcommittees, including the subcommittee established for complaints brought by municipalities such as the City of

Seattle. The legal issues presented by the Insurance Plaintiffs' claims, moreover, are best handled by counsel with extensive experience with subrogation law. As such, it is appropriate for purposes of judicial economy and necessary for the protection of Insurance Plaintiffs' interests for the creation of an Insurance Subrogation Class Action Subcommittee and the appointment of Elliott Feldman and Nathan Dooley to be appointed co-chairs of the Insurance Subrogation Class Action Subcommittee.

Dated: April 12, 2023

**COZEN O'CONNOR**

By: */s/ Nathan Dooley*
Nathan Dooley
CA Bar No. (SBN 224331)
NDooley@cozen.com
601 S. Figueroa Street
Suite 3700
Los Angeles, CA 90017
Tel.: 213.892.7933; Fax: 213.892.7999

Elliott R. Feldman (*pro hac vice motion pending*)
Efeldman@cozen.com
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel.: 215.665.2071; Fax: 215.701.2282

*Attorneys for Plaintiffs*