Gretchen Freeman Cappio (*pro hac vice*)
gcappio@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

*Chair of the Governmental Entities Committee*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 8:22-ML-03052-JVS-KES |
| | The Honorable James V. Selna |
| *This document relates to:* | **CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT** |
| GOVERNMENTAL ENTITIES TRACK | **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    JURISDICTION AND VENUE.............................................................5

       A.    Subject Matter Jurisdiction ........................................................5

       B.    Personal Jurisdiction ..................................................................5

             1.    HMC's and KC's Forum-Related Activities ...........................6

             2.    HMC's and KC's Control Over Their Respective
                   Subsidiaries.........................................................................7

       C.    Venue ..........................................................................................9

III.   PARTIES ..............................................................................................9

       D.    Plaintiffs .....................................................................................9

             1.    Milwaukee, Wisconsin...........................................................9

             2.    Madison, Wisconsin................................................................9

             3.    Green Bay, Wisconsin ............................................................9

             4.    Columbus, Ohio....................................................................10

             5.    Cleveland, Ohio....................................................................10

             6.    Cincinnati, Ohio...................................................................10

             7.    Parma, Ohio..........................................................................11

             8.    Baltimore, Maryland ............................................................11

             9.    Seattle, Washington ..............................................................11

             10.   St. Louis, Missouri................................................................11

             11.   Kansas City, Missouri..........................................................12

             12.   Buffalo, New York ................................................................12

             13.   Rochester, New York ............................................................12

             14.   New York, New York ............................................................12

15. Yonkers, New York ................................................................. 13

16. Tonawanda, New York ........................................................... 13

17. Indianapolis, Indiana ............................................................. 13

E. Defendants ....................................................................................... 13

1. Hyundai Motor Company ....................................................... 13

2. Hyundai Motor America ......................................................... 14

3. Kia Corporation ..................................................................... 14

4. Kia America, Inc. ................................................................... 14

IV. THE KIA HYUNDAI THEFT WAVE ...................................................... 15

A. Measures to Prevent Vehicle Thefts Have Existed for Over a
Century ............................................................................................. 15

B. Hyundai and Kia Deviated from the Industry Standard by
Electing Not to Include Immobilizers in the Susceptible
Vehicles ............................................................................................ 21

C. The Lack of Industry Standard Anti-Theft Devices in Most
Hyundai and Kia Vehicles Has Led to a Wave of Thefts ................ 24

D. Car Thefts Imperil Public Safety .................................................... 25

E. Car Thefts Drain Public Resources and Frustrate Public Policy ...... 29

V. THE CONTINUING PUBLIC NUISANCE AND DEFENDANTS'
LATE, INSUFFICIENT RESPONSE ....................................................... 30

VI. IMPACTS ON PLAINTIFFS ................................................................... 35

A. Milwaukee, Wisconsin .................................................................... 35

B. Madison, Wisconsin ........................................................................ 43

C. Green Bay, Wisconsin ..................................................................... 46

D. Columbus, Ohio ............................................................................... 47

E. Cleveland, Ohio ............................................................................... 56

F. Cincinnati, Ohio ........................................................................ 60

G. Parma, Ohio ............................................................................. 68

H. Baltimore, Maryland .................................................................. 72

I. Seattle, Washington .................................................................... 74

J. St. Louis, Missouri ...................................................................... 79

K. Kansas City, Missouri ................................................................ 82

L. Buffalo, New York ...................................................................... 83

M. Rochester, New York .................................................................. 86

N. New York, New York .................................................................. 89

O. Yonkers, New York .................................................................... 95

P. Tonawanda, New York ................................................................ 97

Q. Indianapolis, Indiana ............................................................... 100

VII. CAUSES OF ACTION ......................................................................... 101

A. Claims under Wisconsin Law Brought by Milwaukee, Madison, and Green Bay ........................................................................ 101

COUNT ONE — PUBLIC NUISANCE ..................................................... 101

COUNT TWO — NEGLIGENCE ............................................................. 104

B. Claims under Ohio Law Brought by Columbus, Cleveland, Cincinnati, and Parma ................................................................ 108

COUNT THREE — COMMON LAW ABSOLUTE PUBLIC NUISANCE .... 108

COUNT FOUR — COMMON LAW QUALIFIED PUBLIC NUISANCE ...... 112

COUNT FIVE — NEGLIGENCE .............................................................. 115

C. Claims Brought under Ohio Law by Columbus ........................... 120

COUNT SIX — STATUTORY PUBLIC NUISANCE ................................. 120

COUNT SEVEN — CIVIL LIABILITY ..................................................... 121

D.     Claims under Maryland Law Brought by Baltimore ......................122

COUNT EIGHT — PUBLIC NUISANCE ........................................................122

E.     Claims under Washington Law Brought by Seattle .......................123

COUNT NINE — STATUTORY PUBLIC NUISANCE ................................123

F.     Claims Brought under Missouri Law Brought by St. Louis and
        Kansas City .................................................................................127

COUNT TEN — PUBLIC NUISANCE ..........................................................127

COUNT ELEVEN — NEGLIGENCE ...........................................................128

COUNT TWELVE — UNJUST ENRICHMENT ...........................................129

G.     Claims Brought under Kansas City Ordinance by Kansas City .....130

COUNT THIRTEEN — VIOLATION OF CITY ORDINANCE ARTICLE
        IX—CONSUMER PROTECTION ...........................................130

H.     Claims under New York Law Brought by Buffalo, Rochester,
        New York City, Yonkers, and Tonawanda ..................................132

COUNT FOURTEEN — PUBLIC NUISANCE ...............................................132

COUNT FIFTEEN — NEGLIGENCE .............................................................134

I.     Claims under Indiana Law Brought by Indianapolis ....................138

COUNT SIXTEEN — PUBLIC NUISANCE ....................................................138

COUNT SEVENTEEN — NEGLIGENCE .......................................................141

VIII.   PRAYER FOR RELIEF ........................................................................144

IX.     DEMAND FOR JURY TRIAL ...............................................................145

iv

## I.    INTRODUCTION

1.      There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not sitting ducks that are simple to steal protects both property and the public by keeping dangerous drivers in stolen vehicles off the roads. This case exposes the massive public safety consequences to cities coast to coast when two car manufacturers made the business decision not to include standard anti-theft technology in their vehicles. Despite taking some initial steps to discourage thefts, Defendants have been unable to abate the dangerous crime wave unleashed on communities nationwide—a crime wave that continues to this day.

2.      The days of "hotwiring" cars with nothing more than a screwdriver are largely over. In most recent car models, the ignition key emits a radio signal that prompts a computer in the car to disengage an immobilizer device and allows the car to start and move. But recent Hyundai and Kia models are a glaring exception.

3.      For all model years between 2011 and 2022, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Defendants Hyundai Motor Company ("HMC"), Hyundai Motor America ("HMA" and, with HMC, collectively "Hyundai"), Kia Corporation ("KC"), and Kia America, Inc. ("KA" and, with KC, collectively "Kia") intentionally ignored industry-standard practices in the name of profit. Specifically, upon information and belief, at all relevant times, Defendants designed, manufactured, and distributed the following automobile models without engine immobilizers: Hyundai Accent, Elantra, Elantra GT, Elantra Coupe, Elantra Touring, Genesis Coupe, Kona, Palisade, Santa Fe, Santa Fe Sport, Santa Fe XL, Sonata, Tucson, Veloster, Venue, and Veracruz; and the Kia Forte, K5, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. These vehicles, when

manufactured and sold without engine immobilizers, are referred to hereinafter as the "Susceptible Vehicles."

4.     As a result, online videos demonstrate how easy it is to steal Hyundai and Kia vehicles. In many cases, thieves use tools no more advanced than a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by forgoing common anti-theft technology have resulted in a dangerous rash of thefts. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, particularly in Milwaukee, Madison, and Green Bay, Wisconsin; Columbus, Cleveland, Cincinnati, and Parma, Ohio; Baltimore, Maryland; Seattle, Washington; St. Louis and Kansas City, Missouri; Buffalo, Rochester, New York City, Yonkers, and Tonawanda, New York; and Indianapolis, Indiana. (collectively, "Plaintiffs").

5.     In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars.

6.     Hyundai and Kia are unique among automobile manufacturers in failing to install engine immobilizers in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them. In the United States, meanwhile, Hyundai and Kia have decided to trade public safety for profits.

7.     The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: for the 2015 model

year, for example, only **26%** of Hyundai and Kia vehicles in the United States were equipped with immobilizers, compared to **96%** of vehicles from all other manufacturers.[1]

8.    Hyundai and Kia are aware of the well-documented benefit of immobilizer technology in preventing thefts, as they opted to install engine immobilizers in their higher end models, and in all of their 2023 vehicles.

9.    Hyundai's and Kia's decisions to put profits over public safety have had devastating consequences for Plaintiffs and their residents. Defendants' failure to install an industry-standard immobilization anti-theft device, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology,[2] has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

10.    This epidemic started in Milwaukee and spread nationwide. By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 30 cars being stolen per day.[3] This trend then spread nationwide, enabled by millions of Hyundai and Kia vehicles lacking immobilizers. As explained below, the crime wave continues to this day in communities coast to coast—and those communities are left to pay the price.

---

[1] *Hyundai and Kia theft losses*, 38 HLDI Bull. 28, 2 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf (emphasis added).

[2] Richard A. Posner, *An Economic Theory of the Criminal Law*, 85 Colum. L. Rev. 6, 1193–1231 (1985), https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=2827&context=journal_articles.

[3] James Gilboy, *Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, thedrive.com (Dec. 11, 2021, 11:15 AM), https://www.thedrive.com/news/43454/why-milwaukee-might-sue-hyundai-kia-over-stolen-car-epidemic.

11.     Vehicle theft is not only a property crime affecting vehicle owners, but it also constitutes a grave threat to public safety. Vehicle theft goes hand in hand with reckless driving, which in turn can result in injuries and/or death. It can result in increased violence, as many car owners are unlikely to part with their vehicles willingly. It also consumes law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

12.     The skyrocketing rate of Kia and Hyundai vehicle thefts has drastically impacted city and police resources for Plaintiffs. Their residents are subjected to increasingly dangerous conditions on their streets, as car thieves (many of them teenagers)[4] are taking advantage of Hyundai's and Kia's failures and engaging in reckless driving, endangering Plaintiffs' employees, residents, and property.

13.     Defendants' conduct has created a public nuisance that could have been avoided had they followed industry-wide standards and installed immobilizer devices, or an equivalent anti-theft device, in all their vehicles.

14.     Among other harms, Plaintiffs have been forced to divert funds and risk officer and public safety to combat the growing burden caused by increased Hyundai and Kia vehicle thefts and their many associated dangers, including reckless driving.

---

[4] *See* Mark A. Cohen & Alex R. Piquero, *New evidence on the monetary value of saving a high-risk youth*, A. R. JOURNAL OF QUANTITATIVE CRIMINOLOGY, 25, 25–49, (2009), https://www.researchgate.net/publication/225637886_New_Evidence_on_the_Monetary_Value_of_Saving_a_High_Risk_Youth.

## II.      JURISDICTION AND VENUE

### A.      Subject Matter Jurisdiction

15.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the parties. The cities of Milwaukee, Madison, and Green Bay are regarded as citizens of the State of Wisconsin for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Columbus, Cleveland, Cincinnati, and Parma are regarded as citizens of the State of Ohio. Baltimore is regarded as a citizen of the State of Maryland. The City of Seattle is regarded as a citizen of the State of Washington. The cities of St. Louis and Kansas City are regarded as citizens of the State of Missouri. Buffalo, Rochester, New York City, Yonkers, and Tonawanda are regarded as citizens of the State of New York. Indianapolis is regarded as a citizen of the State of Indiana. Defendants HMA and KA are citizens of the State of California, where they are headquartered and incorporated. Defendants HMC and KC are both multinational automakers, headquartered in Seoul, South Korea.

### B.      Personal Jurisdiction

16.      This Court has general personal jurisdiction over HMA and KA because they are incorporated and headquartered in the State of California. Defendants have transacted and done business in the State of California and in this judicial district.

17.      This Court has specific jurisdiction over HMC and KC under the long-arm statute of California based on (1) their forum-related activities from which this case arises; (2) the forum-related activities of HMC's primary domestic subsidiary, HMA, which HMC substantially controls; and (3) the forum-related activities of KC's primary domestic subsidiary, KA, which KC substantially controls.

### 1. **HMC's and KC's Forum-Related Activities**

18.　HMC is a South-Korea based company, and its substantial activities directed at the United States give rise to and relate to Plaintiffs' claims.

19.　In a recent complaint to enforce its trademark rights, HMC represented that it "currently designs, manufactures, markets, distributes, and sells a wide range of automobile and related automobile parts to over 190 countries throughout the world, including the United States, under the trademark 'Hyundai.'"[5]

20.　HMC and KC design, manufacture, market, distribute, and sell the Susceptible Vehicles under their registered trademarks "Hyundai" and "Kia," respectively. Between 2011 and 2022, when the Susceptible Vehicles were sold and distributed in Plaintiffs' respective jurisdictions, HMC and KC purposefully availed themselves of the United States' legal protections by registering and maintaining registrations with the United States government for trademarks associated with their vehicles and parts, which HMC and KC used to identify and distinguish its vehicles and parts in the United States, this district, and transferor jurisdictions.

21.　HMC and KC purposefully availed themselves of markets in the United States as each company sold approximately 500 million vehicles per year in this market through their respective domestic subsidiaries, HMA and KA.

22.　HMC and KC manufactured over eight million of the Susceptible Vehicles, which were delivered to HMA and KA for sale in the United States. Upon information and belief, HMC and KC manufactured the majority of the Susceptible Vehicles overseas in South Korea. However, HMC and KC segregated the Susceptible Vehicles intended for

---

[5] First Amended Complaint at 6, *Hyundai Motor Am., Inc. v. Midwest Indus. Supply Co.*, No. 2:17-cv-3010-JCM-GWF (D. Nev. Nov. 21, 2018), ECF No. 34.

6

sale in the United States and shipped those vehicles to the United States with full knowledge that HMA and KA would distribute them across the country.

23.     Rather than passively placing the Susceptible Vehicles into the stream of commerce, HMC and KC intentionally targeted the distribution of the Susceptible Vehicles into United States markets specifically, because engine immobilizers are not expressly required by law to sell the vehicles in this country.

24.     HMC and KC played instrumental roles in HMA's and KA's analysis and decision-making processes related to the design and/or manufacture of the Susceptible Vehicles lacking engine immobilizers sold in the United States.

25.     Upon information and belief, HMC and KC both were involved in monitoring vehicle thefts of the Susceptible Vehicles, as reported by their respective subsidiaries, HMA and KA.

**2.     HMC's and KC's Control Over Their Respective Subsidiaries**

26.     HMC and KC exercise control over HMA and KA, respectively, through both formal and informal means.

27.     Upon information and belief, HMC and KC possess the power to appoint board members to HMA and KA, respectively, and both HMC and KC have exercised this power.

28.     HMC and KC purposely availed themselves of markets in the United States by regularly submitting applications to the Environmental Protection Agency to obtain certification required for the sale of their vehicles in the United States.[6]

---

[6] *See, e.g.*, Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG credit for High Efficiency Alternator Technology (June 10, 2019), https://www.epa.gov/sites/default/files/2019-07/documents/kmc-off-cycle-ghg-credit-high-efficiency-alternator-2019-06-10.pdf (writing on behalf of KC, f/k/a Kia Motors

29.     HMC operates a "Global Command and Control Center" with "walls covered with television screens and computer monitors" that track "every operating line at 27 plants in the world, in real time, 24 hours a day, 365 days a year."[7]

30.     The production chief for a Hyundai plant in Alabama noted that if there is "a hiccup at any of those boards, headquarters wants to know what needs to be done about it—right now[.]"[8]

31.     Upon information and belief, KC representatives similarly monitor Kia's global operations from HMC's Global Command and Control Center.

32.     Senior South Korean executives for HMC and KC also regularly visit Hyundai and Kia plants and offices throughout the United States, including HMA's and KA's California headquarters, both of which are located in this district.

33.     The common executives for HMC and HMA frequently overlap. Jose Muñoz, for example, is the current Global Chief Operating Officer of HMC and serves as the President and CEO of HMA. Meanwhile, Brian Latouf serves as the Global Chief Safety Officer for HMC and serves as the Chief Safety Officer of HMA.

34.     KC and KA also share executive employees. SeongKyu (Sean) Yoo serves as President and CEO of KA, as well as Senior Managing Director of KC. Additionally, HMC and KC have overlapping management, with Eui-Sun Chung serving as the President of KC and the Executive Vice Chairman of HMC.

---

Corporation; *see also* Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG Off-Cycle Credit for HVAC Brushless Motor Technology in 2020 Model Year and later HMC vehicles (Dec. 15, 2020), https://www.epa.gov/system/files/documents/2022-09/hyundai-ghg-credit-pwm-hvac-blm-apl-2020-12-15.pdf.

[7] William J. Holstein, *Hyundai's Capabilities Play*, 70 Strategy & Bus. 62, 67–68 (Spring 2013), https://digitaledition.strategy-business.com/publication/?m=6320&i=145911&p=70&ver=html5.

[8] *Id.* at 68.

35.     Last, HMC and KC control the public name and brand of HMA and KA, respectively.

## C.     Venue

36.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this district. Venue is also proper for HMA and KA because they are headquartered here, have research and development offices here, and a substantial part of the events/omissions giving rise to the claims occurred in this district.

## III.    PARTIES

### D.    Plaintiffs

#### 1.    Milwaukee, Wisconsin

37.     Plaintiff the City of Milwaukee ("Milwaukee") is a municipal corporation organized and operating pursuant to the laws of the State of Wisconsin, with approximately 570,000 residents. Milwaukee is in Milwaukee County and its principal offices are located at 200 East Wells Street, Milwaukee, Wisconsin.

#### 2.    Madison, Wisconsin

38.     Plaintiff the City of Madison ("Madison") is a municipal corporation organized under the laws of the State of Wisconsin. Madison is in Dane County and has approximately 270,000 residents. Madison's principal offices are located at 201 Martin Luther King Jr., Boulevard, Madison, Wisconsin.

#### 3.    Green Bay, Wisconsin

39.     Plaintiff Green Bay ("Green Bay") is a municipal corporation organized under the laws of the State of Wisconsin. Green Bay is in Brown County and has approximately 110,000 residents. Green Bay's principal offices are located at 100 North Jefferson Street, Green Bay, Wisconsin.

### 4.    Columbus, Ohio

40.    Plaintiff the City of Columbus ("Columbus") is a municipal corporation organized under Ohio Law.[9] Columbus has all of the powers of local self-government and home rule and all other powers possible for a city to have under the constitution and laws of the State of Ohio, which are exercised in the manner prescribed by the charter of the City of Columbus.[10] Columbus is the capital and largest city in the State of Ohio and is predominantly located within Franklin County, Ohio. It is the fourteenth largest city in the United States, with a population of approximately 905,528 people. More than 2.1 million people live in the Columbus metropolitan area. Columbus's principal offices are located at 77 North Front Street, Columbus, Ohio.

### 5.    Cleveland, Ohio

41.    Plaintiff the City of Cleveland ("Cleveland") is a municipal corporation organized and chartered pursuant to Article XVIII, Section 7 of the Ohio Constitution. The City has all the powers of local self-government and all other powers possible for a city to have under the Constitution of the state of Ohio, and the laws of the State of Ohio, which are exercised in the manner prescribed by the Charter of the City of Cleveland. Cleveland is in Cuyahoga County and has approximately 370,000 residents. Cleveland's principal offices are located at 601 Lakeside Avenue East, Cleveland, Ohio.

### 6.    Cincinnati, Ohio

42.    Plaintiff the City of Cincinnati ("Cincinnati") is a home-rule municipal corporation chartered under Article XVIII, Section 7 of the Ohio Constitution and acting pursuant to the Charter of the City of Cincinnati, through its City Solicitor. Cincinnati is

---

[9] *See* Ohio Const., art. XVIII § 7 (1912).
[10] *See* Charter of the City of Columbus, pursuant to Ohio Rev. Code Ann. § 715.01 (West 2023).

in Hamilton County and has approximately 310,000 residents. Cincinnati's principal offices are located at 801 Plum Street, Cincinnati, Ohio.

### 7. Parma, Ohio

43. Plaintiff the City of Parma ("Parma") is a municipal corporation organized pursuant to Article XVIII of the Ohio Constitution. Parma has all the powers of local self-government and all other powers possible for a city to have under the constitution of the State of Ohio, and the laws of the State of Ohio. Parma is in Cuyahoga County and has approximately 80,000 residents. Parma's principal offices are located at City Hall, 6611 Ridge Road, Parma, Ohio.

### 8. Baltimore, Maryland

44. Plaintiff the Mayor and City Council of Baltimore ("Baltimore") govern a municipal corporation organized and operating under the Baltimore City Charter and the laws of the State of Maryland. Baltimore is in Baltimore County and has approximately 570,000 residents.

### 9. Seattle, Washington

45. Plaintiff the City of Seattle ("Seattle") is a municipal corporation organized and operating under the Seattle City Charter and the laws of the State of Washington. Seattle is in King County and has a population of approximately 760,000 residents. Seattle's principal offices are located at 600 Fourth Avenue, Seattle, Washington.

### 10. St. Louis, Missouri

46. Plaintiff the City of St. Louis ("St. Louis") is a constitutional charter city in the State of Missouri. In other words, St. Louis is an independent city, meaning it is not party of any county, but exercises both county and municipal functions. The City of St.

