| | |
|---|---|
| Steve W. Berman | Elizabeth A. Fegan |
| HAGENS BERMAN SOBOL SHAPIRO LLP | FEGAN SCOTT LLC |
| 1301 Second Avenue, Suite 2000 | 150 S. Wacker Dr., 24th Floor |
| Seattle, WA 98101 | Chicago, IL 60606 |
| | |
| Kenneth B. McClain | Roland Tellis |
| HUMPHREY FARRINGTON & McCLAIN, P.C. | BARON & BUDD, P.C. |
| 221 W. Lexington Ave., Suite 400 | 15910 Ventura Blvd., Suite 1600 |
| Independence, MO 64050 | Encino, CA 91436 |

*Plaintiffs' Consumer Class Action Leadership Committee*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No.: 8:22-ML-3052 JVS(KESx) **JOINT SUPPLEMENTAL DECLARATION OF THE CONSUMER CLASS ACTION LEADERSHIP COUNSEL IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| This document relates to: *CONSUMER CLASS ACTION CASES* | |

We, Steve W. Berman, Roland Tellis, Elizabeth A. Fegan, and Kenneth B. McClain, declare as follows:

1. We are admitted to appear in this litigation, are counsel of record for the Consumer Class Action Plaintiffs ("Consumer Plaintiffs"), and were appointed to the Consumer Class Action Leadership Counsel ("Class Counsel") in *In re Kia Hyundai Vehicle Theft Marketing, Sales Practices, And Products Liability Litigation*, No. 8:22-ML-3052 JVS(KESx) (C.D. Cal.). We could and would competently testify to the matters stated in this declaration based on personal knowledge or discussions with counsel in our firms.

2. In accordance with the Court's Order dated August 3, 2023 (Dkt. 178), we submit this Joint Supplemental Declaration addressing the Court's request for "[a]n explanation of how the Parties calculated the maximum payout for each Reimbursement for Qualifying Loss (*see* Settlement Agreement § II.D.3(a-d)), including whether and in what amount the reimbursement amount accounts for a risk assessment discount."

3. By way of background, as detailed in Consumer Plaintiffs' Motion for Preliminary Approval, the Parties began negotiating a classwide resolution even before this matter was consolidated by the JPML. The negotiations intensified shortly after this Court appointed leadership. Plaintiffs' desire for an early resolution was driven, in part, by numerous reports from Class Members describing the genuine hardship they faced dealing with the fallout from a stolen and/or damaged Class Vehicle. While many Class Members had insurance coverage, that coverage was sometimes inadequate or, worse yet, inapplicable to the circumstances. We continue to receive information from Class Members describing how the out of pocket costs associated with a stolen vehicle is causing immediate hardship, thus solidifying the need for an expedient resolution in this case.

4. Negotiating a speedy resolution was not only in the best interests of all Class Members, but it was also consistent with Federal Rule 1's mandate that the "the

parties secure the just, speedy, and inexpensive determination of every action and proceeding." Indeed, there is a "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019).

5. In addition to addressing Class Members' desire for a speedy resolution, Class Counsel also had to assess the risks of continued litigation. In this regard, Defendants were consistent in their views that the Class Vehicles met all required Federal Motor Vehicle Safety Standards. Indeed, Defendants recently touted the National Highway Traffic Safety Administration's June 5, 2023, letter to the California Attorney General concerning the Class Vehicle thefts. Of note, NHTSA stated as follows:

> At this time, NHTSA has not determined that this issue constitutes either a safety defect or noncompliance requiring a recall under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. Chapter 301. The Federal Motor Vehicle Safety Standard identified in your letter, FMVSS No. 114, does not require an engine immobilizer. *See* 49 C.F.R. § 571.114. Also, the test procedure specified in that standard does not contemplate actions taken by criminal actors to break open or remove part of the steering column and take out the ignition lock to start a vehicle. *See id*. § 571.114, S6. Here, the safety risk arises from unsafe use of a motor vehicle by an unauthorized person after taking significant destructive actions to parts of the vehicle.

NHTSA's findings would be used by Defendants to undermine Consumer Plaintiffs' claims based on a failure to disclose the lack of an immobilizer in the Class Vehicles, as defendants often contend that many states only require disclosure of safety-related issues.

