**JENNER & BLOCK LLP**
Kate T. Spelman (SBN 269109)
KSpelman@jenner.com
Alice S. Kim (SBN 317479)
AKim@jenner.com
Madeline P. Skitzki (SBN 318233)
MSkitzki@jenner.com
Jenna L. Conwisar (SBN 341521)
JConwisar@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

**JENNER & BLOCK LLP**
Peter J. Brennan (*pro hac vice*)
PBrennan@jenner.com
Michael T. Brody (*pro hac vice*)
MBrody@jenner.com
353 North Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:22-ML-3052-JVS(KESx) |
| | The Honorable James V. Selna |
| | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF** |
| This document relates to: ALL SUBROGATION CASES | Hearing Date:  November 13, 2023<br>Hearing Time:  3:00 p.m. |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendants Kia America, Inc. ("KA"), Hyundai Motor America ("HMA"), Kia Corporation ("KC"), and Hyundai Motor Company ("HMC") (collectively, "Defendants") will and hereby move the above-entitled Court pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss the Subrogation Plaintiffs' Consolidated Complaint (titled "Master Complaint for All Subrogation Plaintiffs") (Dkt. 176) (the "Consolidated Complaint" or "CC") for failure to state a claim on which relief can be granted and failure to plead with sufficient particularity.[1]  KC and HMC also will and hereby move the Court pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss the Consolidated Complaint for lack of personal jurisdiction.

Defendants' Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice and exhibits thereto, the pleadings and papers on file in this litigation, any additional briefing on this subject (including Defendants' reply brief), and any further evidence or arguments that may be presented to the Court at the hearing on this matter.

For the above reasons and for the reasons set forth in the accompanying Memorandum, Defendants respectfully request that the Court dismiss the Consolidated Complaint as to all claims brought by all Subrogation Plaintiffs in the above-referenced action in its entirety, with prejudice and without leave to amend.

This Motion is made following conferences of counsel pursuant to L.R. 7-3, which took place on August 30, 2023 and September 7, 2023.

---

[1] The Subrogation Plaintiffs' Consolidated Complaint is not attached to this Motion because of its length.

1

Dated:  September 8, 2023          JENNER & BLOCK LLP

2

3          /s/ Peter J. Brennan
           Kate T. Spelman
4          Alice S. Kim
           Madeline P. Skitzki
           Jenna L. Conwisar
5          515 South Flower Street, Suite 3300
           Los Angeles, CA  90071-2246
6          Telephone:  (213) 239-5100
           Facsimile:  (213) 239-5199
7          KSpelman@jenner.com
           AKim@jenner.com
8          MSkitzki@jenner.com
           JConwisar@jenner.com
9
           Peter J. Brennan (*pro hac vice*)
10         Michael T. Brody (*pro hac vice*)
           JENNER & BLOCK LLP
11         353 North Clark Street
           Chicago, IL  60654-3456
12         Telephone:  (312) 222-9350
           Facsimile:  (312) 527-0484
13         PBrennan@jenner.com
           MBrody@jenner.com
14
           *Attorneys for Defendants*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.  The Defect Allegations................................................................................ 3

II.  The Subrogation Plaintiffs' Awareness of the Alleged "Defect." ................. 4

III.  The Relevant Regulations and NHTSA's Recent Determination.................. 4

IV.  The Subrogation Plaintiffs' Attempt to Bring Unsupported
     Subrogation Claims on Behalf of Unidentified Insureds. ........................... 6

V.  Procedural Background. .............................................................................. 9

LEGAL STANDARD ....................................................................................... 11

ARGUMENT .................................................................................................... 13

I.  The Subrogation Plaintiffs Cannot State Subrogation Claims..................... 14

    A.  The Subrogation Plaintiffs Fail to Plead the Necessary Facts
       Supporting Their Individual Insureds' Derivative Claims. ................ 16

    B.  The Equities Weigh Against the Subrogation Plaintiffs.................... 24

         i.  The Subrogation Plaintiffs' Claims Fail Under the
           Superior Equities Doctrine. ................................................25

         ii.  The Subrogation Plaintiffs' Claims Also Fail Under
           Other Equitable Doctrines. ................................................ 28

    C.  The Subrogation Plaintiffs Did Not Compensate Their Insureds
       for Losses Caused by Misrepresentation/Omissions. ........................ 29

II.  The Subrogation Plaintiffs' Claims Are Preempted. .................................... 33

III.  KC and HMC Should Be Dismissed for Lack of Personal Jurisdiction. ...... 38

CONCLUSION.................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*3123 SMB LLC v. Horn*,
  880 F.3d 461 (9th Cir. 2018) ............................................................................ 13

*A.O. Fox Memorial Hospital v. American Tobacco Co.*,
  302 A.D.2d 413 (N.Y. App. Div. 2003) ........................................................... 18

*Alamilla v. Hain Celestial Grp., Inc.*,
  30 F. Supp. 3d 943 (N.D. Cal. 2014) .................................................................. 7

*Alfano v. BRP Inc.*,
  No. 08-1704, 2010 WL 2292265 (E.D. Cal. June 4, 2010) ............................... 20

*Allied Mut. Ins. Co. v. Heiken*,
  675 N.W.2d 820 (Iowa 2004) ........................................................................... 24

*Allstate Ins. Co. v. Mazzola*,
  175 F.3d 255 (2d Cir. 1999) ............................................................................. 24

*Angiano v. Anheuser-Busch InBev Worldwide, Inc.*,
  532 F. Supp. 3d 911 (C.D. Cal. 2021) .............................................................. 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 11

*Azoulai v. BMW of North America LLC*,
  No. 16-589, 2017 WL 1354781 (N.D. Cal. Apr. 13, 2017) ................... 23, 31, 32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................... 11

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*,
  344 F.3d 211 (2d Cir. 2003) ....................................................................... 17, 22

*Boschetto v. Hansing*,
  539 F.3d 1011 (9th Cir. 2008) .......................................................................... 12

*Bynum v. Fam. Dollar Stores, Inc.*,
  592 F. Supp. 3d 304 (S.D.N.Y. 2022) .............................................................. 19

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
  637 F.3d 1047 (9th Cir. 2011) ....................................................................... 12

*Calvert Fire Ins. Co. v. James*,
  114 S.E.2d 832 (S.C. 1960) ......................................................................... 28

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ................................................................... 12, 13, 39, 40

*Dix Mut. Ins. Co. v. LaFramboise*,
  597 N.E.2d 622 (Ill. 1992) ..................................................................... 15, 25

*Dobbas v. Vitas*,
  191 Cal. App. 4th 1442 (2011) ......................................................... 15, 24, 29

*DuBeck v. California Physicians' Serv.*,
  234 Cal. App. 4th 1254 (2015) ..................................................................... 29

*E. States Health & Welfare Fund v. Philip Morris, Inc.*,
  11 F. Supp. 2d 384 (S.D.N.Y. 1998) .............................................................. 30

*Eastern States Health & Welfare Fund v. Philip Morris, Inc.*,
  188 Misc. 2d 638 (NY. Sup. Ct. 2000) ............................................... 17, 18, 22

*Feliciano v. Gen. Motors LLC*,
  No. 14-06374, 2016 WL 9344120 (S.D.N.Y. Mar. 31, 2016) ........................... 22

*Fireman's Fund Ins. Co. v. Maryland Cas. Co.*,
  65 Cal. App. 4th 1279 (1998) ...................................................................... 15

*Fireman's Fund Insurance Co. v. Morse Signal Devices*,
  151 Cal. App. 3d 681 (1984) ............................................................ 26, 27, 33

*First Nat. Bank of Columbus v. Hansen*,
  267 N.W.2d 367 (Wis. 1978) ....................................................................... 24

*Gade v. Nat. Solid Wastes Mgmt. Assn.*,
  505 U.S. 88 (1992) ..................................................................................... 34

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000) ....................................................................... 34, 35, 38

*Geneva Const. Co. v. Martin Transfer & Storage Co.*,
  122 N.E.2d 540 (Ill. 1954) .......................................................................... 29

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

*In re Gerber Prod. Co. Heavy Metals Baby Food Litig.*,
No. 21-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ............................... 30

*Goldman v. Abbott Lab'ys, Inc.*,
No. 01-1312, 2001 WL 1558281 (N.D. Ill. Dec. 5, 2001) ................................ 32

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ....................................................................... 13

*Grootonk v. Labrie Env't Grp., LLC*,
No. 22-1868, 2023 WL 5420299 (C.D. Cal. July 20, 2023) ....................... 39, 40

*Harris v. Rand*,
682 F.3d 846 (9th Cir. 2012) ............................................................ 13

*Health Care Serv. Corp. v. Brown & Williamson Tobacco Corp.*,
208 F.3d 579 (7th Cir. 2000) ....................................................... 18, 33

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) ........................................................................ 13

*Humana Inc. v. Medtronic Sofamor Danek USA, Inc.*,
133 F. Supp. 3d 1068 (W.D. Tenn. 2015) ........................................ 18, 23

*IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*,
143 S.W.3d 794 (Tex. 2004) ............................................................ 20

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ....................................................................... 12

*In re iPhone Application Litig.*,
6 F. Supp. 3d 1004 (N.D. Cal. 2013) ................................................... 19

*Julian Volunteer Fire Co. Assn. v. Julian-Cuyamaca Fire Prot. Dist.*,
62 Cal. App. 5th 583 (2021) ............................................................. 28

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ..................................................... 11, 19

*Kwan v. SanMedica Int'l*,
854 F.3d 1088 (9th Cir. 2017) ........................................................... 11

*Lassen v. Nissan N. Am., Inc.*,
211 F. Supp. 3d 1267 (C.D. Cal. 2016) .................................... 23, 31, 32

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

*Leader Nat. Ins. Co. v. Torres*,
    779 P.2d 722 (Wash. 1989) ............................................................................24

*LNS Enterprises LLC v. Cont'l Motors, Inc.*,
    22 F.4th 852 (9th Cir. 2022) ..........................................................................40

*Manwarren v. DeRoyal Indus., Inc.*,
    No. 11-13020, 2013 WL 12155450 (M.D. Fla. Mar. 27, 2013) .....................20

*Martinez v. Aero Caribbean*,
    764 F.3d 1062 (9th Cir. 2014) ........................................................................13

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
    647 F.3d 1218 (9th Cir. 2011) ........................................................................39

*May-Weirauch v. Ethicon, Inc.*,
    No. 20-1205, 2020 WL 6946445 (C.D. Ill. Nov. 25, 2020) ...........................20

*McDaniel v. Wells Fargo Investments*,
    717 F.3d 668 (9th Cir. 2013) ..........................................................................35

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    243 F. Supp. 2d 1073 (C.D. Cal. 2003) ..........................................................39

*Meyers v. Bank of America National Trust & Savings Association*,
    11 Cal. 2d 92 (1938) .............................................................................25, 26, 27

*Morrill v. Scott Fin. Corp.*,
    873 F.3d 1136 (9th Cir. 2017) ...................................................................12, 13

*Morris v. Mitsubishi Motors N. Am., Inc.*,
    782 F. Supp. 2d 1149 (E.D. Wash. 2011) .......................................................35

*Nealy v. U.S. Surgical Corp.*,
    587 F. Supp. 2d 579 (S.D.N.Y. 2008) ............................................................20

*New Hope Pipe Liners, LLC v. Composites One, LCC*,
    No. 09-3222, 2009 WL 4282644 (D.N.J. Nov. 30, 2009) ...............................32

*Pat. Scaffolding Co. v. William Simpson Const. Co.*,
    256 Cal. App. 2d 506 (1967) ....................................................................25, 29

*Payne v. City of St. Joseph*,
    135 S.W.3d 444 (Mo. Ct. App. 2004) ............................................................20

*Phico Ins. Co. v. Aetna Cas. & Sur. Co. of Am.*,
93 F. Supp. 2d 982 (S.D. Ind. 2000) .......... 28

