1  QUINN EMANUEL URQUHART & SULLIVAN LLP
2  Steven G Madison (SBN: 101006)
   stevemadison@quinnemanuel.com
3  Justin Griffin (SBN: 234675)
   justingriffin@quinnemanuel.com
4  865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:  (213) 443-3100

7

8  *Attorneys for Defendants*

9

                    **UNITED STATES DISTRICT COURT**
10
                   **CENTRAL DISTRICT OF CALIFORNIA**
11

12  In re: KIA HYUNDAI VEHICLE          Case No. 8:22-ML-3052-JVS(KESx)
    THEFT MARKETING, SALES
13  PRACTICES, AND PRODUCTS             The Honorable James V. Selna
    LIABILITY LITIGATION
14                                      **DEFENDANTS' NOTICE OF
                                        AND MOTION TO DISMISS
15                                      CONSOLIDATED
                                        GOVERNMENTAL ENTITIES
16                                      COMPLAINT; MEMORANDUM
                                        OF POINTS & AUTHORITIES IN
17  This Document Relates to:           SUPPORT THEREOF**

18  Governmental Entities Actions       Hearing Date: November 13, 2023
19                                      Hearing Time: 3:00 pm

20

21

22

23

24

25

26

27

28

NOTICE IS HEREBY GIVEN that Defendants Kia America, Inc. ("KA"), and Hyundai Motor America ("HMA") (collectively, "Defendants")[1] will and hereby move the above-entitled Court pursuant to Federal Rules of Civil Procedure 12(b)(6) to dismiss the Governmental Entity Plaintiffs' ("GE Plaintiffs") Consolidated Governmental Entities Complaint ("CGEC," Dkt. 175 ).

Defendants' Motion is based on this Notice, the Memorandum of Points and Authorities filed herewith, any additional briefing on the motion (including Defendants' reply brief), the files and records of this case and the related cases centralized in this Multidistrict Litigation, and such argument as is presented to the Court at the hearing on this Motion.

This Motion is made following multiple conferences of counsel pursuant to L.R. 7-3.

DATED:  September 8, 2023

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  /s/ Steven G. Madison
    Steven G. Madison (SBN: 101006)
    stevemadison@quinnemanuel.com
    Justin Griffin (SBN: 234675)
    justingriffin@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
    Telephone:  (213) 443-3000
    Facsimile:   (213) 443-3100

    *Attorneys for Defendants*

---

[1] On September 8, 2023, the Parties filed a joint stipulation by which, *inter alia*, the GE Plaintiffs dismissed their claims against Hyundai Motor Corporation ("HMC") and Kia Corporation ("KC"), Dkt. 216 ¶¶ 7–8, and the Parties stipulated page limits of 70 pages for Defendants' opening brief, 70 pages for the GE Plaintiffs' opposition brief, and 30 page for Defendants' reply brief.

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND ............................................................................................. 4

I. DEFENDANTS' VEHICLES COMPLY WITH FEDERAL LAW AND NHTSA HAS REJECTED PETITIONS TO DECLARE A SAFETY DEFECT OR ORDER A RECALL ................................................................ 4

    A. Neither U.S. Federal Law Nor Regulations Require Immobilizers ........ 4

    B. Defendants' Vehicles Comply With Federal Law And NHTSA Has Found No Safety Defect Requiring A Recall ................................. 6

II. SOCIAL MEDIA, INTERVENING THIRD-PARTY CRIMINALS, AND PLAINTIFFS THEMSELVES CAUSED AN UNPRECEDENTED INCREASE IN THEFT ............................................ 8

    A. Prior To Viral Kia Challenge Defendants' Vehicles Were Stolen Less Than Other Manufacturers' Or Distributors' ................................. 8

    B. Social Media Incites An Unprecedented Craze Of Thefts..................... 9

    C. Theft Epidemic Is Also The Result Of Third-Party Criminals And General Increased Crime Rates............................................................ 11

    D. The GE Plaintiffs' Own Policing And Prosecutorial Policies Further Facilitated The Increased Thefts .............................................. 12

    E. Hyundai And Kia Have Taken And Continue To Take Significant Voluntary Measures To Address The Increased Thefts ...................... 12

PROCEDURAL HISTORY ......................................................................... 14

I. THE CONSUMER ACTIONS AND SETTLEMENT, AND THE SUBROGATION ACTIONS .................................................................... 14

II. THE GOVERNMENTAL ENTITY ACTIONS ........................................... 15

LEGAL STANDARD .................................................................................. 16

ARGUMENT ................................................................................................ 17

I. FEDERAL REGULATIONS LETTING MANUFACTURERS CHOOSE AMONG ANTI-THEFT TECHNOLOGIES PREEMPT PLAINTIFFS' CLAIMS SEEKING TO IMPOSE A DUTY TO INSTALL ENGINE IMMOBILIZERS ......................................................... 17

II. THE GE PLAINTIFFS' CLAIMS FAIL BECAUSE THEIR ALLEGED INJURIES WERE CAUSED BY THE INTERVENING CRIMINAL ACTS OF THIRD-PARTIES......................................................... 21

A.    The Acts Of Car Thieves Are Unforeseeable Superseding Causes Breaking The Causal Chain As A Matter Of Law.................................24

B.    Injuries Allegedly Caused By Unprecedented Social-Media Challenges Are Not Direct Or Foreseeable Consequences Of Vehicle Designs Complying With Federal Anti-Theft Regulations ..........................................................................................................25

III.   THE GE PLAINTIFFS' CLAIMS FAIL BECAUSE DEFENDANTS OWE NO DUTY TO PROTECT LOCAL GOVERNMENTS AGAINST EXPENDITURES NECESSITATED BY THIRD-PARTY CRIMES ..........................................................................................................27

A.    No Special Relationship Obligates Defendants To Protect Local Governments Against Third-Party Criminal Acts .................................29

B.    The Unforeseeability Of The GE Plaintiffs' Injuries Further Weighs Against Imposition Of A Duty ...................................................31

C.    Public Policy Against Limitless Liability Precludes Recognition Of A Duty..........................................................................................33

IV.   ALL GE PLAINTIFFS FAIL TO STATE A CLAIM FOR PUBLIC NUISANCE ..........................................................................................34

A.    No State High Court Would Recognize Public Nuisance Liability Premised Solely On A Product's Alleged Design Defects...................34

1.    No GE Plaintiff's State High Court Has Addressed Public Nuisance Theories Premised Exclusively On Product Design Under Current Law...........................................................35

2.    The GE Plaintiffs' High Courts Would Not Substitute Public Nuisance Law For Product-Liability Law.......................39

3.    Harms From Alleged Design Defects Do Not Implicate A Public Right In Maryland, Missouri, New York, Washington, And Wisconsin ......................................................43

B.    Ohio Plaintiffs' Public Nuisance Claims And Columbus's Statutory Public Nuisance Claim Also Fail For Additional Reasons .........................................................................................48

1.    Ohio Plaintiffs' Public Nuisance Claims Fail Because Federal Law Authorized Defendants' Sale Of Vehicles Without Engine Immobilizers ......................................................48

2.    Ohio Plaintiffs' Absolute Public Nuisance Claims Should Also Be Dismissed Due To Their Failure To Plausibly Allege Intent Or Inherently Dangerous Activity......................50

3.    Columbus's Statutory Public Nuisance Claim Also Fails To Plausibly Allege That Kia Or Hyundai Vehicles Are "Dilapidated, Decayed, Unsafe Or Unsanitary".........................52

V.    GE PLAINTIFFS' REMAINING CLAIMS ALSO FAIL ............................ 53

      A.    Plaintiff Kansas City Cannot State A Violation Of Article IX ............ 53

      B.    Columbus's Civil Liability Claim Fails To Meet Statutory
            Requirements ............................................................................ 54

      C.    The Missouri Plaintiffs Fail To State A Claim For Unjust
            Enrichment ................................................................................ 55

VI.   GE PLAINTIFFS' REQUESTS FOR DAMAGES ARE FORECLOSED
      BY THE MUNICIPAL COST RECOVERY AND ECONOMIC LOSS
      RULES ............................................................................................. 56

      A.    The Municipal Cost Recovery Rule Precludes The New York
            Plaintiffs From Seeking Damages Under All Claims ......................... 56

      B.    The Economic-Loss Rule Forecloses The Ohio And New York
            Plaintiffs' Requests For Damages ................................................. 57

      C.    Plaintiff Columbus Is Not Authorized To Seek Damages Under Its
            Statutory Public Nuisance Claim ................................................. 59

      CONCLUSION ........................................................................................ 60

# TABLE OF AUTHORITIES

**Page**

### Cases

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
   750 N.E.2d 1097 (N.Y. 2001) ..............................................28, 33, 34, 37, 58, 59

*A.M. v. Miami Univ.*,
   88 N.E.3d 1013 (Ohio Ct. App. 2017) ...............................................................29

*Albertson v. State*,
   361 P.3d 808 (Wash. Ct. App. 2015) .................................................................23

*Allen Freight Lines, Inc. v. Consol. Rail Corp.*,
   595 N.E.2d 855 (Ohio 1992) .........................................................................48, 49

*Ashburn v. Anne Arundle Cnty.*,
   510 A.2d 1078 (Md. 1986)..................................................................................29

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................16

*Ashley Cnty. v. Pfizer, Inc.*,
   552 F.3d 659 (8th Cir. 2009) ..............................................................................35

*Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*,
   241 F.3d 696 (9th Cir. 2001)..............................................................................22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................16

*Binkley v. Am. Equity Mortg.*,
   447 S.W.3d 194 (Mo. 2014)................................................................................55

*Bradley v. Ray*,
   904 S.W.2d 302 (Mo. Ct. App. 1995).................................................................29

*Bridges v. Kentucky Stone Co.*,
   425 N.E.2d 125 (Ind. 1981).........................................................................21, 23

*Briehl v. Gen. Motors Corp.*,
   172 F.3d 623 (8th Cir. 1999) ..............................................................................54

*Brown v. Scioto Cnty. Bd. of Comm'rs*,
    622 N.E.2d 1153 (Ohio Ct. App. 1993) ..................................................48, 49, 50

*Burns v. Black & Veatch Architects, Inc.*,
    854 S.W.2d 450 (Mo. Ct. App. 1993) ...........................................................28

*Casper v. Am. Int'l S. Ins. Co.*,
    800 N.W.2d 880 (Wis. 2011) .......................................................................23, 24

*Cefalu v. Cont'l W. Ins. Co.*,
    703 N.W.2d 743 (Wis. 2005) ........................................................................23

*Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ................................................................22, 30, 38

*City of Chicago v. Beretta U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004)......................................................35, 43, 44, 46, 47

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
    863 F.3d 474 (6th Cir. 2017) ..................................................................50, 57, 58

*City of Cleveland v. Ameriquest Mort. Sec., Inc.*,
    615 F.3d 496 (6th Cir. 2010) ................................................................23, 26, 27

*City of Cleveland v. Ameriquest Mort. Sec., Inc.*,
    621 F. Supp. 2d 513 (N.D. Ohio 2009) ....................................28, 48, 49, 50, 58

*City of Columbus v. Reiner*,
    108 N.E.3d 719 (Ohio Ct. App. 2018) ..........................................................52

*City of Gary ex rel. King*,
    801 N.E.2d 1222 (Ind. 2003)........................................................................35, 36

*City of Kansas City v. N.Y.-Kan. Bldg. Assocs., L.P.*,
    96 S.W.3d 846 (Mo. Ct. App. 2002) .............................................................44

*City of Madison v. Hyundai Motor America et al.*,
    No. 8:23-cv-00555 (C.D. Cal.) (Mar. 27, 2023) ..........................................11

*City of Milwaukee v. NL Industries, Inc.*,
    691 N.W.2d 888 (Wis. Ct. App. 2004)..........................................................39

*City of Mingo Junction v. Sheline*,
    196 N.E. 897 (Ohio 1935) ...........................................................................48, 49

*City of New York v. Hyundai Motor America et al.*,
  No. 1:23-cv-04772 (S.D.N.Y.) (Jun. 6, 2023)......................................................11

*City of Philadelphia v. Beretta U.S.A. Corp.*,
  277 F.3d 415 (3d Cir. 2002) ................................................................................35

*City of Rochester v. Hyundai Motor America et al.*,
  No. 8:23-cv-00736 (C.D. Cal.) (Apr. 28, 2023)...........................................10, 11

*City of Seattle v. Monsanto*,
  237 F. Supp. 3d 1096 (W.D. Wash. 2017) (Washington)..................................28

*City of St. Louis v. Benjamin Moore & Co.*,
  226 S.W.3d 110 (Mo. 2007)................................................................................22

*City of St. Louis v. Cernicek*,
  2003 WL 22533578 (Mo. Cir. Ct. Oct. 15, 2013)...............................................55

*City of St. Louis v. Kia America et al.*,
  No. 4:23-cv-00379 (E.D. Mo.) (March 27, 2023)................................................8

*City of St. Louis v. Varahi, Inc.*,
  39 S.W.3d 531 (Mo. Ct. App. 2001) (Missouri) ................................................28

*City of Yonkers v. Hyundai Motor America et al.*,
  No. 8:23-cv-01182 (C.D. Cal.) (Jun. 30, 2023) (Dkt. 1)...................................11

*Cleveland v. JP Morgan Chase Bank*,
  2013 WL 1183332 (Ohio Ct. App. 2013) ...........................................................58

*Cnty of Erie, N.Y. v. Colgan Air, Inc.*,
  2012 WL 1029542 (W.D.N.Y. Mar. 26, 2012), *aff'd*, 711 F.3d 147
  (2d Cir. 2013) .....................................................................................................57

*Cnty. of Santa Clara v. Atl. Richfield Co.*,
  40 Cal.Rptr.3d 313 (Cal. Ct. App. 2006) .....................................................35, 36

*Cofield v. Lead Indus., Ass'n, Inc.*,
  2000 WL 34292681 (D. Md. Aug. 17, 2000)......................................................37

*Detroit Bd. of Educ. v. Celotex Corp.*,
  493 N.W.2d 513, 521 (Mich. Ct. pp. 1992) .................................................35, 41

*Dix v. Motor Mkt., Inc.*,
  540 S.W.2d 927 (Mo. Ct. App. 1976) ................................................................24

*Duke v. Missouri Pac. R.R. Co.*,
  303 S.W.2d 613 (Mo. 1957) ................................................................ 23

*Estate of Ciotto v. Hinkle*,
  145 N.E.3d 1013 (Ohio Ct. App. 2019) ............................................... 31

*Fandrey ex rel. Connell v. Am. Fam. Mut. Ins. Co.*,
  680 N.W.2d 345 (Wis. 2004) .............................................. 22, 31, 33

*Fast Trak Investment Co., LLC v. Sax*,
  962 F.3d 455 (9th Cir. 2020) ............................................................... 34

*Gade v. Nat. Solid Wastes Mgmt. Assn.*,
  505 U.S. 88 (1992) ............................................................................... 17

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000) ....................................................................... 17, 18

*Golden v. Diocese of Buffalo*,
  125 N.Y.S.3d 813 (N.Y. App. Div. 2020) ............................................. 44

*Goodwin v. Yeakle's Sports Bar and Grill, Inc.*,
  62 N.E.3d 384 (Ind. 2016) ........................................... 28, 31, 32, 33

*Hain v. Jamison*,
  68 N.E.3d 1233 (N.Y. 2016) ......................................................... 22, 23

*Hamilton v. Beretta U.S.A. Corp.*,
  750 N.E.2d 1055 (N.Y. 2001) ....................................................... 28, 29, 33

*Hansen v. Friend*,
  824 P.2d 483 (Wash. 1992) .................................................................. 28

*Hargis v. Lankford*,
  372 S.W.3d 82 (Mo. Ct. App. 2012) ................................................... 23

*Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*,
  642 A.2d 219 (Md. 1994) ..................................................................... 25

*Hartley v. State*,
  698 P.2d 77 (Wash. 1985) .................................................................... 23

*Hoffman v. Union Elec. Co.*,
  176 S.W.3d 706 (Mo. 2005) ................................................................ 22

*Horn v. B.A.S.S.*,
 92 F.3d 609 (8th Cir. 1996) ........................................................................... 25, 26

*Howard v. Kiskiel*,
 544 N.Y.S.2d 91 (N.Y. App. Div. 1989) ............................................................ 24

*Howard v. Turnbull*,
 316 S.W.3d 431 (Mo. Ct. App. 2010) ................................................................ 55

*In re Firearm Cases*,
 24 Cal. Rptr. 3d 659 (Cal. Ct. App. 2005) ........................................................ 42

*In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*,
 966 F. Supp. 1525 (E.D. Mo. 1997) .................................................................. 54

*In re Kia Hyundai Vehicle Theft Litig.*,
 MDL No. 3052, 2022 WL 17843100 (J.P.M.L. Dec. 13, 2022) ........................ 14

*In re Lead Paint Litig.*,
 924 A.2d 484 (N.J. 2007) .................................................................................. 35

*Inskeep v. Columbus Zoological Park Ass'n*,
 207 N.E.3d 876 (Ohio Ct. App. 2023) .............................................................. 23

*Jankee v. Clark County*,
 612 N.W.2d 297 (Wis. 2000) ............................................................................ 29

*KB Home Ind. Inc. v. Rockville TBD Corp.*,
 928 N.E.2d 297 (Ind. Ct. App. 2010) .......................................................... 28, 31

*Kearns v. Ford Motor Co.*,
 567 F.3d 1120 (9th Cir. 2009) ........................................................................... 54

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ....................................................................... 16, 17

*Kim v. Budget Rent A Car Systems, Inc.*,
 15 P.3d 1283 (Wash. 2001) .......................................................................... 29, 30

*Kiste v. Red Cab, Inc.*,
 106 N.E.2d 395 (Ind. App. 1952) ................................................................. 24, 25

*Koch v. Consolidated Edison Co. of NY*,
 468 N.E.2d 1 (N.Y. 1984) ........................................................................... 56, 57

*Little v. Union Trust Co. of Md.*,
   412 A.2d 1251 (Md. Ct. Spec. App. 1980) .......................................................... 28

*Madden v. C & K Barbecue Carryout, Inc.*,
   758 S.W.2d 59 (Mo. 1988) .............................................................................. 31

*McDaniel v. Wells Fargo Investments*,
   717 F.3d 668 (9th Cir. 2013) .......................................................................... 19

*McGuiness v. Brink's Inc.*
   60 F. Supp. 2d 496 (D. Md. 1999) .................................................................. 23

*McKown v. Simon Property Group, Inc.*,
   344 P.3d 661 (Wash. 2015) ............................................................................ 31

*Meihost v. Meihost*,
   139 N.W.2d 116 (Wis. 1966) .......................................................................... 25

