Shon Morgan (Bar No. 187736)
shonmorgan@quinnemanuel.com
Cristina Henriquez (Bar No. 317445)
cristinahaneriquez@quinnemanuel.com
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Peter J. Brennan (*pro hac vice*)
PBrennan@jenner.com
**JENNER & BLOCK LLP**
353 North Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| In re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:22-ML-3052-JVS(KESx) |
|---|---|
| | The Honorable James V. Selna |
| This document relates to: CONSUMER CLASS ACTION | **SUPPLEMENTAL SUBMISSION RE: SOFTWARE UPGRADE IN SUPPORT OF CONSUMER CLASS ACTION SETTLEMENT** |

1

# **TABLE OF CONTENTS**

                                                                                    **Page**

2

3  I.  DEFENDANTS' VEHICLES COMPLY WITH FEDERAL LAW,
       AND NHTSA HAS REJECTED PETITIONS TO DECLARE A
4      SAFETY DEFECT OR ORDER A RECALL ...................................................... 3

5      A.  Neither U.S. Federal Law Nor Regulations Require Immobilizers ........ 3

6      B.  Defendants' Vehicles Comply With Federal Law And NHTSA
           Has Found No Safety Defect Requiring A Recall ................................... 5

7
   II. SOCIAL MEDIA AND INTERVENING THIRD-PARTY
8      CRIMINALS CAUSED AN UNPRECEDENTED INCREASE IN
       THEFTS ............................................................................................................. 7

9      A.  Before The Viral "Kia Boyz" Challenge, Defendants' Vehicles
10         Were Stolen Less Than Those Of Other Manufacturers Or
           Distributors ........................................................................................... 7

11     B.  The "Kia Boyz" Challenge ..................................................................... 7

12     C.  Social Media Incited Unprecedented Rise In Thefts .............................. 8

13     D.  Hyundai And Kia's Significant Voluntary Measures To Address
14         The Increased Thefts ............................................................................... 9

15 III. THE ANTI-THEFT SOFTWARE UPGRADE AUGMENTS
       EXISTING THEFT-DETERRENCE TECHNOLOGY ................................. 11

16
   IV. THE COMPANIES' SUCCESSFUL EFFORTS TO PROMOTE AND
17     IMPLEMENT THE ANTI-THEFT SOFTWARE UPGRADE...................... 14

18 V.  NO MANUFACTURER OFFERS THEFT-PROOF VEHICLES ................. 19

19 VI. INITIAL FIELD DATA CONFIRMS THE ANTI-THEFT
       SOFTWARE UPGRADE WORKS AS INTENDED .................................... 21

20
       A.  Independent Testing Confirms The Anti-theft software Upgrade
21         Was Appropriately Validated and Performs As Intended .................... 21

22     B.  The Companies' Evaluation Of Reportedly Stolen Vehicles
           Shows No Basis To Question Anti-theft Software Upgrade
23         Efficacy ................................................................................................ 23

24     C.  Investigation Of Media Reports Give No Reason To Question
           The Anti-theft Software Upgrade Efficacy........................................... 29

25 CONCLUSION.......................................................................................................... 30

26

27

28

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*King v. Cnty. of Los Angeles*,
  885 F.3d 548 (9th Cir. 2018) ................................................................. 3

*Smith v. Los Angeles Unified Sch. Dist.*,
  830 F.3d 843 (9th Cir. 2016) ................................................................. 3

*Winzler v. Toyota Motor Sales U.S.A., Inc.*,
  681 F.3d 1208 (10th Cir. 2012) ............................................................. 3

*In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*,
  601 F. Supp. 3d 625 (C.D. Cal. 2022), *opinion clarified sub nom. In
  re ZF-TRW Airbag Control Units Prod.*, 2022 WL 19425927 (C.D.
  Cal. Mar. 2, 2022) ................................................................................. 3

## **Statutes**

49 U.S.C. § 105 ........................................................................................... 3, 4

49 U.S.C. § 301 ........................................................................................... 3

49 U.S.C. § 331 ........................................................................................... 4

49 U.S.C. §3011 .......................................................................................... 6

## **Other Authorities**

49 C.F.R. § 571.114 S1 ............................................................................... 4, 6

49 C.F.R. § 571.114 S2 ............................................................................... 4

49 C.F.R. § S5.1.1 ....................................................................................... 4

33 Fed. Reg. 6471, 6472 (Apr. 27, 1968) ................................................... 5

71 Fed. Reg. 17752, 17753 (Apr. 7, 2006) ................................................. 5

81 Fed. Reg. 66833, 66835 (Sept. 29, 2016) .............................................. 4

## PRELIMINARY STATEMENT

This MDL comprises litigation prompted by thefts or attempted thefts of certain Hyundai and Kia vehicles as a result of an unprecedented social media phenomenon. In approximately 2020, a group of car thieves who came to be known as the "the Kia Boyz" began posting social media videos that taught—and encouraged—others to steal certain Hyundai and Kia vehicles. Dkt. 84 (Consolidated Consumer Class Action Complaint) at ¶1290. The theft method popularized by social media involved: (1) targeting Hyundai and Kia vehicles with traditional "insert-and-turn" steel key ignition systems, (2) bypassing any manufacturer-equipped burglar alarm by breaking a window and entering the vehicle through the broken window, (3) dismantling the steering column; (4) destructively removing the lock cylinder; and (5) activating the ignition switch (typically with a USB cable or pliers). *Id.* at ¶¶ 1291-95. Hyundai and Kia vehicle thefts perpetrated by this method were promoted on various social media platforms.

Although the affected Hyundai and Kia vehicles all complied with federal law and safety standards, the companies promptly responded in a number of ways to assist vehicle owners and lessees. HMA and KA initially aided customers by offering free steering wheel locks (direct to owners and through local law enforcement and dealers).

Beginning in July 2022, litigation expanded beyond *Marvin, et al. v. Kia America, Inc.,* filed in Wisconsin, resulting in this MDL proceeding. In July and August 2022, cases were filed in Missouri, (*Bendorf v. Kia America, Inc., et al.*), Kansas (*Simmons, et al. v. Kia America, Inc., et al.*), Iowa (*Brady, et al. v. Kia America, Inc. et al.*), Illinois (*Loburgio, et al. v. Kia America, Inc. et al.*), Kentucky (*Day v. Kia America, Inc. et al.),* Ohio (*Fruhling, et al. v. Kia America, Inc., et al.),* California (*Yeghanian v. Kia America, Inc., et al.*), Nebraska (*Hall v. Kia America, Inc., et al.*), New York (*Moon v. Kia America, Inc., et al.*), Minnesota (*Zanmiller v. Kia America, Inc. et al.*), Colorado (*Jones v. Kia America, Inc., et al.*); Florida (*Pue, et al. v. Kia America, Inc., et al.*), Texas (*Bodie et al. v Kia America, Inc. et al.*), and others. As

a result of the increase in litigation and to help customers experiencing thefts, Hyundai and Kia began developing an anti-theft software upgrade to thwart the method of theft popularized by social media.

