# E$^x$ponent®

Exponent
23445 N. 19th Avenue
Phoenix, AZ 85027

telephone 623–582–6949
facsimile 623–581–8814
www.exponent.com

September 25, 2023

Shon Morgan, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017

Re:    Hyundai/Kia Theft Deterrent Software Review
       Exponent Project Number: 2105753

Mr. Morgan:

Pursuant to your request, Exponent has performed an evaluation of the ignition and
security systems of Hyundai and Kia vehicles that are the subject of recent increased
thefts resulting from challenges made popular on social media.  Exponent analyzed the
burglar alarm systems that pre-existed in these vehicles and the software upgrade
recently made available for the subject vehicles.  This report summarizes the analysis
performed by Exponent on this matter.

## 1.0 Background

### 1.1 Engagement

It has been widely reported that beginning in approximately 2021 there has been a rise in
thefts of Hyundai and Kia vehicles resulting from videos posted by car thieves on TikTok
and other social media platforms.  The videos outlined a method by which a thief could
bypass the vehicles' security features and start the vehicle.  The susceptible vehicles were
those not equipped with push-button ignitions and immobilizer systems.  The vehicles
instead had "insert-and-turn" steel key ignition systems.  I have analyzed this matter and
become familiar with the Hyundai/Kia ignition and theft deterrent systems and the software
upgrade developed by Hyundai/Kia to address the theft method.

I am a licensed Professional Mechanical Engineer, registered in the state of Arizona.  I have
been employed by Exponent at the Test and Engineering Center (TEC) in Phoenix, Arizona
since November 1994.  The TEC is Exponent's largest test facility, and we maintain a
vehicle proving ground, inspection laboratories, and full-scale vehicle impact test facilities.
My title is Principal Engineer, and I have the responsibility for managing much of the testing
staff and resources at the TEC.  In my 29 years with Exponent, I have conducted hundreds of
full-scale automotive tests and vehicle investigations.

A portion of the vehicle investigations I have conducted focused on the analysis of vehicles
that had been reported as stolen and were then recovered by law enforcement.  I assisted
clients, mainly representing insurance companies, with the determination of the processes
used by thieves to break into and steal the vehicles.  Through my experience and training

associated with these theft investigations, I have become very familiar with vehicle theft deterrent systems and the methods used by thieves to steal vehicles.

My Curriculum Vitae is attached as Appendix A.  Exponent charges $400 per hour for my time for all activities in 2023.

*1.2 Vehicle Theft Deterrent Systems*

Vehicle manufacturers employ various strategies to deter thieves from stealing cars.  Door locks, ignition locks, steering locks, alarm systems, parts marking, ignition kill systems, and immobilizers are among the most common deterrence methods currently in use.  The United States Department of Transportation defines and enforces requirements for vehicle theft deterrence, and the requirements are consolidated in the Code of Federal Regulations (49 CFR) under Federal Motor Vehicle Safety Standard (FMVSS) number 114, entitled "Theft protection and rollaway prevention".  Vehicles sold in the United States are required to comply with FMVSS 114.  As written, the purpose of the standard as it relates to vehicle thefts is to decrease the likelihood that a vehicle is stolen.  FMVSS 114 requires the following:

1) Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
   a. The normal activation of the vehicle's engine or motor; and
   b. Either steering, or forward self-mobility, of the vehicle, or both.
2) For each vehicle type manufactured by a manufacturer, the manufacturer must provide at least 1,000 unique key combinations, or a number equal to the total number of the vehicles of that type manufactured by the manufacturer, whichever is less. The same combinations may be used for more than one vehicle type.
3) An audible warning to the vehicle operator must be activated whenever the key is in the starting system and the door located closest to the driver's designated seating position is opened. An audible warning to the vehicle operator need not activate:
   a. After the key has been inserted into the starting system, and before the driver takes further action; or
   b. If the key is in the starting system in a manner or position that allows the engine or motor to be started or to continue operating; or
   c. For mechanical keys and starting systems, after the key has been withdrawn to a position from which it may not be turned.
4) If a vehicle is equipped with a transmission with a "park" position, the means for deactivating the vehicle's engine or motor must not activate any device that would prevent steering or forward self mobility unless the transmission is locked in the "park" position.

These requirements can be satisfied by using mechanical ignition locks and metal keys or by using electronic locking systems, such as immobilizers.



The United States Department of transportation also requires compliance with 49 CFR Part 541, entitled "Federal Motor Vehicle Theft Prevention Standard". Manufacturers may comply with this standard by marking the major parts on vehicles for which vehicles are often stolen. Manufacturers may also choose to be exempted from this requirement by installing an anti-theft device, if the federal government concludes that the device is likely to be as effective in reducing and deterring motor vehicle theft as compliance with the parts-marking requirements.

