Gretchen Freeman Cappio (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Phone: (206) 623-1900
Fax: (206) 623-3384
gcappio@kellerrohrback.com

*Chair of the Governmental Entities Committee*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DISTRICT

| | |
|---|---|
| IN RE: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>*This document relates to:*<br><br>GOVERNMENTAL ENTITIES TRACK | No. 8:22-ML-03052-JVS-KES<br><br>The Honorable James V. Selna<br><br>**GOVERNMENTAL ENTITIES' CORRECTED OPPOSITION TO MOTION TO DISMISS**<br><br>Hearing Date: November 13, 2023<br>Hearing Time: 3:00 p.m. |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................1

II.   BACKGROUND .......................................................................3

    A.    Defendants' Unreasonable Conduct Deviated from
        Industry Standards and Failed to Prevent Reasonably
        Foreseeable Thefts. ..........................................................3

    B.    The Public Safety Nuisance and Defendants' Negligence
        Has Had Devastating Consequences for the GE Plaintiffs........5

III.  LEGAL STANDARD .................................................................6

IV.   ARGUMENT...........................................................................7

    A.    NHTSA's Motor Vehicle Safety Regulations Do Not
        Preempt the GE Plaintiffs' Causes of Action. ....................7

        1.    Neither the Safety Act nor FMVSS 114 expressly
            preempt GE Plaintiffs' claims. .................................8

        2.    Congress did not impliedly preempt states from
            regulating the field of motor vehicle safety. ............9

        3.    Defendants cannot meet their burden of showing a
            conflict between GE Plaintiffs' claims and federal
            law.................................................................10

        4.    NHTSA's response to multiple state attorneys
            general does nothing to alter the preemption
            analysis. ..........................................................12

    B.    Foreseeable Downstream Acts of Third Parties Do Not
        Sever the Causal Chain. ...................................................13

    C.    GE Plaintiffs' Public Nuisance Claims Are Well Pled. ..................17

        1.    The GE Plaintiffs have adequately alleged the
            existence of a public nuisance.............................18

2.    The GE Plaintiffs have adequately alleged that Defendants' conduct was a substantial contributing factor to the public nuisance.....................21

3.    There is no basis for exclusion of products, or product design, in the well-established common law of public nuisance. ..........................................22

4.    Neither the OPLA nor the WPLA abrogates the GE Plaintiffs' public nuisance claims. .................27

   a.    The OPLA preempts claims seeking recovery for personal injury and property damage, not claims seeking recovery for economic losses and abatement....................27

   b.    The WPLA does not bar Seattle's public nuisance claim. ..........................................29

5.    Defendants' additional Ohio-specific arguments fail. .....................................................................29

   a.    The Court should reject the Defendants' quasi-preemption argument.........................30

   b.    Defendants are liable for the absolute public nuisance because they intentionally created the conditions for a public nuisance. ..........................33

   c.    Columbus's statutory public nuisance claim is well pled and civil liability allows for the recovery of damages. ...................................34

D.   GE Plaintiffs' Negligence Claims Are Well Pled. ...........................36

1.    Defendants owed a duty of care to all GE Plaintiffs. ..............................................................37

   a.    No special relationship is required for Defendants' duty to exercise reasonable care in manufacturing and distributing their vehicles.................................................37

b.    The reasonable foreseeability of the harm gives rise to a duty to prevent it. ................................38

c.    Public policy supports the imposition of a duty................................................................................41

2.    GE Plaintiffs sufficiently allege Defendants' negligence proximately caused their injuries.........................42

3.    GE Plaintiffs plausibly allege damages. ................................44

E.    The Municipal Cost Recovery Rule Does Not Bar New York GE Plaintiffs' Claims. .......................................................44

F.    The Economic Loss Doctrine Does Not Apply to the Ohio and New York GE Plaintiffs' Request for Damages..............46

1.    Ohio........................................................................................46

2.    New York ...............................................................................48

G.    Missouri GE Plaintiffs Plausibly Allege Their Remaining Claims.......................................................................................49

1.    Kansas City's consumer protection claim is well pled. ......................................................................................49

2.    Missouri GE Plaintiffs' unjust enrichment claim is well pled. ..............................................................................53

V.    CONCLUSION .................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*,
  750 N.E.2d 1097 (N.Y. 2001) ..................................................................48, 49

*A.E. Inv. Corp. v. Link Builders, Inc.*,
  214 N.W.2d 764 (Wis. 1974) ...........................................................................38

*Allen Freight Lines, Inc. v. Consolidated Rail Corp.*,
  595 N.E.2d 855 (Ohio 1992) .....................................................................30, 32

*Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*,
  712 P.2d 914 (Ariz. 1985).................................................................................26

*Ashburn v. Anne Arundel County*,
  510 A.2d 1078 (Md. 1986)................................................................................37

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................6

*Austin v. Univ. of Or.*,
  925 F.3d 1133 (9th Cir. 2019)........................................................................6, 7

*Bauer v. Armslist, LLC*,
  572 F. Supp. 3d 641 (E.D. Wis. 2021) .............................................................36

*Bell v. Bd. of Educ. of N.Y.*,
  687 N.E.2d 1325 (N.Y. 1997) ....................................................................14, 42

*Beul v. ASSE Int'l, Inc.*,
  55 F. Supp. 2d 942 (E.D. Wis. 1999) ...............................................................43

*Binkley v. American Equity Mortgage, Inc.*,
  447 S.W.3d 194 (2014)......................................................................................56

*Bradley v. Am. Smelting & Ref. Co.*,
  709 P.2d 782 (Wash. 1985)...............................................................................29

*Delaware ex rel. Brady v. Publishers Clearing House*,
  787 A.2d 111 (Del. Ch. 2001)...........................................................................51

iv

*Campbell v. Krupp*,
   961 N.E.2d 205 (Ohio Ct. App. 2011)..................................................47

*Carrel v. Allied Products Corp.*,
   677 N.E.2d 795 (Ohio 1997)..............................................................28

*CFPB v. 1st All. Lending, LLC*,
   2022 WL 993582 (D. Conn. Mar. 31, 2022) ......................................51

*CFPB v. All Am. Check Cashing, Inc.*,
   2016 WL 11635752 (S.D. Miss. July 15, 2016) ................................52

*CFPB v. D & D Mktg.*,
   2016 WL 8849698 (C.D. Cal. Nov. 17, 2016)...................................52

*CFPB v. Frederick J. Hanna & Assocs., P.C.*,
   114 F. Supp. 3d 1342 (N.D. Ga. 2015)..............................................52

*CFPB v. Navient Corp.*,
   2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) ....................................52

*CFPB v. RD Legal Funding, LLC*,
   332 F. Supp. 3d 729 (S.D.N.Y. 2018), *vacated on other grounds*,
   828 F. App'x 68 (2d Cir. 2020) .........................................................52

*CFPB v. Siringoringo*,
   2016 WL 102435 (C.D. Cal. Jan. 7, 2016) .......................................52

*CFPB v. TCF Nat'l Bank*,
   2017 WL 6211033 (D. Minn. Sept. 8, 2017) ....................................52

*CFPB v. Think Fin., LLC*,
   2018 WL 3707911 (D. Mont. Aug. 3, 2018) ....................................52

*Chamberlan v. Ford Motor Co.*,
   314 F. Supp. 2d 953 (N.D. Cal. 2004)................................................9

*Cherokee Nation v. McKesson Corp.*,
   529 F. Supp. 3d 1225 (E.D. Okla. Mar. 29, 2021).............................55

*Christiansen v. St. Louis Pub. Serv. Co.*,
   62 S.W.2d 828 (Mo. 1933)..........................................................14, 42

v

*Estate of Ciotto v. Hinkle*,
  145 N.Ed.3d 1013 (Ohio Ct. App. 2019).............................................................41

*City & County of San Francisco v. Purdue Pharma L.P.*,
  491 F. Supp. 3d 610 (N.D. Cal. 2020)..............................................................50

*City of Boston v. Purdue Pharma, L.P.*,
  2020 WL 977056 (Mass. Super. Ct. Jan. 31, 2020)............................................56

*City of Boston v. Smith & Wesson Corp.*,
  2000 WL 1473568 (Mass. Super. Ct. July 13, 2000)..........................................56

*City of Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2022)..................................................................*passim*

*City of Cincinnati v. Deutsche Bank National Trust Co.*,
  863 F.3d 474 (6th Cir. 2017).................................................................47, 48

*City of Cleveland v. Ameriquest Mortgage Securities, Inc.*,
  621 F. Supp. 2d 513 (N.D. Ohio 2009) .....................................................30, 32

*City of Cleveland v. JP Morgan Chase Bank, N.A.*,
  2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013)............................................48

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
  719 F.2d 322 (9th Cir. 1983)......................................................................44

*City of Kansas City v. N.Y.-Kan. Bldg. Assocs., L.P.*,
  96 S.W.3d 846 (Mo. Ct. App. 2002) .............................................................19

*City of Los Angeles v. Bank of Am. Corp.*,
  2014 WL 2770083 (C.D. Cal. June 12, 2014) ..................................................55

*City of Los Angeles v. Citigroup, Inc.*,
  24 F. Supp. 3d 940 (C.D. Cal. 2014)............................................................55

*City of Los Angeles v. JPMorgan Chase & Co.*,
  2014 WL 6453808 (C.D. Cal. Nov. 14, 2014)..................................................55

*City of Los Angeles v. Wells Fargo & Co.*,
  22 F. Supp. 3d 1047 (C.D. Cal. 2014)...........................................................55

*City of Mingo Junction v. Sheline*,
   196 N.E. 897 (Ohio 1935)...................................................................................30

*City of New York v. A-1 Jewelry & Pawn*,
   247 F.R.D. 296 (E.D.N.Y. 2007) .......................................................................22

*City of New York v. Beretta U.S.A. Corp.*,
   315 F. Supp. 2d 256 (E.D.N.Y. 2004)...............................................................21

*City of New York v. Lead Indus. Ass'n*,
   190 A.D. 2d 173 (N.Y. App. Div. 1993) ...........................................................56

*City of Seattle v. Monsanto Co.*,
   237 F. Supp. 3d 1096 (W.D. Wash. 2017)..........................................14, 25, 29

*City of St. Louis v. Cernicek*,
   2003 WL 22533578 (Mo. Cir. Ct. Oct. 15, 2003)............................................56

*City of Wyoming v. Procter & Gamble Co.*,
   210 F. Supp. 3d 1137 (D. Minn. 2016).......................................................22, 25

*Cofield v. Lead Industries Ass'n, Inc.*,
   2000 WL 34292681 (D. Md. Aug. 17, 2000) ...................................................25

*Copart Indus., Inc. v. Consolidated Edison Co. of N.Y.*,
   362 N.E.2d 968 (N.Y. 1977) ..............................................................................24

*Corporex Dev. & Constr. Mgmt, Inc. v. Shook*,
   835 N.E.2d 701 (Ohio 2005) ......................................................................46, 47

*County of Erie v. Colgan Air, Inc.*,
   711 F.3d 147 (2d Cir. 2013)...............................................................................44

*County of Erie v. Colgan Air, Inc.*,
   2012 WL 1029542 (W.D.N.Y. Mar. 26, 2012).................................................45

*Cromeans v. Morgan Keegan & Co.*,
   2013 WL 12129609 (W.D. Mo. Nov. 5, 2013).................................................54

*Cromer v. Children's Hosp. Med. Ctr. Of Akron*,
   29 N.E.3d 921 (Ohio 2015).........................................................................37, 39

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)................................................................................8

*Derdiarian v. Felix Contracting Corp.*,
    414 N.E.2d 666 (N.Y. 1980) ...............................................................15

*Ohio ex rel. Dewine v. Purdue Pharma L.P.*,
    2018 WL 4080052 (Ohio Ct. Com. Pl. Aug. 22, 2018) ......................24

*Digiknow, Inc. v. PKXL Cards, Inc.*,
    2011 WL 2899600 (Ohio Ct. App. July 21, 2011).........................47, 48

*Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*,
    543 N.E.2d 769 (Ohio 1989) ...........................................................14, 43

*Fed. Trade Cmm'n. v. Affiliate Strategies, Inc.*,
    2010 WL 11470099 (D. Kan. June 4, 2010).......................................50

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)..............................................................................9

*FTC v. Freecom Commcn's., Inc.*,
    401 F.3d 1192 (10th Cir. 2005) ...........................................................53

*FTC v. Lights of America, Inc.*,
    760 F. Supp. 2d 848 (C.D. Cal. 2010)......................................51, 52, 53

*FTC v. Sec. Rare Coin & Bullion Corp.*,
    931 F.2d 1312 (8th Cir. 1991)..............................................................53

*Garrett v. Cassity*,
    2011 WL 3235633 (E.D. Mo. July 28, 2011) .....................................54

*Gedeon v. E. Ohio Gas Co.*,
    190 N.E. 924 (Ohio 1934)...............................................................38, 39

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000).......................................................... 10, 11, 12, 30

*Goodwin v. Yeakle's Sports Bar & Grill, Inc.*,
    62 N.E.3d 384 (Ind. 2016) ..............................................................38, 39

viii

*Gov't of U.S. Virgin Islands v. Takata Corp.*,
    67 V.I. 316 (V.I. Super. Ct. 2017) ........................................................ 10, 22, 24

*Hamilton v. Beretta U.S.A. Corp.*,
    750 N.E.2d 1055 (N.Y. 2001) ........................................................................ 39

*Harris v. Great Dane Trailers, Inc.*,
    234 F.3d 398 (8th Cir. 2020) ........................................................................... 9

*Heckler v. State ex rel. Cleveland*,
    144 N.E. 700 (Ohio 1924) ............................................................................ 30

*Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*,
    700 S.W.2d 426 (Mo. 1985) .......................................................................... 41

*State ex rel. Hopkins v. Excelsior Powder Mfg. Co.*,
    169 S.W. 267 (Mo. 1914) ........................................................................ 19, 20

*Howard v. Turnbull*,
    316 S.W.3d 431 (Mo. Ct. App. 2010) ........................................................... 56

*Ileto v. Glock Inc.*,
    349 F.3d 1191 (9th Cir. 2003) ....................................................................... 23

*Jacobson v. Kaforey*,
    75 N.E.3d 203 (Ohio 2016) ........................................................................... 35

*Delaware ex rel. Jennings v. Monsanto Co.*,
    299 A.3d 372 (Del. 2023) ......................................................................... 17, 23

*Delaware ex rel. Jennings v. Purdue Pharma L.P.*,
    2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) ........................................... 45

*Johnson v. Bryco Arms*,
    304 F. Supp. 2d 383 (E.D.N.Y. 2004) ...................................................... 36, 43

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    497 F. Supp. 3d 552 (N.D. Cal. 2020) ................................................... *passim*

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ....................................................................... 51

ix

*Keefer v. State*,
    92 N.E. 656 (Ind. 1910) ............................................................20

*Key v. Hamilton*,
    963 N.E.2d 573 (Ind. Ct. App. 2012) ..............................................41

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
    801 N.E.2d 1222 (Ind. 2003) ...............................................*passim*

*Kiriakos v. Phillips*,
    139 A.3d 1006 (Md. 2016)..........................................................14

*Koch v. Consolidated Edison Co. of N.Y.*,
    468 N.E.2d 1 (1984) ...............................................................44

*La.-Pac. Corp. v. ASARCO Inc.*,
    24 F.3d 1565 (9th Cir. 1994) ......................................................29

*Lake Hamilton Lakeshore Owners Ass'n, Inc. v. Neidlinger*,
    182 So. 3d 738 (Fla. Dist. Ct. App. 2015) ........................................26

*Landon v. Kroll Lab. Specialists, Inc.*,
    999 N.E.2d 1121 (N.Y. 2013) ......................................................41

*LaPuma v. Collinwood Concrete*,
    661 N.E.2d 714 (Ohio 1996) ...................................................27, 28

*Lassen v. Nissan N. Am., Inc.*,
    211 F. Supp. 3d 1267 (C.D. Cal. 2016) .............................................9

*Lester E. Cox Med. Ctrs. v. Amneal Pharms., LLC*,
    2023 WL 6323797 (W.D. Mo. Sept. 28, 2023) ........................................25

*Lopez v. Three Rivers Elec. Coop., Inc.*,
    26 S.W.3d 151 (Mo. 2000).............................................. 13, 36, 38, 40

*Maryland v. Exxon Mobil Corp.*,
    406 F. Supp. 3d 420 (D. Md. 2019)..................................................25

*Mayor & City Council of Baltimore v. Monsanto Co.*,
    2020 WL 1529014 (D. Md. Mar. 31, 2020) ............................................24

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   415 F. Supp. 2d 261 (S.D.N.Y. 2005) ...............................................................36

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   457 F. Supp. 2d 298 (S.D.N.Y. 2006) ...............................................................26

*Moore v. Greensky, LLC*,
   2020 WL 13580659 (W.D. Mo. Dec. 23, 2020) .................................................54

*Nichols v. Coast Distrib. Sys.*,
   621 N.E.2d 738 (Ohio 1993)...............................................................................32

*Nottke v. Norfolk S. Ry. Co.*,
   264 F. Supp. 3d 859 (N.D. Ohio 2017) ...............................................31, 33, 34

*Ohio v. Miner*,
   2012 WL 236696 (Ohio Ct. App. June 22, 2012)..............................................34

