Stephen J. Kane (*pro hac vice*)
stephen.kane@cityofchicago.org
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, IL 60602
Tel: (312) 744-6934
Fax: (312) 744-5185

Jimmy R. Rock (*pro hac vice*)
jrock@edelson.com
EDELSON PC
1255 Union St. NE, 7th Floor
Washington, DC 20002
Tel: (202) 270-4777
Fax: (312) 589-6378

Shantel Chapple Knowlton (*pro hac vice*)
schappleknowlton@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

*Attorneys for Plaintiff City of Chicago*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: KIA HYUNDAI VEHICLE THEFT LITIGATION<br><br>This Document Relates to:<br><br>*City of Chicago v. Kia America, Inc., and Hyundai Motor America* | Case No. 8:22-ML-3052-JVS(KESx)<br><br>The Honorable James V. Selna<br><br>**CITY OF CHICAGO'S OPPOSITION TO MOTION TO DISMISS**<br><br>Hearing Date:   March 18, 2024<br>Hearing Time:   1:30 pm |

# **TABLE OF CONTENTS**

**Page**

**INTRODUCTION** ................................................................................................ 1

**BACKGROUND** ................................................................................................. 2

**ARGUMENT** ..................................................................................................... 4

**I.**  **Counts 1-2 state claims that Defendants violated Chicago consumer-protection ordinances by deceiving consumers** ............................................ 5

**II.**  **Count 3 states a claim that Defendants violated MCC § 2-25-090 by engaging in unfair practices** ............................................................. 9

**III.**  **Counts 4-5 state claims for public nuisance and negligence.** .................. 10

    **A.**  **The right to safe public roads is a public right.** ............................. 11

    **B.**  **Defendants unreasonably interfered with the public's right to safe public roads** ................................................................................. 12

**IV.**  **Count 6 states a claim that Defendants violated MCC § 1-20-020** ......... 15

**V.**  **Defendants identify no other reason to dismiss Chicago's claims** ......... 19

    **A.**  **Chicago's claims are not preempted.** ............................................... 19

    **B.**  **The municipal cost-recovery rule does not apply** ........................... 20

    **C.**  **The economic-loss rule does not apply** ............................................. 22

**CONCLUSION** ................................................................................................ 23

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**United States Supreme Court Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................5

*F.T.C. v. Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972)......................................................................10

*Whitman v. Am. Trucking Assocs.*,
    531 U.S. 457 (2001)......................................................................17

**United States Circuit Court of Appeals Cases**

*Austin v. Univ. of Oregon*,
    925 F.3d 1133 (9th Cir. 2019) .........................................4, 5, 9, 20

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
    719 F.2d 322 (9th Cir. 1983) ...................................................15, 21

*Daniel v. Ford Motor Co.*,
    806 F.3d 1217 (9th Cir. 2015) .........................................................8

*District of Columbia v. Air Fla., Inc.*,
    750 F.2d 1077 (D.C. Cir. 1984) ...................................................16

*O'Connor v. Eubanks*,
    83 F.4th 1018 (6th Cir. 2023) .......................................................15

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) .........................................................5

*United States v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) .........................................................5

**United States District Court Cases**

*City of Chicago v. DoorDash*,
    No. 21C5162, 2022 WL 704837 (N.D. Ill. Mar. 9, 2022) .............5

*City of Chicago v. Purdue Pharma L.P.*,
    211 F. Supp. 3d 1058 (N.D. Ill. 2016) ....................................6, 18

*City of Chicago v. Purdue Pharma L.P.*,
    No. 14 CV 4361, 2021 WL 1208971 (N.D. Ill. Mar. 31, 2021) ............. 13, 18

*City of Chicago v. Smollett*,
    421 F. Supp. 3d 565 (N.D. Ill. 2019) .............................................................. 17

*Cosmetique, Inc. v. ValueClick, Inc.*,
    753 F. Supp. 2d 716 (N.D. Ill. 2010) .............................................................. 19

*County of Cook v. HSBC N. Am. Holdings Inc.*,
    314 F. Supp. 3d 950 (N.D. Ill. 2018) .............................................................. 21

*FTC v. Walmart, Inc.*,
    664 F. Supp. 3d 808 (N.D. Ill. 2023) .............................................................. 10

*In re Nat'l Prescription Opiate Litig.*,
    No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019) .......... 21

*In re Nat'l Prescription Opiate Litig.*,
    458 F. Supp. 3d 665 (N.D. Ohio 2020) ........................................................... 22

*Mathews ex rel. D.W. v. Illinois*,
    No. 18-cv-6675, 2023 WL 5720832 (N.D. Ill. Sept. 5, 2023) ...................... 13

**State Court Cases**

*Barbara's Sales, Inc. v. Intel Corp.*,
    879 N.E.2d 910 (Ill. 2007) ................................................................................. 8

*Barrall v. Bd. of Trs. of John A. Logan Cmty. Coll.*,
    153 N.E.3d 173 (Ill. App. Ct. 2019) ............................................................... 15

*City of Bridgeton v. B.P. Oil, Inc.*,
    369 A.2d 49 (N.J. Super. Ct. Law Div. 1976) ............................................... 16

*City of Chicago v. Am. Cyanamid Co.*,
    823 N.E.2d 126, 130–31 (Ill. App. Ct. 2005) ......................................... 10, 11

*City of Chicago v. Beretta U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004) ....................................................................*passim*

*Connick v. Suzuki Motor Co.*,
    675 N.E.2d 584 (Ill. 1996) ................................................................................. 8

*Elder v. Coronet Ins. Co.*,
    558 N.E.2d 1312 (Ill. App. Ct. 1990) ............................................................. 10

-iii-

*Hecktman v. Pac. Indem. Co.*,
    59 N.E.3d 868 (Ill. App. Ct. 2016) ................................................ 22

*In re Chi. Flood Litig.*,
    680 N.E.2d 265 (Ill. 1997) .......................................................... 22

*Koch v. Consolidated Edison Co. of N.Y.*,
    468 N.E.2d 1 (N.Y. 1984) .......................................................... 16

*Kurti v. Fox Valley Radiologists, Ltd.*,
    464 N.E.2d 1219 (Ill. App. Ct. 1984) ........................................... 6

*Ney v. Yellow Cab Co.*,
    117 N.E.2d 74 (Ill. 1954) ........................................................... 18

