QUINN EMANUEL URQUHART & SULLIVAN LLP
Steven G. Madison (SBN: 101006)
stevemadison@quinnemanuel.com
Justin C. Griffin (SBN: 234675)
justingriffin@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendants Hyundai Motor America and Kia America, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br><br>This Document Relates to:<br><br>*City of Newark v. Hyundai Motor America, Inc. and Kia America, Inc.* | Case No. 8:22-ML-3052-JVS(KESx)<br><br>The Honorable James V. Selna<br><br>**DEFENDANTS' NOTICE OF AND MOTION TO DISMISS PLAINTIFF CITY OF NEWARK'S COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:  June 17, 2024<br>Hearing Time: 1:30 pm |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that on June 17, 2024, at 1:30 p.m., or as soon hereafter as counsel may be heard, in the courtroom of the Honorable James V. Selna (Courtroom 10C) of the above-entitled Court, located at 411 West 4th Street, Santa Ana, CA 92710, Defendants Kia America, Inc. ("KA"), and Hyundai Motor America ("HMA") (collectively, "Defendants") will and hereby do move the above-entitled Court for an order dismissing Plaintiff City of Newark's ("Plaintiff['s]" or "City['s]") Complaint[1] pursuant to Federal Rules of Civil Procedure 12(b)(6) on the grounds that the Complaint fails to state any claim upon which relief may be granted.

Defendants' Motion is based on this Notice, the Memorandum of Points and Authorities filed herewith, Defendants' Request for Judicial Notice, any additional briefing on the motion (including Defendants' reply brief), the files and records of this case and the related cases centralized in this Multidistrict Litigation, and such argument as is presented to the Court at the hearing on this Motion.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1]   Compl., *City of Newark v. Hyundai Motor Am., Inc. et al.*, No. 2:24-cv-00245 (D.N.J. Jan. 16, 2024), Dkt 1.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on March 28, 2024.

DATED: April 12, 2024

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By */s/ Steven G. Madison*

Steven G. Madison (SBN: 101006)
stevemadison@quinnemanuel.com
Justin C. Griffin (SBN: 234675)
justingriffin@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendants Hyundai Motor America and Kia America, Inc.*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................1

BACKGROUND ....................................................................................2

    A.   No U.S. Federal Law or Regulation Requires Immobilizers.................2

    B.   Defendants' Vehicles Comply With Federal Law And NHTSA Has Found No Safety Defect Requiring A Recall ...............................3

    C.   Social Media and Intervening Criminals Caused An Unprecedented Increase In Theft ...............................................4

LEGAL STANDARD.............................................................................4

ARGUMENT.......................................................................................5

I.    FEDERAL LAW PREEMPTS PLAINTIFF'S CLAIMS, WHICH SEEK TO IMPOSE A DUTY TO INSTALL ENGINE IMMOBILIZERS ...............5

    A.   State Tort Claims That Frustrate Significant Objectives Of Federal Law Are Preempted ........................................................5

    B.   Dictating A Specific Anti-Theft Technology Would Frustrate The Objective Of FMVSS 114's Flexibility .......................................6

    C.   Plaintiff's Claims Are Preempted Because They Rely On Defendants Having A Duty To Install Immobilizers ...........................8

II.    THE NJPLA SUBSUMES ALL OF PLAINTIFF'S CLAIMS (OTHER THAN ITS NJPLA CLAIM).................................................................8

III.    PLAINTIFF'S NJPLA CLAIM FAILS .........................................11

    A.   Defendants' Vehicles Are Not Defective ...............................11

    B.   Plaintiff Does Not Establish A Failure to Warn .......................13

IV.    PLAINTIFF'S COMMON LAW PUBLIC NUISANCE CLAIM ALSO FAILS BECAUSE DEFENDANTS NEITHER CREATED NOR CONTROL THE NUISANCE .............................................................14

V.    PLAINTIFF'S FRAUD CLAIMS FAIL TO PASS MUSTER UNDER RULE 9 .........................................................................................17

VI.    PLAINTIFF'S UNJUST ENRICHMENT CLAIM ALSO FAILS BECAUSE DEFENDANTS HAVE NO INDEPENDENT DUTY TO PAY COSTS ASSUMED BY PLAINTIFF ...................................................18

VII.    NEWARK MUNICIPAL NUISANCE CODE § 16:15 IS UNCONSTITUTIONALLY VAGUE ...........................................19

CONCLUSION ............................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

### <u>Cases</u>

*Abbott v. Doctors Ridgik, Steinberg & Assocs., P.A.*,
609 F. Supp. 1216 (D.N.J. 1985)........................................................19

*Arlandson v. Hartz Mountain Corp.*,
792 F. Supp. 2d 691 (D.N.J. 2011)....................................................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................4

*Bailey v. Wyeth, Inc.*,
37 A.3d 549 (N.J. Super. Ct. Law Div. 2008) ...................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................4, 13

*Callano v. Oakwood Park Homes Corp.*,
219 A.2d 332 (N.J. Super. Ct. App. Div. 1966)................................18

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*,
123 F. Supp. 2d 245 (D.N.J. 2000)................................ 14, 15, 16, 17

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
273 F.3d 536 (3d Cir. 2001) ........................................................14, 15

*Frederico v. Home Depot*,
507 F.3d 188 (3d Cir. 2007).........................................................17, 18

*Gade v. Nat. Solid Wastes Mgmt. Assn.*,
505 U.S. 88 (1992)................................................................................5

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000).............................................................................5

*Grewal v. Purdue Pharma L.P.*,
2018 WL 4829660 (N.J. Super. Ct. Ch. Div. Oct. 2, 2018) .............10

*Guidi v. Atl. City*,
668 A.2d 1098 (N.J. Super. Ct. App. Div. 1996).......................19, 22

*Indian Brand Farms v. Novartis Crop Prot., Inc.*,
   890 F. Supp. 2d 534 (D.N.J. 2012)........................................................9, 10

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)....................................................................5

*Kolender v. Lawson*,
   461 U.S. 352 (1983)................................................................................20

*In re Lead Paint Litig.*,
   2002 WL 31474528 (N.J. Super. Ct. Law Div. Nov. 4, 2002)...........................18

*In re Lead Paint Litig.*,
   2005 WL 1994172 (N.J. Super. Ct. App. Div. Aug. 17, 2005) ...................18, 19

*In re Lead Paint Litig.*,
   924 A.2d 484 (N.J. 2007).............................................................9, 10, 16

