Thomas N. McCormick (SBN 325537)
tnmccormick@vorys.com
Vorys, Sater, Seymour and Pease LLP
4675 MacArthur Court, Suite 700
Newport Beach, CA 92660
(949) 526-7903

Kara M. Mundy*
kmmundy@vorys.com
Vorys, Sater, Seymour and Pease LLP
52 E. Gay Street
Columbus, OH 43215
(614) 464-5669

Gary E. Mason*
gmason@masonllp.com
Mason LLP
5335 Wisconsin Avenue, N.W., Suite 640
Washington, D.C. 20015
(202) 292-4490
*Motion for Pro Hac Vice Admission to be submitted.

Counsel for Objector Ruth Rubin

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>ALL CONSUMER CLASS ACTION CASES | CASE NO. 8:22-ML-3052-JVS(KESx)<br><br>**RUTH RUBIN'S NOTICE OF OBJECTION AND OBJECTION TO THE AMENDED SETTLEMENT AGREEMENT**<br><br>The Honorable James V. Selna<br>Date: July 15, 2024<br>Time: 1:30 p.m.<br>Courtroom: 10C |

Pursuant to the Court's October 31, 2023, Order (the "Order") [Docket No. 256] Granting Consumer Class Plaintiffs' Amended Motion for Preliminary Approval of Class Action Settlement (the "Amended Motion") [Docket No. 228], Class Member Ruth Rubin ("Rubin") submits this Notice of Objection and Objection to the Amended Settlement Agreement (the "Settlement").

Rubin's Objection is supported by this Notice of Objection, the accompanying Memorandum of Law, the Declaration of Ruth Rubin ("Rubin Decl."), the Declaration of Rubin's Counsel, Kara M. Mundy ("Mundy Decl."), and the Expert Report of Andrew J. Barile ("Barile Report") and all the attachments thereto.  For the reasons stated herein, this Court should sustain this Objection and deny approval of the Settlement.

As an initial matter, pursuant to the Requirements of Section IX(2) of the Settlement Agreement [Docket No. 247-1] ("Settlement Agreement") and the Long Form Notice, Rubin states:

1.     That the case name and case number are *In re: Kia Hyundai Theft Marketing, Sales Practices, and Products Liab. Litig.*, Case No. 8:22-ML-3052 JVS(KESx) (C.D. Cal.);

2.     That her name is Ruth Rubin, that she resides at ████████████, ████████████, and that her current telephone number is ████████████;[1]

3.     That her Class Vehicle is a 2021 Kia Soul, VIN KNDJ22AU8M7742770;

4.     That the statement of her objection, including all factual and legal grounds for the position, are stated below;

5.     That copies of any documents that she wishes to submit are attached to this Objection;

6.     That in making this Objection she is represented by Thomas N. McCormick and Kara M. Mundy of Vorys, Sater, Seymour and Pease LLP, 4675 MacArthur Court, Suite 700, Newport Beach, CA 92660, and 52 E. Gay Street, Columbus, OH 43215, and by Gary E. Mason of Mason LLP, 5335 Wisconsin Avenue, N.W., Suite 640, Washington, D.C. 20015, and that there is no one else who may be entitled to compensation in connection with the Objection;

---

[1] This information has been redacted for privacy reasons in this public filing.  An unredacted copy has been provided to Class Counsel, Defense Counsel, and the Court.

7.     That she intends to appear at the Final Approval Hearing through her counsel;

8.     That Kara Mundy and Thomas McCormick will appear on her behalf at the Final Approval Hearing and that she does not intend to call anyone to testify in support of the Objection; and

9.     That her signature and her counsel's signature, along with the date of the Objection, are below.

4/17/2024
_____
Date of Objection

DocuSigned by:

Ruth Rubin
_____
Ruth Rubin

Dated: April 17, 2024                    Respectfully submitted,

Thomas N. McCormick
tnmccormick@vorys.com
Vorys, Sater, Seymour and Pease LLP
4675 MacArthur Court, Suite 700
Newport Beach, CA 92660
(949) 526-7903

Kara M. Mundy*
kmmundy@vorys.com
Vorys, Sater, Seymour and Pease LLP
52 E. Gay Street
Columbus, OH 43215
(614) 464-5669
(614) 464-5669 (facsimile)

Gary E. Mason*
gmason@masonllp.com
Mason LLP
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, D.C. 20015
(202) 292-4490
*Motion for Pro Hac Vice Admission
to be submitted.

Counsel for Objector Ruth Rubin

RUTH RUBIN'S OBJECTION TO THE AMENDED SETTLEMENT AGREEMENT
CASE NO. 8:22-ML-3052-JVS(KESx)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... i

I.   INTRODUCTION ....................................................................................... 1

II.  BACKGROUND ......................................................................................... 2

     A.   Rubin's Insurance Premiums Increase ........................................... 2

     B.   Millions of Other Class Members Face Disproportionally High
          Insurance Premiums ....................................................................... 5

     C.   Defendants' Actions Also Decreased the Value of Rubin's Kia
          Soul ............................................................................................ 15

     D.   The Settlement Does Not Account for Class Members Like Rubin ....... 16

III. LAW AND ARGUMENT ......................................................................... 17

     A.   Standard of Review ....................................................................... 17

     B.   The Relief Provided to Class Members Like Rubin Is Inadequate ........ 18

     C.   The Settlement Does Not Treat Class Members Equitably Relative
          to Each Other ................................................................................ 26

          1.   The Release Does Not Treat Class Members Equitably .............. 27

          2.   The Distribution of Settlement Funds Does Not Treat Class
               Members Equitably ...................................................... 28

IV.  CONCLUSION ......................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*Aldapa v. Fowler Packing Co.*, No. 1:15-cv-00420-ADA-SAB, 2023
  U.S. Dist. LEXIS 98344 (E.D. Cal. June 5, 2023) ............................................21, 25

*Ali v. Franklin Wireless Corp.*, No. 21-cv-00687-AJB-MSB, 2024 U.S.
  Dist. LEXIS 12903 (S.D. Cal. Jan. 24, 2024).....................................................27, 28

*Alvarez v. 9021Pho Fashion Square LLC*, No. CV 15-03657 SJO
  (VBKx), 2016 U.S. Dist. LEXIS 204730 (C.D. Cal. Jan. 19, 2016)......................26

*Amchem Prods. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231 (1997)............................24

*Brown v. CVS Pharm., Inc.*, No. CV15-7631 PSG (PJWx), 2017 U.S.
  Dist. LEXIS 182309 (C.D. Cal. Apr. 24, 2017) ....................................................26

*Campbell v. Facebook, Inc.*, 951 F.3d 1106 (9th Cir. 2020).......................................17

*Cashon v. Encompass Health Rehab. Hosp. of Modesto, LLC*, No. 1:19-
  cv-00671-JLT-SKO, 2022 U.S. Dist. LEXIS 4858 (E.D. Cal. Jan. 9,
  2022) ......................................................................................................................18

*Cavka v. Soulcycle Inc.*, No. 8:16-cv-01821-JLS-KES, 2018 U.S. Dist.
  LEXIS 237407 (C.D. Cal. Jan. 25, 2018)...............................................................23

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ...........................19

*City of Long Beach v. Monsanto Co.*, No. CV-16-3493 FMO (ASx),
  2020 U.S. Dist. LEXIS 236442 (C.D. Cal. Nov. 25, 2020) ...................................27

*Cuellar v. First Transit Inc.*, No. 8:20-cv-01075-JWH-JDE, 2024 U.S.
  Dist. LEXIS 3747 (C.D. Cal. Jan. 8, 2024) ...........................................................21

*Cullan & Cullan LLC v. M-Qube, Inc.*, No. 8:13CV172, 2014 U.S. Dist.
  LEXIS 11524 (D. Neb. Jan. 30, 2014) ...................................................................21

*Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454
  (9th Cir. 2000)........................................................................................................19

*Grady v. RCM Techs., Inc.*, No. 5:22-cv-00842 JLS-SHK, 2023 U.S.
Dist. LEXIS 84145 (C.D. Cal. May 2, 2023) ....................................26, 28

*In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., PNC Bank
NA*, 795 F.3d 380 (3d Cir. 2015) ...................................................................24

*In re Kia Hyundai Vehicle Theft Litig.*, No. 8:22-ml-03052-JVS(KESx),
2023 U.S. Dist. LEXIS 211731 (C.D. Cal. Nov. 3, 2023) ....................................17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ...................................................................24

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (C.D. Cal. 2007) ............18, 26

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379 (D.
Ariz. 1989) ...................................................................21

*Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.)*,
654 F.3d 935 (9th Cir. 2011) ...................................................................19

*Lusk v. Five Guys Enters. LLC*, No. 1:17-cv-00762-AWI-EPG, 2021
U.S. Dist. LEXIS 102881 (E.D. Cal. May 31, 2021) ............................................26

*Martinez v. Knight Transp., Inc.*, No. 1:16-cv-01730-SKO, 2022 U.S.
Dist. LEXIS 194584 (E.D. Cal. Oct. 25, 2022)....................................................21

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004)...................................27

*Murray v. Grocery Delivery E-Services USA Inc.*, 55 F.4th 340 (1st Cir.
2022) ...................................................................24

