1  Donald K. Birner
2  256 Osprey Circle
   Saint Marys, GA 31558
3  (309) 642-1589
   d.birner@comcast.net
4  *Donald K. Birner Esq.,*
   *Pro Se Objector*

```
                    F I L E D
              CLERK, U.S. DISTRICT COURT

                  05/03/2024

              CENTRAL DISTRICT OF CALIFORNIA
              BY: _____ DVE _____ DEPUTY
```

5

6

7  **UNITED STATES DISTRICT COURT**

8  **CENTRAL DISTRICT OF CALIFORNIA**

9

10 In re: KIA HUNDAI VEHICLE THEFT          CASE NO. 8:22-ML-3052-JVS(KESx)
   MARKETING, SALES PRACTICES,
11 AND PRODUCTS LIABILITY                  **NOTICE OF OBJECTION AND**
   LITIGATION                              **OBJECTION TO THE AMENDED**
12                                         **SETTLEMENT AGREEMENT**

13                                         The Honorable James V. Selna
   This document relates to:              Date: July 15, 2024
14                                         Time: 1:30 p.m.
   ALL CONSUMER CLASS ACTION               Courtroom: 10C
15 CASES

16

17 _____

18

19

20          <u>**IDENTITY OF OBJECTOR AND INTENT TO APPEAR**</u>

21         This objection is filed by class member Donald K Birner, *pro se* .  The accompanying

22 certification of the objector contains the information required by §III D of the settlement

23 agreement.  See Certification attached as Exhibit 1 incorporated by reference to this Objection.

24         Objector intends to appear at the final approval hearing and present oral argument in

25 support of his objection.

26

27

28

   Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement

**TABLE OF CONTENTS**

I.     LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

                  *The plan is divided into two categories* . . . . . . . . . . . . . . . . . . . . . . 1

        *All of the cash payments are not stated as any sum certain*
                    *or guaranteed minimums* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   *The cash payments are subject to pro-rata decreases and provide no guarantees* . . . . . . 2

   *The plan does not reimburse class members for loss of market value of their class vehicle*
                    *which is an obvious deficiency*. . . . . . . . . . . . . . . . . . . . . . . . 3

       *It Is Not class members responsibility to fix defendants' vehicles*. . . . . . . . . . . 3

             *The claims process is unduly burdensome*. . . . . . . . . . . . . . . . . . . . 3

    *The losses compensable from the common fund do not include insured losses*
                  *obvious deficiency*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       *Releases provisions are broad and unconscionable*. . . . . . . . . . . . . . . . . . 4

              *Defendants have palpable exposure*
              *to significant punitive damages*. . . . . . . . . . . . . . . . . . . . . . . 4

               *Risk/ Benefit analysis is skewed* . . . . . . . . . . . . . . . . . . . . . . . . 5

Consideration of Rule 23(e)(2) Factors

I.     ADEQUACY OF CLASS COUNSEL AND CLASS REPRESENTATIVE
REPRESENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    THE RELIEF PROVIDED TO THE CLASS BY THE SETTLEMENT AGREEMENT
IS INADEQUATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.     The Proposal Does Not Indicate the Actual Value of the Payout to Class
Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.     The Actual Cash Payment Provisions do not State a Minimum Amount Payable to
Class Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.     The Payments are not Outright Payments, but are Reimbursements for Amounts
Advanced by Class Members to Fix Defendants Products . . . . . . . . . . . . . . . . . . 9

        D.     Requirements for Eligibility are Unduly Burdensome and Designed to Reduce
Claims Against Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.   THE COMMON FUND PROCEEDS WILL NOT PROVIDE MEANINGFUL  VALUE TO MOST CLASS  MEMBERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.   Those Class Members who Suffered Either Total Loss of Their Vehicles or Damage to Their Class Vehicles from a Theft or Attempted Theft and Who Carried Comprehensive Coverage will not Receive Compensation other than Perhaps Partial Reimbursement of their Deductible . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   The Deduction of Insurance Payments by Defendant Violates the Spirit and Intent of  the Collateral Source Rule Applicable in most States Including California and Appropriates an Investment of each Class Member . . . . . . . . . . . . . . . . . . . . . . . 11

IV.   CLASS VEHICLES THAT WERE NOT INSURED FOR COMPREHENSIVE COVERAGE NOT LIKELY TO BE A SIGNIFICANT TAKE ON THE COMMON FUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.   The Take Rate of Claims made Consumer Cases According to Empirical Studies Average about 4% with Median of About 3.5% . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.   The Uninsured Class Vehicles are usually Lower Valued Vehicles . . . . . . . . . . 13

    C.   The Black Book Valuation is a Disservice to Class Members Particularly Those without Insurance because it Values at Wholesale and Class Members Replace at Retail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.   Many Total Loss or Damaged by Theft Uninsured Class Vehicles are Probably Unavailable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    E.   The Notice to Class Members States the Common Fund Benefits Available for all Class Members is Misleading as there is not One Benefit Actually Promised or Available to all Class Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    F.   The Payment of the Class Counsel Fees and Expenses from the Common Fund Creates a Conflict of Interest between Class Counsel and Class Members . . . . . 14

