Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606

Kenneth B. McClain
HUMPHREY FARRINGTON & McCLAIN, P.C.
221 W. Lexington Ave., Suite 400
Independence, MO 64050

Roland Tellis
BARON & BUDD, P.C.
15910 Ventura Blvd., Suite 1600
Encino, CA 91436

*Plaintiffs' Consumer Class Action Leadership Committee*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No.: 8:22-ml-03052-JVS-KES<br><br>**CONSUMER CLASS PLAINTIFFS' REPLY IN SUPPORT OF FINAL APPROVAL OF CLASS SETTLEMENT AND CLASS COUNSEL FEE AND EXPENSE AWARD** |
| This document relates to:<br><br>ALL CONSUMER CLASS ACTION CASES | Judge: Hon. James V. Selna<br>Date: July 15, 2024<br>Time: 1:30 p.m.<br>Courtroom: 10C |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  FACT UPDATE ................................................................... 4

    A.   Notice of the Settlement was provided as ordered................... 4

    B.   Objections and Opt-Outs are few in number. ......................... 4

III.  ARGUMENT ...................................................................... 4

    A.   Thirty-six putative Objections fail because the persons do not have standing or do not comply with the Court's requirements. ........................................................... 5

    B.   Represented by her husband and his law firm, Ruth Rubin's objection is rife with conflicts of interest. ................... 6

    C.   The Court should overrule all objections because the Settlement is fair, adequate, and reasonable. ..................... 9

        1.   The $145 million Common Fund plus additional benefits is a tremendous result.................................... 10

        2.   Objections that complain about insurance premiums and coverage fail because they are unsubstantiated, inaccurate, and simply complain that the Settlement is not "better." ................................................ 11

            a.   Rubin's insurance premium objections are unsupported for additional reasons. ................... 13

            b.   The $375-per-claim cap on insurance related expenses is reasonable....................................... 16

            c.   The Settlement provides substantial compensation for Class members who have not experienced a theft or attempted theft. ............... 17

            d.   Ms. Rubin misapplies the Ninth Circuit factors. ................. 19

            e.   Objectors have failed to establish the inability to obtain insurance coverage. ............................... 21

3.   The Settlement need not provide for alleged diminution in value payments.........................................................21

4.   Emotional distress damages are not recoverable..........................23

5.   The claim caps on certain categories of reimbursement are reasonable. ..................................................23

    a.   The claim caps for Class Vehicles that suffered a Total Loss or damage following a theft or attempted theft are appropriate............................................23

    b.   The $250 claim caps for certain incidental damages are appropriate. ...................................................26

6.   The Settlement addresses the alleged Defect in multiple ways. ..................................................................27

7.   The release is narrowly tailored to the facts underlying the Class's claims. ........................................................29

D.   Class Counsel and Plaintiffs have no interests antagonistic with the Class. ..............................................................31

E.   The payment of attorneys' fees from the Common Fund is best practice because it aligns Class Counsel's and the Class's interests. ..............................................................36

F.   The Court-approved Notice satisfies the requirements of Rule 23(c)(2)(B)...........................................................37

G.   The Court-approved claim process is fair, reasonable, and adequate..................................................................38

H.   Other miscellaneous objections lodged by Class members fare no better.............................................................40

IV.   CONCLUSION .............................................................43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aarons v. BMW of N. Am., LLC*,
    2014 WL 4090564 (C.D. Cal. Apr. 29, 2014)...............................................10, 24

*Ali v. Franklin Wireless Corp.*,
    2024 U.S. Dist. LEXIS 12903 ...............................................................30, 35

*Asghari v. Volkswagen Grp. of Am., Inc.*,
    2015 U.S. Dist. LEXIS 188824 (C.D. Cal. May 29, 2015)...........................10, 26

*Barnes v. FleetBoston Fin. Corp.*,
    2006 WL 6916834 (D. Mass. Aug. 22, 2006) .......................................................7

*Bloyed v. General Motors Corp.*,
    881 S.W.2d 422 (Tex. App. 1994) ....................................................................38

*Brightk Consulting Inc. v. BMW of N. Am., LLC*,
    2023 U.S. Dist. LEXIS 168723 (C.D. Cal. Sept. 12, 2023) ........................38, 42

*Brown v. Cvs Pharmacy, Inc.*,
    2017 U.S. Dist. LEXIS 182309 (C.D. Cal. Apr. 24, 2017)............................9, 20

*Buchet v. ITT Consumer Financial Corp.*,
    845 F. Supp. 684 (D. Minn. 1994)....................................................................38

*Chalian v. CVS Pharmacy, Inc.*,
    2021 U.S. Dist. LEXIS 133209 (C.D. Cal. July 16, 2021) ..................................9

*Chavez v. PVH Corp.*,
    2015 WL 9258144 (N.D. Cal. Dec. 18, 2015) ....................................................5

*Churchill Vill., L.L.C. v. GE*,
    361 F.3d 566 (9th Cir. 2004) ..............................................................................5

*City of Long Beach v. Monsanto Co.*,
    2020 U.S. Dist. LEXIS 236442 (C.D. Cal. Nov. 25, 2020) ...............................30

*Collado v. Toyota Motor Sales, U.S.A., Inc.*,
    2011 U.S. Dist. LEXIS 133572 (C.D. Cal. Oct. 17, 2011) ......................1, 13, 42

*In re Community Bank of Northern Virginia Mortgage Lending*
 *Practices Litigation*,
 795 F.3d 380 (3d Cir. 2015) ...............................................................33

*Edwards v. Nat'l Milk Producers Fed'n*,
 2017 U.S. Dist. LEXIS 145214 (N.D. Cal. June 26, 2017)................22

*Eisen v. Porsche Cars N. Am., Inc.*,
 2014 WL 439006 (N.D. Cal. 2014) ...................................................31

*Elsayed v. Maserati N. Am., Inc.*,
 215 F. Supp. 3d 949 (C.D. Cal. 2016) ...............................................23

*Gould v. Motel 6, Inc.*,
 2014 WL 12571421 (C.D. Cal. Jan. 10, 2014)....................................5

*Grady v. RCM Techs., Inc.*,
 671 F. Supp. 3d 1065 (C.D. Cal. 2023) ......................................34, 35

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) .......................................2, 36, 40, 41

*Hartless v. Clorox Co.*,
 273 F.R.D. 630 (S.D. Cal. 2011) ......................................................40

*Hendricks v. StarKist Co.*,
 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016)...................................42

*In re Heritage Bond Litig.*,
 2005 WL 1594403 (C.D. Cal. June 10, 2005)....................................5

*Kanan v. Thinx Inc.*,
 2021 U.S. Dist. LEXIS 191225 (C.D. Cal. June 23, 2021)................19

*In re Korean Air Lines Co.*,
 2013 U.S. Dist. LEXIS 202511 (C.D. Cal. Dec. 6, 2013)....................5

*Lane v. Facebook, Inc.*,
 696 F.3d 811 (9th Cir. 2012) ............................................................5

*In re Lithium Ion Batteries Antitrust Litig.*,
 2020 U.S. Dist. LEXIS 233607 (N.D. Cal. Dec. 10, 2020) ..........26, 35

*Mangone v. First USA Bank*,
 206 F.R.D. 222 (S.D. Ill. 2001) ................................................*passim*

*Martin v. Toyota Motor Credit Corp.*,
   2022 U.S. Dist. LEXIS 156480 (C.D. Cal. Aug. 26, 2022) ..............................10

*Martinez v. Semi-Tropic Coop. Gin*,
   2022 U.S. Dist. LEXIS 190910 (E.D. Cal. Oct. 18, 2022) ................................41

*McHorney v. GameStop Corp.*,
   2010 WL 11549399 (C.D. Cal. June 17, 2010)...................................................34

*Mendoza v. Hyundai Motor Co.*,
   2017 WL 342059 (N.D. Cal. Jan. 23, 2017)................................................*passim*

*Moore v. PetSmart, Inc.*,
   728 F. App'x 671 (9th Cir. 2018) ...........................................................5, 6, 33

*Murray v. Grocery Delivery E-Services USA Inc.*,
   55 F.4th 340 (1st Cir. 2022) ...........................................................32, 33

*In re MyFord Touch Consumer Litig.*,
   2019 U.S. Dist. LEXIS 53356 (N.D. Cal. Mar. 28, 2019) .........................38, 42

*Negrete v. Conagra Foods*,
   2021 U.S. Dist. LEXIS 179282 (C.D. Cal. June 21, 2021)...............................37

*Nwabueze v. AT&T Inc.*,
   2013 U.S. Dist. LEXIS 169270 (N.D. Cal. Nov. 27, 2013) .........................12, 24

*In re Phenylpropanolamine Prods. Liab. Litig.*,
   227 F.R.D. 553 (W.D. Wash. 2004) ................................................................25

*Philliben v. Uber Technologies, Inc.*,
   2016 U.S. Dist. LEXIS 117629 (N.D. Cal. Aug. 30, 2016) ..............................35

*In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab.*
   *Litig.*,
   880 F. Supp. 2d 801 (S.D. Ohio 2012) ...........................................................19

*In re Procter & Gamble Aerosol Prods. Mktg.*,
   2022 U.S. Dist. LEXIS 243238 (S.D. Ohio Oct. 28, 2022) ..............................42

*Pruchnicki v. Envision Healthcare Corp.*,
   439 F. Supp. 3d 1226 (D. Nev. 2020) ..............................................................23

*Rader v. Teva Parenteral Meds., Inc.*,
   276 F.R.D. 524 (D. Nev. 2011) .......................................................................23

*Retta v. Millennium Prods.*,
    2017 U.S. Dist. LEXIS 220288 (C.D. Cal. Aug. 22, 2017) .................. 17, 24, 26

*Schmitt v. Younique, LLC*,
    2020 U.S. Dist. LEXIS 64572 (C.D. Cal. Apr. 9, 2020) .................................... 31

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .............................................................................. 2

*In re T-Mobile Customer Data Sec. Breach Litig.*,
    2023 U.S. Dist. LEXIS 134281 (W.D. Mo. June 29, 2023)................................ 7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 7575004 (N.D. Cal. Dec. 27, 2011) .................................................... 5

*In re Tiktok, Inc., Consumer Priv. Litig.*,
    617 F. Supp. 3d 904 (N.D. Ill. 2022)................................................................ 32

*In re Toyota Unintended Acceleration*,
    2013 U.S. Dist. LEXIS 123298 (C.D. Cal. July 24, 2013) ........................*passim*

*In re Toyota Unintended Acceleration*,
    2013 WL 3224585 (C.D. Cal. June 17, 2013).................................................. 39

*In re Tracfone Unlimited Serv. Plan Litig.*,
    112 F. Supp. 3d 993 (N.D. Cal. 2015)............................................................. 11

*Vargas v. Ford Motor Co.*,
    2017 U.S. Dist. LEXIS 177149 (C.D. Cal. Oct. 18, 2017) ............................... 21

*Warner v. Toyota Motor Sales, U.S.A., Inc.*,
    2017 U.S. Dist. LEXIS 77576 (C.D. Cal. May 21, 2017)........................... 21, 22

*Wilson v. Pactiv LLC*,
    2022 U.S. Dist. LEXIS 136666 (C.D. Cal. July 1, 2022) ................................ 33

*Wylie v. Hyundai Motor Am.*,
    2020 U.S. Dist. LEXIS 258983 (C.D. Cal. Mar. 2, 2020) ............................... 28

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2020 U.S. Dist. LEXIS 129939 (N.D. Cal. July 22, 2020) ............................... 23

*Zakikhani v. Hyundai Motor Co.*,
    2023 U.S. Dist. LEXIS 123158 (C.D. Cal. May 5, 2023)............... 10, 21, 22, 24

1

**Other Authorities**

2

Cal. Rules of Professional Conduct Rule 1-400(D) ...................................................8

3

Cal. Rules of Professional Conduct Rule 1.3 ...........................................................8

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs respectfully submit this reply in support of their Motion for Final Approval of Class Action Settlement (Dkt. No. 367) and their Motion for Class Counsel Fee and Expense Award and Class Representative Awards (Dkt. No. 377).

