1   **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
2     Shon Morgan (Bar No. 187736)
      shonmorgan@quinnemanuel.com
3   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
4   Telephone:   (213) 443-3000
    Facsimile:   (213) 443-3100
5     Cristina Henriquez (Bar No. 317445)
      cristinahenriquez@quinnemanuel.com
6   555 Twin Dolphin Drive, 5th Floor
    Redwood Shores, California 94065
7   Telephone:   (650) 801-5000
    Facsimile:   (650) 801-5100
8
9   *Attorneys for Defendants*

10
                    UNITED STATES DISTRICT COURT
11
                   CENTRAL DISTRICT OF CALIFORNIA
12

13
14  | In re: KIA HYUNDAI VEHICLE | CASE No. 8:22-ml-03052-JVS-KES |
    | THEFT MARKETING, SALES | |
15  | PRACTICES, AND PRODUCTS | **DEFENDANTS' RESPONSE TO** |
    | LIABILITY LITIGATION | **RUTH RUBIN'S OBJECTION TO** |
16  | | **THE AMENDED SETTLEMENT** |
    | | **AGREEMENT (DKT. 371)** |
17

18
19  This document relates to:
20
    CONSUMER CLASS ACTION
21

22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.  RUBIN'S "LOSS OF VALUE" QUALMS LACK MERIT ........................... 2

    A.  Rubin's Loss Of Value Estimate Is Pure Speculation ........................... 2

    B.  The Settlement Restores Any Loss Of Value ........................................ 2

II. RUBIN'S CONJECTURE ABOUT INCREASED INSURANCE PREMIUMS IS UNFOUNDED ................................................................... 3

    A.  Rubin Mischaracterizes Any Premium Increase She Experienced ........ 3

    B.  Rubin Does Not Show Any Premium Increase Resulted From The Challenged Conduct .................................................................... 5

    C.  Rubin Lacks Basis To Estimate Classwide Premium Increases Caused By Defendants .......................................................................... 6

III. RUBIN DOES NOT PROVIDE ANY REASON TO DOUBT THE ADEQUACY OF THE SETTLEMENT ........................................................ 11

    A.  That The Settlement Does Not Compensate Increased Insurance Premiums For Those Who Did Not Experience a Qualifying Theft Or Theft Attempt Does Not Undermine The Settlement's Fairness ................................................................................................ 11

    B.  Compensating Class Members Based On The Extent Of Their Injuries Is Equitable ........................................................................... 12

    C.  The Settlement Affords Adequate Relief ............................................ 13

        1.  The Amount Offered In Settlement Is Substantial And Fairly Compensates for Class Members' Losses ...................... 13

        2.  The Barriers Plaintiffs Face In Proving Their Case And Risks of Litigation Weigh In Favor Of Settlement ................... 16

    D.  The Government's Non-Objection Supports Final Approval .............. 18

CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ali v. Franklin Wireless Corp.*,
  2024 WL 270077 (S.D. Cal. Jan. 24, 2024) ....................................................... 12

*Allen v. Bedolla*,
  787 F.3d 1218 (9th Cir. 2015) .......................................................................... 10

*In re Apple Inc. Device Performance Litig.*,
  50 F.4th 769 (9th Cir. 2022) ............................................................................ 11

*Benanav v. Healthy Paws Pet Ins., LLC*,
  495 F. Supp. 3d 987 (W.D. Wash. 2020) ......................................................... 17

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
  683 F.3d 1144 (9th Cir. 2012) ............................................................................ 7

*In re Broadcom Corp. Sec. Litig.*,
  2005 WL 8152913 (C.D. Cal. Sept. 12, 2005) ................................................. 11

*Campbell v. Facebook Inc.*,
  2017 WL 3581179 (N.D. Cal. Aug. 18, 2017) ........................................... 13, 14

*In re Cathode Ray Tube (Crt) Antitrust Litig.*,
  2016 WL 721680 (N.D. Cal. Jan. 28, 2016) ..................................................... 11

*Cavka v. SoulCycle Inc.*,
  2018 WL 1426343 (C.D. Cal. Jan. 25, 2018) ................................................... 15

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ................................................................. 8, 10

*Chun-Hoon v. McKee Foods Corp.*,
  716 F. Supp. 2d 848 (N.D. Cal. 2010) ............................................................. 15

*Cullan & Cullan LLC v. M-Qube, Inc.*,
  2014 WL 347034 (D. Neb. Jan. 30, 2014) ....................................................... 14

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ........................................................................................... 7

*Hunt v. Bloom Energy Corp.*,
    2024 WL 1995840 (N.D. Cal. May 6, 2024) ...................................................... 16

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ................................................................ 15, 16

*In re Linkedin User Priv. Litig.*,
    309 F.R.D. 573 (N.D. Cal. 2015) ................................................................ 10

*In re MacBook Keyboard Litig.*,
    2023 WL 3688452 (N.D. Cal. May 25, 2023) ...................................................... 12

*Martinez v. Knight Transportation, Inc.*,
    2022 WL 14746410 (E.D. Cal. Oct. 25, 2022) ...................................................... 14

*Mendoza v. Hyundai Motor Co.*,
    2017 WL 342059 (N.D. Cal. Jan. 23, 2017) ...................................................... 11

*Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*,
    2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ...................................................... 8

*Myles v. AlliedBarton Sec. Servs., LLC*,
    2014 WL 6065602 (N.D. Cal. Nov. 12, 2014) ...................................................... 14

*Nat'l Rural Telecomms. Cooperative v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ................................................................ 13

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*,
    292 F. Supp. 3d 1018 (S.D. Cal. 2017) ...................................................... 11

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) ................................................................ 11

*Patrick v. Volkswagen Grp. of Am.*,
    2021 WL 3616105 (C.D. Cal. Mar. 10, 2021) ...................................................... 13

*Rieckborn v. Velti PLC*,
    2015 WL 468329 (N.D. Cal. Feb. 3, 2015) ...................................................... 11

*Rosado v. Ebay Inc.*,
    2016 WL 3401987 (N.D. Cal. June 21, 2016) ...................................................... 15

*Sekiya v. Gates*,
    508 F.3d 1198 (9th Cir. 2007) ................................................................ 10

-iii-

Case No. 8:22-ml-03052-JVS-KES
DEFENDANTS' RESPONSE TO RUTH RUBIN'S OBJECTION
TO THE AMENDED SETTLEMENT AGREEMENT (DKT 371)

*Stoot v. City of Everett*,
  582 F.3d 910 (9th Cir. 2009) ............................................................... 17

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs.,*
  *& Prod. Liab. Litig.*,
  2013 WL 12327929 (C.D. Cal. July 24, 2013) .................................... 18

*In re Tracfone Unlimited Service Plan Litig.*,
  112 F. Supp. 3d 993 (N.D. Cal. 2015).................................................. 18

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .............................................................................. 2

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) .............................................................................. 2

*Victorino v. FCA US LLC*,
  2023 WL 3296155 (S.D. Cal. May 5, 2023) ...................................... 15

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 4212811 (N.D. Cal. July 22, 2020) ..................................... 13

## <u>Other Authorities</u>

*What is Collision Insurance?*, Nationwide.com
  https://www.nationwide.com/lc/resources/auto-
  insurance/articles/what-is-collision-insurance ....................................... 4

## **PRELIMINARY STATEMENT**

Ruth Rubin, the spouse of one of the lawyers representing not only her but also claiming to represent more than 4,000 opt outs, objects to the Settlement[1] (Dkt. 371, "Obj.") because (1) she believes (incorrectly) the Settlement fails to address alleged diminished vehicle value and (2) the Settlement does not offer monetary compensation for purported increased insurance premiums to individuals who never had a theft or attempted theft incident.

Although Rubin speculates these alleged harms constitute "hundreds of millions of dollars" in Class losses, she fails to provide any reliable supporting evidence. She conceded at deposition that her "guesstimate" for lost resale value was based on unsubstantiated beliefs. Rubin also ignores that the Settlement addresses potential diminished value by offering the Class options to equip each Class Vehicle with enhanced anti-theft features. As to purportedly increased insurance premiums, her support is limited to miscalculations of her own premium increase and the report of Andrew Barile, which is not only unreliable and irrelevant, but concludes nothing more than that insurance premiums in general have increased, without meaningful connection to the issues in this lawsuit.

In all events, at core Rubin's objection is that the robust and multi-faceted Settlement before the Court could have *other* relief. But a settlement cannot be disturbed simply because a class member can hypothesize different remedies.

For these and other reasons set forth below, the Court should grant final approval of the Settlement.

---

[1]   Unless otherwise stated, all capitalized terms have the same meaning as in the Amended Settlement Agreement (Dkt. 247-1 ("ASA")).

# ARGUMENT

## I.   RUBIN'S "LOSS OF VALUE" QUALMS LACK MERIT

### A.   Rubin's Loss Of Value Estimate Is Pure Speculation

Rubin complains that the Settlement does not provide monetary compensation for purported "diminished resale values" of Class Vehicles, which she pegs at least $900 million. Obj. at 20. But this figure is nothing more than wild conjecture. Rubin admitted at deposition that she simply conjured out of thin air that each vehicle suffered at least $100 in diminished value. She did not make any inquiry into actual sale negotiations and transactions. Instead, she came to court based on a "feeling" she got from her "review of news reports and other available materials, including the Consumer Complaint[.]" Dkt. 371-3 ("Rubin Decl."), ¶ 8; Declaration of Cristina Henriquez ("Henriquez Decl."), Ex. A ("Rubin Dep.") at 186:19-23 ("My suspicion is that it's lost substantially more than $100 in value, but $100 seems like, you know, a fair, reasonable way underestimate, just to have a number to start with."). Rubin also fails to explain how any action **by defendants**, rather than the third-party criminals, resulted in any purported diminished resale value.

Rubin has not tried to sell her Class Vehicle (*id.* at 96:4-14), thus she has not actually experienced any lost resale value and lacks standing to seek recovery based on speculation of that future injury. So would most other Class Members. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Every class member must have Article III standing in order to recover individual damages."); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J. concurring) (federal courts lack "power to order relief to any uninjured plaintiff, class action or not"); *id.* ("if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand").

