Stephen J. Kane (*pro hac vice*)
stephen.kane@cityofchicago.org
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, IL 60602
Tel: (312) 744-6934
Fax: (312) 744-5185

Jimmy R. Rock (*pro hac vice*)
jrock@edelson.com
EDELSON PC
1255 Union Street NE, 7th Floor
Washington, DC 20002
Tel: (202) 270-4777
Fax: (312) 589-6378

Shantel Chapple Knowlton (*pro hac vice*)
schappleknowlton@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

Jean Larsen (SBN #351989)
jlarsen@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California
Tel: (415) 212-9300
Fax: (415) 373-9435

*Attorneys for Plaintiff City of Chicago*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: KIA HYUNDAI VEHICLE THEFT LITIGATION<br><br>This Document Relates to:<br><br>*City of Chicago v. Kia America, Inc., and Hyundai Motor America*, No. 8:23-cv-02045-JVS (KESx) | Case No. 8:22-ML-3052-JVS(KESx)<br><br>The Honorable James V. Selna<br><br>**CITY OF CHICAGO'S OPPOSITION TO MOTION TO DISMISS**<br><br>Hearing Date:   August 5, 2024<br>Hearing Time:   1:30 pm |

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................ 1

**BACKGROUND** ................................................................................................. 2

**I.**    **Procedural History** ................................................................................ 2

**II.**    **The SAC's Allegations** ......................................................................... 3

    **A.**    *Anti-theft devices become standard.* ..................................... 3

    **B.**    *Criminals discover that Kia and Hyundai models lack anti-theft technology, and a crime spree results.* ........................ 4

**ARGUMENT** ..................................................................................................... 5

**I.**    **Chicago's Claims Are Not Preempted.**............................................... 6

**II.**    **Counts 1-2 State Claims That Defendants Violated Consumer-Protection Ordinances By Deceiving Consumers.**............................ 8

    **A.**    ***Chicago's claims satisfy Rule 9(b).*** ................................... 10

    **B.**    ***Chicago sufficiently alleges that Defendants' advertisements were deceptive and beyond mere puffery.*** .......................... 11

**III.**    **Count 3 States An Unfair-Practices Claim Under MCC § 2-25-090.**...... 14

**IV.**    **Counts 4-5 State Public-Nuisance and Negligence Claims.**.................... 15

    **A.**    ***Safe public roads are a public right.*** ................................. 16

    **B.**    ***Defendants unreasonably interfered with the public's right to safe roads.*** ........................................................................... 17

    **C.**    ***Chicago pleads that Defendants owe—and violated—a duty of care.***........................................................................................ 17

**V.**    **Count 6 States A Claim Under MCC § 1-20-020.** ............................. 19

**VI.**    **The Economic-Loss Rule Does Not Apply.** ...................................... 21

**CONCLUSION** ................................................................................................ 22

i

1
2
# **TABLE OF AUTHORITIES**
3
**United States Supreme Court Cases:**
4
5
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009). ...................................................................5
6
7
*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992) ...................................................................8
8
9
**United States Circuit Court of Appeals Cases:**
10
11
*Austin v. Univ. of Oregon*,
    925 F.3d 1133 (9th Cir. 2019).........................................................5
12
13
*Bell v. Publix Super Markets, Inc.*,
    982 F.3d 468 (7th Cir. 2020) .......................................................11
14
15
*Bensenberg v. FCA US LLC*,
    31 F.4th 529 (7th Cir. 2022)...........................................................7
16
17
*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011)....................................................6, 9
18
19
*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009)..................................................6, 11
20
21
*O'Connor v. Eubanks*,
    83 F.4th 1018 (6th Cir. 2023).......................................................22
22
23
*Resort Car Rental Sys., Inc. v. FTC*,
    518 F.2d 962 (9th Cir. 1975).......................................................12
24
25
*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011).......................................................5
26
27
*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014).......................................................11
28

ii

**United States District Court Cases:**

*Cho v. Hyundai Motor Co.*,
    636 F. Supp. 3d 1149 (C.D. Cal. 2022)...................................................6

*City of Chicago v. DoorDash, Inc.*,
    No. 21 C 5162, 2022 WL 704837 (N.D. Ill. Mar. 9, 2022). ....................9, 11

*City of Chicago v. Equte LLC*,
    2023 WL 6173593 (N.D. Ill. Sept. 19, 2023) ...............................................15

*City of Chicago v. Purdue Pharma L.P.*,
    211 F. Supp. 3d 1058 (N.D. Ill. 2016) ..........................................................9

*City of Chicago v. Purdue Pharma L.P.*,
    No. 14 CV 4361, 2021 WL 1208971 (N.D. Ill. Mar. 31, 2021) .............18, 21

*City of Chicago v. Smollett*,
    421 F. Supp. 3d 565 (N.D. Ill. 2019) ...........................................................20

*Cosmetique, Inc. v. ValueClick, Inc.*,
    753 F. Supp. 2d 716 (N.D. Ill. 2010) ......................................................11, 21

*Cosmetique, Inc. v. Valueclick, Inc.*,
    No. 10 C 367, 2010 WL 11712562 (N.D. Ill. June 28, 2010).......................21

*Fleming v. Dr. Squatch, LLC*,
    No. 22 C 4842, 2024 WL 1676943 (N.D. Ill. Apr. 18, 2024).......................11

*FTC v. Walmart, Inc.*,
    664 F. Supp. 3d 808 (N.D. Ill. 2023) ...........................................................15

*In re Duramax Diesel Litig.*,
    298 F. Supp. 3d 1037 (E.D. Mich. 2018).......................................................8

*In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Pracs. Litig.*,
    No. ML 12-2317 CAS, 2012 WL 6062047 (C.D. Cal. Dec. 3, 2012) ..........11

*In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    155 F. Supp. 3d 772 (N.D. Ill. 2016) ...........................................................10

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010)......................................13

*K&N Eng'g, Inc. v. Spectre Performance*,
   No. EDCV 09-01900 VAP, 2010 WL 11468976
   (C.D. Cal. Feb. 9, 2010) ...............................................................................10

*Martin v. Wendy's Int'l, Inc.*,
   183 F. Supp. 3d 925 (N.D. Ill. 2016) ............................................................13

*Select Comfort Corp. v. Sleep Better Store, LLC*,
   796 F. Supp. 2d 981 (D. Minn. 2011) ...........................................................10

**State Court Cases:**

*Ash v. PSP Distribution, LLC*,
   226 N.E.3d 748 (Ill. App. Ct. 2023)..............................................................13

*Barbara's Sales, Inc. v. Intel Corp.*,
   879 N.E.2d 910 (Ill. 2007) ............................................................................13

*City of Chicago v. Am. Cyanamid Co.*,
   823 N.E.2d 126 (Ill. App. Ct. 2005)..............................................................15

*City of Chicago v. Beretta*,
   821 N.E.2d (Ill. 2004) ............................................................................*passim*

