PAUL MICHAEL MONZIONE
ATTORNEY AT LAW
CA Bar Number 101124
Paul M. Monzione, P.C.
PO Box 1478
Wolfeboro, NH  03894-1478
info@monzionelawoffices.com
PHONE   603-569-9599
FAX        603-569-0599
*Attorney for Class Member/Objector Donald K. Birner*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALE PRACTICES, AND PRODUCTS LIABILITY LITIGATION | CASE NO. 8:22-ml-03052-JVS-KES |
| | The Honorable James V. Selna |
| This document relates to: ALL CONSUMER CLASS ACTION CASES | **OBJECTOR DONALD K. BIRNER'S JOINT REPLY TO THE SUPPLEMENTAL BRIEFS OF DEFENDANTS AND CLASS COUNSEL** |
| | Judge: Hon. James V. Selna Date: September 16, 2024 Time: 1:30 p.m. Courtroom: 10C |
| | **MANDATORY CHAMBERS COPY** |

1
2
3

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT                                        Page

    A.    THE HARM OCCURRED AT THE POINT OF SALE WITH THE
        CONCEALMENT OF SAFETY DEFECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    DEFENDANTS RECEIVED  OVER PAYMENTS FOR NON- EXISTENT
        THEFT  PROTECTION THAT SHOULD BE REFUNDED. . . . . . . . . . . . . 1

    C.    THE DIMINISHED VALUE ANALYSIS RENDERED BY BOTH
        CLASS  COUNSEL AND DEFENDANTS ARE  FATALLY FLAWED  IN
        MAJOR  RESPECTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    D.    THE FIDUCIARY ROLE OF CLASS COUNSEL COULD BE PERCEIVED
        AS COMPROMISED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    E.    EACH CLASS MEMBER EXPERIENCED A LOSS OF BARGAIN DUE
        TO NON  DISCLOSURE OF THEFT PRONE DEFECTS. . . . . . . . . . . . . . 4

II.    KIA MOTORS AND HYUNDAI  FAILED TO MEET GOVERNMENT AND
    INDUSTRY STANDARDS REGARDING ADEQUATE THEFT PROTECTION
    DEVICES TRIGGERING A WIDESPREAD PUBLIC SAFETY CRISIS
    ACROSS AMERICA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    THE GENESIS OF THE HARM  EXTENDED  OVER A DECADE
        AFFECTING OVER 8 MILLION VEHICLES RESULTING IN OVER
        PAYMENTS BY CLASS MEMBERS FOR CLASS VEHICLES. . . . . . . . . 6

    B.    THE VEHICLES SOLD IN VIOLATION OF FEDERAL SAFETY
        STANDARDS SUFFER FROM INHERENT DIMINISHED VALUE
        AND STIGMA COST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    CLASS VEHICLES LACK OF IMMOBILIZER AND OTHER THEFT
        PREVENTION MEASURES VIOLATES NHTSA STANDARD
        FMVSS 114.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.  The Standard Requires that when the Key is Removed or the Ignition
            Lock  is Bypassed the Starting System will Prevent Steering or Forward
            Mobility of the Vehicles, or Both.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2.    **NHTSA Chief Counsel Jacqueline Glassman Recognized the Dual Requirements of the S 5.1.1 (a) & (b) Which Require a Device that Prevents Either Self Mobility or Steering if the Ignition Lock is Bypassed. [Exhibit "A"]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3.    **Regulations Amending Theft Protection Clearly Require Immobilization System that Could Not be Rendered Ineffective by Allowing a Vehicle to Move under its Own Power**. . . . . . . 12

D.    **THE EVIDENCE IS OVERWHELMING THAT INDUSTRY STANDARDS AND PRACTICES REGARDING THEFT PREVENTION WERE NOT MET BY DEFENDANTS FOR A DECADE**. . . . . . . . . . . . . 13

E.    **CLASS COUNSEL'S BRIEF CONTRADICTS ALLEGATIONS OF THE CONSOLIDATED COMPLAINT THAT PRESUME HARM AND LOSS OF MARKET VALUE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.    **RECOGNITION OF THE DIMINISHED VALUE OF THE CLASS MEMBERS VEHICLES IS CONSISTENT WITH BASIC MARKETPLACE INTEGRITY, TRANSPARENCY, AND CONSUMER PROTECTION EXPECTANCY PRINCIPLES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.    **CLASS COUNSEL'S EXPERT, EDWARD STOCKTON'S APPROACH IN CASE NUMBER 3:15-MD-02672-CRB IN RE VOLKSWAGEN CLEAN DIESEL MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY (STOCKTON DECLARATION DKT. NO. 1784-1¶ 28)**. . . . . . . . . . . . . . . . . . . . 19

V.    **OBSERVATIONS OF CLASS COUNSEL'S CLAIMS REGARDING DIMINISHED VALUE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.    **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## POINTS AND AUTHORITIES

*Page*

*CASES:*

Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1070 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . 4

Boyd Motors, Inc. v. Employers Ins. Co. of Wausau, No. 85-2370, 1990 U.S. Dist. LEXIS 11963 (D.Kan. July, 12 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Cole v. General Motors Corp., 484 F.3d 717, 722-23 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 6

Creative Montessori Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 918 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Culver v. City of Milwaukee, 277 F.3d 908, at 913. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Delledonne v. State Farm Mut. Auto. Ins. Co., 621 A.2d 350, 351 (Del.Super.Ct. 1992) . . . . . . . 9

Hartford Fire Ins. Co. v. Rowland, 181 Ga. App. 213, 351 S.E.2d 650, 652 (Ga.Ct.App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re Cendant Corp. Securities Litigation, 404 F.3d 173, 186–87 (3d Cir.2005). . . . . . . . . . . . . 15

In re Linkedin User Privacy Litigation, Case No.: 5:12-CV-03088-EJD (N.D. Cal. Mar. 28, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re Mercedes-Benz Tele Aid Contract Litigation, 257 F.R.D. 46, 58 (D.N.J. 2009) . . . . . . . . . 4

