UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
| Title | In re Kia Hyundai Vehicle Theft Litigation | | |

Present: The Honorable    **James V. Selna, U.S. District Court Judge**

| | |
|---|---|
| Elsa Vargas | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

Proceedings:    **[IN CHAMBERS]** <u>**Order Regarding Motion for Final Approval of Class Action Settlement [376]**</u>

Before the Court is Consumer Class Plaintiffs[1] ("Plaintiffs") move for final approval of their class action settlement ("Settlement"). (Mot., Dkt. No. 376.) Defendants Hyundai Motor Company ("HMC"), Hyundai Motor America ("HMA"), KIA Corporation ("KC"), and KIA America, Inc. ("KA") (collectively "Defendants") filed a statement of non-opposition. (Dkt. No. 467.) Plaintiffs filed a reply brief addressing the objections. (Reply, Dkt. No. 466.)

For the following reasons, the Court **GRANTS** Plaintiffs' Motion for final approval of the Settlement.

## I. BACKGROUND

The background of this case is well-known to the parties and detailed in the Court's prior orders regarding preliminary approval of the Settlement. (<u>See</u> Order Denying Motion for Preliminary Settlement Approval, Dkt. No. 200; Order Granting Motion for Preliminary Settlement Approval, Dkt. No. 259.) The Court recites the underlying facts as necessary to support its Order.

After this Court preliminarily approved the Settlement, Hyundai, and the Claims Administrator, Angeion, provided Notice to the Class in accordance with the Settlement

---

[1] The eighty-five named plaintiffs identified in pages 10–194 of the consolidated Amended Class Action Complaint ("ACAC."). (See Dkt. No. 84 at 10–194.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | 8:22-ml-03052-JVS (KESx) | Date    October 1, 2024 |
| Title | In re Kia Hyundai Vehicle Theft Litigation | |

Agreement.  (Joint Declaration of Class Leadership Counsel ("Leadership Decl."), Dkt. No. 378, ¶¶ 44–50; Declaration of Steven Platt ("Platt Decl."), Dkt. No. 378, Ex. 18; Declaration of Elizabeth Fernandez ("Fernandez Decl."), Dkt. No. 378, Ex. 19.)  In total, 17,969,123 first-class mail notices were sent out to Class Members.  (Fernandez Decl. ¶¶ 7–8; Platt Decl. ¶ 13.)  Hyundai sent out 10,834,388 first-class notices, and Angeion sent out 7,134,735.  (Fernandez Decl. ¶¶ 7–8; Platt Decl. ¶ 13.)  Additionally, an email notice containing a copy of the Class Notice in the body of the email, links to the settlement website, and the Claims Administrator's phone number was sent to 14,090,529 email addresses.  (Platt Decl. ¶ 16.)  Angeion also established Settlement-dedicated phone lines to field Class member inquiries regarding the Settlement.  (Id. ¶ 9.)  Angeion launched the Settlement websites, KiaTheftSettlement.com and HyundaiTheftSettlement.com, on about February 9, 2024.  (Id. ¶ 4.)  On March 4, 2024, Angeion issued a national press release providing notice of the Settlement, and Angeion had four more national press releases scheduled.  (Id. ¶ 18.)  As of April 16, 2024, HyundaiTheftSettlement.com tracked a total of 192,149 unique users who registered 505,184 page views, and KiaTheftSettlement.com tracked 295,607 unique users who registered 723,598 page views.  (Id. ¶ 7.)  And Class Counsel responded to at least 450 individual Class member inquiries since February 17, 2024.  (Joint Reply Declaration of Class Leadership Counsel ("Leadership Reply Decl."), Dkt. No. 466-1, ¶ 3.)

On May 18, 2023, Plaintiffs served Defendants with their first set of Requests for Production, which sought documents relating to Defendants' investigation about the theft risk in Class Vehicles, Defendants' interactions with the National Highway Traffic Safety Administration ("NHTSA") concerning the alleged Defect, the development and efficacy of the Software Upgrade, insurance coverage for Class Vehicles, and Defendants' efforts to mitigate the risk of theft in Class Vehicles.  (Leadership Decl. ¶ 37.)  On December 13, 2023, Plaintiffs served their second set of Requests for Production, which sought documents relating to Defendants' analyses concerning the efficacy of the Software Upgrade and analyses performed by Defendants' expert, James Smith.  (Id. ¶ 38.)  Plaintiffs' also interviewed James Smith.  (Id. ¶ 40.)  The interview focused on the following: Defendants' development of the Software Upgrade, a technical analysis of the Software Upgrade and how it operates, incidents of Class Vehicle thefts that had the Software Upgrade installed, Defendants' roll-out of the Software Upgrade, and anti-theft devices available to Class Vehicles that are not eligible for the Software Upgrade.  (Id.)  Plaintiffs continued to conduct independent investigations concerning the Software Upgrade's efficacy.  (Id. ¶ 41.)  Plaintiffs also monitored the theft rate and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   8:22-ml-03052-JVS (KESx)          Date   October 1, 2024

Title   In re Kia Hyundai Vehicle Theft Litigation

theft methods reported since the Settlement was preliminarily approved and the Software Update was made available to Class members, spoke with Class members relating to the Software Upgrade's effectiveness, and analyzed alleged insurance coverage pricing trends for Class Vehicles.  (Id. ¶¶ 41–42.)

The deadline for objections and opt-outs was May 3, 2024.  (Dkt. No. 256, ¶ 46.)  Class members who did not opt-out have until at least January 11, 2025 to submit claims for reimbursements.  As of June 17, 2024, Class Counsel received a total of 89 objections.  (See Dkt. Nos. 461–464.)  And about 6,462 requests for exclusion were submitted.  (Leadership Reply Decl. ¶ 14.)

## II. Legal Standard

Under Rule 23(e)(2) if the proposed settlement would bind class members, the Court may approve it only after a hearing and only on finding that it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  "Courts reviewing class action settlements must 'ensure[] that unnamed class members are protected from unjust or unfair settlements affecting their rights,' while also accounting for 'the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'"  Campbell v. Facebook, Inc., 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting In re Hyundai & Kia Fuel Econ. Litig., 926 F.3d 539, 556 (9th Cir. 2019) (en banc) (internal quotation marks omitted)).

When evaluating the fairness of a class action settlement, the Court must consider the following factors:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
      (i) the costs, risks, and delay of trial and appeal;
      (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
      (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and
      (iv) any agreement required to be identified under Rule 23(e)(3); and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Before the revisions to the Federal Rule of Civil Procedure 23(e), the Ninth Circuit had developed its own list of factors to be considered.  See e.g., In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 964 (9th Cir. 2011) (citing Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004)).  The revised Rule 23 "directs the parties to present [their] settlement to the court in terms of [this new] shorter list of core concerns[.]"  Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes.  "The goal of [amended Rule 23(e)] is . . . to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Id.

A "higher standard of fairness" applies when, like here, parties settle a case before the district court has formally certified a litigation class.  See Campbell v. Facebook, Inc., 951 F.3d at 1121 (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).  In such cases, "[t]he dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court-designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)."  Id. (quoting Hanlon, 150 F.3d at 1026).

### III. DISCUSSION

As a preliminary matter, Plaintiffs argue that the Court should reject thirty-six objections for failure to adhere to the Court's requirements.  (Reply at 5; Long Form Notice, Dkt. No. 378-1, Ex. A, at 13–14.)  Specifically, Plaintiffs contend that twelve objectors failed to include the model year and VIN of their Class Vehicles, seven objectors sent their objections by email only, four objectors failed to provide their address, six objectors failed to list the case caption, fifteen objectors failed to state whether they intended to appear at the Final Approval Hearing, ten objectors submitted unsigned objections, and twelve objectors submitted undated objections.  (Reply at 5–6 (citing Dkt. Nos. 461–464, Exs. 1, 7, 9, 12, 14–15, 17, 20–23, 25, 36, 40, 42, 45–46, 50, 54, 58–59, 64–65, 67–68, 73–79, 87, 89).)  As Plaintiffs assert, the Court maintains discretion when deciding whether to overrule procedurally improper objections.  (Reply

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

at 6 (citing <u>Moore v. PetSmart, Inc.</u>, 728 Fed. Appx. 671, 673 (9th Cir. 2018)).) Because the Court finds that such procedural deficiencies can be easily rectified, it declines to sustain the Plaintiffs' objections and will consider the objectors' positions. Plaintiffs also argue that one objection should be overruled because it was submitted after the objection deadline. (Reply at 6 (citing Dkt. No. 461, Ex. 23).) However, the date listed on the objection is May 3, 2024, which was the deadline for objections and opt-outs. (<u>See</u> Dkt. No. 461, Ex. 23.) Because the objection seems to have been filed on the deadline, the Court declines to overrule it as procedurally deficient. Plaintiffs further argue that one objection was submitted by a non-Class member. (Reply at 6 (citing Dkt. No. 464, Ex. 88).) The objector acknowledges that he is not covered by the Settlement. (<u>See</u> Dkt. No. 464, Ex. 88 ("I own a 2011 kia optima sxt with a push start. According to the criteria, and the push start, it appears I am not included in the settlement.").) Because this objection was filed by a non-Class member, the Court **SUSTAINS** the Plaintiffs' objection as to this specific objector. However, for reasons previously stated, the Court **OVERRULES** the Plaintiffs' other objections.

Additionally, Plaintiffs argue that Ruth Rubin's ("Rubin") objection should be overruled because she failed to disclose that her husband, Kenneth Rubin, is a partner at one of the law firms representing her. (Reply at 7 (citing Objection of Ruth Rubin ("Rubin Objection"), Dkt. No. 371).) According to Plaintiffs, this familial relationship "reflect[s] improper motivations for the objection." (<u>Id.</u> (citing unpublished, out-of-circuit district court cases).) The Court declines to reject Rubin's objection on this basis. Plaintiffs also contend that Rubin's objection "failed to disclose that her husband has a personal financial stake in the claim given that joint funds were used to purchase the Class Vehicle and pay insurance premiums." (<u>Id.</u>) But the Court declines to reject Rubin's objection for this reason as well. The Court also declines to reject Rubin's objection on the basis that the law firm representing her used misleading statements to Class members to entice them to opt-out. (<u>Id.</u> at 8.) Contrary to Plaintiffs' assertion and as discussed more fully below, the law firm correctly points out that Settlement does not provide Class members who did not suffer a theft or theft attempt with compensation for increased insurance premiums or their vehicle's diminution in value.

A.    *Whether the Settlement is Fair, Adequate, and Reasonable*

The Court adopts the reasoning in its prior orders evaluating the Settlement's fairness in consideration of the factors in Federal Rule of Civil Procedure 23(e)(2). (<u>See</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |

| | |
|---|---|
| Title | In re Kia Hyundai Vehicle Theft Litigation |

generally Order Denying Motion for Preliminary Settlement Approval; Order Granting Motion for Preliminary Settlement Approval.)  The Court now turns to the objections submitted by the Class members.

