# EXHIBIT C

**CITY OF MADISON**
## INTER-DEPARTMENTAL
**CORRESPONDENCE**

April 30, 2025

**To:** City of Madison Common Council Alders

**From:** John Patterson, Acting Chief of Police

**Subject:** Quarterly Report (1st, 2025)

This document provides an update on selected MPD topics for the first quarter (January, February, and March) of 2025.

**Please consider the data included in this update as preliminary and subject to modification.**

**Emergency and Priority Calls**
During the 1st quarter, MPD patrol response was limited to emergency and priority calls 9.9% of the time. This is down slightly from the 4th quarter of 2024 when our response time was limited 10.4% of the time. Given the volume of 9-1-1 calls or the severity of calls requiring multiple resources, there were 72 instances where MPD's patrol response was limited. Note that some of these instances did not impact citywide response but were limited to a particular district or area of the city. The 72 instances occurred on 53 dates (some days required limited call response multiple times); this means that at some point on 58.9% of the days during the 1st quarter MPD patrol response was limited. The 72 instances spanned about 214.8 total hours of limited call response, an average of 3 hours per instance.

**Significant Incidents**
Events involving firearms are considered a significant incident within our stratified policing crime reduction framework. All calls involving a firearm and shots fired are investigated.

There were thirty (30) shots fired incidents in the City from January 1st through March 31st (2025). This represents a **14.3% decrease** from the 4th quarter of 2024 (35).



Shots fired are broken into the following categories:

|  | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | Total |
|---|---|---|---|---|---|
| Property Damage | 17 |  |  |  | 17 |
| Subjects Struck by Gunfire* | 5 |  |  |  | 5 |
| Accidental Discharge | 4 |  |  |  | 4 |
| Self-Inflicted (intentional) | 6 |  |  |  | 6 |

*Excludes accidental discharge & self-inflicted

The total number of casings recovered in the 1st quarter were: ninety-nine (99).

HKThefts_Madison_00033185

Heroin Overdoses – MPD responded to forty-four (44) known heroin overdoses during the first quarter of 2025. This represents a **13.7% decrease** from the 4th quarter of 2024 (51). [Note that these figures refer to known overdoses. It is likely that many overdoses are occurring without any report to MPD or MFD.]



There were four (4) suspected overdose deaths during the first quarter of 2025. This is a **33% increase** from the 4th quarter of 2024 (3).  [Note that these figures only include overdose deaths with police involvement and clear evidence of an overdose; the actual figure may be higher].

The Madison Police Department actively seeks opportunities to *divert* and *deflect* individuals from the justice system.

*Diversion* occurs when police refer individuals to a program or services in lieu of an arrest. Pre-arrest or pre-charge diversion seeks to connect individuals with community-based help, while avoiding a damaging arrest record.

*Deflection* is community based and entails no criminal justice system involvement beyond an individual's interaction with a police officer in the field. Police deflection programs aim to reduce crime by connecting people living with mental health struggles or substance use disorder to treatment and recovery resources.

**Madison Area Recovery Initiative (MARI)** is a program for individuals living with substance use disorders who have committed eligible, non-violent offenses stemming from their disease of addiction. The program offers six months of individualized treatment and coaching to participants. Participants must complete the program for non-prosecution of the charges they would have faced. Eligible charges include possession of drug paraphernalia, possession of a controlled substance, retail theft, prostitution, and theft/burglary if the victim of the theft/burglary agrees to the MARI program being offered.

The **Addiction Resource Team** is multidisciplinary and utilizes a police officer and a Peer Specialist from Safe Communities. The teams follow up with people who have experienced a non-fatal overdose or other precipitating event that brought them into contact with Madison Police or Madison Fire personnel. The purpose is to connect individuals with recovery resources, meet people where they are, and provide harm reduction materials. The team distributes the opioid reversal agent Naloxone and fentanyl test strips on outreach visits.

Robberies – Twenty-22 (22) robberies occurred in the City during the first quarter of 2025.  This is an **18.5% decrease** from the 4th quarter of 2024 (27).



Burglaries – MPD responded to 99 burglaries during the first quarter of 2025. This represents a **3.1% increase** from the burglaries reported in the 4th quarter of 2024 (96).



Stolen Autos – MPD investigated sixty-five (65) stolen autos during the first quarter of 2025. This is a **1.6% increase** from the 4th quarter of 2024 (64).



Thefts from Vehicles – MPD investigated 131 thefts from vehicles during the first quarter of 2025. From the 4th quarter of 2024 (166), this is a **21.1% decrease**.



MPD encourages everyone in our community to remove valuables from their vehicle, lock their vehicles, and when possible, park near lights.

### Arrest Data

**On-view arrests:** Law enforcement physically took someone into custody and transported them to jail.
**Citations:** This is an administrative arrest. The individual is issued a ticket and promises to appear in court.

In the 1st quarter of 2025, MPD responded to **35,167 calls for service**. Of this total, there were 1,427 on-view arrests and 663 citations issued (Group A and Group B offenses).

First quarter **on-view arrest** data:

| Sex | Q1 Adults | % | Q1 Youth | % |
|---|---|---|---|---|
| Male | 1,050 | 76.6% | 39 | 62.9% |
| Female | 320 | 23.4% | 23 | 37.1% |
| Unknown | 0 | 0% | 0 | 0% |
| **Total** | **1,370** | **100%** | **62** | **100%** |

| Race | Q1 Adults | % | Q1 Youth | % |
|---|---|---|---|---|
| Asian | 18 | 1.3% | 2 | 3.2% |
| African American | 656 | 47.9% | 39 | 62.9% |
| Native American | 8 | 039% | 0 | 0% |
| Other | 46 | 3.4% | 2 | 3.2% |
| Caucasian | 642 | 46.9% | 19 | 30.6% |
| **Total** | **1,370** | **100%** | **62** | **100%** |
| Hispanic* | 136 | 9.9% | 9 | 14.5% |

"Hispanic" is not a racial designator used for UCR/IBR crime reporting purposes. However, it is an ethnicity collected and tracked in MPD's records management system, in addition to race. These arrest figures are based on that data. Each arrested person with a Hispanic ethnicity will also have a race indicated (from the above options) and reflected in MPD's crime reporting.

**1,142** distinct adult individuals accounted for the **1,370** instances of physical arrests in the 1st quarter of 2025. **144** individuals were physically arrested more than one time in the 1st quarter of 2025. These "repeat arrestees" accounted for **13%** of all adult arrests during this timeframe.

**621** distinct youth accounted for the **646** instances of physical arrests in the 1st quarter of 2025. **24** youth were physically arrested more than one time in the 1st quarter of 2025. These "repeat youth arrestees" accounted for **4%** of all youth arrests during this timeframe.

First quarter **citation** data:

| Sex | Q1 Adults | % | Q1 Youth | % |
|---|---|---|---|---|
| Male | 362 | 56% | 13 | 72.2% |
| Female | 2 | 44% | 5 | 27.8% |
| Unknown | 0 | 0% | 0 | 0% |
| **Total** | **620** | **100%** | **18** | **100%** |
| | | | | |
| Race | Q1 Adults | | Q1 Youth | % |
| Asian | 21 | 3.3% | 0 | 0% |
| African American | 160 | 24.8% | 8 | 44.4% |
| Native American | 3 | 0.5% | 0 | 0% |
| Other | 20 | 3.1% | 1 | 5.6% |
| Caucasian | 442 | 68.4% | 9 | 50% |
| **Total** | **646** | **100%** | **18** | **100%** |
| Hispanic* | 45 | 7% | 4 | 22.2% |

"Hispanic" is not a racial designator used for UCR/IBR crime reporting purposes. However, it is an ethnicity collected and tracked in MPD's records management system, in addition to race. These arrest figures are based on that data. Each arrested person with a Hispanic ethnicity will also have a race indicated (from the above options) and reflected in MPD's crime reporting.

The National Incident Based Reporting System (NIBRS) is used by MPD and follows the standards set by the FBI and Wisconsin Department of Justice. MPD is required to submit incidents and arrests for two different categories. Group A Offenses are reported violations and arrests of state statutes and city ordinances that are grouped into persons crime, property crime, and societal crime categories. Group B Offenses are arrest-only data. Arrests include citations and physical. Group A offenses are more serious crimes such as Murder, Rape, Robbery, etc. Group B offenses tend to be minor in nature, such as Curfew/Loitering/Vagrancy Violations, Disorderly Conduct, Driving Under the Influence, etc. (2023 NIBRS User Manual).

Resources:
https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/home
https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/ucr/nibrs

| Group A Offenses | Q1 | Q2 | Q3 | Q4 | Total | % |
|---|---|---|---|---|---|---|
| Animal Cruelty | 6 | | | | 6 | 0.2% |
| Arson | 2 | | | | 2 | 0.1% |
| Assault Offenses | 309 | | | | 309 | 11.5% |
| Bribery | 1 | | | | 1 | 0% |
| Burglary | 23 | | | | 23 | 0.9% |
| Counterfeiting/Forgery | 2 | | | | 2 | 0.1% |
| Damage to Property | 90 | | | | 90 | 3.4% |
| Drug/Narcotic Offenses | 159 | | | | 159 | 5.9% |
| Embezzlement | 0 | | | | 0 | 0% |
| Extortion | 1 | | | | 1 | 0% |
| Fraud Offenses | 19 | | | | 19 | 0.7% |
| Gambling Offenses | 0 | | | | 0 | 0% |
| Homicide Offenses | 0 | | | | 0 | 0% |
| Human Trafficking Offenses | 0 | | | | 0 | 0% |
| Kidnapping/Abduction | 22 | | | | 22 | 0.8% |
| Larceny/Theft Offenses | 115 | | | | 115 | 4.3% |
| Motor Vehicle Theft | 18 | | | | 18 | 0.7% |
| Pornography/Obscene Material | 3 | | | | 3 | 0.1% |
| Prostitution Offenses | 0 | | | | 0 | 0% |
| Robbery | 18 | | | | 18 | 0.7% |
| Sex Offenses, Forcible | 17 | | | | 17 | 0.6% |
| Sex Offenses, Non-Forcible | 1 | | | | 1 | 0% |
| Stolen Property Offenses | 7 | | | | 7 | 0.3% |
| Weapon Law Violations | 36 | | | | 36 | 1.3% |
| Group B Offenses | Q1 | Q2 | Q3 | Q4 | Total | % |
| Bad Checks | 0 | | | | 0 | 0% |
| Curfew/Loitering/Vagrancy Violations | 0 | | | | 0 | 0% |
| Disorderly Conduct | 597 | | | | 597 | 22.3% |
| Driving Under the Influence | 76 | | | | 76 | 2.8% |
| Drunkenness | 0 | | | | 0 | 0% |
| Family Offenses, Nonviolent | 10 | | | | 10 | 0.4% |
| Liquor Law Violations | 3 | | | | 3 | 0.1% |
| Peeping Tom | 0 | | | | 0 | 0% |
| Runaway | 0 | | | | 0 | 0% |
| Trespass of Real Property | 131 | | | | 131 | 4.9% |
| All Other Offenses | 1,016 | | | | 1,016 | 37.9% |
| **Total** | **2,682** | | | | **2,682** | **100%** |

*More than one charge may be connected to an arrest.

HKThefts_Madison_00033190

## Use of Force Overview

During the first quarter of 2025, MPD officers responded to **35,167** calls for service. In that time, there were eighty-six (86) contacts in our community in which officers used recordable force during the encounter.  This means that in the first quarter, MPD officers used recordable force **0.24%** (less than one quarter of 1%) of the time when engaging with members in our community. Each of these force incidents was reviewed for compliance with MPD standard operating procedures.

| Description | Q1 | Q2 | Q3 | Q4 | Total/% |
|---|---|---|---|---|---|
| Calls for Service | 35,167 | | | | 35,167 |
| Contacts Where Force Was Used | 86 | | | | 86 |
| % of CFS Where Force Was Used | 0.24% | | | | 0.24% |
| **Force** | | | | | |
| Decentralization/Takedown (e.g. officer pushing or pulling a subject to the ground) | 68 | | | | 60.2% |
| Active Counter Measures (e.g. officer striking a subject with hand, forearm, foot or knee) | 10 | | | | 8.8% |
| Taser Deployment | 11 | | | | 9.7% |
| Hobble Restraints (a belt system that restricts a subject's ability to kick at officers, squad windows, etc.) | 7 | | | | 6.2% |
| OC (i.e. Pepper) Spray Deployment | 13 | | | | 11.5% |
| Baton Strike | 0 | | | | 0% |
| K9 Bite | 1 | | | | 0.9% |
| Firearm Discharged Toward Suspect | 0 | | | | 0% |
| Impact Munition (firearm delivered projectile launched at a lower-than-normal velocity) | 3 | | | | 2.7% |
| Specialty (SWAT/SET) | 0 | | | | 0% |
| **Total** | **113** | | | | **100%** |
| Firearm Discharged to Put Down a Sick or Suffering Animal | 48 | | | | |

*Please refer to the MPD SOP on use of force data collection for the definition of recordable force and distinction between reportable and recordable use of force: http://www.cityofmadison.com/police/documents/sop/UseOfForceData.pdf

First quarter use of force data by district and time of day:

| District | Q1 | Q2 | Q3 | Q4 | Total | % |
|---|---|---|---|---|---|---|
| West | 8 | | | | 8 | 9.3% |
| Midtown | 15 | | | | 15 | 17.4% |
| South | 4 | | | | 4 | 4.7% |
| Central | 24 | | | | 24 | 27.9% |
| North | 11 | | | | 11 | 12.8% |
| East | 21 | | | | 21 | 24.4% |
| Out of County | 0 | | | | 0 | 0% |
| Within County - Assist | 3 | | | | 3 | 3.5% |
| **Total** | **86** | | | | **86** | **100%** |
| **Time of Day/Patrol Shift** | **Q1** | **Q2** | **Q3** | **Q4** | **Total** | **%** |
| 1st Detail (7am – 3pm) | 20 | | | | 20 | 23.3% |
| 3rd Detail (3pm – 11pm) | 36 | | | | 36 | 41.9% |
| 5th Detail (11pm – 7am) | 30 | | | | 30 | 34.9% |
| **Total** | **86** | | | | **86** | **100%** |

**Restorative Justice Data (1ˢᵗ Quarter, 2025)**

The Madison Police Department actively seeks opportunities to *divert* individuals from the justice system.

*Diversion* occurs when police refer individuals to a program or services in lieu of an arrest. Pre-arrest or pre-charge diversion seeks to connect individuals with community-based help, while avoiding a damaging arrest record.

**Restorative Justice** is an approach that focuses on the needs of the victims, respondents, and the affected community. Victims can actively participate in the process, while respondents acknowledge responsibility for their actions.

The goals of restorative justice are to repair harm, reduce the risk of re-offense and rebuild community.

**Community Restorative Court (CRC)** is a diversion program for 17–25-year-olds who are cited for disorderly conduct, simple battery, obstructing an officer, damage to property, or theft (including retail theft).

In lieu of any municipal citation, youth aged 12-16 are referred to our **Restorative Justice** program run by the **YWCA**. Any time an MPD police officer in the field investigates and has probable cause to write a municipal (forfeiture) ticket, that officer must instead issue a Restorative Justice Referral to the youth.

| 12–16-Year-Old Youth Data from YWCA | 17–25-Year-Old Data from CRC | |
|---|---|---|
| Total referrals issued:45<br>Opted-in: 32<br>Neither: 13<br><br>Offenses:<br>• Retail Theft: 11<br>• Theft: 1<br>• Trespass: 8<br>• Disorderly Conduct: 10<br>• Damage to Property: 2<br>• Battery: 2<br>• Resist Or Obstruct: 3<br>• Facsimile Firearm: 1<br>• Under 18 armed: 1<br>• Underage Alcohol Violations: 3<br>• Minor Possess Tobacco: 1<br>• Minor Possess Airsoft Gun: 2 | Referrals from January 1ˢᵗ through March 31ˢᵗ, 2025<br><br>Total MPD Referrals = **55**<br><br>Offenses: | |
| | Battery | 5 |
| | Trespass to Land | 1 |
| | Unlawful Trespass | 6 |
| | Disorderly Conduct | 17 |
| | Damage to Property | 2 |
| | Retail Theft/Shoplifting | 17 |
| | Retail Theft – Intentional Take (>=$500) | 2 |
| | Retail Theft/Shoplift Party to a Crime | 1 |
| | Theft | 2 |
| | Theft – Movable Property | 2 |
| | **TOTAL** | **55** |

**Traffic**

**Traffic Complaints –**

Community members may submit a traffic complaint or concern to the Madison Police Department by utilizing online submissions or calling the Speeder's Hotline (608-266-4822). In the 1ˢᵗ quarter of 2025, MPD received 146 traffic complaints.

**Serious/Fatal Crashes**

In the 1st quarter of 2025, MPD responded to 777 crashes. 85 of these crashes required additional investigations. Those investigations resulted in 1 fatality, 13 serious injuries, and 102 minor injuries.

**Traffic Citations and Warnings**

First quarter **all traffic stops** data:

| Sex | Q1 | Q2 | Q3 | Q4 | Total | % |
|---|---|---|---|---|---|---|
| Male | 3,538 | | | | 3,538 | 61.8% |
| Female | 2,173 | | | | 2,173 | 38% |
| Unknown | 14 | | | | 14 | 0.2% |
| **Total** | **5,725** | | | | **5,725** | **100%** |

| Race | Q1 | Q2 | Q3 | Q4 | Total | % |
|---|---|---|---|---|---|---|
| Asian | 236 | | | | 236 | 4.1% |
| African American | 1,647 | | | | 1,647 | 28.8% |
| Native American | 18 | | | | 18 | 0.3% |
| Other | 338 | | | | 338 | 5.9% |
| Caucasian | 2,452 | | | | 2,452 | 42.8% |
| **Total** | **5,725** | | | | **5,725** | **100%** |
| Hispanic* | 1,034 | | | | 1,034 | 18.1% |

"Hispanic" is not a racial designator used for UCR/IBR crime reporting purposes. However, it is an ethnicity collected and tracked in MPD's records management system, in addition to race. These arrest figures are based on that data. Each arrested person with a Hispanic ethnicity will also have a race indicated (from the above options) and reflected in MPD's crime reporting.

First quarter **citations issued & warnings issued** data:

| Sex | Q1 Citations | Q1 Warnings | Total |
|---|---|---|---|
| Male | 1,625 | 1,913 | 3,538 |
| Female | 912 | 1,261 | 2,173 |
| Unknown | 1 | 13 | 14 |
| **Total** | **2,538** | **3,187** | **5,725** |

| Race | Q1 Citations | Q1 Warnings | Total |
|---|---|---|---|
| Asian | 115 | 121 | 236 |
| African American | 682 | 965 | 1,647 |
| Native American | 7 | 11 | 18 |
| Other | 137 | 201 | 338 |
| Caucasian | 1,116 | 1,336 | 2,452 |
| **Total** | **2,538** | **3,187** | **5,725** |
| Hispanic* | 481 | 553 | 1,034 |

"Hispanic" is not a racial designator used for UCR/IBR crime reporting purposes. However, it is an ethnicity collected and tracked in MPD's records management system, in addition to race. These arrest figures are based on that data. Each arrested person with a Hispanic ethnicity will also have a race indicated (from the above options) and reflected in MPD's crime reporting.

**Training**

MPD is currently in the middle of its Spring Professional Development season. Day 1 of Professional Development is comprised of the State of Wisconsin's mandatory Emergency Vehicle Operations curriculum and includes emergency driving, vehicle contacts and use of tire deflation devices. Day 2 of Professional Development features three hours of Active Shooter Incident Management (ASIM) training, a presentation by the MPD Peer Support Group, and a variety of wellness-related activities.

**Mental Health Update**

Update from Sergeant Jared Prado, Mental Health Unit

## Overview of Mental Health Unit

Since 2015, MPD has had a specialized team of full-time Mental Health Officers. This team consists of six full-time Mental Health Officers (MHOs), and three embedded Law Enforcement Crisis Workers (LECWs). Our MHOs work out of each of the six MPD district stations, and are supervised by one MHU Sergeant. Our LECWs divide their time amongst the various MPD districts and are supervised by one LECW Manager. The MHU is organizationally positioned within MPD's Community Outreach Section.

MHOs and LECWs regularly assist Patrol officers on active calls for service, striving to uphold the MHU values of problem solving and diversion. MHOs and LECWs share responsibilities that include: coordinating efforts with partner agencies; developing safety plans for individuals who would benefit from a unique emergency response; conducting follow-up tasks and engaging in proactive visits with community members living with mental illnesses; attending relevant meetings with stakeholders; and facilitating specialized trainings and community-based presentations.

Our team's close partnership with Journey Mental Health allows our MHOs to co-respond with LECWs into the field, to assist with active crisis calls for service. In many cases, our LECWs provide the clinical context that informs our officers to reach better dispositions and aims to divert individuals from the criminal justice system. In other cases, our LECWs collaborate with MHOs to plan and carry out follow-up with individuals before or after a crisis occurs.

Our Mental Health Unit is supplemented by Mental Health Liaison Officers (MHLOs). MHLOs maintain their primary assignments in Patrol, but owing to their interest and spirit of continuous improvement, they attend two additional training days throughout the year and take on additional tasks and responsibilities related to mental health-related crisis response. MHLOs work within and across districts to provide coordinated, consistent, and collaborative crisis response. Since the inception of the program in 2004, interest in the MHLO role has seen consistent growth. Our MHLOs represent all shifts and districts, and represent both the ranks of Police Officer, Detective and Sergeant.

Our MHOs have all completed the 40-hour Crisis Intervention Team (CIT) training, which is a National Alliance on Mental Illness (NAMI) initiative designed to improve the outcomes of police interactions with people living with mental illnesses. CIT is a nationally-recognized curriculum and for the past two years, MPD command has made a concerted effort to send interested MHLOs to the 40-hour CIT training. Our unit is proud to assist with local offerings of CIT and of Crisis Intervention Partners (CIP) training, the latter of which is a 16-hour training designed for wide-ranging audiences. Our MHOs seek further continuing education opportunities through various providers, notably through NAMI Wisconsin, Association of Threat Assessment Professionals (ATAP), Dane County's Collaborative Stabilization Coalition, the Wisconsin Department of Health Services, and the Wisconsin Department of Justice.

MPD's Mental Health Unit has a role in educating internally (within MPD) and also externally.

## Internal Engagement

Every year, MHOs and LECWs lead 20 hours of Crisis Management training within the MPD Pre-Service Academy.

Since 2022, the assigned MHU Sergeant has been a certified DAAT instructor, so we have incorporated discussion of de-escalation as part of the Crisis Management block. Several MHOs are instructors in other disciplines such as: First Aid, Professional Communication Skills, Tactical Response, Firearms, and Vehicle Contacts. Additionally, MHOs have contributed to or been a consultant for other academy blocks.

Twice per year, MHOs and LECWs lead 16 hours of novel instruction for MHLOs. Most recently in March 2025, this training was provided to all MHLOs, and to members of CARES, the Fitchburg Police Department and the Sun Prairie Police Department. The agenda included: updates delivered by the MHU supervisor, a discussion from a recent MPD Emergency Detention case and policies, a jail mental health (Wellpath) guest presentation, a competency and NGI determination (Wisconsin Dept. of Health Services) guest presentation, a VA Hospital guest presentation, and a living with schizoaffective disorder guest panel that included an experienced physician and person with lived experience.

Additionally, upon request, the MHU provides instruction to MPD's SWAT, sergeants, and other workgroups. In January 2025, the MHU sergeant facilitated a Mental Health/crisis response refresher for newly promoted sergeants. This incorporated discussion of policies, chapter 51 nuances, and navigation of systems.

**External Engagement**

**MPD's MHU is one of only fifteen Police-Mental Health Collaboration (PMHC) learning sites selected by the Council of State Governments Justice Center**. As a learning site, our unit fields inquiries and hosts visitors from law enforcement agencies around the county who seek support to begin or advance behavioral health units of their own.

In 2024, our **MHU logged 30 instances of PMHC learning site-related activities**. These activities included: fielding requests for information from different law enforcement or social service agencies, presenting to internal and external groups on various topics, and holding meetings for the community to discuss our department's response to mental health crises.

This year's learning site activities included several community-based presentations that our unit did, under the "Partnering with Law Enforcement" educational series. This is the second year that we have offered 60-75 minute presentations to various community-based organizations, free of charge. This presentation provides detail about how MPD responds to crisis calls, and an overview of the MHU.

In March of 2024, our unit presented for the MPD Community Academy in what was called "behavioral health night". Attendees learned about: the MHU, the CARES team, Journey Mental Health's services generally, MARI, and our training techniques on professional communication and de-escalation.

In April of 2024, we hosted members of Waukesha County's collaborative crisis team for an in-person site visit. As part of the site visit, we covered various operational features of our MHU.

In June of 2024, our distinction as a learning site provided the opportunity to present for an "Ask the Expert: Community Response & Its Place in the Crisis Continuum" webinar. Sgt. Prado, LECW Edgren, and CARES crisis worker Kinderman spoke about the behavioral health response and collaboration between the teams.

In September of 2024, our unit presented at the International Association of Chiefs of Police (IACP) Summit, hosting by MPD. We presented on our unit and on MARI, to commanders from agencies across the United States.

**SOP Updates**

A number of MPD SOPs were updated during the quarter.  Copies showing the changes are attached to this memo as an appendix.  Note that all MPD SOPs are reviewed regularly, with the most critical SOPs being reviewed annually. This process typically results in additional SOP changes/updates.

MPD posts drafts of new/revised SOPs on our website before final implementation, to allow for public review and comment.

**Defense Logistics Agency/Law Enforcement Support Office (10-33 program)**

MPD did not acquire any property through DLA/LESO during the first quarter of 2025.

**2025 – First Quarter Promotions**

Captain Angie Kamoske to Acting Assistant Chief
Lieutenant Kipp Hartman to Acting Captain
Detective Kelly Dougherty to Acting Lieutenant
Officer Kyle Hoppman to Acting Detective
Officer Firoz Khilji to Acting Detective

**Discipline/compliments (links to quarterly PS&IA summaries)**

https://www.cityofmadison.com/police/documents/psiaSummary2025JanMar.pdf

https://www.cityofmadison.com/police/documents/psiaRecognition2025JanMar.pdf

Updated/New SOPs for MPD: January-March 2025

Line of Duty Death of an Employee: 01/31/2025

Departmental Awards and Recognition: 03/28/2025

Interactions with Youth: 02/03/2025

Interactions with Transgender and Gender Non-Conforming Individuals: 03/04/2025

Language Access Services: 02/03/2025

Major Case Investigations: 02/03/2025

Notification of Commanding Officers: 02/03/2025

Officer Involved Deaths and Other Critical Incidents: 02/03/2025

Personal Appearance: 03/24/2025

Police Motorcycles: 02/03/2025

Response to Persons with Altered State of Mind: 02/03/2025

Search Warrant System: 02/03/2025

Sexual Assault Investigations: 02/03/2025

Special Events Team Specialty Teams: 03/28/2025

Use of Force: 03/24/2025

The following SOPs were updated in the 1st quarter to ensure that all of our SOPs contain non-gender specific language. No other edits were made to these SOPs, and therefore are not attached to this report.

Use of Tire Deflation Devices: 02/03/2025
Unmanned Aircraft Systems: 02/03/2025
Bomb Threats: 03/18/2025
Identification Procedures: 02/03/2025
Hostage Situation Incidents: 02/03/2025
Handling of Evidence, Contraband, Found, or Lost Property: 02/03/2025
Foot Pursuits: 02/03/2025
Emergency Vehicle Operation Guidelines: 02/03/2025
Donation of Vacation and Compensatory Time: 02/03/2025
Domestic Abuse: 02/03/2025
Demonstrations and Assemblies: 02/03/2025
Civil Actions Against Employees: 02/03/2025
Barricaded Person Incident: 02/03/2025
PSIA Complaint Investigation: 02/03/2025
Mental Health Incidents and Crises: 02/03/2025




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

**Line of Duty Death of an Employee**

Effective Date: <mark>09/20/2024</mark>
<mark>01/31/2025</mark>

## Purpose

The purpose of this SOP is to outline the Madison Police Department's response to a line of duty death.

The Madison Police Department (MPD) recognizes that a line of duty death will likely have far-reaching affects across the agency and the community and will require a timely and sensitive response to the needs of the involved officers, surviving family members, the organization, and the community.

The Madison Police Department recognizes that adhering to an incident command model, with clearly defined assignments/roles, will greatly assist the surviving family members and the organization in the aftermath of a line of duty death.

The Madison Police Department recognizes that proper "notification" is a critical component of the survivors' ability to adjust to the loss of a family member.

The Madison Police Department recognizes that ensuring survivor benefits are in order and quickly addressed will assist the surviving family in the aftermath of their loss.

The Chief of Police may institute any part of this policy for a non-commissioned employee of the Madison Police Department, or for any death of a Madison Police Department Public Safety Officer.

## Definitions

**Public Safety Officer**: An individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer.

**Line of Duty Death (LODD)**: Any action, felonious or accidental, which claims the life of a Madison Police Department sworn employee, while on duty. This definition is for the purposes of this policy only. Also:

> Pursuant to 34 U.S. Code SUBCHAPTER XI— PUBLIC SAFETY OFFICERS' DEATH BENEFITS, a line of duty death is presumed when a public safety officer dies from a heart attack, stroke, or vascular rupture while engaged in, on duty, or within 24 hours of participating in a non-routine stressful or strenuous physical law enforcement service, or a training exercise involving non-routine stressful or strenuous physical activity.

**Survivors:** Primary family members of the deceased employee, including spouse, children, grandchildren, parents, grandparents, siblings, fiancé, and/or significant others.

**LODD Involved Officer:** An officer who is directly involved in the line of duty death of another officer.

**Family Liaison Officer**: A member of the Madison Police Department who is assigned to the survivors of the officer killed in the line of duty, for the purposes of coordinating communication between the survivors and the involved agency to include funeral arrangements, benefits, and investigative updates. In most cases, this will be a member of the MPD Peer Support Team who has received specialized training in dealing with line of duty deaths and the role of a Family Liaison Officer.

**Employee Designated Representative (EDR):** A pre-identified person, of the deceased officer's choosing, who can act as a liaison between the survivors, the Family Liaison Officer(s), and the Madison Police Department.

HKThefts_Madison_00033198

**Law Enforcement Death Response Team (LEDR):** The Wisconsin Department of Justice Law Enforcement Death Response team is an available resource/team that is trained to assist with all details surrounding the death of a law enforcement officer, regardless of the circumstances. LEDR's response is willing to assist any agency in any manner requested and can include: Death Notification, Critical Incident Debriefings, Peer Counseling, Funeral Service Preparations, Public Safety Officer Benefits (PSOB), Family Support, Media Coordination, and Department logistics. LEDR can be reached 24/7 at: (866) 410-5337.

**Notification Team:** The personnel responsible for notifying the next of kin of a deceased employee. Ideally, this team consists of the Chief of Police or designee, the person(s) designated in the employee's emergency notification packet, and a representative from the county medical examiner's office, with emergency medical technicians (EMTs) standing by; however, the time necessary to fully assemble and deploy this team must be balanced against the prompt notification of survivors, with special consideration given to any possibility that a survivor might be able to reunite with an employee before their passing.

**Procedures**

## Pre-Incident

1. All employee photographs shall be kept up-to-date.
2. Employees will meet with their supervisor annually to review and edit (if necessary) all paperwork related to critical incidents and emergency notifications.
   a) In order to make prompt notification to an employee's family, in the case of a death, an Employee Emergency Notification packet is saved to the employee's personnel file in LERMS. This packet will contain a notification sequence for each employee of the Madison Police Department, indicating who should be notified first, second, third etc., their addresses, and phone numbers. Employees should include in this sequence someone who would be able to contact/locate dependents who are in school or additional people to contact. Employees may also identify an Employee Designated Representative. See Employee Emergency Notification Information Packet (Form A).
   b) All employees are encouraged to make sure they have up-to-date beneficiary designations in place.
   c) Employee Emergency Notification packets shall only be viewed for official purposes related to a notification, or for administrative purposes by the supervisor responsible to ensure the form has been reviewed annually. Access history to Employee Emergency Notification packets will be audited to ensure that only appropriate access occurs.
3. Peer support officers who can act as Family Liaison Officers should attend training that teaches best practices in dealing with line of duty deaths.

**In the Event of a Line of Duty Death**

A. Duties of LODD Involved Officer(s)

1. Immediately notify dispatch of incident and location. When practical, any radio communication should be done over an encrypted radio channel.
2. Render first aid and request response by emergency medical services.
3. Officer(s) shall inform a supervisor or the Officer-in-Charge of the incident as soon as possible.
4. Protect and secure the scene until relieved.
5. Identify witnesses for subsequent interviews. The LODD involved officer(s) shall not participate in the interviews of witnesses.
6. Brief the first arriving supervisor of the nature of the incident.

