**JENNER & BLOCK LLP**
Sati Harutyunyan (SBN 313138)
SHarutyunyan@jenner.com
Madeline P. Skitzki (SBN 318233)
MSkitzki@jenner.com
Effiong Dampha (SBN 323554)
EDampha@jenner.com
Jenna L. Conwisar (SBN 341521)
JConwisar@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA  90071-2246
Telephone:    +1 213 239 5100
Facsimile:    +1 213 239 5199

**JENNER & BLOCK LLP**
Peter J. Brennan (*pro hac vice*)
PBrennan@jenner.com
Andrianna D. Kastanek (*pro hac vice*)
AKastanek@jenner.com
353 North Clark Street
Chicago, IL  60654-3456
Telephone:    +1 312 222 9350
Facsimile:    +1 312 527 0484

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION - SANTA ANA

| | |
|---|---|
| In re: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:22-ml-3052-JVS (KESx) |
| | **DEFENDANTS HYUNDAI MOTOR AMERICA AND KIA AMERICA, INC.'S OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON** |
| | [REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL] |
| *This document relates to:* ALL SUBROGATION CASES | Judge:   The Honorable James V. Selna<br>Ctrm:    10C, 10th Floor<br>Date:    April 20, 2026<br>Time:    4:00 PM |

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE
EXPERT TESTIMONY OF ALLEN ADAMSON

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 4

I.      Adamson is Unquestionably Qualified. ............................................................... 4

II.     Adamson's Testimony is Relevant and Will Help the Jury ............................. 4

    A.      The Jury Needs Adamson's Testimony to Assess What was Material to Consumers. .................................................................... 4

    B.      Subrogation Plaintiffs' Mischaracterization of Their Claims Does Not Provide Grounds to Exclude Adamson. .............................. 6

III.    Adamson had Sufficient Facts and Data. ............................................................ 8

    A.      Adamson Reviewed Four Independent Sources Establishing That Consumer Demand Was Insufficient to Market Immobilizers. ......................................................................................... 8

    B.      A Decade of Elantra Brochures and Universal Competitor Practice Confirm That Automotive Marketers Treated Immobilizers as Internal Technology—Not Consumer-Facing Features. ................................................................................. 11

IV.     Adamson Applied Named, Structured Analytical Frameworks to Primary Materials, a Method that Meets Rule 702. ..................................... 13

V.      Adamson's Discussion of Stern and Vigilante Satisfies Rule 702. ............. 16

    A.      Stern's Engineering Expertise Does Not Address the Marketing Communication Question at the Center of This Case. .................................................................................................... 16

    B.      Adamson's Decades of Survey Pressure-Testing Experience Qualify Him to Critique Vigilante's Survey, and the Flaws He Found Rests on Universally Recognized Statistical Principles. ........................................................................................ 16

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bluetooth SIG, Inc. v. FCA US LLC*,
  468 F. Supp. 3d 1342 (W.D. Wash. 2020) ................................................... 17, 18

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
  923 F. Supp. 2d 1245 (S.D. Cal. 2013) ............................................................ 19

*Counts v. General Motors*,
  606 F. Supp. 3d 547 (E.D. Mich. 2022) ............................................................ 6

*EEOC v. Freeman*,
  778 F.3d 463 (4th Cir. 2015) ............................................................................ 20

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
  618 F.3d 1025 (9th Cir. 2010) .................................................................. 4, 13, 15

*Green v. H&R Block, Inc.*,
  735 A.2d 1039 (Md. 1999) ................................................................................. 5

*Hangarter v. Provident Life & Accident Ins.*,
  373 F.3d 998 (9th Cir. 2004) ............................................................................ 13

*In re JUUL Labs, Inc. Mktg., Sales Practices & Prods. Liab. Litig.*,
  609 F. Supp. 3d 942 (N.D. Cal. 2022) .............................................................. 11

*In re KIND LLC "Healthy & All Natural" Litig.*,
  627 F. Supp. 3d 269 (S.D.N.Y. 2022) .............................................................. 18

*Khoday v. Symantec Corp.*,
  93 F. Supp. 3d 1067 (D. Minn. 2015) ........................................................ *passim*

*Krommenhock v. Post Foods, LLC*,
  334 F.R.D. 552 (N.D. Cal. 2020) ................................................................ 11, 12

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .......................................................................................... 13

*Lincoln v. Ford Motor Co.*,
  2020 WL 5820985 (D. Md. 2020) ...................................................................... 5

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

*Lloyd v. Gen. Motors Corp.*,
397 Md. 108 (2007) ................................................................................ 4, 6

*Magallon v. Robert Half International,*
743 F. Supp. 3d 1237 (D. Or. 2024) ........................................................ 7

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................... 19

*Martens Chevrolet, Inc. v. Seney*,
292 Md. 328 (1982) ................................................................................. 4

*Novalogic, Inc. v. Activision Blizzard*,
41 F. Supp. 3d 885 (C.D. Cal. 2013) ...................................................... 7

*In re PFA Ins. Mktg. Litig.*,
696 F. Supp. 3d 788 (N.D. Cal. 2021) ............................................... 8, 15