Louis has approximately 290,000 residents. St. Louis's principal offices are located at 314 City Hall, 1200 Market Street, St. Louis, Missouri.

### 11.   Kansas City, Missouri

47.    Plaintiff the City of Kansas City ("Kansas City") is a constitutionally chartered municipal corporation that may sue and plead in its own name. Kansas City is in Jackson County and has approximately 510,000 residents. Kansas City's principal offices are located at 414 East 12th Street, Kansas City, Missouri.

### 12.   Buffalo, New York

48.    Plaintiff the City of Buffalo ("Buffalo") is a municipal corporation organized under the laws of the State of New York. Buffalo is in Erie County and has approximately 280,000 residents. Buffalo's principal offices are located at 65 Niagara Square, Buffalo, New York.

### 13.   Rochester, New York

49.    Plaintiff the City of Rochester ("Rochester") is a municipal corporation organized under the laws of the State of New York. Rochester is in Monroe County and has approximately 210,000 residents. Rochester's principal offices are located at City Hall, 30 Church Street, Rochester, New York.

### 14.   New York, New York

50.    Plaintiff the City of New York is a municipal corporation organized under the laws of the State of New York. It comprises five counties in the State of New York and has approximately 8.5 million residents. The City of New York's address for service, through the Corporation Counsel, is 100 Church Street, New York, New York.

### 15. Yonkers, New York

51.     Plaintiff the City of Yonkers ("Yonkers") is a municipal corporation organized under the laws of the State of New York. Yonkers is located in Westchester County, New York and has approximately 210,000 residents. Yonkers's principal offices are located at 40 South Broadway, Yonkers, New York.

### 16. Tonawanda, New York

52.     Plaintiff the Town of Tonawanda ("Tonawanda") is a municipal corporation organized under the laws of the State of New York. Tonawanda is in Erie County and has approximately 70,000 residents. Tonawanda's principal offices are located at 2919 Delaware Avenue, Kenmore, New York.

### 17. Indianapolis, Indiana

53.     Plaintiff the City of Indianapolis ("Indianapolis") is a municipal corporation organized under the laws of the State of Indiana. Indianapolis is in the seat of Marion County and has approximately 880,000 residents. Indianapolis's principal offices are located at 200 East Washington Street, Indianapolis, Indiana.

### E. Defendants

### 1. Hyundai Motor Company

54.     Defendant Hyundai Motor Company is a multinational automaker headquartered in Seoul, South Korea. HMC, together with Defendants Kia Corporation, Kia America, Inc., and Hyundai Motor America, comprise the Hyundai Motor Group, which designs, manufactures, and distributes the Susceptible Vehicles referenced in this Consolidated Complaint. HMC is the parent corporation of Hyundai Motor America.

13

## 2.   Hyundai Motor America

55.   Defendant Hyundai Motor America is an automobile designer, manufacturer, distributor, and/or servicer of new motor vehicles under the Hyundai brand doing business within the United States. HMA is incorporated and headquartered in the State of California. HMA's principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. HMA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty claims for Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California. Defendant HMA engages in continuous and substantial business in California.

## 3.   Kia Corporation

56.   Defendant Kia Corporation is a multinational automaker headquartered in Seoul, South Korea. KC is the parent corporation of Kia America, Inc. As of December 31, 2017, Defendant KC's largest shareholder is HMC, which holds 33.88% of KC's stock.[11]

## 4.   Kia America, Inc.

57.   Defendant Kia America, Inc. is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the State of California. KA's principal place of business is located at 111 Peters Canyon Road, Irvine, California. KA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty claims for Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California. Defendant KA engages in continuous and substantial business in California.

---

[11] *The Future: Kia Motors Annual Report 2017* at 11, Kia, https://worldwide.kia.com/int/company/ir/archive/annual-report/download/B200002757/F200012579 (last visited July 25, 2023).

## IV.   THE KIA HYUNDAI THEFT WAVE

### A.   Measures to Prevent Vehicle Thefts Have Existed for Over a Century

58.     Since the invention of gasoline-powered automobiles at the close of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and Edward B. Birkenbeuel invented the first electric immobilizer/vehicle security system.[12]

59.     Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[13]

60.     Evans and Birkenbeuel's immobilizer/alarm system consisted of a three-by-three switch panel that connected to the car's battery, horn, and ignition. Upon exiting his vehicle, a driver could turn a few switches on the panel to different positions that, until released, would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.

---

[12] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[13] *Id.* at col. 1 ll. 14–20.



**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"[14]**

61.     The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country, especially in midwestern cities.

62.     As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards. These efforts were also fueled by the post-war rise in vehicle thefts among juveniles and young adults, "who took cars for joyriding and transportation."[15]

---

[14] *Id.* at figs. 1, 2, 3, 4.

[15] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 Crime Sci. 17, 1, 3 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

63.     In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act
(the "Safety Act"), with the aim of administering new motor vehicle and traffic safety
standards.[16] Administration of the Safety Act was overseen by the newly created
Department of Transportation through its sub-agency: the National Highway Traffic
Safety Administration, f/k/a/ the National Traffic Safety Bureau ("NHTSA").

64.     Pursuant to its statutory authority under the Safety Act, NHTSA promulgated
numerous federal motor vehicle safety standards ("FMVSS"). Among these standards,
FMVSS 114[17] requires minimum theft-protection standards for nearly all passenger
vehicles in the United States:

> S1.  Scope.  This  standard  specifies  vehicle  performance  requirements
> intended to reduce the incident of crashes resulting from theft and accidental
> rollaway of motor vehicles
>
> S2. Purpose. The purpose of this standard is to decrease the likelihood that a
> vehicle is stolen, or accidentally set in motion.
>
> S3. Application. This standard applies to all passenger cars, and to trucks and
> multipurpose  passenger  vehicles  with  GVWR  of  4,536  kilograms  (10,000
> pounds) or less.
> . . .
> S5.1 Theft Protection.
> S5.1.1 Each vehicle must have a starting system which, whenever the key is
> removed from the starting system prevents:
> (a)     The normal activation of the vehicle's engine or motor; and
> (b)     Either steering, or forward self-mobility, of the vehicle, or both.
>
> . . .

---

[16] National Traffic and Motor Vehicle Safety Act, Pub. L. 89–563, 80 Stat. 718 (1966).
[17] Standard No. 114; Theft protection and rollaway prevention, 49 C.F.R. § 571.114
(2010) ("FMVSS 114").

S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.[18]

65.   The main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[19]

66.   As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[20] Accordingly, NHTSA recognized that "a reduction of the incidence of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[21] To address this safety risk, which is largely tied to "car thieves who could bypass the ignition lock . . . the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[22]

67.   An industry-standard engine immobilizer is the most effective way to satisfy this requirement, "because it locks out the engine control module if an attempt is made to

---

[18] *Id.*

[19] Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27.pdf#page=1.

[20] *Id.*

[21] *Id.*

[22] Federal Motor Vehicle Safety Standards; Theft Protection, 71 Fed. Reg. 17,753 (Apr. 7, 2006), https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *see also* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27.pdf#page=1.

start the vehicle without the correct key or to bypass the electronic ignition system."[23] Defendants' choice not to use this industry-standard anti-theft technology predictably led to rampant car thefts and resulted in a threat to public safety and an ongoing public nuisance.

68.     In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[24] The most common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring." The graph below illustrates the dramatic rise in car thefts during this time period.[25]



**Vehicle thefts per 10,000 vehicles in operation, and vehicle theft arrests per 100,000 population, 1960-2014**

69.     To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented in 1993.[26] Unlike Evans and Birkenbeuel's

---

[23] Jacqueline Glassman, *Interpretation ID : GF005229-2*, NHTSA (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2#:~:text=This%20responds%20to%20your%20letter,114%2C%20Theft%20Protection.

[24] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 Crime Sci. 17, 1, 3 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

[25] *Id.* at fig. 1.

[26] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).

invention nearly 75 years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[27]

70.    In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle. They prevented hotwiring by ensuring that a car would not start if the key was not present—whether or not the ignition switch was turned or bypassed.

71.    Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[28]

72.    The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[29] Similar mandates soon followed in Australia, New Zealand, and Canada.

73.    As engine immobilizers became the industry standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[30]

---

[27] *Id.*

[28] *Id.*

[29] Commission Directive 95/56/EC, 1995 O.J. (L286) 1 (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[30] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, TILEC Discussion Paper No. 2013-001, SSRN (Jan. 14, 2013), https://deliverypdf.ssrn.com/delivery.php?ID=1270871200970291190780841070810010300220410170310270780990930241060090751271180020300011210051220421261070270870951000260180700460340130640880760220670851100200100580660380900850190171080890311270691110861131210960300010270690900900071060810780300 84&EXT=pdf&INDEX=TRUE.

20

74.     By 2011, studies concluded "that good quality electronic immobilizers [have bec[o]me car theft's killer technology" and proved to be 32.7% "more effective in reducing car theft than alarms" and 42.2% "more effective than central locking."[31]

75.     Equally critical, academic studies support the proposition that "[f]rom the early 1990s onwards, it gradually became less easy for adolescents to begin offending as an increasing proportion of vehicles became secure" because the "young offenders did not have the skill or experience to overcome the new vehicle security technology, particularly electronic immobilizers."[32] As the rate of young offenders decreased due to improved vehicle security, "fewer adolescents" went on to experience "criminal career onset and continuance."[33]

### B.     Hyundai and Kia Deviated from the Industry Standard by Electing Not to Include Immobilizers in the Susceptible Vehicles

76.     Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[34] Specifically, HLDI studies between 1996 and 2013 all showed

---

[31] Graham Farrell *et al.*, *The Crime Drop and the Security Hypothesis*, 48(2) J. Res. Crime & Delinq. 147, 163, 169 (2011), https://www.researchgate.net/profile/Graham-Farrell/publication/255589010_The_Crime_Drop_and_the_Security_Hypothesis/links/54f3b8300cf299c8d9e537d9/The-Crime-Drop-and-the-Security-Hypothesis.pdf.

[32] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 Crime Sci. 17, 1, 7 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

[33] *Id.*; *see also* Graham Farrell, *Forty years of declining burglary in the United States: Explanation and evidence relating to the security hypothesis*, 35 Sec. J. 444, 458 (2022) https://link.springer.com/article/10.1057/s41284-021-00284-4 (arguing that "making crime more difficult to commit may be the most effective way to reduce juvenile crime and progression to adult crime").

[34] *Hyundai and Kia theft losses*, 38 HLDI Bull. 28, 1 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[35] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[36]

77.     Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[37]

78.     The low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Hyundai and Kia were installing immobilizers in their models for sale in the European and Canadian markets.[38]

79.     Nor are Defendants unfamiliar with the benefits of installing immobilizers in the American market. A NHTSA standard separate from FMVSS 114 requires automobile manufacturers to label parts to reduce the demand for stolen cars and chop shops (where stolen cars are disassembled so that their valuable parts can be sold).[39] Manufacturers can apply for exemptions from this labeling requirement based on the inclusion of anti-theft technology, because vehicles with anti-theft technology are much harder to steal in the first place and thus much less likely to be "chopped" for parts. In March of 2007, Hyundai requested an exemption from the labeling requirement for its 2008 Hyundai Azera line

---

[35] *Id.* at 2.

[36] *Id.*

[37] *Id.* at 5.

[38] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Over 50 years of progress: the history of Hyundai*, Hyundai Newsroom (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[39] Requirements for passenger motor vehicles, 49 C.F.R. § 541.5 (June 1, 2011).

based on its inclusion of an immobilizer in that model. Thus, Hyundai recognized the efficacy of immobilizers in reducing vehicle theft.[40]

80. Yet, despite knowing the unquestionable benefit of engine immobilizers, until the last year or so, Hyundai and Kia only offered immobilizers in a few more expensive models, like the Azera. This decision only compounds the harms to low-income communities.[41] Consumers without resources to afford these higher end models are more likely to live in areas with higher crime rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered, but damaged, vehicle after a theft.

81. In September 2022, HLDI found that Hyundais and Kias are stolen at nearly twice the rate of other vehicles in the automobile industry. Specifically, "Hyundais and Kias without immobilizers had a vehicle theft claim rate of 2.18 per 1,000 insured vehicle years" while the remainder of the industry, combined, had a theft claim rate of 1.21.[42]

82. Defendants' decision not to install the simple and highly effective immobilizer in the Susceptible Vehicles between 2011 and 2022, in contrast to the vast

---

[40] Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 72 Fed. Reg. 39,661 (July 19, 2007), https://www.govinfo.gov/content/pkg/FR-2007-07-19/pdf/FR-2007-07-19.pdf; *see also* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 75 Fed. Reg. 1,447 (Jan. 11, 2010), https://www.govinfo.gov/content/pkg/FR-2010-01-11/pdf/2010-236.pdf (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendant Kia's representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[41] Tom Krisher, *Thieves key on hack that leaves Hyundai, Kia cars vulnerable*, AP News (Sept. 21, 2022, 10:21 PM), https://apnews.com/article/social-media-milwaukee-theft-ecd3be407c1b7cb725ae607b8d86bcaf (noting that "[m]any of the vulnerable Hyundais and Kias are often bought by lower-income people" because, as stated by HLDI Senior VP Matt Moore, those cars "are relatively inexpensive vehicles when purchased new").

[42] *Id.* ("An insured vehicle year is equal to one vehicle insured for one year.").

23

majority of car manufacturers that did choose to install immobilizers in nearly all of their vehicles, has, foreseeably, led to the epidemic plaguing Plaintiffs.

### C.   The Lack of Industry Standard Anti-Theft Devices in Most Hyundai and Kia Vehicles Has Led to a Wave of Thefts

83.     Kia and Hyundai chose to flout the industry standard of utilizing an engine immobilizer in the Susceptible Vehicles, which made those vehicles more susceptible to theft. As would-be car thieves learned of this susceptibility, the incidence of theft for Susceptible Vehicles increased, relative to other models, from 2015 to 2020.[43]

84.     However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal Susceptible Vehicles.[44] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[45] As the videos detailed, a thief need only break a window, remove the plastic cowl under the steering

---

[43] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1, 2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017), https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *2017 Hot Wheels Report*, NICB (Sept. 18, 2018), https://www.nicb.org/news/news-releases/2017-hot-wheels-report; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf; *NICB's Hot Wheels:* America's Top Ten Most Stolen Vehicles, NICB (Oct. 13, 2020), https://www.nicb.org/HotWheels2019; and *NICB Releases Annual 'Hot Wheels' Report: America's Top Ten Most Stolen Vehicles*, NICB (Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles.

[44] Greg Rosalsky, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-.

[45] Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022, 9:11 PM), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

column, and use a USB connector (such as the ubiquitous mobile phone charging cable) to turn the ignition switch and start these unsecure cars. In many instances, thieves are able to break into the Susceptible Vehicles and drive away in under one minute.

85.    What followed the trending documentation of the unsecure Susceptible Vehicles was all too predictable: thefts of Kias and Hyundais skyrocketed.[46] In the first half of 2021, the number of stolen Kias and Hyundais in Milwaukee increased by more than thirty and fifteen times, respectively, when compared to the same period in 2020.[47] This dramatic increase was unique to Kias and Hyundais, which represented 67% of all cars stolen in that period, compared to only 6% of stolen cars in 2019.[48] This trend then spread nationwide.

### D.    Car Thefts Imperil Public Safety

86.    Car thefts directly imperil public safety. By creating, facilitating, and/or otherwise contributing to a rash of car thefts, Defendants are responsible for a substantial risk to the public safety.

87.    NHTSA promulgated FMVSS 114 to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the highways."[49] NHTSA

---

[46] *Videos Show Teens How to Steal Certain Kias and Hyundais With Only a USB Cable, Police Warn Amid Rising Thefts*, Inside Edition (Aug. 10, 2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

[47] Sean Tucker, *Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, Kelley Blue Book (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundai-kias-stolen-in-record-numbers/.

[48] Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia*, Truth About Cars (Sept. 20, 2022 2:36 PM), https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971.

[49] *See* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27/pdf/FR-1968-04-27.pdf#page=1.

concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[50] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[51]

88.     The reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' decision to forego the installation of immobilizer devices in the Susceptible Vehicles has led to a clear rise in automobile thefts, and the concomitant threats to public safety. Stolen cars are often driven recklessly—particularly in this case, where cars are stolen for joyriding or use in the commission of other crimes, rather than for parts or resale—which poses a risk to both the operators of the stolen vehicle and any lawful drivers or pedestrians who are unfortunate enough to cross paths.

89.     By creating a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

90.     Reckless driving impacts the comfortable enjoyment of life, health, and safety of others. Distinct from many instances of car theft, where the object is converting the stolen vehicle (either whole or in parts), the recent wave of Hyundai and Kia thefts often involves teenagers joyriding, posting videos of themselves driving recklessly, and then abandoning the stolen vehicles—often after collisions—at all hours of the day and night.

---

[50] *Id.*

[51] *Id.*

91.     Social media platforms are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real dangers of this phenomenon, including youth joyriding through school zones or through crowds of bystanders, and drivers hitting other cars and then running from the scene.[52] The fact that many of the perpetrators are juveniles and therefore inexperienced drivers—in many cases, too young to have a driver's license or permit—adds to the danger.

92.     Police officers responding to vehicle thefts and other crimes stemming from those same thefts also face serious safety threats. In Cleveland, officers have been shot,[53] shot at,[54] and stabbed[55] when responding to and/or encountering a Hyundai or Kia theft incident. In Tonawanda, a police officer stopped a driver in a stolen Kia Sportage SUV

---

[52] *See, e.g.*, @mixtapetrappers_, Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; @monloww__, TikTok (Oct. 10, 2022), https://www.tiktok.com/@monloww__/video/7153012228067773738; @414hypehouse, Instagram (Aug. 19, 2021), https://www.instagram.com/p/CSwsnhfAktd/; @414hypehouse, Instagram (Sept. 10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; @414hypehouse, Instagram (Oct. 20, 2021), https://www.instagram.com/p/CVRCcU5AkwT/.

[53] Julia Bingel, *Cleveland police issue warrant for 17-year-old boy accused of shooting officer (body camera video)*, 19 News (Mar. 30, 2023, 8:51 AM), https://www.cleveland19.com/2023/03/30/cleveland-police-issue-warrant-17-year-old-male-accused-shooting-officer/.

[54] Ed Gallek & Peggy Gallek, *Thieves getting bolder: Police threatened, taunted, and shot by suspects in stolen KIAs*, Fox 8 (Mar. 20, 2023, 4:52 PM), https://fox8.com/news/i-team/thieves-getting-bolder-police-threatened-taunted-and-shot-by-suspects-in-stolen-kias/.

[55] Ed Gallek & Peggy Gallek, *Cleveland police officer stabbed in head with screwdriver*, Fox 8 (June 12, 2023, 2:12 PM), https://fox8.com/news/cleveland-police-officer-stabbed-in-head-with-screwdriver/; *see also* John H. Tucker, *Suspect charged in screwdriver assault on off-duty Cleveland police officer*, Cleveland.com (June 15, 2023, 4:34 PM), https://www.cleveland.com/crime/2023/06/suspect-charged-in-screwdriver-assault-on-off-duty-cleveland-police-officer.html.

and was dragged and "thrown onto the road" when the driver of the stolen Kia attempted to flee.[56] The officer was badly injured and subsequently hospitalized.[57]

93.     A substantial risk to public safety also arises in the event that the would-be thief is confronted in the act. In January 2023, a Cleveland man followed a Hyundai Sonata that struck his car mirror and did not stop. The driver and passenger of the Hyundai got out of the vehicle with guns and began shooting at him.[58] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[59] About one hour later, the same Hyundai, which had been reported stolen days earlier, was involved in a drive-by shooting.[60]

94.     This risk was also tragically demonstrated in Columbus, Ohio, when a 4-year-old was killed in a hit-and-run involving a stolen Kia.[61]

95.     Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed

---

[56] Stephen T. Watson, *Tonawanda officer badly injured when dragged by stolen vehicle is released from ECMC*, Buffalo News (June 5, 2023), https://buffalonews.com/news/local/crime-and-courts/tonawanda-officer-badly-injured-when-dragged-by-stolen-vehicle-is-released-from-ecmc/article_4768ae48-03d4-11ee-8593-4322704cd734.html#tracking-source=article-related-bottom.

[57] *Id.*

[58] Cory Shaffer, *Teens Lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, Cleveland.com (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[59] *Id.*

[60] *Id.*

[61] Carly D'Eon, *Man wanted in fatal hit-and-run of 4-year-old boy turns himself in*, 10 WBNS (July 24, 2023, 6:04 AM), https://www.10tv.com/article/news/local/arrest-warrant-issued-for-man-allegedly-connected-to-fatal-hit-skip-south-franklinton/530-a8ab887d-8c43-48ea-8b4d-91ed5531a351.

chase in Baltimore crashed into another car and a 54-year-old pedestrian.[62] Both cars careened into a nearby building, which collapsed on top of the vehicles and the pedestrian.[63] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[64]



### E.    Car Thefts Drain Public Resources and Frustrate Public Policy

96.    Plaintiffs have expended significant time and resources responding to this public nuisance.

---

[62] Dan Belson, *Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, Balt. Sun (Mar 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html [https://perma.cc/6UHA-S9GT].