6. Additionally, while Consumer Plaintiffs believe that their claims have merit, Defendants raised numerous substantive issues and defenses that present significant risks to their case. On May 1, 2023, Defendants moved to dismiss

1  Plaintiffs' claims under California, Texas, Florida, New York, Pennsylvania, and
2  Missouri law (the "Subject States"). (Dkt. 95). In their motion, Defendants argued
3  that the Class Vehicles are not defective because they comply with the National
4  Traffic and Motor Vehicle Safety Act and Federal Motor Vehicle Safety Standard
5  No. 114, and that they could not be liable for Plaintiffs' alleged injuries because they
6  were caused by intervening criminal acts of third parties. Defendants also challenged
7  Plaintiffs' misrepresentation- and omission-based claims on numerous grounds,
8  argued that Plaintiffs failed to state plausible warranty and unjust enrichment claims,
9  that Plaintiffs' UCL claim under both the "unlawful" and "unfair" prongs fail, and
10 that Plaintiffs cannot seek equitable relief.  Had Defendants prevailed on even a
11 portion of their motion, it would have greatly diminished the Settlement Class'
12 potential recovery because the Subject States make up the five most populated states
13 in the United States and cover a substantial number of Class Vehicles.

14       7.     Against this backdrop, Plaintiffs negotiated an exceptional settlement
15 consisting, in part, of a non-reversionary multi-million-dollar common fund against
16 which Class Members can seek recovery of various forms of financial harm.  In
17 particular, Section II.D.3(a)-(d) of the Settlement Agreement provides Class
18 Members with an opportunity to recover payments for an exhaustive set of
19 enumerated "Qualifying Losses," including reimbursements for (a) a "Total Loss" of
20 a Class Vehicle due to a theft or attempted theft; (b) damage to a Class Vehicle due
21 to a theft or attempted theft; (c) insurance deductibles paid and increased insurance
22 premiums resulting from a theft or attempted theft; and (d) other related expenses
23 such as transportation costs, towing and storage charges, regulatory fees and taxes
24 associated with a replacement vehicle and penalties and fines arising from a stolen
25 vehicle.

26       8.     As is customary in a fixed-sum common fund settlement structure, the
27 Parties had to place reasonable caps on each category of claims to ensure that no
28 single category would deplete the fund and/or unreasonably dilute the ability of all

1  Class Members to seek a fair, reasonable, and adequate recovery under the
2  circumstances.  Such caps were negotiated by the Parties with the benefit of certain
3  assumptions, derived from publicly available information, subject to confirmatory
4  discovery, regarding the value of the Class Vehicles, the availability of insurance
5  coverage, and the estimated costs incurred by Class Members.  Of course, given the
6  litigation posture of the case, the parties also had to assess the risk of continued
7  litigation against the benefits for a relatively speedy resolution, and apply appropriate
8  discounts for such risk and reward.

   a. The "total loss" claim cap of $6,125: This reimbursement category is designed to compensate Class Members who did not have insurance coverage at all or who did not have adequate insurance coverage.[1] Plaintiffs began by assessing the value of the Class Vehicles. Relying on a Blue Book analysis and FBI theft data[2], we concluded that the average value of the Class Vehicles today is approximately $10,400.00.  We then applied an approximate 40% discount after balancing the benefits of a speedy resolution against the risks of continued litigation.

   b. The "vehicle damages" claim cap of $3,375: For this reimbursement category, we relied on insurance data suggesting that 60% of stolen cars are recovered on average in the U.S. [3] Of course, it is reasonable to assume that

---

[1] We considered data published by the insurance industry suggesting that, in 2019, 87.4% of motorists have some form of insurance coverage and 79% purchased theft coverage. *See* https://www.iii.org/fact-statistic/facts-statistics-uninsured-motorists, https://www.iii.org/fact-statistic/facts-statistics-auto-insurance.

[2] *See* https://www.bankrate.com/insurance/car/car-theft-statistics/. In 2019, the average loss was $8,886. *See* https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/motor-vehicle-theft.  This sum also finds support in the Consumer Plaintiff population.  For instance, Plaintiff Hardwell suffered a total loss of $8,000 (paid by the insurer) (*see* Lucas Compl., ¶ 123).

[3] *See* https://www.nicb.org/news/blog/fbi-releases-new-auto-theft-numbers-nearly-750000-motor-vehicles-stolen-2018; *see also* https://www.nicb.org/news/blog/fbi-releases-new-auto-theft-numbers-nearly-750000-motor-vehicles-stolen-2018 (according to the FBI's 2018 Uniform Crime Report Data, the recovery rate for stolen motor vehicles in 2018 came in at 59.3 percent); https://www.statista.com/statistics/252444/recovery-rate-of-stolen-property-in-the-us-by-type/ ("In 2020, about 56.4 percent of locally stolen motor vehicles could be recovered"); https://www.elogps.com/5-stolen-car-recovery-facts-2022/ (the national recovery rate for stolen vehicles was 56.4% in 2020). https://reolink.com/blog/what-to-do-when-car-is-stolen/.