*Philadelphia Indem. Ins. Co. v. Simplex Grinnell, L.P.*,
No. 12-567, 2012 WL 1668979 (N.D. Cal. May 11, 2012) .......... 16

*Priester v. Cromer*,
401 S.C. 38 (2012) .......... 35

*Ranza v. Nike, Inc.*,
793 F.3d 1059 (9th Cir. 2015) .......... 13

*Rehberger v. Honeywell Int'l, Inc.*,
No. 11-85, 2011 WL 780681 (M.D. Tenn. Feb. 28, 2011) .......... 32

*Resnick v. Hyundai Motor Am., Inc.*,
No. 16-593, 2017 WL 1531192 (C.D. Cal. Apr. 13, 2017) .......... 22

*Robles v. Gojo Indus., Inc.*,
No. 21-928, 2022 WL 2163846 (C.D. Cal. Mar. 16, 2022) .......... 7

*Schmidt v. Ford Motor Co.*,
972 F. Supp. 2d 712 (E.D. Pa. 2013) .......... 20

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) .......... 12

*Seibels Bruce Grp., Inc. v. R.J. Reynolds Tobacco Co.*,
No. 99-0593, 1999 WL 760527 (N.D. Cal. Sept. 21, 1999) .......... 16, 18

*Soliman v. Daimler AG*,
No. 10-408, 2011 WL 4594313 (E.D.N.Y. Sept. 30, 2011) .......... 35

*Sompo Japan Ins. Co. of Am. v. Action Exp., LLC*,
19 F. Supp. 3d 954 (C.D. Cal. 2014) .......... 25

*St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.*,
65 Cal. App. 3d 66 (1976) .......... 24

*Steinberg v. CVS Caremark Corp.*,
899 F. Supp. 2d 331 (E.D. Pa. 2012) .......... 19

*Travelers Property Casualty Company of America v. Pathways Personnel Agency, Inc.*,
No. 12-4876, 2013 WL 485833 (N.D. Cal. Feb. 6, 2013) ........................... 26, 27

*Westport Ins. Co. v. Altertec Energy Conservation, LLC*,
82 A.D.3d 1207 (N.Y. App. Div. 2011) ..................................................... 15

*Williamson v. Mazda Motor Am.*,
562 U.S. 323 (2011) .................................................... 34, 35, 37, 38

*Zachmann v. Coleman Co. Inc.*,
No. 20-9146, 2022 WL 161480 (S.D.N.Y. Jan. 18, 2022) .............................. 19

**Constitutions**

U.S. Const. Article VI ....................................................................... 34

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...................................................... 10, 12, 19

Cal. Civ. Code § 1750 ............................................................ 10, 12, 19, 29

Cal. Civ. Code § 1791.1 ..................................................................... 10

Cal. Civ. Code § 1792 ....................................................................... 10

Cal. Comm. Code § 2313 .............................................................. 10, 29

15 U.S.C. § 2301 ...................................................................... 10, 29

49 U.S.C. § 301 ....................................................................... 5, 34

**Court Rules**

Fed. R. Civ. P. 9(b) ............................................................... 11, 12, 19

Fed. R. Civ. P. 12(b)(2) ..................................................................... 12

Fed. R. Civ. P. 12(b)(6) ..................................................................... 11

**Other Authorities**

49 C.F.R. § 571.114 ................................................................ 4, 6, 34, 36

33 Fed. Reg. 6472 (Apr. 24, 1968) ..................................................... 36, 37, 38

vii

55 Fed. Reg. 21869 (May 30, 1990)....................................................................37

56 Fed. Reg. 12464 (March 26, 1991)..............................................................37

57 Fed. Reg. 2039 (Jan. 17, 1992)....................................................................37

71 Fed. Reg. 17752 (Apr. 7, 2006)....................................................................37

5 B.E. Witkin, Witkin California Procedure § 863 (4th ed. 1997)..........................16

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

**INTRODUCTION**

In this first-of-its kind case, a group of several hundred insurance companies (the "Subrogation Plaintiffs") seeks to recover from vehicle distributors and manufacturers—Kia America, Inc. ("KA"), Hyundai Motor America ("HMA"), Kia Corporation ("KC"), and Hyundai Motor Company ("HMC") (collectively, "Defendants")—on behalf of unnamed insureds for risks the insurers knowingly assumed at premiums the insurers themselves set and from which they profited. Unlike a traditional subrogation action arising from theft, the insurers do not target the thieves. Instead, they come after Defendants, who committed no thefts and received no premiums to insure against theft.

The Subrogation Plaintiffs contend that certain Hyundai and Kia branded vehicles starting in model year 2011 contain a "defect" that makes them easy for thieves to steal. According to the "Master Complaint for All Subrogation Plaintiffs" (Dkt. 176) (the "Consolidated Complaint" or "CC"), thefts of Kia and Hyundai vehicles began to "skyrocket[]" in 2020 due to the dissemination on social media of videos that detail how thieves can exploit the vehicles' alleged "defect." That "defect" is alleged to be the lack of an engine immobilizer in the vehicles. The Subrogation Plaintiffs claim they have compensated their insureds for losses related to thefts resulting from the alleged "defect" and seek to recover the payments they allegedly made to those insureds.

Most significantly, although the Subrogation Plaintiffs sue only in subrogation—*i.e.*, by standing in the shoes of their insureds—they fail to (1) identify the insureds on whose behalf they are seeking to recover; (2) allege facts supporting the claims of any, let alone each, of those insureds; and (3) allege facts supporting their basis to recover for each insured in subrogation. But this is not a consumer class action for which they can generally plead information for unidentified class members. Here, the Subrogation Plaintiffs must individually state a claim for every single insured whose losses they seek to recover and must further allege their

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

entitlement to recover in subrogation for each of those insureds.  They have not done so for a single insured, which is fatal to all of their claims.

Even putting aside those deficiencies, the Subrogation Plaintiffs' claims also fail because the equities weigh against the Subrogation Plaintiffs.  Because subrogation is based in part in equity, the Court must consider the equities in determining whether a subrogee can bring a claim on another's behalf.  Although subrogation permits insurers to stand in the shoes of their insureds, insurers and insureds do not stand on equal footing with respect to their claims against third parties.  Insurers, after all, collect premiums as compensation for their assumption of the risk of loss.  Here, the Subrogation Plaintiffs collected premiums to assume the risk of theft (and, indeed, collected premiums for the vehicles at issue in this case for years before thefts allegedly "skyrocket[ed]") and had the ability to research the vehicles and adjust their premiums based on the theft-protection features of those vehicles.  They do not plausibly allege that they could not have determined that they were insuring vehicles lacking immobilizers, and they in fact cite what they allege to be "publicly available information" to support their position that the theft vulnerability of these vehicles was widely known.  Further, they cannot dispute that third-party criminals, and not Defendants, are the primary cause of the losses for which they claim to have compensated their insureds.  Thus, their equities are inferior to those of Defendants, and their claims are therefore barred.

Further, although the Subrogation Plaintiffs claim to only be seeking to recover losses related to thefts of vehicles, they in fact are bringing causes of action that attempt to recover for separate losses.  Because they do not sufficiently connect the alleged thefts to the misrepresentation- and omission-based claims they bring, those claims should be dismissed.

Additionally, the entire basis for Subrogation Plaintiffs' claims—the supposed violation of Federal Motor Vehicle Safety Standard 114 ("FMVSS 114")—is wrong as a matter of law.  Moreover, FMVSS 114 preempts any attempt

to impose on automobile companies an immobilizer requirement, which would undercut the flexibility provided by the standard.

Finally, the Consolidated Complaint should be dismissed as to KC and HMC for lack of personal jurisdiction.

For these reasons, as further discussed below, Defendants respectfully request that the Court grant their Motion and dismiss the Subrogation Plaintiffs' Consolidated Complaint in its entirety, with prejudice and without leave to amend.

## BACKGROUND

### I.     The Defect Allegations.

The Subrogation Plaintiffs allege that certain Kia and Hyundai branded vehicles of model years 2011 to 2022 are "defective" because they lack engine immobilizers (hereinafter, the "Vehicles"). CC ¶¶ 1, 16, 301. According to the Consolidated Complaint, a "group of teenagers in Milwaukee," who called themselves the "Kia Boyz" on social media platforms, began to "publicize" a method of stealing the Vehicles. *Id.* ¶ 302. This social media trend caused thefts of the Vehicles to "skyrocket[]" in 2020. *Id.* ¶ 325.

The lack of an immobilizer allegedly makes the Vehicles more susceptible to theft by criminals. *Id.* ¶ 15. The Subrogation Plaintiffs acknowledge that consumers had the option of purchasing or leasing Hyundai and Kia vehicles that included immobilizers and chose to purchase or lease vehicles without immobilizers. *Id.* ¶¶ 2, 288. And it flows from this that the Subrogation Plaintiffs had the ability to charge different rates for vehicles with and without immobilizers. The Subrogation Plaintiffs also acknowledge that vehicles manufactured by other automotive companies do not contain immobilizers, and yet they do not contend that all such vehicles are "defective," suggesting that their "defect" allegations are more related to the "publiciz[ation]" of thefts on social media than the design of the Vehicles. *Id.* ¶¶ 298, 302.

## II.  The Subrogation Plaintiffs' Awareness of the Alleged "Defect."

The Subrogation Plaintiffs rely on "publicly available information" for their allegation that Defendants should have known of the vulnerability of vehicles lacking immobilizers. *Id.* ¶ 324.  Such "publicly available information" includes the "Hot Wheels" reports published by the National Insurance Crime Bureau (the "NICB") on their website (nicb.org), various studies, and "insurance claims" data. *Id.* ¶¶ 290, 296, 329–31.  According to the Subrogation Plaintiffs, "Hyundai and Kia Vehicles have been listed within the top ten stolen cars since 2013" in the "Hot Wheels" reports.  *Id.* ¶¶ 329–30.  Significantly, the Subrogation Plaintiffs do not allege that they did not have access to any of this information or that they did not use this information in underwriting their policies and setting their premiums.  Yet the Subrogation Plaintiffs nonetheless allege in conclusory fashion that they and their insureds "could not have reasonably discovered" and "had no way of knowing about" the lack of an immobilizer in the Vehicles or the Vehicles' alleged vulnerability to theft.  *Id.* ¶¶ 367, 369.

## III.  The Relevant Regulations and NHTSA's Recent Determination.

At the core of the Subrogation Plaintiffs' "defect" claim is FMVSS 114, which outlines theft-protection standards.  *See id.* ¶¶ 268–85.  As relevant here, FMVSS 114 requires that vehicles "have a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self-mobility, of the vehicle, or both."  49 CFR § 571.114, S5.1.1.

The Subrogation Plaintiffs acknowledge that automotive companies can employ a "bevy of" theft-protection features, including, but not limited to, immobilizers, to comply with FMVSS 114.  CC ¶ 285.  And they further acknowledge that NHTSA has made clear that an immobilizer is only one possible method of compliance with FMVSS 114.  *Id.* ¶ 293.  Nonetheless, the Subrogation Plaintiffs allege that the Vehicles do not comply with FMVSS 114 and "other"

unidentified "Federal and State safety standards and regulations" because they lack immobilizers. *Id.* ¶ 22. According to the Subrogation Plaintiffs, the Vehicles do not comply with FMVSS 114 "because they do not contain a meaningful anti-theft device, such as an immobilizer or any other effective anti-theft features that prevent the normal activation of the vehicle's engine without a key" and "[c]onsequently," "do not contain starting systems that prevent forward self-mobility of the Vehicles when the thief does not have a key." *Id.* ¶ 304.