*Metzger v. Pennsylvania, O. & D. R. Co.*,
   66 N.E.2d 203 (Ohio 1946) ............................................................................ 52

*Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*,
   691 N.W.2d 658 (Wis. 2005) ..................................................................... 39, 44

*Mitchell v. Rite Aid of Md., Inc.*,
   290 A.3d 1125 (Md. 2023) .............................................................................. 22

*Moore v. Steve's Outboard Serv.*,
   339 P.3d 169 (Wash. 2014) ............................................................................ 39

*Morris v. Mitsubishi Motors N. Am., Inc.*,
   782 F. Supp. 2d 1149 (E.D. Wash. 2011) ...................................................... 19

*N. Pac. R.R. Co. v. Whalen*,
   17 P. 890 (Wash. 1888) ............................................................................. 39, 45

*Neal v. IAB Financial Bank*,
   68 N.E.3d 1114 (Ind. Ct. App. 2017) ............................................................ 29

*Nottke v. Norfolk S. Ry. Co.*,
   264 F. Supp. 3d 859 (N.D. Ohio 2017) .......................................................... 50

*Patton v. United States of Am. Rugby Football*,
   851 A.2d 566 (Md. 2004) ........................................................................... 31, 33

*Penelas v. Arms Tech., Inc.*,
    778 So.2d 1042 (Fla. Ct. App. 2001) ........................................................... 35, 42

*People v. Sturm, Ruger & Co.*,
    761 N.Y.S.2d 192 (N.Y. App. Div. 2003) ........................... 22, 23, 26, 28, 37, 38

*Pratt v. Thomas*,
    491 P.2d 1285 (Wash. 1971) ............................................................................. 24

*Priester v. Cromer*,
    736 S.E.2d 249 (S.C. 2012) .............................................................................. 19

*Pulka v. Edelman*,
    358 N.E.2d 1019 (N.Y. 1976) ........................................................................... 31

*R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*,
    959 F.3d 509 (2d Cir. 2020) ........................................................................ 58, 59

*Rardon v. Falcon Safety Prods., Inc.*,
    2021 WL 2008923 (W.D. Mo. May 4, 2021) ............................................. 37, 47

*Rosenberg v. Shostak*,
    405 S.W.3d 8 (Mo. Ct. App. 2013) ................................................................... 22

*Ross v. Nutt*,
    203 N.E.2d 118 (Ohio 1964) ............................................................................ 24

*S. California Inst. of L. v. State Bar of California*,
    2014 WL 11822789 (C.D. Cal. 2014) ............................................................... 17

*Sand Creek Partners, L.P. v. Finch*,
    647 N.E.2d 1149 (Ind. Ct. App. 1995) ........................................................ 21, 22

*Schooley v. Ingersoll Rand, Inc.*,
    631 N.E.2d 932 (Ind. Ct. App. 1994) ............................................................... 22

*Smith v. City of Sedalia*,
    53 S.W. 907 (Mo. 1899) ............................................................................. 43, 45

*Soliman v. Daimler AG*,
    2011 WL 4594313 (E.D.N.Y. 2011) ................................................................. 19

*Southwestern Bell Telephone Co. v. United Video Cablevision of St. Louis, Inc.*,
    737 S.W.2d 474 (Mo. Ct. App. 1987) ............................................................... 56

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ............................................................ 17

*State ex rel. Columbus City Attorney v. Gjessing et al.*,
   No. 2017-EVH-60423 (Ohio Mun. Ct. Jun. 7, 2017) ................................ 52, 53

*State ex rel. Columbus City Attorney v. Southpark Pres. Ltd. P'ship et
   al.*,
   No. 22-EVH-060590 (Ohio Mun. Ct. Aug. 29, 2022) ....................................... 52

*State ex rel. Dresser Indus., Inc. v. Ruddy*,
   592 S.W.2d 789 (Mo. 1980) ............................................................ 37

*State ex rel. Hunter v. Johnson & Johnson*,
   499 P.3d 719 (Okla. 2021) ............................................. 35, 41, 42, 44, 46

*State ex rel. R.T.G., Inc. v. State*,
   780 N.E.2d 998 (Ohio 2002) ............................................................ 50, 52

*State ex rel Wear v. Springfield Gas & Elec. Co.*,
   204 S.W.942 (Mo. Ct. App. 1918) ............................................................ 43, 44

*State v. Exxon Mobil Corp.*,
   406 F. Supp.3d 420 (D. Md. 2019) ............................................................ 21

*State v. Lead Indus. Ass'n, Inc.*,
   951 A.2d 428 (R.I. 2008) .................................................... 35, 41, 43, 46

*State v. Waterloo Stock Car Raceway, Inc.*,
   409 N.Y.S.2d 40 (N.Y. Sup. Ct. 1978) .................................................... 43, 45

*Stephenson v. Universal Metrics, Inc.*,
   641 N.W.2d 158 (Wisc. 2002) ............................................................ 28

*Sutowski v. Eli Lilly & Co.*,
   696 N.E.2d 187 (Ohio 1998) ............................................................ 22

*Tadjer v. Montgomery Cnty.*,
   479 A.2d 1321 (Md. 1984) ............................................................ 37, 44

*Tapia Carmona v. Cnty. of San Mateo*,
   2019 WL 4345973 (N.D. Cal. 2019) ............................................................ 17

*Taylor v. Stevens Cnty.*,
   759 P.2d 447 (Wash. 1988) ............................................................ 22

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

*Tioga Public Sch. Dist. #15 of Williams Cnty. v. U.S. Gypsum Co.*,
  984 F.2d 915 (8th Cir. 1993) .................................................................. 35

*Travelers Cas. & Sur. Co. v. Dormitory Authority-State of NY*,
  734 F. Supp. 2d 368 (S.D.N.Y. 2010) ..................................................... 58

*Valentine v. On Target, Inc.*,
  686 A.2d 636 (Md. Ct. Spec. App. 1996) ............................................... 23

*Valentine v. On Target, Inc.*,
  727 A.2d 947 (Md. 1999) ....................................................................... 28

*Vandenbosch v. Daily*,
  785 N.E.2d 666 (Ind. 2003) ................................................................... 22

*Wallace v. Ohio Dep't of Com.*,
  773 N.E.2d 1018 (Ohio 2002) ........................................................... 22, 28

*Webber v. Armslist, LLC*,
  70 F. 4th 945 (7th Cir. 2023) ............................................................ 26, 28

*Williamson v. Mazda Motor Am.*,
  562 U.S. 323 (2011) ...................................................................... 18, 19, 21

*Winffel v. Westfield Prop. Mgmt., LLC*,
  2022 WL 1591405 (D. Md. May 19, 2022) ............................................ 29

## **Statutes**

49 U.S.C. § 105(c) ..................................................................................... 4, 5

49 U.S.C. § 331 ............................................................................................. 5

49 U.S.C. § 3011(a) ...................................................................................... 7

Columbus City Codes § 701.19 ........................................................ 52, 55, 59

Columbus City Codes § 701.99 ................................................................... 54

Columbus City Codes § 703.17 ................................................................... 52

Ind. Code Ann. § 32-30-6-7(b) ................................................................... 16

Ind. Code Ann. § 32-30-6-6 ........................................................................ 36

N.Y. Penal Law § 100.05.................................................................................27

N.Y. Penal Law § 115.000...............................................................................27

National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 301 ..................... 4, 7

Ohio Revised Code § 2307.60(A)(1)...............................................15, 16, 22, 54, 55

Ohio Revised Code § 2307.71(A)(13)...............................................................38, 40

Ohio Revised Code § 2307.71(B).........................................................................40

Ohio Revised Code § 715.44.........................................................................16, 59

Ohio Revised Code § 7.48.010 *et seq*........................................................16, 39

Revised Code of Washington 7.48.120 ..............................................................39

Revised Code of Washington 7.48.130 ..............................................................39

Revised Code of Washington 7.48.140 ..............................................................44

Revised Code of Washington 7.72.010(4)............................................................41

Wis. Stat. § 823.01.........................................................................................16

## **Other Authorities**

49 C.F.R. § 571.114, S1................................................................................ 5

49 C.F.R. § 571.114 S2................................................................................ 5, 19

49 C.F.R. § 571.114, S5.1.1....................................................................... 5, 19, 50

33 Fed. Reg. 6471, 6472 (Apr. 24, 1968)..........................................................6, 20

55 Fed. Reg. 21869, 21871 (May 30, 1990).............................................................20

56 Fed. Reg. 12464 (Mar. 26, 1991) ..................................................................21

57 Fed. Reg. 2039, 2039–42 (Jan. 17, 1992)........................................................21

71 Fed. Reg. 17752 (Apr. 7, 2006)....................................................................21

71 Fed. Reg. 17752, 17753 (Apr. 7, 2006).......................................................6, 50

81 Fed. Reg. 66833, 66835 (Sept. 29, 2016)........................................................6

32 A.L.R. 6th 261, § 1 ............................................................................... 57

32 A.L.R. 6th 261, § 2 ............................................................................... 57

Donald G. Giffords, *Public Nuisance as a Mass Products Liability
Tort*, 71 U. Cin. L. Rev. 741, 748 (2003) ............................................ 40

Restatement (Second) Torts § 821B cmt. g ............................... 37, 43, 44, 45, 46, 47

Restatement (Second) of Torts § 821C(1), (2)(a) .................................... 43

Restatement (Third) of Torts: Liab. For Econ. Harm § 8 cmt. g ............................ 35

Fed. R. Civ. P. 9(b) ................................................................................. 54

U.S. Const. art. VI ................................................................................... 17

Victor E. Schwartz & Phil Goldberg, *The Law of Public Nuisance:
Maintaining Rational Boundaries on a Rational Tort*, 45 Washburn
L. Rev. 541, 580 (2006) ..................................................................... 42

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

# **PRELIMINARY STATEMENT[1]**

Beginning in 2020, an unprecedented wave of auto thefts proliferated in the U.S. as videos posted on social media demonstrated how to steal certain Kia and Hyundai models and depicted thefts and ensuing joyrides.  The videos were not security or police footage; they were made and posted by the perpetrators themselves with the social media platforms permitting the posting of criminal activity.  The thieves, who came to be known as the "Kia Boyz," encouraged others to also steal Hyundai and Kia models and post videos of their own thefts and joyrides.  Begun in Milwaukee and referred to thereafter as the "Kia Challenge," the thefts are performative in nature: unlike traditional car thefts carried out to get away from the scene of another crime or illegally "fence" the car for money, the object of these thefts is simply to post videos on social media accounts to attract "likes" and notoriety.  Until this extraordinary social-media craze, the vehicles at issue had been sold and driven without incident for almost a decade.

There are more than 5,000 cities in the United States, and over 300 cities with populations greater than 100,000.  In the Consolidated Governmental Entities Complaint ("CGEC"), 17 plaintiff cities ("GE Plaintiffs") attempt to blame these thefts on the decisions of Defendants Hyundai Motor America ("HMA") and Kia America ("KA") to not equip certain standard models with specific theft-prevention technology—principally, an engine immobilizer.  All 17 GE Plaintiffs claim that through this product-design choice, HMA and KA have created a "public nuisance"

---

[1] On September 8, 2023, the GE Plaintiffs and Defendants HMA, KA, Hyundai Motor Company ("HMC"), and Kia Corporation ("KC") filed a joint stipulation and proposed order regarding the CGEC.  *See* Dkt. 216, Stipulation re Consolidated Governmental Entities Complaint, [PROPOSED] Order.  Per the stipulation, the GE Plaintiffs dismiss without prejudice the CGEC and the underlying complaints against Defendants HMC and KC.  *See id.* ¶¶ 7–8.  The Parties also stipulated to the following page limits for HMA's and KA's memorandum of points and authorities in support of their motion to dismiss, the GE Plaintiffs' opposition memorandum, and HMA and KA's reply memorandum: 70 pages, 70 pages, and 30 pages, respectively.

that they must now "abate," and 15 of the 17 sue for negligence as well.  Some of the GE Plaintiffs raise other assorted claims under their states' laws, and one includes a claim under a local municipal ordinance.  Importantly, GE Plaintiffs indisputably may not recover damages allegedly incurred by their residents; only the residents themselves have standing to seek any such remedies, and their claims are being resolved in the consumer class action settlement pending approval by this Court.  The GE Plaintiffs thus purport to seek just their own damages—municipal spending that they attribute to car thefts and additional crimes—and "abatement" of the alleged public nuisance.

As shown in detail below, the CGEC should be dismissed in its entirety, without leave to amend, for the following reasons.

**First,** all the GE Plaintiffs' claims fail under the doctrine of federal preemption.  The U.S. Department of Transportation's National Highway Traffic Safety Administration ("NHTSA"), which administers the federal standards regulating automobile anti-theft and safety measures, has never required cars to be equipped with immobilizer technology.  Instead, NHTSA has sought to promote innovation through a performance standard that any number of theft-prevention technologies can satisfy.  This is a uniform nationwide standard that all of the Hyundai and Kia models in question undisputedly comply with.  Removing any doubt, less than two months before the filing of the CGEC, NHTSA rejected a request by 18 state Attorneys General to recall the Hyundai and Kia vehicles in question, reiterating that federal regulations do not require cars to be equipped with engine immobilizers.  GE Plaintiffs' claims would not only impose a rigid immobilizer duty that federal law rejects but would also undermine the design flexibility that NHTSA's standard purposefully seeks to promote.  Federal law preempts such interferences with federal regulatory objectives.

**Second,** proximate cause is required for liability to attach on any of GE Plaintiffs' claims.  But the CGEC itself makes clear that the increased thefts of the

Hyundais and Kias at issue were proximately caused by the intervening actions of social media users promoting intentional criminal conduct and third-party actors willfully engaging in such intentional criminal conduct.  The seven states whose laws govern the GE Plaintiffs' claims all reject tort liability for injuries caused by unforeseeable criminal conduct.  In all seven states, black-letter law applying that rule rejects liability for harms proximately caused by the criminal conduct of car thieves. But the rule applies with particular force where the intervening car thefts are precipitated by a literally unprecedented social media crime spree.  Regrettably, even the GE Plaintiff cities' (1) lax policing and prosecution policies, and (2) budgetary decision-making that diverted public safety resources away from the prevention and disruption of auto theft and reckless joyriding, occupies a more proximate intervening role in causing the alleged harm than the car companies' production of automobiles that comply fully with all federal motor vehicle safety and anti-theft standards.

**Finally,** Defendants owe no duty to protect local governments against the costs of responding to crime; the state laws at issue bar the GE Plaintiffs' attempt to expand public-nuisance law to regulate product design or to punish conduct complying with a comprehensive federal regulatory regime; the municipal cost recovery doctrine and economic loss doctrine bar the remedies sought; and particular provisions of the laws of the states and cities represented by GE Plaintiffs render the claims fatally defective, all of which provide additional grounds for dismissal of the CGEC.

As this Court is well aware, Defendants have committed significant time, energy, and resources since the "Challenge" proliferated to do right by consumers in providing additional theft prevention devices and software upgrades, initially voluntarily and then as part of the proposed settlement of the consumer class actions. GE Plaintiffs' residents have benefitted and will benefit from these unprecedented efforts.  With all due respect to the elected and appointed officials of the 17 GE Plaintiff cities, their claims against HMA and KA are a misdirected overreach, and the CGEC should be dismissed.

## BACKGROUND[2]

**I.    DEFENDANTS' VEHICLES COMPLY WITH FEDERAL LAW AND NHTSA HAS REJECTED PETITIONS TO DECLARE A SAFETY DEFECT OR ORDER A RECALL**

HMA and KA are American automobile distributors headquartered in California.  CGEC ¶¶ 55, 57.  Korean-based companies HMC and KC own HMA and KA, respectively.  *Id*. ¶¶ 54, 56.  HMA and KA, together with their Korean parent companies, are part of the Hyundai Motor Group ("HMG").  *Id*. ¶ 54.  HMA and KA market, sell, lease, and oversee regulatory compliance and warranty claims for Hyundai- and Kia-branded vehicles through a network of over 1,500 dealers throughout the United States.  *Id.* ¶¶ 55, 57.  Over the last three decades, HMA and KA have sold millions of safe vehicles to Americans.  *Id.* ¶ 21.  Indeed, 100% of Kia models since 2011 and over 98% of Hyundai models since 2011 have received an "Overall Rating" of 4 out of 5 stars (or higher) on the U.S. government's safety ratings.[3]  In addition, through their U.S.-based headquarters, offices, dealerships, and manufacturing plants, HMA and KA employ thousands of Americans.

**A.    Neither U.S. Federal Law Nor Regulations Require Immobilizers**

NHTSA is exclusively vested with authority to regulate automobile safety and security nationally under federal law.  *See* CGEC ¶¶ 63–64; *see also* 49 U.S.C. § 105. Federal law, including the National Traffic and Motor Vehicle Safety Act (the "Motor Vehicle Safety Act"), 49 U.S.C. § 301, and the Motor Vehicle Theft Law Enforcement Act (the "Theft Act"), 49 U.S.C. § 331, and regulations promulgated thereunder by NHTSA, govern motor vehicle safety and anti-theft performance standards.  *See* CGEC ¶¶ 61, 63–64; *see also* 49 U.S.C. § 105(c).

---

[2] The allegations of the CGEC described herein are accepted as true for pleading purposes only.

[3] *See* RJN Ex. 1, National Highway Traffic and Safety Administration 5-Star Safety Ratings, https://www.nhtsa.gov/ratings.

In 1968, NHTSA promulgated Federal Motor Vehicle Safety Standard ("FMVSS") 114, which imposes two anti-theft performance requirements intended to "reduce the incidence of crashes resulting from theft" and "decrease the likelihood that a vehicle is stolen." *See* CGEC ¶¶ 63–64; *see also* 49 C.F.R. § 571.114, S1 & S2. To comply with FMVSS 114, vehicles must have a starting system that, when the key is removed, prevents: (1) "normal activation of the vehicle's engine or motor"; and (2) steering, forward self-mobility, or both. CGEC ¶ 64; 49 C.F.R. § 571.114, S5.1.1.[4] This standard does not require vehicles to be 100 percent impenetrable to thieves. *See* CGEC ¶ 64; *see also* 49 C.F.R. § 571.114, S1 & S2.

Although the electric immobilizer was invented in 1919, CGEC ¶ 58, neither FMVSS 114, nor any other U.S. federal law or regulation, mandated the installation of immobilizers when FMVSS 114 was issued in 1968, *id.* ¶ 66. When the modern passive vehicle immobilizer was invented in 1993, *id.* ¶¶ 69–71—a time when vehicle theft rates were *four times higher than they are today*, *id.* ¶ 68—NHTSA did not mandate its use. Nor did NHTSA mandate the use of immobilizers in the late 1990s when regulators in other countries, including Australia, Canada, and New Zealand, made them mandatory. *Id.* ¶ 72.