The anti-theft software upgrade enhances the manufacturer-equipped burglar alarms to expand the conditions under which ignition-kill technology will prevent the vehicles from starting without the key. The anti-theft software upgrade was launched in phases beginning January 2023 for Kia vehicles and February 2023 for Hyundai vehicles. The anti-theft software upgrade is now available for all anti-theft software-eligible vehicles. HMA and KA have also pursued the removal of the abundant social media videos teaching others how to follow the method of theft popularized on social media. In addition, in 2021, Hyundai and Kia made immobilizer technology standard on most 2022 model year vehicles and all 2023 and later model year vehicles.

The proposed (and now revised) Consumer Class Settlement will provide further relief to affected customers and resolve the consumer class litigation, through a variety of benefits detailed in the concurrently filed motion for preliminary settlement approval. Pursuant to this Court's Order (Dkt. 200), defendants provide this supplement to the preliminary approval record to address the operation, implementation, and efficacy of the anti-theft software upgrade designed to prevent the method of theft popularized in social media channels.

As shown below, the anti-theft software upgrade underwent extensive pre-release validation and its reliability and effectiveness has been confirmed by an outside expert. The anti-theft software upgrade can be obtained for free, is quickly installed, and comes with a lifetime warranty under the proposed settlement. The anti-theft software upgrade offers valuable enhanced vehicle security to approximately seven million Class Members and serves as one of many significant benefits offered under the comprehensive proposed settlement of the Consumer Class Action. The anti-theft software upgrade has already been installed on more than 1.6 million Hyundai and Kia vehicles.

# I.    DEFENDANTS' VEHICLES COMPLY WITH FEDERAL LAW, AND NHTSA HAS REJECTED PETITIONS TO DECLARE A SAFETY DEFECT OR ORDER A RECALL

Hyundai Motor America ("HMA") and Kia America, Inc. ("KA") are American automobile distributors headquartered in California. Since 2011, 100% of Kia models and over 98% of Hyundai models have received an "Overall Rating" of 4 out of 5 stars (or higher) on the U.S. government's safety ratings.[1] Dkt. 220-2 (NHTSA Laboratory Test Procedure for Federal Motor Vehicle Safety Standard ("FMVSS") 114 (July 28, 2010)        (publicly        available        at
**https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/tp-114-04_tag.pdf**)).[2]

## A.    Neither U.S. Federal Law Nor Regulations Require Immobilizers

The National Highway Traffic and Safety Administration ("NHTSA") is exclusively vested with authority to regulate automobile safety and security nationally under federal law. 49 U.S.C. § 105. Federal law, including the National Traffic and Motor Vehicle Safety Act (the "Motor Vehicle Safety Act"), 49 U.S.C. § 301, and the

---

[1]  Much of this background information and the corresponding factual support is set forth in Docket No. 222, Defendants' Notice of and Motion to Dismiss Consolidated Governmental Entities Complaint and Supporting Memorandum and the accompanying Request for Judicial Notice (Dkt. 220). For administrative ease, defendants do not resubmit those supporting documents with this filing.

[2]  Dkt. 220-2 contains undisputed and publicly available information displayed on government websites and was published by the government. *See King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (Courts may take judicial notice of matters of public record, which include "undisputed and publicly available information displayed on government websites"); *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 851 n.10 (9th Cir. 2016) (matters of public record also include "letters published by the government . . . as well as record and reports of administrative bodies"). The Court may therefore take judicial notice that Dkt. 220-2 is a NHTSA publication whose contents reflect NHTSA's official positions. *See Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1212 (10th Cir. 2012) (taking judicial notice of NHTSA records); *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 601 F. Supp. 3d 625, 689 (C.D. Cal. 2022), *opinion clarified sub nom. In re ZF-TRW Airbag Control Units Prod.*, 2022 WL 19425927 (C.D. Cal. Mar. 2, 2022) (taking judicial notice of NHTSA document).

Motor Vehicle Theft Law Enforcement Act (the "Theft Act"), 49 U.S.C. § 331, and regulations promulgated thereunder by NHTSA, govern motor vehicle safety and anti-theft performance standards.  49 U.S.C. § 105(c).

In 1968, NHTSA promulgated Federal Motor Vehicle Safety Standard ("FMVSS") 114, which imposes two anti-theft performance requirements intended to "reduce the incidence of crashes resulting from theft" and "decrease the likelihood that a vehicle is stolen."  49 C.F.R. § 571.114, S1 & S2.  To comply with FMVSS 114, vehicles must have a starting system that, when the key is removed, prevents: (1) "normal activation of the vehicle's engine or motor"; and (2) steering, forward self-mobility, or both.  49 C.F.R. § 571.114, S5.1.1;[3] Expert Report of Jim Smith ("Smith Report") at 2.  This standard does not require vehicles to be 100 percent impenetrable to thieves.  49 C.F.R. § 571.114, S1 & S2.

Further, although the first patent for the electronic immobilizer was granted in 1919, neither FMVSS 114 nor any other U.S. federal law or regulation, mandated the installation of immobilizers when FMVSS 114 was issued in 1968.  When the modern passive vehicle immobilizer was invented in 1993—a time when vehicle theft rates were *four times higher than they are today*—NHTSA did not mandate its use.  Nor did NHTSA mandate the use of immobilizers in the late 1990s when regulators in other countries, including Australia, Canada, and New Zealand, made them mandatory.

In the 50-plus years since the introduction of FMVSS 114 NHTSA made numerous changes and modifications to the standard, but never required immobilizers to be installed as standard equipment in vehicles sold in the U.S.  *See, e.g.*, 81 Fed. Reg.

---

[3]  For the "normal activation" prong, NHTSA directs the tester to start the engine with the key removed; the vehicle passes if the engine will not start.  Dkt. 220-2 at 16 ("With the key removed from the starting system, attempt to start the vehicle engine or motor.").  For the prong requiring prevention of steering or forward self-mobility without a key, the tester determines whether the car can be steered without a key by "rotating the wheel in both directions," whether "forward self-mobility is prevented whenever the key is removed from the starting system," and, if self-mobility is prevented, by what means (e.g., a transmission lock).  *Id.*

66833, 66835 (Sept. 29, 2016) (NHTSA describing that the U.S., unlike Canada, does *not* require immobilizers). Rather, NHTSA maintains that automobile manufacturers should have a *choice* in the anti-theft technology they adopt. When FMVSS 114 was enacted, the agency explicitly *rejected* requests to prescribe "specific theft protection devices" because "it would be unwise to establish a standard in terms so restrictive as to discourage technological innovation in the field of theft inhibition." 33 Fed. Reg. 6471, 6472 (Apr. 27, 1968). As such, "the standard has been framed to permit as many specific devices as possible to meet its requirements." *Id.*

And NHTSA has continued to prioritize manufacturer choice in subsequent amendments to FMVSS 114. *See, e.g.*, 71 Fed. Reg. 17752, 17753 (Apr. 7, 2006). In fact, when NHTSA amended FMVSS 114 in April 2006 to "allow manufacturers *greater flexibility* in designing their override devices and to allow manufacturers the choice to use electronic theft prevention devices, such as immobilizers, instead of using steering locks, *if they desire*", the agency did not change the standard to *require* immobilizers. 71 FR 17752, 17753 (Apr. 7, 2006) (emphasis added).