Mechanical Key Systems

A mechanical key theft deterrent system uses a physical, metal key. The key is used to disengage the ignition lock in order to start the vehicle. The key also disengages the steering lock and the shift lock, allowing the steering wheel to turn and the transmission shift lever to be moved out of the "Park" position.

The Hyundai and Kia vehicles that are the subject of this matter utilize a mechanical key system. For these vehicles, the metal key can also be used to lock and unlock the driver door. I have evaluated the system and find that it meets the requirements outlined in FMVSS 114. For these vehicles, Hyundai and Kia also utilize parts marking to comply with 49 CFR Part 541.

Mechanical key systems are a theft deterrent, making the vehicle less desirable to steal, but are not theft proof. If a thief is able to break into a locked car, the ignition lock may be forcibly removed and the ignition switch may be accessed. A vehicle with a mechanical key system can also be stolen using a tow truck to tow away the vehicle without starting the vehicle or, in some cases, without even entering the vehicle. The vehicle can also be stolen if the vehicle's key is first stolen.

Immobilizer Systems

An immobilizer is an electronic device that prevents a vehicle's engine from starting unless the correct key or key fob is used. For these systems, the key/fob is typically referred to as a "smart key" or "chip key" because an electronic chip, called a transponder chip, is integrated into the head of the key or the key fob. The transponder chip is a microchip equipped with radio frequency identification (RFID) technology. To function, immobilizer electronics integrated into the vehicle's ignition system emit a signal that searches for the transponder chip. When in range of the emitted signal, the transponder chip responds by transmitting a code back to the immobilizer. If the immobilizer receives an identification code indicating the correct transponder chip is in the car, the immobilizer system will allow the vehicle's engine to start. If the correct transponder chip code is not within range of the vehicle's immobilizer system, the vehicle's ignition system and/or engine is not operational.

Immobilizer systems are a theft deterrent but are not theft proof. A vehicle with an immobilizer system can be stolen using a tow truck to tow away the vehicle without starting the vehicle or, in some cases, without even entering the vehicle. Immobilizer systems may



also be vulnerable to electronic replication of the transponder chip RFID code. For electronic replication to occur, the thief needs to be in close proximity to the vehicle's chip key or gain access to the on-board diagnostic (OBD) port inside the vehicle. A vehicle with an immobilizer system can also be stolen if the vehicle's key is first stolen.

*1.3 Theft Method*

Exponent conducted a review of the social media theft method (the "theft method") and confirmed that under certain conditions, for Hyundai and Kia vehicles with insert-and-turn key systems, a locked vehicle could be broken into, started, and driven away. In general, the process is as follows:

- The thief breaks a window, and the alarm does not sound
- The thief enters the vehicle through the broken window and navigates to the driver's seat
- The thief forcibly removes the plastic steering column cover
- The thief forcibly removes the ignition lock
- A screwdriver, pliers, or similar tool (USB cable) is used to turn the ignition switch and start the vehicle
- The alarm system is disabled when the vehicle is started
- With the ignition switch turned to the "ON" position, the steering lock and transmission lock are disengaged
- The vehicle is driven away

Should the thief trigger the factory-installed alarm system before starting the car, which would happen if, for example, any of the doors were opened from the inside, the alarm would sound and the engine would not be able to be started.

*1.4 Hyundai/Kia Theft Deterrent Systems*

Hyundai and Kia offer two integrated theft deterrent systems for the models and model years of vehicles that are of interest in this matter. For Hyundai/Kia vehicles with push-to-start ignition systems, an immobilizer system is standard equipment. The immobilizer system uses a "smart key" with a transponder chip. The correct transponder chip must be near the vehicle's ignition button in order to start the car. Otherwise, the integrated immobilizer system will prevent the car from starting by disabling the engine's fuel delivery system.

An immobilizer system is not typically installed on vehicles with an insert-and-turn mechanical key ignition system. Non-immobilizer vehicles use a "remote key", which includes a mechanical, metal key used to unlock the ignition lock and start the car. The remote key also typically includes a key fob, which can be used to remotely lock and unlock doors, unlock the trunk, and arm the burglar alarm (if installed). The remote key does not typically have a transponder chip installed. These vehicles that did not have immobilizer systems, the "subject vehicles", are those that are targeted by thieves because of the social media challenge.



Exponent reviewed the factory-installed theft deterrent systems for Hyundai and Kia vehicles with the immobilizer system and without the immobilizer system. The immobilizer system vehicles functioned as expected. With the key in the vehicle and near the ignition button, the vehicle could be started by pressing the button. With the key away from the vehicle, the vehicle could not be started.