*In re Nat'l Prescription Opiate Litigation*,
   --- F.4th ---, 2023 WL 5844325 (6th Cir. Sept. 11, 2023)................................27

*In re Nat'l Prescription Opiate Litigation*,
   406 F. Supp. 3d 672 (N.D. Ohio 2019) ........................................................33, 34

*In re Nat'l Prescription Opiate Litigation*,
   452 F. Supp. 3d 745 (N.D. Ohio 2020) ..............................................................55

*In re Nat'l Prescription Opiate Litigation*,
   458 F. Supp. 3d 665 (N.D. Ohio 2020) ..............................................................55

*In re Nat'l Prescription Opiate Litigation*,
   589 F. Supp. 3d 790 (N.D. Ohio 2022) ........................................................24, 26

*In re Nat'l Prescription Opiate Litigation*,
   622 F. Supp. 3d 584 (N.D. Ohio 2022), *appeal docketed*, No. 22-
   3841 (6th Cir. 2022)......................................................................................27, 35

*In re Nat'l Prescription Opiate Litigation*,
   2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) (appeal pending) .........27, 28, 48

*In re Nat'l Prescription Opiate Litigation*,
   2019 WL 2477416 (N.D. Ohio Apr. 1, 2019)................................................50

*In re Nat'l Prescription Opiate Litigation*,
  2019 WL 3737023 (N.D. Ohio June 13, 2019)............................................50, 55

*In re Nat'l Prescription Opiate Litigation*,
  2019 WL 4178617 (N.D. Ohio Sept. 3, 2019)....................................................16

*In re Nat'l Prescription Opiate Litigation*,
  2020 WL 1986589 (N.D. Ohio Apr. 27, 2020)..................................................55

*In re Opioid Litig.*,
  2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018).........................22, 25, 45, 49

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983).........................................................................................8

*Paulus v. Citicorp N. Am., Inc.*,
  2014 WL 4557603 (S.D. Ohio Sept. 12, 2014) .................................................31

*Pelman ex rel. Pelman v. McDonald's Corp.*,
  396 F.3d 508 (2d Cir. 2005)............................................................................53

*Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*,
  646 N.W.2d 777 (Wis. 2002) ...................................................................17, 21

*Pittway Corp. v. Collins*,
  973 A.2d 771 (Md. Ct. App. 2009) .................................................................15

*Raymond Motor Transp., Inc. v. Rice*,
  434 U.S. 429 (1978).........................................................................................9

*Rhodes v. Wright*,
  805 N.E.2d 382 (Ind. 2004) ............................................................................43

*Rowland v. Skaggs Cos.*,
  666 S.W.2d 770 (Mo. 1984) (en banc) ............................................................55

*RWP, Inc. v. Fabrizi Trucking & Paving Co.*,
  2006 WL 2777159 (Ohio Ct. App. Sept. 28, 2006) ...................................47, 48

*Safeway Stores, Inc. v. City of Raytown*,
  633 S.W.2d 727 (Mo. 1982) (en banc) ............................................................54

*Schooley v. Ingersoll Rand, Inc.*,
   631 N.E.2d 932 (Ind. Ct. App. 1994) ...............................................42

*Scottsdale Ins. Co. v. Addison Ins. Co.*,
   448 S.W.3d 818 (Mo. 2014) (en banc) .............................................54

*Southwestern Bell Telephone Co. v. United Video Cablevision of St. Louis, Inc.*,
   737 S.W.2d 474 (Mo. Ct. App. 1987) ..............................................57

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011).............................................................7

*State v. Frahm*,
   444 P.3d 595 (Wash. 2019) .............................................................15

*Stewart v. Wulf*,
   271 N.W.2d 79 (Wis. 1978) ......................................................14, 43

*Strother v. Hutchinson*,
   423 N.E.2d 467 (Ohio 1981)......................................................36, 43

*Taylor v. City of Cincinnati*,
   55 N.E.2d 724 (Ohio 1944)..............................................................33

*Tesar v. Anderson*,
   789 N.W.2d 351 (Wis. Ct. App. 2010) ............................................41

*Toledo Disposal Co. v. State*,
   106 N.E. 6 (Ohio 1914).....................................................................30

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010) ......................................7, 8, 9

*Webb v. Dr. Pepper Snapple Grp., Inc.*,
   2018 WL 1955422 (W.D. Mo. Apr. 25, 2018) ................................54

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   684 F. Supp. 2d 942 (N.D. Ohio 2009) ...........................................46

*White v. Smith & Wesson*,
   97 F. Supp. 2d 816 (N.D. Ohio 2000) .............................................56

*Williamson v. Mazda Motor of Am., Inc.*,
    562 U.S. 323 (2011)................................................................11, 12

*Wilmes v. Consumers Oil Co. of Maryville*,
    473 S.W.3d 705 (Mo. Ct. App. 2015) ...........................................43

**Statutes**

Columbus City Code § 703.17 .......................................................34, 35

Columbus City Code § 701.19 .......................................................28, 29

Columbus City Code § 701.99 ..............................................................35

Federal Trade Commission Act..................................................*passim*

Indiana Code § 32-30-6-6 .....................................................................25

Kansas City Ordinances art. IX § 50-292 ............................................49

National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 301 *et seq.* ........................................................................... 8, 9, 30, 32

Ohio Rev. Code § 3714..........................................................................30

Ohio Rev. Code § 5577...........................................................................30

Ohio Rev. Code § 2307 *et seq.*........................................................*passim*

Wash. Rev. Code § 7.48.010..................................................................29

Wash. Rev. Code § 7.72 *et seq.*................................................. 18, 27, 29

**Other Authorities**

49 C.F.R § 541.5.....................................................................................12

49 C.F.R. § 543 ......................................................................................12

55 Fed. Reg. 21,869 (May 30, 1990)....................................................12

Restatement (Second) of Torts § 288C cmt. A (1965)..........................32

Restatement (Second) of Torts § 302B cmt. F (1965) ..........................41

xiv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Restatement (Second) of Torts § 324A (1965) ......................................................38

Restatement (Second) of Torts § 821B (1979) ......................................... 17, 18, 22

Restatement (Third) of Torts: Liab. For Econ. Harm § 8 cmt. G. .........................26

Restatement (Third) of Restitution and Unjust Enrichment § 22(1)
(2011) ...............................................................................................................56

William L. Prosser, *Handbook of the Law of Torts* § 87 (4th ed. 1971).................22

xv

## I.     INTRODUCTION

The Governmental Entity Plaintiffs ("GE Plaintiffs") are seventeen municipalities that have been rocked by a crime wave involving the rampant thefts of certain Hyundai and Kia vehicles, made possible by the vehicle manufacturers' failure to include reasonable, industry-standard anti-theft technology. The GE Plaintiffs seek to hold the vehicle manufacturers, Defendants Hyundai Motor America ("HMA") and Kia America, Inc. ("KA") (collectively, "Defendants"),[1] accountable for the foreseeable, significant downstream effects of their business decisions on public safety and welfare in the GE Plaintiffs' communities. As alleged in the GE Plaintiffs' consolidated complaint ("Complaint" or "CGEC"), vehicle theft is a well-known keystone crime leading to additional offenses, and the consequences of rampant vehicle theft are far-reaching, long-lasting, and costly for governmental entities to address.

As the Complaint makes clear, HMA and KA designed, manufactured, and distributed millions of cars in the United States between 2011 and 2022 without engine immobilizers or any other reasonable or effective anti-theft technology. This was a major deviation from industry norms: by the 2015 model year, only 26% of Defendants' vehicles contained engine immobilizers, compared to 96% of vehicles from all other manufacturers. CGEC ¶ 7. Defendants knew that this technology was effective in preventing theft. They installed immobilizers in their higher-end vehicles, as well as in every vehicle sold during the same period in Europe and Canada. The consequences of this cost-saving decision were so predictable as to be nearly inevitable: as soon as word got out that these Hyundai and Kia vehicles could be stolen in minutes with tools no more sophisticated than a screwdriver and USB charging cable, thefts skyrocketed in cities across the country. Defendants themselves acknowledge that these thefts were foreseeable, arguing in their motion to dismiss the Insurance Subrogation Plaintiffs'

---

[1] The Parties jointly stipulated to voluntarily dismiss without prejudice and toll GE Plaintiffs' claims against Hyundai Motor Corporation and Kia Corporation. Dkt. No. 216 ¶¶ 7-8.

1

complaint that the insurers "received premiums to cover the *well-known problem of automotive theft* and were in a position to avoid their losses." Defendants' Motion to Dismiss Subrogation Plaintiffs' Consolidated Complaint ("Subrogation Motion"), Dkt. No. 217 at 27 (emphasis added).

The results have been devastating for the GE Plaintiffs. In Milwaukee, where the wave of thefts began, the police department reported in June 2021 that there was a year-over-year increase in thefts of Hyundai and Kia vehicles of a whopping 2,500%, amounting to an average of 30 cars stolen per day. CGEC ¶ 10. The other GE Plaintiffs have also experienced massive and ongoing increases in thefts of Hyundai and Kia vehicles. As described throughout the Complaint, the costs and consequences of this crime wave are immense: the cars are driven recklessly, often by juveniles (with long lives ahead of them, detrimentally affected by their first criminal involvement); the cars are frequently used in the commission of other crimes, sometimes with tragic results; all while police, first responder, prosecutorial, and other finite city resources are diverted from other uses—including other emergencies—to attempt to stem the tide.

Defendants nevertheless maintain that they were not negligent in their intentional decision to flout industry standards and forgo engine immobilizers or other reasonable anti-theft measures in millions of vehicles. Nor, according to Defendants, are they responsible for the public nuisance they caused to GE Plaintiffs and the public by intentionally leaving their vehicles vulnerable to thefts and the ensuing reckless driving and violent crime. The laws of the states and cities at issue, along with public policy considerations similarly recognized in other major public health and safety litigation, like those involving Opioids and JUUL, support holding Defendants accountable for the consequences of their business decisions. Defendants' failure to install industry-standard, reasonable anti-theft measures led to foreseeable, direct, and substantial harm to the GE Plaintiffs.

Defendants spill considerable ink arguing that the National Highway and Traffic Safety Administration ("NHTSA") and the Federal Motor Vehicle Safety Standards

("FMVSS") do not expressly require immobilizers. But courts in numerous contexts—such as in nationwide multidistrict litigation concerning opioid painkillers and JUUL vaping devices, among others—have held defendants liable under nuisance and negligence theories for the downstream effects of purportedly legal conduct. In short, the GE Plaintiffs' public nuisance and negligence claims pertain to broad harms resulting from Defendants' unreasonable interference with the right to public safety, and GE Plaintiffs need not prove that Defendants violated the FMVSS. *See, e.g.*, *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231 (Ind. 2003) ("Whether [a nuisance] is unreasonable turns on whether the activity, even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified.").

Because the GE Plaintiffs' claims are well-pled, Defendants attempt to rely on a sweeping, inaccurate, and contradictory interpretation of preemption doctrine. Defendants also mischaracterize the required elements of the GE Plaintiffs' public nuisance and negligence claims. Finally, Defendants also mischaracterize the requirements for certain GE Plaintiffs' municipal and additional common-law claims, and their invocation of the municipal cost recovery and economic loss rules in seeking dismissal of certain claims is inappropriate and unavailing. GE Plaintiffs have sufficiently pled numerous claims for relief, and Defendants' Motion should be denied.

## II.   BACKGROUND

### A.   Defendants' Unreasonable Conduct Deviated from Industry Standards and Failed to Prevent Reasonably Foreseeable Thefts.

The need for anti-theft protection closely followed the invention of automobiles themselves. CGEC ¶ 58. By the 1970s, federal agencies, in imposing minimum theft-protection standards, had recognized "that stolen cars constitute a major hazard to life and limb on the highways." *Id.* ¶ 65 (citation omitted). More recently, and certainly by 2015, engine immobilizers became standard in nearly all vehicles sold in the United States, with the glaring exception of millions of Hyundai and Kia vehicles. *Id.* ¶¶ 3, 7, 103.

3

The omission of engine immobilizers or an equivalent, reasonable anti-theft device from the Susceptible Vehicles[2] was intentional and saved Defendants money in the short run, but it has proven costly to governmental entities in the long run. Defendants were familiar with engine immobilizers, as they installed them in all their vehicles sold in Europe and Canada, as well as in higher-end models sold in the United States. *Id.* ¶¶ 6, 79. At the same time, research studies touted engine immobilizers as "car theft's killer technology" and highlighted the device's ability to prevent young and often reckless offenders from stealing cars. *Id.* ¶ 74 (citations omitted). Those studies highlighted how a decrease in youth offenders benefits public safety, by limiting the "joyriding" and other reckless behavior that often accompanies car thefts by juveniles, *id.* ¶ 62, and public welfare, by preserving resources that may otherwise have been expended on adolescent offenders experiencing "criminal career onset and continuance." *Id.* ¶ 75. Still, Defendants failed to implement reasonable anti-theft measures that had successfully deterred car thieves, and especially juvenile car thieves, for decades, and that had become standard across the industry, sparking a new and costly wave of thefts, and particularly by juvenile offenders.

Contrary to Defendants' assertions, the rate of theft for the Susceptible Vehicles began to increase, relative to other models, as early as 2015. *Id.* ¶ 83. Later, as social media and online articles detailing how easy it is to steal the Susceptible Vehicles proliferated, the rate of Hyundai and Kia thefts exploded. *Id.* ¶ 84. Defendants characterize the rapid spread in awareness about how easily the Susceptible Vehicles could be stolen as an "unforeseeable . . . multi-state social media campaign of criminal solicitation and facilitation." Dkt. No. 219 ("Motion") at 27. But it was not at all unforeseeable, as Defendants themselves admit in their motion to dismiss the Subrogation Plaintiffs' Complaint ("Subrogation Motion"); in that motion, Defendants argued that the plaintiffs had "received premiums to cover *the well-known problem of automobile theft* and were in

---

[2] GE Plaintiffs provide the complete list, upon information and belief, of the Hyundai and Kia vehicles lacking engine immobilizers in their Complaint. *See* CGEC ¶ 3.

a position to avoid their losses," including by "adjust[ing] premiums based on the presence or absence of an immobilizer." Subrogation Motion at 27 (emphasis added).

**B.      The Public Safety Nuisance and Defendants' Negligence Has Had Devastating Consequences for the GE Plaintiffs.**

The foreseeable consequences of Defendants' decision to omit reasonable anti-theft devices from millions of vehicles start with a massive surge of thefts in cities across the country, but they do not end there. That surge, it bears repeating, is enormous: in Milwaukee, in 2021, the nearly 7,000 completed and attempted thefts of Hyundai and Kia vehicles comprised 67% of all reported cars stolen, where Hyundai and Kia vehicles had comprised only 6% of stolen cars in 2019. CGEC ¶¶ 85, 113. That trend, unfortunately, has held true ever since: Hyundai and Kia vehicles accounted for 58% of all car thefts in 2022 and 52% in the first five months of 2023, vastly out of proportion to their market share. *Id*. ¶ 118.

For the GE Plaintiffs, the costs associated with these thefts are considerable. As thefts of Hyundai and Kia vehicles drastically rose, GE Plaintiffs were forced to divert countless hours responding to and investigating these crimes. *Id*. ¶ 14; *see also id*. ¶ 151 (Columbus estimates that its police officers spent more than 4,500 hours responding to Kia and Hyundai incidents in 2022, compared to 550 hours in 2020). The high rate of juvenile offenders among this theft wave has additional costs to municipalities and communities as well, as illustrated by the academic studies cited in the CGEC. *See id*. ¶¶ 74-75 n.31-33. Additionally, the expenditure of police and emergency resources on these thefts deprives GE Plaintiffs of the ability to combat other crimes—in addition to the upfront costs, there are significant opportunity costs. *Id*. ¶ 97 n.65.

These thefts too frequently have tragic results for the perpetrators, first responders, and the public. *See, e.g.*, *id*. ¶¶ 91-94. In Baltimore, a stolen Hyundai involved in a high-speed chase crashed into a car, a pedestrian, and a nearby building, which collapsed on the vehicles and the pedestrian, killing the pedestrian and injuring occupants of both cars. *Id*. ¶ 95. In Milwaukee, a 16-year-old driving a stolen Kia died when he collided with

another car; his two 12-year-old passengers as well as three passengers in the other car were seriously injured, *id.* ¶ 119; and in January 2023, five juveniles between 13 and 15 in a stolen Kia were involved in a collision that killed a 47-year-old passenger in the other car and seriously injured the driver, *id.* ¶ 120. Tragically, at least 51 individuals, including six police officers and four firefighters, have been killed or injured in the GE Plaintiffs' jurisdictions as a result of stolen Hyundai and Kia vehicle incidents or related incidents. *Id.* ¶¶ 119-20, 122, 139-41, 143, 145, 160-61, 168-69, 172-73, 183, 189, 210-11, 228, 257. The Complaint is replete with details of other incidents, property damage, and self-help measures undertaken by members of the Milwaukee community (ranging from businesses warning their customers not to park Susceptible Vehicles outside to vehicle owners attempting to prevent thefts or recover their vehicles), all consequences of Defendants' business decisions. *Id.* ¶¶ 121-25. The other GE Plaintiffs have similarly detailed the significant increases in theft, tragic incidents, and additional costs they have incurred as a result of this public nuisance. *See id.* ¶¶ 126-31 (Madison, WI); ¶¶ 132-35 (Green Bay, WI); ¶¶ 136-52 (Columbus, OH); ¶¶ 153-61 (Cleveland, OH); ¶¶ 162-73 (Cincinnati, OH); ¶¶ 174-84 (Parma, OH); ¶¶ 185-91 (Baltimore, MD); ¶¶ 192-99 (Seattle, WA); ¶¶ 200-16 (St. Louis, MO); ¶¶ 217-23 (Kansas City, MO); ¶¶ 224-28 (Buffalo, NY); ¶¶ 229-38 (Rochester, NY); ¶¶ 239-48 (New York, NY); ¶¶ 249-52 (Yonkers, NY); ¶¶ 253-58 (Tonawanda, NY); ¶¶ 259-62 (Indianapolis, IN).