*Obermaier v. Obermaier*,
    470 N.E.2d 1047 (Ill. App. Ct. 1984) ............................................ 8

*Pappas v. Pella Corp.*,
    844 N.E.2d 995 (Ill. App. Ct. 2006) ............................................. 8

*Robinson v. Toyota Motor Credit Corp.*,
    775 N.E.2d 951 (Ill. 2002) ........................................................... 9

*Warren v. LeMay*,
    491 N.E.2d 464 (Ill. App. Ct. 1986) ............................................. 9

**Miscellaneous Authority**

Fed. R. Civ. P. 8 ................................................................... 4, 22

Fed. R. Civ. P. 9 ................................................................ 5, 6, 7

FMVSS 114 ........................................................................... 19

Lesley Fair, *Full Disclosure*,
    FTC (Sept. 23, 2024), https://www.ftc.gov/business-
    guidance/blog/2014/09/full-disclosure ....................................... 6, 8

MCC § 1-20-020 ........................................................... *passim*

MCC § 2-25-090 ........................................................... *passim*

MCC § 4-276-470 .......................................................... 5, 15

1

RESTATEMENT (SECOND) OF TORTS § 821B (1979).................................................. 12

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

For years, Defendants Kia America, Inc. and Hyundai Motor America (collectively, "Defendants") placed profits over people. Rather than equip all their vehicles with inexpensive, industry-standard anti-theft technology, Defendants installed this technology only in their luxury models, leaving their middle- and lower-end models unusually susceptible to theft, with no warning to consumers.

The consequences were sadly foreseeable: Chicago was rocked by a crime wave facilitated by rampant theft of Kia and Hyundai vehicles. This wave of car thefts had predictable downstream effects on public safety in Chicago, as stolen vehicles are driven recklessly around congested city streets and used in the commission of all sorts of violent crime.

Chicago seeks to hold Defendants liable for the damage they've caused. The Complaint alleges claims for unfair and deceptive practices under two municipal ordinances, common-law claims for public nuisance and negligence, and a claim for reimbursement of costs that Chicago incurred due to Defendants' unlawful conduct. Defendants' motion seeks to dismiss Chicago's Complaint on the following bases.

As to Chicago's claims for deceptive and unfair practices, Defendants contend their failure to clearly and conspicuously disclose the absence of industry-standard anti-theft technology was not deceptive. This contention flies in the face of common sense and well-established standards for marketing disclosures. Absent a clear disclosure, a reasonable consumer would expect a vehicle to include industry-standard anti-theft technology, and consumers were left holding the bag when their cars were stolen and their insurance rates skyrocketed.

As to the claims for public nuisance and negligence, this Court already held that similar claims brought by 17 municipalities may proceed. The result should be the same here. Defendants' motion principally seeks to distinguish Chicago's claims based on *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004). However, nothing in *Beretta* mandates a different result here. Illinois law would

likewise impose liability where Defendants knowingly put unsafe cars on the streets, causing predictable harms to the public's safe use of public thoroughfares.

As to the cost-recovery claim, Defendants primarily argue that the ordinance upon which Chicago relies does not permit recovery for violations of the common law. In fact, the ordinance authorizes recovery for violations of "state law," which includes common law. Regardless, the cost-recovery also seeks recovery for Defendants' violations of Chicago's consumer-protection ordinances.

Defendants also contend that federal law preempts Chicago's claims, and that the municipal cost-recovery and economic-loss rules preclude Chicago from recovering the damages that Defendants have caused. The Court already rejected those arguments in upholding the Consolidated GE Plaintiffs' claims. Once again, the result should be the same here.

## BACKGROUND

Since the 1970s, regulators have recognized that "stolen cars constitute a major hazard to life and limb." (First Amended Complaint ("FAC") ¶ 43.) Experience since that time has shown that car theft is a class of keystone crime, the type of crime that facilitates additional criminality, such as burglary, assault, and—as Chicago has tragically learned time and again—murder. (*Id.* ¶ 45.)

Starting in the 1990s, car manufacturers began including engine immobilizers in their vehicles, and by the 2010s, immobilizers had become standard equipment for almost every automobile manufacturer in the U.S.—except for Kia and Hyundai. (*Id.* ¶ 22.) By the 2010s, research showed that engine immobilizers are highly effective, and the rate of auto theft has declined by almost two-thirds since immobilizers were introduced. (*Id.* ¶ 23.) Installing these devices is a no-brainer: engine immobilizers are highly effective at combating theft but add only a few hundred dollars per vehicle to production cost. (*Id.* ¶ 25.)

Despite the known benefits and limited costs, many Hyundai and Kia models sold in America between 2011 and 2022 lacked an engine immobilizer, or any

similar anti-theft device, rendering these "Defective Vehicles" unusually susceptible to theft. (*Id.* ¶¶ 24, 26-29.) This omission was inexplicable because Defendants included engine immobilizers in all their cars sold in the EU and Canada, and even in the higher-end models sold in America. (*Id.* ¶ 25.)

Defendants not only failed to install engine immobilizers or any equally effective anti-theft technology in the Defective Vehicles (*id.* ¶¶ 26-27), they also failed to disclose this fact to consumers, instead touting their vehicles as industry leaders in safety and quality. Yet these vehicles were anything but. Although the omission of engine immobilizers or an equivalent anti-theft device from the Defective Vehicles saved Defendants money in the short run, it proved costly to governmental entities such as Chicago in the long run. Lacking effective anti-theft technology, the Defective Vehicles were sitting ducks.

The surge in automobile theft foreseeably caused by Defendants' decision to omit immobilizers from the Defective Vehicles was enormous. In 2022, Chicago experienced a 55% increase in vehicle theft, the largest such increase in the country, which was almost entirely attributable to the theft of Kia and Hyundai cars. (FAC ¶¶ 32-33.) Although Kia and Hyundai models comprise only 7% of vehicles registered in Chicago, they accounted for *over half* of vehicles stolen in Chicago in 2023. (*Id.* ¶¶ 34-35.)