*Lemus v. Rite Aid Corp.*,
   613 F. Supp. 3d 1269 (C.D. Cal. 2022) ........................................................4

*Lewis v. Lead Indus. Ass'n, Inc.*,
   793 N.E.2d 869 (Ill. App. 2003)...............................................................18

*N.J. Dep't of Env't Prot. v. Exxon Corp.*,
   376 A.2d 1339 (N.J. Super. Ct. Ch. Div. 1977)...............................................15

*N.J. Dep't of Env't Prot. v. Larchmont Farms, Inc.*,
   628 A.2d 761 (N.J. Super. Ct. App. Div. 1993)...............................................19

*Port Auth. of N.Y. & N.J. v. Arcadian Corp.*,
   189 F.3d 305 (3d Cir. 1999)...........................................................11, 12, 13

*Priester v. Cromer*,
   736 S.E.2d 249 (S.C. 2012)........................................................................5

*Sisolak v. Ford Motor Co.*,
   2019 WL 3503057 (D.N.J. July 31, 2019)...........................................9, 11

*Soliman v. Daimler AG*,
   2011 WL 4594313 (E.D.N.Y. Sept. 30, 2011) .................................................6

*State v. Golin*,
   833 A.2d 660 (N.J. Super. Ct. App. Div. 2003).......................................19, 20, 21

*Williamson v. Mazda Motor of Am., Inc.*,
  562 U.S. 323 (2011)...........................................................................5, 7

*Zaza v. Marquess & Nell, Inc.*,
  675 A.2d 620 (N.J. 1996)........................................................................9

## **Statutes**

49 U.S.C. Chapter 331 ...............................................................................2

49 U.S.C. § 105 ..........................................................................................2

49 U.S.C. § 105(c) .....................................................................................2

Atlantic City Code 190-1(a) .....................................................................20

Atlantic City Code 190-1(b) § 16:15-1(15) .........................................20, 21

East Windsor Ordinance 18-3.1, § 2.1(a) ...............................................21

East Windsor Ordinance 18-3.1, § 2.1(b) ...............................................21

## **Other Authorities**

49 C.F.R. § 571.114 ...................................................................................3

49 C.F.R. § 571.114, S1, S2, S5.1 .........................................................2, 3

49 C.F.R. § 571.114 S5.1.1  .......................................................................6

33 Fed. Reg. 6471, 6472 (Apr. 27, 1968) ...............................................3, 7

55 Fed. Reg. 21869, 21871 (May 30, 1990) .............................................7

56 Fed. Reg. 12464 (Mar. 26, 1991) .........................................................7

71 Fed. Reg. 17752, 17753 (Apr. 7, 2006) .............................................3, 7

Black's Law Dictionary 421–22 (11th Ed. 2019) .....................................22

Fed. R. Civ. P. § 9(b) ....................................................................4, 17, 18

Restatement (Second) of Torts Section 821B(1) (1979) .........................14

## **PRELIMINARY STATEMENT**

Plaintiff City of Newark ("Plaintiff") alleges Defendants Hyundai Motor America ("HMA") and Kia America, Inc. ("KA") ("Defendants") are liable under New Jersey state law for a series of unprecedented vehicle thefts committed by third-party criminals spurred by social media videos promoting such thefts. In seven claims for relief, Plaintiff's Complaint asserts that Defendants, *by failing to install immobilizers*, negligently designed "defective" vehicles, created a "public nuisance," and mispresented to consumers that Defendants' vehicles were safe. Plaintiff's Complaint should be dismissed for the following reasons:

**First**, all of Plaintiff's claims are preempted by federal law, because Plaintiff explicitly seeks to impose state law tort and statutory liability for failing to install immobilizers, which are not required by federal law, and because mandating immobilizers is contrary to the deliberate flexibility expressly prescribed by the U.S. Department of Transportation's National Highway Traffic Safety Administration ("NHTSA")—as this Court held when dismissing the City of Chicago's similar complaint.

**Second**, the New Jersey Products Liability Act ("NJPLA"), the basis for Plaintiff's Fifth Cause of Action, subsumes and requires dismissal of all of Plaintiff's other claims. New Jersey law is clear that where, as here, the "essential nature" of claims is that of a traditional product liability action—including allegations of flawed product design and inadequate product warnings—the NJPLA is the sole remedy for such claims. All of Plaintiff's claims herein are based in product liability; Plaintiff's other claims must therefore be dismissed.

**Third**, Plaintiff's NJPLA claim itself fails as a matter of law because Plaintiff fails to adequately plead that Defendants (1) distributed vehicles that are defective or unfit for their intended purpose; (2) owed any duty to install immobilizers to protect against third-party misuse of Kia and Hyundai vehicles; or (3) owed any duty to warn about use of their vehicles. The NJPLA permits product liability claims only where

a plaintiff can plead and prove one or more of these elements, and as a result, Plaintiff's NJPLA claim should also be dismissed.

**Fourth**, Plaintiff's First Cause of Action for common law public nuisance fails because where, as here, the independent actions of third parties caused the nuisance (which would not have existed without that third-party conduct), New Jersey courts have held that only those who actually control or create the nuisance may be held liable.

**Fifth**, both of Plaintiff's fraud claims, at common law (Third Cause of Action) and under the New Jersey Consumer Fraud Act ("NJCFA") (Sixth Cause of Action), rely on conclusory allegations, and fall short of Federal Rule of Civil Procedure ("FRCP") 9(b)'s particularized pleading standard.

**Sixth**, Plaintiff's Fourth Cause of Action for unjust enrichment alleges neither that Defendants have a direct relationship with Plaintiff nor any independent duty to shoulder costs assumed by Plaintiff, as are required for unjust enrichment under New Jersey law.

**Finally**, the statute relied upon for Plaintiff's Seventh Cause of Action (NMC § 16:15) is unconstitutionally void under binding New Jersey case law.

For these reasons, and as demonstrated below, Plaintiff's Complaint should be dismissed without leave to amend.

# BACKGROUND

## A.    No U.S. Federal Law or Regulation Requires Immobilizers

NHTSA is exclusively vested with authority to regulate automobile safety. *See* 49 U.S.C. § 105.  Federal law, including the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. Chapter 301, and Motor Vehicle Theft Law Enforcement Act, 49 U.S.C. Chapter 331, and regulations promulgated thereunder by NHTSA, govern vehicle safety and anti-theft performance standards.  *See* 49 U.S.C. § 105(c).