*Myles v. AlliedBarton Sec. Servs., LLC*, No. 12-cv-05761-JD, 2014 U.S.
Dist. LEXIS 159790 (N.D. Cal. Nov. 12, 2014) ........................................19, 21, 24

*Philliben v. Uber Technologies, Inc.*, No. 14-cv-05615-JST, 2016 U.S.
Dist. LEXIS 117629 (N.D. Cal. Aug. 30, 2016) ............................................20, 28

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
Anderson*, 390 U.S. 414 (1968) ...................................................................18

*Theodore Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF,
2020 U.S. Dist. LEXIS 74801 (N.D. Cal. Feb. 5, 2020) ........................................26

*Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482 (E.D. Cal. 2010) .................21

**Other Authorities**

"Kia and Hyundai owners continue to report car theft after free security
   upgrades," available at
   https://www.mprnews.org/story/2024/03/11/kia-and-hyundai-owners-
   continue-to-report-car-theft-after-free-security-upgrades (last visited
   Mar. 31, 2024).........................................................................................2

"KIA owner finds car stolen weeks after obtaining company anti-theft
   software upgrade," available at
   https://www.kiro7.com/news/local/kia-owner-finds-car-stolen-weeks-
   after-obtaining-company-anti-theft-software-
   upgrade/23GTTUMOVZFK3MJBBOSWGL72TQ/ (last visited
   Mar. 31, 2024).........................................................................................2

4 William B. Rubenstein, Newberg and Rubenstein on Class Actions
   § 13:56 (6th ed., June 2022 update).......................................................24

Dana Rieck, *Major insurance companies halt new policies for Kias,
   Hyundais amid St. Louis-area theft surge*, STL Today (Jan. 24. 2023),
   https://www.stltoday.com/news/local/metro/major-insurance-
   companies-halt-new-policies-for-kias-hyundais-amid-st-louis-area-
   theft-surge/article_98089542-db90-5cb0-ba0c-a86882f94adb.html........................5

https://www.cnn.com/2024/01/04/business/hyundai-kia-thefts-increased-
   10-fold/index.html ...................................................................................20

https://www.hbsslaw.com/press/hyundai-kia-car-theft-defect/hyundai-
   kia-theft-class-action-lawsuit-reaches-settlement-valued-at-more-than-
   200-million...............................................................................................19

Jack Fitzgerald, *Kia and Hyundai under Fire from Cities, Insurers over
   Too Easily Stolen Vehicles*, Car and Driver (Jan. 27, 2023),

https://www.caranddriver.com/news/a42674110/kia-hyundai-lawsuit-
insurers-stolen-vehicles/ ........................................................................4

Jonathon Ramsey, *Insurance companies refusing to carry some Hyundai
and Kia models over thefts*, Yahoo!News (Jan. 30, 2023),
*https://ca.news.yahoo.com/insurance-companies-refusing-carry-
hyundai-194700013.html?soc_src=social-sh&soc_trk=ma* ....................................3

Justin Banner, *How Hyundai Is Fixing the Kia Boys Theft Vulnerability
for Free*, MT (Oct. 27, 2023),
https://www.motortrend.com/news/hyundai-fixing-kia-boys-theft-
security-vulnerability-free/ ....................................................................16

LockPickingLawyer, *Seriously? THIS is Kia/Hyundai's Solution
(Garbage Steering Wheel Lock)*, YouTube (Sep. 21, 2023),
https://www.youtube.com/watch?v=JodD_KARacg..............................................17

Pete Grieve, *Car Insurance Woes Continue for Kia and Hyundai Owners
Despite $200 Million Settlement*, The Charlotte Observer (May 22,
2023), https://www.charlotteobserver.com/money/kia-hyundai-
settlement-car-insurance-coverage/ ..........................................................2, 16

Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance
Rates Could Go Up*, NerdWallet,
https://www.nerdwallet.com/article/insurance/kia-hyundai-theft (last
updated Oct. 3, 2022)........................................................................15

**Rules**

Fed. R. Civ. P. 23(e)(2)....................................................................17, 18

Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018
amendment .................................................................................27

# I.    INTRODUCTION

This Court should not approve the Settlement because it contains a glaring flaw. While the Settlement provides monetary compensation for Class Members[2] whose cars suffered a Qualifying Theft or Qualifying Theft Attempt, it fails to account for hundreds of millions of dollars of damages suffered by millions of other Class Members for increased insurance premiums and diminished value of their Class Vehicles.  Instead, Class Members who did not suffer a Qualifying Theft or Qualifying Theft Attempt ("Non-Theft Class Members") receive no compensation but are forced to release all their claims against Defendants for increased insurance premiums they have paid and will continue to pay because of Defendants' actions.  Further, Class Members are forced to release hundreds of millions of dollars in damages related to decreased value of their Class Vehicles without any compensation.  While Plaintiffs recognized, and specifically pleaded in their Consolidated Amended Consumer Class Action Complaint (the "Consumer Complaint") [Docket No. 84], that Class Members have suffered damages related to increased insurance premiums and for the decreased value of their Class Vehicles (and will continue to suffer those damages), Plaintiffs have failed to negotiate any monetary compensation for these damages.  Plaintiffs do not explain to this Court why the Settlement does not provide any consideration for those damages to the Non-Theft Class Members while requiring those Non-Theft Class Members to release their claims.

Plaintiffs' failure to do so is troubling.  Based upon Rubin's investigation, there are likely hundreds of millions of dollars in damages that the Settlement fails to address.  Indeed, it is probable that the damages that Non-Theft Class Members have suffered for their increased insurance premiums exceeds, by itself, the total maximum settlement value of $145,000,000.  The only "consideration" made available to Non-

---

[2] Unless otherwise stated, all capitalized terms shall have the same meaning as in the Settlement if defined therein.

1  Theft Class Members, like Rubin—a Software Upgrade (that not all Non-Theft Class

2  Members are eligible for) or partial reimbursement for other anti-theft devices—does

3  nothing to alleviate their artificially high insurance premiums.[3]  Indeed, this "relief"

4  will neither reduce future increased insurance costs nor compensate for the substantial

5  insurance premiums they have already incurred as a result of Defendants' actions.

6      In short, this Court should not approve the Settlement because it is inadequate

7  and does not treat all Class Members equitably.  This Court should thus sustain this

8  Objection and deny final approval.

9  **II.    BACKGROUND**

10     **A.    Rubin's Insurance Premiums Increase**

11     Rubin is an Ohio resident residing in the Columbus area.  (Rubin Decl. at ¶ 2,

12  attached as Exhibit 1.) In December of 2020, Rubin purchased a 2021 Kia Soul (VIN:

13  KNDJ22AU8M7742770).  (*Id.*)  Rubin was unaware at that time how easy her new car

14  was to steal.  (*Id.*)  Luckily, Rubin has not had her Kia Soul stolen and no attempts have

15  been made to steal her vehicle.  (*Id.*)  Since purchasing her Kia Soul, however, Rubin—

16  like millions of other Kia/Hyundai owners—noticed that her insurance premiums have

17  consistently increased at an alarming rate.  (*Id.*)  Given the rise in thefts of Kia vehicles,

18  Rubin, like millions of other Class Members, was charged unreasonably high insurance

19  premiums to insure her Kia Soul.  *See also, e.g.*, Pete Grieve, *Car Insurance Woes*

20  *Continue for Kia and Hyundai Owners Despite $200 Million Settlement*, The Charlotte

21  Observer  (May  22,  2023),  https://www.charlotteobserver.com/money/kia-hyundai-

22  settlement-car-insurance-coverage/ ("Some Kia and Hyundai drivers are still being

23

---

24  [3] It does not even protect against the risk of theft.  *See, e.g.*, "Kia and Hyundai owners
25  continue  to  report  car  theft  after  free  security  upgrades,"  available  at
    https://www.mprnews.org/story/2024/03/11/kia-and-hyundai-owners-continue-to-
    report-car-theft-after-free-security-upgrades (last visited Mar. 31, 2024);
26  "KIA owner finds car stolen weeks after obtaining company anti-theft software
27  upgrade,"  available  at  https://www.kiro7.com/news/local/kia-owner-finds-car-stolen-
    weeks-after-obtaining-company-anti-theft-software-
28  upgrade/23GTTUMOVZFK3MJBBOSWGL72TQ/ (last visited Mar. 31, 2024).

denied car insurance or charged higher premiums because of the staggeringly high incidences of theft of many of the automakers' vehicles produced between 2011 and 2021 . . . ."); Jonathon Ramsey, *Insurance companies refusing to carry some Hyundai and Kia models over thefts*, Yahoo!News (Jan. 30, 2023), https://ca.news.yahoo.com/insurance-companies-refusing-carry-hyundai-194700013.html?soc_src=social-sh&soc_trk=ma ("Progressive told the news channel, 'Given that we price our policies based on the level of risk they represent, this explosive increase in thefts in many cases makes these vehicles extremely challenging for us to insure. In response, in some geographic areas we have increased our rates and limited our sale of new insurance policies on some of these models.'").