V.   THE INDIRECT CONSTRUCTIVE REVERSION TO DEFENDANTS . . . . . . . . . . . 15

VI.   THE CY PRES BENEFICIARY IS NOT DESIGNATED AND FAILS TO TARGET THE CLASS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VII.   THE EXPANSIVE RELEASE IS CONTRARY TO THE JUDGE'S DIRECTIONS IN HIS CHAMBERS ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VIII   REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

*CASES:*

Bloyed v. Gen. Motors Corp., 881 S.W.2d 422, 431 (Tex. App. 1994) aff'd, 916 S.W.2d 949 (Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bond, 1997 U.S. Dist. LEXIS 6358 at *11-12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Buchet v. ITT Consumer Fin. Corp. 845 F. Supp. 684, 696 (D. Minn. 1994) . . . . . . . . . . . . . 8

Glass v. UBS Financial Services, Inc. (9th Cir. 2009) 331 Fed.Appx. 452, 456 . . . . . . . . . . . . 15

Hanlon, 150 F.3d at 1026 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Helfend v. Southern Ca. Rapid Transit Dist. (1970) 2 Cal. 3d 1, 10 . . . . . . . . . . . . . . . . . 11,12

In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir.2011) . . . . . . . . . . . . . 1

In re Mid Atlantic Toyota Anti Trust Lig. 546 F. Supp. 1379, 1382 . . . . . . . . . . . . . . . . . . . . 8

Kakani v. Oracle Corp., 2007 WL 1793774 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

King v. Wilmett No CO 59236 (Cal. Ct. App. (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Koz v. Kellogg Co., 697 F.3d 858 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,16

Nachshin, 663 F.3d at 1039 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Reynolds v. Beneficial Nat. Bank 288 F.3d 277, 279-80 (7 th Cir. 2002) . . . . . . . . . . . . . . . . 1

Shaffer v. Debbas (1993) 17 Cal.App.4th 33, 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Sheet Metal Workers Local 27 H. Wel. v. Est. of Benick, Civil Action No.: 08-CV-00346 (FLW), at *19 (D.N.J. Dec. 9, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Six Mexican Workers, 904 F.2d at 1305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*RULES:*

Calif.  Civ. Code Section 1542 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 Fed. Reg. 6,471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*OTHER AUTHORITIES:*

Managing Class Action Litigation, A Pocket Guide for Judges, Pg. 16 . . . . . . . . . . . . . . . . . . 8

National Association of Insurance Commissioners (2021) .. . . . . . . . . . . . . . . . . . . . . . . . . . 10

UPDATE: An Empirical Analysis of Federal Consumer Fraud Class Action Settlement (2019-2020) by Day/Jones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Objection**

## I.  LEGAL STANDARD

Where, as here, "class counsel negotiates a settlement agreement before the class is even certified, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir.2011). In such a case, settlement approval "requires a higher standard of fairness" and "a more probing inquiry than may normally be required under Rule 23(e)." Hanlon, 150 F.3d at 1026.  The Judge is a fiduciary of the class, and is subject to the highest duty of care the law requires of fiduciaries. Reynolds v. Beneficial Nat. Bank 288 F.3d 277, 279-80 (7 th Cir. 2002)

## II.  PRELIMINARY STATEMENT

The amended proposed settlement agreement ("PSA" or "Plan") does not offer  fair, reasonable or adequate compensation to class members, who will be bound by the agreement and who are asked to release defendants and various third parties of all liability, including unknown and unsuspected claims.  More importantly it does not solve the problem of the multitude of vehicles on the road that are causing a safety crisis that class counsel and the defendants wish to ignore.

The plan addresses the theft insurgency by reimbursing class members for their efforts to modify their vehicles to resist theft.  The responsibility is that of the manufacturers of the vehicles by such means as a voluntary recall and buyback.

### *The plan is divided into two categories*.

The proposed plan is divided into two categories.  The first consists of free software that merely kicks the can down the road and doesn't begin to solve the problem that millions of defendants vehicles on the road are creating a  national safety catastrophe that won't be solved by a voluntary call to arms by vehicle owners over a period of 180 days.  This quick fix has been derided by a whole host of governmental entities and would take years to implement.

The first category also involves r*eimbursing* class members the cost of outdated theft

Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement          1

prevention equipment such as steering wheel locks that are not likely to be used glass breakage alarms or other amateurish after market modifications ill designed to deter theft.

The reimbursement cycle for measly amounts camouflages the larger problem. Defendants created the theft prone vehicles and than expected  class members to purchase and install products to fix defendants product through a patchwork series of unsophisticated after market equipment.  In addition defendants expect that the class members will accept this shifted responsibility for curing the theft enabled products with uncertain cash sums that will eventually be prorated downward.    These so called benefits are *not* a part of the Common Fund Benefits and do not state a minimum guaranteed sums.

### *All of  the cash payments are not stated as any sum certain or guaranteed minimums an obvious deficiency*

The second category consists qualifying losses compensable from the Common Fund. These are losses that occurred due to the qualifying theft  or qualifying attempted theft that resulted in the vehicle being ruled a total loss of damage to the vehicle.

At first impression, the PSA appears to be a significant since 80 million dollars is set aside in a common fund.   In this case, the devil is in the detail.