## I.   INTRODUCTION

The Settlement is an excellent one that provides more than $275.5 million in non-reversionary cash and other benefits to resolve Class members' claims, reasonably reflects the economic harm suffered by Class members, and satisfies nearly all aspects of the relief Plaintiffs sought when the action was first filed. As discussed below and more fully in Plaintiffs' Motion for Final Approval, the Settlement offers significant and carefully crafted relief to Class members. Class members can claim payments from a non-reversionary common fund for losses and certain incidental expenses relating to the thefts and attempted thefts of Class Vehicles. Class members with Eligible Class Vehicles will also receive a free anti-theft Software Upgrade, which Defendants will warrant for the life of the vehicle to address the method of theft popularized on TikTok. Class members who do not have an Eligible Class Vehicle can make a claim for a direct cash payment of up to $300 (which will be paid separately from the Common Fund and will not be subject to any caps) for their purchase of equivalent anti-theft systems.

The Settlement covers approximately 9 million Class Vehicles, and over 26 million notices were mailed out via first-class mail and e-mail. Dkt. Nos. 378-18, 378-19. Out of the more than ***10 million*** individuals who received notice, only 88 challenge the fairness, adequacy, or reasonableness of the Settlement.[1] This is a small number of objectors given the size of the Class—about .00034%. *See Collado v. Toyota Motor Sales, U.S.A., Inc.*, 2011 U.S. Dist. LEXIS 133572, at *6 (C.D. Cal. Oct. 17, 2011) (only 22 objections out of 239,670 class members indicates that the terms of a proposed class settlement action were reasonably favorable).

---

[1] Of these 88, only 52 are valid objections.

011112-11/2652433 V1

This very small group of objectors asks the Court to deny significant relief to 99.99% of the Class because certain benefits offered under the Settlement will not reimburse the objectors for 100% of their purported damages. But the fairness of a settlement is determined by valuing the settlement as a whole rather than looking at whether each individual injury is fully compensated, and perfection or a 100 percent recovery is not the standard. As the Ninth Circuit stated in rejecting objections that the settlement "could have been better," the possibility that the settlement could have yielded greater benefits "does not mean the settlement presented was not fair, reasonable or adequate. Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (A settlement is "a yielding of absolutes and an abandoning of highest hopes." (citation omitted)). Judged as a whole, this is an excellent Settlement that is fair, adequate, and free from collusion.

Certain objectors complain about the claim caps, but the caps account for a 40% litigation risk discount, which this Court considered and deemed reasonable at preliminary approval. *See* Dkt. No. 200 at 26. *See infra* Section III.C.1. ***That risk discount is even more reasonable now given the Court's subsequent ruling striking class allegations in the Subrogation Plaintiffs' Amended Consolidated Complaint***. The Court held that it would need to make individualized determinations undermining commonality, such as whether there was, "in fact, a Thief Friendly Design" and whether thefts were, "in fact, caused by the Thief Friendly Design and not some other intervening cause, such as a different defect or the insured's own neglect in protecting his or her vehicle." Dkt. No. 390 at 7-8.

Certain objectors complain that the Settlement does not adequately reimburse them for the increase in insurance expenses they have allegedly incurred since

approximately 2022. However, these objectors fail to establish that the Defect was the cause of their premium increases, which have skyrocketed over 50% for a vast number of reasons for **all vehicle brands** between 2020 and 2023. *See infra* Section III.C.2.

A handful of objectors are dissatisfied because they will not be compensated for emotional distress and inconveniences they may have experienced. But such claims are precluded by the economic loss rule in many states and necessarily require an individualized inquiry. *See infra* Section III.C.4. Others object to the fact that the Settlement does not include diminution in value payments. However, the existence and amount of diminution in value may be difficult to establish here. Further, the Software Upgrade and the comprehensive anti-theft packages available for vehicles not eligible for the Software Upgrade are effective means to address the Defect and have already resulted in falling theft rates for Class Vehicles. *See infra* Section III.C.3, 6.

The objection filed by Ruth Rubin, who refers to herself as a "crusader" who "do[esn't] compromise," is without merit and should independently be rejected because of undisclosed conflicts of interests plaguing her and her attorneys. Rubin's counsel includes her husband, who has a personal and professional financial stake in Rubin's claim, as well was the 4,091 opt-outs he and his firm concurrently represent (notably, of these 4,091, only one (Rubin) has objected, rather than opt-out). And her counsel may have violated several Rules of Professional Conduct by soliciting thousands of opt-outs based on false and misleading statements. *See infra* Section III.B.

In sum, while the objectors (which make up less than 0.00034% of the Class) want an improved Settlement, none of the objections refute Plaintiffs' showing that the Settlement as a whole is fair, adequate, and reasonable. Accordingly, Plaintiffs respectfully request that the Court overrule each objection to the Settlement, grant final approval of the Settlement, and grant Plaintiffs' motion seeking attorneys' fees, costs, and service awards.

011112-11/2652433 V1

## II.   FACT UPDATE

**A.   Notice of the Settlement was provided as ordered.**

As the Court directed in Dkt. Nos. 256 and 259, Hyundai (on behalf of itself) and Claims Administrator Angeion (on behalf of Kia), provided Notice to the Class. Between February 12 and March 29, 2024, Hyundai sent via first class mail 10,834,388 initial Class Notices to Hyundai Class members. Dkt. No. 378-19, ¶¶ 7-8. Between February 12 and March 4, 2024, Angeion caused to be mailed via first class mail 7,134,735 initial Class Notices to Kia Class members. Dkt. No. 378-18, ¶ 13. By April 2, 2024, Angeion had also delivered 8,154,955 e-mails containing the Class Notices. Dkt. No. 378-18, ¶ 17. As of April 16, 2024, HyundaiTheftSettlement.com had tracked a total of 192,149 unique users who registered 505,184 page views, and KiaTheftSettlement.com had tracked a total of 295,607 unique users who registered 723,598 page views. Dkt. No. 378-18, ¶ 7. Additionally, Class Counsel responded to at least 450 individual Class Member inquiries since February 17, 2024. Joint Declaration of Consumer Class Action Leadership Counsel in Support of Consumer Class Plaintiffs' Reply in Support of Final Approval of Class Settlement and Class counsel Fee and Expense Award ("Leadership Reply Decl."), ¶ 3.

**B.   Objections and Opt-Outs are few in number.**

The deadline for objections and opt-outs was May 3, 2024. Dkt. No. 256, ¶ 46. Class members who did not opt-out have until at least January 11, 2025, to submit claims for reimbursements. As of June 17, 2024, Class Counsel received a total of 88 objections. Approximately 6,462 requests for exclusion were submitted, of which 4,364 were submitted by Objector Ruth Rubin's counsel. Leadership Reply Decl. ¶ 14. All opt-outs and objections added together represent less than .025% of the Class.

## III.   ARGUMENT

Final approval of a class action settlement asks the court to "evaluate the fairness of a class action settlement as a whole," and find that the settlement is "'fair,

4

011112-11/2652433 V1

reasonable, and adequate.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 818-19 (9th Cir. 2012) (quoting Fed. R. Civ. P. 23(e)(2)). For the reasons explained in Plaintiffs' Motion for Final Approval, the Settlement meets this standard and should be finally approved over the objection of the tiny number of Class members who lodged valid objections. *See* Dkt. No. 376 at 13-20; *see also Churchill Vill., L.L.C. v. GE*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement where 45 objections were received out of 90,000 notices).

## A.   Thirty-six putative Objections fail because the persons do not have standing or do not comply with the Court's requirements.

The Preliminary Approval Order provides that, "[f]or an objection to be considered [it] . . . must comply with the terms of the Settlement Agreement and the Long Form Notice[,]" and "[n]o objection that fails to satisfy these requirements and any other requirements found in the Long Form Notice shall be considered by the Court." *See* Dkt. No. 256, ¶¶ 36-37. Courts in this Circuit routinely reject objections where class members fail to follow the Court's requirements. *See, e.g., Moore v. PetSmart, Inc.*, 728 F. App'x 671, 673 (9th Cir. 2018); *Chavez v. PVH Corp.*, 2015 WL 9258144, at *3 (N.D. Cal. Dec. 18, 2015); *Gould v. Motel 6, Inc.*, 2014 WL 12571421, at *2 (C.D. Cal. Jan. 10, 2014); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575004 (N.D. Cal. Dec. 27, 2011); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *10 n.9 (C.D. Cal. June 10, 2005).

The requirements for submitting objections were clearly stated and communicated to Class members in the notice. *See, e.g.*, Long Form Notice, Dkt No. 228-2 at 56-57. However, despite these plain instructions, 36 purported Class members failed to adhere to the Court's straightforward requirements:

- Twelve individuals failed to include the model year and VIN of their Class Vehicles. Notice of Lodging Ex. Nos. 12, 15, 25, 40, 45, 50, 54, 58, 64, 67, 78, 87. Consequently, neither the Court nor the parties can verify whether they are even Class members. *See In re Korean Air Lines Co.*, 2013 U.S. Dist. LEXIS

202511, at *3-4 (C.D. Cal. Dec. 6, 2013) (rejecting objections where the objectors failed to establish that they were class members and had standing to object).

- Seven individuals sent objections by e-mail only. Notice of Lodging Ex. Nos. 1, 17, 45, 54, 64, 67, 78.

- Four individuals failed to provide their address. Notice of Lodging Ex. Nos. 7, 54, 64, 67.

- Six individuals failed to list the case caption. Notice of Lodging Ex. Nos. 9, 12, 45, 58, 67, 78.

- Sixteen individuals failed to state whether they intend to appear at the Final Approval Hearing. Notice of Lodging Ex. Nos. 14, 20, 21, 22, 36, 46, 50, 54, 59, 64, 65, 67, 75, 79, 89.

- Ten individuals submitted unsigned objections. Notice of Lodging Ex. Nos.  22, 45, 50, 54, 64, 68, 75-78.

- Twelve individuals submitted undated objections. Notice of Lodging Ex. Nos. 23, 36, 40, 42, 45, 54, 64, 67-68, 73, 74, 78.

- Notice of Lodging Ex. No. 23 was submitted after the objection deadline.

- Notice of Lodging Ex. No. 88 was submitted by a non-Class member.

While the Court maintains the discretion to overrule all procedurally improper objections, *Moore*, 728 F. App'x at 673, should the Court consider them, these 36 deficient objections proffer arguments that overlap with those brough by the valid objections. So, even if the Court were to ignore the deficiencies and consider these objections, they should be overruled for the reasons below.

## B. Represented by her husband and his law firm, Ruth Rubin's objection is rife with conflicts of interest.

While nearly all objections were submitted *pro se*, Ruth Rubin was recruited by her husband and his law firm to submit an objection, which responds to Plaintiffs' preliminary approval motion papers rather than the motion for final approval. Dkt. No. 371. There are several reasons why Rubin's objection should be overruled. *First*, Ms.

Rubin and her counsel are plagued by conflicts of interests and are proceeding in bad faith. In her objection, Ms. Rubin failed to disclose that her husband, Kenneth Rubin, is a partner at one of the firms representing her, Vorys, Sater, Seymour and Pease LLP ("Vorys"). He and Vorys are working on the case and stand to benefit from her objection by trying to earn an objector's attorneys' fee award that will dwarf Ms. Rubin's alleged damages claim of $359.34.[2] Leadership Reply Decl., Ex. A (Rubin Tr.) at 24:6-10, 135:23-136:1, 136:21-137:5, 137:17-19, 175:8-22. The objection should be rejected because familial relationships between counsel and an objector reflect improper motivations for the objection. *See, e.g.*, *In re T-Mobile Customer Data Sec. Breach Litig.*, 2023 U.S. Dist. LEXIS 134281, at *42 (W.D. Mo. June 29, 2023) (objector was attorneys' brother-in-law); *Barnes v. FleetBoston Fin. Corp.*, 2006 WL 6916834, at *2 & n.1 (D. Mass. Aug. 22, 2006) (striking objection of serial objector counsel who represented his mother-in-law after representing his wife in a prior case). Ms. Rubin's objection also failed to disclose that her husband has a personal financial stake in the claim given that joint funds were used to purchase the Class Vehicle and pay insurance premiums. Leadership Reply Decl., Ex. A (Rubin Tr.) at 136:21-137:5.