### B.   The Settlement Restores Any Loss Of Value

To the extent any diminished value could be attributed to the design of the Class Vehicles, the Settlement provides Class Members the opportunity to equip their Class

Vehicles with additional anti-theft features, including a free Software Upgrade (for eligible Class Vehicles) and reimbursements for steering wheel locks and other anti-theft measures (for non-software eligible Class Vehicles).  ASA §§ I.Z, II.A-C.  Under the Settlement, defendants will pay for each of these benefits separately from the Common Fund.  *Id.*

Rubin contends that the Software Upgrade does not protect Class Vehicles against risk of theft.  Obj. at 2 n.3.  That contention is unsupported and incorrect.  As shown in the report of Jim Smith.  Dkt. 230-1.

Accordingly, Rubin does not provide any basis to question the Court's preliminary finding that these benefits provide fair and adequate relief to the Class. Dkt. 256 at 8-9.

## II.   RUBIN'S CONJECTURE ABOUT INCREASED INSURANCE PREMIUMS IS UNFOUNDED

### A.   <u>Rubin Mischaracterizes Any Premium Increase She Experienced</u>

Rubin first misrepresents the amount by which her insurance premiums increased for her 2021 Kia Soul.  *See* Rubin Decl. ¶ 2.  She relies on a misleading chart that omits two *decreases* to her premiums (one predating her declaration and one post-dating it).  Rubin also focuses on increases to the entire Kia Soul insurance premium rather than just the premium for comprehensive coverage—the only portion that might cover damage from a theft or theft attempt under her policy.  *See* Rubin Dep. at 57:19-58:19 ("comprehensive is the big one that takes the direct hit from theft"), 62:19-63:9, 65:3-13 (admitting "It does not seem like the labels are correct."), 167:20-168:11 (Rubin's premium for September 2023), 162:18-165:12 (Rubin's most recent premium for April 2024); Dkt. 371-3 ("Barile Rpt.") ¶¶ 10(e), 11 ("a significant increase in policy theft losses will result in an increase in premium rates with respect to comprehensive auto coverage"); *What is collision insurance?*, Nationwide.com, https://www.nationwide.com/lc/resources/auto-

insurance/articles/what-is-collision-insurance ("Damages to your car from theft . . . are all covered by comprehensive insurance.").

Below is a chart that depicts the omitted premiums and that features the portion of the premium that includes theft coverage, *i.e.*, comprehensive coverage:

| Date | Total | Property | **Comprehensive (including Theft coverage)** | Collision |
|------|-------|----------|-----------------------------------------------|-----------|
| Feb 2022 | 516.16 | 93.5 | 57.37 | 190.88 |
| Aug 2022 | 536.3 | 96.75 | 64.12 | 201.89 |
| Feb 2023 | 607.77 | 115.85 | 69.21 | 251.47 |
| Aug 2023 | 580.42 | 114.08 | 72.43 | 239.12 |
| **Sep 2023** | **548.71** | 106.63 | **69.84** | 225.40 |
| Feb 2024 | 716.13 | 135.36 | 120.18 | 303.06 |
| **Apr 2024** | **644.43** | 121.85 | **108.12** | 272.73 |

This chart shows Rubin's total insurance premium did not increase by around $200 between 2022 and 2024 as Rubin claims (Obj. at 3), but rather by only $128.27. Rubin Dep. at 163:7-165:5. And the relevant comprehensive coverage increased by only $50.75 over more than two years. *Id.* at 166:20-24.[2]

Although Rubin contends premium increases for her Kia were "disproportionately high when compared to the value of [her] family's other vehicles" (Obj. at 3; Rubin Decl. ¶ 4), in reality (as reflected below), premiums for her Ford

[2] Rubin produced a set of documents in connection with her objection, and has stipulated to the authenticity of all documents she produced (RUBIN000001–RUBIN000363). Rubin Dep. at 133:15-134:17. The documents Rubin produced include her insurance premiums from Nationwide, which provide the evidentiary support for the data in each of defendants' charts. See Dkt. 466-5, RUBIN000070–RUBIN000138 (Rubin's premiums from February 2022 through February 2024); RUBIN000346–RUBIN000355 (Rubin's most recent premium for the period of April 30, 2024 through August 22, 2024). Rubin has designated these documents "confidential"; out of an abundance of caution, defendants are not filing these documents publicly with this submission, but can provide them separately in camera to the Court, and will either file them publicly if Rubin agrees to remove the designation, or under seal with an accompanying motion pursuant to LR 79-5, if not.

Bronco and Volkswagen Golf increased **more** than for her Kia Soul over the same two-year span.  *See* Rubin Dep. at 173:19-23.

| Vehicle | Feb 2022 | Feb 2024 | Apr 2024 | 2+ Year Difference |
|---|---|---|---|---|
| Kia | $516.16 | $716.13 | $644.43 | $128.27 |
| Ford | $513.16 | $747.63 | $672.74 | $159.58 |
| Volkswagen | $839.87 | $1,139.75 | $1,034.88 | $195.01 |

Moreover, over the last two years, Rubin's total Kia premium always amounted to approximately 22% of her combined auto premium covering her family's four cars.

| Date | Kia Premium | Total Auto Premium | Percentage of Total |
|---|---|---|---|
| Feb 2022 | $516.16 | $2,402.96 | **21.48 %** |
| Aug 2022 | $536.30 | $2,495.95 | **21.48 %** |
| Feb 2023 | $607.77 | $2,719.66 | **22.35 %** |
| Aug 2023 | $580.42 | $2,605.01 | **22.28 %** |
| Sep 2023 | $548.71 | $2,453.40 | **22.37 %** |
| Feb 2024 | $716.13 | $3,213.18 | **22.29 %** |
| Apr 2024 | $644.43 | $2,900.73[3] | **22.22 %** |

Thus, although premiums for **all** Rubin's vehicles have increased, there is no basis to find her Kia's premium has increased at a different rate.