*Connick v. Suzuki Motor Co.*,
   675 N.E.2d 584 (Ill. 1996) ............................................................................13

*Elder v. Coronet Ins. Co.*,
   558 N.E.2d 1312 (Ill. App. Ct. 1990).............................................................14

*Garcia v. Overland Bond & Inv. Co.*,
   668 N.E.2d 199 (Ill. App. Ct. 1996)...............................................................12

*Hecktman v. Pac. Indem. Co.*,
   59 N.E.3d 868 (Ill. App. Ct. 2016)................................................................22

*In re Chi. Flood Litig.*,
   680 N.E.2d 265 (Ill. 1997) ............................................................................22

iv

*Kurti v. Fox Valley Radiologists, Ltd.*,
 464 N.E.2d 1219 (Ill. App. Ct. 1984)................................................................9

*Miller v. William Chevrolet/GEO, Inc.*,
 762 N.E.2d 1 (Ill. Ct. App. 2001).................................................................12

*Murray v. Motorola, Inc.*,
 982 A.2d 764 (D.C. 2009)..............................................................................8

*Ney v. Yellow Cab Co.*,
 117 N.E.2d 74 (Ill. 1954)............................................................................20

*Pappas v. Pella Corp.*,
 844 N.E.2d 995 (Ill. App. Ct. 2006)........................................................13, 14

*Phillips v. DePaul University*,
 19 N.E.3d 1019 (Ill. App. Ct. 2014)............................................................13

*Robinson v. Toyota Motor Credit Corp.*,
 775 N.E.2d 951 (Ill. 2002) ........................................................................14

**Miscellaneous Authorities:**

49 C.F.R. § 571.114..........................................................................................3

Fed. R. Civ. P. 8(a) ..................................................................................5, 7

Fed. R. Civ. P. 9(b) .........................................................................................6

FMVSS 114 ...........................................................................................3, 8, 14

FTC, *FTC Policy Statement on Deception* (Oct. 14, 1983) ....................................12

Journal of Proceedings of the City Council, the City of Chicago, July 21, 2004 ...21

MCC § 1-20-020..........................................................................2, 19, 20, 21

MCC § 2-25-090....................................................................................*passim*

MCC § 4-276-470..........................................................................2, 8, 11, 20

RESTATEMENT (SECOND) OF TORTS § 821B (1979) .................................................. 17

vi

# INTRODUCTION

For years, Defendants Kia America, Inc., and Hyundai Motor America decided to save a few hundred dollars per vehicle by omitting industry-standard or equivalent anti-theft technology, a decision that wreaked havoc on the City of Chicago ("Chicago" or the "City"). Rather than equip all their vehicles with anti-theft technology like other manufacturers, Defendants installed anti-theft technology only in their luxury models and left their middle- and lower-end models susceptible to theft with no warning.

The consequences were foreseeable: Chicago was rocked by a crime wave. Someone would steal a Kia or Hyundai vehicle, having learned how easy it was to do, then drive the car recklessly around congested city streets and use it to commit violent crimes. This, predictably, had downstream effects on public safety in Chicago. The City now seeks to hold Defendants liable for the crisis that Chicago has experienced as a result of Kia and Hyundai's irresponsible conduct. The SAC alleges claims for unfair and deceptive practices under two municipal consumer-protection ordinances, common-law claims for public nuisance and negligence, and a claim for reimbursement of costs that Chicago incurred due to Defendants' unlawful conduct.

Defendants' Motion to Dismiss ("Motion") advances four principal arguments, each of which should be rejected.

First, Defendants contend that federal law preempts Chicago's claims. But the Court already rejected Defendants' preemption arguments in upholding the Consolidated Governmental Entity Plaintiffs' ("GE Plaintiffs") claims. Now that Chicago has amended its complaint to align with the GE Plaintiffs' complaint, the result should be the same.

Second, Defendants' request to dismiss Chicago's consumer-protection claims ignore common sense by trying to narrow the meaning of "safety" in Defendants' own marketing. Regardless, Defendants largely ignore Chicago's failure-to-disclose

1

theory. Yet absent a clear and conspicuous disclosure—which Defendants did not provide—a reasonable consumer would expect a "safe" vehicle to include anti-theft technology.

Third, as for Chicago's public nuisance and negligence claims, this Court already held that similar claims brought by 17 municipalities may proceed. None of Defendants' arguments mandate a different result under Illinois law.

Fourth, Defendants argue that Chicago fails to establish causation under its cost-recovery ordinance, and that the economic-loss rule bars recovery for claims brought under public nuisance and negligence theories. These arguments fail: Chicago more than meets its burden to plead causation, and Municipal Code of Chicago ("MCC") § 1-20-020 explicitly authorizes Chicago to recover economic losses.

## BACKGROUND

### I.    Procedural History

Chicago filed its First Amended Complaint ("FAC") in Illinois state court, alleging (1) deceptive practices in violation of MCC § 4-276-470; (2) deceptive practices in violation of MCC § 2-25-090; (3) unfair practices in violation of MCC § 2-25-090; (4) public nuisance; (5) negligence; and (6) a cost-recovery claim under MCC § 1-20-020. The case was removed to the U.S. District Court for the Northern District of Illinois and transferred into this MDL.

Defendants moved to dismiss the FAC. (Dkt. 286.) The Court granted Defendants' motion based *only* on Defendants' preemption argument, noting that the FAC appeared to mandate the use of engine immobilizers specifically, whereas federal regulations do not specifically mandate them. (Dkt. 334.) The Court clarified that its ruling was based on FAC allegations that referred specifically to "engine immobilizers" "rather than more broadly referring to *any* sufficient anti-theft technology." (*Id.* at 5.) The Court did not reach Defendants' other arguments. (*Id.* at 6.)

Chicago then filed its Second Amended Complaint ("SAC"), amending the wording to base its allegations on the lack of any sufficient anti-theft technology and adding more detail to its deceptive-advertising allegations. (Dkt. 349-1.) Defendants again moved to dismiss, largely repeating the arguments in their original Motion.

## II.    The SAC's Allegations

### A.    *Anti-theft devices become standard.*

Since the 1970s, regulators have recognized that "stolen cars constitute a major hazard to life and limb." (SAC ¶ 77.) Experience since then has shown that car theft is a class of "keystone crime," meaning crime that facilitates additional criminality, such as burglary, assault, and—as Chicago has tragically learned over a dozen times since the epidemic of Hyundai and Kia thefts began—murder. (*Id.* ¶ 82.)

Responding to this need for safe roads, the National Highway Traffic Safety Administration promulgated Federal Motor Vehicle Safety Standard ("FMVSS") 114 to address vehicle theft. FMVSS 114 mandates that vehicle manufacturers equip each vehicle with "a starting system which, whenever the key is removed from the starting system prevents: (a) [t]he normal activation of the vehicle's engine or motor; and (b) [e]ither steering, or forward self-mobility, of the vehicle, or both." 49 C.F.R. § 571.114. Anti-theft technology that meets these requirements, either engine immobilizers or other technologies, ensure that cars are secure from theft in the absence of a key. (*E.g.*, SAC ¶¶ 63-65.)