In Re Toyota Motor Corp 790 F. Supp 1152  (C.D. Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

In Re Volkwagen Clean Diesel Marketing, Sales Practices and Products Liability Case Number 3:15-md-02672-CRB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Johnson v. State Farm Mut. Auto. Ins. Co., 157 Ariz. 1, 754 P.2d 330, 331 (Ariz.Ct.App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lectrodryer v. Seoul Bank, 91 Cal. Rptr. 2d 881, 883 (Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . 4

Stone v. White, 301 U.S. 532, 535-36, 57 S.Ct. 851, 81 L.Ed. 1265 (1937) . . . . . . . . . . . . . . . . 4

*RULES:*

Code of Federal Regulations, 49 U.S.C. §30115 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1

*OTHER AUTHORITIES:*

2

49 CFR § 571.114 - Standard No. 114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

3

4

https://www.destinationkia.com/blogs/1016/wp-content/uploads . . . . . . . . . . . . . . . . . . . . . . . 12

5

Coffee, "The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation," 48
    Law & Contemp. Probs. 5, 26–27 (Summer 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6

7

Jonathan R. Macey & Geoffrey P. Miller, "The Plaintiffs' Attorney's Role in Class Action
    and Derivative Litigation: Economic Analysis and Recommendations for Reform,"
    58 U. Chi. L.Rev. 1, 19–20 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

8

9

Restatement (First) of Restitution § 1 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10

Restatement (Second) of Torts § 928 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11

Samuel Issacharoff, "Governance and Legitimacy in the Law of Class Actions," 1999 S.Ct.
    Rev. 337, 371–72. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**OBJECTOR DONALD K. BIRNER  JOINT REPLY TO THE SUPPLEMENTAL BRIEFS OF DEFENDANTS AND CLASS COUNSEL**</u>

## I.    PRELIMINARY STATEMENT

### A.    HARM OCCURRED AT THE POINT OF SALE BASED UPON THE CONCEALMENT OF MATERIAL SAFETY DEFICIT

The harm to class members occurred at the point of sale when they paid for industry standard theft prevention devices but did not receive them. The discovery of the true theft prone characteristics of the product occurred long after the sales, which is predictable in cases of detrimental reliance by  buyers. The myriad factors regarding the relative depreciation of the cars undertaken by class counsel and defendants is a futile speculative exercise without a purpose.

The contention by class counsel and defense counsel that calculation of the loss is not possible is nothing more than an attempt to confuse the issues, cover up the misconduct of the corporate defendants and basically ignore the loss of bargain principle.

### B.    DEFENDANTS RECEIVED  OVER PAYMENTS FOR NON- EXISTENT THEFT  PROTECTION THAT SHOULD BE REFUNDED

The defendants received over payments from all class members that should be refunded as a matter of fairness and equity. It bears mention that defendants not only received payment for theft prevention, not present on class vehicles, but defendants deceit eliminated the cost of buying the technology from the patent holder and incurring up-front license fees, royalty payments and other fees, which can be quite  high for valuable or uniquely patented technology.

By omitting this technology defendants enhanced their profit margin because they did not sustain the cost of purchasing the immobilizer technology.  This also gave defendants an undeserved competitive advantage over other manufacturers who complied with the standards.

As a result class members and the public have suffered a safety crisis as outlined by the

Attorney Generals of at least ten states.

### C. THE DIMINISHED VALUE ANALYSIS RENDERED BY BOTH CLASS COUNSEL AND DEFENDANTS IS FATALLY FLAWED

1. The damage or harm to the value of the vehicles occurred at the time of sale because class member's vehicle were sold and delivered lacking adequate theft prevention devices. The loss of bargain harm does *not* require any class member to sell their blemished vehicle as claimed by class counsel and defendants—who are solely responsible for the vehicles defective design. Why in the world should class members be forced to sell these vehicles encumbered with safety defects to hold defendants accountable for fraud.

2. The flawed analysis is confined to certain models within a certain time span and fails to take into account there has never been a voluntary recall issued by defendants designed to correct the defects or for that matter to buy back the vehicles. Web-sites such as Edmunds.com customarily ask for valuation purposes if there are 'any other issues' with the car. There is no indication that this was answered in the affirmative by defense counsel, which is a paramount inquiry and response when cars possess design defects.

3. The analysis by both class counsel and defendants is based exclusively upon trade in values which almost always brings considerably lower sales values than private sale transactions. However, private sales face imposing obstacles when cars fail to meet standards imposed upon manufacturers.

[For instance according to the website Edmunds.com utilized by defendants the average trade in value as of 8/23/2024 for this class member's 2014 Kia Soul would be **$2,794.00**. In comparison the average private seller market value according to Edmunds as of 8/23/2024 would be **$ 5,244.00.]**

Yet due to the misrepresentation by defendants and the products' design defects the private sale of these cars would be quite difficult— due to no fault of class member owners. Additionally trade inn values can be manipulated by an adjustment to the MSRP for example.

4.  The exclusive use of trade in values by class counsel and defendants although misleading and undervaluing the cars is necessitated in part due the misconduct of defendants concealing the product's defects as well as to the vehicles unfortunate reputation of being susceptible to theft, not conforming to government standards which  would not bode well or withstand the scrutiny of many individual consumers.

5.    Furthermore, if one expects class members as sellers to oblige the implied contractual covenants of good faith and fair dealing, as they should,  each class member would be candidly disposed to disclose the theft marked historicity of these vehicles, which  renders them all but unsaleable.  The use of low trade in values serves to camouflage the diminishment in value.

**D.    THE FIDUCIARY ROLE OF CLASS COUNSEL COULD BE PERCEIVED AS COMPROMISED.**

It seems that class counsel, somewhere  along the road toward settlement of this matter, could be perceived as compromising his role as a fiduciary for absent class members.