     1.     The $145 Million Common Fund

     Several Class members object to the Settlement because they believe the non-reversionary Common Fund of $145 million is insufficient.  (See Dkt. Nos. 461, 463–464, Exs. 4, 15, 23, 63, 77, 84.)  These objectors argue that the fund should be uncapped, provide billions of dollars in compensation, and that Defendants should be "fully liable" for all alleged losses.  (See, e.g., Dkt. No. 461, Ex. 15 ("The settlement amount should be increased to at least One Billion dollars for indescribable damages and unidentified consumers."); Dkt. No. 461, Ex. 23 ("[T]he $145,000,000 - $200,000,000 settlement will not adequately compensate all Hyundai and Kia owners affected."); Dkt. No. 463, Ex. 63 ("[T]he fund needs to be significantly larger.  As a regular consumer/victim, I do not have access to the full scope of losses nationwide but anticipate covered victim losses to be in the billions.  To ensure reasonable restitution to the victims occur, the fund should not have a limit as the payout amounts to victims are already significantly limited in a reasonable way in which both the victims (purchases of the vehicles) and manufacturer (Kia/Hyundai) share some of the losses."); Dkt. No. 464, Ex. 77 ("[Y]our Honor, this huge company Kia is wanting to save their own hind parts by only giving us the victims the bare minimum.  When in fact they are fully liable to pay the full amount owed not only to myself but to the other victims who were unfortunately impacted by Kia's negligence to take full responsibility for their own actions.").)

     In response, Plaintiffs assert that "the Common Fund is a tremendous result for the Class, especially given the risks facing Plaintiffs' somewhat novel claims."  (Reply at 10.)  To support their position, Plaintiffs rely on expert Edward M. Stockton's ("Stockton") "conservative analysis of potential Settlement claims revealing that, when applying the 40% litigation risk discount, the $145 million Common Fund should suffice."  (Id. (citing Declaration of Edward M. Stockton ("Stockton Decl."), Dkt. No. 228, Ex. 2, ¶ 46 ("If we conservatively assume a 20% claims rate, an average claim of $5,500, and that approximately 225,000 Class Vehicles have been stolen, the fund needed to pay all these claims would be approximately $247,500,000.  Applying Class Counsel's 40% risk discount, this results in $148,200,000, which approximates the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

$145,000,000 Common Fund ceiling.  Again, these figures are likely conservative, as it is reasonable to assume
that many recovered theft vehicles suffered little physical damage beyond damage to the steering column.").)  In its prior orders, the Court found that a 40% decrease and Stockton's expert loss calculation were reasonable.  (Order Denying Motion for Preliminary Settlement Approval at 26; Order Granting Motion for Preliminary Settlement Approval at 4–7.)  And no objector has sufficiently rebutted Stockton's expert testimony.  Thus, the Court **OVERRULES** the objections that the $145 Common Fund is insufficient.  See Aarons v. BMW of N. Am., LLC, No. 11-7667, 2014 WL 4090564, at *12 (C.D. Cal. Apr. 29, 2014) ("The Court is conscious that the settlement will not make most Class members completely whole.  But that is the nature of a settlement. [Defendant] denies any liability, but will nonetheless pay millions of dollars to Class members.  In turn, the Class members will discount their claims to obtain a certain and timely recovery, rather than bear the significant risk and delay associated with further litigation."); Zakikhani v. Hyundai Motor Co., No. 20-cv-01584, 2023 U.S. Dist. LEXIS 123158, at *22 (C.D. Cal. May 5, 2023) ("An objection that merely argues that the settlement terms for Class Members could have been better 'does not mean the settlement [is] not fair, reasonable or adequate.'" (quoting Hanlon, 150 F.3d at 1027)); Asghari v. Volkswagen Grp. of Am., Inc., No. 13-02529, 2015 U.S. Dist. LEXIS 188824, at *73 (C.D. Cal. May 29, 2015) ("As an initial matter, the mere fact that the benefits provided under the settlement agreement will not make all class members 'whole,' and/or the possibility that a 'better' settlement might have been reached, do not provide a sufficient basis upon which to conclude that the settlement agreement is unfair." (citing Hanlon, 150 F.3d at 1027)); In re MacBook Keyboard Litig., No. 18-cv-02813, 2023 WL 3688452, at *10 (N.D. Cal. May 25, 2023) ("[A]ny settlement necessarily involves some line-drawing, and full compensation is not a prerequisite for a fair settlement." (internal quotation marks and citation omitted)).

Moreover, Donald K. Birner ("Birner") objects to the Settlement because "[a]ll of the cash payments are not stated as any sum certain or guaranteed minimum," and "cash payments are subject to pro-rata decreases and provide no guarantees."  (Objection of Donald K. Birner ("Birner Objection"), Dkt. No. 407, at 2.)  First, Plaintiffs correctly point out that "several categories of reimbursement are not being paid from the Common Fund, so they are not subject to potential pro-rata decreases."  (Reply at 11; see also Long Form Notice at 4–5 ("For Class Vehicles not eligible for the Software Upgrade, the Settlement offers reimbursement up to $300 for Class Members' purchase and/or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

installation of a steering wheel lock, glass breakage alarm or similar anti-theft system, or another aftermarket modification designed to deter or prevent theft (a 'Qualifying Purchase'). . . . These Settlement benefits are not capped overall to the Class and will be paid by Defendants separately from the Common Fund identified below.").)  Moreover, Birner's objection "ignores that cash payments are based on actual out-of-pocket expenses incurred by Class Members and that it is not appropriate or even possible to state guaranteed minimum amounts in a manner that applies Class-wide."  (Reply at 11.)  Birner also claims that the Settlement includes "indirect constructive reversion" of a portion of the Common Fund because "the plan in its present form is structured to give defendants unbridled discretion to prorate" claims.  (Birner Objection at 15.)  But as stated in the ASA, the Settlement only allows pro-rata decreases if the value of approved claims exceeds $145 million.  (ASA, Dkt. No. 378-1, §§ II.D.6–7.)  Thus, the Court **OVERRULES** these objections.

Birner and Jhaza Tanner ("Tanner") also object to the Settlement because it does not account for punitive damages.  (Birner Objection at 4–5; Dkt. No. 464, Ex. 76.)  But punitive damages are not considered in determining the fairness of a proposed class action Settlement, and no objector has shown that punitive damages are available under the various statutes that Plaintiffs have sued under.  See, e.g., Clark v. Superior Ct., 50 Cal. 4th 605, 610 (2010) (holding that punitive damages are not available under California's Unfair Competition Law); Rollins, Inc. v. Heller, 454 So.2d 580, 585 (Fla. Ct. App.1984) (holding that punitive damages are not available under Florida's Deceptive and Unfair Trade Practices Act).  Moreover, Birner and Tanner have not cited any case where punitive damages were actually awarded.  Nor have Birner or Tanner sufficiently demonstrated that Defendants' conduct here warrants a punitive damages award.  See In re Tracfone Unlimited Serv. Plan Litig., 112 F. Supp. 3d 993, 1004 (N.D. Cal. 2015) ("And while punitive damages can theoretically be awarded under the CLRA, Birner has not cited any CLRA case where such damages were actually awarded, nor has Birner sufficiently demonstrated that [Defendant]'s conduct here would warrant a punitive damages award under the CLRA.").  Accordingly, the Court **OVERRULES** this objection.

> 2.    The $375 Claim Cap on Insurance-Related Expenses for Class
>        Members who Experienced a Theft or Theft Attempt

Class members object to the Settlement's $375-per-claim cap for paid insurance

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)              Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

deductibles and increased insurance premiums for policies that include theft coverage resulting from a Qualifying Theft or Qualifying Theft Attempt. (Dkt. Nos. 461–464, Exs. 1, 3, 6–7, 16–18, 20, 27, 40, 43, 51, 54–56, 58, 64, 71, 84; Birner Objection.) Most objectors argue that the $375 cap does not cover all of their insurance expenses following a Qualifying Theft or Qualifying Theft Attempt. (See, e.g., Dkt. No. 461, Ex. 1 ("My car insurance deductible is $1,000 and I should not be out any money for Hyundai's negligence, which caused the theft and subsequent destruction of my SUV. I HAD a 2017 Hyundai Tucson with only a little over 74,000 miles on it when it was stolen, taken on a joyride, wrecked, and totaled. I received a settlement from State Farm, less my $1,000 deductible. I think everyone who has an insurance claim in this class action lawsuit should be able to submit documentation and get the full cost of their deductible back."); Dkt. No. 461, Ex. 6 ("My deductible is $500.00 which will not be fully covered by the $375. This should be raised to what the out of pocket costs was for the person impacted. This doesn't seem fair to me."); Dkt. No. 461, Ex. 16 ("100% of deductibles should be returned to the victims not up to $375."); Dkt. No. 461, Ex. 18 ("[C]ombining both insurance deductibles and premiums under the same cap combines two very distinct injuries together."); Dkt. No. 462, Ex. 43 ("My deductible was $1,000.00 related to the theft of my vehicle, and I seek full reimbursement for my loss."); Dkt. No. 463, Ex. 55 ("The amount of compensation for the insurance deductible is not adequate as well. My insurance deductible was $500.00 and the settlement is only offering $375. That does not cover the out-of-pocket losses I incurred."); Dkt. No. 464, Ex. 71 ("We object to the capped total reimbursement amount of $375 for the insurance deductible paid and/or increased premium regardless of whether out-of-pocket losses exceed this amount. We believe that the settlement should not be capped and should allow each claimant to be reimbursed for the total insurance deductible paid, regardless of how much that amount is, as well as the amount of increase in insurance premium due to theft and multiple claims submitted.").) Some objectors contend that their policies provided for deductibles that were 50% to 500% more than the average $500 deductible. (Dkt. No. 462, Ex. 40 ("My vehicle incurred around $3000 in damages during a theft attempt. My insurance deductible was $2500. So my loss was $2500, or the deductible amount."); Dkt No. 463, Ex. 56 ("Not only will the settlement as proposed fail to make me whole, but it is quite unfair that I can only receive $375, while Class Members who paid out-of-pocket to repair their vehicles can receive up to $3375. Consider the case of an uninsured Class Member who paid $750 for theft-related repairs. Under this proposed settlement, they would be fully reimbursed, while I would only receive $375, incurring a $375 loss. It appears I am being penalized for being insured and paying a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

deductible rather than paying for repairs directly.").)

In response, Plaintiffs assert that "the desire for the Settlement to provide greater benefits that do not include any settlement discount is not a compelling basis to deny final approval." (Reply at 17.)  As mentioned above, the claim cap was based on Stockton's finding that "[m]ultiple public sources confirm that $500 is the median and modal (most common) deductible amount,"[2] (Stockton Decl. ¶ 26.D.), and on Class Counsel's determination that a modest discount was appropriate to account for the litigation risk and avoiding the delay of relief to Class members, (Order Denying Motion for Preliminary Settlement Approval at 26 ("Based on these risks and Class Counsel's attestation that the discount represents a fair amount, the Court finds that a 40% decrease is reasonable." (internal citation omitted)).  And no objector has presented any evidence contradicting the Court's prior finding that the discount is reasonable given the risks of litigation.  See Retta v. Millennium Prods., No. 15-1801, 2017 U.S. Dist. LEXIS 220288, at *24–25 (C.D. Cal. Aug. 22, 2017) (noting that the "nature of settlement" is that "Class Members will discount their claims to obtain a certain and timely recovery, rather than bear the significant risk and delay associated with further litigation").

Accordingly, the Court **OVERRULES** these objections.