HKThefts_Madison_00033199

7. Reporting requirements for LODD involved officer(s) will be completed by investigators assigned to the incident. LODD involved officers will not be required to prepare a written report.

B. Duties of the On Scene Supervisor

1. Assume responsibility for the security and preservation of the scene. The involved agency is responsible for the initial response unless relieved by an outside agency lead investigator.
2. Notify the Officer-in-Charge.
3. Ensure that a LODD non-involved supervisor, if not already at the scene, responds immediately to the scene of the incident (A LODD non-involved supervisor is defined as one who has not been involved specifically at the scene, or involved in any tangential fashion, e.g., operation planning, drafting of search warrants, surveillance officers, intelligence gathering, etc.).
4. If necessary, establish a scene command post and give location to the Dane County Public Safety Communications (911 Center).
5. As soon as practical, relieve the officers directly involved in the line of duty death of any further responsibilities at the scene.
6. Identify and separate witnesses until the arrival of the lead investigator and/or other outside investigators.
7. If an outside agency lead investigator is involved, provide all necessary information to the outside agency lead investigator, and then relinquish control of the investigation to the outside agency lead investigator.

C. Duties of the Officer-in-Charge (OIC)

1. The Officer-in-Charge shall retrieve all employee paperwork completed by the deceased officer, which is maintained in the employee's personnel tab in LERMS. The OIC will review the packet for the names of any on-duty officers who are requested to be part of the Notification Team. If possible, those officers will be taken out of service and immediately assigned to the Notification Team.
2. Notify the Officer Involved Critical Incident (OICI) team commander or designee, and the Forensic Services Sergeant.
3. Notify the Chief, the Assistant Chief of Operations, and the Assistant Chief of Investigative and Specialized Services.
4. Notify Commanders of the District where the incident occurred. If the incident occurred outside of the employee's assigned district, the District Commanders of the involved employees should also be notified.
5. In the event of an Officer Involved Death or Other Critical Incident, refer to that SOP.
6. Notify the Captain of the "back-up" District where the incident occurred. For example, West District is backed up by Midtown District. In most cases, this commander will eventually become the Hospital Supervisor.
7. Contact Dane County Public Safety Communications (911 Center) Supervisor to inform on-duty officers of the status of the incident (e.g., injuries to officers and community members, or other important information). This should be done via silent dispatch, utilizing the Mobile Data Computer (MDC) and/or email, and should contain the following information:
   a. Name of the deceased officer(s);
   b. Name of LODD involved employee(s) and their status;
   c. Directive to on-duty officers to refrain from any information sharing outside of MPD, including social media posting;
   d. Advise on-duty officers it is appropriate to communicate to their own families their current status, but they should refrain from sharing any other information until authorized by a commander. It is critically important that information is not inadvertently shared with survivors.

    e. Advise personnel that they may gather at an MPD facility (such as Midtown or the MPD Training Center) for support; but they shall not assemble at the hospital. Only officers who have been directed to go to the hospital as a result of being assigned a necessary and specific law enforcement task by a supervisor should go to the hospital, and they shall check-in with the Hospital Supervisor upon arrival.

8. Notify the Madison Professional Police Officers Association (MPPOA) or Association of Madison Police Supervisors (AMPS) President, or another member of the MPPOA/AMPS board if the President is not available.

9. Notify the Peer Support Team Coordinator and deploy any on-duty Peer Support Officers to initiate the Critical Incident Stress Management protocol.

10. After formal notification to the involved officer's family has been made and in coordination with the Incident Commander, notify the department, via phone chain, followed by an email (sent to PD Group), that an MPD employee/officer was killed in the line of duty. The OIC will identify the officer by name, rank, and the location of the event, the location for all employees to assemble at if they decide to come in to work for support purposes. This email notification shall direct all employees to refrain from making social media notifications about this incident.

11. All media releases shall be cleared through the Internal Communications Commander and/or the Incident Commander. The name of the deceased employee will not be released to the media by the Department before the immediate family is notified. If the media obtains the employee's name prematurely, the Chief of Police or designee will request the name to be withheld until proper notification can be made to the survivors.

D. **Duties of the Notification Team**

1. It is the responsibility of the Notification Team to properly notify the next of kin of an employee who has died in the line of duty. Consideration should be given to immediate family, extended family, significant others, and relevant military branches. The deceased employee's *Emergency Notification Packet* must first be consulted. Prompt notification must be balanced with the wishes of the employee, if noted in their packet, with special consideration given to any possibility that a survivor might be able to reunite with an officer before their death. Additionally, expedience is of the utmost concern in consideration of instant social media, instant messaging, and other means in which the survivor family could learn of the tragedy before proper notification can take place.

2. If there is knowledge of a medical problem with an immediate survivor, medical personnel should be immediately available at the time of notification.

3. Notification will be made in person and ideally never alone. At least two vehicles should be used so someone can stay with the family, if necessary.

4. Never make a death notification on the doorstep. Ask to be allowed into the residence and gather the survivors together. If the survivor is at work, the Notification Team should request that the survivor be brought to a private room. Members shall not inform the workplace supervisor of the purpose of the visit other than to indicate that it is a family emergency.
    a. Inform survivors slowly and clearly of the information that you have.
    b. If specifics of the incident are known, the Notification Team should relay as much information as possible to the family.
    c. Be sure to use the deceased officer's name during the notification. Never give the family a false sense of hope. Use words such as "died" and "dead" rather than "gone away" or "passed away." Experience has shown that survivor family members want and need straightforward talk. State the facts as known. Be clear on what information is known and what is not yet known.

5. If the family requests to visit the hospital, they should be transported by police vehicle.
    a. It is highly recommended that survivors not drive themselves to the hospital.
    b. If the survivor insists on driving, someone should accompany them in the family car.

HKThefts_Madison_00033201

      c.  If young children are at home, and the survivor's decision is for those children to remain at the home, the Notification Team should arrange for babysitting needs. This may involve a co-worker's family, transportation of children to a relative's home, or similar arrangements.

6.  Do not be overly protective of the family. This includes sharing specific information as to how the employee died.

7.  Any promises, such as, "We will promote them posthumously," or "We will retire their badge," shall not be made to the family by any person except the Chief, and even then, strong consideration should be made to withhold such promises and actions until the emotion of the incident is under control.

8.  Prior to departing for the hospital, the Notification Team should notify the Hospital Supervisor (by telephone, if possible) that survivors are en route so that arrangements can be made for their arrival.

9.  The deceased employee's parents should also be afforded the courtesy of a personal notification whenever possible and practical. Be aware of any medical problems of the parents that may exist. If immediate survivors live beyond the Dane County area:

      a.  The Notification Team will ensure that a teletype message is sent to the appropriate jurisdiction, requesting a personal notification.

      b.  The Notification Team may choose to call the other jurisdiction by telephone, in addition to the teletype (TTY) message.

      c.  Arrangements should be made through the notifying agency to facilitate a conference call with the Notification Team, so details of the incident can be relayed directly from the Notification Team to the survivor family.

10.  During a line of duty death, the external monitoring of police frequencies may be extensive. Whenever possible, communications regarding notifications should be restricted to the telephone or to encrypted channels.

11.  The Notification Team should complete written details specifying the identity, time, and place of the survivor notifications.

12.  The Notification Team should remain at the hospital while the family is present until adequately relieved by the family liaison(s).

E.  Duties of the Hospital Supervisor

1.  The Hospital Supervisor is responsible for coordinating the law enforcement activities at the hospital where the injured or deceased officer has been transported. This on-scene role should be initially filled by the first available supervisor, who may be supplemented by a commander from the back-up district of injured or deceased officer.  It is essential this role is filled without delay in order to prevent significant disruption at the hospital. These responsibilities include, but are not limited to the following:

      A.  Announcing to Dispatch over the radio that they have assumed the role of Hospital Supervisor

      B.  As soon as reasonably practical, identify who from the hospital will be MPD's primary point of contact for exchange of information

      C.  Contacting the head of security to ensure patient privacy and the normal functioning of the hospital

      D.  Whenever possible, wearing a traffic vest when in this role, which helps hospital staff know who is in charge from MPD for communication purposes

      E.  Coordinating the arrival of the Notification Team with hospital staff

      F.  Coordinating with the OICI Hospital Supervisor, if applicable

      G.  Limiting the number of MPD personnel at the hospital to only those with a specifically assigned. critical law enforcement task

      H.  Redirecting MPD personnel without an assigned task to the designated place of assembly, like the MPD Training Center. Officers shall not assemble at the hospital.

2.  Do not be overly protective of the family. This includes sharing specific information as to how the employee died.

HKThefts_Madison_00033202

      3. Any promises, such as, "We will promote them posthumously," or "We will retire their badge," shall not be made to the family by any person except the Chief, and even then, strong consideration should be made to withhold such promises and actions until the emotion of the incident is under control.

F. Duties of Assistant Chief of Investigative & Specialized Services

      1. Will make the request for an outside agency lead investigator, or outside agency observer. If an outside agency lead investigator is unavailable, MPD will oversee the criminal investigation and assign a lead investigator.
      2. Will evaluate the need for an administrative review and/ or the need for Professional Standards & Internal Affairs (PSIA) investigation.

G. Duties of the Investigative Commander

      1. This position is typically assigned to an MPD Assistant Chief or Captain and is responsible for coordinating investigative resources related to the line of duty death. This person will typically be the Captain of Investigative Services.
      2. Contact Assistant Chief of Investigative & Specialized Services and notify them of the line of duty death.
      3. In the event of an outside agency criminal investigation, coordinate with the investigating agency to make certain they have access to all necessary MPD resources to conduct the investigation.
      4. Make investigative assignments and coordinate investigative efforts.
      5. Management of investigative personnel (assignments, monitoring hours worked, etc.).
      6. Managing overtime and arranging relief for investigative staff.
      7. Communicate investigative updates to the Assistant Chief of Investigative & Specialized Services and the Incident Commander.
      8. Designate case as "Extraordinary" for Telestaff/payroll purposes (if appropriate).

H. Duties of the Incident Commander

      1. This position is typically assigned to an MPD Assistant Chief or Captain and is responsible for coordinating MPD operational resources. This person should not be in charge of any investigation related to the line of duty death. This person will typically be the Operations Captain.
      2. Establish and staff a Department Command Post (CP), if necessary, to coordinate information and response to the tragedy.
      3. Ensure a Hospital Supervisor has been assigned.
      4. Ensure an Honor Guard Commander has been designated and the duties fulfilled.
      5. Ensure that at least one Family Liaison Officer has been designated and the duties fulfilled.
      6. Ensure a Staffing Commander has been designated and the duties fulfilled.
      7. Designate an Internal Communications Commander.
      8. In conjunction with the Honor Guard Commander, ensure the issuance of a teletype message to formally announce the line of duty death. As soon as practical, an initial TTY may be distributed with the announcement and that arrangements are pending. Details of arrangements should be withheld until completely verified; once that happens, subsequent TTY and email release should be considered. Extreme care should be given to releasing a TTY with information that will need to be changed or withdrawn. A follow-up TTY shall include the following:
          a) Name of deceased.
          b) Date and time of death.
          c) Circumstances surrounding the death.
          d) Funeral arrangements (state if service will be private or a police funeral).
          e) Expressions of sympathy in lieu of flowers.

HKThefts_Madison_00033203

     f) Contact person and phone number for visiting departments to call to indicate their desire to attend or to obtain further information.

9. Direct the wearing of badge mourning bands and any other Agency memorials.

I. Duties of the Peer Support Commander of the Family Liaison Officers

1. This person will assign and oversee the Family Liaison Officer and will monitor the wellbeing of any designated Employee Designated Representative (EDR) from MPD. Typically, this person will be a lieutenant assigned to the Peer Support program. The Peer Support Commander of the Family Liaison Officers will report directly to the Incident Commander until the completion of ceremonial events related to the line of duty death; the Peer Support Commander will then report to the Commander of Support Services.

2. Designate at least one Family Liaison Officer with consideration not to designate someone so close to the survivor family that they would not be able to handle the responsibilities of this role.

3. Coordinate the schedules of the Family Liaison Officers to provide as much daily availability to survivors as possible.

4. Place the Family Liaison Officers on special assignment in order to fulfill their duties.

5. Ensure that the Family Liaison Officers have department issued cell phones and that the phone numbers are shared with the Incident Commander and the Honor Guard Commander.

6. Work with the Family Liaison Officer to coordinate Employee Assistance Program (EAP) and Critical Incident Stress Management (CISM) responses for the survivors.

7. If an MPD Employee Designated Representative (EDR) is working with survivors, monitor the wellbeing of the EDR with recognition that this is an extremely emotionally taxing role.

8. Place the Critical Incident Partner (CIP) on special assignment in order to fulfill their duties.

J. Duties of the Family Liaison Officer

1. This person is a facilitator between the survivors and the MPD. It is important that this person not be someone so close to the survivor family that they would not be able to handle the responsibilities of this role. This person(s) will report directly to a Peer Support Supervisor.

2. The Family Liaison Officer is not a decision-making position, but a "facilitator" between the survivors and the MPD. It is important that the person(s) assigned this role realize they are not to make decisions on behalf of the MPD. The Family Liaison Officer will have immediate access to the Department Incident Commander, the Honor Guard Coordinator, and the Benefits Coordinator so necessary decisions can be made immediately.

3. In conjunction with the Honor Guard Commander or their designee, assist the survivors with funeral arrangements and making them aware of what the Department can offer if they decide to have a law enforcement funeral.

4. Apprise the survivors of information concerning the death and the continuing investigation.

5. Provide as much assistance as possible, including overseeing travel and lodging arrangements for out-of-town family members, arranging for food for the family, meeting childcare and transportation needs, etc. The Peer Support Commander should contact the MPPOA or AMPS President, or board member if the President is unavailable, to discuss and coordinate financial and other logistics associated with these needs.

6. Work with the Benefits Coordinator to obtain needed information from the family for benefit processing, as well as keeping the family apprised of the progress with the death benefits.

7. Work with the deceased officer's district command to ensure that the officer's personal property is returned to the family.

8. Work with the department coordinator regarding "Donations" to the family.
9. If no court proceedings surround the circumstances of the member's death, the Family Liaison Officer will relay all details of the incident to the family at the earliest opportunity. If criminal violations surround the death, the Family Liaison Officer will:
   a. Inform the family of all new developments prior to press release.
   b. Keep the family apprised of legal proceedings.
   c. Introduce the family to the Dane County Crime Response Program and the Dane County Victim/Witness coordinator.
   d. Arrange for investigators and prosecutor(s) to meet with the survivors, at the earliest opportunity before and following any trial, to answer all their questions.
10. The Family Liaison Officer acts as a long-term liaison with the survivors to ensure that, if desired, close contact is maintained between the MPD and the survivors and that their needs are met.

K. Role of the Employee Designated Representative (EDR)

1. This person is predetermined and of the deceased officer's choosing.
2. This person is identified when MPD commanders access your Emergency Death Information Packet (Form A), which is stored in the employee's personnel file in LERMS.
3. If an officer did not identify an Employee Designated Representative on the Emergency Notification Form, the department may appoint one if requested.
4. The Employee Designated Representative will coordinate with the Family Liaison Officer.

L.    Duties of the Honor Guard Commander

1. This is the person who will oversee and coordinate the planning and implementation of all aspects of the funeral arrangements. The Honor Guard Commander will also be primarily responsible for external communications to the greater law enforcement community. This person will report directly to the Incident Commander.
2. Notify the Law Enforcement Death Response Team (LEDR). This notification can be made by contacting the Wisconsin State Patrol Regional Post, where all contact information for the LEDR Team is maintained. LEDR Team contact information is also located at www.wichiefs.org.
3. Work with the Incident Commander and the Notification Team with regard to timely release of initial information via TTY and email. Details of arrangements should be withheld until completely verified; once that happens, subsequent TTY and email release should be considered.
4. Coordinate all movement of the deceased in a ceremonious fashion. This includes any procession from the hospital to the morgue.
5. As soon as possible, arrange for a 24-hour guard that is posted to stay with the fallen officer. While this is a function of the Honor Guard, other sworn employees of the agency can be assigned this role. This 24-hour-a-day posting should start at a minimum following the release of the deceased by the Medical Examiner.
6. As soon as feasible and practical, in conjunction with the Family Liaison Officers, meet with the survivors to determine their wishes regarding MPD participation in the preparation of the funeral or services. Any information in the employee packet shall be shared with the family at this time. The family shall be assured that the MPD is willing and able to coordinate all arrangements, but no decisions will be made without their input and approval (Should the family elect to not have a law enforcement funeral, the Chief must consider holding a Department memorial service in recognition of the need for co-workers to grieve and experience some closure to the line of duty death).
7. Work closely with the family-identified Funeral Director and Clergy to develop arrangements. Attention will be given to selecting venues that will be capable of accommodating the large law enforcement response, and in the absence of such venues, developing contingency plans, as needed.

HKThefts_Madison_00033205

8. In accordance with Honor Guard Policy, ceremonial aspects of the visitation and funeral arrangements will be planned by the Honor Guard Coordinator.
9. Determine what public safety, church, fraternal, and labor organizations will provide in terms of financial assistance for out-of-town family travel, food for funeral attendees following the burial, etc.
10. Evaluate the necessity of reaching out other Honor Guard resources.
11. For the funeral, if necessary:
    a. Designate a *Logistics Lead* whose responsibilities include the following:
        I. Arrange for adequate water/food at each venue.
        II. Arrange for portable restrooms, if needed.
        III. If deemed necessary, arrange for bus transportation from alternate staging/parking locations to venues.
        IV. Responsible for copying and distribution of funeral instructions for visiting agencies.
        V. Responsible for documenting all visiting agencies and dignitaries.
        VI. If directed, coordinate having someone video record services and document agencies present.
    b. Designate a *Traffic Coordinator* whose responsibilities include the following:
        I. Coordinate/Manage traffic and parking at each venue including visitation, funeral, cemetery, and any fellowship function.
        II. Collaborate with any involved jurisdictions for needed traffic control for visitation, funeral, and procession.
        III. Under direction of the Honor Guard Commander, direct the assembly of the squad and vehicle procession.
        IV. Pre-plan and designate the procession route in consultation with the Honor Guard Commander.

M.    Duties of the Internal Communications Commander

1. This person will coordinate the internal communications related to the line of duty death including, but not limited to, support services updates, investigative updates, and ceremonial activities. This person will report to the Incident Commander, but will also be in regular contact with the Investigative Commander, and the Support Commander and will share and coordinate information from these branches to MPD personnel at regular intervals.
2. Coordinate timely department-wide notifications, releasing factual information with directives regarding confidentiality.
3. This person will coordinate with the Public Information Officer (PIO) regarding external communications.

N.    Duties of the PIO

1. This person will be responsible for external communications regarding the incident.
2. This person must coordinate all external releases of information regarding the incident with the Internal Communications Commander.
3. The name of the decedent should be withheld until survivors are notified.
4. If the media learns the identity of the decedent prior to notifications, the PIO will request the name be withheld until proper notification can be made to the survivors.

O.    Duties of the Staffing Commander

1. This person is responsible for ensuring the staffing of all critical department assignments through the conclusion of ceremonies related to the line of duty death.
2. If necessary, coordinate deployment of outside law enforcement agencies to cover functions of patrol services at the time of the funeral, if deemed necessary.

HKThefts_Madison_00033206

3. Coordinate extra patrol of family residence throughout all phases of the planning, visitation, and funeral.

P.   Duties of the District

1. Ensure that involved personnel have had appropriate opportunities to contact family members, Union officials, and/or attorneys.
2. Coordinate with the Support Commander to ensure that EAP and trauma services have been offered.
3. Ensure that regular command updates are given to the Chief and Assistant Chief of Operations.
4. If applicable, ensure that the Significant Exposure to Blood Borne Pathogens SOP is followed.
5. Responsible for Community Care tasks.
6. Arrange for the cleaning out of the employee's workspace and/or locker, as well as the delivery of the employee's personal belongings to the family at an appropriate time. This should be coordinated through the Family Liaison Officer.

Q.   Duties of the Support Commander

1. This position is typically assigned to an MPD Assistant Chief or Captain and will be primarily focused on providing support to commissioned and non-commissioned personnel. This support will come in many forms including, but not limited to, Peer Support, EAP, LEDR, and Finance (Benefits). This person will typically be the Peer Support Captain.
2. Ensure that the Wisconsin Law Enforcement Death Response (LEDR) Team has been contacted at (866)410-5337.
3. Designate a Peer Support Commander of the Family Liaison Officers.
4. Designate an Internally Focused Peer Support Supervisor and ensure that Peer Support is immediately activated.
5. Notify City of Madison Risk Management within 24 hours of the event.

R.   Duties of the Internally Focused Peer Support Supervisor

1. This person is responsible for coordinating MPD's internal EAP, Peer Support, and CISM resources in response to a line of duty death. This assignment reports to the Support Commander.
2. Ensure that police witnesses and other employees, who may be emotionally affected by the death of another employee, will be afforded the opportunity to attend a Critical Incident Stress Management (CISM) debriefing held by a trained mental health professional (EAP).
3. Ensure that services of the LEDR Team, as well as the Department's contracted Employee Assistance Program (EAP) provider is activated immediately.
4. Coordinate all EAP, Peer Support and CISM response.

   i.   EAP responsibilities:
        1. Coordinate a CISM response for the involved officers.
        2. Coordinate a CISM response for MPD command staff.
        3. Provide grief support services for all impacted MPD employees (civilian and commissioned)
   ii.  Peer Support Responsibilities:
        1. Assist EAP staff in identifying impacted MPD personnel and coordinating CISM response.
        2. Provide a supportive presence at the Districts.
        3. Conduct follow up check-ins as requested.
        4. Provide grief support to impacted MPD personnel if/when requested.

HKThefts_Madison_00033207

LINE OF DUTY DEATH OF AN EMPLOYEE                                   STANDARD OPERATING PROCEDURE

S.    Duties of the Benefits Coordinator

1.  This role will typically be filled the MPD Human Resources Coordinator.
2.  This person will work with benefits specialists from LEDR and Concerns of Police Survivors (COPS) to ensure every available survivor benefit is explored.
3.  This person will coordinate with the Family Liaison Officer(s) to share benefits information with the appropriate survivors.
4.  This person's responsibilities will continue well after the immediate event.
5.  This person will report directly to the Department Support Commander.
6.  This person will be responsible for the following:
    a.  Filing Workers' Compensation claims and related paperwork.
    b.  Contacting the appropriate agencies immediately to ensure that the beneficiary receives death and retirement benefits, the employee's remaining paychecks, and payment for remaining annual and compensatory time.
    c.  Gathering information on all benefit/funeral payments, to include the Federal Public Safety Officers Benefits Act that is available to the family.
    d.  Notifying police organizations, such as Wisconsin Professional Police Association (WPPA), and any other fraternal organizations of which the employee was a member. These organizations may also offer financial assistance with logistical needs of the funeral services.
    e.  Preparing a printout of the various benefits/funeral payments that are due to the family, listing named beneficiaries and contacts at various benefits offices and when they can expect to receive payment.
    f.  Meeting with the surviving family a few days after the funeral to discuss the benefits they will receive, what has been done, as well as what has yet to be completed. A copy of the prepared printout and any other related paperwork should be given to the family at this time.
    g.  If there are surviving children from a former marriage, the guardian of those children should also receive a printout of what benefits the child(ren) may be receiving.
    h.  Attention should be given to the revocation of health care benefits. Many providers allow a 30-day grace period before canceling or imposing monthly payments upon survivors.
    i.  Continue meeting with the family until benefit applications are well underway. Then, meet with the family in four to six months to ensure they are receiving benefits.

T.   Public Safety Officer Death Benefit (PSOB)

1.  Public Safety Officer Death Benefit (PSOB) is a program that provides a death benefit to eligible survivors of a public safety officer whose death is the direct and proximate result of a traumatic injury sustained in the line of duty or certain work-related heart attacks or strokes. To receive a death benefit, the claimant must establish that the public safety officer died as the direct and proximate result of an injury sustained in the line of duty. Under the program, it is presumed that a public safety officer who dies from a heart attack, stroke, or vascular rupture, while engaged in, on duty after, or within 24 hours of participating in a non-routine stressful or strenuous physical law enforcement activity, or other emergency response activity, or a training exercise involving non-routine stressful or strenuous physical activity, has died in the line of duty for death benefit purposes. The PSOB program pays a one-time lump sum death benefit to eligible survivors of a public safety officer killed in the line of duty. The amount paid to the officer's survivors is the amount authorized to-be paid on the date that the officer died, not the amount authorized to-be paid on the date that the claim is approved.
2.  PSOB death benefits are paid to eligible survivors in the following order:

HKThefts_Madison_00033208

a) If the officer is survived by only a spouse and no children, 100% of the death benefit goes to the spouse.

b) If the officer is survived by a spouse and children, 50% of the death benefit goes to the spouse and the remaining 50% is distributed equally among the officer's children.

c) If the officer is survived by only children and not a spouse, the death benefit is equally distributed among the officer's children. If the officer is survived by neither a spouse nor children, the death benefit is paid to the individual(s) designated by the officer in the most recently executed designation of beneficiary on file at the time of the officer's death. If the officer does not have a designation of beneficiary on file, the benefit is paid to the individual(s) designated by the officer in the most recently executed life insurance policy on file at the time of the officer's death.

d) If the officer is survived by neither a spouse nor eligible children and the officer does not have a life insurance policy, the death benefit is equally distributed between the officer's surviving parents.

e) If the officer is survived by neither a spouse, nor eligible children, nor parents, and the officer did not have a designation of beneficiary or a life insurance policy on file at the time of their death, the benefit is paid to surviving adult, non-dependent, children of the officer.

f) A death or disability benefit will not be paid:

   i.   If the fatal or catastrophic injury was caused by the intentional misconduct of the public safety officer or the officer's intention to bring about their death, disability, or injury;

   ii.  If the public safety officer was voluntarily intoxicated at the time of their fatal or catastrophic injury;

   iii. If the public safety officer was performing their duties in a grossly negligent manner at the time of their fatal or catastrophic injury;

   iv.  If an eligible survivor's actions were a substantial contributing factor to the officer's fatal or catastrophic injury.

U.   Continued Support for the Family

1. Members of the Department must remain sensitive to the needs of the survivors long after the member's death. The grief process has no timetable. More than half of the surviving spouses can be expected to develop a post-traumatic stress reaction to the tragedy.

2. Holidays may be especially difficult for the family, particularly if small children are involved. Increase contact with the survivors, as additional support is important at these times.

3. The Chief of Police or a designee should observe the member's death date with a short note to the family, flowers on the grave, and/or wreath placement at the Wisconsin Law Enforcement Officers Memorial.

Original SOP: 05/13/2015
(Reviewed Only: 03/04/2016, 12/20/2016, 12/26/2017, 02/04/2022)
(Revised: 01/15/2019, 01/28/2020, 01/31/2023, 1/23/2024, 09/20/2024, 01/31/2025)
(Name Change and Overhaul of SOP: 01/28/2020 – previously known as Line of Duty, Life-Threatening Injury or Death of an Employee SOP)

HKThefts_Madison_00033209


**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**


## Departmental Awards and Recognition

Eff. Date <mark>1 1/20/2023</mark> <mark>03/28/2025</mark>

## Purpose

The Madison Police Department (MPD) hosts a ceremony on an annual basis where MPD personnel and members of the public are recognized for actions and efforts that are deemed exemplary.

The purpose of this procedure is to clarify the definitions and criteria under which an employee or community member may receive such recognition and the underlying process to recommend and select those individuals.

In no way does the lack of formal recognition through this process intend to dismiss the hard work, sacrifice, and dedication that our employees and our public routinely display. Rather, this process also honors their efforts in our collective service to the City of Madison and our constituents.

## Definitions/Criteria

**DEPARTMENTAL AWARDS**

The number of awards given are not restricted to a certain number (i.e., only one Lifesaving Award, etc.). **However, the Awards Committee will make the determination as to how many people will receive a particular award.**

1.  **Medal of Valor Award:** The Medal of Valor is the highest recognition of achievement presented by the Madison Police Department. The Medal of Valor shall be awarded to department personnel who distinguish themselves with extraordinary individual acts of bravery or heroism above and beyond that which is normally expected in the line of duty and potentially at extreme, life-threatening, personal risk. Personnel must have displayed extreme courage by placing their own safety in immediate peril in the pursuit of their duties. The actions must be so undoubtedly outstanding that they clearly distinguish above the call of duty actions from lesser forms of bravery. If a department member uses poor judgment or procedures that created the necessity for their action, they will not be eligible for this award. **Recipients of the Medal of Valor Award will receive a medal, a certificate by the Chief of Police, and a uniform pin.**

2.  **Meritorious Conduct Award:** The Meritorious Conduct Award shall be awarded to department personnel who distinguish themselves by meritorious achievement or meritorious service. Meritorious actions are those actions that clearly surpass that which is normally required or expected. The degree of merit need not be unique, but must be exceptional and superior. Acts of courage which do not meet the voluntary risk of life requirements for the Medal of Valor Award may be considered for the Meritorious Conduct Award. **Recipients of the Meritorious Conduct Award will receive a medal, a certificate signed by the Chief of Police, and a uniform pin.**

3.  **Meritorious Lifesaving Award:** The Meritorious Lifesaving Award shall be awarded to department personnel or community member(s) for saving a human life under circumstances during which the recipient exposed themselves to either personal risk and/or significant or prolonged hardship. **Recipients of the Meritorious Lifesaving Award will receive a medal, a challenge coin, a certificate signed by the Chief of Police, and a uniform pin. Community member recipients of a Meritorious Lifesaving Award will receive a challenge coin and a certificate signed by the Chief of Police.**

4.  **Lifesaving Award:** <mark>The Lifesaving award shall be awarded to recognize the actions of department personnel or community members that directly resulted in the saving or preservation of human life that otherwise **WOULD** have been lost without the intervention of the department member/community member. These actions can include, but are not limited to, applications of lifesaving medical equipment (tourniquets, chest seals, etc.), direct lifesaving techniques (CCR, Heimlich, etc.), or direct intervention or removal of a subject from an imminently life-threatening situation that did not expose</mark>

HKThefts_Madison_00033210

the recipient of the award to personal risk or prolonged hardship. ~~The Lifesaving Award shall be awarded to recognize the actions of department personnel or community member(s) that resulted in the saving or preservation of human life that otherwise would have been lost without the involvement of the department member/community member.~~ **NOTE**: Routine response to a drug overdose will not be considered for a lifesaving citation or award. Consider an employee recognition for routine response to a drug overdose. If extenuating circumstances were present during an overdose response, see exemplary performance citation. **Recipients of the Lifesaving Award will receive a challenge coin, a certificate signed by the Chief of Police, and a uniform pin. Community member recipients of a Lifesaving Award will receive a challenge coin and a certificate signed by the Chief of Police.**

5.     **Blue Star Award:** The Blue Star shall be awarded to department personnel who receive an injury of a degree necessitating hospitalization or the immediate care of a physician. This injury must be of a serious nature, capable of causing death or extended disability. To qualify for this award, the injury must be attributable to the deliberate actions of another directed toward the recipient or another person, or during the commission of a crime or attempted apprehension of the perpetrator, or in an attempt to save a human life placing oneself in immediate peril. **Recipients of the Blue Star Award will receive a medal, a certificate signed by the Chief of Police, and a uniform pin.**

6.     **Community Member Recognition Award:** The Community Member Recognition Award is awarded for acts of service to the department and community under circumstances involving bravery, personal risk, or significant hardship on the part of a community member. **Recipients of the Community Member Recognition Award will receive a challenge coin and a certificate signed by the Chief of Police.**

7.     **Outstanding Service Award:** Outstanding service represents performance by a department employee, ~~during a period of 12 months or more~~ that demonstrates a quality and/or quantity of work clearly and significantly exceeding the requirements of a position. This would also include work-related act(s) by an employee that results in exceptional performance on a special project, or occurrences in which the employee has demonstrated exceptional knowledge, skills, or ability within the scope of assigned duties and responsibilities. An employee who has demonstrated sustained community service, either on or off duty, is eligible for this award, including an employee who has shown exceptional creativity, initiative, and/or determination in finding solutions to a problem utilizing a problem solving approach. Problem-Solving efforts that will be recognized through this award will have had a significant impact on either the community and/or the department. **Recipients of the Outstanding Service Award will receive a challenge coin and a certificate signed by the Chief of Police.**

8.     **Outstanding Support Award:** This award is intended for an individual who is not employed by the Madison Police Department, but who, in their profession, has supported the Madison Police Department in an extraordinary effort. This would include, but not be limited to, other police agencies, Probation and Parole, Human Services, or other agencies that through a collaborative effort work with the police department. Individuals who volunteer their time to the Madison Police Department are eligible for this award. **Recipients of the Outstanding Support Award will receive a challenge coin and a certificate signed by the Chief of Police.**

## CHIEF'S CITATIONS

There are circumstances when an employee or community member engages in behavior or activity that does not meet the criteria for a departmental award, but exceeds the level and scope of conduct normally acknowledged through a supervisory commendation or performance recognition. Those occurrences should be submitted to the Chief and Awards Committee for consideration for a Chief's Citation. The following four categories are the most common application of the Chief's Citation, although other circumstances may be considered at the discretion of the Chief of Police.