*Procter & Gamble Co. v. Ultreo, Inc.*,
574 F. Supp. 2d 339 (S.D.N.Y. 2008) ................................................... 18

*Reinsdorf v. Skechers U.S.A.*,
922 F. Supp. 2d 866 (C.D. Cal. 2013) .................................................. 19

*Sass v. Andrew*,
152 Md. App. 406 (2003) ......................................................................... 4

*Saxon Glass Techs., Inc. v. Apple Inc.*,
393 F. Supp. 3d 270 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d
Cir. 2020) .............................................................................................. 18

*Thomas v. Newton Int'l Enterprises*,
42 F.3d 1266 (9th Cir. 1994) ................................................................. 17

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab.
Litig.*,
2016 WL 807377 (E.D. Pa. Mar. 2, 2016) ........................................... 15

*United States v. Scholl*,
166 F.3d 964 (9th Cir.1999) ..................................................................... 7

**Court Rules**

Federal Rule of Evidence 402 .................................................................... 8

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE
EXPERT TESTIMONY OF ALLEN ADAMSON

Federal Rule of Evidence 702 ..................................................................................*passim*

**Other Authorities**

Shari Diamond, et al., *Reference Guide on Survey Research* 689 (4th ed. 2025) ........................................................................................... 19

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

## **INTRODUCTION**

Subrogation Plaintiffs' motion rests on a fundamental contradiction. Several of their claims against Defendants rest on allegations that Defendants misrepresented, omitted, and concealed material facts from consumers. These are claims that turn on what automotive marketers communicated, why, and how consumers actually make vehicle purchasing decisions. To support these claims, Subrogation Plaintiffs (through their proffered expert William Vigilante, Ph.D.) commissioned a marketing survey about whether car consumers expected immobilizer disclosure. Having placed marketing evidence at the center of this case, Subrogation Plaintiffs now move to exclude Allen Adamson—a marketing practitioner with forty years of industry experience—because they claim his testimony is irrelevant and unreliable. Dkt. 1556 ("Mot"). Subrogation Plaintiffs cannot have it both ways, and the Court should deny the motion.

Adamson satisfies every element of Federal Rule of Evidence 702. Subrogation Plaintiffs cannot dispute his qualifications. Adamson served as Chairman of Landor, one of the world's leading brand consultancies, held senior positions at Ogilvy, one of the world's leading advertising agencies, managed brands at Unilever, one of the world's leading consumer-packaged-goods companies, worked with automotive clients on brand communications and customer journey mapping, and is an Adjunct Professor at New York University Stern School of Business, one of the top business schools in the United States. His credentials are not in question.

Adamson's opinions are relevant because Subrogation Plaintiffs' misrepresentation-based claims—the Maryland Consumer Protection Act ("MCPA") violation (Count C), fraud by omission (Count D), and negligent misrepresentation (Count E)—each require proof that the allegedly withheld information was material to consumers' purchasing decisions. That is a marketing question, and Adamson answers it by opining that no automotive marketer in 2019

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

treated immobilizer presence as a consumer-facing feature that was important to disclose to consumers, nor do automotive (or any other) marketers disclose the features that a product does not have. Marriott, for example, tells you the features offered at their hotels but not the features offered at the Ritz that a Marriott does not have.

Adamson's opinions also rest on sufficient facts and data: four independent sources and converging on a lack of consumer demand for immobilizers—HMA's own "Voice-of-the-Customer" research process, which registered no demand signal for immobilizers through multiple channels over more than a decade; the competitive set of Toyota, Honda, BMW, and Subaru, none of which marketed immobilizers; Subrogation Plaintiffs' own survey results, which showed a majority of respondents were confused about theft-protection features even after biased titling and leading questions; and the anecdotal experience of the bellwether insured Beth Wolkowicz, who knew little to nothing about immobilizers when leasing the 2019 Elantra at-issue in the upcoming trial.

Adamson's methodology is reliable: he applied established frameworks—the BrandSimple simplicity principle, the purchase funnel, and the customer journey—that courts in this circuit have recognized as sufficient for practitioners with his background. And he applied those frameworks reliably: to a decade of Elantra brochures, four competitor brochure sets, and HMA personnel testimony that confirmed from the inside what the brochures showed from the outside. All in all, Adamson offers reliable opinions on marketing.

Subrogation Plaintiffs put anti-theft marketing in play. They cannot now claim that Adamson—a bona fide marketing expert—has nothing to offer the jury.

## BACKGROUND

Allen Adamson is a marketing and brand strategy practitioner with over forty years of marketing experience—more than twenty of which he spent at a senior level. He served as Chairman of Landor, one of the world's leading brand strategy

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE
EXPERT TESTIMONY OF ALLEN ADAMSON

consultancies, and held senior positions at the advertising agencies Ogilvy and D'Arcy Masius Benton & Bowles before that. He has managed brands at Unilever, has worked with automotive clients on brand communication and customer journey mapping, and teaches at New York University's Stern School of Business. He has authored five books on marketing and branding, including *BrandSimple*, which addresses how effective marketing communicates to consumers of complex products.