[63] *Id.*

[64] *Id.*

97.     Additionally, the opportunity costs of expending significant police and emergency services on these thefts has deprived Plaintiffs of the ability to combat other crimes or otherwise focus on community protection.[65]

98.     As a result of the skyrocketing rate of theft of Hyundai and Kia vehicles nationwide, some insurance companies are refusing to write policies for certain Hyundai and Kia models in major cities, thereby increasing the potential number of uninsured motorists on the road.[66]

## V.     THE CONTINUING PUBLIC NUISANCE AND DEFENDANTS' LATE, INSUFFICIENT RESPONSE

99.     The rampant thefts of Hyundai and Kia vehicles are still impacting Plaintiffs, years after the rise in thefts of the Susceptible Vehicles first began.[67]

100.    Data from the Council on Criminal Justice shows that between 2019 and 2023 motor vehicle theft has increased an average of 104% across 30 cities in the United

---

[65] John Roman *et al.*, *Cost-Benefit Analysis for Crime Prevention: Opportunity Costs, Routine Savings and Crime Externalities*, 14 Crime Prevention Stud. 53–92 (Jan. 2002), https://www.researchgate.net/publication/28575336_Cost-Benefit_Analysis_for_Crime_Prevention_Opportunity_Costs_Routine_Savings_and_Crime_Externalities.

[66] Peter Valdes-Dapena, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM), https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* Robert Higgs, *Progressive, State Farm halt new car insurance policies for high theft models of Kia and Hyundai*, Cleveland.com (Jan. 31, 2023, 1:06 PM), https://www.cleveland.com/business/2023/01/progressive-state-farm-halt-new-car-insurance-policies-for-high-theft-models-of-kia-and-hyundai.html; *see also* Joe Hernandez, *Dealers still sell Hyundais and Kias vulnerable to theft, but insurance is hard to get*, NPR (May 4, 2023, 5:00 AM), https://www.npr.org/2023/05/04/1173048646/hyundai-kia-car-theft-tiktok-insurance-dealerships (discussing how "a dozen" insurance companies denied coverage for the new owner of 2020 Kia Forte).

[67] Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, AP News (May 9, 2023, 7:40 AM), https://apnews.com/article/hyundai-kia-tiktok-theft-stolen-8e0a353d24be0e7bce36e34c5e4dac51.

States.[68] This includes certain Plaintiffs, such as Buffalo, Cincinnati, Rochester, Seattle, and St. Louis.[69]

101.   Defendants' responses to the crises that they have created show they continue to prioritize profits over safety. Defendants have refused to implement a recall to install engine immobilizers in the Susceptible Vehicles, initially only suggesting that owners of Susceptible Vehicles use wheel locks and, for some municipalities, offering wheel locks for them to distribute.[70] Unfortunately, the wheel locks are not entirely effective; Susceptible Vehicles with wheel locks in use have still been stolen and, in some instances, used in connection with other crimes, including shootings.[71] In addition, municipalities are not set up to distribute automotive parts to residents.

102.   More recently, Hyundai and Kia have begun rolling out a "software update" rather than installing immobilizers.[72] As highlighted in the multistate letter sent on behalf of 18 Attorneys General, Hyundai acknowledged that some of the affected vehicles cannot

---

[68] Ernesto Lopez *et al.*, *Crime Trends in U.S. Cities: Mid-Year 2023 Update*, Council Crim. Just. (July 2023), https://counciloncj.org/mid-year-2023-crime-trends/.

[69] *Id.*

[70] Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, Milwaukee J. Sentinel (July 19, 2021, 10:16 AM), https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

[71] Ashley Sears, *Milwaukee woman's Kia stolen twice, had steering wheel lock*, FOX 6 News Milwaukee (Sept. 28, 2021), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice; *see also* David Rose, *'B****, I swear, b****, I'm gonna crack your phone:' Drive-by shooting suspect says to Tacoma woman*, FOX 13 Seattle (Jan. 25, 2023), https://www.q13fox.com/news/b-i-swear-b-im-gonna-crack-your-phone-drive-by-shooting-suspect-says-to-tacoma-woman; and *Boy, 15, fighting for his life after shooting involving stolen Kia in Minneapolis*, CBS News Minnesota (Apr. 6, 2023), https://www.cbsnews.com/minnesota/video/boy-15-fighting-for-his-life-after-shooting-involving-stolen-kia-in-minneapolis/.

[72] *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

be updated, and Kia "confirmed that some unspecified number of affected vehicles cannot receive the updates."[73]

103.   As acknowledged in the motion for preliminary approval of the class action settlement in the instant litigation, only 6.9 million of the approximately *9 million* Susceptible Vehicles are even eligible for the update.[74]

104.   In the three months immediately following Kia's and Hyundai's release of the software update, data gathered from the Associated Press showed "that the number of Hyundai and Kia thefts is still growing[.]"[75] The software update has not stopped the nuisance that the Susceptible Vehicles created and the expenses that Plaintiffs have incurred and continue to incur.

105.   The update's efficacy has not been proven in the real world. There have been numerous reports of Kia and Hyundai vehicles being stolen after receiving the software update, and Kia and Hyundai have identified scenarios where the software logic fails.[76]

---

[73] Letter from Attorneys General to Ann Carlson, Acting Administrator of the National Highway Traffic Safety Administration ("Letter from Attorneys General to NHTSA") at 6 (Apr. 20, 2023), https://oag.dc.gov/sites/default/files/2023-04/AG%20Multistate%20Letter%20to%20NHTSA%204.20.2023%20%281%29.pdf.

[74] Consumer Class Pls.' Notice Mot. & Mot. Prelim. Approval Class Action Settlement at 12, *In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Products Liability Litigation*, 8:22-ml-03052-JVS-KES (C.D. Cal. July 20, 2023), ECF No. 166; *see also* Carly Schaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, Auto. News (June 2, 2023, 8:00 AM), https://www.autonews.com/regulation-safety/kia-hyundai-antitheft-software-fix-needs-fixes [https://perma.cc/HGH7-ZHZF] (noting that Defendants estimate "there are 9 million affected vehicles between them on the road").

[75] *See* Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, AP News (May 9, 2023, 7:40 AM), https://apnews.com/article/hyundai-kia-tiktok-theft-stolen-8e0a353d24be0e7bce36e34c5e4dac51.

[76] Carly Shaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, Auto. News (June 2, 2023, 8:00 AM), https://www.autonews.com/regulation-safety/kia-hyundai-antitheft-software-fix-needs-fixes [https://perma.cc/HGH7-ZHZF] (discussing a February 2023 service bulletin issued from Kia to its dealers regarding a software

For vehicles not covered by the update, Defendants are offering nothing more than steering wheel locks, or rebates for already purchased wheel locks.[77] As noted by multiple Attorneys General, steering wheel locks "still would not correct the underlying safety flaw . . . and . . . would impermissibly shift the responsibility for fixing this problem from the company to the individual vehicle owners."[78]

106.  In addition, upon information and belief, the software update can significantly inconvenience the drivers of the Susceptible Vehicles, making them less likely to seek it out. Rather than install an actual immobilizer, the software update doubles the length of the vehicles' theft alarm sound and adds a new logic check to the vehicles' onboard computers that is intended to prevent the Engine Control Unit from allowing the engine to start and run if the key fob is not used to unlock the doors. This update will interfere with the usability of the Susceptible Vehicles in many everyday situations.

107.  As noted by the Attorneys General in their letter dated April 20, 2023, there are at least two other significant issues with the software update. First, "not all eligible vehicles can receive the updates immediately"—approximately two million vehicles with the "starting system flaw" are still awaiting eligibility for the update.[79] Meanwhile, these

---

compatibility issue for Kia vehicles equipped with remote start accessories; another bulletin issued from Kia in late-May of 2023 acknowledged that "the problem has not been remedied").

[77] *See* Zac Palmer, *Hyundai launches software update to fix some of 4 million vehicles at risk of theft*, Yahoo! (Feb. 14, 2023), https://autos.yahoo.com/hyundai-launches-software-fix-4-155800221.html.

[78] Letter from Attorneys General to NHTSA at 6.

[79] *Id.* at 6–7. Additionally, media outlets report that customers are "having a difficult time getting through" to customer service representatives for Hyundai and Kia to inquire about the software update and their vehicle's eligibility. *See Hyundai, Kia owners frustrated by customer call center wait times to get security upgrade*, WHIO TV 7 (Feb. 16, 2023, 8:47 PM), https://www.whio.com/news/crime-and-law/hyundai-kia-owners-frustrated-by-customer-call-center-wait-times-get-security-update/SXRBN3OTHVC37OLC3735Y755ZU/.

vehicles "will remain on the road, vulnerable to theft and posing a threat to public safety."[80] Second, Defendants' "voluntary service campaign" does not prompt certain "regulatory requirements and oversight and instead places additional burdens on individual vehicle owners."[81]

108.   Owners of the Susceptible Vehicles have already experienced issues where the software update—which requires the car to be unlocked using the fob before starting, failing which the alarm will sound—conflicts with after-market remote start systems that they had installed, rendering the vehicles functionally inoperable. As one owner recently posted: "I have the update. I also have an aftermarket remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[82]

109.   There can be no doubt that communities nationwide are suffering harmful downstream consequences because of business decisions Hyundai and Kia made not to include immobilizer technology in certain vehicles. And as local governments have experienced nationwide when vaping products and drugs have unleashed widespread harms affecting public health and safety, local communities are left paying the price for others' business decisions to boost profits.

110.   Prior to this software update, Hyundai turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[83]

---

[80] Letter from Attorneys General to NHTSA at 7.
[81] *Id.*
[82] Reddit (Feb. 15, 2023, 7:05 AM),
[https://web.archive.org/web/20230311080407/https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/?sort=new].
[83] Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, Nerd Wallet (Jan. 26, 2023, 1:31 PM),
https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.

Defendants could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the cars were sold, Defendants could have implemented a mandatory recall. Instead, Hyundai chose to make money from a crime wave it caused.

111.   Because Hyundai and Kia have not implemented a mandatory recall for the installation of immobilizers, millions of the Susceptible Vehicles remain on the road. A recent report from CARFAX found that 4.9 million Hyundais and Kias remain susceptible to theft.[84]

112.   By electing profits over safety and deviating from the industry standard by not including engine immobilizers as a standard safety feature, Defendants have created a public nuisance that continues to this day.

## VI.   IMPACTS ON PLAINTIFFS

### A.   Milwaukee, Wisconsin

113.   The surge in thefts of Hyundai and Kia vehicles started in Milwaukee before expanding to other cities. In 2021, Milwaukee police recorded nearly 7,000 attempted and completed Kia and Hyundai vehicle thefts with the two car makes comprising 67% of all cars stolen for that year.[85]

---

[84] Patrick Olsen, *Nearly 5 Million Hyundai and Kia Models Need Anti-Theft Repairs*, CARFAX Blog (July 19, 2023), https://www.carfax.com/blog/kia-hyundai-theft-repairs.

[85] Ben Jordan, *Hyundais and Kias make up 68% of stolen cars this year in Milwaukee*, WTMJ-TV Milwaukee (Sept. 23, 2021, 4:54 PM), https://www.tmj4.com/news/local-news/hyundais-and-kias-make-up-68-of-stolen-cars-this-year-in-milwaukee.



114.   Between 2020 and 2021, attempted and completed thefts of Kia vehicles increased more than 660%; attempted and completed thefts of Hyundai vehicles increased almost 700% during the same time period.

115.   By the end of 2021, Milwaukee had the eighth-highest motor vehicle theft rate of any city in the United States and the highest overall theft rate change, with an increase of 72% from 2020 to 2021.[86]

116.   In 2021, nearly half of the individuals arrested for car theft in Milwaukee were 16 years old or younger.[87]

---

[86] *See NICB Report Finds Vehicle Thefts Continue to Skyrocket in Many Areas of U.S.*, NICB (Sept. 1, 2022), https://www.nicb.org/news/news-releases/nicb-report-finds-vehicle-thefts-continue-skyrocket-many-areas-us.

[87] *See* City of Milwaukee Judiciary & Legislation Committee Meeting, *Communication from the Milwaukee Police Department and certain car manufacturers relating to a recent significant increase in vehicle theft*, File 210367, at 17:17 (Dec. 6, 2021), https://milwaukee.granicus.com/player/clip/2984?view_id=2&redirect=true&h=acd2a61fb8f2928dda0e9d8f17ad13cd.

## Arrest by Age
Motor Vehicle Theft and Operating without Owners Consent  (OAWOOC)

| Age | 2020 | 2021* |
|---|---|---|
| 16 and younger | 264 | 518 |
| 17-25 | 309 | 347 |
| 26-35 | 107 | 134 |
| 36 and older | 65 | 62 |
| Total | 745 | 1,061 |

117.   The Milwaukee Common Council has worked to address this crisis, including in a December 6, 2021 meeting of the Judiciary and Legislation Committee.[88] At that meeting, Nick DeSiato, then the Chief of Staff for the Milwaukee Police Department, provided a presentation on the car theft epidemic.[89] Mr. DeSiato confirmed that there had indeed been a meteoric rise in auto thefts, and that "Kia and Hyundai are driving our auto theft numbers citywide."[90]

118.   More recently, Milwaukee continues to report significant thefts of Hyundai and Kia vehicles: the two car makes accounted for 58% all car thefts in 2022 and 52% of all car thefts from January 1 to June 1, 2023.[91]

---

[88] *See generally* City of Milwaukee Judiciary & Legislation Committee Meeting, *Communication from the Milwaukee Police Department and certain car manufacturers relating to a recent significant increase in vehicle theft*, File 210367 (Dec. 6, 2021), https://milwaukee.granicus.com/player/clip/2984?view_id=2&redirect=true&h=acd2a61
fb8f2928dda0e9d8f17ad13cd.

[89] *Id.* at 12:18.

[90] *Id.* at 16:29.

[91] Ben Jordan & Jackson Danbeck, *Project: Drive Safer, AG Kaul, Milwaukee leaders demand action from Kia/Hyundai to address thefts: 'They've been that easy to steal'*, WTMJ-TV Milwaukee (Mar. 20, 2023, 3:24 PM), https://www.tmj4.com/news/local-news/attorneys-general-from-23-states-including-wisconsin-issue-letter-to-kia-hyundai-

119.   As a result of the rampant thefts of Hyundai and Kia vehicles in Milwaukee, there have been tragic and fatal incidents of reckless driving involving those same stolen vehicles. In June 2021, a 16-year-old was killed after he stole a Kia Sportage and collided with another car.[92] His two 12-year-old accomplices were also seriously injured, as were three passengers in the car that he struck. The images and dashcam footage of this tragedy show how the epidemic of vehicle theft imperils the public.[93]



---

over-rampant-car-thefts#:~:text=According%20to%20Milwaukee%20Police%2C%208%2C096,manufactured%20by%20those%20two%20automakers.

[92] *Teen driving stolen car killed in head-on crash, 5 others injured*, WISN 12 News (June 16, 2021, 5:32 PM), https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640.

[93] Caroline Reinwald, *Dashcam video shows fatal crash moments after police cancel pursuit*, WISN 12 News (Oct. 13, 2021, 11:00 PM), https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614.

120.   In January 2023, five juveniles, between the ages of 13 and 15, crashed a stolen Kia into another car, killing the 47-year-old passenger of the car that was hit.[94] The driver of the car that was struck received hospital treatment for serious injuries, including a broken back and bruised lung.[95] One of the five juveniles in the stolen car also was taken to the hospital; the other four were taken into custody.[96] Milwaukee police began chasing the stolen Kia based on its match to a suspected vehicle involved in an armed robbery earlier in the day.[97]



121.   The surge in stolen Hyundais and Kias has also led to significant property damage for Milwaukee and its local businesses. The owner of a Milwaukee auto body shop, for example, described the shop's car lot as a "demolition derby" after a group of

---

[94] Caroline Reinwald, *Milwaukee Man dies during first date after stolen car crashes into their car*, WISN 12 News, (Jan. 24, 2023, 8:31 AM), https://www.wisn.com/article/milwaukee-man-dies-during-first-date-after-stolen-kia-crashes-into-their-car/42628885.
[95] *Id.*
[96] *Id.*
[97] *Id.* at 01:01.

car thieves spent approximately 45 minutes ramming the Kia they stole against other cars in the lot, in an attempt to free it from the barriers to the lot's exit.[98]

122.   In January 2023, two teenagers stole a Kia and crashed it into a Glendale police squad car.[99] The officer of the squad car was transporting a prisoner to the Milwaukee Secure Detention Facility. Both the officer and the prisoner were transported to the hospital for precautionary evaluations.[100] The owners of the Kia noted their car was stolen while they were attending a Milwaukee Bucks game, leading the Bucks' organization to issue a statement about where attendees should go for more "secure" parking.[101]



[98] Madalyn O'Neill, *Milwaukee car thieves cause 'a lot of destruction for 1 vehicle,' owner says*, Fox 6 Milwaukee (Oct. 25, 2022), https://www.fox6now.com/news/milwaukee-car-thieves-caused-destruction-1-vehicle-owner-says.

[99] Caroline Reinwald, *Two teenagers steal Kia, crash it into Glendale police squad car*, WISN 12 News (Jan. 17, 2023, 4:05 PM), https://www.wisn.com/article/thieves-steal-kia-crash-it-into-glendale-police-squad-car/42526160.

[100] *Id.*

[101] *Id.* at 00:33.

123.   In February 2023, a driver crashed a stolen Kia into a tree near Washington High School. Several occupants of the vehicle fled the scene, and two individuals were taken into custody.[102]



124.   With no assistance from Defendants as thefts were first surging in Milwaukee, owners of the Susceptible Vehicles resorted to self-help, banding together to form groups to identify repeat thieves and stolen cars.[103] One local restaurant even directed patrons to inform the host if they drive a Hyundai or Kia so they could be seated near a window to keep an eye on their car.[104]

---

[102] CBS 58 Newsroom, *Driver crashes stolen Kia into tree near Washington High School, 2 arrested*, CBS 58 (Feb. 15, 2023, 1:21 PM), https://cbs58.com/news/driver-crashes-stolen-kia-into-tree-near-washington-high-school-2-arrested.

[103] Caroline Reinwald, *Council members urge Kia, Hyundai to build better anti-theft systems*, WISN 12 News (June 16, 2021, 10:30 PM), https://www.wisn.com/article/mke-common-council-members-urge-kia-hyundai-to-build-better-anti-theft-systems/36745134.

[104] *See* Julia Fello (@JuliaFello), Twitter, (Apr. 19, 2022, 8:19 AM), https://twitter.com/JuliaFello/status/1516436304439001101?t=Ndd2JJvd5Vr8G5xhzyJpIQ&s=19; *see also* CBS 58 Newsroom, *Lakefront Brewery offers guests with Kias, Hyundais closer parking due to rise in theft*, CBS 58 (Apr. 18, 2022, 6:34 PM), https://www.cbs58.com/news/lakefront-brewery-offers-guests-with-kias-hyundais-closer-parking.



125.   Milwaukee is the original epicenter for the Kia/Hyundai theft epidemic,[105] and the symptoms have manifested there with tragic results, as shown by the increase in Milwaukee's traffic fatality rates. Despite a substantial reduction in traffic due to COVID-19, traffic fatalities in Milwaukee increased by 50% in 2020,[106] and remained elevated for 2021 and 2022.[107] Not only has Milwaukee experienced a heartbreaking surge in automobile fatalities, it has also seen record high numbers of pedestrian fatalities.[108]

---

[105] Evan Casey, *Milwaukee Eighth in Nation for Vehicle Thefts*, Urb. Milwaukee (Sept. 16, 2022, 1:04 PM), https://urbanmilwaukee.com/2022/09/16/hd-report-milwaukee-is-the-8th-worst-city-in-the-nation-for-vehicle-thefts/.

[106] Bruce Murphy, *Reckless Driving a National Problem*, Urb. Milwaukee (Feb. 15, 2022, 1:59 PM), https://urbanmilwaukee.com/2022/02/15/back-in-the-news-reckless-driving-a-national-problem/.

[107] Rob Mentzer, *Wisconsin Traffic Deaths Rising*, Urb. Milwaukee (Feb. 25, 2022, 1:03 PM), https://urbanmilwaukee.com/2022/02/25/wisconsin-traffic-deaths-rising/#:~:text=The%20state%20ended%202021%20with,the%20time%20was%20an%20outlier.

[108] Ben Jordan, *Project: Drive Safer*, In-Depth: Milwaukee County pedestrian fatalities *reach 20-year high*, WTMJ-TV Milwaukee (Nov. 23, 2022, 5:42 PM), https://www.tmj4.com/news/project-drive-safer/in-depth-milwaukee-county-pedestrian-fatalities-reach-20-year-high.

## B.   Madison, Wisconsin

126.   The City of Madison has been similarly impacted by the skyrocketing rate of Hyundai and Kia vehicle thefts. Between 2021 and 2022, thefts of Kia vehicles in Madison increased by more than 124%.



127.   In the summer of 2022, thefts of Kia and Hyundai automobiles increased by 270%. During that time period, Hyundais and Kias accounted for more than half of all auto thefts in Madison. According to Madison's data, for the entirety of 2022, the percentage of auto theft attributable to Hyundai and Kia was twice the historical norm.



128.   This surge in thefts is affecting all of Madison, but it has especially impacted the northern and southern neighborhoods of the city between January 1, 2022, and March 25, 2023, as illustrated by the map below.