SUPPLEMENTAL DECLARATION OF CONSUMER
CLASS ACTION LEADERSHIP COUNSEL IN
SUPPORT OF MOT. FOR PRELIM. APPROVAL

1  recovered vehicles that were not declared a "total loss" are often damaged. Relying again on the above-referenced FBI data concerning vehicle thefts noted above, we determined that the sum of $6,000 is a fair approximation of the damages incurred by a stolen but recovered Class Vehicle. Again, we applied an approximate 40% discount after balancing the benefits of a speedy resolution against the risks of continued litigation.

c. The "insurance deductible"/"premium" claim cap of $375: For this reimbursement category, we again relied on insurance data suggesting that the average auto deductible in the U.S. is $500[4] and we estimated that insurance premiums on the Class Vehicles increased an average of $50 per year due to the increase in thefts and attempted thefts. Again, in arriving at the $375 cap, we applied a 40% discount for the reasons described above.

d. The "related expenses" cap of $250: This reimbursement category is designed to compensate Class Members who incurred expenses such as transportation costs, towing charges and fees and taxes associated with a replacement vehicle. Based on information derived from other automobile cases, we computed an approximate charge of $500 for these categories of expenses and again applied an approximate 40% risk discount.

9. Needless to say, the claim caps were the subject of spirited, arms-length negotiations overseen by Hon. Margaret Morrow (Ret.) and were subject to give and take over the course of several mediation sessions. Notably, we obtained a "most favored nations" type clause in Categories 3.a and 3.b, above, to account for the possibility that, prior to entry of Final Approval and Judgement in the Consumer Case, Defendants resolve the insurance subrogation claims on more favorable reimbursement terms. Additionally, we negotiated the right for Class Members to

---

[4] *See* https://www.caranddriver.com/car-insurance/a35824412/average-car-insurance-deductible/; https://www.statefarm.com/simple-insights/auto-and-vehicles/car-insurance-deductibles-and-coverages-choosing-well; https://www.fool.com/the-ascent/insurance/auto/car-insurance-deductible/.

make multiple claims under each Reimbursement Category above if a Class Vehicle was subject to multiple thefts or attempted thefts. *See* Settlement Agreement § II.D.4.

10. In addition to the non-reversionary common fund described above, Plaintiffs negotiated a separate, and uncapped, benefit for Class Members who own vehicles that are not eligible for the software upgrade being offered by Defendants. This benefit reimburses eligible Class Members for up to $300 per vehicle for installation of alarm systems and other types of after-market anti-theft systems. This category was based, in part, on the cost of installation of the Accessory Security Kit available through Hyundai dealerships. Estimates of the cost for parts and labor for the Accessory Security Kit approached $500 per vehicle and, again, an appropriate 40% risk discount was applied.

11. Class Members' certain and timely receipt of the benefits under the Settlement is an unquestionably reasonable outcome when faced with the challenges ahead. *See Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair."); *Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant.").

12. It is our view, based on our collective and significant experience in complex automotive defect cases like this one, that this is an exceptional result for the compromise of contested claims that have not yet survived a motion to dismiss.

\* \* \*

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

1  Executed August 10, 2023, at Seattle, Washington.

2
3   /s/ Steve W. Berman
    Steve W. Berman, Esq.
4   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
5   Seattle, WA 98101

6
7  Executed August 10, 2023, at Encino, California.

8   /s/ Roland Tellis
    Roland Tellis, Esq.
9   BARON & BUDD, P.C.
    15910 Ventura Blvd., Suite 1600
10  Encino, CA 91436
11

12
13  Executed August 10, 2023, at Chicago, Illinois.

14   /s/ Elizabeth A. Fegan
     Elizabeth A. Fegan, Esq.
15   FEGAN SCOTT LLC
     150 S. Wacker Dr., 24th Floor
16   Chicago, IL 60606
17

18
19  Executed August 10, 2023, at Independence, Missouri.

20   /s/ Kenneth B. McClain
     Kenneth B. McClain, Esq.
21   HUMPHREY FARRINGTON & McCLAIN
     221 W. Lexington Ave., Suite 400
22   Independence, MO 64050
23

24
25
26
27
28