NHTSA very recently considered and rejected the Subrogation Plaintiffs' interpretation of FMVSS 114 as applied to the Vehicles. On April 20, 2023, a group of 18 Attorneys General, led by California Attorney General Rob Bonta, sent a letter to the Acting Administrator of NHTSA, requesting that NHTSA "use its authority to institute a recall" of the Vehicles. RJN Ex. 1 at 1. In the letter, the Attorneys General contended that the Vehicles "do not comply with Federal Motor Vehicle Safety Standards (FMVSS) and/or that have a defect posing an unreasonable risk to motor vehicle safety." *Id.* at 7. Specifically, they asserted that the Vehicles violate FMVSS 114, reasoning that "[t]he rampant theft of Hyundai and Kia vehicles makes clear that these vehicles' starting systems do not prevent engine activation, steering, or forward self-mobility when the key is removed from the starting system." *Id.* at 8. Further, they claimed that the Vehicles' alleged "vulnerability to theft constitutes a defect posing an unreasonable risk to safety, providing NHTSA with an independent basis to order a recall," as "many incidents of reckless driving" have "result[ed] in injuries, death, and property damage," and "[s]tolen Hyundai and Kia vehicles have also been used in the commission of further crimes, including homicides, robberies, and other violent crimes." *Id.* at 8.

NHTSA clearly and unambiguously rejected the position of the Attorneys General in a letter dated June 5, 2023, stating:

> NHTSA has not determined that this issue constitutes either a safety defect or noncompliance requiring a recall under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. Chapter 301. The Federal

> Motor Vehicle Safety Standard identified in your letter, FMVSS No. 114, does not require an engine immobilizer. *See* 49 C.F.R. § 571.114. Also, the test procedure specified in that standard does not contemplate actions taken by criminal actors to break open or remove part of the steering column and take out the ignition lock to start a vehicle. *See id.* § 571.114, S6.  Here, the safety risk arises from unsafe use of a motor vehicle by an unauthorized person after taking significant destructive actions to parts of the vehicle.

RJN Ex. 2 at 2.  Thus, NHTSA expressly declined to find either that the Vehicles contain a safety defect or that they violate FMVSS 114 or any applicable regulations.

## IV.   The Subrogation Plaintiffs' Attempt to Bring Unsupported Subrogation Claims on Behalf of Unidentified Insureds.

According to the Consolidated Complaint, all Subrogation Plaintiffs are "insurance companies with policyholders who are insured under automobile policies for Vehicles that they purchased or leased."  CC ¶ 4.  The Subrogation Plaintiffs allege they "incurred damages and/or losses because their Insureds' Vehicles were stolen, damaged and/or vandalized, for which insurance claims were submitted and paid." *Id.*; *see also id.* ¶ 17 ("Due to the Defendants' failure to include the required anti-theft system in the Vehicles, Plaintiffs paid for covered damages sustained by Plaintiffs' Insureds as a result of theft, attempted theft, vandalism or other damage to the Vehicles arising from the Thief Friendly Design, including theft of or damage to other property, in accordance with the terms and conditions of the insurance policies issued by Plaintiffs to their Insureds.").  The Subrogation Plaintiffs claim that, "[a]s a result of such payments," they "are legally, equitably and contractually subrogated to the rights of their Insureds to recover compensation from the Defendants." *Id.* ¶ 17.

These general allegations are as detailed as the Consolidated Complaint gets. Despite bringing only subrogation claims—*i.e.*, only claims on behalf of individual insureds—the Subrogation Plaintiffs plead no facts about any individual insured or about their own entitlement to recover in subrogation.  Most notably, they do not provide the identities and VINs of any of the insureds for whom they are seeking to

recover.  The Consolidated Complaint is also bereft of any detail concerning those insureds.  For example, they allege that their "Insureds purchased and/or leased their respective Vehicles from Defendants, through Defendants' authorized dealerships, with the understanding that these dealerships were acting on behalf of Defendants, or were otherwise expected to be the eventual purchasers of the Vehicles when bought from a third party." *Id.* ¶ 347.  That allegation is nonsensical and entirely unsupported as to each insured.  The Subrogation Plaintiffs fail to allege any facts regarding (1) where any individual insured purchased or leased a Vehicle (including entity and geographical location), or (2) the understanding of any individual insured as to the relationship between the place of purchase or lease of his or her Vehicle and Defendants.  And it is implausible that every single insured for whom the Subrogation Plaintiffs are seeking to recover purchased or leased a Vehicle from an independent Kia or Hyundai dealership.

The Consolidated Complaint is replete with other conclusory allegations that are not pleaded as to any individual insureds.  Importantly, despite alleging that they are attempting to collect for payments of over $1 billion "as a result of theft, attempted theft, vandalism or other damage to the Vehicles arising from the Thief Friendly Design," they allege no facts connecting any individual insured's Vehicle theft to what they refer to as the "Thief Friendly Design."  *Id.* ¶ 17.  That is not a mere oversight.  The Consolidated Complaint makes extensive use of data and reports published by the NICB.  *See, e.g.*, *id.* ¶¶ 297 & n.30; 329–30 & n.37 (citing NICB data and reports available on the NICB website, nicb.org).  Data from those very sources suggest—and common sense confirms—that criminals can steal, vandalize, and otherwise damage vehicles in a multitude of ways.[1]  Even vehicles

---

[1] The Court may consider other information included in the sources the Subrogation Plaintiffs have incorporated by reference.  *See, e.g.*, *Alamilla v. Hain Celestial Grp., Inc.*, 30 F. Supp. 3d 943, 944 (N.D. Cal. 2014) (noting that plaintiffs had "incorporated by reference the entire text of the articles they quote in their complaint"); *Robles v. Gojo Indus., Inc.*, No. 21-928, 2022 WL 2163846, at *3 (C.D. Cal. Mar. 16, 2022), *aff'd*, No. 22-55627, 2023 WL 4946601 (9th Cir. Aug. 3, 2023)

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

with immobilizers can be and are stolen.  *See id.* ¶ 297 n.30 (citing 2013 NICB report recommending "**Common Sense:** Lock your car and take your keys.  It's simple enough, but many thefts occur because owners make it easy for thieves to steal their cars.").[2]  It is notable, then, that the Consolidated Complaint makes no attempt to connect any theft at issue here with the so-called defect.

Other examples of conclusory allegations lacking information about the individual insureds include the following:

- Despite alleging that they made payments to their insureds "in accordance with the terms and conditions of the insurance policies," they do not allege facts regarding any of the insurance policies at issue (or attach those policies to the Consolidated Complaint).  *Id.* ¶ 17; *see also id.* ¶ 22 ("Plaintiffs have and/or will pay policy proceeds to their respective Insureds pursuant to their policies of insurance.").

- Despite alleging that "Defendants concealed and omitted material information regarding the true nature of the Thief Friendly Design in every communication they had with Plaintiffs and Plaintiffs' Insureds and made representations about the quality, reliability, and safety of the Vehicles," they do not describe any such communications or allege that any individual insured viewed or relied on any representations (or advertisement containing omissions) at all.  *Id.* ¶ 344.

- Despite alleging that, absent the alleged misrepresentations, their insureds "would not have bought or leased the Vehicles or would not have paid as much for them," they do not allege that any individual insured takes that position.

---

(finding that articles cited in complaint were "proper subjects of incorporation by reference").

[2] Although the Consolidated Complaint claims that this 2013 report noted that "a reduction in vehicle thefts requires an immobilizer," in fact, the report recommended "four 'layers of protection' against theft": (1) common sense; (2) a visible or audible warning device; (3) an immobilizing device like a "kill" switch, a fuel cut-off, or a smart key; and (4) a tracking device.  *Id.* ¶ 297 & n.30.

1   *Id.* ¶ 346.

2   • Despite alleging that they are collectively seeking "an amount exceeding one

3   billion dollars," they do not allege facts regarding any payments that were

4   made to any individual insured.  *Id.* ¶ 23.

5   **V.    Procedural Background.**

6   This litigation began with a putative consumer class action filed in the Circuit

7   Court of Milwaukee County, Wisconsin on June 23, 2021, and removed to U.S.

8   District Court for the Eastern District of Wisconsin on October 5, 2021.  Starting

9   over a year after the filing of the original complaint in that case, several law firms

10   began filing nearly-identical consumer actions in other jurisdictions.

11   On August 31, 2022, the plaintiffs in one of the copycat actions moved before

12   the U.S. Judicial Panel on Multidistrict Litigation (the "JPML") to consolidate all of

13   the actions into a single multidistrict proceeding.  *See In re Kia Hyundai Vehicle*

14   *Theft Litig.*, MDL No. 3052, 2022 WL 17843100, at *1 (J.P.M.L. Dec. 13, 2022).

15   The JPML created MDL No. 3052 in this Court on December 13, 2022.  *Id.*

16   This MDL now consists of three separate tracks of cases: (1) consumer cases;

17   (2) municipality cases; and (3) insurance subrogation cases.  Since March 10, 2023,

18   eight cases were filed in this District (and subsequently transferred to this Court) by

19   Subrogation Plaintiffs: (1) *State Automobile Mutual Insurance Company v. Hyundai*

20   *Motor America*, No. 8:23-cv-00443 (C.D. Cal., filed March 10, 2023); (2) *The*

21   *Standard Fire Insurance Company v. Hyundai Motor America*, No. 8:23-cv-00792

22   (C.D. Cal., filed May 5, 2023); (3) *21st Century Centennial Insurance Company v.*

23   *Hyundai Motor America*, No. 2:23-cv-04288 (C.D. Cal., filed June 1, 2023);

24   (4) *State Farm Automobile Insurance Company v. Hyundai Motor America*, No.

25   8:23-cv-00981 (C.D. Cal., filed June 5, 2023); (5) *Zurich American Insurance*

26   *Company v. Kia America, Inc.*, No. 8:23-cv-01051 (C.D. Cal., filed June 14, 2023);

27   (6) *American National Property & Casualty Company v. Hyundai Motor America*,

28   No. 8:23-cv-01225 (C.D. Cal., filed July 10, 2023); (7) *Grange Insurance*

9

*Association v. Hyundai Motor America*, No. 8:23-cv-01354 (C.D. Cal, filed July 27, 2023); and (8) *Westfield Insurance Company v. Hyundai Motor America*, No. 2:23-cv-06212 (C.D. Cal., filed Aug. 1, 2023).  Those cases were consolidated into the Consolidated Complaint on July 28, 2023.[3]

The Subrogation Plaintiffs bring all their claims in subrogation.  *See, e.g.*, CC ¶¶ 7, 18, 23.[4]  They purport to bring their claims under the laws of all 50 states, the District of Columbia, and Puerto Rico.  *Id.* ¶¶ 383–4074.  The Consolidated Complaint includes 11 claims under California law, which it purports to assert on behalf of a nationwide class: (1) breach of implied warranty; (2) breach of express warranty pursuant to Cal. Comm. Code § 2313; (3) breach of express warranty in violation of Song-Beverly Act; (4) breach of implied warranty in violation of the Song-Beverly Act (Cal. Civ. Code §§ 1791.1 and 1792); (5) violation of the Consumers Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750 et seq.); (6) violation of the Unfair Competition Law ("UCL") (Bus. & Prof. Code § 17200 et seq.); (7) fraud by omission and concealment; (8) breach of express and implied warranties under the Magnuson-Moss Warranty Act ("MMWA") (15 U.S.C. § 2301 et seq.); (9) negligence; (10) negligent failure to warn; and (11) negligent misrepresentation.  *Id.* ¶¶ 383–558.  For the remainder of the states/territories, it asserts between 5 and 8 claims, including breach of implied warranty, breach of express warranty, violation of consumer protection laws, fraud, various negligence-based claims, and product liability (in a limited number of states).  *Id.* ¶¶ 559–4074.

Of the 343 or so total Subrogation Plaintiffs,[5] only 200 bring their claims on

---

[3] Although the Consolidated Complaint is unclear as to whether it incorporates all the plaintiffs from the eight currently filed cases, the Subrogation Plaintiffs have since clarified that all subrogation cases are subsumed in the Consolidated Complaint.  *See* Dkt. 204.

[4] They make clear that their alleged damages are limited to payments they have made to their insureds.  CC ¶ 23.  And they refer to themselves in various places as "Subrogation Plaintiffs."  *Id.* ¶ 7; *see also* Dkt. 204.