In the 50-plus years since the introduction of FMVSS 114, NHTSA has made numerous changes and modifications to the standard, but never required immobilizers to be installed as standard equipment in vehicles sold in the U.S. *Id.* ¶ 23; 81 Fed.

---

[4] For the "normal activation" prong, NHTSA directs the tester to start the engine with the key removed; the vehicle passes if the engine will not start. RJN Ex. 2, Laboratory Test Procedure for FMVSS 114, at 16 (July 28, 2010), https://www.nhtsa.gov/ sites/nhtsa.gov/files/documents/tp-114-04_tag.pdf ("With the key removed from the starting system, attempt to start the vehicle engine or motor."). For the prong requiring prevention of steering or forward self-mobility without a key, the tester determines whether the car can be steered without a key by "rotating the wheel in both directions," whether "forward self-mobility is prevented whenever the key is removed from the starting system," and, if self-mobility is prevented, by what means (*e.g.*, a transmission lock). *Id.*

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

Reg. 66833, 66835 (Sept. 29, 2016) (NHTSA describing that the U.S., unlike Canada, does *not* require immobilizers).   Rather, NHTSA maintains that automobile manufacturers should have a *choice* in the anti-theft technology they adopt.   When FMVSS 114 was enacted, the agency explicitly *rejected* requests to prescribe "specific theft protection devices," because "it would be unwise to establish a standard in terms so restrictive as to discourage technological innovation in the field of theft inhibition." 33 Fed. Reg. 6471, 6472 (1968).   As such, "the standard has been framed to permit as many specific devices as possible to meet its requirements." *Id.*   And NHTSA has continued to prioritize manufacturer choice in subsequent amendments to FMVSS 114.  *See, e.g.*, 71 Fed. Reg. 17752, 17753 (Apr. 7, 2006) (amending FMVSS 114 "to allow manufacturers *greater flexibility* in designing their override devices and to allow manufacturers the choice to use electronic theft prevention devices, *such as* immobilizers, instead of using steering locks, *if they desire*" (emphases added)).

## B.      Defendants' Vehicles Comply With Federal Law And NHTSA Has Found No Safety Defect Requiring A Recall

GE Plaintiffs allege that Defendants designed, manufactured, and distributed vehicles without engine immobilizers, *up to twelve years ago*, and such vehicles were the subject of an unprecedented epidemic of vehicle thefts that began in 2020 and has significantly impacted law enforcement operations, emergency services, and public safety *in 2023*.  *See, e.g.*, CGEC ¶¶ 3, 4, 13, 104, 109, 112.   The CGEC includes no allegations, however, that Hyundai and Kia vehicles themselves are unsafe, or fail to comply with any applicable laws or regulations.

In fact, on April 20, 2023, 18 state Attorneys General—including the Attorneys General of several home states of cities who have sued HMA and KA—wrote to NHTSA (the "State AGs' Recall Request") asking the agency to

> use its authority to institute a recall of unsafe Hyundai and Kia
> vehicles manufactured between 2011 and 2022 whose easily-

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

bypassed ignition switches and lack of engine immobilizers make them particularly vulnerable to theft.[5]

While the CGEC cites and quotes the State AG Letter, the GE Plaintiffs fail to mention NHTSA's response.   The omission is disappointing but understandable: NHTSA unequivocally rejected the State AGs' Recall Request.  In its response of June 5, 2023 ("NHTSA Response")[6]—three weeks before the GE Plaintiffs filed the CGEC— NHTSA flatly rejected the state Attorneys General's (and the GE Plaintiffs') contention that the lack of engine immobilizers in Defendants' vehicles violates FMVSS:

> At this time, NHTSA has not determined that this issue constitutes either a safety defect or noncompliance requiring a recall under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. Chapter 301. . . . FMVSS No. 114, does not require an engine immobilizer . . . .[7]

RJN Ex. 3, NHTSA Response at 2.  NHTSA added that "[h]ere, the safety risk arises from unsafe use of a motor vehicle by an unauthorized person after taking significant destructive actions to parts of the vehicle."  *Id.*  In light of the NHTSA Response, GE

---

[5] State AGs' Recall Request, April 20, 2023 (cited at CGEC ¶¶ 102 & n.73, 107, 107 nn. 80, 81), *available at* https://oag.ca.gov/system/files/attachments/press-docs/4-20-23%20NHTSA%20Recall%20to%20Hyundai%20and%20Kia.pdf.

[6] RJN Ex. 3, NHTSA Response.

[7] Indeed, federal law requires that NHTSA notify a manufacturer "immediately after making an initial decision" that a vehicle "contains a defect related to motor vehicle safety or does not comply with" an FMVSS requirement, 49 U.S.C. §3011(a), and NHTSA maintains a public website to notify the public when NHTSA or a manufacturer has determined a vehicle has a safety-related defect or does not comply with FMVSS.  *See* RJN Ex. 5, "Safety Issues and Recalls," https://www.nhtsa.gov/recalls#:~:text=A%20recall%20is%20issued%20when%20a%20manufacturer%20or,by%20manufacturers%20prior%20to%20any%20involvement%20by%20NHTSA, last accessed Sept. 8, 2023.  NHTSA has never made such a determination here.

---

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

Plaintiffs appear to have sanitized the CGEC of prior complaints' allegations that Defendants' vehicles had a safety defect or violated FMVSS 114.[8]

## II.   SOCIAL MEDIA, INTERVENING THIRD-PARTY CRIMINALS, AND PLAINTIFFS THEMSELVES CAUSED AN UNPRECEDENTED INCREASE IN THEFT

### A.   Prior To Viral Kia Challenge Defendants' Vehicles Were Stolen Less Than Other Manufacturers' Or Distributors'

The CGEC includes no allegations that, *before* late 2020 (or in many cities, even later), either the general public or Defendants were aware of the multi-step process required to steal Defendants' vehicles (a theft procedure that the Kia Boyz promoted through social media), or that Defendants' vehicles were stolen at higher rates relative to other manufacturers or distributors. *See* CGEC ¶¶ 113, 126, 132, 135, 137, 153, 164, 206, 225, 243, 253 (graphics depicting relatively few Hyundai and Kia thefts until social media trend began). On the contrary, Defendants' vehicles have not historically been the subject of significant theft. Various charts included in the CGEC show that thefts of Hyundai and Kia vehicles made up a tiny fraction of overall thefts relative to thefts of other manufacturers' or distributors' vehicles before fall 2022. For example, Buffalo's chart, CGEC at p. 84, which purports to reflect the combined percentage of Kia and Hyundai auto thefts in Buffalo between January 2020 and January 2023, alleges that Hyundais and Kias (even combined) made up a miniscule

---

[8] *See*, *e.g.*, *City of Cleveland v. Hyundai Motor America et al*., No. 8:23-cv-00419 (C.D. Cal.) (Mar. 7, 2023) (Dkt. 1) at 80 ("Defendants' failure to include an engine immobilizer, or a substitute system capable of satisfying FMVSS 114, violates that law"); *City of Columbus, Ohio v. Kia America, Inc. et al*., No. 2:23-cv-00654 (S.D. Ohio) (Feb. 16, 2023) (Dkt. 3) at 92 ("[Defendants] also failed to comply with statutory, regulatory, and other safety requirements, including the minimum safety regulations for motor vehicle performance and anti-theft protection"); *City of Kansas City v. Hyundai Motor America et al*., No. 4:23-cv-00399 (W.D. Mo.) (June 12, 2023) (Dkt. 1) at 64 ("[T]he vehicles do not comply with Federal Motor Vehicle Safety Standard 114"); *City of St. Louis v. Kia America et al*., No. 4:23-cv-00379 (E.D. Mo.) (Mar. 27, 2023) (Dkt. 1) at 89 ("The lack of an effective engine immobilizing system in vehicles was a latent defect").

---

1  fraction of overall car thefts in Buffalo from 2020 through July 2022, and that thefts

2  of Hyundais and Kias remained flat during that period.[9]

3  **B.    Social Media Incites An Unprecedented Craze Of Thefts**

4      The GE Plaintiffs allege that the theft epidemic underlying their claims began

5  in Milwaukee in late 2020, when the "Kia Boyz" started posting "'how-to' videos" on

6  social media platforms—some of which did not even exist when many of the Hyundai

7  and Kia vehicles targeted were manufactured.  RJN Ex. 5, Certificate of Amendment

8  changing musical.ly Inc. to TikTok Inc. in May, 2019);  CGEC ¶¶ 84, 85, 91.  These

9  videos of criminal activity, which the social media platforms permitted to be posted,

10 provided step-by-step instructions demonstrating how to steal Hyundai and Kia

11 vehicles.  *See*, *e.g.*, RJN Ex. 7, Greg Rosalsky, *Someone stole my truck. I got a crash*

12 *course on the wild black market for stolen cars*, NPR (Aug. 23, 2022) (cited at CGEC

13 ¶ 84 n.44).  The videos then "challenge[] teens to steal a car off the street" in a

14 "coordinated effort."  RJN Ex. 8, Chris DiLella & Andrea Day, *TikTok challenge*

15 *spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022) (cited at CGEC ¶ 84

16 n.45).

17     Even according to the GE Plaintiffs' own allegations, the unprecedented

18 increase in Hyundai and Kia thefts arose out of this viral social media "challenge,"

19 which began almost a decade after some of these vehicles were manufactured and

20 sold, and publicized a little-known means of criminal theft.  CGEC ¶¶ 84–85

21 ("skyrocket[ing]" "explosion" of thefts of Hyundais and Kias "was all too predictable"

22 following the Kia Boyz' "trending" videos detailing theft "how-to"); ¶ 91 (social

23 media platforms "rife" with videos encouraging joyriding and reckless driving); ¶ 137

24

25 ───────────────
   [9] *See also id.* pp. 43–44 (Madison), pp. 46–47 (Green Bay), pp. 48, 54–55 (Columbus),
26 pp. 56–57 (Cleveland), pp. 61–63 (Cincinnati), p. 80 (St. Louis), pp. 92–93 (New
   York City), and pp. 97–98 (Tonawanda); *see also id.* pp. 35–36 (Milwaukee reflecting
27 low and flat Kia and Hyundai thefts prior to 2021, because Kia Boyz videos originated
28 in Milwaukee earlier than other cities).

("rise of car thefts in Columbus began in late 2021, fueled in the summer of 2022 when viral online trends publicized Kia's and Hyundai's security flaws"); ¶ 153 (similar in Cleveland until mid-2022); ¶ 162 (same for Cincinnati); ¶ 175 (same for Parma); ¶ 193 ("Seattle Police Department shows a rapid increase in thefts of Hyundai and Kia vehicles starting in July 2022, coinciding with the release of popular TikTok tutorial videos explaining the exploit").  This is borne out in the articles the GE Plaintiffs cite in the CGEC, which acknowledge that the Kia Boyz videos led to a "viral craze on TikTok," or TikTok "challenge," RJN Ex. 8, Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022) (cited at CGEC ¶ 84 n.45), which even Plaintiff New York's Police Department patrol chief has explained "*is definitely, without a doubt, driving that issue,*" RJN Ex. 9, Lauren Leffer, *NYPD to Hand Out 500 Free Air Tags as Car Thefts Rise*, Yahoo! News (May 1, 2023) (cited at CGEC ¶ 247 n.178) (emphasis added).[10]

The CGEC conspicuously omits allegations from the GE Plaintiffs' prior complaints detailing social media's pivotal role in unleashing the Kia Challenge theft wave.[11]  But, as detailed above, the central importance of that intervening conduct

---

[10] Notably, several plaintiffs fail to allege any *overall* increase in car thefts in their cities, and instead allege only that *Kia/Hyundai* thefts increased.  *See*, *e.g.*, CGEC ¶¶ 126–131 (Madison); ¶¶ 249–52 (Yonkers); ¶ 259 (Indianapolis alleging that "total vehicle theft generally has been on the decline since 2021").

[11] *See*, *e.g.*, *City of Columbus, Ohio v. Kia America, Inc. et al.*, No. 2:23-cv-00654 (S.D. Ohio) (Feb. 16, 2023) (Dkt. 3) at 63-64 ("This past spring/summer, the 'Kia Challenge' began on TikTok.  The challenge was a contest to determine who could steal the most Kia and Hyundai vehicles" and "[t]his challenge inspired an unprecedented and dramatic wave of car thefts nationwide"); *City of Cleveland v. Hyundai Motor America et al.*, No. 8:23-cv-00419 (C.D. Cal) (Mar. 7, 2023) (Dkt. 1) at 3 ("TikTok and news videos teaching the relative ease with which Hyundai and Kia vehicles can be stolen have gone viral"); *City of Cincinnati v. Hyundai Motor America et al.*, No. 2:23-cv-01750 (C.D. Cal.) (Mar. 8, 2023) (Dkt. 1) at 3 (same); *City of Parma v. Hyundai Motor* America et al., No. 1:23-cv-01360 (N.D. Ohio) (Jul. 13, 2023) (Dkt. 1) at 3 (same); *City of Rochester v. Hyundai Motor America et al.*, No.

remains inescapable in both the GE Plaintiffs' surviving allegations and the many news articles that the CGEC incorporates by reference.

### C. Theft Epidemic Is Also The Result Of Third-Party Criminals And General Increased Crime Rates

Spurred on by the recent viral videos and the ensuing social media "challenge," the GE Plaintiffs allege that third-party criminals have embarked on an unprecedented wave of Hyundai and Kia car thefts.  The GE Plaintiffs further detail several tragic incidents involving third-party criminals who chose to steal a car and then chose to drive that car recklessly, *see*, *e.g.*, CGEC ¶¶ 90, 91, or in some instances to commit other crimes while in a stolen vehicle, *see*, *e.g.*, *id.* ¶¶ 92, 93.  The GE Plaintiffs do not and cannot allege that Defendants were involved in negligent or reckless driving, or in any of the subsequent crimes alleged in the CGEC.

In addition, the alleged increase in thefts of Hyundai and Kia vehicles has taken place against a backdrop of increased overall crime.  Rates of vehicle thefts "were already trending upwards before these vehicles became popular targets."  RJN Ex. 10, Ernesto Lopez *et al*., *Crime Trends in U.S. Cities: Mid-Year 2023 Update*, Council Crim. Just. (July 2023) (cited at CGEC ¶ 100 n.68).  "Automotive crime [was] up across the board [in 2022]."  RJN Ex. 11, Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia*, Truth About Cars (Sept. 20, 2022) (cited at CGEC ¶ 85 n.48).

---

8:23-cv-00736 (C.D. Cal.) (Apr. 28, 2023) (Dkt. 1) at 3 (same); *City of Buffalo v. Hyundai Motor America et al*., No. 8:23-cv-00572 (C.D. Cal.) (Mar. 30, 2023) (Dkt. 1) at 3 (same); *City of Yonkers v. Hyundai Motor America et al*., No. 8:23-cv-01182 (C.D. Cal.) (Jun. 30, 2023) (Dkt. 1) at 3 (same); *City of New York v. Hyundai Motor America et al*., No. 1:23-cv-04772 (S.D.N.Y.) (Jun. 6, 2023) (Dkt. 1) at 3 (same); *City of Madison v. Hyundai Motor America et al*., No. 8:23-cv-00555 (C.D. Cal.) (Mar. 27, 2023) (Dkt. 1) at 3 (same).

**D.    The GE Plaintiffs' Own Policing And Prosecutorial Policies Further Facilitated The Increased Thefts**

The GE Plaintiffs' CGEC further acknowledges that the GE Plaintiffs' own policing and prosecutorial policies contributed to the craze of thefts since late 2020. The sources the GE Plaintiffs rely upon for their allegations explain that many GE Plaintiffs failed to thoroughly investigate car thefts or to arrest or prosecute perpetrators.  *Compare* CGEC pp. 36, 37 (although overall car thefts more than doubled from approximately 4,500 to 10,500 from 2020 to 2021, arrests for these crimes increased only increased from 745 to 1,061).

When police do apprehend car thieves, the CGEC's sources explain, the GE Plaintiffs often choose not to prosecute them.  In fact, Milwaukee Mayor Tom Barrett has admitted that only two percent of car theft suspects are prosecuted.  RJN Ex. 12, James Gilboy, *Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, The Drive (Dec. 11, 2021) (cited at CGEC ¶ 10 n.3).

The GE Plaintiffs' lax policies have also led to a pattern of recidivism, with many individuals committing car theft numerous times.  *Id*. ¶ 124 (acknowledging that there are "repeat thieves" in Milwaukee), ¶ 140 (acknowledging "[y]et another repeat offender" in Columbus); *see also* RJN Ex. 14, Kayla Canne, *Lawsuit against Kia, Hyundai to be filed by Rochester*, Rochester Democrat & Chron., (Apr. 24, 2023) (cited at CGEC ¶ 230 n.166) (Rochester juvenile was arrested in eight different car thefts across the country).

**E.    Hyundai And Kia Have Taken And Continue To Take Significant Voluntary Measures To Address The Increased Thefts**

As the GE Plaintiffs acknowledge, Hyundai and Kia have taken sizable, voluntary steps towards mitigating the theft epidemic.

First, Defendants made immobilizers standard equipment on all new vehicles as of late 2021, which means that most 2022 model-year vehicles, RJN Ex. 14, Elliot Hughes, *Kia, Hyundai will make security features standard on new vehicles and*

*distribute free steering wheel locks after surge of thefts*, Milwaukee J. Sentinel (July 19, 2021) (cited at CGEC ¶ 101 n.70), and all 2023 model-year vehicles, CGEC ¶ 8, will include immobilizers.

Second, Defendants distributed free steering wheel locks to affected communities. *Id.* ¶ 101. From November 2022 to February 2023, Hyundai and Kia "work[ed] with law enforcement agencies to provide more than 26,000 steering wheel locks . . . to 77 law enforcement agencies in 12 states." RJN Ex. 4, *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023) (cited at CGEC ¶ 102 n.72). In the words of the Milwaukee Police Department, "[b]oth Hyundai and Kia have been very receptive and *immediately* began working on a solution . . . MPD appreciates their responsiveness and commitment to addressing the auto thefts plaguing our community." RJN Ex. 13, Elliot Hughes, *Kia, Hyundai will make security features standard on new vehicles and distribute free steering wheel locks after surge of thefts*, Milwaukee J. Sentinel (July 19, 2021) (cited at CGEC ¶ 101 n.70) (emphasis added).