## B.     Defendants' Vehicles Comply With Federal Law And NHTSA Has Found No Safety Defect Requiring A Recall

Plaintiffs allege that defendants designed, manufactured, and distributed vehicles without engine immobilizers, *up to twelve years ago*, and such vehicles were the subject of the recent, unprecedented epidemic of vehicle thefts.

Moreover, on April 20, 2023, 18 State Attorneys General—including the Attorneys General of several home states of cities that have sued HMA and KA—sent a letter to NHTSA (the "State AGs' Recall Request") asking the agency to:

> use its authority to institute a recall of unsafe Hyundai and Kia vehicles manufactured between 2011 and 2022 whose easily-bypassed ignition

switches and lack of engine immobilizers make them particularly
vulnerable to theft.[4]

While six State Attorneys General submitted an unsolicited letter to the Court
(Dkt. 186) and highlighted the State AGs' Recall Request, which all of them took part
in, none mentioned NHTSA's response.    The omission is disappointing but
understandable: NHTSA unequivocally rejected the State AGs' Recall Request.  In its
response of June 5, 2023 ("NHTSA Response"), NHTSA rejected the State Attorneys
General's contention that the lack of engine immobilizers in Defendants' vehicles
violates FMVSS:

> At this time, NHTSA has not determined that this issue constitutes either
> a safety defect or noncompliance requiring a recall under the National
> Traffic and Motor Vehicle Safety Act, 49 U.S.C. Chapter 301. The
> Federal Motor Vehicle Safety Standard identified in your letter, FMVSS
> No. 114, does not require an engine immobilizer. *See* 49 C.F.R. §
> 571.114. Also, the test procedure specified in that standard does not
> contemplate actions taken by criminal actors to break open or remove
> part of the steering column and take out the ignition lock to start a
> vehicle. *See id.* § 571.114, S6. Here, the safety risk arises from unsafe
> use of a motor vehicle by an unauthorized person after taking significant
> destructive actions to parts of the vehicle.[5]

---

[4]  Dkt. 189 (Defendants' Response to Governmental Entities' Statement and Letter
From Six State Attorneys General Re: The Proposed Consumer Settlement Agreement)
at 8-16 (attaching State AGs' Recall Request, April 20, 2023, also publicly available at
https://oag.ca.gov/system/files/attachments/press-docs/4-20-
23%20NHTSA%20Recall%20to%20Hyundai%20and%20Kia.pdf).

[5]  Indeed, federal law requires that NHTSA must notify a manufacturer
"immediately after making an initial decision" that a vehicle "contains a defect related
to motor vehicle safety or does not comply with" an FMVSS requirement, 49 U.S.C.
§3011(a), and NHTSA maintains a public-facing website to notify the public when
either NHTSA or a manufacturer has determined a vehicle has a safety-related defect
or does not comply with FMVSS.  *See* Dkt. 220-5.

Dkt. 220-3 at 2 (NHTSA Response).[6]  NHTSA added that "[h]ere, the safety risk arises from unsafe use of a motor vehicle by an unauthorized person after taking significant destructive actions to parts of the vehicle."  *Id.*

## II.  SOCIAL MEDIA AND INTERVENING THIRD-PARTY CRIMINALS CAUSED AN UNPRECEDENTED INCREASE IN THEFTS

### A.  Before The Viral "Kia Boyz" Challenge, Defendants' Vehicles Were Stolen Less Than Those Of Other Manufacturers Or Distributors

Historically, defendants' vehicles have not been the subject of significant theft. Indeed, various charts included in the Consolidated Governmental Entity Complaint (Dkt. 175) show that before Fall 2022, thefts of Hyundai and Kia vehicles made up a tiny fraction of overall vehicle thefts relative to thefts of vehicles of other manufacturers or distributors.  For example, Buffalo's chart (Dkt. 175 at 84), which purports to reflect the combined percentage of Hyundai and Kia auto thefts in Buffalo between January 2020 and January 2023, alleges that Hyundais and Kias (even combined) made up a miniscule fraction of overall car thefts in Buffalo from 2020 through July 2022, and that thefts of Hyundai and Kia vehicles remained relatively flat during that period.[7]

### B.  The "Kia Boyz" Challenge

Plaintiffs allege the theft epidemic underlying their claims began in Milwaukee in late 2020, when the "Kia Boyz" started posting "'how-to' videos" on social media

---

[6]  For the reasons stated *supra* in note 2, the Court may take judicial notice of Dkt. 220-5, as it is a NHTSA communication whose contents reflect NHTSA's official positions.

[7]  The same is true for Madison (*id.* at 43-44), Green Bay (*id.* at 46-47), Columbus (*id.* at 48, 54-55), Cincinnati (*id.* at 61-63), St. Louis (*id.* at 80), New York City (*id.* at 92-93), and Tonawanda (*id.* at 97-98).  *See also id.* at 35-36 (Milwaukee reflecting low and flat Hyundai and Kia thefts prior to 2021, because "Kia Boyz" videos originated in Milwaukee earlier than in other cities).

platforms—some of which did not even exist when many of the Hyundai and Kia vehicles targeted were manufactured. *See generally* Dkt. 84. The social media videos teach viewers to steal Hyundai or Kia vehicles by (1) targeting Hyundai and Kia vehicles with a traditional "insert-and-turn" steel key ignition systems, (2) bypassing any manufacturer-equipped burglar alarm by breaking in through a window and entering the vehicle through the broken window, (3) dismantling the steering column; (4) destructively removing the lock cylinder; and (5) turning the exposed ignition switch (typically with a USB cable or pliers). Dkt. 84 at ¶¶ 1291-95; Smith Report at 4. Many social media users not only learned how to steal the vehicles, but also responded to the social media "challenge" by promoting this method of theft in their own social media videos depicting thefts of Hyundai and Kia vehicles using that same recipe. "Kia Boyz" now refers to anyone who steals Hyundai or Kia cars using that same method of theft popularized on social media.

Plaintiffs allege this social media trend sparked a marked rise in the theft rates of these vehicles in Milwaukee and other major U.S. cities. *See* Dkt. 84.

### C.    Social Media Incited Unprecedented Rise In Thefts

There is no indication that, *before* late 2020, the general public was aware of the multi-step process required to steal defendants' vehicles that the "Kia Boyz" promoted through social media, or that defendants' vehicles were stolen at higher rates relative to other manufacturers.

Rather, the theft increase began in late 2020, when the "Kia Boyz," started posting "'how-to' videos" on social media platforms—including some platforms that did not even exist when many of the Hyundai and Kia vehicles targeted were manufactured—detailing the multi-step process to steal Hyundai and Kia vehicles. *See* Dkt. 84 at ¶ 1290. These videos of criminal activity, which the social media platforms permitted to be posted, provided step-by-step instructions demonstrating how to steal

certain Hyundai and Kia vehicles.[8]  The videos then "challenge[] teens to steal a car off the street" in a "coordinated effort."[9]  The "Kia Boyz" "became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais."  Dkt. 175 at ¶ 84.