Exponent inspected vehicles without the immobilizer system and reviewed documentation for the specifications of the theft deterrent systems in these vehicles. According to ALLDATA, an online source for vehicle specification and repair information, and Hyundai/Kia sources, the large majority of the vehicles subjected to the social media theft method come from the factory with integrated burglar alarm systems. These burglar alarm systems include a feature that prevents the vehicle from starting (i.e., an ignition kill system) if the alarm is triggered. According to the information in ALLDATA, the component that controls this feature is called the Burglar Alarm Relay, and it is intended to cut off power to the vehicle's starting system and prevent the engine from starting in the event of a theft attempt, when the alarm is triggered.

As a representative example, the ALLDATA schematic for the 2019 Hyundai Sonata starting system in shown in Figure 1. The Burglar Alarm Relay is connected to the vehicle's ignition system and controlled by the Smart Junction Block. The Smart Junction Block, the theft deterrent system, and the ignition system are all controlled by a computer in the vehicle called the Body Control Module (BCM).

Exponent confirmed through inspection that the theft deterrent systems in these vehicles function as described by ALLDATA and the vehicles' owner's manual. The alarm is set by locking the vehicle with the key fob or with the mechanical key in the driver door key lock. Once set, if the alarm is triggered, the Burglar Alarm Relay activates and the car will not start. The alarm will trigger if a door is opened without using the key, the trunk is opened without using the key, or the hood is opened. When triggered, the alarm will sound the vehicle horn for 30 seconds. The alarm is disarmed by unlocking the doors with the key fob or unlocking the driver door with the mechanical key.



Figure 1. Burglar Alarm Relay (circled in red) integrated into ignition system

*1.5 Hyundai/Kia Theft Deterrent Software Upgrade*

The software upgrade now being offered for eligible subject vehicles utilizes the existing ignition kill functionality to prevent the theft method.  The upgraded software now activates the Burglar Alarm Relay (i.e., the ignition kill system) not only when the alarm is triggered, how the original software was programmed to function, but also when the alarm is armed. The burglar alarm no longer needs to be triggered to activate the ignition kill, the burglar alarm need only to be armed by locking the car doors.  These changes prevent a vehicle from being started when subjected to the social media theft method.  With the alarm set, the vehicle cannot be started by forcibly removing the ignition lock and turning the ignition switch.  Instead, the alarm will trigger, the horn will sound, and the engine will not start.

The function of the software upgrade is principally the same across all eligible Hyundai and Kia vehicles, but due to differences in vehicle features and the varied suppliers of components, including the BCMs, more than 100 different versions of the software were developed.

A minority of the Hyundai and Kia manufactured without the immobilizer system were also manufactured without the factory installed burglar alarm systems.  For those vehicles, no integrated ignition kill system exists and, therefore, an upgrade to the existing BCM software is not an option.

## 2.0 Software Upgrade Review

As the software upgrade was released and installed in vehicles, Exponent analyzed the function of the software and its efficacy in preventing the social media theft method. Exponent has reviewed the software upgrade installation process performed at dealerships and evaluated the function of the software upgrades after they were installed. I also performed the installation of the software upgrade myself and performed an in-depth review of the alarm systems functionality after the upgrade. In addition, Exponent reviewed the function of the software upgrade on vehicles that were used by Hyundai/Kia to develop and validate the software upgrade. Exponent also inspected and analyzed vehicles that were reported as stolen after the software upgrade was installed to determine the likely method used to steal the vehicle and understand the functionality of the alarm system.

### 2.1 Software Upgrade Installation and Function

Exponent installed the upgraded software on a 2017 Hyundai Sonata using the Hyundai Global Diagnostic System (GDS) scan tool. The tool is connected onto the vehicle's OBD port and is used to communicate with the various computers and modules in the vehicle. Following the instructions provided in Hyundai Technical Service Bulletin (TSB) 23-01-014H-5, the upgraded software was downloaded to the vehicle's BCM and installed. The installation process was completed in under 10 minutes. After installation, the GDS tool was used to confirm the proper software identification number was installed. The installation was performed without any difficulties.

Exponent then performed a series of tests on this vehicle with the newly upgraded software to analyze the alarm system's functionality. Approximately 100 tests were conducted to evaluate how the alarm is armed and disarmed and to understand how the alarm is triggered. The alarm system performed as expected, and the vehicle could not be started using the social media theft method when the alarm was armed.