### III.   LEGAL STANDARD

"It is well established that, under Rule 8(a), a plaintiff need only provide 'enough facts to state a claim to relief that is plausible on its face.'" *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The court should uphold a claim if the plaintiff provides "'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' to support the allegations."

*Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (citation omitted). "All factual allegations are accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Austin*, 925 F.3d at 1137 (citing *Iqbal*, 556 U.S. at 678 (noting that "the plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully") (citation omitted).

## IV.   ARGUMENT

### A.   NHTSA's Motor Vehicle Safety Regulations Do Not Preempt the GE Plaintiffs' Causes of Action.

Defendants argue that NHTSA (which acknowledges that it "meets frequently with vehicle manufacturers[,]" Dkt. No. 220-3) does not "require immobilizers" in its vehicles and thus this Court cannot either. Motion at 4. However, it is important at the outset to note what NHTSA's recent letter to state attorneys general said and what it did *not* say.

NHTSA did not endorse Defendants' conduct, state that the vehicles at issue were "safe," or opine that governmental entities were not affected. Rather, it said, "*At this time*, NHTSA has not determined that this issue constitutes either a safety defect or noncompliance *requiring a recall under [its authority]*." Dkt. No. 220-3 at 3 (emphasis added). Crucially, it acknowledged that "reckless driving is a serious safety issue, whether by an authorized or unauthorized person…NHTSA will also continue to closely monitor this issue." *Id.* Nor did it comment on the authority of states' attorneys general, local governments, or this Court. It certainly did not say that Defendants are not liable for the downstream, foreseeable consequences they have created. That issue is entirely outside NHTSA's purview, and the letter has no preemptive effect.

Moreover, Defendants incorrectly frame GE Plaintiffs' Complaint as "imposing a narrow engine-immobilizer requirement" that "runs headlong into federal preemption rules." Motion at 17-18. As a preliminary matter, Defendants repeat the mistake of manufacturers in other car cases by failing to clearly state what they contend is preempted (i.e., the relief sought or the claim) and the basis for their contention. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,

7

754 F. Supp. 2d 1145, 1195-96 (C.D. Cal. 2010). Whatever the grounds, Defendants' contention is legally and factually baseless.

Legally, there are two types of preemption—express or implied—neither of which applies here. Congress did not expressly preempt states from regulating motor vehicle safety, as numerous courts have found. *See infra* Section IV.A.1. Absent express preemption, state law only impliedly yields to federal law: (1) "[w]hen Congress intends federal law to 'occupy the field,'" and (2) where state law "conflict[s] with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989)). Rather than occupying the field, Congress intentionally reserved for states their historical role in regulating motor vehicle safety. *See infra* Sections IV.A.2-3.

Factually, Defendants mischaracterize the GE Plaintiffs' claims and the relief they seek in an attempt to manufacture a conflict. But the GE Plaintiffs do not seek to require Defendants to install engine immobilizers in their vehicles. Rather, GE Plaintiffs contend Defendants violated their duties by failing to equip their vehicles with reasonable anti-theft technology (which they could have satisfied by installing engine immobilizers). CGEC ¶¶ 283, 333. To remedy Defendants' failure, GE Plaintiffs seek damages and abatement. *See id.* ¶¶ 264, 325, 419, 429, 473, 511, 535. Defendants articulate no basis for preempting such relief or claims.

### 1. Neither the Safety Act nor FMVSS 114 expressly preempt GE Plaintiffs' claims.

Defendants do not appear to argue that the National Traffic and Motor Vehicle Safety Act ("Safety Act") expressly preempts the state and common law claims at issue in this case. Nor could they. The Safety Act does not contain "explicit preemptive language." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983). Rather, as this Court previously recognized, "the Safety Act expressly provides that rights and remedies created by the Act are *supplemental* to rights and remedies provided by State law." *In re Toyota*, 754 F. Supp. 2d at 1196 (emphasis

added) (citing 49 U.S. § 30103(d)). Accordingly, neither the Safety Act nor FMVSS 114 expressly preempt the GE Plaintiffs' claims. Defendants must then show that GE Plaintiffs' claims are impliedly preempted.

### 2. Congress did not impliedly preempt states from regulating the field of motor vehicle safety.

"As a threshold matter, the Court must decide if the presumption against preemption applies to this case." *Id.* This Court has previously recognized that where, as here, the "regulatory field in question" involves motor vehicle safety, the presumption against preemption applies. *Id.*; *see also Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 959 (N.D. Cal. 2004) (applying the presumption after determining that the plaintiffs' claims arose, in part, "in the field[] of motor vehicle safety[,]" which was "an area of traditional State police power"); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443 (1978) ("In no field has this deference to state regulation been greater than that of highway safety regulation."). Because the presumption applies, Defendants "bear[] the burden of showing that it was Congress' 'clear and manifest' intent to preempt" GE Plaintiffs' claims. *In re Toyota*, 754 F. Supp. 2d at 1197 (quoting *Chamberlan*, 314 F. Supp. 2d at 962).

Defendants cannot meet that burden. In fact, Defendants do not assert, let alone identify, a particular "field" that they contend federal law occupies that would preempt GE Plaintiffs' claims and remedies. Nor could they. Field preemption applies where a federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (citation omitted). As many courts have held, "Congress in the Safety Act plainly did not intend to occupy the field of motor vehicle safety[.]" *Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir. 2020); *see also Chamberlan*, 314 F. Supp. 2d at 960 ("Legislative history shows that Congress did not intend the [Safety Act] to be a pervasive scheme, but rather intentionally left certain areas of safety regulation to the States."); *Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267,

9

1276 (C.D. Cal. 2016) (rejecting automakers' assertion that "federal law has occupied the entire field of vehicle safety regulation such that field preemption applies"). Since field preemption does not apply, Defendants must prove that the GE Plaintiffs' claims would create an actual conflict with federal law.

### 3. Defendants cannot meet their burden of showing a conflict between GE Plaintiffs' claims and federal law.

GE Plaintiffs' claims and the remedies they seek do not conflict with federal law. Conflict preemption arises when the conflicts between state and federal law (1) "make it 'impossible' for private parties to comply with both state and federal law" or (2) "prevent or frustrate the accomplishment of a federal objective." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000). Defendants mischaracterize GE Plaintiffs' claims as an "attempt to use state tort law to impose a rigid duty to use engine immobilizers." Motion at 18. Even if that were true, Defendants could meet their obligations under state law by installing engine immobilizers—and simultaneously satisfy FMVSS 114—which necessarily means it would not be "impossible" to comply with both sources of law. *See Gov't of U.S. Virgin Islands v. Takata Corp.*, 67 V.I. 316, 434 (V.I. Super. Ct. 2017) ("Even assuming, *arguendo*, the Court were to order abatement in the manner requested in the [c]omplaint, [defendants] fail to explain how complying with both an Order by this Court and one from the NHTSA is impossible[.]").

But GE Plaintiffs do not seek to impose a duty on Defendants to install engine immobilizers specifically. Rather, GE Plaintiffs assert a duty to "act as a reasonably careful person would[,]" which includes taking all reasonable steps necessary to prevent the manufacture "of a product that was so unreasonably easy to steal." *See, e.g.*, CGEC ¶¶ 283, 333. GE Plaintiffs seek (among other things) abatement of the resulting public safety nuisance created by Defendants' failure to take such reasonable steps. *See id.* ¶¶ 264, 325, 419, 429, 473, 511, 535. GE Plaintiffs' claims and the remedies they seek do not frustrate the purpose of any federal law because, unlike *Geier*, they do not depend on using a conflicting or even a single technology. 529 U.S. at 881 (petitioners' claim hinged

10

on establishing "a duty to install an airbag when they manufactured the 1987 Honda Accord").

Even assuming GE Plaintiffs' claims would restrict a manufacturer's choice regarding the use of anti-theft devices, Defendants' conflict preemption argument still fails. Following *Geier*, the Supreme Court clarified that a "state tort suit may restrict the manufacturer's choice" where "it does not 'stan[d] as an obstacle to the accomplishment . . . of the full purposes and objectives of federal law.'" *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 336 (2011) (alteration in original) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). NHTSA adopted FMVSS 114 because it recognized that "a reduction of the incidence of auto theft would make a substantial contribution to motor vehicle safety." CGEC ¶ 66 (citing FMVSS 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968)).

Defendants assert that "flexibility and the innovation it drives have always been a 'significant objective' of NHTSA's theft-prevention regulation." Motion at 21. But Defendants were not sued because they installed innovative anti-theft technology that failed; they were sued because they refused to install innovative anti-theft technology. For while every other major car manufacturer in the United States has, for decades, implemented innovative anti-theft measures (including engine immobilizers), Defendants, in the vast majority of their vehicles, did not. Put more bluntly, Defendants have not innovated at all, such as by adopting some equivalent or improved anti-theft measure; rather, they intentionally decided to lag behind the rest of the industry. This choice left their cars unreasonably prone to theft in the same manner as cars twenty or thirty years older—the same manner of theft that the rest of the industry prevents via immobilizers (as do Defendants, in certain higher-end vehicles and in markets outside the United States). Defendants intentionally prioritized profits over safety. The GE Plaintiffs' claims advance, rather than frustrate, the primary goals of federal safety regulations— namely, to prevent vehicle theft and improve public safety. Conflict preemption therefore does not apply.

### 4.   NHTSA's response to multiple state attorneys general does nothing to alter the preemption analysis.

In response to a letter sent by multiple states' attorneys general regarding the Kia and Hyundai theft crisis, NHTSA stated that FMVSS 114 "does not require an engine immobilizer." Dkt No. 220-3 at 3 (citing 49 C.F.R. § 571.114). NHTSA's letter should have no impact on this Court's preemption analysis. First, as stated above, GE Plaintiffs' claims do not require Defendants to install engine immobilizers, specifically, but instead seek use of reasonable anti-theft measures. *See supra* Sections IV.A.1, .3. Second, "state tort law does not conflict with a federal 'minimum standard' merely because state law imposes a more stringent requirement." *Williamson*, 562 U.S. at 336 (quoting United States Brief in *Geier* at 21). As "the Solicitor General explained [in *Geier*,] a standard giving manufacturers 'multiple options for the design of' a device would not pre-empt a suit claiming that a manufacturer should have chosen one particular option, where 'the Secretary did not determine that the availability of options was necessary to promote safety.'" *Id.* (quoting United States Brief in *Geier* at 22). NHTSA has recognized the effectiveness of engine immobilizers by granting exemptions under 49 C.F.R. § 543 from the parts-marking requirements in 49 C.F.R § 541.5 for vehicles that are equipped with engine immobilizers. CGEC ¶ 79 n.39. Kia and Hyundai are aware of this policy and have availed themselves of it for their immobilizer-equipped vehicles. *Id.*

Defendants argue that "flexibility is a significant objective of NHTSA's anti-theft regulation." Motion at 19. But Defendants fail to show that such flexibility would conflict with or make it impossible to comply with the overall goal of promoting *safety*. The flexibility provided by FMVSS 114 is purportedly tied to the need to permit "new designs and innovations." 55 Fed. Reg. 21,869, 21,871 (May 30, 1990). Defendants here are not innovating. Instead, Defendants attempt to wield preemption as a shield from accountability where their very failure to "innovate"—or even keep up with the rest of the industry, and their own practices in higher-end vehicles and other markets—gave rise to a public safety crisis. Moreover, Defendants' compliance with federal regulations does

12

not foreclose relief. *See, e.g.*, *City of Gary*, 801 N.E.2d at 1231 (An unreasonable interference "even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified"); *Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 155 (Mo. 2000) (compliance with federal aviation regulations did not foreclose duty to exercise ordinary care based on foreseeability of harm); *see also infra* Sections IV.B, C. For all of these reasons, the Court should reject Defendants' preemption arguments.

## B. Foreseeable Downstream Acts of Third Parties Do Not Sever the Causal Chain.

Defendants argue that intervening acts by third parties break the causal chain, as a matter of law and as a factual matter.[3] Motion at 21-27. Defendants' arguments should be rejected for three reasons. First, under the common law of all seven states at issue, foreseeable acts (like the theft of an easy-to-steal car) by a third party do not constitute a superseding cause that would cut off the causal chain. The Complaint adequately alleges that the wave of thefts was reasonably foreseeable to Defendants, and Defendants themselves have argued before this Court that these thefts were not only fully foreseeable but known to both Defendants and the Subrogation Plaintiffs. Subrogation Motion at 27. Second, as a general matter, whether an act constitutes a superseding cause is a factual inquiry not suitable for resolution on a motion to dismiss. Defendants rely on inapposite cases to argue that, as a matter of law, vehicle theft by a third party is always a superseding cause, but where the subsequent criminal acts of a third party are foreseeable to Defendants, those acts do not sever the causal chain.

---

[3] Defendants do not argue, but assert in the background section, that GE Plaintiffs' policing and prosecution policies "contributed to the craze of thefts." Motion at 12. Defendants' assertion is as baseless as it is tasteless. GE Plaintiffs have diverted considerable resources to this crime wave. That rates for arrests and recidivism have not kept pace with the surge in crime—as Defendants assert, *id.*—is indicative at most of how Defendants' cost shifting has burdened GE Plaintiffs' scarce resources. Regardless, this is not a basis to dismiss the Complaint at this stage. *See infra* Section IV.B.

As Defendants accurately state, "[t]he intervening act or omission of a third party will *not* operate to defeat recovery from the defendant if the act or omission would necessarily, or might reasonably, have been foreseen by the defendant." *Id.* at 22-23 (emphasis added) (quoting *Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 937 (Ind. Ct. App. 1994)). *See also Kiriakos v. Phillips*, 139 A.3d 1006, 1026 (Md. 2016); *Christiansen v. St. Louis Pub. Serv. Co.*, 62 S.W.2d 828, 831 (Mo. 1933); *Bell v. Bd. of Educ. of N.Y.*, 687 N.E.2d 1325, 1326 (N.Y. 1997); *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*, 543 N.E.2d 769, 776 (Ohio 1989); *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1107 (W.D. Wash. 2017); *Stewart v. Wulf*, 271 N.W.2d 79, 88 (Wis. 1978). Here, the GE Plaintiffs have adequately alleged that the harms at issue were reasonably foreseeable to Defendants. The Complaint alleges that, within the automotive industry, it was widely known that immobilizers were highly effective at reducing vehicle theft, especially for adolescents, and that before immobilizers were introduced in the 1990s, widespread "hot-wiring" of cars was a threat to public safety. CGEC ¶¶ 68-75. By the time Defendants began distributing cars without immobilizers in 2011, over a decade of data demonstrated the effectiveness of immobilizers in reducing crime and increasing public safety. *Id.* ¶ 74. Defendants knew or had reason to know the consequences of distributing cars that are unreasonably easy to steal.

Defendants also argue that Plaintiffs have not alleged that Defendants were aware of how susceptible their cars were to theft, or that their cars were being stolen at high rates compared to other vehicles, prior to 2020. Motion at 8. That is not so. *See* CGEC ¶¶ 78-80. As Plaintiffs allege, "[a]s would-be car thieves learned of this susceptibility, the incidence of theft for Susceptible Vehicles increased, relative to other models, from 2015 to 2020." *Id.* ¶ 83. These and other allegations established throughout the Complaint, *id.* ¶¶ 73-80, support that Defendants had reason to know, prior to 2020, that their vehicles were highly susceptible to theft. And while the specific modality responsible for proliferating how to steal these cars may not have been known, it was certainly foreseeable that word on how to steal the cars would get out.

Moreover, the susceptible nature of their vehicles and the resulting risk of theft was not only *foreseeable* but *known*, both to Defendants and, according to Defendants, to the insurers. Subrogation Motion at 27 ("Moreover, the Subrogation Plaintiffs received premiums to cover the well known problem of automobile theft and were in a position to avoid their losses [by charging higher premiums]."). Defendants further cite "'publicly available information,' including 'insurance claims' data, which, they argue, makes clear that theft rates were widely available and widely available for years." *Id.* Defendants knew that a car without an immobilizer was a sitting duck—so much so that they argue the Subrogation Plaintiffs should have been able to "adjust premiums based on the presence or absence of an immobilizer" to cover losses associated with increased thefts. Subrogation Motion at 27.

In any event, whether an intervening act by a third party rises to the level of superseding cause is generally a question for the trier of fact, unless reasonable minds could not differ as to the foreseeability of the act. *State v. Frahm*, 444 P.3d 595, 601 (Wash. 2019); *see also Pittway Corp. v. Collins*, 973 A.2d 771, 792 (Md. Ct. App. 2009) (same); *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980) ("Because questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve.").