But the problems for Chicago only begin with the vehicle theft. As the Department of Transportation found more than 50 years ago, an increase in automobile theft results in a substantial decrease in public safety. (*Id.* ¶¶ 43-45.) For instance, young offenders may steal cars and take them joyriding. But even this seemingly innocuous act can have devastating consequences. Reckless driving on congested city streets poses a threat to life and limb for all other drivers and passengers. (*Id.* ¶ 46.) For example, in April 2023, a 6-month-old Chicago boy was killed after a stolen Hyundai blew through a red light and struck the vehicle his mother was driving. (*Id.* ¶ 50.) Chicago has seen numerous instances of stolen Kias

and Hyundais used in additional crimes. For instance, these stolen vehicles were used in more than a dozen murders in just a four-month period spanning October 2022 to January 2023. (*Id.* ¶ 48.) On multiple occasions, individuals used stolen Kias or Hyundais to commit strings of armed robberies or other crimes. One such spree ended with the murder of a Chicago police officer. (*Id.* ¶ 49.) Another ended when the vehicle slammed into the back of a City truck and exploded. (*Id.* ¶ 51.)

These foreseeable downstream effects of Defendants' decision not to equip certain vehicles with industry-standard anti-theft technology have hit Chicago's poorest neighborhoods the hardest. (*Id.* ¶ 39.) Many of these households rely on a single car and lack the resources to pay for a rental when that car gets stolen and trashed; what's more, insurance rates for these cars have gone through the roof, creating another financial burden that Chicago's poorest residents can hardly afford. (*Id.* ¶¶ 37-41.)

Chicago has expended substantial resources combating the effects of Defendants' conduct and will continue to do so until the effects have been abated. Chicago has been forced to divert resources to investigate car thefts and related crimes precipitated by Defendants' conduct. (*Id.* ¶ 54.) Chicago also has, and will continue to, expend resources on public outreach and awareness efforts to help fight the scourge of Kia and Hyundai thefts. (*Id.* ¶¶ 54-55.) And Chicago continues to expend resources dealing with increased rates of reckless driving, car accidents, and related fatalities. (*Id.* ¶ 54.)

## ARGUMENT

Under Fed. R. Civ. P. 8(a), "a plaintiff need only provide 'enough facts to state a claim to relief that is plausible on its face.'" *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts uphold complaints that provide "'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011). "All factual allegations are accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Austin*, 925 F.3d at 1137. Under Fed. R. Civ. P. 9(b), circumstances constituting fraud should be stated with particularity. "This means the plaintiff must allege 'the who, what, when, where, and how of the misconduct charged.'" *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).

## I.   Counts 1-2 state claims that Defendants violated Chicago consumer-protection ordinances by deceiving consumers.

Counts 1-2 allege that Defendants violated two ordinances in the Municipal Code of Chicago ("MCC"), MCC § 4-276-470 and MCC § 2-25-090, by engaging in deceptive practices in the sale of the Defective Vehicles. (FAC ¶¶ 66-83.) Section 4-276-470(1) makes it unlawful for any person "to act, use or employ any deception, fraud, false pretense, false promise or misrepresentation, or to conceal, suppress or omit any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, for cash or on credit, or advertisement of any merchandise, whether or not any person has in fact been misled." Similarly, section 2-25-090(a) states: "No person shall engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city." Chicago "does not have to allege reliance, injury, or causation" under these ordinances "because this is an enforcement action." *City of Chicago v. DoorDash, Inc.*, No. 21C5162, 2022 WL 704837, at *2 (N.D. Ill. Mar. 9, 2022).

Deceptiveness is judged under identical standards for these ordinances. *See City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1076 (N.D. Ill. 2016). The ordinances also adopt by reference the standards for deceptive and unfair

practices in the Illinois Consumer Fraud and Deceptive Business Practices Act and by the Federal Trade Commission. *See* MCC § 2-25-090(a).

The Federal Trade Commission has provided clear guidance to businesses: "[i]f the disclosure of information is necessary to prevent an ad from being deceptive, the disclosure has to be clear and conspicuous."[1] For a disclosure to be clear and conspicuous, "consumers don't have to hunt for it"; the disclosure "reaches out and grabs their attention."[2]

Illinois courts have reiterated this principle in reviewing both what an advertisement did say in conjunction with what it did not say to determine if the advertisement is deceptive. "A statement, although technically true, may nevertheless be fraudulent where it omits qualifying material, for a half-truth is sometimes more misleading than an outright lie." *Kurti v. Fox Valley Radiologists, Ltd.*, 464 N.E.2d 1219, 1223 (Ill. App. Ct. 1984).

The Complaint alleges that Defendants engaged in actionable deception by (a) affirmatively misrepresenting the Defective Vehicles' safety and (b) failing to disclose that the Defective Vehicles omitted industry-standard anti-theft equipment. (FAC ¶¶ 71, 80.) The Complaint identifies ten advertisements in which Defendants made these misrepresentations and omissions, providing links to each advertisement. (*Id.* ¶¶ 18-20 nn.2-5.) These allegations suffice to state a claim, even under Rule 9(b)'s heightened standard:

- Who: "Hyundai and Kia" published the challenged advertisements. (*Id.* ¶ 19.)
- What: Defendants made representations suggesting that they met and even exceeded "industry quality and safety standards," but omitted that the Defective Vehicles lack industry-standard anti-theft technology. (*Id.* ¶¶ 19-20.)

---

[1]    Lesley Fair, *Full Disclosure*, FTC (Sept. 23, 2014), https://www.ftc.gov/business-guidance/blog/2014/09/full-disclosure.
[2]    *Id.*

-6-

- When: Defendants published the advertisements as part of "advertising campaigns" about "vehicles manufactured from 2011 through 2022," with the linked advertisements identifying the model years. (*Id.* ¶ 19 & nn.2-5.) Only Defendants know the precise dates when they published the advertisements.

- Where: Defendants published the advertisements in brochures, television commercials, and elsewhere. (*Id.* nn.2-5.)

- How: Defendants published the advertisements online and on television. (*Id.*)

Defendants nevertheless argue that the Complaint flunks Rule 9 as to seven of the identified advertisements because the Complaint quotes only from the other three advertisements. (Mot. at 13-14.) That is a non-starter: Defendants do not challenge the sufficiency of the allegations as to the three advertisements quoted in the Complaint under Rule 9(b), so the deception claims would survive even if they insufficiently pled the other seven misrepresentations. Beyond this, Defendants' Rule 9(b) argument ignores Chicago's failure-to-disclose claim. The Complaint identifies "what" all ten of the identified advertisements omitted—that the Defective Vehicles lack industry-standard anti-theft technology—and the remaining details are as described above. (FAC ¶ 19 & n.2.) Chicago's deception claims are thus nothing like the claims that the Court dismissed in the Consolidated GE Plaintiffs' case, where Kansas City failed to identify a single deceptive advertisement, instead offering only "bare and conclusory" allegations. (Dkt. 270 at 18-19.)