In 1968, NHTSA promulgated Federal Motor Vehicle Safety Standard ("FMVSS") 114, imposing two anti-theft performance requirements.   49 C.F.R.

§ 571.114, S1, S2, S5.1.  This standard does not require vehicles to be 100 percent impenetrable to thieves.  *See id.*

Neither FMVSS 114 nor any federal law or regulation has ever mandated installation of immobilizers.  *See* 49 C.F.R. § 571.114.  Rather, NHTSA seeks to provide automobile manufacturers with a choice in the anti-theft technology they adopt.  When FMVSS 114 was enacted, NHTSA rejected requests to prescribe "specific theft protection devices," because "it would be unwise to establish a standard in terms so restrictive as to discourage technological innovation in the field of theft inhibition."  33 Fed. Reg. 6471, 6472 (Apr. 27, 1968).  As such, "the standard has been framed to permit as many specific devices as possible to meet its requirements." *Id.*; *see also* 71 Fed. Reg. 17752, 17753 (Apr. 7, 2006).

**B.      Defendants' Vehicles Comply With Federal Law And NHTSA Has Found No Safety Defect Requiring A Recall**

On April 20, 2023, 18 state Attorneys General—including the Illinois Attorney General—wrote to NHTSA (the "State AGs' Recall Request") asking the agency to:

> use its authority to institute a recall of unsafe Hyundai and Kia vehicles manufactured between 2011 and 2022 whose easily-bypassed ignition switches and lack of engine immobilizers make them particularly vulnerable to theft.

RJN Ex. 1 at 1 (cited at Compl. ¶ 39).  Not surprisingly, Plaintiff fails to mention NHTSA's response, in which the agency unequivocally rejected the State AGs' Recall Request, and their contention that the lack of immobilizers in Defendants' vehicles violates FMVSS:

> At this time, NHTSA has not determined that this issue constitutes either a safety defect or noncompliance requiring a recall…FMVSS No. 114, does not require an engine immobilizer.

RJN Ex. 2 at 2.  NHTSA added, "[h]ere, the safety risk arises from unsafe use of a motor vehicle by an unauthorized person after taking significant destructive actions to parts of the vehicle."  *Id.*

### C. Social Media and Intervening Criminals Caused An Unprecedented Increase In Theft

The Complaint includes no allegations that, *before* mid-2021, either the general public or Defendants were aware of the multi-step process required to steal Defendants' vehicles (a procedure the Kia Boyz promoted on social media, *see* RJN Ex. 3), or that Defendants' vehicles were stolen at higher rates relative to other manufacturers or distributors, *see* Compl. ¶ 43.  Rather, Plaintiff alleges Defendants' vehicles constituted only 11% of vehicle thefts in Newark in 2022.  *Id.* ¶ 29.

Even according to Plaintiff's allegations, the unprecedented increase in thefts began in Newark in 2023—over a decade after some vehicles were manufactured and sold.  *Id.* ¶¶ 30–31.  And the theft epidemic has been spurred on by a social media challenge in which thieves "post[] their methods on Tik Tok and other popular social media platforms."  RJN Ex. 4.

### LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  *Id.* (internal quotation marks omitted).  Rather, the plaintiff must "allege more by way of factual content to nudge his claim" of unlawful action "across the line from conceivable to plausible."  *Id.* at 683 (cleaned up).

FRCP 9(b) imposes a heightened pleading standard for claims sounding in fraud.  *Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269, 1278–79 (C.D. Cal. 2022).  An allegation of fraud "must state with particularity the circumstances constituting fraud."  FRCP 9(b).

In ruling on a motion to dismiss, a court may consider: (1) all material within the pleadings; (2) documents incorporated into the complaint by reference; and

(3) matters of which a court may take judicial notice. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

## ARGUMENT

I.   **FEDERAL LAW PREEMPTS PLAINTIFF'S CLAIMS, WHICH SEEK TO IMPOSE A DUTY TO INSTALL ENGINE IMMOBILIZERS**

    A.   **State Tort Claims That Frustrate Significant Objectives Of Federal Law Are Preempted**

Federal law preempts state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat. Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 98 (1992).  That includes state tort rules that "impose legal duties" in "conflict directly with federal regulatory mandates."  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 871, 881–82 (2000) (FMVSS provision allowing manufacturers to select from a variety of passive restraints preempted a state tort suit premised on a manufacturer's failure to install driver's side airbags because the federal standard imposed flexible performance requirements, rather than mandating a particular type of passive restraint and a state tort theory mandating one specific restraint thus would stand "'as an obstacle to the accomplishment and execution of' the important…federal objectives" of the standard).  Federal regulations carry out statutory commands, and so preempt any tort claim that would frustrate a "significant objective of [a] federal regulation." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (federal regulation giving manufacturers options for compliance preempts state rules restricting those options when, as in *Geier*, flexibility was a "significant objective" of the regulation).

For example, a state tort rule requiring auto manufacturers to use only laminated glass was preempted by FMVSS 205, which allowed for use of *either* laminated *or* tempered glass.  *Priester v. Cromer*, 736 S.E.2d 249, 260 (S.C. 2012). Federal law likewise preempted a state-law tort duty to anchor seatbelts to automobile frames, because federal regulations recognize that giving manufacturers options

would "encourage the correct use of safety belts and [] increase the overall safety belt usage rate." *Soliman v. Daimler AG*, 2011 WL 4594313, at *5 (E.D.N.Y. Sept. 30, 2011).

### B.   Dictating A Specific Anti-Theft Technology Would Frustrate The Objective Of FMVSS 114's Flexibility

Plaintiff does not allege that Defendants failed to comply with FMVSS 114. Nor can it given NHTSA's explicit statement in its rejection of the State AG Recall Request that "FMVSS No. 114 [] does not require an engine immobilizer." *See supra* Background B; RJN Ex. 2, at 1–2.  Unable to assert non-compliance with FMVSS 114's flexible mandate, Plaintiff attempts to use state tort law to impose a rigid duty to use immobilizers.  *See* Compl. ¶¶ 1–2 (defining "industry-standard, anti-theft technology" and "basic anti-theft technology" as "ignition immobilizers"), ¶ 7 ("Hyundai and Kia's failure to equip their vehicles with ignition immobilizer devices gives rise to [all of Plaintiff's claims]"), ¶¶ 17–26, 28–29, 35, 63 ("Defendants, acting individually and together, were negligent in failing to equip their vehicles with immobilizer technology").  Plaintiff's attempt runs headlong into *Geier*, *Priester*, and *Soliman*.