As shown in the chart below, in a span of just two years, Rubin's six-month insurance premiums for the Kia increased nearly $200 from $516.16 to $716.13:

| Date | Total | Property Damage | Damage to Auto | Comprehensive |
|---|---|---|---|---|
| Feb-22 | $516.16 | $93.50 | $57.37 | $190.88 |
| Aug-22 | $536.30 | $96.75 | $64.12 | $201.89 |
| Feb-23 | $607.77 | $115.85 | $69.21 | $251.47 |
| Aug-23 | $580.42[4] | $114.08 | $72.43 | $239.12 |
| Feb-24 | $716.13 | $135.36 | $120.18 | $303.06 |

(Rubin Decl. at ¶ 3.)

Rubin's insurance premiums have not only increased, but they are disproportionately high when compared to the value of her family's other vehicles. (*Id.* at ¶ 4.) In addition to her Kia Soul, Rubin's family owns a 2019 Volkswagen Golf R (a high performance car), a 2022 Ford Bronco, and a 2023 Subaru Crosstrek. (*Id.*) The current six-month insurance premium for each vehicle is as follows:

| Vehicle | Last Insurance Premium |
|---|---|
| Kia Soul | $716.13 |
| Golf R | $1,139.75 |
| Ford Bronco | $747.63 |

---

[4] Rubin's premium for August 2023 decreased because her son went to college without taking a vehicle, and thus her policy was eligible for a discount. He subsequently took a vehicle to college, thereby ending the discount.

DocuSign Envelope ID: AB3D88E8-0072-4B08-8747-DAA774643393

| Subaru Crosstrek | $609.67 |
|---|---|

(*Id.*)

While Rubin's Kia Soul does not have the most expensive insurance premium in dollars, it is far and away the most expensive car for her to insure when you compare the premium to the value of the cars. (*Id.* at ¶ 5.) When assessing the Kelley Blue Book Trade-in Value for her vehicles (assuming each car was driven 10,000 miles/year and in Very Good Trade-in Value), her Kia Soul has the highest proportionate insurance premium out of all her vehicles:

| Vehicle | Kelley Blue Book Trade-in Value | Percentage of Current Value |
|---|---|---|
| Kia Soul | **$13,279** | **5.39%** |
| Golf R | $28,727 | 3.97% |
| Ford Bronco | $46,036 | 1.62% |
| Subaru Crosstrek | $23,090 | 2.64% |

(*Id.*)

Based on this information, Rubin was surprised to learn that she was paying nearly twice as much in insurance premiums on her Kia Soul than what she should be paying. (Rubin Decl. at ¶ 6.) The average percentage of the insurance premiums relative to current value of her family's Golf R, Ford Bronco, and Subaru Crosstrek was 2.74%. (*Id.*) When taking that percentage and applying it to her Kia Soul, Rubin should be paying approximately $364.37 in insurance premiums, which is $351.76 less than what she is currently paying. (*Id.*)

Rubin's insurance agent approached other insurance companies to attempt to find a less expensive premium, but no other insurance company her agent works with would insure the Kia Soul. (*Id.* at ¶ 7.) Rubin's insurance agent stated that none of the "consideration" available to Non-Theft Class Members would lower her premiums if she took advantage of them. (*Id.*) Other Class Members have suffered the same problem. (Consumer Compl., ¶¶ 1441–42.) Some insurance companies, like State Farm and Progressive, have even ceased offering insurance for certain Class Vehicles. (*Id.* at ¶ 1438.) *See also* Jack Fitzgerald, *Kia and Hyundai under Fire from Cities,*

*Insurers over Too Easily Stolen Vehicles*, Car and Driver (Jan. 27, 2023), https://www.caranddriver.com/news/a42674110/kia-hyundai-lawsuit-insurers-stolen-vehicles/ ("Thefts have become so commonplace that there are reports some major insurance providers are refusing to open new policies on affected Kias and Hyundais, while some drivers with existing coverage are paying higher and higher premiums."); Dana Rieck, *Major insurance companies halt new policies for Kia, Hyundais amid St. Louis-area theft surge*, STL Today (Jan. 24. 2023), https://www.stltoday.com/news/local/metro/major-insurance-companies-halt-new-policies-for-kias-hyundais-amid-st-louis-area-theft-surge/article_98089542-db90-5cb0-ba0c-a86882f94adb.html ("In a seemingly unprecedented move, insurance behemoths such as Progressive and State Farm are declining to open new policies on Kias and Hyundais altogether, while drivers with existing plans are stuck paying increasingly high premiums.").

## B.    Millions of Other Class Members Face Disproportionally High Insurance Premiums

Rubin is not alone.  Millions of Class Members throughout the nation are suffering from similar increased premiums on their Class Vehicles.  As pleaded in the Consumer Complaint "[t]he increase in theft coverage payouts began to affect insurance companies, which in turn causes Class Members' premiums to increase." (Consumer Compl., ¶ 1433.)  For example, Plaintiff Herbert Taylor received a quote to renew his policy at an increase of $54 per month (i.e., a $324 increase over six months). (*Id.* at ¶ 1435.)  Other Class Members have been quoted at annual rate increases of $300, and monthly rate increases ranging from $25 to $60 per month.  (*Id.* at ¶ 1434.)[5]

---

[5] In their Joint Supplemental Declaration of the Consumer Class Action Leadership Counsel in Support of Motion for Preliminary Approval of Class Action Settlement, Class Counsel concede that insurance premiums increased as a result of the increase in thefts, but significantly understate that increase.  [ECF 180 at p. 6], ("[W]e estimated that insurance premiums on the Class Vehicles increased an average of $50 per year due to the increase in thefts and attempted thefts.").

The allegations in the Consumer Complaint are consistent with Rubin's own investigation.  Rubin's counsel engaged an expert, Andrew Barile, to determine whether other Class Members faced increased premiums like Rubin.  (Mundy Decl. at ¶ 2, attached as Exhibit 2), and (Barile Report, attached as Exhibit 3.)  Mr. Barile analyzed and relied on a preliminary report by Seth Fliegler, a Managing Director at Kroll (https://www.kroll.com/en/our-team/seth-fliegler), which investigated whether other Class Members faced higher insurance premiums when compared to non-Class Vehicles.   (Barile Report at ¶¶ 2, 5.) Mr. Fliegler's analysis evaluated insurance premiums as a percentage of the MSRP value and the Trade-in Value (based on Kelley Blue Book value) in the Washington, D.C. market and the St. Louis, MO market.  That analysis determined that Class Members in these markets are consistently paying higher premiums then non-Class Members:

| Vehicle | Premium as Percent of MSRP (DC) | Premium as Percent of MSRP (St Louis) | Premium as Percent of Trade-in Value (DC) | Premium as Percent of Trade-in Value (St Louis) |
|---|---|---|---|---|
| **2017 Kia Forte** | **3.00%** | **3.63%** | **6.60%** | **7.64%** |
| 2017 Honda Civic | 2.39% | 2.85% | 5.85% | 6.63% |
| 2017 Toyota Corolla | 2.36% | 2.80% | 4.08% | 4.63% |
| **2018 Hyundai Tucson** | **2.02%** | **2.48%** | **3.63%** | **4.30%** |
| 2018 Honda CR-V | 1.81% | 2.21% | 2.58% | 3.03% |
| 2018 Nissan Rouge | 1.75% | 2.12% | 3.52% | 4.12% |
| **2019 Hyundai Sonata** | **2.12%** | **2.57%** | **3.77%** | **4.31%** |
| 2019 Honda Accord | 1.80% | 2.15% | 2.56% | 2.86% |
| 2019 Toyota Camry | 1.77% | 2.12% | 3.21% | 3.62% |
| **2021 Kia Sportage** | **3.70%** | **3.81%** | **5.59%** | **5.53%** |
| 2021 Nissan Rouge | 3.55% | 3.57% | 4.95% | 4.79% |
| 2021 Toyota RAV4 | 3.31% | 3.31% | 4.09% | 3.94% |
| **2022 Kia Soul** | **4.42%** | **4.82%** | **5.46%** | **5.69%** |
| 2022 Mazda CX-30 | 3.61% | 3.89% | 4.04% | 4.24% |
| 2022 Chevrolet Trailblazer | 4.09% | 4.46% | 4.56% | 4.68% |

(*Id.* at ¶¶ 27-29.)  These numbers showed that Class Members are paying, on average, approximately 16% to 26% higher premiums than non-Kia/Hyundai owners:

| Vehicle | Increased Premiums Compared to Similar Vehicles (DC) | Increased Premiums Compared to Similar Vehicles (St Louis) |
|---|---|---|
| 2017 Kia Forte | 24.77% | 26.31% |
| 2018 Hyundai Tucson | 15.98% | 16.86% |

RUTH RUBIN'S OBJECTION TO THE AMENDED SETTLEMENT AGREEMENT
CASE NO. 8:22-ML-3052-JVS(KESx)

| Vehicle | Increased Premiums Compared to Similar Vehicles (DC) | Increased Premiums Compared to Similar Vehicles (St Louis) |
|---|---|---|
| 2019 Hyundai Sonata | 23.47% | 24.83% |
| 2021 Kia Sportage | 19.14% | 21.07% |
| 2022 Kia Soul | 21.25% | 21.62% |

(*Id.*)