Upon close scrutiny, virtually all of the cash payment in category one and two above fail to state a minimum guaranteed amount due class members.  The payments are stated as *reimbursements* "up to" a stated cap (e.g. class members that are "eligible for reimbursement for up to $50.00 per class vehicle").  Translated this means anywhere from $1.00 to $50.00. It caps the liability of Defendants but does not provide a guarantee a minimum value to class members. Class members have the right to the minimum guaranteed payments to determine if they wish to accept, opt out or object to the settlement.  Furthermore reimbursing class members does not take these defective vehicles off the highways of America.

### *The cash payments are subject to pro-rata decreases and provide no guarantees*

Indeed, much later in the Notice, the probability that the these payments will be reduced is verified  directly by the plan's statement that the benefits are subject to proration.  (Notice of

Proposed Class Settlement, pg 10) ( PSA) **F. Payment-Related** 1. *For each Claim qualifying for a reimbursement payment under this Settlement Agreement, and only following determination whether Claims are subject to a pro rata increase or decrease*)

### *The plan does not reimburse class members for loss of market value of their class vehicle which is an obvious deficiency*

The class vehicles are theft prone which has, without doubt, considerably reduced their fair market value.   Yet the plan wholly fails to provide for compensation or restitution for the loss of market value of class vehicles, which  affects virtually every class member.  Regarding plummeting market value of these class vehicles — imagine  the honest seller informing a would be Kia or Hyundai  purchaser, that the vehicle he is selling lacks the usual and customary theft deterrent devices for that model year (i.e immobilizer) and was 10 times more likely to be stolen by novice crooks than other similar vehicles in the marketplace. Hard sell indeed.

Or mention that the City of Minneapolis passed a resolution calling for federal action from the National Highway Traffic Safety Administration to initiate a national recall of defective Kia and Hyundai models made vulnerable to theft due to vehicles lacking industry-standard engine immobilizer technology and anti-theft devices which were not installed by the automakers.  RCA 2024-00161[1]

### *It Is Not class members responsibility to fix defendants' vehicles*

In addition, the plan payments in most instances are reimbursements requiring class members to first expend their own funds  to rectify or fix defendants' product and then hope the "up to" actually comes even close to making them whole.

### *The claims process is unduly burdensome*

The claims processing and eligibility requirements are strict, unduly burdensome and designed to discourage class members from filing claims.  Since this is a claims made proposal, this factor is significant on the claim take.  The claim form itself is 8 pages of technical verbiage.

---

[1]Stolen Kias and Hyundais were linked to five homicides, 13 shootings, 36 robberies and 265 crashes last year, according to the Minneapolis Police Department and first reported by the Star Tribune. Oftentimes, those incidents involved children and teenagers.

Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement          3

Class counsel in its recent Fee Petition remarked that over 210,000 class members have already filed claims which illustrates that these class members are not aware that the plan has not yet been approved.

### *The losses compensable from the common fund do not include insured losses another obvious deficiency*

The total loss of vehicle benefits due to a "Qualified Theft" are a ruse because class members who carried comprehensive coverage and were compensated by their insurer will not receive any benefits, except for the possibility of a partial refund of their deductible since the settlement proceeds are *minus* any compensation received from any source, which wipes out the meager black valued settlement amount.

This aspect of the Plan effectively allows Defendants mitigate its damages by seizing an insurance asset of class members. Although the supplemental potential recoveries listed under total loss claims offer to reimburse deductibles are also subject to the "up to" $375.00 and deductibles are often set at $500 to $1,000.00 or more.

### *Releases provisions are broad and unconscionable*

The Plan's release provisions are excessively broad, purporting to release all claims of defendants and some third parties, including unknown or unsuspected claims. This provision is in direct conflict with the presiding Judge's directive concerning releases in its Chambers Order See Doc. #200 pg. 24 next to last paragraph.

### *Defendants have exposure to significant punitive damages*

The record indicates class counsel suggests that defendants run of the mill defenses pose a risk of dismissal if the case continues. Yet class counsel overlooks or chooses not to mention defendants and its officers vulnerability, due to its premeditated decision not to equip its lower value cars with standard theft prevention devices on over 9 million vehicle over the last decade.

Such a choices could be deemed, by some juries as reprehensible and worthy of ruinous punitive damages sometimes permissible in aggregate litigation pursuant to the consumer protection statutes in some states or for claims sounding in Fraud and Deceit. (e.g The nation wide California action stated in the Consolidated Complaint states in pertinent part a claim based

upon Fraud by Omission "*Defendants misconduct warrants an assessment of punitive damages.*" pg. 21 ¶ 1648  Other states have filed similar counts sounding in fraud and requesting punitive damages or other forms of enhanced damages.)

The well plead allegations of the Consolidated Complaint vividly illustrate the seminal fact that the defendants knowingly manufactured and introduced into the marketplace over 9 million vehicles spanning a period of 10 years or so which lacked basic theft deterrent devices enabling these vehicles to be stolen in less than 90 seconds by novice thieves.

The Consolidated Complaint in Section One "Nature of Action" capably outlines the obvious that "stolen cars constitute a major hazard to life and limb … [and] cause unreasonable risk of accident, personal injury, and death[.]" 33 Fed. Reg. 6,471 (Apr. 27, 1968).The National Highway Traffic Safety Administration ("NHTSA") concluded that, "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety." *Id*

And, "Beginning with at least 2000 model year ("MY") vehicles, immobilizers were standard on 62% of models sold by Defendants' _competitors_ in the U.S. market, and by the 2008 model year 90% immobilizers were standard competitors vehicles sold in the U.S. were sold."[2]  It is undeniable that defendants knowingly manufactured vehicles without theft prevention equipment— that was standard equipment on almost all of  its competitors vehicles—  causing unreasonable and unnecessary risk of personal injury or death.  At the same time, defendants were continually professing their undying concern for the safety of the consumers of its vehicles.