The *second* reason to reject the Rubin objection arises from Vorys' and its co-counsel Mason LLP's ("Mason") (i) concurrent representation of thousands of opt-outs, and (ii) misleading statements to Class members used to entice them to opt-out. On the opt-out deadline, Vorys and Mason mailed 4,364 opt-out forms to Defense counsel. Leadership Reply Decl. ¶ 14.[3] More than 1,000 of the opt-out forms were deficient; 606 opt-out forms did not include VIN numbers or were non-Class vehicles, and an additional 519 identified vehicles are not included in the Settlement or the Class. Further, the opt-outs were solicited through Mason's website, which contained

---

[2] Ken Rubin performed inaccurate calculations that are contained in Ms. Rubin's declaration and otherwise collected information contained in that declaration.

[3] Although Vorys and Mason represent 4,365 individuals relating to the alleged Defect, it appears that only one person, Ms. Rubin, objected rather than opted out.

misleading information about the Settlement. That website states that "[t]he Class Action Settlement will provide compensation and reimbursement to Class members for specific types of damages and losses suffered as a result of the security defect (subject to individualized proof), **but the Class Action Settlement *does not* provide monetary compensation and reimbursement to class members whose Class Vehicle has not been stolen or the subject of an attempted theft, but who have nevertheless paid increased insurance premiums due to the existence of the security defect**." Leadership Reply Decl., ¶ 15 (emphasis in original). But the Settlement *does* provide money to Class members whose Class Vehicle have not been stolen or been the subject of an attempted theft, namely: (i) reimbursement up to $250 for lost income and/or childcare costs incurred in obtaining the Software Upgrade; (ii) reimbursement for a key fob purchase made to receive the Software Upgrade (up to $350 per key fob, limit of 2 per Class Vehicle); (iii) reimbursement up to $50 for steering wheel locks; and (iv) reimbursement up to $300 for the purchase of an aftermarket anti-theft system for Class Vehicles not eligible for the Software Upgrade.[4]

Thus, the website used to solicit mass opt-outs to the Settlement may violate professional rules of conduct by misinforming Class members.[5] And given that over 25% of the opt-out forms submitted by Rubin's counsel were incomplete and/or did not qualify for the Settlement, Rubin's counsel did not conduct the required due diligence of their clients' claims. *See* Cal. Rules of Professional Conduct Rule 1.3.

---

[4] The website also states that "[i]f you opt out of the Class Settlement, … you can also still receive the software upgrade, Leadership Reply Decl., ¶ 15, yet nothing other than the Settlement compels Defendants to install the Software Upgrade.

[5] *See, e.g.*, Cal. Rules of Professional Conduct Rule 1-400(D) ("A communication or a solicitation (as defined herein) shall not: (1) Contain any untrue statement; or (2) Contain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead the public; or (3) Omit to state any fact necessary to make the statements made, in the light of circumstances under which they are made, not misleading to the public . . . .").

011112-11/2652433 V1

Rubin's objection should be rejected for a *third* reason: it relies on the ginned-up and unreliable "preliminary" report of Andrew Barile, who in turn relies on a "preliminary" and unreliable analysis prepared by Kroll LLC purportedly issued almost two weeks prior to this Court's preliminary approval order and approximately five months **before** Rubin was recruited by Vorys. *See* Dkt. No. 371-3 ("Barile Report"); Leadership Reply Decl., Ex. A (Rubin Tr.) 139:1-5. Ms. Rubin was unable to say who paid for the Kroll and Barile work, thus raising the obvious question of whether her objection is being used to offset the cost of Vorys' mass opt-outs. *Id*. at 139:12-14.

In sum, Rubin and her counsel have an unwaivable and fundamental conflict of interest with the Class and have misled the Court and countless Class members as part of a scheme to use Rubin's objection to enrich themselves. Accordingly, the Court should overrule Rubin's objection.

## C.    The Court should overrule all objections because the Settlement is fair, adequate, and reasonable.

"The Ninth Circuit has explained that 'the proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.'" *Brown v. Cvs Pharmacy, Inc.*, 2017 U.S. Dist. LEXIS 182309, at *9 (C.D. Cal. Apr. 24, 2017) (quoting *Officers for Justice v. Civ. Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1980)). Nor must a settlement be the "ideal or the best outcome." *Chalian v. CVS Pharmacy, Inc.*, 2021 U.S. Dist. LEXIS 133209, at *9 (C.D. Cal. July 16, 2021). Rather, a court must simply decide "whether the settlement is fair, free of collusion, and consistent with plaintiff's fiduciary obligations to the class." *Id*. The Settlement is fair and reasonable because it provides robust and comprehensive forms of relief for all Class members based upon the damages each Class member sustained and the strength of their claims.

011112-11/2652433 V1

### 1. The $145 million Common Fund plus additional benefits is a tremendous result.

Several objectors complain that the non-reversionary Common Fund of up to $145 million is insufficient. Notice of Lodging Ex. Nos. 4, 15, 23, 63, 77, 84. Of course, this ignores the many other benefits that the Settlement provides. *See Martin v. Toyota Motor Credit Corp.*, 2022 U.S. Dist. LEXIS 156480, at *8 (C.D. Cal. Aug. 26, 2022) (Selna, J.) (settlement terms "cannot be viewed in isolation [but] in conjunction with the Settlement as a whole")). And "[a]n objection that merely argues that the settlement terms for Class Members could have been better 'does not mean the settlement [is] not fair, reasonable or adequate.'" *Zakikhani v. Hyundai Motor Co*., 2023 U.S. Dist. LEXIS 123158, at *22 (C.D. Cal. May 5, 2023)) (quoting *Hanlon*, 150 F.3d at 1027)); *see also Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 U.S. Dist. LEXIS 188824, at *73 (C.D. Cal. May 29, 2015) ("[T]he possibility that a 'better' settlement might have been reached, do[es] not provide a sufficient basis upon which to conclude that the settlement agreement is unfair." (citing *Hanlon*, 150 F.3d at 1027)). Generally, these Class members argue that the fund should be uncapped, provide billions of dollars in compensation, and that Defendants should be "fully liable" for all alleged losses. But the Common Fund is a tremendous result for the Class, especially given the risks facing Plaintiffs' somewhat novel claims. Expert Edward Stockton, an economist with extensive experience evaluating economic harm in automotive defect cases, presented a conservative analysis of potential Settlement claims revealing that, when applying the 40% litigation risk discount, the $145 million Common Fund should suffice. *See* Dkt. No. 228-3 ¶ 46; *see also* Dkt. No. 200 at 26 (finding the 40% litigation risk discount here is reasonable); *Aarons v. BMW of N. Am., LLC*, 2014 WL 4090564, at *12 (C.D. Cal. Apr. 29, 2014) (settlements will not make most class members completely whole, and class members will "discount their claims to obtain a certain and timely recovery, rather than bear the significant risk and delay associated with further litigation"). No objector has effectively rebutted Mr. Stockton's testimony.

One objector (Birner) complains that "[a]ll of the cash payments are not stated as any sum certain or guaranteed minimum" and "cash payments are subject to pro-rata decreases and provide no guarantees." Dkt. No. 407 at 2. As an initial matter, the objection is factually incorrect, as several categories of reimbursement are not being paid from the Common Fund, so they are not subject to potential pro-rata decreases. Further, Birner's objection ignores that cash payments are based on actual out-of-pocket expenses incurred by Class members and that it is not appropriate or even possible to state guaranteed minimum amounts in a manner that applies Class-wide. Birner also argues that the Settlement includes "indirect constructive reversion" of a portion of the Common Fund because "the plan in its present form is structured to give defendants unbridled discretion to prorate" claims. Dkt. No. 407 at 15. This is wrong, because the Settlement only allows pro-rata decreases if the value of approved claims exceeds $145 million. *See* ASA §§ II.D.6-7.

Birner and Jhaza Tanner object to the Settlement because the total Settlement does not account for punitive damages. However, punitive damages are not considered in determining fairness. *Mangone v. First USA Bank*, 206 F.R.D. 222, 229 (S.D. Ill. 2001) (collecting cases). And there has been no showing that punitive damages are warranted. *See In re Tracfone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1004 (N.D. Cal. 2015) (rejecting Birner's objection regarding punitive damages).

### 2. Objections that complain about insurance premiums and coverage fail because they are unsubstantiated, inaccurate, and simply complain that the Settlement is not "better."

Several objectors[6] object to the Settlement on the grounds that it does not adequately compensate them for increases in insurance premiums and/or they have reported difficulty obtaining comprehensive theft coverage from insurers. These objections simply complain that the Settlement should be more robust and provide for

---

[6] Notice of Lodging Ex. Nos. 33, 70, 23, 18, 47, 52, 53, 86, 59, 76, 24, 21, 51, 36, 31, 75, 26, 4, 37, 44, 41, 30, 12, 10, 62, 22, 67, 45, 65, 58, 39, 14, 83, 81, 84, 80, 32, 3, 15, 28, 29, and Ruth Rubin.

more monetary compensation—objections that are routinely overruled and deemed insufficient to deny final approval. *See supra.* And although certain Class members complain that their insurance premiums have increased, ***they do not show that the Defect is the reason for the increases***.

A report published by Insurify[7] acknowledged that "Kia and Hyundai drivers saw a major premium spike [since 2020], ***but so did everyone else***." Leadership Reply Decl. ¶ 9. In 2023, the average cost of full-coverage insurance for Kia and Hyundai models was $206 per month, while the average monthly insurance rate for six comparable models was $207. *Id*. Between 2020 and 2023, insurance rates skyrocketed across all vehicle brands. *Id*. Kia and Hyundai models increased 55% during this time, which is in line with the 51% increase for comparable vehicles. *Id*. The report further noted that a multitude of factors affect insurance rates, including vehicle maintenance, which was up 10% year over year. *Id*.

Insurify's findings are consistent with other studies. For example, *Car and Driver* on February 2, 2024, reported that the U.S. Bureau of Labor Statistics' December 2023 consumer price index data revealed that car insurance rates rose 43% since December 2020. *Id,* ¶ 10. Within 2023 alone, insurance rates increased 20% year over year, which was the largest increase among the approximate 200 categories that the government tracks. *Id*. The *Car and Driver* article also noted that insurance price increases were also attributable to COVID-19 shutdowns artificially depressing insurance rates in 2020. *Id.*

These objectors have failed to demonstrate that their insurance premiums increased as a direct result of the alleged Defect. *See Nwabueze v. AT&T Inc.*, 2013 U.S. Dist. LEXIS 169270, at *28 (N.D. Cal. Nov. 27, 2013) (overruling objections that were "largely conclusory and fail to provide legal support or evidence"); *In re Toyota*

---

[7] Insurify is a leading insurance comparison website that partners with major insurance companies, including Nationwide, Farmers, and Liberty Mutual, and is licensed in all 50 states. Leadership Reply Decl., ¶ 9 n.5.

*Unintended Acceleration*, 2013 U.S. Dist. LEXIS 123298, \*310-311 (C.D. Cal. July 24, 2013) (rejecting unsupported objections to a proposed fee award where the objectors presented no expert declaration or other evidence undermining the Court's conclusions); *Collado v. Toyota Motor Sales, U.S.A., Inc.*, 2011 U.S. Dist. LEXIS 133572, at \*7 (C.D. Cal. Oct. 17, 2011) (overruling objection as "too insubstantial for the Court to disturb the overall settlement").