**B.     Rubin Does Not Show Any Premium Increase Resulted From The Challenged Conduct**

Rubin also fails to provide any evidence that any premium increase resulted from the issues in this litigation as opposed to the myriad reasons premiums can change.  As Rubin and her expert Barile acknowledge, premiums can change for many reasons.  Barile Rpt. ¶ 7 ("Auto insurance companies use several factors in setting the price for personal auto insurance[,]" including "location, type of vehicles, coverage, deductible, vehicle usage, driving record, claims history, discounts, and credit score."); Rubin Dep. at 114:24-115:4 ("there are other factors pushing up automobile

---

[3]   This comparison omits the total premium for a fifth car that Rubin acquired after February 2024 for the sake of keeping the four compared cars constant.

insurance"). Indeed, Rubin's insurance premium for her Kia fluctuated over the years for various unrelated reasons. *Id.* at 145:7-19 (premium increased when each of her sons received their licenses); Rubin Decl. ¶ 3 n.1 (premium for August 2023 decreased because her "son went to college without taking a vehicle, and thus the policy was eligible for a discount"); Rubin Dep. at 163:7-15 (premium decreased when she enrolled in a Nationwide discount program).

Notably, Rubin's own insurance broker said in May 2023 that her increases were due to "[s]upply chain and labor shortages resulting in increased premium costs, increase in vehicle parts costs, increased in used car prices due to vehicle shortages, increased in auto accidents and fatalities." *Id.* at 51:2-53:22. Rubin further acknowledges it would be impossible to determine what percent (if any) of her increase is attributable to the design of her vehicle or rise in thefts. *See id.* at 12:12-23 ("[W]hen we look at the overall rate changes in the Kia, there are other factors in play, and I can't determine what piece is what.").

### C.   Rubin Lacks Basis To Estimate Classwide Premium Increases Caused By Defendants

**Rubin's class-wide estimate is flawed.** Rubin estimates $161,253,000 in classwide increased premiums based on no more than her unexplained assumption that she "overpaid" by $358.34 in premiums in the first four months of 2024 and that at least 100,000 other Class Members faced the same "overpayment." Obj at 19; *see also id.* at 20 n.8. Rubin does not explain how she arrives at the $358.34 figure (*see* Rubin Decl.), or the basis for her assumption of 100,000 Class Members who purportedly "overpaid" for theft insurance. Nor does her expert Barile justify these assumptions.

**Rubin misrepresents the Barile Report.** Rubin's insurance premium arguments rely heavily on the report of her proffered expert. But the Barile report does not reach (or support) any of the conclusions Rubin contends. She characterizes Barile as concluding that individuals with Class Vehicles pay more in insurance

premiums than those without Class Vehicles (Obj. at 6); that "insurance premiums specifically attributable to the increased theft risk posed by the Class Vehicles have significantly increased" (*id.* at 14); and that "computing the increased premiums, at least regarding the premium increases implemented by Allstate, can be systematically computed" for Class Members who did not experience a Qualifying Theft or Qualifying Theft Attempt (*id.* at 15).

But nowhere does Barile opine that individuals with Class Vehicles are "paying more" in insurance premiums than those without Class Vehicles, or that "insurance premiums specifically attributable to the increased theft risk posed by the Class Vehicles have significantly increased" as Rubin contends (Obj. at 14), much less that he can "systematically compute" any such insurance premium increases.  *Id.* at 15.

**The limited opinions Barile does offer are methodologically unsubstantiated and inadmissible.**[4]  Barile's opinions that insurance premiums for Hyundai and Kia vehicles have increased, purportedly due to thefts of Class Vehicles, and are "expected to continue" to go up, are based on his examination of insurance premium rate filings from a single insurer (Allstate) in just eight states (Colorado, Illinois, New Jersey, New Mexico, Ohio, Pennsylvania, Texas, and Wisconsin) in 2023.  Barile Rpt. ¶¶ 25-26.  Barile admitted at deposition he has no reason to believe those rate filings are representative of filings for other years, insurers, or states. Henriquez Decl., Ex. B ("Barile Dep.") at 86:7-11, 86:22-90:5, 143:11-14, 148:13-25, 149:1-13, 149:18-22, 150:2-7, 150:17-23.   He also admitted he selected his "examples" by "zero[ing] in only on the insurance company's comments of discussing

---

[4]   Expert testimony is allowed under Rule 702 only if the opinions and underlying methodology are relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).   Rubin fails to carry her burden of establishing the Barile report's admissibility.  *See Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

the theft losses" of Kia and Hyundai vehicles, and excluded state rate filings, like Florida's, that did not have what he "was looking for." *Id.* at 81:12-83:7, 85:3-6.