Starting in the 1990s, car manufacturers began including engine immobilizers in their vehicles to meet this requirement. By the 2010s, immobilizers had become standard equipment for almost every automobile manufacturer in the U.S.—except Kia and Hyundai. (*Id.* ¶ 23.) By the 2010s, research showed that engine immobilizers were highly effective at reducing theft, which has declined by almost two-thirds since immobilizers were introduced. (*Id.* ¶ 24.) Installing these devices is a cost-effective way to comply with FMVSS 114: not only are immobilizers very

good at combating theft, they also only add a few hundred dollars to the production cost of each car. (*Id.* ¶ 26.)

Despite the known benefits and limited costs, many Hyundai and Kia models sold in America between 2011 and 2022 lacked an engine immobilizer or *any* anti-theft protections, rendering these "Defective Vehicles" unusually susceptible to theft. (*Id.* ¶¶ 27-28.) This omission was inexplicable: Defendants included immobilizers in all their cars sold in the European Union and Canada, and even in the higher-end models sold in America. (*Id.* ¶ 26.) Defendants not only failed to install engine immobilizers or any effective anti-theft technology in the Defective Vehicles (*id.* ¶¶ 27-28), they also failed to disclose this fact to consumers. Instead, Defendants touted their vehicles as industry leaders in safety and quality. (*Id.* ¶ 126.)

### B.   Criminals discover that Kia and Hyundai models lack anti-theft technology, and a crime spree results.

The surge in automobile theft foreseeably caused by Defendants' decision to omit immobilizers or equivalent anti-theft technology from the Defective Vehicles was enormous. In 2022, Chicago experienced a 55% increase in vehicle theft, the largest such increase in the country, which was almost entirely attributable to the theft of Kia and Hyundai cars. (SAC ¶¶ 65-66.) Although Kia and Hyundai models comprise only 7% of vehicles registered in Chicago, they accounted for *over half* of vehicles stolen in Chicago in 2023. (*Id.* ¶¶ 67-68.)

As the Department of Transportation found more than 50 years ago, an increase in automobile theft substantially decreases public safety. (*Id.* ¶¶ 78-80.) Reckless driving on city streets poses a threat to life and limb for all other drivers and passengers. (*Id.* ¶¶ 77, 80.) Stolen vehicles were used in more than a dozen murders in just a four-month period spanning October 2022 to January 2023. (*Id.* ¶ 82.) Criminals used stolen Kias or Hyundais to commit multiple armed robberies and other crimes. One such spree ended with the murder of a Chicago police officer.

1  (*Id.* ¶ 83.) Another ended when the vehicle slammed into the back of a City truck

2  and exploded. (*Id.* ¶ 85.)

3        Chicago has expended substantial resources combating the effects of

4  Defendants' conduct and will continue to do so until the effects have abated.

5  Chicago has been forced to divert resources to investigate car thefts and related

6  crimes precipitated by Defendants' conduct. (*Id.* ¶ 143.) Chicago also has, and will

7  continue to, expend resources on public outreach and awareness efforts to help fight

8  the scourge of Kia and Hyundai thefts. (*Id.* ¶ 149.) And Chicago continues to expend

9  resources dealing with increased rates of reckless driving, car accidents, and related

10  fatalities. (*Id.* ¶ 178.)

11        Moreover, Chicago consumers who unwittingly purchased the Defective

12  Vehicles have been left paying sometimes thousands of dollars to replace or repair

13  stolen vehicles and increased insurance rates. (*Id.* ¶ 4.) More than 130 Chicagoans

14  contacted Chicago following its initial complaint to describe the harms that they

15  have suffered due to Defendants' misconduct (*id.* ¶¶ 57-61)—harms that Chicago

16  seeks to remedy through this action.

17                                **ARGUMENT**

18        Under Federal Rule of Civil Procedure 8(a), "a plaintiff need only provide

19  'enough facts to state a claim to relief that is plausible on its face.'" *Austin v. Univ.*

20  *of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019) (citation omitted). A claim has "facial

21  plausibility when the plaintiff pleads factual content that allows the court to draw

22  the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S.

23  662, 678 (2009). Courts uphold complaints that provide "'enough fact[s] to raise a

24  reasonable expectation that discovery will reveal evidence' to support the

25  allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011). "All factual

26  allegations are accepted as true, and all reasonable inferences must be drawn in

27  favor of the plaintiff." *Austin*, 925 F.3d at 1137.

28

Under Federal Rule of Civil Procedure 9(b), plaintiff must allege "the who, what, when, where, and how of the misconduct charged." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). Claims must be "'specific enough to give defendants notice of the particular misconduct.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Courts consider the context of the claims in determining whether the standard has been met. *See Cho v. Hyundai Motor Co.*, 636 F. Supp. 3d 1149, 1165 (C.D. Cal. 2022) ("Rule 9(b)'s heightened pleading standard is 'somewhat relaxed' in the context of fraudulent omission.").

## I.      Chicago's Claims Are Not Preempted.

The Court dismissed the FAC because "rather than more broadly referring to *any* sufficient anti-theft technology," it was "based on the vehicles' lack of an engine immobilizer, specifically." (Dkt. 334 at 5-6.) The SAC corrects this error by challenging Defendants' failure to use immobilizers "or equivalent anti-theft technology" (*e.g.*, SAC ¶¶ 3-4)—an allegation that is substantively identical to the GE Plaintiffs' allegation that this Court cited in upholding the GE Plaintiffs' complaint. (Dkt. 270 at 6.) Accordingly, because Chicago no longer seeks to "impose a narrow engine-immobilizer requirement," the SAC does "not even raise a question of preemption." (*Id.*) Defendants offer three arguments in seeking to avoid this conclusion, but each argument contradicts this Court's decision upholding the GE Plaintiffs' complaint.

First, Defendants assert that the SAC's allegations about "'industry-standard anti-theft' technology" reference "immobilizers only." (Mot. at 5.) Defendants miss the point. The SAC alleges that Defendants acted unlawfully by omitting industry-standard immobilizers "***or equivalent*** anti-theft equipment." (SAC ¶ 17 (emphasis added); *accord, e.g., id.* ¶¶ 3-4, 30-34, 63-64.) These allegations confirm that Chicago does not narrowly seek to require that Defendants use immobilizers. Nor does Defendants' assertion distinguish the GE Plaintiffs' complaint: it repeatedly

called immobilizers "industry-standard." (Dkt. 175 ¶ 9; *accord, e.g.*, *id.* ¶¶ 3, 13, 67, 73, 83, 110, 112.)