In specific Class Counsel  plead time and again throughout the amended consolidated complaint Dkt #84  on behalf of the lead plaintiffs, for example, that:

785.    Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Theft Prone Defect.

786.    Plaintiff did not receive the benefit of her bargain. Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she

did not receive a vehicle that met ordinary and reasonable consumer expectations

regarding quality design, and safe and reliable operation. The Theft Prone Defect

has significantly diminished the value of Plaintiff's Class Vehicle.

787.    Had Defendants disclosed the Theft Prone Defect, Plaintiff would not

have purchased her Class Vehicle, or would have paid less to do so.

In sum, class counsel stated the theft prone defect constitutes an ascertainable loss, based

upon wrongful conduct, plaintiffs lost the benefit of their bargain, the theft prone defect

significantly diminished the value of Plaintiff's Class Vehicle and if defects were disclosed by

defendants, Plaintiffs would not have purchased their Class Vehicle, or would have paid less for

it.

Now class counsel pivots 180 degrees and opines the loss is not ascertainable or capable

of scientific proof based upon a "market effect" theory.  Furthermore, he now claims that the loss

will only be incurred upon the sale of the class vehicle by class members, using objector Rubin as

an example.  Dkt # 532 p 5.   Curiously Class Counsel sees no injustice with defendants

pocketing and retaining  their ill-gotten gains— derived from concealing the true characteristics

of their products over an extended period— at the expense of all class members.

Notwithstanding class counsel's turnabout, the case for diminished value is apparent.

Class members claims arise from a single repetitive course of conduct by defendants that affected

each and every class member, and the costs to each class member of pursuing his or her suit

would exceed any potential recovery. The only realistic solution is aggregate litigation.

### E.  EACH CLASS MEMBER EXPERIENCE A LOSS OF BARGAIN DUE TO NON  DISCLOSURE OF SAFETY DEFECT

The loss for each and every class member was incurred at the time of purchase and is not

based upon a future selective book value or exceptional marketplace computations. The class

cars here lacked industry standard theft prevention immobilizers all unknown to plaintiffs but

well known to defendants at the time of purchase.

Defendants deliberately concealed this safety defect. The loss occurred at time of the sale

because each and every class member paid more for the non conforming cars than they would

have paid if the theft prevention defect was disclosed. Indeed, the Code of Federal Regulations

requires self certification and disclosure of any safety related defects. e.g See 49 U.S.C. §30115 [1]

This situation is analogous to the Volkswagen matter where the cars violated pollution

standards and were forced to buy back the vehicles or make payments to class members.

These class members realistically would not have paid the same price for cars that

violated safety standards, which motivated defendants to conceal the defect. The sales history

thereafter is not relevant. Harm was inflicted here at the point of sale by over payment due to

diminished value of the non conforming vehicles that lacked required theft prevention devices,

all the while unjustly enriching the defendants.

It has long been recognized that unjust enrichment or restitution is an equitable cause of

action meant to provide relief to a party who has conferred a benefit on another under

circumstances where the retention of that benefit would be inequitable, not punish those who

were wrongfully enriched. Restatement (First) of Restitution § 1 (1937); see also Stone v. White,

301 U.S. 532, 535-36, 57 S.Ct. 851, 81 L.Ed. 1265 (1937);  In Re Mercedes-Benz Tele Aid

Contract Litigation, 257 F.R.D. 46,58 (D.N.J  2009)

---

[1]A manufacturer or distributor of a motor vehicle or motor vehicle equipment shall certify to the distributor or dealer at delivery that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed under this chapter. A person may not issue the certificate if, in exercising reasonable care, the person has reason to know the certificate is false or misleading in a material respect.

"In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of each state's law are two fundamental elements-the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff." In re Mercedes-Benz Tele Aid Contract Litigation, 257 F.R.D. 46, 58 (D.N.J. 2009) "receipt of a benefit and unjust retention of the benefit at the expense of another." Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1070 (9th Cir. 2014) (quoting Lectrodryer v. Seoul Bank, 91 Cal. Rptr. 2d 881, 883 (Ct. App. 2000)

This objector suggests that the court exercise its discretion and apply an offset percentage of the clean NADA market value (e.g. 10%) just before the public scandal broke and refund that amount to each class member who purchased a class vehicle unaware of the theft prone defect.

This refund approach assures the class that defendants will not be rewarded for its misconduct of concealing the true characteristics of the vehicles and unjustly retain the benefit of the overpayment at the expense of each class member, while many class members still drive non-compliant theft prone vehicles. By contrast Class counsel's placement of a burden upon class members to show a reduction in future market value and sell their vehicle is unreasonable and unrealistic. This undue burden combined with an initial sale loss, misses the mark of a fair and equitable settlement. Class counsel's approach allows defendants to pocket the ill-gotten gains all to the detriment of the deceived class. [2]

---

[2]**General Economic Considerations for Consumers/Buyback Participants:**
17. Plaintiffs allege that consumers who purchased subject vehicles did so under fraudulent conditions. As a consequence, consumers did not acquire the vehicles that they bargained for. As a result, consumers overpaid for the subject vehicles because the vehicles lacked certain attributes that Volkswagen had marketed as being embodied in the vehicles and for which consumers had bargained. Furthermore, the excess emissions produced by the subject vehicles created negative utility (economic loss) for consumers who valued environmentally sound vehicle characteristics, but as a result of the emissions fraud, actually drove environmentally non-compliant vehicles. EXPERT STOCKTON REPORT IN VW par. 17 Ex B

**II.    KIA MOTORS AND HYUNDAI  FAILED TO MEET GOVERNMENT AND INDUSTRY STANDARDS REGARDING ADEQUATE THEFT PROTECTION DEVICES TRIGGERING A WIDESPREAD PUBLIC SAFETY CRISIS ACROSS AMERICA.[3]**

**A.    THE GENESIS OF THE HARM  EXTENDED  OVER A DECADE AFFECTING OVER 8 MILLION VEHICLES RESULTING IN OVER PAYMENTS BY CLASS MEMBERS FOR CLASS VEHICLES.**

The harm caused by defendants' failure to meet both government and industry standards occurred continuously and simultaneously as each class vehicle was introduced by defendants into the stream of commerce for over a decade, by sale to class owners all being unaware of the lack of immobilizers, who consequently overpaid for these vehicles.