### 3.    The $250 Claim Cap for Certain Incidental Damages

Several Class members object to the $250-per-claim cap for out-of-pocket expenses incurred due to a Qualifying Theft or Theft Attempt, such as rentals, towing, speeding fines, and reimbursement for lost income and childcare expenses relating to the Software Upgrade.  (See Dkt. Nos. 461–464, Exs. 6, 9, 16, 20, 32, 45, 49–50, 54–56, 60, 65, 68–69, 73, 76, 84, 86.)  The Court finds that these objections are similar to those arguing for an uncapped Common Fund and full payment of insurance deductibles.  See Asghari, 2015 U.S. Dist. LEXIS 188824, at *62 ("[T]he fact that plaintiffs were not able to secure all relief prayed for in their complaint and that some class members may not directly benefit under the settlement agreement does not compel a finding that a settlement is unfair.").  Thus, for reasons previously mentioned, the Court

---

[2]  Indeed, as Plaintiffs point out, several Class members who filed objections based on the insurance deductible claim cap reported that their deductibles were $500.  (Reply at 17 n.10 (citing Dkt. Nos. 461–463, Exs. 3, 6, 16, 18, 27, 49, 54–55).)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |

| | |
|---|---|
| Title | In re Kia Hyundai Vehicle Theft Litigation |

**OVERRULES** these objections.

Additionally, Marcela Nicol, Dana Perantie, and Jill Puleo object to the Settlement because the incidental expenses do not include additional categories, such as compensation for dog care and private parking space expenses. (Dkt. No. 463, 55 ("There is no option for animal care-related services, only childcare services, and I object to this as I had to incur out-of-pocket expenses to put my dogs in a daycare/boarding facility in order to drive 2 hours away from where I live to see where my car was abandoned."); Dkt. No. 463, Ex. 60 ("Trying to minimize this vehicle's excess risk of theft, I began paying to park in the secure garage at my place of employment, Washington University. I am requesting reimbursement of the cost of parking from October 2023 through the time I was notified that the security upgrade was available for my Kia vehicle, late August 2023. The total cost of secure parking to help prevent my Kia vehicle from being targeted again was $906.00."); Dkt. No. 463, Ex. 65 ("After [a] conversation with my insurance company, I began to park my 2011 Tuscon in guarded parking garages and lots rather than street parking, when available, for fear that this vehicle was still being broken into at high rates despite the software upgrade.").) But a settlement is not meant to provide relief for every possible incidental damage suffered by a Class member. See, e.g., Mendoza v. Hyundai Motor Company, Ltd., No. 15-cv-01685, 2017 WL 342059, at *10 (N.D. Cal. Jan. 23, 2017) ("[T]he Court finds that a class settlement is not capable of resolving every possible [] damages claim a Class Member might wish to pursue. It would not be fair to the class as a whole to set aside an otherwise fair settlement because it does not address unique and difficult to prove hardships suffered by only a few members of the class."). Thus, the Court **OVERRULES** these objections.

Lastly, Michael Smith seeks compensation for the $3,807 rental fees he incurred during the two-and-a-half month period it took a non-Kia repair center to fix his vehicle. (Dkt. No. 464, Ex. 73 ("[T]he repair shop in possession of my vehicle, Auto Collision Center in Hayward, CA, was unable to retrieve the necessary parts to repair the vehicle until April. I needed to drive to my place of employment, so while my vehicle was in the repair shop wailing for parts to arrive, I rented a car from Enterprise. My insurance provider, Geico, only paid for 30 days of rental car fees. Therefore, I had to pay out of pocket for the rental car for the remainder of the time, from February 9th to April 22nd. The total amount that I needed to pay for this extremely long delay due to the lack of availability of parts was $3,807.53.").) However, as explained above, the fact that Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

members who experienced unique forms of damages will not be completely reimbursed does not warrant finding that the Settlement is unfair. Furthermore, Plaintiffs contend that "these cases typically involve more complex scenarios that make such claims weaker." (Reply at 26.) According to Plaintiffs, "Smith would likely need to establish the cause of the delay in repairing his vehicle and his efforts to mitigate that harm. The Settlement removes this risk by offering a recovery that is not contingent on establishing such facts." The Court agrees with Plaintiffs and **OVERRULES** this objection.

    4.    The Claim Caps for Class Vehicles that Experienced a Total Loss
        Following a Theft or Theft Attempt

The Settlement provides Class members who suffered losses related to a Qualifying Theft or Qualifying Theft Attempt, including total loss of Class Vehicles, up to 60% of the Black Book value of the vehicle and damage to Class Vehicles and personal property up to the greater of $3,375 or 30% of the Black Book value of the vehicle. (ASA § II.D.3.) As noted in the Court's prior Order,

> under the Amended Settlement Agreement's Total Loss and Partial
> Loss payment caps, "available compensation to Class Members
> would depend directly upon vehicle value." Stockton "expect[s] the
> large majority of claimants, under the revised payment caps, to
> receive compensation in line with or exceeding the benchmark of
> 60% of their monetary losses, with some exceptions."

(Order Granting Motion for Preliminary Settlement Approval at 6 (quoting Stockton Decl. ¶ 8).) However, some Class members claim that they should be entitled to 100% of their losses. (See Dkt. Nos. 462, 464, Exs. 48, 70, 76.) But as mentioned above, objections that Class members are not fully reimbursed for their losses do not demonstrate that the Settlement is unfair, unreasonable, or inadequate. See, e.g., Aarons, 2014 WL 4090564, at *12 ("[T]he Class members will discount their claims to obtain a certain and timely recovery, rather than bear the significant risk and delay associated with further litigation."); Retta, 2017 U.S. Dist. LEXIS 220288, at *24–25 (same). Thus, the Court **OVERRULES** these objections.

Additionally, Joseph Messina objects to using the Black Book to value Class Vehicles. (Dkt. No. 462, Ex. 48 ("I also object to the proposed Settlement using Black

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

Book data because it requires a paid subscription to access, and thus is not freely available to Class Members.").)  However, as Plaintiffs point out, "the Black Book is an industry standard index used to value used vehicles and is accepted as an appropriate index for class settlements."  (Reply at 24; Leadership Reply Decl. ¶ 11 ("As noted by the Court in its Preliminary Approval order, Dkt. No. 259, the Settlement incorporates Black Book valuations for certain categories of reimbursement.  Based on Class counsel's prior experience and knowledge, it is our professional opinion that Black Book is more reliable and easier to administer than Blue Book.  Black Book valuations are used on Cars.com, which Kelley Blue Book describes as "a high-traffic website, focusing primarily on classified listings.").)  The Court agrees with Plaintiffs.  See, e.g., Zakikhani, 2023 U.S. Dist. LEXIS 123158, at *9 (applying Black Book to determine settlement compensation for total losses); In re: Hyundai and Kia Engine Litig. II, No. 8:18-cv-02223-JLS-JDE, Order Granting Class Counsel's Motion for Final Settlement Approval, Dkt. No. 163, at 7 (same).  And even though Black Book does require a paid subscription to access, the Settlement Administrator can inform each Class member the value of their vehicle upon request.  (Leadership Reply Decl. ¶ 3; ASA § IV.C.5 ("The Settlement Administrator shall be prepared to respond to questions regarding the status of submitted Claims, how to submit a Claim, and other aspects of this Settlement.").)  Similarly, Birner contends that "[t]he Black Book value is the lowest valued index and dealer oriented focusing on wholesale and auction prices and generally attached a lower value than say the Kelly Bluebook or Edmunds which are more consumer oriented."  (Birner Objection at 13.)  But Birner fails to provide any case law or other evidence to support his objection.  (See id. at 13–14.)  Meanwhile, Class Counsel have declared that based on their "prior experience and knowledge, it is [their] professional opinion that Black Book is more reliable and easier to administer than Blue Book."  (Leadership Reply Decl. ¶ 11.)  No objector has provided an expert declaration or any other evidence undermining the Class Counsel's opinion.  (See generally Dkt. Nos. 461–464; Birner Objection; Rubin Objection.)  Thus, the Court **OVERRULES** these objections.

Danielle Dunlap and Birner also object to the Settlement because many Class members have insurance, which covered their losses.  (Dkt. No. 461, Ex. 20 ("Kia did not pay my monthly premium for 5 years to turn around and say your insurance covered your car value so they get out of full reimbursement of my out of pocket expenses.");  Birner Objection at 4 ("The total loss of vehicle benefits due to a 'Qualified Theft' are a ruse because class members who carried comprehensive coverage and were compensated by their insurer will not receive any benefits, except for the possibility of a partial refund

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

of their deductible since the settlement proceeds are minus any compensation received from any source, which wipes out the meager black valued settlement amount.").) However, as Plaintiffs point out, under the objectors' own analysis, "these Class members have been made whole" by their insurance companies. (Reply at 25.) Birner further asserts that the Settlement "effectively allows Defendants [to] mitigate its damages by seizing an insurance asset of class members." (Birner Objection at 4.) But Birner overlooks the fact that the majority of insured Class Vehicles are covered by the Subrogation Track of this multi-district litigation. Accordingly, the Court **OVERRULES** these objections.

Lastly, Birner argues that many vehicles suffering a Total Loss are probably "unavailable." (Id. at 14.) But as Plaintiffs assert, "the fact that older Class Vehicles that experienced thefts are 'unavailable' is a meaningful strength of the Settlement and weakness of the case." (Reply at 25.) For example, if those claims were to proceed to trial, it would be difficult for those Class members to prove that the thefts of their vehicles were related to the alleged defect. Meanwhile, the Settlement provides that "[i]f a Class Vehicle was stolen and a Class member demonstrates through objectively reliable documentation that the Class Vehicle was not recovered after being stolen, this circumstance will be treated as a 'Qualifying Theft.'" (ASA § I.AA.) Thus, the Court **OVERRULES** Birner's objection.

### 5. Emotional Distress Damages

Some objectors claim that they experienced emotional distress and suffered inconveniences, such as long hours on the phone, relating to the alleged defect. (See Dkt. Nos. 461–464, Exs. 1, 7, 11, 21–22, 24–26, 30–31, 45, 47–48, 52, 56, 60, 66, 69, 71, 76, 89.) However, Plaintiffs argue that "such intangible damages are not appropriate for this Settlement" and pose several hurdles. (Reply at 23.) For instance, Plaintiffs contend that emotional distress damages "are subject to the economic loss rule in California and many other states and are not compensable for the consumer claims at issue in this case." (Id. (citing Elsayed v. Maserati N. Am., Inc., 215 F. Supp. 3d 949, 952–64 (C.D. Cal. 2016) (rejecting emotional distress damages for vehicle defect lawsuit because plaintiff did not suffer physical injury); Pruchnicki v. Envision Healthcare Corp., 439 F. Supp. 3d 1226, 1233 (D. Nev. 2020) (holding that Nevada requires "'a plaintiff to demonstrate that he or she has suffered some physical manifestation of emotional distress in order to support an award of emotional damages.'" (citation

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

omitted)); In re Yahoo! Inc. Customer Data Sec. Breach Litig., No. 16-MD-02752, 2020 U.S. Dist. LEXIS 129939, at *69–70 (N.D. Cal. July 22, 2020) (rejecting objection based on failure to include compensation for emotional stress because such claims were "too speculative to constitute a measure of damages")).)  None of the objectors present any evidence to support their alleged claim of emotional distress.  And even if Class members could meet all the elements to support an emotional distress claim, emotional distress "is necessarily an individualized inquiry, and the amount of damages in such cases 'is not susceptible to a mathematical or formulaic calculation.'"  Rader v. Teva Parenteral Meds., Inc., 276 F.R.D. 524, 530 (D. Nev. 2011) (citation omitted).