9.     **Lifesaving Citation:** The Lifesaving Citation shall be awarded to departmental personnel to recognize exemplary actions taken that contributed to the preservation of human life that **COULD** have been lost without the involvement of the department member. These actions can include but are not limited to exemplary response to individuals exhibiting suicidal behaviors, exemplary performance in locating missing individuals when there are clear dangers to the missing person (e.g. dangerous

HKThefts_Madison_00033211

weather), and other situations where the officers' actions were exemplary and contributed to the preservation of human life. **NOTE**: Routine response to a drug overdose will not be considered for a lifesaving citation or award. Consider an employee recognition for routine response to a drug overdose. If extenuating circumstances were present during an overdose response, see exemplary performance citation. Lifesaving efforts which do not involve personal risk, prolonged direct exposure, or significant hardship still have a dramatic impact on those constituents who are recipients of that assistance and should be recognized. ~~Department members who receive this citation must have taken lifesaving measures that are above and beyond what would be available to the general public (i.e., Naloxone). Those department members and/or community members who engage in lifesaving efforts that do not meet the criteria for a Lifesaving Award should be considered for a Chief's Citation for Lifesaving.~~ **Recipients of the Chief's Citation for Lifesaving will receive a certificate signed by the Chief of Police.**

10.     **Community Member Assistance Citation:** Community Member action which does not meet the criteria for a Community Member Recognition Award, but still involves a significant level of assistance by a community member that benefits the community and the department, should be considered for a Chief's Citation for Community Member Assistance. **Recipients of the Chief's Citation for Community Member Assistance will receive a certificate signed by the Chief of Police.**

11.     **Problem-Solving Citation:** Awarded to a Madison Police Department employee who has shown creativity, initiative, and/or determination to find solutions to a problem utilizing a problem solving approach to identify and effectively deal with a problem(s) that if not addressed, would continue to negatively impact the department and/or community. **Recipients of the Chief's Citation for Problem-Solving will receive a certificate signed by the Chief of Police.**

12.     **Exemplary Performance Citation:** Awarded to a Madison Police Department employee who has demonstrated exemplary performance in their service to the department and/or the community through work on a specific project(s) or performance during a specific incident(s). This citation should be considered when the employee's contributions do not meet the criteria for an Outstanding Service Award or Meritorious Conduct Medal. **Recipients of the Chief's Citation for Exemplary Performance will receive a certificate signed by the Chief of Police.**

## COMMENDATIONS/RECOGNITIONS

There are occasions when community members, co-workers, supervisors, and commanders recognize the work and performance of commissioned and civilian employees.

When this occurs, an Employee Recognition form should be completed. If the personnel listed should be considered for an award, the "Consider for Department Award" area of the employee recognition form should be completed. Completing this portion of the form will route the recognition form to the awards committee through the Public Information Officer.

Should a Community Member Commendation meet the criteria for either a Departmental Award or Chief's Citation, a Departmental Award/Chief's Citation Nomination Form must be completed and the related process followed as prescribed below.

A copy of the letter with explanation of the award/recognition will be placed in the employee's personnel file.

## Procedure

### ELIGIBILITY

Any commissioned or non-commissioned member of the MPD is eligible for a Departmental Award or Chief's Citation, except the Community Member Recognition Award and the Outstanding Support Award. A recipient can only obtain one award for each recognized event, except for the Blue Star Award. The recipient should be given the highest award for which they are eligible.

HKThefts_Madison_00033212

Community members are eligible for the Community Member Recognition, Meritorious Lifesaving, Lifesaving, and Outstanding Support Awards. Community members may also be eligible for a Chief's Citation for Lifesaving and Community Member Assistance.

Any MPD employee is eligible for an Employee Commendation/Recognition. Community members may be issued a Commendation letter in those circumstances where a Chief's Citation is not appropriate.

The incident that is being nominated for an award/citation must have taken place in the calendar year prior to the awards ceremony (example: an incident that occurred January 1-December 31, 2019 is only eligible for nomination in the 2020 process).

## NOMINATION PROCESS

A nomination can come from any source. However, if a supervisor/commander becomes aware of an event or performance that would make an individual eligible for a Departmental Award or a Chief's Citation, that supervisor/commander shall complete a nomination form or direct a person with the most direct knowledge of the event to submit a nomination form with assistance from the supervisor/commander.

## NOMINATION COMMITTEE

Each year, the MPD Human Resources Coordinator or Chief's designee will be responsible for selecting members of the Nomination Committee. The committee will be comprised of at least 12 members as designated below. Additional members can be added to ensure the integrity of the selection process. The purpose of the committee is to review all nomination forms collected by the Chief's Office. The MPD Human Resources Coordinator will select all the members of the Nomination Committee, except for the Madison Professional Police Officers Association (MPPOA) Representative, who will be designated by the MPPOA President.

Committee members will serve between three and five years, except for the MPD Human Resources Coordinator or Chief's designee. The MPD Human Resources Coordinator will ensure "continuity of experience" when establishing the committee.

The committee will meet once a year (or as needed) to make recommendations as to which individuals qualify for the above-mentioned awards. The MPD Human Resource Coordinator will provide the committee's recommendations to the Assistant Chief of Support and Community Outreach for review. The Assistant Chief of Support and Community Outreach will take any necessary declined awards/citations to the Chief of Police for their final review.

The MPD Human Resource Coordinator will contact the nominator of the individual(s) who were not selected for a Departmental Award after they have been provided the approved recommendations from the Chief. The nominator will be notified their nomination was not approved. After notification, the decision can be appealed within a 10 day period. That appeal consists of an email to the Chief of Police and to the Police Executive Office Supervisor to the Chief of Police. *The Chief of Police will have final decision on the appeal*.

The awards presentation will coincide around National Law Enforcement Week in May of each year. The Awards Committee will consist of:
1.    Officer Advisory Committee Representative
2.    MPPOA Board Representative
3.    Public Information Officer
4.    MPD Human Resources Coordinator (or Chief's designee)
5.    Community Representative (non-MPD employee)
6.    Local 6000 member of MPD
7.    Civilian Advisory Committee Representative
8.    Sergeant
9.    Detective
10.   Investigator

HKThefts_Madison_00033213

DEPARTMENTAL AWARDS AND RECOGNITION                                   STANDARD OPERATING PROCEDURE

11.     Lieutenant
12.     Civilian member of MPD
13.     Civilian Supervisor
14.     Alternate Member **(optional)**

The MPD Human Resources Coordinator will make every effort to ensure that the Awards Committee has a diverse membership, consistent with other MPD processes.

## WEARING OF PINS

An officer has the option to wear the approved uniform pin for the Medal of Valor, Meritorious Lifesaving Award, Lifesaving Award, Meritorious Conduct Medal, and the Blue Star Award.

## NOMINATION FORM

A specific form (Departmental Award/Chief's Citation Nomination Form) has been developed to be utilized by all personnel for the purpose of recommending an employee or community member for either a Departmental Award or a Chief's Citation. An Employee Recognition form could alternatively be completed for MPD employees and the checkbox on the employee recognition form to be considered for an award shall be checked. This will route the recognition form to the awards committee through the Chief's Office. Both forms can be located on MPD's intranet.

Original SOP: 04/08/2015
(Revised: 03/04/2016, 04/07/2016, 01/13/2017, 10/19/2020, 05/28/2021, 03/13/2023, 11/20/2023, 03/28/2025)
(Reviewed Only: 12/26/2017, 01/31/2020)

HKThefts_Madison_00033214


**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**


**Interactions with Youth**

Eff. Date ~~12/30/2019~~ 02/03/2025

## Purpose

The purpose of this standard operating procedure is to provide guidelines for interactions with youth by Madison Police Department (MPD) officers. MPD recognizes that youth are psychologically, emotionally, and physically different than adults. These differences require officers to be aware of the unique circumstances and needs youth may have when interacting with youth during the scope of their duties. Officers should be aware of the typical developmental tendencies of youth to react anxiously, distrustfully, or defiantly to unfamiliar individuals, particularly those in positions of power and authority.

Research has shown that adolescent brains are not fully developed until the age of 25. As a result, youth do not process advanced thought, reasoning, or impulses the same as adults. Most youth will naturally age out of lawbreaking behavior, even without any intervention from the justice system. Research has also shown that diversion generally decreases a young person's likelihood of re-arrest as compared with formal justice system involvement.

There are instances where alternatives to an arrest or citation will lead to better outcomes for the youth and for the community. MPD is committed to exercising alternatives to arrest and citation for young people whenever possible, consistent with public safety.

MPD is also committed to reducing the overrepresentation of youth of color in the criminal justice system. MPD is committed to the pursuit of equitable policing practices to forge positive relationships and build trust between law enforcement and communities of color.

## Definitions

### Youth

A person who is under 17 years old.

## Procedure

### Contact Standards

When interacting with youth, MPD officers should follow the guidelines outlined below:

1.  Ask individuals their age and not make assumptions about how old they are.

2.  Clearly explain what action the officer is taking (including what the action will entail), why the officer is taking the actions that he or she is taking, as well as the consequences if the youth does not follow instructions. Youth may require significantly more explanation ~~about what is happening and why~~ than adults.

3.  Recognize that a youth ~~young person~~ may not comply right away with orders or directives and that multiple attempts may be needed for the youth to fully understand. Officers should make efforts to slow down and not rush through interactions absent an emergency situation.

4.  When feasible, seek specific information about individual youths that may ~~able, consult applicable SharePoint bulletins, case notes, and mental health dispatch notes to~~ identify potential rapport-building techniques ~~triggers~~ and special considerations for that youth.

HKThefts_Madison_00033215

## Use of De-Escalation Techniques

Officers should use de-escalation techniques with youth, consistent with their training and the MPD Standard Operating Procedure (SOP).

Youth often respond to tone more immediately than verbal directives, which can easily lead to an unexpected and unhelpful response to a simple request or instruction. Officers can minimize that potential by:

1. Using a calm and measured tone to gain voluntary compliance;

2. Using simple, concrete language and short direct phrases, using affirmative rather than negative commands, e.g. *do* versus *don't*;

3. Using repetition in a clear voice to reinforce instructions;

4. Repeating back what youth say to demonstrate officers' understanding of the youth's statements, offer an opportunity for clarification, and slow down the interaction;

5. Not using threats, intimidation, or other gestures or behaviors that may be seen as aggressive, to gain compliance;

6. Clearly explaining why the officer is taking the actions that the officer he or she is taking, as well as the consequences if a young person does not follow instructions;

7. Allowing youth to make choices when appropriate, even if it is only the appearance of a choice to gain compliance, and;

8. Allowing time for youth to comply, including consideration of the environment and competing stimulus (e.g. sirens, flashing lights, noise, commotion).

Original SOP: 12/30/2019
(Reviewed Only: 01/11/2021, 02/04/2022, 01/31/2023, 02/05/2024)
(Revised: 02/03/2025)



**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

**Interactions with Transgender and**
**Gender Non-Conforming Individuals**



Eff. Date 03/08/2024 03/04/2025

## Purpose

The purpose of this standard operating procedure (SOP) is to establish guidelines and expectations for Madison Police Department response for services with the transgender community and gender non-conforming individuals. Consistent with our MPD Core Values, we strive to deliver the highest service possible.

## Definitions

Cisgender: A term used to describe people who identify with the sex they were assigned at birth.

Gender Non-Conforming: A term for individuals whose gender expression does not fall within traditional expectations of masculine or feminine gender.

Gender Expression: One's external expression of self, not necessarily related to one's gender identity.

Gender Identity: One's internal sense of their gender.

Sex Assigned at Birth: A label usually applied at birth by a healthcare professional based on examination of the child's external anatomy. The assignment of biological sex at birth. The assigned sex may or may not reflect one's gender identity, gender expression, or body presentation.

Sexual Orientation: The type of sexual, romantic, emotional/spiritual attraction one feels for others.

Transgender: An umbrella term for persons whose gender identity or gender expression does not conform to that typically associated with the sex which they were assigned at birth.

## Procedure

A. Employees should address transgender and gender non-conforming individuals by the individuals' expressed chosen name and pronouns, individual's expressed preference, even if the individual has not received legal recognition of the chosen name.

B. In addressing or discussing a transgender or gender non-conforming individual, employees should use the chosen preferred personal pronouns for that individual (e.g., she/her/hers, he/him/his, they/them/theirs, etc.). If an employee is uncertain about which personal pronouns to use, the employee shall should respectfully and mindfully ask the individual which pronouns would be chosen preferred. If an employee is uncertain about which chosen pronouns to use, the employee should respectfully and mindfully ask the individual.

C. Employees shall not use language that a reasonable person would consider demeaning or derogatory; in particular, language aimed at a person's actual or perceived gender identity, gender expression, or sexual orientation.

D. Employees shall not make assumptions regarding an individual's sexual orientation based on the individual's gender identity or expression.

E. Employees shall not disclose an individual's transgender or gender non-conforming identity to any other person or group absent a proper law enforcement purpose.

HKThefts_Madison_00033217

F.  Officers should be cognizant of the fact that transgender and gender non-conforming individuals may have unique medical needs and good faith efforts should be taken to facilitate those known/expressed conditions requiring a timely medical response.

G.  All searches shall be done in compliance with the MPD SOP on Searches.

## Records: Name and Gender Classification for Data/Report Purposes

A.  For all subjects, officers shall report the biological sex of the person as it appears on an official government identification. Other names used should be entered into the report/law enforcement records management system (LERMS) as an alias.

B.  When completing narratives that include transgender or gender non-conforming individuals, officers will note the individual's legal information in the report; however, the individual's chosen name and personal pronouns will be used during the body/narrative of the report.

Original SOP: 07/19/2018
(Revised: 08/13/2018, 03/08/2024, 03/04/2025)
(Reviewed Only: 01/31/2020, 02/04/2022)

HKThefts_Madison_00033218



**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**



## Language Access Services

Eff. Date 01/31/2023 02/03/2025

## Purpose

The Madison Police Department (MPD) is committed to providing equal opportunity and equal access to all police resources and services in order to ensure full compliance with all civil rights laws. These guidelines further the MPD's commitment to broadening access to its services for our increasingly diverse residents, including those for whom which English is not their primary first language.

Language barriers can sometimes inhibit or even prohibit individuals with Limited English proficiency (LEP) from accessing and/or understanding important rights, obligations, and services, or from communicating accurately and effectively in difficult situations. Hampered communication with LEP victims, witnesses, alleged perpetrators, and community members can present the MPD with safety, evidentiary, and ethical challenges. Ensuring maximum communication ability between police officers and all segments of the community serves the interests of all.

## Definitions

1. **Primary Language:** A primary language is an individual's native tongue or the language in which an individual most effectively communicates. The MPD should make every effort to ascertain an individual's primary language to ensure effective communication.

2. **Limited English Proficiency (LEP):** Limited English Proficiency designates individuals whose primary language is not English and who have a limited ability to read, write, speak, or understand English. This includes individuals who are deaf and hard of hearing.

3. **Interpretation:** Interpretation is the act of listening to a communication in one language (source language) and orally converting it to another language (target language) while retaining the same meaning.

4. **Translation:** Translation is the replacement of written text from one language (source language) into an equivalent written text in another language (target language).

5. **Bilingual:** Bilingual refers to the ability to use two languages proficiently.

6. **MPD Bilingual Employee:** An MPD bilingual employee is an MPD employee who has been identified during the hiring process as being able to speak, read, and/or write a foreign language and who can communicate directly and accurately both in English and another language. Bilingual employees may be fluent enough to communicate in a non-English language but may not be sufficiently fluent to interpret or translate from one language into another.

## Procedure

It is the standard operating procedure (SOP) of the MPD that employees members will take reasonable steps to provide timely, meaningful access for persons with limited English Proficiency (LEP) to the services and benefits the MPD provides.

In implementing this SOP, the MPD will inform members of the public that language access assistance services are available free of charge as part of the MPD's community policing, outreach, and enforcement efforts. All MPD personnel shall provide free language assistance services to LEP individuals whenever the individual requests language access assistance services or if it is evident that the individual is unable to effectively read, write, or understand English.

HKThefts_Madison_00033219

When available, MPD will attempt to use commissioned officers for interpretation/translation services. In the event an officer is not available, civilian employees may be considered to assist in translating. The following guidelines should be used:

- Contact the Officer-in-Charge (OIC) to discuss the case and determine if commissioned personnel are available.
- In the event civilians are to be used, consideration shall be given to the following:
    - Any request to use a civilian employee must first be approved by their supervisor before initiating contact with the employee.
    - Nature of the request (criminal investigation, obtaining information).
    - How extensive will their involvement be, where, in time, follow-up, potential court testimony, etc.
    - Safety of employee (in-person/by phone), officer should stand by.
    - Any personal conflicts for the employee to become involved.

While the employee can request not to provide translation, due to exceptional circumstances, the OIC or an MPD commander will have the final authority in deciding their use based on the needs of the MPD.

If an ~~qualified~~ MPD bilingual employee is not available, a certified interpreter can be accessed 24 hours/day seven days/week by the MPD via various services contracted by the City of Madison and the Dane County 911 Center including in-person assistance, telephonic interpretation, and/or audio-visual aids. The OIC will maintain contact information to provide to all employees when needed.

Using family, friends, bystanders or others to interpret creates the potential for a breach of confidentiality, conflict of interest, or inadequate interpretation. MPD personnel should not request the assistance of family, friends, or bystanders to serve as interpreters when communicating with an LEP individual who is the subject of a criminal investigation unless exigent circumstances exist and no MPD or City resources are available to assist. If this occurs, the non-availability of MPD or City resources should be documented in the officer's report. When interacting with an LEP individual in an informal, non-confrontational context (when the LEP individual is not the subject of a criminal investigation), officers may use friends, family, or bystanders to serve as interpreters if the LEP individual requests that the third party assist and the third party agrees to do so. Barring exigent circumstances or non-arrest situations, MPD personnel should avoid using minor children to provide interpretation assistance.

When considering requesting interpretation assistance from outside agency professionals (social workers, medical staff, etc.) MPD personnel should be cognizant of the potential for conflict of interest and breach of confidentiality. These requests should generally be avoided when communicating with an LEP individual who is the subject of a criminal investigation unless exigent circumstances exist and no MPD or City resources are available to assist. MPD personnel may request translation assistance from Dane County Human Services (DCHS) employees; the decision to assist is that of the individual.

## Definitions

7.  **Primary Language:** A primary language is an individual's native tongue or the language in which an individual most effectively communicates. The MPD should make every effort to ascertain an individual's primary language to ensure effective communication.

8.  **Limited English Proficiency (LEP):** Limited English Proficiency designates individuals whose primary language is not English and who have a limited ability to read, write, speak, or understand English. This includes individuals who are deaf and hard of hearing.

9.  **Interpretation:** Interpretation is the act of listening to a communication in one language (source language) and orally converting it to another language (target language) while retaining the same meaning.

10.    **Translation:** Translation is the replacement of written text from one language (source language) into an equivalent written text in another language (target language).

11.    **Bilingual:** Bilingual refers to the ability to use two languages proficiently.

12.    **MPD Qualified Bilingual Member:** An MPD qualified bilingual member is a bilingual employee, who has identified themselves during the hiring process as being able to speak, read, and/or write a foreign language and who has the ability to communicate directly and accurately both in English and another language. Bilingual members may be fluent enough to communicate in a non-English language, but may not be sufficiently fluent to interpret or translate from one language into another.

13.    **MPD Authorized/Qualified List:** The qualified list is an accounting of the MPD personnel who are bilingual and are authorized to act as interpreters and bilingual communicators. This list will be updated and modified on a yearly basis.

## Public Notification of MPD Services

1.    At each MPD building public entry point and lobby, signage shall be posted in multiple languages stating that interpreters are available free of charge to LEP individuals.

2.    MPD shall post notification in the public lobby of each district station, in multiple languages, to inform LEP individuals of the availability of translated forms and documents in the public lobby of each district station to inform LEP person about which forms are translated.

3.    Additionally, language identification cards will be posted to enable the LEP person to point to the language they speak so the employee can inform the chosen interpretation service of the language required for interpretation.

## Translation of Written Material

1.    This plan shall be translated into Spanish (and other languages as deemed appropriate per the City of Madison's Language Access Plan (LAP) if deemed appropriate) and will be made available in Spanish in any locations where the plan is posted in English.

2.    In addition, the MPD will translate written materials that are distributed to the public (pamphlets, fliers, notices, posters, etc.) when reasonable.

3.    Additional languages will be added or removed as deemed necessary by the City of Madison's LAP through annual reviews conducted.

## Website

The MPD will post various items on its website that are translated into Spanish languages identified by the City of Madison's LAP; such items include forms, community-related announcements, and other information.

## Cellular Phones

The MPD will provide cell phones to patrol officers with the Language Line number programmed to provide access to language interpretation services to members in the field.

## Complaints

The MPD will offer a variety of ways in which LEP individuals can file a complaint against an employee. Community members can file a complaint online through our website, via telephone, in person, or by picking up a paper form at any of the district stations or public libraries.

HKThefts_Madison_00033221

Original SOP: 11/03/2015
(Revised: 02/29/2016, 10/25/2018, 01/31/2023, 02/03/2025)
(Reviewed Only: 12/22/2016, 12/26/2017, 01/11/2021)

HKThefts_Madison_00033222



**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**



## Major Case Investigations

Eff. Date ~~01/31/2023~~ 02/03/2025

## Violent Crime Unit (VCU) Major Cases

**INITIAL CONTACT/ASSIGNMENTS**

Upon receiving any of the following calls for service, the nearest available officer and supervisor will be dispatched to the scene and/or victim's location:

1.  Homicide or attempted homicide
2.  Any death that is not attended by a physician
3.  Any serious injury and/or condition where there is reason to suspect the injury/condition was caused by the act or omission of another or the cause is unknown
4.  Any death or serious injury involving a motor vehicle (MV) where there is intent to injure or kill (MV accidents, however negligent, will be investigated in accordance with the Investigation of Motor Vehicle Crashes Involving Serious Injury or Death procedure)
5.  Any weapons violation believed to have just occurred or in progress

The supervisor at the scene shall ensure that the Officer in Charge (OIC) is notified and advised of the circumstances surrounding the incident as soon as practicable.

When a major case, typically a homicide (or attempted homicide that might require a Command Post (CP)) has occurred, the OIC or field supervisor should:

- If normal VCU working hours, contact the VCU Detective Sergeant directly.
- If outside normal VCU working hours, the Lieutenant of Investigative Services should be called per current practice.

If the Lieutenant of Investigative Services determines the case will likely fall within the scope of VCU responsibility, the VCU Detective Sergeants should be contacted. If the Lieutenant of Investigative Services is unavailable, one of the off-duty VCU Detective Sergeants should be contacted. If Investigative Services Lieutenant or Sergeants are unavailable, the Investigative Services Captain should be contacted. If it is unclear whether the incident should be investigated by VCU or by another specialty unit, the Investigative Services Captain and the Captain of the district where the incident occurred should be contacted to discuss the circumstances and determine the appropriate assignment.

The Officer in Charge will ensure the notifications are made to the following per current protocol:

- Madison Police Department (MPD) Chief
- Assistant Chiefs
- District Command staff

If the determination is made that the incident is a major case requiring a command post, the VCU will have overall responsibility for managing the incident and the command post. Generally, a command post should be established—and an incident considered a major case—if it is a serious offense requiring significant coordination of investigative resources. The District Captain, Assistant Chief of Investigative and Specialized Services, and Assistant Chief of Operations should be contacted as soon as reasonable.

The need for a Command Post in other types of crimes where the VCU is the primary investigating unit is possible and that decision can be made on a case specific basis by unit supervisors.

The decision to establish a Command Post should be made after consulting with a Detective Sergeant of the Violent Crime Unit, or with the Investigative Services Lieutenant. If neither of these are available, the Investigative Services Captain should be contacted.
The Investigative Services Lieutenant is responsible for determining what resources are needed and for ensuring that those resources are contacted. The Investigative Services Lieutenant and VCU Detective

HKThefts_Madison_00033223

Sergeant will be responsible for designating a lead detective. The Investigative Lieutenant should consider utilizing detectives from other specialized units, such as the Persons Crimes Unit to supplement VCU detectives. One district detective should to be assigned as the primary district detective who will be imbedded in the VCU until it is mutually agreed upon for that detective to return to their district.

## COMMAND POST

A command post will be set up to direct the overall operation of the investigation. The Investigative Services Lieutenant will select the location of the command post based on the needs of the case (typically the appropriate district station). The CP will be run out of this district, ideally for the first 24-48 hours (as the investigation dictates); then, if it is necessary for the CP to continue operations after this time, the CP will be transferred to the Central District Incident Command Room.

While the needs of cases vary, it is recommended that the command post be staffed as follows (in an effort to maintain consistency within Command Posts):
- Investigative Lieutenant (overall incident commander); if the Investigative Services Lieutenant is unavailable, this position should be filled by another Investigative Commander (generally a district such as a Detective Lieutenant)
- VCU Detective Sergeant
- Criminal Intelligence Section (CIS) Personnel
- Logistics Officer, (if needed)
- Command Post Assistant or Investigative Support Officer (if needed)

Back up to the following personnel should be as follows:
- Investigative Services should be relieved by another the designated District Detective Lieutenant
- VCU Detective Sergeant should be relieved by the other VCU Detective Sergeant or the Burglary/Property Crime or Special Victims Unit the BCU Detective Sergeant
- If the other VCU Detective Sergeants or the BCU Detective Sergeant is are not available, this role can be filled by the District Detective Lieutenant if it is determined necessary

## RESPONSIBILITIES

### Investigative Captain

- Make appropriate notifications, as needed:
  - Chiefs
  - District Command
  - District Attorney's (DA's) office (if appropriate and in all homicide cases)
- Ensure Investigative Lieutenant has necessary resources
- Keep Chief and Assistant Chiefs apprised of investigation
- Communicate with MPD Finance Section staff for Association of Madison Police Supervisors (AMPS) overtime implications

### Investigative Lieutenant and Detective Sergeant

- Overall management of the case
- Identify Lead and Scene Detectives
- Make investigative assignments:
  - Designate lead detective
  - Designate lieutenant (if needed/available) and detective to oversee each scene
  - Coordinate investigative response to hospitals (if appropriate)
  - Designate detective to serve as liaison to victim families
  - Coordinate MPD detectives presence at autopsy (if appropriate)

HKThefts_Madison_00033224

MAJOR CASE INVESTIGATIONS                                          STANDARD OPERATING PROCEDURE

- ~~Work with District Detective Lieutenant to designate primary district detective assigned to VCU~~
  - Identify and coordinate other investigative tasks, as needed
- Communicate and coordinate efforts with the designated scene supervisor
- Communicate and coordinate efforts with CIS Supervisor
- Communicate and coordinate efforts with Case Lead Detective
- Communicate with the OIC
- Communicate with Command Staff
- Designate case as "Extraordinary" for TeleStaff/payroll purposes, if appropriate
- Communicate with MPD Finance Section staff for case number cost accounting
- Facilitate the release of information to MPD personnel through briefing and other police agencies
- Collaborate with the Public Information Officer (PIO), case detective, Investigative Captain, and District Captain on case press releases
- Communicate with District Attorney staff and case detective
- Review reports for investigative leads
- Management of personnel (assignments, monitoring hours worked, etc.)
- Managing overtime and arranging relief for Investigative personnel
- Evaluate need for support staff, such as Gang and Neighborhood Crime Abatement Team (GNCAT), Neighborhood Resource Officers (NRO)/Neighborhood Police Officers (NPO), additional detectives, etc.
- Notify Property Room staff and evaluate needs, if applicable
- Create and prioritize a task list of work to be done
- Organize and lead briefings and debriefings of case investigators
- Organize and coordinate case information
- Ensure phone calls made to the command post are answered and information recorded
- Evaluate need for a detective to be assigned to family members (victim, suspect, witness, etc.)
- Arrange for special equipment or needs of the investigation
- Oversee report completion and process (see below)
- Brief incoming commander when being relieved
- Make sure command post log is maintained
- Manage the "to do list"

## Lead Detective

- Provide input to case lieutenant on investigation, assignments, etc.
- The lead detective should have an opportunity early in the investigation to view the crime scene
- The lead detective should have an opportunity to view critical evidence prior to it being secured/packaged
- Participate and provide direction during evidence processing discussions between command post, Forensic Services Unit (FSU) lab personnel, and on-scene forensic and investigative personnel
- Coordinate needs with Property Room staff, if applicable
- Generally, remain in command post to maintain overall perspective on case and investigation
- Lead detective may assist in significant investigative tasks (suspect interview), if appropriate
- Co-lead or backup lead should generally assist with investigation and not remain in command post, unless relieving lead detective
- Review all incoming information by participating in briefings and de-briefings of investigative staff
- Review incoming reports for investigative leads
- Monitor Task lists/tips and prioritize for assignment
- Coordinate questions used in canvassing
- Monitor and provide input on information released to the media/public
- Assist case lieutenant in briefing the District Attorney
- Work closely with assigned Assistant District Attorney

HKThefts_Madison_00033225

**District Command Staff**

- Provide assistance to Investigative Detective Lieutenant, as needed
- Work with Investigative Captain to make necessary notifications
- Maintain familiarity with case and investigation
- Assist with notifications (Management Team, Alders, etc.), if needed
- Assist in the press releases
- Ensure that MPD Peer Support has been notified of the incident
- Plan any necessary patrol debriefings
- Coordinate with VCU on the sharing of information internally

**CIS Personnel**

Upon request from the Violent Crime Unit, CIS will respond directly to the Command Post as soon as possible. CIS will immediately provide one CIS Supervisor (if needed) and one CIS Officer in the Command Post for the first 72 hours. If special circumstances are present, VCU Commanders can extend CIS assignment beyond the 72 hours.

The CIS Supervisor and/or Officer will:
- Communicate with and assist the Investigative Lieutenant
- Evaluate and ensure that adequate CIS resources are called-in (i.e. additional CIS Officers/Investigative Support Officer)
- Ensure that the Electronic Log Sheet is set-up for assigned staff to make log entries
- Establish and post the "CIS Requests To Do List" to best determine CIS request priorities

## Non-VCU Major Cases

### INITIAL CONTACT/ASSIGNMENTS

When a major case has occurred and it has been determined the Violent Crime Unit will not be primary investigating unit, the OIC or field supervisor should initially make contact with the Detective Lieutenant from the investigative focus of the type of district in which the incident occurred, if the incident occurs during normal working hours. During off-hours, the on-call Detective Lieutenant should be contacted. If the determination is made that the incident is a major case requiring a command post, the Detective Lieutenant from the investigative focus of the type of district in which the incident occurred should be contacted; this Detective Lieutenant will have overall responsibility for managing the incident. Generally, a command post should be established – and an incident considered a major case – if it is a serious offense requiring significant coordination of investigative resources. The District Captain of the district where the incident occurred and the Assistant Chief of Operations should be contacted as soon as reasonable. Factors to be considered when determining whether an incident should be considered a major case and whether a command post should be established include the following:

- Is the offense a homicide, attempted homicide, in-custody death, Officer-Involved critical incident, serious serial crime, or any other serious crime?
- Did the incident result in a severe level of injury (death, great bodily harm, hospitalization)?
- Is there a danger to the community?
- Are there a large number of suspects/contacts involved?
- Does the incident/investigation involve multiple jurisdictions?
- Are there multiple tasks to be prioritized and immediately assigned that, if not addressed quickly, would harm the investigation or would result in danger to individuals or the community?
- Are there a significant number of investigative personnel involved in the investigation requiring immediate briefing and assignment?
- Is there a Commander available to run the Command Post?

HKThefts_Madison_00033226

The absence of some or all of these factors does not negate the need for a Command Post in other circumstances, but commanders will want to consider which additional resources would be needed for less serious cases.

If the Detective Lieutenant from the specialty unit investigating the district in which the incident occurred is not available, a Detective Lieutenant from another Unit district should be contacted as indicated (if no Detective Lieutenants are available, other command staff should be contacted):

- Persons Crimes West backs up VCU and vice versa Midtown / Midtown backs up West
- FJ/SC East Central backs up FJ/SC West and vice versa South / South backs up Central
- North backs up East / East backs up North

The Detective Lieutenant is responsible for determining what resources are needed, for ensuring that those resources are contacted, and for designating a lead detective. Generally, detectives should be contacted/assigned in this order:

- Detective District detective from assigned specialty related to incident
- Detective District detective with skills/experience related to incident
- Detective Out-of-district detective from assigned specialty related to incident
- Detective Out-of-district detective with skills/experience related to incident

These should be viewed as guidelines; they may be deviated from if circumstances warrant, but the tasks still need to be completed.