Defendants retained Adamson to evaluate HMA's marketing communications for the 2019 Elantra from an industry-practice perspective: whether those communications conformed to automotive marketing norms, and whether consumer demand for immobilizers was sufficient to have caused any automotive marketer to treat immobilizers as a consumer-facing feature worth disclosing. Equally important, he also opines on whether features that were unavailable on one vehicle but available on other vehicles would normally be disclosed in marketing that vehicle. *See* Dkt. 1556-3, Expert Report of Allen Adamson ("Adamson Report") §§ 1.3–1.4. He was also asked to evaluate the consumer survey conducted by Subrogation Plaintiffs' expert, Dr. William Vigilante, from a marketing standpoint. *Id.* § 5.

Adamson's analysis drew on HMA's marketing materials across the Elantra's decade of production, competitor brochures from Toyota, Honda, BMW, and Subaru, and deposition testimony from HMA marketing and product planning personnel. His central opinions are that no automotive marketer in 2019 treated immobilizer presence as a consumer-facing feature, that the industry's universal practice was to communicate what each trim level includes (not to catalog absent internal components), and that the absence of any consumer demand signal in HMA's own research apparatus confirms that conclusion. *Id.* §§ 1.3–1.4, 4.

Adamson also reviewed Vigilante's survey—a 502-person study titled "Theft Protection Survey" administered in 2025, which drew respondents exclusively from ten cities selected by Subrogation Plaintiffs' counsel because of their elevated

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

Kia/Hyundai theft rates. *See id.* §§ 5.3. Adamson found the survey marred by four flaws: a biased title that telegraphed the expected answer before respondents read a single question, leading questions that embedded the survey's preordained conclusions in their premises, a sample population geographically restricted to theft-affected markets with no methodological basis for the selection, and questions measuring 2025 attitudes rather than 2019 consumer expectations. *Id.* §§ 5.2–5.4.

## ARGUMENT

### I.    Adamson is Unquestionably Qualified.

Subrogation Plaintiffs do not challenge Adamson's qualifications. Nor could they; his over forty years of marketing experience easily clears the Rule 702 threshold. *See, e.g., Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1043 (9th Cir. 2010) (reversing, as an abuse of discretion, the exclusion of an expert who had forty years of marketing experience).

### II.    Adamson's Testimony is Relevant and Will Help the Jury

#### A.    The Jury Needs Adamson's Testimony to Assess What Was Material to Consumers.

Subrogation Plaintiffs bring multiple claims that require proof of materiality. The ACC alleges that HMA violated the Maryland Consumer Protection Act ("MCPA") by "misrepresenting, omitting, concealing, and/or failing to disclose material facts" about the Subject Vehicles' anti-theft design (Count C), ACC ¶ 1970; committed fraud by omission and concealment by withholding information that "a reasonable person would find . . . an important factor in purchasing, leasing, or retaining a new or used motor vehicle" (Count D), *id.* ¶ 1990; and negligently "remained silent and failed to inform Plaintiffs' Insureds of the Thief Friendly Design" (Count E), *id.* ¶ 1999. Under applicable Maryland law, each of these claims has materiality as an element. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 141–42 (2007) (MCPA); *Sass v. Andrew*, 152 Md. App. 406, 428–29 (2003) (fraud by omission); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 335–36 (1982) (negligent

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE
EXPERT TESTIMONY OF ALLEN ADAMSON

misrepresentation). And "[a]n omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Lincoln v. Ford Motor Co.*, 2020 WL 5820985, at *6 (D. Md. 2020) (citation modified); Md. State Bar Standing Comm. on Pattern Jury Instructions, MPJI-Cv 19:6(1) & cmt. 4. Thus, materiality is a determination the jury *must make* to reach a verdict on Subrogation Plaintiffs' misrepresentation-based claims. *See Green v. H&R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999). Adamson would help them make it.

Adamson's testimony will help the jury determine whether the information that Defendants allegedly withheld from consumers about the Subject Vehicles' anti-theft features (or lack thereof) was material to consumers' purchasing decisions. Adamson opines—based on HMA's marketing materials, competitor brochures across the automotive industry, and Hyundai personnel testimony—that no automotive marketer in 2019 treated immobilizer presence as a consumer-facing feature worth disclosing. *See* Adamson Report §§ 1.3–1.4, 4. Nor would an automotive marketer highlight features that a vehicle did not have, including features available on more expensive trims, models, or competing vehicles. *Id.* § 2.4.2. Rather, the industry norm, Adamson explains, was to communicate what products include, not to catalog absent features or internal technology. *Id.* That opinion situates Subrogation Plaintiffs' materiality claim in the actual marketing environment at the time of sale. To assess whether a reasonable buyer would have expected disclosure of an absent immobilizer or valued such a disclosure, the jury needs to understand how automotive features were communicated and which ones were treated as consumer-facing. Adamson's testimony would provide that context both for automotive brands and the marketing world at large.

Courts consistently admit expert testimony on industry marketing practice in consumer protection omission cases for this reason. In *Khoday v. Symantec Corp.* for example, the court admitted a marketing professor's opinion that the defendants'

disclosure practices were "reflective of standard marketing practices"—over objections that the expert had never personally used the products at issue and did not personally interview consumers. 93 F. Supp. 3d 1067, 1078–79 (D. Minn. 2015); *see also Counts v. General Motors*, 606 F. Supp. 3d 547, 572 (E.D. Mich. 2022) (admitting expert testimony on "the effects of advertising and other factors on vehicle-consumers' purchasing decisions" in a case about the omission of emissions systems information in vehicle marketing). This Court should do the same.