129.   In 2021, Madison police officers spent 848.75 hours responding to stolen Hyundai and Kia incidents. In 2022, Madison police officers spent 1,256.32 hours—a nearly 50% increase—which does not include follow-up detective work or time spent prosecuting cases. In addition, since 2022, officers have spent 6,176.7 minutes investigating attempted thefts of Hyundais and Kias. The amount of time spent responding to rampant thefts puts additional stress on Madison's limited resources. However, despite these efforts, without action from Defendants, Madison has been unable, on its own, to abate this nuisance.

130.   Moreover, the phenomenon of skyrocketing Hyundai and Kia vehicle thefts has already led to extreme incidents in Madison. On June 20, 2022, four juveniles, with ages ranging from 12- to 14-years old, were arrested for the theft of a Kia.[109] Photographs from the scene show the Kia rolled over after crashing into an unoccupied parked car.[110]



[109] City of Madison, *Incident Report for Case # 2022-239938* (June 21, 2022, 1:41 AM), https://www.cityofmadison.com/police/newsroom/incidentreports/incident.cfm?id=29925.
[110] *Id.*

131.   For arrests made of Hyundai and Kia vehicle theft in Madison between 2021 and 2022, 55% of the individuals arrested were under 18 years old. The youngest individual arrested during that time period was only 11 years old.

### C.   Green Bay, Wisconsin

132.   The City of Green Bay has experienced a similar surge in thefts of Hyundai and Kia vehicles. In 2020, eight Hyundai or Kia vehicles were stolen in Green Bay. In 2021, ten Hyundais or Kias were stolen in Green Bay. In 2022, the number of stolen Kias and Hyundais increased to 18, and in 2023, the crisis has only worsened. From January 1, 2023 to July 18, 2023, there have been 41 Hyundai or Kia thefts in Green Bay—more than *nine times higher* than the rate of Hyundai and Kia theft in 2020.



133.   This increase in thefts is unique to Hyundai and Kia vehicles. In 2020, Hyundais and Kias accounted for 5% of all motor vehicle thefts in Green Bay. In 2021, those makes accounted for 6% of all motor vehicle thefts. In 2022, that figure rose to 9%,

and so far in 2023 Hyundais and Kias have accounted for 35% of all motor vehicle thefts in Green Bay.

134.   As thefts of these vehicles increased, so too did the number of times officers had to pursue Hyundai and Kia vehicles, which suggests these vehicles were being used to commit other crimes or otherwise endangered the public (*e.g.*, being driven recklessly).

135.   The surge in thefts has caused law enforcement officers to spend more and more of their time responding to stolen Hyundai and Kia vehicles. Thefts of Hyundai and Kia vehicles have also led to extreme driving with disastrous consequences. On June 21, 2023, a stolen Kia rammed into a Green Bay squad car before speeding off.[111]



### D.   Columbus, Ohio

136.   The City of Columbus has been, and continues to be, significantly damaged by the thefts of Kia's and Hyundai's extremely vulnerable cars.

---

[111] Jonathan Krause, *Another rash of Kia and Hyundai Thefts in Green Bay [VIDEO]*, WHBY (June 28, 2023, 1:25 PM), https://www.whby.com/2023/06/28/another-rash-of-kia-and-hyundai-thefts-in-green-bay/.

137.   Sitting in the Midwest where the crime-wave began, the rise of car thefts in Columbus began in late 2021, fueled in the summer of 2022 when viral online trends publicized Kia's and Hyundai's security flaws.



138.   The ease to which the cars' vulnerabilities could be exposed found a ready audience in children in particular. Indeed, last year, Columbus police arrested an 11-year-old boy for stealing a Kia; just seven days later, he was arrested for stealing a Hyundai.[112]

139.   The relative youth of the car thieves, and their limited experience with driving, also makes post-theft accidents even more likely. In the same month in which the 11-year-old was arrested twice, a 14-year-old died after he lost control of a stolen Hyundai

---

[112] Lacey Crisp, *Columbus non-profit aims to help juvenile car thieves*, 10 WBNS (Aug. 10, 2022, 10:42 PM), https://www.10tv.com/article/news/crime/columbus-dream-aims-to-help-juvenile-car-thieves/530-47d58521-b856-4ce4-84ec-3abd3a2f7216.

while driving 80 miles per hour. One of the passengers, the same age, also died with another 14-year-old seriously injured.[113]



140.   Yet another repeat offender survived one crash only to later collide with a garbage truck owned by the City of Columbus, totaling the garbage truck and sending four Columbus teenagers to the hospital.[114]

---

[113] Bri Buckley, *"You're driving yourself into an early grave," leaders calls for teen car theft to stop*, ABC 6 (July 25, 2022, 7:56 AM), https://abc6onyourside.com/news/local/youre-driving-yourself-into-an-early-grave-community-religious-leaders-calls-for-teen-car-theft-to-stop-real-kia-boys-hyundai-fatal-crash-we-are-linden-columbus-franklin-county-ohio#:~:text=Police%20said%20two%2014%2Dyear,and%20crashing%20cars%20around%20Columbus.

[114] Steve Levine, *Police in Central Ohio say teens stealing cars is now a trend that is escalating quickly*, ABC 6 (Aug. 17, 2022, 3:33 PM), https://abc6onyourside.com/news/local/police-in-central-ohio-say-teens-stealing-cars-is-now-a-trend-that-is-escalating-quickly-whitehall-columbus-real-kia-boys-franklin-county-sheriffs-office.

141.   The victims of these thefts include, of course, law enforcement officers tasked with protecting Columbus. For instance, one police cruiser was struck by a stolen Kia this past winter, driven by two teens suspected of being involved in a robbery; as the teens ran off, the officer was left pinned inside the police cruiser with head and neck injuries.[115]

---

[115] WSYX Staff, *Officer pinned in cruiser following collision with Kia allegedly stolen by teens*, ABC 6 (Feb. 28, 2023, 7:02 AM), https://abc6onyourside.com/news/local/law-enforcement-involved-in-crash-columbus-police-confirm-involves-stolen-vehicle-walford-avenue-elmore-avenue#https://www.nbc4i.com/news/local-news/columbus/stolen-kia-crashes-into-columbus-police-car-hospitalizing-officer.



142.    Nor is the damage limited to the car owners, the cars, the thieves/passengers, and public employees. Stolen vehicles, unsurprisingly, can be used as the means for further criminal acts, both direct and indirect. Stolen cars have been used as weapons by ramming Columbus police cruisers in an attempt to escape. They have further been used as battering rams to break into stores.[116]

---

[116] 10TV Web Staff, *Police: Teen boy steals Hyundai from body shop, crashes it into Franklinton tech store*, 10 WBNS (June 22, 2023, 1:12 PM), https://www.10tv.com/article/news/crime/stolen-vehicle-crash-columbus-franklinton/530-025d3cfb-b36e-47d9-9e9d-da4143fd698c; 10TV Web Staff, *Police: Suspected stolen vehicle crashes into east Columbus discount store*, 10 WBNS (June 12, 2023, 7:52 PM), https://www.10tv.com/article/news/crime/suspected-stolen-vehicle-crash-family-dollar-east-columbus/530-49a3c6db-9b95-4d69-8df2-3cd535a6938b.



143.   Or, once stolen, they are further sold or used by others who knowingly receive stolen property. This was precisely the scenario that led to four Columbus firefighters and five juveniles ending up in the hospital after the juveniles' previously stolen Kia collided with a firetruck. The driver was a 12-year-old.[117]



---

[117] WSYX Staff, *12-year-old boy behind wheel of stolen car that crashed into Columbus fire engine*, ABC 6 (May 30, 2023, 3:08 PM), https://abc6onyourside.com/news/local/12-year-old-boy-behind-wheel-of-stolen-car-that-crashed-into-columbus-fire-engine#.

144.   Miraculously avoiding tragedy (apparently twice), stolen vehicles have even crashed at elementary school playgrounds.[118]



145.   But most recently, and perhaps most tragically, on July 22, 2023, a 4-year-old pedestrian was struck and killed by a suspect fleeing a traffic stop and driving recklessly through an apartment complex in a stolen Kia.[119]

146.   It is important to remember, moreover, that all of these secondary impacts (beyond just the thefts themselves) are not captured in the raw "theft only" data, although it certainly leads to documented harm. These are just a few of the examples of damages inherent within a secondary market of unsafe and stolen vehicles.

147.   But despite all the publicity and all the effort of its employees, the thefts in Columbus have neither diminished nor shown any signs of stopping, much less slowing.

---

[118] 10TV Web Staff, *Police: Driver crashes suspected stolen Hyundai into East Linden Elementary School playground*, 10 WBNS (May 23, 2023, 7:46 AM), https://www.10tv.com/article/news/crime/stolen-vehicle-crash-east-linden-elementary-school-playground/530-ec5020d0-6311-4b95-9507-bf2eac6c8ae8.

[119] Carly D'Eon, *Man wanted in fatal hit-and-run of 4-year-old boy turns himself in*, 10 WBNS (July 24, 2023, 6:04 AM), https://www.10tv.com/article/news/local/arrest-warrant-issued-for-man-allegedly-connected-to-fatal-hit-skip-south-franklinton/530-a8ab887d-8c43-48ea-8b4d-91ed5531a351.

Over this past Memorial Day weekend, for example, at least 45 Kias and Hyundais were stolen (nearly 75% of all cars stolen), including at least one vehicle, ironically, that already had the Kia-issued anti-theft device installed.[120]

148.   No one is being deterred and, if anything, the stealing of Kias and Hyundais is becoming even more common as compared to the theft of cars from other manufacturers. Defendants' share of the "market" is currently at its second-highest level, nearing its peak last summer. Nearly 60% of all stolen cars are now Kias and Hyundais:



149.   Even on an absolute level, of the six highest months of Kia/Hyundai thefts on record, half of those happened within the first half of 2023:

---

[120] Steve Levine, *Lancaster family's Kia stolen in Columbus weeks after anti-theft device installed in car*, ABC6 (May 30, 2023, 2:23 PM), https://abc6onyourside.com/news/local/lancaster-familys-kia-stolen-in-columbus-weeks-after-new-anti-theft-device-installed-vehicle-theft-kia-hyundai-vandalism-anti-theft-device-crime-central-ohio.

Columbus Motor Vehicle Thefts

150.    Given that the other half of those six highest months was the summer of 2022 (the months of June, July, and August), and the rate of thefts has steadily risen from March through June of 2023, there is reason to believe that July and August of 2023 will similarly sport some of the highest rates of Kia and Hyundai thefts.

151.    In 2022, Columbus police offers spent over 4,500 hours responding to stolen Kia and Hyundai incidents, simply to complete the report, and, so far in 2023, Columbus police have already spent over 2,500 hours on the same. Compare this to 550 hours in 2020 before the crime wave started in 2021, which only resulted in over 900 hours for that year. This does not include the time spent completing follow-up detective work, recovering the vehicle, processing any arrest, or prosecuting cases. And, of course, every hour spent on abating the nuisance is one less hour spent preventing or responding to the City of Columbus' other pressing needs.

152.   All told, based on these statistics, until the supply of Kias and Hyundais are removed from Columbus, there's no reason to think this public nuisance—and the harm to the City of Columbus—will cease anytime soon, if at all.

**E.      Cleveland, Ohio**

153.   The Cleveland Police Department has also experienced a considerable increase in Hyundai and Kia vehicle theft, starting in July 2022.



154.   Between October and December 2022, nearly 1,200 Hyundai and Kia vehicles were stolen in Cleveland.[121]

155.   For December 2022 alone, Hyundais and Kias accounted for approximately 66% of total vehicle theft in Cleveland.

---

[121] *See id.*



156.   The surge in Hyundai and Kia thefts continues to impact Cleveland to this day, with Hyundai and Kia vehicles making up nearly half of all vehicle thefts in Cleveland for May 2023.



157.   This phenomenon of thefts has already led to extreme and harmful incidents in Cleveland. In the last week of January 2023, alone, there were at least three other stolen car police pursuits in the greater Cleveland area, two of which ended in crashes.[122] One of the crashes involved a stolen Kia that drove across four lanes of traffic, clipped a charter bus carrying members of the Baldwin Wallace University swim team, and crashed into a retaining wall.[123]

158.   Also in late January 2023, a man in Cleveland reported that his Hyundai was stolen. While driving his other car, a Kia Rio, the man spotted his stolen Hyundai at a Burger King drive thru. When he attempted to block the Hyundai, two teenagers in the stolen car rammed the man's Kia against the restaurant.[124] Police reported that the incident was part of a three-day crime spree involving two shootings within an hour of each other that the driver of the stolen Hyundai helped carry out.[125]

---

[122] Bryn Caswell, *Dash-cam video shows wrong-way crash on I-480; third stolen car pursuit in a week*, News 5 Cleveland (Feb. 1, 2023, 5:03 PM), https://www.news5cleveland.com/news/local-news/dash-cam-video-shows-wrong-way-crash-on-i-480-third-stolen-car-pursuit-in-a-week.

[123] Laura Morrison, *Baldwin Wallace swim team bus hit by stolen vehicle: Police*, Fox 8 (Jan. 30, 2023, 9:22 AM), https://fox8.com/news/baldwin-wallace-swim-team-bus-hit-by-stolen-vehicle-police/.

[124] Cory Shaffer, *Teens lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, Cleveland.com (Feb. 3, 2023, 5:03 PM), (https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[125] *Id.*



159.   Most recently, on July 25, 2023, officers arrested 12 juveniles between the ages of 13 and 17 "for allegedly viciously attacking an innocent man at a gas station."[126] The suspects included nine boys and three girls, all of whom arrived at the gas station in three vehicles, later confirmed to be Kias and Hyundais stolen one day prior.[127] The suspects also fired "weapons in the parking lot of the gas station and down St. Clair Avenue."[128]

160.   As discussed *supra*, several Cleveland police officers have also been injured, both on and off duty, in responding to Hyundai and Kia vehicle thefts. On March 14, 2023, a Cleveland police officer sustained gunshot wounds to his thigh and arm while

---

[126] Julia Bingel, *Video: 12 teens beat man, fire guns at Cleveland gas station, Cuyahoga County prosecutor says*, 19 News (July 26, 2023, 12:09 PM), https://www.cleveland19.com/2023/07/26/12-juveniles-beat-man-fire-weapons-cleveland-gas-station-according-cuyahoga-county-prosecutor/.

[127] *Id.* at 00:30.

[128] *Id.*

investigating Hyundai and Kia thefts in the area.[129] Two other officers crashed their squad car when responding to the incident and were subsequently hospitalized.[130]

161.   On June 11, 2023, two teenage suspects slashed an off-duty Cleveland police officer in the head after the officer attempted to prevent the suspects from taking the officer's personal Kia Sorento.[131]

## F.    Cincinnati, Ohio

162.   The same vehicle theft trend is evident in Cincinnati, where, for example Kia and Hyundai vehicles accounted for 72% of reported auto thefts or attempts in February 2023, compared to only 8% of thefts in February 2022.

---

[129] Molly Walsh, *Cleveland officer shot, others injured in crash, during pursuit of vehicle theft suspects*, Police 1 (Mar. 16, 2023), https://www.police1.com/officer-safety/articles/cleveland-officer-shot-others-injured-in-crash-during-pursuit-of-vehicle-theft-suspects-NI3BdH9MK9clYfIx/.

[130] *Id.*

[131] Ryan Haidet, *Suspects wanted after off-duty Cleveland police officer 'slashed in the head with a screwdriver' during weekend robbery*, WKYC.com (June 13, 2023, 5:54 AM), https://www.wkyc.com/article/news/local/cleveland/off-duty-cleveland-officer-slashed-screwdriver-robbery/95-05768479-0c01-4b1a-80d9-949dd5159996; *see also* Alec Sapolin & Sia Nyorkor, *Off-duty Cleveland officer slashed in the head with screwdriver by car thieves*, Cleveland 19 News (June 12, 2023, 12:14 PM), https://www.cleveland19.com/2023/06/12/off-duty-cleveland-officer-slashed-head-with-screwdriver-by-car-thieves/.



## Auto Theft Spike
(attempted and completed)

* Data labels note percent of auto thefts that were KIA or Hyundai

163.    According to Cincinnati Police Department data on attempted and completed auto theft, when comparing 2021 to 2022 there was a 416.6% increase in Kia and Hyundai theft. During the same time period, there was a 3.6% *decrease* in auto theft for all other vehicle makes. This trend has persisted into 2023, and 72% of attempted or completed auto thefts in Cincinnati involve a Kia or Hyundai vehicle. Up until July 2022, Kia and Hyundai vehicles consistently combined to account for less than 20 attempted or completed thefts per month. In July 2022, that number spiked to 150, and in February 2023 that number approached 250, a more than 1,000% increase over the historical norm.



# Auto Theft
### (attempted and completed)

**Count of Auto Thefts (Top 5 Manufacturers)**
January 1, 2020 - February 28, 2023

**1255% increase**
(Apr 22 = 11,  Jul 22 = 149)

CHEVROLET — FORD — HONDA — HYUNDAI — KIA

164.   The number of Hyundai and Kia vehicle thefts in Cincinnati has continued to skyrocket in 2023. In May 2023, a record-high 137 Hyundai vehicles were stolen. The 595 Hyundai vehicles stolen between January and June 2023 represent a 1,114% increase from the 49 Hyundai vehicles stolen between January and June 2022. Similarly, the 393 Kia vehicles stolen between January and June 2023 represent an 859% increase from the 41 Kia vehicles stolen between January and June 2022.



165.   As the theft of Hyundai and Kia vehicles has increased, Cincinnati's police officers have had to divert resources to account for the rash of thefts. The graph below shows the spike in officer time spent responding to a scene where a Hyundai or Kia vehicle is included in the dispatcher notes for an auto theft or auto theft recovery call.



63

166.   The substantial rise in thefts presents a risk not only for property damage, but to public safety, as thieves often engage in reckless driving, as well as other dangerous criminal conduct, including robbery and firearm thefts. Specifically, Hyundai and Kia vehicles have been targeted by thieves seeking weapons (and other valuables) that might have been left in patrons' vehicles. In 2022, six firearms were reported stolen in an auto theft involving a Hyundai or Kia, compared to two such thefts in the prior two years combined.



167.   Turning to reckless driving, in 2020, stolen Hyundais and Kias were involved in 15 crashes. In 2021, 13 such crashes occurred. In the first half of 2022, there were four

such crashes, before a meteoric jump to 21 crashes involving stolen Kia and Hyundai vehicles in the second half of 2022. Already, there have been 12 crashes involving stolen Kias and Hyundais in 2023, nearly as many as in all of 2021.



168.   The phenomenon of rampant Hyundai and Kia thefts in Cincinnati has already led to extreme and tragic accidents. On August 28, 2021, a 14-year-old driving a stolen Hyundai Elantra crashed when exiting I-71 at Ridge Road in Cincinnati.[132] The stolen car crashed into a pole, hitting a tree before coming to rest on its side.[133] The 14-year-old driver was partially ejected from the vehicle and pronounced dead at the scene, and a 13-year-old passenger suffered injuries.[134]

---

[132] Kaitlin Lewis, *Hamilton County Sheriff: one dead in Saturday morning crash involving two juveniles*, Cincinnati Enquirer (Aug. 28, 2021, 4:23 PM), https://www.cincinnati.com/story/news/2021/08/28/hamilton-county-sheriff-one-dead-car-crash-involving-two-juveniles/5637645001/.
[133] *Id.*
[134] *Id.*

65

169.   On July 8, 2022, at approximately 6:20 p.m., police observed a stolen 2014 Kia Rio being driven in the Queensgate neighborhood by a 13-year-old.[135] The youth was attempting to turn onto Kenner Street from Dalton Avenue, when he lost control of the car and crashed into metal poles and a transformer box.[136] A 12-year-old passenger was seriously injured in the resulting crash.[137]

170.   Around this same time, a local woman in Cincinnati discovered that her 2019 Kia Forte was stolen outside of her apartment building—the car was subsequently wrecked and abandoned.[138] Contents inside the car, including the car seat for her small child, were gone.[139]

171.   On February 8, 2023, a police chase involving a stolen Hyundai ended in a crash in the College Hill neighborhood, damaging a six-foot-tall brick pillar and fence.[140]

172.   More recently, Cincinnati police have reported multiple incidents of drive-by shootings involving stolen Hyundai vehicles. On May 31, 2023, an adult male and three

---

[135] Luke Jones, *Teen who crashed in car with 13-year-old driver: We was running from the police*, Local 12 (July 12, 2022, 7:27 PM), https://local12.com/news/local/teens-joyride-police-chase-pursuit-crash-west-end-stolen-car-kennedy-heights-injury-cincinnati-local-12-wkrc-tristate-ohio-kentucky-indiana-crime-news.

[136] *Police: 13-year-old driver crashes seriously injuring 12-year-old passenger*, Local 12 (July 11, 2022, 9:24 AM), https://local12.com/news/local/police-13-year-old-driver-crashes-seriously-injuring-12-year-old-passenger-cincinnati-ohio-dalton-avenue-crash-control-kia-rio-hospital-investigation-speed.

[137] *Id.*

[138] James Pilcher, *'Kia Boys' stolen car trend hits one local woman who wonders if she'll ever get hers back*, Local 12 (Aug. 23, 2022, 1:56 PM), https://local12.com/news/local/kia-boys-stolen-car-trend-hits-one-local-woman-who-wonders-if-shell-ever-get-hers-back-cincinnati-ohio-avondale-forte-tiktok-thieves-car-seat-trimaine-elliott.