[5] The Subrogation Plaintiffs have sought to add a number of insurers as parties through Notices of Appearance or other similar form documents.  Although

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

behalf of a class (the "Class Plaintiffs"); the remaining Subrogation Plaintiffs have expressed their intention to opt out if a class is ever certified. *Id.* ¶¶ 7, 44. Despite making clear that they are only seeking to recover for "damages and/or losses" they incurred "because their Insureds' Vehicles were stolen, damaged and/or vandalized, for which insurance claims were submitted and paid," the Class Plaintiffs have defined the putative class and subclasses to include all insurance carriers that issued automobile and property insurance policies whose insureds purchased or leased Kia or Hyundai Vehicles, regardless of whether the Vehicles were stolen. *Id.* ¶¶ 4, 354–57.

## LEGAL STANDARD

**Federal Rule of Civil Procedure 12(b)(6).** "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facts indicating the "mere possibility of misconduct" fall short. *Id.* at 679. "[C]onclusory allegations" and "unwarranted inferences" are also "insufficient to avoid dismissal" under Rule 12(b)(6). *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (citations and internal quotation marks omitted). Rather, the plaintiff must "allege more by way of factual content to 'nudg[e]' his claim" of unlawful action "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570).

**Federal Rule of Civil Procedure 9(b).** Further, Plaintiffs' claims that sound in fraud are also subject to Rule 9(b)'s heightened pleading standard. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (holding that Rule 9(b) applies to state-law claims that "allege a unified course of fraudulent conduct," including UCL and CLRA claims, regardless of whether fraud is a necessary element of those claims). Rule 9(b) requires Plaintiffs to "state with particularity the circumstances

---

Defendants dispute that these insurers have been properly added, for purposes of discussion, those new insurers are included in this total.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

constituting fraud"—or, in other words, to "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054–55 (9th Cir. 2011) (citations and internal quotation marks omitted).

**Federal Rule of Civil Procedure 12(b)(2).**  A defendant may move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). "Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Because "California's long-arm statute is co-extensive with federal standards, . . . a federal court may exercise personal jurisdiction if doing so comports with federal constitutional due process."  *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).[6] "Constitutional due process requires that defendants 'have certain minimum contacts' with a forum state 'such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  To establish minimum contacts, the plaintiff must show the defendant has either "'continuous and systematic general business contacts' with a forum state (general jurisdiction)" or "sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)."  *Id.* at 1142 (citation omitted).

"A court may assert general jurisdiction over foreign . . . corporations . . .

---

[6] Because the individual cases that have been subsumed in the Consolidated Complaint were all filed in this District, the Court should look to California's long-arm statute.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Where the defendant is a corporation, general jurisdiction is usually available only in the state where the corporation is incorporated or maintains its principal place of business.  *Daimler AG*, 571 U.S. at 138–39.  A corporation's principal place of business is "where a corporation's officers direct, control, and coordinate the corporation's activities," *Harris v. Rand*, 682 F.3d 846, 851 (9th Cir. 2012) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010)), which "should normally be the place where the corporation maintains its headquarters," *3123 SMB LLC v. Horn*, 880 F.3d 461, 465 (9th Cir. 2018) (quoting *Hertz*, 559 U.S. at 93).  "Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015) (quoting *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014)).

## **ARGUMENT**

As an initial matter, the Consolidated Complaint should be dismissed for three subrogation-specific reasons.  *First*, neither Defendants nor this Court can even evaluate whether the Subrogation Plaintiffs sufficiently state any causes of action because they fail to (1) identify the insureds on whose behalf they are seeking to recover;  (2) allege facts supporting the claims of each of those insureds; and (3) allege facts supporting their basis to recover for each insured in subrogation. Without this information, they cannot proceed in subrogation, as courts throughout the country have held.

*Second*, the equities clearly weigh against the Subrogation Plaintiffs.  Because subrogation is based in equity, to succeed on their claims, the Subrogation Plaintiffs must establish that the equities weigh in their favor.  Given that they are sophisticated insurers who are tasked with investigating risk in underwriting their policies, that they have collected (and continue to collect) premiums for the Vehicles at issue since 2011, and that, according to the allegations of the Consolidated Complaint, they have

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

had equal or superior access to publicly available information revealing increasing theft rates among these Vehicles since 2013, the equities do not support their claims. Further, their equities are clearly inferior to those of Defendants, given that any alleged losses to their insureds resulted from the intervention of third-party thieves. Whether the Court considers the equities under the superior equities doctrine or the doctrines of laches and waiver, the Subrogation Plaintiffs should not be permitted to proceed in subrogation.

*Third*, because the Subrogation Plaintiffs cannot connect any alleged thefts of their insureds' Vehicles to any misrepresentations/omissions, they cannot allege that they compensated their insureds for claims related to misrepresentations/omissions and therefore cannot bring misrepresentation/omission-based claims in subrogation.

Further, the Subrogation Plaintiffs' claims are impliedly preempted in light of Defendants' compliance with FMVSS 114.[7]

Finally, the Subrogation Plaintiffs' claims against KC and HMC should be dismissed for lack of personal jurisdiction.

# I.   The Subrogation Plaintiffs Cannot State Subrogation Claims.

While the precise contours of causes of action for subrogation may vary by state, as a general matter, courts have required at least the following elements to state a cause of action in subrogation:

> (1) The insured has suffered a loss for which the party to be charged is liable, either because the latter is a wrongdoer whose act or omission caused the loss or because he is legally responsible to the insured for the loss caused by the wrongdoer;

---

[7] This Motion focuses only on the overarching defects in the Consolidated Complaint, rather than specific defects with the individual claims. For example, the deficiencies identified in the motion to dismiss the consumer consolidated complaint (Dkt. 95) all appear to exist in this Consolidated Complaint, but Defendants cannot be sure because, as discussed further below, the Subrogation Plaintiffs have not sufficiently alleged those claims as to their individual insureds. If the Subrogation Plaintiffs amend to add the required information as to claims of their individual insureds, Defendants can then assess whether to seek dismissal of the individual claims.

(2) the insurer, in whole or in part, has compensated the insured for the same loss for which the party to be charged is liable;

(3) the insured has an existing, assignable cause of action against the party to be charged, which action the insured could have asserted for his own benefit had he not been compensated for his loss by the insurer;

(4) the insurer has suffered damages caused by the act or omission upon which the liability of the party to be charged depends;

(5) justice requires that the loss should be entirely shifted from the insurer to the party to be charged, whose equitable position is inferior to that of the insurer; and

(6) the insurer's damages are in a stated sum, usually the amount it has paid to its insured, assuming the payment was not voluntary and was reasonable.

*Dobbas v. Vitas*, 191 Cal. App. 4th 1442, 1449–50 (2011), *as modified on denial of reh'g* (Feb. 1, 2011).

Because "[t]he right of subrogation is purely derivative," "[a]n insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1292 (1998). Put another way, the insurer "stand[s] in the shoes" of its insured and accordingly "has no greater rights than the insured and is subject to the same defenses assertable against the insured." *Id.* "Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have." *Id.*; *see also Dix Mut. Ins. Co. v. LaFramboise*, 597 N.E.2d 622, 624 (Ill. 1992) ("One who asserts a right of subrogation must step into the shoes of, or be substituted for, the one whose claim or debt he has paid and can only enforce those rights which the latter could enforce."); *Westport Ins. Co. v. Altertec Energy Conservation, LLC*, 82 A.D.3d 1207, 1209 (N.Y. App. Div. 2011) ("Subrogation, an equitable doctrine, allows an insurer to stand in the shoes of its insured and seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse. The insurer's rights against a third party are derivative and limited to the

15

rights the insured would have against that third party. Therefore, [an] insurer can only recover if the insured could have recovered and its claim as subrogee is subject to whatever defenses the third party might have asserted against its insured.") (citations and internal quotation marks omitted).

### A.   The Subrogation Plaintiffs Fail to Plead the Necessary Facts Supporting Their Individual Insureds' Derivative Claims.

The Subrogation Plaintiffs' claims should all be dismissed because the Subrogation Plaintiffs have failed to (1) identify the insureds on whose behalf they are seeking to recover; (2) allege facts supporting the claims of each of those insureds; and (3) allege facts supporting their basis to recover for each insured in subrogation. Put differently, the Subrogation Plaintiffs have failed to sufficiently plead a claim for any individual insureds, so they are accordingly unable to recover in subrogation for those insureds.

In light of the derivative nature of a subrogation claim, to plead such a claim, an insurer "is required to allege facts reflecting the insured's entitlement to relief" as well as "the facts on which the claim of subrogation is based." *Philadelphia Indem. Ins. Co. v. Simplex Grinnell, L.P.*, No. 12-567, 2012 WL 1668979, at *3 (N.D. Cal. May 11, 2012); *Seibels Bruce Grp., Inc. v. R.J. Reynolds Tobacco Co.*, No. 99-0593, 1999 WL 760527, at *8 (N.D. Cal. Sept. 21, 1999) (quoting 5 B.E. Witkin, Witkin California Procedure § 863 (4th ed. 1997)).[8]

Courts throughout the country have held that plaintiff subrogees could not succeed on subrogation claims where they did not identify the subrogors and provide information about each individual subrogor's claim against the defendant. This Court should follow that authority.

The Second Circuit's decision in *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.* is instructive. 344 F.3d 211 (2d Cir. 2003), *certified question accepted*, 801 N.E.2d 417 (N.Y. 2003), *and certified question answered*

---

[8] Because subrogation is derivative, this argument should apply across jurisdictions.

1   *sub nom. Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818
2   N.E.2d 1140 (2004).  There, several health insurance plans sued a group of tobacco
3   companies for misrepresenting the risks of smoking.  *Id.* at 215.  After a trial on one
4   of the plan's claims, a jury awarded damages to the plan for both direct and
5   subrogation claims.  *Id.* at 217.  The trial court denied the tobacco companies' motion
6   for judgment as a matter of law, and the tobacco companies appealed.  The Second
7   Circuit held that the plan's subrogation claim should not have been allowed to
8   proceed because the plan (1) "never identified the actual number of subrogors or
9   their names" and (2) never "provided any individualized information about the
10  claims to which [the plan] alleged it was subrogated."  *Id.* at 217–18.  In so holding,
11  the court reasoned that "[a]t the very least, a subrogation claim would require [the
12  plan] to identify its subrogors and those subrogors' claims so that defendants would
13  have the opportunity to assert defenses against those claims."  *Id.* at 218.

14       The Second Circuit in *Blue Cross & Blue Shield of New Jersey* relied on two
15  New York cases, which also held that subrogation plaintiffs must provide specific
16  information about the individual subrogors' claims to proceed on subrogation
17  claims.  In *Eastern States Health & Welfare Fund v. Philip Morris, Inc.*, health and
18  welfare benefit trust funds sued tobacco companies to recover money paid for
19  medical bills incurred by their participants and beneficiaries.  188 Misc. 2d 638,
20  640–41 (NY. Sup. Ct. 2000).  On a motion to dismiss, the court held that the
21  subrogation claims should be dismissed because the funds (1) did not "identify the
22  participants and beneficiaries to whose claims they [were] subrogated," and
23  (2) "omitted facts which, if proven, would establish liability on Defendants' part."
24  *Id.* at 652–53.  The court reasoned that, "[w]ithout ascertaining what the specific
25  injuries are for each person, and without the ability to demonstrate what other factors
26  may have caused the injuries, Defendants cannot fairly defend the Funds' claims."
27  *Id.* at 653; *see also id.* ("Without greater detail specifying each participant's or
28  beneficiary's claim, Defendants are unable to conduct an individual analysis and

1    adequately defend the subrogation cause of action.").