Third, Defendants voluntarily developed a software upgrade. CGEC ¶ 102. "Hyundai and Kia have developed theft deterrent software for millions of their vehicles that lack an immobilizer and will provide it FREE of charge to vehicle owners. The software updates the theft alarm software logic to extend the length of the alarm sound from 30 seconds to one minute and requires the key to be in the ignition switch to turn the vehicle on." RJN Ex. 4, *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023) (cited at CGEC ¶ 102 n.72). By May 2023, installations reached 6,000 per day. RJN Ex. 15, Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, AP News (May 9, 2023) (cited at CGEC ¶ 104 n.75). This software upgrade was announced in February 2023, before all but one of the GE Plaintiffs here filed suit.

Furthermore, Hyundai and Kia have continued efforts to remove the inciting videos from social media. "But as new ones surface . . . there have been additional waves of thefts." *Id.*

## PROCEDURAL HISTORY

### I.   THE CONSUMER ACTIONS AND SETTLEMENT, AND THE SUBROGATION ACTIONS

This multi-district litigation began with the filing of an individual consumer action, *Marvin v. Kia America, Inc.*, in the Circuit Court of Milwaukee County, Wisconsin on June 23, 2021 (later removed to U.S. District Court for the Eastern District of Wisconsin), alleging that security features on certain Hyundai and Kia vehicles were inadequate.  That lawsuit was followed by other individual and proposed consumer class actions making substantially the same allegations, and in December 2022 the U.S. Judicial Panel on Multidistrict Litigation (the "JPML") consolidated all of those consumer actions into a single multidistrict proceeding.  *See In re Kia Hyundai Vehicle Theft Litig.*, MDL No. 3052, 2022 WL 17843100, at *1 (J.P.M.L. Dec. 13, 2022).  Those consumer plaintiffs generally asserted claims for (1) violation of state consumer protection statutes based on both alleged misrepresentations and omissions, (2) breach of implied warranty, (3) fraud by omission and concealment, and (4) unjust enrichment.

On May 18, 2023, following months of negotiations, the consumer plaintiffs and Defendants filed a joint stipulation informing the Court of a settlement-in-principle of the consumer class action claims, valued at over $200 million.  Dkt. 107. On July 20, 2023 those parties moved for preliminary approval of the nationwide class settlement. Dkt. 111, 166.  While this Court has initially denied preliminary approval, Dkt. 200, the parties are scheduled to file a renewed motion addressing the Court's comments on September 27, 2023.  Dkt. 213.

Beginning in and around March 2023, automobile insurers began filing complaints against Defendants, including for (1) breach of implied and express

warranty, (2) violations of consumer protection statutes, (3) fraud by omission and concealment, and (4) negligence and negligent misrepresentations. These subrogation plaintiffs filed a consolidated complaint on July 28, 2023, pursuant to this Court's Order No. 12, and the motion to dismiss that complaint will be briefed separately.

## II.     THE GOVERNMENTAL ENTITY ACTIONS

On January 23, 2023, Seattle sued HMA and KA in the Western District of Washington and filed a tag-along notice in the JPML proceeding (MDL 3052) the next day. JPML, MDL No. 3052, Dkt. 121. Over the next several months, the cities of Baltimore, MD, Buffalo, NY, Cincinnati, OH, Cleveland, OH, Columbus, OH, Indianapolis, IN, Kansas City, MO, Madison, WI, Milwaukee, WI, New York, NY, Parma, OH, Rochester, NY, St. Louis, MO, and Yonkers, NY followed suit. Each of those complaints was filed either directly in the Central District of California, or within the cities' home districts, after which they were coordinated in this MDL.

The cities thereafter filed their CGEC on July 28, 2023, adding HMC and KC as defendants for the first time. Dkt. 175. Green Bay, WI, and Tonawanda, NY also joined the CGEC as plaintiffs for the first time, not having previously filed their own cases either directly, or in their home districts. The 17 GE Plaintiffs generally assert claims for negligence and statutory and/or common law public nuisance. *Id.* ¶¶ 263–532. In addition, St. Louis and Kansas City assert claims for unjust enrichment, Kansas City alleges a violation of a local ordinance, and Columbus brings a claim for civil liability based on a violation of section 2307.60 of the Ohio Civil Code. *Id.* ¶¶ 381–88, 438–59. The GE Plaintiffs thereafter stipulated to the dismissal of HMC and KC. Dkt. 216.

Defendants move to dismiss all of the claims, as follows:

**Maryland (Baltimore):** common law public nuisance (*id.* ¶¶ 389–99).

**Missouri (Kansas City and St. Louis):** (1) common law public nuisance (*id.* ¶¶ 420–30); (2) negligence (*id.* ¶¶ 431–37); (3) unjust enrichment (*id.* ¶¶ 438–448); (4) violation of city ordinance Article IX – Consumer Protection, §§ 50-291 – 50-305

(brought by Kansas City only) (*id.* ¶¶ 449–59).

**New York (Buffalo, Rochester, New York City, Yonkers, and Tonawanda):** (1) common law public nuisance (*id.* ¶¶ 460–73); (2) negligence (*id.* ¶¶ 474–95).

**Ohio (Columbus, Cleveland, Cincinnati, and Parma):** (1) common law absolute public nuisance (*id.* ¶¶ 302–25); (2) common law qualified public nuisance (*id.* ¶¶ 326–47); (3) negligence (*id.* ¶¶ 348–72); (4) public nuisance pursuant to Section 715.44 of the Ohio Revised Code (brought by Columbus only) (*id.* ¶¶ 373–80); (5) Civil Liability pursuant to Section 2307.60(A)(1) of the Ohio Rev. Code (brought by Columbus only) (*id.* ¶¶ 381–88).

**Wisconsin (Green Bay, Madison, Milwaukee):** (1) public nuisance pursuant to Wis. Stat. § 823.01 and common law (*id.* ¶¶ 263–81); (2) negligence (*id.* ¶¶ 282–301).

**Indiana (Indianapolis):** (1) public nuisance pursuant to Ind. Code Ann. § 32-30-6-7(b) (*id.* ¶¶ 496–511); (2) negligence (*id.* ¶¶ 512–32).

**Washington (Seattle):** (1) public nuisance pursuant to Wash. Rev. Code ("RCW") § 7.48.010 *et seq.* and common law (*id.* ¶¶ 400–19).

## <u>LEGAL STANDARD</u>

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (again quoting *Twombly*, 550 U.S. at 555). Rather, the plaintiff must "allege more by way of factual content to 'nudg[e]' his claim" of unlawful action "across the line from conceivable to plausible." *Id.* at 683 (quoting *Twombly*, 550 U.S. at 570).

In ruling on a motion to dismiss, a court may consider: (1) all material within the pleadings; (2) documents incorporated into the complaint by reference; and (3) matters of which a court may take judicial notice. *Khoja v. Orexigen Therapeutics,*

*Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  "When a written instrument or subject of judicial notice contradicts allegations in a complaint to which it is attached, the Court need not accept the allegations of the complaint as true."  *S. California Inst. of L. v. State Bar of California*, 2014 WL 11822789, at *1 (C.D. Cal.  2014) (Selna, D.J.) (internal citation omitted); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  In addition, "[g]eneral, conclusory allegations need not be credited [] when they are belied by more specific allegations of the complaint." *Tapia Carmona v. Cnty. of San Mateo*, 2019 WL 4345973, at *9 (N.D. Cal. 2019) (citations omitted).

## ARGUMENT

**I. FEDERAL REGULATIONS LETTING MANUFACTURERS CHOOSE AMONG ANTI-THEFT TECHNOLOGIES PREEMPT PLAINTIFFS' CLAIMS SEEKING TO IMPOSE A DUTY TO INSTALL ENGINE IMMOBILIZERS**

The GE Plaintiffs' claims all seek to impose a duty on Hyundai and Kia to protect against car theft using one specific technology—engine immobilizers.  That narrow mandate would undercut the design flexibility provided by the federal theft-prevention performance standard, FMVSS 114, which gives manufacturers the option to select any anti-theft technology meeting certain performance criteria.  As NHTSA has explained for decades, its refusal to require particular anti-theft technologies reflects its policy judgment that flexibility will best encourage the development of new theft-prevention technologies over time.  Federal law impliedly preempts the GE Plaintiffs from countermanding that judgment by imposing a narrow engine-immobilizer requirement.

Because federal law is "the supreme Law of the Land," U.S. Const. art. VI, it preempts any state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Gade v. Nat. Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 98 (1992).  That includes state tort rules that "impose legal duties" in "conflict with federal regulatory mandates." *Geier v. American Honda*

*Motor Co.,* 529 U.S. 861, 871 (2000).   Federal regulations carry out statutory commands, and so preempt any tort claim that would frustrate a "significant objective of [a] federal regulation." *Williamson v. Mazda Motor Am.*, 562 U.S. 323, 330 (2011).

The GE Plaintiffs do not dispute that Hyundai and Kia have always complied fully with FMVSS 114, which they concede can be satisfied by various technologies. *See* CGEC ¶ 67 (characterizing immobilizers only as "the most effective way" to satisfy FMVSS 114).  In particular, the GE Plaintiffs do not allege that the vehicles at issue lack either ignition locks that prevent normal activation or steering-column locks that prevent steering without a key. *Id.* ¶¶ 63–82.  In fact, as referenced above, *supra* Background I.B., in June 2023, NHTSA rejected a petition asking it to determine that the vehicles violate FMVSS 114, disagreeing with Attorneys General who contended Hyundai and Kia vehicles violated FMVSS 114 because they did not employ engine-immobilizer technology.  NHTSA Response, at 1–2.  The agency explicitly stated: "FMVSS No. 114 [] does not require an engine immobilizer."  *Id.*

Unable to assert non-compliance with FMVSS 114's flexible mandate, the GE Plaintiffs attempt to use state tort law to impose a rigid duty to use engine immobilizers.  But that runs headlong into federal preemption rules.  In *Geier v. American Honda Motor Co.*, the Supreme Court held that an FMVSS allowing manufacturers to select from a variety of passive restraints preempted a state tort suit premised on a manufacturer's failure to install driver's side airbags. 529 U.S. at 886. That federal standard, FMVSS 208, imposed flexible performance requirements, rather than mandating a particular type of passive restraint, because "a mix of devices would help develop data on comparative effectiveness, would allow the industry time to overcome the safety problems and the high production costs associated with airbags, and would facilitate the development of alternative, cheaper, and safer passive restraint systems."  *Id.* at 879.  A state tort theory mandating one specific kind of passive restraint thus would "st[and] 'as an obstacle to the accomplishment and execution of' the important … federal objectives" of FMVSS 208.  *Id.* at 881.  In

1   *Williamson*, the Court later clarified that when a federal regulation gives

2   manufacturers options for compliance, it preempts state rules restricting those options

3   when, as in *Geier*, flexibility was a "significant objective" of the regulation.  562 U.S.

4   at 336.

5       Since *Williamson*, courts have found that where "federal law grants an actor 'a

6   choice,' and state law 'would restrict that choice,' state law is preempted if preserving

7   'that choice [was] a significant [federal] regulatory objective.'"  *McDaniel v. Wells*

8   *Fargo Investments*, 717 F.3d 668, 675 (9th Cir. 2013).  For example, a state tort rule

9   requiring auto manufacturers to use only laminated glass was preempted by FMVSS

10  205, which allowed **either** laminated **or** tempered glass in light of each glass type's

11  distinctive safety benefits.  *Priester v. Cromer*, 736 S.E.2d 249, 260 (S.C. 2012).  And

12  federal law likewise preempted a state-law tort duty to anchor seatbelts to automobile

13  frames, since federal regulations recognize that giving manufacturers options for

14  anchoring seatbelts would "encourage the correct use of safety belts and [] increase

15  the overall safety belt usage rate."  *Soliman v. Daimler AG*, 2011 WL 4594313, at *5

16  (E.D.N.Y. 2011); *cf. Morris v. Mitsubishi Motors N. Am., Inc.*, 782 F. Supp. 2d 1149,

17  1159–60 (E.D. Wash. 2011) (federal law preempted a tort claim that would have

18  required additional airbag warnings beyond those required by FMVSS 208, as such a

19  duty would frustrate NHTSA's purpose of minimizing "information overload").

20      Here, as in those cases, flexibility is a significant objective of NHTSA's anti-

21  theft regulation.  NHTSA's anti-theft safety standard, FMVSS 114, aims to "decrease

22  the likelihood that a vehicle is stolen, or accidentally set in motion."  49 C.F.R.

23  § 571.114 S2 (2021).  As described in detail above, FMVSS 114 does not prescribe a

24  particular anti-theft technology, but instead mandates that a vehicle's starting system

25  prevent (1) "normal activation" of the engine and (2) "steering or forward self-

26  mobility" when the key is removed.  *See* 49 C.F.R. § 571.114 S5.1.1 (2021).  Any

27  technology that meets these performance requirements—whether an immobilizer or

28  something else—satisfies FMVSS 114.  NHTSA's Test Procedures for FMVSS 114,

which the agency uses to verify compliance, underscore the standard's flexibility.  By testing compliance by reference to objective criteria, such as whether the car engine starts or the steering wheel can rotate when the key is removed, the Test Procedures clearly contemplate that a range of technologies may satisfy FMVSS 114.[12]

NHTSA's decision to let manufacturers select among different theft-prevention technologies is not merely a byproduct of the regulatory framework but a significant regulatory objective.  For decades, NHTSA's unbroken position has been that a flexible performance standard best protects against vehicle theft.  Prior to enacting FMVSS 114, NHTSA received "many" requests to prescribe "specific theft protection devices," including brake locks and "so-called 'pop-out' keys which automatically eject from the locking system" of a car.  33 Fed. Reg. 6471, 6472 (Apr. 24, 1968).  NHTSA declined to mandate those, or any, technologies because "it would be unwise to establish a standard in terms so restrictive as to discourage technological innovation in the field of theft inhibition.  Consequently, the standard has been framed to permit as many specific devices as possible to meet its requirements."  *Id.*

NHTSA has repeatedly reaffirmed this objective since.  For example, in 1990, NHTSA considered adding certain requirements to FMVSS 114, but when NHTSA asked manufacturers whether its proposed changes "would . . . improperly restrict design flexibility," some responded "that the proposal established overly precise requirements, which would limit new designs and innovations."  55 Fed. Reg. 21869, 21871 (May 30, 1990).  NHTSA therefore expanded its new rule to identify various alternative mechanisms of compliance.  *Id.* at 21871–72.  And in response to petitions for reconsideration, NHTSA further amended the rule in 1991 and 1992 to "provide manufacturers with greater flexibility in designing" their locking and transmission systems to meet the performance standard.  56 Fed. Reg. 12464 (Mar. 26, 1991); *see*

---

[12] RJN Ex. 2, NHTSA, Laboratory Test Procedure for FMVSS 114, at 4, 16 (July 28, 2010), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/tp-114-04_tag.pdf.

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

1   *also* 57 Fed. Reg. 2039, 2039–42 (Jan. 17, 1992).  NHTSA revised FMVSS 114 again

2   in 2006.  71 Fed. Reg. 17752 (Apr. 7, 2006).  NHTSA agreed with a manufacturer's

3   petition that the existing rule used "terminology that was unnecessarily design-

4   restrictive," and therefore elected to broaden the standard at issue.  *Id.* at 17753.

5        Because flexibility and the innovation it drives have always been a "significant

6   objective" of NHTSA's theft-prevention regulation, *Williamson*, 562 U.S. at 330, the

7   regulation preempts state tort duties that would undercut that flexibility, eliminate

8   manufacturer choice, and impose rigid technological mandates that NHTSA has

9   rejected.  That is precisely what the GE Plaintiffs' claims would do.  The GE Plaintiffs

10   argue that Hyundai and Kia violated a duty of care because they allegedly failed "to

11   install an industry-standard immobilization anti-theft device," CGEC ¶ 9, and the GE

12   Plaintiffs' causes of action seek to hold the companies liable for "forgoing the

13   installation of engine immobilizers."  *See id.* ¶¶ 83, 274, 285, 316, 334, 352, 416, 466,

14   478, 504, 515.  The GE Plaintiffs would thus have this Court use state tort law to

15   impose a universal mandate to use a single anti-theft technology, where federal

16   regulators have for decades strived to safeguard manufacturer design flexibility.  The

17   GE Plaintiffs may believe that NHTSA's judgment is wrong and that engine

18   immobilizers provide theft-protection superior to other technologies FMVSS 114

19   permits.  But their attempt to impose that judgment in lieu of NHTSA's, universally

20   and by way of state tort law, would directly override NHTSA's longstanding pursuit

21   of flexible safety standards and thus impermissibly impair a "significant objective of

22   [a] federal regulation."  *Williamson*, 562 U.S. at 330.

23   **II.  THE GE PLAINTIFFS' CLAIMS FAIL BECAUSE THEIR ALLEGED**
24   **INJURIES WERE CAUSED BY THE INTERVENING CRIMINAL ACTS OF THIRD-PARTIES**

25        The GE Plaintiffs fail to plead proximate causation as required to state a claim

26   for public nuisance or negligence.  *See State v. Exxon Mobil Corp.*, 406 F. Supp. 3d

27   420, 452 (D. Md. 2019) (public nuisance); *Bridges v. Kentucky Stone Co.*, 425 N.E.2d

28   125, 126 (Ind. 1981) (negligence); *Sand Creek Partners, L.P. v. Finch*, 647 N.E.2d

1149, 1153 (Ind. Ct. App. 1995) (public nuisance); *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113 (Mo. 2007) (negligence and public nuisance); *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1147–48 (Ohio 2002) (negligence and public nuisance); Ohio Revised Code § 2307.60(A)(1) (civil liability); *Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696, 706–07 (9th Cir. 2001) (public nuisance); *Fandrey ex rel. Connell v. Am. Fam. Mut. Ins. Co.*, 680 N.W.2d 345, 351 (Wis. 2004) (negligence and public nuisance); *Taylor v. Stevens Cnty.*, 759 P.2d 447, 452 (Wash. 1988); *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. 2005); *Wallace v. Ohio Dep't of Com.*, 773 N.E.2d 1018, 1031 (Ohio 2002); *Hain v. Jamison*, 68 N.E.3d 1233, 1236–37 (N.Y. 2016) (negligence); *People v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192. 201–02 (N.Y. App. Div. 2003) (public nuisance).

Although proximate cause standards for the GE Plaintiffs' tort claims vary slightly by state in non-material aspects, each jurisdiction emphasizes familiar concepts such as directness, natural and probable consequences, and foreseeability. *See, e.g.*, *Vandenbosch v. Daily*, 785 N.E.2d 666, 671 (Ind. 2003) ("A party's act is the proximate cause of an injury if it is the natural and probable consequence of the act and should have been reasonably foreseen . . . ."); *Mitchell v. Rite Aid of Md., Inc.*, 290 A.3d 1125, 1152 (Md. 2023); *Rosenberg v. Shostak*, 405 S.W.3d 8, 18 (Mo. Ct. App. 2013); *Hain*, 68 N.E.3d at 1237; *Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187, 190 (Ohio 1998); *Philip Morris*, 241 F.3d at 706–07 (Washington law); *Fandrey*, 680 N.W.2d at 351 (Wis. 2004) (each applying similar concepts).