Even according to the Plaintiffs' own allegations, the unprecedented increase in Hyundai and Kia thefts arose out of this viral social media "challenge," which began almost a decade after some of these vehicles were manufactured and sold, and publicized a little-known means of criminal theft.  Dkt. 84 at ¶ 1354 ("the number of reported Class Vehicle thefts would skyrocket in 2020 when" these "'how-to' videos" "began to circulate on social media").

### D.     Hyundai And Kia's Significant Voluntary Measures To Address The Increased Thefts

Hyundai and Kia have taken sizable, voluntary steps to mitigate the theft epidemic.

First, defendants made immobilizers standard equipment on all new vehicles as of late 2021, which means that most 2022 model-year vehicles and all 2023 model-year vehicles will include immobilizers.[10]  Declaration of Nick Dempkowski ("Dempkowski Decl.") at ¶ 3; Declaration of Long Nguyen ("Nguyen Decl.") at ¶ 3.

---

[8]    *See, e.g.*, Dkt. 220-7 (Greg Rosalsky, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022) (publicly available at https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-)).

[9]    Dkt. 220-8 (Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022) (publicly available at https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html)).

[10]    Dkt. 220-13 (Elliot Hughes, *Kia, Hyundai will make security features standard on new vehicles and distribute free steering wheel locks after surge of thefts*, Milwaukee   J.   Sentinel   (July   19,   2021)   (publicly   available   at

Second, HMA and KA distributed free steering wheel locks to affected communities by either shipping them directly to customers and/or making them available through local law enforcement and/or dealers. Dempkowski Decl. at ¶ 3; Nguyen Decl. at ¶ 3. From November 2022 to February 2023, HMA and KA "work[ed] with law enforcement agencies to provide more than 26,000 steering wheel locks . . . to 77 law enforcement agencies in 12 states." Dkt. 220-4 (*Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023) (https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft)).[11]    In the words of the Milwaukee Police Department, "[b]oth Hyundai and Kia have been very receptive and *immediately* began working on a solution . . . MPD appreciates their responsiveness and commitment to addressing the auto thefts plaguing our community." Dkt. 220-13. As of September 26, 2023, HMA and KA together have distributed more than 390,000 steering wheel locks. Dempkowski Decl. at ¶ 3; Nguyen Decl. at ¶ 3.

Third, defendants voluntarily developed an anti-theft software upgrade. Dempkowski Decl. at ¶ 3; Nguyen Decl. at ¶ 3. "Hyundai and Kia have developed theft deterrent software for millions of their vehicles that lack an immobilizer and will provide it FREE of charge to vehicle owners. The software updates the theft alarm software logic to extend the length of the alarm sound from 30 seconds to one minute and requires the key to be in the ignition switch to turn the vehicle on." Dkt. 220-4. By May 2023, installations reached 6,000 per day.[12]    As of September 21, 2023,

---

https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/)).

[11]  For the reasons stated *supra* in note 2, the Court may take judicial notice of Dkt. 220-4, as it is a NHTSA communication whose contents reflect NHTSA's official positions.

[12]  Dkt. 220-15 (Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, AP News (May 9, 2023) (available at https://apnews.com/article/hyundai-kia-tiktok-theft-stolen-8e0a353d24be0e7bce36e34c5e4dac51)).

cumulative installations total 880,929 for Hyundai vehicles. Nguyen Decl. at ¶ 10. As of September 26, 2023, cumulative installations total 755,710 for Kia vehicles. Dempkowski Decl. at ¶ 10. As of September 22, 2023, HMA has incurred reimbursement costs associated with the anti-theft software upgrade of at least $41,134,701.25. Nguyen Decl. at ¶ 15. And as of September 26, 2023, KA has incurred reimbursement costs associated with the anti-theft software upgrade of at least $33,269,200.67. Dempkowski Decl. at ¶ 14.

Furthermore, HMA and KA have continued efforts to remove the inciting videos from social media. Dempkowski Decl. at ¶ 3; Nguyen Decl. at ¶ 3. "But as new ones surface . . . there have been additional waves of thefts." Dkt. 220-15.

## III.    THE ANTI-THEFT SOFTWARE UPGRADE AUGMENTS EXISTING THEFT-DETERRENCE TECHNOLOGY

The technology of engine immobilizers varies from one manufacturer to the next, but in general terms an engine immobilizer prevents a vehicle's engine from starting unless the correct key or fob is present. An engine immobilizer is similar to an ignition kill system, which prevents the vehicle's engine from starting unless certain conditions are satisfied. Smith Report at 2-6.

The Hyundai and Kia vehicles that are eligible for the anti-theft software upgrade were equipped with a burglar alarm system that incorporates an ignition kill feature. Dempkowski Decl. at ¶ 5; Nguyen Decl. at ¶ 5; Smith Report at 16. As originally designed, the ignition kill feature would activate when the burglar alarm was triggered. Dempkowski Decl. at ¶ 5; Nguyen Decl. at ¶ 5; Smith Report at 5. An alarm will trigger when the vehicle has been properly locked and the burglar alarm is armed with the key or fob and, for example a hood or trunk is subsequently opened without the key. Dempkowski Decl. at ¶ 5; Nguyen Decl. at ¶ 5; Smith Report at 5. The anti-theft software upgrade enhances the ignition kill system by requiring the use of an authorized key or fob to first disarm the system in order to start the vehicle. Dempkowski Decl. at ¶ 5; Nguyen Decl. at ¶ 5; Smith Report at 6. The burglar alarm will be triggered to

activate the ignition kill when an attempt is made to start the vehicle without first disarming the alarm. Dempkowski Decl. at ¶ 5; Nguyen Decl. at ¶ 5; Smith Report at 6. From a technical perspective, the anti-theft software upgrade is implemented by modifying the Integrated Body Control Unit/Body Control Module (IBU/BCM) software logic on eligible vehicles. Dempkowski Decl. at ¶ 5; Nguyen Decl. at ¶ 5.

The method of theft popularized by social media promotes entry by breaking a window. Smith Report at 9, 16. The anti-theft software upgrade is designed to prevent the vehicle from being started when subjected to window break-ins of the social-media style challenge, as long as the vehicle owner locks their vehicle and arms the burglar alarm. Dempkowski Decl. at ¶ 6; Nguyen Decl. at ¶ 6; Smith Report at 9, 16. By design, the anti-theft software upgrade does not impair vehicle reliability or performance; it simply expands the logic and parameters by which the existing alarm system operates. Dempkowski Decl. at ¶ 6; Nguyen Decl. at ¶ 6.

Although the anti-theft software upgrade operates the same way across all eligible Hyundai and Kia vehicles, many different iterations of the anti-theft software had to be developed. Dempkowski Decl. at ¶ 7; Nguyen Decl. at ¶ 7. Due to differences in the number and design of control modules, including among different trim levels within the same vehicle model, the anti-theft software upgrades need to be specifically designed to account for different model variations. Dempkowski Decl. at ¶ 7; Nguyen Decl. at ¶ 7; Smith Report at 6. Multiple vehicle systems, including body control modules, engine control modules, and ignition systems, interact in order to accommodate this technology. Dempkowski Decl. at ¶ 7; Nguyen Decl. at ¶ 7. Because of the need to develop many variations of the anti-theft software upgrade across models and trims, the anti-theft software upgrade was rolled out at different times for eligible vehicles. Dempkowski Decl. at ¶ 7; Nguyen Decl. at ¶ 7.