Exponent observed the software upgrade installation performed by Hyundai/Kia technicians on several additional vehicles, and Exponent performed functional testing of the software after the installations. In all cases the installation was performed without difficulties. In one case, an installation performed on a 2019 Kia Rio, the software upgrade was installed without difficulty and the installation was confirmed. When tested, the software did not function completely as expected. Exponent informed Hyundai/Kia of this finding and assisted the manufacturers with additional evaluations of Kia Rios. Hyundai/Kia quickly identified the issue: for a subset of Kia Rios with a specific BCM model, the software upgrade functionality had been properly programmed but a single feature of the software had not been turned on by mistake. It is Exponent's understanding that this issue has now been resolved. Exponent confirmed that this issue did not exist for all Kia Rios by verifying proper function of the software on multiple other Rio vehicles.



Exponent reviewed documentation of the manufacturers' validation testing process. The process required passing greater than 90 tests designed to confirm proper operation of the ignition kill function and to confirm that the software upgrade was compatible with other vehicle functions, including lights, windshield wipers, and defoggers, and will not impair vehicle performance. This set of tests provides reasonable confidence that the software upgrade performs as intended and operates compatibly with other vehicle functions.

After reviewing the manufacturers' validation process, Exponent performed functional testing on a set of 19 vehicles that were utilized by the manufacturer for the software upgrade validation. This was a subset of the vehicles used by the manufacturer to validate the software upgrade installation and performance, but, as shown in Table 1, it included a broad cross section of Kia models and model year platforms. In our review, the software upgrade was installed correctly and functioned as expected in all 19 cases. In all 19 cases the vehicles could not be started using the social media theft method when the alarm was armed.

| Year | Vehicle Make | Model | VIN |
|------|------|-------|-----|
| 2015 | Kia | Rio | KNADM5A34F6442178 |
| 2020 | Kia | Rio | 3KPA25AD7LE288544 |
| 2016 | Kia | Rio | KNADM4A39G6653372 |
| 2016 | Kia | Rio | KNADM5A36G6565725 |
| 2021 | Kia | Seltos | KNDEUCA27M7054923 |
| 2019 | Kia | Forte | 3KPF34AD8KE006245 |
| 2015 | Kia | Forte | KNAFX6A8XF5403070 |
| 2017 | Kia | Forte | 3KPFL4A79HE123903 |
| 2016 | Kia | Sedona | KNDMB5C19G6132520 |
| 2014 | Kia | Sedona | KNDMG4C71E6589576 |
| 2011 | Kia | Sportage | KNDPB3A23B7084979 |
| 2021 | Kia | Sportage | KNDPM3AC4M7877360 |
| 2019 | Kia | Optima | 5XXGT4L38KG340985 |
| 2014 | Kia | Optima | 5XXGM4A76EG348204 |
| 2021 | Kia | Sorento | 5XYRGLC7MG066982 |
| 2011 | Kia | Sorento | 5XYKT4A19BG037432 |
| 2021 | Kia | K5 | 5XXG24J2XMG002407 |
| 2019 | Kia | Sorento | 5XYPGDA50KG473342 |
| 2021 | Kia | Soul | KNDJ23AUXM7784105 |

Table 1. Validation vehicles inspected by Exponent



*2.2 Software Upgrade Efficacy*

Exponent has reviewed the validation testing processes for the anti-theft software upgrade, and Exponent has performed its own evaluation of the software upgrade installation process, its function, and its effectiveness against the theft method defined by the social media challenge. This software upgrade solution utilizes pre-existing anti-theft technology installed at the factory, and so it is efficient to implement across the country through the national dealership networks. The software upgrade is quickly installed and a successful installation may be quickly confirmed.

The Hyundai/Kia software upgrade is effective in preventing the social media theft method. When such a thief attempts to steal a vehicle with the software upgrade, the alarm will sound and the engine will not start. Of course, the alarm must be armed for it to provide an effective deterrent. The software upgrade provides no additional theft deterrent if the alarm system is not armed by locking the vehicle.

No vehicle is theft-proof, and neither immobilizer technology nor ignition kill systems can prevent all thefts. Door locks, ignition locks, ignition kill systems, burglar alarms, parts marking, and immobilizers are all intended to inhibit vehicle theft. Despite such measures, all cars can be stolen by first stealing or otherwise accessing the car's key. Cars can also be stolen by use of a tow truck. Immobilizer systems can also be defeated by capturing and duplicating the code from the key's transponder or programming the vehicle to accept a new transponder code.

Understanding that no vehicle is theft-proof, it is not surprising that thefts have occurred and may continue to occur on vehicles equipped with the software upgrade. It is similarly not surprising that thefts may continue to occur on vehicles equipped with immobilizers and other types of anti-theft systems. Should other social media challenges be issued with instructions for stealing a different make of vehicles, it is likely that the theft rates for that make of vehicles will rise.