Defendants nonetheless argue that the conduct of car thieves is unforeseeable as a matter of law, citing cases which they contend establish a "black-letter rule" that a defendant "is not responsible for third-party harm caused by the conduct of a car thief." Motion at 24-25. Yet the cases Defendants rely upon are inapposite, as they each involve individual car owners or drivers leaving keys in a parked car, leaving a taxicab running, or leaving a car unlocked. The liability of individual car owners in fact patterns such as these has been limited due to considerations of public policy[4]—considerations which are

---

[4] *See, e.g.*, *Pittway Corp. v. Collins*, 973 A.2d 771, 787-88 (Md. Ct. App. 2009) ("Legal causation is a policy-oriented doctrine designed to be a method for limiting liability

markedly different when the defendants are manufacturers selling millions of cars without anti-theft technology, rather than individual car owners inadvertently leaving their keys in their vehicles. And while these cases are not on all fours with the GE Plaintiffs' negligence claims, they are even less applicable to the GE Plaintiffs' public nuisance claims. *See infra* Section IV.C.2 (discussing causation standard for public nuisance).

The claims that have survived motions to dismiss in nationwide multidistrict litigation against the manufacturers of opioids and electronic cigarettes are more analogous. In those cases, as well, an intermediary criminal act occurred—either the diversion of the controlled substance or the sale of nicotine products to minors. Yet, in Ohio, Judge Polster held that the intervening criminal conduct did not sever proximate causation as "a jury could reasonably conclude diversion is a foreseeable consequence of the alleged misconduct." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4178617, at *4 n.8 (N.D. Ohio Sept. 3, 2019). Likewise, in the JUUL litigation, Judge Orrick held that even if "students deliberately using JUUL products at schools were intervening acts to the government entities' injuries, those intervening acts were reasonably foreseeable" and thus did not undermine proximate causation. *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 664 (N.D. Cal. 2020). As with the instant action, the teen vaping epidemic proliferated in part due to viral Instagram, TikTok, and Facebook posts—but the claims against the defendant manufacturer survived. *Id.* at 624 (discussing a "bombard[ment]" of advertisements of JUUL products via Instagram and Snapchat), 650, 665-66 (denying motion to dismiss

---

after cause-in-fact has been established."); *see also* Prosser & Keeton, The Law of Torts § 42, at 273 (5th ed. 1984) ("Legal causation" depends "essentially on whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred").

16

nuisance and negligence claims against JUUL in complaints brought both by consumers and governmental entities).

The GE Plaintiffs have alleged that the downstream acts of third parties resulting in damages to governmental entities are foreseeable and therefore do not constitute superseding causes. The question of which specific modality was used to spread the word of the susceptibility of these vehicles does nothing to alter the conclusion that a foreseeable criminal act of a third party supports proximate causation.

## C.   GE Plaintiffs' Public Nuisance Claims Are Well Pled.

Defendants assert that GE Plaintiffs fail to state a claim for public nuisance. Motion at 34. Evaluating the sufficiency of Plaintiffs' public nuisance claims boils down to two questions: (1) does a public nuisance exist?[5] and (2) did the defendant substantially contribute to creating or maintaining it? The answer to both is "yes."

Defendants construct a different question—whether the GE Plaintiffs' state laws "permit public nuisance claims based solely on allegedly defective product designs"—and claim "silence" from the courts on the issue. *Id.* But this is not the right question, and even if it were, courts have not been silent about public nuisances arising from products, including product designs. As the Delaware Supreme Court observed in a recent decision upholding a public nuisance claim arising from the use of products, "historical examples abound of products that were held to create a public nuisance." *Delaware ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 383 (Del. 2023).

Under the common law definition, a public nuisance is "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B (1979). As discussed below, first, the GE Plaintiffs have alleged that an unreasonable interference (rampant vehicle thefts, associated crimes, and the

---

[5] See *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 646 N.W.2d 777, 793–94 (Wis. 2002) ("Since a public nuisance can arise by either negligent or intentional conduct, the first element necessary to prove liability for maintaining a public nuisance requires only the existence of the public nuisance itself.").

17

corresponding diversion of city resources) with a common right (public safety) exists. Second, the GE Plaintiffs have alleged that Defendants substantially contributed to creating and maintaining this interference with public safety, by selling the Susceptible Vehicles without adequate anti-theft measures despite being substantially certain of the consequences, and by failing to take meaningful steps to address the ongoing threat to public safety in the GE Plaintiffs' jurisdictions. The GE Plaintiffs have thus plausibly alleged the elements of their public nuisance claims. In addition, neither Ohio's Products Liability Act ("OPLA"), Ohio Rev. Code § 2307.71 *et seq.*, nor Washington's Product Liability Reform Act ("WPLA"), Wash. Rev. Code § 7.72, abrogates GE Plaintiffs' nuisance claims under Ohio and Washington law, and Defendants' additional arguments regarding the Ohio GE Plaintiffs' public nuisance claim should be rejected.

1. **The GE Plaintiffs have adequately alleged the existence of a public nuisance.**

A common law public nuisance is "an unreasonable interference with a right common to the general public." Restatement § 821B. An unreasonable interference includes (a) "acts that significantly interfere with public health, safety, peace, comfort, or convenience," (b) "conduct that is contrary to a statute, ordinance, or regulation," or (c) "conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware." *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2022) (citing Restatement § 821B(2)). Here, the public has a right to safely use their streets, sidewalks, and businesses, and when that right is invaded because of a cost-cutting business decision, it is an unreasonable interference. Defendants argue that the GE Plaintiffs' allegations "do not implicate a public right," Motion at 43-47, characterizing the Complaint as containing only "scattered personal injuries and property damage," *id.* at 47, and "anecdotal allegations" representing only "a statistical blip." *Id.* at 45-46. But the Complaint is replete with allegations describing the significant, unreasonable

interference with public peace and safety that has resulted from Defendants' decision to forgo immobilizers in some of their vehicles.

What Defendants attempt to minimize as "anecdotal allegations" are instead stark evidence of the gravity and pervasiveness of the problem. These allegations illustrate the significant interference with the collective right to safety that belongs to the public in common, as the harms from Defendants' business decisions are not limited to owners and lessees of Susceptible Vehicles. Examples include the following:

- Accidents involving bystanders, pedestrians (CGEC ¶¶ 120, 189), and cyclists (*id.* ¶ 211);

- Reckless driving and crashes on school campuses and playgrounds (*id.* ¶¶ 91, 123, 144, 234-35);

- Storefronts being smashed by these vehicles (*id.* ¶¶ 142, 199, 232-33);

- A restaurant directing patrons to inform the host if they drive a Hyundai or Kia so they could be seated near a window to keep an eye on their car (*id.* ¶ 124); and

- The GE Plaintiffs' police departments having to divert resources away from other community safety needs to respond to one Hyundai or Kia incident after another (*id.* ¶¶ 135, 165, 213, 231, 247, 251-52).

These are not "scattered" incidents. These examples illustrate a widespread pattern and far-reaching impact on public safety. Defendants correctly state that a public right is "collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." Motion at 43 (quoting Restatement (Second) of Torts § 821B cmt. g). But Defendants mistakenly argue that, because some individual members of the public have sustained injuries, there is no broader public right at issue. Among the factors relevant to determining when a nuisance exists, courts consider "whether the alleged nuisance is located in a public place, a place where the public is likely to congregate, a place where the public has a right to go, or a place where the public is likely to come into contact with the nuisance." *City of Kansas City v. N.Y.-Kan. Bldg. Assocs., L.P.*, 96 S.W.3d 846, 857 (Mo. Ct. App. 2002); *see also State ex rel. Hopkins v. Excelsior Powder Mfg. Co.*, 169 S.W. 267, 273 (Mo. 1914) ("A nuisance is public when it affects the rights enjoyed by citizens as part of the public, as the right of

19

navigating a river, or traveling a public highway; rights to which every citizen is entitled.") (quoting Joyce on Nuisances § 5); *Keefer v. State*, 92 N.E. 656, 657 (Ind. 1910) ("A nuisance is a public nuisance if it annoys such part of the public as necessarily comes in contact with it.") (quoting *State v. Tabler*, 72 N.E. 1039, 1040 (Ind. App. 1905)). In *Excelsior Powder*, the court concluded that explosions at a powder mill that threw debris across a road and a passenger rail line and shattered schoolhouse and storefront windows was a public nuisance, *see* 169 S.W. at 269; in *Keefer*, blasting in a stone quarry that "cast[] rock upon the surrounding properties and highways," too, was a public nuisance. 92 N.E. at 657. As these and other historical public nuisance cases demonstrate, the fact that individual members of the public may—while exercising a public right, such as by traveling on a public highway—encounter and be harmed by a nuisance does not transform the nuisance from public to private. The same is true here.

Defendants argue that "every alleged vehicle defect could be contended to interfere with 'safe and reasonable access to public thoroughfares.'" Motion at 42 (quoting CGEC ¶¶ 270, 311, 330, 410). This is both a strawman—as Plaintiffs do not contend that every defect interferes with a public right, but instead plead detailed allegations as to why this one does—and a slippery-slope argument that does not grapple with the actual allegations or caselaw at issue. As the Indiana Supreme Court has explained, "[w]hether it is unreasonable turns on whether the activity, even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified." *City of Gary*, 801 N.E.2d at 1231.

By definition, not every vehicle defect could support a public nuisance claim because the interference must be unreasonable. There is always a risk that a vehicle may be stolen or driven dangerously, just as there is always a risk that stored explosives may cause an explosion. But what makes stored explosives a public nuisance in some cases is that the manner or place of their storage creates an unreasonable risk to public safety. Likewise, the GE Plaintiffs' public nuisance claims are in line with these well-established

common-law principles. By selling millions of vehicles without industry-standard anti-theft technology—foreseeably resulting in a rash of thefts, crimes, and associated harms—Defendants have created a significant and unreasonable threat to public safety. The GE Plaintiffs therefore adequately allege an unreasonable interference with a public right.

### 2. The GE Plaintiffs have adequately alleged that Defendants' conduct was a substantial contributing factor to the public nuisance.

The GE Plaintiffs also sufficiently allege that Defendants' conduct is a substantial contributing factor to the creation and maintenance of the nuisance. Defendants knew that without the anti-theft devices present in 96% of all other manufacturers' vehicles—and present in Defendants' own vehicles sold in other markets, including Canada—their cars would be at a substantially greater risk of being stolen. Although Defendants assign blame to various others, their conscious decision not to include this simple device created the conditions that have put the public at serious risk. That is enough. *See, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 281 (E.D.N.Y. 2004) ("Satisfaction of the causation requirement for liability in public nuisance actions requires proof that a defendant, alone or with others, created, contributed to, or maintained the alleged interference with the public right."); *see also Physicians Plus*, 646 N.W.2d at 792 (under Wisconsin law, "liability for maintaining a public nuisance requires that the defendant had either actual or constructive notice of the public nuisance and that the failure to abate the public nuisance was a cause of the plaintiff's injuries"). More than three years have passed since the Kia Boyz came to notoriety—three years in which Defendants were put on actual notice of the existence of this crisis, and three years in which Defendants have done little that has been effective in curbing this costly nuisance other than to belatedly install immobilizers in all of their vehicles for the 2023 model year, which confirms Defendants' knowledge that immobilizers are effective. CGEC ¶ 8. The steps that Defendants have taken to date are insufficient as of the filing of the CGEC—several months after the rollout of the software update Kia and Hyundai thefts remained elevated. *Id.* ¶ 104.

21

Although Defendants assert that proximate cause is a requirement for public nuisance claims in all of the GE Plaintiff jurisdictions, Motion at 21-22, courts in New York and Wisconsin recognize that the proximate cause analysis is not applicable to a public nuisance claim. *See In re Opioid Litig.*, No. 400000/2017, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018) ("[t]he court is doubtful, in any event, whether a discussion of proximate cause in a case based on negligence should even apply in a case based on public nuisance."); *City of New York v. A-1 Jewelry & Pawn*, 247 F.R.D. 296, 347-48 (E.D.N.Y. 2007) ("where the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases"); *City of Wyoming v. Procter & Gamble Co.*, 210 F. Supp. 3d 1137, 1162 (D. Minn. 2016) ("In the place of a typical 'causation' requirement, Wisconsin only requires that a plaintiff pursuing a public nuisance claim show that he or she (1) had 'either actual or constructive' notice of the alleged public nuisance, and (2) the failure of the defendant to 'abate' the public nuisance caused the plaintiff's injury."). As the court in *Takata Corp.* explained, "In general, courts also require the plaintiff make some showing of causation that links the defendant to the creation or maintenance of the public nuisance. When the tort of public nuisance is based on Section 821B, courts have expansively construed the causation requirement in accordance with the broad language of the Restatement provision." 67 V.I. at 407–08.

### 3.    There is no basis for exclusion of products, or product design, in the well-established common law of public nuisance.

Defendants argue for a categorical exclusion of public nuisance claims where the condition alleged to be interfering with a public right involves a product's design. Motion at 34-35. There is no basis for this exclusion in the common law. On the contrary, a nuisance-causing activity includes "all acts that are a cause of harm." Restatement § 834 cmt. b. The term "nuisance" refers "to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion." William L. Prosser, *Handbook of the Law of Torts* § 87 (4th ed. 1971).

22

State high courts considering public nuisance claims involving products reject Defendants' proposed categorical exclusion, including with respect to a product's design, as has the Ninth Circuit. "'[U]nder the Restatement's broad definition, a public nuisance action can be maintained for injuries caused by a product if the facts establish that *the design*, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public.'" *Ileto v. Glock Inc.*, 349 F.3d 1191, 1214 (9th Cir. 2003) (emphasis added). Simply put, "[i]f an activity meets the requirements of an unreasonable interference with a public right, it may constitute a public nuisance." *City of Gary*, 801 N.E.2d at 1233 (holding that city stated claim for public nuisance claim against handgun manufacturers under Indiana law). In reversing a lower court's dismissal of a public nuisance claim based on a categorical exclusion of claims involving products, the Delaware Supreme Court recently explained that the issue "is not whether a product is involved or whether the defendant exercised control of the product at the time of the alleged nuisance[;]" rather, "the crux of the issue is: can a product manufacturer be held liable after a product it manufactures is sold to third parties whose activities release the product into the environment and cause a public nuisance?" *Jennings*, 299 A.3d at 383. Following what it described as a "common-sense approach" and applying well-established common-law principles, the *Jennings* Court held that the plaintiff had stated a claim for public nuisance against a product manufacturer who knew or had reason to know that its products would pose an unreasonable risk to public health, welfare, and safety. *Id.* at 384.

Despite Defendants' insistence that the GE Plaintiffs' public nuisance claims would result in "free-wheeling" and "limitless" liability, Motion at 47, 35, not every product liability claim involving personal injury could give rise to an interference with public health or public safety. Very few products create a condition that unreasonably interferes not only with the rights of the user or consumer of the product, but of the public in general. However, *if* a product creates a condition which unreasonably interferes with a public right, a public nuisance exists. In a case involving an alleged automotive defect, for example, the court held that a public nuisance claim could proceed on allegations that the

defect—airbags containing a propellant that was particularly unstable in the local climate—interfered with the right of public safety for all drivers on the roads, not just the owners of vehicles with the defective airbags. *See Takata Corp.*, 67 V.I. at 403-11.

For good reason, the theory of public nuisance, from its origin, has been a broad one.[6] This flexible doctrine ensures that parties who cause harm to a public right are held responsible for that harm. But the doctrine is not limitless: a plaintiff must adequately plead an interference with a public right, that the interference is unreasonable, and that the defendant substantially contributed to the creation or maintenance of the nuisance. In addition, there are limitations in who has standing or statutory authority to bring public nuisance claims. Where these requirements are met, however, courts applying the law of the GE Plaintiffs' jurisdictions have all upheld public nuisance claims involving products. *See, e.g.*, *In re Opiate Litig.*, 589 F. Supp. 3d 790, 815 (N.D. Ohio 2022) (rejecting pharmacy defendants' argument that allowing nuisance claims under Ohio law based on the opioid crisis "would allow consumers to convert almost every products liability action into a public nuisance claim" and noting that the Ohio Supreme Court has "specifically emphasized the adaptability of Ohio law to new circumstances") (citation omitted); *Ohio ex rel. Dewine v. Purdue Pharma L.P.*, No. 17 CI 261, 2018 WL 4080052, at *4 (Ohio Ct. Com. Pl. Aug. 22, 2018) (finding public nuisance claim adequately pled under Ohio law and citing the "broad definition of public nuisance allowing an action to be maintained 'for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unnecessarily interferes with a right common to the general public'") (citation omitted); *Mayor & City Council of Baltimore v. Monsanto Co.*,

---

[6] *See Copart Indus., Inc. v. Consolidated Edison Co. of N.Y.*, 362 N.E.2d 968, 971 (N.Y. 1977) (discussing the history of public nuisance at common law and explaining that, "[a]long with the civil remedy protecting rights in land, there developed a separate principle that an infringement of the right of the crown, or of the general public, was a crime and, in time, this class of offenses was so enlarged as to include any 'act not warranted by law, or omission to discharge a legal duty, which inconveniences the public in the exercise of rights common to all Her Majesty's subjects.'") (quoting Stephen, General View of Criminal Law of England (1890), p. 105).