Defendants also assert that the Complaint does not plead the elements of a deception claim. First, Defendants contend that the quoted representations are true. For example, Defendants say that their representation about a Kia vehicle's "comprehensive list of advanced safety systems" referenced systems designed to avoid traffic accidents, not anti-theft technology. (Mot. at 16.) But Defendants made their unqualified representation about Kia's safety systems on page 3 of the advertisement; the discussion about traffic-safety systems cited by Defendants is on pages 18 and 22. (RJN, Ex. 6 at 3, 18, 20.) Even in the unlikely event that

-7-

consumers understood that Defendants' discussion about traffic-safety systems qualified Defendants' representation about their "safety systems," that information is not "clear and conspicuous" because consumers must "hunt for it." *Full Disclosure*, *supra* n.2. Regardless, Defendants' "truth" defense ignores Chicago's failure-to-disclose claim; Defendants do not contend that their advertisements disclosed that the Defective Vehicles lacked basic anti-theft technology.

Nor are the quoted representations mere "puffery." (Mot. at 18.) The puffery defense does not allow sellers to "'say that [products] have attributes that they do not possess.'" *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007). That is precisely what Defendants did by suggesting that the Defective Vehicles exceeded industry safety standards. (FAC ¶ 19.) In any event, Defendants' puffery defense does not address Chicago's failure-to-disclose claim. *See Pappas v. Pella Corp.*, 844 N.E.2d 995, 1001-02 (Ill. App. Ct. 2006) (rejecting puffery defense because plaintiffs identified a product defect that seller failed to disclose).

Second, Defendants argue that the Complaint inadequately pleads materiality. (Mot. at 14.) "Materiality … is generally a question of fact." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015); *accord Obermaier v. Obermaier*, 470 N.E.2d 1047, 1052 (Ill. App. Ct. 1984). The Complaint alleges that Defendants' misrepresentations and omissions were "material." (FAC ¶¶ 42, 70, 72.) For good reason: of course consumers making purchasing decisions would consider a car's lack of industry-standard technology that made the car unusually susceptible to theft. *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996). Indeed, this Court held that the Subrogation Plaintiffs sufficiently explained how critical anti-theft technology is to car buyers, and how they had been injured in reliance on Defendants' deception. (Dkt. 269 at 13-14.)

Third, Defendants challenge the Complaint's intent allegations. (Mot. at 15.) True, in alleging that Defendants "intentionally misrepresented and omitted material facts related to the quality, reliability, and safety of their vehicles to Chicago

consumers" (FAC ¶ 70), the Complaint does not expressly allege that Defendants intended consumers to rely on their deception. But "[a] party is considered to intend the necessary consequences of his own acts or conduct." *Warren v. LeMay*, 491 N.E.2d 464, 474 (Ill. App. Ct. 1986). The Complaint explains that Defendants' marketing emphasizes safety (FAC ¶¶ 18-20), demonstrating Defendants' understanding that safety is important to consumers. The Complaint also alleges that Defendants knew that engine immobilizers reduced theft yet chose not to disclose the absence of that technology in the Defective Vehicles. (*Id.* ¶¶ 20, 24-25.) The Complaint thus provides ample basis to infer that Defendants intended to induce reliance on their deception. *See Austin*, 925 F.3d at 1137.

## II. Count 3 states a claim that Defendants violated MCC § 2-25-090 by engaging in unfair practices.

Count 3 alleges that Defendants' sales of cars that are unreasonably susceptible to theft is an unfair practice under MCC § 2-25-090. (FAC ¶¶ 84-96.) Whether a practice is "unfair" requires consideration of "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002). Not all three criteria need to be satisfied; a practice that satisfies one factor to a significant degree may be deemed unfair without further inquiry. *Id.*

Defendants do not dispute that their conduct caused substantial injury to consumers, for good reason. (*See* FAC ¶¶ 46-55 (detailing injuries suffered by Chicagoans).) Because factor three is satisfied to a significant "degree," the Court need go no further. *Robinson*, 775 N.E.2d at 961. But Defendants' arguments fail in any event.

Defendants first argue that their conduct complies with public policy because no statute or common law requires immobilizers. (Mot. at 15.) But for a practice to offend public policy, it need only fall within "the penumbra of some common-law,

-9-

statutory or other established concept of unfairness." *Elder v. Coronet Ins. Co.*, 558 N.E.2d 1312, 1316 (Ill. App. Ct. 1990) (quoting *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972)). The Complaint satisfies that standard. Regulators have long articulated a public policy that automobiles should not be unreasonably susceptible to theft. (FAC ¶ 89.) To satisfy this policy, the industry has installed immobilizers as standard practice, including Defendants in their vehicles outside the U.S. (*Id.* ¶¶ 21-25.) Defendants' failure to meet industry standards for their lower-end U.S. cars, especially when combined with their failure to disclose that fact to consumers, offends public policy.

Defendants also argue that their conduct was not immoral, unethical, oppressive, or unscrupulous because consumers could have bought other vehicles. (Mot. at 16.) But "when someone 'unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision-making,' an injury isn't reasonably avoidable." *FTC v. Walmart, Inc.*, 664 F. Supp. 3d 808, 835-36 (N.D. Ill. 2023). Defendants' failure to disclose that the Defective Vehicles lacked anti-theft technology meant that consumers "were not making fully informed choices." *Id.* at 836. And the Complaint amply alleges that Defendants' conduct was immoral, oppressive, and unscrupulous: Defendants marketed the Defective Vehicles to lower-income consumers, who now must pay higher insurance premiums, undertake other actions to protect their vehicles, or live without them. (FAC ¶¶ 39-41.)

### III. Counts 4-5 state claims for public nuisance and negligence.

Count 4 alleges that Defendants created a public nuisance in Chicago. (FAC ¶¶ 97-113.) To state a public-nuisance claim, a complaint must allege: "(1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3) proximate cause, and (4) injury." *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 130-31 (Ill. App. Ct. 2005). Defendants contest whether the City has adequately alleged the first two elements. In doing so,

Defendants also seek dismissal of Count 5—for negligence—on the ground that the Complaint does not identify a cognizable duty. Defendants' arguments fail.