Here, as in those cases, flexibility is a significant objective of NHTSA's regulation.  FMVSS 114 does not prescribe a particular anti-theft technology, but instead mandates that a vehicle's starting system prevent (1) "normal activation" of the engine and (2) "steering, or forward self-mobility" when the key is removed.  *See* 49 C.F.R. § 571.114 S5.1.1 (2021).  ***Any*** technology meeting these performance requirements satisfies FMVSS 114.  NHTSA's Test Procedures for FMVSS 114, which the agency uses to verify compliance, underscore the standard's flexibility.  By testing compliance through reference to objective criteria, such as whether the car engine starts or steering wheel can rotate when the key is removed, the Test Procedures contemplate that a range of technologies may satisfy FMVSS 114.  RJN Ex. 5, at 4, 16.

NHTSA's decision to let manufacturers select among different theft-prevention technologies is not merely an afterthought, but a significant regulatory objective.  For decades, NHTSA's position has been that a flexible performance standard best protects against vehicle theft.  Prior to enacting FMVSS 114, NHTSA received "many" requests to prescribe "specific theft protection devices," including brake locks and "so-called 'pop-out' keys which automatically eject from the locking system."  33 Fed. Reg. 6471, 6472 (Apr. 27, 1968).  NHTSA declined to mandate those, or any, technologies because "it would be unwise to establish a standard in terms so restrictive as to discourage technological innovation in the field of theft inhibition.  Consequently, the standard has been framed to permit as many specific devices as possible to meet its requirements."  *Id.*

NHTSA has repeatedly reaffirmed this objective.  In 1990, NHTSA considered adding certain requirements to FMVSS 114, but when NHTSA asked manufacturers whether its proposed changes "would…improperly restrict design flexibility," some responded "the proposal established overly precise requirements, which would limit new designs and innovations."  55 Fed. Reg. 21869, 21871 (May 30, 1990).  NHTSA therefore expanded its new rule to identify various alternative mechanisms of compliance.  *Id.* at 21871, 21872.  In response to petitions for reconsideration, NHTSA further amended the rule in 1991 and 1992 to "provide manufacturers with greater flexibility in designing" their locking and transmission systems to meet the performance standard.  56 Fed. Reg. 12464 (Mar. 26, 1991).  In another revision in 2006, NHTSA agreed with a manufacturer's petition that the existing rule used "terminology that was unnecessarily design-restrictive," and elected to broaden the standard.  71 Fed. Reg. 17752, 17753 (Apr. 7, 2006).

Because flexibility and the innovation it drives have always been "significant objective[s]" of NHTSA's theft-prevention regulation, *Williamson*, 562 U.S. at 330, the regulation preempts state tort duties that would undercut that flexibility, eliminate

manufacturer choice, and impose rigid technological mandates that NHTSA has rejected—precisely what Plaintiff's claims would do.

### C.    Plaintiff's Claims Are Preempted Because They Rely On Defendants Having A Duty To Install Immobilizers

Plaintiff alleges that Defendants violated a duty of care specifically by "failing to equip their vehicles with immobilizer technology," Compl. ¶ 63, and seeks to hold Defendants liable for *that* omission, *see id.* ¶ 7 ("Hyundai and Kia's failure to equip their vehicles with ignition immobilizer devices gives rise to [plaintiff's] claims"), ¶¶ 1–2 (defining "industry-standard, anti-theft technology" and "basic anti-theft technology" as "ignition immobilizers").  Plaintiff's claims are expressly premised on "the absence of ignition immobilizers," *id.* ¶¶ 21, 26, 28–29, 35, the "lack of immobilizing technology," *id.* ¶ 34, 42, and Defendants' alleged "negligen[ce] in failing to equip their vehicles with immobilizer technology," *id.* ¶ 63.   Indeed, Plaintiff's Complaint fails to mention any other anti-theft measures on which the claims are based.  Plaintiff thus seeks to mandate Defendants' use of immobilizers (and in fact references immobilizers 27 times in its Complaint), running afoul of FMVSS 114.  Just as the Court found with the City of Chicago's complaint, Plaintiff's Complaint here "definitively rests its claims on the allegation that Defendants failed to use engine immobilizers."  Dkt. 334 at 6.

The City of Newark's Complaint should likewise be dismissed.  *See id.*

## II.    THE NJPLA SUBSUMES ALL OF PLAINTIFF'S CLAIMS (OTHER THAN ITS NJPLA CLAIM)

Assuming *arguendo* Newark's claims are not preempted, the New Jersey Products Liability Act, N.J.S. § 2A:58C *et seq.* ("NJPLA") subsumes all of Plaintiff's other claims, which should therefore be dismissed.

In enacting the NJPLA, the New Jersey Legislature sought "to limit the expansion of products-liability law," specifically by "limit[ing] the liability of manufacturers so as to balance the interests of the public and the individual with a

view towards economic reality." *Zaza v. Marquess & Nell, Inc.*, 675 A.2d 620, 627 (N.J. 1996) (cleaned up).  "The language chosen by the Legislature in enacting the [NJ]PLA is [therefore] both expansive and inclusive, encompassing virtually all possible causes of action relating to harms caused by consumer and other products." *In re Lead Paint Litig.*, 924 A.2d 484, 503 (N.J. 2007).  In other words, with "the passage of the Product Liability Act…there came to be one unified, statutorily defined theory of recovery for harm caused by a product."  *Id.*

To determine whether claims are subsumed by NJPLA, New Jersey courts look to whether the "essential nature" of the claims is that of "a traditional product liability action."  *Indian Brand Farms v. Novartis Crop Prot., Inc.*, 890 F. Supp. 2d 534, 544, 547 (D.N.J. 2012).  Specifically, "if the facts of a case suggest that the claim is about defective manufacture, flawed product design, or failure to give an adequate warning, then the PLA governs and the other claims are subsumed."  *Sisolak v. Ford Motor Co.*, 2019 WL 3503057, at *4 (D.N.J. July 31, 2019) (citation omitted).