Mr. Barile also analyzed public filings of insurance companies, such as Allstate—one of the big five auto insurers in the United States. In those filings, Allstate has already sought or is currently seeking to increase the comprehensive coverage for certain Class Vehicles in various states due to increased risk of thefts and related claims. (*Id.* at ¶ 26.) By way of example only, and not by way of limitation, Mr. Barile analyzed the following states: Colorado, Illinois, New Jersey, New Mexico, Ohio, Pennsylvania, Texas, and Wisconsin. (*Id.*)

**Colorado**

On or about May 19, 2023, Allstate Fire and Casualty Insurance Company (which collectively with its other related companies mentioned herein is referred to as "Allstate") submitted a Rate/Rule Filing with an effective date of July 29, 2023, for the State of Colorado adjusting the premiums on 2011–2022+ Kia and Hyundai vehicles due to the increased theft rates. Specifically, in its public Rate Filing Memorandum, Allstate explained the increase in premiums:

> Allstate is introducing an interaction between Make and Model Year. This interaction will be used to adjust Comprehensive coverage rates for Kia and Hyundai vehicles with increased theft risk due to both real and perceived absences of certain anti-theft technologies.
>
> These flat multiplicative factors were selected from a loss ratio relativity analysis using a credibility-weighting of Allstate countrywide and Colorado-specific paid loss data for the fiscal accident year ending and evaluated as of 12/31/2022. Please see the table below for indicated and selected Kia and Hyundai vehicle flat multiplicative factors by Model Year.

| Kia and Hyundai Vehicle Factor Table | | |
|---|---|---|
| Model Year | Indicated Factor | Selected Factor |
| 2011-2019 | 3.52 | 1.83 |
| 2020 | 1.87 | 1.29 |
| 2021 | 1.35 | 1.12 |
| 2022+ | 1.29 | 1.10 |

1  (*Id.*)

2  Thus, based on the above, Allstate increased the premiums for the

3  comprehensive portion of auto insurance coverage, which covers theft-related claims,

4  by a flat multiplicative factor of 1.83 (an 83% increase) for 2011–2019 Class Vehicles,

5  1.29 (a 29% increase) for 2020 Class Vehicles, 1.12 for (a 12% increase) for 2021 Class

6  Vehicles, and 1.10 (a 10% increase) for 2022+ Kia and Hyundai vehicles in Colorado.

7  (*Id.*)

8  **<u>Illinois</u>**

9  On or about May 12, 2023, Allstate North American Insurance Company

10  submitted a Rate/Rule Filing with an effective date of July 14, 2023, for the State of

11  Illinois, adjusting the premiums on 2011–2022+ Kia and Hyundai vehicles due to the

12  increased theft rates.  Specifically, in its Illinois Rate Filing Memorandum, Allstate

13  explained the increase in premiums:

14  With this filing, Allstate is introducing Variable Interaction Pattern 1 between
   Make, Model and Model Year. This interaction will be used to adjust

15  Comprehensive coverage rates for Kia and Hyundai vehicles where we have seen
   increased theft losses.

16  These flat multiplicative factors were selected from a loss ratio relativity analysis

17  using credibility weighted Illinois paid loss data for the fiscal accident year
   ending and evaluated as of 12/31/2022.  The countrywide indicated flat

18  multiplicative factors were used as the complement of credibility.  Please see the
   table below for indicated and selected flat multiplicative factors by Model Year

19  for all Kia models and specific Hyundai models.

20

| Kia and Hyundai Vehicle Factor Table | | | | | |
|---|---|---|---|---|---|
| Model Year | Countrywide Indicated Factor | Illinois Indicated Factor | Illinois Credibility (8K Claims Standard) | Credibility Weighted Indicated Factor | Selected Factor |
| 2011-2019 | 1.63 | 2.29 | 49% | 1.95 | 1.70 |
| 2020 | 1.46 | 2.51 | 22% | 1.69 | 1.50 |
| 2021 | 1.29 | 2.00 | 20% | 1.44 | 1.35 |
| 2022+ | 1.15 | 1.65 | 19% | 1.25 | 1.15 |

25  (*Id.*)

26  Thus, based on the above, Allstate increased the premiums for the

27  comprehensive portion of auto insurance coverage, which covers theft-related claims,

28  by a flat multiplicative factor of 1.70 (a 70% increase) for 2011–2019 Class Vehicles,

8

1.50 (a 50% increase) for 2020 Class Vehicles, 1.35 for (a 35% increase) for 2021 Class Vehicles, and 1.15 (a 15% increase) for 2022+ Kia and Hyundai vehicles in Illinois. (*Id.*)

**New Jersey**

On or about February 12, 2023, Allstate New Jersey Property and Casualty Insurance Company submitted a Rate/Rule Filing, with an effective date of October 16, 2023, for new policies and an effective date of November 23, 2023, for renewal policies for the State of New Jersey adjusting the premiums for 2011–2022+ Kia and Hyundai vehicles. Specifically, in its New Jersey Rate Filing Memorandum, Allstate explained the increase in premiums:

> Allstate is introducing an interaction between Make and Model Year. This interaction will be used to adjust Comprehensive coverage rates for Kia and Hyundai vehicles with increased theft risk due to both real and perceived absences of certain anti-theft technologies.

> The flat multiplicative factors below were selected from a loss ratio relativity analysis using credibility weighted Allstate New Jersey paid loss data for the fiscal accident year ending and evaluated as of 12/31/2022. The Allstate countrywide loss ratio relativities were used as a complement of credibility for calculating indicated flat multiplicative factors. Please see the table below for indicated and selected Kia and Hyundai vehicle flat multiplicative factors by Model Year. Note that the selected flat multiplicative factor for Model Year 2022 applies to subsequent Model Years as well. Also, due to capping, the proposed flat multiplicative factors are only being applied to non-Milewise policies at this time. Allstate plans to move towards the proposed flat multiplicative factors for Milewise policies as well with future rate filings.

> Note that proposed Kia and Hyundai vehicle flat multiplicative factors apply to all Kia and Hyundai models for the impacted Model Years. As shown below, these models face an elevated theft risk compared to other models. While the vehicle manufacturers are offering customers options to respond to the heightened theft risk, we have not yet seen these steps reduce theft rates, and these vehicles are still proving vulnerable to this heightened theft even though safety features can vary across models. Allstate will continue to monitor the manufacturer fix and corresponding theft risk and will re-evaluate the pricing as appropriate.

| Kia and Hyundai Vehicle Factor Table | | | | |
|---|---|---|---|---|
| Model Year | Countrywide Loss Ratio Relativity | New Jersey Loss Ratio Relativity | Credibility Weighted Loss Ratio Relativity | Proposed Factor |
| 2011-2015 | 1.68 | 1.12 | 1.55 | 1.30 |
| 2016-2019 | 1.58 | 0.99 | 1.43 | 1.20 |
| 2020-2021 | 1.38 | 0.90 | 1.26 | 1.10 |
| 2022 | 1.19 | 0.53 | 1.08 | 1.05 |

9

(*Id.*)

Thus, based on the above, Allstate increased the premiums for the comprehensive portion of auto insurance coverage, which covers theft-related claims, by a flat multiplicative factor of 1.30 (a 30% increase) for 2011–2015 Class Vehicles, 1.20 (a 20% increase) for 2016–2019 for Class Vehicles, 1.10 (a 10% increase) for 2020–2021 Class Vehicles, and 1.05 (a 5% increase) for 2022+ Kia and Hyundai vehicles in New Jersey.  (*Id.*)

**New Mexico**

On or about January 12, 2023, Allstate Fire and Casualty Insurance Company submitted a Rate/Rule Filing with an effective date of March 4, 2024, for new policies and an effective date of April 8, 2024, for renewal policies for the State of New Mexico, adjusting the premiums for 2011–2022+ Kia and Hyundai vehicles due to the increased theft rates.  Specifically, in its New Mexico Rate Filing Memorandum, Allstate explained the increase in premiums:

> With this filing, Allstate is updating an interaction between Make and Model Year.  This interaction is used to adjust Comprehensive coverage rates for Kia and Hyundai vehicles with increased theft risk due to both real and perceived absences of certain anti-theft technologies.
>
> These factors were selected from a loss ratio relativity analysis using credibility weighted New Mexico paid loss data from 1/1/2022-6/30/2023 evaluated as of 6/30/2023.  The countrywide indicated factors were used as the complement of credibility.  Please see the table below for indicated and selected Kia and Hyundai vehicle factors by Model Year.

| Kia and Hyundai Vehicle Factors | | |
| --- | --- | --- |
| Model Year | Indicated Factor | Selected Factor |
| Prior Years | 0.97 | 1.00 |
| 2011-2019 | 2.15 | 1.85 |
| 2020 | 1.71 | 1.55 |
| 2021 | 1.49 | 1.40 |
| 2022-2023 | 1.26 | 1.20 |
| 2024+ | - | 1.20 |

(*Id.*)

Thus, based on the above, Allstate increased the premiums for the comprehensive portion of auto insurance coverage, which covers theft-related claims, by a flat multiplicative factor of 1.85 (an 85% increase) for 2011–2019 Class Vehicles,

RUTH RUBIN'S OBJECTION TO THE AMENDED SETTLEMENT AGREEMENT
CASE NO. 8:22-ML-3052-JVS-(KESx)