The fact  included these theft prevention devices were included on their more expensive models reflects defendants preference for a slightly increased profit margin over the safety of their customers and the public at large.

### *Risk/benefit analysis skewed*

Such misconduct should assuredly have compromised their credibility and bargaining leverage for settlement purposes. Yet the minimal perceived strengths of defendants case are

---

[2]Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 14, 2013). Center Discussion Paper Series No. 2013-004, TILEC Discussion Paper No. 2013-001, Available at SSRN: https://ssrn.com/abstract=2202165.

prominently mentioned by class counsel, while the deliberate and reprehensible choice of defendants to manufacture theft susceptible vehicles by the millions causing class member and the public at large a multitude of harms, all but goes unmentioned in the risk/benefit analysis by class counsel.  If the plan is approved , defendants will shed liability 'on the cheap' and  class counsel will reap a massive fee without  trying the case, however, class members will have an agreement that fails to provide even minimum value, and misses the mark of addressing the theft issue in a meaningful manner.

The  millions of class members who for the past 10 years unknowingly purchased these vehicles and were not informed by defendants that its vehicles were theft prone have been exposed to the  inherent dangers of vehicle theft because of defendants calculated and reckless decision to elevate profits over the safety of its customers, as well as the public at large.

Inconceivably, the record, for purposes of settlement, bears little or no mention of the magnitude of the risk the defendants would face if these cases proceeded to jury trials in the various states they are pending, not only by enhanced monetary awards but by undermining defendants public image that has been so carefully cultivated.[3]

In some states–not all–the violations of consumer protections acts sanction punitive damages in class actions to punish the wrongdoer and deter such conduct.  The successive exposure of these defendants to such enhanced damages such as treble damages, punitive damages and attorney's fees is truly staggering.

If this MDL case is not settled on fair terms and these cases were returned to the 76 transferee courts, defendants might well face massive exposure to enhanced damages, having a

---

[3]

For instance, the consolidated complaint in this case makes claim under Nationwide action/California  Counts relief pursuant to the California Legal Remedies Act § 1770 ("CLRA") based upon unfair or deceptive acts or practices, which seems an appropriate characterization of defendants repetitive misconduct here provides for punitive damages in §1780 (a) (4).  And § 1781 state that "any consumer entitled to bring an class action under§ 1780 may bring an action on behalf of those similar situated.  Other states consumer protection statutes and/or actions based upon fraud and deceit entitle allow recovery of punitive damages in class actions when the acts are consistent with the class as whole.

domino affect in the chain of federal courts.

These defendants continue to stonewall their responsibilities to produce safe cars and attempt to shift blame to third parties websites for letting the populace know that their cars are easily stolen.  For example, the notice to class members under 9 a.) Software upgrade regarding the underlying purpose of the upgrade, *"is designed to prevent (defendants') vehicles from starting without the key present by the method of theft popularize on TikTok and other social media.*  On the contrary, the thefts were enabled and popularized by  the lack of theft prevention devices by defendants.

**Consideration of Rule 23 (e) (2) Factors**

**I.     ADEQUACY OF CLASS COUNSEL AND CLASS REPRESENTATIVE REPRESENTATION.**

The parties have not engaged in sufficient investigation to enable the court to intelligently make an appraisal of the settlement.  In specific, to the best knowledge of the Objector, the parties have not presented the court with critical information such as:  estimations by either party of  the number or percentage of class members who are expected to file claims; the amount of the settlement that is likely to be distributed to class members; the reasons for expanding the release of liability; information about the range of possible verdicts; any memos or documentation of discussions regarding attorney fee awards. Ignore the core concern which is public safety.

**II.    THE RELIEF PROVIDED TO THE CLASS BY THE SETTLEMENT AGREEMENT IS INADEQUATE BECAUSE IT FAILS TO ADDRESS THE CORE ISSUE AND FIX THE VEHICLES**

**A.     The Proposal Does Not Indicate the Actual Value of the  Payout to Class Members.**

The proposal appears to be significant because it allots 80 million dollars to a common fund with incidental payments for such expenses for child care. However since over 8 million class vehicles are affected that sum amounts to about $10.00  per class vehicle. Yet, there is no indication of the value of the settlement to class members, nor is there an estimate by defendants or Class counsel of the take rate of members or the number or percentage of class members expected to file claims.

Settlements that do not indicate their value or a reasonable estimate of the amount of damages that will accrue to the class are suspect at best.  Bloyed v. Gen. Motors Corp., 881 S.W.2d 422, 431 (Tex. App. 1994) aff'd, 916 S.W.2d 949 (Tex. 1996)

In addition, courts are rightfully disturbed by class action settlements that contain no provision for a minimum payout. Buchet v. ITT Consumer Fin. Corp. 845 F. Supp. 684, 696 (D. Minn. 1994); see also In re Mid Atlantic Toyota Anti Trust Lig. 546 F. Supp. 1379, 1382.  "The district court in the Buchet case decided that the refusal to establish a minimum cash contribution indicated the low economic value the defendant placed on the settlement agreement as presented to the court." Buchet 845 F.Supp. at 696; Bloyed v. Gen. Motors Corp., 881 S.W.2d 422, 431 (Tex. App. 1994) aff'd, 916 S.W.2d 949 (Tex. 1996)

**B.    The Actual Payment Provisions do not State a Minimum Amount Payable to Class  Members.**

The actual value of the settlement cannot be reasonably estimated without a minimum guaranteed cash payment.