         **a.**    **Rubin's insurance premium objections are unsupported for additional reasons.**

      Despite insurance rates for Kia and Hyundai vehicles increasing in line with the market, Rubin asks the Court to assume direct causation and that each Class member suffered $358.34 in "damages" from increased premiums in 2024, regardless of whether their vehicles were stolen. Dkt. No. 371 at 19, 20 n.8. Rubin's assertion should be rejected for several, independent reasons. *First*, Rubin does not explain how she calculated $358.34 in "damages" for increased insurance premiums. *Second*, even if she can support her purported damage calculation, Ms. Rubin assumes that all Class members had their insurance premiums increase by the same $358.34 amount. This cannot be true; her Class Vehicle was a 2021 model year, while the majority of Class Vehicles are much older and worth considerably less (and thus less expensive to insure). In any event, individualized proof would be required, a hurdle that Ms. Rubin does not even attempt to clear. Indeed, as Rubin's purported expert concedes, individualized insurance premium pricing is based upon a multitude of direct and indirect factors, "includ[ing], but . . . not limited to, location, type of vehicles, coverage, deductible, vehicle usage, driving record, claims history, discounts, and credit score." Dkt. No. 371-3, ¶ 7. These individualized issues may be necessary to establish indirect causation for insurance premiums caused by the theft of other Class Vehicles. *See* Dkt. No. 390 (striking class allegations in the Subrogation Plaintiffs' Amended Consolidated Complaint); *id.* at 7 ("Subrogation Plaintiffs fail to explain how the Court can determine that the claimed losses are indisputably ones for which the insurers are

not primarily liable without needing to examine individualized evidence as to each insured's claims (e.g., the scope of each insurer's subrogation rights, terms of the applicable subrogation principles)."); *id.* at 8 ("[T]he Court would need to determine whether there was, in fact, a Thief Friendly Design and, if so, whether it was, in fact, caused by the Thief Friendly Design and not some other intervening cause, such as a different defect or the insured's own neglect in protecting his or her vehicle.").

*Third*, Ms. Rubin assumes that all Class member policy terms are comparable to hers, like her extremely low deductible of $100 for non-collision (*i.e.*, theft) claims, which has an inverse correlation to insurance premiums. Leadership Reply Decl., Ex. C; *see id.* ¶ 19 ("Your insurance premium is the amount you pay for the plan. The deductible is the amount you pay out-of-pocket for an auto repair before we cover the rest. As one goes up in cost, the other usually comes down."). Additionally, her policy rate is based upon two or three drivers, including her husband and teenage sons, while most insureds' policies are not. *Id.*, Ex. C. And Rubin's premium is based, in part, on her residence in Columbus, Ohio, a highly dense urban area, and is priced differently than, for example, a rural part of the country or even Ohio more generally.

*Fourth*, Rubin assumes that everyone has the same insurance claim history and driving record, two critical variables among many that affect premiums, despite her husband's record of speeding and teenage sons' ages. Leadership Reply Decl., Ex. A (Rubin Tr.) 9:20-10:1, 21:6-15. *Fifth*, to argue that her Class Vehicle "has the highest proportionate insurance premium out of all her vehicles" when comparing premium to vehicle value, Rubin uses the Kelley Blue Book Trade-in Value and assumed that each of her vehicles were driven 10,000 miles/year and were "in Very Good Trade-in Value." Dkt. No. 371 at 4. But Rubin has failed to offer any support for her assumptions or the method of valuing her vehicles, and she ignores the fact that insurance companies utilize specific usage when setting premium policies. Dkt. No. 371-3 ¶ 7.

---

14

011112-11/2652433 V1

*Sixth*, Rubin ignores that countless Class members will sell or otherwise dispose of Class Vehicles for reasons not related to the Defect in 2024 and would not be entitled to alleged insurance premium damages. *See* Leadership Reply Decl., Ex. A (Rubin Tr.) 96:4-8.

There are additional reasons to reject Ms. Rubin's objection. Her objection (Dkt. No. 371) and declaration (Dkt. No.371-1) contain information that is at best false but likely intentionally misleading. The declaration identifies four insurance coverage data points for her 2021 Kia Soul: (i) "Total" premium charged; (ii) premium for "Property Damage;" (iii) premium for "Damage to Auto;" and (iv) premium for "Comprehensive." *See* Dkt. No. 371-1, ¶ 3. Her documents show that the data contained in the chart on page 2 of her Declaration is demonstrably false with respect to the amounts reflected in the column for "Comprehensive" coverage. The amounts listed as "Comprehensive" coverage in the Declaration are identified as "Collision" coverage in Rubin's insurance declaration sheets. *See*, *e.g.*, Leadership Reply Decl., Ex. D (February 2022 policy states $190.88 for "Collision" premium and $57.37 for "Damage To Your Auto Other Than Collision (Comprehensive)")). Including these amounts as damages to be claimed as part of Rubin's objection is misleading because "Collision" coverage (mislabeled as "Comprehensive") does ***not*** cover damage from theft. *See* Leadership Reply Decl., Ex. E at 17.[8] Similarly, the columns labeled "Property Damage" and "Bodily Injury" in Rubin's Declaration cover property damage and physical injuries caused by insured drivers, and, therefore, would ***not*** be affected by theft rates or the actions of unauthorized criminal drivers. *Id.*; *see also* Leadership Reply Decl., ¶ 19 (Nationwide Insurance Company website describing "Property damage liability" coverage as insurance that "helps pay for damages to another

---

[8] *See also* Leadership Reply Decl., Ex. E (defining "Comprehensive" coverage as insurance that is "[a]lso known as 'other than collision,' this coverage can help pay for damage to your vehicle from vandalism, theft, weather events and accidents involving animals.").

011112-11/2652433 V1

person's vehicle or property" and "Bodily injury liability" as covering instances where "you cause an accident and someone is injured.").

The Barile report, which relies on a "preliminary analysis" prepared by Kroll LLC and is incomplete, fares no better. Barile admitted that:

- This was the first time he has attempted to do insurance underwriting specific to the risk of theft of a particular make and model of vehicle. *See* Leadership Reply Decl., Ex. B (Barile Tr.) at 29:7-12, 33:17-34:4.

- The methodology he and Kroll employed is not found anywhere in published literature or insurance industry standards, *id.* at 34:5-12, and he developed the methodology for the analysis reflected in his report using only his experience. *Id.* at 34:12-19; *see also id.* 35:2-5.

- His analysis is limited to only eight states, and he does not know if it is possible to extrapolate nationwide from the data in those states. *Id.* at 143:11-14.

- He does not know if his opinion regarding rate increases for Hyundai and Kia automobiles is representative of rate increases across the country. *Id.* at 87:3-11. Indeed, he limited his investigation to rate increases filed by Allstate Insurance Company in the same eight states without knowing what percentage of Hyundai and Kia vehicles Allstate insures in those states. *Id.* at 89:5-90:2. And he failed to investigate Rubin's insurer, Nationwide Insurance Company. *Id.* at 90:3-10.

**b. The $375-per-claim cap on insurance related expenses is reasonable.**

Several Class members[9] object to the $375 per claim cap for paid insurance deductibles and increased insurance premiums for policies that include theft coverage resulting from a Qualifying Theft or Qualifying Theft Attempt. A few objectors complain that the $375 cap does not provide 100% of their insurance expenses following a Qualifying Theft or Qualifying Theft Attempt, while others (such as Notice of Lodging Ex. Nos. 40 and 56) complain that their policies provided for deductibles

---

[9] Notice of Lodging Ex. Nos. 43, 18, 20, 6, 16, 27, 51, 56, 64, 7, 54, 58, 71, 40, 17, 84, 3, 1, 55, and Donald Birner.

that were 50% to 500% more than the average $500 deductible. However, the desire for the Settlement to provide greater benefits that do not include any settlement discount is not a compelling basis to deny final approval. *Retta v. Millennium Prods.*, 2017 U.S. Dist. LEXIS 220288, at *24 (C.D. Cal. Aug. 22, 2017) (the "nature of settlement" is that "Class Members will discount their claims to obtain a certain and timely recovery, rather than bear the significant risk and delay associated with further litigation."); *Mendoza v. Hyundai Motor Co.*, 2017 WL 342059, at *10 (N.D. Cal. Jan. 23, 2017) ("It would not be fair to the class as a whole to set aside an otherwise fair settlement because it does not address unique and difficult to prove hardships suffered by only a few members of the class.").

This reasonable cap was based upon Plaintiffs' expert's finding that "[m]ultiple public sources confirm that $500 is the median and modal (most common) deductible amount," Dkt. No. 228-3, ¶ 26.D,[10] and Class Counsel's determination that a modest discount was appropriate to avoid delay in relief to Class members and the litigation risks if this case were to proceed. *See* Dkt. No. 200 at 26 ("[T]he Court finds that a 40% decrease is reasonable"). Objectors present no persuasive arguments that the cap is anything but reasonable given the risks of the litigation.

      **c.**    **The Settlement provides substantial compensation for Class members who have not experienced a theft or attempted theft.**

Ms. Rubin complains that Class members who have not experienced a theft are not entitled to any reimbursement for insurance related expenses, and therefore the consideration they will receive under the Settlement is negligible or non-existent. *See* Dkt. No. 371. Rubin is wrong again—the Settlement provides such Class members with many other benefits. *First*, the Settlement provides all Class members the primary relief sought in the Action: an effective remedy to the alleged Defect that will diminish the risk of theft created by the lack of an immobilizer. For Class members with eligible

---

[10] Many Class members who filed objections based on the insurance deductible claim caps reported that their deductibles were $500. *See, e.g.*, Notice of Lodging Ex. Nos. 3, 6, 16, 18, 27, 49, 54, 55.

Class Vehicles, they may obtain the free Software Upgrade, which Defendants will warrant for the life of the vehicle. ASA §§ II.A.1-A.2. Further, the Settlement requires Defendants to install the Software Upgrade any time a Class Vehicle is brought into a Hyundai or Kia dealership, and the Software Upgrade will be available for at least 360 days following the latter of final approval or the widespread availability of the Software Upgrade. ASA § II.A.3,5. Absent the Settlement, Defendants are not required to offer the Software Upgrade, *see* Dkt. No. 376 at 8 (NHTSA letter stating the vehicles do not violate FMVSS No. 114), nor are they required to automatically install the software, warrant its perpetual performance, or make it available until at least July 2025.[11]

*Second*, Class members who own or lease Class Vehicles that, due to technical limitations, are not eligible to receive the Software Upgrade, may seek reimbursement of up to $300 per vehicle for the purchase of anti-theft systems or components designed to deter or prevent theft. ASA §§ I.Z., II.C.1.[12] Notably, the claim payments may be used to install anti-theft devices that supplement the ignition cylinder protector offered by Defendants, which makes it difficult to breach the steering column and tamper with the ignition cylinder. *See* Dkt. No. 376 at 12-13 (discussing ignition cylinder protector).

*Third*, Class members with Class Vehicles eligible for the Software Upgrade may also seek reimbursement from the Common Fund for lost income and childcare expenses up to $250 to obtain the Software Upgrade and for the purchase of new key fobs up to $350 per fob (limited to two fobs per Class Vehicle) where necessary to implement the Software Upgrade. ASA § II.D.5. Such Class members may also seek reimbursement up to $50 per Class Vehicle for the purchase of a steering wheel lock

---

[11] Indeed, prior to reaching the Settlement, Kia stated that the Software Upgrade was "A LIMITED TIME OFFER" and that owners must contact a dealership to install the Software Upgrade before August 1, 2024. Leadership Reply Decl., ¶ 20.

[12] Any Class member who received a steering wheel lock provided by Defendants or through a law enforcement department may submit a reimbursement claim up to $250 for the purchase and installation of a glass breakage alarm or similar anti-theft system (including installation), or another aftermarket modification designed to deter or prevent theft. ASA § II.C.2.

made at least 30 days before the Software Upgrade became available for their Class Vehicle, which is paid separate from the common fund. ASA § II.B.1.

*Fourth*, as part of the Settlement, Defendants conducted a nationwide press campaign promoting the Software Upgrade and discussing its availability and effectiveness at preventing vehicle thefts, which included publication on social media platforms. ASA § II.A.6; Declaration of Steven Platt Regarding Class Notice and Settlement Administration, Dkt. No. 378-18. Accordingly, the Settlement provides substantial benefits to Class members who have not experienced a theft.

These Settlement benefits are a tremendous result for the Class given the difficulties presented by their claims. Defendants would strenuously oppose the claims, arguing that the Defect did not manifest in Class Vehicles that did not suffer a theft or attempted theft. *See* Dkt. No. 371 at 19-20 (Rubin alleged that only 1% of Class Vehicles were stolen in 2023); *Kanan v. Thinx Inc.*, 2021 U.S. Dist. LEXIS 191225, at *19-20 (C.D. Cal. June 23, 2021) (Selna, J.) (finding plaintiffs must "allege either the manifestation of the defect in their product or a substantial certainty of manifestation." (citation omitted)); *In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F. Supp. 2d 801, 866 (S.D. Ohio 2012) (for implied warranty in tort claims in Ohio, "courts have held that the loss occurs at the point at which the alleged defect manifests, rather than the point at which the sale is made.").