Nor did Barile check whether the rate increases in his cherry-picked examples actually went into effect. As he acknowledges, "[e]ach auto insurance company must file its state rates with the state insurance department and in some cases seek and obtain approval." Barile Rpt. ¶ 8. His report does not say which states require prior approval, and he does not know whether the rate filings he relies upon actually went into effect. Barile Dep. at 145:19-25, 147:23-148:12.

Similarly, Barile's report places heavy emphasis on statements in his eight hand-selected rate filings that he contends show Allstate was purportedly seeking premium increases "specifically on the Class Vehicles" due to "increased thefts or attempted thefts" of Class Vehicles. Barile Rpt. ¶ 26. But those rate filings actually show that if they had gone into effect, the requested premium increases would have applied to *all* Hyundai and Kia vehicles, not just Class Vehicles. *Id.* In other words, he cannot and does not attempt to separate out premium increases for Class Vehicles or the challenged design.

Finally, Barile's report (and in turn, Rubin's Objection) impermissibly relies on "preliminary analysis" by Kroll LLC, which Barile contends concluded that "Class Members are paying, on average, approximately 16% to 26% higher premiums than non-Kia/Hyundai owners." Barile Rpt. ¶ 27; *see also id.* ¶¶ 28-29 ("I relied on Kroll's study to further confirm the conclusions I reached."). Not only does the Kroll "report" not reach that conclusion, it is also inadmissible as unreliable.

The Kroll "report" is actually an eight-page PowerPoint with no backup data or supporting documents that Barile appended as Exhibit B to his declaration. Barile Rpt., Ex. B ("PowerPoint"). Barile admitted he obtained and relied on the PowerPoint without verifying its accuracy. Barile Dep. at 108:22-109:25. That alone provides

-8-

Case No. 8:22-ml-03052-JVS-KES
DEFENDANTS' RESPONSE TO RUTH RUBIN'S OBJECTION
TO THE AMENDED SETTLEMENT AGREEMENT (DKT 371)

basis to exclude it.[5]   Barile also misled the Court when he stated that the PowerPoint had been prepared by "Seth Fliegler, a managing director at Kroll"; Barile merely found Fliegler's name on a LinkedIn profile and assumed he prepared it.[6]   *Id.* at 98:5-99:20.   Barile did not speak to anyone at Kroll and does not, in fact, know who, if anyone, at Kroll actually prepared the PowerPoint.   *Id.* at 101:3-105:11.

Moreover, the PowerPoint is self-evidently methodologically unsound and does not support the conclusions Barile suggests.   The PowerPoint purports to assess five specific Hyundai or Kia model-year vehicles, and to compare insurance premiums for "comparable vehicles with similar MSRPs" for a single hypothetical driver in one Zip code for both St. Louis, Missouri, and Washington, D.C.   PowerPoint at 3-4.[7]   But Rubin provides no backup—not even the identity of the insurance aggregator website purportedly used to obtain insurance premium quotes— and thus the contents of the report cannot be examined and verified.   The PowerPoint also does not explain how the five Hyundai and Kia vehicles were selected, nor does it explain how the sets of comparator vehicles were selected as opposed to other

---

[5]   *See Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, 2019 WL 13045054, at *4 (C.D. Cal. Feb. 28, 2019) (excluding expert opinions because expert "engaged in no independent analysis to determine whether [estimate] was accurate"); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 546 (C.D. Cal. 2012) (excluding expert opinions where expert relied exclusively on investigation conducted by others and offered "no independent analysis or opinion").

[6]   Rubin similarly refers to the report as being produced by Fliegler, and goes so far as to cite to Fliegler's profile on the Kroll website.   Obj. at 6.   She has yet to correct the record for the Court.

[7]   Specifically, it purports to compare premiums from: the 2017 Kia Forte to the 2017 Honda Civic and Toyota Corolla; the 2018 Hyundai Tucson to the 2018 Honda CR-V and Nissan Rogue; the 2019 Hyundai Sonata to the 2019 Honda Accord and Toyota Camry; the 2021 Kia Sportage to the 2021 Nissan Rogue and Toyota RAV 4; and the 2022 Kia Soul to the 2022 Mazda CX-30 and Chevrolet Trailblazer.   PowerPoint at 6.

potential comparators.  The PowerPoint also does not explain how or why it would be possible to extrapolate from these five vehicle examples, utilizing a single driver profile in two locations, to compare premiums for all Hyundai and Kia Class Vehicles to all other similar vehicles everywhere throughout the United States.[8]  And nowhere does it conclude, as Barile contends, that "Class Members are paying, on average, approximately 16% to 26% higher premiums than non-Kia/Hyundai owners."  Barile Rpt. ¶ 27.[9]

\*       \*       \*

The Court should reject Rubin's baseless and unreliable projections.  *See Sekiya v. Gates*, 508 F.3d 1198, 1200 (9th Cir. 2007) (rejecting objections that contained "[b]are assertions and lists of facts unaccompanied by analysis and completely devoid of caselaw").

---

[8]  Here too, the PowerPoint provides no explanation of how the single set of driver inputs or the two Zip codes were selected, or how those limited inputs could be used to extrapolate the "results" to the entire population of Hyundai and Kia owners in Washington D.C. (more than 20 zip codes) or St. Louis (more than 65 zip codes), much less across the United States.