Second, Defendants argue that the SAC's allegations challenging Defendants' failure to install immobilizers or equivalent anti-theft technology "still seek to impose . . . an impermissibly narrow requirement." (Mot. at 5.) That argument contradicts the Court's decision upholding the GE Plaintiffs' complaint, which likewise challenged Defendants' failure to "install[] immobilizer devices, or an equivalent anti-theft device." (Dkt. 175 ¶ 13.) The Court cited this allegation as making clear that despite the GE Plaintiffs' more-than-100 references to immobilizers, immobilizers were just "one permissible option available to Defendants" under the GE Plaintiffs' theory. (Dkt. 270 at 6.) Defendants themselves made this point in moving to dismiss Chicago's FAC: "Unlike the [GE] Complaint, which refers to immobilizers 'or an equivalent anti-theft device,' . . . [Chicago] explicitly seeks to require engine immobilizers specifically." (Dkt. 286 at 12.) Now that Chicago has amended its complaint to align with the GE Plaintiffs' allegations, the Court's decision upholding the GE Plaintiffs' complaint controls.

Third, Defendants argue that the term "equivalent anti-theft technology" is impermissibly vague. (Mot. at 6-7.) Again, that argument contradicts the Court's decision upholding the GE Plaintiffs' complaint based in part on its use of this exact phrase, which Defendants themselves cited in arguing that Chicago's FAC was preempted. Defendants' reliance on California products-liability cases that failed to identify a particular defect is misplaced: Chicago does not bring a products-liability claim.  (*Id.*) And in any case, "Illinois recognizes a claim for non-specific defect, which . . . relieves the plaintiff of the obligation to identify a particular defect in the product." *Bensenberg v. FCA US LLC*, 31 F.4th 529, 535-36 (7th Cir. 2022). Accordingly, the SAC satisfies Federal Rule of Civil Procedure 8(a)(2) by notifying Defendants that they should have used immobilizers *or* equivalent anti-theft technology.

7

Even if Defendants' preemption argument were correct, however, Chicago's consumer-protection claims would stand. Defendants' preemption argument relies exclusively on FMVSS 114's *manufacturing* standards. FMVSS 114 does not, however, create a federal standard governing representations or disclosures that automobile manufacturers must make in *marketing* vehicles. Federal law thus does not preempt Counts 1-3—and Count 6 to the extent it is based on violations of Chicago's consumer-protection ordinances—for this additional reason. *See In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1064 (E.D. Mich. 2018) (conflict preemption did not apply to claim alleging that car manufacturer failed to disclose facts about emissions system); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 528–29 (1992) (holding that a federal statute which mandated specific warnings on cigarette packaging preempted failure to warn claims regarding advertising, but not claims about deception or misrepresentation); *Murray v. Motorola, Inc.*, 982 A.2d 764, 778 (D.C. 2009), *as amended on reh'g* (D.C. Dec. 10, 2009) (holding no preemption of the consumer protection statute where "FCC has left it as a matter of manufacturer discretion what information to provide to consumers about the use of their cell phones"). Federal manufacturing standards do not give Defendants a free pass to make deceptive statements and omit critical information to consumers.

## II.    Counts 1-2 State Claims That Defendants Violated Consumer-Protection Ordinances By Deceiving Consumers.

Counts 1-2 allege that Defendants violated MCC §§ 4-276-470 and 2-25-090 by deceiving Chicagoans in selling the Defective Vehicles. (SAC ¶¶ 100-119.) Section 4-276-470(1) makes it unlawful for any person to "employ any deception . . . false promise or misrepresentation, or to conceal, suppress or omit any material fact with intent that others rely upon such concealment . . . in connection with the sale . . . or advertisement of any merchandise, whether or not any person has in fact been misled." Section 2-25-090(a) states: "No person shall engage in any act of consumer fraud, unfair method of competition, or unfair or deceptive act or practice

1  while conducting any trade or business in the city." Chicago "does not have to allege

2  reliance, injury, or causation" under either ordinance "because this is an

3  enforcement action." *City of Chicago v. DoorDash, Inc.*, No. 21 C 5162, 2022 WL

4  704837, at *2 (N.D. Ill. Mar. 9, 2022).

5        Deceptiveness is judged under identical standards for these ordinances. *See*

6  *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1076 (N.D. Ill. 2016).

7  MCC § 2-25-090(a) adopts by reference interpretations of the Illinois Consumer

8  Fraud and Deceptive Business Practices and Federal Trade Commission ("FTC")

9  Acts. The FTC has stated: "[i]f the disclosure of information is necessary to prevent

10  an ad from being deceptive, the disclosure has to be clear and conspicuous."[1] For a

11  disclosure to be clear and conspicuous, "consumers don't have to hunt for it"; the

12  disclosure "reaches out and grabs their attention."[2] Illinois courts have reiterated this

13  principle in reviewing what an advertisement did say in conjunction with what it did

14  not say to determine if the advertisement is deceptive. "A statement, although

15  technically true, may nevertheless be fraudulent where it omits qualifying material,

16  for a half-truth is sometimes more misleading than an outright lie." *Kurti v. Fox*

17  *Valley Radiologists, Ltd.*, 464 N.E.2d 1219, 1223 (Ill. App. Ct. 1984).

18        The SAC alleges that Defendants deceived Chicago consumers by (a)

19  affirmatively misrepresenting the Defective Vehicles as safe, and (b) failing to

20  disclose that the Defective Vehicles lacked immobilizers or equivalent anti-theft

21  equipment. (SAC ¶¶ 105, 115.) The SAC analyzes four representative

22  advertisements in detail, explains the "who, what, when, where, and how" these ads

23  were deceptive, *Cafasso*, 637 F.3d at 1055, and cites more than ninety ads to which

24  the four representative ads correspond. (SAC ¶¶ 30-44 and nn.11-20.) Indeed, the

25

26

27  [1]    Lesley Fair, *Full Disclosure*, FTC (Sept. 23, 2014), https://www.ftc.gov/business-guidance/blog/2014/09/full-disclosure.

28  [2]    *Id.*

9

SAC provides more detail than the Subrogation Plaintiffs' consumer-protection claims, which this Court upheld. (Dkt. 269 at 23-24.)

Defendants nevertheless move to dismiss Counts 1-2 for two reasons. Neither has merit.

### A.   Chicago's claims satisfy Rule 9(b).

Defendants argue that Chicago violates Rule 9(b) because it does not explain "why" Defendants' advertisements are deceptive. (Mot. at 13.) In fact, the SAC explains that Defendants marketed the Defective Vehicles as safe despite the absence of anti-theft technology, and that a reasonable consumer would not know that Defendants' vehicles lacked anti-theft technology absent a clear and conspicuous disclosure—which Defendants' advertisements failed to provide. (SAC ¶¶ 54-56.)