The critical facts in this case and  in Toyota Motor Corp. 790 F. Supp. 1152, 1167 (C.D. Cal. 2011) is that Plaintiffs bargained for safe, defect-free vehicles, but instead received unsafe, defective vehicles, for which they overpaid.

Furthermore, plaintiffs have alleged much more than overpaying for a defective product. They have alleged that all of the vehicles lacked immobilizer technology and were theft prone because of this concealed design defect that violated federal standards, as well as industry practices and standards.  The market effect argument has no traction when the class vehicles had the safety defect at the time of purchase and the defect has not been remedied through recalls.

Here the over payment was caused by reliance upon alleged misrepresentation or non disclosure of the fact that the cars failed to have adequate and required theft protection devices. Plaintiffs/objector's theory is not based upon a "market effect" theory or simply paying too much but rather an undisclosed defective safety design by the manufacturer causing the overpayment.

---

[3]See DKT, 193 attorney generals letter to court (unique vulnerability of Hyundai and Kia theft-prone vehicles threatens public safety in our states)

In re Linkedin User Privacy Litigation, Case No.: 5:12-CV-03088-EJD (N.D. Cal. Mar. 28, 2014)

See Cole v. General Motors Corp., 484 F.3d 717, 722-23 (5th Cir. 2007); In re Toyota Motor Corp., Unintended Acceleration Mktg 790 F. Supp. 2d 1152, **1163** (C.D. Cal. 2011) ("[T]he economic losses resulting from the defect are readily established: defective cars are simply not worth as much.")   In addition the historicity of these cars relative to their blemished safety standards contaminates all private seller transactions.

Those over payments are forever gone along with any costs associated with such 'over payments', including financing costs, higher insurance premiums and other disunity expenses as dubbed by class counsel's expert witness in other cases. These over payments are sunken costs that are not recovered by any subsequent sale.  The added cost of loss caused by concealment of the defect has already been incurred and cannot be recovered except by reimbursement by defendants.[4]

**B.    THE VEHICLES SOLD IN VIOLATION OF FEDERAL SAFETY STANDARDS SUFFER FROM INHERENT DIMINISHED VALUE AND STIGMA COST.**

The *immediate diminished value* or harm is not derived from subsequent sales experience, as maintained by defendants, but rather the difference between the value of the vehicles with conforming theft protection at the time of purchase and the reduced value due to the lack of conforming theft protection. In other words, the difference between payment made for the cars with the expectation that it had conforming theft protection compared with the actual value of the

---

[4]The sunk-cost fallacy (SCF) refers to a greater tendency to continue an endeavor once an investment in time, effort, or money has been made (Arkes & Blumer, 1985). Doing so is considered an error because a rational decision maker should only consider current marginal costs and benefits and should neglect sunk cost because it is irretrievable no matter which option is chosen (Navarro & Fantino, 2005; R. Thaler, 1980).

1    vehicles lacking of standard theft protection immobilizers.

2        The argument that class members' loss or injury must be tied to a "market effect"

3    occurring at the time of purchase which resulted in them overpaying for their vehicle was

4    specifically rejected by this court in In re Toyota Motor Corp. Unintended Acceleration Mktg.

5    790 F. Supp. 2d 1152, **1165** (C.D. Cal. 2011) because the *"court accepted the allegations that all*

6    *Toyota vehicles had the safety defect at the time of purchase and the defected were not*

7    *subsequently remedied through recalls, hence all plaintiffs suffered economic loss at the time of*

8    *purchase because they received a [theft prone] defective vehicle. The fact that Plaintiffs*

9    *discovered this defect after the time of purchase is of no moment. The economic loss was present*

10   *from the beginning.*"

11       The vehicles also suffer from '*inherent diminished value*' sometimes referred to as stigma

12   cost, rendering the vehicles less desirable than an identical vehicle that was not necessary to be

13   repaired, software retrofitted or rehabilitated.

14       Regarding diminished value the court expressed at hearing last month that:

15       "Well, from my perspective, there are certain events in the life of a car that occur
         regularly that could affect its value. I think the most obvious one is being in an
16       accident. It can be repaired. It can be a hundred percent car-worthy and so on, but
         to a certain part of the marketplace, the fact that it was in an accident puts a taint
17       on the car." Transcript pg. 8 lines 16-22  [July 15, 2024 hearing]

18       We submit that these vehicles which violate federal safety standards and invite theft

19   taint the cars.

20       As this court mentioned in its tentative Order, *"class vehicles are still perceived by others*

21   *as easy to steal and thieves have no way of knowing if a vehicle has the Software Upgrade."*

22   Order at Pg. 26.  In accord with the court's sentiment is the Restatement (Second) of Torts.

According to the Restatement (Second) of Torts § 928 (1977):

> When one is entitled to a judgment for harm to chattels not amounting to a total destruction in value, the damages include compensation for:

> (a) the difference between the value of the chattel before the harm and the value after the harm or, at his election in an appropriate case, the reasonable cost of repair or restoration, with due allowance for any difference between the original value and the value after repairs, and

> (b) the loss of use.

A survey of reported cases with claims for the diminished value of vehicles reveals that the typical claim involves  a few thousand dollars. See, e.g., Boyd Motors, Inc. v. Employers Ins. Co. of Wausau, No. 85-2370, 1990 U.S. Dist. LEXIS 11963 (D.Kan. July 12, 1990) (diminished value claim for fourteen cars totaling $40, 609.48 for an average of about $2,900 per car); Johnson v. State Farm Mut. Auto. Ins. Co., 157 Ariz. 1, 754 P.2d 330, 331 (Ariz.Ct.App. 1988) (diminished value claim of $3,000); Hartford Fire Ins. Co. v. Rowland, 181 Ga. App. 213, 351 S.E.2d 650, 652 (Ga.Ct.App. 1986) (diminished value claim of $2,500); Delledonne v. State Farm Mut. Auto. Ins. Co., 621 A.2d 350, 351 (Del.Super.Ct. 1992) (diminished value claim of $8,000).