Accordingly, the Court **OVERRULES** this objection.

6.    Efficacy of Software Upgrade

Several Class members claim that the Software Upgrade does not adequately address the risk of future theft.  (See Dkt. Nos. 461–464, Exs. 4, 17, 27, 31, 36, 41, 48, 57, 66, 70, 86.)  As explained in its prior order, the Court was satisfied with Defendants' showing regarding the efficacy of the Software Upgrade.  (Order Granting Motion for Preliminary Settlement Approval at 7–9.)  In that order, the Court examined the declaration of James Smith ("Smith"), a licensed Professional Mechanical Engineer registered in Arizona who has worked for Exponent at the Test and Engineering Center in Phoenix, Arizona since 1994.  (Id.)  Since the Court's order, "Class Counsel continued to investigate and monitor post-installation instances of thefts, which included an interview of Defendants' expert James Smith."  (Leadership Reply Decl. ¶ 5.)

Most of the Software Upgrade objections rely on public media reports.  (See, e.g., Dkt. No. 461, Ex. 27 ("KIA's claim the software update is a fix is FALSE.  I have included three news articles (marked 1-A, 1-B, and 1-C) that show reports of KIA vehicles being stolen, after the software update has been applied.  I am aware of KIA's response that the vehicle needs to be locked for the software update to work.  However, if one can break a window and push the unlock button on the car's door interior, the software update has no effect."); Dkt. No. 462, Ex. 36 ("The software is a bandaid patch protection that doesn't provide permanent protection from theft in the future.  Software can be compromised.  Some owners of affected vehicles with software installed have already had their vehicles stolen and/or damaged.  Please see enclosed March 11, 2024 news article by Carl Spencer."); Dkt. No. 462, Ex. 41 ("Although Kia asserts that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

anti-theft software will fix the problems, it does not. Many news agencies (as well as online bloggers) have demonstrated that the software package does not fix the theft issue (below is a link to one example). Numerous vehicles that have received the software 'fix' have been stolen. See the link below (and documents attached).").) In response, Plaintiffs argue that "[t]he problem with these dated public media reports is that no one can validate whether the thefts being reported were due to the failure of the Software Upgrade." (Reply at 27.) Plaintiffs contend that based on the tests conducted by Smith, "[w]hen such instances have been investigated, the Software Upgrade has been shown to be effective." (Id.) For the reasons stated in its prior order, the Court agrees. (Order Granting Motion for Preliminary Settlement Approval at 8–9.) Even other objectors highlighted the efficacy of the Software Upgrade. For instance, Phyllis Killebrew Flanders noted in her objection that the Software Upgrade, installed in May 2023, prevented thieves from stealing her vehicle. (Dkt. No. 461, Ex. 24 ("After entry, they broke into my Kia, breaking the driver's side passenger window and destroying the steering column. They were not able to take my Kia because I had previously had the software update in May 2023.").)

Additionally, as noted by Plaintiffs, "as the Software Upgrade continues to roll out, the rate of theft for Class Vehicles has begun to fall." (Reply at 28.) For example, in a CBS News report dated February 22, 2024, the Minneapolis Police Chief Brian O'Hara stated that "[e]ach week the proportion of cars stolen that are Kias and Hyundais have been decreasing." (Leadership Decl. ¶ 60.) Likewise, "Chicago theft data for October through November 2023 shows a year-over-year decrease of 33% to 42% for Kia and Hyundai vehicles, and compared to October 2022, December 2023 auto thefts are 46% lower for Kia and Hyundai vehicles." (Id.) And a March 2024 report released by the Colorado Auto Theft Prevention Authority found that "the number of Kia and Hyundai thefts dropped 27.8% and 22.7%, respectively, in 2023 as compared to 2022." (Leadership Reply Decl. ¶ 6.) The report also noted that the "Kia and Hyundai OEMs are taking action to mitigate this trend with a system security update for certain Kia and Hyundai vehicles." (Id.) Despite the Software Upgrade's efficacy, objectors June Hunt and Eric Kracht claim the Settlement is inadequate unless Defendants install an engine immobilizer on all Class Vehicles. (Dkt. No. 462, Ex. 36 ("I would only be satisfied if Hyundai would install engine immobilizers free of charge on all affected vehicles."); Dkt. No. 462, Ex. 41 ("Providing an operable and effective anti-theft alarm systems, installed in the affected vehicles, which includes a full engine immobilizer.").) But Plaintiffs contend that "an engine

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                 Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

immobilizer is not the only way to effectively address the risk of theft created by the Defect and provide anti-theft security features comparable to traditional engine immobilizers." (Reply at 28.) Plaintiffs further note that "insisting upon the installation of traditional immobilizers exceeds what NHTSA has said is required under federal law." (Id.; see also Dkt. No. 378, Ex. 20 ("The Federal Motor Vehicle Safety Standard identified in your letter, FMVSS No. 114, does not require an engine immobilizer.").) The Court agrees with Plaintiffs. See Wylie v. Hyundai Motor Am., No. 16-cv-02102, 2020 U.S. Dist. LEXIS 258983, at *5 (C.D. Cal. Mar. 2, 2020) (overruling "the objections that Hyundai should recall the Class Vehicles").

Thus, the Court **OVERRULES** the objections regarding the efficacy of the Software Upgrade.

> 7.    Benefits Offered to Class Vehicles that Are Ineligible for the Software Upgrade

Class members with Class Vehicles that are ineligible to receive the Software Upgrade may seek reimbursement of up to $300 per Class Vehicle for the purchase of a steering wheel lock, a glass breakage alarm or similar anti-theft system (including installation), or another aftermarket modification designed to deter or prevent theft so long as that purchase was made when the Class Vehicle was ineligible for the Software Upgrade. (ASA §§ I.X., II.C.1.) According to Class Counsel, the "anti-theft device will supplement the ignition cylinder protector, which makes it difficult to breach the steering column and tamper with the ignition cylinder that Defendants have offered free of charge for each of these vehicles." (Reply at 29 (citing Leadership Decl. ¶ 39).) However, some Class members object to these benefits. (See Dkt. No. 462, Ex. 35; Dkt. No. 462, Ex. 44 ("While the settlement proposes to pay for a 'The Club' or similar device to prevent theft and a glass breakage alarm, neither of these things actually prevent the problem caused by Kia's design flaw."); Dkt. No. 462, Ex. 48 ("The proposed Settlement needs to include an option where Kia, and not an after-market provider, will install, in Class Vehicles that do not have an immobilizer and are not eligible for the Software Upgrade, an anti-theft engine immobilizer. I object to the proposed Settlement which currently does not have this option."); Dkt. No. 464, Ex. 80 ("[T]he wheel lock's effectiveness is too dependent on the driver remembering to install it whenever the vehicle is unattended. I believe the solution to the problem of insurability is the Software Upgrade for which my vehicle is currently not eligible, so I'm suggesting that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

the Software Upgrade be made available for all Class Vehicles.").)  But as the NHTSA stated in its response to the California Attorney General, it "has not determined that this issue constitutes either a safety defect or noncompliance requiring a recall under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. Chapter 301.  The Federal Motor Vehicle Safety Standard identified in your letter, FMVSS No. 114, does not require an engine immobilizer."  (Dkt. No. 378, Ex. 20.)  Thus, the Court finds that the benefits offered to Class members with Class Vehicles that are ineligible for the Software Upgrade are fair, adequate, and reasonable.

Accordingly, the Court **OVERRULES** these objections.

> 8.  Insurance Premium Increase for Class Members who did not Experience a Theft or Theft Attempt

Several Class members who did not experience a Qualifying Theft or Theft Attempt object to the Settlement because it does not compensate them for increases in insurance premiums.  (See Dkt. Nos. 461–464, Exs. 3–4, 10, 12, 14–15, 18, 21–24, 26, 28–29, 30–33, 36–37, 39, 41, 44–45, 47, 51–53, 58–59, 62, 65, 67, 70, 75–76, 80–81, 83–84, 86; Rubin Objection.)  Importantly, most objectors simply complain that their insurance premiums have increased but fail to present any evidence demonstrating that the alleged defect is the reason for said increases.  (See, e.g., Dkt. No. 461, Ex. 4 ("Cost to the class vehicle owners such as higher insurance premiums (that% related to theft or attempted theft) is directly attributed to this manufactures (class vehicles).  The settlement should be higher to offset this extra insurance burden ca[]used by the manufactures security design."); Dkt. No. 461, Ex. 10 ("My insurance every six months is equal to the annual cost of my home insurance.  My home is worth more [] in value than the car which has been depreciating every year."); Dkt. No. 461, Ex. 21 ("My insurance has jumped due to the Kia thefts.  In one big increase the insurance jumped up 42%.  After the increase every premium adjustment is on top of that 42% increase."); Dkt. No. 462, Ex. 44 ("In addition to the obvious concerns with the potential for my car to be stolen, I have also recently learned that the insurance rates for my car are higher as a result of its ease of theft."); Dkt. No. 463, Ex. 52 ("Even though I have had, and still have for many years, an excellent driving/payment history with USAA, with the only claim being one of a single windshield replacement, my Kia insurance policy premium is continually increasing every 2-3 months."); Dkt. No. 464, Ex. 83 ("The increase in insurance premiums faced by Hyundai/Kia owners (my premiums increased by almost

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |

| | |
|---|---|
| Title | In re Kia Hyundai Vehicle Theft Litigation |

$200.00 in one year alone as a direct result of the 1000% increase in Hyundai/Kia thefts!!)").)  But simply asserting that insurance premiums have increased due to the higher risk of theft of the Class Vehicles is not enough to justify denying final approval of the Settlement.  Some objectors even admit that their insurers have not stated that the increase in insurance premiums is due to the perceived risk of theft in Class Vehicles due to the alleged defect.  (See, e.g., Dkt. No. 461, Ex. 12 ("While Geico will not admit that the increase is due to the increase in thefts of Kia make models, the timing seems evident."); Dkt. No. 464, Ex. 70 (Geico policy stating that "you may see that your premium is increasing.  There are many factors that affect your insurance premium such as age, driving history, location, and the increasing cost of vehicle repairs.  When one (or more) of these factors change, it may impact your policy premium.").)

Additionally, Plaintiffs note that a report published by Insurify[3] acknowledged that "Kia and Hyundai drivers saw a major premium spike [since 2020], but so did everyone else."  (Leadership Reply Decl. ¶ 9.)  For example,

> [i]n 2023, the average cost of full-coverage insurance for Kia and Hyundai models was $206 per month, while the average monthly insurance rate for six comparable models was $207.  Insurify further found that between 2020 and 2023, insurance rates increased across all vehicle brands.  Kia and Hyundai models increased 55% during this time, which is in line with the 51% increase for comparable vehicles.  The report further noted that a multitude of factors affect insurance rates, including vehicle maintenance, which was up 10% year over year.