**COMMAND POST**

A command post will be set up to direct the overall operation of the investigation. The case Lieutenant will select the location of the command post based on the needs of the case (typically the district station of district where the incident occurred).

The case Lieutenant will generally be the Detective Lieutenant assigned to the relevant specialty unit investigating district where the crime occurs, or, in that Detective Lieutenant's absence, the back-up Detective Lieutenant. While the needs of cases vary, it is recommended that the command post be staffed as follows:

- Case Detective Lieutenant (overall incident commander)
- Case Lead Detective
- CIS Personnel
- Logistics Officer (if needed)
- Command Post Assistant or Investigative Support Officer (if needed)

**RESPONSIBILITIES**

**Case Detective Lieutenant or Case Commander**

- Overall management of the case
- Identify Case and Scene Detectives
- Make investigative assignments:
  - Designate lead detective and co-lead (if appropriate)
  - Designate lieutenant (if needed/available) and detective to oversee each scene
  - Coordinate investigative response to hospitals (if appropriate)
  - Designate detective to serve as liaison to victim families
  - Coordinate MPD detectives presence at autopsy (if appropriate)
  - Identify and coordinate other investigative tasks, as needed
- Communicate and coordinate efforts with the designated scene supervisor, if needed/available
- Communicate and coordinate efforts with CIS Supervisor
- Communicate and coordinate efforts with Case Lead Detective
- Communicate with the OIC

- Communicate with Command Staff
- Make appropriate notifications, as needed:
  – Chiefs
  – District Command
  – DA's office (if appropriate and in all homicide cases)
- Communicate with MPD Finance Section staff for case number cost accounting
- Designate case as "Extraordinary" for TeleStaff/payroll purposes, if appropriate
- Facilitate the release of information to MPD personnel through briefing and to other police agencies
- Collaborate with the PIO, case detective, and District Captain on case press releases
- Communicate with District Attorney's office staff with case detective
- Review reports for investigative leads
- Management of personnel (assignments, monitoring hours worked, etc.)
- Managing overtime and arranging relief for staff
- Evaluate need for support staff
- Notify Property Room staff and evaluate needs, if applicable
- Create and prioritize a task list of work to be done
- Organize and lead briefings and debriefings of case investigators
- Organize and coordinate case information
- Ensure phone calls made to the command post are answered and information recorded
- Evaluate need for a detective to be assigned to family members (victim, suspect, witness, etc.)
- Arrange for special equipment or needs of the investigation
- Ensure that a timeline is started and kept up to date
- Oversee report completion and process (see below)
- Brief incoming commander when being relieved
- Keep Chief and Assistant Chiefs apprised of investigation
- Make sure command post log is maintained
- Manage the "to do list"

## Lead Detective

- Provide input to case lieutenant on investigation, assignments, etc.
- The lead detective should have an opportunity early in the investigation to view the crime scene
- The lead detective should have an opportunity to view critical evidence prior to it being secured/packaged
- Participate and provide direction during evidence processing discussions between CP, FSU lab personnel, and on-scene forensic and investigative personnel
- Coordinate needs with Property Room staff, if applicable
- Generally, remain in command post to maintain overall perspective on case and investigation
- Lead detective may assist in significant investigative tasks (suspect interview), if appropriate
- Co-lead or backup lead should generally assist with investigation and not remain in command post, unless relieving lead detective
- Review all incoming information by participating in briefings and de-briefings of investigative staff
- Review incoming reports for investigative leads
- Monitor Task lists/tips and prioritize for assignment
- Coordinate questions used in canvassing
- Monitor and provide input on information released to the media/public
- Assist case lieutenant in briefing the District Attorney
- Work closely with assigned Assistant District Attorney

## District Command Staff

- Provide assistance to Case Detective Lieutenant, as needed
- Maintain familiarity with case and investigation

HKThefts_Madison_00033228

- Assist with notifications (Management Team, Alders, etc.), if needed
- Assist with coordination of internal information sharing
- Ensure that MPD Peer Support has been notified of the incident
- Notify MPD Finance Section of Major Case
- Assist in the press releases

## CIS Personnel

Upon request from the <mark>specialty unit investigating the incident</mark>, CIS will respond directly to the Command Post as soon as possible. CIS will immediately provide one CIS Supervisor (if needed) and one CIS Officer in the Command Post for the first 72 hours. If special circumstances are present, District Commanders can request to extend CIS assignment beyond the 72 hours through the Investigative Services Captain or Lieutenant.

The CIS Supervisor and/or Officer will:
- Communicate with and assist the Case Detective Lieutenant.
- Evaluate and ensure that adequate CIS resources are called in (e.g., additional CIS Officers/ Investigative Support Officer).
- Ensure that the Electronic Log Sheet is set up for assigned staff to make log entries.
- Establish and post the "CIS Requests To Do List" to best determine CIS request priorities.
- Generate and Search Available Intelligence venues.
- Communicate and obtain information from outside resources.

## Logistics Officer

Coordinate and process requests for additional resources, support, materials for the incident. Review the incident action plan and estimate needs for the next operational period.

## Command Post Assistant

While it is recognized that this position is not required in all cases, the workload of some cases is so significant that additional help may be needed in the command post. This position is staffed at the discretion of the case Detective Lieutenant. If staffed, this position will be expected to assist and support the needs of the case Detective Lieutenant and the CIS Supervisor as requested. This position could be staffed by investigative support personnel, CIS personnel, or another commander.

## Crime Scene

Once a crime scene has been identified and secured, it must be protected from contamination; therefore, the number of personnel allowed in the crime scene must be limited and strictly controlled. Access to the crime scene is limited to personnel needed to effectively process the scene, as determined by the designated scene supervisor. In most instances this includes only FSU personnel, scene and/or lead detective, and those directly assisting them.

**Note: Coordination with the FSU Sergeant and Investigators should be done prior to entering scene as videotaping of the crime scene should be done prior to anyone entering.**

## Designated Crime Scene Supervisor

- If utilized, typically the designated crime scene supervisor role is filled by the district operations Lieutenant
- Overall responsibility for the management, security, and processing of the crime scene
  – Respond directly to scene
  – Relieve patrol sergeant of overall scene responsibility
- Assign perimeter security positions

HKThefts_Madison_00033229

    – Maintain inner and outer perimeter
    – Ensure that scene is properly secured
    – Ensure that an officer is assigned to maintain log of who enters/exits scene
- Coordinate assignment of detectives at scene with case detective lieutenant
- If necessary, request mobile command post response vehicle (CV-1)
- Verify that legal authority exists to perform complete search/processing of scene
- Work with the FSU Sergeant to coordinate the investigative efforts of detectives and investigators
- Control access to the scene to reduce contamination
- Management of personnel (assignments, monitoring hours worked, etc.)
- Managing overtime and arranging relief for staff
- Evaluate resource needs:
    – Additional personnel
    – Special equipment
- Coordinate area canvass after consultation with the Command Post
- Establish staging area for media:
    – In absence of PIO, serve as point of contact for media
    – Coordinate any media releases with command post
- Ensure crime scene log is maintained
- Coordinate responsibility of scene with FSU Sergeant or other supervisor
- After scene stabilizes and assignments are given, respond to the Command Post
- Assist the Case Lieutenant, as needed

## FSU Sergeant

- If utilized, has overall responsibility for directing the collection and processing of evidence
- Communicate and work with the designated Crime Scene supervisor to coordinate the efforts of investigators and Detectives
- Work with designated Crime Scene supervisor to determine which evidence investigators will collect and which evidence detectives will collect
- Determine the need for outside agency assistance with processing scene/evidence
- FSU Sergeant may request the County Crime Scene Vehicle through the Dane County Sheriff's Office (DCSO) OIC, if needed
- Ensure Lead Investigator has been selected as the representative for the FSU
- Make sure Lead Investigator briefs CP staff at completion of scene processing
- As conclusion of incident, a formal After Incident Review will take place incorporating the FSU personnel and the detective(s) of the affected district

## Crime Scene Detective

- Respond directly to scene
- Conduct work as assigned by the designated Crime Scene supervisor or by Command Post personnel
- Works with investigators, as assigned, identify evidence at the scene
- Search the scene for evidence in accordance with proper authority and procedure
- Search for clues and evidence to establish the elements of a crime and identification of suspects
- Report to and discuss findings with the designated Crime Scene supervisor and/or Command Post personnel
- Relay case information to Investigators

## Investigators

- Lead Investigator will make contact with the Scene Detective to start information flow to the CP

HKThefts_Madison_00033230

- Lead Investigator will coordinate processing efforts for multiple scenes utilizing investigator pool on hand
- Lead Investigator will gather information from all other active scenes and communicate those efforts to the CP
- Process the scene and collect evidence under direction of the FSU Sergeant or designated Crime Scene supervisor
- The body bag seal will be photographed when it is placed on the bag at the scene
- Video and photograph scene; create a crime scene diagram
- Work with Crime Scene Detectives to identify evidence and process the scene
- At conclusion of processing, Lead Investigator will go to CP and give final scene de-briefing on FSU collection efforts and to coordinate future operations

## Canvass Personnel

- Conduct canvass as directed by designated scene supervisor to locate witnesses or evidence
- Utilize MPD Neighborhood Canvass form and questions as guideline for canvass
- Screen contacts for persons requiring more detailed interviews
- Document vehicle plates and descriptions from area (department's plate reader vehicle)
- Names on mailboxes
- Share basic information about incident with residents (as approved by Scene supervisor /Command Post) to calm fears and solicit information
- Share canvass results with scene supervisor and Command Post and complete report

## Other Scene Personnel

- Perform tasks as assigned by Scene Lieutenant
- Complete report documenting actions

# Use of CV-1

- The designated scene supervisor is in charge of CV-1
- CV-1 is a resource for personnel at the scene; it is not a substitute for the main command post
- Entry to CV-1 is limited to those who have a specific need for access
- Make request through the 911 Center for delivery to scene. Request MPD designee to operate at scene and return after use

# Hospital Assignment

- Supervisor should respond if possible
- Detective or officer must stay with victim until released by the Command Post (includes going into surgery, wearing proper hospital attire)
- Limit number of people in exam room or with victim
- Obtain names of Madison Fire Department (MFD) personnel treating/transporting victim
- Obtain names of hospital emergency room (ER) personnel treating victim
- If possible, an investigator who has not been to crime scene shall assist in processing victim, clothing, and evidence. Swabs, photographs, and evidence collection shall be coordinated through the investigator assigned to the hospital
- Collect evidence (bedding, clothing, etc.), as needed
- Obtain consent for release of medical information from victim, if possible
- Check in with command post prior to leaving hospital
- Hospital Investigator will link up with Dane County Medical Examiner personnel to ensure body recovery goes according to protocol and to ensure an autopsy time has been identified. This information will be passed on to the Lead Investigator and CP by the Hospital Investigator.

## TeleStaff/Payroll/Personnel Management

- Incidents that should be considered a TeleStaff Extraordinary Event:
    - All homicides
    - All officer involved shootings
    - All fatality or critical injury traffic crashes
    - All full-team SWAT activations
    - Other events likely to generate 30 or more hours of total overtime (including follow-up)
- If incident qualifies, notify MPD Payroll personnel by sending an email to the PD Payroll email group. Notification must include date of incident, time of incident, location of incident, case number, and brief explanation of incident (e.g. shots fired, attempted homicide, house explosion, etc.). Payroll notification should occur as soon as possible (preferably the date of the incident), but must take place prior to the close of payroll for the incident.
- All employees working the event need to be notified that overtime entries should be OT Extraordinary.
- Personnel management includes the following considerations:
    - Manage overall overtime
    - After an employee(s) has worked 10 continuous hours, a supervisor should start to work on a transition plan for the employee(s), so the employee(s) does not work more than 12 continuous hours. If a supervisor deems it necessary to hold an employee(s) in excess of 12 continuous hours, the supervisor should evaluate the following:
        - How vital a role in the investigation does the employee have?
        - Is there a compelling reason the employee needs to work extended hours?
        - Does the employee show signs of fatigue?
        - Can the employee reasonably be relieved without adversely impacting the investigation?
        - Relieve the employee(s) as soon as possible.

## Autopsy Protocol

The Medical Examiner's (ME) Office will schedule an autopsy for all homicides, questionable deaths, and unexplained deaths, unless the District Attorney's office has been consulted and agrees an autopsy is not necessary.

The scheduling and coordination of autopsies is the responsibility of the Medical Examiner's Office, giving due consideration to availability of the Medical Examiner, the ME's office resources, as well as the resources of the Madison Police Department (MPD).

When the body is removed from the scene, the Medical Examiner will place the body on a clean sheet. In criminal cases, the sheet will be collected as evidence at the conclusion of the autopsy.

At the autopsy, the seal shall be photographed before and after being cut and the attending detective/investigator will document the time/date of this process in a report. The body bag seal does not have to be collected and stored as evidence after being removed. The body bag shall be examined for trace evidence during the autopsy and will not be destroyed without consulting with the District Attorney's office. The following will usually be collected:

- Fingerprints (MPD Investigator)
- Fingernail scrapings (occasionally)
- Fingernail clippings or swabs of fingernails, if nails are too short
- Blood (even if transfused) needed for deoxyribonucleic acid (DNA) testing and toxicology
- DNA stain cards
- Clothing and personal effects of the deceased
- Photographs (MPD Investigator)
    - Photograph entire body with injuries prior to removing clothes and/or washing

HKThefts_Madison_00033232

- Photograph entire body with injuries after body washing
- Photograph entire body after removing clothing
- Photographs of case appropriate internal evidence
- Photographs of the body and autopsy should be reviewed by case detective prior to body being released

The following items should be considered for collection if case appropriate:
- Head hair, facial hair, body hair, pubic hair
- Skeletal X-rays (generally taken with infants if there is suggestion of abuse, occasionally taken with children)
- Body swabs
- Nasal swabs
- Sexual Assault kit

Detectives should consult with investigator on special procedures or techniques and make arrangements for appropriate equipment. Coordination with the ME's office should take place prior to the autopsy.

Sexual Assault exams are conducted by the Medical Examiner. Sexual Assault exams should generally be requested in domestic homicides or in cases believed to involve sexual assaults.

Determining what should be collected during the autopsy is a collaborative effort between the Medical Examiner, investigator, and detective. The Medical Examiner will usually collect the following:
- Blood, Urine, Vitreous: all necessary for toxicology
- Liver, Kidney, Bile, Spleen: toxicology in special circumstances
- Stomach contents: toxicology, pill fragments, investigative needs, timing information
- Lung, Liver, Fat: inhalation deaths
- Brain toxicology
- Other samples, as needed

The primary responsibility of the Dane County Morgue is for storage of samples obtained from an autopsy.

Evidence will be shipped by the Medical Examiner's office personnel to an appropriate laboratory for analysis. All refrigerated and freezer evidence resulting from an autopsy will be stored at the Dane County Morgue unless specifically signed out to MPD for testing by the Wisconsin State Crime Lab (WSCL) at the request of the District Attorney.

The role of the investigator is to assist in collecting evidence at the autopsy. Immediately after the autopsy, the investigator will secure evidence collected. If there is need for further analysis by the Forensic Services Unit, FSU will take responsibility for that item. For autopsies on homicide victims, two investigators will attend and collect/secure evidence, as needed.

The detective present at the autopsy is responsible for documenting the preliminary findings regarding cause of death, as reported by the Medical Examiner. This documentation should be succinct and within the ability of the detective. The detective shall consult with the ME for appropriate details.

A search warrant can be based on the preliminary findings of the autopsy. However, detectives should be mindful of the need to carefully document and clarify the Medical Examiner's findings to prevent a misunderstanding or misinterpretation of a Medical Examiner's statement.

When the cause of death is pending toxicology, personnel at the appropriate laboratory will initially test specimen samples as requested by the Medical Examiner. The District Attorney may request secondary tests conducted by the WSCL. The samples will be obtained from the Medical Examiner's office and transported to the WSCL by the case detective. Those requests may be appropriate when investigating an unexplained death, gunshot wounds, or drug overdoses. When submitting requests, the case detective will need to specify

HKThefts_Madison_00033233

the reasons and tests needed. The results will be provided to the specific detective who submitted the request and to the Medical Examiner's Office.

The Medical Examiner's Office collects blood to send to personnel at the appropriate laboratory on most deaths. The Medical Examiner's Office may request a presumptive test as well if the death is a suspected drug overdose.

In all drug overdose or suspected drug overdose cases, the Medical Examiner will collect blood to be analyzed by an appropriate laboratory for analysis. If there is a probability that criminal charges will be filed or if there is a questionable death, the detective, at the request of the District Attorney, will transport the specimen to the WSCL as soon as possible. If there are no criminal charges or suspect identified, then the detective can wait until the results of the Medical Examiner's test is made available.

If death occurs at a hospital or medical facility, the District Attorney's Office can obtain a subpoena for the facility's medical information and documentation of the deceased, if necessary.

Release of information regarding cause and manner of death in homicides, questionable deaths, and unexplained deaths, shall be made by the Medical Examiner's Office after consulting with the District Attorney and case detective. Media requests to MPD for that information should be referred to the Medical Examiner's Office.

Organ Donation – The investigating law enforcement agency and the District Attorney must be consulted before authorizing the harvest of organs. Bone and tissue harvesting will only be done after the autopsy. Organs will be harvested in a hospital operating room.

The Medical Examiner will not release the body of the deceased before consulting with the case detective and District Attorney's Office.

Most autopsies should have no more than one detective and one investigator (homicides shall have two investigators present). The only exception is for newly promoted detectives or investigators to attend for training purposes. The Medical Examiner's Office should be notified of additional attendees prior to the autopsy.

Detective reports documenting an autopsy should be written so non-medical personnel can understand the terms used and include:
- A list of all evidence taken by the detective
- Preliminary information from the medical examiner on the cause and manner of death
- Who was present during the autopsy
- Identification of the body
- Information pertinent to the investigation
- Anatomical diagrams, if needed
- Brief documentation of injuries, but should not conflict with the Medical Examiner (limited detail, non-technical)

Investigator reports documenting an autopsy should include:
- Time autopsy started and ended
- Body Bag seal number and time it was cut
- Who was present
- Items collected and who it was received from
- A list of all evidence taken

## Information Sharing

Effective and timely information sharing is a critical component to the management of any major case.

HKThefts_Madison_00033234

**EXTERNAL**

- In most instances, the PIO should be called in and should serve as the media's contact for information
- If the PIO is not available, one person should be responsible for all media releases and contact to ensure that consistent and accurate information is released
- All information releases must be coordinated through and approved by the Command Post Lieutenant
- A media staging area should be established, typically somewhere in the vicinity of the crime scene
- District command staff should coordinate door-to-door information sharing with residents when appropriate
- Long-term external information sharing should be coordinated between the PIO and District Command Staff

**INTERNAL**

- A commander should be designated to oversee information sharing internally and with other law enforcement agencies; if no other commanders are available, this responsibility initially rests with the Command Post Lieutenant; once the designated scene supervisor clears the scene and responds to the Command Post, responsibility passes to that lieutenant
- An evaluation of internal information sharing should be ongoing during the investigation; information appropriate for release should be shared through briefings, email, etc.
- Information should be shared with other law enforcement agencies, as needed, to support the investigation or for safety reasons; CIS personnel should generally be responsible for sharing information as approved by the Case Lieutenant
- The Lead Investigator or an FSU representative with full knowledge of the active case will maintain contact with the case detective throughout the duration of the open case; this will include through a potential trial
- The Lead Investigator will ensure that the case detective receives a full work up matrix of all items collected for the case; the matrix will break down priority levels for evidence submission to the WSCL office
- If necessary, the Lead Investigator can be present and assist the case detective in submitting evidence to the WSCL office
- The Lead Investigator will work with the case detective ensuring all materials will be present upon a jury trial

## Lead/Tip Management

It is important that any large volume of citizen lead or 'tip' information be managed properly from the onset of an investigation. Equally important is the simplicity of the system utilized to collect and store that information.

- The Case Lieutenant should assign someone in the Command Post to take responsibility for collecting and logging incoming tips/leads; this will typically be a CIS officer initially. Once CIS support is no longer available, the lieutenant should designate a detective to assume this responsibility
- All incoming tips should pass through the person designated to manage tips/leads; tips/leads should be maintained in a log-book or electronic database, which should include the date the information is received, the caller's name, their telephone number, and the content of the tip
- Each lead should be reduced to a common form for data entry and uniformity and the 'original' format (e-mail, telephone message, officer's report) should be retained and attached to the common form; the information should be cataloged under the major case number associated with the event
- Each tip should be assigned for follow up/review and the actions taken should be documented in a report as well as in the log-book/database

HKThefts_Madison_00033235

## Reporting Procedures

- The decision to lock cases in the Law Enforcement Records Management System (LERMS) will be made by the District or Unit Commander with notification to the Captain (though the OIC may initially designate that a major case be temporarily locked pending this decision). The following personnel should be notified that a case should be locked:
  - Case Process Supervisor
  - Records Manager if Case Process Supervisor is unavailable
  - Records Supervisor if Case Process Supervisor is unavailable

- Reports will be added to LERMS as they come in with security as to who has access. Default access for locked cases includes Chiefs, Captains, and Lieutenants; others may be specified as appropriate by a Commander (case Detectives, etc.). Access may be limited further if needed (sensitive cases, etc.)
- Cases appropriate for consideration to be locked:
  - Homicides
  - Cases involving Officers or other high-profile individuals as suspects
  - Other high-profile cases (officer involved critical incidents, etc.)
- OIC, Lead Detective Lieutenant, and Case Process Supervisor decide if Police Report Typists (PRTs) need to be called in; the Case Process Supervisor will decide who and when if PRT support is needed
- Command Staff in the Investigative CP will be responsible for notifying on-scene patrol personnel to respond to the Investigative CP upon clearing the scene. Once at the CP, field personnel will be asked to brief the CP or designated team leader on actions taken at the scene (verbal summary of action and information about the case)
- The case Detective Lieutenant or VCU supervisor will review all reports in a Major Case in LERMS
- The case Detective Lieutenant, the lead Detective, and the District Attorney assigned (if applicable) may have the option to receive a draft version of hard copies of the numbered reports as they are updated
- Detectives and investigators should follow their normal protocol in reviewing and correcting reports for uploading to LERMS and major case reports should be a priority
- All major case documents should be scanned into LERMS
- Any investigative work created by specialized software (timelines, phone analysis, etc.) should be scanned into LERMS (if possible). The officer/detective creating the work should complete a supplemental report outlining the process and software utilized.
- Supporting documents (timelines, bulletins, etc.) should also be saved in LERMS under "Case Activity"
- Lead Detective is designated as in charge of the reports and begin to number reports and attachments in LERMS
- Numbered reports can be referred via the e-Referral process to the DA's office whenever possible depending on the size of the case and updated via e-Referral periodically depending on need. If too large, the case can be put on a CD or DVD and delivered to Intake staff at the DA's office. Reports need to be in the DA's office PROTECT program and not just given directly to the assigned Deputy District Attorney (DDA) or Assistant District Attorney (ADA). Property and contact information can be extracted directly from LERMS as a tool to be given to the DA's office as well. Hard copies of reports will be considered draft or working copies and original reports will be housed in LERMS

## Long-Term Case Management

If a detective changes assignment (e.g., changes investigative specialty districts, goes to Task Force, or another detective assigned position) and still has an assigned caseload, the general rule is the caseload will follow that detective to their new assignment. Detectives should work with their current supervisors prior to changing assignments on what cases are still active and will need additional follow-up. Other inactive cases should be closed out appropriately. If a Detective lieutenant changes assignment, the general rule is that supervisory responsibility for a major case will remain in the district where it occurred. Detectives should still

HKThefts_Madison_00033236

confer with their previous supervisor on additional work done on those caseloads for record-keeping purposes.

If a situation arises where the detective is unable to continue with their caseload in their new assignment or there are other extraordinary circumstances, those instances will be reviewed on a case-by-case basis with discussions to occur between the newly assigned supervisor and the supervisor assigned to the district where the case originated.

Locked cases should be part of regular case review with Detectives/Lieutenants. The duration of time a case is locked is case specific, but should be limited when appropriate. Homicide cases should generally not remain locked beyond discovery when the reports have been turned over to the defense. Cases locked due to officer or high-profile subject involvement may remain locked longer or permanently. Locked cases should be reviewed quarterly to see if they could be unlocked.

## Deviation from this SOP

It is understood that every major case is different and that some of the items/positions/actions will not be needed for every case. For example, if the commander does not see a need for CV-1, they commander does not have to use it; or a commander may decide not to canvass the area, but will still be responsible for contacting residents in another way. Deviating from this SOP does not relieve one of the responsibilities outlined by the SOP.

Original SOP: 02/01/2015
(Revised: 04/23/2015, 09/15/2017, 12/06/2017, 08/02/2018, 09/20/2018, 01/03/2022, 01/31/2023, 02/03/2025)
(Reviewed Only: 02/25/2016, 01/09/2017, 01/30/2019, 01/31/2020, 01/11/2021, 02/05/2024)
(Persons Crimes Investigations SOP merged into this SOP 12/06/2017)

HKThefts_Madison_00033237


**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**


## Notification of Commanding Officers

Eff. Date ~~08/18/2023~~ 02/03/2025

## Purpose

To clarify the situations requiring the notification of District or Work Unit Command Staff.

## Required Notification of Commanding Officers

The following situations always require the notification of the District/Work Unit Command staff **and** the Assistant Chief of Field Operations as soon as possible **regardless of when the incident occurs.** Voice/Text messages should be left, but it is important to have direct contact with the command staff and an assistant chief. The Officer in Charge (OIC) is responsible to ensure these notifications are made.

1.  A homicide or attempted homicide where death appears probable or where the victim sustains a significant injury. This includes weapons offenses where a victim is shot, stabbed (non-superficial), or sustains other injuries requiring hospitalization.
2.  Weapons offenses of shots fired into an **occupied** residence or into an **occupied** vehicle.
3.  When the suspect or person of interest of a high profile case has been arrested (i.e. homicide, attempted homicide, or any other high profile case that has received media attention).
4.  A situation requiring an SWAT call-up. **NOTE: SWAT** Commander will be called **first** in this instance.
5.  A situation requiring a SET call-up. **NOTE: SET** Commander will be called **first** in this instance.
6.  A fatal traffic crash.
7.  A significant incident involving an employee, on or off duty, e.g., serious injury or death of an employee, officer-involved shooting or use of deadly force, serious disciplinary measures, allegations of or arrest for criminal violations, or an employee or an employee's family member(s) being the victim of a serious violent crime. This includes on duty injuries in which an officer is unable to complete their shift. These examples are illustrative and not meant to be inclusive. **NOTE:** The Chief of Police wants to be notified in the event of ANY employee—sworn/civilian—injury, whether on or off-duty.
8.  Madison Police Department (MPD) arrest of any law enforcement officer.
9.  A fire that results in a fatality.
10. A significant community issue or incident that requires police attention or involves notable persons.
11. Unusually extensive criminal damage to property/graffiti.
12. When a case is generating significant media interest and the scene supervisor is requesting Public Information Officer (PIO) assistance.
13. MPD pursuit that terminates in a crash causing injury to any party.
14. Any incident or attempted incident involving a serious crime where the victim and offender are not known to one another (stranger sexual assault, stranger carjacking, stranger armed street robbery).

If there is any doubt as to whether a call should be made, make the call. When unable to contact the appropriate Commanding Officer, contact should be attempted as follows:
1.  Assistant Chief of Field Operations
2.  Assistant Chief of Investigative and Specialized Services
3.  Assistant Chief of Support and Community Outreach
4.  Executive Section/Operations Captain
5.  Any other District Commander

**CONSULTATION WITH DISTRICT, WORK UNIT, OR ON-CALL DETECTIVE LIEUTENANT**

Many cases warrant the immediate involvement of detectives and additional investigative resources. During normal work hours, the appropriate Detective Lieutenant, Investigative Lieutenant, or Detective Sergeant may be contacted directly. After 4 pm on weekdays, during normal Detective on-duty hours, the OIC can contact Detective Sergeants or Detectives directly with pre-approval from District, Work Unit, or On-Call Lieutenants.

HKThefts_Madison_00033238

The following table lists the incident types which **require** contact with the appropriate Lieutenant. In some cases, contact is only required in the event that a Patrol Supervisor or the OIC determine that additional investigative resources are needed.  In cases where contact is required or additional resources are being requested, the OIC should contact the appropriate person from the following table:

| INCIDENT TYPE | Contact required | Mon - Fri | After Hours, weekend or holiday |
|---|---|---|---|
| Homicide / Attempted Homicide where death appears probable | Yes | Violent Crime Unit (VCU) Detective Sergeant | Investigative Services Lieutenant of VCU |
| Kidnapping | Yes | | Back-Up:  Either of the VCU Detective-Sergeants |
| Weapons offense with occupied building or vehicle struck | Yes | | |
| Victim with a gunshot wound | Yes | | |
| Self-inflicted gunshot wound | If additional resources are needed | ~~Persons Crimes District Detective~~ Lieutenant | On-Call Detective Lieutenant |
| Infant/Child death investigation or significant head or brain trauma | Yes | Special Victims Unit (SVU) Detective Sergeant | ~~Investigative Services~~ Lieutenant of SVU |
| Child abduction or attempted abduction (not intended for child custody dispute) | Yes | | Back-Up: SVU Detective Sergeant |
| Sexual assault of a child ** An after-hours delayed report with no evidence readily available to collect, victim is safe and suspect is known, can be written up and routed to the ~~Investigative   Services   Detective~~ Lieutenant of SVU | If additional resources are needed | | |
| Physical abuse of a child | If additional resources are needed | | |
| Child Neglect | If additional resources are needed | | |
| Serious or fatal auto crash | Yes | Lieutenant of Traffic and Specialized Services | Lieutenant of Traffic and Specialized Services  Back-Up:  Captain of Traffic and Specialized Services or Sergeant of Forensic Services |
| First or second-degree sexual assault ** An after-hours delayed report with no evidence readily available to collect, victim is safe, and suspect is known, can be written up and routed to either the East  FJ/SC ~~the~~ District Detective Lieutenant or the West FJ/SC Detective Lieutenant | If additional resources are needed | Family Justice/Sensitive Crimes (FJ/SC) ~~District~~ Detective Lieutenant (East or West) | On-Call Detective Lieutenant |
| First degree reckless endangering safety | Yes | Persons Crimes Detective Lieutenant | |
| Arson to occupied building | Yes | Persons Crimes Detective Lieutenant | |
| Home invasion without shots fired | If additional resources are needed | Persons Crimes Detective Lieutenant | |
| An investigation that requires additional | If additional | Persons Crime Detective | |

HKThefts_Madison_00033239

| resources or expertise not available on an on-duty status | resources are needed | Lieutenant  Appropriate Specialty Detective Lieutenant | |
| Imminent threat, targeted, or mass casualty violence | **Yes** | Persons Crimes Detective Lieutenant | |
| MPD pursuit (if terminates with crash causing injury follow Command notification protocols) | **Yes** | Email involved officer's District/work unit Lieutenant with date and case # | Email involved officer's District/work unit Lieutenant with date and case # |

**NOTE:** There may be circumstances involving crimes other than those already specified which, because of the complexity, on-going crime pattern, etc. (examples: counterfeit rings, business burglaries, armed robberies) warrant the immediate involvement of detectives. A call to the On-Call Detective Lieutenant is appropriate in these instances. **When in doubt,** a call to consult with the On-Call Detective Lieutenant should be made. The on-call contact number is 608-243-0544.

**CONTACTING THE FORENSIC SERVICES UNIT SERGEANT**

The Forensic Services Unit (FSU) Sergeant should be contacted whenever additional investigator resources are needed for an investigation, or for consultation on investigative steps/resources. If the FSU Sergeant is unavailable, the Traffic & Specialized Services Lieutenant should be contacted. Voice/Text messages should be left, but it is important to have direct contact with an FSU supervisor/commander.

The following situations **require** notification of the FSU Sergeant (Back-Up: Traffic & Specialized Services Lieutenant):

1. A homicide or attempted homicide where death appears probable.
2. A serious or fatal auto crash.
3. A death investigation resulting the Medical Examiner's staff requesting an Investigator attend the autopsy.
4. A request by an outside agency for assistance by FSU personnel.
5. An investigation requiring additional FSU resources.

**NOTE:** Notification can be made by on-duty Investigators if time permits. This may help facilitate passing of pertinent information between on-duty investigators and the FSU Sergeant (Back-Up: FSU Command).

**CALL-IN PROCEDURE FOR DETECTIVES, SWAT, SET**

When the On-Call Detective Lieutenant has determined that detectives are to be called in, the On-Call Detective Lieutenant will provide a list of detectives to the OIC. It is the responsibility of the OIC to then contact the detectives from this list utilizing the Telestaff call-in process.