**B.      Subrogation Plaintiffs' Mischaracterization of Their Claims Does Not Provide Grounds to Exclude Adamson.**

Subrogation Plaintiffs contend that the "crux" of their claims is a product defect and the "fail[ure] to provide customers with necessary warnings regarding the propensity for the Vehicles to be stolen." Mot. at 10. On that premise, they argue, a marketing expert cannot help. That argument fails for three reasons.

First, Subrogation Plaintiffs' own pleading refutes the "warnings" framing. The Maryland claims in the ACC are framed entirely in the language of omissions, concealment, and failure to disclose—not product warnings. Count C alleges that HMA violated the MCPA by "misrepresenting, omitting, concealing, and/or failing to disclose material facts." ACC ¶ 1970. Count D is captioned "Fraud by Omission, Suppression or Concealment," *id.* ¶¶ 1983–95, and specifically alleges materiality, *id.* ¶ 1990 ("a reasonable person would find anti-theft protection an important factor in purchasing, leasing, or retaining a new or used motor vehicle"). Count E alleges that HMA "negligently remained silent and failed to inform Plaintiffs' Insureds of the Thief Friendly Design." *Id.* ¶ 1999. The word "warning" does not appear in any of these counts to characterize what HMA allegedly failed to do. Subrogation Plaintiffs cannot now cram their case into a narrower "product warning" theory to exclude marketing expertise. The question, as pleaded, is whether HMA's omission of immobilizer information from its marketing communications was material to consumers' purchasing decisions. Adamson answers it.

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

Second, Subrogation Plaintiffs' own litigation conduct forecloses the relevance objection. They offered Vigilante's survey to prove that consumers attached importance to immobilizer protection—a consumer-expectations question that sits squarely in marketing territory. Having placed that question in the case, Subrogation Plaintiffs cannot argue that a defense expert addressing a closely related question is irrelevant. A party offering expert testimony on a topic concedes that the topic is relevant and ripe for expert assistance. Subrogation Plaintiffs make that concession by offering Vigilante's consumer survey.

Third, the cases that Subrogation Plaintiffs cite offer them no support. *United States v. Scholl* is a criminal tax case affirming the district court's exclusion of some opinions from a gambling expert because his own testimony undercut the very theory it was offered to support. 166 F.3d 964, 970–71 (9th Cir. 1999). That rationale does not touch Adamson. The court in *Novalogic, Inc. v. Activision Blizzard* excluded the plaintiff's marketing expert after the plaintiff *expressly conceded* the expert was not qualified to opine on the central legal question in his report and the expert articulated no recognizable analytical framework. 41 F. Supp. 3d 885, 896–97 (C.D. Cal. 2013). Adamson has impressive marketing credentials, by contrast, and identifies the established marketing frameworks he used to review materials. And the court in *Magallon v. Robert Half International* excluded an industry-standards expert only because she identified no standard beyond bare statutory compliance, reducing her testimony to an inadmissible legal conclusion. 743 F. Supp. 3d 1237, 1250 (D. Or. 2024). The court, in fact, reaffirmed that industry-practice testimony "is generally considered to be properly admissible, when relevant." *Id.* Adamson's opinions about automotive marketing norms are a far cry from legal conclusions. Rather, they are exactly the kind of industry-practice testimony that *Magallon* describes as generally admissible. None of these cases involves a qualified marketing expert opining on industry norms in an omission-based consumer protection case. They are inapposite.

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

Adamson will help the jury understand what automotive marketers communicated about internal security features in 2019, why immobilizers were not treated as consumer-facing features, and whether HMA's marketing practices conformed to industry norms. He will also put HMA's automotive marketing practices in context with general consumer marketing practices. That testimony goes to materiality. Rules 702(a) and 402 therefore permit it.

## III.   Adamson had Sufficient Facts and Data.

Subrogation Plaintiffs attack Adamson's opinions about consumer demand and internal technology on the same theory: that he never spoke to consumers and never conducted surveys. Over the course of more than forty years rising to the highest levels of the marketing profession, Adamson has expertise and insight into consumer thinking far beyond what any individual survey of a limited group of consumers could yield. Subrogation Plaintiffs' criticisms also miss the point: Professor Adamson is an industry-practice expert offering opinions about what automotive marketers did, and why and how those actions are consistent with what other marketers do across other consumer categories. For this category of opinion, a practitioner's review of company documents, competitor materials, and industry testimony is appropriate—and sufficient—evidentiary foundation. "[D]eficiencies as to the selection of the documents that [the expert] reviewed goes to the weight to be given to his opinions, not their admissibility." *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 799 (N.D. Cal. 2021); *see also Khoday*, 93 F. Supp. 3d at 1079. Adamson thus satisfies Rule 702(b).

### A.   Adamson Reviewed Four Independent Sources Establishing That Consumer Demand Was Insufficient to Market Immobilizers.