[139] *Id.*

[140] Jennifer Edwards Baker, *Police chase ends in crash that closes W. North Bend Road*, Fox 19 (Feb. 8, 2023, 5:07 AM), https://www.fox19.com/2023/02/08/police-chase-ends-crash-that-closes-w-north-bend-road/.

juveniles, ages 10, 14, and 15, were shot in a drive-by shooting involving a 2017 Hyundai Sonata with temporary tags that was suspected to be stolen.[141] Video surveillance of the incident captured the moment that one of the suspects began shooting out of the rear passenger window.



---

[141] WLWT Digital Staff, *Suspect Vehicle in Over-the-Rhine shooting found near Bond Hill*, WLWT 5 (June 1, 2023, 5:12 PM), https://www.wlwt.com/article/over-the-rhine-shooting-grant-park-suspect-car-found/44067612.

173.    Then, on July 16, 2023, a 37-year-old woman was killed in a drive-by shooting involving a stolen Hyundai.[142] The Cincinnati Police Department Homicide Unit is investigating the case.[143]

### G.    Parma, Ohio

174.    The City of Parma has experienced a similar surge in thefts of Hyundai and Kia vehicles. Between 2021 and 2022, the number of Kia vehicles stolen in the City of Parma increased by more than 414% and thefts of Hyundai vehicles increased by more than 416%. The rash of thefts has continued at a similar pace in 2023.

175.    The combined number of Hyundai and Kia vehicle thefts in 2022 more than quintupled the number of thefts of those same vehicles in 2021. As thefts of these vehicles increased, so too did the number of times officers had to pursue Hyundai and Kia vehicles, which suggests these vehicles were being used to commit other crimes or otherwise endangered the public (*e.g.*, being driven recklessly).

---

[142] Mildred Fallen *et al.*, *Woman killed in another drive-by shooting in Cincinnati*, Fox 19 Now (July 17, 2023, 1:01 AM), https://www.fox19.com/2023/07/17/woman-killed-another-drive-by-shooting-cincinnati/.
[143] *Id.*



176.   In the first six months of 2023, 24 Hyundai and Kia vehicles were stolen—more than the total Hyundai and Kia vehicle thefts for all of 2020 and, also, for all of 2021, *combined*.

177.   Parma law enforcement officers also pursued ten Hyundai and Kia vehicles through the first six months of 2023, which matches the total number of pursuits for those same vehicles for all of 2022.



178.   The surge in thefts has caused Parma law enforcement officers to spend more and more of their time responding to stolen Hyundai and Kia vehicles. In 2022, officers were on scene responding to stolen Hyundai and Kia vehicles for more than 20,000 minutes. This near ten-fold increase since 2020 has placed a tremendous strain on Parma's Uniform Patrol Division, whose time has been diverted from other important duties, not to mention the time other divisions spend investigating and prosecuting these crimes.

179.   In the first four months of 2023, Parma officers have already spent more time responding to reports of stolen Hyundai and Kia vehicles than they did in all of 2020.

180.   Thefts of Hyundai and Kia vehicles in Parma have led to extreme driving with disastrous consequences.

181.   For example, a 14-year-old driving a stolen Kia Optima led Parma officers on a high-speed pursuit in the early morning hours of October 2, 2022. The vehicle eventually crashed into an apartment building, causing damage to its foundation, and disabling the vehicle.

182.   On November 6, 2022, Parma officers were forced to pursue a stolen Kia Forte traveling over 100 miles per hour, including in a 25 miles per hour zone. The stolen Kia almost struck another vehicle and crashed through a construction cone before officers were able to stop the vehicle. The three juveniles inside the stolen Kia were taken into custody.

183.   In December 2022, a 17-year-old male in a stolen Hyundai Elantra led Parma police on a high-speed pursuit. The driver of the stolen Hyundai ran multiple stop signs and reached speeds of 80–90 miles per hour before crashing into a home just outside

Parma city limits.[144] A 25-year-old woman and her infant were inside the home during the crash and, fortunately, neither was injured. The driver of the stolen vehicle sustained head injuries and was transported to the hospital. The Hyundai vehicle was towed back to Parma.



184.    In mid-January 2023, four teenagers in a stolen Hyundai Elantra attempted to elude police before crashing into a utility pole in Parma.[145] Three of the individuals apprehended were between the ages of 17 and 19. Officers also observed a Kia SUV that had been reported stolen, but the driver of the car was able to get away. Prior to the police

---

[144] WKYC Staff, *Photos: Car slams into Cleveland home following stolen vehicle pursuit*, WKYC.com (Dec. 13, 2022, 7:08 PM), https://www.wkyc.com/article/news/local/cleveland/car-slams-into-cleveland-home-pictures/95-1198fbd5-86a0-499b-a32a-fafe1437c292.

[145] Anna Meyer & Bri Buckley, *4 teenagers taken into custody after crashing stolen Hyundai into pole in Cleveland*, WKYC.com (Jan. 18, 2023, 11:22 PM), https://www.wkyc.com/article/news/local/cuyahoga-county/teenagers-crash-stolen-hyundai-cleveland/95-7ab0ff03-3d0e-475e-a26b-7521e3103aa8.

chase, officers observed a group of individuals in the stolen Kia trying to steal another vehicle in an apartment complex.[146]

### H.    Baltimore, Maryland

185.   The City of Baltimore has been similarly impacted by the skyrocketing rate of Hyundai and Kia vehicle thefts. Between 2021 and 2022 alone, thefts of Hyundai and Kia vehicles in Baltimore increased by more than 106% (391 Hyundai and Kia thefts in 2021; 807 thefts in 2022).

186.   The explosion in thefts became even more profound in the first six-and-a-half months of 2023. During the period from January 1 and July 15, 2023, there were 1,687 thefts of Hyundai and Kia vehicles. If the trend holds steady throughout the remaining five-and-a-half months, there will be more than 3,200 thefts of Hyundai and Kia vehicles (an increase of approximately 396% from 2022).



---

[146] *Id.*

187.   The susceptibility of Hyundai and Kia vehicles to theft has caused financial damages to drivers in the City of Baltimore. Some insurers have adopted significant increases in the rates charged for motor vehicles insurance of such vehicles in Baltimore. More poignant is the fact that some insurers have begun to refuse coverage of the Susceptible Vehicles.

188.   In addition, drivers in the City of Baltimore whose Hyundai and Kia vehicles were stolen and recovered with damage have had difficulty getting their cars repaired because the increase in thefts has caused a shortage of replacement parts.

189.   The increase in vehicle thefts, including Hyundai and Kia vehicles, also causes serious risk to personal health and safety of a significant portion of Baltimore residents. The potential results from increased thefts and related risks to safety is demonstrated in a recent tragedy. On February 8, 2023, a stolen Hyundai Sonata ran a red light and hit another vehicle, causing both cars to strike a pedestrian and rowhome, which collapsed.[147] The pedestrian was killed in the horrifying accident, which was caught on video.[148]

190.   In addition, Baltimore itself has incurred significant costs as a result of the explosion in Hyundai and Kia thefts. The Baltimore Police Department ("BPD") has borne a significant portion of these costs. In 2023, to date, the BPD has expended approximately 1,750 additional hours responding to thefts of Hyundai and Kia vehicles. By the end of 2023, that figure is likely to double if the current rate of thefts continues. And these hours and costs do not capture the full extent of economic damage to Baltimore, including the following: (1)

---

[147] Dan Belson, *Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, Balt. Sun (Mar. 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html [https://perma.cc/6UHA-S9GT].
[148] *Id.*

73

follow-up investigation; (2) prosecution; and (3) officer court appearances as witnesses, to name just a few.

191.   This strain on BPD's limited resources impairs the safety and welfare of all Baltimore Residents.

## I.   Seattle, Washington

192.   Seattle has seen a significant increase in car thefts, and specifically of Kias and Hyundais. In 2022, Seattle police reported 6,244 motor vehicle thefts, nearly 1,000 more than in the same period in 2021.[149] In July 2022 alone, the Seattle Police Department reported a 620% increase in reports of stolen Hyundais and Kias over July 2021.[150] This surge continues, with no end in sight.

193.   Approximately 825 Hyundai and Kia vehicles were reported stolen in Seattle in 2022, compared to the reported 158 Hyundai and Kia vehicles stolen in 2021. Data obtained from the Seattle Police Department shows a rapid increase in thefts of Hyundai and Kia vehicles starting in July 2022, coinciding with the release of popular TikTok tutorial videos explaining the exploit.[151] As the police department put it:

> In July, police investigated 36 reports of stolen Kias (compared
> to five in July 2021) and believe suspects may be using a method
> learned from TikTok, using a USB drive or cable and other tools,

---

[149] Joel Moreno, *Video: Would-be thieves use car, hammer to try and smash hardware store door*, KTXS 12 (Jan. 20, 2023, 9:16 AM), https://ktxs.com/news/nation-world/video-would-be-thieves-use-car-hammer-to-try-and-smash-hardware-store-door-surveillance-seattle-jeremy-cooper-maple-leaf-ace-hardware-law-enforcement-auto-thefts-tacoma-puget-sound-auto-theft-task-force.

[150] Lauren Donovan, *Seattle police warn latest surge in Kia auto thefts linked to TikTok*, Yahoo! News (Aug. 15, 2022), https://news.yahoo.com/seattle-police-warn-latest-surge-230508235.html?guccounter=2.

[151] Public Affairs, *Warning to KIA Drivers – Recent Spike in Thefts May Be Tied to TikTok Videos*, SPD Blotter (Aug. 15, 2022, 12:22 PM), https://spdblotter.seattle.gov/2022/08/15/warning-to-kia-drivers-recent-spike-in-thefts-may-be-tied-to-tiktok-videos/.

in place of a key, to start a vehicle. The vehicles stolen in July—Kia models Optima, Soul, Sorrento, Forte, and Sportage—were all manufactured between 2014 and 2021.[152]



194.   Unsurprisingly, Hyundai and Kia vehicles were among the top ten most stolen car brands for all motor vehicle thefts in Seattle in 2022. The significant increase in Hyundai and Kia vehicle theft is especially staggering compared to other car brands. From 2021 to 2022, thefts for Hyundai and Kia vehicles increased by 363% and 503%, respectively. The next closest increase, proportionally, was the theft of Ford vehicles, which increased by a fraction of Hyundai and Kia vehicle thefts: 60%, over the same time period.

195.   Through the first six months of 2023, Seattle has experienced more thefts of Hyundai and Kia vehicles, respectively, than for all of 2022.

---

[152] *Id.*



196.   This surge in thefts is affecting all of Seattle, but has been hitting the Northgate, Capitol Hill, Central Area/Squire Park, and North Beacon Hill neighborhoods of Seattle particularly hard.



**2022 Kia & Hyundai Thefts by Neighborhood**

197.   Approximately 64% of Hyundai and Kia vehicles that were stolen in Seattle in 2022 were also recovered within Seattle city limits. This suggests that the motivation for many of these thefts was not the economic value of the vehicle—they were not driven to chop shops to be disassembled for parts—but rather the vehicles were stolen for joyriding or to be used as transportation for vehicle theft and/or other crimes.

198.   Seattle-wide, overall motor vehicle theft also reached a 15-year high in 2022, up 30% from 2021. Total motor vehicle theft in Seattle for 2023 is also projected to surpass Seattle's 2022 numbers, based on data through the first six months of 2023.



199.   The increase in thefts of Hyundai and Kia vehicles has also correlated with increased threats to public safety in Seattle. On March 29, 2023, at approximately 3:30 a.m. Seattle police responded to a burglary in Seattle's Fremont neighborhood.[153] Upon arrival, officers observed that the suspects used a stolen Kia sedan to smash through the windows of a recreational marijuana business.[154]

---

[153] Colleen West, *Burglars use car to crash into Fremont pot store*, Kiro 7 News (Mar. 29, 2023 11:21 AM), https://www.kiro7.com/news/local/fremont-pot-store-latest-target-smash-grab-burglars/XPG43PX54ZBEBLWGGYMNLJKPGI/.

[154] *Id.*



### J.     St. Louis, Missouri

200.    St. Louis is a constitutionally chartered municipal corporation that may sue and plead in its own name. Defendants' Susceptible Vehicles have created a serious public health and safety crisis in St. Louis, and St. Louis has directly and foreseeably sustained all economic damages alleged herein.

201.    Between May 2021 and February 2022, St. Louis received reports of 3,221 vehicle thefts.

202.    Between May 2022 and February 2023, St. Louis received reports of 7,341 vehicle thefts. This represents a 128 % increase in the number of reported stolen vehicles.

203.    Since May 2022, the St. Louis Metropolitan Police Department has received more than 4,500 reports of thefts of Kia or Hyundai vehicles.

204.    Between May 2022 and February 2023, St. Louis received reports of an average of 15 Kias or Hyundais being stolen per day. During the summer and fall months of 2022, St. Louis received reports of an average of over 23 Kias or Hyundais stolen every day.

205.   Since May 2022, 58% of all vehicles stolen in St. Louis have been Kias or Hyundais.

206.   In the first four months of 2022, there were 163 stolen Hyundais or Kias in St. Louis. In the first four months of 2023, 1,077 Hyundais or Kias were stolen in St. Louis—a 561% increase.[155]



207.   Many of these stolen Hyundais and Kias have been used in furtherance of additional violent crimes.

208.   In June 2022, a stolen Hyundai Elantra and stolen Kia Optima were involved in a shooting in which six other vehicles were shot and damaged.[156]

---

[155] Spectrum News Staff, *Hyundai, Kia Thefts Are 50% of Stolen Cars in St. Louis City, County for Start of 2023*, Spectrum News (May 16, 2023, 6:08 PM), https://spectrumlocalnews.com/mo/st-louis/news/2023/05/16/hyundai-and-kia-thefts-in-2023-are-roughly-half-of-all-stolen-cars-in-st--louis-city-and-county-.

[156] Christine Byers, *St. Louis Threatens to Sue Hyundai and Kia Over Theft Epidemic*, KSDK 5 (Aug. 29, 2022, 3:16 PM), https://www.ksdk.com/article/news/investigations/st-louisthreatens-to-sue-hyundai-kia-over-theft-epidemic/63-ba297b2b-e09d-4087-a3ed-00960f7815b7.

209.   On June 12, 2022, a car thief stole a Kia Optima and took it for a joyride. The car thief struck a parked vehicle, resulting in the Kia flipping onto its passenger side and landing in the front yard of a two-person residence in the Mark Twain / I-70 Industrial neighborhood. The stolen Kia caused significant damage to the parked car and the homeowners' vehicle, which was parked in their driveway.

210.   In August 2022, a stolen Kia Optima and a stolen Hyundai Sonata were involved in a mid-day shootout near a busy intersection south of downtown St. Louis, in which a 17-year-old was shot and a bullet entered an occupied apartment.[157]

211.   On September 6, 2022, a bicyclist traveling on South Grand Boulevard was struck and killed by a speeding Kia sedan which had been stolen.[158]

212.   The foreseeable use of Kia and Hyundai's defective products by car thieves has also resulted in substantial damage to city property, including fire hydrants, street signs and traffic signals, which St. Louis has expended funds to repair and replace.

213.   Defendants' failure to equip the Susceptible Vehicles with immobilizer technology has resulted in an increased expenditure of the City of St. Louis' resources, forcing St. Louis to devote significant manpower to documenting, investigating and recovering stolen Kia and Hyundai vehicles.

214.   Additionally, the St. Louis's towing service has been inundated with requests to tow recovered stolen Kias and Hyundais. Plaintiff City of St. Louis has incurred significant costs relating to employee time spent towing and processing stolen defective Kia and Hyundai vehicles.

---

[157] *Id.*

[158] Sam Clancy, *Bicyclist Killed in Hit-and-Run Crash Near Tower Grove Park in South St. Louis*, KSDK 5 (Sept. 7, 2022, 4:09 PM), https://www.ksdk.com/article/news/crime/bicyclistkilled-hit-and-run-crash-tower-grove-park-south-st-louis/63-feccae6a-a139-4541-9025-aab3d579eae4.

215.   The financial resources St. Louis has expended in an attempt to protect its residents from Defendants' Susceptible Vehicles far outpaces its ordinary expenditures and diverts financial and human resources—creating further downstream impacts, such as siphoning resources that could be devoted to other law enforcement priorities, such as efforts to reduce violent crime.

216.   In May 2023, St. Louis Metropolitan Police Chief Robert J. Tracy was reported as saying: "the huge spike in Kias and Hyundai thefts make the job of police departments like ours much more difficult, siphoning resources that could be devoted to other law enforcement priorities."[159]

### K.   Kansas City, Missouri

217.   Kansas City is a constitutionally charted municipal corporation that may sue and plead in its own name. Defendants' Susceptible Vehicles have created a serious public health and safety crisis in Kansas City, and Kansas City has directly and foreseeably sustained all economic damages alleged herein.

218.   Like other communities, Kansas City has seen a dramatic surge in the number of thefts of Susceptible Vehicles attributable to the absence of immobilizer technology. The thefts of Hyundai and Kia vehicles accelerated at a rapid pace during 2022: 37 Hyundai and Kia vehicles were stolen during the first quarter of 2022 while 192 were stolen during the last quarter.

219.   The accelerated pace of stolen vehicles continued into 2023. In 2022, 382 thefts of Kia vehicles were reported. But in the month of January 2023 alone, there were already over 105 thefts of Kia vehicles reported—nearly one half of the entire 2022 total.

[159] Esteban Parra, *How Delaware police are responding to TikTok challenge of stealing Kia, Hyundai vehicles*, Del. News J. (May 11, 2023, 4:47 AM), https://www.delawareonline.com/story/news/local/2023/05/11/tiktok-challenge-driving-increase-kia-hyundai-vehicle-thefts-delaware/70187558007/.

220.    Hyundai vehicles have seen a similar increase with over 50 of them being reported stolen just in January 2023.

221.    That trend has persisted through 2023. As of July 14, 2023, there have been 1,192 Kia vehicles stolen in Kansas City.

222.    As of that same date, 880 Hyundai vehicles have been stolen.

223.    As of July 2023, Kia and Hyundai vehicles make up 47% of all stolen vehicles in Kansas City.

### L.    Buffalo, New York

224.    In Buffalo, the police reported an unprecedented increase in Hyundai and Kia vehicle thefts starting in the summer of 2022. An estimated 274 Kias were stolen in Buffalo for all of 2022, compared to 64 stolen Kias in 2021 and 51 stolen Kias in 2020.[160]

225.    Theft rates of Kias and Hyundais are projected to continue skyrocketing: for the first two months of 2023 alone, over 350 Kias and Hyundais were stolen in Buffalo.[161] For the first five months of 2023, the Buffalo Police Department reported 471 thefts of Hyundai vehicles and 689 thefts of Kia vehicles.

---

[160] Press Release, Senator Charles E. Schumer, *Schumer: Dangerous & Infuriating Surge of Kia, Hyundai Car Thefts in Upstate NY is Out of Control – 350+ Stolen in Buffalo This Year Alone and Hundreds More across Upstate NY – Senator Calls on Feds to Get Involved and Demands Kia, Hyundai to Give Upstate Communities the Help They Need Now* (Feb. 27, 2023) https://www.schumer.senate.gov/newsroom/press-releases/schumer-dangerous-and-infuriating-surge-of-kia-hyundai-car-thefts-in-upstate-ny-is-out-of-control_350-stolen-in-buffalo-this-year-alone-and-hundreds-more-across-upstate-ny--senator-calls-on-feds-to-get-involved-and-demands-kia-hyundai-to-give-upstate-communities-the-help-they-need-now.

[161] *Id.*



226.   For January 2023 alone, thefts of Hyundai vehicles in Buffalo increased 2,667% compared to January 2022; thefts of Kia vehicles increased 2,270% during that same time period. Hyundai and Kia vehicles accounted for nearly 67% of all vehicle thefts in Buffalo for January 2023 alone.



227.   The surge in stolen Hyundai and Kia thefts has also led to devastating and fatal accidents. In October 2022, a 16-year-old individual driving a stolen Kia Sportage crashed the vehicle near the intersection of Routes 33 and 198 in Buffalo.[162]



228.   All five passengers of the October 2022 Buffalo crash were ejected from the vehicle, three of whom were pronounced dead at the scene.[163] Another passenger later died at the hospital, and the remaining passenger and driver sustained serious injuries. The four passengers who died were all between the ages of 14 and 19.[164] The 16-year-old driver faces four counts of second-degree manslaughter, among other charges.[165]

---

[162] Aidan Joly & Evan Anstey, *Four teens killed in rollover crash in Buffalo, two injured*, RochesterFirst.com (Oct. 25, 2022, 12:26 PM), https://www.rochesterfirst.com/crime/police/four-teens-killed-in-crash-at-33-and-198/.

[163] *Id.*

[164] Graeme Massie, *Car crash that killed four teens is linked to 'Kia Challenge' TikTok craze, Buffalo police say*, Independent (Oct. 25, 2022, 9: 38 PM), https://www.independent.co.uk/news/world/americas/crime/buffalo-teen-crash-tiktok-kia-challenge-b2210473.html.

[165] Maki Becker, *Teen in stolen Kia crash that killed 4 must wear ankle monitor, report to probation*, Buffalo News (Dec. 11, 2022), https://buffalonews.com/news/local/crime-and-courts/teen-in-stolen-kia-crash-that-killed-4-must-wear-ankle-monitor-report-to-

## M.    Rochester, New York

229.    Between January and April 2023, Rochester police reported an estimated 2,365% increase in thefts of Hyundai and Kia vehicles in the Rochester area compared thefts of the same vehicles between January and April 2022. Specifically, police data shows that 789 Hyundai and Kia vehicles have been stolen in Rochester in the first four months of 2023, with an average of seven cars being stolen per day.