2        The court in *A.O. Fox Memorial Hospital v. American Tobacco Co.*, 302

3    A.D.2d 413 (N.Y. App. Div. 2003), came to the same conclusion.  There, plaintiff

4    nonprofit hospitals and a trade association sued tobacco companies and a public

5    relations firm to recover the unreimbursed costs of supplying health care to

6    consumers of tobacco products. *Id.* at 414.  The court held that the subrogation claim

7    was properly dismissed on a motion to dismiss because the plaintiffs "failed to

8    identify the individual patients and their particular injuries and specify facts which,

9    if proven, would establish liability." *Id.*

10       This reasoning is not limited to New York law.  For example, in *Humana Inc.*

11   *v. Medtronic Sofamor Danek USA, Inc.*, the plaintiff insurer sued a medical device

12   manufacturer for, among other things, reimbursement for certain benefits paid to

13   insureds who had product liability claims arising from use of the medical device at

14   issue.  133 F. Supp. 3d 1068, 1071 (W.D. Tenn. 2015).  The court granted the

15   defendant's motion to dismiss the subrogation claim because the complaint did not

16   identify (1) the "individual insureds for Plaintiff to step into their shoes," or (2) "a

17   specific 'debt' or 'payment to [the insurer's] insured.'" *Id.* at 1073–74.  And in

18   *Seibels*, on a motion to dismiss, the court dismissed a claim for contribution in part

19   because the insurer plaintiff did "not provide defendants with notice of whose shoes

20   they stand in, *i.e.*, for which of their insured companies they [were] asserting claims

21   of contribution." 1999 WL 760527, at *8; *see also Health Care Serv. Corp. v. Brown*

22   *& Williamson Tobacco Corp.*, 208 F.3d 579, 581 (7th Cir. 2000) (to state a

23   subrogation claim, insurers "must identify the persons to whose claims the insurers

24   are subrogated" and show that "the insureds are entitled to recover" and "the

25   plaintiffs have a contractual right to proceed on each insured's behalf with respect

26   to each claim").

27       As in the above-cited cases, here too the Subrogation Plaintiffs have not

28   (1) identified any insureds on whose behalf they are suing Defendants; (2) alleged

1  facts supporting the claims of their individual insureds against Defendants; or

2  (3) alleged facts supporting their right to recover in subrogation for each insured.

3  For example, as discussed above, the Subrogation Plaintiffs fail to plead for any

4  individual insured: (i) the place of purchase (entity/location) of the Vehicle; (ii) the

5  date of purchase; (iii) the representation(s) viewed and relied on by the insured; (iv)

6  facts connecting the alleged theft of the Vehicle to the lack of immobilizer; (v) the

7  payment made to the insured; and (vi) the basis for making the payment to the

8  insured.

9      Without these allegations, the Subrogation Plaintiffs cannot state any of their

10  claims.  And they certainly cannot state any of their claims sounding in fraud and

11  therefore subject to Rule 9(b)'s heightened pleading standard.  *See Kearns*, 567 F.3d

12  at 1125.  The following are just a few examples of missing elements:

13  • Fraud, negligent misrepresentation, and many consumer protection claims

14    require allegations of reliance.  *See, e.g.*, *In re iPhone Application Litig.*, 6 F.

15    Supp. 3d 1004, 1022 (N.D. Cal. 2013) (California UCL and CLRA claims

16    require reliance); *Steinberg v. CVS Caremark Corp.*, 899 F. Supp. 2d 331, 341

17    (E.D. Pa. 2012) (dismissing Pennsylvania Unfair Trade Practices and

18    Consumer Protection Law claim where plaintiff "failed to allege that he was

19    aware of the defendants' representations" or that "he relied on those

20    statements in electing to fill his prescriptions at CVS"); *Zachmann v. Coleman*

21    *Co. Inc.*, No. 20-9146, 2022 WL 161480, at *3–4 (S.D.N.Y. Jan. 18, 2022)

22    (dismissing New York General Business Law section 349 and 350 claims

23    where plaintiffs did "not sufficiently allege a causal connection between their

24    purchase of defendant's coolers and defendant's labelling"); *Bynum v. Fam.*

25    *Dollar Stores, Inc.*, 592 F. Supp. 3d 304, 313, 316 (S.D.N.Y. 2022) (fraud and

26    negligent misrepresentation claims require reasonable reliance); *Schmidt v.*

27    *Ford Motor Co.*, 972 F. Supp. 2d 712, 721 (E.D. Pa. 2013) (dismissing fraud

28    and negligent misrepresentation claims for failure to sufficiently plead

19

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

reliance); *Angiano v. Anheuser-Busch InBev Worldwide, Inc.*, 532 F. Supp. 3d 911, 919 (C.D. Cal. 2021), *appeal dismissed*, No. 21-55460, 2021 WL 5315446 (9th Cir. Aug. 5, 2021) (dismissing fraud and negligent misrepresentation claims for failure to plead justifiable reliance).   The Subrogation Plaintiffs do not plead that any individual insured relied on any particular representations and therefore do not sufficiently plead their fraud, negligent misrepresentation, and consumer protection claims.

- All of the Subrogation Plaintiffs' claims require causation.  *See, e.g.*, *Alfano v. BRP Inc.*, No. 08-1704, 2010 WL 2292265, at *2 (E.D. Cal. June 4, 2010) (for negligent failure to warn claim, "California law requires proof that 'the inadequacy or absence of the warning was a substantial cause of the plaintiff's injury'") (citation omitted); *May-Weirauch v. Ethicon, Inc.*, No. 20-1205, 2020 WL 6946445, at *3 (C.D. Ill. Nov. 25, 2020) (noting that "[i]n Illinois, a showing of causation is required for products liability claims," including fraud, negligence, breach of express and implied warranty, and gross negligence); *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 584 (S.D.N.Y. 2008) (under New York law, "a claim for breach of implied warranty requires the plaintiff to establish causation"); *Payne v. City of St. Joseph*, 135 S.W.3d 444, 450 (Mo. Ct. App. 2004) (under Missouri law, "[t]o establish a causal connection between the alleged negligent act and injury, the plaintiff must show both causation in fact and proximate cause"); *Manwarren v. DeRoyal Indus., Inc.*, No. 11-13020, 2013 WL 12155450, at *2 (M.D. Fla. Mar. 27, 2013) (finding that, under Florida law, claims based in product liability, including breach of express and implied warranty, fraud, and negligent misrepresentation, require proximate causation); *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) (under Texas law, negligence claim requires "damages proximately caused by the breach" of duty).  Without alleging any facts regarding the circumstances of

20

the alleged theft of each insured's Vehicle, the Subrogation Plaintiffs do not sufficiently plead any causal relationship between the thefts and the alleged defect in the insureds' Vehicles.[9]  This is important.  Vehicles can be stolen in many ways, by various methods and by criminals with diverse motivations. The fact that a vehicle was stolen, vandalized, or damaged does not—without more—automatically mean that the vehicle was stolen in the particular theft method alleged here, which references the "Kia Boyz" social media challenge. Criminals can steal vehicles, including vehicles with immobilizers, by different methods such as towing the vehicles away, taking the vehicles away by flatbed truck, using keys left in or near the vehicles, and so on.  *See* CC ¶ 297 n.30 (citing 2013 NICB report suggesting that "many thefts occur because owners make it easy for thieves to steal their cars" by failing to lock their cars and/or take their keys).  Indeed, the Court itself has suggested the possibility that not every theft of a Vehicle is necessarily tied to the defect alleged in the MDL.  *See* Dkt. 200 at 25 ("[T]he Court is not prepared to require Class Members to waive all claims against Defendants that are 'related to theft of a Class Vehicle.' . . .  Releases should be limited to the facts of this case and should not encompass circumstances that are not addressed by the Settlement.").

Accordingly, without allegations supporting each insured's individual claims, the Subrogation Plaintiffs cannot seek to recover on behalf of those insureds.  The Subrogation Plaintiffs are attempting to stand in the shoes of their insureds by bringing the claims of those insureds, yet they make no attempt to plead the facts underlying those claims.  That is not permitted, not in the least because Defendants

---

[9] Such facts are needed to evaluate Plaintiffs' causation claims.  In any event, as discussed below, the Subrogation Plaintiffs will not be able to connect any alleged misrepresentations/omissions to Vehicle thefts, dooming all claims premised on misrepresentations/omissions.  Further, as set forth in Defendants' motions to dismiss the consumer and municipality consolidated complaints (Dkt. 95 at 13–15), the intervening acts of third-party criminals break any chain of causation.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

must "have the opportunity to assert defenses against those claims." *Blue Cross & Blue Shield of New Jersey*, 344 F.3d at 218; *see also Eastern States Health & Welfare Fund*, 188 Misc. 2d at 653 (requiring plaintiffs to identify subrogors and plead their claims so that defendants could "fairly defend" against the claims).[10]

And even if this Court were to allow the Subrogation Plaintiffs leave to amend their Consolidated Complaint, and the Subrogation Plaintiffs do in fact sufficiently plead their claims as to each insured, their claims will still fail.  For example, the economic loss rule will bar the Subrogation Plaintiffs' tort claims.  Under the economic loss rule, "a plaintiff may recover in tort only where he or she can allege person[al] injury or damage to other property, that is, property *other than the product itself.*"  *Resnick v. Hyundai Motor Am., Inc.*, No. 16-593, 2017 WL 1531192, at *10 (C.D. Cal. Apr. 13, 2017); *Feliciano v. Gen. Motors LLC*, No. 14-06374, 2016 WL 9344120, at *14 (S.D.N.Y. Mar. 31, 2016) (noting that it is "well settled" under New York, Michigan, and Florida law that "the economic loss rule prohibits recovery for injury to the product itself or consequential losses flowing therefrom") (citations and internal quotation marks omitted).

*Feliciano* is instructive.  There, the plaintiffs alleged that their vehicles had a defect that caused antifreeze to leak from the radiator, which could lead to mechanical troubles and a malodorous smell in the passenger compartment.  *Id.* at *1.  The court found that, because the plaintiffs failed to allege any personal injury related to the fumes or any damage other than to the vehicle itself, the economic loss rule barred their negligence claim.  *Id.* at *14.

Here, the Subrogation Plaintiffs do not and cannot allege that the "defect" in itself causes any personal injury or property damage to their insureds.  Even if the Court determined that causation was satisfied, the Subrogation Plaintiffs will not be

---

[10] Notably, the Subrogation Plaintiffs seem to acknowledge that they must plead claims as to each insured, contending in the Class Allegation section of the Consolidated Complaint that each insurer's case could potentially be "comprised . . . of hundreds or thousands of claims."  CC ¶ 364.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

1    able to plead any personal injury or damage to anything other than the Vehicles.

2    Thus, the Subrogation Plaintiffs' tort claims will be barred by the economic loss rule.

3           Additionally, the Subrogation Plaintiffs will not be able to plead a design

4    defect sufficient to state a consumer fraud claim.  Courts have held that plaintiffs

5    cannot state consumer fraud claims based on allegations that a "properly-functioning

6    product was defective because there is a safer design."  *Lassen v. Nissan N. Am.,*

7    *Inc.*, 211 F. Supp. 3d 1267, 1284–89 (C.D. Cal. 2016).  For example, in *Azoulai v.*

8    *BMW of North America LLC*, the court found that the plaintiff did not sufficiently

9    allege a defect for purposes of consumer fraud claims where they alleged that the

10   product was defective because it lacked a sensor that the plaintiffs "believe[d] would

11   make the vehicles safer" because the plaintiffs did not allege that the sensor "was

12   bargained for."  No. 16-589, 2017 WL 1354781, at *6 (N.D. Cal. Apr. 13, 2017).

13   The Subrogation Plaintiffs have already alleged that their insureds had the option of

14   purchasing or leasing Kia and Hyundai vehicles with immobilizers.  CC ¶¶ 2, 288.