As a corollary of those principles, in each state, liability does not attach where a third-party's unforeseeable intervening act breaks the chain of causation between the defendant's conduct and the plaintiff's injury.  *See, e.g.*, *Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 937 (Ind. Ct. App. 1994) ("The intervening act or omission of a third party will not operate to defeat recovery from the defendant if the act or omission would necessarily, or might reasonably, have been foreseen by the

defendant."); *Valentine v. On Target, Inc.*, 686 A.2d 636, 642 (Md. Ct. Spec. App. 1996); *Hargis v. Lankford*, 372 S.W.3d 82, 87 (Mo. Ct. App. 2012); *Inskeep v. Columbus Zoological Park Ass'n*, 207 N.E.3d 876, 883 (Ohio Ct. App. 2023); *Hain*, 68 N.E.3d at 1237; *Albertson v. State*, 361 P.3d 808, 814 (Wash. Ct. App. 2015); *Cefalu v. Cont'l W. Ins. Co.*, 703 N.W.2d 743, 750 (Wis. 2005) (similar).   Cases illustrating that textbook principle in each jurisdiction are legion.   *See, e.g.*, *Bridges*, 425 N.E.2d at 127 (Indiana) (no proximate cause against dynamite company for negligent storage where the dynamite's theft and detonation three weeks later were not "a natural and probable consequence which . . . should reasonably have been foreseen"); *McGuiness v. Brink's Inc.* 60 F. Supp. 2d 496, 499 (D. Md. 1999) (Maryland law) (no proximate cause against employer where employee lent employer-sponsored handgun to third-party who injured plaintiff because "illegal loan of the weapon" and the third-party's "subsequent misuse of it" were both "unforeseeable and far too attenuated to hold the defendant liable"); *Duke v. Missouri Pac. R.R. Co.*, 303 S.W.2d 613, 617 (Mo. 1957) (no proximate cause despite the fact damage caused by the defendant led to injury, because "no danger existed in the condition except because of the independent [intervening] cause"); *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496, 505–06 (6th Cir. 2010) (no proximate cause under Ohio law where city's injuries "could have been caused by many other factors" besides defendants' packaging of mortgage-backed securities, and therefore determining what damages occurred because of defendants would require a "complex assessment"); *Sturm*, 761 N.Y.S.2d at 201 (no proximate cause where the harms alleged were "too remote from defendants' otherwise lawful commercial activity" and "caused directly and principally by the criminal activity of intervening third parties"); *Hartley v. State*, 698 P.2d 77, 86 (Wash. 1985) (no proximate cause where government's failure to revoke license of drunk driver "too remote and insubstantial to impose liability" for subsequent harms of further drunk driving); *Casper v. Am. Int'l S. Ins. Co.*, 800 N.W.2d 880, 900 (Wis. 2011) (no proximate cause against executive for his

1   employee's negligent driving, because any negligence by defendant was remote "in
2   terms of time, distance, and cause").

3          For two reasons, these proximate cause rules foreclose liability here as a matter
4   of law.  First, bright-line caselaw in every relevant jurisdiction precludes liability for
5   harms caused by a third-party car thief's criminal conduct.  Second, no jurisdiction
6   would recognize liability for injuries allegedly materializing as a result of an
7   unforeseeable social-media phenomenon years after Defendants' manufacture and
8   distribution of vehicles that comply with federal anti-theft regulations.

### A.      The Acts Of Car Thieves Are Unforeseeable Superseding Causes Breaking The Causal Chain As A Matter Of Law

11         Applying basic proximate cause rules, each of the states at issue here has
12  recognized the same bright-line rule for instances where a car thief steals and then
13  recklessly operates a vehicle.   That rule, adopted by a "clear majority of []
14  jurisdictions," holds that: (1) the thief's reckless use of the vehicle intervenes between
15  the defendant vehicle owner and the third-party plaintiff's injury, and (2) "it was not
16  reasonably foreseeable that an intermeddler would both take [an] auto and then
17  negligently operate it."  *Dix v. Motor Mkt., Inc.*, 540 S.W.2d 927, 931 (Mo. Ct. App.
18  1976).  This is true even where defendants knew or should have known that other
19  vehicles were frequently stolen from the same area.  *Id.* at 929.  Courts instead reason
20  the car's vulnerability to theft "was merely a condition or circumstance which did not
21  operate to cause any injury to the plaintiff except for the intervening independent
22  negligence of the thief."  *Ross v. Nutt*, 203 N.E.2d 118, 121 (Ohio 1964); *see also
23  Howard v. Kiskiel*, 544 N.Y.S.2d 91, 92 (N.Y. App. Div. 1989) ("[T]he owner of an
24  automobile who leaves his keys in his car is not liable for the [subsequent] negligence
25  of a thief who steals the automobile."); *Pratt v. Thomas*, 491 P.2d 1285, 1286 (Wash.
26  1971) (a crash caused by a thief is "not a part of the natural and continuous sequence
27  of events" because it is "the result of new and independent forces"); *Kiste v. Red Cab,
28  Inc.*, 106 N.E.2d 395, 398 (Ind. App. 1952) ("it has been uniformly held" that such

defendants are not liable because "the negligent operation of the thief was the proximate or intervening cause of the injury"); *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 642 A.2d 219, 230–32 (Md. 1994) ("the manner in which [the thief] drove the van, and its consequences, were 'highly extraordinary'" and therefore broke the chain of causation); *Meihost v. Meihost*, 139 N.W.2d 116, 121 (Wis. 1966) (even assuming negligence on the part of the owner, "allowance of recovery would place too unreasonable a burden upon the owners").

That black-letter rule—the defendant is not responsible for third-party harm caused by the conduct of a car thief—precludes proximate causation here as to the GE Plaintiffs' claims under each relevant state law.  The CGEC makes clear that the GE Plaintiffs' alleged injuries were caused by criminal conduct of car thieves—including the thieves' creation of a viral social media "challenge" promoting further thefts—who allegedly operate the stolen vehicles in a reckless manner and use stolen vehicles in furtherance of additional independent crimes.  CGEC ¶¶ 84, 90–92.  As a matter of law, any conduct by Defendants is not the proximate cause of the GE Plaintiffs' alleged injuries; rather, the GE Plaintiffs' injuries were caused by independent intervening criminal conduct.  For that reason alone, each GE Plaintiff's tort claims must be dismissed.

**B.    Injuries Allegedly Caused By Unprecedented Social-Media Challenges Are Not Direct Or Foreseeable Consequences Of Vehicle Designs Complying With Federal Anti-Theft Regulations**

Beyond specific black-letter law foreclosing liability for injuries caused by car thieves' criminal conduct, proximate cause is lacking because the thefts the GE Plaintiffs allege were immediately caused by an extraordinary intervening act: an unprecedented social-media campaign targeting vehicles that fully comply with federal anti-theft regulations.  *See supra* Background II.A.–C.  In every relevant jurisdiction, the rule that proximate cause is defeated by unforeseeable third-party wrongdoing precludes liability for "surprising, unexpected, or freakish" intervening

acts.  *Horn v. B.A.S.S.*, 92 F.3d 609, 612 (8th Cir. 1996) (Missouri law); *see supra* Argument II.  That rule carries particular force when, as here, it is undisputed that before the third-party's intervening conduct the defendant engaged in lawful commercial activity in compliance with applicable laws and regulations.  *See, e.g.*, *Webber v. Armslist, LLC*, 70 F. 4th 945, 949–50 (7th Cir. 2023) (Wisconsin law); *Sturm*, 761 N.Y.S.2d at 201–02.

In Ohio, courts apply the "direct relation" test to determine proximate cause, which considers, among other factors, the difficulty in determining which damages can be attributed to the defendant's misconduct.  *Ameriquest*, 615 F.3d at 502.  In *Ameriquest*, the court granted dismissal where the plaintiff city's alleged injury "could have been caused by many other factors," including third-parties' "voluntary choices [] made for a variety of reasons unrelated to the Defendants," *id.* at 504–05, and therefore the court would have to engage in a "complex assessment" to "determine which municipal expenditures increased and tax revenues decreased because of [defendants' conduct.]" *Id.* at 506.

The GE Plaintiffs allege that Defendants began marketing vehicles without engine immobilizers no later than 2011, CGEC ¶¶ 3, 20, 82, yet allege no issue with thefts of those vehicles until at least ten years later.  *See, e.g.*, *id.* ¶¶ 10, 85, 113–115, 137, 153, 246.  The face of the Complaint makes clear that the catalyst for the alleged uptick in thefts at that time was not the unchanged, federally compliant design of vehicles that had been on the road for years, but a group of teenagers, the "Kia Boyz," who began posting videos demonstrating how to bypass the cars' theft-protection systems in late 2020 as part of a "social media challenge." *Id.* ¶¶ 84, 242; *see id.* ¶¶ 4, 85, 162, 193, 242.  According to the CGEC, the "viral" spread of that "popular" online challenge, *id.* ¶¶ 146, 162, caused "thefts of Kias and Hyundais" to "skyrocket[.]" *Id.* ¶ 85; *see id.* ¶ 193 ("Data … shows a rapid increase in thefts . . . ***coinciding with the release of popular TikTok tutorial videos*** explaining the exploit") (emphasis added); *supra* Background II.A.–B.

It is difficult to imagine a more unforeseeable intervening act than a multi-state social-media campaign of criminal solicitation and facilitation,[13] CGEC ¶ 12, with no apparent historical precedent, popularized on an app that was virtually unheard-of until after most of these vehicles—all of which comply with federal anti-theft regulations—were manufactured and distributed.  *See id.* ¶¶ 84–85, 193; *supra* Background I.B., II.A.–B.

The Complaint certainly identifies nothing that would have allowed Defendants to anticipate such an unprecedented phenomenon—on the contrary, it makes clear that they distributed cars with no engine immobilizers for at least a decade without incident.  *See, e.g.*, CGEC ¶¶ 113, 127, 135, 137, 149, 153, 162–164, 175, 195, 206, 225, 245 (showing consistently low theft rates of Defendants' vehicles before Kia Boyz challenge).  The social media challenge and thieves committing crimes—both criminal "voluntary choices [] made for a variety of reasons unrelated to the Defendants," *Ameriquest*, 615 F.3d at 504–05—are the immediate causes of the GE Plaintiffs' alleged injuries, and therefore the court would have to engage in an increasingly "complex assessment" to "determine which municipal expenditures increased . . . because of [Defendants' conduct.]" *Id.* at 506.

Just as they are not liable for the criminal conduct of third-party car thieves, Hyundai and Kia could not have proximately caused injuries immediately resulting from an unprecedented criminal social-media phenomenon.

### III.  THE GE PLAINTIFFS' CLAIMS FAIL BECAUSE DEFENDANTS OWE NO DUTY TO PROTECT LOCAL GOVERNMENTS AGAINST EXPENDITURES NECESSITATED BY THIRD-PARTY CRIMES

The GE Plaintiffs' public nuisance and negligence claims also fail because, as a matter of law, Defendants owe no duty to protect local governments from fiscal injuries caused by criminal third-party conduct.  "The threshold question in any

---

[13] *See, e.g.*, N.Y. Penal Law § 100.05 (criminal solicitation); N.Y. Penal Law § 115.000 (criminal facilitation).

negligence action is: does defendant owe a legally recognized duty of care to plaintiff?"  *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1060 (N.Y. 2001) (New York); *see also Burns v. Black & Veatch Architects, Inc.*, 854 S.W.2d 450, 452–53 (Mo. Ct. App. 1993); *Wallace*, 773 N.E.2d at 1026; *Stephenson v. Universal Metrics, Inc.*, 641 N.W.2d 158, 163 (Wisc. 2002); *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016) (accord).   "The existence and scope of a tortfeasor's duty is, of course, a legal question for the courts."  *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1101 (N.Y. 2001).[14] Courts in the GE Plaintiffs' states likewise consider whether or not there is a "duty" in analyzing public nuisance claims.  *See City of St. Louis v. Varahi, Inc.*, 39 S.W.3d 531, 535 (Mo. Ct. App. 2001) (Missouri); *Little v. Union Trust Co. of Md.*, 412 A.2d 1251, 1255 (Md. Ct. Spec. App. 1980) (Maryland); *KB Home Ind. Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 306 (Ind. Ct. App. 2010) (Indiana); *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 621 F. Supp. 2d 513, 521 (N.D. Ohio 2009) (Ohio qualified public nuisance); *City of Seattle v. Monsanto*, 237 F. Supp. 3d 1096, 1106 (W.D. Wash. 2017) (Washington); *Webber*, 70 F.4th at 965 (Wisconsin); *Sturm*, 761 N.Y.S.2d at 201 (New York).

Here, principles common to all jurisdictions foreclose a duty to design, manufacture, or distribute products in such a manner as to minimize local governments' expenditures.  Although the CGEC alleges the existence of a duty in conclusory terms, CGEC ¶ 350, it identifies no special relationship or foreseeable category of injury meriting such a novel tort duty—and widely recognized public policy considerations weigh against recognizing one.

---

[14] *See also Burns*, 854 S.W.2d at 453 (Missouri); *Wallace*, 773 N.E.2d at 1026 (Ohio); *Stephenson*, 641 N.W.2d at 163 (Wisconsin); *Goodwin*, 62 N.E.3d at 386–87 (Indiana) (again accord); *Hansen v. Friend*, 824 P.2d 483, 485 (Wash. 1992); *Valentine v. On Target.Inc.*, 727 A.2d 947, 949 (Md. 1999).

### A. No Special Relationship Obligates Defendants To Protect Local Governments Against Third-Party Criminal Acts

The GE Plaintiffs unabashedly trumpet that their alleged injuries flow entirely and directly from third-party criminal conduct: They attribute fiscal harms, such as law enforcement and EMS costs, to third-parties' auto thefts, reckless driving, and other crimes. *See, e.g.,* CGEC ¶¶ 113–532. The GE Plaintiffs seek to hold Defendants liable for these harms for allegedly failing to "prevent" the "vehicle theft[s]." *Id.* ¶ 1. But as a "general rule," a defendant "has no duty to protect another from deliberate criminal attacks by a third person." *Bradley v. Ray*, 904 S.W.2d 302, 311 (Mo. Ct. App. 1995).[15] Rather, "most jurisdictions," including all states at issue here, recognize a "duty to control a third person's conduct so as to prevent personal harm to another" only when "a 'special relationship' exists either between the actor and the third person or between the actor and the person injured." *Ashburn v. Anne Arundel Cnty.*, 510 A.2d 1078, 1083 (Md. 1986).[16] "This judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another." *Hamilton*, 750 N.E.2d at 1061. The special relationship requirement avoids "the specter of limitless liability . . . because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship." *Id.*

For example, in *Kim*, a plaintiff injured by a car thief's reckless driving sued the company that left the car "unlocked . . . with the keys in the ignition" in an administrative facility with "no fences, barriers, lights, security personnel, or

---

[15] *Accord Neal v. IAB Financial Bank*, 68 N.E.3d 1114, 1118 (Ind. Ct. App. 2017); *Winffel v. Westfield Prop. Mgmt., LLC*, 2022 WL 1591405, at *3 (D. Md. May 19, 2022) (Maryland law); *Hamilton*, 750 N.E.2d at 1061; *A.M. v. Miami Univ.*, 88 N.E.3d 1013, 1022-23 (Ohio Ct. App. 2017); *Kim v. Budget Rent A Car Systems, Inc.*, 15 P.3d 1283, 1285 (Wash. 2001); *Jankee v. Clark County*, 612 N.W.2d 297, 321 (Wis. 2000).

[16] *See also id.*

---

cameras."   15 P.3d at 1284.   The Washington Supreme Court observed that "[g]enerally, our cases, involving a duty to protect a party from the criminal conduct of another, have" involved a defendant's "'special relationship' with the victim" or "'special relationship' with the criminal," giving as examples relationships of businesses to invitees and innkeepers to guests.  *Id.* at 1285–86.  Recognizing that "[n]either circumstance is present here," the Court held that the company owed no duty to protect the plaintiff from the risk that a third-party would steal and recklessly drive the car.  *Id.* at 1286, 1288.

While the GE Plaintiffs, like the *Kim* plaintiff, allege injuries flowing from third-parties' car thefts, the absence of any relationship that would support a duty is even more glaring here.  These lawsuits are not brought by consumers who allegedly purchased Defendants' vehicles or even bystanders allegedly injured by them.  They are brought by public entities unconnected to Defendants alleging that third-party criminals, also unconnected to Defendants, committed crimes that indirectly required the GE Plaintiffs to make outlays for public services.  The GE Plaintiffs' own relationship to Hyundai and Kia starts and stops with their allegation that the GE Plaintiffs "expended funds" to provide such services, *see e.g.*, CGEC ¶ 212—a relationship the GE Plaintiffs could equally assert against an unlimited number of other parties whose conduct is alleged to result in public costs.  Nor do the GE Plaintiffs suggest that Defendants had a relationship with the criminals or any ability to control their conduct:  In fact, they allege that the thieves acted at the instigation of social-media gangs.  *Id.* ¶¶ 84–85.

Unable to assert any special relationship that would obligate Defendants to protect them from third-party crimes, the GE Plaintiffs attempt to establish a duty instead by coloring their claims as ones based on affirmative malfeasance, asserting that Defendants "created, incubated, and maintained the conditions necessary for a secondary market of unsafe and stolen vehicles."  *See e.g.*, *id.* ¶ 307 & n.184 (citing *Beretta*, 768 N.E.2d at 1142–44).  But no allegations in the CGEC describe those

supposed secondary markets or link them to any of the GE Plaintiffs' injuries.  On the contrary, the CGEC alleges that the cars "are stolen for joyriding or use in the commission of other crimes, rather than for parts or resale."  CGEC ¶ 88; *see id.* ¶¶ 90, 197 (alleging that the "motivation for many of these thefts was not the economic value of the vehicle[s]," as they were "not driven to chop shops to be disassembled for parts").  A throwaway reference to "secondary markets" cannot plausibly create a duty for law-abiding product manufacturers and distributors to insure against the cost of public services in response to third-party crimes.