Before being released to vehicle owners and lessees, each tested version of the anti-theft software upgrade for Hyundai and Kia vehicles underwent a rigorous validation process that required passing many separate tests. Dempkowski Decl. at ¶ 8;

1  Nguyen Decl. at ¶ 8; Smith Report at 8.  This validation testing required confirmation
2  that all alarm and ignition kill functions operated properly under numerous different
3  scenarios, which tested both the conditions under which the alarm and ignition kill
4  functions were supposed to activate as well as when they should not activate.
5  Dempkowski Decl. at ¶ 8; Nguyen Decl. at ¶ 8; Smith Report at 8.  The testing
6  parameters were conveyed by Research and Development teams at HMC and KC that
7  worked directly with the suppliers who provided the enhanced anti-theft software logic.
8  Dempkowski Decl. at ¶ 8; Nguyen Decl. at ¶ 8.  Included in those test scenarios were
9  various functionality tests to ensure the updated anti-theft software operated compatibly
10 with other vehicle functions such as vehicle lights, windshield wipers, defoggers,
11 various warning signals, etc. and a "sleep mode" test to ensure the Body Control
12 Module in which the anti-theft software upgrade operates remains stable when in a low-
13 power state (key off and all entry points such as doors, hood, trunk, tailgate closed).
14 Dempkowski Decl. at ¶ 8; Nguyen Decl. at ¶ 8; Smith Report at 8.

15     Each of the many versions of the anti-theft software upgrade underwent
16 validation testing.  Dempkowski Decl. at ¶ 8; Nguyen Decl. at ¶ 8.  The thoroughness
17 of this testing process combined with later field troubleshooting provided Hyundai and
18 Kia engineers a commercially appropriate level of confidence that overall the anti-theft
19 software upgrades perform as intended and operate compatibly and safely with all other
20 vehicle functions.[13]  Dempkowski Decl. at ¶ 8; Nguyen Decl. at ¶ 8; Smith Report at 8,
21 16.

[13]  To promote continued vehicle security, defendants will not publicly disclose the
precise protocols for testing and validating the software upgrade.  Charts summarizing
these validations tests are provided in the Declaration of Cristina Henriquez at ¶¶ 2-6,
Ex. A.  Defendants have produced the validation documents in confirmatory discovery.
*Id.* at ¶ 5.

## IV.    THE COMPANIES' SUCCESSFUL EFFORTS TO PROMOTE AND IMPLEMENT THE ANTI-THEFT SOFTWARE UPGRADE

HMA and KA began offering free installation of the anti-theft software upgrade on a rolling basis beginning on February 14, 2023, and January 19, 2023, respectively. Dempkowski Decl. at ¶ 4; Nguyen Decl. at ¶ 4.  Hyundai owners and lessees were notified by mail starting on February 20, 2023; some were also notified by email starting on February 28, 2023.  Nguyen Decl. at ¶ 4.  Kia owners and lessees were notified by mail (and some by email too) as early as January 2023.  Dempkowski Decl. at ¶ 4.  These efforts precede approval or implementation of the proposed class settlement.  Collectively, dealers nationwide have been installing the anti-theft software upgrade on an average of several thousand vehicles per day.  Dempkowski Decl. at ¶ 10; Nguyen Decl. at ¶ 10.

The below charts show anti-theft software upgrade installations on Hyundai vehicles as of September 21, 2023.  Nguyen Decl. at ¶ 10.  The data indicates that aggregate completions continue at steady rates.  Adjusted completion rates reflect the reality that many individual vehicles within a class that spans more than 12 years have been scrapped, are unregistered, or are otherwise unlikely to return to road service and therefore will never receive the upgrade. *Id.* at ¶ 11.  These adjusted rates show anti-theft software upgrade installations already near or above 50%, even *before* the settlement has received preliminary approval.



After adjusting for vehicles reported as being off the road (scrapped or unregistered), the installation rate for each eligible Hyundai vehicle exceeds 41%. Nguyen Decl. at ¶¶ 10-11.

| Model | MY | Completed | Total | Completed % | Account For Total | Adj Comp % |
|---|---|---|---|---|---|---|
| Elantra | 2017-2020 | 134,341 | 467,594 | 28.7% | 88,865 | 47.7% |
| Sonata | 2015-2019 | 123,237 | 457,356 | 26.9% | 109,918 | 51.0% |
| Venue | 2020-2021 | 18,054 | 31,735 | 56.9% | 1,668 | 62.1% |
| Kona | 2018-2022 | 37,062 | 78,645 | 47.1% | 5,829 | 54.5% |
| Veloster | 2012-2021 | 17.043 | 95,141 | 17.9% | 23,147 | 42.2% |
| Accent | 2018-2022 | 25,010 | 81,927 | 30.5% | 10,725 | 43.6% |
| Elantra | 2021-2022 | 8,376 | 19,886 | 42.1% | 1,003 | 47.2% |
| Elantra Gt | 2018-2020 | 5,446 | 17,342 | 31.4% | 2,314 | 44.7% |

| Model | MY | Completed | Total | Completed % | Account For Total | Adj Comp % |
|---|---|---|---|---|---|---|
| Santa Fe | 2013-2018 | 15,832 | 63,902 | 24.8% | 8,821 | 38.6% |
| Santa Fe Sport | 2013-2018 | 91,147 | 356,157 | 25.6% | 55,397 | 41.1% |
| Santa Fe Xl | 2019 | 1,289 | 3,128 | 41.2% | 217 | 48.1% |
| Sonata | 2011-2014 | 77,845 | 542,733 | 14.3% | 168,123 | 45.3% |
| Tucson | 2011-2022 | 159,161 | 514,540 | 30.9% | 74,267 | 45.4% |
| Elantra | 2011-2020 | 116,084 | 893,383 | 13.0% | 256,006 | 41.6% |
| Elantra Gt | 2013-2017 | 14,113 | 75,751 | 18.6% | 17,944 | 42.3% |
| Genesis Coupe | 2013-2014 | 1,160 | 13,032 | 8.9% | 4,546 | 43.8% |
| Palisade | 2020-2021 | 4,039 | 8,572 | 47.1% | 377 | 51.5% |
| Santa Fe | 2019-2022 | 31,690 | 83,782 | 37.8% | 5,856 | 44.8% |
| Sonata | 2015-2019 | 0 | 61 | 0.0% | 45 | 73.8% |
| **Grand Total** | | **880,929** | **3,804,667** | **23.2%** | **835,068** | **45.1%** |

As of September 26, 2023, the adjusted total anti-theft software upgrade installation rate (accounting for vehicles that are scrapped, unregistered, or are otherwise unlikely to return to road service) also approaches 40% for all anti-theft software-eligible Kia vehicles. Dempkowski Decl. at ¶ 11.