*2.3 Theft Recovery Vehicle Analysis*

To further evaluate the efficacy of the software upgrade, Exponent inspected and/or analyzed documentation for vehicles that had been reported as stolen despite a report that the software upgrade had been installed. Four cases were analyzed as described following.

<u>2017 Hyundai Tucson, VIN KM8J23A46HU462631</u>

A 2017 Hyundai Tucson (Figure 2) was inspected at an auto body shop after it had been reported as stolen and subsequently recovered. The auto body shop had begun to disassemble and repair the vehicle prior to the inspection. To facilitate repairs, the driver door had been removed from the vehicle. The driver door handle and the left rear door handle had also been removed. The driver door was disassembled, and the driver door glass was found intact and sitting in the back seat of the vehicle. The right front window was



rolled down at the time of the inspection.  The small window behind the left rear door had been removed and was found intact in the back seat of the vehicle.  All window glass was not broken.



Figure 2. 2017 Hyundai Tucson reported as theft recovery

The body shop technician working on the vehicle was interviewed, and he confirmed that he had removed the driver door and disassembled the door to address what appeared to be collision damage on outer skin of the door that extended onto the left fender.  He confirmed that he removed the door handles and that the door handles were not damaged.  Inspection of the driver door handle confirmed it had not been damaged and the door lock was intact.

The steering column cover had been forcibly removed and the ignition lock cylinder had been forcibly removed, exposing the ignition switch.  The damage to the ignition lock is consistent with a tool, such as a flat blade screwdriver, being inserted into the key slot and then moved with force to break the ignition lock away from the ignition switch.

A GDS tool was connected to the OBD port and was used to identify the software that was currently installed on the BCM.  The software upgrade had been installed.  The function of the software was also confirmed by testing that the alarm would trigger if armed when the ignition switch was turned, and the vehicle would not start.



The evidence indicates that the doors were unlocked, and the alarm was not armed at the time of the theft. The driver door lock was intact, and all the window glass was intact, so there was no evidence of forced entry. Had the upgraded alarm system been armed, the alarm would have triggered, and the engine would not have started when the ignition switch was turned. The alarm would have also been triggered, engaging the ignition kill system, when a tool was inserted into the key slot in the ignition lock.

<u>2020 Kia Rio, VIN 3KPA24AD5LE275043</u>

A 2020 Kia Rio (Figure 3) was inspected at a Kia dealership after it had been reported as stolen and subsequently recovered. Damage to the vehicle resulting from the theft had been repaired, but the owner of the vehicle provided photographs of the vehicle taken prior to the repairs. The photographs taken prior to the repairs showed that the right rear window had been broken out, the steering column cover had been removed, and the ignition locked had been removed, exposing the ignition switch.

The vehicle had since been repaired, and an aftermarket alarm system had been installed since the theft had occurred.



Figure 3. 2020 Kia Rio reported as theft recovery



A Kia GDS tool (or KDS) was connected to the OBD port and was used to identify the software that was currently installed on the BCM. The software upgrade had been installed. The function of the software was tested, and it did not function completely as inspected. With the alarm armed it did not trigger when the ignition switch was turned, and the engine started. This 2020 Kia Rio functioned similarly to the 2019 Kia Rio discussed previously, for which a feature of the upgraded software had not been turned on by mistake. Kia later confirmed that this 2020 Kia Rio was in the same subset of Kia Rios as the 2019 Kia Rio discussed previously. It is our understanding that this issue with the upgraded software has now been resolved.

<u>2021 Kia Rio, VIN 3KPA24AD0ME405652</u>

A 2021 Kia Rio (Figure 4) was inspected at an auto mechanic shop after it had been reported as stolen and subsequently recovered. The right rear window had been broken out and the steering column cover had been forcibly removed. Most of the ignition lock was missing, but a piece of the lock housing was present in the vehicle and its broken condition was consistent with the ignition lock having been forcibly removed. The ignition switch was exposed by removal of the ignition lock.



Figure 4. 2021 Kia Rio reported as theft recovery

An aftermarket GPS security system was installed in the vehicle and plugged into the OBD port. The aftermarket system was unplugged so that a KDS could be connected to the OBD port and used to identify the software that was currently installed on the BCM. The software upgrade had been installed. The function of the software was tested, and it did not function



completely as inspected. With the alarm armed it did not trigger when the ignition switch was turned, and the engine started. This occurred with and without the aftermarket GPS security system plugged into the OBD port. This 2021 Kia Rio functioned similarly to the 2019 Kia Rio discussed previously, for which a feature of the upgraded software had not been turned on by mistake. Kia later confirmed that this 2021 Kia Rio was in the same subset of Kia Rios as the 2019 Kia Rio discussed previously. It is our understanding that this issue with the upgraded software has now been resolved.