24

No. RDB-19-0483, 2020 WL 1529014, at *10 (D. Md. Mar. 31, 2020) ("The City has alleged that Monsanto manufactured, distributed, marketed, and promoted PCBs, resulting in the creation of a public nuisance that is harmful to health and obstructs the free use of the City's stormwater and other water systems and waters.");[7] *Maryland*, 406 F. Supp. 3d at 467-68 (allowing public nuisance claim against manufacturer of MTBE gasoline additive); *City of Wyoming*, 210 F. Supp. 3d at 1162 (holding city stated public nuisance claim under Wisconsin law against manufacturers of so-called "flushable" wipes that, when used as directed, created problems in municipal sewer systems and where defendants "continued their sales after gaining knowledge of the alleged problems"); *Lester E. Cox Med. Ctrs. v. Amneal Pharms., LLC*, No. 6:22-CV-03192-MDH, 2023 WL 6323797, at *4 (W.D. Mo. Sept. 28, 2023) (on motion to dismiss, rejecting defendants' argument that "Missouri law bars public-nuisance claims premised on the marketing and distribution of lawful products"); *In re Opioid Litig.*, No. 400000/2017, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018) (denying motion to dismiss public nuisance claim under New York law against opioid manufacturers); *City of Gary*, 801 N.E.2d at 1235 (allowing public nuisance claim under Indiana law against handgun manufacturers and distributors where the defendants knew of downstream practices with their products "and ha[d] it within their power to curtail them but d[id] not do so for profit reasons")[8]; *City of Seattle*, 237 F. Supp. 3d at 1107 (denying motion to dismiss public nuisance claim against PCB manufacturer).

---

[7] Defendants cite *Cofield v. Lead Industries Ass'n, Inc.*, No. MJG-99-3277, 2000 WL 34292681, at *6-7 (D. Md. Aug. 17, 2000), *see* Motion at 37, but subsequent Maryland cases have noted that no other Maryland authorities have followed *Cofield*'s holding on public nuisance. *See Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 467-68 (D. Md. 2019) ("Maryland courts have never adopted the 'exclusive control' rule for public nuisance liability outlined by the court in *Cofield*. To the contrary, Maryland courts have found that a defendant who created or substantially participated in the creation of the nuisance may be held liable even though he (or it) no longer has control over the nuisance-causing instrumentality.") (citation omitted).

[8] Indiana public nuisance law is grounded in statute. *See* Ind. Code § 32-30-6-6.

Defendants, in arguing that "most courts" reject nuisance liability based on product sales, cite Restatement (Third) of Torts: Liab. For Econ. Harm § 8 cmt. g. Motion at 34. But this section of the Restatement only applies to "claims for economic loss brought by a private party who suffered an injury distinct in kind from those suffered by members of the affected community in general." *In re Opiate Litig.*, 589 F. Supp. 3d 790, 824 (N.D. Ohio 2022) (cleaned up). The comments to this section specifically acknowledge that the definition of "public nuisance" for governmental claims "'tends to be considerably broader than the common-law definition recognized by this Section as a basis for a private suit.'" *Id.* (quoting Restatement (Third) of Torts: Liab. For Econ. Harm § 8 cmt. g). If anything, the Restatement undermines Defendants' position.

Finally, it bears repeating that the purported legality of Defendants' decisions under the FMVSS does not excuse them for liability for the nuisance they have created. *City of Gary*, 801 N.E.2d at 1231 ("Whether [a nuisance] is unreasonable turns on whether the activity, even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified."); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 457 F. Supp. 2d 298, 309 (S.D.N.Y. 2006) ("Where the circumstances of a particular locality or the manner in which the activities are carried out creates a public nuisance, no statute criminalizing the activity is necessary for plaintiffs to proceed with their claim"); *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 712 P.2d 914, 922 (Ariz. 1985) ("[T]he inquiry in a nuisance claim is not whether the activity allegedly constituting the nuisance is lawful but whether it is reasonable under the circumstances."); *Lake Hamilton Lakeshore Owners Ass'n, Inc. v. Neidlinger*, 182 So. 3d 738, 741 (Fla. Dist. Ct. App. 2015) ("An activity can constitute a judicially abatable nuisance notwithstanding full compliance with either legislative mandate or administrative rule.") (quotation marks and citation omitted).

### 4. Neither the OPLA nor the WPLA abrogates the GE Plaintiffs' public nuisance claims.

#### a. The OPLA preempts claims seeking recovery for personal injury and property damage, not claims seeking recovery for economic losses and abatement.

In Ohio, the OPLA only preempts common law "product liability claims." Ohio Rev. Code § 2307.71(B). The term "[p]roduct liability claim" refers to a claim that "seeks to recover compensatory damages" for "death, physical injury to person, emotional distress, or physical damage to property other than the product in question." *Id.* § 2307.71(A)(13). Although "a cause of action may concern a product, it is not a product liability claim"—and therefore is not preempted—"unless it alleges damages other than economic ones." *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) (relying on Ohio Rev. Code § 2307.72(C)). The OPLA does not preempt claims seeking equitable relief either. *In re Opiate Litig.*, No. 1:17-md-2804, 2018 WL 6628898, at *14 (N.D. Ohio Dec. 19, 2018) (appeal pending).[9] Since the remedy of abatement is equitable, the remedy is not preempted by the OPLA, even when the plaintiff is seeking money to abate the nuisance. *In re Opiate Litig.*, 622 F. Supp. 3d 584, 605-07 (N.D. Ohio 2022), *appeal docketed*, No. 22-3841 (6th Cir. 2022). The Ohio GE Plaintiffs are not seeking to recover for death, physical injury, emotional distress, or property damage. They are seeking economic damages and equitable relief. The OPLA therefore has no application here.

Defendants argue that a 2007 amendment to the OPLA suggests otherwise. Motion at 38, 40. In so doing, they skip over the 2005 amendment, which undercuts their position.

---

[9] After the defendants in the Opioid MDL filed their motion, the Sixth Circuit certified *sua sponte* the following question to the Ohio Supreme Court: "Whether the Ohio Product Liability Act, Ohio Revised Code § 2307.71 *et seq.*, as amended in 2005 and 2007, abrogates a common law claim of absolute public nuisance resulting from the sale of a product in commerce in which the plaintiffs seek equitable abatement, including both monetary and injunctive remedies?" *In re Opiate Litig.*, --- F.4th ---, Nos. 22-3750/3751/3753/3841/3843/3844, 2023 WL 5844325 (6th Cir. Sept. 11, 2023). The Supreme Court of Ohio has not yet decided whether to answer this question.

27

In the 2005 amendment, the legislature added the preemption language of Ohio Rev. Code § 2307.71(B). The legislative history for this amendment explains that the intent was to supersede the Supreme Court of Ohio's decision in *Carrel v. Allied Products Corp.*, 677 N.E.2d 795 (Ohio 1997), which held that common-law claims for negligent design survived the enactment of the OPLA. *In re Opiate Litig.*, 2018 WL 6628898, at *13. The "General Assembly's inclusion of *Carrel*" implies "the intentional exclusion and therefore the tacit acceptance of the Ohio Supreme Court's holding in *LaPuma*." *Id.* And *LaPuma*, as noted above, held that OPLA only applies to claims that seek recovery for non-economic losses. 661 N.E.2d at 716. The section *LaPuma* relied on (Ohio Rev. Code § 2307.72(C)) was not altered by the 2005 amendment either. Thus, the Ohio GE Plaintiffs' common-law claims here survive under the 2005 amendment.

The 2007 amendment is similarly unhelpful to Defendants. The legislature made clear that this amendment was "not intended to be substantive." *In re Opiate Litig.*, 2018 WL 6628898, at *13 (quoting 2006 Ohio Laws File 198 (Am. Sub. S.B. 117)). Yet according to Defendants, this amendment precludes a plaintiff from pursuing public nuisance claims arising from a defective product. Motion at 38, 40. Furthermore, the text of the 2007 amendment confirms that the legislature was not making such a substantive change. The amendment merely clarifies that a "product liability claim," for the purposes of the OPLA, "also includes" public nuisance claims. *In re Opiate Litig.*, 2018 WL 6628898, at *14. The 2007 amendment did not alter the definition of a "product liability claim;" it simply provided an example of a product liability claim. *Id.* Both before and after the 2007 amendment, a public nuisance claim is only a "product liability claim" if non-economic damages are sought. *Id.* Again, the Ohio GE Plaintiffs' common-law claims, seeking economic damages, survive under the 2007 amendment.

Finally, even assuming the OPLA extends to claims seeking only economic loss and equitable relief, the OPLA does not affect Columbus's claim based on City Code § 701.19. This is because the OPLA only extinguishes "common law" product liability claims, not statutory ones. *See id.* at *15. Columbus can thus proceed on its statutory

28

nuisance claim under City Code § 701.19, even if Defendants' OPLA argument otherwise has merit (which it does not).

### b.   The WPLA does not bar Seattle's public nuisance claim.

Defendants also argue that the WPLA bars the City of Seattle's claim. Motion at 40. However, "Seattle's public nuisance claim is grounded on statutory causes of action, *see* Wash. Rev. Code § 7.48.010 to .130, not common law, so it is not preempted by the WPLA." *City of Seattle*, 237 F. Supp. 3d at 1107 (denying motion to dismiss public nuisance claim against product manufacturer). In addition, the WPLA does not preempt common-law nuisance claims based on allegations of intentional conduct. *See La.-Pac. Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1584 (9th Cir. 1994), as amended (Aug. 30, 1994).

As Defendants acknowledge, the WPLA does not encompass claims based on intentionally caused harm. Motion at 40. Here, the Complaint alleges that Defendants made a conscious decision to forgo standard anti-theft measures in the Susceptible Vehicles, and that Defendants were aware of the risks and likely consequences of doing so. CGEC ¶¶ 3, 73-80. Based on these allegations, which must be taken as true at this stage, the GE Plaintiffs have pleaded intentional conduct. "If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Bradley v. Am. Smelting & Ref. Co.*, 709 P.2d 782, 785 (Wash. 1985) (quoting Restatement § 8A, cmt. b (1965)).

### 5.   Defendants' additional Ohio-specific arguments fail.

Defendants advance three additional arguments specific to Ohio GE Plaintiffs: first, a quasi-preemption argument that FMVSS regulations exempt them from liability for Ohio public nuisance claims; second, that the Ohio GE Plaintiffs have not alleged all elements of their absolute public nuisance claims; and third, that Columbus has not sufficiently alleged a specific element of its statutory public nuisance claim. Each of these arguments fails for the reasons set out below.

### a. The Court should reject the Defendants' quasi-preemption argument.

Defendants' quasi-preemption argument fails because Defendants cannot show that FMVSS 114 preempts or indirectly bars the Ohio GE Plaintiffs' claims. The Safety Act specifically states that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103(e). The Safety Act therefore explicitly preserves state tort claims that demand a higher level of safety than required by FMVSS regulations. *See Geier*, 529 U.S. at 868-70. This alone should doom the Defendants' quasi-preemption argument—that FMVSS 114 somehow bars the Ohio GE Plaintiffs' claims, even if it does not preempt those claims.

Nonetheless, despite the plain language of 49 U.S.C. § 30103(e), Defendants insist that the FMVSS regulations exempt them from liability for an Ohio public nuisance claim. But the Ohio Supreme Court has never used a federal regulation (or for that matter, ***any*** regulation)[10] to provide immunity for a public nuisance. If a defendant cannot show that federal law preempts a state-law public nuisance claim, a defendant cannot defeat a state-law public nuisance claim through the incorporation of federal law. The case law cited by Defendants does not assist them. Defendants' reliance on *City of Cleveland v. Ameriquest Mortgage Securities, Inc.*, 621 F. Supp. 2d 513 (N.D. Ohio 2009), is misplaced. The Ohio Supreme Court has insisted that the defendant prove that its conduct was authorized by

---

[10] *See Allen Freight Lines, Inc. v. Consolidated Rail Corp.*, 595 N.E.2d 855, 857 (Ohio 1992) (analyzing Ohio Rev. Code 5577.05 as a "proper exercise of legislative authority" that eliminated a legal duty as a matter of law); *City of Mingo Junction v. Sheline*, 196 N.E. 897 (Ohio 1935) (analyzing Ohio Rev. Code § 3714); *Toledo Disposal Co. v. State*, 106 N.E. 6 (Ohio 1914) (paragraphs 3 and 4 of syllabus) (Ohio license to operate business "passed within its legislative power" and "made under legislative authority"); *Heckler v. State ex rel. Cleveland*, 144 N.E. 700 (Ohio 1924) (paragraph 1 of syllabus) ("The state Legislature in the exercise of its police power has authorized the erection and operation of garbage plants by municipalities, within or without their limits, and any such plant so equipped and operated as to eliminate all avoidable gases, odors, and liquids cannot be abolished as a public nuisance.").

the Ohio legislature, not merely in compliance with a federal regulatory scheme. Defendants cannot do that here.

Moreover, a plaintiff need not show unlawful conduct to prevail on an absolute nuisance claim, and Defendants have failed to show that FMVSS 114 displaces their common law duties by specifically authorizing their conduct. Ohio law recognizes two types of public nuisances: absolute nuisances and qualified nuisances. *Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 859, 862 (N.D. Ohio 2017). An absolute nuisance can consist of either (1) "an intentional act resulting in harm"; or (2) an act involving "unlawful conduct causing unintentional harm."[11] *Id.* (quoting *Gevelaar v. Millennium Inorganic Chems.*, No. 2012-A-0013, 2013 WL 501745, at *3 (Ohio Ct. App. Feb. 8, 2013)); *Beretta*, 768 N.E.2d at 1143 n.4 (same). A "cause of action in qualified nuisance is essentially an action in negligence." *Paulus v. Citicorp N. Am., Inc.*, No. 2:12-cv-856, 2014 WL 4557603, at *17 (S.D. Ohio Sept. 12, 2014) (quoting *Hardin v. Naughton*, No. 98645, 2013 WL 1696054, at *5 (Ohio Ct. App. Apr. 18, 2013)).

The gist of Defendants' quasi-preemption argument is that the Ohio GE Plaintiffs must show that Defendants' conduct was unlawful. A plaintiff, however, can recover for an absolute nuisance caused by *either* intentional conduct *or* unintentional unlawful conduct. So even if this quasi-preemption argument applied to the Ohio GE Plaintiffs' qualified nuisance claims, it would not apply to their absolute nuisance claims. *See Nottke*, 264 F. Supp. 3d 863-66 (concluding that plaintiff had stated a claim for absolute nuisance while also concluding that plaintiff's claim for qualified nuisance was barred by federal regulations).

But the quasi-preemption argument does not bar the Ohio GE Plaintiffs' qualified nuisance claim either. Such a claim, as stated above, is similar to a claim for negligence. "Compliance with a legislative enactment or an administrative regulation does not prevent

---

[11] An absolute nuisance can also consist of a non-culpable act resulting in accidental harm from an abnormally dangerous condition. *Nottke*, 264 F. Supp. 3d at 862. This type of absolute nuisance is not at issue here.

31

a finding of negligence where a reasonable man would take additional precautions." Restatement § 288C; *see also Nichols v. Coast Distrib. Sys.*, 621 N.E.2d 738, 740 (Ohio 1993) (citing the Restatement). Where a statute, ordinance, or regulation provides a standard of care, the "standard defined is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation." Restatement § 288C cmt. a.[12] Here, the FMVSS regulation specifically stated they provide "minimum standards for motor vehicle or motor vehicle equipment performance." 49 U.S.C. § 30102(a)(10). True, in "some instances, a statute defines a duty so thoroughly that it applies in all situations and replaces common-law duties." *Nichols*, 621 N.E.2d at 740. But that is not the case here. On the contrary, the FMVSS regulations do the opposite by stating that they do not eliminate a manufacturer's common law duties. 49 U.S.C. § 30103(e).

Two of the cases cited by Defendants highlight the distinction between general compliance with the law and the type of specific authorization that displaces common law duties. In *Allen Freight*, the statute at issue made clear there was no legal duty, which eliminated any qualified nuisance claim. 595 N.E.2d at 856. In *Ameriquest*, regulators "were explicitly encouraging the very conduct of which the City complain[ed]." 621 F. Supp. 2d at 526-31. Defendants have not argued, and cannot argue, that NHTSA encourages manufacturers to forgo immobilizers and other forms of equally effective anti-theft technology.

Defendants' quasi-preemption obstacle faces one final obstacle: If the bar set by FMVSS 114 is as low as they claim, then the regulation cannot immunize their conduct. In *Beretta*, the city challenged the defendant's practices in distributing firearms, and the defendant argued that its conduct was legislatively authorized. The Supreme Court of Ohio rejected this position:

---

[12] The Restatement provides an example: The "enactment of an automobile speed limit of forty miles an hour does not mean that the driver is free to proceed always at that speed, and he may be required to slow down to fifteen miles an hour, or even to stop, where traffic conditions require it." Restatement (Second) of Torts § 288C cmt. a (1965).

> Even though there exists a comprehensive regulatory scheme involving the manufacturing, sales, and distribution of firearms, see, e.g., Section 922, Title 18, U.S. Code; Part 178, Title, C.F.R., the law does not regulate the distribution practices alleged in the complaint.