### A.     The right to safe public roads is a public right.

This Court held that the Consolidated GE Plaintiffs identified a public right to be free from unreasonable "interference with the use of public roads." (Dkt. 270 at 13.) Chicago alleges an identical public right to be free from unreasonable "interfere[nce] with the peaceful use of public streets." (FAC ¶ 104.) Defendants nevertheless assert that *Beretta* "rejected" the public right recognized by this Court. (Mot. at 6.) *Beretta* did no such thing, instead stating that "we need not decide" the issue. 821 N.E.2d at 1116. Regardless, *Beretta*'s dicta does not govern the different facts here.

In *Beretta*, Chicago asserted that gun companies created a public nuisance. Chicago did not allege that defendants "engaged in any conduct in … Chicago," sold defective guns, or deceived the public about gun safety. *Id.* at 1114, 1140. The court thus understood the asserted public right to be harm caused by third-party criminals' misuse of non-defective guns, not by the companies' unlawful conduct in Chicago (or anywhere else). It was in this context that *Beretta* "question[ed]" whether nuisance claims extend to an individual's "right[] to be free from the threat of illegal conduct **by others**." *Id.* at 1114 (emphasis added).

In this case, by contrast, the Complaint alleges that Defendants **themselves** engaged in misconduct in Chicago by selling defective cars. (FAC ¶¶ 25-28.) The Complaint also alleges that Defendants **themselves** deceived the public at large— including Chicagoans—by misrepresenting the cars' safety and failing to disclose the absence of anti-theft technology. (*Id.* ¶¶ 18-20.) Accordingly, this case fits within the general rule recognized in *Beretta*: public rights "include the rights of public health, public safety, [and] public peace[.]" 821 N.E.2d at 1114.

Confirming this, *Beretta* adopted the definition of public right set forth in RESTATEMENT (SECOND) OF TORTS § 821B (1979). That's the same framework

governing the claims that this Court already held sufficiently alleged a public right under seven states' laws. (Dkt. 270 at 13.) The result should be the same here.

**B.    Defendants unreasonably interfered with the public's right to safe public roads.**

Defendants again invoke *Beretta* in contending that the City has not alleged unreasonable interference with a public right. In Defendants' telling, *Beretta* limits nuisance claims to conduct involving the use of land or conduct in violation of codified law. (Mot. at 7.) As an initial matter, the Complaint plausibly alleges that Defendants violated Chicago ordinances. (FAC ¶¶ 66-96.) The Complaint thus adequately pleads unreasonable interference with a public right even under Defendants' interpretation of *Beretta*. *Compare Beretta*, 821 N.E.2d at 1124 ("The … complaint contains no specific factual allegations of actual violations of applicable statutes and regulations by any of the named defendants.").

Moreover, Defendants' interpretation of *Beretta* is wrong. To be sure, *Beretta* expressed "reluctance" to expand the tort beyond land use or statutory violations. 821 N.E.2d at 1117. But the court stated that a defendant may unreasonably interfere with a public right, even when "conducting a lawful enterprise," if the defendant is "negligent in carrying out the enterprise." *Id.* at 1124.

The Complaint alleges that Defendants were negligent in selling the Defective Vehicles. (FAC ¶¶ 114-30.) Defendants challenge the Complaint's negligence claim solely by contesting whether they had a cognizable duty. This Court already held that the Consolidated GE Plaintiffs similar allegations "sufficiently state[d] a duty." (Dkt. 270 at 8-9) (GE Plaintiffs asserted duty to "(1) exercise reasonable care in the design and manufacture of Defendants' vehicles and (2) guard against the intentional and/or criminal conduct of third parties"). The result should be the same here. Like the Consolidated GE Plaintiffs, Chicago alleges that Defendants had a duty to act as a reasonable car manufacturer and they breached that duty by failing to include industry-standard anti-theft technology in the Defective Vehicles. (FAC ¶¶ 114-

-12-

19.) Chicago alleges that Defendants knew the benefits of immobilizers and other anti-theft devices, knew that the failure to install reasonable anti-theft technology would lead to more car thefts, and knew that increased car thefts would harm public safety. (*Id.* ¶¶ 100-02, 115-17.) The harms catalogued in the Complaint were thus entirely "foreseeable." (*Id.* ¶ 101.)

Defendants again suggest that *Beretta* mandates a different outcome. In *Beretta*, Chicago contended that gun manufacturers and distributors owed a duty to exercise reasonable care to prevent firearms from ending up in the hands of individuals who could not lawfully possess them. 821 N.E.2d at 1125. *Beretta* acknowledged that it was reasonably foreseeable that guns would make their way into the hands of criminals but concluded that it was "less foreseeable" that defendants' "'lawful commercial activity'" would result in criminals buying guns outside Chicago for use in Chicago. *Id.* at 1126, 1136.

Unlike defendants in *Beretta*, "whose conduct 'did not violate any law,'" Chicago alleges that Defendants "'<u>unlawfully</u> market[ed]'" the Defective Vehicles. *City of Chicago v. Purdue Pharma L.P.*, No. 14 CV 4361, 2021 WL 1208971, at *13 (N.D. Ill. Mar. 31, 2021). "Thus, while, in *Beretta* and like cases, the 'criminal acts of third parties' may not have been sufficiently foreseeable for purposes of proximate cause … defendants' *unlawfully* deceptive and unfair marketing of [cars] require[s] a different result." *Id.* And while "Chicago has no licensed firearms dealers," *Mathews ex rel. D.W. v. Illinois*, No. 18-cv-6675, 2023 WL 5720832, at *6 (N.D. Ill. Sept. 5, 2023), Defendants do business in Chicago (FAC ¶¶ 8, 10)—making the harm more foreseeable here.

Moreover, the automobile industry has known for decades that "cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." (*Id.* ¶ 44.) As this Court reasoned:

OPPOSITION TO MOTION TO DISMISS                              CASE NO. 8:22-ML-3052-JVS(KESx)

perhaps no other product impacts public safety or engages law
enforcement and municipal governments to a greater extent than
automobiles. It is foreseeable, then, that the lengths a manufacturer will
go—or not go—to design their cars with protections against theft will
determine the burden others will bear to respond to such theft.