In *Lead Paint*, 26 municipalities (including the City of Newark) filed complaints against lead paint manufacturers and distributors for, *inter alia*, fraud and public nuisance, seeking to recover the costs of detecting and removing lead paint from buildings, providing medical care to affected residents, and developing education programs about the dangers of lead paint.  *In re Lead Paint*, 924 A.2d at 487.  The New Jersey Supreme Court ordered dismissal of the cities' public nuisance claims, in part because the NJPLA subsumed them.  *Id.* at 505.  The court considered first that "the paint products distributed or sold by defendants were intended to be used by consumers" and "the harms plaintiffs seek to vindicate" include "physical damage to property, personal physical illness or injury, and the like."  *Id.* at 503 (cleaned up).  The court then clarified, "[w]ere there any doubt" about whether the plaintiffs' claims sounded in products liability causes of action, "a careful reading would demonstrate" that "[t]he central focus of plaintiffs' complaints is that defendants were aware of dangers associated with lead…and failed to warn of those

dangers." *Id.* The court explained that "[t]his classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA." *Id.*

New Jersey courts have consistently interpreted the *Lead Paint* holding to subsume—and therefore require dismissal of—common law, statutory, and equitable claims that sound in products liability. *See Bailey v. Wyeth, Inc.*, 37 A.3d 549, 583 (N.J. Super. Ct. Law Div. 2008) (finding statutory and common law fraud claims based on product misrepresentations subsumed by the NJPLA, and noting that "New Jersey state and federal courts have consistently dismissed product liability claims based on common law theories"), *aff'd sub nom.*, *DeBoard v. Wyeth, Inc.*, 28 A.3d 1245 (N.J. Super. Ct. App. Div. 2011); *Novartis*, 890 F. Supp. 2d at 547, 549 (holding that common law misrepresentation and NJCFA claims brought against insecticide producer were subsumed by the NJPLA, and stating that "the PLA is paramount over other legislation"); *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 704 (D.N.J. 2011) (holding unjust enrichment claim subsumed because "irrespective of the theory underlying the claim, the core issue in Plaintiff's claims is harm caused by a product") (internal quotation marks omitted); *Grewal v. Purdue Pharma L.P.*, 2018 WL 4829660, at *17 (N.J. Super. Ct. Ch. Div. Oct. 2, 2018) (holding public nuisance claims against opioids manufacturers subsumed by the NJPLA).

So too should this Court dismiss Plaintiff's claims as subsumed by the NJPLA. Plaintiff's Complaint consists entirely of "classic articulation[s] of tort law duties [] to warn of or to make safe." *Bailey*, 37 A.3d at 581; *see, e.g.,* Compl. ¶ 51 ("in manufacturing, selling, and refusing to fix the vehicles…"); ¶ 93 (same); ¶ 63 ("Defendants…were negligent in failing to equip their vehicles with immobilizer technology"); ¶ 67 ("Defendants represented to Plaintiff and its citizens that their cars were safe"); ¶ 83 ("Defendants [] failed to provide consumers adequate warnings about their lack of anti-theft technology"). These allegations are about "defective manufacture, flawed product design, [and] failure to give an adequate warning[;

therefore] the PLA governs and the other claims are subsumed." *Sisolak*, 2019 WL 3503057, at *4.

Under New Jersey law, all claims other than the Fifth Cause of Action fall squarely within the ambit of the NJPLA, and must therefore be dismissed.

## III. PLAINTIFF'S NJPLA CLAIM FAILS

### A. Defendants' Vehicles Are Not Defective

Plaintiff's NJPLA claim itself also must be dismissed, as Plaintiff has not adequately alleged that Defendants' vehicles are defective because (a) they have not (and cannot) allege that the vehicles are not fit for their intended purpose and (b) Defendants had no duty to prevent criminal misuse by third parties.

New Jersey law provides that "[a] product is not in a defective condition when it is safe for *normal consumption and handling*." *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 314 (3d Cir. 1999) (emphasis added). Where "the use of the product is beyond its intended or reasonably anticipated scope, an injury resulting from that use is not probative of whether the product was fit, suitable, and safe." *Id.* (cleaned up).

Further, under New Jersey law, a manufacturer has a duty to address only *objectively foreseeable* misuses. *Id.* at 314. "Objective foreseeability…does not affix responsibility for future events that are only theoretically, remotely, or just possibly foreseeable, or even simply subjectively foreseen by a particular manufacturer." *Id.* at 315. In *Port Authority*, the court held that "manufacturers have no duty to prevent a criminal misuse of their products which is entirely foreign to the purpose for which the product was intended." *Id.* at 313. There, a building owner sued fertilizer manufacturers following the 1993 bombing of a parking garage at the World Trade Center. *Id.* at 315. The court found allegations that defendants "were aware of previous instances in which fertilizer products [mixed with other substances] were used in bombs" insufficient to establish objective foreseeability, stating that a finding otherwise "would expand the scope of manufacturers' liability under New Jersey law,

a result contrary to the legislative policy of the NJPLA…to limit the expansion of products-liability law.  We leave such an expansion of duty to the legislature." *Id.* at 316.

Plaintiff has not alleged, nor can it, that Defendants' vehicles—with or without immobilizers—are unfit for their intended purpose or unsafe for normal consumption and handling.  *See* RJN Ex. 2.  Nor could Plaintiff credibly allege that thieves' use of stolen vehicles is within the "intended or reasonably anticipated scope" of use for such vehicles.  *See, e.g.,* Compl. ¶ 40; *see also infra* Section III.A.

Neither has Plaintiff established that Defendants owed a duty to prevent criminal misuse by third parties.  For the same reasons discussed in *Port* Authority, it would be inappropriate to expand the scope of liability here.  The specific misuse of Hyundai and Kia vehicles at issue—third-party criminals embarking on an unprecedented wave of Hyundai and Kia car thefts arising from a TikTok trend of "how-to" videos, a decade after some vehicles were manufactured and sold—was not objectively foreseeable.  In fact, Plaintiff never alleges that it was.  While *some number* of car thefts *generally* may be foreseeable to *any* vehicle distributor or manufacturer, the proliferation of "how-to" videos on social media, and the magnitude of thefts flowing from these videos were unforeseeable.  Indeed, Plaintiff does not allege that Defendants' vehicles were stolen at higher rates than others *before 2021*.

Nonetheless, ultimately the Third Circuit has settled on fairness, "not foreseeability alone," as the test for whether a defendant has a duty to prevent criminal misuse.  *Port Auth.*, 189 F.3d at 316.  It would be grossly unfair to expect a car manufacturer to anticipate and prevent the unique and unprecedented manner of theft of its vehicles on a scale as sweeping as Plaintiff alleges.  *Id.*

Plaintiff's claim that Defendants' vehicles were defective fails as a matter of law.