1.55 (a 55% increase) for 2020 for Class Vehicles, 1.40 (a 40% increase) for 2021 Class Vehicles, and 1.20 (a 20% increase) for 2022+ Kia and Hyundai vehicles in New Mexico. (*Id.*)

**Ohio**

On or about November 9, 2023, Allstate Fire and Casualty Insurance Company submitted a Rate/Rule Filing with an effective date of November 20, 2023, for new policies, and an effective date of December 21, 2023, for renewal policies for the State of Ohio adjusting the premiums for 2011–2022+ Kia and Hyundai vehicles due to the increased theft rates. Specifically, in its Ohio Rate Filing Memorandum, Allstate explained the increase in premiums:

> After monitoring the experience of the affected vehicles, Allstate is revising the interaction between Make and Model Year with this filing. This interaction will be used to adjust Comprehensive coverage rates for Kia and Hyundai vehicles with increased theft risk due to both real and perceived absences of certain anti-theft technologies.
>
> These factors were selected from a loss ratio relativity analysis using credibility weighted Ohio paid loss data from 1/1/2022-6/30/2023 evaluated as of 6/30/2023. Please see the table below for indicated and selected Kia and Hyundai vehicle factors by Model Year for the Comprehensive coverage.

| Model Year | Countrywide Indicated Factor | Ohio Indicated Factor | Credibility (10,623 Claims Standard) | Credibility Weighted Indicated Factor | Selected Factor |
|---|---|---|---|---|---|
| 2011-2019 | 1.92 | 2.36 | 57% | 2.17 | 1.90 |
| 2020 | 1.67 | 2.34 | 24% | 1.83 | 1.65 |
| 2021 | 1.44 | 2.50 | 24% | 1.70 | 1.45 |
| 2022+ | 1.24 | 1.71 | 26% | 1.36 | 1.25 |

(*Id.*)

Thus, based on the above, Allstate increased the premiums for the comprehensive portion of auto insurance coverage, which covers theft-related claims, by a flat multiplicative factor of 1.9 (a 90% increase) for 2011–2019 Class Vehicles, 1.65 (a 65% increase) for 2020 Class Vehicles, 1.45 (a 45% increase) for 2021 Class Vehicles, and 1.25 (a 25% increase) for 2022+ Kia and Hyundai vehicles in Ohio. (*Id.*)

///

///

**Pennsylvania**

On or about August 10, 2023, Allstate North American Insurance Company submitted a Rate/Rule Filing with an effective date of November 20, 2023, for new policies, and an effective date of February 12, 2024, for renewal policies for the State of Pennsylvania adjusting the premiums for 2011–2022+ Kia and Hyundai vehicles due to the increased theft rates. Specifically, in its Pennsylvania Rate Filing Memorandum, Allstate explained the increase in premiums:

> Model results are being implemented as indicated, with the following exceptions:
>
> Variable Interaction Factors for Kia and Hyundai vehicles have been adjusted where we have seen increased theft losses.
>
> These adjustments apply to Comprehensive coverage in the Make, Model, and Model Year interaction table. The factor adjustments were selected based on a loss ratio relativity analysis using Allstate countrywide paid loss data for the fiscal accident year ending and evaluated as of 12/31/2022.

| Model Year | Indicated Factor Adjustment | Selected Factor Adjustment |
|---|---|---|
| Prior Years | 0.93 | 1.00 |
| 2011-2019 | 1.63 | 1.45 |
| 2020 | 1.46 | 1.35 |
| 2021 | 1.29 | 1.20 |
| 2022+ | 1.15 | 1.10 |

(*Id.*)

Thus, based on the above, Allstate increased the premiums for the comprehensive portion of auto insurance coverage, which covers theft-related claims, by a flat multiplicative factor of 1.45 (a 45% increase) for 2011–2019 Class Vehicles, 1.35 (a 35% increase) for 2020 Class Vehicles, 1.20 (a 20% increase) for 2021 Class Vehicles, and 1.10 (a 10% increase) for 2022+ Kia and Hyundai vehicles in Pennsylvania. (*Id.*)

///

///

RUTH RUBIN'S OBJECTION TO THE AMENDED SETTLEMENT AGREEMENT
CASE NO. 8:22-ML-3052-JVS(KESx)

**Texas**

On or about August 23, 2023, Allstate Fire and Casualty Insurance Company submitted a Rate/Rule Filing with a proposed effective date of October 19, 2023, for the State of Texas adjusting the premiums for 2011–2022+ Kia and Hyundai vehicles due to the increased theft rates.  On information and belief, the status of this rate filing is still pending state action.  (*Id.*)

Specifically, in its Texas Rate Filing Memorandum, Allstate explained the increase in premiums:

> Allstate is introducing an interaction between Make and Model Year.  This interaction will be used to adjust Comprehensive coverage rates for Kia and Hyundai vehicles with increased theft risk due to both real and perceived absences of certain anti-theft technologies.

> These factors were selected from a loss ratio relativity analysis using Allstate countrywide paid loss data for the fiscal accident year ending and evaluated as of 12/31/2022.  Please see the table below for indicated and selected Kia and Hyundai vehicle factors by Model Year.

| Kia and Hyundai Vehicle Factor Table | | |
|---|---|---|
| Model Year | Indicated Factor | Selected Factor |
| Prior Years | 0.94 | 1.00 |
| 2011-2019 | 1.62 | 1.45 |
| 2020 | 1.46 | 1.35 |
| 2021 | 1.29 | 1.20 |
| 2022+ | 1.20 | 1.10 |

(*Id.*)

Thus, based on the above, Allstate is seeking, pending state approval, to increase the premiums for the comprehensive portion of auto insurance coverage, which covers theft-related claims, by a flat multiplicative factor of 1.45 (a 45% increase) for 2011–2019 Class Vehicles, 1.35 (a 35% increase) for 2020 Class Vehicles, 1.29 (a 29% increase) for 2021 Class Vehicles, and 1.10 (a 10% increase) for 2022+ Kia and Hyundai vehicles in Texas.  (*Id.*)

**Wisconsin**

On or about May 10, 2023, Allstate Property Casualty Insurance Company submitted a Rate/Rule Filing with an effective date of May 15, 2023, for new policies, and an effective date of July 19, 2023, for renewal policies for the State of Wisconsin

adjusting the premiums for 2011–2022+ Kia and Hyundai vehicles due to the increased theft rates. Specifically, in its Wisconsin Rate Filing Memorandum, Allstate explained the increase in premiums:

> With this filing, Allstate is introducing an interaction between Make and Model Year and will be revising the Rate Adjustment factors.
>
> **Make and Model Year Interaction Rating**
>
> With this filing, Allstate is introducing an interaction between Make and Model Year. This interaction will be used to adjust Comprehensive coverage rates for Kia and Hyundai vehicles with increased theft risk due to a lack of certain anti-theft technologies.
>
> These factors were selected from a loss ratio relativity analysis using credibility weighted Wisconsin paid loss data for the fiscal accident year ending and evaluated as of 12/31/2022. The countrywide indicated factors were used as the complement of credibility. Please see the table below for indicated and selected Kia and Hyundai vehicle factors by Model Year.

| Kia and Hyundai Vehicle Factor Table | | | | |
|---|---|---|---|---|
| Model Year | Countrywide Indicated Factor | Wisconsin Indicated Factor | Wisconsin Credibility (8K Claims Standard) | Credibility Weighted Indicated Factor | Selected Factor |
| 2011-2019 | 1.62 | 2.31 | 21% | 1.76 | 1.65 |
| 2020 | 1.46 | 5.79 | 9% | 1.84 | 1.60 |
| 2021 | 1.29 | 4.95 | 9% | 1.62 | 1.55 |
| 2022+ | 1.16 | 2.05 | 8% | 1.23 | 1.15 |

(*Id.*)

Thus, based on the above, Allstate increased the premiums for the comprehensive portion of auto insurance coverage, which covers theft-related claims, by a flat multiplicative factor of 1.65 (a 65% increase) for 2011–2019 Class Vehicles, 1.60 (a 60% increase) for 2020 Class Vehicles, 1.55 (a 55% increase) for 2021 Class Vehicles, and 1.15 (a 15% increase) for 2022+ Kia and Hyundai vehicles in Wisconsin. (*Id.*)

As Rubin has not had the benefit of discovery, she provides the above publicly-available premium increases by Allstate to this Court to illustrate that insurance premiums specifically attributable to the increased theft risk posed by the Class Vehicles have significantly increased. Moreover, the above Allstate exemplars

1   demonstrate that computing the increased premiums, at least regarding the premium

2   increases implemented by Allstate, can be systematically computed for affected Non-

3   Theft Class Members.

4          Finally, further investigation, or if discovery on these issues were allowed to be

5   taken in this case of the Subrogation Insurance Company Plaintiffs, would likely reveal

6   additional and widespread premium increases implemented by the Insurance

7   Subrogation Plaintiffs—who claim to have collectively suffered over $1 billion of

8   insurance payouts relating to the increased theft risks relating to the Class Vehicles.

9   *See also* Barile Report, ¶ 11 (stating that "a significant increase in policy theft losses

10  will result in an increase in premium rates with respect to comprehensive auto

11  coverage").