All of the monetary payments are *"up to"* a stated amount which is meaningless to  class members.  All the *"up to"* does is cap the monetary liability of defendants.  It promises nothing whatsoever to the class members.  It fails to inform class members of the actual value of their so called benefit.

Due process requires a stated minimum guaranteed amount to class members before they can be expected to dig into their pockets, anticipate reimbursement and ultimately surrender their claims.

In Managing Class Action Litigation, A Pocket Guide for Judges under "Appraisal of Settlement" *states a Judge's "appraisal of the settlement should focus on the value actually distributed to the class who have filed claims."*  Pg 16 ¶ and furthermore under hot button indicators, *"some settlement terms show their potential unfairness on their face, we call them "hot button indicators"    *        *     * Hot button indicators include any remedy to which you cannot confidently assign a cash value."*  The "up to" scenario  cannot confidently be assigned a cash value. [See benefits under paragraph 9 of the notice to class members relative to several

Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement          8

items of reimbursement.]

### C.      The Payments are not Outright Payments, but are Reimbursements for Amounts Advanced by Class Members to Fix Defendants Products.

Furthermore, these alleged benefits, if one meets the eligibility criteria, such as steering wheel locks and key fobs, are not outright payments to class members.  They are 'reimbursements' to class members for such items after the *"purchase and installation of [specified items]* paid for by the class member.  The script of this ruse is that the class member is required to expend his or her own funds to fix defendants 'theft enabled vehicle' and actually trust it works to prevent theft.

Only after *the purchase and installation of specified items* by class members and after they have jumped through the eligibility hoops may the class member anticipate reimbursement "up to"  a stated cap.  *See b) Benefits for class members not eligible of software upgrade.* Understandably, most class members would decline such a vague and incomplete offer for reimbursement of an unknown amount from a company that had lacked candor regarding the safety of their automobiles.

### D.      Requirements for Eligibility are Unduly Burdensome and Designed to Reduce Claims Against  Defendants.

Defendants and class counsel both have incentives to make the claims process burdensome because it reduces the 'take rate' by the class.

Therefore, the additional contribution of 60 million by defendant becomes unnecessary. It is, in a sense, a constructive reversion.  Class counsel is invested in making the gross value of the common fund  appear large because the fee awarded is often pegged to the common fund created. However, the most important factor of a class action settlement is the amount of funds that actually reach class members.  At this point an estimation by defendants hasn't appeared on the record other than their paid expert who makes reckless assumptions.

According to a white paper by Day/Jones law firm entitled UPDATE: an Empirical Analysis of Federal Consumer Fraud Class Action Settlement (2019—2020) found that class members received less than 30% of any monetary awards.  For 20 consumer fraud class action cases, Day/Jones found, "The average take rate was 4.91%, and the median take rate was 3.90%.

1  Only three settlements had a rate higher than 10%, and only two had a rate higher than 15%."

2  In a claims made, the take rate is often quite low.  In this case, the take rate is expected to

3  be lower because the procedure for filing claims is convoluted and burdensome which factors

4  often trigger low take rates.

5      The 8 page single spaced small font claim form which must be completed in its entirety

6  with the class member expected to attest to under the penalty of perjury under the laws of the

7  United States which is a thinly veiled is an attempt to intimidate a would be claimant.

8      The 15 page small font single spaced long form notice to class  saddles the claimant with

9  numerous tasks that if not accomplished allows defendants to deny the claim. (for example, see

10  pg. 11 of notice of proposed class settlement describing many "proofs" that require "objectively

11  reliable documents.")

12
**III.    THE COMMON FUND PROCEEDS WILL NOT PROVIDE MEANINGFUL**
13  **VALUE TO MOST CLASS  MEMBERS BECAUSE IT IS RESTRICTED TO**
    **THOSE WHO SUSTAINED THE TOTAL LOSS OR DAMAGE TO THEIR**
14  **CLASS VEHICLES**

15      **A.    Those Class Members who Suffered Either Total Loss of Their Vehicles or**
            **Damage to Their Class Vehicles from a Theft or Attempted Theft and Who**
16          **Carried Comprehensive Coverage will not Receive Compensation other than**
            **Perhaps Partial Reimbursement of their Deductible.**
17
    The long form notice to class members states a *"qualifying loss" means out- of -pocket*
18
*or uncompensated loss resulting from a qualifying theft or qualifying theft attempt provided such*
19
*loss is reimbursable under the common fund.* (emphasis supplied)
20
    Those class members who carried comprehensive insurance, estimated at 80%  on their
21
class vehicles, who either suffered the total loss of their vehicle or damage to their vehicle due to
22
a qualified theft or theft attempt will not receive any compensation except for the possibility of
23
partial reimbursement of the deductible, since the insurance payment will exceed the plan
24
benefits.  [According to National Association of Insurance Commissioners in 2021 (the latest
25
data available) 80 percent of insured drivers purchase comprehensive coverage in addition to
26
liability insurance. (Triple-I analysis of 2021 NAIC data.)] The reimbursement for any deductible
27
paid is limited *up to $375.*  In  most instances the actual deductibles are between $500.00 to
28