### d.   Ms. Rubin misapplies the Ninth Circuit factors.

Rubin recognizes that the Ninth Circuit has instructed district courts to consider at least eight factors when analyzing a motion for final approval, *see* Dkt. No. 371 at 18 (citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011), yet she summarily dismisses those factors that cut against her arguments on behalf of "Non-Theft Class Members." She dismisses the risk, expense, complexity, and likely duration of further litigation factor, stating "the risks of continued litigation do not apply here because Non-Theft Class Members like Rubin will gain no relief for their increased insurance premiums or their Class Vehicles' decreased value regardless

011112-11/2652433 V1

1    of whether they lose at trial or if they settle the case." Dkt. No. 371 at 23. Nonsense.

2    The Settlement offers Rubin tangible benefits, including money, which she chose to

3    ignore. Further, she discounts the risk that a class may not be sustained through trial if

4    the Settlement is not approved. Not only does Rubin ignore the weaknesses of pursing

5    damages for increased insurance premiums for Class Vehicles that were not stolen

6    (discussed above), but she also ignores the risks faced by all claims alleged in the

7    action, including those by Class members that had their Vehicles' stolen. *See* Dkt. No.

8    376 at 7-9. For instance, when striking class allegations in the Subrogation Plaintiffs'

9    complaint, this Court found that "even if the Class Subrogation Plaintiffs prevailed on

10   the common question that Defendants misled or concealed a defect that caused class

11   vehicles to be susceptible to theft, the question of whether each insured's vehicle was

12   stolen or damaged due to Defendants' Thief Friendly Design raises individualized

13   inquiries." *See* Dkt. No. 390 at 6. While this applies to all Class members' claims, the

14   individualized inquiry would be more of a challenge to Rubin's claim which relies on

15   theft rates for vehicle models that differ from hers. Rubin also ignores that continued

16   litigation would include significant expenses and delay any potential recovery. *See*

17   *generally* Dkt. No. 371; *Brown*, 2017 U.S. Dist. LEXIS 182309, at *9 ("[A]ny analysis

18   of a fair settlement amount must account for the risks of further litigation and trial, as

19   well as expenses and delays associated with continued litigation.").

20          Rubin also disregards the "reaction of the class" factor, making a naked claim

21   that "[s]uffice it to say, if Non-Theft Class Members knew they were not obtaining any

22   sufficient consideration to release their claims and continue to suffer the harms alleged

23   in the Consumer Complaint, they likely would be displeased." Dkt. No. 371 at 25. But

24   were courts to apply Rubin's argument, the factor would become totally meaningless.

25   Regardless, the reaction of the Class has been overwhelmingly favorable. Leadership

26   Reply Decl., ¶ 4. For example, a Class member sent Class Counsel an unsolicited email,

27   stating: "I am writing to express my gratitude for your dedicated representation of our

28

settlement class in the Hyundai claim. Your efforts in addressing and rectifying this matter have been greatly appreciated…. Your assistance in this matter is invaluable to me[.]" *Id.*

### e. Objectors have failed to establish the inability to obtain insurance coverage.

Certain objectors state that they are concerned about their ability to obtain insurance coverage, but none have proved an inability to obtain a policy. In many instances, it is illegal for insurance companies to cease coverage for select models, Leadership Reply Decl., ¶ 7, and Class members' fears are based on unsubstantiated media reports. Moreover, Hyundai has entered into a partnership with AAA to provide insurance coverage to Class members. *Id.*, ¶ 8.

### 3. The Settlement need not provide for alleged diminution in value payments.

Several objectors complain that the Settlement fails to provide them with payments for alleged diminution in value damages.[13] These objections are again essentially complaints that the Settlement should just be better, which "'does not mean the settlement [is] not fair, reasonable or adequate.'" *Zakikhani*, 2023 U.S. Dist. LEXIS 123158, at *22 (quoting *Hanlon*, 150 F.3d at 1027)); *see also Vargas v. Ford Motor Co.*, 2017 U.S. Dist. LEXIS 177149, at *9 (C.D. Cal. Oct. 18, 2017) (rejecting objection "arguing that the settlement should provide more relief, e.g., for diminution in value" because "[s]imply wanting a more favorable settlement is not a sufficient basis for an objection to a class action settlement that is otherwise fair, adequate, and reasonable."); *Warner v. Toyota Motor Sales, U.S.A., Inc.*, 2017 U.S. Dist. LEXIS 77576, at *27-28 (C.D. Cal. May 21, 2017) (overruling objections to settlement as inadequate or unfair because it does not provide compensation for diminished value because "[t]hese objections . . . fail to take into account the difficulties of establishing

---

[13] Notice of Lodging Ex. Nos. 9, 18, 52, 86, 51, 36, 31, 26, 44, 72, 79, 41, 61, 30, 12, 38, 83, 81, 15 and Donald Birner and Ruth Rubin.

1  classwide diminution in value damages . . . with owners buying and selling . . . at
2  different times and in different circumstances.'" (citation omitted)).

3       Further, the objectors "ha[ve] not presented any evidence suggesting that the []
4  defect impacted the resale price of [their] vehicle[s.]" *Zakikhani*, 2023 U.S. Dist.
5  LEXIS 123158, at *26-27. For example, Rubin states that "[t]he damages potentially
6  recoverable for the Class Vehicles' diminution of value are staggering." Dkt. No. 371
7  at 20. She assumes that if each Class Vehicle "lost just $100," it would be $900 million
8  in additional damages. *Id*. at 20-21. But Rubin provides no support for the $100
9  assumption. *See id*. Rather, she relies on a single news article and Class Counsel's
10 allegations in the Complaint. *See id.* at 15. She ignores that the news article does not
11 account for the Settlement remedy and that Class Counsel subsequently investigated
12 the adequacy of these repairs.[14] *See Edwards v. Nat'l Milk Producers Fed'n*, 2017 U.S.
13 Dist. LEXIS 145214 (N.D. Cal. June 26, 2017).

14      These objections also "fail to take 'into account the difficulties of establishing
15 classwide diminution in value damages . . . with owners buying and selling . . . at
16 different times and in different circumstances.'" *Warner*, 2017 U.S. Dist. LEXIS
17 77576, at *27-28 (alteration in original) (quoting *Eisen v. Porsche Cars N. Am., Inc.*,
18 2014 WL 439006, *8 (N.D. Cal. 2014)) (overruling objection to class action settlement
19 over alleged rust-prone defect affecting certain Toyota vehicles). "'[D]iminution in
20 value damages pose great difficulties in a class action context, particularly when
21 considering the challenge of proving such damages on a classwide basis.'" *Id*.
22 (quoting *Asghari*, 2015 WL 12732462, at *26).

23
24
25

26 ───────────────
   [14] Similarly, Objector Donald Birner states, "The class vehicles are theft prone
27 which has, without doubt, considerably reduced their fair market value." Dkt. No. 407
   at 3. But Birner ignores that each Class Vehicle will be entitled to a repair and fails to
28 provide any empirical support for the alleged diminution in value.

### 4. Emotional distress damages are not recoverable.

Although some objectors[15] allege to have experienced emotional distress and suffered inconveniences relating to the alleged Defect, such intangible damages are not appropriate for this Settlement. Emotional distress damage claims pose several hurdles. For example, such damages are subject to the economic loss rule in California and many other states and are not compensable for the consumer claims at issue in this case. *See, e.g.*, *Elsayed v. Maserati N. Am., Inc.*, 215 F. Supp. 3d 949, 952 (C.D. Cal. 2016) (rejecting emotional distress damages for vehicle defect lawsuit because plaintiff did not suffer physical injury); *Pruchnicki v. Envision Healthcare Corp.*, 439 F. Supp. 3d 1226, 1233 (D. Nev. 2020) (Nevada requires "'a plaintiff to demonstrate that he or she has suffered some physical manifestation of emotional distress in order to support an award of emotional damages.'" (citation omitted)); *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 U.S. Dist. LEXIS 129939, at *69-70 (N.D. Cal. July 22, 2020) (rejecting objection based on failure to include compensation for emotional stress because such claims were "too speculative to constitute a measure of damages").

Even if Class members can satisfy the above requirements—which is unlikely—emotional distress "is necessarily an individualized inquiry, and the amount of damages in such cases 'is not susceptible to a mathematical or formulaic calculation.'" *Rader v. Teva Parenteral Meds., Inc.*, 276 F.R.D. 524, 530 (D. Nev. 2011) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003)).

### 5. The claim caps on certain categories of reimbursement are reasonable.

#### a. The claim caps for Class Vehicles that suffered a Total Loss or damage following a theft or attempted theft are appropriate.

The Settlement provides substantial compensation for Class members that suffered losses related to Qualifying Thefts or Qualifying Theft Attempts, including total loss of Class Vehicles up to 60% of the Black Book value of the vehicle and

---

[15] Notice of Lodging Ex. Nos. 69, 47, 52, 76, 11, 21, 56, 26, 22, 45, 7, 25, 66, 71, 48, 60, 1, 31, 24, 45, 30, 89.

011112-11/2652433 V1

damage to Class Vehicles and personal property up to the greater of $3,375 or 33% of the Black Book value of the vehicle. ASA § II.D.3. Mr. Stockton opined that under these caps the "available compensation to Class Members would depend directly upon vehicle value" and that he "expect[s] the large majority of claimants, under the revised payment caps, to receive compensation in line with or exceeding the benchmark of 60% of their monetary losses, with some exceptions." Dkt. No. 228-3, ¶ 8. Yet, certain Class members (Notice of Lodging Ex. Nos. 48, 70, 76) complain that they should be entitled to 100% of their losses. Again, objections that 100% of damages are not reimbursed do not demonstrate that the Settlement is not fair, reasonable, and adequate. *Aarons*, 2014 WL 4090564, at *12 (class members will "discount their claims to obtain a certain and timely recovery, rather than bear the significant risk and delay associated with further litigation"); *Retta*, 2017 U.S. Dist. LEXIS 220288, at *24.

Objections to using the Black Book to value Class Vehicles are unsupported, because the Black Book is an industry standard index used to value used vehicles and is accepted as an appropriate index for class settlements. *See, e.g.*, *Zakikhani*, 2023 U.S. Dist. LEXIS 123158, at *9 (applying Black Book to determine settlement compensation for total losses); *In re: Hyundai and Kia Engine Litigation II*, No. 8:18-cv-2223-JLS-JDE, Dkt. No. 163 (C.D. Cal. Apr. 9, 2024) (same); Leadership Reply Decl., ¶ 11 (noting that *Cars.com* relies on Black Book valuations). While objector Messina notes that it typically "requires a paid subscription to access," the Settlement Administrator can tell each Class member the value of their vehicle.

Mr. Birner argues that "[t]he Black Book value is the lowest valued index and dealer oriented focusing on wholesale and auction prices and generally attached a lower value than say the Kelly Bluebook or Edmunds which are more consumer oriented." Dkt. No. 407 at 13. *First*, Birner offers no support for his assertion that the Black Book is "the lowest valued," as he must to sustain his objection. *Zakikhani*, 2023 U.S. Dist. LEXIS 123158, at *26-27; *Nwabueze*, 2013 U.S. Dist. LEXIS 169270, at *28; *In re*

1  *Toyota Unintended Acceleration*, 2013 U.S. Dist. LEXIS 123298, at *310-311. *Second*,

2  even if Birner is correct that Black Book's valuation is less than other indexes, its use

3  is reasonable (if not perfect, as Birner demands) because Black Book is more reliable

4  and easier to administer than Blue Book. Leadership Reply Decl. ¶ 11.

5      Birner also argues that reimbursements for Total Losses are a "ruse" because

6  many Class members have insurance that covered their losses. Dkt. No. 407 at 4.[16]

7  Birner's argument is fundamentally flawed. Under Birner's own analysis, these Class

8  members have been made whole. To the extent Birner argues that the Settlement

9  "effectively allows Defendants [sic] mitigate its damages by seizing an insurance asset

10  of class members," he ignores the fact that the majority of insured Class Vehicles are

11  covered by the Subrogation Track of this MDL. *See In re Phenylpropanolamine Prods.*

12  *Liab. Litig.*, 227 F.R.D. 553, 565 (W.D. Wash. 2004) (overruling objection that

13  common fund "is inadequate because it only covers non-reimbursed and non-

14  reimbursable expenses").