[9]  Indeed, the limited "conclusions" of the Kroll PowerPoint are that "Hyundai and Kia insurance premiums appear to have an inconsistent trend relative to comparable cars across the different vehicle sets, years and geographies," and "appear to have the highest percent of car values" for both MSRP and trade-in estimates.  PowerPoint at 6.  It is unclear how the PowerPoint could reach even these limited conclusions, as it self-evidently reflects a snapshot of quoted premiums for just five vehicles and comparators in two locations on an unstated date in 2023, and does not track premiums over time. *Id.*

## III.   RUBIN DOES NOT PROVIDE ANY REASON TO DOUBT THE ADEQUACY OF THE SETTLEMENT

### A.   <u>That The Settlement Does Not Compensate Increased Insurance Premiums For Those Who Did Not Experience a Qualifying Theft Or Theft Attempt Does Not Undermine The Settlement's Fairness</u>

"[I]t is the nature of a settlement, as a highly negotiated compromise . . . that it may be unavoidable that some class members will always be happier with a given result than others." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (citation and alteration omitted).  But that inevitability does not render a settlement inadequate. *Id.*  Indeed, "the proper standard for approval of the proposed settlement is whether it is fair, reasonable, adequate, and free from collusion—not whether the class members could have received a better deal in exchange for the release of their claims." *In re Linkedin User Priv. Litig.*, 309 F.R.D. 573, 583 (N.D. Cal. 2015); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982) ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.").

Courts routinely overrule similar objections that settlements do not compensate for all alleged harms.  *See, e.g.*, *Mendoza v. Hyundai Motor Co.*, 2017 WL 342059, at *10 (N.D. Cal. Jan. 23, 2017) (overruling objections and explaining that "a class settlement is not capable of resolving every possible consequential damages claim a Class Member might wish to pursue"); *Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1048 (S.D. Cal. 2017) (overruling objection and observing "even if [plaintiff] could demonstrate that the potential recovery in this case was significantly higher than the results achieved in the Settlement Agreement, that alone would not render the present Settlement unfair, unreasonable, or inadequate"); *In re Broadcom Corp. Sec. Litig.*, 2005 WL 8152913, *3 (C.D. Cal. Sept. 12, 2005) ("By definition, a settlement is not designed to compensate fully all damages that a Class may have sustained.").

## B.   Compensating Class Members Based On The Extent Of Their Injuries Is Equitable

Rubin claims the Settlement is inequitable because it does not reimburse class members with no theft incident.  Obj. at 26-27.  But "[a] plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable." *In re Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 721680, at *21 (N.D. Cal. Jan. 28, 2016).  For this reason, "an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Rieckborn v. Velti PLC*, 2015 WL 468329, at *8 (N.D. Cal. Feb. 3, 2015) (citation omitted).

Courts have approved settlements that target compensation to those most likely to have suffered a compensable injury. *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 780-81 (9th Cir. 2022) (affirming settlement despite objectors' complaint it "extinguishe[d] the claims" of a broad group of product owners without compensating them because the settlement "limit[ed] recovery to the subset of owners who can attest that 'they experienced' the alleged defects"); *In re MacBook Keyboard Litig.*, 2023 WL 3688452, at *10 (N.D. Cal. May 25, 2023) (affirming settlement over objectors who alleged they were harmed yet were entitled to nothing, explaining that "any settlement necessarily involves some line-drawing, and full compensation is not a prerequisite for a fair settlement" (citation omitted)).

Here, the Settlement is more generous than those in *Apple* and *Macbook* because it provides benefits to all Class Members.  That the Settlement limits monetary compensation for increased insurance premiums to those who experienced a Qualifying Theft or Qualifying Theft Attempt does not render the Settlement unfair or inequitable.[10]

---

[10]   Rubin's reliance on *Ali v. Franklin Wireless Corp.*, 2024 WL 270077 (S.D. Cal. Jan. 24, 2024) is misplaced.  In *Ali*, the court denied preliminary approval because the proposed settlement "indiscriminately" released all claims arising out of the class

Accordingly, there is no reason to disturb this Court's finding at preliminary approval that "[t]he Settlement provides different types of relief to groups of Class Members who have suffered different types of harms" and "this type of differentiation is permissible."  Dkt. 200 ("Aug. 16 Order") at 29.

## C.   The Settlement Affords Adequate Relief

### 1.   The Amount Offered In Settlement Is Substantial And Fairly Compensates for Class Members' Losses

Although Rubin would like to focus this inquiry solely on increased insurance premiums (Obj. at 19), "assessing the consideration obtained by the class members in a class action settlement" for fairness requires evaluating "the complete package taken as a whole, rather than the individual component parts[.]"  *Nat'l Rural Telecomms. Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (quotation omitted).  As this Court has already found based on the evidence submitted, the Settlement provides adequate compensation and "most insured class members are likely to receive near full compensation for their qualifying events[.]"  Dkt. 259 ("Nov. 3 Order") at 7.