Defendants also argue that the SAC flunks Rule 9 because it quotes only some of the ninety-plus cited advertisements. (Mot. at 12-13.) But because the quoted advertisements satisfy Rule 9(b), Counts 1-2 would survive regardless. Beyond this, Defendants' argument ignores Chicago's failure-to-disclose claim, which expressly alleges that quoted advertisements (SAC ¶¶ 38-40) *and* most other cited advertisements (*id.* ¶¶ 41-45) omitted that the Defective Vehicles lack immobilizers or equivalent anti-theft technology.

In any event, "a plaintiff who provides a 'general outline of the fraud scheme' sufficient to 'reasonably notify the defendants of their purported role' in the fraud satisfies Rule 9(b)." *In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 812 (N.D. Ill. 2016). Thus, where (as here) "a plaintiff is alleging a systematic practice of fraud, the complaint need not include 'specific details of *every* alleged fraudulent claim forming the basis of [plaintiff]'s complaint,' but merely some representative examples." *K&N Eng'g, Inc. v. Spectre Performance*, No. EDCV 09-01900 VAP, 2010 WL 11468976, at *8 (C.D. Cal. Feb. 9, 2010) (citing cases); *see also Select Comfort Corp. v. Sleep Better Store, LLC*,

1    796 F. Supp. 2d 981, 985 (D. Minn. 2011) ("representative examples," rather than

2    "an exhaustive list of any allegedly fraudulent statements" satisfied Rule 9(b)); *In re*

3    *Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Pracs. Litig.*, No. ML 12-

4    2317 CAS, 2012 WL 6062047, at *15 (C.D. Cal. Dec. 3, 2012).

5         *Cosmetique, Inc. v. ValueClick, Inc.*, 753 F. Supp. 2d 716 (N.D. Ill. 2010),

6    cited by Defendants, is not to the contrary. In *Cosmetique*, the complaint alleged that

7    "two specific" advertisements were deceptive, but plaintiff opposed dismissal by

8    "chang[ing] the basis of its claim" to assert "a broad scheme of fraud." *Id.* at 720-21.

9    Here, by contrast, the SAC alleges "a pattern and practice" of deception and

10   explains that the four cited examples are "representative of similar advertisements."

11   (SAC ¶¶ 41-42.) The SAC thus gives Defendants sufficient "'notice of the [alleged]

12   misconduct.'" *Kearns*, 567 F.3d at 1124.

13        **B.    Chicago sufficiently alleges that Defendants' advertisements were**

14        **deceptive and beyond mere puffery.**

15        Defendants next argue that the challenged representations were true because

16   they addressed "safety while driving" rather than the safety of Defendants' vehicles

17   from theft. (Mot. at 16.) Whether marketing is deceptive generally presents "'an

18   issue of fact rather than law,'" *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 479

19   (7th Cir. 2020), because "'the determination [ ] whether an ad has a tendency to

20   deceive is an impressionistic one.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750,

21   762 (7th Cir. 2014). An Illinois court thus upheld Chicago's deception claims under

22   MCC §§ 2-25-090 and 4-276-470 because "whether reasonable consumers were

23   deceived . . . is a question of fact inappropriate for resolution on a motion to

24   dismiss." *DoorDash*, 2022 WL 704837, at *3; *see Fleming v. Dr. Squatch, LLC*, No.

25   22 C 4842, 2024 WL 1676943, at *3 (N.D. Ill. Apr. 18, 2024) (Illinois Consumer

26   Fraud Act claims are "generally not suitable for resolution on a motion to dismiss.").

27        Defendants' argument is likewise not suitable for resolution now. Each

28   advertisement quoted in the SAC includes a representation about the safety of

11

Defendants' vehicles that does not confine the representation to safety while driving. For example, a 2012 Kia Forte brochure represented on page 3 that the vehicle has a "comprehensive list of advanced safety systems." (SAC ¶ 37.) Defendants respond that consumers should have known that this representation was limited to safety while driving because the brochure discussed that topic on pages 18 and 22. (Mot. at 14 (citing Dkt. 432-5).) Even if the latter discussion cabined Defendants' representation about the vehicle's comprehensive safety systems, Defendants cannot cure a deceptive statement by requiring consumers to "hunt for" a corrective disclosure buried 15-or-more pages later. Fair, *supra* at n.1. And even if the challenged representations "may be construed so as not to constitute a misrepresentation," that is "immaterial," *Garcia v. Overland Bond & Inv. Co.*, 668 N.E.2d 199, 203 (Ill. App. Ct. 1996), because "[a]dvertising capable of being interpreted in a misleading way should be construed against the advertiser." *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975); *see Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 13 (Ill. Ct. App. 2001) (Illinois Consumer Fraud Act "eliminates any requirement of plaintiff diligence in ascertaining the accuracy of misrepresentations"). That is particularly true where (as here) a representation "concern[s] the safety of [a] product," in which case the FTC "'require[s] scrupulous accuracy in advertising.'" FTC, *FTC Policy Statement on Deception*, at 2 n.7 (Oct. 14, 1983).[3]

Regardless, Defendants' "truth" defense cannot defeat Chicago's failure-to-disclose claim. Defendants do not argue that their advertisements disclosed that the Defective Vehicles lacked basic anti-theft technology. Nor do Defendants suggest that these omissions were immaterial. On the contrary, as the SAC alleges (SAC ¶¶ 53-62), consumers would consider the absence of basic anti-theft technology when

___

[3] A full copy of the policy statement is available at https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf.

1   making purchasing decisions. *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584,

2   594-95 (Ill. 1996). Cases cited by Defendants are inapposite. *Ash v. PSP*

3   *Distribution, LLC*, 226 N.E.3d 748, 756 (Ill. App. Ct. 2023), held that a

4   manufacturer's failure to disclose that its cat food contained whole flaxseed was

5   "not material." Again, Defendants do not and cannot contend that Chicago

6   inadequately pleads materiality. *Phillips v. DePaul University*, 19 N.E.3d 1019,

7   1031 (Ill. App. Ct. 2014), held that a law school did not misrepresent its graduate-

8   employment statistics as being limited to full-time legal jobs where the school stated

9   that one-third of its graduates took jobs that did not require a law degree and

10  reported that some graduates acquired part-time and non-legal jobs. By contrast,

11  Defendants did not so much as suggest that the Defective Vehicles lacked basic anti-

12  theft technology.

13          Finally, Defendants argue that the quoted representations are mere "puffery."

14  (Mot. at 13.) Puffery consists of "[s]tatements that either refer to a product in such

15  blustery, exaggerated terms that no consumer would rely on them as truthful . . . or

16  that make a general claim of superiority so vague as to be incapable of being

17  proved." *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 934 (N.D. Ill. 2016).

18  The puffery defense does not allow sellers to "'say that [products] have attributes

19  that they do not possess.'" *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926

20  (Ill. 2007). That is precisely what Defendants did by suggesting that the Defective

21  Vehicles were "filled with the sort of premium features you'd only expect to find on

22  luxury cars" (SAC ¶ 40) and exceeded industry-safety standards. (*Id.* ¶¶ 36, 42.)