Predictably, the lack of adequate theft deterrent devices was eventually discovered and exploited by amateur thieves throughout the country causing massive property loss, along with a staggering number of personal injury victims and fatalities.[5]

## C.    CLASS VEHICLES LACK OF IMMOBILIZER AND OTHER THEFT PREVENTION MEASURES VIOLATES NHTSA STANDARD FMVSS

---

[5]These stolen vehicles have been used in furtherance of violent crimes and are frequently involved in traffic collisions. For example, in Minneapolis alone in 2022, thefts of Hyundai and Kia vehicles were tied to at least 5 homicides, 13 shootings,36 robberies, and 265 motor vehicle collisions.  * * * Thieves recklessly driving these stolen vehicles have caused significant injuries and at least nine deaths. dkt # 193 pg 2  Minn. AG

114.[6]

1. **The Standard Requires that when the Key is Removed or the Ignition Lock is Bypassed the Starting System Prevents Steering or Forward Mobility of the Vehicles, or Both.**

The unassailable fact is that class vehicles at the time of manufacture and entry into the stream of commerce all lacked immobilizer technology, which prevents steering or vehicle forward self mobility or both when either the key is removed or ignition is bypassed.  The so-called Kia boys routinely bypassed the ignition lock, started the cars with a USB cord and proceeded to drive them with steering and forward self mobility of the vehicle fully operational.

In pertinent part S 5.1.1 of FMVSS 114 states:

Each vehicle must have a starting system which, whenever the key is removed from the starting system **prevents**:

(a) The normal activation of the vehicle's engine or motor; ***and***

(b) Either steering, or forward self-mobility, of the vehicle, or both.

Subsection (b) above requires that a FMVSS 114 conforming vehicle must ***also prevent***:

"either steering, or forward self-mobility, of the vehicle, or both." [emphasis supplied]

2. **NHTSA Chief Counsel Jacqueline Glassman Recognized the Dual Requirements of the S 5.1.1 (a) & (b) Which Require a Device that Prevents Either Self Mobility or Steering if the Ignition Lock is Bypassed. [Exhibit "A"]**

In 2004 NHTSA Chief Counsel Jacqueline Glassman recognized the dual requirements of the S 5.1.1 (a) & (b) above, stating in response to an unidentified automaker requesting an interpretation of the section as follows:

---

[6]49 CFR Chapter V. Part § 571.114 Standard No. 114; Theft protection and roll away prevention.

*We note that in promulgating FMVSS No. 114, the agency expressed concern about car thieves who could bypass the ignition lock. In response to this concern, the **agency decided to require a device**, which would prevent either self-mobility or steering even if the ignition lock were bypassed (see 33 FR 4471, April 27, 1968).* [emphasis supplied]

Chief counsel concluded:

*The engine control module immobilizer described in your letter satisfies the requirements of S4.2(b) because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system. When the engine control module is locked, the vehicle is not capable of forward self-mobility because it is incapable of moving forward under its own power.* ref 114 d. 9/24/04

See attached *Exhibit "A,"* copy of entire letter from chief counsel.[7]

### 3. Regulations Amending Theft Protection Clearly Required Immobilization System Designed so it Could Not be Rendered Ineffective by Allowing a Vehicle to Move under its Own Power.

It is further noted that 49 CFR Part 543 App. A —provides specific criteria that the immobilization system must be designed to meet so that it cannot easily be defeated to allow forward self propulsion by disrupting the voltage or by using tools auto thieves commonly rely upon on; Scissors, wire-strippers, wire cutters and electrical wires, a hammer, a slide hammer, a chisel, a punch, a wrench, a screwdriver, pliers, steel rods and spikes, a hacksaw, a battery operated drill, a battery operated angle grinder; and a battery operated jigsaw.

49 CFR §543 states in par. (13), "The immobilization system shall be designed so that it can neither be bypassed nor rendered ineffective in a manner that would allow a vehicle to move under its own power, or be disarmed, using one or more of the tools and equipment listed in paragraph (14) of this appendix: (I) Within a period of less than 5 minutes, when tested as

---

[7]Hyundai/Kia models can be easily stolen because engine start can be achieved without the key and operationalizing both steering and self-mobility Ex. A attached  pg. 3

installed in the vehicle; or (ii) Within a period of less than 2.5 minutes, when bench-tested outside the vehicle.**"**

NOTE: C.R.C, c. 1038.114, regulations amending Theft Protection and roll away prevention-standard 114 in effect March 30, 2011

### D.    THE EVIDENCE IS OVERWHELMING THAT THE INDUSTRY STANDARD AND PRACTICE REGARDING THEFT PREVENTION WERE NOT MET BY DEFENDANTS FOR A DECADE.

Beginning with at least the 2000 model year vehicles, immobilizers were standard on 62% of models sold by Defendants' *competitors* in the U.S. market, and by the 2008 model year 90% immobilizers were standard competitors' vehicles sold in the U.S. were sold.[8]  It is undeniable that defendants knowingly manufactured vehicles without theft prevention equipment— that was standard equipment on almost all of its competitors vehicles— causing unreasonable and unnecessary risk of property damage, personal injury or death.

"Engine immobilizers were standard in *96 percent* of other new cars by 2015, including the same Kia and Hyundai models the companies sold in Canada and Europe, according to the attorneys general, but were only installed in 26 percent of Kia and Hyundai models in the U.S. that same year."[9]

See also ¶*1343 of amended consol complaint*. "HMC and KC sell the very same, or substantially similar vehicles to the Class Vehicles in other countries, with one major difference:

---

[8]Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 14, 2013). Center Discussion Paper Series No. 2013-004, TILEC Discussion Paper No. 2013-001, Available at SSRN: https://ssrn.com/abstract=2202165.