(Id.)  Plaintiffs assert that "Insurify's findings are consistent with other studies."  (Reply at 12.)  According to *Car and Driver* on February 2, 2024, "the U.S. Bureau of Labor Statistics' December 2023 consumer price index data revealed that car insurance rates rose 43% since December 2020.  Within 2023 alone, insurance rates increased 20% year over year, which was the largest increase among the approximate 200 categories that the government tracks."  (Leadership Reply Decl. ¶ 10.)  *Car and Driver* further noted that

---

[3]  According to Plaintiffs, "Insurify is a leading insurance comparison website that partners with major insurance companies, including Nationwide, Farmers, and Liberty Mutual, and is licensed in all 50 states."  (Leadership Reply Decl. at 3 n.5.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                      Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

"insurance price increases were also attributable to COVID-19 shutdowns artificially depressing insurance rates in 2020." (Id.)  As mentioned above, the objectors fail to show that their insurance premiums increased as a direct result of the alleged defect.  See Nwabueze v. AT&T Inc., No. 09-01529, 2013 U.S. Dist. LEXIS 169270, at *28 (N.D. Cal. Nov. 27, 2013) (overruling objections that were "largely conclusory and fail to provide legal support or evidence").

However, there are a couple objectors who have presented some evidence that their insurance premiums have increased due to the high risk of theft in the Class Vehicles.  (See Dkt. Nos. 461–462, Exs. 22, 36.)  For instance, Elena Ehrlich attached a document titled "Why are comprehensive premiums increasing for certain Kia, Hyundai, and Toyota Prius models?" from a Farmers insurance website.  (Dkt. No. 461, Ex. 22.)  According to the document, "[c]ertain Kia, Hyundai, and Toyota Prius models have been targeted by thieves, resulting in a significant increase in comprehensive claims filed by Farmers® policyholders.  We are increasing comprehensive premiums to address the increase in claims on these vehicles." (Id.)  In response to the question of "why has there been a significant increase in comprehensive claims for these vehicles?," Farmers responds that a "large volume of Kia and Hyundai models have been manufactured without an anti-theft mechanism (immobilizer) to shut down the engine when the car is being stolen." (Id.)  The affected models were "[a]ll Kia and Hyundai vehicles with model years 2020 and older," and Farmers stated that "[t]here is no discount or premium adjustment available for customers getting the software upgrade." (Id.)  Likewise, June Hunt attached a March 11, 2024 CNN news article to her objection.  (Dkt. No. 462, Ex. 36.)  The article quoted Jeff Sibel ("Sibel"), a spokesman for Progressive, who stated that "[d]uring the past year we've seen theft rates for certain Hyundai and Kia vehicles more than triple and in some markets these vehicles are almost 20 times more likely to be stolen than other vehicles." (Id.)  According to Sibel,

> [g]iven that we price our policies based on the level of risk they represent, this explosive increase in thefts in many cases makes these vehicles extremely challenging for us to insure.  In response, in some geographic areas we have increased our rates and limited our sale of new insurance policies on some of these models.

(Id.)  However, the Court finds that these two news articles are insufficient to deny final approval of the Settlement.  As briefly mentioned above and explained in more detail

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   8:22-ml-03052-JVS (KESx)                Date   October 1, 2024

Title   In re Kia Hyundai Vehicle Theft Litigation

below, insurance companies rely on several factors when deciding whether to raise insurance premiums. And the increase in insurance premiums due to the perceived risk of theft of the Class Vehicles is not quantifiable. Therefore, the Court **OVERRULES** these objections.

Rubin also objects to the Settlement because she will not be compensated for the increase in insurance premiums. (See generally Rubin Objection.) Specifically, Rubin claims that "assuming just 100,000 of the 'millions of current and former owners and lessees of Class Vehicle' suffered damages in the amount of $358.34 for 2024, like [she] has, the Class stands to gain $35,834,000 in additional damages for 2024 alone." (Id. at 19.)

However, Plaintiffs contend that Rubin's assertion should be rejected for several reasons. (Reply at 13–16.) First, Plaintiffs argue that "Rubin does not explain how she calculated $358.34 in 'damages' for increased insurance premiums." (Reply at 13.) Second, Plaintiffs note that "even if she can support her purported damage calculation, Ms. Rubin assumes that all Class members had their insurance premiums increase by the same $358.34 amount." (Id.) But that cannot be true. As Plaintiffs point out, Rubin's "Class Vehicle was a 2021 model year, while the majority of Class Vehicles are much older and worth considerably less (and thus less expensive to insure)." (Id.) Moreover, Rubin's purported expert even concedes that "[a]uto insurance companies use several factors in setting the price for personal auto insurance. These factors generally include, but are not limited to, location, type of vehicles, coverage, deductible, vehicle usage, driving record, claims history, discounts, and credit score." (Report of Andrew J. Barile ("Barile Report"), Dkt. No. 371-3, ¶ 7; see also Dkt. No. 470, Ex. A, at 12:12-23 ("[I]t's my belief that a certain percentage is attributable to kids being added, but when we look at the overall rate changes in the Kia, there are other factors in play, and I can't determine what piece is what."); Dkt. No. 470, Ex. A, at 51:2-53:22 ("Many of these are the same on the auto side. Supply chain and labor shortages resulting in increased premium costs, increase in vehicle parts costs, increased in used car prices due to vehicle shortages, increased in auto accidents and fatalities.").) Plaintiffs argue that "[t]hese individualized issues may be necessary to establish indirect causation for insurance premiums caused by the theft of other Class Vehicles." (Reply at 13.) Third, Plaintiffs contend that "Rubin assumes that all Class member policy terms are comparable to hers, like her extremely low deductible of $100 for non-collision (i.e., theft) claims, which has an inverse correlation to insurance premiums." (Id. at 14 (citing Leadership Reply Decl.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   8:22-ml-03052-JVS (KESx)                     Date   October 1, 2024

Title   In re Kia Hyundai Vehicle Theft Litigation

¶ 19 ("Your insurance premium is the amount you pay for the plan. The deductible is the amount you pay out-of-pocket for an auto repair before we cover the rest. As one goes up in cost, the other usually comes down.").) Moreover, Rubin's policy rate is based on three drivers, including her husband and teenage sons, while most insureds' policies are not. (Leadership Reply Decl., Ex. C.) Plaintiffs also claim that Rubin's premium is in part based on her location, Columbus, Ohio, which is "a highly dense urban area" and "is priced differently than, for example, a rural part of the country." (Reply at 14.) Fourth, Plaintiffs take issue with the fact that "Rubin assumes that everyone has the same insurance claim history and driving record, two critical variables among many that affect premiums, despite her husband's record of speeding and teenage sons' ages." (Id.; see also Deposition Transcript of Ruth Rubin ("Rubin Depo. Tr."), Dkt. No. 466-2, at 9:20-10:1, 21:6-15.) Fifth, Plaintiffs note that Rubin uses the Kelley Blue Book Trade-in Value and assumes that each of her vehicles were driven 10,000 miles/year and were in "Very Good Trade-in Value." (Reply at 14 (quoting Rubin Objection at 4).) However, "Rubin has failed to offer any support for her assumptions or the method of valuing her vehicles, and she ignores the fact that insurance companies utilize specific usage when setting premium policies." (Id.)

Lastly, Plaintiffs note that the Barile Report that Rubin uses to support her claims is unreliable. For example, Andrew Barile ("Barile") admitted that this was "the very first time" he attempted to do insurance underwriting specific to risk of theft of a vehicle's particular make and model. (Deposition Transcript of Andrew Barile ("Barile Depo. Tr."), Dkt. No. 466-3, at 29:7-12, 33:17-34:4.) Barile also admitted that the methodology he and Kroll used is not found in any published literature or insurance industry standards, and Barile developed the methodology using only his experience. (Id. at 34:5-19; 35:2-25.) In addition to limiting his analysis to only eight states, Barile "offers no opinion" on whether it is possible to extrapolate nationwide from the data in those states. (Id. at 143:11-14.) Nor does Barile know if his opinion regarding rate increases for Hyundai and Kia vehicles is representative of rate increases across the country. (Id. at 87:3-11.) In fact, Barile limited his investigation to rate increases filed by Allstate Insurance Company in those eight states without even knowing what percentage of Hyundai and Kia vehicle Allstate insures in those states. (Id. at 89:5-90:2.) And Barile did not investigate Rubin's insurer, Nationwide Insurance Company. (Id. at 90:3-10.)

Moreover, the Barile Report impermissibly relies on a "preliminary analysis" by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

Kroll LLC, which Barile asserts concluded that "Class Members are paying, on average, approximately 16% to 26% higher premiums than non-Kia/Hyundai owners." (Barile Report ¶ 27; see also id. ¶¶ 28–29 ("I relied on Kroll's study to further confirm the conclusions I reached.")  But the Kroll preliminary analysis is just an eight-page PowerPoint with no supporting documents.  (See Barile Report, Ex. B.)  Barile even admitted that he obtained and relied on the PowerPoint without verifying its accuracy.  (Dkt. No. 470, Ex. B, at 108:22-109:25.)  Nor does Barile know who, if anyone, at Kroll actually prepared the PowerPoint.  (Id. at 98:5-99:20, 101:3-105:11.)  See Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC, No. 16-01841, 2019 WL 13045054, at *4 (C.D. Cal. Feb. 28, 2019) (excluding expert opinions because expert "engaged in no independent analysis to determine whether [estimate] was accurate").

        Defendants also contend that "the PowerPoint is self-evidently methodologically unsound and does not support the conclusions Barile suggests." (Defendants' Response to Rubin Objection, Dkt. No. 470, at 9.)  For the following reasons, the Court agrees with Defendants.  For example, the PowerPoint claims to assess five specific Hyundai or Kia model-year vehicles and to compare insurance premiums for "comparable vehicles with similar MSRPs" for a single hypothetical driver in one zipcode for St. Louis, Missouri and Washington, D.C.  (Barile Report, Ex. B, at 3–4.)  However, Rubin and Barile provide no support for how this information was obtained, making it impossible to verify the contents of the PowerPoint.  (See generally Rubin Decl.; Barile Report.)  Nor does the PowerPoint explain how the five Hyundai and Kia vehicles were selected or how the sets of comparable vehicles were selected.  (See generally Barile Report, Ex. B.)  And as Defendants point out, the PowerPoint "does not explain how or why it would be possible to extrapolate from these five vehicle examples, utilizing a single driver profile in two locations, to compare premiums for all Hyundai and Kia Class Vehicles to all other similar vehicles everywhere throughout the United States." (Defendants' Response to Rubin Objection at 10.)  And contrary to Barile's assertion in his Report, the PowerPoint nowhere suggests that "Class Members are paying, on average, approximately 16% to 26% higher premiums than non-Kia/Hyundai owners." (Barile Report ¶ 27; see generally Barile Report, Ex. B.)

        For the reasons explained above, the Court **OVERRULES** Rubin's objections regarding increased insurance premiums.