It is recognized that there may be circumstances that prompt the OIC to request assistance from the On-Call Detective Lieutenant in making calls to the detectives, and these situations may be negotiated on a case-by-case basis. However, any further assistance provided by the On-Call Detective Lieutenant is optional and not required.

When the SWAT or SET Commander has determined a unit call-up is warranted, it is the responsibility of the OIC to coordinate the SWAT/SET member notification process utilizing the Telestaff call-in process.

**NOTIFICATION OF MPPOA/AMPS PRESIDENT**

The President(s) of the Madison Professional Police Officers Association (MPPOA) and/or the Association of Madison Police Supervisors (AMPS) should be notified whenever a significant incident involving an employee, on or off duty, occurs, e.g., serious injury or death of an employee, officer-involved shooting or use of deadly

HKThefts_Madison_00033240

force, or an employee or an employee's family member(s) being the victim of a serious violent crime. These examples are illustrative and not meant to be inclusive.

**INFORMATION CONSIDERATIONS PRIOR TO CALLING ON-CALL DETECTIVE LIEUTENANT**

1. Nature of incident (i.e. stabbing, sexual assault, home invasion, etc.); was weapon/force/threat of violence used

2. Scene(s) – located and secured (i.e. vehicle, residence, outdoors, etc.); Supervisor, Detective, or Investigator currently involved in on-duty status; presence of evidence; weather conditions that may impact evidence collection; evidence collection coordination

3. Time lapse from incident to reporting — if there was a delay, why

4. Victim(s) information – name; age; current location (hospital, scene, unknown, etc.); injuries; MPD in contact

5. Suspect(s) information – name(s), if known; in unknown, do we have a description or other pertinent information; relation to victim(s); location/custody status, if known;

6. Witness(s) information – are there any; if so, how many; location; MPD in contact

7. Other considerations – language/culture barrier; handicap for any involved parties (physical, mental illness, cognitive delays, etc.); juvenile (Safe Harbor situation, contact Dane County Human Services (DCHS), protection issues, etc.); crowd or media concerns

The above information will assist the On-Call Detective Lieutenant in making a decision on the best way to proceed with the investigation, and who, if anyone, will be called in to assist.

Original SOP: 02/25/2015
(Revised: 02/24/2016, 02/03/2017, 06/15/2017, 02/19/2018, 05/02/2018, 01/17/2019, 05/01/2019, 12/30/2019, 01/15/2021, 01/31/2023, 08/18/2023, 02/03/2025)
(Reviewed Only: 02/04/2022, 02/05/2024)

HKThefts_Madison_00033241




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

## Officer Involved Deaths and Other Critical Incidents

Eff. Date <mark>1/23/2024</mark> <mark>02/03/2025</mark>

**Officer Involved Death (OID):** An incident involving the death of an individual that results directly from an action or an omission of a law enforcement officer while the officer is on duty or while the law enforcement officer is off duty but performing activities that are within the scope of the officer's law enforcement duties.

**Other Officer Involved Critical Incident (OICI):** An event in which an officer is involved as a principal, as a victim, or is the custodial officer where significant injury likely to cause death occurs or when an officer intentionally discharges their firearm at another person.

**Criminal Investigation:** An investigation of a critical incident to ascertain all the relevant evidence as to whether or not anyone committed a crime during the course of the event that led up to and included the critical incident. The criminal investigation is separate and precedes the internal and civil investigation.

**Involved Officer:** An officer who is directly involved in the critical incident as a principal, a victim, or is the custodial officer.

**Involved Agency:** The "involved agency" is the law enforcement agency that employs the officer(s) who is (are) directly involved in the officer-involved death. In the event that officers from more than one agency are directly involved, there can be multiple involved agencies. In such cases, the second agency should be considered an involved agency depending on their level of involvement, if any, in the incident.

**Outside Agency Lead Investigator:** The outside agency lead investigator has statutory authority to oversee and direct the investigation. The outside agency lead investigator will work with the supervisors of the involved agency in order to accomplish the investigation. The involved agency supervisor(s) will use their formal authority within the agency to assist the lead investigator.

Pursuant to Wis. Stat. 175.47, the Madison Police Department (MPD) will request that an outside agency conduct the criminal investigation of any officer involved death where an MPD officer is a principally involved officer. MPD, if requested, may conduct the criminal investigation of another agency's officer involved death if approved by the Chief or designee.

A.    **Officer Involved Death: Duties of Involved Officer(s)**

1.    Immediately notify dispatch of incident and location.
2.    Render first aid and request response by emergency medical services.
3.    Officer(s) shall inform a supervisor or the Officer-in-Charge (OIC) of the incident as soon as possible.
4.    Protect and secure the scene until relieved.
5.    Identify witnesses for subsequent interviews. The involved officer(s) shall not participate in the interviews of witnesses.
6.    Brief the first arriving supervisor of the nature of the incident and consider providing a voluntary Public Safety Statement according to Section C below.
7.    When relieved of duties at the scene by a supervisor, remain with assigned uninvolved officer and proceed to a local hospital.
8.    Upon request, surrender all weapons and equipment used in the incident in the officer's possession at the time of the incident. Replacement of weapons and equipment will occur as soon as practical.
9.    The Involved Officer(s) will be required to provide a blood sample. The blood draw and subsequent testing will be in accordance with Attachment B.
10.    Reporting requirements for involved officer(s) will be completed by investigators assigned to the incident. Involved Officers will not be required to prepare a written report.
11.    Review for content and accuracy the OID report(s) detailing their statement(s).

HKThefts_Madison_00033242

12. Unless exigent circumstances related to an on-going threat require it, involved officers shall not watch video related to the incident until their formal interview with the outside agency lead investigator, or upon receiving approval from the lead outside agency investigator.

13. Unless exigent circumstances related to an on-going threat require it, involved officers shall not discuss the incident with other involved officers until after the completion of their formal interview with the outside agency investigator.

## B.   Officer Involved Death:  Duties of On-Scene Supervisor

1. Assume responsibility for the security and preservation of the scene. The involved agency is responsible for the initial response until relieved by the outside agency lead investigator.

2. Contact the officer(s) involved to obtain a Public Safety Statement.

3. Notify the dispatcher to broadcast a message if no officer(s) have been injured.

4. In the event an officer is injured, immediately notify the Officer-in-Charge.

5. Ensure that a non-involved supervisor, if not already at the scene, responds immediately to the scene of the incident. (A non-involved supervisor is defined as one who has not been involved specifically at the scene, or involved in any tangential fashion, e.g., operation planning, drafting of search warrants, surveillance officers, intelligence gathering, etc.)

6. Establish a scene command post and give location to the Dane County Public Safety Communications (911 Center)

7. As soon as practical, relieve the officers directly involved in the critical incident of any further responsibilities at the scene. A non-involved fellow officer shall be assigned to accompany the involved officer(s) until such time that the lead investigator or designee is able to assume responsibility. If the involved officer elects to speak about the incident with the non-involved officer, those conversations are not privileged and may become part of the investigation.

8. Identify and separate witnesses until the arrival of the outside agency lead investigator and / or other outside investigators.

9. Provide an opportunity for the involved officer to contact Union officials or legal counsel as soon as practical. Provide phones and numbers as needed.

10. Provide all necessary information to the outside agency lead investigator and then relinquish control of the investigation to the outside agency lead investigator.

## C.   Public Safety Statement

1. Response to Public Safety Statement questions by the principal officer is voluntary.

2. The first arriving supervisor not involved in the incident will seek a Public Safety Statement from the involved officer. This is not an interview, but will address only the most basic information regarding the incident, to include the following:
   a. Injuries requiring immediate medical intervention
   b. Location and description of offenders
   c. Identify evidence in order that it be protected from loss
   d. Identity of witnesses
   e. Has the scene changed or been altered in any way since the incident
   f. Use of force, what type of force was used
   g. A minimal summary of the event in order to address and better understand the first six investigative points

3. If practical possible, the Public Safety Statement should be done with a Forensic Services Unit (FSU) Investigator present. If this is not possible/practical, a second short statement can be obtained if needed.

4. The supervisor obtaining the Public Safety Statement will document the information in a report and share it with the outside investigating agency.

HKThefts_Madison_00033243

4.   In the event a supervisor is not available, a detective or investigator also may take the Public Safety Statement from the involved officer(s).

5.   The supervisor, detective or investigator obtaining the Public Safety Statement will document the information in a report.

D.   **Officer Involved Death: Duties of the Officer-In-Charge (OIC)**

1.   Notify the OICI Team Commander or designee and the Forensic Services Lieutenant.
2.   Contact the District Commanders of the district where the incident occurred. If the incident occurred outside of the employee's assigned district, the District Commanders of the involved employees should also be notified.
3.   Notify the Chief, Assistant Chief of Operations, and Assistant Chief of Investigative & Specialized Services.
4.   Contact Dane County Public Safety Communications (911 Center) and direct them to inform officers of the status of the incident (e.g., injuries to officers and community members, important information). This should generally be done in a private manner (email, phone, Mobile Data Computer (MDC) message, etc.).
5.   In the event of an injury or death of an employee, notify the immediate family per the Line of Duty, Life Threatening Injury, or Death of an Employee SOP.
6.   Notify the Professional Standards and Internal Affairs Unit (PSIA) and the Public Information Officer (PIO).
7.   Notify the Peer Support Team Coordinator and deploy any on-duty Peer Support Officers to the scene to initiate the Critical Incident Stress Management protocol.
8.   Follow the Aftercare Protocol and deploy Critical Incident Partner officers to the scene.
9.   All media releases shall be cleared through the OICI Commander and the Office of the Chief of Police.

E.   **Officer Involved Death: Duties of the OICI Commander**

1.   Contact the Assistant Chief of Investigative & Specialized Services and make notification of the critical incident.
2.   Ensure that services regarding the involved personnel have been provided.
3.   Liaison with the outside agency lead investigator to ensure the lead investigator has access to all necessary resources to conduct the investigation.
4.   Communicate with the OIC.
5.   Communicate with Command Staff.
6.   Make appropriate notifications as needed:
     •   Chiefs
     •   District Command
     •   District Attorney's Office (if appropriate and in all homicide cases)
7.   Communicate with MPD Finance Unit staff for case number cost accounting.
8.   Designate case as "Extraordinary" for Telestaff/payroll purposes (if appropriate), including an email notification to PD Payroll with the required details.
9.   Management of personnel (assignments, monitoring hours worked, etc).
10.  Managing overtime and arranging relief for staff.
11.  Evaluate need for support staff.

F.   **Officer Involved Death:  Outside Agency Lead Investigator**

1.   Per Wis. Stat. § 175.47, the investigation into an officer-involved death must be led by at least two investigators employed by outside agencies, one of whom is designated as the outside agency lead investigator.
2.   The outside agency lead investigator is not required to personally accomplish every single task involved in the investigation. The role of the outside agency lead investigator is one of oversight and supervision; personally performing critical tasks while delegating and overseeing other tasks. If MPD is investigating another agency's officer involved

HKThefts_Madison_00033244

death, the OICI Commander will determine to what extent personnel from the involved agency will be asked to assist.

3.  The outside agency lead investigator is in charge of the investigation. The outside agency lead investigator of an officer-involved death must be responsible for the investigation and have hands-on leadership of investigation activities. If MPD is investigating another agency's officer involved death, members of the OICI team will be assigned to the investigation.

4.  The outside agency lead investigator will direct the overall investigation and shall coordinate with the lead officer/agency conducting any underlying criminal investigation of the event, or events, which led to the officer-involved death. They shall take possession of, or direct the collection of, all evidence, take or direct the taking of statements of witnesses and police officers, and act as the primary contact for prosecutors.

5.  The outside agency, when practicable, will provide a supervisory officer with sufficient training and experience in conducting major investigations. This supervisory officer will respond to the scene along with the investigators and will interface with the command staff of the involved agency. If MPD is investigating another agency's officer involved death, the OICI Commander will oversee the investigation.

6.  MPD's expectations are that the outside agency will accomplish (personally or by delegation) the following tasks related to the investigation:

    a.  Supervise the crime scene investigation and ensure that all involved parties and witnesses are kept separate during the scene investigation. If these parties are moved to another location, this responsibility is transferred to the investigator at that location.

    b.  Liaison with the involved agency supervisor and/or incident commander to ensure the necessary equipment and/or personnel are brought to the scene and utilized efficiently.

    c.  In conjunction with the involved agency supervisor, ensure that the integrity of the scene is maintained. The involved agency supervisor shall continue to manage that agency's resources committed to the investigation.

    d.  Act as a liaison between the department and investigators from the Dane County District Attorney's Office.

    e.  Make contact with the deceased person's next-of-kin for the purpose of notifying them of the death, providing them with notification of services, furnishing them with required documents regarding victim rights, identifying witnesses, suspects, evidence, or crimes, and serving as the point of contact with them throughout the investigation.

    f.  Facilitate a walk-through of the secure and intact scene for personnel from the DA's office, as well as the command staff and/ or internal investigators of the involved agency as needed. The purpose of the walk-through is to give these representatives an understanding of the conditions and layout of the scene for future proceedings.

    g.  Ensure that a complete copy of the criminal investigation is provided to the Dane County District Attorney's Office for review within a reasonable amount of time.

    h.  Participate in all necessary district attorney appearances to include any future inquest proceedings.

G.  **Officer Involved Death: Duties of OICI Investigation Team**

1.  Review the Officer Involved Critical Incident Investigation Conflict of Interest Checklist and report to OICI Commander if there is the potential for a conflict of interest. See Attachment A for the checklist.

2.  Assist as directed by the OICI Commander.

3.  If MPD is investigating another agency's officer involved death, fulfill responsibilities of the outside agency lead investigator as described in this SOP.

HKThefts_Madison_00033245

H.    **Officer Involved Death:  Duties of the Hospital Assignment**

The involved agency is responsible for the initial hospital response until relieved by the outside agency lead investigator. If the incident results in an officer, community member, or suspect being transported to a medical facility, the outside agency lead investigator, or designee, shall respond to the facility and be responsible for the following:

1.    Serve as a liaison with hospital staff to ensure that all involved officers are kept separate from suspects, witnesses, or other injured parties and that the investigation does not unduly disrupt the normal operations of the hospital.
2.    In conjunction with the involved agency, establish appropriate security for suspects and/or department member(s).
3.    Establish a liaison with the involved agency's administration to ensure that an injured officer's family members, spouse, or significant other are notified, and if practicable, transported to the medical facility, pursuant to the officer's wishes.
4.    Ensure that investigators are assigned to interview any witnesses present and that all evidence is collected. If possible, an investigator who has not been to the crime scene will conduct evidence gathering at the hospital. Care should be taken to preserve the integrity of physical evidence present on the involved officer's equipment, person, or clothing until investigators can collect it. It may be inappropriate to wait for an FSU investigator to photograph the involved officer or to collect evidence under certain circumstances (such as to facilitate medical treatment, or to address significant exposure concerns, etc.).
5.    Ensure that the names of treating Madison Fire Department (MFD) and hospital staff are documented.
6.    Brief the command staff of the involved agency and/or family members of any injured officers as soon as circumstances allow.

I.    **Officer Involved Death:  Interviewing Involved Officers**

1    Involved officer(s) will be given the opportunity to provide voluntary statements. The Outside Agency Lead Investigator or their designee will communicate with the officer(s)' Union Representative or legal counsel on this issue. No officer will be disciplined for declining to make a voluntary statement. If the officer(s) declines to provide voluntary statements, the criminal investigation will proceed without the officer(s)' statements.
2.    Detailed interviews should be delayed to allow the involved officer(s) time to overcome the initial stress of the incident. Whenever practical, the involved officers should give one formal statement with all needed parties present.
3.    Involved officers are not to file any reports.
4.    Involved officers shall not participate in any group debriefings until they have completed their detailed interview.
5.    If the interview is to be observed by personnel other than those directly involved, the officer and any representatives will be notified.
6.    If audio and/or visual records are available and are relevant to the involved officer's point of reference of the incident, the involved officer(s) may be allowed to review the recordings prior to or during their formal statement.
     a.    Generally, the formal statement should begin with the involved officer providing a statement based on the officer's recollection of the incident. Relevant video/audio may then be reviewed (in the presence of a member of the OICI team) prior to the completion of the formal statement.
     b.    Deviation from this guideline is at the discretion of the OICI Commander.
     c.    Interviews of MPD officers by an outside agency will be in accordance with the outside agency's standard procedures.
7.    The involved officer will have an opportunity to review for accuracy the report detailing their statement before it is submitted.

HKThefts_Madison_00033246

8. All interviews of involved officers will be audio recorded unless impractical or the officer refuses.

9. The Assistant Chief of Investigative & Specialized Services (or designee), after consulting with the Assistant Chief of Operations (or designee), Professional Standards & Internal Affairs (PSIA), and the OICI Commander, will determine whether the officer(s) will be ordered to provide statements. If the officer(s) is (are) ordered to provide statements, adhere to the following procedure:

   a. PSIA will order the officer(s) to provide a statement and the order will be documented in writing.

   b. The compelled interview will be audio recorded and transcribed, and will be documented under the PSIA case number for the critical incident review.

   c. PSIA will coordinate the compelled interview of the involved officer(s) with the goal of obtaining a complete and accurate statement from the officer(s). This may involve the utilization of Detectives as primary interviewers. If Detectives are utilized, the OICI Commander, after consultation with PSIA, will assign Detectives that have not been involved in the criminal investigation to be the primary interviewers.

   d. Detectives conducting the compelled interviews will report directly to PSIA and the original reports will be maintained by PSIA. Content of the compelled interview (and reports documenting the compelled interview) will only be used for internal investigation/review of the incident and will not be released to the District Attorney's Office (or other prosecuting entity), to the OICI Investigation Team, or to any member of the public. Compelled statements will only be subject to release when no possibility for criminal prosecution (of the subject of the compelled interview) remains.

   e. If a compelled statement is made prior to the resolution of a district attorney review of a criminal investigation, then a second Assistant Chief will be involved to oversee the criminal investigation.

   f. Deviations from this procedure may only occur with the approval of the Chief (or designee).

J. **Officer Involved Death: Scene Investigation**

The Outside Agency Lead Investigator or designee is responsible for the investigation of the scene, to include documentation and recovery of all evidence. At the discretion of the outside agency lead investigator, the physical tasks (measuring, photographing), may be delegated to another agency, including the involved agency, but in all cases, will be overseen by the outside agency lead investigator (unless circumstances require immediate evidence collection to avoid loss or contamination).

1. The Outside Agency Lead Investigator will take possession of or direct the collection of all evidence. The Outside Agency Lead Investigator will work with the assisting agency(s) to determine which items of evidence will be conveyed for analysis (to the crime lab or elsewhere).

2. The Outside Agency Lead Investigator, or scene investigator designee, is responsible for maintaining the integrity of the crime scene(s) until the initial investigation is concluded.

3. The scene investigator designee shall regularly communicate their findings to the outside agency lead investigator. At the appropriate time, they will facilitate a walk through for personnel from the district attorney's office and the involved agency's command staff as needed.

K. **Officer Involved Death: Interviews of Community Member Witnesses**

1. All key community member witnesses should be audio recorded when possible.

2. Photographs should be taken from the vantage point of key witnesses.

HKThefts_Madison_00033247

L.    **Officer Involved Death: Canvass**

    1.    A canvass should be completed only at the direction of the lead investigating agency. Ultimately, it is important that all citizen witnesses be located, identified, and thoroughly interviewed. However, full community member interviews should not be completed by MPD personnel unless the lead investigator requests it, or the information is perishable (as determined by the on-scene MPD supervisor or the OICI Commander).

    2.    Consider documenting vehicle plates and descriptions from the canvass area.

    3.    Consider documenting names on mailboxes if appropriate.

M.    **Officer Involved Death: Duties of the District**

    1.    Ensure that involved personnel have had appropriate opportunities to contact family members, Union officials, and/or attorneys.

    2.    Ensure that Employee Assistance Program (EAP) services have been offered.

    3.    Officers directly involved in the incident shall be placed on Administrative Leave with Pay. This leave is not a suspension and is no way to be construed as disciplinary action or any indication of wrongdoing on the part of the officer(s).

    4.    Ensure that within 72 hours of the incident, the involved officer(s) are contacted by an MPD approved traumatic stress professional.

    5.    Ensure that regular command updates are given to the Chief and to the Assistant Chief of Operations.

    6.    If applicable, ensure that the Significant Exposure to Blood Borne Pathogens SOP is followed.

    7.    Responsible for Community Care tasks.

    8.    Ensure the City's external medical call-in line (Paradigm,844-847-8709) is contacted for each involved officer noting the reporting is to document exposure to a critical incident event. The employee's supervisor will call this external line on the employee's behalf.

N.    **Officer Involved Death: Duties of Assistant Chief of Investigative & Specialized Services**

    1.    Will make request for an outside agency lead investigator.

O.    **Officer Involved Death: Duties of the Chief or Highest Ranking Officer**

    1.    The Chief or highest ranking officer available should provide a press conference or briefing within four (4) hours of the case time when officer actions result in the death or great bodily harm of a member of the community or a member of the Department.

P.    **Officer Involved Death: District Attorney**

    1.    Will have the option to view the scene (walk through).

    2.    Observe the investigation from the Command Post.

Q.    **Officer Involved Death: Lead Investigator's Report**

    1.    Per Wis. Stat. § 175.47(5)(a), "The investigators conducting the investigation under sub. (3)(a) shall, in an expeditious manner, provide a complete report to the district attorney of the county in which the officer-involved death occurred. (b) If the district attorney determines there is no basis to prosecute the law enforcement officer involved in the officer-involved death, the investigators conducting the investigation under sub. (3)(a) shall release the report...."

    2.    The Outside Agency Lead Investigator shall prepare a written report as required above. This report will summarize the entire investigation, including the actions performed by

HKThefts_Madison_00033248

the Outside Agency Lead Investigator, as well as those actions performed by other investigators to whom those tasks were delegated.

3. Prior to submitting their report, the Outside Agency Lead Investigator will gather and review all reports generated by other investigators, as well as other available relevant reports such as the autopsy report, crime lab results, and medical records.

4. A complete copy of all reports, photographs, audio/video recordings, and other records collected by the Outside Agency Lead Investigator will be given to the district attorney along with the Outside Agency Lead Investigator's report.

5. The Outside Agency Lead Investigator, along with a representative of the involved agency, shall meet with the district attorney at the conclusion of the investigation for a formal review of the incident.

**Other Officer Involved Critical Incident (OICI):** An event in which an officer is involved as a principal, a victim, or is the custodial officer, where significant injury likely to cause death occurs or when an officer intentionally discharges their firearm at another person. In the event of an other officer involved critical incident involving an MPD officer as the principal officer, the Chief of Police will determine whether the criminal investigation will be handled by MPD or whether an outside agency will be requested. If an outside agency is requested, the investigation will be conducted consistent with the officer involved death investigation procedures in this SOP (except where inapplicable). If MPD conducts the investigation, a qualified observer from an outside agency will be requested to monitor the investigation.

A.    **Other Critical Incidents: Duties of Involved Officer(s)**

1. Immediately notify dispatch of incident and location.
2. Render first aid and request response by emergency medical services.
3. Officer(s) shall inform a supervisor or the Officer-in-Charge of the incident as soon as possible.
4. Protect and secure the scene until relieved.
5. Identify witnesses for subsequent interviews. Involved officer(s) shall not participate in the interviews of witnesses.
6. Brief the first arriving supervisor of the nature of the incident and consider providing a voluntary Public Safety Statement consistent with Section C below.
7. When relieved of duties at the scene by a supervisor, remain with assigned uninvolved officer and proceed to a local hospital.
8. Upon request, surrender all weapons and equipment used in the incident in the officer's possession at the time of the incident. Replacement of weapons and equipment will occur as soon as practical.
9. The Involved Officer(s) will be required to provide a blood sample. The blood draw and subsequent testing will be in accordance with Attachment B.
10. Reporting requirements for involved officer(s) will be completed by investigators assigned to the incident.
11. Review for content and accuracy the report(s) detailing their statement(s).
12. Unless exigent circumstances related to an on-going threat require it, involved officers shall not watch video related to the incident until their formal interview with OICI detectives or upon receiving the approval of the OICI Commander.
13. Unless exigent circumstances related to an on-going threat require it, involved officers shall not discuss the incident with other involved officers until after the completion of their formal interview with OICI detectives.

B.    **Other Critical Incidents: Duties of On-Scene Supervisor**

1. Assume responsibility for the security and preservation of the scene.
2. Contact the officer(s) involved to obtain a Public Safety Statement.
3. Notify the dispatcher to broadcast a message if no officer(s) have been injured.
4. In the event an officer is injured, immediately notify the Officer-in-Charge.

HKThefts_Madison_00033249

5. Ensure that a non-involved supervisor, if not already at the scene, responds immediately to the scene of the incident. (A non-involved supervisor is defined as one who has not been involved specifically at the scene, or involved in any tangential fashion, e.g., operation planning, drafting of search warrants, surveillance officers, intelligence gathering, etc.).

6. Establish a scene command post and give location to the Dane County Public Safety Communications (911 Center).

7. As soon as practical, relieve the officers directly involved in the critical incident of any further responsibilities at the scene. A non-involved fellow officer shall be assigned to accompany the involved officer(s), until the appropriate evidence collection has occurred. If the involved officer elects to speak about the incident with the non-involved officer, those conversations are not privileged and may become part of the investigation.

8. Provide an opportunity for the involved officer to contact Union officials or legal counsel as soon as practical. Provide phones and numbers as needed.

9. Protect the scene and separate and secure witnesses until the arrival of investigative personnel.

C. **Public Safety Statement**

1. Response to Public Safety Statement questions by the principal officer is voluntary.

2. The first arriving supervisor not involved in the incident will seek a Public Safety Statement from the involved officer. This is not an interview, but will address only the most basic information regarding the incident, to include the following:
   a) Injuries requiring immediate medical intervention
   b) Location and description of offenders
   c) Identify evidence in order that it be protected from loss, etc
   d) Identity of witnesses
   e) Has the scene changed or been altered in any way since the incident
   f) Use of force, what type of force was used
   g) A minimal summary of the event in order to address and better understand the first six investigative points

2. 3. If practical possible, the Public Safety Statement should be done with a Forensic Services Unit (FSU) Investigator present. If this is not possible/practical, a second short statement can be obtained if needed.

3. 4. The supervisor obtaining the Public Safety Statement will document the information in a report and share it with the outside investigating agency.

4. 4. In the event a supervisor is not available, a detective or investigator also may take the Public Safety Statement from the involved officer(s).

5. 5. The supervisor, detective or investigator obtaining the Public Safety Statement will document the information in a report.

D. **Other Critical Incidents: Duties of the Officer-In-Charge (OIC)**

1. Notify the OICI Team Commander or designee and the Forensic Services Sergeant.

2. Contact the District Commanders of the District where the incident occurred. If the incident occurred outside of the employee's assigned district, the District Commanders of the involved employees should also be notified.

3. Notify the Chief, Assistant Chief of Operations, and Assistant Chief of Investigative & Specialized Services.

4. Contact Dane County Public Safety Communications (911 Center) and direct them to inform officers of the status of the incident (e.g., injuries to officers and community members, important information). This should generally be done in a private manner (email, phone, MDC, etc.).

5. In the event of an injury or death of an employee, notify the immediate family per the Line of Duty, Life Threatening Injury, or Death of an Employee SOP.

HKThefts_Madison_00033250

6.  Notify Professional Standards and Internal Affairs Unit (PSIA) and the Public Information Officer (PIO).
7.  Notify the Peer Support Team Coordinator and deploy any on-duty Peer Support Officers to the scene to initiate the Critical Incident Stress Management protocol.
8.  Follow the Aftercare Protocol and deploy Critical Incident Partner officers to the scene.
9.  All media releases shall be cleared through the OICI Commander and the Office of the Chief of Police.

E.  **Other Critical Incidents: Duties of the OICI Commander**

1.  Contact Assistant Chief of Investigative & Specialized Services and make notification of the critical incident.
2.  Ensure that services regarding the involved personnel have been provided.
3.  Overall management of the case. Communicate and coordinate with the Violent Crime Unit (VCU) Supervisor as necessary. Make investigative assignments and coordinate investigative efforts to include the following:
    a.  Designate a lead detective
    b.  Designate a scene detective to oversee each scene
    c.  Designate a canvass detective
    d.  Designate an involved officer detective
    e.  Designate a subject/decedent detective
    f.  Designate a detective to serve as a liaison to the subject/decedent family, if appropriate
    g.  Coordinate investigative response to the hospitals, if appropriate
4.  Communicate with the OIC.
5.  Communicate with Command Staff.
6.  Make appropriate notifications as needed:
    - Chiefs
    - District Command
    - DA's office (if appropriate and in all homicide cases)
7.  Communicate with MPD Finance Unit staff for case number cost accounting.
8.  Designate case as "Extraordinary" for Telestaff/payroll purposes (if appropriate).
9.  Communicate with the Involved Agency
        a. When MPD is the involved agency, facilitate the release of information to MPD personnel.
        b. When MPD is the investigating agency, the OICI Commander may provide investigative status updates (i.e., progress, timeline, things completed) to the chief executive (or their designee) of the involved agency. Specific details regarding information obtained during formal interviews of the involved officer(s) may be shared with the involved agency after the completion of all formal interviews.
10. Management of personnel (assignments, monitoring hours worked, etc).
11. Managing overtime and arranging relief for staff.
12. Evaluate need for support staff.
13. Evaluate the need for the Focused Interruption Coalition (FIC).
14. Notify Property Room staff and evaluate needs (if appropriate).
15. Ensure phone calls made to the command post are answered and information recorded.
16. Arrange for special equipment or needs of the investigation.
17. Keep Chief and Assistant Chiefs apprised of investigation.
18. Facilitate a walkthrough of the secure and intact scene for personnel from PSIA and/or from the DA's office, as well as involved personnel (if appropriate). The purpose of this walkthrough is to give these representatives an understanding of the conditions and layout of the scene for future proceedings.
19. Ensure that a copy of the criminal investigation is provided to the Dane County District Attorney's Office, to include all reports, attachments, and videos.

HKThefts_Madison_00033251

F.    **Other Critical Incidents: Duties of the Outside Law Enforcement Agency Observer**

1.    Will view the scene.
2.    Will be partnered with the OICI Commander
3.    Will observe the investigation with the OICI Commander.
4.    Will report to their Executive Officer designee.
5.    Will do a summary memo to their Executive Officer on the integrity of the investigation. This should not be a summary of the facts of the case, but rather an overview as to whether the investigation was thorough, objective, impartial, and consistent with best practices relating to the investigation of law enforcement critical incidents.
6.    The Executive Commanding Officer or their designee will share the memo with the Chief of the Madison Police Department. The memo will become part of the case file.

G.    **Other Critical Incidents: Duties of OICI Investigation Team**

1.    Review the Officer Involved Critical Incident Investigation Conflict of Interest Checklist and report to OICI Commander if there is the potential for a conflict of interest. See Attachment A for the checklist.
2.    Assist with the criminal investigation of incidents within the City of Madison and conduct OICI investigations outside the City of Madison as directed by the Chief of Police.
3.    Detectives will be assigned a specific function by the OICI Commander that may include any of the following:
    a.    Lead Detective - see major case protocol
    b.    Scene Detective - see major case protocol
    c.    Canvass Detective
        i.    Conduct canvass as directed by the OICI Commander in the case of MPD investigating the incident, OR only as directed by the lead investigating agency. It is important that all community member witnesses be located, identified, and thoroughly interviewed. These interviews may be conducted by police officers or detectives. All key community member witnesses shall be audio recorded when possible. Detectives should be equipped with portable audio recorders for this purpose. Photographs should be taken from the vantage point of key witnesses.
        ii.    Utilize Canvass form and questions as a guideline for the canvass.
        iii.    Screen contacts for persons requiring more detailed interviews.
        iv.    Consider documenting vehicle plates and descriptions from the area.
        v.    Consider documenting names on mailboxes if appropriate.
        vi.    Search for and document all video cameras within the canvass perimeter and notify the scene lieutenant.
        vii.    Share canvass results with scene lieutenant and OICI Commander and complete a report.
        viii.    When appropriate, work with the OICI Commander to designate a Video Detective. The Video Detective is responsible for ensuring that all video is collected as evidence according to best practices. The Video Detective shall write a report detailing the contents of all collected video.
        ix.    Work with the assigned Crime Analyst to ensure a complete canvass of the designated area.
    d.    Involved Officer Detective
        i.    Work with FSU Investigators to ensure that evidence on the involved officer is collected and that needed photographs of the involved officer are taken.
        ii.    Ensure that an FSU Investigator retrieves and takes custody of the weapon(s) used by the officer(s) at the hospital if possible or at a

HKThefts_Madison_00033252

neutral site. The OICI Commander shall determine whether the circumstances of the incident require that the officer's duty weapon be taken for laboratory analysis. When the duty weapon is taken, the FSU Investigator shall take custody of the officer's weapon in a discrete manner and it should be replaced with another weapon, or the officer will be advised that it will be returned or replaced at a later time as appropriate. (When processing an officer's personal weapon as evidence, consideration shall be given to marking the weapon with the necessary information as inconspicuously as possible.) FSU Investigators will also take needed photographs and collect evidence from the officer(s) involved at the scene, hospital, or other neutral site.

    iii.    Inform the OICI Commander if the officer has suffered a Significant Exposure.

    f.    Suspect / Injured Party / Decedent Detective

        i.    Ensure the presence of an FSU investigator for appropriate evidence collection.

        ii.    Notify the Dane County DA's Crime Response Program

        iii.    If the injury is serious and / or incapacitating, confirm that a family member or next-of-kin has been contacted.