Adamson does not opine that consumers were indifferent to vehicle security in the abstract. His opinion is narrower and more precise: consumer demand for immobilizers was not strong enough at the time these vehicles were designed, marketed, and sold to cause any automotive marketer to treat immobilizer presence

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

as a feature that was important to consumers. That marketing opinion rests on four independent sources of evidence.

First, it draws on HMA's own consumer research apparatus, "Voice of the Consumer." The most direct evidence on consumer demand is HMA's own. HMA did not ignore the question of what consumers wanted; it built an extensive process around it. In a deposition Adamson reviewed, Ricky Lao (HMA's Director of Product Planning since 2010), testified that ███████████████████ ████████████████████████████████████████████ ████████████████████ Declaration of Effiong K. Dampha in Support of Defendants' Oppositions to Subrogation Plaintiffs' Motions to Exclude (Dampha Decl.), Ex. 1 ("Lao Dep.") at 35:4, 42:3–5 (Nov. 5, 2025). █████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ *Id.* at 30:9–17, 33:18– 34:10, 35:17–39. ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████ *Id.* at 43:2–7. ████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ *Id.* at 202:9–12, 200:4–12. █████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ *Id.* at 45:20–46:3. HMA's data thus support Adamson's narrative. The proximity key is a feature consumers experience every day. They requested it. Immobilizers are internal components consumers never interact with. Consumers did not ask for them.

Second, Adamson investigated how HMA competitors—Toyota, Honda, BMW, and Subaru—marketed their vehicles. None treated immobilizer presence as a "primary consumer benefit or differentiating feature." Adamson Report §§ 4.8–4.9. This competitive set reveals the industry's collective judgment about what consumers value—a judgment independently reached by the best-resourced marketing organizations in the world, each spending billions of dollars to identify and communicate product attributes that drive purchase decisions. When Toyota, Honda, BMW, and Subaru all independently declined to market their immobilizers, that unanimity reflects the industry's assessment of consumer demand. It is, as Adamson's report observes, the dog that did not bark; a feature that consumers valued was communicated, and a feature that consumers did not specifically value was not communicated. *Id.* § 4.10.

Third, Vigilante's own survey, which Adamson reviewed, ironically confirms the same absence of demand. When asked whether traditional-key vehicles include theft-deterrent features, 25% of respondents said "No" and 27% said "Not Sure"—meaning that over half of respondents did not expect cars like the 2019 Hyundai Elantra to have anti-theft technology. Adamson Report §§ 5.3.5, 5.4. Subrogation Plaintiffs' own survey thus undercuts their theory—despite all the methodological levers that Subrogation Plaintiffs pulled to bias the survey toward a favorable result. *See* Vigilante Report, Dkt. 1558-12 at 41 (Vigilante Report).

Fourth, Adamson reviewed the deposition testimony of Beth Wolkowicz, the 30(b)(6) witness for Key Point, the insured in the upcoming bellwether. She testified that ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████ *See* Dampha Decl., Ex. 2 ("Wolkowicz Dep.") at 113:24–114:7; *see also* Adamson Report § 5.4.2. Though anecdotal, her testimony comports with Adamson's broader finding that consumers did not demand immobilizers enough to cause auto companies to market them.

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

Subrogation Plaintiffs' answer is that Adamson should have conducted his own surveys. Mot. at 11–12. But Rule 702(b) imposes no such requirement. Marketing experts are "not required to perform customer surveys or empirical research" to support opinions based on "long experience and research" and "review of [defendant's] own internal consumer research and other documents." *In re JUUL Labs, Inc. Mktg., Sales Practices & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 1010 (N.D. Cal. 2022); *see also Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) (citation modified). The demand signal for immobilizer disclosure was absent in HMA's own research, absent across the entire competitive set, absent from Subrogation Plaintiffs' own survey data, and absent from the insured in the upcoming trial. That Adamson did not find that same absence in a fifth source—a survey of his own design—is a cross-examination point, not a basis for exclusion.

**B.     A Decade of Elantra Brochures and Universal Competitor Practice Confirm That Automotive Marketers Treated Immobilizers as Internal Technology—Not Consumer-Facing Features.**

Adamson's internal technology opinion is likewise about marketing classification, not engineering. His opinion is that automotive marketers universally treat immobilizers as background components—"like engine management computers or transmission control modules"—rather than consumer-facing features like navigation systems, heated seats, or proximity keys. Adamson Report §§ 2.4, 6, Concl. 3. That classification reflects a fundamental marketing principle: effective communication focuses on the outcomes that consumers experience, not the internal technology that produces those outcomes. *Id.* § 2.4.

The principle is not novel or obscure. As Adamson recounts, laptop manufacturers communicate battery life, not the "power management integrated circuits" inside. *Id.* § 2.4.2. Credit card issuers advertise "secure transactions," not "specific encryption chips." *Id.* Automotive brands communicate safety ratings, crash test scores, and airbag systems—the outcomes that matter to people—not the

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

wiring harness configurations or engine management software that enable vehicle operation. *Id.* §§ 4.6, 4.7.