230.    Through June 2023, total vehicle thefts increased approximately 376% compared to January through June 2022. This rise is directly attributable to elevated Hyundai and Kia thefts. The Rochester Police Department reports that of the approximately 1,063 cars stolen from January to mid-April 2023, nearly 75% are Hyundai and Kia vehicles.[166] Including theft data through June 2023, Hyundai and Kias still constitute approximately 43% of all vehicles stolen in Rochester for 2023.

231.    The rash of Hyundai and Kia thefts has also correlated with a dramatic rise in patrol and investigative officer time spent responding to the thefts. In the first six months of 2023 alone, Rochester patrol officers' time spent responding to Hyundai and Kia theft incidents has increased 405% from the total time patrol officers spent responding to Hyundai and Kia theft incidents for *all* of 2022.

232.    The ease of stealing the Susceptible Vehicles has also led to a spike in additional crimes in Rochester. Since January 2023, Rochester police have recorded tens of incidents of suspects breaking into various local businesses. Just under 40% of these

---

probation/article_030d8c44-56e8-11ed-a8c0-b77671ebf054.html
[https://perma.cc/JUF3-NS4X].

[166] Kayla Canne, *Lawsuit against Kia, Hyundai to be filed by Rochester*, Rochester Democrat & Chron. (Apr. 24, 2023, 3:01 PM),
https://www.democratandchronicle.com/story/news/2023/04/24/lawsuit-against-kia-and-hyundai-to-be-filed-by-rochester-ny/70146820007/ [https://perma.cc/JUF3-NS4X].

burglaries (or "smash-and-grabs") involved a stolen Kia or Hyundai that was used either for transportation to and from crime scenes or to smash through the doors or windows of businesses to gain entry and steal various merchandise. More than 15% of the incidents involved unknown vehicles that had noticeable window damage and/or matched the modus operandi of other burglaries involving stolen Hyundai or Kia vehicles.

233.   For nearly 30% of the smash-and-grab incidents targeting Rochester businesses between January and April 2023, Hyundai and Kia vehicles were used to aid thieves in stealing, among other things, jewelry, cash, e-cigarettes, cigars, and liquor. During a March 25, 2023 incident at a Dick's Sporting Goods store, suspects drove a stolen Hyundai through the store entrance and attempted, unsuccessfully, to access the store's gun cases.

234.   The phenomenon of Hyundai and Kia thefts has already led to extreme and reckless incidents in Rochester. On April 18, 2023, police investigated a stolen Kia SUV that was driven "recklessly at high speeds" over sidewalks and lawns at Franklin High School, with over 600 students in attendance, in Rochester.[167]

235.   Cell phone footage of the event shows the chaotic scene, as the Kia "barrels through the courtyard, zigging and zagging, sending kids screaming and running away in fear."[168] Chief of Communications for the Rochester City School District, Marisol Ramos-Lopez, described the event with one word: "Terror."[169]

---

[167] James Battaglia, *Stolen Kia driven on Franklin High School courtyard, Rochester police investigating*, RochesterFirst.com (Apr. 20, 2023, 11:11 AM), https://www.rochesterfirst.com/rochester/suv-driven-on-franklin-high-school-courtyard-rochester-police-investigating/.
[168] *Id.*
[169] *Id.*

RCSD ADDRESSES SAFETY CONCERNS

236.    More recently, on April 25, 2023, a 14-year-old was arrested after stealing a Kia in Rochester. Police officers in the nearby town of Gates, New York responded to the scene after witnessing the Kia "doing donuts in the road" before pulling into a driveway.[170] When officers pulled into the same driveway, the Kia "backed over a neighbor[']s lawn, jumped a curb and hit a Gates police car on Chili Avenue."[171] A police chase ensued, where the stolen Kia "drove through a wooden fence" before officers "found it flipped over in the intersection."[172] Gates and Rochester police officers, as well as New York State Police, took two suspects, including the 14-year-old driver, into custody.

---

[170] Evan Bourtis & Bonnie Marrocco, *A 14-year-old is charged with driving the stolen Kia involved in Tuesday's police chase*, News 10 NBC (Apr. 25, 2023, 9:12 AM), https://www.whec.com/top-news/gates-police-investigate-after-chase-ended-with-crash-in-rochester/.

[171] *Id.*

[172] *Id.*



237.   On June 18, 2023, two teenagers were arrested after using a stolen Kia in the robbery of a 70-year-old man and 69-year-old woman. Rochester police officers pursued the stolen Kia, before the car crashed on Elmwood Avenue near Route 590, "causing portions of Elmwood to be closed down in both directions for a period of time."[173]

238.   In the first four months of 2023 alone, Rochester police have made 60 arrests associated with Hyundai and Kia vehicles—about half of which involved juvenile suspects. Countywide, 65 juveniles have been charged for crimes related to these vehicle thefts, and six are still in custody at the Children's Detention Center.

**N.   New York, New York**

239.   In New York City, the police department reports that approximately 287 Kias were stolen in 2022, compared to approximately 119 in 2021—a roughly 241% increase. There was a similar spike in thefts of Hyundais, with approximately 416 reported stolen in 2022, compared to 232 in 2021, a 179.3% increase. And the problem continues to

---

[173] Kayla Bianchi, *RPD: Two teens arrested following robbery, police chase, crash*, RochesterFirst.com (June 19, 2023, 4:19 PM), https://www.rochesterfirst.com/news/developing-investigation-on-elmwood-avenue/.

escalate. In 2023, in comparison to past years, there has been a virtual explosion of thefts of Kias and Hyundai: an estimated 1,435 Hyundai and Kia vehicles were reported stolen in the first six months of 2023. This represents a roughly 670.6% increase in thefts of Kia and Hyundai vehicles as compared to those same months in 2022, when there were only 214 such thefts.

240.   The spike in thefts for Kias and Hyundais in New York City is even more dramatic when compared to thefts in the city for other makes of cars: in the first six months of 2023 there were approximately 872 thefts of Hyundais reported, establishing Hyundai as the second most stolen car brand in New York City during that period, as compared to 2022, when it was the seventh most commonly stolen. Similarly, approximately 563 Kias were reported stolen between January and June 2023, positioning Kia as the fourth most stolen make of car in New York City, compared to 2022, when it was eleventh.

241.   It is especially telling that while thefts of Kias and Hyundais have grown exponentially in New York City in 2023, thefts of most other makes have been decreasing. For comparison, from January through June 2023, thefts of Fords, Toyotas, BMWs, Nissans, and Mercedes in 2023 have all decreased from their numbers in 2022, many by significant amounts.[174] Thefts of Hondas, one of the most common makes of car in New York City, and the most frequently stolen, have increased by only 3% during those same months.

242.   In a recent press conference, New York City Mayor Eric Adams, then New York Police Department ("NYPD") Commissioner Keechant Sewell, and Philip Banks, Deputy Mayor for Public Safety, highlighted the significant harm to public safety in New

---

[174] In New York City, thefts of Ford vehicles are down 31%; thefts of Toyotas are down 27.6%; thefts of Nissans are down 17.8%; thefts of Mercedes are down 19.9%; and thefts of BMWs are down 19.1%.

York City caused by the vulnerability of the Susceptible Vehicles to theft due to the absence of anti-theft measures—a vulnerability that is being exacerbated by the viral social media challenge spreading word of its existence—and the many NYPD resources that are being directed to address this issue.[175] A review of data reflecting reported auto thefts in 2022 in New York City confirms the serious and escalating threat that the Mayor, Police Commissioner, and Deputy Mayor described: thefts of Kias and Hyundais rose rapidly in New York City between September and December 2022, particularly in the Bronx and northern Manhattan. Prior to September 2022, there were an average of 22 Hyundais reported stolen in the city per month, compared to approximately 139 such vehicles reported stolen in December 2022—a 631.8% increase. Similarly, prior to October 2022, there were an average of 13 Kias reported stolen in the city per month, compared to approximately 108 such vehicles reported stolen in December 2022—an 830.8% increase.

243.   The theft of Kias and Hyundais has continued to skyrocket in New York City. From January to June 2023, approximately 563 Kias and 872 Hyundais were reported stolen, compared to approximately 76 Kias and 138 Hyundais reported stolen during those same months in 2022. Thefts of Kias and Hyundais now represent 24.2% of all reported car thefts in 2023 in New York City. The increase in thefts of these vehicles has been significant. For comparison, in 2022, even including the spike of thefts seen in December 2022, thefts of Kias and Hyundais represented only 6.5% of all reported car thefts in the New York City.

---

[175] NYC Mayor's Office, *Mayor Eric Adams Makes Public Safety Announcement with NYPD Commissioner Sewell*, YouTube (Mar. 30, 2023), https://www.youtube.com/watch?v=Ns03Y3O3ogA.



244.   The disproportionate rate of Hyundai and Kia vehicle thefts has continued into recent months. In June 2023, Hyundai and Kia vehicles comprised approximately 23% of all reported car thefts in New York City.



245.   Attempted thefts of Hyundai and Kia vehicles are also on the rise in 2023. In May 2023, there were 47 attempted thefts of Hyundai vehicles and 21 attempted thefts of

Kia vehicles. The two car makes accounted for 78% of all attempted automobile thefts in
New York City for that month.



NYPD Attempted Car Thefts
June 2022 – June 2023

246.   Indeed, as seen in the City of New York's most recent CompStat report—a
periodic public NYPD report on the rates of certain major categories of crime—thefts of
Kias and Hyundais have contributed to a double digit increase in Grand Larceny Auto
("GLA") rates in New York City in 2023. In comparison, almost all of the other major
crime categories have declined in 2023 compared to their 2022 numbers: reported GLA's
have increased 17.9% in New York City through July 23, 2023, compared to an 11.3%
drop in reported murders, a 10.9% decline in reported rapes, a 6.2% decrease in reported
robberies, an 11.2% drop in reported burglaries, and a 2.3% decline in reported grand
larcenies.[176] In addition, the NYPD's Crime Control Strategies Division reports that there

---

[176] NYPD Citywide CompStat, Volume 30, Number 29 (through July 23, 2023),
https://www.nyc.gov/assets/nypd/downloads/pdf/crime_statistics/cs-en-us-city.pdf. *See
also* https://compstat.nypdonline.org/2e5c3f4b-85c1-4635-83c6-22b27fe7c75c/view/89;
*see also* Spectrum News Staff, *March sees drop in murders, but 'static' overall crime*,
Spectrum News (Apr. 6, 2023, 5:10 PM), https://www.ny1.com/nyc/all-
boroughs/news/2023/04/06/nypd-crime-statistics-march-2023.

have been 364 arrests for thefts of Hyundai and Kia vehicles since the uptick in thefts of Kias and Hyundais began in September 2022.

247.   Specifically, the NYPD's Auto Crime Unit, and officers assigned to local precincts are expending valuable time and resources to respond to and investigate the thefts, including putting their own safety at risk in pursuit of reckless and dangerous drivers, while at the same time, the NYPD's Crime Prevention and Community Outreach Divisions have been forced to launch a public awareness campaign in an effort to alert the public and thereby prevent these thefts.[177] Moreover, the NYPD has also undertaken campaigns to purchase and distribute steering wheel locks to the owners of the Susceptible Vehicles in an effort to prevent thefts, and to distribute tracking devices—Apple AirTags and Android Tile trackers—that would allow iPhone and Android mobile phone users to track their vehicles when they are stolen, and potentially facilitate or expedite recovery of the stolen vehicles by the NYPD.[178]

248.   These public outreach and distribution campaigns, and any related costs incurred in carrying them out, above and beyond normal policing costs, are attributable to the public nuisance created and maintained by Defendants.

---

[177] NYC Mayor's Office, *Mayor Eric Adams Makes Public Safety Announcement with NYPD Commissioner Sewell*, YouTube (Mar. 30, 2023), https://www.youtube.com/watch?v=Ns03Y3O3ogA.

[178] Lauren Leffer, *NYPD to Hand Out 500 Free Air Tags as Car Thefts Rise,* Yahoo! News (May 1, 2023), https://news.yahoo.com/nypd-hand-500-free-airtags-171200700.html?guccounter=1; *see also* NYPD Community Affairs (@NYPDCommAffairs), Twitter, (May 18, 2023, 11:07 AM), https://twitter.com/NYPDCommAffairs/status/1659259516041535495?s=20.



15 hours ago

**Attention Kia/Hyundai Owners!!**

The NYPD Crime Prevention Division will be distributing a limited number of Apple Airtags and Tile Trackers free of charge, to owners of Kia and Hyundai vehicles who meet the criteria above.

The event is this Saturday, May 20, 2023
Location: 2855 Ulmer Street, Queens, NY 11357
Time of event: 11:00am - 1:00pm (while supplies last)

For more information, contact your local precinct Crime Prevention Officer.

**O.    Yonkers, New York**

249.    Between January and May 2023, Yonkers police reported a 1,100% increase in stolen and attempted stolen Hyundai and Kia vehicles over the same period in 2022. From December 2022 to May 2023, Yonkers police reported a 1,250% increase in stolen and attempted stolen Hyundai and Kia vehicles compared to December 2021 to May 2022.

250.    The graphs below illustrate the recent surge in thefts:





251. The rise of Hyundai and Kia theft incidents has caused Yonkers law enforcement officers to spend more and more of their time responding to stolen Hyundai and Kia vehicles. Between January 1, 2020, and May 31, 2023, Yonkers police officers have spent an estimated 322 hours responding to the scene of auto-theft related incidents involving Hyundai and/or Kia vehicles. In addition, this required an estimated 97 hours of supervision from the Field Services Bureau, providing guidance and direction to patrol officers and certifying related police reports. Furthermore, an additional 198 hours were dedicated to investigative work by detectives from the Investigations Bureau and Auto-Theft Unit. Additionally, members of the Support Services Bureau have spent an

estimated 30 hours tracking these crimes and developing strategies to curtail them. The rampant thefts of Hyundai and Kia vehicles have placed a tremendous strain on the Yonkers Police Department as a whole, due to time being diverted from other important duties.

252.   As thefts of Hyundai and Kia vehicles skyrocketed in Yonkers, so too did officer time spent recovering and attempting to recover these stolen vehicles. So far in 2023, the Yonkers Police Department has recovered more stolen Hyundai and Kia vehicles than in 2020–2022 *combined*. This work, while critical, necessarily diverts officer time from other important duties, not to mention the time other bureaus spend investigating and prosecuting these crimes.

**Recovered Stolen Hyundais & Kias**

|  | 2020 | 2021 | 2022 | 2023 YTD | Total |
|---|---|---|---|---|---|
| **Hyundai** | 4 | 4 | 4 | 21 | **33** |
| **Kia** | 0 | 2 | 4 | 18 | **24** |
| **Grand Total** | **4** | **6** | **8** | **39** | **57** |

***\*Recovered data includes Kias & Hyundais stolen from Yonkers and recovered in Yonkers or any other jurisdiction as well as Kias & Hyundais recovered in Yonkers stolen from other jurisdictions***

## P.    Tonawanda, New York

253.   The Town of Tonawanda has experienced a similar surge in thefts of Hyundai and Kia vehicles. In 2020, four Hyundai or Kia vehicles were stolen in Tonawanda. In 2021, nine Hyundais or Kias were stolen in Tonawanda. In 2022, the number of stolen Kias and Hyundais increased by 300% to 45. In 2023, the crisis has only worsened, and from January 1 to July 18, 2023, there have been 85 Hyundai or Kia thefts in Tonawanda— *39 times higher* than the rate of Hyundai and Kia thefts in 2020.



254.   This increase in thefts is unique to Hyundai and Kia vehicles. In 2020, Hyundais and Kias accounted for 4% of all motor vehicle thefts in Tonawanda. In 2021, those makes accounted for 9% of all motor vehicle thefts. In 2022, that figure jumped to 32%, and so far in 2023 Hyundais and Kias have accounted for 69% of all motor vehicle thefts in Tonawanda.



255.   As thefts of these vehicles increased, so too did the number of times officers had to pursue Hyundai and Kia vehicles, which suggests these vehicles were being used to commit other crimes or otherwise endangered the public (*e.g.*, being driven recklessly).

256.    The surge in thefts has caused law enforcement officers to spend more and more of their time responding to stolen Hyundai and Kia vehicles. Thefts of Hyundai and Kia vehicles have also led to extreme driving with disastrous consequences. On May 29, 2023, Tonawanda police officers effectuated a traffic stop when a 2019 Kia Sportage drove through a red light.[179] The vehicle had been stolen, and the driver sped off during the traffic stop, dragging a police officer with him. The officer was hospitalized with severe injuries and remains on medical leave.

257.    In addition, the surge in Kia and Hyundai thefts has led to a dangerous driving and crashes. On June 27, 2023, a stolen Hyundai crashed into a tree outside the Town of Tonawanda water treatment plant.[180] One of the passengers was injured, and another was a juvenile.

258.    Stolen Kias and Hyundais have also been used to commit other violent crimes in Tonawanda, such as a drive-by shooting with bullets fired into a house from a stolen Hyundai.[181]

---

[179] Maki Becker, *Suspect in hit-and-run of Tonawanda officer has 3 other criminal cases pending*, Buffalo News (May 31, 2023), https://buffalonews.com/news/local/crime-and-courts/suspect-in-hit-and-run-of-tonawanda-officer-has-3-other-criminal-cases-pending/article_778d8954-ffd3-11ed-a268-3fd9553a9fb7.html.

[180] Emily Miller, *Buffalo man faces charges after crashing stolen Hyundai*, WIVB.com (June 28, 2023, 3:39 PM), https://www.wivb.com/news/local-news/erie-county/tonawanda/buffalo-man-faces-charges-after-crashing-stolen-hyundai/?utm_source=flipboard&utm_content=other.

[181] Evan Anstey, *Shots fired into Town of Tonawanda home, suspects believed to be driving stolen Kia*, WIVB.com (June 28, 2023, 10:18 AM), https://www.wivb.com/news/local-news/erie-county/tonawanda/shots-fired-into-town-of-tonawanda-home-suspects-believed-to-be-driving-stolen-kia/.

## Q.   Indianapolis, Indiana

259.   In Indianapolis, total vehicle theft generally has been on the decline since 2021. From January 1 to March 3 of 2021, the City of Indianapolis saw 1,018 incidents of vehicle theft. There were 952 such incidents in that time period in 2022, and 902 in 2023.

260.   Despite this overall trend, there has been a meteoric rise in Hyundai and Kia theft in 2023. In 2022, from January 1 to July 21, Indianapolis experienced 194 thefts of Kia or Hyundai vehicles. In 2023, that total is 907—a 368% increase. So far in 2023, Kia and Hyundai have accounted for 27% of all vehicle thefts, compared to only 7% in 2022 during the same time period.

261.   The public safety threat associated with juveniles and young adults recklessly driving these stolen Kia and Hyundai vehicles continues to plague Indianapolis. In February 2023, a stolen Hyundai Sonata was involved in a police chase, which ended when the vehicle crashed on I-465 at Brookville Road in Indianapolis.[182] The 17-year-old driver and 14-year-old passenger fled, and upon inspection, the stolen vehicle was found to contain six guns, two of which were loaded, a backpack full of ammunition, and a grenade launcher.[183]

---

[182] Ashlyn Wright, *2 teens arrested following pursuit with ISP on Interstate 465*, WRTV.com (Feb. 15, 2023, 2:31 PM), https://www.wrtv.com/news/local-news/crime/2-teens-arrested-following-pursuit-with-isp-on-interstate-465.
[183] *Id.*



262.   So far, in 2023, there have been eleven confirmed violent incidents involving a stolen Hyundai or Kia, including shootings on April 26 and June 19 and ten robberies involving stolen Kias or Hyundais.

## VII.   CAUSES OF ACTION

**A.   Claims under Wisconsin Law Brought by Milwaukee, Madison, and Green Bay**

### COUNT ONE — PUBLIC NUISANCE

263.   The Cities of Milwaukee, Madison, and Green Bay ("Wisconsin GE Plaintiffs" or "Wisconsin Cities") incorporate each preceding paragraph as though fully set forth herein.

264.   Pursuant to Wis. Stat. Ann. § 823.01 (West 2023) and common law, the Wisconsin GE Plaintiffs bring this action to recover damages and abate the public nuisance described above, as to all Defendants.

265.   Under Wisconsin law, a public nuisance is an unreasonable interference with a right common to the general public. A public nuisance includes a condition or activity which substantially or unduly interferes with the use of a public place or with the activities of an entire community, or which interferes with the public health, the public safety, the public peace, the public comfort, or the public convenience. If the public is injured in its civil or property rights or privileges or in respect to public health to any degree, that is sufficient to constitute a public nuisance.

266.   Defendants—through their designing, manufacturing, and distributing of automobiles that are dangerously susceptible to theft—have created, contributed to, and maintained a public nuisance that substantially interferes with rights common to the general public. In addition, each Defendant knows, or has reason to know, that its conduct has a significant effect upon public rights and endangers the safety of the general public in the Wisconsin Cities.

267.   The Wisconsin GE Plaintiffs and their respective residents have a common right to be free from conduct that interferes with the peaceful use of public streets, sidewalks, commerce, travel, and the quality of daily life.

268.   Defendants have endangered and harmed the public, undermined law enforcement efforts to deter vehicle theft, and otherwise diverted scarce law enforcement resources.

269.   Defendants' conduct has directly caused a severe disruption of the public welfare, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

270.   Further, Defendants' conduct substantially interferes with the public's right to safe and reasonable access to public thoroughfares.