15   They cannot claim that the Vehicles are defective because they lack a feature the

16   insureds did not choose.[11]

17          Finally, even if the Subrogation Plaintiffs could allege claims on behalf of

18   individual insureds that survive the above bars, they would need to plead their

19   entitlement to collect in subrogation on each such claim for each insured, which they

20   have not done here.  *See Humana*, 133 F. Supp. 3d at 1073 (finding that plaintiff

21   insurer was required to allege "a specific 'debt' or 'payment to [the insurer's]

22   insured'").  Given that they do not allege any facts regarding the payments they have

23   made or the policies under which they have allegedly made those payments, they

24   fail to plead three essential elements of their claims—that they (1) have compensated

25   their insureds for the same loss for which Defendants are liable; (2) have suffered

26

27   [11] As the Consolidated Complaint as currently drafted is devoid of necessary factual allegations, Defendants cannot fully assess and brief these and other issues at this

28   time.  Should the Court allow the Subrogation Plaintiffs to amend and should they sufficiently amend, Defendants can and will do so at the appropriate time.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

damages caused by the act or omission upon which the liability of Defendants depends; and (3) did not voluntarily pay their insureds.  *See Dobbas*, 191 Cal. App. 4th at 1449–50.  Accordingly, all of the Subrogation Plaintiffs' claims must be dismissed.

**B.     The Equities Weigh Against the Subrogation Plaintiffs.**

Because subrogation is based in equity, the Subrogation Plaintiffs must establish that the equities weigh in their favor.  *See, e.g.*, *id*. at 1450 (insurer plaintiff must establish that "justice requires that the loss should be entirely shifted from the insurer to the party to be charged, whose equitable position is inferior to that of the insurer"); *St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.*, 65 Cal. App. 3d 66, 72, 135 (1976) ("[T]he right of subrogation applies in all cases in which a person, not a volunteer, pays a debt for which another is primarily answerable, and which, *in equity and good conscience*, should have been discharged by the latter.") (emphasis added); *First Nat. Bank of Columbus v. Hansen*, 267 N.W.2d 367, 370 (Wis. 1978) ("Subrogation is based on equity and is permitted only when the rights of those seeking subrogation have greater equity than the rights of those who oppose it."); *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999) ("The doctrine of subrogation . . . is based upon principles of equity . . . ."); *Leader Nat. Ins. Co. v. Torres*, 779 P.2d 722, 723 (Wash. 1989) ("[S]ubrogation is an equitable doctrine and resolution of each case should be based upon 'the equitable factors involved . . . .'") (citation omitted); *Allied Mut. Ins. Co. v. Heiken*, 675 N.W.2d 820, 828 (Iowa 2004) ("[T]he entire concept of subrogation is driven by principles of equity . . . .").  As the Supreme Court of Illinois explained:

> The right of subrogation is an equitable right and remedy which rests on the principle that substantial justice should be attained by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall.  Subrogation is allowed to prevent injustice and unjust enrichment but will not be allowed where it would be inequitable to do so.  There is no general rule which can be laid down to determine whether a right of subrogation exists since this right depends upon the equities of each particular case.

1   *Dix Mut. Ins. Co. v. LaFramboise*, 597 N.E.2d 622, 624 (Ill. 1992) (citations
2   omitted).

3          Here, the superior equities doctrine, as well as other equitable doctrines, bar
4   the Subrogation Plaintiffs' claims.

5               i.    The Subrogation Plaintiffs' Claims Fail Under the Superior
6                     Equities Doctrine.

7          The ability to bring a subrogation claim is subject to the superior equities
8   doctrine, "which prevents an insurer from recovering against a party whose equities
9   are equal or superior to those of the insurer." *Sompo Japan Ins. Co. of Am. v. Action
10  Exp., LLC*, 19 F. Supp. 3d 954, 958 (C.D. Cal. 2014), *as amended* (June 4, 2014)
11  (citation omitted).  Although subrogation generally provides a mechanism by which
12  an insurer can stand in the shoes of its insured and thereby assert claims on behalf
13  of the insured, the insurer's rights against third parties are not on equal footing with
14  those of an insured because an insurer was paid a premium to assume the risk of loss.
15  *Id.* (noting that superior equities doctrine "derives in part from the fact that the
16  insurer has been paid a premium to assume the risk of loss").  Indeed, by permitting
17  subrogation, "insurers who have accepted premiums to cover the very loss which
18  occurred receive a windfall." *Pat. Scaffolding Co. v. William Simpson Const. Co.*,
19  256 Cal. App. 2d 506, 516 (1967).  Because "insurers, being in the insurance
20  business, are in a position effectively to spread the risk and to gauge their premiums
21  upon their loss experience," to bring a subrogation claim, their equities must be
22  superior to those of the third-party defendant.  *Id.*

23         The California Supreme Court first recognized the superior equities doctrine
24  in *Meyers v. Bank of America National Trust & Savings Association*, which held that
25  the ability to bring a subrogation claim "depend[s] upon the respective equities of
26  the parties."  11 Cal. 2d 92, 102 (1938).  A third party that is not the "primary cause
27  of the loss" should not bear the loss and thus should not be liable in subrogation.  *Id.*
28  at 102–03.

1   *Fireman's Fund Insurance Co. v. Morse Signal Devices* ("*Morse*") is also

2   instructive.  151 Cal. App. 3d 681 (1984).  There, the insureds had contracted with

3   the alarm company defendants for the maintenance of burglar or fire alarm systems.

4   *Id.* at 685.  When fire and burglary events occurred at the insureds' premises, the

5   alarm systems failed to function properly, allegedly resulting in fire damage that

6   could have been avoided.  *Id.* at 686.  The court found that the superior equities

7   doctrine barred the insurer's claim for subrogation and affirmed the trial court's

8   grant of the alarm company defendants' demurrers.  In so holding, the court reasoned

9   that "the primary cause of the loss is the creator of the fire or the burglar," and "[t]he

10  Alarm Companies' alleged negligence would be secondary to creation of the perils."

11  *Id.* at 688.  The court further noted that "[t]he insurance company, which charges its

12  premiums based on the extent of insurance coverage, [was] in the best position to

13  spread the risks assumed," particularly given that "[t]he insureds procured insurance

14  for the very losses that were suffered."  *Id.*

15  *Travelers Property Casualty Company of America v. Pathways Personnel*

16  *Agency, Inc.* ("*Pathways*") further illustrates the doctrine.  No. 12-4876, 2013 WL

17  485833 (N.D. Cal. Feb. 6, 2013).  In that case, an insurer that paid losses associated

18  with an employee's misappropriation of company funds brought a subrogation

19  action against the staffing company who referred the employee, alleging that the

20  staffing company failed to use reasonable care in screening and interviewing the

21  employee, who had a history of prior thefts.  *Id.* at *1–2.  The court held that the

22  insurer could not recover against the staffing company for referring the employee

23  because the staffing company did not participate in the theft itself.  *Id.* at *3.  The

24  court explained that "in order for the fault of the third person to be 'related' to the

25  'primary cause' of the loss, the conduct of the third party must have promoted or

26  encouraged the fraud."  *Id.* at *4.  The court found there were "no facts alleged that

27  [the staffing company] promoted or encouraged [the employee] to misappropriate

28  funds."  *Id.*  Accordingly, the court granted the staffing company's motion to

1  dismiss. *Id*.

2  Here, too, Defendants were not the "primary cause of the loss"; rather, any

3  "loss" was caused by the thieves who stole the vehicles, as the Subrogation Plaintiffs

4  have made clear that they are seeking only to recover for damages caused by

5  criminals—just like the insurers in *Morse* and *Pathways*. CC ¶¶ 4, 17; *Meyers*, 11

6  Cal.2d at 102; *Morse*, 151 Cal. App. 3d at 688; *Pathways*, 2013 WL 485833, *4.

7  Although the Consolidated Complaint tries to downplay the role of the thieves in the

8  loss, the lack of immobilizer in and of itself could not have caused any harm.  Only

9  once the thieves stole the Vehicles did the insureds suffer harm, thereby obligating

10  the Subrogation Plaintiffs to make payments to their insureds.  And the Subrogation

11  Plaintiffs do not (and cannot) allege that Defendants in any way "promoted" or

12  "encouraged" the criminals to steal the vehicles. *Pathways*, 2013 WL 485833, at *3.

13  Moreover, the Subrogation Plaintiffs received premiums to cover the well-

14  known problem of automobile theft and were in a position to avoid their losses.  The

15  Subrogation Plaintiffs had the ability to adjust premiums based on the presence or

16  absence of an immobilizer, and they could have declined coverage altogether if they

17  had determined the risk was too great.  Despite conclusorily alleging that they "could

18  not have reasonably discovered" and "had no way of knowing about" the lack of

19  immobilizer in the Vehicles or the Vehicles' alleged vulnerability to theft, they cite

20  "publicly available information," including "insurance claims" data, which make

21  clear that theft rates were widely available and widely available for years.  CC

22  ¶¶ 324, 331, 367, 369.  It is also implausible for sophisticated insurers to allege that

23  they lacked the information that undoubtedly goes into their calculation of insurance

24  premiums.  And it cannot be ignored that the Subrogation Plaintiffs have collected

25  premiums for these Vehicles since 2011.  In these circumstances, equity bars the

26  Subrogation Plaintiffs from bringing claims on behalf of the insureds against parties

27  that they do not and cannot claim engaged in or encouraged criminal behavior.

28

1
2

      ii.      <u>The Subrogation Plaintiffs' Claims Also Fail Under Other Equitable Doctrines.</u>

3       In addition to the superior equities doctrine, various equitable doctrines bar
4 the Subrogation Plaintiffs from recovering in subrogation. *See, e.g.*, *Calvert Fire*
5 *Ins. Co. v. James*, 114 S.E.2d 832, 836 (S.C. 1960) (because subrogation is "founded
6 in equity," it "may be forfeited by inequitable conduct on [the insurer's] part,"
7 including that "it may be lost by laches, or by conduct giving rise to waiver or
8 estoppel").

9       Laches is particularly applicable here. *See, e.g.*, *Phico Ins. Co. v. Aetna Cas.*
10 *& Sur. Co. of Am.*, 93 F. Supp. 2d 982, 991–92 (S.D. Ind. 2000) (finding that excess
11 insurer's subrogation claims were barred by laches). Laches may bar an action
12 where a defendant can show: "(1) unreasonable delay; and (2) either acquiescence
13 in the act about which plaintiff complains or prejudice to the defendant resulting
14 from the delay." *Julian Volunteer Fire Co. Assn. v. Julian-Cuyamaca Fire Prot.*
15 *Dist.*, 62 Cal. App. 5th 583, 602 (2021), *review denied* (June 30, 2021) (citation and
16 internal quotation marks omitted). Here, the Subrogation Plaintiffs allege that
17 "publicly available information" has reflected high theft rates for the Vehicles since
18 2013. CC ¶¶ 324, 329–30. And given that the Subrogation Plaintiffs insure against
19 the risk of theft, it is implausible for them to allege they could not determine whether
20 the Vehicles lacked immobilizers. In light of their knowledge and decision to
21 continue insuring the Vehicles, they have unreasonably delayed in bringing this
22 action and acquiesced in the issue about which they now complain. Their claims are
23 thus barred by laches.

24       The Court should also find that the Subrogation Plaintiffs' claims are barred
25 by the doctrine of waiver. A plaintiff can be found to waive a claim where it has "an
26 existing right" and "a knowledge of its existence," and engages in "conduct so
27 inconsistent with the intent to enforce the right as to induce a reasonable belief that
28 it has been relinquished." *DuBeck v. California Physicians' Serv.*, 234 Cal. App.

4th 1254, 1265 (2015) (citation and internal quotation marks omitted).  Again, taking as true the allegations of the Consolidated Complaint, "publicly available information" has reflected high theft rates for the Vehicles since 2013, and the Subrogation Plaintiffs cannot plausibly allege they did not know of this information or that the Vehicles lacked immobilizers.  CC ¶¶ 324, 329–30.  By continuing to insure the Vehicles and not bringing suit for 10 years, they have waived their claims.

Accordingly, whether the Court views the equities under the superior equities doctrine, laches, or waiver, the equities weigh heavily against permitting the Subrogation Plaintiffs to bring claims in subrogation, and all their claims should be barred.