### B.       The Unforeseeability Of The GE Plaintiffs' Injuries Further Weighs Against Imposition Of A Duty

The GE Plaintiffs' unforeseeable injuries likewise cut against recognizing a novel duty.  Indiana, Maryland, Missouri, and Washington consider foreseeability "among the most important of . . . factor[s]" in choosing whether to recognize a novel tort duty.  *Patton v. United States of Am. Rugby Football*, 851 A.2d 566, 571 (Md. 2004); *accord Goodwin*, 62 N.E.3d at 391; *KB Home Ind.*, 928 N.E.2d at 306; *Madden v. C & K Barbecue Carryout, Inc.*, 758 S.W.2d 59, 62 (Mo. 1988) (en banc); *McKown v. Simon Property Group, Inc.*, 344 P.3d 661, 665 (Wash. 2015).  In New York and Ohio, foreseeability cannot support recognition of a duty but only "defin[es] the scope and extent of the duty."  *Estate of Ciotto v. Hinkle*, 145 N.E.3d 1013, 1020–21 (Ohio Ct. App. 2019); *accord Pulka v. Edelman*, 358 N.E.2d 1019, 1019, 1023 (N.Y. 1976) ("foreseeability is a limitation on duty").  In Wisconsin, the foreseeability inquiry has been folded into  a six-factor "public policy" test for limiting tort liability.  *Fandrey*, 680 N.W.2d at 354 n.12.  Under any of the above rules, the unprecedented and unforeseeable nature of the GE Plaintiffs' alleged injuries precludes a tort duty for Defendants to protect against them.

Courts refuse to recognize a duty where "the category of negligent conduct at issue" is not "sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party."  *Goodwin*, 62 N.E.3d at 391.

1    Unlike the proximate cause foreseeability analysis, which focuses on the facts of a
2    case, the "foreseeability component of duty requires a more general analysis of the
3    broad type of plaintiff and harm involved, without regard to the facts of the actual
4    occurrence." *Id. Goodwin* illustrates a case where the lack of foreseeability precluded
5    duty.  There, patrons injured in a shooting sued a bar for negligence, contending that
6    it negligently failed to search the shooter for weapons.  *Id.* at 385–86.  In rejecting
7    liability, the Indiana Supreme Court observed that the "broad type of plaintiff here is
8    a patron of a bar and the harm is the probability or likelihood of a criminal attack,
9    namely: a shooting inside a bar." *Id.* at 393.  The court reasoned that "although bars
10   can often set the stage for rowdy behavior, we do not believe that bar owners routinely
11   contemplate that one bar patron might suddenly shoot another," and, citing concerns
12   about limitless liability, concluded that "a shooting inside a neighborhood bar is not
13   foreseeable as a matter of law." *Id.* at 393–94.

14        Here, the category of conduct at issue is the sale of automobiles with federally
15   compliant theft-prevention systems, while the "broad type of plaintiff" is a municipal
16   government asserting increased expenditures on public services.  Just as bar owners
17   do not "routinely contemplate that one bar patron might suddenly shoot another," *id.*
18   at 394, no car company would contemplate that the sale of federally compliant
19   vehicles would result in unanticipated fiscal harm to local governments.  Defendants
20   are aware of no instance in automotive history where a purported vehicle design-defect
21   caused an appreciable increase in municipal spending, and that scenario allegedly
22   materialized here only because of an unprecedented social-media campaign soliciting
23   car theft at a multi-state scale.  Although the GE Plaintiffs load their CGEC with
24   conclusory allegations that their injuries were foreseeable, *see, e.g.*, CGEC ¶¶ 285,
25   287, 313, 315, 334, 336, 354, they allege no *facts* that plausibly support that
26   contention.  Whatever foreseeable categories of harms auto companies have a duty to
27   protect against when they design their vehicles, fiscal injuries to local governments
28   are not among them.

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

### C. Public Policy Against Limitless Liability Precludes Recognition Of A Duty

Finally, the GE Plaintiffs' claims fail in all states at issue because public policy would not be served by dramatically expanding tort liabilities and allowing local governments to insert themselves into any product dispute alleged to result in increased municipal spending.  In defining tort duties, courts consider public policy concerns such as "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."  *Hamilton*, 750 N.E.2d at 1060; *see Goodwin*, 62 N.E.3d at 394; *Patton*, 851 A.2d at 571; *Fandrey*, 680 N.W.2d at 348 n.1, 354–55.  In *532 Madison Ave.*, for example, commercial establishments sued a real-estate company for their purely economic losses after construction accidents closed 15 city blocks for two weeks.  750 N.E.2d at 1099–100.  Citing the need to "avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act," the Court observed that "an indeterminate group in the affected areas . . . may have provable financial losses directly traceable to the two construction-related collapses, with no satisfactory way geographically to distinguish among" them.  *Id.* at 1101, 1103.  It therefore held that "negligence claims based on economic loss alone fall beyond the scope of the duty owed . . . by defendants."  *Id.* at 1103.

Similar policy concerns preclude recognition of a novel tort duty for product manufacturers to insure local governments against public outlays allegedly associated with defective products.  Like the duty rejected in *532 Madison Ave.*, the GE Plaintiffs' negligence claims would impose "unlimited liability to an indeterminate class of persons," requiring product manufacturers to insure any amounts spent by any government in the country to provide public services allegedly necessitated by some product defect.  *Id.* at 1101.  Also like that case, there is no "satisfactory way to []

-33-

distinguish" among such municipal expenditures to provide "a principled basis for apportioning liability." *Id.* at 1103. The result should be the same: the GE Plaintiffs' attempt to impose unprincipled and unlimited tort liability fails as a matter of law.

## IV. ALL GE PLAINTIFFS FAIL TO STATE A CLAIM FOR PUBLIC NUISANCE

### A. No State High Court Would Recognize Public Nuisance Liability Premised Solely On A Product's Alleged Design Defects

The GE Plaintiffs' public nuisance claims also fail because no state high court—in the GE Plaintiffs' jurisdictions or elsewhere—would allow the GE Plaintiffs to repackage a design-defect theory as a public nuisance claim. The GE Plaintiffs' public nuisance theories rest exclusively on Defendants' "decision not to include standard anti-theft technology"—that is, immobilizers—"in their vehicles." CGEC ¶ 3. They allege that the lack of immobilizer technology rendered Defendants' vehicles "defectively[] designed," *id.* ¶ 433; *see also id.* ¶¶ 76–82, 212, 214, and that Defendants "created a public nuisance" by "not including engine immobilizers as a standard safety feature." *Id.* ¶ 112; *see also id.* ¶¶ 13, 67. The GE Plaintiffs do not purport to identify any alleged wrongdoing by Defendants besides this design choice.

None of the GE Plaintiffs' state high courts has addressed whether those states' current laws permit public nuisance claims based solely on allegedly defective product designs. Because of that silence, this Court must use its "best judgment" and "all available data" to "predict[] how the state's highest court would decide" the GE Plaintiffs' nuisance claims. *Fast Trak Investment Co., LLC v. Sax*, 962 F.3d 455, 465 (9th Cir. 2020).

The soundest prediction is that, rather than massively expand liability for product manufacturers, the GE Plaintiffs' high courts would follow "most courts" in rejecting nuisance liability based on product sales. Restatement (Third) of Torts: Liab. For Econ. Harm § 8 cmt. g (2020 ed. Oct. 2022 update). The basic policy concern animating those decisions—that "the common law of public nuisance is an inapt vehicle for addressing" harms from products, *id.*—applies with even greater force to

the GE Plaintiffs' attempt to pass a *pure* design-defect theory as a public nuisance. The GE Plaintiffs' state high courts are virtually certain to reject that attempt because: (1) it would vitiate the longstanding policies and protections of product-liability law as applied to alleged design defects; and (2) harms from products (including stolen cars) do not implicate the collective rights that public nuisance law protects.

1. <u>No GE Plaintiff's State High Court Has Addressed Public Nuisance Theories Premised Exclusively On Product Design Under Current Law</u>

A large majority of appellate decisions have rejected using nuisance law to regulate product sales. Those decisions, in both states that define nuisance by common law and states that do so by statute, cite the risk of displacing product-liability rules and creating limitless liability for manufacturers.[17] A small minority of appellate decisions have allowed such cases to proceed—typically on theories of harmful promotional or distribution practices, not design defect.[18]

---

[17] *See State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021); *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009) (Arkansas law); *State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 456 (R.I. 2008); *In re Lead Paint Litig.*, 924 A.2d 484, 499 (N.J. 2007); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004) (Illinois law); *Penelas v. Arms Tech.*, Inc., 778 So.2d 1042 (Fla. Ct. App. 2001); *Sturm*, 761 N.Y.S.2d at 196; *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3d Cir. 2002) (Pennsylvania law); *Tioga Public Sch. Dist. #15 of Williams Cnty. v. U.S. Gypsum Co.*, 984 F.2d 915 (8th Cir. 1993) (North Dakota law); *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 521 (Mich. Ct. App. 1992).

[18] *See, e.g., City of Gary ex rel. King*, 801 N.E.2d 1222, 1231, 1241 (Ind. 2003) (permitting public nuisance claim alleging that firearms manufacturers, distributors, and dealers "knowingly participate[d] in a distribution system that unnecessarily and sometimes even intentionally provides guns to criminals, juveniles, and others who may not lawfully purchase them"); *Cnty. of Santa Clara v. Atl. Richfield Co.*, 40 Cal.Rptr.3d 313, 328 (Cal. Ct. App. 2006) ("A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition. Here, *the alleged basis for defendants' liability for the public nuisance created by lead paint is their affirmative*

---

The GE Plaintiffs here target not harmful distribution or marketing practices but product design: they seek public nuisance liability based exclusively on certain vehicles' design and appear to contemplate an abatement remedy consisting of the recall and retrofitting of vehicles.  *See, e.g.*, CGEC ¶ 426 ("[E]ach Defendant has current control sufficient to abate the nuisance because it has agents who service and repair vehicles after sale and could install such technology today.").  None of the GE Plaintiffs' state high courts has endorsed such a sweeping role for nuisance under existing law—no appellate court anywhere has.

**Indiana**.  Indiana's nuisance statute defines a nuisance as "[w]hatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property."  Ind. Code § 32-30-6-6.  Recognizing that this language is "very broad" and "if read literally would create a cause of action for many activities not actionable as nuisances at common law," the Indiana Supreme Court has "reaffirm[ed] that a nuisance claim is … predicated" on the common-law requirement of "unreasonable interference with a public right."  *City of Gary*, 801 N.E.2d at 1230–31 (citing Restatement (Second) Torts § 821B).  In *City of Gary*, the Indiana Supreme Court held that the state's public nuisance law reached allegations that gun companies "knowingly participate in a distribution system that unnecessarily and sometimes intentionally provides guns to criminals, juveniles, and others who may not lawfully purchase them."  *Id.* at 1231.  The *City of Gary* plaintiffs did not premise their nuisance claim on a design defect and the court nowhere suggested that nuisance law would be an appropriate vehicle to litigate pure defect claims, nor has any Indiana appellate decision since.

---

*promotion of lead paint for interior use, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards*.") (emphasis added).

**Maryland.**   Maryland, following the Second Restatement, defines a public nuisance as an "unreasonable interference with a right common to the public." *Tadjer v. Montgomery Cnty.*, 479 A.2d 1321, 1327–28 (Md. 1984) (quoting Restatement (Second) of Torts § 821B).   No Maryland appellate court has considered whether a plaintiff may bring a public nuisance claim based on product sales.   *See Cofield v. Lead Indus., Ass'n, Inc.*, 2000 WL 34292681, at *6–7 (D. Md. Aug. 17, 2000) (finding no Maryland case addressing "whether a plaintiff has a claim for private or public nuisance against a manufacturer or seller of a product that poses a hazard when applied to the plaintiff's property" and dismissing public nuisance claim against lead paint manufacturers).

**Missouri.**   Missouri likewise uses the Second Restatement's definition of a public nuisance as "an unreasonable interference with a right common to the public." *State ex rel. Dresser Indus., Inc. v. Ruddy*, 592 S.W.2d 789, 792 (Mo. 1980) (quoting Restatement (Second) Torts § 821B).   No Missouri Supreme Court case has ever addressed whether the state's public nuisance doctrine regulates the sale of goods.   In *Benjamin Moore*, the Missouri Supreme Court affirmed the dismissal of a city's public nuisance lawsuit against a lead-paint manufacturer, holding that the city's failure to identify the manufacturers of the paint associated with each abatement project defeated causation.   226 S.W.3d at 116–17.   Because it rejected the lawsuit on causation grounds, the Court did not address the permissibility of public nuisance lawsuits predicated on product sales, nor has any Missouri appellate case since.   *See Rardon v. Falcon Safety Prods., Inc.*, 2021 WL 2008923, at *12 (W.D. Mo. May 4, 2021) ("Plaintiff cites no case in which a Missouri court has extended the concept of a public nuisance to defectively designed products . . . .").

**New York.**   Under New York law, a public nuisance is a "substantial interference with the exercise of a common right of the public." *532 Madison*, 750 at 1104.   No New York Court of Appeals case has addressed the doctrine's applicability to product sales.   In *Sturm*, New York's intermediate appellate court rejected a public

1  nuisance claim challenging gun manufacturers' distribution practices, quoting

2  appellate decisions warning that "if public nuisance law were permitted to encompass

3  product liability, nuisance law 'would become a monster that would devour in one

4  gulp the entire law of tort.'" 761 N.Y.S.2d at 197.

5     **Ohio.** Ohio uses the Second Restatement's definition of a public nuisance as

6  "an unreasonable interference with a right common to the general public." *Beretta*,

7  768 N.E.2d at 1142. A 2002 Ohio Supreme Court decision allowing a nuisance action

8  challenging gun companies' "ongoing conduct of marketing, distributing, and selling

9  firearms" to proceed is the sole state appellate decision to recognize a public nuisance

10  claim premised even in part on "product design and construction." *Id.* But in 2007,

11  the Ohio Legislature amended the Ohio Product Liability Act ("OPLA") to preempt

12  liability for any "public nuisance claim or cause of action at common law in which it

13  is alleged that the design, manufacture, supply, marketing, distribution, . . . or sale of

14  a product unreasonably interferes with a right common to the general public." Ohio

15  Rev. Code § 2307.71(A)(13). No Ohio appellate decision has addressed product-

16  based public nuisance claims since this amendment.

17     **Washington.** Washington statutes define "nuisance" as "[t]he obstruction of

18  any highway or the closing of the channel of any stream used for boating or rafting

19  logs, lumber or timber, or whatever is injurious to health or indecent or offensive to

20  the senses, or an obstruction to the free use of property, so as to essentially interfere

21  with the comfortable enjoyment of the life and property." RCW 7.48.010.[19] A public

22  nuisance is one that "affects equally the rights of an entire community or

23

_____

24  [19] RCW 7.48.120 alternatively defines nuisance as "unlawfully doing an act, or
25  omitting to perform a duty, which act or omission either annoys, injures or endangers
    the comfort, repose, health or safety of others, offends decency, or unlawfully
26  interferes with, obstructs or tends to obstruct, or render dangerous for passage, any
    lake or navigable river, bay, stream, canal or basin, or any public park, square, street
27  or highway; or in any way renders other persons insecure in life, or in the use of
28  property."

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

neighborhood." RCW 7.48.130. "Despite the expansive [statutory] definition . . . generally, an activity is a nuisance only when it interferes unreasonably with other persons' use and enjoyment of their property." *Moore v. Steve's Outboard Serv.*, 339 P.3d 169, 171 (Wash. 2014). No Washington appellate decision has ever held that public nuisance law may extend to product sales, and long ago the Supreme Court of the Territory of Washington rejected an attempt to expand nuisance to the sale of alcohol. *N. Pac. R.R. Co. v. Whalen*, 17 P. 890, 892–94 (Wash. 1888).

**Wisconsin.** Wisconsin follows the Second Restatement in defining a public nuisance as "an unreasonable interference with a right common to the general public." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 670 (Wis. 2005). In *City of Milwaukee v. NL Industries, Inc.*, 691 N.W.2d 888 (Wis. Ct. App. 2004), Wisconsin's intermediate appellate court found a triable issue of fact on whether lead-paint manufacturers caused a public nuisance, *id.* at 893–95, but did not address whether nuisance law extends to product sales because the manufacturers' causation motion "assume[d] that a public nuisance exists." *Id.* at 892. No Wisconsin appellate court has considered the permissibility of public nuisance claims based on product sales generally or product design in particular.

2. The GE Plaintiffs' High Courts Would Not Substitute Public Nuisance Law For Product-Liability Law

None of the GE Plaintiffs' state high courts would expand public nuisance law to encompass pure product-liability claims. "[W]ell-developed bodies of law guide courts in evaluating claims for damages caused by products grounded in strict liability, negligence, or even misrepresentation." Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 748 (2003). Decades of caselaw and legislative interventions have calibrated product-liability rules to rationally apportion responsibility for harms from products. The GE Plaintiffs would discard these principles for a new liability regime. Rather than prove that a specific design defect in a specific product proximately caused a specific personal or property injury,

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

the GE Plaintiffs seek to package an array of alleged injuries caused by diverse third-party conduct as a single public nuisance—and then litigate liability for those varied injuries in one fell swoop.  Worse still, the GE Plaintiffs would have this Court "abate" that alleged nuisance, presumably by compelling Defendants to recall and retrofit their vehicles.

The Ohio Supreme Court and Washington Supreme Court would refuse the GE Plaintiffs' invitation simply because it collides with their state product-liability statutes.  OPLA "abrogate[s] all common law product liability claims or causes of action."  Ohio Rev. Code § 2307.71(B).  Since 2007, the "product liability claims" OPLA abrogates have included "any public nuisance claim or cause of action at common law in which it is alleged that the design . . . of a product unreasonably interferes with a right common to the general public."  *Id.* § 2307.71(A)(13).  That unambiguous statutory language precludes the Ohio Plaintiffs' public nuisance claims, which assert that the design of Defendants' vehicles interferes with a public right.  *See* CGEC ¶ 307 ("Defendants[] created, contributed to, and maintained a public nuisance when they intentionally . . . designed, manufactured, marketed, sold, and distributed unsafe vehicles that were statistically more vulnerable to theft without an engine immobilizer or equivalent technology.").

Similarly, the Washington Product Liability Act ("WPLA") preempts "any claim or action brought for harm caused by the . . . design" of a product based on "any . . . substantive legal theory except fraud, intentionally caused harm or a claim or action under the consumer protection act."  RCW 7.72.010(4).  That provision unambiguously bars Seattle's claim, which seeks to hold Defendants liable for "harm" allegedly "caused by the . . . design" of their vehicles on substantive legal theories other than "fraud, intentionally caused harm" or Washington's consumer-protection act.  CGEC ¶ 416 ("By intentionally forgoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting Seattle.").