| Model | MY | Completed | Total | Completed % |
|---|---|---|---|---|
| K5 | 2021-2022 | 3,126 | 6,368 | 49.1% |
| Sportage | 2011-2016 | 45,052 | 192,501 | 23.4% |
| Sportage | 2017-2022 | 136,885 | 328,375 | 41.7% |
| Optima (TF) | 2011-2015 | 18,991 | 120,793 | 15.7% |

| Model | MY | Completed | Total | Completed % |
|---|---|---|---|---|
| Optima (QF) | 2011-2015 | 42,258 | 224,132 | 18.9% |
| Optima (Jfa) | 2016-2020 | 70,310 | 279,523 | 25.2% |
| Optima (JF) | 2016-2018 | 5,839 | 25,163 | 23.2% |
| Sorento | 2011-2015 | 57,043 | 403,744 | 14.1% |
| Sorento | 2016-2020 | 124,677 | 421,935 | 29.5% |
| Sorento | 2021-2022 | 5,712 | 13,495 | 42.3% |
| Forte | 2014-2016 | 28,069 | 207,046 | 13.6% |
| Forte | 2017-2018 | 33,775 | 183,709 | 18.4% |
| Forte | 2019-2021 | 62,915 | 232,260 | 27.1% |
| Soul | 2020-2022 | 59,229 | 57,450 | 35.7% |
| Rio | 2012-2017 | 7,333 | 91,839 | 8.0% |
| Rio | 2018-2021 | 16,387 | 69,702 | 23.5% |
| Sedona | 2020-2021 | 2,910 | 44,376 | 6.6% |
| Sedona | 2015-2021 | 15,247 | 79,336 | 19.2% |
| Seltos | 2021-2022 | 19,952 | 50,784 | 39.3% |
| **Grand Total** | | 755,710 | 3,140,851 | 24.1% |

*Id.* at ¶ 10.  Moreover, as one would expect, installation rates tend to be lower in areas with low theft rates, as reflected in the geographic chart below concerning Hyundai vehicles.  *See* Nguyen Decl. at ¶ 12.  Owners in these areas might deem the upgrade unnecessary, particularly given NHTSA's position that immobilizers are not required.



The companies continue to be proactive and innovative in their efforts to encourage installation of the anti-theft software upgrade, including working with local governments and police departments.  For example, from July 27-31, 2023, HMA collaborated with Washington D.C. Mayor Muriel Bowser and acting Metropolitan Police Chief Pamela A. Smith to provide a mobile service center at RFK Stadium. Nguyen Decl. at ¶ 13.  The mobile service center complemented HMA's efforts to drive further installations of Hyundai's free anti-theft software upgrade.  *Id.*  Specially trained mobile service technicians were available on-site and installed and completed the anti-theft software upgrade on more than 6,000 vehicles during the event.  *Id.*  Similarly, on August 12, 2023, KA collaborated with the Atlanta police department, Atlanta Mayor Andre Dickens, and Kia dealers in Atlanta to provide a mobile service center in Atlanta. Dempkowski Decl. at ¶ 12.  Specially trained mobile service technicians were available on-site and installed and completed the anti-theft software upgrade on many vehicles and distributed numerous steering wheel locks.  *Id.*

In addition, the proposed Settlement Agreement provides that the anti-theft software upgrade will be implemented on eligible vehicles without request when Class Members bring their vehicles to an authorized dealer even for unrelated services or repairs. (Revised Settlement Agreement ("R.S.A."), Section II.A.3).

To further promote notice and installation of the anti-theft software upgrade, the proposed Settlement Agreement also requires the issuance of a nationwide press campaign (including via social media platforms, such as TikTok and Instagram) and a driver awareness and instructional campaign promoting the anti-theft software upgrade and discussing its availability and effectiveness. *Id.* at Section II.A.6.

In light of their robust outreach activities with respect to the anti-theft software upgrade, HMA and KA are forecasting a completion rate well above that of a typical customer-noticed campaign. Dempkowski Decl. at ¶ 12; Nguyen Decl. at ¶ 13.

In addition, dealers performing the anti-theft software upgrade also affix two stickers, one each on the driver and passenger windows, that indicate that the vehicle is equipped with anti-theft logic. Dempkowski Decl. at ¶ 13; Nguyen Decl. at ¶ 14. Based on anti-theft software upgrade completions as of September 21, 2023, HMA estimates it has issued more than 1,761,858 decals. Nguyen Decl. at ¶ 14. Similarly, based on anti-theft software upgrade completions as of September 26, 2023, KA estimates it has issued more than 1,511,420 decals. Dempkowski Decl. at ¶ 13.

## V.    NO MANUFACTURER OFFERS THEFT-PROOF VEHICLES

In assessing the value and efficacy of the anti-theft software upgrade, it is important to be cognizant that no vehicle is theft-proof, and neither immobilizer technology nor ignition kill systems can prevent all thefts. Smith Report at 9, 16. Door locks, ignition locks, ignition kill systems, burglar alarms, and parts marking are all features intended to inhibit vehicle theft. *Id.* Despite such measures, all cars can be stolen by first stealing or otherwise accessing the car's key. *Id.* Cars are also often stolen by use of a tow truck. *Id.* Immobilizer systems can be defeated by capturing and duplicating the code from the key's transponder or programming the vehicle to accept a

1  new transponder code.  *Id*.  Vehicle thefts made using these methods to defeat

2  immobilizer systems are well known by law enforcement agencies.

3      Just as vehicles with factory-equipped immobilizer technology are routinely

4  stolen in a variety of ways, breach scenarios exist that are more complex than breaking

5  a window (as in the social media method of theft) in response to which the anti-theft

6  software upgrade might not (and was not designed to) prevent a theft.  Like all anti-

7  theft measures, the anti-theft software upgrade has known limitations.  *Id*.  It does not

8  serve the interests of Hyundai and Kia vehicle owners to detail such possible theft

9  methods.  No evidence suggests such methods played any role in the uptick of thefts

10  that led to this litigation, or that such methods are being employed now on any

11  meaningful or promoted scale to evade the protections afforded by the anti-theft

12  software upgrade or that would make Hyundai and Kia vehicles relatively less secure

13  than other manufacturers' vehicles.

14      For example, the National Insurance Crime Bureau's ("NICB") recent national

15  theft data from 2022 shows that, among the top 10 stolen vehicle models is the Toyota

16  Camry, and the most stolen model year is 2021.  *NICB Vehicle Theft Trend Data*,

17  National Insurance Crime Bureau (July 27, 2023), https://www.nicb.org/news/news-

18  releases/new-report-shows-full-size-trucks-have-highest-theft-rate.  That Toyota model

19  year contains an immobilizer system,[14] yet was stolen in aggregate numbers that do not

20  materially differ from the number of Hyundai and Kia models that were most stolen

21  during the same period, and at the height of the social media trend targeting those

22  Hyundai and Kia models.  This data tends to show that incorporation of immobilizer or

23  similar ignition kill technology will not necessarily result in materially fewer thefts if

24  thieves favor and target a particular model.