<u>2017 Kia Sportage, VIN KNDPMCAC5H7034158</u>

Exponent reviewed photographs and documentation for a 2017 Kia Sportage (Figure 5) that was reported as stolen and recovered. The photographs show the vehicle was stripped of parts and appeared to be parked in an alley way. Figure 6 is a photograph of the ignition lock of this subject vehicle. The ignition lock is in place and the steering column cover is intact.



Figure 5. 2017 Kia Sportage reported as theft recovery



Figure 6. 2017 Kia Sportage ignition lock

However, the photograph also shows that the ignition lock may have been tampered with. The key slot is turned to the "ON" position and there is no key in the slot.  If the software upgrade was installed and the alarm was armed, and a tool, such as a flat blade screwdriver, was inserted into the key slot, the alarm would trigger, and the engine would not start.

Given these observations, this vehicle was likely not stolen using the social media theft method.  It is more likely this vehicle was either started with a key, or not started at all and instead towed away.  This vehicle is an all-wheel drive model, so it would be difficult to tow away without first putting the transmission into neutral.  This could be accomplished by getting into the occupant compartment either through an unlocked door, an open window, or by breaking a window, and then accessing and pressing the shift lock release button to shift the transmission.  The vehicle could then be towed away very readily.  Figure 7 is a photograph of vehicle interior, and the shift lock release button cover appears to be removed, exposing the release button.  Neither the software upgrade nor typical immobilizer technology would prevent a thief from stealing a car by towing it away or using the vehicle's key.





Figure 7. 2017 Kia Sportage shift lock button cover appears to be missing

It is also notable that the photographs of this vehicle show it is extensively stripped, suggesting that this vehicle was targeted for parts value and not for joyrides or other purposes typically associated with the social media trend targeting Hyundai and Kia cars.  In my experience analyzing vehicles that have been recovered after thefts, vehicles that are stolen for parts are frequently taken to secluded locations where they can be stripped.  The photographs show that this vehicle was towed to an alley way or similar secluded area.

In summary, Exponent has inspected vehicles and/or reviewed documentation for four vehicles that have been reported as stolen after having the software upgrade installed.  For two of those vehicles, the upgraded software was properly installed but was not functioning correctly because a feature of the upgraded software had not been turned on by mistake.  Exponent understands that this issue with the upgraded software has now been resolved.

For the third vehicle, the evidence indicates that the doors were unlocked and the alarm was not armed at the time of the theft.  For the fourth vehicle, the information reviewed indicates the vehicle was likely not stolen using the social media theft method.  It is more likely this vehicle was started with a key or not started at all and instead towed away.

Ex™

## 3.0 Summary of Findings

Exponent has performed an evaluation of the ignition and security systems of Hyundai and Kia vehicles that are the subject of recent increased thefts resulting from challenges made popular on social media. Exponent analyzed the burglar alarm systems that pre-existed in these vehicles and analyzed the software upgrade that has been made available for the subject vehicles.

Exponent reviewed documentation of the manufacturers' validation testing process. This set of tests provides reasonable confidence that the software upgrade performs as intended and operates compatibly with other vehicle functions. Exponent performed its own evaluation of the software upgrade installation process, its function, and its effectiveness against the theft method defined by the social media challenge. This software upgrade solution utilizes pre-existing anti-theft technology installed at the factory, and so it is efficient to implement across the country through the national dealership networks. The software upgrade is quickly installed, and a successful installation may be quickly confirmed.

The Hyundai/Kia software upgrade is effective in preventing the social media challenge theft method. When such a thief attempts to steal a vehicle with the software upgrade, the alarm will sound and the engine will not start. Of course, the alarm must be armed for it to provide an effective deterrent. The software upgrade provides no additional theft deterrent if the alarm system is not armed by locking the vehicle.

No vehicle is theft-proof, and neither immobilizer technology nor ignition kill systems can prevent all thefts. Door locks, ignition locks, ignition kill systems, burglar alarms, parts marking, and immobilizers are all intended to inhibit vehicle theft. Despite such measures, all cars can be stolen by first stealing or otherwise accessing the car's key. Cars can also be stolen by use of a tow truck. Immobilizer systems can also be defeated by capturing and duplicating the code from the key's transponder or programming the vehicle to accept a new transponder code.