768 N.E.2d at 1143. A similar statement could be made here: yes, FMVSS 114 provides certain minimum standards for anti-theft technology, but the defect (according to Defendants) arises from unauthorized persons "taking significant destructive actions to parts of the vehicle." Motion at 7 (quoting Dkt. No. 220-3 at 3). If this type of defect does not fall within the scope of FMVSS 114 (as Defendants claim), then, like in *Beretta*, the applicable federal regulations do not govern the practices addressed in the complaint and Defendants' argument fails.

### b. Defendants are liable for the absolute public nuisance because they intentionally created the conditions for a public nuisance.

As noted above, a plaintiff can recover for absolute nuisance when the defendant's conduct was intentional. *Nottke*, 264 F. Supp. 3d at 862. For this claim, the plaintiff need not prove the defendant intended to create the nuisance; the plaintiff merely needs to show the defendant intended to bring about the conditions for the nuisance to occur. *In re Opiate Litig.*, 406 F. Supp. 3d 672, 675 (N.D. Ohio 2019). The harm, in other words, is simply the "necessary consequence" of—or "incident" to—their intended acts. *Id.*; *see also Taylor v. City of Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944).

The decisions in *Nottke* and *In re Opiate Litigation* are instructive. In *Nottke*, the plaintiff alleged that the defendant-railroad had created a public nuisance by operating a braking system that created a high-pitched squealing. 264 F. Supp. 3d at 861. The defendant presumably did not intend to inflict harm on the plaintiff. The court still found that the plaintiff could proceed on an absolute nuisance claim because the harm to the plaintiff was a necessary consequence of the defendant's operation of the braking system. *Id.* at 863-864. Along the same lines, in *In re Opiate Litigation*, the court denied summary judgment on the plaintiffs' public nuisance claim where there was evidence that the

33

defendants intentionally created the conditions for the public nuisance. 406 F. Supp. 3d at 675-76.

The Ohio GE Plaintiffs have easily pled an intentional absolute nuisance here. Defendants intentionally manufactured and sold millions of cars that could be stolen by a middle schooler in a matter of minutes with just a screwdriver and a USB cord. The discovery of this fact was inevitable. When word of Defendants' corner-cutting got out, thefts of Kias and Hyundais surged. As in *Nottke* and *In re Opiate Litigation*, Defendants intentionally created the conditions for a public nuisance. Accordingly, the Ohio GE Plaintiffs may pursue claims for absolute public nuisance.

### c. Columbus's statutory public nuisance claim is well pled and civil liability allows for the recovery of damages.

Columbus alleges that by flooding the city with unsafe vehicles, Defendants created a public nuisance in violation of City Code 703.17. Under City Code 703.17, a vehicle constitutes a public nuisance when the vehicle is in an unsafe condition that is detrimental to the public health, safety, and welfare, or well-being of the surrounding area. The word "unsafe" is not defined by the City Code, but broadly speaking, the term refers to something that is "'[d]angerous; not secure.'" *Ohio v. Miner*, No. E-11-052, 2012 WL 236696, at *2 (Ohio Ct. App. June 22, 2012) (alteration in original) (quoting Black's Law Dictionary 1539 (6th ed.1990)).

Defendants distributed thousands of their vehicles to Columbus residents, and those vehicles are neither safe nor secure. Since juveniles use those vehicles to drive recklessly and commit other crimes, the very presence of Defendants' vehicles in a neighborhood can make the neighborhood more dangerous. Defendants' vehicles pose a grave threat to the public health, safety, and welfare, and well-being of residents of Columbus.

The City Code focuses on the condition of the vehicle, *see* Columbus City Code 703.17(P), not on whether the vehicle (if operated by a responsible driver) can be driven safely, Motion at 53. Here, the subject vehicles are in an unsafe condition because they can be easily stolen. Further, Defendants' suggestion that vehicle security has nothing to

34

do with safety strains credulity. *Id.* at 52-53 (focusing instead on the unsafe actions of the car thieves themselves). Defendants, after all, repeatedly claim that they complied with the FMVSS regulations relating to theft protection.

Columbus properly requested that Defendants be "enjoined from continuing these nuisances and be compelled to abate them." CGEC ¶ 380. Defendants say that Columbus cannot obtain "damages." *See* Motion at 75. But, as stated above, "abatement" can include the payment of money, and Columbus seeks "abatement" to the fullest extent allowed under Ohio law. *See In re Opiate Litig.*, 622 F. Supp. 3d at 606-07. Defendants are therefore wrong to suggest that Columbus cannot recover money as a form of abatement under the City Code.

Also, Columbus can recover damages for violations of Columbus City Code 703.17 under Ohio Rev. Code § 2307.60, which "creates a civil cause of action for damages resulting from any criminal act, unless otherwise prohibited by law." *Jacobson v. Kaforey*, 75 N.E.3d 203, 207 (Ohio 2016). A person who violates Columbus City Code 703.17 commits a criminal act. *See* Columbus City Code 701.99(A). It follows that a person injured by a violation of Columbus City Code 703.17 is entitled to recover damages in a civil action unless this remedy is otherwise prohibited by law.

Defendants have not identified such a prohibition. They argue that the Columbus City Council excluded damages as a remedy for a statutory public nuisance because the City Code only expressly authorizes the remedy of abatement. Motion at 55. Yet the City Code makes plain that the consequences for a public nuisance crime ("a misdemeanor of the first degree") under the City Code are "in addition to and separate from any civil or administrative penalties or remedies provided for by this code or pursuant to Ohio law." Columbus City Code 701.99(A). Because Ohio Rev. Code § 2307.60 is unquestionably a civil remedy provided by Ohio law, Columbus can recover under Ohio Rev. Code § 2307.60 for Defendants' violation of City Code 703.17.

**D.      GE Plaintiffs' Negligence Claims Are Well Pled.**

Under the laws of Indiana, Missouri, New York, Ohio, and Wisconsin, the elements of negligence are essentially identical: duty, breach, causation, and injury/damages. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 415 F. Supp. 2d 261, 273 (S.D.N.Y. 2005) (applying Indiana law); *Lopez*, 26 S.W.2d at 155 (Missouri); *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 394 (E.D.N.Y. 2004); *Strother v. Hutchinson*, 423 N.E.2d 467, 469 (Ohio 1981); *Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641, 668 (E.D. Wis. 2021). Defendants appear to take issue with the elements of duty, causation, and at least as to certain GE Plaintiffs, injury. Motion at 21, 27, 56. As set out more fully below, Defendants' arguments fail. With respect to duty, first, although Defendants contend they have no duty to protect the GE Plaintiffs from criminal acts by third parties, they do have a duty to carry out the services they have undertaken—manufacturing and distributing automobiles—with reasonable care. Second, because the harms to the GE Plaintiffs from Defendants' business decisions to forgo immobilizers were foreseeable, Defendants had a duty to prevent those harms.[13] Third, public policy also gives rise to a duty in the GE Plaintiffs' jurisdictions. With respect to breach, causation, and damages, the GE Plaintiffs allege that Defendants breached their duties when they failed to install an engine immobilizer, or an equally effective anti-theft device, in all Susceptible Vehicles,[14] and that as a proximate result of these intentional acts and omissions, the GE Plaintiffs suffered injury, including the diversion of police and emergency resources to respond to the rampantly increasing thefts of the Susceptible Vehicles, as well as broader threats to public

---

[13] *See* CGEC ¶¶ 283-87 (Wisconsin GE Plaintiffs: Milwaukee, Madison, and Green Bay), 349-56 (Ohio GEO Plaintiffs: Columbus, Cleveland, Cincinnati, and Parma), 432-34 (Missouri GE Plaintiffs: St. Louis and Kansas City), 475-80 (New York GE Plaintiffs: Buffalo, Rochester, New York, Yonkers, and Tonawanda), 513-17 (Indiana GE Plaintiff: Indianapolis).

[14] *Id.* ¶ 3; *see also id.* ¶¶ 288 (Wisconsin), 357 (Ohio), 435 (Missouri), 481 (New York), 518 (Indiana).

36

safety and welfare.[15] Defendants' motion to dismiss the GE Plaintiffs' negligence claims should be denied.

**1.    Defendants owed a duty of care to all GE Plaintiffs.**

**a.    No special relationship is required for Defendants' duty to exercise reasonable care in manufacturing and distributing their vehicles.**

Defendants contend that there is no duty to prevent harm from acts by third parties absent a special relationship. Motion at 29-31. Contrary to Defendants' assertions, the fact that Defendants and GE Plaintiffs do not have a recognized relationship is not dispositive of any of GE Plaintiffs' negligence claims.[16] A duty based on a special relationship is simply one way in which a duty may arise. *See, e.g.*, *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 929 (Ohio 2015) (explaining that duty usually arises from the foreseeability of injury and recognizing "certain legally recognized relationships between parties" as another path for establishing duty). As the Restatement recognizes, certain conduct by an allegedly negligent actor may give rise to a duty to third parties despite the absence of any special relationship, subjecting the actor to liability for negligence:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for Cromer v. Children's Hosp. Med. Ctr. of Akron, 29 N.E.3d 921, 929 (Ohio 2015) (recognizing "certain legally recognized relationships between parties" as another path for establishing duty)physical harm resulting from his failure to exercise reasonable care to protect his undertaking if,
>
> (a) his failure to exercise reasonable care increases the risk of such harm[.]

---

[15] *Id.* ¶¶ 289-95 (Wisconsin), 358-64, 368 (Ohio), 433, 436-37 (Missouri), 482-88, 492 (New York), 519-25, 528-29 (Indiana).

[16] Defendants cite *Ashburn v. Anne Arundel County*, 510 A.2d 1078, 1083 (Md. 1986), for the assertion that the duty to control third-party conduct arises only where a special relationship exists between the parties themselves or between the negligent actor and the third party. This case is irrelevant because the City of Baltimore (the only Maryland GE Plaintiff) does not assert a negligence claim. The same is true for the City of Seattle (for purposes of Defendants' reliance on Washington case law).

37

Restatement (Second) of Torts § 324A (1965). Defendants' negligence in intentionally forgoing the installation of reasonable anti-theft measures in the Susceptible Vehicles they manufactured and distributed increased the risk of harm that GE Plaintiffs incurred when thefts of the Susceptible Vehicles inevitably skyrocketed. CGEC ¶¶ 73-80.

### b.    The reasonable foreseeability of the harm gives rise to a duty to prevent it.

Defendants' arguments against the existence of a duty also ignores the primary duty the GE Plaintiffs assert: Defendants' duty to exercise reasonable care in the design and manufacture of their vehicles. CGEC ¶¶ 287, 349, 432, 475, 513. Specifically, the GE Plaintiffs assert that, irrespective of the duty to guard and/or monitor against third-party criminal conduct, Defendants owed a duty to act as a reasonably prudent person and/or company would act under the same circumstances in the design, development, manufacture, testing, and distribution of their vehicles. *Id.* ¶ 288; *see also id.* ¶¶ 357, 432, 481, 513.

Separate from the existence of a "special relationship," courts also consider foreseeability or probability of harm in determining whether a defendant owed a legal duty. *See, e.g.*, *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 392 (Ind. 2016) ("[W]hether an act is foreseeable in the context of duty" requires "'some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it.'") (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 367 (Tenn. 2008)); *Lopez*, 26 S.W.3d at 156 (Missouri) ("For purposes of determining whether a duty exists, this Court has defined foreseeability as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it."); *Gedeon v. E. Ohio Gas Co.*, 190 N.E. 924, 926 (Ohio 1934) (recognizing a duty to exercise care where "the probability of injury to those in the plaintiff's general situation should have been perceived by a reasonably prudent and careful person"); *A.E. Inv. Corp. v. Link Builders, Inc.*, 214 N.W.2d 764, 766 (Wis. 1974)

("A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone.").

Unlike *Goodwin*, where the Supreme Court of Indiana determined that "bar owners [do not] routinely contemplate that one bar patron might suddenly shoot another[,]" 62 N.E.3d at 393-94, the probability of substantially reducing thefts by installing technology like an engine immobilizer was abundantly clear to Defendants in this case. The rate of vehicle theft plummeted at the turn of the twenty-first century as more car manufacturers began utilizing engine immobilizers. CGEC ¶¶ 68-69. Defendants unsuccessfully attempt to shift the focus of the foreseeability analysis away from the overall likelihood of successful thefts and instead focus on the foreseeability of certain very specific aspects of the present crime wave. But this element only concerns the *frequency* of the crime and the *number* of victims, and thus the overall risk of harm.

The foreseeability of the risk of harm is not affected by the magnitude, severity, or exact probability of a specific harm, but instead by the question of whether *some* risk of harm would be foreseeable to the reasonably prudent person. *See Gedeon*, 190 N.E. at 927 (Ohio). Thus, "the existence and scope of a person's legal duty is determined by the reasonably foreseeable, general risk of harm that is involved." *Cromer*, 29 N.E.3d at 929. Here, the Complaint alleges that the harm GE Plaintiffs are experiencing as a result of Defendants' business decision was fully foreseeable to Defendants. Unlike *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1060-61 (N.Y. 2001), where the plaintiffs failed to prove "a change in marketing techniques that would likely have prevented their injuries[,]" 750 N.E.2d at 1062 (New York), GE Plaintiffs point to multiple research studies showing the efficacy of modern engine immobilizers in reducing overall theft rates, CGEC ¶¶ 68, 73-76, and to the fact that Defendants themselves knew this. Defendants touted the efficacy of engine immobilizers in the select vehicles in which they installed immobilizers in the United States, *id.* ¶ 79, demonstrating that they were well aware of the probability that the anti-theft device would substantially reduce thefts. Moreover, as industry standards evolved to the point that nearly every other vehicle in the

39

United States had an engine immobilizer, Defendants were negligent in failing to follow suit.

Defendants' knowing and intentional choice to sell cars that are much more likely to be stolen specifically due to the lack of industry-standard anti-theft technology foreseeably led to harm to the GE Plaintiffs. The reasonableness of Defendants' conduct can be measured in relation to other car manufacturers in the United States—essentially all of whom have regularly installed engine immobilizers to prevent thefts from occurring at such a high rate. The Supreme Court of Missouri's decision in *Lopez* further exemplifies this point. There, plaintiffs in a wrongful death suit claimed that the defendant power company "was negligent in failing to warn pilots of the potential danger of flying into power lines that spanned across a location on the Osage River." 26 S.W.3d at 155. A jury found in favor of plaintiffs and defendant appealed, arguing it owed no duty because the accident was not foreseeable. *Id.* The power lines causing the crash "were not considered an obstruction to air navigation so as to require marking under Federal Aviation Administration (FAA) regulations." *Id.* Nevertheless, the court found ample evidence to support the imposition of a duty. First, the defendant "was aware of a similar accident that had occurred in 1975, resulting in three fatalities." *Id.* at 156. Second, plaintiffs' expert witness "stated that the 'norm' in the industry after an accident occurs is either to mark the line or to request an aeronautical study from the FAA regarding whether the power lines should have been marked." *Id.* at 157.

Just as in *Lopez*, GE Plaintiffs have pled that Defendants knew of the benefits of engine immobilizers in deterring thefts for decades prior to the manufacture of the Susceptible Vehicles. CGEC ¶¶ 69, 72-73, 78-79. Moreover, despite the lack of express regulations requiring engine immobilizers in the United States, the "industry standard" for at least two decades has been to include them. *Id.* ¶¶ 73, 77. Defendants' knowledge of the benefits of engine immobilizers therefore placed them in the best position to guard against the harm that occurred.

### c.   Public policy supports the imposition of a duty.

Although not an essential element of a negligence claim, four of the five relevant jurisdictions (Indiana, Missouri, New York, and Ohio) consider public policy in determining whether a legal duty is owed. *See, e.g.*, *Key v. Hamilton*, 963 N.E.2d 573, 583 (Ind. Ct. App. 2012) (recognizing that public policy concerns demanded "hold[ing] an individual responsible for the reasonably foreseeable results of his behavior"); *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 432 (Mo. 1985) (framing "duty" as resting "on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; . . . the prevention of future harm; [and] the economic burden upon the actor and the community"); *Landon v. Kroll Lab. Specialists, Inc.*, 999 N.E.2d 1121, 1124 (N.Y. 2013) (finding a duty of care from a testing lab to a third party, under New York law, based in part on "strong policy-based considerations"); *Estate of Ciotto v. Hinkle*, 145 N.Ed.3d 1013, 1046 (Ohio Ct. App. 2019) ("Strong public policy may justify imposition of a legal duty" and "[c]ertainly, public policy favors preserving human life and preventing crime"). And although public policy considerations may preclude liability in Wisconsin, such considerations are not present here. *See Tesar v. Anderson*, 789 N.W.2d 351, 357 (Wis. Ct. App. 2010) ("Using public policy factors to prevent liability is a drastic judicial remedy that should be employed sparingly because it . . . denies a litigant recovery for injury.").

For purposes of guarding against intentional or criminal misconduct, the Restatement balances "the magnitude of the risk against the utility of the actor's conduct" based on certain factors, including:

> [T]he known character; past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take.

Restatement (Second) of Torts, § 302B cmt. f (1965).