(Dkt. 270 at 8.) Nothing about *Beretta* undermines the Court's reasoning.

*Beretta* further declined to find a duty on public-policy grounds, reasoning
that such a duty would impose an "immense" burden on defendants to restructure
their businesses. 821 N.E.2d at 1126. No similar "immense" burden would be
imposed here, despite Defendants' citation-free protestations to the contrary.
Installing engine immobilizers is a relatively cheap endeavor—one that Defendants
themselves have undertaken outside the U.S. (FAC ¶ 25.)

In arguing that Chicago has not pled unreasonable interference with a public
right, Defendants also cite *Beretta*'s statement that the lawful sale of non-defective
guns could not unreasonably interfere with a public right because that question
required "balancing … the harm caused by firearms versus their utility," which "is
better suited to legislative [determinations]." 821 N.E.2d at 1121. *Beretta* explained
that "although courts frequently weigh such factors in other contexts," the gun
context is different because firearms that are illegal in Chicago "may be possessed
legally by some persons, in some parts of the state"—precluding a one-size-fits-all
judicial resolution. *Id.*

*Beretta*'s discussion about the legislature's role does not cabin the judiciary's
usual ability to find a common-law duty. *See id.* at 1117-1121 (discussing the
legislature's role); *id.* at 1121-27 (separately discussing common-law duties). Nor
are there are similar concerns about overstepping judicial boundaries in this context.
No law authorizes Defendants to unlawfully market and sell defective cars that are
unusually susceptible to theft, so imposing liability here will not override legislative

choices elsewhere in Illinois. Nor would doing so displace federal regulations: Chicago's claims are consistent with those regulations, as explained below.

**IV.     Count 6 states a claim that Defendants violated MCC § 1-20-020.**

Count 6 alleges that Defendants violated MCC § 1-20-020. (FAC ¶¶ 131-38.) Section 1-20-020 provides: "[a]ny person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law, or such person's failure to correct conditions which violate any federal, state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs."

Defendants offer three bases for dismissal. First, Defendants argue that Chicago cannot base a section 1-20-020 claim on violations of sections 2-25-090 or 4-276-470 because the Complaint fails to state a claim under the latter ordinances. (Mot. at 19.) For reasons described above, Defendants are incorrect.

Second, Defendants argue that section 1-20-020's reference to "violation of any federal, state or local law" excludes costs related to violations of common law. (*Id.* at 18-20.) Defendants' argument violates the plain terms of the ordinance: tort law is a species of state law. *See O'Connor v. Eubanks*, 83 F.4th 1018, 1028 (6th Cir. 2023) (Thapar, J., concurring) ("common law is state law"). The background against which Chicago's City Council adopted section 1-20-020 confirms that there is no reason to read the term "state law" to *exclude* state tort law. *See Barrall v. Bd. of Trs. of John A. Logan Cmty. Coll.*, 153 N.E.3d 173, 176 (Ill. App. Ct. 2019) (statutory purpose and history are useful to interpreting statutory text).

The City Council adopted MCC § 1-20-020, which was originally enacted as MCC § 15-30-020, following failed municipal attempts in the 1970s and 1980s to recoup costs incurred dealing with major accidents caused by corporate negligence. *See, e.g.*, *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322 (9th Cir. 1983) (costs evacuating residents after a negligent derailment of train carrying liquid petroleum); *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077

-15-

(D.C. Cir. 1984) (costs providing emergency services and cleaning up a negligent plane crash); *City of Bridgeton v. B.P. Oil, Inc.*, 369 A.2d 49 (N.J. Super. Ct. Law Div. 1976) (costs fighting an oil spill); *Koch v. Consol. Edison Co. of N.Y.*, 468 N.E.2d 1 (N.Y. 1984) (costs for the aftermath of a 1977 blackout caused by gross negligence). Although courts held that the municipal cost-recovery rule precluded municipalities from recouping these losses, the courts acknowledged that the rule was of common-law vintage and subject to legislative displacement. *See Air Fla.*, 750 F.2d at 1080 & n.5; *Koch*, 468 N.E.2d at 8.

It is against this backdrop that the Chicago City Council was asked to adopt an ordinance allowing Chicago "to recover certain expenses incurred … in providing fire suppression and hazardous materials emergency services, from persons who negligently or illegally caused the emergency." Journal of Proceedings of the City Council, the City of Chicago, Sept. 12, 1990, p. 20133.[3] The Council responded by adopting an ordinance. Journal of Proceedings of the City Council, the City of Chicago, Dec. 5. 1990, pp. 27508-09. In May 2000, the Council redesignated the ordinance to a different portion of the City Code and amended the cost-recovery portion of the ordinance to expand the City's ability to recover for the provision of services beyond fire suppression or hazardous materials emergencies. Journal of Proceedings of the City Council, the City of Chicago, May 17, 2000, p. 32566.[4]

This context confirms that the phrase "federal, state or local law" encompasses recovery from persons who acted recklessly or negligently in violation of state common law. If the City Council had chosen a different approach, one

---

[3] Copies of all the Journals of Proceedings referenced are publicly available at the City Clerk's webpage, https://www.chicityclerk.com/legislation-records/journals-and-reports/journals-proceedings.

[4] The timing of this amendment explains why *Beretta* did not discuss this ordinance; Chicago filed its final amended complaint in that action in March 2000, when section 1-20-020 was still limited to fires and hazardous materials.

would expect some recognition of that fact in the City Council minutes or the ordinance itself, but there is no such indication. *See Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001) (legislators rarely "hide elephants in mouseholes"). There is therefore no basis to conclude that the ordinance excludes recovery of costs incurred to abate Defendants' nuisance or remedy damages caused by Defendants' negligence.

Third, Defendants argue that the Complaint inadequately pleads that Defendants' unfair and deceptive advertising caused Chicago's costs. (Mot. at 19-20.) The Complaint bases the cost-recovery claim on violations of consumer-protection ordinances and the common law (FAC ¶ 135), but Defendants' argument addresses only the former. Defendant thus waived any argument concerning causation and Chicago's tort claims, leaving no need to go further: the cost-recovery claim would survive even if Defendants were right. In any case, Defendants are wrong.