/ / /

/ / /

Case No. 8:22-ML-3052-JVS(KESx)
NOTICE OF AND MOTION TO DISMISS COMPLAINT

### B.    Plaintiff Does Not Establish A Failure to Warn

#### 1.    Plaintiff Does Not Allege A Failure to Warn

Plaintiff alleges in wholly conclusory fashion that "Defendants also failed to provide consumers adequate warnings about their lack of anti-theft technology." Compl. ¶ 83.   This allegation fails to "give the defendant fair notice of what the…claim is and the grounds upon which it rests."   *Twombly*, 550 U.S. at 555. Specifically, Plaintiff does not identify what information Defendant allegedly should have provided, or to whom such information should have been disclosed.   The Complaint therefore leaves this Court, and Defendants, to guess as to the nature of Defendants' would-be "duty to warn."

#### 2.    Defendants Owe No Duty To Warn

Plaintiff's vague failure to warn allegation resembles that in *Port Authority*— "[e]ssentially, plaintiff's claim is that defendants negligently marketed their products to the general public, not that defendants failed to warn users of the products' dangers." *Port Auth.*, 189 F.3d at 319.   There, the Third Circuit noted that "plaintiff can cite no authority (and we can find none) under [] New Jersey law….which supports the existence of a duty to warn [customers] that [third parties] may alter the products and harm third parties," *id.* at 320, and stated that "no cases, even under the common law, support the existence of such a duty," *id.* at 319.

New Jersey law does not recognize any duty to warn that third parties may steal and criminally misuse vehicles.   Accordingly, as in *Port Authority*, the claim must be dismissed.

#### 3.    Plaintiff Cannot Allege Any Failure to Warn Caused Its Injury

Even assuming *arguendo* some duty to warn, Plaintiff has not alleged that any failure to warn was the proximate cause of its injuries, as required under New Jersey law.   *See id.*   Plaintiff has not alleged that any such warnings would have had *any impact* on *any element* of the causal chain.   Absent *any* such allegations as to causation, Plaintiff's failure to warn claim fails.

## IV.   PLAINTIFF'S COMMON LAW PUBLIC NUISANCE CLAIM ALSO FAILS BECAUSE DEFENDANTS NEITHER CREATED NOR CONTROL THE NUISANCE

Plaintiff's First Cause of Action for public nuisance is also fatally defective because it does not plausibly allege that Defendants created or have control over the purported nuisance.

An alleged public nuisance is actionable if a defendant participates "to a substantial extent in carrying [the nuisance] on" or "exert[s] a certain degree of control over its source." *Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp*., 123 F. Supp. 2d 245, 265 (D.N.J. 2000) (quoting Restatement (Second) of Torts Section 821B(1) (1979)); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.,* 273 F.3d 536, 539 (3d Cir. 2001). *See also In re Lead Paint*, 924 A.2d at 501–02 (dismissing public nuisance claim where lead paint manufacturers and distributors did not have sufficient control over plaintiffs' poorly maintained premises).  Under New Jersey law, the requisite "control" is not satisfied simply where the defendants were designers, manufacturers, or distributers of a product eventually linked to an alleged public nuisance.  *See Camden Cnty.,* 123 F. Supp. 2d at 267 (manufacturing and distributing guns does not constitute "control" over the criminal gun market); *In re Lead Paint*, 924 A.2d at 501–02 (defendant manufacturers and distributors of lead paint did not exert sufficient control over the public nuisance that resulted from landlords' negligent use of their product).  Rather, if a defendant's alleged conduct cannot be linked to the resulting nuisance "by further control or substantial participation," then "there simply is not a sufficient nexus between the defendants' conduct and the alleged injury," and the claim should be dismissed.  *Camden Cnty.*, 123 F. Supp. 2d at 267.  Public nuisance "does not sweep so broadly as to impose liability on manufacturers of a legal product, who follow relevant regulations, and who do not control or participate in irresponsible secondary and tertiary acts that are more directly responsible for the end harm."  *Id.* at 267.

In *Camden County*, the County alleged that various gun manufacturers recklessly and negligently marketed and distributed guns, facilitated straw purchases and the creation of a criminal market for guns, and failed to monitor or supervise their distributors.  123 F. Supp. 2d at 250–51.  In connection with its public nuisance claim, the County further asserted that the manufacturers' conduct—the creation and implementation of gun distribution and marketing policies—endangered public safety, health, and peace.  *Id.* at 251–52.  In dismissing that claim, the court found that the County had failed to allege the manufacturers exercised control over, or "endorsed or condoned the alleged end result of their marketing policies, which is the criminal gun market in Camden."  *Id.* at 266–67.

Further, the court concluded that "the defendants' allegedly wrongful conduct…could *never* ripen into a public nuisance absent the conduct of third parties…*i.e.*, criminals."  *Id.* at 266.  "[D]efendants have no duty to control the misconduct of third parties" and are not liable for conduct that they themselves did not "control or participate in."  *Id.* at 266–67.  Thus, "the defendant must have a tangible role in creating and carrying out the nuisance" in order for liability to reach him.  *Id.*  The *Camden County* court held that, "[w]here the acts of independent, third-parties are the cause of the nuisance, parties that have neither controlled nor created the nuisance should not be held responsible."  *Id.* at 267; *see also N.J. Dep't of Env't Prot. v. Exxon Corp*., 376 A.2d 1339, 1343–44, 1350 (N.J. Super. Ct. Ch. Div. 1977) (dismissing public nuisance claim where the escape of petroleum into waters "occur[red] without the intervention of [defendant]"); *Camden Cnty.*, 273 F.3d at 541 ("If independent third parties cause the nuisance, parties that have not controlled or created the nuisance are not liable.").  Both the district court and Third Circuit in *Camden County* refused the County's attempt "to extend the limits of public nuisance law so far as to eliminate the requirement that the defendants control or participate in the harm to be abated."  123 F. Supp. 2d at 267.