12         **C.    Defendants' Actions Also Decreased the Value of Rubin's Kia Soul**

13         Defendants' actions have not only caused Rubin to experience unreasonably

14  high insurance premiums, but Defendants' actions have also caused the value of her

15  Kia Soul to decrease at a faster rate than it would have absent the defect.  (Rubin Decl.

16  ¶ 8); *see also* Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance*

17  *Rates Could Go Up*, NerdWallet, https://www.nerdwallet.com/article/insurance/kia-

18  hyundai-theft (last updated Oct. 3, 2022) ("[I]f you own one of the affected Kia or

19  Hyundai models, you could face additional consequences, including pricier insurance

20  and reduced resale value on a vehicle that's known to be easily stolen.").  As Plaintiffs

21  correctly alleged in the Consumer Complaint, Class Members have suffered damages

22  "in the form of diminished market value . . . as a direct result of Defendants'

23  misrepresentations and omissions regarding the Class Vehicles' characteristics and the

24  existence of the Theft Prone Defect."  (Consumer Compl., ¶ 1445.)  Specifically, "[n]o

25  reasonable consumer . . . would purchase or lease a vehicle, for tens of thousands of

26  dollars, that has an outsized, unmitigated risk of theft."  (*Id. at* ¶ 1446.)  "Indeed, the

27  diminution in value is even greater now that Class Vehicles are becoming uninsurable,

28  and therefore unfit for their ordinary use."  (*Id.*)

**D.     The Settlement Does Not Account for Class Members Like Rubin**

Despite Plaintiffs' acknowledging that Non-Theft Class Members, like Rubin, face increased insurance premiums and a diminished market value as a direct result of the defective vehicles, the Settlement fails to provide those Class Members ***anything*** for these losses.  *See* Pete Grieve, *Car Insurance Woes Continue for Kia and Hyundai Owners Despite $200 Million Settlement*, The Charlotte Observer (May 22, 2023), https://www.charlotteobserver.com/money/kia-hyundai-settlement-car-insurance-coverage/ ("While theft victims could get up to $6,125 as a result of the litigation, ***vehicle owners are not going to be compensated if their insurance was hiked but their cars weren't stolen or damaged***.") (emphasis added).  The Settlement inequitably breaks up Class Members into two groups: (1) those who have had their vehicle stolen or have had their vehicle attempted to be stolen; and (2) those who have not.  For those in the first group, the Settlement compensates them for "[r]eimbursement of any insurance deductibles paid and increased insurance premiums for insurance policies that includes theft coverage . . . ."  (Settlement Agreement, Section (II)(D)(3)(c).)  Those in the second group, however, are not entitled to any compensation for their increase in insurance premiums.  Instead, some of them—depending on their specific car—can receive a Software Upgrade, which does not, and cannot, cure the increased insurance premiums suffered by Class Members like Rubin.  For example, a thief would have no idea that a Class Vehicle contains the Software Upgrade, and thus, it does not serve as a deterrent to potential theft.  Those in the second group whose cars cannot receive the Software Upgrade can receive a "Club," which is a steering wheel lock.  The "Club," already provided to many Class Members, such as Rubin, is worthless at stopping thefts.  *See also* Justin Banner, *How Hyundai Is Fixing the Kia Boys Theft Vulnerability for Free*, MT (Oct. 27, 2023), https://www.motortrend.com/news/hyundai-fixing-kia-boys-theft-security-vulnerability-free/ ("The first—and albeit temporary—fix to better fortify vulnerable car models involved steering wheel locks, but those were not only easily defeatable but

1   were also easily opened with a low-skill lock pick attack.  Even the fix was flawed.");

2   *see also* LockPickingLawyer, *Seriously? THIS is Kia/Hyundai's Solution (Garbage*

3   *Steering     Wheel     Lock)*,     YouTube     (Sep.     21,     2023),

4   https://www.youtube.com/watch?v=JodD_KARacg.  In other words, Class Vehicles

5   will still be targeted by criminals, which will continue to keep insurance premiums

6   high.  Despite not receiving any compensation, the second group is forced to release

7   their claims for their increased insurance premiums.  (Settlement Agreement, Section

8   (VI)(1) ("Releasors irrevocably release . . . any and all . . . claims . . . relating to Class

9   Vehicles . . . based on the facts alleged in the any consumer complaint filed in the

10  Action . . . .").)

11  **III.   LAW AND ARGUMENT**

12      **A.   Standard of Review**

13         This Court summarized the standard of review for approving class settlements

14  in its November 3, 2023 Order [Docket No. 259].  *In re Kia Hyundai Vehicle Theft*

15  *Litig.*, No. 8:22-ml-03052-JVS(KESx), 2023 U.S. Dist. LEXIS 211731 (C.D. Cal.

16  Nov. 3, 2023).  This Court may approve the Settlement "only on finding that it is 'fair,

17  reasonable, and adequate.'"  *Id.* at *3 (quoting Fed. R. Civ. P. 23(e)(2)).   When

18  reviewing the Settlement, the Court "must 'ensure[] that unnamed class members are

19  protected from unjust or unfair settlements affecting their rights,' when also accounting

20  for 'the strong judicial policy that favors settlements, particularly where complex class

21  action litigation is concerned.'"  *Id.* (quoting *Campbell v. Facebook, Inc.*, 951 F.3d

22  1106, 1121 (9th Cir. 2020)).  While there is a policy that favors settlements, a "'higher

23  standard of fairness' applies when, like here, parties settle a case before the district

24  court has formally certified a litigation class."  *Id.* at *4 (quoting *Campbell*, 951 F.3d

25  at 1121).  Thus, "additional protections" and "a more probing inquiry" are necessary

26  when reviewing a settlement entered into before class certification.  *Id.* (quoting

27  *Campbell*, 951 F.3d at 1121).

28  ///

Fed. R. Civ. P. 23(e)(2) lists the factors this Court must consider when assessing the Settlement:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

        (i)    the costs, risks, and delay of trial and appeal;

        (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

        (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

## B.    The Relief Provided to Class Members Like Rubin Is Inadequate

When evaluating the adequacy of the relief provided to class members, a court "compare[s] the terms of the compromise with the likely rewards of litigation." *Cashon v. Encompass Health Rehab. Hosp. of Modesto, LLC*, No. 1:19-cv-00671-JLT-SKO, 2022 U.S. Dist. LEXIS 4858, at *16 (E.D. Cal. Jan. 9, 2022) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)). A court should "focus on 'substantive fairness and adequacy,' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Id.* at *17 (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (C.D. Cal. 2007). When making this determination, courts analyze eight factors:

(1) the amount offered in settlement;

(2) the strength of the plaintiff's case;

(3) the risk, expense, complexity, and likely duration of further litigation;

(4) the extent of discovery completed and the stage of the proceedings;

(5) the experience and views of counsel;

(6) the reaction of the class members of the proposed settlement;

(7) the presence of a governmental participant; and

(8) the risk of maintaining class action status throughout the trial.

*Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.)*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).  Applying these factors to the Settlement shows that the relief provided by the Settlement is completely inadequate to Class Members like Rubin.

### **The Amount Offered in Settlement**

This factor weighs strongly against approving the Settlement.  When assessing whether the amount offered in the settlement is fair, courts should compare "the settlement amount to 'estimates of the maximum amount of damages recoverable in a successful litigation . . . .'"  *Myles v. AlliedBarton Sec. Servs., LLC*, No. 12-cv-05761-JD, 2014 U.S. Dist. LEXIS 159790, at *11 (N.D. Cal. Nov. 12, 2014) (quoting *Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454, 459 (9th Cir. 2000)).

Class Members, like Rubin, stand to recover substantial funds if successful at trial.  For example, assuming just 100,000 of the "millions of current and former owners and lessees of Class Vehicles" (Amended Motion, 1) suffered damages in the amount of $358.34 for 2024, like Rubin has, the Class stands to gain ***$35,834,000*** in additional damages for 2024 ***alone***.  (Mundy Decl. at ¶ 3.)

This estimate is low.  Class Counsel estimates that there are 9 million Class Vehicles.[6]  (*Id.* at ¶ 4.) Most of the Class Vehicles fall into Rubin's situation.  For example, in the first half of 2020, 1 out of every 1,000 insured Kia/Hyundai vehicles

---

[6] https://www.hbsslaw.com/press/hyundai-kia-car-theft-defect/hyundai-kia-theft-class-action-lawsuit-reaches-settlement-valued-at-more-than-200-million.

were reported stolen (approximately .1%) and in 2023 that figure increased over tenfold to 11.2 per 1000 (approximately 1%).[7]  (*Id.*)  Thus, the vast majority of Kia/Hyundai owners have not had their vehicle stolen or experienced an attempted theft.  If even 5% of Class Members have increased premiums in 2024 like Rubin, the total damages for 2024 alone lost by this settlement would total more than ***$160,000,000***, eclipsing the total maximum settlement amount contained in the Settlement.[8]  (*Id.*)

Class Counsel has failed to establish why the settlement amount is fair in light of the potentially hundreds of millions of dollars Non-Theft Class Members stand to gain if this matter proceeds to trial.  *Philliben v. Uber Technologies, Inc.*, No. 14-cv-05615-JST, 2016 U.S. Dist. LEXIS 117629 at *28 (N.D. Cal. Aug. 30, 2016) ("Under these circumstances, the Court finds that Plaintiffs have not adequately explained why a gross settlement fund amount of $28.5 million is fair, adequate, and reasonable compared to what class members paid Uber for safety.").  Nor has Class Counsel explained why Non-Theft Class Members are not entitled to recover for increased insurance premiums they have been required to pay as a result of the defect, as opposed to those suffering a Qualifying Theft or Qualifying Theft Attempt who ***are*** allowed to recover those increased insurance premiums.