1   $1,000.00.  The class vehicles, which will not receive any benefits, under the common fund are

2   the higher valued class vehicles.  Class member who sustained a loss of value of their vehicles

3   but have insurance, have no remedy

4          **B.     The Deduction of Insurance Payments by Defendant Violates the Spirit and
               Intent of the Collateral Source Rule Applicable in most States Including
5              California and Appropriates an Investment of each Class Member.**

6          The settlement agreement incorporates and applies the substantive law of the state of

7   California.  California law and most other states apply the collateral source rule to property.

8   Courts consider insurance a form of investment, the benefits of which become payable without

9   respect to any other possible source of funds.

10          *"If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's*

11  *insurance, plaintiff would be in a position inferior to that of having bought no insurance,*

12  *because his payment of premiums would have earned no benefit." Helfend v. Southern Ca. Rapid*

13  *Transit Dist. (1970) 2 Cal. 3d 1, 10.* The collateral source rule applies in property damage cases

14  (Shaffer v. Debbas (1993) 17 Cal.App.4th 33, 40.)  Many insurers contend that they are liable

15  only for items such as unpaid property damage deductibles.  However, such a position violates a

16  policy behind the collateral source rule, namely that the tortfeasor **"***should not be able to avoid*

17  *payment of full compensation for the injury inflected merely because the victim has had the*

18  *foresight to provide [herself] with insurance***."** (Helfend, supra, 2 Cal.3d at p. 10, emphasis

19  added in the original.)

20          Allowing defendants to hijack insurance benefits, which is a form of investment, to

21  subsidize this settlement brought about because of defendants theft enabled vehicles is unfair.

22          This class member is mindful that insurance companies have sued defendants to recover

23  funds paid on behalf of their insureds, however, the defendants can draft the appropriate check or

24  payment payable to both the class member and his or her insurance company.

25          The insured and insurer will have the responsibility to resolve any differences they may or

26  may not have in light of the overall legal landscape and applicable state law.   It is noted that

27  often,  because the insurer is a passive beneficiary in this situation, its rights to reimbursement

28  may be subject to reasonable fees and expenses for the services that created the fund.

1   (e.g  Sheet Metal Workers Local 27 H. Wel. v. Est. of Benick, Civil Action No.: 08-CV-00346

2   (FLW), at *19 (D.N.J. Dec. 9, 2008) ("[U]nless clearly precluded by contract, public policy[,] or

3   other compelling reason, Federal common law notions of equity dictate that a party who benefits

4   from a common fund must share in the expense of creating it." Bond, 1997 U.S. Dist. LEXIS

5   6358 at *11-12.

6        Accordingly, Plaintiff's subrogation lien on Defendant's third-party recovery is subject to

7   a pro-rata reduction for Defendant's attorney's fees pursuant to the common-fund doctrine.") The

8   collateral source rule should not be used to diminish defendants' liability for harm caused by its

9   tortuous acts. King v. Wilmett No CO 59236 (Cal. Ct. App. (2010) "Our Supreme Court has

10  adopted the collateral source rule (Lund, supra, 31 Cal.4th at pp. 9-10; Hrnjak, supra, 4Cal.3d at

11  pp. 729-730; Helfend, supra, at p. 6)" King v. Willmett, No. C059236, 26 (Cal. Ct.App. Aug. 5,

12  2010)

13  **IV.   CLASS VEHICLES THAT WERE NOT INSURED FOR COMPREHENSIVE**
**        COVERAGE NOT LIKELY TO BE A SIGNIFICANT TAKE ON THE COMMON**
14  **        FUND.**

15      **A.   The Take Rate of Claims made Consumer Cases According to Empirical**
**            Studies Average about 4% with Median of About 3.5%.**
16

17      Since the plan benefits in the case of class vehicles that are not insured will not be offset

18  by insurance, some class members will be reimbursed by the common fund**.**  Notwithstanding

19  this fact, the take rate in claims made in consumer cases is usually quite low.   An Empirical

20  Analysis of Federal Consumer Fraud Class Action Settlements (2019-2020) by Day/Jones which

21  analyzed a set of 110 consumer fraud class actions settlements approved by federal courts from

22  2010 to 2020 found that typically only a small fraction of class members receive monetary

23  benefits from the settlements.

24      In an aggregate 57 cases for which we had data about class participation,53 the average
        take rate was 4.55%, and the median was 3.22%. Eleven settlements had take rates at or
25      below 1%, and 42—the vast majority of settlements—had take rates below 5%

26       In this case at bar, the claims form is 8 pages long consisting of single spaced type about 5

27  font attached to the end of a long form notice of 15 pages**.**  The eligibility requirements listed on

28  page 17 are numerous and complex and states that the claim must be submitted no later than 180

Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement       12

days after final approval.  Most class members would not know when final approval might take place. The claims process is unduly burdensome and discourages claim submission.[4]  The claims rate will probably be lower than the norm.