15      Birner also contends that many vehicles suffering a Total Loss or a theft are

16  probably "unavailable." Dkt. No. 407 at 14. While the objection Birner is trying to

17  make is unclear, the fact that older Class Vehicles that experienced thefts are

18  "unavailable" is a meaningful strength of the Settlement and weakness of the case.

19  Should those claims proceed, those Class members would have difficulty establishing

20  that their thefts were related to the Defect. Moreover, the Settlement provides that "[i]f

21  a Class Vehicle was stolen and a Class member demonstrates through objectively

22  reliable documentation that the Class Vehicle was not recovered after being stolen, this

23  circumstance will be treated as a 'Qualifying Theft.'" ASA § I.AA.

24

25

26

27    [16] Similarly, Objection No. 20 objects to the Settlement because it does not provide

28  money spent by her insurance company relating to her theft claim.

**b.    The $250 claim caps for certain incidental damages are appropriate.**

Certain objectors[17] also object to the $250 per claim cap for certain miscellaneous out-of-pocket expenses incurred due to a Qualifying Theft or Qualifying Theft Attempt, such as rentals, towing, and speeding fines, and reimbursement for lost income and childcare expenses relating to the Software Upgrade. Like objections to the insurance expense claim cap, these objections fail because they boil down to the argument that the Settlement should be better, and damages should not be subject to any discounts. *See Retta*, 2017 U.S. Dist. LEXIS 220288, at *24; *Asghari*, 2015 U.S. Dist. LEXIS 188824, at *62-63.

In addition, Objection Nos. 55, 60 and 65 complain that the allowable categories of incidental expenses do not include additional categories, such as at least $900 in compensation for private parking space expenses or compensation for daycare expenses for dogs. But "a class settlement is not capable of resolving every possible consequential damages claim a Class Member might wish to pursue." *Mendoza*, 2017 WL 342059, at *10.

Similarly, certain objectors want compensation for outsized expenses following a Class Vehicle theft. For example, Michael Smith (Notice of Lodging Ex. No. 73) complains that he incurred $3,807 in rental fees during the 2.5-month period it took a non-Kia repair center to fix his vehicle. But it is reasonable that Class members who allegedly experienced unique forms of damages do not receive complete reimbursement in a settlement because these cases typically involve more complex scenarios that make such claims weaker. *In re Toyota Unintended Acceleration*, 2013 U.S. Dist. LEXIS 123298, at *285; *In re Lithium Ion Batteries Antitrust Litig.*, 2020 U.S. Dist. LEXIS 233607, at *68 (N.D. Cal. Dec. 10, 2020) . For example, Smith would likely need to establish the cause of the delay in repairing his vehicle and his efforts to mitigate that harm. The Settlement removes this risk by offering a recovery that is not

---

[17] Notice of Lodging Ex. Nos. 9, 20, 6, 16, 49, 54, 84, 73, 60, 69, 55, 56, 65, 45, 50, 76, 86, 68, 32.

011112-11/2652433 V1

contingent on establishing such facts. And, as noted above, the existence of outlier cases may provide a sensible basis for opt-outs, but they do not render a Settlement as a whole unfair, inadequate, or unreasonable. *See Mendoza*, 2017 WL 342059, at *10.

**6.     The Settlement addresses the alleged Defect in multiple ways.**

**a.     The Software Upgrade adequately addresses the alleged Defect.**

Several objectors[18] contend that the Software Upgrade does not adequately address the risk of future theft. They are wrong. As the parties previously explained, the Software Upgrade is designed to prevent the precise method of theft popularized in social media channels. *See* Dkt. No. 259 at 7-9 (analyzing the parties' "Showing Regarding Efficacy of Software Upgrade"). Defendants submitted the declaration of James Smith ("Smith Decl.," Dkt. No. 230–1), who conducted approximately 100 tests on the Software Update and determined that "[t]he alarm system performed as expected, and the vehicle could not be started using the social media theft method when the alarm was armed." *Id*. at 7. Smith investigated specific instances of reported thefts in vehicles that have had the Software Upgrade installed, and in each of these cases, Smith determined that the Software Upgrade performed as intended and that the theft was not attributable to the Defect (i.e., the lack of an immobilizer). *Id*. at 12-13. Class Counsel continued to investigate and monitor post-installation instances of thefts, which included an interview of Smith. Leadership Reply Decl. ¶ 5.

Many of the objections based on the efficacy of the Software Upgrade rely on dated public media reports. The problem with these dated public media reports is that no one can validate whether the thefts being reported were due to the failure of the Software Upgrade. When such instances have been investigated, the Software Upgrade has been shown to be effective. Dkt. No. 230–1 at 12-13. In fact, objector Flanders noted in her objection that the Software Upgrade, installed in May 2023, successfully prevented a group of thieves from stealing her vehicle.

---

[18] Notice of Lodging Ex. Nos. 70, 86, 27, 57, 36, 31, 4, 41, 66, 17, 48.

As anticipated, as the Software Upgrade continues to roll out, the rate of theft for Class Vehicles has begun to fall (reminiscent of the experience in the *Toyota Unintended Acceleration* settlement with the installation of the brake override). In a CBS News report from February 22, 2024, the Minneapolis Police Chief Brian O'Hara noted that "[e]ach week the proportion of cars stolen that are Kias and Hyundais have been decreasing" and car thefts across all brands year-to-date in Minneapolis have decreased by 34%. Dkt. No. 378, ¶ 60. Similarly, Chicago theft data for October through November 2023 shows a year-over-year decrease of 33% to 42% for Kia and Hyundai vehicles, and compared to October 2022, December 2023 auto thefts are 46% lower for Kia and Hyundai vehicles. *Id.* A March 2024 report issued by the Colorado Auto Theft Prevention Authority noted that "[t]he Kia and Hyundai OEMs are taking action to mitigate this trend with a system security update for certain Kia and Hyundai vehicles." Leadership Reply Decl., ¶ 6. The report found that the number of Kia and Hyundai thefts dropped 27.8% and 22.7%, respectively, in 2023 as compared to 2022. *Id*. This data strongly suggests that the Software Upgrade is an appropriate means of providing a remedy to the alleged Defect in this action. *Id.*

Despite the Software Upgrade's efficacy, objectors Hunt and Kracht argue that the Settlement is insufficient because nothing short of the installation of an engine immobilizer, at no cost to them, on all Class Vehicles should be approved. However, as noted, an engine immobilizer is not the only way to effectively address the risk of theft created by the Defect and provide anti-theft security features comparable to traditional engine immobilizers. Moreover, insisting upon the installation of traditional immobilizers exceeds what NHTSA has said is required under federal law. *See Wylie v. Hyundai Motor Am.*, 2020 U.S. Dist. LEXIS 258983, at *5 (C.D. Cal. Mar. 2, 2020) (overruling "the objections that Hyundai should recall the Class Vehicles.").

011112-11/2652433 V1

**b.     The benefits offered to owners and lessees of Class Vehicles that are not eligible for the Software Upgrade are fair and reasonable and adequately address the alleged Defect.**

Class members who own or lease a Class Vehicle that is not eligible for the Software Upgrade are entitled to receive up to $300 to install an anti-theft device of their choice. The anti-theft device will supplement the ignition cylinder protector, which makes it difficult to breach the steering column and tamper with the ignition cylinder that Defendants have offered free of charge for each of these vehicles. Dkt. No. 378, ¶ 39. Owners of Class Vehicles that are not eligible for the Software Upgrade will receive a robust anti-theft package that will allow them to adequately remedy the risk of theft posed by the absence of an immobilizer.

Certain objectors[19] have objected to the Settlement because they do not believe these benefits are adequate, believe that only a settlement that provides for the installation of an engine immobilizer would be adequate, or complain that their vehicles are not eligible for the Software Upgrade. But as NHTSA has opined, there is no specific technology that is required to comply with FMVSS No. 114 and ensure adequate anti-theft features. While the Software Upgrade is one such method, a robust package of anti-theft features comprised of an ignition cylinder protector and an anti-theft device of each qualifying Class member's choosing will provide equal protection.

**7.     The release is narrowly tailored to the facts underlying the Class's claims.**

The Settlement "limits the release to claims, 'relating to Class Vehicles and the method of theft popularized on TikTok and other social media channels relating to the lack of engine immobilizers as alleged in this Action . . . .'" Dkt. No. 259 at 10 (quoting ASA § VI.1). Yet, objectors Rubin, Birner, and Daryl Olszewski object to the Settlement due to the scope of the release. Their arguments have no merit.

Rubin misinterprets case law when arguing that "[t]he Settlement does not treat Class Members equitably with respect to the release." Dkt. No. 371 at 27. Her claim is

---

[19] Notice of Lodging Ex. Nos. 35, 44, 48, 80.

29

based on her misguided argument that she is not receiving adequate compensation for her claim because she is not entitled to reimbursement for increased insurance premiums while such claims are included in the release. When considering whether the scope of a release is proper, courts in the Ninth Circuit consider whether "the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'" *Ali v. Franklin Wireless Corp.*, 2024 U.S. Dist. LEXIS 12903, at *12-13 (quoting *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008))). Here, the scope of the factual predicate for the release is not contested, as it is narrowly tailored to the allegations in the operative complaint. *See* Dkt. No. 259 at 2 (approving amended release after the parties "limited [it] to the facts of this case").

Rubin's reliance on *Ali v. Franklin Wireless Corp.* is misplaced because the problematic release in that settlement "indiscriminately cover[ed] any and all claims arising out of the class members' ownership of Franklin shares during the Class Period—without regard to whether such claim arises out of, or bears any relation to, the allegations in the operative complaint[.]" 2024 U.S. Dist. LEXIS 12903, at *13. As this Court previously found, the release here is narrowly tailored to the allegations in the operative complaint. Similarly, *City of Long Beach v. Monsanto Co.*, 2020 U.S. Dist. LEXIS 236442, at *10 (C.D. Cal. Nov. 25, 2020), is distinguishable because, among other issues, the problematic release in that case barred "the claims of persons or entities who are not parties to this case." Further, the comment that Rubin cites from that case addresses a portion of the settlement that required class members, most of whom "will receive a very modest payout," to indemnify the defendant. Here, the release is narrowly tailored to include only parties to the case and does not require Class members to indemnify Defendants. Dkt. No. 259 at 10.

Olszewski's and Rubin's arguments are similar in that Olszewski argues that the majority of Class members "receive nothing in exchange for releasing their claims."

---

PLS.' REPLY IN SUPPORT OF FINAL APPROVAL OF CLASS SETTLEMENT AND FEES
CASE NO.:  8:22-ML-03052-JVS-KES

011112-11/2652433 V1

However, as discussed above, that assumption is incorrect. Olszewski further assumes that the Software Upgrade is of no benefit to the Class because (i) it does not work and (ii) it is in "defendants' self- interest[]" to prevent thefts.[20] The former argument is wrong, and the latter ignores that Defendants are not required by contract or law to offer the Software Upgrade. *See* Dkt. No. 376 at 8 (quoting NHTSA letter stating the vehicles do not violate FMVSS No. 114). Further, as noted above, the Settlement supplements what Hyundai and Kia initially offered to provide Class members through the Software Upgrade.

Birner argues that the release is "contrary to the judge's direction" and excessively broad because it includes "persons and institutions that are not parties to this lawsuit" and releases unknown claims. Dkt. No. 407 at 16. His argument ignores that the Court specifically approved the release after initially finding that the first iteration submitted to the Court was ambiguous and broad. *See* Dkt. No. 259 at 2; Dkt. No. 200 at 25. Additionally, courts routinely approve releases covering affiliated persons and entities of the parties and unknown claims. *E.g.*, *Schmitt v. Younique, LLC*, 2020 U.S. Dist. LEXIS 64572, at *10 (C.D. Cal. Apr. 9, 2020) (Selna, J.) (approving release where Plaintiffs and each Settlement Class member are deemed to have waived the provisions of California Civil Code § 1542 or similar laws); *Eisen*, 2014 U.S. Dist. LEXIS 14301, at *26-27 (noting "[r]eleases of non-parties in class action settlements are readily approved and enforced" because "[n]o defendant would agree to a release that permitted plaintiffs to continue to initiate litigation against individuals or entities related to the defendant.").