Indeed, the Settlement offers multiple elements of relief including for losses related to Qualifying Thefts or Theft Attempts (including for insurance deductibles, stolen personal property, and damage to Class Vehicles) and access to or reimbursements for other anti-theft measures.  ASA §§ I.Z, II.A-C.  Other benefits also inure to the Class, including the creation, testing, implementation, promotion,

---

members' ownership of the company's shares, regardless of whether such claims were related to the allegations in the complaint.  *Id.* at *5.  Here, in contrast, this Court already found the Settlement's release is sufficiently narrow, as it "limits the release to claims 'relating to Class Vehicles and the method of theft popularized on TikTok and other social media channels relating to the lack of engine immobilizers as alleged in this Action . . . .'"  Nov. 3 Order at 9-10 (quoting ASA § VI.1).

and warranty of the Software Upgrade and notice and administration of the Settlement. *Id.*

Courts often find similar classwide relief fair and adequate. *See, e.g.*, *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *14 (N.D. Cal. July 22, 2020) (rejecting objections to the size of the settlement because the objectors failed to "account for the fact that the Settlement Fund does not constitute all of the relief to the Settlement Class"); *Patrick v. Volkswagen Grp. of Am.*, 2021 WL 3616105, at *4 (C.D. Cal. Mar. 10, 2021) (affirming final settlement that provided software update to redress alleged vehicle defect given defendant's "potential substantive defenses" and risk that plaintiff "could fail to obtain class certification"); *Campbell v. Facebook Inc.*, 2017 WL 3581179, at *5 (N.D. Cal. Aug. 18, 2017) (overruling objector who claimed to get "no value" from the settlement because the settlement provided alternative relief to the class, which the court "viewed against the likely rewards of litigation").

Rubin's reliance on *Philliben v. Uber Techs., Inc.* is misplaced. Obj. at 20 (citing *Philliben*, 2016 WL 4537912 (N.D. Cal. Aug. 30, 2016)). There, the court denied *preliminary* approval of a class settlement that would have offered approximately 82 cents to every member of a single class of Uber riders regardless whether and how many times the rider used the specific service at issue because it would "compensate persons who haven't been injured . . . at the expense of persons who have been" and because it did not "allocate funds according to degree of injury." *Id.* at *5. Here, in contrast, the Settlement does not compensate any one group at the expense of another. The Settlement also fairly compensates Class Members based on their degree of injury, as the "available compensation to Class Members would depend directly upon vehicle value." *See* Nov. 3 Order at 6 (quoting Declaration of Edward M. Stockton).

Rubin cites a number of cases that denied preliminary approval of class settlements in part because of disparities between the substantiated damages plaintiffs

claimed to be owed under California's Private Attorney General Act and the amount offered in the settlements. *See* Obj. at 21 (citing *Myles v. AlliedBarton Sec. Servs., LLC*, 2014 WL 6065602, at *4 (N.D. Cal. Nov. 12, 2014); *Martinez v. Knight Transportation, Inc*., 2022 WL 14746410, at *12 (E.D. Cal. Oct. 25, 2022)).  As explained above, unlike in *Myles* and *Martinez*, Rubin offers no reliable evidence beyond her "belief" and conjecture that the Class suffered more in damages than the Settlement provides, or that Class members could get $160,000,000 for "increased" insurance premiums or $900,000,000 for "loss of value" of vehicles.[11]

Regardless, "[t]he Ninth Circuit expressly rejected any requirement that the settling parties value maximum damages that can be obtained at trial, as that figure would be inherently speculative." *Victorino v. FCA US LLC*, 2023 WL 3296155, at *6 (S.D. Cal. May 5, 2023) (citing  *Lane v. Facebook, Inc*., 696 F.3d 811, 818 (9th Cir. 2012)).  Indeed, the Court "may presume that through negotiation, the parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Rosado v. Ebay Inc*., 2016 WL 3401987, at *4 (N.D. Cal. June 21, 2016) (quotation omitted).  That is precisely what occurred here. "After Class Counsel's initial assessment of the case's strengths and weaknesses, the Parties engaged in multiple settlement discussions over the course of approximately eight months," ultimately leading to the Settlement Agreement.  Aug. 16 Order at 22-23; Nov. 3 Order.

Lastly, Rubin's reliance on *Cavka v. SoulCycle Inc*., 2018 WL 1426343 (C.D. Cal. Jan. 25, 2018) is also misplaced.  There, the court denied preliminary approval

---

[11]  Rubin's citation to *Cullan & Cullan LLC v. M-Qube, Inc*., 2014 WL 347034, at *9 (D. Neb. Jan. 30, 2014) is similarly misplaced.  There, the court denied preliminary approval of a proposed settlement because the parties had "not shown that they are entitled to prosecute the action as a class action" and provided zero "[e]vidence or method by which the court c[ould] determine the class members' potential ranges of recovery or their chances of collecting a verdict."

because the class received zero monetary consideration and there were several signs of collusion between the parties. *Id.* at *4. Unlike in *Cavka*, the Settlement Agreement creates a non-reversionary Common Fund and provides other substantial benefits. *See generally* ASA. Further, as this Court already found, "[t]he Settlement is the result of informed, good-faith, arm's-length negotiations between the Parties and their capable and experienced counsel and is not the result of collusion." Dkt. 256 at 2; *see also* Aug. 16 Order at 17; Nov. 3 Order at 4.