23  And as this Court held in rejecting a puffery defense, "[a]dvertisements that make

24  representations about safety are actionable." *In re Toyota Motor Corp. Unintended*

25  *Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1176-

26  77 (C.D. Cal. 2010). In any case, Defendants' puffery defense does not permit

27  dismissal of Chicago's failure-to-disclose claim. *See Pappas v. Pella Corp.*, 844

28

1  N.E.2d 995, 1001-02 (Ill. App. Ct. 2006) (rejecting puffery defense because

2  plaintiffs identified a product defect that seller failed to disclose).

**III.    Count 3 States An Unfair-Practices Claim Under MCC § 2-25-090.**

4       Count 3 alleges that Defendants' sales of cars that are unreasonably

5  susceptible to theft is an unfair practice under MCC § 2-25-090. (SAC ¶¶ 120-34.) A

6  practice is "unfair" if it (1) "offends public policy;" (2) "is immoral, unethical,

7  oppressive, or unscrupulous;" or (3) "causes substantial injury to consumers."

8  *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002). Not all

9  three criteria need to be satisfied; a practice that satisfies one factor to a significant

10  degree may be deemed unfair without further inquiry. *Id.* The SAC plausibly alleges

11  all three factors (SAC ¶¶ 124-32), and Defendants' contrary arguments lack merit.

12       First, Defendants argue that their conduct complies with public policy

13  because no statute or common law requires immobilizers. (Mot. at 18.) But for a

14  practice to offend public policy, it need only fall within "the penumbra of some

15  common-law, statutory or other established concept of unfairness." *Elder v. Coronet

16  Ins. Co.*, 558 N.E.2d 1312, 1316 (Ill. App. Ct. 1990) (quoting *F.T.C. v. Sperry &

17  Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)). Regulators have long articulated a

18  public policy that automobiles should not be unreasonably susceptible to theft, a

19  policy enumerated in FMVSS 114. (SAC ¶¶ 19-20, 125.) To satisfy this policy, car

20  manufacturers (including Defendants elsewhere) have installed immobilizers as

21  standard practice. (*Id.* ¶ 26.) Defendants' failure to meet industry standards for their

22  lower-end U.S. cars by installing immobilizers or equivalent anti-theft technology,

23  especially when combined with their failure to disclose that fact, offends public

24  policy.

25       Second, Defendants argue that their conduct was not immoral, unethical,

26  oppressive, or unscrupulous because consumers could have bought other vehicles.

27  (Mot. at 19.) But "when someone 'unreasonably creates or takes advantage of an

28  obstacle to the free exercise of consumer [decision-making],' an injury isn't

14

reasonably avoidable." *FTC v. Walmart, Inc.*, 664 F. Supp. 3d 808, 835-36 (N.D. Ill. 2023). Defendants' failure to disclose that the Defective Vehicles lacked anti-theft technology meant that consumers "were not making fully informed choices," leaving them unwittingly vulnerable to vehicle theft. *Id.* at 836. And the SAC amply alleges that Defendants' conduct was immoral, oppressive, and unscrupulous: Defendants marketed the Defective Vehicles to lower-income consumers, who now must pay higher insurance premiums, undertake other actions to protect their vehicles, or live without them—and live with the crime sprees that followed the theft of their vehicles. (SAC ¶¶ 73-75.)

Third, Defendants don't meaningfully dispute that the injuries to consumers are substantial. For good reason: thousands of Chicagoans have incurred substantial damages due to Defendants' misconduct. (*Id.* ¶¶ 4-5, 55, 80-89, 128.) Defendants instead argue that consumers "could have avoided the harm" because they were not "forced to purchase Hyundai or Kia vehicles." (Mot. at 19-20.) That argument simply reprises Defendants' position on the second factor and fails for the same reasons. *City of Chicago v. Equte LLC*, No. 21 C 518, 2023 WL 6173593 (N.D. Ill. Sept. 19, 2023), cited by Defendants, does not help them. *Equte* held that vaping companies' ineffective age-verification system did not harm the minors who purchased the companies' products because the minors purposefully exploited loopholes in the system to purchase the products. *Id.* at *13. In contrast, Defendants obfuscated and omitted key information about the Defective Vehicles, causing consumers to purchase the Vehicles unwittingly.

## IV.   Counts 4-5 State Public-Nuisance And Negligence Claims.

Count 4 alleges that Defendants created a public nuisance in Chicago. (SAC ¶¶ 135-52.) To state a public-nuisance claim, a complaint must allege: "(1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3) proximate cause, and (4) injury." *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 130-31 (Ill. App. Ct. 2005). Defendants contest

1   whether Chicago has adequately alleged the first two elements. (Mot. at 7.) In doing

2   so, Defendants also seek dismissal of Count 5—for negligence (SAC ¶¶ 153-69)—

3   on the ground that the SAC does not identify a cognizable duty. Defendants'

4   arguments fail.

5            **A.        Safe public roads are a public right.**

6            This Court held that the GE Plaintiffs identified a public right to be free from

7   unreasonable "interference with the use of public roads." (Dkt. 270 at 13.) Chicago

8   alleges the same public right: to be free from unreasonable "interfere[nce] with the

9   peaceful use of public streets." (SAC ¶ 142.) Relying only on dicta in *City of*

10  *Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), Defendants argue that

11  the Illinois Supreme Court "rejected" this public right. (Mot. at 7-8.) *Beretta* did no

12  such thing, instead stating that "we need not decide" the issue. 821 N.E.2d at 1116.

13  Regardless, *Beretta*'s dicta does not govern the different facts here.

14          In *Beretta*, Chicago asserted that gun companies created a public nuisance.

15  Chicago did not allege that defendants "engaged in any conduct in . . . Chicago,"

16  sold defective guns, or deceived the public about gun safety. *Id.* at 1114, 1140. The

17  court thus understood the asserted public right to be based on harm caused by third-

18  party criminals' misuse of non-defective guns, not by the companies' unlawful

19  conduct in Chicago (or anywhere else). It was in this context that *Beretta*

20  "question[ed]" whether nuisance claims extend to an individual's "right[] to be free

21  from the threat of illegal conduct **by others**." *Id.* at 1114 (emphasis added).

22          In contrast, the SAC here alleges that Defendants themselves engaged in

23  misconduct in Chicago by selling defective cars, including through dealerships

24  located in Chicago. (SAC ¶¶ 8-9, 25-28.) The SAC also alleges that Defendants

25  deceived the public—including Chicagoans—by misrepresenting the cars' safety

26  and failing to disclose the absence of anti-theft technology. (*Id.* ¶¶ 30-62.)

27  Accordingly, this case aligns with the general rule recognized in *Beretta*, which

28  states that public rights "include the rights of public health, public safety, [and]

                                                16

1   public peace." 821 N.E.2d at 1114. Confirming this, *Beretta* adopted the definition

2   of public right set forth in RESTATEMENT (SECOND) OF TORTS § 821B (1979)—the

3   same framework under which this Court found a public right under seven states'

4   laws. (Dkt. 270 at 13.) The result should be the same here.