[9]California Attorney General Rob Bonta and nearly two dozen other attorneys general sent a letter Monday to executives with Kia America and Hyundai Motor Company over concerns that the companies have failed to include anti-theft technology in their car.

all HMC and KC vehicles sold in Europe (since 1998), Australia (since 2001) and Canada (since 2007) have engine immobilizers. For example, in the 2020 Kia Sportage Owner's Manual for Canada, Kia notes that the "vehicle is equipped with an electronic engine immobilizer system to reduce the risk of unauthorized vehicle use." 73 e.g.,

https://www.destinationkia.com/blogs/1016/wp-content/uploads.

Undoubtably, if class members had been advised that these vehicles violated  both governmental and industry standards— either they would not have purchased these vehicles or would have paid less for such vehicles.  This less than candid process was repeated time and again for over a decade by defendants.  The damages incurred result from nondisclosure of a known omission.

Yet defendants game plan attempts to shift blame to third parties including the very crooks they emboldened and enabled by the lack of immobilizers.

**E.    CLASS COUNSEL'S BRIEF CONTRADICTS ALLEGATIONS OF THE CONSOLIDATED COMPLAINT THAT PRESUMES HARM AND LOSS OF MARKET VALUE.**

Class counsel claim that diminished value is not susceptible of proof is unpersuasive particularly in light of the allegations of the consolidated complaint signed by Mr. Berman.

As stated in the consolidated complaint Dkt 84 at ¶ *1446-1448.* he reasons that:

*1446.   "No reasonable consumer, including Plaintiffs, would purchase or lease*

*as vehicle, for tens of thousands of dollars, that has an outsized,*

*unmitigated risk of  theft, or they would have paid less for their vehicles.*

*Indeed, the diminution in value is even greater now that Class Vehicles*

*are becoming uninsurable, and therefore unfit for their ordinary use."*

*DKT 84 ¶1446 consol. complt.*

1447.   *A certified auto appraiser and insurance expert based in Houston noted the obvious in September 2022, stating that "[y]ou're going to be in for a loss of market value due to these vehicles constantly being stolen."*

1448.   *The loss of value for Class Vehicles as the result of the Theft Prone Defect has been noted by others too. For example, Nerdwallet highlighted that even Class Members whose Vehicles have not been stolen suffer as a result of the Theft Prone Defect, "including pricier insurance and reduced resale value on a vehicle."*

Yet class counsel not only abandons this very clear and cogent claim, he champions the position of the defendant.

Upon  Public Exposure of its defective theft prone design, instead of expressing regret and remorse over Defendants' decision making process that preferred profits over harming innocent people now attempt to scape goat and blame the thieves they empowered, emboldened and enabled with their defective design which facilitated numerous thefts, as well as the dire consequences of property loss, injuries and fatalities across America.

## III.    RECOGNITION OF THE DIMINISHED VALUE OF THE CLASS MEMBERS VEHICLES IS CONSISTENT WITH THE BASIC  MARKETPLACE INTEGRITY, TRANSPARENCY, AND CONSUMER PROTECTION EXPECTANCY PRINCIPLES CODIFIED BY STATUES.

Defendants should not benefit from their deliberate failure to disclose and fix known design defects that result in diminished property values and a staggering number of personal injuries and fatalities all foreseeable risks known to defendants when each of them elected to

produce and sell the inferior product.

In the modern marketplace mass producers of goods are expected to engage with transparency, disclosure and quality assurance consistent with warranties, disclosure laws and governmental oversight referred to generally as *Caveat Venditor*.[10]

Class counsel, supposedly serving as a fiduciary for the class, advances arguments benefitting the defendants. The consultant, who wishes to appear objective, but who dances around disclosing the amount he was or is to be paid for his services, as well as identity of the payer of his services, should not influence the court to veer from its tentative declaration, because there is indeed more than one method open for fair-minded redistribution of the consumer funds invested in these compromised vehicles.

These class members have suffered real harm to a major life purchase and who believed, rightfully so, that they made a 'safe purchase' when in fact the purchase exposed them, their families and other innocent bystanders to enhanced exposure vehicle theft and its consequencial risks to life and limb.

Despite the scope of the misconduct, affecting over 8 million consumer vehicles, the multiple harms created and the daunting time period of a decade or more, class counsel presently claims that no viable remedy exists— which tends to serve counsel's private financial interest—

---

[10]Sometimes referred to as "inherent diminished value" or "stigma damages." Stigma damages "occur after the vehicle has been fully restored to its pre-loss condition, but it carries an intangible taint due to its having been involved in an accident." See See State Farm Mut. Auto. Ins. Co. v. Mabry, 274 Ga. 498 (2001). The Georgia Supreme Court has reasoned the insured's loss "is the difference between the value of the vehicle prior to the loss and its value after the loss." Id. at 502.  (e.g Dunn v. Meridian Mut. Ins. Co., 836 N.E.2d 249 (Ind. 2005) and In Wiese-GMC, Inc. v. Wells, 626 N.E.2d 595, 598 (Ind.Ct.App. 1993), trans. denied, our Court of Appeals followed the Restatement (Second) of Torts in holding that damages recoverable from a tortfeasor who damages property include diminution of value of a repaired chattel.  See Restatement (Second) of Torts § 928 (1977)

rather than the fulfillment of his fiduciary duties, a truly troubling recurring conundrum of the modern class action spawning conflicting interests between class counsel and absent class members and presents at least the appearance of collusion between parties on opposite sides of a case.