        9.      Inability to Obtain Insurance Coverage

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

 

       Some objectors are concerned about their ability to obtain insurance coverage. (See, e.g., Dkt. No. 464, Ex. 86 (submitting an "adverse action notice" from Progressive, stating that Progressive declined to offer insurance coverage because "[b]ased on the vehicle information provided, [they] are unable to offer your customer a policy at this time due to high theft rates for one of more of your vehicle year, make(s) and model(s)").)  However, while it may be difficult to obtain insurance coverage with a particular insurance company for a particular Class Vehicle, none of the objectors have demonstrated an inability to obtain an insurance policy.  As Plaintiffs point out, "[i]n many instances, it is illegal for insurance companies to cease coverage for select subset of models."  (Leadership Reply Decl. ¶ 7; see also id. ("For example, on March 7, 2023, the Michigan Department of Insurance and Financial Services issued a bulletin to remind insurers that they must offer auto insurance to all eligible Michiganders regardless of vehicle make or model, except in certain circumstances as defined under the law.").) Additionally, Hyundai has entered into a partnership with AAA to provide insurance coverage to Class members.  (Id. ¶ 8.)  See Collado v. Toyota Motor Sales, U.S.A., Inc., No. CV10-3113, 2011 U.S. Dist. LEXIS 133572, at *7 (C.D. Cal. Oct. 17, 2011) (finding objection "too insubstantial for the Court to disturb the overall settlement").

       Accordingly, the Court **OVERRULES** this objection.

       10.    Diminution in Value

       Many Class members object to the Settlement because it does not provide them with diminution in value damages even though their vehicle did not suffer a theft or theft attempt.  (See Dkt. Nos. 461–464, Exs. 9, 12, 15, 18, 26, 30–31, 36, 38, 41, 44, 51–52, 61, 72, 79, 81, 83, 86; Rubin Objection; Birner Objection.)  According to Rubin, "Defendants' actions have [] caused the value of her Kia Soul to decrease at a faster rate than it would have absent the defect."  (Rubin Objection at 15.)  Other objectors make similar arguments.  (See, e.g., Dkt. No. 461, Ex. 12 ("[W]hy would a normal American person voluntarily elect to purchase one of these affected vehicles at full market rate knowing that they can be easily stolen."); Dkt. No. 462, Ex. 41 ("The proposed settlement does not address depreciation of the vehicle, which is a serious issue.  It is widely known that the affected models are easy to steal and therefore difficult (and/or costly) to insure.  Both of those factors will impair both the marketability and market price of these vehicles."); Dkt. No. 464, Ex. 81 ("The depreciation of the vehicle's value

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

due to potential buyer's being reluctant to purchase vehicles both susceptible to breakins AND the likelihood that an insurer will not insure the vehicle!"); Birner Objection at 3 ("The class vehicles are theft prone which has, without doubt, considerably reduced their fair market value. Yet the plan wholly fails to provide for compensation or restitution for the loss of market value of class vehicles, which affects virtually every class member.").) As alleged in the Amended Class Action Complaint ("ACAC"), Class members have suffered damages "in the form of diminished market value, and loss of the benefit of their bargain as a direct result of Defendants' misrepresentations and omissions regarding the Class Vehicles' characteristics and the existence of the Theft Prone Defect." (ACAC, Dkt. No. 84, ¶ 1445.) The Class members specifically alleged that "[n]o reasonable consumer, including Plaintiffs, would purchase or lease a vehicle, for tens of thousands of dollars, that has an outsized, unmitigated risk of theft, or they would have paid less for their vehicles." (Id. ¶ 1446.) Despite not receiving any compensation for their vehicle's diminution in value, Class members who did not suffer a theft or theft attempt are required to release their claims against Defendants. (ASA § VI.1 ("Upon entry of a Court order granting final approval of the Settlement Agreement and entering judgment pursuant to section VII.C below, Releasors irrevocably release, waive, and discharge any and all past, present, and future liabilities, claims, causes of action, legal claims, damages, costs . . . relating to Class Vehicles . . . based on the facts alleged in any consumer complaint filed in the Action . . . .").)

In response, this Court ordered supplemental briefing to explain why the Settlement did not provide consideration for diminution of market value for Class members who did not suffer theft or theft attempt. (Dkt. No. 529.) Such a step was necessary because if the Court approved the Settlement, the Class members who did not suffer a theft or theft attempt would receive nothing for diminution of value of their vehicles. The Court rejected Plaintiffs' argument that the Software Upgrade or reimbursement for other anti-theft devices were adequate consideration. The installation of the Software Upgrade did not eliminate the fact that Class Vehicles could still be perceived by others as easy to steal. Moreover, the Court rejected Defendant's claim that objector had "not actually experienced any lost resale value and lacks standing to seek recovery based on speculation of that future injury [as would] would most other Class Members." (See Defendants' Response to Rubin Objection at 2.) "If a defect causes [the vehicles to be susceptible to theft], it makes sense that people would be less willing to buy or use those [vehicles] on the off-chance that they might experience the [alleged] defect. All else being equal, prices typically decrease when demand decreases." In re

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prod. Liab. Litig.,
754 F. Supp. 2d 1145, 1162 (C.D. Cal. 2010).  Standing merely requires a redressable
injury that is fairly traceable to Defendants' conduct.  Whether a plaintiff can recover for
that injury under a particular theory of liability is a separate question.  Here, Plaintiffs
allege economic loss injuries, which are sufficient to confer standing.  (See ACAC ¶¶
1445–46 (claiming overpayment, diminished market value, and loss of the benefit of
their bargain as a direct result of Defendants' misrepresentations and omissions
regarding the Class Vehicles' Theft Prone Defect).)

Plaintiffs filed supplemental briefing on the issue of diminution of market value.
(Pls.' Supp. Brief, Dkt. No. 532.)  Plaintiff also filed a reply to opposition.  (Pls.' Reply
to Supp. Brief, Dkt. No. 597.)  Plaintiffs rely on expert Stockton's Supplemental
Declaration to show no significant diminution of market value.  (Pls.' Supp. Brief at 1
(citing Supplemental Declaration of Edward M. Stockton ("Supp. Stockton Decl."), Dkt.
No. 532, Ex. 1, ¶¶ 6, 15–18).)  Expert Stockton found that between 2021 and July 2023
(the time of the Settlement Agreement), Class Vehicles showed no statistically
significant evidence of diminution of market value compared to comparable models.  (Id.
at 2 (citing Supp. Stockton Decl., ¶¶ 6, Tabs 2, 4).)  Defendants likewise filed
supplemental briefing and a reply.  (Defs.' Supp. Brief, Dkt. No. 538; Defs.' Reply to
Supp. Brief, Dkt. No. 598.)  Defendants argue that "[d]iminished value in automotive
cases is notoriously difficult to establish on a class basis . . . ."  (Defs.' Supp. Brief at 1.)
Defendants also agree with Plaintiffs' analysis of resale value data, which is "consistent
with the independent review by defendants both during settlement negotiations and
through the settlement approval process."  (Id.)  In fact, Defendants provide Edmunds
data that shows other makes and models diminished more than comparable Hyundai and
Kia vehicle models between August 2023 and July 2024.  (Id. at 2.)  This evidence is
reliable and sufficient to show that diminished value need not be included in the
settlement.

Objector Ruth Rubin filed a response to supplemental briefing.  (Rubin's Resp. to
Supp. Briefing, Dkt. No. 561.)  First, Rubin cites several cases to show that diminution
of value may be recoverable in class action cases.  (Id. at 3 (citing cases).)  Specifically,
Rubin cites In re Volkswagon for the proposition that diminution in value can be
recoverable in class action lawsuits. See In re Volkswagon "Clean Diesel" Mktg., Sales
Pracs., & Prod. Liab. Litig., MDL No. 2672 CRB (JSC), 2016 U.S. Dist. LEXIS 148374,
at *720 (N.D. Cal. Oct. 25, 2016), aff'd, 895 F.3d 597 (9th Cir. 2018).  However, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   8:22-ml-03052-JVS (KESx)                        Date   October 1, 2024

Title   In re Kia Hyundai Vehicle Theft Litigation

mere fact that other parties in another case found a diminution in market value does not make it so in the present case. In <u>In re Volkswagon</u>, the Court approved a settlement agreement that included eligible sellers who sold their vehicles prior to the settlement. <u>Id.</u> However, such a provision is not appropriate in this case where there is no evidence of diminished market value.

Additionally, Rubin cites this Court's approval of the settlement agreement in <u>In re Toyota Motor Corp.</u>, where diminution of market value was incorporated into the agreement. See <u>In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.</u>, No. 8:10ML02151 JVS (FMOX), 2013 U.S. Dist. LEXIS 123298, at *230 (C.D. Cal. July 24, 2013) (Selna, J.). However, unlike in this case, in <u>In re Toyota</u>, reliable experts provided testimony that diminished value could be calculated and resulted in a fund to reflect damages. <u>Id.</u> at *251. Indeed, here, Plaintiffs' reliable expert found the opposite—that diminished value did not occur between 2021 and 2023. Therefore, <u>In re Toyota</u> is not applicable.

Rubin also cites <u>In re Ford Motor Co. Bronco II Prods. Liab. Litig.</u>, where the court rejected class settlement, in part, because it failed to include diminution in value. CIVIL ACTION MDL-991 SECTION G, 1995 U.S. Dis. LEXIS 3507, at *19–20 (E.D. La. Mar. 15, 1995). However, in <u>In re Ford Motor Co.</u>, the Court rejected settlement because the class would recover *none* of the relief originally sought in the complaints nor would it remedy the safety problems with the vehicles. <u>Id.</u> Indeed, the class had brought claims worth potentially hundreds of millions, <u>see id.</u> at *17, but the settlement only proposed a "utility vehicle video," an owner's guide supplement, a free vehicle inspection, and a sun-visor warning sticker. <u>Id.</u> at *2. Unlike in <u>In re Ford Motor Co.</u>, the proposed settlement provides a monetary relief in a variety of ways, such as the common fund, insurance deductible, premium increases, and incidental damages. Thus, <u>In re Ford Motor Co.</u> is misplaced. See <u>Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.</u>, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("In assessing the consideration obtained by the class members in a class action settlement, it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.") (cleaned up).

Second, Rubin argues that settlement without diminution of market value is inappropriate before discovery has occurred. (Rubin's Resp. to Supp. Briefing at 5.) However, Plaintiffs have provided an expert declaration that there was not widespread

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                     Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

diminution of market value.  Likewise, objectors failed to find or submit any evidence of
diminution of market value.  Ultimately, "Settlement is the offspring of compromise; the
question we address is not whether the final product could be prettier, smarter or
snazzier, but whether it is fair, adequate and free from collusion."  Hanlon, 150 F.3d at
1027.  Objectors may not be pleased that diminution of market value is excluded, but
Plaintiffs and Defendants duly considered the diminution of market value and found no
evidence of such damages.  See Vaughn v. Am. Honda Motor Co., 627 F. Supp. 2d 738,
749 (E.D. Tex. 2007) ("It does not make the settlement unfair or unreasonable that the
class has to release speculative claims for diminution in value.").

   Objector Birner also filed a response to supplemental briefing.  (Birner's Resp. to
Supp. Briefing, Dkt. No. 573.)  Birner argues that the analysis relied on by Plaintiffs and
Defendants is based "exclusively upon trade in values which almost always bring
considerably lower sales values than private sale transactions." (Id. at 2.)  Birner is
correct that Plaintiffs and Defendants relied on trade-in value rather than private sale
transactions.  This, however, does not change the reliability of such sources.  See In re
Volkswagon "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 2016 U.S. Dist.
LEXIS 148374, at *730 (relying on clean trade-in value to determine diminution of
market value in settlement agreement).  Defendant relied on Edmunds-estimated trade-in
values, which this Court finds to be a reliable source that reflects the market value.  (See
also Defs. Supp. Brief at 2.)  Expert Stockton acquired MSRP data from JD Power and
the Clean Trade-In value.  (Pls.' Supp. Brief at 1–2.)  This Court likewise finds
Plaintiffs' source to be a reliable indicator of the market value of the Class Vehicles from
2021 to July 2023.