            1. Establish a rapport, provide notification of services, and provide required documents regarding victim rights.

            2. Establish a timeline for the Suspect / Injured Party / Decedent's activities for the recent past.

            3. Gather additional investigative information: Identify witnesses, suspects, evidence, or crimes.

            4. Obtain the family's statements regarding Suspect / Injured Party / Decedent.

        iv.    Maintain communication with the family or next-of-kin throughout the investigative process, with attention paid to working with Dane County's Crime Response Program to explain the process and procedure to the next of kin while recognizing the unique emotional needs that may be present in an OICI incident.

## H.  Other Critical Incidents: Crime Analysts

1. The primary responsibility of the Crime Analyst will be to partner with the canvass detective to ensure a thorough and complete canvass for witnesses and video evidence.

## I.  Other Critical Incidents: Hospital Supervisor

1. Serve as a liaison with hospital staff to ensure that all involved-officers are kept separate from suspects, witnesses, or other injured parties, and that the investigation does not unduly disrupt the normal operations of the hospital.

2. In conjunction with the involved agency, establish appropriate security for suspects and/or department member(s).

3. Work with the OIC to ensure that an injured officer's, or department member's, family members, spouse, or significant other are notified, and if practicable, transported to the medical facility, pursuant to the member's wishes. See Line of Duty, Life-Threatening Injury, or Death of an Employee SOP.

4. Work with the OICI Commander to ensure detectives are assigned to interview any witnesses present and that all evidence is collected. If possible, an FSU Investigator who has not been to the crime scene will conduct evidence gathering at the hospital. Care should be taken to preserve the integrity of physical evidence present on the involved officer's equipment, person, or clothing until investigators can collect it. It may be

HKThefts_Madison_00033253

inappropriate to wait for an FSU investigator to photograph the involved officer or to collect evidence under certain circumstances (such as to facilitate medical treatment, or to address significant exposure concerns, etc.).

5. Ensure that an FSU Investigator collects a blood sample from the involved officer(s) in accordance with Attachment B.

6. Ensure that the names of treating MFD and hospital staff are documented.

7. Brief the command staff and/or family members of any injured department member(s) as soon as circumstances allow.

8. Ensure the City's external medical call-in line (Paradigm, 844-847-8709) is contacted for each involved officer noting the reporting is to document exposure to a critical incident event. The employee's supervisor will call this external line on the employee's behalf.

9. Check in with the Command Post before leaving the hospital

J.     **Other Critical Incidents:  Interviewing Involved Officers**

1. Involved officer(s) will be given the opportunity to provide voluntary statements. The OICI Commander or Lead Detective will communicate with the officer(s)' Union Representative or legal counsel on this issue. No officer will be disciplined for declining to make a voluntary statement.  If the officer(s) decline to provide voluntary statements, the criminal investigation will proceed without the officer(s)' statements.

2. Detailed interviews should be delayed to allow the involved officer time to overcome the initial stress of the incident. Whenever practical, the involved officers should give one formal statement with all needed parties present.

3. Involved officers are not to file any reports.

4. Involved officers shall not participate in any group debriefings until they have completed their detailed interview.

5. If the interview is to be observed by personnel other than those directly involved, the officer and any representatives will be notified.

6. If audio and/or video records are available and are relevant to the involved officer's point of reference of the incident, the involved officer may be allowed to review the recordings prior to or during their formal statement.
   a. Generally, the formal statement should begin with the involved officer providing a statement based on their recollection of the incident. Relevant video/audio may then be reviewed (in the presence of a member of the OICI team) prior to the completion of the formal statement.
   b. Deviation from this guideline is at the discretion of the OICI Commander.

7. The involved officer will have an opportunity to review for accuracy the report detailing their statement before it is submitted.

8. All interviews of involved officers will be audio recorded unless impractical or the officer refuses.

9. The Chief of Police is the sole authority as to when an officer is arrested unless exigent circumstances exist.

10. The Assistant Chief of Investigative & Specialized Services, after consulting with the Assistant Chief of Operations (or designee), PSIA, and the OICI Commander, will determine whether the officer(s) will be ordered to provide statements. If the officer(s) are ordered to provide statements, the following procedure will be adhered to:

    a. PSIA will order the officer(s) to provide a statement and the order will be documented in writing.
    b. The compelled interview will be audio recorded and transcribed and will be documented under the PSIA case number for the critical incident review.
    c. PSIA will coordinate the compelled interview of the involved officer(s) with the goal of obtaining a complete and accurate statement from the officer(s). This may involve the utilization of Detectives as primary interviewers. If Detectives are utilized, the OICI Commander, after consultation with PSIA,

HKThefts_Madison_00033254

     will assign Detectives that have not been involved in the criminal investigation to be the primary interviewers.

d. Detectives conducting the compelled interviews will report directly to PSIA and the original reports will be maintained by PSIA. Content of the compelled interview (and reports documenting the compelled interview) will only be used for internal investigation/review of the incident and will not be released to the District Attorney's Office (or other prosecuting entity), to the OICI Investigation Team, or to any member of the public. Compelled statements will only be subject to release when no possibility for criminal prosecution (of the subject of the compelled interview) remains.

e. If a compelled statement is made prior to the resolution of a District Attorney review of a criminal investigation, then a second Assistant Chief will be involved to oversee the criminal investigation.

f. Deviations from this procedure may only occur with the approval of the Chief (or designee).

K.   **Other Critical Incidents: Duties of the District**

1.   Ensure adequate supervision at all scenes.
2.   Ensure that involved personnel have had appropriate opportunities to contact family members, Union officials, and/or attorneys.
3.   Ensure that EAP services have been offered.
4.   Officers directly involved in the incident shall be placed on Administrative Leave with Pay. This leave is not a suspension and is no way to be construed as disciplinary action or any indication of wrongdoing on the part of the officer(s).
5.   Ensure that within 72 hours of the incident, the involved officer(s) are contacted by an MPD approved traumatic stress professional.
6.   Ensure that regular command briefings are given to the Chief and to the Assistant Chief of Operations.
7.   If applicable, ensure that the SOP regarding Significant Exposure to Blood Borne Pathogens is followed.
8.   Responsible for Community Care tasks.
9.   Ensure the City's external medical call-in line (Paradigm, 844-847-8709) is contacted for each involved officer noting the reporting is to document exposure to a critical incident event. The employee's supervisor will call this external line on the employee's behalf.

L.   **Other Critical Incidents: Duties of Assistant Chief of Investigative & Specialized Services**

1.   Oversight of the criminal investigation.
2.   Coordinate media releases until such time that this responsibility is delegated back to the District.
3.   Will make the request from for an outside agency lead investigator, or outside agency observer.

M.   **Other Critical Incidents: Duties of the Chief or Highest Ranking Officer**

1.   The Chief or highest ranking officer available should provide a press conference or briefing within four (4) hours of the case time when officer actions result in the death or great bodily harm of a member of the community or a member of the Department.

N.   **Other Critical Incidents: District Attorney**

1.   Will have the option to view the scene (walk through).
2.   Observe the investigation from the Command Post.
3.   All reports, attachments, videos, etc. involving the critical incident shall be submitted to the District Attorney's Office for review.

**PS&IA Function – Officer Involved Deaths and Critical Incidents**

A.    **Officer Involved Death and Other Critical Incidents: PSIA Lieutenant**

1.    The PSIA Lieutenant will coordinate with the OICI Commander and designate a supervisor to make the Use of Force Blue Team entry.
2.    Will determine which officers will be required to undergo an administrative blood draw.
3.    Will receive the results of the any administrative blood draw and will notify the officer of The results of any testing.
4.    Will notify the criminal investigation that blood results are available.

B.    **Officer Involved Death and Other Critical Incidents: MPD Policy Compliance Review**

All Officer Involved Deaths and Other Critical Incidents shall be reviewed for compliance with MPD Policy.

1.    Professional Standards and Internal Affairs Unit (PSIA)
      a.    PSIA has the primary responsibility for conducting the internal investigation to ensure compliance with MPD Policy, Procedures, Regulations, Work Rules, and Training and Standards.
      b.    PSIA may be present in the command post and at key steps in the investigation (scene walk through, interviews, etc.) as appropriate. The OICI Commander retains responsibility for directing the investigation.
      c.    PSIA may observe the interviews of involved officers conducted by OICI personnel.
      d.    PSIA shall have access to all reports and interview transcripts.
      e.    Additional supervisory personnel may be assigned to PSIA as needed.
      f.    If the criminal investigation has not obtained a full account of the observations of the on-scene emergency medical providers, PSIA will interview them as part of the administrative investigation
      g.    The PSIA internal review/investigation of the incident shall be concluded as soon as practical.
      h.    The PSIA findings of the incident may be utilized as the basis for future training.
      i.    PSIA will report the findings of the internal investigation directly to the Assistant Chief of Support Services.

2.    Assistant Chief of Investigative & Specialized Services
      a.    Oversee all internal investigations resulting from the Officer Involved Critical Incident that results in death or serious injury.
      b.    Review administrative command decisions of the internal investigation.

HKThefts_Madison_00033256

# Officer Involved Critical Incident
# Mental Health Response

**DEFINITIONS**

**Officer Involved Critical Incident (OICI):** An event in which an officer is involved as a principal, a victim, or is the custodial officer, where death or injury likely to cause death occurs or when an officer intentionally discharges their firearm at another person. This includes all in-custody deaths, use of deadly force, or serious motor vehicle crash involving a squad car.

**Critical Incident Partner (CIP):** A co-worker, of an involved officer's choosing, who is assigned to the officer involved in a critical incident. The CIP will act as a liaison between the officer, their family, and the MPD.

**Peer Support Officer (PSO):** Selected and trained Commissioned personnel who confidentially support MPD employees (Civilian and Commissioned), MPD retirees, and their families, who are confronting challenging stressors of everyday life. Peer Support Officers will also ensure that MPD's Critical Incident Stress Management (CISM) process is activated in the aftermath of a critical incident and will work with Critical Incident Partners (CIP) to provide aftercare to involved officers in a critical incident.

**CISM Provider:** A select group of mental health professionals that are available through the City's Employee Assistance Program (EAP) to provide Critical Incident Stress Management services in response to critical incidents. These services may include, but are not limited to, assessment, defusing, debriefing, follow up, and outreach to affected officers and family members/significant others.

**Consultant:** A licensed mental health professional whose practice includes the treatment of officers who experience a critical incident.

**Aftercare Response**

A. **Peer Support** – MPD SOP: Employee Assistance Program outlines the role of the Peer Support Officers in facilitating the CISM response, to include providing information about the stresses often induced by critical incidents, coordinating the defusing process immediately following the incident and prior to involved officers going home, and finally scheduling and facilitating any subsequent Critical Incident Debriefing. The role of the PSO in an OICI is to ensure that the MPD Employee Assistance Program SOP is observed and to facilitate our CISM protocol. The Peer Support Coordinator will be responsible for the oversight/monitoring of the aftercare process.

B. **Critical Incident Partner (CIP)** – The CIP is an officer pre-designated by the involved officer to be deployed to focus exclusively on the emotional welfare of the involved officer. Each officer will designate one or two officers in order of preference in advance of any involvement in a critical incident. Officers' pre-designated list of CIP officers will be housed confidentially in LERMS be consulted and activated upon an officer's involvement in a critical incident. The form will be completed/updated annually during the Employee Feedback process. The CIP will be pulled from their regular assignment and/or called in to work to support the involved officer. Guidelines for the role of the CIP are as follows:
   - The CIP will serve as a liaison for the involved officer and other MPD personnel throughout the investigative process.
   - The CIP may be put on Administrative Leave with Pay with the involved officer to whom they are assigned as support. The length of time that a CIP will be placed on Administrative Leave with Pay will be evaluated on a case-by-case basis and approved through chain of command.
   - The CIP will review the "OICI Aftercare Information" packet outlining MPD expectations and procedures with the involved officer following the incident.
   - The CIP will coordinate continued support and CISM care with the assigned PSO.

HKThefts_Madison_00033257

- Communications between the CIP and the involved officer regarding the critical incident are not privileged and therefore not confidential.

C.  **Critical Incident Stress Management** (CISM) – Recognizing that officers involved in a critical incident are likely to experience compounded stress related to the incident and any ongoing investigation(s) into their actions, the MPD CISM response to officers involved in an OICI will include additional formalized support as outlined in this SOP beyond that which is covered in the MPD Employee Assistance Program SOP. Support systems already in place under the MPD Employee Assistance Program SOP include a mandatory Defusing and optional attendance at any subsequent Critical Incident Debriefings.

D.  **Clinical Consultation** - Officers involved in a critical incident will be required to attend mandatory consultations with a Clinical Consultant. The first of these consultations will occur within 24-72 hours following the incident. Subsequent required sessions will be scheduled prior to the officer's return to work or at three (3) months, six (6) months post-incident; at one (1) year post-incident; and annually thereafter up to five (5) years post-incident (as indicated by the Clinical Consultant). The District/Unit Commander and the MPD Human Resource Coordinator will work with the involved officer(s) to schedule these mandatory consultations. Officers attending Clinical Consultation appointments outside of scheduled work hours shall make Telestaff entries that reflect the original case number and OT Extraordinary Event.

    The only feedback provided to MPD regarding the mandatory consultations is an acknowledgement from the Clinical Consultant that a meeting with the officer took place. No substantive information regarding the officer's medical or mental health condition will be shared with the MPD.

E.  **Administrative Leave with/Pay** – Involved Officers (as defined in this SOP) Officers involved in an OICI shall be placed on Administrative Leave with Pay for a minimum of two rotations, beginning with the first work day following the incident and will be placed on a Monday-Friday, 8 AM to 4 PM schedule. This leave is not a suspension and is in no way to be construed as disciplinary action or any indication of wrongdoing on the part of the officer. Officers on Administrative Leave with Pay should not be recognizable as police officers during contact with the public. They can go armed (including to court) as long as they receive permission through the Training Division.

F.  **Restricted Duty -** Involved officers may transition from Administrative Leave with Pay to a full or part-time restricted duty assignment. Officers on restricted duty should not be recognizable as police officers during any contact with the public. They can go armed (including to court) as long as they receive permission through the Training Division.
    a.  Before transitioning to a restricted duty assignment, the involved officer's District/Unit Command, the MPD Human Resource Coordinator, and the involved officer will ensure that:
        o  The involved officer has a desire to return to work in a Restricted Duty capacity.
        o  An agreed upon work schedule has been communicated to and approved by the appropriate Assistant Chief and Human Resource Coordinator.
        o  The involved officer has a clearly identified supervising commander.
        o  Work responsibilities and/or assignments are clearly defined and approved.
        o  The involved officer has attended required meetings with the clinical consultant.
        o  Re-familiarization training has occurred before participation in activities that may require emersion into stressful scenarios, such as special team training or in-service.

HKThefts_Madison_00033258

G. **Return to Full Duty** – The Chief of Police must approve an involved officer's return to full duty. Before becoming eligible for return to full duty, the involved officer's District/Unit Command, the MPD Human Resource Coordinator, and the involved officer will ensure that:

1. The office of PSIA has completed their review of the incident and final dispositions have been determined by the Chief of Police.
2. The investigation has been submitted to the District Attorney for review.
3. The involved officer has attended required meetings with the clinical consultant.
4. The involved officer has participated in a relevant re-familiarization training scenario as appropriate and depending on the circumstances surrounding the critical incident in which they were involved. For example, if an officer was involved in a critical incident that included the use of deadly force by use of a firearm, the officer would participate in a firearms course of fire facilitated by Personnel & Training staff. The purpose in this case is not to qualify the officer, but rather it is intended only to provide the officer with the opportunity to assess their own readiness and comfort level with respect to deadly force decision making and weapons handling.
   a. Re-familiarization training scenarios will be coordinated by Training staff as needed and will be tailored to provide the officer with a useful opportunity for self-assessment based on their specific incident.
   b. District/Unit command is responsible for coordinating this re-familiarization training for the involved officer with the Training team. After the re-familiarization/scenario based training has taken place, the District/Unit Commander shall ensure that the involved officer and the training team feel that restricted duty is appropriate/approved.

5. The officer has met with their District/Unit Captain or Lieutenant to establish a Return to Duty Plan.

**Return to Duty Plan** – It is important for officers involved in critical incidents to participate in developing their individual Return to Duty Plan. While the MPD will set minimum requirements, the involved officer, the MPD Human Resources Coordinator, and the officer's chain of command should all work together to create a plan that best meets the needs of the officer and facilitates a successful return to duty transition. Options to consider include:

o Graduated return schedule that allows for a paced re-entry.
o Return in a temporary Restricted Duty capacity or inside assignment for a period of time.
o Temporary change of assignment to a non-patrol work unit such as Traffic Enforcement Safety Team (TEST), Community Policing Team (CPT), partnering with a Neighborhood Police Officer (NPO), etc.
o Ride with a partner officer for a period of time.
o Return to regular assignment under close supervision.

No two officers react the same to involvement in a critical incident and each incident in and of itself brings to bear unique circumstances. For this reason, it is important to allow for flexibility in developing a return to duty plan. The key is that a clear plan should be developed and put in writing with all interested parties participating in its development so that all share the same understanding of the expectations and timeline set forth.

Officers involved in an OICI will be afforded the option of using Administrative Leave with Pay on the one-year anniversary date of the incident, regardless of staffing levels. Officers should work with their chain of command to facilitate this leave if desired.

H. **District Command Responsibilities** – In addition to the responsibilities discussed in the investigative portion of this SOP, District Command will ensure the following officer aftercare issues are addressed:

1. Coordinate Administrative Leave with Pay as appropriate and make all necessary Telestaff entries for this leave.

HKThefts_Madison_00033259

OFFICER INVOLVED DEATHS AND OTHER CRITICAL INCIDENTS                 STANDARD OPERATING PROCEDURE

2.  Establish a plan for regular contact with the officer while they are on administrative leave.
3.  Work with the CIP to provide ongoing updates to the officer regarding the status of the investigation, DA, and internal administrative reviews.
4.  Monitor the behavior of officers involved in critical incidents for symptoms of acute or prolonged stress.
5.  Coordinate with the Human Resource Coordinator that clinical consultation appointments are scheduled in accordance with the timing outlined in this SOP.
6.  Coordinate with the Captain of Training and their designee in identifying a training team member that will facilitate re-familiarization training.
7.  Consult with the Clinical Consultant regarding "readiness" for either a return to Restricted Duty and/or a Return to Full Duty.
8.  Meet with the officer and their CIP or other chosen support person to develop and document a Return to Duty Plan.

I.  **Responsibilities of the Madison Police Department Training Captain:**
1.  Assign an MPD training team member to provide a replacement handgun to the involved officer(s).
2.  Ensure that an identified training team member is assigned to review incident specifics to identify any possible training concerns and to work with the officer to provide any necessary review or clarification.
3.  Ensure that a training team member is assigned to the involved officer(s) to coordinate re-familiarization training or scenario based training for the involved officer as they work through an identified return to duty plan. The purpose in this case is not to qualify the officer, rather it is intended only to provide the officer with the opportunity to assess their own readiness and comfort level with respect to deadly force decision-making and weapons handling.
4.  Ensure that a training team member is assigned to consult with PS&IA during their internal review of the incident.
5.  Ensure that a training team member is assigned to receive the involved officer(s)' firearm(s) from an OICI Team member in order to have it function tested and inspected prior to returning it to the officer(s).

J.  **Responsibilities of the MPD Human Resource Coordinator**:
1.  Coordinate with the District/Unit Commander regarding all appropriate Telestaff entries.
2.  Ensure that all clinical consultation appointments are scheduled and attended.
3.  Ensure each employee's exposure to a critical incident has been documented with Paradigm.
4.  Ensure that any invoices received for medical treatment of involved officer(s) are appropriately addressed.

K.  **Ongoing Care/Post-Traumatic Stress Disorder Prevention** – Officers involved in critical incidents are at risk of developing and suffering from post-traumatic stress disorder (PTSD). Symptoms of PTSD may not arise immediately and in some cases, officers may attempt to hide the problem.

Because of the significant impact that these types of incidents can have on an officer's wellbeing over time and in an effort to provide ongoing support to mitigate the cumulative stress that often occurs in the aftermath of a critical incident, all supervisors and co-workers should monitor the behavior of officers involved in a critical incident for symptoms of acute or prolonged stress. All officers should be informed of and trained as appropriate regarding the nature of these incidents, potential symptoms of critical incident stress, as well as how the necessary investigations that often accompany an OICI are conducted. For this reason, ongoing communication with the officer throughout the process and following their return to duty is essential in stemming any long-term stress related to an OICI.

HKThefts_Madison_00033260

Original SOP: 11/06/2013
(Revised: 04/24/2014, 07/15/2014, 11/23/2015, 6/10/2016, 06/06/2017, 12/21/2017, 06/08/2018, 09/08/2020, 06/01/2022, 1/23/2024, 02/03/2025)
(Reviewed Only: 02/25/2016, 01/30/2019, 1/31/2023)

HKThefts_Madison_00033261

**Attachment A**

# Officer Involved Critical Incident
## Investigation Conflict of Interest Checklist

**Involved Officer:** An officer who is directly involved in the critical incident as a principal, a victim or is the custodial officer.

If any of the below criteria apply to you, you will not be eligible to participate as an investigator of the incident. You shall notify the OICI Commander immediately. If you have a potential conflict of interest, you shall discuss this with the OICI Commander before participating in the investigation.

1.    You are a direct relative or are related by marriage to the involved employee(s).

2.    You have been involved in a romantic or sexual relationship with the involved employee(s).

3.    A former spouse or domestic partner of yours is currently or has been involved in a relationship with the involved employee(s).

4.    You have been involved in an internal investigation as a complainant or subject of an investigation involving the employee(s).

5.    Any other possible conflict of interest that would create a potential appearance of unfairness in your ability to conduct an objective investigation (close friendship with the involved officer(s), etc.).

HKThefts_Madison_00033262

Attachment B

# Post-Incident Alcohol/Drug Testing

Any employee involved as the principal officer in an officer involved critical incident will be required to submit to chemical testing for alcohol and drugs as provided for in this document. The collection and testing will be in accordance with these guidelines:

1. The primary means of testing will be a blood draw conducted at a medical facility (in the event that a blood draw is not practical, urine may be used as an alternate test). If it is not practical for the sample to be collected at a medical facility, an alternate means of collection—utilizing an appropriately trained professional—may be used.

2. The sample will be collected as soon as is reasonably practical after the incident, taking other needed post-incident tasks into account (collecting other evidence, medical treatment, etc.).

3. The sample should be collected in the presence of an FSU Investigator. The FSU investigator will ensure that the sample is handled, transported, and shipped in accordance with proper evidence handling practices. In the event that an Investigator is not available to monitor the sample collection within a reasonable time frame, the OICI Commander may assign an MPD supervisor or OICI Team Member to do so. The sample will be turned over to an FSU Investigator as soon as possible for further handling.

4. A sufficient sample will be collected to allow for additional testing in case of an initial positive test.

5. The sample will be sealed and transported to a testing facility using proper evidence handling practices. MPD will not retain any portion of the sample.

6. MPD will request a report from the testing facility that shows the presence and concentration of the following substances and derivatives:
   a. Alcohol
   b. Marijuana/THC (Tetrahydrocannabinol)
   c. Cocaine
   d. Opiates
   e. Amphetamines
   f. LSD (lysergic acid diethylamide)
   g. PCP (phencyclidine)

7. The test result report will be directed to the PSIA Lieutenant and will be placed in the internal investigative file. The OICI commander will notify the outside investigating agency (if applicable) and the District Attorney's office that the test results are available. The test result report will be provided to the outside investigating agency and/or to the District Attorney's office if requested.

8. The PSIA Lieutenant or designee will share the test results with the involved employee. A copy of the results will go in the PSIA investigation file. The lab will automatically destroy any remaining sample six (6) weeks after the test results become available. The involved employee may request additional testing with the remaining sample. In that event, it is the responsibility of the involved employee to notify the PSIA Lieutenant that the employee would like any remaining sample to be preserved by the lab.

9. Other testing protocols as permitted by policy, APM, or law remain in effect.

HKThefts_Madison_00033263




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

## Personal Appearance

Eff. Date 01/27/2020 03/24/2025

## Purpose

All members of the department are visible representatives of the City of Madison and its Police Department. In an effort to present commissioned officers as recognizable to the public and to maintain a consistent and professional image to citizens with whom we have contact, as well as to other MPD employees, a neat, clean, and well-groomed appearance is required of all employees during work hours.

It is understood that what constitutes a "professional image" is in many ways a subjective matter. As such, while the guidelines outlined below provide specific parameters and restrictions, no personal appearance protocol can cover all contingencies or opinions as to whether or not one's particular personal appearance is "professional." For this reason, employees must exert a certain amount of judgment in their choice of appearance and clothing for those areas not specifically outlined in this SOP. If an employee is uncertain in these areas, they should seek input from a supervisor. **If/when differences of opinion arise, final discretionary authority as to what is allowable or prohibited under these appearance guidelines rests with the Chief of Police.**

## Procedure

### PERSONAL HYGIENE

All employees shall ensure that their body and clothing is kept clean to prevent offensive odor.

### TATTOOS AND BRANDING

1.  Tattoos and branding may be required to be kept covered if they are political, have a potential negative impact to MPD, or have potentially offensive words, terms, logos, pictures, cartoons, or slogans.
2.  Visible tattoos and branding on the ears, head, or face are prohibited. Visible tattoos on the neck area are prohibited unless approved by the Chief of Police.

### FINGERNAILS

Fingernails shall be professional in appearance and not be of a length that interferes with the safe and successful performance of one's job responsibilities.

### HAIR AND HAIR ACCESSORIES

An employee's hair shall not be such that it presents an unprofessional, unkempt, or neglected appearance. Hair accessories must be professional in appearance. If wigs and hair pieces are worn, they must conform to the established grooming standards.

Uniformed personnel (commissioned or civilian) with hair that is long enough to obstruct their vision should secure their hair in such a way so as not to interfere with their line of sight. Hair shall not in any way obstruct the visibility of any uniform insignia or the wearing of the uniform hat/cap, or the proper placement of protective head gear/gas mask.

### FACIAL HAIR

1.  Employees may wear beards, Vandyke goatees, mustaches, or other arrangements that present a groomed appearance when maintained in a neat, clean manner.

HKThefts_Madison_00033264

2. Sideburns will be neatly trimmed and tapered in the same manner as the haircut. They will be evenly trimmed on each side of the face.
3. Officers' facial hair shall be trimmed or shaved so as not to interfere with the proper seal of the gas mask.

## JEWELRY

1. Jewelry worn shall be professional and may not have potentially offensive words, terms, logos, pictures, cartoons, or slogans.
2. Earlobe hoops or plugs (used to enlarge piercing holes in the earlobes) are not allowed.
3. Officers and uniformed civilians may wear two rings on each hand, which cannot have a height over one half inch from the top of the finger.
4. Officers and uniformed civilians may wear one wrist watch.
5. Officers and uniformed civilians shall not wear more than two earrings on each ear. They shall not be larger than 10mm each.
6. Uniformed officers and uniformed civilians shall not wear any visible necklace, unless authorized by the department (i.e., ID chain).
7. Uniformed officers and uniformed civilians may wear one bracelet which fits close to the skin. Medical bracelets are also allowed.

## BODY PIERCING

All MPD personnel may wear one piece of body piercing jewelry (other than previously allowed earrings), no larger than 5mm that is professional in appearance, does not pose a safety risk, and does not interfere with the employee's job performance.

## NON-UNIFORM CLOTHING

Non-uniformed employees of the department should recognize that their appearance and dress reflect on the department in a manner similar to that of uniformed employees and therefore shall be professional in appearance. The non-uniform clothing standards below are minimum standards. Particular job duties (i.e., representing MPD at a meeting or event) may require the employee to dress to a higher standard. It is expected that employees will be aware of those situations and dress appropriately. They should contact their supervisor if they have questions about particular situations. There may also be times where job duties would reasonably allow for a lower standard of clothing than what is listed below. In those situations an employee shall obtain supervisor's approval before dressing to a lower standard.

1. Clothing shall be neat and clean and shall not be torn, frayed, stained, excessively faded, or sheer to the skin.
2. Clothing must cover the midriff and back.
3. Clothing shall not be excessively loose or tight fitting and must not impede work or pose safety hazards when people are doing the work required.
4. Clothing, buttons, badges, or pins shall not have political or potentially offensive words, terms, logos, pictures, cartoons, or slogans. US Flag pins are allowed that are no larger than one square inch.
5. Non-commissioned employees may wear shorts that are knee length or longer and are professional in appearance. Athletic shorts shall not be worn.
6. Undergarments shall not be visible.
7. Non-uniformed commissioned employees potentially engaged in field work shall not wear sandals, open toed shoes, or open backed shoes.
8. Strapless, halter, and spaghetti strap clothing shall not be worn unless worn under another blouse, shirt, or jacket.
9. Skirts and dresses are not permitted for commissioned staff as they are not compatible with operational field work.
10. Tank tops or muscle shirts shall not be worn unless worn under another shirt.
11. Beach-style flip-flops, bedroom slippers, and other shoes that are not professional in appearance shall not be worn.

12.  Headgear shall be appropriate for the circumstances and surroundings of the particular work environment the person is engaged in at the time. Scarves are allowed, as are head covers that are required for religious or medical purposes, with a Commander's approval.

13.  Sweatpants, bib overalls, lounge pants, and athletic pants are not acceptable attire while working in an office environment.

14.  The minimum clothing standard for court for employees is dress shoes, dress pants, shirt, blouse, suit, and a sport coat or tie.

15.  The Madison Police Department name, logo, badge, or patch (or any reasonable approximation intended to draw a connection to MPD) may not be used on any product, including clothing or other items, without the approval of the Chief of Police.  Personnel wishing to create new products and seek approval from the Chief must first consult with their commander.

Original SOP: 09/09/2014
(Revised: 08/03/2015, 01/27/2020, 03/24/2025)
(Reviewed Only: 02/15/2016, 12/20/2016, 12/26/2017, 02/04/2022, 02/05/2024)

HKThefts_Madison_00033266




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

---

## Police Motorcycles

Eff. Date ~~04/01/2022~~ 02/03/2025

## Purpose

The purpose of this standard operating procedure (SOP) is to establish guidelines for the use of the motorcycle and related equipment, including its use as an emergency vehicle in accordance with Wisconsin State Statute 346.03, and to promote the safety of officers and the public.

## Procedure

### AUTHORIZATION

Members of the Madison Police Department (MPD) are authorized to operate an MPD motorcycle for enforcement purposes if they possess a valid driver's license endorsed for motorcycle operation and after they have successfully completed an authorized police motorcycle operators training course. Motorcycle operators must attend and successfully complete annual motorcycle in-service training to maintain certification.

### USE OF MOTORCYCLES

Police motorcycles are fully marked Authorized Emergency Vehicles (AEV). They are assigned to the Traffic Enforcement Safety Team (TEST), used primarily for traffic enforcement, community outreach and education, and special events. ~~education and community engagement~~. Motor officers may assist with patrol calls or as back-up to other officers; ~~be available as back-up to other officers,~~ however, should not be used for general patrol duties unless in response to a true emergency. This does not preclude the use of a motorcycle in special assignments when approved by a supervisor. The officer assigned to a motorcycle shall use due regard when making a decision to respond to emergency calls for service in consideration of the unique characteristics of the motorcycle.

### EMERGENCY OPERATION OF POLICE MOTORCYCLE

Police motorcycle operators shall operate the motorcycle in accordance with the provisions of Wisconsin State Statute 346.03, as well as the MPD Emergency Vehicle Operation Guidelines SOP ~~MPD SOP regarding Emergency Vehicle Operation~~.

In all cases, when an officer elects to exercise the exemptions provided to police vehicles under Wisconsin State Statute operators must exercise due regard.

### VEHICLE PURSUITS

Motorcycles are not intended to be, nor should they be considered, pursuit vehicles. MPD Police motorcycles are authorized to be involved in pursuits subject to the following restrictions:

- Motor Officers shall only engage in a vehicle pursuit when the officer has probable cause to believe that any person in the vehicle has committed (or attempted to commit) a felony involving the use (or threatened use) of force and a high probability exists that the suspect, if not immediately apprehended, may cause death or great bodily harm to another. Officers may terminate and discontinue a pursuit when the act of pursuit, in and of itself, creates an unreasonable danger of death or great bodily harm to the public, officers, or the suspect.