Adamson's brochure analysis gives the principle concrete, case-specific context. Across ten model years of the Hyundai Elantra—2012 through 2022—multiple trim levels included an immobilizer. *Id.* § 4.10. Yet across that entire decade, the immobilizer appeared in exactly two brochures: in 2017, when the Elantra underwent a full model redesign and the immobilizer appeared as a technical detail bundled with the proximity key, and in 2018, where a single trim had formatting space to accommodate it. *Id.* By the 2019 model year—the year of the vehicle at issue—the reference disappeared, and it never returned. *Id.* Meanwhile, a proximity key entry appeared in every applicable Elantra brochure from 2012 onward without interruption. *Id.* The brochure record itself is the evidence: a feature consumers valued appeared every year, while an internal component that consumers never requested appeared twice in a decade as a formatting artifact, then was dropped.

Subrogation Plaintiffs argue Adamson has no factual basis to classify immobilizers as internal technology rather than safety features, because "[n]o one told him that any consumers excluded immobilizers from their understanding or definition of safety features." Mot. at 13. Ironically, the bellwether insured, in a deposition Adamson cites, ███████████████████████████████████ ███████████████████████████████████ *See* Wolkowicz Dep. at 113:24–114:7. But, more fundamentally, Adamson is describing what automotive marketers—HMA and its competitors—actually did, and explaining why the industry's consistent communication choices reflect how the category is treated. That is an industry-practice opinion. It does not require consumer input; it is grounded in the same materials that *Khoday* held sufficient: company documents, competitive examples, and an expert's professional assessment of the category norms. 93 F. Supp. 3d at 1078–79.

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

## IV.   Adamson Applied Named, Structured Analytical Frameworks to Primary Materials, a Method that Meets Rule 702.

When an expert applies qualitative industry-practice knowledge rather than scientific methodology, the traditional *Daubert* factors—testability, error rates, peer review—"simply are not applicable." *Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quotations omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The Court's task is to ensure that Adamson "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"—that is, that Adamson did what experienced marketing practitioners do. *Kumho Tire*, 526 U.S. at 152. And the Court's inquiry into the reliability of qualitative expertise like Adamson's "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter*, 373 F.3d at 1017 (quotations omitted). Yet Adamson has both deep expertise and a well-established theory.

On expertise, "knowledge of, and experience within," a relevant industry—like marketing—provides enough foundation to give expert testimony on that industry's practices and norms. *Hangarter*, 373 F.3d at 1017, n.14. The Ninth Circuit has applied that principle to reverse a district court, on an abuse-of-discretion standard, that excluded the testimony of an expert witness with forty years of marketing experience. *Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d at 1043. Adamson brings that same level of experience. In his decades of marketing experience, he has held senior agency roles at Ogilvy and Landor (some of the world's leading brand consultancies), done brand management at Unilever, and holds an adjunct professorship at NYU Stern School of Business. Adamson Report § 1.1. He has authored five books on branding and marketing, including *BrandSimple*, whose core thesis—that "effective marketing focuses on what is included and relevant, not on cataloging every absent component"—he applies in this case. *Id.* § 1.1.2. He has worked on automotive brands and "built customer

journey maps for complex products." *Id.* § 1.3. To their credit, Subrogation Plaintiffs do not challenge any of these credentials.

Adamson's opinions do not rest on his credentials alone. He applies two named, structured frameworks to a body of primary materials. The first is derived from the *BrandSimple* simplicity principle: effective marketers communicate what products include, organized by consumer benefit, rather than cataloging absent features. *Id.* §§ 2.1–2.4. This is not Adamson's idiosyncratic invention; it is a foundational principle in marketing theory, traceable to the Dove, Rolls-Royce, and Volkswagen campaigns he details in his report, and to the customer journey work he did at Landor. *Id.* §§ 2.1–2.3. The second is the purchase funnel and customer journey framework: tools that allow a practitioner to evaluate what a company's communication choices reveal about which features it believed consumers valued at each stage of the buying process. *Id.* §§ 3.1–3.3.

From those analytical frameworks, Adamson drew two operational principles: that features receiving prominent, dedicated communication represent the manufacturer's assessment of consumer priorities, and that features receiving marginal or no communication represent the manufacturer's assessment of what consumers do not prioritize. *Id.* § 3.3. He then applied those principles to primary materials. As discussed above, he applied them to: a decade of Hyundai Elantra brochures (the primary communication medium at the conversion stage of the automotive customer journey); competitor brochures from Toyota, Honda, BMW, and Subaru; and deposition testimony from HMA personnel (Kate Fabian, Thai Vu, and Ricky Lao). Those witnesses confirmed from the inside what the brochures showed from the outside: that HMA's marketing responsibility was to tell consumers "exactly what the products have in them," that the company had never received consumer demand signals for immobilizers, and that the feature was treated as internal technology. Adamson Report §§ 4.3–4.4.

These are not the outputs of *ipse dixit* speculation. Precisely this approach has been approved by federal courts across the country. *See, e.g.*, *Fortune Dynamic*, 618 F.3d at 1043 (forty years of marketing experience supports opinions about "what companies within the industry do"); *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, 2016 WL 807377, at *5 (E.D. Pa. Mar. 2, 2016) ("A marketing professional's review and analysis of company documents to extrapolate marketing strategies, coupled with the expert's experience and background may be enough to establish that the expert's methodology is reliable."); *Khoday*, 93 F. Supp. 3d at 1078–79 (admitting industry-practice marketing expert who relied on document review and professional experience without personally using or testing the products at issue).