271.   Defendants' conduct has affected and continues to affect a substantial number of people within the Wisconsin GE Plaintiffs' communities and is likely to continue causing significant harm.

272.   The nuisance created by Defendants' conduct is abatable.

273.   At all relevant times, Defendants, have been the manufacturers, marketers, and/or distributors of the Susceptible Vehicles being stolen at record rates and which are, at times, being used in the commission of other violent crimes in the State of Wisconsin and in the Wisconsin Cities.

274.   At all times relevant to this litigation, Defendants knew or had reason to know of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%. Defendants also knew or had reason to know that the installation of immobilizers in their own vehicles has significant deterrent effects on the rate of car theft.

275.   Defendants knew or had reason to know that their conduct has caused an increase in vehicle theft that has had, and will continue to have, a detrimental effect on the safety, welfare, peace, comfort, and convenience of the general public in the Wisconsin Cities.

276.   At minimum, Defendants knew or had reason to know that this interference with public safety was substantially certain to result from their conduct.

277.   By intentionally forgoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting the Wisconsin GE Plaintiffs.

278.   In the alternative, the conduct underlying the public nuisance alleged herein was negligent. Hyundai and Kia could have avoided all this by installing engine immobilizers in the Susceptible Vehicles at the time of manufacture. Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct, and Defendants' conduct was a factual and proximate cause, of the injuries, harm, and economic losses that the Wisconsin GE Plaintiffs have suffered and will continue to suffer.

279.   As a result of Defendants' conduct, the Wisconsin GE Plaintiffs suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services. The Wisconsin GE Plaintiffs will continue to incur such damages until the nuisance is abated. These damages are particular to the Wisconsin GE Plaintiffs and are different in kind and degree to the harms suffered by Wisconsin residents at large.

280.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort for which a government would reasonably expect to provide services. The Wisconsin GE Plaintiffs allege an ongoing public nuisance resulting from Defendants' intentional conduct and requiring ongoing services and resources beyond what a government would reasonably expect to provide.

281.   The Wisconsin GE Plaintiffs request an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for damages suffered as a result of the public nuisance; and injunctive relief.

## COUNT TWO — NEGLIGENCE

282.   The Wisconsin GE Plaintiffs incorporate each preceding paragraph as though set forth fully herein.

283.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so unreasonably easy to steal.

284.   Defendants owed the Wisconsin GE Plaintiffs a duty to not expose the Wisconsin GE Plaintiffs to an unreasonable risk of harm.

285.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

286.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause the Wisconsin GE Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the Wisconsin GE Plaintiffs. Defendants were therefore in the best position to protect the Wisconsin GE Plaintiffs against the foreseeable rise in the theft of Hyundai and Kia vehicles.

287.   At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles could cause the Wisconsin GE Plaintiffs' injuries. As alleged *supra*, nearly all cars sold in the United States by other manufacturers are equipped with engine immobilizers, and, as the data throughout the Consolidated Complaint demonstrates, are not subject to the epidemic of thefts and associated harms that plague Defendants' Susceptible Vehicles. And upon information and belief, Defendants use immobilizers in other markets, including Canada.

288.   As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

289.   Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in the Wisconsin Cities.

290.   Defendants knew and/or should have known that it was foreseeable that the Wisconsin GE Plaintiffs would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

291.   Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

292.   Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that the Wisconsin GE Plaintiffs suffered, and will continue to suffer.

293.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

294.   The Wisconsin GE Plaintiffs' injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

295. As a proximate result of Defendants' wrongful acts and omissions, the Wisconsin GE Plaintiffs have been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services, and/or address property damage on public roads in the Wisconsin GE Plaintiffs' respective communities.

296. Defendants engaged in conduct, as described above, that constituted reckless disregard of the Wisconsin GE Plaintiffs' rights, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

297. Defendants' conduct constituting reckless disregard of the Wisconsin GE Plaintiffs' rights, was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard of the Wisconsin GE Plaintiffs' rights and adopted or approved that conduct after it occurred.

298. The Wisconsin GE Plaintiffs have incurred, and will continue to incur, expenditures over and above their ordinary public services.

299. The tortious conduct of each Defendant was a substantial factor in producing harm to the Wisconsin GE Plaintiffs

300. Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of the Wisconsin GE Plaintiffs' rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

301.   The Wisconsin GE Plaintiffs are without fault and injuries to the Wisconsin GE Plaintiffs and their residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the design, research, development, manufacturing, testing, and distribution of the Susceptible Vehicles.

**B.   Claims under Ohio Law Brought by Columbus, Cleveland, Cincinnati, and Parma**

**COUNT THREE — COMMON LAW ABSOLUTE PUBLIC NUISANCE**

302.   The Cities of Columbus, Cleveland, Cincinnati, and Parma ("Ohio GE Plaintiffs" or "Ohio Cities") incorporate each preceding paragraph as though fully set forth herein.

303.   Defendants have a duty not to unreasonably, unlawfully, or significantly interfere with the common rights of the Ohio public, including those of the Ohio GE Plaintiffs; these common rights include the right to be free from interference with their peace, comfort, convenience, health, welfare, and safety.

304.   Defendants breached this duty and therefore created and maintained a public nuisance.

305.   A "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.

306.   Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the safety, welfare, peace, comfort, and sense of security of the Ohio GE Plaintiffs and their residents. *See* Restatement (Second) of Torts § 821B (Am. Law Inst. 1979).

307.   Defendants, created, contributed to, and maintained a public nuisance when they intentionally, consciously, knowingly, and purposefully: (a) designed, manufactured,

108

marketed, sold, and distributed unsafe vehicles that were statistically more vulnerable to theft without an engine immobilizer or equivalent technology; (b) failed to prevent and/or created, incubated, and maintained the conditions necessary for a secondary market of unsafe and stolen vehicles;[184] and (c) failed to abate either one and pay compensation for the same despite their actual knowledge of the past, continuing, and future harm.

308.   Defendants' conduct has directly caused a severe disruption of public order and safety. The disruption created by Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

309.   The public nuisance is an *absolute* public nuisance because Defendants' nuisance-creating conduct was intentional.

310.   Defendants knew that vehicle immobilizers are standard components in vehicles because of their effectiveness in reducing motor vehicle theft and corresponding impact on public safety. As alleged *supra*, Defendants utilize vehicle immobilizers in their higher end models. Nonetheless, Defendants knowingly and intentionally decided not to use vehicle immobilizers in the Susceptible Vehicles. Defendants are aware that their conduct has caused an increase in vehicle theft and thus has had, and will continue to have, a detrimental effect on the public welfare, safety, peace, comfort, and convenience of the Ohio GE Plaintiffs and their respective residents.

311.   Defendants' conduct also substantially interferes with the public's right to safe and reasonable access to public thoroughfares. That conduct has contributed to the creation of unlawful obstructions and impediments to the flow of municipal transit vehicles and public traffic in the Ohio Cities.

---

[184] *See Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142–44 (Ohio) (holding that the plaintiff had "adequately pled its public-nuisance claim," by alleging the defendants facilitate the flow of firearms into an illegal, secondary market).

312.   Defendants had control over the design and manufacture of the Susceptible Vehicles and the distribution of the Susceptible Vehicles to the Ohio Cities. Defendants continued to maintain control over the conduct through the ability, and failure, to implement a recall to remediate the susceptibility.

313.   It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to the Ohio GE Plaintiffs.

314.   Based on Defendants' intentional and unreasonable actions and their special position in understanding the decades of literature supporting the deterrent effects of engine immobilizers, without Defendants' actions, vehicle theft in the Ohio Cities would not have become so widespread, and the enormous public safety issues that now exist would have been averted.

315.   Defendants knew or had reason to know that their conduct would create a public nuisance. Defendants knew or had reason to know that their conduct was interfering with the public right to public safety and/or that the interference with public safety caused by easier vehicle theft was substantially certain to result from their conduct. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%.

316.   By intentionally forgoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting the Ohio Cities.

317.   The public nuisance created by Defendants' actions is substantial and unreasonable. Defendants' actions have caused and continue to cause significant harms to the Ohio GE Plaintiffs and their communities. The harm inflicted outweighs any offsetting benefit.

318.   As a direct and proximate result of Defendants' conduct, the Ohio GE Plaintiffs have suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services.

319.   Hyundai and Kia could have avoided all this by installing engine immobilizers in the Susceptible Vehicles at the time of manufacture.

320.   Defendants' conduct has affected and continues to affect the Ohio GE Plaintiffs' communities, and the Ohio GE Plaintiffs will continue to incur economic losses until the nuisance is abated.

321.   The nuisance created by Defendants' conduct is abatable.

322.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort for which a government would reasonably expect to provide services. The Ohio Cities allege an ongoing public nuisance resulting from Defendants' intentional conduct and requiring ongoing services and resources beyond what a government would reasonably expect to provide.

323.   The Ohio GE Plaintiffs have incurred expenditures for special programs over and above their ordinary public services.

324.   The Ohio GE Plaintiffs have suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by Ohio citizens at large. These are harms that can only be suffered by the Ohio GE Plaintiffs.

325.   The Ohio GE Plaintiffs request an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for compensation for the economic loss suffered as a result of that nuisance; and injunctive relief. The Ohio GE

Plaintiffs do not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

### COUNT FOUR — COMMON LAW QUALIFIED PUBLIC NUISANCE

326.   The Ohio GE Plaintiffs incorporate each preceding paragraph as though fully set forth herein.

327.   Reasonably prudent automobile manufacturers in the same position as Defendants have a duty not to unreasonably, unlawfully, or significantly interfere with the common rights of the Ohio public, including those of the Ohio Cities; these common rights include the right to be free from interference with their peace, comfort, convenience, health, welfare, and safety.

328.   Defendants breached this duty and therefore created and maintained a public nuisance.

329.   Defendants have created, contributed to, and maintained a public nuisance by: (a) designing, manufacturing, and distributing unsafe vehicles that were statistically more vulnerable to theft without an engine immobilizer or equivalent technology; (b) failing to prevent and/or creating, incubating, and maintaining the conditions necessary for a secondary market of unsafe and stolen vehicles;[185] and (c) failing to abate either one and paying compensation for the same despite their actual knowledge of the past, continuing, and future harm.

330.   Defendants' conduct also substantially interferes with the public's right to safe and reasonable access to public thoroughfares. That conduct has contributed to the

---

[185] *See Cincinnati*, 768 N.E.2d at 1142–44 (holding that the plaintiff had "adequately pled its public-nuisance claim," by alleging the defendants facilitate the flow of firearms into an illegal, secondary market).

creation of unlawful obstructions and impediments to the flow of municipal transit vehicles and public traffic in the Ohio Cities.

331.   The Ohio Cities and their residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

332.   The public nuisance is a *qualified* public nuisance because Defendants negligently engaged in conduct or omissions which endanger or injure the health, safety, or comfort of the public in the Ohio Cities.

333.   Defendants had a duty to exercise ordinary care and/or reasonable care in the design, research, development, manufacture, testing, and distribution of their vehicles into the stream of commerce, including a duty to exercise care to assure that the vehicles were safe and equipped with industry-standard anti-theft measures.

334.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

335.   Defendants knew or reasonably should have known that a secondary market could exist, and did exist, for unsafe and stolen vehicles.

336.   It was also foreseeable that local governments, like the Ohio Cities, would bear the burden for combating the theft of the vehicles and the existence and effects of that newly-created market of unsafe and stolen vehicles.

337.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine

immobilizer in the Susceptible Vehicles could cause the Ohio GE Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the Ohio GE Plaintiffs.

338.   As such, Defendants, by action and inaction, representation and omission, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

339.   The public nuisance created by Defendants' actions is substantial and unreasonable. Defendants' actions have caused and continue to cause significant harms to the Ohio GE Plaintiffs and their communities. The harm inflicted outweighs any offsetting benefit.

340.   As a direct and proximate result of Defendants' conduct, the Ohio GE Plaintiffs have suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services.

341.   Hyundai and Kia could have avoided all this by installing engine immobilizers in the Susceptible Vehicles at the time of manufacture.

342.   Defendants' conduct has affected and continues to affect the Ohio GE Plaintiffs' communities, and the Ohio GE Plaintiffs will continue to incur economic losses until the nuisance is abated.

343.   The nuisance created by Defendants' conduct is abatable.

344.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort for which a government would reasonably expect to

provide services. The Ohio Cities allege an ongoing public nuisance resulting from Defendants' intentional conduct and requiring ongoing services and resources beyond what a government would reasonably expect to provide.

345.  The Ohio GE Plaintiffs have incurred expenditures for special programs over and above their ordinary public services.

346.  The Ohio GE Plaintiffs have suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by Ohio citizens at large. These are harms that can only be suffered by the Ohio GE Plaintiffs.

347.  The Ohio GE Plaintiffs request an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for compensation for the economic loss suffered as a result of that nuisance; and injunctive relief. The Ohio GE Plaintiffs do not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

## COUNT FIVE — NEGLIGENCE

348.  The Ohio GE Plaintiffs incorporate each preceding paragraph as though set forth fully herein.

349.  At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, development, manufacture, testing and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the (a) design, manufacturing, marketing, distribution, and sale of unsafe vehicles that were vulnerable to theft without an engine immobilizer or equivalent technology; and (b) creation, incubation, or

maintenance of the conditions necessary for a secondary market of unsafe and stolen vehicles.[186]

350. Defendants owed and continue to owe the Ohio GE Plaintiffs a duty not to expose the Ohio GE Plaintiffs to an unreasonable risk of harm.

351. Defendants' duties were preexisting.

352. At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

353. Defendants knew or reasonably should have known that their vehicles were statistically more vulnerable to theft without engine immobilizers, the natural and probable consequence would be increased thefts (including formerly unsuccessful attempts that would now become successful), and that a secondary market would exist, and now does exist, for unsafe and stolen vehicles.

354. It was also reasonably foreseeable that local governments, like the Ohio Cities, would bear the cost for dealing with vehicle theft and the effects of a market of unsafe and stolen vehicles.

355. Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause the Ohio GE Plaintiffs' injuries and

---

[186] *See Cincinnati*, 768 N.E.2d at 1142–44 (holding that the plaintiff had "adequately pled its public-nuisance claim," by alleging the defendants facilitate the flow of firearms into an illegal, secondary market); *also In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 6628898, at \*19 (N.D. Ohio Dec. 19, 2018) (affirming that opioid manufacturers owed local governments a duty not to create foreseeable secondary markets for opioids).

thus created a dangerous and unreasonable risk of injury to the Ohio GE Plaintiffs. Defendants were therefore in the best position to protect the Ohio GE Plaintiffs against the foreseeable rise in the theft of Susceptible Vehicles.

356.   At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles could cause the Ohio GE Plaintiffs' injuries. As alleged *supra*, nearly all cars sold in the United States by other manufacturers are equipped with engine immobilizers, and, as the data throughout the Consolidated Complaint demonstrates, are not subject to the epidemic of thefts and associated harms that plague Defendants' Susceptible Vehicles. And upon information and belief, Defendants use immobilizers in other markets, including Canada.

357.   As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

358.   Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in the Ohio Cities.

359.   Defendants knew and/or should have known that it was foreseeable that the Ohio GE Plaintiffs would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

360.   Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

361.   Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that the Ohio GE Plaintiffs suffered and will continue to suffer.

362.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

363.   The Ohio GE Plaintiffs' injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

364.   As a proximate result of Defendants' wrongful acts and omissions, the Ohio GE Plaintiffs have been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, and provide emergency medical services within the Ohio Cities.

365.   Defendants engaged in conduct, as described above, that constituted reckless disregard of the safety and health of the Ohio Cities' respective residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

366.   Defendants' conduct constituting reckless and conscious disregard for public safety was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard for public safety and adopted or approved that conduct after it occurred.

367.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The Ohio GE Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

368.   The Ohio GE Plaintiffs have incurred, and will continue to incur, expenditures over and above their ordinary public services due to the negligence caused by Defendants' actions.

369.   The tortious conduct of each Defendant was a substantial factor in producing harm to the Ohio GE Plaintiffs.

370.   Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of the Ohio GE Plaintiffs' rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

371.   The Ohio GE Plaintiffs are without fault and injuries to the Ohio GE Plaintiffs and their respective residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the design, research, development, manufacturing, testing, and distribution of their vehicles.

372.   The Ohio GE Plaintiffs assert this Cause of Action as a common law tort claim for negligence and not as a "product liability claim" as defined in Ohio Rev. Code Ann. § 2307.71 (West 2007). The Ohio GE Plaintiffs do not seek damages for death, physical injury to person, emotional distress, or physical damage to property, as defined under the Ohio Product Liability Act.

### C.     Claims Brought under Ohio Law by Columbus

### COUNT SIX — STATUTORY PUBLIC NUISANCE

373.   The City of Columbus, acting separately from the Cities of Cleveland, Cincinnati, and Parma, brings the following claim for statutory public nuisance.

374.   The City of Columbus realleges incorporates each preceding paragraph as though set forth fully herein.

375.   Under Section 715.44 of the Ohio Revised Code, the City of Columbus may "[a]bate any nuisance and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist" and to "[p]revent injury and annoyance from any nuisance." [187]

376.   Under Title 7 of the Columbus City Codes, the "Heath, Sanitation and Safety Code," a "public nuisance" includes any unsafe vehicle that is "detrimental to the public health, safety, and welfare. . . ."[188]

377.   Kia and Hyundai have designed, manufactured, marketed, sold, and distributed unsafe vehicles leading to an unprecedented surge in auto-theft and related harm in the City of Columbus.

378.   When "there are reasonable grounds to believe that there is a violation of this Heath, Sanitation and Safety Code resulting in the existence of an actual or potential public nuisance" or "whenever there exist conditions that adversely affect the health, safety, or welfare of any person," Columbus may seek legal relief in court.[189]

379.   This "public nuisance" was a substantial factor and the legal and proximate cause of the long-lasting damages incurred (and continue to be incurred) by the City of

---

[187] Ohio Rev. Code Ann. § 715.44 (West 2023).

[188] Columbus City Code 703.17; 703.17(A).

[189] Columbus City Code 701.19.

Columbus that is unique to itself and different in kind and degree from those incurred by the general public, including dramatically-increased expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services that were beyond the expenses otherwise reasonably expected to occur in the ordinary course.

380.   Kia and Hyundai should also be enjoined from continuing these nuisances and be compelled to abate them.

## COUNT SEVEN — CIVIL LIABILITY

381.   The City of Columbus, acting separately from the Cities of Cleveland, Cincinnati, and Parma, bring the following claim for civil liability.

382.   The City of Columbus re-alleges each of the allegations in the foregoing paragraphs as if fully restated herein.

383.   Section 2307.60(A)(1) of the Ohio Revised Code provides that anyone injured in person or property by a criminal act may recover full damages in a civil action. [190]

384.   The City of Columbus is a "person" under this statute.

385.   A violation of Columbus' "Heath, Sanitation and Safety Code" is a first-degree criminal misdemeanor. [191]

386.   Any penalty for this criminal misdemeanor is "in addition to and separate from any civil or administrative penalties or remedies provided for by this code or pursuant to Ohio law" in addition to any other remedy available by law. [192]

---

[190] Ohio Rev. Code Ann. § 2307.60(A)(1) (West 2008).
[191] Columbus City Code 701.99(A).
[192] *Id.*; *see also id.* at (D).

121

387.   Kia and Hyundai, in creating, contributing to, and suffering a "public nuisance") have committed first degree criminal misdemeanors.[193]

388.   This "public nuisance" of unsafe vehicles was a substantial factor and the legal and proximate cause of the long-lasting damages incurred (and continue to be incurred) by the City of Columbus that are unique to itself and different in kind from those incurred by the general public, including dramatically-increased expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services that were beyond the expenses otherwise reasonably expected to occur in the ordinary course.

### D.    Claims under Maryland Law Brought by Baltimore
### COUNT EIGHT — PUBLIC NUISANCE

389.   The City of Baltimore incorporates each preceding paragraph as though set forth fully herein.

390.   Baltimore, as governmental authority, enjoys *parens patriae* standing to assert public nuisance claims. This cause of action is brought pursuant to Baltimore's *parens patriae* interest in protecting the health and well-being—physical and economic—of a substantial segment of the Baltimore population.

391.   Defendants created a condition that is harmful to human health, indecent and offensive to the senses, and obstructs the free use of property and resources, so as to interfere with the comfortable enjoyment of such property and resources.

392.   Defendants' actions and omissions have caused an unreasonable and substantial interference and risk to citizens who own or operate certain Hyundai and Kia vehicles throughout Baltimore. This interference and risk are ongoing and continuing.

---

[193] Columbus City Code 703.17(A).

393. Defendants created a condition that affected a substantial number of people at the same time—specifically, Defendants have created a significant risk of auto theft and bodily injury including death that affects tens of thousands of Baltimore residents.

394. An ordinary person would be reasonably annoyed and disturbed by Defendants' actions as described throughout the Consolidated Complaint, including manufacturing, selling, leasing and otherwise providing to the general public vehicles without adequate anti-theft devices, contrary to industry standards.

395. The social utility and/or benefit (if any) derived from Defendants' deficient vehicles do not outweigh the gravity of the harm inflicted on Baltimore and its residents.

396. Baltimore has not consented to Defendants' conduct.

397. Baltimore and its residents who own or operate Defendants' deficient vehicles have suffered and continue to suffer harm different from the type of harm suffered by the general public. Baltimore is a governmental authority that has incurred costs and losses of a kind and degree different from members of the general public (*e.g.*, additional hours expended by BPD).