## C.    The Subrogation Plaintiffs Did Not Compensate Their Insureds for Losses Caused by Misrepresentation/Omissions.

Because the Subrogation Plaintiffs do not allege that they compensated their insureds for losses caused by alleged misrepresentations/omissions, they cannot bring misrepresentation- and omission-based claims in subrogation.[12]   Put differently, the Subrogation Plaintiffs can only recover for the "same loss" for which they compensated their insureds.  *Dobbas*, 191 Cal. App. 4th at 1450; *see also, e.g.*, *Pat. Scaffolding Co.*, 256 Cal. App. 2d at 511–12 (subrogation claim against a third party requires a "causal relationship between the wrong and the damage"); *Geneva Const. Co. v. Martin Transfer & Storage Co.*, 122 N.E.2d 540, 546 (Ill. 1954) ("[A] person who, pursuant to a legal liability, has paid for a loss or injury resulting from the negligence or wrongful act of another, will be subrogated to the rights of the injured person against such wrongdoer."); *E. States Health & Welfare Fund v. Philip Morris, Inc.*, 11 F. Supp. 2d 384, 397 (S.D.N.Y. 1998) ("to establish a right of subrogation under New York law," "the purported subrogee must have actually

---

[12] For example, as to the California claims, this includes the causes of action for breach of express warranty (under Cal. Comm. Code § 2313, the Song-Beverly Act, and the MMWA), violation of the CLRA, fraud by omission and concealment, and negligent misrepresentation.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

1    made payment to the subrogor for the subrogor's loss.").[13]   Here, the Subrogation
2    Plaintiffs allegedly compensated their insureds for the theft of their Vehicles—not
3    for their having been misled into paying more for their Vehicles than they would
4    have otherwise paid—and therefore the Subrogation Plaintiffs cannot bring claims
5    related to misrepresentations/omissions.

6        Any alleged injury to consumers from misrepresentations/omissions about the
7    anti-theft technology in the Vehicles is purely economic and unrelated to damage
8    from Vehicle theft.   The injury would be that the consumers (arguably) paid more
9    for their vehicles than the vehicles were otherwise worth or that they did not receive
10   the full benefit of their bargain.   Whether considered a "price premium," "benefit of
11   the bargain," or "diminution in value" injury, such injury was *not* shared by the
12   insurers and is not part of the losses the Subrogation Plaintiffs seek to recover.   *See,*
13   *e.g.*, *In re Gerber Prod. Co. Heavy Metals Baby Food Litig.*, No. 21-269, 2022 WL
14   10197651, at *5 (E.D. Va. Oct. 17, 2022) (underlying the benefit of the bargain and
15   price premium theories "is the basic principle that economic harm results when the
16   purchase price of a product exceeds the actual value of the product after taking into
17   account a defendant's improper actions").

18       Here, the Subrogation Plaintiffs seek to recover for their insureds' losses
19   associated with the thefts of their vehicles.   *See, e.g.*, CC ¶ 4 (Subrogation Plaintiffs
20   alleging they "incurred damages and/or losses because their Insureds' Vehicles were
21   stolen, damaged and/or vandalized, for which insurance claims were submitted and
22   paid"); *id.* ¶ 17 ("Due to the Defendants' failure to include the required anti-theft
23   system in the Vehicles, Plaintiffs paid for covered damages sustained by Plaintiffs'
24   Insureds as a result of theft, attempted theft, vandalism or other damage to the
25   Vehicles arising from the Thief Friendly Design, including theft of or damage to
26   other property . . . .").

27
28   _____
     [13] This argument is also based on general subrogation principles that do not vary
     across jurisdictions.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

1    But injuries arising from thefts were subject to a different causal chain than

2  injuries from alleged misrepresentations/omissions.  The Subrogation Plaintiffs are

3  alleging that the "defect" in the Vehicles made the Vehicles more susceptible to

4  theft, and third-party thieves then stole the Vehicles.  That causal chain is already

5  attenuated.  *Cf. Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1283 (C.D. Cal.

6  2016) ("Any injury is . . . attenuated because that risk of harm manifests not because

7  the vehicles malfunction or fail, but rather because of human error . . . .").  However,

8  it is more plausible than the theory that misrepresentations/omissions caused

9  consumers to pay more for the Vehicles than they were worth, which then caused

10  the Vehicles to be stolen.

11    Indeed, courts have recognized a distinction between product defect-based

12  claims—which are premised on harm caused by the product itself—and

13  misrepresentation-based claims—which are premised on an inflation in purchase

14  price.  *Azoulai v. BMW of North America LLC* is instructive.  No. 16-589, 2017 WL

15  1354781 (N.D. Cal. Apr. 13, 2017).  There, the plaintiffs brought consumer fraud

16  claims alleging that the BMW soft close automatic feature was defective because it

17  did not have sensors to detect fingers in the car doors before activating and that

18  BMW unlawfully failed to disclose the alleged defect.  *Id.* at *1.  Although the

19  plaintiffs alleged that they and/or their family members suffered physical injuries

20  from the soft close feature, they did not seek to collect for those injuries under

21  product liability claims.  *Id.* at *2, 4.  The court found that the plaintiffs lacked

22  standing to pursue consumer fraud claims premised on the theory that "they overpaid

23  for their vehicles and the claimed defect caused a diminution in value," and

24  concluded that the plaintiffs' "attempt to hybridize products liability and consumer

25  fraud doctrines . . . fail[ed] because ultimately, under the facts pled, Plaintiffs ha[d]

26  not suffered any injury in fact related to the claims at issue."  *Id.* at *4–5.  This case

27  makes clear that injuries from products liability and consumer fraud (*i.e.*,

28  misrepresentation-based) claims are distinct.

Courts interpreting consumer protection claims from throughout the country have noted this distinction.   *See, e.g.*, *Lassen,* 211 F. Supp. 3d at 1280–81 (distinguishing products liability claims, which require that plaintiffs "experience physical injury to person or property," from consumer fraud claims seeking economic damages from overpayment or diminution in value); *New Hope Pipe Liners, LLC v. Composites One, LCC*, No. 09-3222, 2009 WL 4282644, at *3 (D.N.J. Nov. 30, 2009) (noting that "[t]raditional products liability claims arise out of the situation where a product fails to perform as would ordinarily be expected in the absence of any specific promises made by the seller or manufacturer" whereas "[r]epresentation-based claims . . . deal with the situation where a product does not conform to specific representations made directly to the buyer" and that "representation-based harms are distinct from products liability-type harms"); *Rehberger v. Honeywell Int'l, Inc.*, No. 11-85, 2011 WL 780681, at *3 (M.D. Tenn. Feb. 28, 2011), *on reconsideration in part*, 2012 WL 1951867 (M.D. Tenn. May 30, 2012) ("Here, the relevant harm was the plaintiff's decision to purchase the F50F, which was caused by the defendant's alleged misrepresentations and omissions, not by the product.  Indeed, this harm occurred before the plaintiff ever operated the air cleaner."); *Goldman v. Abbott Lab'ys, Inc.*, No. 01-1312, 2001 WL 1558281, at *4 (N.D. Ill. Dec. 5, 2001) ("economic damages arising from the unfair or deceptive trade practices allegedly engaged in by the defendant are distinct and wholly separate from the financial remedies available for damages caused by the product itself").

Here, the Subrogation Plaintiffs are alleging that the insureds on whose behalf they seek to recover suffered harm when their vehicles were stolen by third-party thieves.  *See, e.g.*, CC ¶¶ 4, 17.  Even if the Court accepts the Subrogation Plaintiffs' defect allegations, the Subrogation Plaintiffs still cannot show that the misrepresentations/omissions caused the thefts.  Because the Subrogation Plaintiffs can only recover for the same loss for which they compensated their insureds, the Subrogation Plaintiffs' claims based on misrepresentations/omissions should be

1    dismissed.  *See Morse*, 151 Cal. App. 3d at 691 (finding that insurer could not

2    succeed in subrogation for antitrust claim because the insurer had "not compensated

3    its insureds for the same losses contemplated under the antitrust claim," as "[n]one

4    of [insurer's] compensation paid to its insured is related to pricing terms of the alarm

5    systems"); *cf. Health Care Serv. Corp.*, 208 F.3d at 581 ("It is unclear why health

6    insurers are entitled to pursue these claims, when (for example) the complaint does

7    not give any reason to believe that the insurers have compensated the insureds for

8    antitrust injury or purchased the right to pursue smokers' antitrust claims.").

9    **II.    The Subrogation Plaintiffs' Claims Are Preempted.**

10          The Subrogation Plaintiffs' claims all seek to impose a duty on Defendants to

11   protect against car theft using one specific technology—engine immobilizers.  That

12   narrow mandate would undercut the flexibility provided by the federal theft-

13   prevention performance standard, FMVSS 114, which gives manufacturers the

14   option to select any anti-theft technology meeting certain criteria.  As NHTSA has

15   explained for decades, its refusal to require particular anti-theft technologies reflects

16   its policy judgment that flexibility will best encourage the development of new theft-

17   prevention technologies.

18          Although the Subrogation Plaintiffs allege that Defendants do not comply

19   with FMVSS 114, there is no legitimate dispute regarding Defendants' compliance.

20   As an initial matter, the Subrogation Plaintiffs acknowledge that (1) automotive

21   companies can employ a "bevy of" theft-protection features, including, but not

22   limited to, immobilizers, to comply with FMVSS 114; and (2) NHTSA has made

23   clear that an immobilizer is only one possible method of compliance with FMVSS

24   114.  CC ¶¶ 285, 293.  Further, NHTSA recently rejected a petition asking it to

25   determine that the Vehicles violate FMVSS 114 because they do not employ engine-

26   immobilizer technology:

27          At this time, NHTSA has not determined that this issue constitutes
             either a safety defect or noncompliance requiring a recall under the
28           National Traffic and Motor Vehicle Safety Act, 49 U.S.C. Chapter 301.

33

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

1

2

3

4

5

> The Federal Motor Vehicle Safety Standard identified in your letter, FMVSS No. 114, does not require an engine immobilizer. *See* 49 C.F.R. § 571.114. Also, the test procedure specified in that standard does not contemplate actions taken by criminal actors to break open or remove part of the steering column and take out the ignition lock to start a vehicle. *See id.* § 571.114, S6. Here, the safety risk arises from unsafe use of a motor vehicle by an unauthorized person after taking significant destructive actions to parts of the vehicle.

6 RJN Ex. 2. Given Defendants' compliance, federal law impliedly preempts any

7 attempt by the Subrogation Plaintiffs to impose through litigation a narrower engine-

8 immobilizer requirement that would interfere with NHTSA's goal to promote

9 flexibility and innovation.

10    Because federal law is "the supreme Law of the Land," U.S. Const. art. VI, it

11 preempts any state law that "stands as an obstacle to the accomplishment and

12 execution of the full purposes and objectives of Congress," *Gade v. Nat. Solid*

13 *Wastes Mgmt. Assn.*, 505 U.S. 88, 98 (1992). That includes state tort rules that

14 "impose legal duties" in "conflict directly with federal regulatory mandates." *Geier*

15 *v. American Honda Motor Co.*, 529 U.S. 861, 871 (2000). Because federal

16 regulations carry out statutory commands, preemption bars any tort claim that would

17 frustrate a "significant objective of [a] federal regulation." *Williamson v. Mazda*

18 *Motor Am.*, 562 U.S. 323, 330 (2011).

19    Unable to plausibly assert non-compliance with FMVSS 114's flexible

20 mandate, the Subrogation Plaintiffs attempt to use state tort law to impose a rigid

21 and specific duty to use engine immobilizers. But that runs headlong into federal

22 preemption rules. In *Geier*, the Supreme Court held that an FMVSS allowing

23 manufacturers to select from a variety of passive restraints preempted a state tort suit

24 premised on a manufacturer's failure to install driver's side airbags. 529 U.S. at 886.