-40-

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

In Washington, Indiana, Maryland, Missouri, New York, and Wisconsin, state high courts also would reject the GE Plaintiffs' design-defect theory of nuisance because it would undermine the boundaries separating nuisance from product liability. Courts asked to extend public nuisance law to products recognize that "public nuisance and products liability are two distinct causes of action, each with rational boundaries that are not intended to overlap." *Lead Indus. Ass'n*, 951 A.2d at 456. Product-liability law "has its own well-defined structure, which is designed specifically to hold manufacturers liable for harmful products that the manufacturers have caused to enter the stream of commerce." *Id*. By contrast, "[p]ublic nuisance focuses on the abatement of annoying or bothersome activities." *Id*. Traditional examples include injunctions against water pollution from a leaking pipeline, overgrown hedges obstructing streets, and illegal gambling houses. *See Hunter*, 499 P.3d at 724 n.13. Because they evolved to address "discrete, localized problems," *id*. at 731, nuisance actions are not "limited by the strict requirements that surround a products liability action." *Lead Indus. Ass'n*, 951 A.2d at 456–57.

For example, nuisance-abatement actions lack statutes of limitations and thus would create "perpetual liability" for product manufacturers. *Hunter*, 499 P.3d at 729. "Statutes of limitations are founded in . . . public policy, and the public would not be served by neutralizing the limitation period by labeling a products liability claim as a nuisance claim." *Celotex*, 493 N.W.2d at 521. Similarly, decades of product-liability caselaw set forth causation, damages, and comparative fault rules to allocate responsibility for particular injuries allegedly caused by particular products. Governmental nuisance claims, by contrast, constitute a "blunt and capricious method of regulation," *In re Firearm Cases*, 24 Cal. Rptr. 3d at 682, that threaten to weaken causation requirements by litigating liability for alleged harms from products at an aggregate, societal level. "Under this scenario, product manufacturers would be thrust into the role of insurers of their products and be forced to police their consumers to ensure that products would not be used in ways that could create a public nuisance."

Victor E. Schwartz & Phil Goldberg, *The Law of Public Nuisance: Maintaining Rational Boundaries on a Rational Tort*, 45 Washburn L. Rev. 541, 580 (2006).

Stretching public nuisance law to regulate harms allegedly arising purely from product *design* threatens a particularly profound disruption of product-liability law. Because product-liability cases usually allege personal injury, almost every alleged design defect could be framed as an interference with "public health" or "public safety," as the GE Plaintiffs allege here. And every alleged vehicle defect could be contended to interfere with "safe and reasonable access to public thoroughfares." *Id.* ¶¶ 270, 311, 330, 410. Manufacturers thus would have "no way to know whether they might face nuisance liability for . . . selling products"—whether "the fast food industry [will] be liable for obesity," or whether "an alcohol manufacturer [will] be liable for psychological harms," and whether "a car manufacturer [will] be liable for health hazards from lung disease to dementia or for air pollution." *Hunter*, 499 P.3d at 731.

Further, on the GE Plaintiffs' theory, local governments could not only seek damages for such harms but also ask courts to "equitably" abate the offending design by reengineering products. As a matter of law, that remedy would not be reserved for city governments—because any private party specially injured by a public nuisance can demand an abatement injunction, anyone who alleges they were specially injured by a product could enlist their local courts to recall redesign that product.[20] That absurd outcome would violate the principle that "the judiciary is not empowered to 'enact' regulatory measures in the guise of injunctive relief." *Penelas*, 778 So.2d at 1045.

No state high court would allow the GE Plaintiffs to litigate this design-defect dispute as a public nuisance action aggregating a raft of alleged harms at a jurisdictional level, subject to an unprincipled judicial "abatement" remedy. For that reason alone, this Court should dismiss counts 1, 3, 4, 6, 8, 9, 10, 14, and 16.

---

[20] *See* Restatement (Second) of Torts § 821C(1), (2)(a).

3. <u>Harms From Alleged Design Defects Do Not Implicate A Public Right In Maryland, Missouri, New York, Washington, And Wisconsin</u>

The Maryland, Missouri, New York, Washington, and Wisconsin Plaintiffs' public nuisance claims also fail because the CGEC's allegations of thefts and accidents involving Hyundai and Kia vehicles do not plausibly allege an interference with a "right common to the general public," Restatement (Second) of Torts § 821B (Am. L. Inst. 1977), as required to state a public nuisance claim.

"The interference with a public right is the sine qua non of a cause of action for public nuisance." *City of Chicago*, 821 N.E.2d at 1115. A public right is a "right to a public good, such as an 'indivisible resource shared by the public at large, like air, water, or public rights of way.'" *Lead Indus. Ass'n*, 951 A.2d at 448. It is "collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." Restatement (Second) of Torts § 821B cmt. g. An injury "even to large numbers of persons in their enjoyment of private rights" does not support a claim for public nuisance. *State v. Waterloo Stock Car Raceway, Inc.*, 409 N.Y.S.2d 40, 44 (N.Y. Sup. Ct. 1978). For example, "the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance." Restatement (Second) of Torts § 821B cmt. g. But if "the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance." *Id.*

The Restatement's polluted-stream example comes from two Missouri appellate decisions. *See id.* (citing *Smith v. City of Sedalia*, 53 S.W. 907 (Mo. 1899) and *State ex rel Wear v. Springfield Gas & Elec. Co.*, 204 S.W.942 (Mo. Ct. App. 1918)). Appellate courts in Maryland, New York, and Wisconsin have likewise

-43-

adopted the Second Restatement's definition of a public right.  *See Tadjer*, 479 A.2d
at 1327–28 (quoting Restatement (Second) of Torts § 821B cmt. g); *Milwaukee Metro.
Sewerage*, 691 N.W.2d at 669 (same); *Golden v. Diocese of Buffalo*, 125 N.Y.S.3d
813, 815 (N.Y. App. Div. 2020) (same).  And Washington codifies the requirement of
injury to a collective right by statute, defining a public nuisance as "one which affects
equally the rights of an entire community or neighborhood."  RCW 7.48.140.

Although public nuisance decisions occasionally refer broadly to interferences
with "public health, safety, peace, morals, or convenience," *City of Kansas City v.
N.Y.-Kan. Bldg. Assocs., L.P.*, 96 S.W.3d 846, 857 (Mo. Ct. App. 2002), those cases
have never held that *anything* that in *some sense* interferes with public health or safety
constitutes a nuisance—that rule would be limitless.  Instead, such cases address
conduct that was historically regulated as a nuisance at common law (or prohibited by
statute) and is local in nature: "Cases involving the right of public safety have involved
nuisances created by vicious dogs, the storage of explosives, blasting, the storage or
use of fireworks, or the presence of unsafe buildings."  *City of Chicago*, 821 N.E.2d
at 1114.  Thus, in *Hunter*, the Oklahoma Supreme Court rejected the premise that that
the Oklahoma nuisance statute's prohibition on conduct that "[a]nnoys, injures, or
endangers the . . . health, or safety of others," could be invoked to regulate prescription
opioids as a nuisance.  499 P.3d at 724.  The court explained that the health effects of
opioids do not present "a comparable incident to those in which we have anticipated
that an injury to the public health would occur, e.g., diseased animals, pollution in
drinking water, or the discharge of sewer on property," which are "property-related
conditions" that have "no beneficial use and only cause annoyance, injury, or
endangerment." *Id.* at 727.

Here, the Maryland, Missouri, New York, Washington, and Wisconsin
Plaintiffs fail to plausibly allege any interference with a public right.

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

The only harm that ***all*** the GE Plaintiffs attribute to Hyundai and Kia's vehicle design is an alleged increase in thefts of certain models.[21]  But thefts of a product do not implicate any collective right—only the quintessentially private right to property. Private citizens who claim economic loss due to an alleged defect can sue under warranty or consumer-protection theories, as some car owners have done in class actions whose settlement is currently pending before the Court.  *See, e.g.*, *Morrow v. Hyundai Motor Am., Inc.*, No. 8:22-cv-01674 (C.D. Cal.).  But it is hornbook law that these private injuries "do not become a public nuisance" merely because they affect "a large number of persons."  Restatement (Second) Torts § 821B cmt. g; *see, e.g.*, *Waterloo*, 409 N.Y.S.2d at 43–44 ("a public nuisance is . . . distinguished from . . . injury even to large numbers of persons in the enjoyment of private rights"); *Smith*, 53 S.W. at 911 (Missouri law) (injury of "same character" to "several landowners" from "polluted stream . . . does not convert the injurious act into a public nuisance, for it is only those individuals, and not the public in general, who suffer"); *Whalen*, 17 P. at 894  (injuries from alcohol remain "several as to each particular" person despite possibility that "some uncertain aggregate of [people]" may suffer harm).

Beyond the thefts themselves, the CGEC alleges that thieves have sometimes used Defendants' products in dangerous ways that have occasionally injured others, stating that between 2021 and 2023, some third-parties caused property damage, personal injury, or wrongful death by recklessly driving stolen Hyundais and Kias or using them in street crimes.[22]  Even assuming that the CGEC's anecdotal allegations

---

[21] *See, e.g.*, CGEC ¶¶ 113–118, 122–123 (Milwaukee); ¶¶ 126–129 (Madison); ¶¶ 132–134 (Green Bay); ¶¶ 185–186 (Baltimore); ¶¶ 192–198 (Seattle); ¶¶ 200–206 (St. Louis); ¶¶ 217–223 (Kansas City); ¶¶ 224–226 (Buffalo); ¶¶ 249–252 (Yonkers); ¶¶ 243–248 (New York City); ¶¶ 229–230 (Rochester); ¶¶ 253–255 (Tonawanda).

[22] *See, e.g.*, CGEC ¶¶ 119–121 (Milwaukee); ¶ 130 (Madison); ¶135 (Green Bay); ¶ 189 (Baltimore); ¶ 199 (Seattle); ¶¶ 207–211 (St. Louis); ¶¶ 227–228 (Buffalo); ¶¶ 232–235 (Rochester); ¶¶ 256–258 (Tonawanda).  By contrast, three Plaintiffs— New York City, Kansas City, and Yonkers—allege only a rise in theft.

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

of such injuries represent more than a statistical blip, physical injuries or property damage that citizens allegedly suffer from the misuse of products implicate private, rather than public rights.  A public right is "collective in nature and not like the individual right that everyone has not to be assaulted or . . . negligently injured." Restatement (Second) of Torts § 821B cmt. g.

Consistent with that conclusion, courts applying diverse state public nuisance laws have held that the "manufacture and distribution of products rarely cause a violation of a public right." *Hunter*, 499 P.3d at 728.  In *Hunter*, for example, the court rejected a statutory nuisance claim against a pharmaceutical manufacturer, observing that harms from prescription medicines are "not for a communal injury but are instead more in line with a private tort action for individual injuries sustained from use of a lawful product."  *Id.*  Similarly, in *Lead Indus. Ass'n*, although it was "undisputed that lead poisoning constitute[d] a public health crisis" that could affect "a child's chances for success in school and life," the court rejecting the state's public-nuisance claim, holding that the "right of an individual child not to be poisoned is strikingly similar to other examples of nonpublic rights cited by the courts." 951 A.2d at 436–37, 454; *see also City of Chicago*, 821 N.E.2d at 1114–15 ("we are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product").

That conclusion holds with special force where, as here, personal injury or property damage allegedly results from third-parties' misuse of products.  There is no "public right to be free from the threat that others may defy criminal laws," *Hunter*, 499 P.3d at 727, because any such right would impose liability on an absurd scale:

> If there is [a] public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers.  This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars, taverns,

liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right.

*City of Chicago*, 821 N.E.2d at 1116. The high courts of Maryland, Missouri, New York, Washington, and Wisconsin have never endorsed such free-wheeling liability and would not do so now. The CGEC's allegations of scattered personal injuries and property damage from stolen Hyundais and Kias do not describe an interference with any public right.

The GE Plaintiffs' contention that thefts of Hyundai and Kia vehicles affect road safety do not alter that conclusion. It is true that an "obstruction of a public highway" can interfere with the public right to access the road. Restatement (Second) Torts § 821B cmt. g. But the GE Plaintiffs allege no obstruction of any road—just an increased and diffuse risk that car thieves will recklessly drive stolen vehicles. *See, e.g.*, CGEC ¶¶ 270, 311, 330, 410. There "is a difference between an action that (1) impedes the public's ability to use, or safety on, a particular piece of property or part of the public streets, and one that (2) creates a risk that could be encountered in a myriad of unspecified public places." *Rardon*, 2021 WL 2008923, at *11 (citing Restatement (Second) of Torts § 821B cmt. g). Whereas discrete road obstructions directly interfere with public use of a collective resource, threats to road safety from reckless driving (or a product defect) do not stop anyone from using any road. Such diffuse safety threats would include every alleged vehicle defect as well as countless products, such as "cell phones, DVD players, and other lawful products," that "may be misused by drivers, creating a risk of harm to others." *City of Chicago*, 821 N.E.2d at 1116. Whether they occur on a road or elsewhere, personal injuries and property damage caused by such products implicate private, not public rights. For that independent reason, the Maryland, Missouri, New York, Washington, and Wisconsin GE Plaintiffs' public nuisance claims should be dismissed.

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

### B. Ohio Plaintiffs' Public Nuisance Claims And Columbus's Statutory Public Nuisance Claim Also Fail For Additional Reasons

#### 1. Ohio Plaintiffs' Public Nuisance Claims Fail Because Federal Law Authorized Defendants' Sale Of Vehicles Without Engine Immobilizers

Ohio Plaintiffs' common-law public nuisance claims fail as a matter of law because the challenged conduct—Defendants' choice of anti-theft technology—is directly regulated by federal law, and the Ohio Plaintiffs do not challenge Defendants' compliance with those regulations.

"[L]ong-established Ohio law" holds that "compliance with a regulatory scheme exempts the regulated conduct from constituting a public nuisance." *Ameriquest*, 621 F. Supp. 2d at 531; *see Brown v. Scioto Cnty. Bd. of Comm'rs*, 622 N.E.2d 1153, 1159 (Ohio Ct. App. 1993) ("[A]lthough it would be a nuisance at common law, conduct which is fully authorized by statute or administrative regulation is not an actionable tort. This is especially true where a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct exist."). "Under a long line of decisions, a showing that the challenged conduct is subject to regulation and was performed in conformance therewith insulates such conduct from suit as a public nuisance." *Ameriquest*, 621 F. Supp. 2d at 528 (citing *Allen Freight Lines, Inc. v. Consol. Rail Corp.*, 595 N.E.2d 855 (Ohio 1992); *City of Mingo Junction v. Sheline*, 196 N.E. 897 (Ohio 1935)). Thus, a defendant who engages in regulated conduct cannot be liable for public nuisance under Ohio law if plaintiff does not "challenge [the defendant's] compliance with those regulations." *Ameriquest*, 621 F. Supp. 2d at 528.

In *Ameriquest*, for example, the court dismissed Cleveland's public nuisance claim against an issuer of mortgage-backed securities backed by subprime loans that allegedly led to a foreclosure epidemic. *Id.* at 516, 526–31. Ohio law required this result because the underlying subprime mortgage lending was subject to "extensive regulation," and the City nowhere alleged that the defendants "violated any of the

-48-

myriad laws governing mortgage lending." *Id.* at 530.[23]  Similarly, in *Allen Freight Lines*, the Supreme Court of Ohio considered a statute that set a maximum height for vehicles on public roads and further stated that "[t]his section does not require the state, a municipal corporation, county, township, or any railroad or other private corporation to provide sufficient vertical clearance to permit the operation of such vehicle, or to make any changes in or about existing structures now crossing streets, roads, and other public thoroughfares in this state."  595 N.E.2d at 856.  Because the statute "create[d] no duty" in the defendants to provide vertical clearance for maximum-height vehicles, the court reasoned, it "except[ed] [them] from liability for failure to provide vertical clearance for maximum-height vehicles premised on … common-law nuisance." *Id.* at 857–58.

Part of NHTSA's comprehensive regulation of motor-vehicle safety, FMVSS 114 directly regulates automakers' selection of anti-theft technologies.  *See supra* Background I.A.  And, as earlier explained, rather than requiring auto companies to adopt any particular technology, FMVSS 114 requires them to satisfy a theft-prevention performance standard, by equipping their car with systems that, when the key is removed, prevent (1) "normal activation" of the engine and (2) either "steering or forward self-mobility."  49 C.F.R. § 571.114 S5.1.1.  That rule nowhere suggests that these performance requirements must be met with immobilizers rather than traditional technologies such as steering or ignition locks.  When NHTSA amended

---

[23] The plaintiff in *Ameriquest* brought only a *qualified* public nuisance claim, and the court accordingly limited its holding to "qualified public nuisance actions under Ohio common law." *Ameriquest*, 621 F. Supp. 2d at 528 n.13.  But as the state-court cases cited by the *Ameriquest* court make clear, the rule that "what the law sanctions cannot be held to be a public nuisance" applies to all forms of common-law public nuisance under Ohio law. *See Brown*, 622 N.E.2d at 1159 (holding that because defendant's "pollution control facility operates under the sanction of law, it cannot be a common-law public nuisance" of any kind); *City of Mingo Junction*, 196 N.E. at 900 (holding that city could not be liable for public nuisance for lawfully setting aside street to allow residents to sled and failing to disturb lawfully parked car in sledding area).

FMVSS 114 to allow use of immobilizers, it explained that its amendment would "allow manufacturers the *choice* to use electronic theft prevention devices, such as immobilizers, instead of using steering locks, *if they desire*." 71 Fed. Reg. 17752, 17753 (emphasis added). The agency recently reaffirmed that choice in declining to recall defendants' vehicles, stating that "FMVSS No. 114, does not require an engine immobilizer." RJN Ex. 3, NHTSA Response.

Ohio Plaintiffs cannot and do not dispute that Hyundai's and Kia's vehicles complied fully with FMVSS 114. *See* CGEC ¶¶ 63–82; *see also* RJN Ex. 3, NHTSA Response. Ohio Plaintiffs are thus left challenging design choices that were directly subject to and "sanction[ed]" by an elaborate federal regulatory regime. *Ameriquest*, 621 F. Supp. 2d at 528. Ohio law forecloses nuisance liability for such legally compliant conduct. *Id.*

> 2.  <u>Ohio Plaintiffs' Absolute Public Nuisance Claims Should Also Be Dismissed Due To Their Failure To Plausibly Allege Intent Or Inherently Dangerous Activity</u>

The "essence" of absolute nuisance under Ohio law is that "no matter how careful one is, such activities are inherently injurious and cannot be conducted without damaging someone else's property or rights . . . A modern example would be a neighborhood 'crack house.'" *Brown*, 622 N.E.2d at 1159; *see Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 859, 864 (N.D. Ohio 2017) (absolute nuisance requires that "harm and resulting damage are the *necessary consequences* of just what the defendant is doing") (emphasis added) (citation omitted). A claim for absolute public nuisance thus requires "either the 'intentional' creation of a public nuisance or 'an abnormally dangerous condition that cannot be maintained without injury to property, no matter what care is taken.'" *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477 (6th Cir. 2017) (citing *State ex rel. R.T.G., Inc. v. State*, 780 N.E.2d 998, 1010 (Ohio 2002)). The Ohio Plaintiffs' allegations do not plausibly allege either.