---

25

26      [14]    *See* 2021 Toyota Camry Owner's Manual at 79 (available at

27  https://assets.sia.toyota.com/publications/en/om-s/OM06242U/pdf/OM06242U.pdf?_gl=1*k2iapj*_tmna_ga*NDAxODgwMjQ1LjE2OTMwODc0NjI.*_tmna_ga_EP43E5EFVZ*MTY5MzA4NzQ2MS4xLjEuMTY5MzA4

28  NzY3OC40MS4wLjA).

The state-by-state data in the NICB report further illustrates the relative vulnerability of cars with immobilizers as compared to the vehicles at issue. For example, although three cities within New York state have sued, the NICB data shows 7 of the 10 most stolen vehicles in New York in 2022 *had* immobilizers. Only one Hyundai model and no Kia models are on that list. In a number of other states (which range in demographics and location), *no* Hyundai or Kia model was in the top 10 most stolen vehicles for 2022, yet the lists for these states are replete with vehicles that *do* contain immobilizers—for example Arizona, Alabama, Alaska, Arkansas, Idaho, Indiana, Iowa, Maine, Mississippi, Montana, New Hampshire, New Jersey, Oregon, South Carolina, South Dakota, Texas, Utah, and Vermont. This data shows that vehicles with immobilizers can be and are stolen at significant rates and suggests that multiple factors impact which models are stolen most frequently.

## VI.    INITIAL FIELD DATA CONFIRMS THE ANTI-THEFT SOFTWARE UPGRADE WORKS AS INTENDED

The anti-theft software upgrade was launched in early 2023. Dempkowski Decl. at ¶ 10; Nguyen Decl. at ¶ 10. Currently more than 1.6 million Hyundai and Kia vehicles have the anti-theft software upgrade installed. Dempkowski Decl. at ¶ 10; Nguyen Decl. at ¶ 10. All available evidence suggests the anti-theft software upgrade is working as intended to prevent thefts attempted by means of the method popularized on social media.

### A.    Independent Testing Confirms The Anti-theft Software Upgrade Was Appropriately Validated and Performs As Intended

In connection with this submission, HMA and KA retained James Smith, a mechanical engineer and vehicles system expert at Exponent, to verify the efficacy of the anti-theft software upgrade. Exponent's test pool included (a) vehicles on which the companies had validated the anti-theft software; (b) other Class Vehicles that had the anti-theft software upgrade installed; and (c) vehicles reported as stolen. Exponent's

methodologies and findings are detailed in Mr. Smith's report, submitted concurrently. *See* Smith Report. The significant determinations include the following:

- The process that Hyundai and Kia used to validate the anti-theft software, which required passing many tests designed to confirm proper operation of the ignition kill function and compatibility with other vehicle functions, **provides reasonable confidence that the anti-theft software upgrade performs as intended and operates compatibly with other vehicle functions**.

- Installation of the anti-theft software upgrade was performed in less than 10 minutes and without difficulties.

- Functional testing by Exponent of the anti-theft software upgrade on 19 vehicles showed it was installed correctly and functioned as expected. **In all 19 cases the vehicles could not be started using the social media theft method**.

Smith Report at 7-8. In addition to assessing the pre-launch validation process and testing the anti-theft software upgrade as installed on a cross-section of vehicles, Exponent also evaluated four vehicles that had been reported stolen after having received the anti-theft software upgrade. *Id.* at 9. The results of those investigations are summarized below and did not alter Exponent's conclusion that the anti-theft software upgrade operated effectively to prevent the social media method of theft.

- On a 2017 Hyundai Tucson, Exponent confirmed that, even after the theft, the anti-theft software upgrade operated properly to cause the alarm to trigger (if armed) when the ignition switch was turned and thus prevent the vehicle from starting. Exponent concluded that, rather than the theft resulting from a failure of the anti-theft software, the evidence indicated the doors were unlocked and the alarm was not armed at the time of the theft. *Id.* at 9, 11.

- Another of these vehicles was the 2017 Kia Sportage referenced in an August 22, 2023 email to the Court by Kathryn Snyder. Exponent concluded this vehicle did not exhibit signs of the social media method of theft. Instead, for reasons detailed in the Smith report, the investigation showed "[i]t is more likely this vehicle was either started with a key, or not started at all and instead towed away." *Id.* at 13-15.

- Finally, Exponent investigated two Kia Rios where the anti-theft software did not operate as expected. Both vehicles were confirmed to be among a small subset of Kia Rios that received the incorrect anti-theft software, an implementation error that Kia has acknowledged and taken steps to rectify. *Id.* at 11-13.

As further explained in Mr. Smith's full report, his investigation of the anti-theft software development, validation and performance on installed vehicles permitted him to conclude to a "reasonable degree of engineering certainty" that the Hyundai/Kia anti-theft software upgrade "is effective in preventing the social media challenge theft method." *Id.* at 16.

### B.    The Companies' Evaluation Of Reportedly Stolen Vehicles Shows No Basis To Question Anti-theft Software Upgrade Efficacy

For reasons previously explained, it is unfortunate but expected that some thefts of vehicles equipped with the anti-theft software upgrade continue. Cars by all manufacturers equipped with immobilizers and ignition kill systems are stolen frequently and dominate the recent "most-stolen" lists of most states. *See* Section V.[15] Continued thefts might be particularly likely to result when thieves target a particular

---

[15]  For example, there are reports that immobilizer-equipped vehicle thefts rose in the United Kingdom from 2021-2022. *See* David Mullen, *Keyless Cars Twice As Likely To Be Stolen As Non-Keyless Models: Time To Dust Off The Steering Wheel Lock?* (November 28, 2022) (publicly available at https://www.driving.co.uk/news/keyless-cars-twice-as-likely-to-be-stolen-as-non-keyless-models/).

brand or model, as undoubtedly resulted from the documented social media phenomenon here that centered on certain Hyundai and Kia models. The anti-theft software upgrade operates as a barrier to the method of theft popularized by social media, but, like immobilizers generally, cannot be expected to prevent all thefts.

HMA and KA are endeavoring to investigate reported thefts that come to their attention of vehicles with the anti-theft software upgrade to confirm the efficacy of the upgrade in the field. Dempkowski Decl. at ¶ 15; Declaration of John Gramata ("Gramata Decl.") at ¶ 3. These investigations typically begin when a customer reports to HMA or KA that his/her vehicle was the subject of a theft or attempted theft. Dempkowski Decl. at ¶ 15; Gramata Decl. at ¶ 3. To the extent possible, the investigations involve interviewing the customer, reviewing any documentation or other materials relating to the incident, and inspecting the vehicle if made available to HMA or KA. Dempkowski Decl. at ¶ 15; Gramata Decl. at ¶ 3. Some customers submit photographs and/or make their vehicles available to HMA or KA. Dempkowski Decl. at ¶ 15; Gramata Decl. at ¶ 3. HMA and KA also make reasonable independent efforts to gather the available information about the purported thefts, such as police reports. Dempkowski Decl. at ¶ 15; Gramata Decl. at ¶ 3. If the mode of theft is not apparent from circumstances or interviews, and to the extent the vehicle is available to HMA or KA, the vehicle is evaluated to confirm the anti-theft software upgrade is operating as intended and activates the ignition kill feature as designed to prevent the theft mode popularized on social media. Dempkowski Decl. at ¶ 16; Gramata Decl. at ¶ 4. As shown below these **investigations have yet to reveal an instance where the appropriate anti-theft software upgrade did not perform as designed to prevent theft by the social media method.**[16] *See* Dempkowski Decl. at ¶ 17; Gramata Decl. at ¶ 5.