The findings presented herein are made to a reasonable degree of engineering certainty, based on the materials reviewed and my education, training, and experience. The opinions and comments formulated during this analysis are based on observations and information available at the time of the analysis. Exponent has relied upon information provided by Hyundai, Kia, and other sources and cannot guarantee the accuracy of this source material. Although Exponent has exercised usual and customary care in the conduct of this analysis, the responsibility for the use of the subject product remains fully with Hyundai and Kia.

Exponent has made every effort to accurately and completely investigate all areas of significance identified during our investigation. If new data becomes available, there are perceived omissions or misstatements in this report regarding any aspect of the evaluation, or should additional analysis provide further insight, Exponent reserves the right to amend and/or supplement these findings, and we ask that such items be brought to our attention as soon as possible so that we have the opportunity to fully address them.



If you have any questions, please contact me at (623) 587-4139.

Sincerely,

*Jim Smith*

Jim Smith, P.E.
Principal Engineer

Appendix A
Curriculum Vitae





# E<sup>x</sup>ponent®
Engineering & Scientific Consulting

## James Smith, P.E.
Principal Engineer | Vehicle Engineering
Phoenix
+1-623-587-4139 tel | jsmith@exponent.com

## Professional Profile

As a Professional Mechanical Engineer, Mr. Smith specializes in the failure analysis of mechanical systems, including industrial equipment, shop tools, and vehicle systems, as well as the investigation and analysis of vehicle accidents. He has over 20 years of experience in automotive testing and mechanical system failure evaluations.

Mr. Smith provides strategic guidance on the design and execution of full-scale vehicle crash and sled tests, quasi-static strength tests, and handling and stability demonstrations.  He has conducted hundreds of experiments and has developed extensive knowledge and experience with various test methods and fixtures, instrumentation, and data acquisition techniques.

Mr. Smith is experienced with the investigation and analysis of motor vehicle accidents involving passenger automobiles, motorcycles, heavy trucks, forklifts, industrial vehicles, off road vehicles, and pedestrians. His research and publications include full-scale crash tests involving motorcycles, tractor-trailers, and passenger cars, full-scale rollover tests of sport utility vehicles and light trucks, full scale sled tests involving motorcycles and passenger cars, occupant kinematics and injury in motorcycle and automobile collisions, and the application of computer simulations to automotive collisions. His expertise includes the analysis of recorded sensor data stored in airbag control modules as well as the evaluation of human factors in vehicular accidents. Mr. Smith utilizes a variety of computer software and simulation tools in his failure and accident investigations.

## Academic Credentials & Professional Honors

M.S., Mechanical Engineering, Arizona State University, 1994

B.S., Aerospace Engineering, Arizona State University, 1992

Sigma Gamma Tau

Allied Signal Fellowship recipient

## Licenses and Certifications

Professional Engineer Mechanical, Arizona, #37367

## Professional Affiliations

Society of Automotive Engineers (member)

National Society of Professional Engineers (member)

National Association of Professional Accident Reconstruction Specialists (member)

The American Society of Mechanical Engineers (member)

## Publications

Mkandawire C, Imler S, Smith J. Obese forklift operator neck loads and back loads on a sit down lift truck during a sudden drop. ASME International Mechanical Engineering Congress & Exposition, IMECE2016 65169, Phoenix, AZ, 2016.

Ravi S, Smith J, Mkandawire C. Methods for evaluating occupant kinematics in forklift tipover demonstrations using occupants with high BMI values. ASME International Mechanical Engineering Congress & Exposition, IMECE2013 63366, San Diego, CA, 2013.

Smith J, Frank T, Bosch K, Fowler G, Carter J. Full-scale moving motorcycle into moving car crash testing for use in safety design and accident reconstruction. SAE Technical Paper Series, 2012-01-0103, SAE World Congress and Exhibition, Detroit, MI, April 2012.

Frank T, Smith J, Fowler G, Carter J, Bosch K. Simulating moving motorcycle to moving car crashes. SAE Technical Paper Series, 2012-01-0621, SAE World Congress and Exhibition, Detroit, MI, April 2012.

McGowan J, Bussone W, Raasch C, Smith J, Smedley J. Tractor-semitrailer driver and sleeping compartment occupant responses to low-speed impacts. SAE Technical Paper Series, 2012-01-0566, SAE World Congress and Exhibition, Detroit, MI, April 2012.

Rodowicz KA, Dupont K, Smedley J, Raasch C, Mkandawire C, Fittanto D, Bare C, Smith J. Passenger vehicle occupant response to low-speed impacts with a tractor-semitrailer. SAE Technical Paper Series, 2011-01-1125, SAE World Congress and Exhibition, Detroit, MI, April 2011.