41

Here, Defendants' past conduct—which includes installing immobilizers in all of their vehicles sold in Europe and Canada during the applicable period, and in certain vehicles sold in the United States as early as 2007—shows that they were well aware of the technology's efficacy in reducing the rate of thefts. CGEC ¶¶ 72, 78-79. Moreover, the gravity of the harm suffered due to rampant vehicle thefts was apparent as early as the 1960's, when NHTSA's predecessor agencies recognized that approximately one in every five vehicles stolen were involved in accidents that injured one or more people. *Id.* ¶ 66. While Defendants failed to take responsibility for the rampant thefts, GE Plaintiffs were left to pay the ultimate price, diverting countless hours to responding and investigating thefts, and distributing steering wheel locks to owners of the Susceptible Vehicles. *Id.* ¶¶ 14, 101. Last, the "burden of the precautions" Defendants are required to take—i.e., installing reasonable anti-theft measures, such as engine immobilizers—is relatively slight, as evidenced by the nearly 100% of vehicles from other manufacturers that have contained immobilizers since at least 2015, and by Defendants' own decision to install them in all their vehicles starting in 2023. *Id.* ¶¶ 7-8. For all these reasons, public policy supports the imposition of a duty to (1) exercise reasonable care in the design and manufacture of Defendants' vehicles and (2) guard against the intentional and/or criminal conduct of third parties.

### 2. GE Plaintiffs sufficiently allege Defendants' negligence proximately caused their injuries.

Defendants argue that the GE Plaintiffs have not adequately alleged proximate cause, asserting primarily that the acts of third parties were intervening superseding causes. Motion at 21-27. But as discussed above, the foreseeable acts of third parties do not constitute superseding causes. *See supra* Section IV.B.

Defendants' decision to omit industry-standard anti-theft devices was a proximate cause of the GE Plaintiffs' harms, based on the foreseeability that such thefts would occur as a natural and probable consequence of Defendants' actions. *See Schooley*, 631 N.E.2d at 937 (Indiana); *Christiansen*, 62 S.W.2d at 831 (Missouri); *Bell*, 687 N.E.2d at 1326

(New York); *Fed. Steel & Wire Corp.*, 543 N.E.2d at 776 (Ohio); *Stewart*, 271 N.W.2d at 87-88 (Wisconsin).

In *Stewart*, the Supreme Court of Wisconsin affirmed a jury verdict finding the defendant's conduct to be negligent "in leaving a loaded pistol on a bed in a children's room with the door open to a frequently used hallway." 271 N.W.2d at 83. Although the plaintiff's subsequent handling of the gun served as an intervening cause to the harm that resulted, the defendant "negligently created a dangerous situation" and the harm that resulted "was a foreseeable consequence of th[at] situation." *Id.* at 87-88. The court further rejected the defendant's argument that public policy considerations should absolve him of liability, noting that "cases in which a causally negligent tort-feasor has been relieved of liability are infrequent and present unusual and extreme considerations." *Id.* at 88.

In *Johnson*, a case applying New York law, the district court determined that the plaintiff sufficiently pled that "defendants were a direct link in the causal chain that resulted in his injuries and that they were in the best position to prevent the foreseeable harm he suffered." 304 F. Supp. 2d at 399. Critically, for purposes of the motion to dismiss stage, the court also determined that "[d]iscovery is needed to determine whether [plaintiff] should be allowed to proceed on this theory." *Id.*; *see also Rhodes v. Wright*, 805 N.E.2d 382, 388 (Ind. 2004) ("The question of proximate cause is one usually left to the jury."); *Strother v. Hutchinson*, 423 N.E.2d 467, 471 (Ohio 1981) (concluding that "reasonable minds might well have arrived at different conclusions upon the issues of negligence and proximate cause, and therefore they were questions of fact for the jury"); *Wilmes v. Consumers Oil Co. of Maryville*, 473 S.W.3d 705, 722 (Mo. Ct. App. 2015) (similar); *Beul v. ASSE Int'l, Inc.*, 55 F. Supp. 2d 942, 948 (E.D. Wis. 1999) ("Whether a negligent act is a substantial factor in contributing to an injury is ordinarily a question left to the jury[.]").

As alleged in the Complaint, the theft-prone vehicles were placed on the road with actual knowledge that they included a higher likelihood of theft given the absence of an immobilizer or other reasonable anti-theft measures. CGEC ¶¶ 73-74; *see also id.* ¶ 76

(citing a study discussing thieves who would target older model years of a vehicle series without immobilizers). Thus, GE Plaintiffs have adequately alleged that Defendants were in the best position to guard against thefts and that Defendants' acts and omissions proximately caused the injuries alleged here.

### 3. GE Plaintiffs plausibly allege damages.

Other than the New York and Ohio GE Plaintiffs, Defendants appear to concede that the GE Plaintiffs properly allege damages. For New York and Ohio, GE Plaintiffs rely on their arguments below as to why neither the municipal cost recovery rule nor the economic loss rule precludes damages under New York and Ohio law. Accordingly, all GE Plaintiffs adequately plead damages, including the expense of "significant police and emergency services" in responding to the vehicle thefts. *Id.* ¶ 97.

### E. The Municipal Cost Recovery Rule Does Not Bar New York GE Plaintiffs' Claims.

Defendants argue that the New York GE Plaintiffs' claims are precluded by the municipal cost recovery rule. Motion at 56. But that rule does not apply where a governmental entity seeks to recover costs resulting from a defendant's ongoing and persistent misconduct or the creation of a public nuisance. *See City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983) (explaining that "[r]ecovery has also been allowed where the acts of a private party create a public nuisance which the government seeks to abate"); *In re JUUL*, 497 F. Supp. 3d at 644 (finding that municipal cost recovery rule did not bar plaintiffs' recovery of public costs under public nuisance and negligence where plaintiffs alleged ongoing and persistent misconduct).

The cases Defendants cite involved discrete emergency incidents requiring municipal services in response. *See Koch v. Consolidated Edison Co. of N.Y.*, 468 N.E.2d 1 (1984) (Edison's gross negligence in connection with a 25-hour citywide blackout); *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 150 (2d Cir. 2013) (the crash of a commercial airline flight as it approached Buffalo-Niagara International Airport). It was precisely the discrete nature of the event that led the court in *Colgan* to apply the municipal

44

cost recovery rule. *County of Erie v. Colgan Air, Inc.*, No. 10-CV-157S, 2012 WL 1029542, at *4 (W.D.N.Y. Mar. 26, 2012) (noting "Plaintiff has alleged neither a continuing nor recurrent problem"). In considering whether the rule applies to a specific case, courts have repeatedly distinguished this sort of discrete incident from an alleged pattern of repeated or ongoing misconduct resulting in harm to the public. *In re Opioid Litig.*, 2018 WL 3115102, at *10. As Judge Garguilo held in *In re Opioid Litig.*, the municipal cost recovery did not bar plaintiffs' public nuisance claim. *Id.* Nor did the rule pose any barrier to their negligence claims. *Id.* at 25-27.

Judge Garguilo's holding was no outlier—in the JUUL MDL and opioid litigation, courts have overwhelmingly concluded that the municipal cost recovery rule does not apply to public nuisance and negligence claims that are not premised on a discrete event. *See, e.g.*, *In re JUUL Labs*, 497 F. Supp. 3d at 643-45 (finding the "municipal cost recovery rule does not bar the claims of [a New York school district and other governmental entities] . . . from recovering the monetary damages they seek for their public nuisance and negligence claims" because they "plausibly allege damages that are not a result of a single discrete incident that a government entity can reasonably expect to incur"); *Delaware ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223 MMJ CCLD, 2019 WL 446382, at *6 (Del. Super. Ct. Feb. 4, 2019) ("The Court finds that the municipal cost recovery rule does not apply in this case. In five separate courts, and in the multi-district federal litigation based in Ohio, judges have rejected the notion that the municipal cost recovery rule bars recovery for public costs."). Defendants' sale of vehicles without reasonable anti-theft measures, despite the adoption of such measures by every other automaker in the United States market, and by Defendants themselves in Canadian and European markets, has caused New York GE Plaintiffs to incur costs that far exceed the normal provision of police and emergency services in response to discrete incidents, and the resulting harm is ongoing. Thus, the costs the New York GE Plaintiffs seek to recover are not barred by the municipal cost recovery rule. Moreover, the New York GE

45

Plaintiffs also seek injunctive relief, which Defendants have (correctly) not suggested is in any way subject to the municipal cost recovery rule.[17]

## F.   The Economic Loss Doctrine Does Not Apply to the Ohio and New York GE Plaintiffs' Request for Damages.

The GE Plaintiffs' claims do not sound in contract or product liability. Instead, they are public nuisance and negligence claims arising from Defendants' intentional conduct. Thus, the economic loss doctrine does not apply to GE Plaintiffs' claims under Ohio or New York law.

### 1.   Ohio

Defendants paint the economic loss doctrine as a strict bar to recovery. But in Ohio, the applicability of this economic loss rule depends on the complexity of the parties and the type of tort claim at issue. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.,* 684 F. Supp. 2d 942, 949 (N.D. Ohio 2009). Here, where the tortious conduct was intentional, and the parties had no contractual relationship, the economic loss doctrine does not apply.[18]

At its heart, the economic loss rule is centered around limiting recovery for purely economic losses resulting from the negligent performance of a contract, as the risk of economic loss is something that contracting parties can negotiate as a term of the contract. *See Corporex Dev. & Constr. Mgmt, Inc. v. Shook*, 835 N.E.2d 701, 704 (Ohio 2005). The Ohio Supreme Court explained that the rule "stems from the recognition of a balance between tort law, designed to redress losses suffered by a breach of duty imposed by law to protect societal interests, and contract law, which holds that parties to a

---

[17] The JUUL MDL court noted that even if the municipal cost recovery rule were to apply, "'it would entail only a limit on the scope of damages that the [government entities] might recover' and not mandate dismissal of their entire public nuisance or negligence claims." *Id.* at 645 n.71 (citing *Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 265 (D.N.J. 2000), *aff'd*, 273 F.3d 536 (3d Cir. 2001)).

[18] Defendants do not argue that the economic loss doctrine applies to the Ohio GE Plaintiffs' claim for absolute public nuisance. *See* Motion at 57.

46

commercial transaction should remain free to govern their own affairs." *Id.* Thus, in cases involving only economic loss, the rule "will bar the tort claim if the duty arose only by contract." *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011). In *Digiknow, Inc. v. PKXL Cards, Inc.*, No. 96034, 2011 WL 2899600 (Ohio Ct. App. July 21, 2011), the Ohio Court of Appeals articulated why the economic loss rule is limited to actions arising from contracts.

> [T]he reasoning behind the economic loss doctrine is that tort law is not intended to compensate parties for monetary losses suffered as a result of duties that are owed to them simply as a result of the contract. This is because of the sense that if the tort law was "allowed to progress too far, contract law would drown in a sea of tort."

*Id.* at *1 (citations omitted). Thus, in *Beretta*, the Ohio Supreme Court found that the city *could* seek damages under qualified nuisance and negligence claims for increased municipal expenditures due to gun manufacturers' tortious conduct. 768 N.E.2d at 1150.

Defendants rely on *City of Cincinnati v. Deutsche Bank National Trust Co.*, 863 F.3d 474 (6th Cir. 2017), in attempting to extend the economic loss rule outside of contractual duties. In that case, the Court identified two unpublished Ohio Court of Appeals cases in which the economic loss rule applied without privity, found that the Ohio Supreme Court had not resolved the question, and thus applied the rule. *Id.* at 478. But both of those cases show why the Ohio Supreme Court would not extend the economic loss rule in such a circumstance, if presented with the question here. In the first of the two unpublished cases upon which *Deutsche Bank* relies, a construction company cut a bundle of telephone cords owned by SBC Ameritech while performing roadwork. *RWP, Inc. v. Fabrizi Trucking & Paving Co.,* No. 87382, 2006 WL 2777159, at *3 (Ohio Ct. App. Sept. 28, 2006). The businesses that had contracted with SBC Ameritech to use those telephone lines sued, asserting claims of breach of contract against SBC Ameritech and qualified nuisance and negligence against the construction company. *Id.* There, the contracting parties could have accounted for interruptions of service due to third-parties' negligence. Here, there is no corollary contract; the Ohio GE Plaintiffs' economic losses stem not from a contractual duty but from their status as an arm of the state's plenary police power.

47

The second of the two cases relied on in *Deutsche Bank* makes precisely the same argument that the GE Plaintiffs do. *See City of Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *8 (Ohio Ct. App. Mar. 21, 2013). That case referenced the historical inapplicability of the economic loss rule to non-contractual duties, and stated that "[t]he doctrine does not present a strong case for application to the City's suit where the duty alleged to have been breached is not related to a contractual relationship and the City has alleged particularized damages associated with decreased tax revenue and increased costs of safety services." *Id.* However, the court constrained itself with horizontal stare decisis based on *Fabrizi*. *Id.* This Court is not so constrained, and can, as was done in *In re Opiate Litigation*, independently determine whether the Ohio Supreme Court would likely apply the economic loss rule in an action such as this. No. 1:18-cv-02804, 2018 WL 4895856, at *40 (N.D. Ohio Oct. 5, 2018), *report and recommendation adopted in part, rejected in part*, No. 1:17-md-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018).

In *In re Opiate Litigation*, applying these same principles, the economic loss rule was found inapplicable as against governmental entities suing under negligence and nuisance. *Id.* Instead, the court followed *Berretta*, *Digiknow*, and the underlying rationale behind the economic loss rule to find it inapplicable where the injured party could not have allocated the risk of loss as part of a contract. *Id.* Here, as in *In re Opiate Litigation*, "the harm alleged is caused by involuntary interactions between a tortfeasor and a plaintiff." *Id.* Thus, the economic loss rules does not apply.

### 2. New York

Defendants cite to *532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 750 N.E.2d 1097, 1103 (N.Y. 2001), for the adoption of the economic loss rule in New York. Motion at 58. That is not the holding of *532 Madison*, a factually distinguishable case involving private plaintiffs whose businesses were closed or residents evacuated as a safety precaution due to a construction collapse, as the court made clear. *Id.* at 1101 n.1 (finding that "[t]he 'economic loss' rule. . . relied on by

defendants has no application here" and distinguishing factual circumstances where the rule would apply, including "an end-purchaser of a product limited to contract remedies and [barred from] . . . seek[ing] damages in tort for economic loss against a manufacturer."). As in *532 Madison*, the economic loss rule does not apply here, as the GE Plaintiffs are not end users. Instead, the holding of *532 Madison* was based on duty and the failure of the private plaintiffs to assert special injuries in order to bring a public nuisance claim. *Id.* at 1104. Subsequent and more factually analogous cases demonstrate that the economic loss rule applies in New York only in cases asserting product liability or contract claims. *In re JUUL*, 497 F. Supp. 3d at 659; *In re Opioid Litig.*, 2018 WL 3115102, at \*27. This case does not arise in product liability or breach of contract, and thus, the economic loss rule does not apply.

## G. Missouri GE Plaintiffs Plausibly Allege Their Remaining Claims.

### 1. Kansas City's consumer protection claim is well pled.

Defendants make two arguments concerning Kansas City's ordinance-based nuisance claim. Motion 53-54. Both are unpersuasive.

First, Defendants recast their federal preemption argument, stating that because the NHTSA declined to find a safety defect, there could be no harm to Kansas City consumers. This argument fails for all the reasons previously articulated. *See supra* at Section IV.A. NHTSA's finding is irrelevant as to whether Defendants represented their merchandise was "of a particular standard," when it was not. *See* Kansas City, Mo. Ordinances art. IX § 50-292(7). Kansas City's claim is that Defendants' failure to install reasonable anti-theft measures ultimately resulted in a public nuisance to the citizens of Kansas City. This claim is unaffected by any NHTSA determination.

Second, Defendants argue that Kansas City's ordinance claim fails to meet the particularity requirements of Rule 9(b), but Kansas City brings its claim on behalf of its citizens seeking an order declaring Defendants' conduct a nuisance. CGEC ¶ 69. This claim does not sound in fraud, and no court has held that it does. When a municipal government brings a claim for nuisance based on deceptive trade practices, courts hold

that Rule 9(b)'s heightened pleading requirements do not apply. *In re Opiate Litig.*, No. 1:17-cv-02804, 2019 WL 2477416, at *17 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in relevant part,* No. 1:17-md-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019). *Cf. City & County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 674 (N.D. Cal. 2020) ("A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition.") (citation omitted). Kansas City's nuisance claim here is much like the Blackfeet Nation's nuisance claim on behalf of the citizens of its reservation in *In re Opiate Litigation*: both complaints allege that defendants created an ongoing hazardous condition that subjected its citizens to an elevated level of crime and fear. *See* 2019 WL 2477416, at *17. In denying defendants' motion to dismiss the Blackfeet Nation's claim, the court in the Opioids litigation rejected defendants' argument that Rule 9(b) should apply to allegations that the defendants were "liable for nuisance causing conduct" that included "deceptive marketing practices." *Id.*

More broadly, Rule 9(b) does not apply when a governmental entity brings a claim to protect the public interest. For example, the district court in *Fed. Trade Cmm'n. v. Affiliate Strategies, Inc.*, No. 09-4104-JAR-KGS, 2010 WL 11470099 (D. Kan. June 4, 2010), distinguished the Kansas Consumer Protection Act ("KCPA") claim brought by Kansas' Attorney General from private consumer actions brought under the KCPA. *Id.* at *10 ("[T]his Court declines to impose upon the Attorney General the obligation of pleading 'who, what, where, and when' when he or she brings a claim to protect the public interest."). The court reasoned that even though "district courts have consistently held that the [c]omplaint/[p]etition must meet the higher pleading standard of Rule 9(b) . . . none of these cases involved claims brought by the Attorney General to protect the public interest." *Id.* at *9. Thus, even if the heightened pleading standard might apply generally to private KCPA claims, it does not apply to actions brought by government agencies whose claims serve the public interest.