The Complaint alleges that "[t]he direct and proximate result of Defendants' violation of federal, state and/or local law was a wave of thefts of the Defective Vehicles, and the resulting costs to Chicago in responding to the wave of thefts and crimes and injuries associated with those thefts." (*Id.* ¶ 136.) "Because of Defendants' unlawful actions"—i.e., including Defendants' deceptive and unfair practices—"Chicago has incurred and will continue [to] incur costs for police, emergency, health, prosecutions, corrections, youth rehabilitation, and other services as well as costs for repairing property damage, and public outreach." (*Id.* ¶ 137.) This Court upheld the Consolidated GE Plaintiffs' similar causation allegations, explaining that "[t]heft is the very foreseeable conduct that *anti-theft devices* specifically protect against." (Dkt. 270 at 9-11.) The result should be the same here. *See City of Chicago v. Smollett*, 421 F. Supp. 3d 565, 574 (N.D. Ill. 2019) (denying motion to dismiss section 1-20-020 claim because "the costs the City incurred investigating [defendant's] false statements are 'reasonably related' to the false

-17-

statements"); *see also Ney v. Yellow Cab Co.*, 117 N.E.2d 74, 80 (Ill. 1954) ("[i]f …
the criminal act might reasonably have been foreseen, the causal chain is not broken
by the intervention of such act").

Defendants insist that Chicago must identify particular consumers exposed to
Defendants' deception and connect those individuals with thefts. (Mot. at 19-20.)
But section 1-20-020 allows Chicago to recover costs "reasonably related to"
Defendants' violations. The City Council inserted that language in a 2004
amendment; before that, Chicago could recover only costs incurred "as the result of"
unlawful conduct. Journal of Proceedings of the City Council, the City of Chicago,
July 21, 2004, p. 28445. Defendants' argument would undo the 2004 amendment,
requiring a close connection between illegality and the provision of city services.

Moreover, this case is at the pleading stage; it is far too early to require the
details demanded by Defendants. As the Court stated in upholding the Subrogation
Plaintiffs' claims, the complaint need not "identify *every* insured on whose behalf
they are seeking to recover or allege facts supporting the claims of *each* of those
insureds at this stage[.]" (Dkt. 269 at 12.) "All that information is appropriately
suited for discovery." (*Id.*)

*Purdue Pharma* is not to the contrary. *Purdue Pharma* initially required
Chicago to identify doctors who heard opioid companies' misrepresentations. 211 F.
Supp. 3d at 1083. The court later acknowledged that other courts "did not require
the plaintiffs to allege that particular misrepresentations caused particular
prescribers … to write medically inappropriate prescriptions." *Purdue*, 2021 WL
1208971, at \*12. Moreover, Chicago amended its complaint to add "significant
prescriber-based allegations" and "advert[ed] to expert testimony that was offered in
the MDL" supporting causation. *Id.* The court thus held that Chicago "need not
make specific allegations connecting each Chicago prescriber to specific
misrepresentations and omissions." *Id.*

-18-

There is likewise no need for Chicago to identify particular consumers whom Defendants deceived. Given Defendants decade-long advertising campaign (FAC ¶ 19), it is more than "plausible" that Defendants deceived "at least one" of their thousands of Chicago customers. *Cosmetique, Inc. v. ValueClick, Inc.*, 753 F. Supp. 2d 716, 723 (N.D. Ill. 2010). Had consumers known the truth, fewer Defective Vehicles would be on Chicago streets, resulting in fewer cars to steal, recklessly drive, and use in committing crimes. And had Defendants not sold cars without industry-standard anti-theft technology, the cars would not have been unreasonably susceptible to theft at all. (FAC ¶ 91.)

**V.     Defendants identify no other reason to dismiss Chicago's claims.**

    **A.     Chicago's claims are not preempted.**

Defendants contend that Federal Motor Vehicle Standard ("FMVSS") 114 preempts Chicago's tort claims because it encourages companies to innovate with anti-theft devices, while Chicago's claims supposedly seek to mandate immobilizers. The Court rejected this argument in the Consolidated GE Plaintiffs' case because "Defendants mischaracterize the scope of the claims." (Dkt. 270 at 6.) The Court explained that "[t]he claims do not impose a narrow engine-immobilizer requirement," observing that "[t]he Complaint's references to 'anti-theft technology' [are] consistent with the broad standard for required devices under FMVSS 114." (*Id.*) The complaint therefore "does not even raise a question of preemption[.]" (*Id.*)

Defendants distinguish the Court's decision by noting that Chicago does not expressly allege that Defendants could have satisfied their obligations by installing immobilizers *or* an "equivalent" device, leaving "no other permissible option" than immobilizers. (Mot. at 12-13.) In fact, Chicago's claims do not depend on the use of immobilizers. Like the Consolidated GE Plaintiffs, Chicago's Complaint contains allegations challenging Defendants' choice "to forego (often simple) industry-standard, anti-theft technologies"—without reference to immobilizers. (FAC ¶ 2; *accord id.* ¶ 90.) The phrase "often simple" and the plural word "technologies"

make clear that Defendants can satisfy their obligations through multiple methods. Drawing "all reasonable inferences" in Chicago's favor, *Austin*, 925 F.3d at 1137, "[t]he Complaint's references to 'anti-theft technology' [are] consistent with the broad standard for required devices under FMVSS 114," so the Complaint "does not even raise a question of preemption[.]" (Dkt. 270 at 6.)

To be sure, as Defendants point out, the Complaint challenges Defendants' failure to install immobilizers. (Mot. at 13 (citing FAC ¶ 3).) That is because immobilizers are industry-standard anti-theft technology (FAC ¶ 3), not because they are the only method to minimize car thefts. Nor does Defendants' point distinguish the Consolidated GE Plaintiffs' complaint, which alleges that Defendants "created a public nuisance … by not including engine immobilizers." (Dkt. 175 ¶112.) Defendants also note that the Complaint defines "Defective Vehicles" as those "without engine immobilizers." (FAC ¶¶ 26-28.) That definition simply describes the vehicles at issue here; it says nothing about whether Defendants could satisfy their obligations without immobilizers. And once again, this does not distinguish the Consolidated GE Plaintiffs' complaint, which likewise defined the "Susceptible Vehicles" as Hyundai and Kia "models without engine immobilizers." (Dkt. 175 ¶ 3.)