Similarly, in *In re Lead Paint Litigation*, the New Jersey Supreme Court held that lead paint manufacturers did not create or control a public nuisance consisting of health harms from residential lead paint because "the conduct that has given rise to the public health crisis is…poor maintenance of premises where lead paint may be found by the owners of those premises." 924 A.2d at 501. The court added that imposing nuisance liability on the manufacturers would make "the conduct of merely offering an everyday household product for sale…suffice for the purpose of interfering with a common right." *Id.* "Such an interpretation would far exceed any cognizable cause of action." *Id.*

Like the plaintiffs in *Camden County* and *In re Lead Paint*, Newark attempts to stretch public nuisance law to hold manufacturers liable for "irresponsible secondary and tertiary acts that are more directly responsible for the end harm." *Id.* Here, Plaintiff claims that Defendants' alleged "manufacturing, selling, and refusing to fix the vehicles at issue constitutes a public nuisance pursuant to the New Jersey common law." Compl. ¶ 51. However, like in *Camden County*, Plaintiffs do not allege that Defendants control or created the nuisance, or "endorsed or condoned" the end result of their manufacturing or distribution efforts—the thefts of any of their vehicles. Indeed, Defendants have made extensive efforts to prevent vehicle thefts. *Id*. ¶¶ 45–47. The Kia Boyz social media craze encouraged car thieves, over whom Defendants have no control, to steal vehicles. Just as the criminal misuse of guns in *Camden County* would not have occurred "absent the conduct of third parties…*i.e.*, criminals," 123 F. Supp. 2d at 266, so too the vehicle theft crisis here would not have occurred but for the conduct of third-party criminals. Here, as in *Camden County*, Defendants' actions—manufacturing and distributing vehicles—"could *never* ripen into a public nuisance absent the conduct of third parties… i.e., criminals." *Id.*

Because Defendants' actions cannot be linked to the resulting nuisance—the rise in vehicle thefts—without the participation of third parties, there is not a sufficient nexus between Defendants' conduct and the alleged injury. And because the "acts of

independent, third parties are the cause of the nuisance, [Defendants, who] have neither controlled nor created the nuisance should not be held responsible." *Id*. at 267. The Court should dismiss the public nuisance claim.

## V. PLAINTIFF'S FRAUD CLAIMS FAIL TO PASS MUSTER UNDER RULE 9

Because Plaintiff fails to even approach the heightened pleading requirements of FRCP 9(b), its common law fraud and NJCFA claims—based on alleged misrepresentations "that [Defendants'] cars were safe," Compl. ¶¶ 67, 87, and omission "that their cars' anti-theft technology was not comparable to conventional industry standards or compliant with federal regulations," *id*. ¶¶ 68, 88—must be dismissed.

FRCP 9(b), which applies to both of Plaintiff's fraud claims, requires a plaintiff "to place the defendant on notice of the precise misconduct with which it is charged…the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200–01 (3d Cir. 2007) (cleaned up).

Plaintiff's allegations lack *any* precision or specificity whatsoever. Plaintiff alleges only that "Defendants represented to Plaintiff and its citizens that their cars were safe," Compl. ¶¶ 67, 87, and "Defendants intentionally suppressed the fact that their cars' anti-theft technology was not comparable to conventional industry standards or compliant with federal regulations," *id*. ¶¶ 68, 88. While Defendants contest the veracity of these allegations—their vehicles *are* safe and compliant with federal regulations, *see* RJN Ex. 2; *supra* Section III.A—even accepting the allegations *arguendo*, neither allegation specifies the date, time, nor place of the alleged fraud. Nor does Plaintiff specify the publication or statement in which Defendants allegedly made a misrepresentation (or omission), or the recipients thereof. These bare-bone, conclusory allegations fail to satisfy Rule 9(b)'s pleading

standard.  *Frederico*, 507 F.3d at 200–01 (affirming dismissal where "[n]one of these broad statements disclose…the substance of the misrepresentation" let alone its time and place or the identity of the speaker).

For these reasons, Plaintiff's fraud claims must be dismissed.

## VI.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM ALSO FAILS BECAUSE DEFENDANTS HAVE NO INDEPENDENT DUTY TO PAY COSTS ASSUMED BY PLAINTIFF

Defendants have no duty to pay the costs borne by Plaintiff, as required for Plaintiff's unjust enrichment claim.  Because the doctrine of unjust enrichment is "an element of quasi-*contractual* liability," *In re Lead Paint Litig.*, 2005 WL 1994172, at *14 (N.J. Super. Ct. App. Div. Aug. 17, 2005) (emphasis added), *rev'd on other grounds*, New Jersey law traditionally has required "some direct relationship between the parties."  *Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 335 (N.J. Super. Ct. App. Div. 1966).  There is none here.

In *Lead Paint*, plaintiff municipalities argued that "defendants' creation of the public nuisance caused plaintiffs to spend money to abate the nuisance."  *In re Lead Paint*, 2005 WL 1994172, at *15.  In affirming the trial court's dismissal of the unjust enrichment claims, the appellate court noted "there must be some independent basis which establishes a duty on the part of the defendant to act."  *Id.* at *16 (quoting *Lewis v. Lead Indus. Ass'n, Inc.*, 793 N.E.2d 869, 877 (Ill. App. 2003)).  A claim for unjust enrichment "involves a direct relationship between the parties," but no such relationship existed between the local government entities and manufacturers of lead paint.  *In re Lead Paint Litig.*, 2002 WL 31474528, at *22 (N.J. Super. Ct. Law Div. Nov. 4, 2002).  Accordingly, the plaintiffs' "unjust-enrichment theory provide[d] them no added basis for recovery."  *In re Lead Paint*, 2005 WL 1994172, at *16.

Given almost identical contentions here—that Plaintiff paid for municipal services allegedly made necessary by Defendants' vehicles, *see, e.g.*, Compl. ¶¶ 73,

74—and the similar lack of any direct or contractual relationship whatsoever between Plaintiff and Defendants, Plaintiff's unjust enrichment claim should be dismissed.

## VII.   NEWARK   MUNICIPAL   NUISANCE   CODE   §   16:15   IS UNCONSTITUTIONALLY VAGUE

Plaintiff's Seventh Cause of Action asserts Defendants violate NMC § 16:15, a penal ordinance prohibiting various activities (none of which relate to automobiles) as nuisances.  Plaintiff relies specifically on NMC §§ 16:15-1(14) and (15), which prohibit causing, maintaining, or permitting, "[a]ny matter, thing, condition or act" which is or may become (1) "detrimental or a menace to the health of the inhabitants of this municipality," or (2) "an annoyance, or interfere with the comfort or general well-being of the inhabitants of this municipality."  Plaintiff's claim fails because NMC § 16:15 contains language identical to other statutory provisions which New Jersey courts have twice invalidated on unconstitutional grounds.  *See State v. Golin*, 833 A.2d 660, 665–66 (N.J. Super. Ct. App. Div. 2003); *Guidi v. Atl. City*, 668 A.2d 1098, 1098–99 (N.J. Super. Ct. App. Div. 1996).