The Settlement not only fails to account for increased insurance premiums suffered by Non-Theft Class Members, but it also fails to account for the Class Vehicles' diminished resale values.  As Plaintiffs alleged in the Complaint, Class Members suffered damages "in the form of diminished market value."  (Consumer Compl., ¶ 1445.)  The damages potentially recoverable for the Class Vehicles' diminution of value are staggering.  Assuming each Class Vehicle (of the estimated 9

---

[7] https://www.cnn.com/2024/01/04/business/hyundai-kia-thefts-increased-10-fold/index.html.

[8] Assuming Class Counsel's estimate of 9 million Class Members is correct, 5% of the class would be 450,000 Class Vehicles.  Assuming each Class Vehicle sustained the same amount of increased premiums as Rubin did for 2024 ($358.34), then the total damages for those Class Members would be $161,253,000 (450,000 multiplied by $358.34).

RUTH RUBIN'S OBJECTION TO THE AMENDED SETTLEMENT AGREEMENT
CASE NO. 8:22-ML-3052-JVS(KESx)

1   million) lost just $100 in value due to the defect, the total damages would be $900

2   million.  In sum, the amount offered in the Settlement is woefully inadequate given the

3   potential for recovery in this case.  *See Myles v. AlliedBarton Sec. Servs., LLC*, No. 12-

4   cv-05761-JD, 2014 U.S. Dist. LEXIS 159790, at *12 (N.D. Cal. Nov. 12, 2014)

5   ("[Plaintiff] states that the maximum potential recovery here is $18,975,000 . . . .  Even

6   if the proposed settlement purported to give the entire $1,750,000 gross settlement

7   amount to the class, which it does not, that amount is only about one-eleventh the

8   claimed maximum potential recovery.  The parties have not offered an adequate

9   explanation for this steep discounting."); *Martinez v. Knight Transp., Inc.*, No. 1:16-

10  cv-01730-SKO, 2022 U.S. Dist. LEXIS 194584, at *36 (E.D. Cal. Oct. 25, 2022)

11  (denying preliminary approval of settlement agreement because "Plaintiff does not

12  adequately explain what appears to be an overly aggressive discounting of the claims

13  in this case"); *see also Cullan & Cullan LLC v. M-Qube, Inc.*, No. 8:13CV172, 2014

14  U.S. Dist.  LEXIS 11524, at *30 (D. Neb. Jan. 30, 2014) ("The intervenors contend

15  that over $225 million in fraudulent charges is at issue . . . .  A settlement fund of $6 to

16  $6.5 million seems inadequate in the face of alleged losses of such magnitude.").

17                              **The Strength of the Case**

18          This factor also weighs against approving the Settlement.  When addressing this

19  factor, the Court should weigh "the strength of plaintiffs' case on the merits balanced

20  against the amount offered in the settlement."  *Cuellar v. First Transit Inc.*, No. 8:20-

21  cv-01075-JWH-JDE, 2024 U.S. Dist. LEXIS 3747, at *17–18 (C.D. Cal. Jan. 8, 2024)

22  (citing *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 488 (E.D. Cal. 2010)).

23  To do so, courts "evaluate[] objectively the strengths and weaknesses inherent in the

24  litigation and the impact of those considerations to the parties' decisions to reach these

25  agreements."  *Aldapa v. Fowler Packing Co.*, No. 1:15-cv-00420-ADA-SAB, 2023

26  U.S. Dist. LEXIS 98344, at *11 (E.D. Cal. June 5, 2023) (citing *In re Wash. Pub. Power*

27  *Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989)).

28  ///

1    In their Complaint, Plaintiffs allege that **all** Class Members' insurance premiums
2    have increased, regardless of whether their vehicle was stolen or attempted to be stolen.
3    (Consumer Compl., ¶ 1431–1444.)  Yet, the Amended Motion contains no description
4    of how Plaintiffs evaluated the strength of the claims for increased insurance premiums,
5    nor does it state whether Plaintiffs evaluated the strength of the claim for purposes of
6    negotiating on behalf of Class Members for these losses.  Indeed, there is no indication
7    that Plaintiffs ever considered the value of Non-Theft Class Members' claims for
8    insurance premiums or for diminution in value.  Yet, based on a preliminary analysis—
9    and as discussed above—insurance rates of Non-Theft Class Members is definitively
10   increasing, and yet they are being given no monetary compensation.

11   It is clear that Plaintiffs focused on Class Members who have had their Class
12   Vehicle stolen (or attempted to be stolen).  For example, Plaintiffs state that "the
13   involvement of criminal third-party acts raises novel questions regarding causation and
14   the specter of unique fact questions that would be difficult to overcome at class
15   certification."  (Amended Motion, 23.)  If this defense has any validity, it is much
16   stronger as to Class Members who have had their vehicle stolen than as to Non-Theft
17   Class Members.  Unlike increased insurance premiums for when a vehicle is actually
18   stolen, there is no criminal act that directly causes an increase in insurance premiums
19   based upon a Class Vehicle being theft-prone.

20   **The Risk, Expense, Complexity, and Likely Duration of Further**
21   **Litigation**

22   While there is always an inherent risk in litigation and that continued litigation
23   will bear further costs, Plaintiffs have not adequately assessed the risk, expense,
24   complexity, and likely duration of further litigation for Non-Theft Class Members.
25   Plaintiffs suggest that "[b]y the time Plaintiffs' claims are presented to a jury . . . many
26   more Class members will have suffered vehicle thefts and damages, sold their vehicles,
27   and otherwise lost the benefits offered under the proposed Settlement."  (Amended
28   Motion, 24.)

What about Non-Theft Class Members like Rubin?  The Settlement will not reduce insurance premiums or increase the value of her vehicle, and it does not compensate Rubin for her losses.  Accordingly, the risks of continued litigation do not apply here because Non-Theft Class Members like Rubin will gain no relief for their increased insurance premiums or their Class Vehicles' decreased value regardless of whether they lose at trial or if they settle the case.  *Cavka v. Soulcycle Inc.*, No. 8:16-cv-01821-JLS-KES, 2018 U.S. Dist. LEXIS 237407, at *11 (C.D. Cal. Jan. 25, 2018) ("While the parties are correct that continued litigation poses the risk that 'the Settlement Class would potentially get nothing' . . . that is a risk worth taking where the Settlement provides nothing anyway.").  In other words, because the Settlement gives Non-Theft Class Members essentially nothing in exchange for their release of claims, the risk of going to trial is far better than settling.

### The Extent of Discovery Completed and the Stage of the Proceedings

Plaintiffs acknowledge in their Amended Motion that "Plaintiffs began confirmatory discovery . . . to verify the fairness of the Settlement benefits and obtain information and testimony from Defendants with knowledge of the alleged Defect and proposed remedies, including the Software Upgrade, before final approval." (Amended Motion, 27.)  In the Declaration attached to the Amended Motion, Class Counsel described this "Confirmatory Discovery" as seeking documents regarding "insurance coverage for Class vehicles."  (Amended Motion, 11.)  It is unclear what information Kia and Hyundai would have regarding insurance premiums.  Instead, such information would better come from Class Members themselves or the numerous insurance companies involved in this case.

Plaintiffs do not provide any insight on the status of any discovery from insurance companies to discern the extent of increased insurance premiums.  It is also unclear if Plaintiffs ever verified the amount of increased premiums suffered by Class Members.  At best, Plaintiffs failed to conduct this due diligence, or at worst, Plaintiffs are leaving hundreds of millions of dollars on the table to reach a quick settlement.  *See*

DocuSign Envelope ID: AB3D88E8-0072-4B08-8747-DAA774643393

1   *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223,

2   233 (2d Cir. 2016) "[D]ivergent interests require separate counsel when it impacts the

3   'essential allocation decisions' of plaintiffs' compensation and defendants' liability.")

4   (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231 (1997)); *Murray v.*

5   *Grocery Delivery E-Services USA Inc.*, 55 F.4th 340, 345 (1st Cir. 2022) ("In the class

6   settlement context, conflicts sometimes arise because there is a common fund -- i.e., an

7   aggregate proposed settlement amount covering all claims -- that must be allocated

8   among class members.  In these zero-sum circumstances, a benefit to one group of class

9   members (in the form of a larger portion of the common fund) comes at the detriment

10  of the other class members (who receive a smaller portion as a result).  This presents a

11  concern that the class representatives or class counsel may 'have sold out some of the

12  class members' by allocating some of their fair share to other class members.") (citing

13  4 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 13:56 (6th ed.,

14  June 2022 update)); *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., PNC*

15  *Bank NA*, 795 F.3d 380, 393–394 (3d Cir. 2015) ("Not every intra-class conflict is

16  consequential, but certain ones are what we have called 'fundamental' . . . .  A

17  'fundamental' conflict exists, for example, when some class members 'have been

18  harmed by the same conduct that benefitted other members of the class' . . . .  To be

19  'fundamental,' a conflict must touch on 'the specific issues in controversy' . . . .  While

20  it may be wise to appoint separate counsel even before a serious conflict fully emerges,

21  the requirement to put separate counsel in place arises when a conflict ceases to be

22  theoretical and becomes real and fundamental.") (citations omitted).