**B.    The Uninsured Class Vehicles are usually Lower Valued Vehicles.**

The choice to forego comprehensive/collision coverage is usually a decision based upon the value of the vehicle which does nor warrant the expense of insuring it.  In addition, the age of the vehicle often means there are no financing liens that require such insurance.  As a result, less monies will be paid out of the common fund per vehicle to accommodate these claims and less value to class members.

**C.    The Black Book Valuation is a Disservice to Class Members Particularly Those without Insurance because it Values at Wholesale and Class Members Replace at Retail.**

The selection of the Black Book reduces the value of this settlement for class members. The reimbursement payment for the total loss of a vehicle due to a qualifying theft or attempt is 60% of the Black Book value minus the total insurance payments or other payments but was not made whole as measured by the Black Book value.

The Black Book value is the lowest valued index and dealer oriented focusing on wholesale and auction prices and generally attached a lower value than say the Kelly Bluebook or Edmunds which are more consumer oriented.

The Plan reduces the payout of the fair market value by 40% due to purported risk of litigation.  In light of that reduction a further reduction to the wholesale prices is overreach by defendants.

When a consumer's vehicle is declared a total loss he or she shops for a new car; it is not

---

[4]The declaration of Mr. Stockton retained by defendants/class counsel in his summary paragraph No. 46 states that based upon his experience with class settlements a claims made rate of 15 % is proper  He then goes on to assume a 20% claims made rate and inexplicitly deduces that 225,000 class vehicles have been stolen.  None of these claims are supported in any manner whatsoever with the claims rate exaggerated. In addition, he curiously  volunteers that "for time working on this matter, Plaintiffs compensate my employer at a rate of $550.00 per hour *   * with $65 to $185 per hour for staff members.  (We assume that the $550.00 figure is his hourly recompense) Yet the total he & staff were paid for the job is not stated. (excuses the compensation of his employer for his time)

Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement        13

at the wholesale or auction value, but rather on a retail basis. This means that almost all class members incurring the total loss of their vehicle due to a qualifying theft or qualifying attempted theft will not be reimbursed by defendants for their deductible usually $500.00 to $1,000.00 or other sums not covered by insurance because being made whole is measured by the lower Black Book value.

**D.  Many Total Loss or Damaged by Theft Uninsured Class Vehicles are Probably Unavailable.**

Since upon the total loss of or significant damage to the uninsured class vehicle lacking comprehensive coverage, there likely would not be compensation from any insurer or any third party and over the past decade no relief offered by defendants, it is expected that the uninsured vehicles were quickly disposed.

**E.  The Notice to Class Members States the Common Fund Benefits Available for all Class Members is Misleading as there is not One Benefit Actually Promised or Available to all Class Members.**

The qualifying losses compensable from the common fund are almost exclusively for the class members who suffered the total loss of a class vehicle or damage to a class vehicle due to a qualifying theft or attempted theft.

Four of the five listed add-on reimbursement expenses all require a theft or an attempted theft.  The fifth expense is a non theft related incident expense with a significant caveat. The fifth expense is  a specific  "software upgrade (for eligible class vehicles) ***may be*** entitled to payments from the common fund." (emphasis supplied) pg. 9, last line of notice.

**F.  The Payment of the Class Counsel Fees and Expenses from the Common Fund Creates a Conflict of Interest between Class Counsel and Class Members.**

The payment of class counsel's fees requested in the amount in excess of 13 million plus expenses reduces the share of class members creating a conflict of interest. Payment to class counsel diminishes the funds available to distribute to class members.

In  addition, the PSA 247-1 pg 16 states that class counsel will review and evaluate any appeals filed and submit documentation to defendant.  In return, defendant will pay class counsel up to $600,000.  Class counsel has fiduciary duties to all class members and is on opposite sides

of the case is disconcerting; class counsel is evaluating appeals for defendant and being paid to do so. This quasi client attorney relationship seems improper and in conflict with the duties owed to the class.  At the very least, it has the appearance of impropriety.

## V.     THE INDIRECT CONSTRUCTIVE REVERSION TO DEFENDANTS.

Funding of the additional 60 million bringing the fund to 145 million does not have any stated requirements that trigger this contribution except if the 80 million is consumed by claims which under the circumstances is quite unlikely because the plan in its present form is structured to give defendants unbridled discretion to prorate the any claims received to wit: "payments from the common fund to satisfy approved claims are subject to a pro-rata decrease based upon the amount of approved claims if the common fund is insufficient to pay all approved claims". pg 16 II D 6 doc. 247-1

It appears that defendants are acutely aware that the courts do not take kindly to reversions to defendants.

In *Kakani v. Oracle Corp.*, 2007 WL 1793774, the Northern District of California explained that a reversionary scheme creates a "bonanza" for the defendant, because the defendant eliminates all liability as to class members, regardless of how many claims they actually pay. The Court further rejected calculation of the plaintiffs' counsel's fees based on the total settlement amount, rather than the actual amount paid to class members, since such might lead to plaintiffs' counsel receiving more than the entire class.

See also, *Glass v. UBS Financial Services, Inc.* (9th Cir. 2009) 331 Fed.Appx. 452, 456 (reversionary provisions are generally "problematic").