**D.      Class Counsel and Plaintiffs have no interests antagonistic with the Class.**

This Court found Plaintiffs' representation of the Class to be adequate at preliminary approval, and there is no reason why that finding should be any different

---

[20] Similarly, Eric Kracht argues that "Kia America has already agreed to provide it to every owner. Thus, this proposed settlement provides nothing in addition to what is already available."

now. *See* Dkt. No. 200 at 16-17; Dkt. No. 259 at 3-4. Nevertheless, in a string of inapposite citations, Rubin appears to argue that the Settlement is the unfair and inadequate product of Plaintiffs' and the Class's alleged conflict of interest with Class members who have not suffered a theft. *See* Dkt. No. 371 at 23-24. As an initial matter, Rubin ignores that Class Representatives include Plaintiffs who had their vehicles stolen and those who had not, like Rubin. *See, e.g.*, Dkt. No. 84, ¶¶ 109-117, 502-512; *see also In re Tiktok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 924 (N.D. Ill. 2022) (overruling objection that plaintiffs and their counsel did not adequately represent the interests of a subgroup of minor class members when some class representatives were minors themselves). Plaintiffs and Class counsel thus had no conflict of interests or other reason to favor Class members that have already experienced a theft over those that have not.

Further, Rubin's non-binding support is distinguishable. In *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig*ation, the Second Circuit found a conflict of interests between class members with future claims seeking injunctive relief and those with current damages seeking to maximize cash compensation for past harm. 827 F.3d 223, 233-34 (2d Cir. 2016). But here, each Class member has suffered harm, which will be compensated by an effective remedy to the Defect along with compensation for past harm, to the extent any Class members suffered consequential damages.

*Murray v. Grocery Delivery E-Services USA Inc.*, 55 F.4th 340, 345 (1st Cir. 2022), actually helps Plaintiffs because the First Circuit recognized that "[n]ot all conflicts require separate representation," and the standard "is not 'perfect symmetry of interest' among the class.'" *Id.* (citation omitted). The court added that "Class actions in which all class members have materially common claims are unlikely to require separate representation. . . . Therefore, such differences would be unlikely to 'overbalance the common interests of the class members as a whole' in obtaining the

largest settlement possible without running up transaction costs." *Id* at 346 (citation omitted). Only "significant differences" could raise potential conflicts, and even then, the conflict can be addressed by having members of each group participate in negotiations. *Id.* at 345-46.

In *In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, 795 F.3d 380, 394 (3d Cir. 2015), the Third Circuit noted that its prior decision in the case found an intra-class conflict where the named plaintiffs had claims that required equitable tolling, while a "sizeable subgroup" of class members had timely claims. Here, there are no significant differences between the claims of Class members with stolen and not stolen vehicles, and Plaintiffs include both constituencies who were represented by Class Counsel in the Settlement negotiations.

Even assuming *arguendo* that a conflict exists between Class members who have and have not experienced a theft, it would not be a fundamental conflict. For there to be a fundamental conflict, "there must be some actual, apparent conflict beyond the mere unequal allocation of settlement funds." *Moore*, 728 F. App'x at 674. And "when class members essentially seek the same thing from the defendant and differ only with respect to the amount or value of their claims, absent vast differences or some other evidence of unfairness, there is no fundamental conflict sufficient to defeat adequacy." *Id*. Here, Class members who have experienced a theft and those who have not are seeking the same relief: a vehicle not suffering from the alleged Defect and compensation for any consequential damages. All that differs is the amount of consequential damages each Class member may have sustained and the strength of their individual claims. *See Wilson v. Pactiv LLC*, 2022 U.S. Dist. LEXIS 136666, *8 (C.D. Cal. July 1, 2022) (noting that a "fundamental, structural conflict" does not exists where "the difference in recovery between Class Members appears to be one of degree, rather than kind.").

---

For similar reasons, Rubin's argument that the Settlement does not treat Class members equitably relative to each other fails. Dkt. No. 371 at 26-28. "To determine reasonableness and fairness, courts should evaluate, *inter alia*, 'whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.'" *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1082 (C.D. Cal. 2023) (citations omitted). As discussed, Rubin's claims are the same as all other Class members, even though Rubin's claims are weaker. Although increased insurance premiums may be included in the $375 insurance deductible category of Common Fund claims for Class Vehicles following a theft, such claims are stronger than establishing the indirect cause of insurance premium increase for vehicles that have not been stolen like Rubin's vehicle because: (i) the Defect indisputably manifested in a stolen vehicle, and (ii) when an insurance claim is filed, there is a direct correlation to increased insurance premiums as a result of the insured vehicle, and not third-party vehicles. *See* Declaration of Edward M. Stockton, Dkt. No. 228-3 ¶¶ 26, 35.

Consequently, as Rubin's own case recognizes, "'[i]t is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits.'" *Grady*, 671 F. Supp. 3d at 1082 (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008)); *see also McHorney v. GameStop Corp.*, 2010 WL 11549399, at *4 (C.D. Cal. June 17, 2010) ("[A]dequacy of an allocation plan turns on whether counsel ha[ve] properly apprised [themselves] of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.")); Dkt. No. 200 at 29 (finding that "the Settlement provides differing types of relief to groups of Class Members who have suffered different types of harms. This type of differentiation is permissible." (citation omitted)); *In re Toyota Unintended Acceleration*, 2013 U.S. Dist. LEXIS 123298, at

34

011112-11/2652433 V1

1   *285 (objections to settlement allocation that "settles weaker, riskier claims for about

2   one-third the amount of stronger, less risky claims" are meritless); *In re Lithium Ion*

3   *Batteries Antitrust Litig.*, 2020 U.S. Dist. LEXIS 233607, at *68 (is appropriate for

4   class members with weaker claims to receive a limited share of the total recovery).

5        Rubin's reliance on *Philliben v. Uber Technologies, Inc.*, 2016 U.S. Dist. LEXIS

6   117629, at *13 (N.D. Cal. Aug. 30, 2016), is also misplaced. There, class members

7   received the same payout, even though a "substantial portion of the class" never paid

8   the "Safe Rides Fee," which was the basis for the action. Consequently, the court found

9   that "the settlement proposes to compensate persons who haven't been injured, and it

10  does so at the expense of persons who have been." *Id.* Here, all Class members have

11  standing and were injured, and the Settlement does not provide compensation to anyone

12  who has not been injured. Further, the proposed settlement in *Philliben* sought to divide

13  the available funds between all class members equally regardless of the number of Safe

14  Rides Fees each class member paid. *Id.* at *14. But here, the Settlement, as amended

15  following the Court's initial order concerning preliminary approval, treats Class

16  members equitably by paying out common fund claims based on the value of each

17  Class Vehicle and the damages each Class member sustained. *See* Dkt. No. 259. Insofar

18  as *Philliben* is instructive, it shows that the absence of additional compensation to

19  Rubin is warranted. *Grady*, 2023 U.S. Dist. LEXIS 236308, in which a majority of the

20  common fund was to be used to pay "a class member who worked for one day . . . the

21  same distribution as another employee who worked for six months, a year, or more,"

22  is also inapposite. And in *Ali v. Franklin Wireless Corp.*, the court inappositely certified

23  a class comprised of "[a]ll persons . . . who purchased or otherwise acquired" a given

24  security, yet the subsequent settlement provided that class members who acquired

25  shares by "receipt or grant by gift, inheritance or operation of law" are not entitled to

26  settlement funds, while such class members were included in the release. 2024 U.S.

27  Dist. LEXIS 12903, at *3. There are no such issues here.

28

---

011112-11/2652433 V1

**E.     The payment of attorneys' fees from the Common Fund is best practice because it aligns Class Counsel's and the Class's interests.**

Out of approximately 26 million Class members, two have objected to Class Counsel's fee request, and neither objects to the amount of fees requested. Tomera Davis argues that attorneys' fees should be separate from "[a]ll settlement payouts" and that Plaintiffs should have negotiated a better settlement providing for attorneys' fees *in addition* to all the monetary and non-monetary benefits offered in the Settlement.[21] This does not warrant denying final approval or the fee request because it as yet another argument that the Settlement should have achieved "more." *See, e.g.*, *Hanlon*, 150 F.3d at 1027. Further, awarding fees and costs from a common fund is regularly done in class settlements in the Ninth Circuit. *Id.* at 1029.

The second objection, filed by Mr. Birner, argues that the fee request creates a conflict of interest between Class Counsel and the Class because the fee is to be paid from the Common Fund. *See* Dkt. No. 407 at 14. Again, awarding fees form a common fund is commonplace in the Ninth Circuit and elsewhere. Further, this objection misunderstands the nature of the alleged conflict. The payment of attorney's fees from the Common Fund aligns Class Counsel's and the Class's interests, rather than the reverse, as Class Counsel is incentivized to negotiate for the largest common fund possible. That is why the percentage of the common fund is the prevailing and preferred method of awarding attorney's fees in class actions. *See* Dkt. No. 377 at 8-10.

Further, Birner incorrectly complains about class counsel being compensated by Defendants for evaluating appeals. Dkt. No. 407 at 14-15. As is standard practice, if a Class member chooses to appeal a claim determination, Class Counsel may, but is not required, to serve as personal counsel to the Class member. The Settlement includes a provision that allows Class Counsel to be compensated for this additional time spent

---

[21] Davis also ignores that attorneys' fees will only be taken from Common Fund claims and as noted above, several categories of reimbursement are uncapped and paid separately from the Common Fund.

36

advocating on behalf of individual Class members. ASA § II.F. This provision thus affords Class members representation in the appeal process at Defendants' expense, without the need to search for individual representation. It hardly creates a conflict.

**F.    The Court-approved Notice satisfies the requirements of Rule 23(c)(2)(B).**

Mr. Birner complains that the Court-approved notice did not include any "indication of the value of the settlement to class members, nor is there an estimate by defendants or Class counsel of the take rate of members or the number or percentage of class members expected to file claims" or guaranteed "minimum payout." Dkt. No. 407 at 7-8. *But see* Dkt. No. 200 (finding "that the proposed notice meets the requirements of Rule 23(c)(2)(B)."). This argument fails for several reasons.

*First*, it ignores that several key categories of reimbursement, such as reimbursements for anti-theft devices for Class vehicles not eligible for the Software Upgrade and steering wheel locks for all Class Vehicles, are not subject to any claim cap or paid out from the Common Fund. Thus, reimbursements for these categories are "guaranteed cash payouts" that Birner complains about. *Second*, as discussed above, due to the nature of the claims process for cash reimbursements, it is not reasonable or even possible to indicate a "minimum payout" for each Class member.

*Third*, Birner's argument that the notice does not indicate "the take rate of members or the number or percentage of class members expected to file claims" ignores that Plaintiffs' expert, Stockton, opined that "based on prior experience with class settlements, that the claims rate will average approximately 15 percent" and his analysis "conservatively assume[d] a 20% claims rate." Dkt. No. 228-3 ¶ 46. Further, "[a]s a general rule, class notice must strike a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing class members." *Negrete v. Conagra Foods*, 2021 U.S. Dist. LEXIS 179282, at *28 (C.D. Cal. June 21, 2021) (citation omitted). The information Birner complains is missing from the notice, such as a "take rate," is not required and rarely included in notices

1  because it would overly complicate a notice that Birner elsewhere implies is too long

2  and confusing. *See* Dkt. No. 407 at 3, 10, 12.

3      Birner's reliance on the non-binding decisions in *Bloyed v. General Motors*

4  *Corp.*, 881 S.W.2d 422, 431 (Tex. App. 1994), and *Buchet v. ITT Consumer Financial*

5  *Corp.*, 845 F. Supp. 684, 687 (D. Minn. 1994), is misplaced. Both cases are readily

6  distinguishable as coupon-only settlements, and the courts' concerns about a lack of

7  minimum payment have no relevance here where Defendants have agreed to a non-

8  reversionary Common Fund of at least $80 million, among other benefits, as well as

9  remedies for the alleged Defect affecting Class Vehicles—as opposed to a future

10  purchase. Further, Plaintiffs here have provided a reasonable estimate of the amount of

11  damages Class members will personally receive. *See* Dkt. No. 228-3 at 7-8.