### 2. The Barriers Plaintiffs Face In Proving Their Case And Risks of Litigation Weigh In Favor Of Settlement

Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case. *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010) (first factor favored settlement where "plaintiffs' remaining claims appear tenuous"). As this Court already found in granting plaintiffs' motion for preliminary approval, the strength of plaintiffs' case—or lack thereof—weighs in favor of approval given "there are substantial risks for the Class should the case proceed to trial." Aug. 16 Order at 26. A focus on claims for increased insurance premiums and diminution in value cannot change that since "a class-action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims." *Lane*, 696 F.3d at 824.

Plaintiffs likewise cannot prove reliance or that defendants had pre-suit knowledge, or other similar elements of claims and here showcases just some of the barriers plaintiffs face. *See generally* Dkt. 95.

**Plaintiffs cannot prove essential elements of their claims or damages.** As discussed further in defendants' motion to dismiss the Consolidated Consumer Complaint, plaintiffs cannot recover from defendants any loss in value or increased insurance premiums because liability does not attach where a third-party's unforeseeable intervening act breaks the chain of causation between the defendant's conduct and the alleged injury. *See also id.* at 13-15; *accord Hunt v. Bloom Energy*

*Corp.*, 2024 WL 1995840, at \*5 (N.D. Cal. May 6, 2024) ("Defendants plan to raise substantial causation and damages defenses, such that Plaintiffs' potential recovery could be dramatically limited, if not eliminated.").

Furthermore, Rubin's Objection simply confirms what the parties already knew: plaintiffs cannot prove—as they must to succeed on each of their claims—defendants' conduct was the actual or proximate cause of a class-wide insurance premium increase or diminution in value.  Indeed, Rubin does not attempt to provide a framework for determining purported loss of value of her vehicle beyond sheer guesswork, and she, like many other Class members, would not have standing to pursue loss of value claims.  *See supra* § I.A.  Again, neither Rubin nor Barile offer any evidence that Rubin's insurance premiums (or any others) increased *because of defendants' conduct*, rather than, for example, the fact that rates have increased nationwide, or because of individualized factors idiosyncratic to Rubin's household, as would potentially be the case for every single Class member.

Finally, as Barile's report and testimony shows, some claims would also fail because of an additional, unforeseeable intervening cause: in some states, a neutral state insurance commissioner decides whether to accept or reject proposed rate changes.  *See Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009) ("liability may not attach if an intervening decision of an informed, neutral decision-maker 'breaks' the chain of causation, meaning that the harm to the plaintiff can be traced more directly to an intervening actor" (citation omitted)).[12]

---

[12]   In states where a commissioner must approve rate increases, Plaintiffs' claims are also barred by the filed rate doctrine, which "bars lawsuits that challenge the reasonableness of insurance rates filed and approved by a regulating agency." *Benanav v. Healthy Paws Pet Ins., LLC*, 495 F. Supp. 3d 987, 997-99 (W.D. Wash. 2020).

1    The ample array of defenses is laid out more fully in defendants' motion to

2    dismiss, Dkt. 95, were recognized by the Court in granting preliminary approval, and

3    need not be repeated in here.

4    For these reasons, Rubin's skewed analysis vastly overestimates the strength of

5    plaintiffs' case and underestimates the risks of litigation.  Contrary to Rubin's

6    assertion, the strength of plaintiffs' case and the risks of litigation both favor

7    settlement.  Moreover, those who believe they can fare better in litigation can opt out

8    of the Settlement and take their chance in court.

9    **D.    The Government's Non-Objection Supports Final Approval**

10   Rubin contends the presence of a governmental participant is "neutral" because

11   no government entity is participating in this case.  Obj. at 25-26.  However, the

12   Governmental Entities made clear that they do not oppose the monetary portion of the

13   Settlement. *See* Nov. 3 Order at 7-9.  Moreover, any concerns regarding the Software

14   Upgrade have been adequately addressed by the report submitted by James Smith

15   (Dkt. 230-1).  Thus, this factor is not neutral; it favors final approval. *See In re Toyota*

16   *Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2013

17   WL 12327929, at *18 (C.D. Cal. July 24, 2013) (Selna, J.) ("Although no

18   governmental entity is a party to this action, the proposed settlement nevertheless

19   bears the silent imprimatur of government approval because despite receiving notice,

20   no state or federal official has filed an objection to the proposed settlement."); *In re*

21   *Tracfone Unlimited Service Plan Litig.*, 112 F. Supp. 3d 993, 1006 (N.D. Cal. 2015)

22   (finding that "[n]o government entity has raised any objections to the proposed

23   settlement" weighs in favor of final approval).

24   **CONCLUSION**

25   Rubin's objection is meritless and does not provide basis to reject the

26   Settlement.

27

28

1  DATED: June 17, 2024

2

QUINN EMANUEL URQUHART & SULLIVAN, LLP

3

4

By  /s/ Shon Morgan

5

Shon Morgan

6

7

*Attorneys for Kia America, Inc., Kia Corporation, Hyundai Motor America, and Hyundai Motor Company*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## L.R. 11-6.2. Certificate of Compliance

The undersigned, counsel of record for Defendants, certifies that this brief contains 5,659 words, which complies with the word limit of L.R. 11-6.1.

DATED:  June 17, 2024                 QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _____/s/ Shon Morgan_____
Shon Morgan

*Attorneys for Kia America, Inc., Kia Corporation, Hyundai Motor America, and Hyundai Motor Company*