5       **B.    Defendants unreasonably interfered with the public's right to safe**

6            **roads.**

7       Defendants again cite *Beretta* to argue that Chicago has not alleged

8   unreasonable interference with a public right. According to Defendants, *Beretta*

9   limits nuisance claims to conduct involving the use of land or violations of codified

10  law. (Mot. at 9.) As an initial matter, the SAC plausibly alleges that Defendants

11  violated Chicago ordinances. (SAC ¶¶ 100-34, 170-79.) The SAC thus adequately

12  pleads unreasonable interference with a public right even under Defendants'

13  interpretation of *Beretta*. *Compare Beretta*, 821 N.E.2d at 1124 ("The . . . complaint

14  contains no specific factual allegations of actual violations of applicable statutes and

15  regulations by any of the named defendants.").

16      Moreover, Defendants' interpretation of *Beretta* is wrong. To be sure, *Beretta*

17  expressed "reluctance" to expand the tort beyond land use or statutory violations.

18  821 N.E.2d at 1117. But the court stated that a defendant can unreasonably interfere

19  with a public right, even when "conducting a lawful enterprise," if the defendant is

20  "negligent in carrying out the enterprise." *Id.* at 1124. And as described in Section

21  C, the SAC adequately alleges Defendants behaved negligently.

22      **C.    Chicago pleads that Defendants owe—and violated—a duty of care.**

23      The SAC alleges that Defendants were negligent in selling the Defective

24  Vehicles. (SAC ¶¶ 153-69.) Defendants challenge this claim solely by contesting

25  whether they had a cognizable duty. This Court already held that the GE Plaintiffs'

26  similar allegations "sufficiently state[d] a duty" to "(1) exercise reasonable care in

27  the design and manufacture of Defendants' vehicles and (2) guard against the

28  intentional and/or criminal conduct of third parties." (Dkt. 270 at 8-9.) The result

17

should be the same here. Like the GE Plaintiffs, Chicago alleges that Defendants had a duty to act as a reasonable manufacturer and breached that duty by failing to include effective anti-theft technology in the Defective Vehicles. (SAC ¶¶ 153-69.) Chicago alleges that Defendants knew the benefits of immobilizers and other anti-theft devices, knew that the failure to install reasonable anti-theft technology would lead to more car thefts, and knew that increased car thefts would harm public safety. (*Id.* ¶ 4.) The harms catalogued in the SAC were thus entirely "foreseeable." (*Id.* ¶ 90.)

Defendants argue that *Beretta* mandates a different outcome. In *Beretta*, Chicago contended that gun manufacturers and distributors owed a duty of reasonable care to prevent firearms from ending up in the hands of individuals who could not lawfully possess them. 821 N.E.2d at 1125. *Beretta* acknowledged it was foreseeable that criminals would obtain guns, but concluded that it was "less foreseeable" that defendants' "'lawful commercial activity'" would lead to criminals buying guns outside of Chicago for use in Chicago. *Id.* at 1126, 1136. Unlike *Beretta*, where defendants' "conduct 'did not violate any law,'" Chicago alleges that Defendants' sale and marketing of Defective Vehicles was itself unlawful. *See City of Chicago v. Purdue Pharma L.P.*, No. 14 CV 4361, 2021 WL 1208971, at *13 (N.D. Ill. Mar. 31, 2021) ("[W]hile, in *Beretta* and like cases, the 'criminal acts of third parties' may not have been sufficiently foreseeable for purposes of proximate cause . . . defendants' *unlawfully* deceptive and unfair marketing . . . require[s] a different result.").

The automobile industry has known for decades that "cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." (SAC ¶ 78.) Based on similar allegations in the GE Plaintiffs' complaint, the Court has already determined that "[i]t is foreseeable, then, that the lengths a manufacturer will go—or not go—to design their cars with protections against theft will determine

18

1    the burden others will bear to respond to such theft." (Dkt. 270 at 8.) Nothing about
2    *Beretta* undermines the Court's reasoning.

3        *Beretta* further declined to find a duty on public-policy grounds, reasoning
4    that such a duty would impose an "immense" burden on defendants to restructure
5    their businesses. 821 N.E.2d at 1126. No similar "immense" burden would be
6    imposed here, despite Defendants' citation-free protestations to the contrary.
7    Installing engine immobilizers is a relatively cheap endeavor—one that Defendants
8    themselves have undertaken outside the U.S. (SAC ¶ 26.)

9        In arguing that Chicago has not pled unreasonable interference with a public
10   right, Defendants also cite *Beretta*'s statement that the lawful sale of non-defective
11   guns could not unreasonably interfere with a public right because that question
12   required "balancing . . . the harm caused by firearms versus their utility," which "is
13   better suited to legislative [determinations]." 821 N.E.2d at 1121. *Beretta* explained
14   that "although courts frequently weigh such factors in other contexts," the gun
15   context is different because firearms that are illegal in Chicago "may be possessed
16   legally by some persons, in some parts of the state"—precluding a one-size-fits-all
17   judicial resolution. *Id.*

18       *Beretta*'s discussion about the legislature's role does not cabin the judiciary's
19   usual ability to find a common-law duty. *See id.* at 1117-21 (discussing the
20   legislature's role); *id.* at 1121-27 (separately discussing common-law duties). Nor
21   are there are similar concerns about overstepping judicial boundaries in this context.
22   No law authorizes Defendants to unlawfully market and sell defective cars that are
23   unusually susceptible to theft, so imposing liability here will not override legislative
24   choices elsewhere in Illinois. Nor would doing so displace federal regulations:
25   Chicago's claims are consistent with those regulations, as explained above.

26   **V.    Count 6 States A Claim Under MCC § 1-20-020.**

27       Count 6 alleges that Defendants violated MCC § 1-20-020. (SAC ¶¶ 170-79.)
28   Section 1-20-020 provides: "[a]ny person who causes the city or its agents to incur

19

costs in order to provide services reasonably related to such person's violation of any federal, state or local law . . . shall be liable to the city for those costs."

Defendants offer two bases for dismissal. First, Defendants argue that Chicago cannot base a section 1-20-020 claim on violations of sections 2-25-090 or 4-276-470 because the SAC fails to state a claim under the latter ordinances. (Mot. at 20.) Defendants are incorrect. *See supra*, Sections II-III.