"Class counsel owes a fiduciary obligation of particular significance to their clients when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf." Culver v. City of Milwaukee, 277 F.3d 908, at 913; In re Cendant Corp. Securities Litigation, 404 F.3d 173, 186–87 (3d Cir.2005); Samuel Issacharoff, "Governance and Legitimacy in the Law of Class Actions," 1999 S.Ct. Rev. 337, 371–72; Jonathan R. Macey & Geoffrey P. Miller, "The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform," 58 U. Chi. L.Rev. 1, 19–20 (1991).] As Professor Coffee put it in another article, "the trial court's approval is a weak reed on which to rely once the adversaries have linked arms and approached the court in a solid phalanx seeking its approval." Coffee, "The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation," 48 Law & Contemp. Probs. 5, 26–27 (Summer 1985). Creative Montessori Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 918 (7th Cir. 2011)

The methodology is simplistic, fundamental and logical. Cars that don't meet standards are like footballs[11] or any other goods; they are by their very nature deemed unfit for the purpose

---

[11]At Wilson Sporting Goods River Grove IL the official N.F.L football named "The Duke" for the last 84 years is hand made to exacting specifications. And if at anytime a Duke football fails to 'meet spec.' it is hot branded on its face as 'blemished' and unfit for sale.

intended and less valuable in the marketplace.  They are indeed blemished in the marketplace.  Particularly those cars, some 2.3 million, that are ineligible for software updates.

First, determine the clean NADA or book value of the vehicles just prior to the scandal becoming public which would be designed to restore class members to the position they would have occupied if defendants' vehicles did not possess the defective theft prone characteristic.

Second, return a given percentage of those excess funds to the purchaser usually less than 10% representing the reimbursement for the overpayment incurred due to the previous sale.

Indeed, class counsel's expert witness in the case at bar, Edward Stockton, took this approach in Case Number 3:15-md-02672-CRB  In Re Volkwagen Clean Diesel Marketing, Sales Practices and Products Liability (Stockton Declaration Dkt. No. 1784-1¶ 28)  Mr. Stockton also supported restitution and tangible loss payments. In Re Volkswagen Clean Diesel.  Exhibit B

Presuming the parties are conducting an arms length transaction with each party having full knowledge of the subject matter of the transaction in a sale where buyer and seller act independently and have no relationship with each other, are acting independently in their own self interest.  Buyers and sellers are expected in the modern marketplace to engage with transparency.  Such a posture tends to maintain market integrity.

The issue is straight forward--how much should be discounted based upon a known flaw from both perspectives.  This is the approach generally taken on the VW diesel case and Toyota unintended acceleration case. Any other methodology leads to unnecessary complications and striking various comparisons that may or may not be valid or even factually consistent.

Otherwise the less sophisticated party, often the consumer, is taken advantage of and the same scenario plays out as portrayed when defendants withheld vital information about the lack

of an immobilizer.  This objector suggests between 7.5 % to 10% of the clean NADA value right before the event became public be made available to class members who qualify.

Class counsel's and defendants charts and vehicle comparisons impliedly presume that everyone who sold or purchased a class vehicle after the scandal was public were necessarily informed and aware of the product defect as well as its implications which is a manifest unknown.  This critical information about class vehicles is that they failed to have necessary theft protection systems determine in part the ultimate expenditure by the consumer for these vehicles.

There is no indication or information how many purchasers in the samples used by allied defendants and class counsel, for example, were keenly aware that the vehicle being purchased was burdened by the lack of adequate theft prevention devices and should be offset.

Class counsel's and defendants approach is also hypercritical in the sense that it perpetuates the wrongful marketplace conduct exhibited by defendants 8 million times over the last decade. It is only fair at the time of sale that buyer and seller should both  know of the lack of theft deterrent devices on the class vehicles but also the implications that result, such as the much greater exposure to not only the theft but all the consequences attendant thereto such as personal injury and fatalities before the sale is consummated.

If both seller and buyer are each fully apprised of the increased exposure to theft and all of its attendant implications and risks, then it is most difficult to resist the inference that any future sales price will be less that the FMV.   Transparent sales ideology does not require or permit the eligible class member seller to conceal this unattractive aspect of their tainted vehicles to would be purchasers. It is also unreasonable to expect class members selling their vehicles to conceal the defect as did defendants.

**IV.    CLASS COUNSEL'S EXPERT, EDWARD STOCKTON'S APPROACH  IN CASE NUMBER 3:15-MD-02672-CRB  IN RE VOLKSWAGEN CLEAN DIESEL MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY (STOCKTON DECLARATION DKT. NO. 1784-1¶ 28).**

Mr. Stockton serves as class counsel's expert in the above matter.  His full report in the VW matter is attached hereto as Exhibit B.

In summary, in the VW case, since the class vehicles did not meet government standards regarding pollution control, Stockton concluded that the class members overpaid for the non compliant vehicles. The same situation exists in this matter.  The class vehicles were defective because, unknown to class members, they polluted the environment so class members overpaid for these  non-conforming vehicles.  Such damages are fixed and not recoverable unless payment by defendants for diminished value becomes a part of the agreement without the need to sell the car.

Mr. Stockton elected to use NADA clean trade values as of September 2015 published in August 2015 predating the public announcement of the diesel gate scandal resulting in his view as the "most proximate valuation available" and which he concluded was as a "reasonable and reliable starting point." pg 7-8 of his opinion.

He determined without explanation that 8% was a reasonable TDI or overpayment by class members in light of their pollution control mishaps. pg 10 ¶ 19  Stockton  DKT 1784-1  He further stated that the subject vehicles faced three general negative economic effects which raised the TDI to almost 12%.

First, these consumers overpaid at the time of purchase and he adds, likely overpaid for ownership costs.  They also suffered from the 'disutility' of negative value.

Second, according to  Mr. Stockton, consumers replacing the subject vehicles likely

accelerated their purchase behavior (acquisition of next vehicle) which necessitated premature

economic costs.

Third, certain consumers replacing subject vehicles incurred residual economic

costs associated with early vehicle disposal and overpayment."  He also opined that replacement

of these vehicles would result in sales tax and registration fees not anticipated and loss of

warranty, refinancing costs and so on.