   The final objection, raised by both objectors, is that there was evidence of a
diminution of market value for the 2024 calendar year.  To be sure, Plaintiffs concede
that expert Stockton found that Class Vehicles showed evidence of a modestly lower
value retention for the calendar year 2024.  (Id. at 2 (citing Supp. Stockton Decl., ¶ 19).)
Defendants also concede this finding.  (See Defs. Supp. Brief at 3 ("According to the
Edmunds data, the lone vehicle class where Hyundai and Kia vehicles saw slightly
greater decreases than competitor vehicles for 2024 was among mid-size vehicles.").)
Thus, both objectors argue that the diminution in value claim for 2024 should be carved
out from the settlement.  (See, e.g, Rubin Resp. to Supp. Briefing at 2.)

   The Court declines to carve out an exception for 2024.  First, as Plaintiffs point

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   8:22-ml-03052-JVS (KESx)          Date   October 1, 2024

Title   In re Kia Hyundai Vehicle Theft Litigation

out, a showing of a lower value retention "does not necessarily indicate that the models declined in value *as a result of the Defect*." (Pls.' Supp. Brief at 2.) In fact, there are two confounding variables that could explain the lower value retention in 2024. (Id. at 3.) Expert Stockton stated that 2024 is a "period when the resale market emerged and likely corrected from historical price run-ups, which allows for the possibility of different patterns of resale pricing inflation/deflation . . . ." (Supp. Stockton Decl., ¶ 22.) Moreover, in 2023, Hyundai/Kia and consumers settled "two large class actions related to undisclosed safety defects and issue 'park outside' recalls for more than 3 million additional vehicles." (Pls.' Supp. Brief at 3.) If the lower retention was a result of the Defect, it would likely have reflected such diminution in the years following its high publicity. (See id. at 3; Supp. Stockton Decl. ¶ 22.) Second, as Plaintiffs' counsel notes, the 2024 calendar year falls outside the relevant range of settlement. Thus, there is no scientific evidence showing diminution of market value at the time of settlement and up to July 2023. Therefore, the Court finds that the parties considered diminution of market value and both reasonably and reliably concluded that there was no basis for such damage award.

Accordingly, the Court **OVERRULES** the Rubin and Birner objections.

> 11.   Whether the Release Is Narrowly Tailored to the Facts Underlying
>        Class Members' Claims

The Settlement limits the release to claims "relating to Class Vehicles and the method of theft popularized on TikTok and other social media channels relating to the lack of engine immobilizers as alleged in this Action . . . ." (ASA § VI.1.) However, Birner argues that the release is "contrary to the judge's direction" and excessively broad because it includes "persons and institutions that are not parties to this lawsuit" and releases unknown claims. (Birner Objection at 16.) However, as Plaintiffs point out, this "Court specifically approved the release after initially finding that the first iteration submitted to the Court was ambiguous and broad." (Reply at 31 (citing Order Denying Motion for Preliminary Settlement Approval at 25 ("Releases should be limited to the facts of this case and should not encompass circumstances that are not addressed by the Settlement."); Order Granting Motion for Preliminary Settlement Approval at 9–10).) Moreover, courts routinely approve releases covering affiliated persons and entities of the parties and unknown claims. See, e.g., Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 748 (9th Cir. 2006) ("A class settlement may also release factually related

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

claims against parties not named as defendants[.]”); Shay v. Apple Inc., No. 20-cv-1629, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) (“The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.”); Schmitt v. Younique, LLC, No. 17-cv-01397, 2020 U.S. Dist. LEXIS 64572, at *10 (C.D. Cal. Apr. 9, 2020) (approving release where Plaintiffs and each Settlement Class member are deemed to have waived the provisions of California Civil Code § 1542 or similar laws); Eisen, 2014 U.S. Dist. LEXIS 14301, at *26–27 (“The releases in the settlement are reasonably tailored and necessary to secure the consent of [Defendant] to the Settlement Agreement. No defendant would agree to a release that permitted plaintiffs to continue to initiate litigation against individuals or entities related to the defendant. Releases of non-parties in class action settlements are readily approved and enforced.”).

Accordingly, the Court **OVERRULES** Birner’s objection.

B.      *Notice to the Class*

Objector Birner claims that the Notice did not include any “indication of the value of the settlement to class members, nor is there an estimate by defendants or Class counsel of the take rate of members or the number or percentage of class members expected to file claims” or guaranteed “minimum payout.” (Birner Objection at 7–8.) Plaintiffs argue that Birner’s objection “ignores that several key categories of reimbursement, such as reimbursements for anti-theft devices for Class vehicles not eligible for the Software Upgrade and steering wheel locks for all Class Vehicles, are not subject to any claim cap or paid out from the Common Fund.” (Reply at 37.) In fact, the Long Form Notice states that “[f]or Class Vehicles not eligible for the Software Upgrade, the Settlement offers reimbursement up to $300 for Class Members’ purchase and/or installation of a steering wheel lock, glass breakage alarm or similar anti-theft system, or another aftermarket modification designed to deter or prevent theft (a ‘Qualifying Purchase’).” (Long Form Notice at 4.) Moreover, “[t]hese Settlement benefits are not capped overall to the Class and will be paid by Defendants separately from the Common Fund identified below.” (Id. at 5.) Therefore, according to Plaintiffs, “reimbursements for these categories are ‘guaranteed cash payouts’ that Birner complains about.” (Reply at 37.)

Additionally, Plaintiffs argue that Birner’s objection “ignores that Plaintiffs’

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

expert, Stockton, opined that 'based on prior experience with class settlements, that the claims rate will average approximately 15 percent' and his analysis 'conservatively assume[d] a 20% claims rate.'" (Id. at 37 (citing Stockton Decl. ¶ 46).)  Moreover, as the Ninth Circuit has held, a class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." Churchill Vill., L.L.C. v. GE, 361 F.3d 566, 575 (9th Cir.2004) (internal quotation marks omitted); see also Wershba v. Apple Comput., Inc., 91 Cal. App. 4th 224, 252 (2001), disapproved of on other grounds by Hernandez v. Restoration Hardware, Inc., 4 Cal. 5th 260, 269 (2018) ("As a general rule, class notice must strike a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing class members.").  Thus, as Plaintiffs contend, the "information Birner complains is missing from the notice, such as a 'take rate,' is not required and rarely included in notices because it would overly complicate a notice that Birner elsewhere implies is too long and confusing." (Reply at 37–38 (citing Birner Objection at 3, 10, 12).)  Birner also relies on inapposite, out-of-circuit cases to support his position. (See Birner Objection at 8 (citing Bloyed v. Gen. Motors Corp., 881 S.W.2d 422, 431 (Tex. App. 1994); Buchet v. ITT Consumer Fin. Corp., 845 F. Supp. 684, 687 (D. Minn. 1994)).)  Both of those cases are coupon-only settlements.  That is not the case here.  In this case, Defendants agreed to a non-reversionary Common Fund of at least $80 million, among other benefits.  And "Plaintiffs here have provided a reasonable estimate of the amount of damages Class Members will personally receive." (Reply at 38 (citing Stockton Decl. ¶¶ 14–17).)  Thus, the Court finds that the Notice to the Class satisfies the requirements of Rule 23(c)(2)(B).

####    C.    Claim Process

Some objectors argue that the Settlement claim process warrants denial of final Settlement approval.  (See Dkt. Nos. 461–463, Exs. 8, 4, 25–26, 46, 65; Birner Objection.)  For instance, Jill Puleo claims that she does not have the required Proof of Payment for her steering wheel lock.  (Dkt. No. 463, Ex. 65 ("[W]ithout knowing about the class action lawsuit or any other reason to keep a receipt, I did not keep a copy of that transaction.").)  Likewise, Shauntiquea Foston complains that the Settlement includes "unreasonable documentation requirements," particularly given that some Class Members "lack the resources or organizational skills to maintain comprehensive documentation." (Dkt. No. 461, Ex. 25.)  In response, Plaintiffs assert that "proof of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)          Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

payment and other documentation requirements are routine in similar settlements and part of best practices." (Reply at 38.) <u>See, e.g.</u>, <u>Brightk Consulting Inc. v. BMW of N. Am., LLC</u>, No. 21-02063, 2023 U.S. Dist. LEXIS 168723, at *5 (C.D. Cal. Sept. 12, 2023) (approving settlement process which included requirement that each "Class Member [] submit a 'legible repair order from a BMW Center,' 'proof of payment,' the mileage of the car at the time of the repair, the date of the repair, and 'a description of the Eligible Repair performed with indications as to the parts and labor for the repair'"); <u>In re MyFord Touch Consumer Litig.</u>, No. 13-cv-03072, 2019 U.S. Dist. LEXIS 53356, at *11–12 (N.D. Cal. Mar. 28, 2019) (requiring "proof of ownership at the time of the repair, documents showing information about the repair, and proof of payment for the repair"); <u>In re Anthem, Inc. Data Breach Litig.</u>, 327 F.R.D. 299, 325 (N.D. Cal. 2018) ("Although Settlement Class Members must also submit supporting documentation, the Settlement requires only 'documentation [that] should naturally exist and have been retained or is obtainable.' In addition to eliminating the need to prove causation, this mode of substantiation is significantly less than what Class Members would have had to produce at trial." (internal citation omitted)). Moreover, Plaintiffs argue that the Settlement "allows for multiple forms of proof for all requirements." (Reply at 39.) For instance, Proof of Payment can include attestations in certain circumstances, and "Proof of Qualifying Theft" and "Proof of Qualifying Theft Attempt" may include police reports that can be filed at any time prior to submitting a claim. (ASA §§ I.V, I.X.)

Moreover, Jared Anderson disagrees with the claim period ending 180 days after final approval. (Dkt. No. 461, Ex. 4.) But according to Plaintiffs, "an end date for the claims period is necessary to administer the Settlement, which may be adjusted pro rata based on the number of approved claims." (Reply at 39.) Plaintiffs further argue that "the benefits provided in the Settlement adequately address the risk of theft created by the alleged Defect such that there is no need to extend the claim period beyond a reasonable period to allow all Class members to repair their vehicles." (<u>Id.</u>) The Court agrees with Plaintiffs and finds that the 180-day claim period is sufficient.

Lastly, Birner argues that the "claims processing and eligibility requirements are strict, unduly burdensome and designed to discourage class members from filing claims." (Birner Objection at 3.) However, "[t]he requirement that class members download a claim form or request in writing a claim form, complete the form, and mail it back to the settlement administrator is not onerous." <u>In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prod. Liab. Litig.</u>, No. 10 ML 02151, 2013 WL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)              Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

3224585, at *18 (C.D. Cal. June 17, 2013).  And Birner does not explain what is "strict" or "unduly burdensome" about the claims process.  (See generally Birner Objection.)  At most, Birner argues that the claim form is "technical verbiage." (Id. at 3.)  But Class members can, as many have done, contact Class Counsel or the Settlement Administrator to help them with the claims process.  (See ASA § IV.C; Leadership Reply Decl. ¶ 3.)  Birner further asserts that "Class counsel in its recent Fee Petition remarked that over 210,000 class members have already filed claims which illustrates that these class members are not aware that the plan has not yet been approved."  (Birner Objection at 4.)  The Court finds this argument unpersuasive.  As Plaintiffs point out, "Class members need not wait until the Settlement receives final approval to file their claims." (Reply at 40.)