- Motorcycles engaged in a pursuit shall drive with due regard and follow the MPD Emergency Vehicle Operation Guidelines SOP.

---

HKThefts_Madison_00033267

- Due to the increased vulnerability to the operator of a police motorcycle, any pursuit initiated by the motorcycle operator shall be taken over by a marked squad as soon as possible.

- A motorcycle officer who has turned over the primary pursuit to a marked squad shall not continue to be involved in the pursuit unless otherwise directed by the supervisor monitoring the pursuit.

## MOTORCYCLE INSPECTION

At the start of their tour of duty, motorcycle operators shall inspect the motorcycle for cleanliness and proper operation. Any deficiencies should be corrected prior to operation.

## REQUIRED EQUIPMENT

All operators of police motorcycles shall use the following safety equipment:
1. Department of Transportation (DOT) and MPD approved safety helmet
2. Eye protection
3. Approved leather boots
4. Motor-issued body worn camera (BWC)

## MOTOR-ISSUED BODY WORN CAMERAS

A BWC will be assigned to each Motor Officer motor unit. Motor Officers will utilize the BWC assigned to the respective motor that is assigned to them, or that they might be operating on a temporary basis.

BWCs are to be used when the Motor Officer is utilizing an MPD motorcycle as the Motor Officer's assigned vehicle for the shift or assignment, or as directed by a supervisor.

At the beginning of each shift or assignment, Motor Officers utilizing a BWC for their shift will ensure the BWC equipment is functioning properly by completing the follow procedures:

- Verifying the unit has uploaded prior shift/assignment files and that the unit is charged for the upcoming shift
- Mounting the BWC in a position where it can effectively record video and audio when activated throughout an officer's shift

At the conclusion of each shift or assignment, Motor Officers utilizing a BWC for their shift will upload download anyd/all video captured during the previous shift by completing the follow procedures:

- Docking the BWC in a bank or individual upload/charging cradle.
- Officers shall ensure that the "Classify Tag" and "Case File Number" fields of the recording window are filled out properly for each recording, within 48 hours of the file upload or as soon as practicable. If there is no case number associated with the recording, officer shall type their respective pd+initials "none" in the Case File Field. Officers should enter any additional information (e.g., license plate, name, suspect information, etc.) deemed pertinent to the investigation in the "Note" field. The classification tag, case file number, and additional information entered by the officer will serve as the initial selection for the duration of the video retention of each video recording.

Motor Officers may operate motorcycles when their assigned BWC is not functioning or not available.
- If problems with the BWC system are identified, motor officers are required to report the issue to Information Management and Technology (IMAT) by calling the IMAT support line Monday-Friday 8:00am-4:30pm at 608-261-9655 or by sending an email containing the BWC number and description of the problem to the IMAT support email address, imat@cityofmadison.com.

Motor Officers are not required to operate BWC during specialty assignments such as escorts.

HKThefts_Madison_00033268

## OPERATION OF MOTOR-ASSIGNED BWCs

1)  Motor Officers should activate and record (which includes a 30-second pre-event) the following:
    a.  All traffic stops;
    b.  All interviews as required by Wisconsin State Statutes when other established recording facilities are not available, practical, or preferred;
    c.  When an officer attempts to place an individual into physical custody (either criminal or protective) when safe to do so;
    d.  When approaching an individual the officer reasonably anticipates may be taken into custody when safe to do so;

2)  BWCs may also be utilized to record any other official police contacts or actions beyond those listed in point #1 above.

3)  Officers should make reasonable efforts to position the BWC to accurately capture events.

4)  Once initiated, video and audio recordings should remain activated until the incident or event has concluded or until deactivation is permissible. The conclusion of an incident or event has occurred when any arrest(s) related to the incident have been made and arrestee(s) have been transported, after a stopped motor vehicle driver is released from a traffic stop, or when no further law enforcement action is likely to occur related to the incident or event. Deactivation of video and audio recordings prior to the conclusion of the incident or event is permissible:
    a.  When an officer is not directly involved in activity related to the incident or event (i.e., blocking traffic at a position not near the scene of an incident); officers not directly involved in the incident or event do not need to complete a report if the purpose is to just document the cessation of their recording;
    b.  When an officer reasonably believes there is no evidentiary value in collecting further video and audio; for transparency reasons, officers shall document in a report or in call notes the assessment for the cessation of any recording, or
    c.  When the incident or event is of such duration that recording needs to be deactivated to conserve power or storage capacity of the BWC and the officer is not directly involved in activity relating to the incident or event (i.e., blocking traffic at a position not near the scene of an incident).

5)  Officers may temporarily mute audio recording of conversations between police personnel for administrative reasons including, but not limited to, the following:
    a.  Employee to employee training (e.g., during Field Training, incident debriefings, etc.);
    b.  Officer to supervisor discussions about incident dispositions and/or charging decisions;
    c.  Employee to employee discussions involving response strategy or tactics; or
    d.  Personal conversations unrelated to the incident or event being investigated.

6)  Reasons for any intentional interruptions/microphone muting during video recordings shall be audibly noted prior to the muting and documented within official reports, narrative sections of citations, or in call notes. After the purpose of a temporary mute of an audio recording has concluded, officers shall reactivate the audio recording.

## VIDEO TRANSFER AND DOCUMENTATION

Video recording(s) shall be transferred at least once during the course of each work shift or assignment during which the officer wore a BWC. Exceptions to this must be approved by the Officer in Charge (OIC) or other supervisor. Transfer of video from BWC units shall be accomplished by USB wired transfer at workstations at the designated motor officer assignment locations (East, Midtown, and South Police District stations) or via bank or individual cradle.

HKThefts_Madison_00033269

Officers should make every attempt to transfer video recording(s) deemed to be evidence prior to the end of their shift. If the video transfer process requires the employee to be on overtime, the officer shall obtain prior approval for the overtime from a supervisor or from the OIC.

If the video does not transfer or other BWC device issues occur, contact Information Management and Technology (IMAT) through the support line Monday-Friday 8:00am-4:30pm at 608-261-9655 or send an email containing the BWC unit number and description of the problem to the IMAT support email address, imat@cityofmadison.com prior to the end of the employee's shift.

**MOTOR-ASSIGNED BWC VIDEO MANAGEMENT**

This section will follow the "In-Car Video Management" section as outlined in the MPD "In-Car Video System" SOP.

All Motor-Assigned BWC video system recordings are official police records which are subject to Wisconsin Open Records Law.

Original SOP: 01/13/2017
(Reviewed Only: 12/26/2017)
(Revised: 01/15/2020, 04/01/2022, 02/03/2025)




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

## Response to Persons with Altered State of Mind

Eff. Date: 01/14/2022
02/03/2025

## Purpose

To provide guidance for Madison Police Department (MPD) personnel when responding to or encountering situations involving persons displaying behaviors consistent with an altered state of mind, that may be caused by mental illness, emotional crisis, or the influence of drugs and/or alcohol. We recognize that most persons in an altered state of mind are not dangerous and may only present dangerous behavior in certain circumstances or conditions.

## Definitions

*Altered state of mind*: "An altered state is any mental state(s), induced by various physiological, psychological, or pharmacological maneuvers or agents which can be recognized subjectively by the individual (or by an objective observer of the individual) as representing a sufficient deviation in subjective experience of psychological functioning from certain general norms for that individual during alert, waking consciousness" [The Wiley-Blackwell Handbook of Transpersonal Psychology].

## Procedure

Responding to situations involving individuals who officers reasonably believe to be in an altered state of mind carries the potential for violence; requires officers to make difficult judgments about the mental state and intent of the individual; and necessitates the use of police skills, techniques, and abilities to effectively and appropriately resolve the situation. The goal shall be to resolve the situation as safely as possible for all individuals involved. Depending on the totality of the circumstances and the behavior of the individual, officers should consider requesting Madison Fire Department (MFD) personnel to respond and stage prior to making contact with the subject.

Only a trained mental health professional can diagnose mental illness. Officers are not expected to diagnose mental or emotional conditions, but rather, to recognize behaviors that are indicative of persons affected by mental illness or crisis, with special emphasis on those that suggest potential violence and/or danger. Officers are trained to respond to mental health related incidents in such a manner so as to de-escalate crisis situations whenever possible.

The following are generalized signs and symptoms of behavior that may suggest that a person is currently in an altered state of mind – whether due to mental illness, acute emotional crisis, or reactions to alcohol, psychoactive drugs, or medical conditions:

- Persistent fear of persons, places, or things
- Frustration and/or anxiety in new or unforeseen circumstances
- Abnormal memory loss related to basic information (e.g. name, home address, recent events)
- Delusions – fixed false beliefs
- Hallucinations – the experience of sights, sounds, or other perceptions in the absence of external stimuli not under the subject's voluntary control
- Agitation
- Confusion or disorientation

While the above signs/symptoms may inform the ultimate resolution of the situation, officers should assess the danger a person presents to self or others as soon as is feasible. Factors that should be considered as part of any threat assessment may include:

HKThefts_Madison_00033271

RESPONSE TO PERSONS WITH ALTERED STATE OF MIND                     STANDARD OPERATING PROCEDURE

- Availability of any weapons
- Statements by the person that suggest the person is prepared to commit a violent act
- Information provided by reliable reporters (family members, mental health professionals, etc.)
- A personal history of violence known to officers
- Inability of the person to physically control their emotions of rage, anger, fright, or agitation
- Other special circumstances consistent with Defensive and Arrest Tactics (DAAT) and departmental training

If feasible, under the totality of the circumstances, officers should attempt to slow down or stabilize the situation so that more time, options, and resources are available for the best possible resolution. Examples of de-escalation with a person in an altered state of mind may include, but are not limited, to the following:

- Effective use of back-up
  - Have only one officer communicate with the person at a time
  - Request additional personnel if indicated (e.g., Mental Health Officers (MHOs), Crisis Negotiation Team (CNT) members, etc.)
- Effective use of distance and time, when feasible
  - More distance generally creates more time to react, which allows more options to be considered (e.g., less lethal options ~~munitions~~, use of a ballistic ~~tactical~~ shield, etc.)
  - When feasible, use additional time to increase the likelihood of a positive resolution
- Effective use of cover/concealment
  - Placing or using environmental barriers between the person and officers
- Effective communication from a safe position
  - Take steps to calm the person
  - Actively listen to the person's concerns
  - Explain the person's options
  - Orient the person to reality
  - Attempt to be truthful, when possible
  - If feasible, gather additional information about the person
- Any other tactics and approaches that attempt to achieve public safety ~~law enforcement~~ objectives

Once the subject and scene have been stabilized, officers should work to resolve the situation using the least restrictive measures to secure the welfare of all those concerned, to connect individuals with mental illness or substance use concerns ~~Alcohol and Other Drug Abuse (AODA) issues/dependency~~ to needed services, and to divert them from the criminal justice system whenever possible. Strong consideration should be given for a medical evaluation, particularly when the source or reason for the behavior cannot be determined or if the source is suspected drug use or a mental health crisis. This medical evaluation can be accomplished either by requesting that MFD personnel respond to the scene of the contact or by transporting the subject to an emergency room ~~depending on the circumstances~~.

See also: MPD's Mental Health Incidents/Crises SOP, Use of Force SOP, and Intoxicated and Incapacitated Persons SOP ~~Standard Operating Procedures~~.

Original SOP: 09/15/2017
(Revised: 12/23/2019, 01/14/2022, 02/03/2025)
(Reviewed Only: 12/26/2017, 01/30/2019, 01/11/2021, 01/31/2023)

HKThefts_Madison_00033272




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

## Search Warrant Service

Eff. Date <mark>01/31/2023</mark> <mark>02/03/2025</mark>

Search warrants will only be sought where probable cause exists to believe that evidence, contraband, or a person for whom an arrest warrant exists is in the location named in the warrant. Command approval is required prior to seeking a search warrant for any building, dwelling, or other occupied premises. Command approval is not required to apply for a search warrant for property or vehicles that are already in Madison Police Department (MPD) custody/control, or for premises that are already occupied and controlled by MPD personnel.

All search warrants requiring any type of tactical/forcible entry will be planned and serviced as knock and announce warrants by MPD Special Weapons and Tactics (SWAT) personnel. The following process will be utilized:

1.  The District/Team/Work Unit wanting to serve the search warrant obtains permission from their command staff to proceed with the search warrant planning process. The appropriate Assistant Chief will be notified.

2.  District/unit commander or designee contacts an MPD SWAT commander or supervisor to request assistance with warrant planning and service. The MPD SWAT Search Warrant Request Summary form will be completed and provided to District and SWAT Command. A SWAT supervisor will be designated to coordinate the planning process.

3.  The district/unit commander or designee will assist SWAT in the planning process as needed (providing intelligence/information, assisting with threat assessment, etc.).

4.  SWAT personnel will plan and serve the warrant. District/unit personnel may be requested to assist with the tactical plan (stop cars, etc.) and will be responsible for the post-entry investigative aspect of the warrant. District command staff will coordinate post-warrant communication with the neighborhood/community as appropriate (based on investigative needs, impact on the area, visibility of the tactical operation, etc.).

5.  MPD Personnel should not apply for no-knock search warrants that will be served by MPD SWAT.

The threat assessment/planning process will dictate the number of personnel, equipment, and tactics to be used during warrant service. All personnel directly involved in a search warrant operation will be in uniform or otherwise clearly identifiable as police. The operational plan and tactics utilized will be consistent with MPD SWAT training and procedures and with best practices. Operational planning for search warrant service will focus on mitigating risk to officers, suspects, and community members.

**Unknown Risk and High-Risk Warrants**

SWAT assesses warrant service as either unknown risk or high-risk. Regardless of known or perceived risk factors, and whether or not the warrant is deemed to be high-risk or unknown risk, ***MPD SWAT will utilize knock and announce practices on all warrant service.*** The use of knock and announcement is based on guidance and best practices provided by the National Tactical Officers Association (NTOA) and is congruent with MPD's and SWAT's safety priorities.

<mark>*Knock and Announce*</mark>

Officers must knock and announce prior to entering the dwelling. The team leader is responsible for performing the knock and announce function and for notifying dispatch or the Command Post of such, or designating another officer to do so.

HKThefts_Madison_00033273

When knocking and announcing, officers must provide notice to anyone inside the residence, including verbal and physical announcements/notifications, including use of a public address device (PA), police sirens, knocking on the door to the dwelling, and other means and mechanisms in order to announce their presence and purpose. The knock and announcement must be reasonably audible to persons inside the dwelling. It is only necessary to knock and announce once per dwelling.

After knocking and announcing, officers must wait a reasonable amount of time for the occupants to allow entry. If a reasonable amount of time passes and officers are not allowed in, entry may be forced. What constitutes a reasonable time is primarily dependent on the time of day the warrant is served and the size of the residence.

If occupants refuse to comply with officers, or if there is no response, a forcible breach of the residence may be authorized by the Command Post.

Should a forcible breach be authorized, MPD SWAT may employ a variety of tactical methods and equipment in order to serve the warrant while minimizing risk to uninvolved subjects, officers, and suspects.

*High-Risk Warrant Service*

High-Risk Warrants typically involve a greater investment of police personnel and utilization of additional equipment and resources in order to address and/or mitigate the various risk factors.

The following factors should be considered when evaluating whether service of a particular warrant is high-risk:

- Presence of firearms at the location to be searched
- Presence of other weapons posing a risk to officers at the location to be searched
- History of firearm possession/use on the part of suspects or others who may be present at the location to be searched
- History of possession/use of other weapons on the part of suspects or others who may be present at the location to be searched
- History of violence on the part of suspects or others who may be present at the location to be searched (includes any history demonstrating a risk/threat to officers)
- History of resisting officers on the part of suspects or others who may be present at the location to be searched
- Presence of dangerous dogs at location to be searched
- Fortifications
- Look outs
- Other specific dwelling issues (size of dwelling, location, etc.)
- Video surveillance

*Waiver of Knock and Announce Requirement*

Under certain circumstances, the requirement to knock and announce may be waived. During warrant service where information and/or observation indicate that the situation has transitioned into a hostage situation or active shooter, there is no requirement to knock and announce prior to making entry. It is also understood that in a fluid and dynamic tactical environment, there may be other circumstances that justify waiver of the knock and announce requirement; however, for most circumstances, a tactical disengagement and other efforts aimed at avoiding the compression of time is the appropriate response.

Original SOP: 03/04/2015
(Reviewed Only: 02/17/2016, 11/08/2017, 01/31/2020, 02/05/2024)
(Revised: 01/19/2017, 11/27/2018, 12/01/2020, 01/03/2022, 01/31/2023, 02/03/2025)

HKThefts_Madison_00033274




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

## Sexual Assault Investigations

Eff. Date ~~01/31/2023~~ 02/03/2025

## Purpose

To provide guidelines and expectations for the Madison Police Department (MPD) response to Sexual Assault Investigations involving adult and child victims. Consistent with our MPD Core Values and Mission Statement, we strive to deliver the highest service possible while following a victim-centered, trauma-informed approach to the investigation of these crimes.

Sexual Assault allegations will be investigated in an unbiased manner, free of assumptions and stereotypes about victims. Personnel investigating sexual assault allegations will keep in mind that victims of these crimes may present with a wide range of potential reactions to sexual assault, some of which may not be in line with an officer's investigative objectives.

When investigating sexual assault allegations, officers should work to build rapport with the victim, use trauma-informed and victim-centered practices, treat the victim with respect and dignity, and document the victim's statement as provided by the victim, using exact quotes when possible.

## Definitions

**Victim-Centered:** Placing the crime victim's priorities, needs, and interests at the center of the investigation. Ensuring that restoring victims' feelings of safety and security are a priority and safeguarding against practices that may inadvertently re-traumatize victims.

**Trauma-Informed:** Investigations are conducted with an understanding of the effects of trauma on survivors, including the many and varied emotional *and* physical responses victims may *or may not* have to a traumatic experience. Priority is placed on restoring the survivor's feelings of safety, choice, and control.

## Procedure

**INVESTIGATING CASES INVOLVING ADULT VICTIMS OF SEXUAL ASSAULT**

1. Adult victims should be offered trauma-informed and culturally competent services and supports when possible.
    a. The initial responding officer shall advise the victim they may request to be interviewed by an officer of the gender of their choice. Should the victim request an officer of the gender different from the gender of the initial responding officer, the officer shall immediately notify a supervisor and a reasonable attempt will be made to honor the victim's request.
        i. Once follow up has been assigned to a detective, the case will remain with the detective regardless of gender.
    b. If the victim has Limited English Proficiency (LEP), the initial responding officer shall take reasonable steps to provide free language assistance services to that victim in accordance with MPD's Language Access Services Standard Operating Procedure (SOP).
        i. Interviews of victims, particularly of sensitive crimes, should be done in the victim's primary language.
        ii. Children or other family members or friends of the victim should not be used to interpret the victim's statement.
        iii. Victim Advocates and Dane County Social Workers should not be used to interpret the victim's statement, as that may run contrary to their professional mission and ethos.

HKThefts_Madison_00033275

   c. The initial responding officer shall, as soon as is practicable, offer to contact an advocate from the Rape Crisis Center to respond to support the victim throughout the reporting and evidence collection process.

   d. In the event of a fresh occurrence, where a public danger exists, the initial responding officer shall make a reasonable attempt to obtain suspect, officer safety, and other relevant information to relay to other officers as soon as possible.

   e. The officer conducting the victim interview shall:

      i. Spend time building rapport with the victim, assuring their physical safety and getting them medical care as soon as practicable. Interview the victim using open-ended, narrative inviting questions.

      ii. Allow the victim to provide their statement with as little interruption as possible. The officer should utilize natural breaks in the victim's statement to ask follow-up questions, recognizing that victims may not provide statements in chronological order due to the effects of trauma.

      iii. Notify the Officer-in-Charge (OIC) of the circumstances of the incident. The OIC will determine ~~if the incident is a 1st or 2nd degree sexual assault or~~ if additional investigative resources or advice is needed. ~~, and, if~~ If so, the OIC will ensure that the On-Call Detective Lieutenant (if after normal business day) or the appropriate Family Justice/Sensitive Crimes (FJ/SC) Lieutenant (adult victims) or the Special Victims Unit (SVU) Lieutenant/Detective Sergeant (child victims) ~~District Detective Lieutenant is~~ are notified of the circumstances. The exception to notification is an incident involving consensual sex between teenagers within 3 years of age.

      iv. Collect any available evidence from the victim and scene(s), (e.g., photos, clothing, biological items, etc.), and also offer and recommend a medical forensic hospital exam if the assault occurred no more than 120 hours prior to the time it is reported. Meriter Hospital's Forensic Nurse Examiner (FNE) program should be used for collection of biological evidence from the victim.

         1. Any time an officer is dispatched for a sexual assault and the victim is reporting, the officer should stand by outside the room while the exam is being done, in case the nurse needs to communicate with the officer, and to then take the evidence for processing.

         2. Please see the SOP on Searches, specifically the Strip Search section, for further details on the collection of evidence from the suspect.

         3. An Investigator, at the request of the interviewing officer or a supervisor, shall process the scene(s) of a sexual assault for evidence, including photos.

         4. All sexual assault FNE kits shall be physically or electronically submitted to the Wisconsin State Crime Lab (WSCL) by the assigned case detective. The submission form can found on the WSCL website, which is titled "DFS Transmittal":
https://www.doj.state.wi.us/dfs/evidence-submission-information.

         Electronic submissions to the WSCL Forensic Case Manager are permissible when the complexities and/or facts of the case may require WSCL input prior to the physical transport of the FNE kit. If submitted electronically and the WSCL will accept the FNE kit for analysis, the kit will then be physically submitted to the WSCL by the assigned case detective.

         If WSCL denies the FNE kit, whether physically or electronically submitted, WSCL will provide the submitter a letter of refusal stating why the FNE kit is not being accepted. This letter shall be scanned as an attachment into the case file and a report shall be completed by the submitter.

         This SOP does not pertain to FNE kits collected in any other type of criminal investigation (e.g. strangulation).

HKThefts_Madison_00033276

For questions regarding the submission of evidence, refer to the contact information for the lab in our service area (Madison Crime Lab – 608-266-2031). For questions about Evidence Submission Guidelines, please contact the WSCL Forensic Case Manager (currently: Kathy Mahnke, via email at mahnkeka@doj.state.wi.us or 608-609-6125) [most current contact information accessible online] – https://www.doj.state.wi.us/dfs/evidence-submission-guidelines

5. Even if the assault occurred more than 120 hours prior to the time of the report, victims should be told of the existence of the Meriter FNE program, specifically that the victim can be tested for sexually transmitted infections and/or treated for other injuries.

## INVESTIGATING CASES INVOLVING CHILD VICTIMS (SEXUAL AND PHYSICAL ABUSE AND NEGLECT)

1. Child victims should be offered trauma-informed and culturally competent services and supports when possible.
   a. As with adult victims, if the child victim has Limited English Proficiency (LEP), the initial responding officer shall take reasonable steps to provide free language assistance services to that victim in accordance with MPD's Language Access Services SOP.
   b. Family members, friends, Victim Advocates and Social Workers should not be used to interpret the child victim's statement.
2. The primary officer shall notify Dane County Human Services (DCHS) within 12 hours of the report of a sexual assault of a juvenile per state statute 48.981(1)(2)&(3).
3. The primary officer shall notify the parents or guardians, if appropriate, of the juvenile victim within 24 hours.
4. When investigating a sexual assault of a child under the age of 16, the investigating officer should collect as much information as possible without interviewing the victim. However, in some cases, given the unique circumstances of an investigation, an officer may determine that it is necessary to obtain a limited statement from the child in order to identify and address immediate investigative needs (e.g. probable cause elements, location/venue, safety concerns, evidence collection, etc.). Further investigative and interview considerations are outlined in more detail later in this SOP. The officer shall notify the OIC of the unique investigative circumstances.
   a. The OIC shall contact the Special Victims Unit (SVU) Lieutenant (if after normal business day) or Special Victims Unit Detective Sergeant prior to conducting a detailed interview or physical exam.
   b. The subsequent investigation will be at the direction of the SVU Lieutenant or SVU Detective Sergeant assigned to the case.
5. When the investigating officer or detective for cases involving child victims determines that probable cause exists that the suspect has committed crimes in violation of the statutes listed below, the cases will routinely be referred to the district attorney for criminal prosecution:
   a. Sexual intercourse or sexual contact under s. 940.225, 948.02, 948.025 or 948.085
   b. Sexual exploitation of a child under s. 948.05
   c. Permitting, allowing, or encouraging a child to violate s. 944.30 (Prostitution)
   d. Causing a child to view or listen to sexual activity s. 948.055
   e. Causing a child to expose genitals or pubic area s. 948.10

## INVESTIGATIONS INITIATED BY HUMAN SERVICES

### Officer-in-Charge Information

Child Protective Services (CPS) workers have been asked to make Dispatch the first point of contact for Madison Police Department (MPD) collaboration for the initial field investigation when responding to reports of child abuse and neglect. It is MPD's established procedure to respond to these initial reports with on-duty patrol officers.

HKThefts_Madison_00033277

**Responding Officer/Field Supervisor Considerations**

1. Determine who will lead the interview (Officer or DCHS worker).
2. If CPS leads the interview, officer should take *detailed* notes of interview.
   a. Officer should document the child victim's own words, in quotation marks, whenever possible.
   b. Officer should document, in quotation marks, questions asked of the child by the DCHS worker.
3. Officer *can and should* ask questions pertaining to their investigation if those questions are not asked by CPS.
4. Officer must ensure they have explored the elements of alleged crime.
5. CPS is ultimately responsible for conducting a safety assessment for the child (making sure the child is safe).
6. Regardless of who leads the interview, officers shall complete a detailed report.
7. Note: If Children are alleged victims of abuse by a caregiver or unknown person, the children can be interviewed without parental consent at any location police are legally authorized to be present (see Wisconsin statute 48.981(3)(c)1.b.).

## INVESTIGATIONS CONDUCTED WITHOUT CPS PRESENT

- A CPS worker will not respond out to the field to make contact with a child victim in every case. In order to assist CPS in determining whether or not a worker will respond to the field, the responding officer should attempt to obtain as much collateral information as possible from parties other than the child to inform CPS's decision to respond or not. Gathering this collateral information from other sources will also allow the officer to make an educated decision as to whether or not an interview of the child victim in the field is necessary should CPS not respond.

  o The responding officer should collect collateral information from the reporting party, the non-offending parent (if possible), any third parties that may have pertinent information (teachers, counselors, friends, etc.), and any witnesses to the alleged abuse.

  o After collecting this collateral information from sources other than the child, the officer should make phone contact with the on-call CPS worker and provide all collateral information gained from these sources. The responding officer should ask the CPS worker to share any other pertinent information CPS may have regarding the child victim or other involved parties. The responding officer should inquire with CPS if there are current open cases involving this child victim and/or the alleged offender, or if there were prior cases and/or screen-outs involving this child victim and/or the alleged offender. The responding officer should obtain any pertinent identification and contact information for the alleged offender and others involved in the present investigation.

  o If, after this information sharing with the on-call CPS worker, the CPS worker indicates they will respond to the field, the responding officer shall wait to continue their investigation with the CPS worker. If the CPS worker responds, follow the considerations listed above. If the CPS worker advises they will not respond to the field, the responding officer must consider whether or not to interview the child.

- To assess the need to interview the child in the field, the responding officer must evaluate whether or not they have corroborated information of abuse, neglect, or that the child witnessed a serious crime (domestic violence, weapons offense, homicide) from their collateral information sources and their contact with CPS.

  o If the responding officer has corroboration that the child is a victim of abuse or neglect, the officer must ensure the preservation and collection of pertinent evidence. The responding officer, in consultation with the OIC or the SVU Lieutenant/Detective Sergeant, should offer, explain, and provide an opportunity for a FNE exam if circumstances warrant it. The

HKThefts_Madison_00033278

responding officer must also offer, explain, and provide an opportunity for photographs to be taken that capture any visible injuries, whether they appear fresh or to have healed. The responding officer should ensure that any weapons or implements alleged to have been used to injure the child are seized as evidence.

- The responding officer should determine if the child is in need of immediate medical treatment and work with the non-offending parent or caregiver to obtain that treatment for the child. The officer should also make an assessment if the child is safe in its present placement situation.

- If the officer believes, based on their investigation, that the child victim is at risk of manipulation, threats, or pressure to recant their initial disclosure, or the officer can articulate that future access to the child victim may be limited by others, the officer may decide to interview the child in the field. If the officer determines an interview of the child in the field is necessary, the officer shall contact the OIC and provide them with the basis for this decision. The OIC shall contact the SVU Lieutenant for consultation and consideration of detective resources being called in.

  o  Should the responding officer interview the child in the field, the officer should not do a "truth/lie" assessment, nor should they use any body diagrams/drawings. The "truth/lie" assessment is only necessary for a recorded forensic interview, which a field interview is not. Body diagrams/drawings should only be used post-disclosure by a trained interviewer.

  o  The officer must use open-ended questions that allow the child to answer in narrative form, in the child's own words. An officer should spend some time building rapport with the child prior to transitioning to the topic of concern. The officer can ask the child questions like the following: "Tell me all about it." and "Do you know why I'm here to talk to you today." The use of "tell me" questions will allow the officer to obtain the elements of the crime, identify potential evidence, determine jurisdiction, and identify any witnesses. If the "tell me" questions, coupled with collateral information have not given the timeframe of the incident, the responding officer should attempt to ascertain "when" from the child. The responding officer should attempt to determine timeframe using developmentally appropriate words and open-ended questions.

  o  Officers should understand that a child's ability to sequence events and to provide timelines varies based on the child's developmental abilities, chronological age, and whether or not the child encoded that detail of the abuse. Officers should not ask a child to guess as to timelines of events. If the child provides information that the incident was not recent enough to raise evidentiary concerns (i.e. the need for a FNE, visible injuries, scene preservation), an estimate by the child is sufficient.

- Responding officers can refer to the purple First Responder Contact Without CPS reference card for guidance when out in the field. The above information is summarized in the below outline, which is located on that reference card.

## REFERENCE CARD OUTLINE – FIRST RESPONDER CONTACT WITHOUT CPS

1. Collateral Information Collection from Others.
   a. Reporting Party.
   b. Non-offending parent (if possible).
   c. 3rd Parties with information (teachers, counselors, friends, etc.).
   d. Witnesses.

2. CPS Contact.
   a. Provide CPS information obtained from #1.
   b. Determine other collaborative information from CPS.
      i. Other open/prior cases with subjects.
      ii. Identification/contact information for offender and others.

HKThefts_Madison_00033279

      c.  Will CPS come out?
- i. Yes - wait to continue investigation with CPS.
- ii. No - proceed to #3.

      d.  If CPS responds, determine who will lead the interview (Officer or DCHS worker).
- i. If CPS leads the interview, officer should take *detailed* notes of interview.
- ii. Officer *can and should* ask questions pertaining to their investigation if those questions are not asked by CPS.
    1) Officer must ensure they have explored the elements of alleged crime.
- iii. CPS is ultimately responsible for conducting a safety assessment for the child (making sure the child is safe).

3. Factors to Determine if Officer Should Conduct Child Interview.
   a. Do we have corroborated information of abuse, neglect, or that child witnessed (CRIME) obtained by #1 and #2? No need for officer to interview child.
       i. Preserve/collect pertinent evidence.
          1) FNE exam/photos/weapons/implements/etc.
          2) Determine if child is in need of immediate medical treatment.
          3) Determine if the child is safe in its present placement.
   b. Even if 3.a. is present, officer articulates need for immediate child interview (manipulation of child's testimony, family dynamics/pressure, etc.).

4. Contact Sergeant/OIC.
   a. Provide information obtained from #1, #2, and #3.
   b. Determine if on-call Detective Lieutenant will be contacted (and presumably, a detective called in).

5. Officer Interview of the Child.
   a. General guidelines.
       i. Do NOT do truth/lie.
       ii. Do NOT use body diagrams.
       iii. Must use open-ended questions (i.e., "tell me all about it").
          1) "Tell me *what* happened." (elements of crime).
          2) "Tell me *how* it happened." (evidence - weapons, DNA).
          3) "Tell me *where* it happened." (jurisdiction).
          4) "Tell me who else was there." (witnesses).
          5) If the "tell me" questions, coupled with collateral information, have not given the *"when,"* attempt to ascertain *"when"* from the child.
             a) Developmentally appropriate words.
             b) If not recent enough to raise evidentiary concerns, close is good enough.