Just as they do not challenge his qualifications, Subrogation Plaintiffs do not challenge any of Adamson's marketing principles or how he applies them. They do not argue that the simplicity principle is wrong. They do not argue that the customer journey is a discredited method. They do not argue that automotive marketing material should catalog absent internal components. Nor could they. Instead, Subrogation Plaintiffs' argument on methodology simply restates their argument on factual foundation: Adamson didn't interview consumers, didn't commission surveys, and didn't reach out to competitors. Mot. at. 14–15. But, even if those criticisms were true, they are not methodological flaws warranting exclusion. *See, e.g.*, *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 799 (N.D. Cal. 2021) (deficiencies in document selection go to weight, not admissibility); *Khoday*, 93 F. Supp. 3d at 1078 ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility."). In other words, Subrogation Plaintiffs' entire attack is on the scope of Adamson's research—not on the validity of the framework he used or the accuracy of what he found when he applied it. That is the hallmark of a weight argument, not a reliability argument.

15

## V.    Adamson's Discussion of Stern and Vigilante Satisfies Rule 702.

Adamson's opinions touching on Stern and Vigilante each satisfy Rule 702. His point about Stern is a boundary observation—a product engineering expert does not address the distinct marketing question at the center of this case—and it requires no credentials in engineering to make. His critique of Vigilante's survey is more extensive: drawing on decades of pressure-testing consumer research to ensure it would yield reliable, actionable data for clients, Adamson identified four defects that courts and survey methodology authorities alike recognize as grounds for exclusion. That those defects are elementary is not a concession to Subrogation Plaintiffs' qualifications attack; it is the reason his critique demands *less* specialized expertise, not more.

### A.    Stern's Engineering Expertise Does Not Address the Marketing Communication Question at the Center of This Case.

Adamson's observation about Stern is brief and requires little authority to sustain. Stern is a product design and engineering expert. *See* Adamson Report § 5.1. His domain is engineering decisions—whether the product was designed with adequate anti-theft hardware. The marketing question in this case—whether HMA's communications about the 2019 Elantra conformed to automotive industry norms—is not Stern's area. *Id.* A marketing expert is not required to hold credentials in product engineering to observe that a product engineer's testimony does not address a distinct marketing question; nor is a court required to close its eyes to the obvious division between these two fields. Adamson's point about Stern is indisputable, and Subrogation Plaintiffs do not seriously argue otherwise.

### B.    Adamson's Decades of Survey Pressure-Testing Experience Qualify Him to Critique Vigilante's Survey, and the Flaws He Found Rest on Universally Recognized Statistical Principles.

Adamson reliably applied established marketing and survey-evaluation principles to critique Vigilante's survey. His critique identifies four categories of

fundamental flaws—a biased survey title, leading questions, a non-representative sample, and temporal irrelevance—each of which is independently recognized by survey methodology authorities and courts as grounds for questioning survey reliability. *See* Adamson Report § 5.2–5.4. These flaws are not peripheral objections; they are the same defects Defendants document at length in their pending motion to exclude Vigilante. *See* Defs.' Mot. to Exclude Vigilante, Dkt. 1540, at 7–11. Adamson reached the same conclusions by applying the pressure-testing lens he developed over decades evaluating consumer research for clients who had to act on the results. *See* Adamson Report § 1.1.3.

Adamson is qualified to offer this critique. Throughout his career, Adamson's role was not to write surveys but to evaluate them: to assess whether the questions, sequencing, sample, and framing would yield data credible enough to support business decisions. Adamson Dep., Dkt. 1556-2 at 68:16–22 ("I'm an expert in looking at [a survey] and understanding are these questions going to get us the answer . . . my focus was pressure testing this to make sure that it would deliver an answer that would be credible and believable and accurate."); 72:25–73:3 ("[M]y main role was to ensure that the information we provided to our clients was accurate and actionable."). He has performed this function "hundreds" of times across multiple industries and product categories. Adamson Report § 1.1.3. That experience provides more than the "minimal foundation of knowledge, skill, and experience required in order to give 'expert' testimony as to survey design and methodology." *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342, 1349 (W.D. Wash. 2020) (quoting *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269–70 (9th Cir. 1994)). In *Bluetooth*, the court admitted a damages economist—not a survey specialist—to critique a trademark survey because he had experience in survey research methods and marketing analytics. Here, Adamson brings decades of marketing practice evaluating the reliability of consumer research, a stronger foundation than the economist the court admitted in *Bluetooth*.

The qualification challenge also collapses under its own logic. Vigilante himself is not a survey expert. He had never previously conducted a consumer expectations survey about automobile features. Dkt. 1550-12 at 224:13–16. He was unfamiliar with the American Association for Public Opinion Research Guidelines and the Federal Judicial Center's Manual on Survey Methodology. *Id.* at 224:17–23. Yet he "did [his] own statistics" without a statistician. *Id.* at 228:3–5.