398. Defendants' conduct was a substantial factor in causing Baltimore's harm.

399. Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

### E. Claims under Washington Law Brought by Seattle

### COUNT NINE — STATUTORY PUBLIC NUISANCE

400. The City of Seattle incorporates each preceding paragraph as though set forth fully herein.

401. Seattle brings this claim under Wash. Rev. Code Ann. § 7.48.010 *et seq.* (West 2023) and common law regarding public nuisances.

402.   An actionable nuisance is defined as, *inter alia*, "the obstruction of any highway . . . [or] whatever is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property."[194]

403.   Specifically, a nuisance includes the following conduct:

> Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures, or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage. . .any public . . . street or highway; or in any way renders other persons insecure in life, or in the use of property.[195]

404.   Pursuant to Wash. Rev. Code Ann. § 7.48.130, "[a] public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal."

405.   Defendants' conduct has endangered the comfort and public safety of the entire Seattle community and therefore constitutes a public nuisance.

406.   Defendants have engaged in acts and omissions which endangered the health and safety of Seattle residents and caused substantial annoyance, inconvenience, and injury to the public by causing increased Kia and Hyundai vehicle theft, reckless driving, and property damage. Defendants' actions and omissions have substantially, unreasonably, and injuriously interfered with the public safety, a right common to all residents of Seattle.

407.   Each Defendant has created or assisted in the creation of a condition that is injurious to public safety in Seattle.

---

[194] Wash. Rev. Code Ann. § 7.48.010..
[195] Wash. Rev. Code Ann. § 7.48.120.

124

408.   Defendants' conduct has directly caused a substantial disruption of public health, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

409.   This harm to Seattle and the public is substantial, unreasonable, widespread, and ongoing. The rights, interests, and inconvenience to the community far outweigh the rights, interest, and inconvenience to Defendants, who have profited from their wrongful conduct.

410.   Defendants' conduct substantially contributed to the creation of a public nuisance that has interfered, and continues to interfere, with public safety and the right to safe and reasonable access to public thoroughfares.

411.   Defendants' conduct has led to the "obstruct[ion] or encroach[ment] upon public highway[s], private ways, streets, alleys, commons, landing places, and ways to burying places" and also has interfered with the flow of municipal transit vehicles and public traffic, thus constituting a nuisance of the kind specifically enumerated and prohibited under Wash. Rev. Code Ann. § 7.48.140(4).

412.   Defendants' conduct has affected and continues to affect a substantial number of people within Seattle's community and is likely to continue causing significant harm.

413.   But for Defendants' conduct in failing to follow industry standards by forgoing the installation of vehicle immobilizers in the Susceptible Vehicles between 2011 and 2022, the tremendous increase in the theft of Hyundai and Kia vehicles, and the collateral consequences to the lives and property of Seattle's community that currently exist as a result of Defendants' conduct, would have been averted.

414.   Seattle has had to spend significant resources responding to Hyundai and Kia thefts—resources which would not have been required had those cars been built to industry standard. Thus, in addition to the interference with the safety and wellbeing of the Seattle community, Defendants' conduct has harmed Plaintiff's property interests.

415.   Defendants knew or had reason to know that their conduct would create a public nuisance. Defendants knew or had reason to know that their conduct was interfering with the public right to public safety and/or that the interference with public safety caused by easier vehicle theft was substantially certain to result from their conduct. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%.

416.   By intentionally forgoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting Seattle.

417.   The public nuisance Defendants created and/or substantially contributed to continues. The rate of theft of Hyundai and Kia vehicles in Seattle continues to climb, further interfering with the public safety.

418.   Seattle has taken steps to address the harm caused by Defendants' conduct, including additional policing efforts and public outreach and education. However, abating the public safety effects caused by the significant increase in Kia and Hyundai vehicle theft, property damage, and harm to the welfare of Seattle's community resulting from Defendants' conduct will require more than these steps.

419.   Pursuant to Wash. Rev. Code Ann. § 7.48.020, Seattle requests damages and an order providing for abatement of the public nuisance that Defendants have created or

assisted in the creation of, and enjoining Defendants from future violations of Wash. Rev. Code Ann. § 7.48.010.

### F.   Claims Brought under Missouri Law Brought by St. Louis and Kansas City

### COUNT TEN — PUBLIC NUISANCE

420.   The Cities of St. Louis and Kansas City, Missouri ("Missouri GE Plaintiffs" or "Missouri Cities") incorporate each preceding paragraph as though fully set forth herein.

421.   Each Defendant's conduct, both individually and collectively, in manufacturing, selling, and refusing to fix the vehicles at issue constitutes a public nuisance.

422.   The conduct of each Defendant involves a significant interference with public health, public safety, public peace, and public comfort.

423.   Each Defendant's conduct giving rise to the vehicle theft crisis is of a continuing nature and has produced a permanent or long-lasting effect that has a significant effect on all Missouri GE Plaintiffs and their citizens.

424.   Defendants' interference with the public health, the public safety, the public peace, and the public welfare resulted in significant harm to Missouri GE Plaintiffs.

425.   Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in the Missouri Cities.

426.   Each Defendant is and was at all relevant times in control of technology that could immobilize a vehicle by preventing the vehicle from being started without a unique code transmitted by the user's key. And each Defendant has current control sufficient to

abate the nuisance because it has agents who service and repair vehicles after sale and could install such technology today.

427.   Each Defendant acted knowingly, or was substantially certain, that its conduct would result in the public nuisance and significant harm complained of herein. And the conduct of each Defendant, either individually or collectively, was a substantial factor in producing and then maintaining the public nuisance complained of herein.

428.   Each Defendant's conduct in causing the public nuisance complained of herein was unreasonable and the gravity of the harm caused far outweighs any utility of the Defendant's conduct.

429.   Moreover, each Defendant's refusal to act to abate the nuisance constitutes unreasonable conduct.

430.   Each Defendant's conduct damaged, and continues to damage, all Missouri GE Plaintiffs in an amount to be determined at trial.

## COUNT ELEVEN — NEGLIGENCE

431.   The Missouri GE Plaintiffs incorporate each preceding paragraph as though fully set forth herein.

432.   Defendants have a duty to exercise reasonable care in the design, manufacture, sale, and distribution of their vehicles in Missouri.

433.   The risk that vehicles lacking immobilizer technology would be easily stolen was reasonably foreseeable to Defendants, as was the risk that knowledge of this basic design flaw and instructions on how to steal such a defective vehicle would be broadly shared, thereby causing a large number of thefts of vehicles made by Defendants. It also was reasonably foreseeable that Missouri GE Plaintiffs would be injured by having to respond to a crime wave caused by the Defendants' defectively-designed products.

434.   Reasonable care requires equipping vehicles with basic, common technology that can deter and prevent vehicle thefts and threats to public safety.

435.   Defendants, acting individually and together, were negligent in failing to equip their vehicles with immobilizer technology and thereby breached their duties to exercise reasonable care.

436.   Defendants' acts and omissions imposed an unreasonable risk of harm in Missouri to others separately and/or combined with the improper or unlawful acts of third parties.

437.   As a proximate result of the Defendants' breach of their duties of care, Defendants damaged and continue to damage all Missouri GE Plaintiffs in an amount to be determined at trial.

**COUNT TWELVE — UNJUST ENRICHMENT**

438.   The Missouri GE Plaintiffs incorporate each preceding paragraph as though fully set forth herein.

439.   As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the cost-savings realized in failing to equip their vehicles with immobilizer technology.

440.   In Missouri, unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

441.   Missouri GE Plaintiffs have expended substantial amounts of money to remedy or mitigate the harms caused by Defendants' conduct, and Missouri GE Plaintiffs anticipate those costs will only increase as the problem continues without a solution.

442.   These expenditures include the provision of law enforcement services and other public safety resources to address the theft epidemic.

443.   These expenditures have helped sustain Defendants' businesses, and they have been necessary only because Defendants continue to refuse to act to address the problem.

444.   Missouri GE Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' conduct.

445.   Defendants are aware of these obvious benefits, and their retention of the benefits is unjust.

446.   Defendants have unjustly retained benefits to the detriment of Missouri GE Plaintiffs, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

447.   Defendants' misconduct alleged in this case is ongoing and persistent.

448.   Missouri GE Plaintiffs seek an order compelling Defendants to disgorge all unjust enrichment to Missouri GE Plaintiffs.

### G.   Claims Brought under Kansas City Ordinance by Kansas City
### COUNT THIRTEEN — VIOLATION OF CITY ORDINANCE ARTICLE IX— CONSUMER PROTECTION

449.   Kansas City incorporates each preceding paragraph as though fully set forth herein.

450.   Under Article IX of Kansas City's Ordinances, Kansas City has authority to regulate consumer transactions and, if necessary, take enforcement action when those transactions constitute an unlawful business practice.[196]

---

[196] Kansas City, Mo. Ordinances art. IX, §§ 50-291–50-305.

451. Defendants' vehicles constitute "merchandise" within the meaning of § 50-291.

452. Defendants' sales of their vehicles to residents of Kansas City constitute "consumer transactions" under § 50-291.

453. Under § 50-292, when selling merchandise, it is unlawful for a person to make "a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of merchandise . . . ."[197]

454. The provision also makes it unlawful for a person to represent "that merchandise is of a particular standard, style or model, if it is of another . . . ."[198]

455. Defendants have marketed and represented their vehicles as being safe, even though the vehicles lack basic, rudimentary safety equipment such as immobilizer technology.

456. Accordingly, Defendants have engaged in unlawful business practices within Kansas City in violation of section 50-292(5) and 50-292(7).

457. Under section 50-297, "the repeated commission of an unlawful business practice is hereby declared and deemed to be a public nuisance."[199]

458. Under section 50-298, Kansas City may seek an injunction on behalf of itself and its residents "against continued unlawful business practices which are nuisances . . . ."[200]

---

[197] Kansas City, Mo. Ordinances art. IX, § 50-292(5).
[198] *Id.* at (7).
[199] Kansas City, Mo. Ordinances art. IX, § 50-297.
[200] Kansas City, Mo. Ordinances art. IX, § 50-298.

131

459.   Accordingly, Kansas City seeks an order: (a) declaring Defendants' conduct a public nuisance under section 50-297; and (b) enjoining Defendants' unlawful business practices under section 50-298.

### H.   Claims under New York Law Brought by Buffalo, Rochester, New York City, Yonkers, and Tonawanda

### COUNT FOURTEEN — PUBLIC NUISANCE

460.   The Cities of Buffalo, Rochester, New York, Yonkers, and Tonawanda ("New York GE Plaintiffs" or "New York Cities") incorporate each preceding paragraph as though fully set forth herein.

461.   Defendants, through their designing, manufacturing, and distributing of automobiles that are dangerously susceptible to theft, have created, contributed to, and maintained a public nuisance that substantially interferes with rights common to the general public.

462.   A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y., Inc., 362 N.E.2d 968, 971* (1977) (internal citations omitted).

463.   Defendants' conduct has interfered, and continues to interfere, with the use by the public of public streets and sidewalks in the New York Cities, and has endangered the safety, health, and comfort of the general public in the New York Cities.

464.   In addition, Defendants' conduct has undermined law enforcement efforts to deter vehicle theft and has otherwise diverted scarce law enforcement resources.

465.   At all relevant times, Defendants have been the manufacturers, marketers, and/or distributors of the Susceptible Vehicles being stolen at record rates that are, at times, being used in the commission of violent crimes in the State of New York and the New York Cities.

466.   At all times relevant to this litigation, Defendants knew or had reason to know of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically the increased risk of vehicle theft and public harm. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%. Defendants also knew or had reason to know that the installation of immobilizers in their own vehicles has considerable deterrent effects on the rate of car theft.

467.   Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the safety, welfare, peace, comfort, and convenience of the general public in the New York Cities.

468.   Defendants, through their business practices, contribute to a significant increase in vehicle theft, reckless driving, and the use of their vehicles in the commission of other crimes in the New York Cities, thus endangering the safety and health of considerable numbers of the New York GE Plaintiffs' respective residents, depriving the New York GE Plaintiffs' residents of the peaceful use of the public streets and sidewalks, undermining law enforcement efforts, increasing law enforcement costs and diverting law enforcement resources, and interfering with commerce, travel, and the quality of daily life in the New York Cities.

469.   Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in the New York Cities.

470.   As a result of Defendants' conduct, the New York GE Plaintiffs have suffered and will continue to suffer economic damages, including significant expenditures for police and other services. The New York GE Plaintiffs will continue to incur economic losses until the nuisance is abated. These damages are particular to the New York GE Plaintiffs and are different in kind to the harms suffered by New York residents at large.

471.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The New York GE Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

472.   The New York GE Plaintiffs have incurred, and will continue to incur, expenditures over and above their ordinary public services due to the public nuisance created by Defendants' actions.

473.   The New York GE Plaintiffs request an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of, compensation for the economic losses suffered as a result of the nuisance, and injunctive relief.

## COUNT FIFTEEN — NEGLIGENCE

474.   The New York GE Plaintiffs incorporate each preceding paragraph as though set forth fully herein.

475.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so easy to steal.

476.   Defendants owed and continue to owe the New York GE Plaintiffs a duty not to expose the New York GE Plaintiffs to an unreasonable risk of harm.

477.   Defendants' duties were preexisting.

478.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

479.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause the New York GE Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the New York GE Plaintiffs. Defendants were therefore in the best position to protect the New York GE Plaintiffs against the foreseeable rise in the theft of Susceptible Vehicles.

480.   At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles could cause the New York GE Plaintiffs' injuries. As alleged *supra*, nearly all cars sold in the United States by other manufacturers are equipped with engine immobilizers, and, as the data throughout the Consolidated Complaint demonstrates, are not subject to the epidemic of thefts and associated harms that plague Defendants' Susceptible Vehicles. And upon information and belief, Defendants use immobilizers in other markets, including Canada.

481.   As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development,

manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

482.   Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in the New York Cities.

483.   Defendants knew and/or should have known that it was foreseeable that the New York GE Plaintiffs would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

484.   Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

485.   Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that the New York GE Plaintiffs suffered and will continue to suffer.

486.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

487.   The New York GE Plaintiffs' injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

488.   As a proximate result of Defendants' wrongful acts and omissions, the New York GE Plaintiffs have been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending,

diverting, and increasing resources to retrieve stolen cars and/or address property damage on public roads within the New York Cities.

489.   Defendants engaged in conduct, as described above, that constituted reckless disregard of the safety and health of the New York GE Plaintiffs' respective residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

490.   Defendants' conduct constituting reckless and conscious disregard for public safety was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard for public safety and adopted or approved that conduct after it occurred.

491.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The New York GE Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

492.   The New York GE Plaintiffs have incurred, and will continue to incur, expenditures over and above their ordinary public services due to the negligence caused by Defendants' actions.

493.   The tortious conduct of each Defendant was a substantial factor in producing harm to the New York GE Plaintiffs.

494.   Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of the New York GE Plaintiffs' rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

495.   The New York GE Plaintiffs are without fault and injuries to the New York GE Plaintiffs and their residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the design, research, development, manufacturing, testing, and distribution of their vehicles.

## I.   Claims under Indiana Law Brought by Indianapolis
## COUNT SIXTEEN — PUBLIC NUISANCE

496.   The City of Indianapolis incorporates each preceding paragraph as though fully set forth herein.

497.   The City of Indianapolis is authorized to seek abatement of and damages for the public nuisance described herein under Ind. Code Ann. § 32-30-6-7(b) (West 2014).

498.   Under Ind. Code Ann. § 32-30-6-6 (West 2023), a nuisance is defined as "[w]hatever is (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property[.]" A public nuisance affects an entire neighborhood or community and unreasonably interferes with a right common to the public.

499.   Indiana Code further provides that "[a] county, city, or town that brings a successful action under this section to abate or enjoin a nuisance is entitled to recover reasonable attorney's fees incurred in bringing the action." [201]

500.   Defendants—through their designing, manufacturing, and distributing of automobiles that are dangerously susceptible to theft—have created, contributed to, and

---

[201] Ind. Code Ann. § 32-30-6-7 (West 2014).

138

maintained a public nuisance that substantially interferes with rights common to the general public.

501.   Defendants' conduct has interfered, and continues to interfere, with the use by the public of public streets and sidewalks in Indianapolis, and has endangered the safety, health, and comfort of the general public in Indianapolis.

502.   In addition, Defendants' conduct has undermined law enforcement efforts to deter vehicle theft and otherwise diverted scarce law enforcement resources.

503.   At all relevant times, Defendants have been the manufacturers, marketers, and/or distributors of the Susceptible Vehicles being stolen at record rates that are, at times, being used in the commission of violent crimes in the State of Indiana and in Indianapolis.

504.   At all times relevant to this litigation, Defendants knew or had reason to know of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically the increased risk of vehicle theft and public harm. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%. Defendants also knew or had reason to know that the installation of immobilizers in their own vehicles has considerable deterrent effects on the rate of car theft.

505.   Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the safety, welfare, peace, comfort, and convenience of the general public in Indianapolis.

506.   Defendants, through their business practices, contribute to a significant increase in vehicle theft in Indianapolis, reckless driving, and the use of their vehicles in the commission of other crimes, thus endangering the safety, health, and welfare of the

public within Indianapolis, depriving Indianapolis residents of the peaceful use of the public streets and sidewalks, undermining law enforcement efforts, increasing law enforcement costs and diverting law enforcement resources, and interfering with commerce, travel, and the quality of daily life in Indianapolis. The public nuisance caused by Defendants' conduct is ongoing.

507.   Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in Indianapolis.

508.   As a result of Defendants' conduct, Indianapolis has suffered and will continue to suffer economic damages, including but not limited to significant expenditures for police, emergency, health, and other services. Indianapolis will continue to incur economic losses until the nuisance is abated. These damages are particular to Indianapolis and are different in kind to the harms suffered by Indianapolis residents at large.

509.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Indianapolis alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

510.   Indianapolis has incurred, and will continue to incur, expenditures over and above its ordinary public services.

511.   Indianapolis requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for compensation for the economic losses suffered as a result of the nuisance; and injunctive relief.

## COUNT SEVENTEEN — NEGLIGENCE

512.   The City of Indianapolis incorporates each preceding paragraph as though set forth fully herein.

513.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so easy to steal.

514.   Defendants owed and continue to owe Indianapolis a duty not to expose Indianapolis to an unreasonable risk of harm.

515.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

516.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Indianapolis's injuries and thus created a dangerous and unreasonable risk of injury to Indianapolis. Defendants were therefore in the best position to protect Indianapolis against the foreseeable rise in the theft of Hyundai and Kia vehicles.

517.   At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles could cause Indianapolis's injuries. As alleged *supra*, nearly all cars sold in the United States by other manufacturers are equipped with engine immobilizers, and, as the data throughout the

Consolidated Complaint demonstrates, are not subject to the epidemic of thefts and associated harms that plague Defendants' Susceptible Vehicles. And upon information and belief, Defendants use immobilizers in other markets, including Canada.

518.    As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

519.    Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Indianapolis.

520.    Defendants knew and/or should have known that it was foreseeable that Indianapolis would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

521.    Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

522.    Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that Indianapolis suffered, and will continue to suffer.

523.    Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

524.   Indianapolis's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

525.   As a proximate result of Defendants' wrongful acts and omissions, Indianapolis has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services, and/or address property damage on public roads in Indianapolis's community.

526.   Defendants engaged in conduct, as described above, that constituted reckless disregard for the safety and health of Indianapolis's residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

527.   Defendants' conduct constituting reckless and conscious disregard of public safety was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard for public safety and adopted or approved that conduct after it occurred.

528.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Indianapolis alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

529.   Indianapolis has incurred, and will continue to incur, expenditures over and above its ordinary public services.

530.   The tortious conduct of each Defendant was a substantial factor in producing harm to Indianapolis.

531.   Defendants' conduct was not only negligent, but also willful, knowing, and reckless conduct, constituting reckless disregard of Indianapolis's rights, including the right to public safety, therefore warranting an award of aggravated or punitive damages.

532.   Indianapolis is without fault and injuries to Indianapolis and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the design, research, development, manufacturing, testing, and distribution of their vehicles.

## VIII. PRAYER FOR RELIEF

533.   Entering an Order that the conduct alleged herein constitutes a public nuisance under the laws of Wisconsin, Ohio, Maryland, Washington, Missouri, New York, and Indiana;

534.   Entering an Order that Defendants are jointly and severally liable;

535.   Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

536.   Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

537.   Awarding equitable relief to fund automobile theft prevention;

538.   Awarding actual and compensatory damages;

539.   Awarding punitive damages;

540.   Awarding reasonable attorneys' fees and costs of suit;

541.   Awarding pre-judgment and post-judgment interest; and

144

542. Awarding such other and further relief as the Court deems just and proper under the circumstances.

## IX.   DEMAND FOR JURY TRIAL

543. Plaintiffs hereby demand a trial by jury.

RESPECTFULLY SUBMITTED this 28TH DAY OF JULY, 2023.

By */s/ Gretchen Freeman Cappio*
Gretchen Freeman Cappio (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Phone: (206) 623-1900
Fax: (206) 623-3384
gcappio@kellerrohback.com
*Chair of the Governmental Entities Committee*

By */s/ Rick L. Ashton*
Rick L. Ashton (*pro hac vice*)
ALLEN STOVALL NEUMAN & ASHTON LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
Phone: (614) 221-8500
Fax: (614) 221-5988
ashton@asnalaw.com
*Member of the Governmental Entities Committee*

**ADDITIONAL COUNSEL LISTED IN APPENDIX A**