25 That federal standard, FMVSS 208, imposed flexible performance requirements,

26 rather than mandating a particular type of passive restraint, because "a mix of

27 devices would help develop data on comparative effectiveness, would allow the

28 industry time to overcome the safety problems and the high production costs

1  associated with airbags, and would facilitate the development of alternative, cheaper,

2  and safer passive restraint systems." *Id.* at 879. A state tort theory that would have

3  required one specific kind of passive restraint thus "would have stood 'as an obstacle

4  to the accomplishment and execution of' the important . . . federal objectives" of

5  FMVSS 208. *Id.* at 881. In *Williamson*, the Court later clarified that when a federal

6  regulation gives manufacturers options for compliance, it preempts state rules

7  restricting those options when, as in *Geier*, flexibility was a "significant objective"

8  of the regulation. 562 U.S. at 336.

9      Since *Williamson*, courts have found that where "federal law grants an actor

10  'a choice,' and state law 'would restrict that choice,' state law is preempted if

11  preserving 'that choice [was] a significant [federal] regulatory objective.'"

12  *McDaniel v. Wells Fargo Investments*, 717 F.3d 668, 675 (9th Cir. 2013) (citation

13  omitted). For example, a state tort rule requiring automobile manufacturers to use

14  only laminated glass was preempted by FMVSS 205, which allowed *either*

15  laminated *or* tempered glass in light of each glass type's distinctive safety benefits.

16  *See Priester v. Cromer*, 401 S.C. 38 (2012). And federal law likewise preempted a

17  state-law tort duty to anchor seatbelts to automobile frames, since federal regulations

18  recognize that giving manufacturers options for anchoring seatbelts would

19  "encourage the correct use of safety belts and [] increase the overall safety belt usage

20  rate." *Soliman v. Daimler AG*, No. 10-408, 2011 WL 4594313, at *5 (E.D.N.Y.

21  Sept. 30, 2011); *cf. Morris v. Mitsubishi Motors N. Am., Inc.*, 782 F. Supp. 2d 1149,

22  1159–60 (E.D. Wash. 2011) (federal law preempted a tort claim that would have

23  required additional airbag warnings beyond those required by FMVSS 208, as such

24  a duty would frustrate NHTSA's purpose of minimizing "information overload").

25      Here, as in those cases, flexibility is a significant policy objective of NHTSA's

26  anti-theft regulation. NHTSA's anti-theft performance standard, FMVSS 114, aims

27  to "decrease the likelihood that a vehicle is stolen, or accidentally set in motion." 49

28  C.F.R. § 571.114, S2 (2021). FMVSS 114 does not prescribe a particular anti-theft

technology, but instead mandates that a vehicle's starting system prevent (1) "normal activation" of the engine and (2) "steering or forward self-mobility" when the key is removed.  49 C.F.R. § 571.114, S5.1.1 (2021).

NHTSA's Test Procedures for FMVSS 114, which the agency uses to verify compliance, underscore the standard's flexibility.  *See* RJN Ex. 3.  For FMVSS 114's "normal activation" prong, NHTSA directs the tester to start the engine with the key removed; the vehicle passes if the engine will not start.  *Id.* at 16 ("With the key removed from the starting system, attempt to start the vehicle engine or motor."). For the prong requiring prevention of steering or forward self-mobility without a key, the tester determines whether the car can be steered without a key by "rotating the wheel in both directions," whether "forward self-mobility is prevented whenever the key is removed from the starting system," and, if self-mobility is prevented, by what means (*e.g.*, a transmission lock).  *Id.*  Any technology that meets these performance requirements satisfies FMVSS 114—it is the prevention of normal activation and either steering or forward self-mobility that matters, not the means by which manufacturers achieve it.

NHTSA's decision to let manufacturers select among different theft-prevention technologies is not merely a byproduct of the regulatory framework but a significant regulatory objective.  For decades, NHTSA's unbroken position has been that a flexible performance standard best protects against vehicle theft.  Prior to enacting FMVSS 114, NHTSA received "[m]any requests to prescribe "specific theft protection devices," including brake locks and "so-called 'pop-out' keys which automatically eject from the locking system" of a car.  33 Fed. Reg. 6472 (Apr. 24, 1968).  NHTSA declined to mandate those, or any, technologies because "it would be unwise to establish a standard in terms so restrictive as to discourage technological innovation in the field of theft inhibition.  Consequently, the standard has been framed to permit as many specific devices as possible to meet its requirements."  *Id.*

1      NHTSA has repeatedly reaffirmed this objective.  For example, in 1990,

2 NHTSA considered adding certain requirements to FMVSS 114, but when NHTSA

3 asked manufacturers whether its proposed changes "would . . . improperly restrict

4 design flexibility," some responded "that the proposal established overly precise

5 requirements, which would limit new designs and innovations." 55 Fed. Reg. 21869,

6 at 21871 (May 30, 1990).  NHTSA therefore expanded its new rule to identify

7 various alternative mechanisms of compliance.  *Id.* at 21871–72.  And in response

8 to petitions for reconsideration, NHTSA further amended the rule in 1991 and 1992

9 to "provide manufacturers with greater flexibility in designing" their locking and

10 transmission systems to meet the performance standard.  56 Fed. Reg. 12464 (March

11 26, 1991); *see also* 57 Fed. Reg. 2039, 2039–42 (Jan. 17, 1992).

12      NHTSA revised FMVSS 114 again in 2006.  71 Fed. Reg. 17752 (Apr. 7,

13 2006).  NHTSA agreed with a manufacturer's petition that the existing rule used

14 "terminology that was unnecessarily design-restrictive," and therefore elected to

15 broadened the standard at issue.  *Id.* at 17753.

16      Because flexibility and the innovation it drives have always been a

17 "significant objective" of NHTSA's theft-prevention regulation, *Williamson*, 562

18 U.S. at 330, the regulation preempts state tort duties that would undercut that

19 flexibility, eliminate manufacturer choice, and impose rigid technological mandates

20 that NHTSA has rejected.  That is precisely what the Subrogation Plaintiffs' claims

21 would do.  The Subrogation Plaintiffs ask this Court to use state tort law to impose

22 a rigid universal mandate to use a single anti-theft technology, where federal

23 regulators have for decades strived to safeguard manufacturer flexibility.

24      Mandating the use of engine immobilizers is precisely the kind of narrow

25 technological requirement that NHTSA eschewed as "unwise" when it decided to

26 allow "as many specific devices as possible" to satisfy FMVSS 114.  33 Fed. Reg.

27 6472 (Apr. 24, 1968).  For over half a century, NHTSA has adhered to that judgment,

28 safeguarding manufacturer flexibility for reasons similar to its judgment in *Geier*

that technological diversity best fosters innovation and facilitates "the development of alternative, cheaper, and safer" safety technologies. *Geier*, 529 U.S. at 879. That remains the agency's judgment today, as reflected in its June 5 reaffirmation that FMVSS 114 "does not require an engine immobilizer." RJN Ex. 2. The Subrogation Plaintiffs may believe that the agency's judgment is wrong and that engine immobilizers provide theft-protection superior to other technologies FMVSS 114 permits. But their attempt to impose that judgment universally by way of state tort law would directly override NHTSA's longstanding pursuit of flexible safety standards and thus impermissibly impair a "significant objective of [a] federal regulation." *Williamson*, 562 U.S. at 330.

## III.   KC and HMC Should Be Dismissed for Lack of Personal Jurisdiction.

The Consolidated Complaint makes no attempt to allege that this Court has *specific* personal jurisdiction over Defendants. Instead, it only broadly alleges that this Court has "general personal jurisdiction" over all four Defendants. CC ¶ 248. It further alleges that Defendants (without specifying any Defendant in particular) "conduct substantial business in this judicial district, and they intentionally and purposefully placed the Vehicles that are the subject of this action into the stream of commerce within California and elsewhere in the United States." *Id.* But the Consolidated Complaint conspicuously does not allege that KC or HMC is incorporated in California—nor could it. Rather, the Consolidated Complaint expressly avers that KC "is a South Korean corporation with its headquarters located in Seoul, South Korea," and that HMC "is a South Korean corporation with its headquarters located in Seoul, South Korea." *Id.* ¶¶ 29, 36. The Consolidated Complaint similarly fails to allege that KC or HMC has its principal place of business in California. *See id*. ¶ 248.

For corporations like KC and HMC, "the place of incorporation and principal place of business are paradigm bases for general jurisdiction." *Daimler AG*, 571 U.S. at 137 (alterations, citation, and quotation omitted). According to the

Consolidated Complaint's own allegations, however, KC and HMC are both South Korean corporations headquartered in Seoul, South Korea—not California.  CC ¶¶ 29, 36.

The Consolidated Complaint attempts to skirt these "paradigm bases for general jurisdiction" with broad allegations that all four Defendants generally "conduct substantial business" and "intentionally and purposely placed the Vehicles . . . into the stream of commerce within California and elsewhere in the United States."  *Id.* ¶ 248.  These allegations provide the Court with only a "limited snapshot" and "insufficient information for the [C]ourt to analyze whether the entities may be properly considered 'essentially at home' in California."  *Grootonk v. Labrie Env't Grp., LLC*, No. 22-1868, 2023 WL 5420299, at *4 (C.D. Cal. July 20, 2023) (citing *Daimler AG*, 571 U.S. at 139 n.20).  General jurisdiction, after all, "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide."  *Daimler AG*, 571 U.S. at 139 n.20.  "A corporation that operates in many places can scarcely be deemed at home in all of them"; "[o]therwise, 'at home' would be synonymous with 'doing business' . . . ."  *Id.*

The Subrogation Plaintiffs' allegations that HMC and KC use websites to promote vehicles distributed by their U.S. subsidiaries, *see* CC ¶¶ 31, 38, similarly fall short, *see Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1225 (9th Cir. 2011) (holding that California lacked general jurisdiction over a defendant that maintained "highly interactive" website accessible in California); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 243 F. Supp. 2d 1073, 1084 (C.D. Cal. 2003) (court lacked general jurisdiction over defendant who "engage[d] in a continuous stream of commercial contact with the forum state, including provision of its software and execution of licensing agreements with a large number of California residents[,] . . . a website for counting downloads of its software, and in-state legal and public relations representatives").

As such, these allegations—even if credited by the Court—are legally

insufficient to meet general jurisdiction's "exacting standard," *Grootonk*, 2023 WL 5420299, at *3 (citation omitted), or to show that KC and HMC in particular have contacts with California that are "so 'continuous and systematic as to render [them] essentially at home'" in California.  *LNS Enterprises LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858–59 (9th Cir. 2022) (alteration in original) (quoting *Daimler AG*, 571 U.S. at 127).  This Court therefore can and should dismiss KC and HMC for lack of personal jurisdiction.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion and dismiss the Consolidated Complaint in its entirety, with prejudice and without leave to amend.  Defendants further respectfully request that this Court dismiss the Consolidated Complaint as to KC and HMC for lack of personal jurisdiction.

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

1    Dated:  September 8, 2023              JENNER & BLOCK LLP

2

3                                           */s/ Peter J. Brennan*
                                            Kate T. Spelman
                                            Alice S. Kim
4                                           Madeline P. Skitzki
                                            Jenna L. Conwisar
5                                           515 South Flower Street, Suite 3300
                                            Los Angeles, CA  90071-2246
6                                           Telephone:  (213) 239-5100
                                            Facsimile:  (213) 239-5199
7                                           KSpelman@jenner.com
                                            AKim@jenner.com
8                                           MSkitzki@jenner.com
                                            JConwisar@jenner.com
9
                                            Peter J. Brennan (*pro hac vice*)
10                                          Michael T. Brody (*pro hac vice*)
                                            JENNER & BLOCK LLP
11                                          353 North Clark Street
                                            Chicago, IL  60654-3456
12                                          Telephone:  (312) 222-9350
                                            Facsimile:  (312) 527-0484
13                                          PBrennan@jenner.com
                                            MBrody@jenner.com
14
                                            *Attorneys for Defendants*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS SUBROGATION PLAINTIFFS' CONSOLIDATED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Section 5 of Order No. 1, I certify that the parties conferred in a good-faith effort to resolve the matter without court action prior to the filing of this Motion.

Dated: September 8, 2023          JENNER & BLOCK LLP

*/s/ Peter J. Brennan*
_____
Peter J. Brennan

*Attorneys for Defendants*