Ohio Plaintiffs have not, and cannot, allege that Defendants intended to create a public nuisance by lawfully selling vehicles that comply with federal theft-prevention regulations.  Ohio Plaintiffs allege that Defendants "intentionally" (1) "designed, manufactured, marketed, sold, and distributed unsafe vehicles," and (2) "created, incubated, and maintained the conditions for a secondary market of unsafe and stolen vehicles."  CGEC ¶¶ 23, 277, 307.  But these allegations, both individually and collectively, fail to allege an intentional creation of a public nuisance.  To the extent the Court assumes for purposes of this motion that some public nuisance exists, there are no allegations (nor could there be) that Defendants intended to create that public nuisance—the Ohio Plaintiffs have not (and could not have) alleged that Defendants intended for there to be an unprecedented and unforeseen wave of thefts in response to viral "how to" videos promoted through social media applications not even in existence when many of the vehicles were sold.

Further, the Ohio Plaintiffs' allegation that Defendants intentionally manufactured "unsafe" vehicles and created a "secondary market" for the same are conclusory and implausible: (1) NHTSA has found no safety defect with any of these vehicles, *see* RJN Ex. 3, NHTSA Response ("At this time, NHTSA has not determined that this issue constitutes either a safety defect or noncompliance requiring a recall . . . Here, the ***safety risk arises from <u>unsafe use</u> of a motor vehicle*** by an unauthorized person after taking significant destructive actions to parts of the vehicle.") (emphasis added); (2) the CGEC itself recognizes no such secondary market exists, *see* CGEC ¶¶ 88 ("particularly in this case, where cars are stolen for joyriding or use in the commission of other crimes, rather than for parts or resale"), 197 ("the motivation for many of these thefts was not the economic value of the vehicle—they were not driven to chop shops to be disassembled for parts—but rather the vehicles were stolen for joyriding"); and (3) the CGEC recognizes Defendants have actively pursued several efforts to *prevent* such thefts.  *See supra* Background I.B., II. E.

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

Nor have the Ohio Plaintiffs alleged that the vehicles constitute an "abnormally dangerous" condition that "cannot be maintained without injury to property . . . no matter what care is taken." Indeed, Defendants distributed vehicles as to which NHTSA has not found a safety defect, with (according to the GE Plaintiffs' own allegations) low and flat theft rates before the social media craze began. *See supra* Background I.B. Danger is not a "necessary consequence" of these vehicles, nor is it a condition "no matter what care is taken." *See* CGEC ¶ 110 (conceding if care is taken to prevent theft, these vehicles are safe); *see also R.T.G., Inc.*, 780 N.E.2d at 1010 (holding coal mining is not an absolute nuisance "because it can be conducted safely when care is taken"); *Metzger v. Pennsylvania, O. & D. R. Co.*, 66 N.E.2d 203, 205 (Ohio 1946) (holding locomotive smoke similarly does not constitute an absolute nuisance).

3. <u>Columbus's Statutory Public Nuisance Claim Also Fails To Plausibly Allege That Kia Or Hyundai Vehicles Are "Dilapidated, Decayed, Unsafe Or Unsanitary"</u>

Plaintiff Columbus brings an additional public nuisance claim under Title 7 of the Columbus City Codes. Under Title 7, Columbus may seek injunctive relief—abatement—in response to a public nuisance, defined in relevant part as: "any structure or vehicle, which is permitted to be or remain . . . [i]n a dilapidated, decayed, unsafe or unsanitary condition detrimental to the public health, safety, and welfare, or well-being of the surrounding area." Columbus City Codes 703.17. Columbus City Codes 701.19, which grants Columbus standing to seek abatement of a public nuisance, specifically discusses nuisances such as noxious weeds, sanitary maintenance, and rodent control. *See, e.g., City of Columbus v. Reiner*, 108 N.E.3d 719, 720 (Ohio Ct. App. 2018) (seeking relief for noxious weeds based on Columbus City Codes 701.19 and 703.17, among others); *State ex rel. Columbus City Attorney v. Southpark Pres. Ltd. P'ship et al.*, No. 22-EVH-060590 (Ohio Mun. Ct. Aug. 29, 2022) (seeking injunctive relief for roach infestations, damaged fixtures, and broken windows); *State ex rel. Columbus City Attorney v. Gjessing et al.*, No. 2017-EVH-

60423 (Ohio Mun. Ct. Jun. 7, 2017) (seeking injunctive relief for waste in yard and inoperable vehicles).

Columbus does not and cannot plausibly allege that Defendants' vehicles are in a "dilapidated, decayed, unsafe or unsanitary condition," as contemplated by the Columbus City Code.  Other than the repeated and conclusory use of the phrase "unsafe," the CGEC includes no allegations about the safety of Defendants' vehicles themselves, alleging only that Defendants' vehicles have been stolen by third-party criminals, and that *those criminals* sometimes choose to *operate* the vehicles in an unsafe manner (as any manufacturer's vehicles may be when their operators choose to speed, etc.).  *See, e.g.*, CGEC ¶¶ 146 (referring to "unsafe and stolen vehicles" after reciting several instances of criminal reckless driving), 349 (conflating "unsafe" vehicles as "vulnerable to theft").  Indeed, NHTSA itself distinguished between the (safe) vehicles themselves and unsafe criminal behavior, when refusing various States' Attorneys General's request for a recall.  *See* RJN Ex. 3, NHTSA Response. Defendants' vehicles remain as safe as other vehicles on the road, and Columbus has not and cannot plausibly allege otherwise.  *See supra* Background I.B.  This claim therefore must be dismissed.

## V.    GE PLAINTIFFS' REMAINING CLAIMS ALSO FAIL

### A.    Plaintiff Kansas City Cannot State A Violation Of Article IX

Kansas City's claim for violation of the city's consumer-protection ordinance (Article IX) fails because the city has not pleaded "a false representation as to the characteristics…uses, [or] benefits….of merchandise" or a "represent[ion] that merchandise is of a particular standard, style or model, if it is of another."  Section 50-292(5), (7).

Kansas City alleges that Hyundai and Kia "marketed and represented their vehicles as being safe, even though the vehicles lack basic, rudimentary safety equipment such as immobilizer technology."  CGEC ¶ 455.  First, Defendants' vehicles comply with federal regulations, and NHTSA has declined to find a safety

defect.  *See supra* Background I.B.  Second, the GE Plaintiffs do not identify a single marketing representation made by either Hyundai or Kia—much less do they do so with the particularity required by Rule 9(b) for claims based on alleged misrepresentations.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (Rule 9(b) applies to state-law claims that "allege a unified course of fraudulent conduct" regardless of whether fraud is a necessary element of those claims).  Indeed, marketing a car as "safe" is too vague and subjective to be actionable.  *See In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. 1525, 1531 (E.D. Mo. 1997), aff'd sub nom. *Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999) (vague statements as to a car's quality and safety are mere puffery and therefore not actionable).  Count 13 therefore warrants dismissal.

## B. Columbus's Civil Liability Claim Fails To Meet Statutory Requirements

Columbus's Civil Liability claim also should be dismissed.  Ohio Revised Code Section 2307.60(A)(1) allows anyone injured by a criminal act to recover damages in a civil action, unless excepted by law.  Columbus attempts to manufacture such a "criminal act" by combining its statutory public nuisance claim (a civil violation of Title 7 of the Columbus City Codes), with Columbus City Codes § 701.99(A), which makes any violation of Title 7 of the Columbus City Codes punishable as a criminal misdemeanor.  This attempt to manipulate a civil violation into a criminal misdemeanor, and then back into a civil claim as a back-door to seek damages that are not permitted, must be rejected.

*First*, because the underlying "criminal misdemeanor" upon which Columbus relies to assert its Civil Liability claim is based on the creation or maintenance of a statutory public nuisance (e.g., dilapidated, decayed unsafe or unsanitary structures or vehicles), Columbus's Civil Liability claim falls with its statutory public nuisance claim.  *See supra* Argument IV.B.3.

*Second*, the pertinent law upon which Columbus relies for the purported "criminal act" is the Columbus City Code, which enumerates seven remedies available to Columbus in response to a public nuisance—including abatement—but which *does not* allow Columbus to seek damages.  *See* Columbus City Code §§ 701.19 (providing only for abatement, not damages); Ohio Revised Code § 2307.60(A)(1) (disallowing damages for civil liability where excepted by law).  In other words, the Columbus City Council (its legislative body) ***excluded*** damages as a remedy for a statutory public nuisance.  The claim for Civil Liability therefore must be dismissed for this additional reason.

## C.   The Missouri Plaintiffs Fail To State A Claim For Unjust Enrichment

The Missouri Plaintiffs' unjust enrichment claims fail because they do not plead that they conferred a cognizable benefit upon Defendants which Defendants retained.

To state a claim of unjust enrichment under Missouri law, a plaintiff must allege that that it "conferred a benefit on the defendant" that "the defendant accepted and retained."  *Howard v. Turnbull*, 316 S.W.3d 431, 437 (Mo. Ct. App. 2010).  Here, the benefit that the Missouri Plaintiffs purportedly conferred—payments for the "costs of the harms" associated with "failing to equip [Hyundai and Kia] vehicles with immobilizer technology," CGEC ¶¶ 439, 444—was not conferred upon Defendants at all, much less "accepted and retained" by them.  *Howard*, 316 S.W.3d at 437.  Missouri courts reject unjust enrichment claims when, as here, there is no direct transaction between plaintiff and defendant.  *See, e.g.*, *Binkley v. Am. Equity Mortg.*, 447 S.W.3d 194, 199 (Mo. 2014) (affirming judgment in favor of defendant where plaintiffs could not establish that they "directly paid a fee" to defendant that defendant retained); *City of St. Louis v. Cernicek*, 2003 WL 22533578, at *3 (Mo. Cir. Ct. Oct. 15, 2013) (dismissing unjust enrichment claims against firearm manufacturers for harm to city because "Plaintiff cannot and does not allege . . . that Plaintiff here conferred a benefit upon Defendants that they appreciated, accepted and retained");

1  *Southwestern Bell Telephone Co. v. United Video Cablevision of St. Louis, Inc.*, 737

2  S.W.2d 474, 475–76 (Mo. Ct. App. 1987) (no unjust enrichment claim to recover for

3  services provided because there was "neither an expectation of payment nor an

4  awareness of such expectation").

## VI.   GE PLAINTIFFS' REQUESTS FOR DAMAGES ARE FORECLOSED BY THE MUNICIPAL COST RECOVERY AND ECONOMIC LOSS RULES

### A.   The Municipal Cost Recovery Rule Precludes The New York Plaintiffs From Seeking Damages Under All Claims

9      The New York Plaintiffs' efforts to recover as damages "economic losses" and

10  "expenditures over and above their ordinary public services," CGEC ¶¶ 472–73, 485,

11  487–88, 492, are precluded by the municipal cost recovery rule.

12      "The general rule is that public expenditures made in the performance of

13  governmental functions are not recoverable," and therefore a city may not seek

14  reimbursement for such expenditures from a tortfeasor. *Koch v. Consolidated Edison

15  Co. of NY*, 468 N.E.2d 1, 8 (N.Y. 1984) (holding city and public benefit corporations

16  "should not be permitted to recover [from defendant power company] costs incurred

17  for wages, salaries, overtime and other benefits of police, fire, sanitation and hospital

18  personnel from whom services (in addition to those which would normally have been

19  rendered) were required in consequence of [citywide] blackout").  This general rule,

20  known as the municipal cost recovery rule or free public services doctrine, is grounded

21  in considerations of public policy—namely, that since state legislatures establish local

22  governments to provide core services for the public and pay for those services by

23  spreading the costs to all citizens through taxation, any decision reallocating those

24  costs implicates fiscal policy, a matter best left to the legislature. *Id.*; 32 A.L.R. 6th

25  261, § 2.

26      Notably, while a public entity can seek reimbursement for services expended in

27  abating a nuisance in specific circumstances where a statute or ordinance expressly

28  permits it to do so, *see, e.g.*, *Koch*, 468 N.E.2d at 8 ("certain exceptions to the general

-56-

rule have been created by statutory enactment to give a municipality a claim for expenditures for fire fighting and police powers"), there is no such authorizing statute or ordinance applicable here.  Nor is there a "general public nuisance exception" to the municipal cost recovery rule, as "it would be the exception that swallows the rule, since many expenditures for public services could be re-characterized by skillful litigants as expenses incurred in abating a public nuisance."  *Cnty of Erie, N.Y. v. Colgan Air, Inc.*, 2012 WL 1029542, at *4 (W.D.N.Y. Mar. 26, 2012) (dismissing county's complaint seeking to recover costs of emergency and clean-up services it incurred when responding to airplane crash as barred by the free public services doctrine), *aff'd*, 711 F.3d 147, 150–53 (2d Cir. 2013); *see also Colgan Air, Inc.*, 711 F.3d at 151–53 (holding there is no general public nuisance exception to municipal cost recovery rule and no statutory exception applied to allow recovery of emergency and clean-up services); *see also* 32 A.L.R. 6th 261, § 1 ("[A]bsent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services.").

Accordingly, the New York Plaintiffs should be prohibited from seeking reimbursement for such expenditures from Kia and Hyundai.

### B. The Economic-Loss Rule Forecloses The Ohio And New York Plaintiffs' Requests For Damages

The economic-loss rule bars (1) the Ohio Plaintiffs from recovering damages for the costs of carrying out public services under their qualified public nuisance and negligence claims, and (2) the New York Plaintiffs from recovering such damages under their negligence claims.

Under Ohio law, plaintiffs asserting tort claims are prohibited from recovering purely economic losses that do not arise from tangible physical injury.  *Deutsche Bank*, 863 F.3d at 477 ("The premise of the economic-loss rule is that tort law does not impose an independent duty to avoid consequential economic damages"); *see also*

*Ameriquest*, 621 F. Supp. 2d at 525; *Cleveland v. JP Morgan Chase Bank*, 2013 WL 1183332, at *8 (Ohio Ct. App. 2013) ("[T]he economic loss rule applies to qualified public nuisance claims.") (citation omitted).

In *Deutsche Bank*, the city plaintiff alleged that the bank's policy of violating property maintenance regulations when the cost of compliance outweighed the foreclosed property's resale value created a public nuisance of blighted properties, and the city sought damages in the form of increased police and fire response expenses, a decrease in the city's tax base, and an increase in the city's administrative costs. 863 F.3d at 476. The Sixth Circuit noted that "[t]he Ohio Court of Appeals has twice invoked the economic-loss rule to reject qualified public nuisance claims like the one here," and held that the economic-loss rule similarly barred damages for the city's qualified public nuisance claim. *Id.* at 478. Here, where the Ohio Plaintiffs seek almost identical forms of consequential, economic damages, and expressly declare that they "do not seek damages for death, physical injury to person, emotional distress, or physical damage to property," CGEC ¶ 372, the economic loss rule similarly forecloses their request for damages. *Id.* ¶ 340 (alleging "the Ohio GE plaintiffs have suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, youth rehabilitative services, and other services"); *see also id.* ¶¶ 342, 347, 355 (similar).

Similarly, New York law has limited the scope of duty owed by a defendant in a negligence action to only plaintiffs who have suffered "personal injury or property damage," but not "economic loss alone." *532 Madison Ave.*, 750 N.E.2d at 1103; *Travelers Cas. & Sur. Co. v. Dormitory Authority-State of NY*, 734 F. Supp. 2d 368, 379 (S.D.N.Y. 2010) ("[T]o avoid 'crushing exposure' to suits by countless parties who have suffered economic loss, New York courts have concluded that absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." (cleaned up)); *cf. R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 518 (2d Cir. 2020)

MOTION TO DISMISS CONSOLIDATED GOVERNMENTAL ENTITIES COMPLAINT

(dismissing negligence claim to recover purely economic damages where there was "no plausible allegation that any property owned by [the plaintiff] was invaded, injured, or damaged by [the defendant]").  In *532 Madison Ave.*, the New York Court of Appeals concluded that the negligence claims of business owners who suffered purely economic losses when their businesses were forced to close following construction disasters on the landowner defendants' property fell beyond the scope of duty owed by defendants.  750 N.E.2d at 1103.  In so ruling, the court explained that it had "never held" "that a landowner owes a duty to protect an entire urban neighborhood against purely economic losses."  *Id.* at 1102.  The New York Plaintiffs—who have not plausibly alleged personal injury or property damage— therefore cannot pursue negligence claims under the economic-loss rule.

### C.   Plaintiff Columbus Is Not Authorized To Seek Damages Under Its Statutory Public Nuisance Claim

Columbus cites two sources of statutory authority for its statutory public nuisance claim: Ohio Revised Code § 715.44 and Columbus City Codes § 701.19. CGEC ¶¶ 104, 107.  Neither grants Columbus standing to seek damages.

The Ohio Revised Code provides that Columbus may "[a]bate any nuisance and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist."  Ohio Revised Code § 715.44.  The Columbus City Codes similarly provide that "[t]he director may (F) Cause to be filed a civil complaint for injunctive relief seeking abatement of the public nuisance in a court of jurisdiction."  Columbus City Codes § 701.19.  Each authority expressly authorizes Columbus to pursue only equitable relief in response to a public nuisance— specifically, abatement.  Neither of these statutes authorizes Columbus to recover damages pursuant to its statutory public nuisance claim.  Therefore, even if this Court permitted Columbus to pursue a statutory public nuisance claim, the remedy should be limited to abatement, and not monetary damages.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should dismiss the CGEC.

DATED:  September 8, 2023          QUINN EMANUEL URQUHART & SULLIVAN, LLP


                                   By _/s/ Steven G. Madison_____
                                      Steven G. Madison (SBN: 101006)
                                      stevemadison@quinnemanuel.com
                                      Justin Griffin (SBN: 234675)
                                      justingriffin@quinnemanuel.com
                                      865 South Figueroa Street, 10th Floor
                                      Los Angeles, California 90017-2543
                                      Telephone:  (213) 443-3000
                                      Facsimile:   (213) 443-3100


                                      *Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Section 5 of Order No. 1, I certify that the parties conferred in a good-faith effort to resolve the matter without court action prior to the filing of this Motion.


Dated: September 8, 2023     QUINN EMANUEL URQUHART & SULLIVAN LLP

               */s/ Steven Madison*_____
               Steven Madison

               *Attorneys for Defendants*