---

[16] If there were an instance where the software failed, the Settlement Agreement provides warranty protection for the software upgrade for the life of the vehicle. (R.S.A., Section II.A.2). As expected during a rollout of this scale, minor issues have

The Companies' investigation of thefts of vehicles equipped with the anti-theft software upgrade (including some reported in certain media cases cited by the government entity plaintiffs (Dkt. 183 at 7)) has confirmed that, in many instances, the theft was accomplished by other means.  Investigations into many customer reports of theft after purported installation of the anti-theft software upgrade remain ongoing or were inconclusive (in part because the vehicle might not have been made available for inspection).  But several conclusions can be drawn from the available data:

- These investigations have yet to confirm an instance where the vehicle-appropriate, anti-theft software upgrade does not perform as designed.

- There were more than one hundred eighty-seven occasions where the theft mode popularized by social media had been attempted but no theft resulted, indicating that the anti-theft software upgrade worked precisely as designed to prevent the theft.

- HMA and KA combined found at least ninety-nine thefts perpetrated by a method other than the theft mode popularized by social media, which the anti-theft software upgrade was not designed to prevent.

- In some instances, there was no indication of forced entry, thus the vehicle was likely left unlocked—the anti-theft software upgrade requires that the system be armed (vehicle locked) in order for it to activate.

arisen during implementation.  For example, there are some reported instances of minor compatibility issues with vehicle remote start convenience features, some of which have been resolved with new software deployment and the remaining of which are currently being investigated.  Dempkowski Decl. at ¶ 9; Nguyen Decl. at ¶ 9.  This issue did not affect operation of the software upgrade or any factory-equipped remote start feature.  Additional software addressed this issue and became available July 7, 2023 (Kia) and August 16, 2023 (Hyundai).  Dempkowski Decl. at ¶¶ 9; Nguyen Decl. at ¶ 9.  Also, KA discovered a manual error with respect to the software version installed on certain Rio models.  Affected owners are being notified to obtain free installation of the appropriate software version.  Dempkowski Decl. at ¶ 9.

- These investigations also found more than twenty occasions where an owner reported a vehicle stolen but either dealer records or records from the company that runs the anti-theft software could not confirm that those vehicles had ever received the anti-theft software upgrade.

- Several thefts were likely perpetrated by "chop shop" organizations that appeared to have used a mode of theft different than the theft mode popularized by social media.

Dempkowski Decl. at ¶ 17; Gramata Decl. at ¶ 5.

One example of the latter scenario—a vehicle apparently targeted for parts and stolen in a different way—is reflected in the letter sent by class member Kathryn Snyder to the Court on August 22, 2023[17] and the photographs she provided below:



_____

[17] None of the other consumers who contacted the Court raised any issues related to software upgrade performance. *See* April Johnson letter dated August 23, 2023 (attempted theft of 2015 Kia Optima); Ken Paulson e-mail dated August 27, 2023 (theft of unidentified Hyundai vehicle not alleged to have received the software upgrade); Anthony Pistillo letter dated August 30, 2023 (owned software-ineligible 2013 Hyundai Elantra Coupe).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







Significantly, as shown in the photos, including those Ms. Snyder provided, the ignition lock might have been tampered with since the key slot is turned to the "ON" position and there is no key in the slot. As Mr. Smith observed, "[i]f the software upgrade was installed and the alarm was armed, and a tool, such as a flat blade screwdriver, was inserted into the key slot, the alarm would trigger, and the engine would not start." Given these observations, Mr. Smith concluded, "this vehicle was likely not stolen using the social media theft method. It is more likely this vehicle was either started with a key, or not started at all and instead towed away." Towing could be accomplished by accessing and pressing the shift lock release button to shift the transmission, and Mr. Smith saw evidence in the photos that this might have occurred. At that point, the "vehicle could then be towed away very readily." As Mr. Smith determined, neither the anti-theft software upgrade nor the typical immobilizer technology used by other manufacturers would prevent a theft accomplished by towing or use of a key. *See* Smith Report at 14. It is also notable that this vehicle appears to have been extensively stripped, meaning it was targeted for parts value and not for joyrides or other purposes typically associated with the social media theft trend targeting Hyundai and Kia cars. Vehicles stolen for parts are frequently towed to secluded locations where they can be stripped.

### C.   Investigation Of Media Reports Give No Reason To Question The Anti-theft Software Upgrade Efficacy

Similar explanations apply to many if not all the instances of thefts reported in media reports of vehicles that purportedly had the anti-theft software upgrade installed. A sample of these results (including thefts reported in media cited by the Government Entities) is summarized below.

| Report | Investigation results |
|---|---|
| 2020 Kia Sportage of Guerrero-Pincheria reportedly stolen after receiving the anti-theft software upgrade (cited by Government Entity Plaintiffs, Dkt. 183 at 7 https://www.nbcwashington.com/investigations/some-kia-owners-question-anti-theft-software-fix-after-cars-were-stolen-following-upgrade/3390525/) | The vehicle has not been recovered and thus not inspected, but because no glass was left at the scene, this vehicle was likely subject to a different method of theft than that popularized on social media. |
| 2019 Kia Sportage of Cook was reported as the subject of a window break-in *attempted* theft (cited by Government Entity Plaintiffs, Dkt. 183 at 7 https://www.nbcwashington.com/investigations/some-kia-owners-question-anti-theft-software-fix-after-cars-were-stolen-following-upgrade/3390525/) | Because a theft was attempted but could not be completed, it is reasonable to conclude the anti-theft software upgrade worked as designed. |
| 2020 Kia Optima of Rose was reportedly stolen after a window break-in. Car was recovered with USB cord inside (cited by Government Entity Plaintiffs, Dkt. 183 at 7 https://www.nbcwashington.com/investigations/some-kia-owners-question-anti-theft-software-fix-after-cars-were-stolen-following-upgrade/3390525/) | The vehicle had no keys, so it could not be armed and disarmed at the time of the inspection to determine if the anti-theft software upgrade was operating. This investigation remains inconclusive. |

*See* Dempkowski Decl. at ¶ 17.

## <u>CONCLUSION</u>

The anti-theft software upgrade operates as an effective, expedient, and unobtrusive deterrent for the type of theft that prompted this litigation. The Companies developed this technology at substantial expense and are offering it, fully warranted, as part of this Settlement even though such technology is not required by law and the true cause of any injury to consumers are criminal acts of non-parties. The anti-theft software upgrade provides significant protection that, along with other benefits in the proposed Settlement, offer a more than fair and reasonable resolution of the consumer claims and merit preliminary approval.

Dated:  September 27, 2023

By:  /s/*Shon Morgan*
       Shon Morgan
       Cristina Henriquez
       QUINN EMANUEL URQUHART
       & SULLIVAN, LLP
       865 South Figueroa Street, 10th Fl.
       Los Angeles, CA  90017-2543

       Peter J. Brennan
       JENNER & BLOCK LLP
       353 North Clark Street
       Chicago, IL 60654-3456

       *Counsel for Defendants*