Fittanto D, Bare C, Smith J, Mkandawire C. Passenger vehicle response to low-speed impacts involving a tractor-semitrailer. SAE Technical Paper Series, 2011-01-0291, SAE World Congress and Exhibition, Detroit, MI, April 2011.

Cuadrado J, Smyth B, Smith J, Digges K. Validation of sled tests for far-side occupant kinematics using Madymo. SAE Technical Paper Series, 2010-01-1160, SAE World Congress and Exhibition, Detroit, MI, April 2010.

Peterson DS, Smith JW. Comparison of vehicle measurement techniques. Collision Fall 2009; 4(2).

Frank TA, Smith JW, Hansen DC, Werner SM. Motorcycle rider trajectory in pitch-over brake applications and impacts. SAE Technical Paper Series, 2008-01-0164, SAE World Congress and Exhibition, Detroit, MI, April 2008.

Carter JW, Luepke P, Henry K, Germane G, Smith JW. Rollover dynamics: An exploration of the fundamentals. SAE Technical Paper Series, 2008-01-0172, SAE World Congress and Exhibition, Detroit, MI, April 2008.

Luepke P, Carter J, Henry K, Germane G, Smith JW. Rollover crash tests on dirt: An examination of rollover dynamics. SAE Technical Paper Series, 2008-01-0156, SAE World Congress and Exhibition, Detroit, MI, April 2008.

Smyth B, Smith JW. Developing a sled test from crash test data. SAE Technical Paper Series, 2007-01-0711, SAE World Congress and Exhibition, Detroit, MI, April 2007.

Larson S, Smith JW, Werner S, Fowler G. Vehicle rollover testing, methodologies in recreating rollover collisions. SAE Technical Paper Series, 2000-01-1641, SAE Automotive Dynamics and Stability Conference, Troy, MI, May 15-17, 2000.

Smith JW. Stabilizing controller design for the reference pressure regulator. Master's Thesis, Arizona State University, 1994.

**Selected Invited Presentations**

Smith JW. Automotive crash testing. Continuing Legal Education Seminar, Sanders & Parks, September 22, 2016.

Peterson D, Smith J. Getting answers with photogrammetry. Continuing Legal Education Seminar, Sanders & Parks, January 24, 2013.

Smith JW. Motorcycle accident reconstruction methods and recent advancements. Continuing Legal Education Seminar, Sanders & Parks, April 7, 2011.

Smith JW. Accident reconstruction and experts. Farmers Insurance Liability Zone Conference, September 25, 2007.

Smith JW. Developing a sled test from crash test data. Presentation for Toyota Motor Company, Torrance, CA, October 31, 2006.

Smith JW. Collecting evidence: A crash course in conducting inspections. Continuing Legal Education Seminar, Bowman and Brooke, August 5, 2005.

Smith JW. Gathering and preserving evidence for accident reconstruction. 16th Annual Update of Arizona Law 2005, Jones, Skelton & Hochuli, May 4, 2005.

Smith JW. Accident reconstruction. Continuing Legal Education Seminar, Jones, Skelton & Hochuli, January 25, 2005.

Smith JW. An introduction to engineering issues in automotive litigations. Continuing Legal Education

Seminar and Workshop, Hyundai Motor America, April 27-28, 2004.

## Additional Education & Training

Crash Safety Research Center, Jeffrey W. Muttart, *Human Factors for Traffic Crash Reconstruction*, October 25-29, 2010.

T.E.A.M. Arizona Motorcyclist Training Centers, *Basic Rider Course* (Motorcycle Rider Skill Training Course), November 14-16, 2008.

Eos Systems Inc., *PhotoModeler Collision Investigation*, Phoenix, AZ, September 23-25, 2008.

Collision Safety Institute, *Crash Data Retrieval Data Analyst Course*, Phoenix, AZ, July 8-11, 2008.

Collision Safety Institute, *Crash Data Retrieval Technician Course*, Phoenix, AZ, July 7, 2008.

Exponent, *Forklift Operator's Training per OSHA 1910.178*, Phoenix, AZ, April 16, 2008.

Society of Automotive Engineers, *Vehicle Accident Reconstruction Methods Seminar,* Detroit, MI, April 3-

4, 2006.

Engineering Dynamics Corporation, *HVE Forum,* San Francisco, CA, May 3-7, 2004.

Northwestern University Traffic Institute, *Traffic Accident Reconstruction I,* Chicago, IL, October 20-31, 2003.

National Instruments, *LabVIEW Hands-On Seminar,* Phoenix, AZ, March 27, 2003.

General Motors Service Technology Group, *Supplemental Inflatable Restraint Systems,* Phoenix, AZ, January 24, 1997.