Similarly, when the Delaware Attorney General brought an enforcement action under the Delaware Uniform Deceptive Trade Practices Act and Consumer Fraud Act, the court in *Delaware ex rel. Brady v. Publishers Clearing House*, 787 A.2d 111 (Del. Ch. 2001), denied defendant's motion to dismiss for failure to plead with specificity under Rule 9(b). *Id.* at 117. The court reasoned that the remedial goals of consumer protection statutes "are inconsistent with the application of the particularized pleading requirements of Rule 9(b)" because the statute's goal is to protect the consuming public: "a requirement that the State plead with particularity . . . would serve only to defeat the legislative mandate to the Attorney General in bringing actions such as these on behalf of the citizens of this State." *Id.*; *see also, e.g.*, *CFPB v. 1st All. Lending, LLC*, No. 3:21-cv-55 (RNC), 2022 WL 993582, at *5 (D. Conn. Mar. 31, 2022) (claim brought by government was distinguishable from statutory causes of action brought by individuals where courts apply Rule 9(b) standard). This reasoning applies with equal force here. Defendants' analysis mistakenly assumes the plaintiff is a consumer. Kansas City, as a constitutionally charted municipal corporation, may plead and sue in its own name. CGEC ¶ 217. As a regulator, it seeks an injunction against Defendants to enjoin the nuisance and protect the consuming public. This is no different than a state attorney general bringing a cause of action under a state statute to protect a state consumer.

Defendants rely on the 9th Circuit's opinion in *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009), for the proposition that Rule 9(b)'s particularity requirements apply to consumer protection statutes. *See id.* at 1125. But the holding from *Kearns* was based on a private cause of action brought by an individual consumer, *id.* at 1122, and does not address whether a municipal government would be subject to Rule 9(b)'s pleading requirements when bringing a claim on behalf of its consuming public. GE Plaintiffs are also cognizant of this Court's holding from *FTC v. Lights of America, Inc.*, 760 F. Supp. 2d 848 (C.D. Cal. 2010), which reached a different conclusion concerning section 5 of the FTC Act and applied Rule 9(b)'s heightened standards to that federal statute. That case, however, differs significantly from the present one. First, it addressed a claim under

51

section 5 of the FTC Act, not a municipal ordinance seeking to enjoin a nuisance. *See id.* at 850. Moreover, as the Court noted, application of Rule 9(b) did "not unduly hinder the FTC's enforcement of the FTC Act" because the FTC has "'broad investigatory power'" and the "'ability to obtain discovery prior to the commencement of this litigation.'" *Id.* at 854 n.6 (citation omitted). Kansas City has no such authority, and application of Rule 9(b) to its claim would significantly hinder its ability to protect it citizens.

Since this Court's holding in *Lights of America*, federal courts across the country, and in this district, have consistently held regulators are not subject to the heightened pleading standards when bringing claims to protect the public. *See CFPB v. D & D Mktg.*, No. CV 15-9692 (PSG) (Ex), 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016) ("[T]he majority of courts have found that a heightened pleading standard is inappropriate, even if there is a 'deceptive' dimension to such claims.") (citation omitted).[19] *See also cf. CFPB v. Siringoringo*, No. SACV 14-01155 JVS (AJWx), 2016 WL 102435, at *4 (C.D. Cal. Jan. 7, 2016) (Selna, J.) ("Courts have determined that the standard for a CFPA deception

---

[19] *See also CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 769 (S.D.N.Y. 2018) ("Accordingly, the Court applies Rule 8(a) in evaluating the Government's pleading of its claim under N.Y. GBL § 349."), *vacated on other grounds*, 828 F. App'x 68 (2d Cir. 2020); *CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *8 (D. Mont. Aug. 3, 2018) ("The Court recognizes the overwhelming weight of precedent in favor of the CFPB's position. The Court declines to apply the Rule 9(b) heightened pleading standard to the CFPA."); *RD Legal Funding*, 332 F. Supp. 3d at 768 ("[A]pplication of Rule 9(b) 'to consumer protection claims is not only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes.'" (citation omitted); *CFPB v. TCF Nat'l Bank*, No. 17-166 (RHK/DTS), 2017 WL 6211033, at *2 (D. Minn. Sept. 8, 2017) (denying motion to dismiss and rejecting argument government's claim was subject to heightened pleading standard of Rule 9(b)); *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1373-74 (N.D. Ga. 2015) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1296 (4th ed. 2008) (same); *CFPB v. All Am. Check Cashing, Inc.*, No. 3:16-cv-356-WHB-JCG, 2016 WL 11635752, at *3 (S.D. Miss. July 15, 2016) (same); *CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *25 (M.D. Pa. Aug. 4, 2017) (same).

52

claim is the same as the standard under section 5(a) of the Federal Trade Commission Act.") (citing *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1373-74)).

Moreover, numerous appellate circuit courts have rejected Defendants' argument. *See FTC v. Freecom Commcn's., Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005) ("A § 5 claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b), and the district's court's inclination to treat it as such unduly hindered the FTC's ability to present its case."); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("It would be virtually impossible for the FTC to offer such proof [of reliance] . . . . This is not a private fraud action, but a government action brought to deter unfair and deceptive trade practices and obtain restitution on behalf of a large class of defrauded investors."); *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) ("[Section] 349 [of New York's General Business Law] extends well beyond common-law fraud to cover a broad range of deceptive practices."). In sum, this case is distinguishable from *Lights of America* because Kansas City cannot avail itself of the same pre-filing investigatory tools available to the FTC, and the jurisprudence that has evolved since *Lights of America* counsels a different conclusion, as do multiple federal circuit courts.

This Court should adhere to the well-developed line of authority finding that Rule 9(b)'s heightened pleading standards do not apply to nuisance claims or to enforcement actions filed by local regulatory bodies. Under either prong of the analysis, the result is the same: the Court should deny Defendants' Motion.

### 2. Missouri GE Plaintiffs' unjust enrichment claim is well pled.

Defendants contend that "Missouri courts reject unjust enrichment claims when, as here, there is no direct transaction between plaintiff and defendant," arguing that the GE Plaintiffs did not confer a benefit on Defendants. Motion at 55. On the contrary, Missouri courts have repeatedly rejected the notion that a benefit must be "directly conferred" by the plaintiff to the defendant, and Missouri law recognizes that unjust enrichment also occurs where one party pays for damages for which another should be liable.

In *Moore v. Greensky, LLC*, No. 4:20-cv-00002-FJG, 2020 WL 13580659 (W.D. Mo. Dec. 23, 2020), for example, the district court for the Western District of Missouri rejected defendants' argument that "the benefit must be directly conferred by the plaintiff to the defendant" and instead adopted "the flexible totality of the circumstances approach…as the best statement of Missouri law regarding unjust enrichment." *Id.* at *2; *see also Garrett v. Cassity*, No. 4:09CV-01252 ERW, 2011 WL 3235633, at *9 (E.D. Mo. July 28, 2011) (holding that "there is no requirement for an unjust enrichment claim that the plaintiff conferred a benefit directly on the defendant" and noting the absence of "direct" from the common elements of the claim); *Cromeans v. Morgan Keegan & Co.*, No. 2:12-CV-04269-NKL, 2013 WL 12129609, at *5-7 (W.D. Mo. Nov. 5, 2013) ("[T]he Court has rejected [defendant's] claim that Missouri law limits unjust enrichment claims to circumstances where the plaintiff directly conferred a benefit upon the defendant . . . ."); *Webb v. Dr. Pepper Snapple Grp., Inc.*, No. 4:17-00624-CV-RK, 2018 WL 1955422, at *6 (W.D. Mo. Apr. 25, 2018) ("[T]his Court is persuaded that 'there does not appear to be any bright line rule regarding how directly the defendant must have received a benefit at the plaintiff's expense.'") (citation omitted).

Missouri courts therefore clearly understand that unjust enrichment occurs—and a benefit is conferred—not just when one party pays money directly to a defendant, but also when that party pays to address the consequences of the defendant's action, and they express this principle across a wide range of cases where one party has not directly conferred a benefit upon another. For example, Missouri recognizes a cause of action for equitable subrogation "to prevent unjust enrichment" when an insurer has paid a debt that "'in good conscience should be paid by the one primarily responsible for the loss.'" *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 831-32 (Mo. 2014) (en banc) (citation omitted). And as the Missouri Supreme Court has explained, a joint tortfeasor's right to contribution from another joint tortfeasor "is based upon the 'principle of fairness'" and is enforced "to rectify unjust enrichment." *Safeway Stores, Inc. v. City of Raytown*, 633 S.W.2d 727, 730 (Mo. 1982) (en banc) (citation omitted); *see id.* at 732 (it

would be "inherently unfair" to deny a right to contribution where one pays a liability that another owes).[20]

Missouri law is therefore consistent with holdings in this district and from courts across the country that have refused to dismiss unjust enrichment claims where municipalities have paid for the externalities caused by a defendant. *See, e.g.*, *City of Los Angeles v. Citigroup, Inc.*, 24 F. Supp. 3d 940, 954 (C.D. Cal. 2014) (unjust enrichment arises not only where one party pays another, "'but also where the expenditure saves the other from expense or loss'") (citation omitted); *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047 (C.D. Cal. 2014) (same); *City of Los Angeles v. Bank of Am. Corp.*, No. CV 13-9046 PA (AGRx), 2014 WL 2770083, at *12 (C.D. Cal. June 12, 2014) (denying motion to dismiss unjust enrichment count premised on city's payment of costs of defendant's discriminatory lending under California law); *City of Los Angeles v. JPMorgan Chase & Co.*, No. 2:14-cv-04168-ODW (RZx), 2014 WL 6453808, at *10 (C.D. Cal. Nov. 14, 2014) (allegations that city paid the "costs of harm caused by Chase's discriminatory lending" were sufficient to plead unjust enrichment).[21] This is particularly

---

[20] *See also Rowland v. Skaggs Cos.*, 666 S.W.2d 770, 773 (Mo. 1984) (en banc) ("The right to contribution serves to rectify the unjust enrichment that occurs when one tortfeasor 'discharge[s] a burden which both in law and conscience was equally the liability of the other.'") (alteration in original) (citation omitted).

[21] *See also, e.g.*, *Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225, 1240 (E.D. Okla. Mar. 29, 2021) ("paying the costs of the 'negative externalities' caused by a defendant's conduct is a form of enrichment because the defendant does not have to pay the costs of its own conduct"); *In re: Opiate Litig.*, 452 F. Supp. 3d 745, 790 (N.D. Ohio 2020) (denying dismissal under Florida law where complaint pled the municipality "'conferred a benefit upon all [d]efendants [because] they paid for the cost of harm caused by the defendant's conduct, i.e., the defendant's externalities'") (citation omitted); *In re Opiate Litig.*, No. 1:17-md-2804, 2020 WL 1986589, at *11 (N.D. Ohio Apr. 27, 2020) (rejecting argument under Florida law that there was "no direct transaction between the parties, and therefore no direct benefit conferred"); *In re Opiate Litig.*, 458 F. Supp. 3d 665, 695-96 (N.D. Ohio 2020) ("a negative externalities analysis is compatible with Michigan's unjust enrichment jurisprudence," and allows for "payment of the costs associated with the opioid crisis—the costs of doing business that, absent recovery in this action, [d]efendants would never have to bear"); *In re Opiate*

55

true where the municipality acted with the need to protect public safety.[22]

Defendants' cases are of no help to them. *Howard v. Turnbull*, 316 S.W.3d 431 (Mo. Ct. App. 2010), involved a contract to secure a line of credit for an LLC, and merely holds that a benefit is not conferred on the LLC's owner when it is conferred on the LLC. Notably, the court recognized that on different facts, a cause of action might lie against the LLC's owner for contribution or reimbursement. *Id.* at 437-38. Thus, *Howard* does not support the proposition that no benefit can be conferred absent a direct transaction between plaintiff and defendant. Similarly, *Binkley v. American Equity Mortgage, Inc.*, 447 S.W.3d 194 (2014), does not reject any relevant theory of unjust enrichment: rather, it simply affirms summary judgment on an unjust enrichment count because there was no evidence the defendant actually charged plaintiffs for preparing legal documents, and thus no evidence that defendant received any benefit at all. *City of St. Louis v. Cernicek*, No. 02CC-1299, 2003 WL 22533578, at *3 (Mo. Cir. Ct. Oct. 15, 2003) is a state trial

---

*Litig.*, No. 1:17-md-2804, 2019 WL 3737023, at *8-9 (N.D. Ohio June 13, 2019) (allegation that substantial costs were incurred in mitigating negative externalities was sufficient under Montana and Oklahoma unjust enrichment law); *White v. Smith & Wesson*, 97 F. Supp. 2d 816, 829 (N.D. Ohio 2000) (allegations "that the City has paid for what may be called the [d]efendants' externalities—the costs of the harm caused by the [d]efendants' failure to incorporate safety devices into their handguns," were sufficient to support unjust enrichment claim under Ohio law); *City of Boston v. Purdue Pharma, L.P.*, No. 1184CV02860, 2020 WL 977056, at *6 (Mass. Super. Ct. Jan. 31, 2020) ("the fact that the harms the Cities abated were downstream 'externalities' of the Distributor [d]efendants' alleged conduct is not a bar to the claims" under Massachusetts law); *City of Boston v. Smith & Wesson Corp.*, No. 199902590, 2000 WL 1473568, at *18 (Mass. Super. Ct. July 13, 2000) (city adequately pled unjust enrichment against gun manufacturers by alleging that it paid for "costs of the harm caused by [d]efendants' conduct ('externalities')").

[22] *See, e.g.*, *City of New York v. Lead Indus. Ass'n*, 190 A.D. 2d 173, 177 (N.Y. App. Div. 1993) (denying dismissal of claim for restitution under New York law for the reasonable costs of abating the hazard and treating its victims); *cf.* Restatement (Third) of Restitution and Unjust Enrichment § 22(1) (2011) ("A person who performs another's duty to a third person or to the public is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision to intervene without request.").

court opinion that analyzes the unjust enrichment count in one sentence with no reference to factual allegations. And *Southwestern Bell Telephone Co. v. United Video Cablevision of St. Louis, Inc.*, 737 S.W.2d 474 (Mo. Ct. App. 1987), is readily distinguishable on the basis of its particular facts: it holds that where a utility was statutorily required to provide a service that it otherwise had never charged for, the trial court was within its discretion to find against the utility where it had waited eight months (until the project was roughly 85% complete) to bill for its "locate and mark" service and announce that it expected to be paid. *Id.* at 475-76.

Here, the GE Plaintiffs allege that as a direct result of Defendants' failure to include reasonable, industry-standard anti-theft technology in their products, the GE Plaintiffs were forced to expend resources to protect public safety; these expenditures to remedy the negative externalities of Defendants' conduct benefitted Defendants; Defendants knowingly accepted and retained these benefits, continuing to produce products lacking anti-theft technology; and the circumstances make it unfair and unjust for Defendants to retain the benefits, violating fundamental principles of justice, equity, and good conscience. CGEC ¶¶ 439-46. This is more than sufficient to state a claim for unjust enrichment under Missouri law.

## V.     CONCLUSION

GE Plaintiffs plausibly allege that Defendants were each a substantial contributing factor to the public safety crisis impacting each GE Plaintiff. Each of the seventeen GE Plaintiffs has stated a valid nuisance under the seven applicable state laws, and the fifteen GE Plaintiffs that allege negligence claims have adequately done so under the common law of the five applicable states. Neither the municipal cost recovery rule nor the economic loss rule precludes claims seeking damages for the Ohio and New York Plaintiffs. Finally, certain GE Plaintiffs—Columbus, Ohio; Kansas City, Missouri; and St. Louis, Missouri—all adequately plead claims under their municipal ordinances or the applicable common law.

1    For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its

2 entirety.

3

4

5 Dated this 3rd day of October, 2023.     Respectfully submitted,

6

7                                    By /s/ Gretchen Freeman Cappio

8                                       Gretchen Freeman Cappio (*pro hac vice*)
                                        KELLER ROHRBACK L.L.P.

9                                       1201 Third Avenue, Suite 3200
                                        Seattle, WA 98101-3052

10                                      Phone: (206) 623-1900
                                        Fax: (206) 623-3384

11                                      gcappio@kellerrohrback.com

12                                      *Chair of the Governmental Entities*
                                        *Committee*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE

The undersigned, Chair of the Governmental Entities Committee, certifies that this brief complies with the page limit set by court order dated September 11, 2023.

*/s/ Gretchen Freeman Cappio*
GRETCHEN FREEMAN CAPPIO

## CERTIFICATE OF SERVICE

I certify that on October 3, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


*/s/ Gretchen Freeman Cappio*
GRETCHEN FREEMAN CAPPIO