## B.    The municipal cost-recovery rule does not apply.

Defendants contend that the municipal cost-recovery rule precludes Chicago from recovering "economic damages"—i.e., any monetary recovery beyond fines and consumer restitution under Chicago's consumer-protection ordinances. (Mot. at 20-21.) The cost-recovery rule provides that "public expenditures made in the performance of governmental functions are not recoverable in tort." *Beretta*, 821 N.E.2d at 1144. This Court rejected application of the rule to preclude the Consolidated GE Plaintiffs from recovering costs incurred due to Defendants' misconduct. (Dkt. 270 at 21-22.) The result should be the same here.

The cost-recovery rule is inapplicable when recovery is "authorized by statute." *Beretta*, 821 N.E.2d at 1145. Chicago's cost-recovery ordinance does just that, authorizing cost recovery "regardless of whether the city would have otherwise incurred those costs." MCC § 1-20-010.

Moreover, "the municipal cost recovery rule has significant exceptions, requiring a fact-bound analysis beyond what is provided in the pleadings." *County of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 965 n.8 (N.D. Ill. 2018). First, the rule does not bar recovery by a municipality "to abate" a public nuisance. *See Flagstaff*, 719 F.2d at 324. *Beretta*, which relied heavily on *City of Flagstaff*, noted this exception but found it inapplicable because Chicago admitted that its requested damages "do not represent the cost of abatement." 821 N.E.2d at 1147. Here, by contrast, Chicago seeks damages "to abate the nuisance" caused by Defendants. (FAC ¶ 113.) Defendants try to avoid the abatement exception by quoting the Complaint's allegation that "'Chicago has been unable, on its own, to abate the nuisance.'" (Mot. at 21.) But the Complaint alleges that the nuisance "is abatable" (FAC ¶ 109), and seeks to recover damages from Defendants for that very purpose: to abate the nuisance.

Second, the cost-recovery rule does not apply when "an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its normal operating budget for municipal … services." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3737023, at *8 (N.D. Ohio June 13, 2019). Chicago could not have contemplated a 55% increase in vehicle thefts in 2022—more than any U.S. city—"largely attributable to a massive surge in stolen Kias and Hyundais." (FAC ¶¶ 32-33.) To be sure, *Beretta* rejected an exception to the cost-recovery rule when the nuisance is "ongoing" based on the notion that those costs are "more predictable." 821 N.E.2d at 1147. But when a nuisance "result[s] in new and additional costs for protecting the public welfare that

-21-

[go] 'far beyond what a government entity might ordinarily be expected to pay,'
[t]hese increased costs are recoverable even *under Beretta.*" *In re Nat'l Prescription
Opiate Litig.*, 458 F. Supp. 3d 665, 685 (N.D. Ohio 2020) (citation omitted).

Third, the cost-recovery rule does not preclude municipalities from
recovering for "damage to public property." *Beretta*, 821 N.E.2d at 1145. The
Complaint seeks recovery to address damage to public property. (FAC ¶¶ 54,
111, 126.)

**C.   The economic-loss rule does not apply.**

Defendants argue that the economic-loss rule precludes Chicago from
recovering economic damages under its common-law claims. (Mot. at 21-22.) That
argument fails for several independent reasons.

First, for reasons described above, section 1-20-020 allows Chicago to
recover costs incurred due to Defendants' common-law violations.

Second, the economic-loss rule does not preclude damages to abate a
nuisance. *See Beretta*, 821 N.E.2d at 1141 (citing case holding that "the economic
loss doctrine did not bar plaintiff's claim for damages for the costs of asbestos
abatement"). Again, the Complaint seeks damages "to abate the nuisance." (FAC
¶ 113.)

Third, the economic-loss rule does not apply "where the plaintiff sustained
damage, *i.e.,* personal injury or property damage, resulting from a sudden or
dangerous occurrence." *Hecktman v. Pac. Indem. Co.*, 59 N.E.3d 868, 872-74 (Ill.
App. Ct. 2016); *see In re Chi. Flood Litig.*, 680 N.E.2d 265, 279 (Ill. 1997)
(property owners who suffered property damage in flood could recover "all
consequential damages" resulting from nuisance). Again, the Complaint alleges
damage to public property. (FAC ¶¶ 111, 126.) Defendants' response—that the
Complaint does not "specify" damaged public properties (Mot. at 22)—demands
more than Rule 8 requires and is wrong in any event. (*See* FAC ¶ 51 ("a stolen

1  Hyundai burst into flames after slamming into the back of a city-owned sanitation
2  truck").)

3                              **CONCLUSION**

4         The motion to dismiss should be denied. If the Court dismisses any part of the
5  Complaint due to a pleading failure, however, Chicago respectfully requests leave to
6  amend.

7

8  DATED: February 13, 2024                    Respectfully submitted,

9                                              **City of Chicago**

10                                             _/s/ Stephen J. Kane_
11                                             Stephen J. Kane (_pro hac vice_)
                                               stephen.kane@cityofchicago.org
12                                             City of Chicago Department of Law
                                               121 North LaSalle Street, Room 600
13                                             Chicago, IL 60602
14                                             Tel: (312) 744-6934
                                               Fax: (312) 744-5185
15

16                                             _/s/ Jimmy Rock_
17                                             Jimmy Rock (_pro hac vice_)
                                               jrock@edelson.com
18                                             EDELSON PC
19                                             1255 Union Street NE, 7th Floor
                                               Washington, DC 20002
20                                             Tel: (202) 270-4777
                                               Fax: (312) 589-6378
21

22                                             Shantel Chapple Knowlton (_pro hac
23                                             vice_)
                                               schappleknowlton@edelson.com
24                                             EDELSON PC
25                                             350 North LaSalle Street, 14th Floor
                                               Chicago, Illinois 60654
26                                             Tel: (312) 589-6370
27                                             Fax: (312) 589-6378

28                                             _Attorneys for Plaintiff City of Chicago_

                              -23-

# CERTIFICATION

The undersigned, counsel of record for Plaintiff City of Chicago, certifies that this brief contains 6,972 words, which complies with the word limit of L.R 11.6.1.[5]

*/s/ Jimmy Rock*

---

[5] Defendants' brief does not include the certification required by L.R. 11.6.2 and does not appear to comply with the word limit in L.R. 11.6.1.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


*/s/ Jimmy Rock*