NMC § 16:15 is a penal statute and must be strictly construed.  New Jersey defines a penal statute as "one which imposes punishment for an offense against the state as compared to a wrong against an individual." *N.J. Dep't of Env't Prot. v. Larchmont Farms, Inc.*, 628 A.2d 761, 770 (N.J. Super. Ct. App. Div. 1993) (holding that the Pesticide Control Act of 1971 is penal in nature because of its design to penalize those who perpetrate a public wrong—harm to the environment) (quoting *Abbott v. Doctors Ridgik, Steinberg & Assocs., P.A.*, 609 F.Supp. 1216, 1218 (D.N.J. 1985)).  NMC § 16:15 seeks to punish for conduct perpetrated against the public rather than an individual, and provides for no private right of action.  *See* NMC §§ 16:15-1(14)–(15) (prohibiting public nuisance impacting "health" and "comfort or general well-being" of "the inhabitants of this municipality").  And "[t]o withstand a void-for-vagueness challenge, a penal ordinance must define the offense 'with sufficient definiteness [such] that ordinary people can understand what conduct is prohibited

and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Golin*, 833 A.2d at 665 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

New Jersey courts have held that language identical to that of NMC §§ 16:15-1(14) and (15) violates due process and is therefore unconstitutional. In *Guidi v. City of Atlantic City*, a New Jersey court strictly construed and struck down a penal provision of the Atlantic City Code mirroring NMC § 16:15-1(15).[1] 668 A.2d at 1098–99. There, the defendant was charged under Atlantic City Code 190-1(b) for "[f]eeding [] birds resulting in heavy accumulations of bird feces" in public areas, thereby "interfering with comfort and general well-being of residents." *Id.* at 1098. The court struck down this provision for unconstitutional vagueness because it "subject[ed] a defendant to an unascertainable standard" and did not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 1098–99. Ultimately, the court noted that "[a] violation of an ordinance should not depend upon which enforcement officer, or for that matter which judge, happens to be considering the actor's conduct." *Id.* at 1099 (internal quotation marks omitted).

Similarly, in *Golin*, a New Jersey court held that two statutory provisions that mirror NMC §§ 16:15-1(14) and (15) were unconstitutionally vague. 833 A.2d at 665. There, the defendant was convicted of violating, and required to pay fines under, two penal provisions of East Windsor Ordinance 18-3.1, §§ 2.1(a) and 2.1(b), for allowing tree branches on her property to overhang and obstruct a public sidewalk.[2]

---

[1] Atlantic City Code 190-1(b) prohibited "[a]ny matter, thing, condition or act which is or may become an annoyance, or interfere with the comfort or general well-being of the inhabitants of this municipality." *Id.* Although the plaintiff in *Guidi* also charged the defendant with violating Atlantic City Code 190-1(a), which mirrors the language of NMC § 16:15-1(14), the defendant only challenged (and thus the court only addressed) the unconstitutionality of Atlantic City Code 190-1(b).

[2] East Windsor Ordinance 18-3.1 §§ 2.1(a) and 2.1(b) prohibit, respectively: "[a]ny matter, thing, condition or act which is or may become detrimental or a menace to the health of the inhabitants of this municipality," and "[a]ny matter, thing, condition or

*Id.* at 662–63.  But the court there echoed the *Guidi* decision, noting that there was "no reason that the municipality [could not] enact a more specific ordinance to proscribe the objectionable conduct." *Id.* at 666.  The court held that "there [was] no discernable difference between the[] two provisions" because "[t]hey both contain identical, vague language referring to 'any matter, thing, condition or act'" and "[b]oth set unascertainable standards that encourage arbitrary and discriminatory enforcement." *Id.* at 665–66.

Here, Plaintiff relies on the same overly broad and vague statutory penal language deemed unconstitutionally vague by the *Guidi* and *Golin* courts.  Neither NMC § 16:15-1(14) nor NMC § 16:15-1(15)—both of which contain identical, vague references to "[a]ny matter, thing, condition or act"—provide "sufficient definiteness" such that an ordinary person could understand what conduct is prohibited.  *Id.* at 665.  In fact, nothing in NMC § 16:15-1, which prescribes fifteen categories of prohibited conduct, relates to automobiles whatsoever—making it incomprehensible how the ordinance could *ever* be interpreted to require immobilizers.  *See, e.g.*, NMC § 16:15-1(4) (prohibiting "garbage…to leak…from any…vessel in which such matter…may be…carried"); NMC § 16:15-1(10) (prohibiting "shaking of mops…from any roof…of any building,"); NMC § 16:15-1(11) (prohibiting "growing of [] weeds…which are liable to become the breeding grounds for mosquitoes").  Rather, Plaintiff's interpretation of NMC §§ 16:15-1(14) and (15) would result in precisely what the *Guidi* and *Golin* courts warned against: arbitrary enforcement of legal conduct nowhere proscribed as unlawful by statute. *See Guidi*, 668 A.2d at 1099.  New Jersey courts have made clear that this type of discriminatory enforcement violates due process, and so too here, NMC §§ 16:15-1(14) and (15) violate Defendants' due process of law.

_____

act which is or may become an annoyance, or interfere with the comfort or general well-being of the inhabitants of this municipality."

In addition, assuming *arguendo* the Court finds that NMC § 16:15 is not penal in nature, dismissal is still warranted because Plaintiff has no authority under NMC § 16:15 to seek either abatement or damages for any purported nuisance. NMC § 16:15-4(b) allows for damages only "on conviction" of the ordinance; no such conviction has been obtained here. *See* Black's Law Dictionary 421–22 (11th Ed. 2019) (defining "convict" as "to find (a person) guilty of a criminal offense upon a criminal trial, [or] a plea of guilty"). Moreover, while NMC § 16:15-4(c) permits abatement, it requires Plaintiff to proceed under N.J.S. §§ 26:3-45 *et seq.*, which vests authority in a "***local board*** [to] recover, by a civil action, the expenses incurred in such removal and abatement…" N.J.S. § 26:3-54 (emphasis added). Rather than enlist a local board, Newark has taken it upon itself to attempt to enforce NMC § 16:15, contrary to the ordinance's requirements.

This claim should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiff's Complaint in its entirety.

DATED:  April 12, 2024

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  */s/ Steven G. Madison*
    Steven G. Madison (SBN: 101006)
    stevemadison@quinnemanuel.com
    Justin C. Griffin (SBN: 234675)
    justingriffin@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
    Telephone:  (213) 443-3000
    Facsimile:   (213) 443-3100

*Attorneys for Defendants Hyundai Motor America and Kia America, Inc.*