23      Based upon Rubin's initial investigation, as demonstrated above, Plaintiffs could

24  have, and should have, determined that ***all*** Class Members should be compensated for

25  increased premiums.  *Myles*, 2014 U.S. Dist. LEXIS 159790 at *12 (finding that the

26  parties did "not provide enough information about the facts of this case to allow the

27  Court to determine whether the steep discount in plaintiffs' recovery is justified.  This

28  may be because the parties have not yet conducted sufficient discovery and have not

1  fully vetted the true risks and benefits of the claims.").

## The Experience and Views of Counsel

In the Amended Motion, Class Counsel offers a conclusory basis for why they believed the Settlement is fair.  As demonstrated above, Class Counsel gave no consideration to Non-Theft Class Members like Rubin, and for why they believe the Settlement is fair for those Non-Theft Class Members.  Based on this, it is unclear if Class Counsel correctly analyzed the value of the Class Members' claims for increased insurance premiums, and overly focused on the vehicles that have been, or were attempted to be, stolen.  Indeed, Class Counsel only mentions the Software Upgrade in their declaration, and they do not mention the insurance premiums directly.  (*See* Amended Motion, Ex. B at ¶ 36 ("The parties have also started confirmatory discovery, which will further allow us to verify the fairness and benefits provided in the proposed Settlement and obtain testimony from [Defendants] . . . [regarding] proposed remedies, including the Software Upgrade, prior to final approval.")).  This factor weighs in favor of denying the Settlement.

## The Reaction of the Class Members of the Proposed Settlement

This Objection is being filed before the number of opt-outs or other objections is known.  Suffice it to say, if Non-Theft Class Members knew they were not obtaining any sufficient consideration to release their claims and continue to suffer the harms alleged in the Consumer Complaint, they likely would be displeased.

## The Presence of a Governmental Participant

While there are governmental entities pursuing claims in this case, they are not members of the Consumer Class, and are expressly excluded from the Settlement.  (Settlement, (VI)(2) ("The Settlement Agreement and release do not release . . . claims brought or awards sought by the Government Entities . . . .").)  Thus, this factor is neutral.  *See Aldapa*, 2023 U.S. Dist. LEXIS 98344 at *23 ("[T]here are no direct governmental participants in this action . . . .  Therefore, the Court finds that this factor neither weighs in favor nor against granting final approval."); *Brown v. CVS Pharm.,*

*Inc.*, No. CV15-7631 PSG (PJWx), 2017 U.S. Dist. LEXIS 182309, at *13–14 (C.D. Cal. Apr. 24, 2017) ("This factor is neutral because there is no government entity participating in the case.").

### The Risk of Maintaining Class Action Status Throughout the Trial

Rubin recognizes that there is a risk that a class may not be sustained through trial if the Settlement is not approved. However, under the Settlement Non-Theft Class Members will receive no compensation and still have to release their claims, so this risk is immaterial.

In sum, six of the above eight factors weigh against the Settlement, and only one of the factors supports the Settlement in this case. Accordingly, as demonstrated above, the Settlement is woefully inadequate and should not be approved.

### C.    The Settlement Does Not Treat Class Members Equitably Relative to Each Other

"In evaluating the equitable treatment of class members, courts consider whether the proposal 'improperly grant[s] preferential treatment to class representatives or segments of the class.'" *Grady v. RCM Techs., Inc.*, No. 5:22-cv-00842 JLS-SHK, 2023 U.S. Dist. LEXIS 84145, at *25 (C.D. Cal. May 2, 2023) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (C.D. Cal. 2007)). "[C]ourts also consider whether the method of distribution or allocation of the settlement proceeds is fair, reasonable, and adequate." *Id.* at *32 (citing *Theodore Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2020 U.S. Dist. LEXIS 74801, at *9 (N.D. Cal. Feb. 5, 2020); *Alvarez v. 9021Pho Fashion Square LLC*, No. CV 15-03657 SJO (VBKx), 2016 U.S. Dist. LEXIS 204730, at *6 (C.D. Cal. Jan. 19, 2016)). Specifically, this Court should assess "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Lusk v. Five Guys Enters. LLC*, No. 1:17-cv-00762-AWI-EPG, 2021 U.S. Dist. LEXIS 102881, at *28–29 (E.D. Cal. May 31, 2021) (quoting Fed. R. Civ. P.

1    23(e)(2)(D) advisory committee's note to 2018 amendment); *cf. Mirfasihi v. Fleet*

2    *Mortg. Corp.*, 356 F.3d 781, 785–86 (7th Cir. 2004) ("[T]he denial of all relief to the

3    information class might be justified if careful scrutiny indicated that the class had no

4    realistic prospect of sufficient success to enable an actual distribution to the class

5    members.").

6                          **1.    The Release Does Not Treat Class Members Equitably**

7              The Settlement does not treat Class Members equitably with respect to the

8    release.  The Settlement does not provide Non-Theft Class Members with any

9    reimbursement for their increased insurance premiums.  Yet, those owners are releasing

10   their claims for increased insurance premiums.  (Settlement Agreement, Section VI(1).)

11   In contrast, the Settlement provides Class Members who have suffered a Qualifying

12   Theft or Qualifying Theft Attempt with "[r]eimbursement of any insurance deductibles

13   paid and increased insurance premiums for insurance policies that includes theft

14   coverage, resulting from the Qualifying Theft of Qualifying Theft Attempt . . . ."

15   (Settlement Agreement, Section (II)(D)(3)(c).)  Thus, the release inequitably bars Non-

16   Theft Class Members from seeking damages stemming from increased insurance

17   premiums when they are not entitled to any compensation for those damages under the

18   Settlement.  *See Ali v. Franklin Wireless Corp.*, No. 21-cv-00687-AJB-MSB, 2024

19   U.S. Dist. LEXIS 12903, at *11 (S.D. Cal. Jan. 24, 2024) ("The additional criteria

20   would therefore disqualify certain class members from obtaining relief, while at the

21   same time, bind them to the settlement and release of all claims."); *City of Long Beach

22   v. Monsanto Co.*, No. CV-16-3493 FMO (ASx), 2020 U.S. Dist. LEXIS 236442, at *13

23   (C.D. Cal. Nov. 25, 2020) (". . . the overly broad release and indemnification provision

24   are also concerning given that it appears that most of the class members will receive a

25   very modest payout").

26   ///

27   ///

28   ///

### 2. The Distribution of Settlement Funds Does Not Treat Class Members Equitably

As discussed throughout this Objection, the Settlement grants Class Members suffering a Qualifying Theft or Qualifying Theft Attempt reimbursement for their increased insurance premiums, while providing no compensation for those increased insurance premiums to Non-Theft Class Members. Thus, the distribution of the Settlement Funds does not treat Class Members equitably. *See Ali v. Franklin Wireless Corp.*, No. 21-cv-00687-AJB-MSB, 2024 U.S. Dist. LEXIS 12903, at *11 (S.D. Cal. Jan. 24, 2024) ("Because Lead Plaintiff provides no explanation for limiting relief to certain class members, the Court is unable to evaluate whether such difference in treatment is fair or reasonable."); *Grady v. RCM Techs., Inc.*, No. 5:22-cv-00842 JLS-SHK, 2023 U.S. Dist. LEXIS 236308, at *20 (C.D. Cal. Sep. 7, 2023) ("It is highly unusual to have a settlement in which a careful allocation based on actual harm is set aside in favor of an allocation that disproportionately focuses on waiting time penalties."); *Philliben v. Uber Technologies, Inc.*, No. 14-cv-05615-JST, 2016 U.S. Dist. LEXIS 117629, at *18 (N.D. Cal. Aug. 30, 2016) ("Because the proposed settlement fails to allocate compensation among class members according to the type and number of Uber services purchased, the Court finds it would unfairly provide preferential treatment to certain class members at the expense of others.").

## IV.   CONCLUSION

For the reasons stated herein, Rubin respectfully requests that this Court deny approval of the Settlement.

Dated: April 17, 2024

Respectfully submitted,

/s/ Thomas N. McCormick
Thomas N. McCormick (SBN 325537)
tnmccormick@vorys.com
Vorys, Sater, Seymour and Pease LLP
4675 MacArthur Court
Suite 700
Newport Beach, CA 92660
(949) 526-7903

Kara M. Mundy*
kmmundy@vorys.com
Vorys, Sater, Seymour and Pease LLP
52 E. Gay Street
Columbus, OH 43215
(614) 464-5669
(614) 464-5669 (facsimile)

Gary E. Mason*
gmason@masonllp.com
Mason LLP
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, D.C. 20015
(202) 292-4490

*Motion for Pro Hac Vice Admission
to be submitted.

Counsel for Ruth Rubin

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUTH RUBIN'S OBJECTION TO THE AMENDED SETTLEMENT AGREEMENT
CASE NO. 8:22-ML-3052-JVS(KESx)