Therefore, these defendants advertise a common fund with a maximum of 145 million when in fact the terms and conditions of the agreement allow defendants to reduce the claims so those funds are not available to the class —yet defendants eliminate all liability to all class members regardless of the amount it pays on each claim.

## VI.    THE CY PRES BENEFICIARY IS NOT DESIGNATED AND FAILS TO TARGET THE CLASS.

The cy pres beneficiary is not named and simply requiring court approval does not satisfy the requirement that there must be "a driving nexus between the plaintiff class and the cy pres beneficiaries." Koz v. Kellogg Co., 697 F.3d 858 (9th Cir. 2012);  Six Mexican Workers, 904

1  F.2d at 1305. Class members have a right to know the identity of the Cy Pres recipient.

2  　　　To ensure that the settlement retains some connection to the plaintiff class and the

3  underlying claims, however, a cy pres award must qualify as "the next best distribution" to giving

4  the funds directly to class members. Id. at 1308 (internal quotation marks omitted).

5  Koz v. Kellogg Co., 697 F.3d 858, 865 (9th Cir. 2012)

6  　　　Although the PSA requires the Cy Pres recipient to be approved by the court that

7  happenstance did not placate the court in Koz. ("Our concerns are not placated by the settlement

8  provision that the charities will be identified at a later date and approved by the court") Koz v.

9  Kellogg Co., 697 F.3d 858, 867 (9th Cir. 2012) See also Nachshin, 663 F.3d at 1039 "When

10  selection of cy pres beneficiaries is not tethered to the nature of the lawsuit and the interests of

11  the silent class members, the selection process may answer to the whims and self interests of the

12  parties, their counsel, or the court."

13  **VII.　　THE EXPANSIVE RELEASE IS CONTRARY TO THE JUDGE'S DIRECTIONS.**

14  　　　The release is excessively broad.  It requires class members to release persons and

15  institutions that are not parties to this lawsuit.  It requires class members to release unknown and

16  unsuspected claims, and give consent and agency to class representatives waiving protections of

17  the law.

18  　　　The court's chamber's Order specifically stated that: *"Releases should be limited to the*

19  *facts of this case and should not encompass circumstances that are not addressed by the*

20  *Settlement."*　The release contained in the Notice to class members exceeds the limited release

21  directed by the court and waives the protection afforded class members by the Calif.  Civ.  Code

22  Section 1542 notwithstanding the parties chose to apply California law.

23  　　　In addition the Settlement Agreement purports to license class representatives with

24  agency to waive on behalf of all class members *the benefit of any law of any state or territory of*

25  *the United States, federal law or principle of common law, or of international or foreign law,*

26  *which is similar, comparable, or equivalent to Section 1542 of the California Civil Code.*

27

28

## VIII.  REQUEST FOR RELIEF

A.  Disapprove the plan in its present state;

B.  If the parties wish to resubmit a modified plan and should the Court agree, we suggest the modified  plan, if any,  incorporate the following changes:

1.  The amounts for the cash benefit should be stated as a guaranteed minimum;

2.  The loss of market value of class members vehicles must be addressed;

3.  Only allow adjustment below cap if the Common Fund of $145 million will  be exceeded not $80 million floor

4.  Modify the release deleting third parties and unknown claims; and unsuspected claims

5.  Eliminate the deduction of insurance proceeds relative to total loss or damage due to qualified theft or attempted theft based upon the collateral source rule;

6.  Provide class members with a buyback option at fair market value plus restitution as opposed to diminishing the fair market value by 40%

7.  Issue a voluntary recall of these vehicles to employ immobilizer equipment

DATED:  May 3, 2024

S/ Donald K. Birner
Donald K. Birner
256 Osprey Circle
Saint Marys, GA 31558
(309) 642-1589
d.birner@comcast.net
*Donald K. Birner Esq.,*
*Pro Se Objector*

1
2
3

**CERTIFICATE OF SERVICE**

4      I hereby certify that on this day I electronically filed the foregoing Objection using the

5  CM/ECF filing system thus effectuating service of such filing on all CM/ECF registered

6  attorneys in this case and who have consented to receive service through the CM/ECF System.  I

7  have also mailed the same to counsel of record for the class and defendants postmarked May 3rd

8  2024. at their addresses listed on the Notice of  Proposed Class Action Settlement

9
10  DATED this 3rd day of May, 2024.

11                                                           S/ Donald K. Birner

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement

# EXHIBIT 1

## CERTIFICATION

1.  In re: KIA HUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
    CASE NO. 8:22-ML-3052-JVS(KESx) (C.D Cal)

2.  Donald K. Birner
    256 Osprey Cir.
    Saint Marys, GA 31558-4101
    309 642 1589

3.  Class vehicle is; 2014 Kia Soul, VIN: KNDJN2A23E7018833

4.  Statement of my objection and the legal grounds for the position are state above.

5.  The OBJECTOR is an attorney as well as a class member and he has not retained legal representation and does not plan to have legal representation at the final approval hearing. He does not anticipate having any persons testify on his behalf or in regards to his objection. Objection finished on 5/03/2024

6.  If this objector seeks a fee he will do so as prescribed under Federal Rule of Civil Procedure 23 (e) (5) ( B) in a timely fashion.

DATE;__5/03/2024_____

S/ Donald K Birner

Donald K. Birner

Donald K. Birner's Notice of Objection and Objection to the Amended Settlement Agreement