12  **G.     The Court-approved claim process is fair, reasonable, and adequate.**

13      Four objectors complain about the Settlement claim process and argue the

14  process itself warrants denial of final approval. Jill Puleo states that she does not have

15  the required Proof of Payment for her steering wheel lock. Similarly, Shaunitquea

16  Foston complains that the Settlement includes unreasonable documentation

17  requirements, particularly given that some owners "lack the resources or organizational

18  skills to maintain comprehensive documentation." But proof of payment and other

19  documentation requirements are routine in similar settlements and part of best

20  practices. *See, e.g.*, *Brightk Consulting Inc. v. BMW of N. Am., LLC*, 2023 U.S. Dist.

21  LEXIS 168723, at *5 (C.D. Cal. Sept. 12, 2023) (approving settlement process which

22  included requirement that required each "Class Member to submit a 'legible repair

23  order from a BMW Center,' 'proof of payment,' the mileage of the car at the time of

24  the repair, the date of the repair, and 'a description of the Eligible Repair performed

25  with indications as to the parts and labor for the repair.'"); *In re MyFord Touch*

26  *Consumer Litig.*, 2019 U.S. Dist. LEXIS 53356, at *12 (N.D. Cal. Mar. 28, 2019)

27  (requiring "proof of ownership at the time of the repair, documents showing

28

011112-11/2652433 V1

information about the repair, and proof of payment for the repair"). Mindful that providing the required documentation can be a challenge for some, the Settlement allows for multiple forms of proof for all requirements. For instance, Proof of Payment can include attestations in certain circumstances, ASA § I.V, and "Proof of Qualifying Theft" and "Proof of Qualifying Theft Attempt" may include police reports that can be filed at any time prior to submitting a claim. *Id*. § I.X.

Jerad Anderson objects to the claim period ending 180 days after final approval. But an end date for the claims period is necessary to administer the Settlement, which may be adjusted pro rata based on the number of approved claims. Moreover, the benefits provided in the Settlement adequately address the risk of theft created by the alleged Defect such that there is no need to extend the claim period beyond a reasonable period to allow all Class members to repair their vehicles.

Birner's objection summarily states that "[t]he claims processing and eligibility requirements are strict, unduly burdensome and designed to discourage class members from filing claims." Dkt. No. 407 at 3. But "[t]he requirement that class members download a claim form or request in writing a claim form, complete the form, and mail it back to the settlement administrator is not onerous." *In re Toyota Unintended Acceleration*, 2013 WL 3224585, at *18 (C.D. Cal. June 17, 2013). Birner fails to explain what is so "strict" or "unduly burdensome" about a claims process that is routinely approved by courts. At most, he suggests that the claim form contains too much "technical verbiage," Dkt. No. 407 at 3, while at the same time arguing that not enough information is provided in the Notice. *Id*. at 3, 10, 13. Even assuming *arguendo* that there is "technical verbiage" that Class members cannot understand, all Class members can, as many already have, contact Class Counsel or the Settlement administrator to walk them through the claims process. Moreover, Birner claims that the number of Class members, over 200,000, who have submitted claims to date "illustrates that these class members are not aware that the plan has not been approved."

*Id*. at 4. The argument makes no sense. He seemingly does not understand that the claims process began with the Notice Date, and Class members need not wait until the Settlement receives final approval to file their claims.

**H.      Other miscellaneous objections lodged by Class members fare no better.**

While most of the *pro se* objections fall within one of the above categories, certain Class members lodged additional objections to the Settlement, none of which warrant denial of final approval.

***Buyback program and replacement vehicles***. Some objectors[22] want Defendants to institute a buyback program or provide them with new vehicles. In addition to a "replacement vehicle of equal or greater value," Jhaza Tanner seeks "[f]ull reimbursement of all payments made on the vehicle and associated insurance premiums." Relatedly, other Class members[23] complain that the Settlement does not provide reimbursement for the cost of purchasing new replacement vehicles. These objections thus improperly argue that Class counsel should have negotiated a better deal for them. *Hanlon*, 150 F.3d at 1027.

***Cy pres***. The Settlement provides that "any 'minimum' balance remaining from the Common Fund i.e., the $80 million floor of the Common Fund, after the claims period has expired shall be redistributed to claimants on a pro-rata basis based on each claimant's eligible claim amount, unless administratively infeasible, in which case they shall be distributed to a Court-approved *cy pres* recipient, until such minimum balance is depleted." ASA § II.F.7. Two Class members, Tomera Davis and Birner, object to this provision. Davis questions whether the *cy pres* recipient will be related to Defendants and that it "seems sketchy." Birner objects because "Class members have a right to know the identity of the Cy Pres recipient." Dkt. No. 407 at 16. But allowing for *cy pres* distributions after further distribution to Class members is administratively infeasible is permissible and routinely approved in the Ninth Circuit. *See, e.g.*, *Hartless*

---

[22] Notice of Lodging Ex. Nos. 27, 2, 47, 25, 76, 26, 41.
[23] Notice of Lodging Ex. Nos. 17, 20, 32, 29.

*v. Clorox Co.*, 273 F.R.D. 630, 642 (S.D. Cal. 2011) (citing *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009)); *Martinez v. Semi-Tropic Coop. Gin*, 2022 U.S. Dist. LEXIS 190910, at *16 (E.D. Cal. Oct. 18, 2022) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012)).

***Claim cap for steering wheel lock reimbursements***. Wesley Watson, Debra Watson, and David Watson complain that they each paid $65 for steering wheel locks, but the Settlement only provides reimbursements up to $50. Like objections to claim caps discussed above, the $50 cap is reasonable and does not indicate the Settlement is not fair, reasonable, and adequate.

***Reconstructed vehicle title***. David Mickinack complains that his vehicle will suffer from being a reconstructed title. As discussed above, the Settlement need not provide relief for every possible form of incidental damages to be granted final approval. *See Mendoza*, 2017 WL 342059, at *10.

***Local Attorney***. Jhaza Tanner objects to the Settlement due to "the lack of representation from Los Angeles, CA, in the class counsel." The location of Class Counsel bears no import on the adequacy of the Settlement, and the objection is wrong. Roland Tellis, who is in Los Angeles, was appointed by this Court as Class Counsel. And Hagens Berman has a Los Angeles office.

***Admission of liability***. John Podgornik objects to the Settlement due to "Kia's lack of acknowledgement in abusing consumer trust" and asks that the Court impose a penalty of $1,000 for each Class Vehicle. The absence of an admission of liability is routine and common in settlements (indeed, it is commonly a motivating factor for a defendant to settle claims), and the Court cannot impose a "civil fee/penalty" in the Settlement; this demand is simply an objection for not getting a "better" settlement. *Hanlon*, 150 F.3d at 1027.

***Reimbursement for anti-theft system installed in Software Upgrade eligible Class Vehicles***. Wesley Watson, Debra Watson, David Watson, Casey DeKam, and

011112-11/2652433 V1

Jacob Steinber complain that the Settlement does not provide additional reimbursements for installation of aftermarket anti-theft devices. As an initial matter, these objections are founded on the mistaken assumption that the Software Upgrade is inadequate to address the risk of theft. Moreover, these objections, like many others, complain that the Settlement does not provide them with additional compensation and is not "better." Again, such objections do not carry. *Hendricks v. StarKist Co.*, 2016 WL 5462423, at *6 (N.D. Cal. Sept. 29, 2016) ("That a more favorable result for some Class Members could potentially have been reached is not a sufficient reason to reject an otherwise fair and reasonable settlement." (citation omitted)).

**Reimbursement for proven out-of-pocket expenses only**. Braunwynn Franklin, Glenn McDowell, Ronald Birner, and Amanda Broussard object that the claims process requires them to provide Proof of Payment to receive compensation. However, requiring Class members to demonstrate actual out-of-pocket expenses incurred relating to the alleged Defect is routine in settlement administration processes and necessary to prevent fraud. *See, e.g.*, *Brightk Consulting Inc.*, 2023 U.S. Dist. LEXIS 168723, at *5; *In re MyFord Touch Consumer Litig.*, 2019 U.S. Dist. LEXIS 53356, at *12; *see also In re Procter & Gamble Aerosol Prods. Mktg.*, 2022 U.S. Dist. LEXIS 243238, at *16 (S.D. Ohio Oct. 28, 2022).

**Remote ignition systems**. Sharry Edwards and Richard Ladouceur object to the Settlement because the Software Upgrade cannot be installed on their Class Vehicles given that they installed aftermarket remote starters that are not compatible with the Software Upgrade. It is not feasible to design, install, and warrant the Software Upgrade to be compatible with countless unknown aftermarket devices that modify the ignition system. Consequently, to the extent certain Class members have installed aftermarket devices that impede Hyundai's and Kia's ability to install the Software Upgrade in their vehicles, the issue is an outlier that does not warrant denial of the Settlement. *See Collado*, 2011 U.S. Dist. LEXIS 133572, at *7.

*Other*. Phyllis Killebrew Flanders objects to the Settlement because thieves damaged her "electric privacy gate" when stealing her Class Vehicle, and she seeks to be compensated for all the gate repairs." Her objection overlooks, though, that damage to her gate is covered up to $3,375 or 33% of Black Book value of the Class Vehicle (whichever is greater) because it is "personal property stolen or damaged as a result of a Qualifying Theft or Qualifying Theft Attempt."

Nancy Pawlowski complains of title and credit reporting issues specific to a single dealership and herself, which she infers demonstrates "an overall business model for the Kia Corporation to operate on the basis of fraud and deceit." This objection is highly individualized and does not require the Court to deny millions of Class members the benefits of the Settlement. *See Mendoza*, 2017 WL 342059, at *10.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court overrule each objection to the Settlement, grant final approval of the Settlement, and grant Plaintiffs' motion seeking attorneys' fees, costs, and service awards.

Dated: June 17, 2024.                 Respectfully Submitted.


By:  *Steve W. Berman*
      Steve W. Berman, Esq.
      **HAGENS  BERMAN  SOBOL  SHAPIRO LLP**
      1301 Second Avenue, Suite 2000
      Seattle, Washington 98101
      Telephone: 206-623-7292
      Facsimile: 206-623-0594
      Email: steve@hbsslaw.com


By:  *Elizabeth A. Fegan*
      Elizabeth A. Fegan, Esq.
      **FEGAN SCOTT LLC**
      150 S. Wacker Dr., 24th Floor
      Chicago, Illinois 60606

43

011112-11/2652433 V1

Telephone: 312.741.1019
Fax: 312.264.0100
Email: beth@feganscott.com

By: _Kenneth B. McClain_
    Kenneth B. McClain, Esq.
    **HUMPHREY FARRINGTON & McCLAIN**
    221 W. Lexington Ave., Suite 400
    Independence, Missouri 64050
    Telephone: 816.836.5050
    Facsimile: 816.836.8966
    Email: kbm@hfmlegal.com

By: _Roland Tellis_
    Roland Tellis, Esq.
    **BARON & BUDD, P.C.**
    15910 Ventura Boulevard, Suite 1600
    Encino, California 91436
    Telephone: 818.839.2333
    Facsimile: 214.523.5500
    Email: rtellis@baronbudd.com

    *Consumer Class Action Leadership Counsel and Counsel for Plaintiffs*

011112-11/2652433 V1

1

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

2
3
4

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 14,681 words, which exceeds the 7,000 word limit of L.R. 11-6.1. Accordingly, Plaintiffs have filed an application for leave to exceed the word limit.

5

Dated: June 17, 2024.          Respectfully Submitted.

6
7
8
9
10
11
12

By: _Steve W. Berman_
      Steve W. Berman, Esq.
      **HAGENS BERMAN SOBOL SHAPIRO LLP**
      1301 Second Avenue, Suite 2000
      Seattle, Washington 98101
      Telephone: 206-623-7292
      Facsimile: 206-623-0594
      Email: steve@hbsslaw.com

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

011112-11/2652433 V1