Second, Defendants argue that the SAC inadequately pleads that Defendants' unfair and deceptive advertising caused Chicago's costs. (Mot. at 20-21.) Not so. The SAC alleges: "The direct and proximate result of Defendants' violation of federal, state and/or local law was a wave of thefts of the Defective Vehicles, and the resulting costs to Chicago in responding to the wave of thefts and crimes, injuries, and property damage associated with those thefts." (SAC ¶ 175). "Because of Defendants' unlawful actions . . . Chicago has incurred and will continue to incur costs for police, emergency, health, corrections, and other services; costs to repair property damage; and costs for public outreach and theft prevention." (*Id.* ¶ 178.) This Court upheld the GE Plaintiffs' similar causation allegations, explaining that "[t]heft is the very foreseeable conduct that *anti-theft devices* specifically protect against." (Dkt. 270 at 9-11.) The result should be the same here. *See City of Chicago v. Smollett*, 421 F. Supp. 3d 565, 574 (N.D. Ill. 2019) (denying motion to dismiss section 1-20-020 claim because "the costs the City incurred investigating [defendant's] false statements are 'reasonably related' to the false statements"); *see also Ney v. Yellow Cab Co.*, 117 N.E.2d 74, 78 (Ill. 1954) ("If . . . the criminal act might reasonably have been foreseen, the causal chain is not broken by the intervention of such act.").

Defendants insist that Chicago must identify particular consumers exposed to Defendants' deception and connect those individuals with thefts. (Mot. at 21.) But section 1-20-020 allows Chicago to recover costs "reasonably related to" Defendants' violations. The City Council inserted that language in a 2004

amendment; before that, Chicago could recover only costs incurred "as the result of" unlawful conduct. Journal of Proceedings of the City Council, the City of Chicago, July 21, 2004, p. 28445. Defendants' argument would undo the 2004 amendment, requiring a close connection between illegality and the provision of city services.

Moreover, it is far too early to require the details demanded by Defendants. As the Court stated in upholding the Subrogation Plaintiffs' claims, the complaint need not "identify *every* insured on whose behalf they are seeking to recover or allege facts supporting the claims of *each* of those insureds at this stage." (Dkt. 269 at 12.) "All that information is appropriately suited for discovery." (*Id.*). Chicago thus "was not required to list in its complaint the names of specific consumers that were misled in order to state a claim." *Cosmetique Inc. v. Valueclick, Inc.*, No. 10 C 367, 2010 WL 11712562, at *2 (N.D. Ill. June 28, 2010).

*Purdue Pharma* is consistent with this: it held that Chicago "need not make specific allegations connecting each Chicago prescriber to specific misrepresentations and omissions." 2021 WL 1208971, at *12. Given Defendants' decade-long advertising campaign (SAC ¶ 30), it is more than "plausible" that Defendants deceived "at least one" of their thousands of Chicago customers. *Cosmetique*, 753 F. Supp. 2d at 723. Had consumers known the truth, fewer Defective Vehicles would be on Chicago streets, resulting in fewer cars to steal, recklessly drive, and use in committing crimes. And had Defendants not sold cars without *any* anti-theft technology, the cars would not have been unreasonably susceptible to theft at all. (SAC ¶¶ 124-26.)

## VI.   The Economic-Loss Rule Does Not Apply.

Defendants argue that the economic-loss rule precludes Chicago from recovering damages for its public-nuisance and negligence claims. (Mot. at 21-22.) That argument fails for three independent reasons.

First, section 1-20-020 allows Chicago to recover costs incurred due to Defendants' common-law violations, including public nuisance and negligence. (*See*

Dkt. 305 at 15-17.) There is no reason to read the term "state law" in the ordinance

to *exclude* state tort law. *See O'Connor v. Eubanks*, 83 F.4th 1018, 1028 (6th Cir.

2023) (Thapar, J., concurring) ("common law is state law").

Second, the economic-loss rule does not preclude damages to abate a

nuisance. *See Beretta*, 821 N.E.2d at 1141 (citing a case holding that "the economic

loss doctrine did not bar plaintiff's claim for damages for the costs of asbestos

abatement"). The SAC seeks damages to cover costs for public outreach and theft-

prevention measures, as well as compensation for economic and property damages

and injunctive relief "to abate the nuisance." (SAC ¶¶ 149, 151-52, 178.)

Third, the economic-loss rule does not apply "where the plaintiff sustained

damage, *i.e.*, personal injury or property damage, resulting from a sudden or

dangerous occurrence." *Hecktman v. Pac. Indem. Co.*, 59 N.E.3d 868, 872–74 (Ill.

App. Ct. 2016); *see In re Chi. Flood Litig.*, 680 N.E.2d 265, 279 (Ill. 1997)

(property owners who suffered property damage in flood could recover "all

consequential damages" resulting from nuisance). The SAC alleges damage to

public property. (SAC ¶¶ 85, 149, 165.) Defendants' response—that the SAC does

not "specify" damaged public properties aside from one city-owned sanitation truck

(Mot. at 22)—demands more than Rule 8 requires and is wrong in any event. (*See*

SAC ¶¶ 85, 149, 165.)

## CONCLUSION

The motion to dismiss should be denied. If the Court dismisses any part of the

SAC due to a pleading failure, however, Chicago respectfully requests leave to

amend.

1   DATED: June 28, 2024                          Respectfully submitted,

2                                            **City of Chicago**

3                                          */s/ Stephen J. Kane*

4                                          Stephen J. Kane (*pro hac vice*)
stephen.kane@cityofchicago.org

5                                          City of Chicago Department of Law

6                                          121 North LaSalle Street, Room 600
Chicago, Illinois 60602

7                                          Tel: (312) 744-6934

8                                          Fax: (312) 744-5185

9                                          */s/ Shantel Chapple Knowlton*

10                                        Jimmy Rock (*pro hac vice*)
jrock@edelson.com

11                                        EDELSON PC

12                                        1255 Union Street NE, 7th Floor
Washington, DC 20002

13                                        Tel: (202) 270-4777

14                                        Fax: (312) 589-6378

15                                        Shantel Chapple Knowlton (*pro hac vice*)

16                                        schappleknowlton@edelson.com

17                                        EDELSON PC

18                                        350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654

19                                        Tel: (312) 589-6370

20                                        Fax: (312) 589-6378

21                                      Jean Larsen (SBN #351989)
jlarsen@edelson.com

22                                      EDELSON PC

23                                      150 California Street, 18th Floor
San Francisco, California

24                                      Tel: (415) 212-9300

25                                      Fax: (415) 373-9435

26                                    *Attorneys for Plaintiff City of Chicago*

27

28

OPPOSITION TO MOTION TO DISMISS                  CASE NO. 8:22-ML-3052-JVS(KESx)

## CERTIFICATION

The undersigned, counsel of record for Plaintiff City of Chicago, certifies that this brief contains 6,928 words, which complies with the word limit of L.R 11-6.1.

*/s/ Shantel Chapple Knowlton*

24

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on June 28, 2024, I electronically filed the foregoing

3  document with the Clerk of the Court using the CM/ECF system which will send

4  notification of such filing to all counsel of record.

5

6                                          */s/ Shantel Chapple Knowlton*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS                    CASE NO. 8:22-ML-3052-JVS(KESx)