In any event, it appears that the up front loss considering all factors was about 12%

typically according to class counsel's expert Mr. Stockton's analysis in the VW case, which has

marked similarities to this case.  His computations are illustrated in Exhibit B attached hereto.

## V.    OBSERVATIONS OF CLASS COUNSEL'S CLAIMS REGARDING DIMINISHED VALUE.

(1)   "We believed that a release of such claims in return for the

benefits received was in the best interests of all class members including those who

did  not have  theft-related damages." page 2 of 16 lines 10-12. [class counsel]

**Objector's response:**

(1)   Approximately 2.3 million class vehicles, which are not eligible for the software

update and will continue to be targeted for theft, receive virtually no consideration, are expected

to grant defendants a full release of liability and are saddled with cars that are largely

unmarketable.  It is most difficult to conceive that is in the best interest of all class members.

**Objector's Response to Mr. Stockton's supplemental opinion:**

Mr. Stockton concluded in his supplement report prepared for this case, in stark contrast

to his approach in the VW case, found that no significant changes in DM but he does admit that

there was an unprecedented run up in resale prices that began in 2020 and continued into 2023 and that, "*However, it should be noted that the period following the "Kia Boyz" videos, that might reasonably be identified as the potential DV Period for Class Vehicles, coincides closely with the severe disruptions generally to the resale automotive market."*

Even more relevant, he erroneously fails to take into consideration that class members lost the *benefit of bargain*, in that class members who purchased a vehicle that was of a lesser standard, grade, and quality than represented, did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality, design, and safe and reliable operation. The Theft Prone Defect significantly diminished the value of Plaintiff's Class Vehicle.  Had Defendants disclosed the Theft Prone Defect, class members would not have purchased the Class Vehicle, or would have paid much less for their vehicles.

The overpayment is a tangible loss because it is based upon a design defect that relates to safety.  Any retentive value is irrelevant based upon market losses or gains are not relevant or related to the harm caused by defendants ongoing deliberate nondisclosure of the cars safety violations.

The over payment is a sunken cost and the sale of the class vehicle does not recapture that cost any more than the traditional hard core gambler who continues to gamble to 'win back' his losses.  No one wins back losses...they are sunken costs.  Class members were not gamblers, but consumers who had the right to believe the cars met safety standards or they would not be offered for sale. And the regulations are available to provide buy back remedies in the event the cars are not compliant.

The overcharge relating to the initial transaction does not change, no matter the

subsequent sales history. [Accordingly, Ms. Rubin need not sell her car to realize her loss of DV]

As stated by the Restatement (Second) of Torts, the damage from a partial loss is not calculated from surmised future sales.

When one is entitled to a judgment for harm to chattels not amounting to a total destruction in value, the damages include compensation for:

(a) the difference between the value of the chattel before the harm and the value after the harm or, at his election in an appropriate case, the reasonable cost of repair or restoration, with due allowance for any difference between the original value and the value after repairs, and

(b) the loss of use.

The harm that affects value is the lack of immobilizer device designed to prevent thefts, which occurred simultaneously with the class members' vehicle purchase and does not necessitate a resale.

As a result, class counsel lacked a good faith basis for approving a settlement agreement that does not take into consideration  loss of bargain principles.

## VI. CONCLUSION

Class counsel and defendants in unison claim that diminished value is so speculative that any lost value should be ignored by the court, this ploy staggers the imagination and condones a decade of misrepresentation by means of deliberate omission.

The class cars violated federal safety standards as well as industry standards and practices.  These defects resulted in overpayments by class members.  If the vehicles had

immobilization technology, amateur thieves could not bypass the ignition with a USB cord and drive the cars off with impunity jeopardizing public safety and causing havoc.

To suggest by implication that class members could sell these cars at private sale without informing would be purchasers about their theft prone lineage strikes us as absurd.

Dated: August 26, 2024                 By: Objector's attorney

                                        /s/ *Paul M. Monzione*
                                       Paul M. Monzione, attorney
                                       for Objector/Class member

PAUL MICHAEL MONZIONE
ATTORNEY AT LAW
CA Bar Number 101124
Paul M. Monzione, P.C.
PO Box 1478
Wolfeboro, NH  03894-1478
info@monzionelawoffices.com
PHONE   603-569-9599
FAX      603-569-0599
*Attorney for Class Member/Objector Donald K. Birner*

**<u>L.R. 11-6.2. Certificate of Compliance</u>**

The undersigned certifies that this brief contains 6,941 words, which complies with the word limit of L.R. 11-6.1.

Dated:  August 26, 2024

/s/ *Paul M. Monzione*

1

## **PROOF OF SERVICE**

2

3  I hereby certify that on August 23, 2024, a true copy of the above document JOINT REPLY TO THE

4  SUPPLEMENTAL BRIEFS OF DEFT'S AND CLASS COUNSEL and attached exhibits, were served upon the

5  attorney of record for all pro se parties who have been granted leave to file documents

6  electronically in this case  pursuant to L.R. 5-4.1.1 and all those who have appeared in this case

7

8  and are registered to receive service through the CM/ECF System.  In addition, on August

9  26,2024.   I also caused a true and correct copy of the foregoing document to be served by

10  causing it to be mailed to the following at the below addresses:

11

12  Patriot Insurance Company
C/O Melissa Ann Payne

13  Payne Law, Ste. 250
26600 Detroit Road

14  Westlake, OH 44054

15

16  Direct Auto Insurance Company
C/O Laurence A. Harrington

17  508 B. Glen Echo Road
Philadelphia, PA 19119

18

19  Max Ephraim Rodriguez
Pollock Cohen LLP

20  111 Broadway Suite 1804
New York, NY 10006

21

22  James M. Davis
Blood Hurst and O'Reardon LLP

23  501 West Broadway, Suite 1490
San Diego, CA 92101

24

25  DATED: August 26, 2024

26                          /s/ *Paul M. Monzione*
                        Attorney for Objector Donald K. Birner

27

28