Thus, the Court finds that the claim process is fair, reasonable, and adequate.

D.    *Miscellaneous Objections*

Most of the pro se objections fall within the aforementioned categories, but a few Class members made additional objections to the Settlement.  The Court will address those now.

1.    Buyback Program and Replacement Vehicles

Some objectors seek to have Defendants institute a buyback program or provide them with new vehicles.  (See Dkt. Nos. 461–462, 464, Exs. 2, 25–27, 41, 47, 76.)  For instance, Jhaza Tanner seeks "a replacement vehicle of equal or greater value" and "[f]ull reimbursement of all payments made on the vehicle and associated insurance premiums." (Dkt. No. 464, Ex. 76.)  Similarly, other objectors complain that the Settlement does not provide reimbursement for the cost of purchasing new replacement vehicles.  (Dkt. Nos. 461–462, Exs. 17, 20, 29, 32.)  However, as discussed in the Court's prior orders, there are substantial risks for the Class should the case proceed to trial.  (See Order Denying Motion for Preliminary Settlement Approval; Order Granting Motion for Preliminary Settlement Approval.)  As stated in their Motion,

> [b]ased on their experience, Class Counsel believe that Defendants
> would argue throughout this litigation that: (1) the Class Vehicles
> are not defective, and that the vast majority of Class Vehicles have

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

not experienced a manifestation of the Defect (i.e., theft); (2) even if
the Defect did exist, Defendants did not have pre-sale knowledge of
its existence.  This litigation concerns dozens of vehicle models,
some of which were designed and sold over a decade ago.  Thus,
establishing Defendants' knowledge of the Defect at the time of sale
through records which may be more than a decade old presents
considerable difficulties; and (3) Plaintiffs' claims rest upon novel
and untested theories of liability which may not withstand summary
judgment or an appeal.  In particular, Plaintiffs' claims depend upon
a finding that the Class Vehicles do not comply with federal
standards and that the criminal actions of third parties do not
eliminate Defendants' liability.

(Mot. at 8.)  Plaintiffs also assert that "through this Settlement, Class Members can avoid
the meaningful risks and expenses posed by continued litigation and enjoy the significant
and guaranteed benefits years before the earliest date possible through continued
litigation."  (Id. at 9.)  See, e.g., Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.),
213 F.3d 454, 459 (9th Cir. 2000) (settlement amounting to "only a fraction of the
potential recovery" was fair "given the difficulties in proving the case"); Barragan v.
Populus Fin. Grp., Inc., No. 21-cv-08021, 2023 U.S. Dist. LEXIS 27605, at *8 (C.D. Cal.
Feb. 10, 2023) ("An immediate recovery for class members is preferable to prolonged
risk and expense of further litigation."); Ruiz v. JCP Logistics, Inc., No. 13-1908, 2016
WL 6156212, at *5 (C.D. Cal. Aug. 12, 2016) ("Settlement eliminates the risks inherent
in continued litigation, and it may be the last chance for class members to obtain
relief.").  As the Ninth Circuit has noted,

> [o]f course it is possible, as many of the objectors' affidavits imply,
> that the settlement could have been better. . . . Settlement is the
> offspring of compromise; the question we address is not whether the
> final product could be prettier, smarter or snazzier, but whether it is
> fair, adequate and free from collusion.  In this regard, the fact that
> the overwhelming majority of the class willingly approved the offer
> and stayed in the class presents at least some objective positive
> commentary as to its fairness.

Hanlon, 150 F.3d at 1027 (emphasis added).  Thus, the Court finds that objections

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    8:22-ml-03052-JVS (KESx)                    Date    October 1, 2024

Title    In re Kia Hyundai Vehicle Theft Litigation

calling for a buyback program and replacement vehicles improperly argue that the Settlement should be better.

Accordingly, the Court **OVERRULES** these objections.

      2.    Cy pres

The ASA provides that "any 'minimum' balance remaining from the Common Fund i.e., the $80 million floor of the Common Fund, after the claims period has expired shall be redistributed to claimants on a pro-rata basis based on each claimant's eligible claim amount, unless administratively infeasible, in which case they shall be distributed to a Court-approved cy pres recipient, until such minimum balance is depleted." (ASA § II.D.7.) Two objectors, Tomera Davis ("Davis") and Birner, object to this provision. (See Dkt. No. 461, Ex. 16; Birner Objection.) Davis questions whether the cy pres recipient will be related to Defendants and that it "seems sketchy." (Dkt. No. 461, Ex. 16.) Similarly, Birner objects because "Class members have a right to know the identity of the Cy Pres recipient." (Birner Objection at 16.) "However, this issue becomes ripe only if the entire settlement fund is not distributed to class members." Rodriguez v. West Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009) (citation omitted). "That trigger point has not been reached; no cy pres disbursement is imminent; and the fund in this case may well be depleted before cy pres kicks in." Id. Thus, the Court concludes that the objections regarding the identity of the cy pres recipient are premature at this time. See, e.g., Hartless v. Clorox Co., 273 F.R.D. 630, 642 (S.D. Cal. 2011) ("The issue of cy pres distribution, however, is premature until the claims process is concluded and it is determined that there are unclaimed funds."); Martinez v. Semi-Tropic Coop. Gin, No. 19-cv-01581, 2022 U.S. Dist. LEXIS 190910, at *16 (E.D. Cal. Oct. 18, 2022) ("Nevertheless, the Ninth Circuit observed also that issues related to the identity of a cy pres beneficiary are not generally ripe until there are funds that remain unclaimed.").

Accordingly, the Court **OVERRULES** these objections.

      3.    Claim Cap for Steering Wheel Lock Reimbursements

Three objectors claim that they each paid $65 for steering wheel locks, but the Settlement only provides a $50 reimbursement. (See Dkt. No. 464, Exs. 81–83.) However, similar to the claim cap objections addressed above, the Court finds that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

$50 cap for steering wheel lock reimbursements is reasonable.

Accordingly, the Court **OVERRULES** these objections.

### 4.     Reconstructed Vehicle Title

David Mickinac argues that his vehicle will suffer from being a reconstructed title due to the theft.  (See Dkt. No. 462, Ex. 50.)  However, for reasons previously stated in its prior orders, the Court finds that the Settlement is reasonable with respect to Class members who suffered a theft or theft attempt.  And as discussed above, the Settlement does not need to provide relief for every possible form of incidental damages.  See Mendoza, 2017 WL 342059, at *10.

Accordingly, the Court **OVERRULES** this objection.

### 5.     Local Attorney

Jhaza Tanner objects to the Settlement due to "the lack of representation from Los Angeles, CA in the class counsel."  (See Dkt. No. 464, Ex. 76.)  First, as Plaintiffs contend, "[t]he location of Class Counsel bears no import on the adequacy of the Settlement."  (Reply at 41.)  Second, the objection is incorrect.  For example, Roland Tellis, who is in Los Angeles, was appointed as Class Counsel in this Court's prior order.  (See Order Granting Motion for Preliminary Settlement Approval.)  And Hagens Berman Sobol Shapiro LLP, one of the Class Counsel's law firms, has a Los Angeles office.  (Id.)

Accordingly, the Court **OVERRULES** this objection.

### 6.     Admission of Liability

John Podgornik objects to the Settlement due to "Kia's lack of acknowledgement in abusing consumer trust" and asks that the Court impose a $1,000 civil fee/penalty for each Class Vehicle.  (See Dkt. No. 463, Ex. 63.)  In response, Plaintiffs assert that "[t]he absence of an admission of liability is routine and common in settlements (indeed, it is commonly a motivating factor for a defendant to settle claims), and the Court cannot impose a 'civil fee/penalty' in the Settlement."  (Reply at 41.)  The Court agrees with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

Plaintiffs. This demand is merely an objection for not getting a "better" Settlement. Hanlon, 150 F.3d at 1027.

Accordingly, the Court **OVERRULES** this objection.

> 7.    Reimbursement for Anti-Theft System Installed in Software Upgrade Eligible Class Vehicles

Five Class members object that the Settlement does not provide additional reimbursements for installation of aftermarket anti-theft devices. (See Dkt. Nos. 461, 464, Exs. 18, 74, 81–83.) These objections rest on the assumption that the Software Upgrade is inadequate to address the risk of theft. But as discussed above and in this Court's prior order, the Software Upgrade adequately addressed the risk of theft in Class Vehicles. Moreover, these objections, like many others, simply argue that the Settlement should be "better" by providing Class Members with additional compensation. See Hendricks v. StarKist Co., No. 13-cv-00729, 2016 WL 5462423, at *6 (N.D. Cal. Sept. 26, 2016) ("That a more favorable result for some Class Members could potentially have been reached is not a sufficient reason to reject an otherwise fair and reasonable settlement. . . . More significantly, the request for a higher settlement fails to account for the risk, expense, complexity, and likely duration of further protracted litigation." (quotation marks and citation omitted)).

Accordingly, the Court **OVERRULES** these objections.

> 8.    Remote Ignition Systems

Sharry Edwards and Richard Ladouceur object to the Settlement because the Software Upgrade cannot be installed on their Class Vehicles since they installed aftermarket remote starters that are not compatible with the Software Upgrade. (See Dkt. Nos. 461–462, Exs. 21, 42.) In response, Plaintiffs argue that it is "not feasible to design, install, and warrant the Software Upgrade to be compatible with countless unknown aftermarket devices that modify the ignition system." (Reply at 42.) The Court agrees with Plaintiffs. And to the extent certain Class members have installed aftermarket remote starters that prevent the installation of the Software Upgrade in their Class Vehicles, the issue seems too insubstantial for the Court to disturb the overall Settlement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 8:22-ml-03052-JVS (KESx) | Date | October 1, 2024 |
|---|---|---|---|

| Title | In re Kia Hyundai Vehicle Theft Litigation |
|---|---|

Accordingly, the Court **OVERRULES** these objections.

> 9.    Other

Phyllis Killebrew Flanders ("Flanders") objects to the Settlement because thieves damaged her "electric privacy gate" when stealing her vehicle, and she seeks to be compensated for the gate repairs.  (See Dkt. No. 461, Ex. 24.)  However, as Plaintiffs point out, Flanders' objection overlooks that "damage to her gate is covered up to $3,375 or 33% of Black Book value of the Class Vehicle (whichever is greater) because it is 'personal property stolen or damaged as a result of a Qualifying Theft or Qualifying Theft Attempt.'" (Reply at 43 (quoting ASA § II.D.3.b.).)

Nancy Pawlowski objects to the Settlement because of title and credit reporting issues specific to a single dealership and herself, which allegedly demonstrates "an overall business model for the Kia Corporation to operate on the basis of fraud and deceit."  (See Dkt. No. 463, Ex. 61.)  But the Court finds that this particular objection is highly individualized and not typical of the Class.  See Mendoza, 2017 WL 342059, at *10–11.

Accordingly, the Court **OVERRULES** these objections.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for final approval of the Settlement.

**IT IS SO ORDERED.**