6. See "Searches" SOP for guidance on suspect FNE exams.

Original SOP: 11/18/2015
(Revised: 04/05/2016, 12/06/2017, 05/02/2018, 10/05/2020, 01/14/2022, 01/31/2023, 02/03/2025)
(Name change only: 05/03/2016)
(Reviewed Only: 01/09/2017, 01/30/2019, 02/05/2024)

HKThefts_Madison_00033280




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

## Special Events Team Specialty Teams

Eff. Date 01/03/2024 03/28/2025

## PURPOSE

The purpose of this standard operating procedure (SOP) is to establish guidelines for the Madison Police Department (MPD) Special Events Team (SET) Specialty Teams' functions and responsibilities outside of crowd event activations. SET Specialty Team crowd event activation details are available in the MPD Demonstrations and Assemblies SOP. The SET Specialty Teams include the following specialty teams: Bike Team, Community Dialogue Team (CDT), Dignitary Protection Team (DPT), Field Extrication Team (FXT), Grenadiers, Logistics, and Medics.

## DEFINITIONS

**SET Bike Team**: The SET Bike Team, under the direct command of the MPD SET, provides a more nimble transportation and response option for SET personnel beyond the range and capabilities of on-foot SET personnel. SET Bike Team members have specialized training and skills to use police bikes to perform crowd engagement and management duties.

**SET Community Dialogue Team (CDT):** The SET Community Dialogue Team (CDT), under the direct command of the MPD SET, exists to provide informational and educational opportunities about event and demonstration activities. SET CDT members work closely with Community Dialogue Representatives and are often designated tapped to serve as Demonstration/Event Liaisons when feasible.

**SET Dignitary Protection Team (DPT):** The SET Dignitary Protection Team (DPT), under the direct command of the MPD SET, may be used during dignitary visits within the jurisdiction of MPD. DPT members receive specialized training in skills related to planning a dignitary visit, providing direct protection to dignitaries, and driving in a motorcade. DPT members prepare to serve in both uniformed and plainclothes official capacities.

**SET Field Extrication Team (FXT)**: The SET Field Extrication Team (FXT), under the direct command of the MPD SET, exists to better respond to protest events with an internal resource. SET FXT members have specialized training and skills to extricate persons from protest devices when demonstrators' actions and/or practices unreasonably impede traffic, restrict the public's freedom of movement, and/or jeopardize public safety.

**SET Grenadiers**: The SET Grenadier position, under the direct command of the MPD SET, exists to enhance the capabilities of SET. The SET Grenadier team members have specialized training, equipment, and skills in the use of chemical (CS) and oleoresin capsicum (OC or Pepper Spray) munitions, sprays, or aerosols, and in the deployment of impact munitions.

**SET Logistics**: The SET Logistics Team, under the direct command of the MPD SET, is responsible for the organization, standard guidelines, and maintenance of SET's physical assets. SET Logistics Team members ensure that needed SET assets are deployed and available for any given SET activation, and that the assets are properly stored at the conclusion of any activation.

**SET Medics**: The SET Medic position, under the direct command of the MPD SET, exists to better respond to protest and crowd events with an internal resource. The SET Medics have specialized training and skills to provide immediate emergency medical care to officers and to community members within an austere environment.

HKThefts_Madison_00033281

**SET SPECIALTY TEAM PERSONNEL**

SET Commanders will designate a primary SET command structure (sergeant(s), lieutenant, and captain) to supervise the overall operation of each SET Specialty Team.

When any SET Specialty Team needs to add new members, that team's primary commanders will select new members from eligible SET members through a process determined by SET commanders. The SET Medics and SET Grenadiers should maintain a number of team members sufficient to staff each SET platoon with at least two (2) SET Medics and two (2) SET Grenadiers. SET members can serve on more than one SET Specialty Team; however, given the equipment needs of SET Medics and SET Grenadiers, SET members will not be allowed to maintain simultaneous assignment to the SET Medics team and to the SET Grenadiers team.

**TRAINING/STANDARDS**

All members of any SET Specialty Team shall attend all full-team and specialty team trainings scheduled throughout the year unless excused by a SET commander or designee. Membership on any SET Specialty Team is a privilege and specialty team members shall remain dedicated to serving in their specialty role(s), shall remain committed to maintaining the core competencies of their specialty team assignment(s), and shall be physically able to perform the necessary tasks associated with their specialty team assignment(s). SET Specialty Team members shall also demonstrate the proper use and handling of all equipment and must be able to use their team's assigned equipment safely. Records of all trainings and activities shall be maintained in the participating officers' personnel file and SET commanders shall designate a SET supervisor or senior member of each SET Specialty Team to forward to MPD Training the records related to any training. Each SET Specialty Team further employs the following training and standards guidelines for each team:

- **SET BIKE TEAM**: The SET Bike Team trains biannually. SET Bike Team members must also take an International Police Mountain Bike Association (IPMBA) certification training, MPD Bike Training, or equivalent as soon as practicable after selection to the SET Bike Team if not already certified before selection.

- **SET COMMUNITY DIALOGUE TEAM**: The SET CDT convenes biannually ~~quarterly~~, with at least one of these two ~~four~~ sessions open to community attendance and participation. ~~SET CDT members must also take the Wisconsin Unified Tactics Professional Communications Skills instructor course as soon as practicable after selection to the SET CDT if not already a certified PCS instructor before selection.~~

- **SET DIGNITARY PROTECTION TEAM:** The SET DPT trains at least biannually.

- **SET FXT**: The SET FXT trains quarterly. New SET FXT members will be sent to Field Force Extrication Tactics training as soon as practicable after selection to the SET FXT.

- **SET GRENADIERS**: The SET Grenadiers train biannually.

- **SET LOGISTICS**: The SET Logistics team convenes as a group when needed to coordinate details related to any new equipment acquisitions, storage location adjustments, or other logistical considerations.

- **SET MEDICS**: The SET Medics train quarterly. SET Medics shall maintain any required certifications or licenses as determined by the SET commander(s). SET Medics shall follow appropriate protocol for treatment as established by the following authorities: the State of Wisconsin Department of Justice Law Enforcement Standards Board for Tactical Emergency Casualty Care and the directions, trainings, and protocol as ordered by the Medical Director of the Madison Police Department.

HKThefts_Madison_00033282

**SET SPECIALTY TEAM DEPLOYMENT**

SET Specialty Team(s) will be deployed to crowd events pursuant to the provisions of the MPD Demonstrations and Assemblies SOP.

MPD members shall use the following guidance when evaluating any request to employ the use of the following SET Specialty Teams within the City of Madison jurisdiction:

- **SET Bike Team**: At the request and/or with approval of a supervisor, SET Bike Team members may utilize MPD police bikes to respond to calls for service and as a mode of transportation during their work shift. Officers should have a City of Madison Police vehicle equipped with a bike rack accessible (i.e., available at a district station, parked near a deployment) when utilizing bikes as an alternate mode of transportation during their shift. SET Bike Team members should deploy in numbers no fewer than at least two (2) Bike Team members for any deployment on bikes.

- **SET CDT**: SET CDT members should be selected to serve as Demonstration/Event Liaisons whenever available and requested by SET Command for known/planned events. In the case of a spontaneous crowd event, an MPD supervisor or the Officer in Charge (OIC) should notify a SET commander to determine if there are any available on-duty SET CDT members who could assist with communication attempts with the event organizers/person(s)-in-charge.

- **SET DPT**: SET DPT members may be requested to provide support when there is a visiting dignitary. The request should include the extent of protection that is being requested, what kind of protection detail the dignitary will provide, known threats to the dignitary, the itinerary of the event, transportation being requested, and contact details the DPT event lead can contact for more information.

- **SET FXT**: SET FXT members should not carry FXT equipment outside of SET deployments or during the course of their regular duties unless authorized by a SET commander or designee. In the event that patrol personnel respond to an incident where a protest device is being used, officers on scene should notify a street supervisor and/or the Officer in Charge (OIC) that a protest device is being used. The OIC should then notify a SET commander to determine if the SET FXT should be activated. The SET FXT may be utilized for situations outside of a SET deployment under specific requests with the approval of a SET commander or designee and with the authorization of the Chief of Police or the Chief's designee.

- **SET Grenadiers**: SET Grenadiers should not carry Grenadier equipment outside of SET deployments or during the course of their regular duties unless authorized by a SET commander or designee. In exigent circumstances, SET Grenadiers may deploy specialized grenadier equipment without the permission of a supervisor, but shall inform a SET commander as soon as practicable. Upon deployment of chemical, OC, or impact munitions by SET Grenadiers, available SET members should assist with decontamination and medical treatment of those affected, unless circumstances specifically prohibit rendering such assistance.

- **SET Logistics**: SET Logistics Team members may deploy SET vehicle assets (minivans, Utility Terrain Vehicles (UTVs)) outside of a SET deployment under specific requests with the approval of a SET commander.

- **SET Medics**: At the request of a supervisor, or at their own discretion, SET Medics may deploy to a call for service involving mass casualties or to a clear need for emergency medical care coverage. SET Medics may also respond to an emergent tactical call where there is a potential for injury to officers or others, but to which Madison Fire Department Tactical Emergency Medical Services (MFD TEMS) personnel have not yet arrived. In the event of such a deployment, the SET Medic shall notify SET command and/or the Officer in Charge (OIC) as soon as practicable.

HKThefts_Madison_00033283

SPECIAL EVENTS TEAM SPECIALTY TEAMS

SET Medics may keep their SET-issued specialized medical equipment with their regular work equipment for this purpose.
- o  Deployment of SET Medics on SET Bike Team:
  - SET Medics who deploy with the SET Bike Team for any assignment shall carry their medical gear with them on bike.
- o  Deployment of SET Medics to SET Field Extrication Team extrications:
  - At least one SET Medic should be present during any extrication. A SET Medic, the FXT supervisor, or designee shall request a Madison Fire Department ambulance to be on standby in a reasonable staging location to the extrication.

**MUTUAL AID**

SET Specialty Teams may be deployed pursuant to a mutual aid request from another agency for the particular team's specialty with the approval of a SET commander and with the authorization of the Chief of Police or Chief's designee. In any mutual aid deployment, SET Specialty Team members shall always abide by the MPD Code of Conduct, MPD SOPs generally, and the SET Specialty Team's training and standards.

**EQUIPMENT**

Each SET Specialty Team shall maintain an inventory of all equipment and supplies assigned to that team and each team's equipment and supplies shall be used for official use only. Any equipment not functioning properly, damaged, or dysfunctional shall be taken out of service and shall not be used until repaired or replaced. Any SET Specialty Team munitions or supplies with identifiable expiration dates shall be used only in a training environment beyond the expiration date.

The Lieutenant of each SET Specialty Team shall submit an annual report documenting any use, maintenance, warranties, and repairs of the equipment assigned to that lieutenant's specialty team. These annual reports shall be submitted to the SET Lead Commander or designee.

SET Bike Team members shall conduct an inspection of their assigned bicycles and equipment prior to use to ensure proper working order of equipment. SET Bike Team members are responsible for the routine care and maintenance (i.e., tire pressure, chain lubrication, overall cleaning) of their assigned bike. If a needed repair is beyond the ability of the SET Bike Team member, an email should be sent to the PD SET Bike email group and the email should include a description of the issue and the location of the bicycle in need of repair. Each department-owned police bicycle will have an annual maintenance tune-up performed by members of the SET Bike Team/MPD Bike Mechanics. Police bicycles requiring maintenance and/or repairs beyond the capabilities of the SET Bike Team members may be taken to a private bicycle repair shop with authorization from the SET Lead Commander.

SET CDT members shall perform an annual review of any printed—physical documents/brochures and online—informational/educational materials. SET CDT supervisors will also maintain a log of informational/educational sessions held throughout the course of the year.

SET DPT members should be prepared to operate in a plainclothes capacity. The team will designate soft uniform standards as well as apparatus to clearly identify plainclothes officers as police officers in the event of a critical incident.

SET FXT members shall perform a function check of all FXT equipment on a regular basis and the department shall provide Personal Protective Equipment (PPE) for SET FXT members. SET FXT shall wear all appropriate PPE during deployments and trainings. During any extrication, SET FXT members shall provide any necessary PPE and take any reasonable precautions to ensure the safety of the arrested person, the public, and other officers.

Original SOP: 09/20/2022

HKThefts_Madison_00033284

(Special Events Team Field Extrication Team SOP, Special Events Team Grenadiers SOP and Special Events Team Medic Platoon SOP combined into this one SOP 09/20/2022)
(Revised: 01/31/2023, 01/03/2024, 03/28/2025)

HKThefts_Madison_00033285




**CITY OF MADISON POLICE DEPARTMENT**
**STANDARD OPERATING PROCEDURE**

## Use of Force

Eff. Date 01/22/2024 03/24/2025

## Purpose

Consistent with our Mission and Core Values, the Madison Police Department (MPD) is committed to protecting and preserving human life. The protection and preservation of all human life – including the lives of individuals being taken into custody – is the MPD's fundamental objective and primary duty of all MPD employees. The application of deadly force is a measure of last resort, only to be employed when an officer reasonably believes all other options have been exhausted or would be ineffective.

The MPD is committed to resolving conflicts through the use of communication skills, crisis intervention, and de-escalation tactics, when feasible. Officers may only use that force that which is objectively reasonable, and only in furtherance of a legitimate, lawful objective. "Objective reasonableness" is a test based on the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386 (1989). Officers will only apply force in a manner consistent with MPD's Code of Conduct, SOP, and training.

As used in this standard operating procedure (SOP), deadly force refers to the intentional use of a firearm or other instrument that creates a high probability of death or great bodily harm.

### DE-ESCALATION

Whenever safe and feasible, officers will attempt to utilize de-escalation tactics and techniques in a manner consistent with the De-Escalation SOP.

### DUTY TO INTERVENE

Any officer present and observing another officer using excessive force, engaged in unlawful conduct, or in violation of the Madison Police Department's Code of Conduct has an affirmative obligation to intervene and to report without regard for chain of command or experience of the personnel involved. An officer shall intervene, only if circumstances are such to safely do so and if the force in question is clearly beyond what is objectively reasonable under the circumstances. Any officer observing the use of excessive force shall notify an uninvolved supervisor as soon as practicable. No officer may be discharged, disciplined, demoted, or otherwise discriminated against because the officer intervened to prevent what they believed was excessive force or reported or is thought to have reported what they believed to be excessive force.

### NON-DEADLY FORCE

### THE USE OF OLEORESIN CAPSICUM SPRAY (OC SPRAY)

1. Officers may use OC spray when they reasonably believe they are facing active resistance, or its threat, from the subject. OC spray is not to be used against subjects who are offering only passive resistance.
2. Officers shall only direct OC spray in a manner as prescribed by the Chief of Police through MPD training.
3. OC spray shall not be used once an individual is subdued and under control.
4. High-volume OC delivery systems (larger than MK-9) will only be used as outlined below.
5. If practical, the individual on whom OC spray was used should be provided with an opportunity to eliminate the effects of the irritant by washing and flushing the affected areas with water.

### USE OF SPECIALIZED CHEMICAL IRRITANT DELIVERY SYSTEMS

Specialized chemical irritant delivery systems include the following:

HKThefts_Madison_00033286

1.    High-volume OC delivery systems (larger than MK-9)
2.    Projectile-delivered chemical irritants (OC or CS)
3.    Hand-thrown chemical irritant canisters (OC or CS)

Specialized chemical irritant delivery systems will only be deployed by officers who have been trained in their use and use will be consistent with departmental training. Only delivery systems and munitions approved by the Chief of Police or designee are authorized for use.

**Unlawful Assembly/Crowd Control** – Specialized chemical irritant delivery systems will only be used in a crowd control context under the following circumstances:

1.    Dispersal of unlawful assembly
       a.  The incident commander has declared an unlawful assembly and made the decision to disperse a crowd as outlined in the MPD Demonstrations and Assemblies SOP.
       b.  Appropriate warnings have been provided as outlined in the MPD Demonstrations and Assemblies SOP.
       c.  The crowd has been provided reasonable time to disperse but has not dispersed voluntarily.
       d.  Unlawful behavior resulting in the unlawful assembly declaration is continuing.
       e.  The incident commander determines that the use of specialized chemical irritant delivery systems is reasonably necessary to do one or more of the following:
            i.   Protect officers or others from imminent physical harm;
            ii.  Respond to specific acts of violence or property damage;
            iii. Disperse the crowd without utilizing more intrusive levels of force.
       f.  Avenues of egress for the crowd exist.
       g.  Officers involved are appropriately equipped and notified that use of specialized chemical irritant delivery systems is imminent.
       h.  The incident commander should also balance the immediate need for the use of specialized chemical irritant delivery systems (the severity and volume of unlawful activity) with the potential for adverse impact of said use (effect on uninvolved persons; visibility/traffic concerns; etc.).
       i.  The incident commander has approved use.

2.    Exigent circumstances
       In all but the most extreme circumstances, specialized chemical irritant delivery systems should only be deployed to disperse an unlawful assembly with incident commander approval as outlined above. Emergency deployment without incident commander approval is only permitted under the following circumstances:
       a.  Criteria for an unlawful assembly exists.
       b.  An urgent and immediate threat of physical harm to officers or others exists.
       c.  The risk of immediate physical harm is such that approval from the incident commander for deployment cannot be sought without unreasonably risking the safety of officers or others.
       d.  Addressing the immediate threat by use of other force options is not practical or would be ineffective.
       e.  Avenues of egress for the crowd exist.
       f.  Deploying officers will notify the incident commander of the use of specialized chemical irritant delivery systems as soon as practical.

**Tactical operations/barricaded subjects** – When seeking resolution of a barricaded suspect/subject incident, specialized chemical irritant delivery systems may be utilized as follows:

1.    The decision has been made that intervention/resolution is required, consistent with the Barricaded Persons Incidents SOP.
2.    Attempts to resolve the incident without tactical intervention have failed.
3.    Legal authority to enter the area occupied by the suspect/subject exists.

HKThefts_Madison_00033287

4.    The subject/suspect is armed or reasonably believed to be armed, or other circumstances suggest that tactical entry creates a significant risk to officers or others.
5.    The incident commander determines that the use of specialized chemical irritant delivery systems is reasonably necessary to attempt to get the suspect/subject to exit (when avenues of egress/exit are available) or to facilitate safer employment of other tactical interventions.
6.    Officers involved are appropriately equipped and notified that use of specialized chemical irritant delivery systems is imminent.
7.    The incident commander should balance the need for the use of specialized chemical irritant delivery systems with the potential for adverse impact of said use (effect on uninvolved persons; visibility/traffic concerns; etc.).
8.    Specialized chemical irritant delivery systems deployed to the interior of a dwelling must be non-pyrotechnic, unless deadly force is justified. This excludes pyrotechnic chemical munitions designed for interior use or delivered in an approved "burn box" or other similar device.
9.    Specialized chemical irritant delivery systems should only be deployed by projectile if it is unsafe or impractical to deploy manually. Projectiles should be deployed in a manner to reduce the risk of striking a person.
10.   The incident commander has approved use.
11.   Specialized chemical irritant delivery systems may be deployed in tactical operation/barricaded subject incident without prior command approval under the following circumstances:
      a.    All of the criteria described above for command approved deployment are present;
      b.    An urgent and immediate threat of physical harm to officers or others exists;
      c.    The risk of immediate physical harm is such that approval from the incident commander for deployment cannot be sought without unreasonably risking the safety of officers or others.

## ELECTRONIC CONTROL DEVICE USE

1.    An approved electronic control device (ECD) may only be utilized by officers who have successfully completed training in its use. Deployment and use of the electronic control devices will be in accordance with MPD training and procedure.
2.    In cases where a subject is believed to be armed with a dangerous weapon, an ECD is not a substitute for deadly force. In such situations, an officer should not be armed with an ECD without another officer at the scene having the immediate ability to deliver deadly force, unless unique circumstances indicate otherwise. Officers armed with an ECD should continuously monitor and evaluate the ability of other officers present to deliver deadly force.
3.    An officer may only display, present, or threaten to use an ECD if the officer reasonably believes that the potential for its authorized use exists. Furthermore, an officer may only display, present, or threaten to use an ECD absent deadly force coverage if they reasonably believe the involved person is not armed with a dangerous weapon.
4.    An ECD may only be used under the following circumstances:
      a.    To overcome violent or assaultive behavior or its threat when the officer reasonably believes that the subject poses an articulable threat of harm to an officer or to another person.
      b.    To control persons in order to prevent them from harming themselves or others.
5.    Use of an ECD under the following circumstances is prohibited, unless exigent circumstances are present:
      a.    Against handcuffed subjects.
      b.    Against subjects fleeing on foot.
      c.    Against subjects in an elevated position where a fall is likely to result in significant injury.
      d.    Against subjects operating a motor vehicle.
      e.    Against small children.
      f.    Against a subject who is visibly pregnant or known to be pregnant.
      g.    Against elderly subjects.
      h.    From a moving vehicle.
6.    The ECD will not be used under the following circumstances:
      a.    For coercion or intimidation.

HKThefts_Madison_00033288

USE OF FORCE                                                      STANDARD OPERATING PROCEDURE

b.  To escort or prod subjects.
c.  To awaken unconscious or intoxicated subjects.
d.  Against subjects who are offering only passive resistance.

7.  ECD probes may not be intentionally fired at the face, head, or neck, or groin, unless the use of deadly force would be justified.

8.  Multiple, extended, or simultaneous ECD applications against a single individual are generally not recommended and should be avoided unless the officer reasonably believes that the need to control the subject or unavailability of alternative force options outweighs the potential risk posed by multiple, extended, or simultaneous applications.

9.  Officers shall assess all subjects against whom an ECD has been deployed. The subject shall be evaluated by medical personnel if:
    a.  The subject requests medical treatment.
    b.  The subject displays an adverse reaction to the ECD deployment.
    c.  The subject has been exposed to more than one ECD simultaneously.
    d.  The subject has been exposed to three (3) or more ECD firing cycles, or one continuous firing cycle of 15 seconds or more.

10. If the ECD probes have penetrated the skin in a sensitive area (head, neck, groin, or breast), the subject will be conveyed to an emergency room for probe removal. If the probes are embedded in non-sensitive areas, a trained officer may remove them.

11. Removing the air cartridge to deploy an ECD in the drive-stun mode is not authorized as a primary ECD deployment technique.

## REMOTE RESTRAINT DEVICE

1.  Only department-approved remote restraint devices may be used and only by officers that who successfully completed training in their use. Deployment of remote restraint devices will be in accordance with MPD training.

2.  Remote restraint devices may be used only under the following circumstances:
    a.  To overcome violent or assaultive behavior or its threat when the officer reasonably believes that the subject poses an articulable threat of harm to an officer or to another person.
    b.  To control a subject in order to prevent them from harming themselves or others.

3.  Use of remote restraint devices is prohibited under the following circumstances, unless exigent circumstances are present:
    a.  Against handcuffed subjects.
    b.  Against subjects fleeing on foot.
    c.  Against subjects in an elevated position where a fall is likely to result in significant injury.
    d.  Against subjects operating a motor vehicle.
    e.  Against small children.
    f.  Against a subject who is visibly pregnant or known to be pregnant.
    g.  Against elderly subjects.
    h.  From a moving vehicle.

4.  The remote restraint devices may not be intentionally fired at the face, head, or neck, or groin unless deadly force is authorized.

5.  If the remote restraint devices probes have penetrated the skin in a sensitive area (head, neck, groin, or breast), the subject will be conveyed to an emergency room for probe removal. If the probes are embedded in non-sensitive areas, a trained officer may remove them in accordance with training.

6.  When deployed operationally, all cartridge components will be collected and property tagged.

## BATON USE

1.  A baton may be used to overcome continued resistance or assaultive/dangerous behavior when an officer reasonably believes a lesser degree of force would be insufficient to control the situation.

HKThefts_Madison_00033289

2.  An officer shall never intentionally strike a person's head with a baton unless such an action is justified under the use of deadly force.
3.  Officers shall only use MPD-approved batons and techniques.
4.  MPD-approved batons are the only authorized impact weapons. Flashlights, radios, firearms, etc., are not recommended as impact weapons; however, the MPD recognizes that emergency self-defense situations involving other objects and instruments may occur.

**IMPACT PROJECTILES**

1.  Impact projectile weapons may only be utilized by officers who have successfully completed training in their use. Deployment of impact projectiles will be in accordance with MPD training. Only munitions approved by the Chief of Police or designee are authorized for use.
2.  In cases where a subject is believed to be armed with a dangerous weapon, an impact projectile weapon is not a substitute for deadly force. Unless circumstances indicate otherwise, an officer should not go armed with an impact projectile weapon unless another officer at the scene has the immediate ability to deliver deadly force. Officers armed with impact projectile weapons should continuously monitor and evaluate the ability of other officers present to deliver deadly force.
3.  It is the responsibility of the officer going armed with an impact projectile weapon to ensure that the weapon is loaded with impact projectiles each time the weapon is deployed.
4.  Deployment of impact projectiles at non–vital areas of a subject's body is considered non–deadly force. Impact projectiles may only be used under the following circumstances:
    a.  To overcome violent or assaultive behavior or its threat when the officer reasonably believes that the subject poses an articulable threat of harm to an officer or to another person.
    b.  To control persons in order to prevent them from harming themselves or others.
    Additionally, an officer must reasonably believe that a lesser degree of force would be insufficient to control the situation, or that it is necessary to deliver force at a safe distance from the subject.
5.  ~~The intentional deployment of impact projectiles at the face, head, or neck is considered deadly force.~~ Impact projectiles may not be intentionally fired at the face, head, or neck, unless the use of deadly force would be justified.
6.  All persons taken into custody who have been struck with an impact projectile will be conveyed to an emergency room for medical clearance.
7.  A deadly force investigation will commence only if deployment of an impact projectile results in death or great bodily harm.
8.  Absent an imminent risk of harm to officers or community members, impact projectiles will not be used in crowd control situations. Before deploying an impact projectile in a crowd environment, the officers shall consider the density of the crowd and the potential for striking a bystander. Impact projectiles will not be used to move or disperse crowds.
9.  Impact projectiles may be deployed in other jurisdictions pursuant to a mutual aid request. In the event that an individual struck with an impact projectile is taken into custody by another agency, officers from that agency shall be notified of the need for medical treatment.

**CANINE USE**

See MPD SOP on Canine Use.

**USE OF RESTRAINING DEVICES**

1.  Officers shall place handcuffs on any individual in custody when the officer reasonably believes the individual may become violent, attempt to escape, or pose a danger to self or others. It is mandatory that all persons who have aggressively resisted or attacked another person be placed in handcuffs.
2.  Officers shall apply handcuffs in a manner prescribed by the Chief of Police through MPD training.
3.  When handcuffs prove to be insufficient in restraining an individual (e.g., kicking, attempting to flee, etc.), officers may employ the use of additional MPD-approved restraining devices.

HKThefts_Madison_00033290

4.    In an emergency situation when an MPD-approved restraining device is not available, the MPD recognizes that alternative devices may have to be employed. In such situations, approved devices should be substituted as soon as reasonably practicable.

5.    Individuals who are placed in a maximum restraint position should be continuously monitored for breathing and circulation.

## USE OF SPIT HOODS

1.    A spit hood is a temporary protective device, which may be used on persons who display behavior or threatening behavior that pose a hazard of exposure to bodily fluids transmitted by spitting, wiping blood from their face/head, or wiping/blowing nasal discharges at or onto officers.

2.    Officers should use only MPD-approved spit hoods. In an emergency situation if a department approved spit hood is not readily available, officers may utilize other breathable items, such as surgical masks, etc.

3.    Subjects must be stabilized and restrained (handcuffed) before applying the hood. The subject should be advised, when practical, that a hood is being applied.

4.    Officers shall apply the spit hood in accordance with MPD training.

5.    Persons wearing the spit hood must be closely monitored and shall not be left unattended.

6.    Officers shall document the use of the spit hood including the circumstances requiring its use in their report of the incident. A copy of the report shall be routed to the MPD Use of Force Coordinator.

## USE OF FORCE REPORTING REQUIRED

Any officer who uses physical force, or any of the following enumerated weapons, devices, or tactics against another person, shall complete an original or supplementary report on the incident during which the force was used:

1.    Firearms (including pointing a firearm at an individual)

2.    Baton or Less Lethal Impact Munitions

3.    Chemical Agents, OC spray, or Electronic Control Devices

4.    Handcuffs or other Restraining Devices, including hobble restraints, spit hoods, remote restraint devices, etc.

5.    Physical force, including focused and diffused strikes, pressure points, escort holds, decentralization techniques, holding or grabbing of subjects, etc.

The report shall specifically note the totality of the circumstances necessitating force and the manner of force employed. A copy of the report should be routed to the MPD Use of Force Coordinator.

## AFTERCARE

Once the scene is safe and as soon as practical, an officer shall provide appropriate medical care consistent with their training to any individual who has visible injuries, who complains of being injured, or who requests medical attention. Individuals taken into custody should be positioned in a way so that their breathing is not obstructed.

Any time recordable force (takedowns, active countermeasures, OC spray, impact weapons, hobble restraints, less lethal projectiles, ECD deployments, K9 apprehensions) is used, officers will affirmatively ask the subject against whom the force has been used if the subject wants medical treatment.

## USE OF FORCE REVIEW AND INVESTIGATIONS

All instances of the use of non-deadly force shall be reviewed for compliance with MPD procedure by an appropriate supervisor. Any time a commissioned employee uses recordable force during an incident, the force must be documented in the MPD use of force database.

HKThefts_Madison_00033291

In cases where a complaint is filed pertaining to an officer's use of non-deadly force, the Professional Standards and Internal Affairs Unit (PSIA) has the primary responsibility for coordinating the internal investigation to ensure compliance with the MPD Use of Force SOP.

If necessary, as part of the District's or PSIA's internal investigation, members from the Training Team who are certified WI Defensive and Arrest Tactics (DAAT) instructors can be consulted to determine findings and forward their conclusions to the appropriate source requesting assistance.

## DEADLY FORCE

The use of deadly force is only authorized when, under any of the following circumstances, an officer reasonably believes a lesser degree of force would be insufficient:

1.      To protect another person or persons from what is reasonably believed to be an imminent threat of death or great bodily harm.
2.      To protect the officer from what is reasonably believed to be an imminent threat of death or great bodily harm.
3.      To prevent the escape of a fleeing subject when all of the following are present:
        a.      The officer has probable cause to believe that the person has committed or has attempted to commit a felony involving the use or threatened use of deadly force.
        b.      The officer reasonably believes the subject presents a continuing imminent risk of great bodily harm or death to the officer or another subject if not immediately apprehended.
4.      To protect the officer or another from an animal which an officer reasonably believes may cause great bodily harm if not immediately controlled, or to end the suffering of an animal gravely injured or diseased after considering public view, safety, and other reasonable dispositions. Officers shall only use a firearm to euthanize a gravely injured or diseased animal.

As used in this SOP, the word "imminent" means "about to happen." An imminent threat is an immediate threat.

## VERBAL WARNING

Before using deadly force, officers shall, if practicable and feasible, identify themselves and order the subject to desist from unlawful activity.

## DEADLY FORCE IS NEVER AUTHORIZED

Deadly force is never authorized:

1.      As a warning shot.
2.      From a moving vehicle, unless deadly force is justified and the consequences of not acting to stop the threat outweigh the risk created by the use of deadly force.
3.      At a moving vehicle unless:
        a.      A person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle; or
        b.      the vehicle is operated in a manner that reasonably appears deliberately intended to strike an officer or another person and all other reasonable means of defense have been exhausted (or are not present or practical), which includes moving out of the path of the vehicle. To prevent the threat of being struck by a vehicle, officers should avoid intentionally putting themselves in the path of any moving vehicle, and when such positioning is unavoidable, move out of the vehicle's path as soon as practical.
4.      When its use unreasonably risks the lives of innocent bystanders.

HKThefts_Madison_00033292

**PROHIBITED TECHNIQUES**

The following techniques create a substantial likelihood of death or great bodily harm and are prohibited (except if deadly force is authorized and all other reasonable means of defense have been exhausted or are not present or practical):

1.    Intentional punching or striking of the throat/trachea.
2.    Intentional continued restriction of the carotid neck arteries.
3.    Intentional application of pressure to the windpipe or throat with an arm or other object.

**AFTERCARE**

Once the scene is safe and as soon as practical, an officer shall provide appropriate medical care consistent with the officer's training to any individual who has visible injuries, complains of being injured, or requests medical attention.

**INVESTIGATION OF THE USE OF DEADLY FORCE**

See the Madison Police Department "Officer Involved Critical Incidents" Standard Operating Procedure.

Original SOP: 03/23/2015
(Revised: 05/26/2016, 07/10/2017, 12/06/2017, 03/01/2019, 09/23/2019, 10/14/2019, 01/27/2020, 01/14/2022, 04/25/2022, 06/21/2022, 06/27/2022, 01/31/2023, 12/18/2023, 1/22/2024, 03/24/2025)
(Reviewed Only: 12/22/2016)
(Deadly Force, Use of and Non-Deadly Force Use of SOPs combined into Use of Force SOP: 06/21/2022)

HKThefts_Madison_00033293