In any event, Adamson's critique rests on recognized survey principles. The four defects Adamson identified are failures according to standards that courts have long recognized.

First, presenting respondents with a "Theft Protection Survey" heading before they read a single question tells them the subject and the expected answer. Adamson Report § 5.3.2. Leading respondents toward a predetermined conclusion through framing is a recognized ground for questioning survey reliability. *See In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 288 (S.D.N.Y. 2022) (excluding survey questions that "improperly direct[ed] survey participants to the 'correct' answer").

Second, survey question 9 characterizes the key fob requirement "as a theft deterrent feature" before asking whether respondents agree—building the conclusion into the premise. Adamson Report § 5.3.3. Courts consistently recognize leading question design as a survey defect. *Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 352 (S.D.N.Y. 2008) ("A survey is not credible if it relies on leading questions which are inherently suggestive.") (citation omitted); *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 287–88 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d Cir. 2020) (excluding survey in part because it used leading questions).

Third, Vigilante surveyed respondents exclusively from ten cities selected, by his own admission, by his Subrogation Plaintiffs counsel—not by any survey methodology. Vigilante acknowledged he could explain why one city, Milwaukee,

was chosen (elevated Hyundai/Kia theft rates), while the other nine were selected by Subrogation Plaintiffs' Counsel for undisclosed reasons. Vigilante Dep. 229:25–234:1; *see also id.* at 231:3–5 (admitting "the clients . . . had specific areas they wanted covered"). Those ten cities excluded the entire South, Southwest, and the vast majority of suburban and rural markets where Hyundai and Kia sell vehicles. Adamson Report § 5.3.4. Vigilante made no attempt to match the sample to the general public. Vigilante Dep. 230:14–238:7. A survey whose "design was so blatantly biased that the results [were] unreliable" is inadmissible. *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1257 (S.D. Cal. 2013); *see also Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) (excluding survey where expert "did not identify any basis . . . for selecting the survey population").

Fourth, the survey, conducted in 2025, measures what consumers think is "appropriate" today—after years of media coverage about the Kia/Hyundai theft epidemic—not what consumers expected in 2019 when they purchased their vehicles. Adamson Report §§ 5.2, 5.3.1. A question about 2025 attitudes is not relevant evidence of 2019 consumer expectations, which is what Subrogation Plaintiffs' claims require. *See* Shari Diamond, et al., *Reference Guide on Survey Research* 689 (4th ed. 2025) ("the content . . . of a survey must be scrutinized" to determine "whether or not the survey was designed to provide relevant data on the issue before the court").

Together, these flaws "cumulatively undermine [the survey's] relevance and reliability." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 563–64 (S.D.N.Y. 2007); *see also EEOC v. Freeman*, 778 F.3d 463, 467 (4th Cir. 2015) ("The sheer number of mistakes and omissions" in an analysis may "render[] it 'outside the range where experts might reasonably differ.'") (quoting *Kumho*, 526 U.S. at 153).

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

At bottom, as Adamson put the point, "[a]nyone with a basic one year at business school would" identify the flaws in Vigilante's survey. Adamson Dep. 73:9–17. Adamson has more than enough experience with consumer survey research to point out these obvious flaws.

## CONCLUSION

Subrogation Plaintiffs put HMA's anti-theft marketing in play when they brought misrepresentation-based claims. Having done so, they cannot exclude the defense's expert from testifying on the marketing questions they themselves placed before the jury. Their motion to exclude Adamson should be denied.

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

Dated:  April 3, 2026               Respectfully Submitted,


                                By:  */s/ Peter J. Brennan*
                                     Sati Harutyunyan
                                     Madeline P. Skitzki
                                     Effiong Dampha
                                     Jenna L. Conwisar
                                     JENNER & BLOCK LLP
                                     515 South Flower Street, Suite 3300
                                     Los Angeles, CA  90071-2246
                                     Telephone:  +1 213 239 5100
                                     Facsimile:   +1 213 239 5199
                                     SHarutyunyan@jenner.com
                                     MSkitzki@jenner.com
                                     EDampha@jenner.com
                                     JConwisar@jenner.com

                                     Peter J. Brennan (*pro hac vice*)
                                     Andrianna D. Kastanek (*pro hac vice*)
                                     JENNER & BLOCK LLP
                                     353 North Clark Street
                                     Chicago, IL  60654-3456
                                     Telephone:  +1 312 222 9350
                                     Facsimile:   +1 312 527 0484
                                     PBrennan@jenner.com
                                     AKastanek@jenner.com

                                     Edward Susolik
                                     John D. Van Ackeren
                                     CALLAHAN & BLAINE
                                     3 Hutton Centre Drive, Ninth Floor
                                     Santa Ana, CA  92707
                                     Telephone:  +1 714 862 1081
                                     Facsimile:   +1 714 241 4445
                                     ES@callahan-law.com
                                     JVanAckeren@callahan-law.com

                                     *Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,008 words, which complies with the word limit of L.R. 11-6.1.

Dated:  April 3, 2026                    */s/ Peter J. Brennan*
                                                    Peter J. Brennan

DEFENDANTS' OPPOSITION TO SUBROGATION PLAINTIFFS' RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY OF ALLEN ADAMSON